IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THOMAS HAYDEN BARNES,     *
     *
Plaintiff,     *
     *
-vs-     *
     *   Case No. 1:08-cv-00077-CAP
RONALD M. ZACCARI, *et al.*,     *
     *
Defendants.     *
     *

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

All parties agree that Plaintiff Hayden Barnes ("Barnes") was expelled from Valdosta State University ("VSU") because he protested the University's plan to build a parking garage on campus. It is also undisputed that this action was taken summarily, without notice or any form of hearing or other process as provided by basic notions of due process as well as by established University policies. These illegal actions silenced Barnes' voice and threw his life into turmoil. Given no effective alternative, Hayden Barnes sought relief from this Court by filing this action on January 9, 2008.

1

A little more that a week after the Complaint was filed, Defendant Board of Regents of the University System of Georgia ("Board of Regents") voted without explanation to rescind the expulsion.  Defs.' Ex. 2.  Now the Defendants, including VSU's President Ronald Zaccari ("Zaccari"), the University, the Board of Regents, Laverne Gaskins ("Gaskins"), Kurt Keppler ("Keppler"), Russ Mast ("Mast"), Victor Morgan ("Morgan"), and Leah McMillan ("McMillan"), ask this Court to dismiss Barnes' claims, as if the unlawful deprivation of his rights had never happened.[1]  However, Defendants cannot wish away Barnes' serious constitutional and statutory claims merely by claiming to have undone their misdeeds.

Far from being grounds for dismissal, Defendants' motions read like signed confessions.  In particular, the VSU Defendants embrace President Zaccari's absurd cover story that Barnes' peaceful protest activities – most notably, a satiric collage on his Facebook page – constituted a "clear and present danger" and that "Plaintiff's speech, as presented on his Facebook web page does not constitute protected speech."  VSU Defs.' Mem. at 4.  They also make outlandish arguments that Barnes had no due process rights, and that, in any event, such rights were not

---

[1] All Defendants except for Leah McMillan have filed a joint motion to dismiss, and Ms. McMillan has filed a separate motion to dismiss.  In this Memorandum, the Defendants are referred to collectively as "Defendants," or, when necessary, the joint-filing Defendants are referred to as the "VSU Defendants."

violated by the lack of any pre-deprivation hearing, or by a post-deprivation "process" that was nothing more than the exercise of President Zaccari's arbitrary whim.

Accordingly, this Court should deny Defendants' motions to dismiss. It also should grant summary judgment in favor of Hayden Barnes, at least in part. To the extent the Court believes there are any unresolved issues of material fact regarding any remaining claims for which summary judgment is not yet appropriate, the case should proceed promptly to discovery on those claims. [2]

## BACKGROUND

As set forth in detail in the Complaint and in the accompanying Statement of Undisputed Facts, Hayden Barnes was expelled as a direct response to his expression of political views that offended Defendant Zaccari. The VSU President had been upset that Barnes had distributed flyers on campus to raise environmental

---

[2] The VSU Defendants' motion relies on documents outside the Complaint and must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(b)(6); *Carter v. Stanton*, 405 U.S. 669, 671 (1972) (where "matters outside the pleadings were presented, and not excluded by the court," it is "required … to treat the motion to dismiss as one for summary judgment and to dispose of it as provided in Rule 56") (internal citation omitted). *See also* Defs.' Mot. for Leave to File Br. in Excess of 25 Pages at 1 (requesting permission to file a longer brief "in Support of their Motion for *Summary Judgment*.") (emphasis added). Since the VSU Defendants evidently agree that Barnes' claims can be resolved purely on the law, summary judgment may be rendered against them. *See* Statement of Undisputed Facts.

concerns about the construction of a $30-million parking garage, and he summoned Barnes for a meeting in his office. Compl. ¶¶ 2, 23-31; Statement of Undisputed Facts ¶¶ 12-15; Pl.'s Ex. K.

Coincidentally, Barnes meeting with Zaccari took place on April 16, 2007, the same day as the tragic shootings at Virginia Tech University. Statement of Undisputed Facts ¶ 16. But President Zaccari did not discuss Virginia Tech at that meeting, at which Defendant Mast also was present. Compl. ¶¶ 30, 32; Statement of Undisputed Facts ¶ 15. Rather, Zaccari focused on attempting to explain and justify his plans for the parking garage. Pl.'s Ex. K. He complained that Barnes had "made life hard" for him, and that he "could not forgive" Barnes for that embarrassment. Zaccari asked Barnes, "who do you think you are" to question my judgment? *Id.*; Compl. ¶ 33.

When Barnes continued his protest activities after the April 16 meeting, including publishing a letter to the editor in VSU's student newspaper on April 19, President Zaccari complained to other faculty members about the student's activities. Compl. ¶¶ 35-37. VSU officials monitored Barnes' Facebook.com page, and Defendant Mast alerted Zacarri to a political collage on Barnes' webpage protesting the parking garage that depicted a multi-level parking structure, a bulldozer, a globe flattened by a tire tread, an asthma inhaler, included a photo of

Zaccari, and a picture of a public bus under a no-smoking-style "not allowed" red circle and slash. Pl.'s Ex. B. The collage also included text such as "more smog," "bus system that might have been," "climate change statement for president Zaccari," and "S.A.V.E.-Zaccari Memorial Parking Garage." *Id*.

Zaccari seized upon the Facebook collage to make an argument that Barnes represented some kind of threat to campus security and to his personal safety. Compl. ¶¶ 38, 39; Statement of Undisputed Facts ¶¶ 11, 18. On or about April 20, 2007, under orders from Zaccari, a VSU police officer contacted Defendant McMillan, who provided campus counseling services to Barnes. Compl. ¶ 39. McMillan responded that Barnes had not exhibited any violent tendencies and had made no threats of any kind. *Id*. ¶ 39. Undaunted, Zaccari personally met with McMillan on or about April 24 to discuss Barnes' speech activities and treatment history. *Id*. ¶ 42; Statement of Undisputed Facts ¶ 23. McMillan repeated that Barnes had not exhibited violent tendencies in his meetings with her. Compl. ¶ 42; Statement of Undisputed Facts ¶ 24. At Zaccari's direction, McMillan then contacted Barnes' personal psychiatrist, Dr. Kevin Winders, who confirmed that Plaintiff's history included no record of threats, violence or even "significant confrontations." Statement of Undisputed Facts ¶¶ 25-27; Pl.'s Ex. G; *see also* Compl. ¶¶ 4, 44, 47-50; Statement of Undisputed Facts ¶¶ 20-21, 30-32 (detailing

further observations and communications confirming expert evaluations that Barnes never posed any type of threat).

On April 26, 2007, Zaccari hand-delivered to McMillan printouts of the collage and other Facebook pages that he said "concerned" him, as well as Barnes' letter to the editor.  Compl. ¶ 45; Statement of Undisputed Facts ¶ 29; Pl.'s Ex. E.[3] Additionally, at Zaccari's request, Defendant Gaskins sought advice from counsel for the Board of Regents how a university president could file a complaint against a student.  Compl.  ¶ 46; Statement of Undisputed Facts ¶ 28; Pl.'s Ex. F.  Gaskins was told "[i]t is not good practice for the President to be bringing a complaint against any student," because to do so would eliminate "due process at the campus level."  Pl.'s Ex. F.

Notwithstanding the warning from the Board's counsel about procedural improprieties, and despite McMillan's (and Dr. Winders') repeated assurances that Barnes represented no threat of any kind to anyone, Defendant Zaccari pressed on with his campaign to expel him.  Compl. ¶ 50; Statement of Undisputed Facts ¶¶ 21, 28.  On May 3, 2007, Zaccari called a meeting with Defendants Gaskins, Mast, McMillan and Keppler.  The group decided, unilaterally and without any notice,

---

[3] Plaintiff's Exhibit E is a collection of materials provided by Defendant Zaccari to Defendant McMillan by hand-delivery on April 26, 2007.  It is referred to hereinafter as "Zaccari/McMillan Materials."

hearing, or other formal process, to expel Barnes from VSU. Compl. ¶ 51; Statement of Undisputed Facts ¶¶ 10, 33-34; Pl.'s Ex. A (hereinafter "Expulsion Ltr.").

On May 7, 2007, Zaccari notified Barnes of his expulsion from VSU via letter. Compl. ¶ 52; Statement of Undisputed Facts ¶¶ 10, 35, 36. The notice was not delivered to Barnes personally, but was merely deposited under the door to his dorm room. Compl. ¶ 52. With a copy of Barnes' Facebook collage attached, the letter said that Barnes was "considered to present a clear and present danger to this campus" and that he was "administratively withdrawn" pursuant to "Board of Regents' policy 1902."[4] Expulsion Letter.

VSU has no policy that provides for "administrative withdrawals." Compl. ¶ 57; Statement of Undisputed Facts ¶¶ 39, 40, 42.[5] Rather, the VSU student handbook sets for disciplinary procedures that require: (1) a "judicial committee" composed of either eleven VSU students or five faculty members and two students

---

[4] Board of Regents Policy 1902 states that any student "who clearly obstructs, or disrupts, or attempts to obstruct or disrupt" campus activities "shall be subject to disciplinary procedures, possibly resulting in dismissal" from VSU. This same policy is listed in the VSU student handbook under the title "Disorderly Assembly." Compl. ¶ 53; Pl.'s Ex. D.

[5] The copies of the VSU policies attached as Exhibit C to Plaintiff's Memorandum (hereinafter "Annotated Policies") are true and correct copies of documents compiled and annotated during the decisionmaking process regarding Barnes, and maintained in his FERPA file at VSU.

which will be assigned to hear a given case; (2) five days' prior notice in writing of the charges made against the student and the date, time and place of a hearing to be held regarding those charges; (3) the right to have an advisor accompany the student to the hearing; (4) the right to question any and all witnesses and to submit his or her own witnesses; (5) the right to open proceedings; and (6) the right to have the proceedings recorded. Annotated Policies at BARNES 000015-19. In this case, VSU accorded Barnes none of these due process protections. Compl. ¶ 55; Statement of Undisputed Facts ¶ 39; Expulsion Ltr.

Another section of the student handbook that provides for "mental health withdrawals" requires: (1) a determination by a mental health professional (not an administrator) that a student may be of danger to himself or others; (2) recommendation by such a mental health professional that a hearing be held concerning the student; and (3) a hearing conducted by the office of the Dean of Students, at which the student may present witnesses and evidence. Annotated Policies at BARNES 000001. Again, VSU followed none of these policies. Compl. ¶ 56; Statement of Undisputed Facts ¶ 40; Expulsion Ltr. Instead, Defendant Zaccari's "administrative withdrawal" notice said that Barnes would be reinstated at VSU if he provided: (1) correspondence from a psychiatrist indicating that Barnes posed no danger to self or others; and (2) documentation from a

"certified mental health professional" indicating that Barnes would receive ongoing therapy during his tenure at VSU.  Expulsion Ltr.

The very next day after he received the expulsion notice, May 8, 2007, Barnes arranged for the necessary documents to be sent to Defendant Zaccari. Compl. ¶ 58; Statement of Undisputed Facts ¶ 43.  Dr. Winders sent a letter that repeated his earlier opinion that Barnes never posed any threat of any kind, observing, "I am surprised that this action was taken with a good report from me and no further evaluation to contradict my findings."  Pl.'s Ex. J.  Similarly, Defendant McMillan sent a letter to the Board of Regents and Defendant Zaccari confirming her professional opinion that she did not believe Barnes was "a threat, indirectly or directly to anyone on the VSU Campus (i.e., President, staff, faculty, students, others, or self)."  Compl. ¶ 59; Statement of Undisputed Facts ¶ 44; Pl.'s Ex. I.

Despite the substantial and uncontradicted evidence that Barnes posed no problem whatsoever, Defendant Zaccari refused to reverse his decision and issued a memorandum to VSU staff on May 9, 2007, notifying them of the expulsion and requiring Barnes to vacate his housing within 48 hours.  Compl. ¶ 60; VSU Defs.' Mem. at 3-4.  Barnes was not notified of this 48-hour deadline, nor was he monitored or escorted from the campus by security.  Compl. ¶¶ 60-62.

On May 21, Barnes appealed his expulsion to the Board of Regents. Compl. ¶ 63; Statement of Undisputed Facts ¶ 47; Pl.'s Ex. K. In a June 21 letter to the Board, Zaccari defended his decision to build the parking garage and accused Barnes of "mocking" him. Compl. ¶ 64; Statement of Undisputed Facts ¶ 48; Pl.'s Ex. L (Zaccari Ltr. to Neely, June 21, 2007). Exploiting the tragedy at Virginia Tech, he sought to justify his actions with reference to the Facebook pages by asserting without supporting evidence that he would have run the risk of "alert[ing] the campus to a potential threat" and causing "alarm" if he had provided Barnes the due process rights guaranteed to him. Zaccari Ltr. to Neely.

On or about August 7 and 8, 2007, the Board heard Barnes' appeal and referred the matter to an Administrative Law Judge at the Office of State Administrative Hearings. Compl. ¶ 65. Barnes was unrepresented by counsel during this time, and attorneys for the Board of Regents communicated with directly in preparation for the hearing. On or about December 17, 2007, after the State became aware that Barnes had obtained counsel, the Board of Regents moved in the administrative proceedings for a continuation of the scheduled hearing so that it could reevaluate Barnes' appeal in a closed executive session. *Id.* ¶ 66; Pl.'s Ex. O.

On January 9, 2008, Barnes filed a complaint in this Court, alleging that the Defendants' actions violated his right to free speech as guaranteed by the First Amendment to the U.S. Constitution, his right to due process as guaranteed by the Fourteenth Amendment and University policies, statutory rights guaranteed by the Americans With Disabilities Act and the Rehabilitation Act, and rights guaranteed by contract with the State of Georgia.   On January 17, 2008, the Board of Regents rescinded the expulsion decision without comment.  Defs.' Ex. 2.

On April 1, 2008, the VSU Defendants filed a Pre-Answer Motion to Dismiss, asserting that Barnes' speech was not constitutionally protected.  VSU Defs.' Mem. at 5.  They also argue that the Plaintiff was not deprived of any procedural or substantive due process rights, and that it is sufficient that Barnes "was provided an opportunity to address his withdrawal with VSU officials."  *Id.* at 15.  Defendants further claim that Barnes' due process claims are moot.  *Id.* at 17-18.  Defendants also contend that they are not proper parties in § 1983 or ADA actions, that Barnes' claims are barred by the Eleventh Amendment, and that the contract claims are invalid.  Finally, the VSU Defendants claim that the complaint does not allege a causal connection between Barnes' claims and the actions of Defendants Gaskins, Keppler, Mast, or Morgan, and that, in any event, the individual Defendants are protected from liability by qualified immunity.

Defendant McMillan, who is separately represented, also filed a motion to dismiss. McMillan asserts that the Complaint does not allege unlawful action on her part, but that instead it highlights the fact that she reported "to VSU President Ronald Zaccari on multiple occasions that Plaintiff was ***not*** dangerous and had made ***no*** threats, in reponse to Mr. Zaccari's inquiries." McMillan Mem. at 2-3 (emphasis in original). Accordingly, McMillan asserts that she is not liable for any constitutional violations and that she is protected by qualified immunity. *Id*. at 5-9.

## STANDARD OF REVIEW

For review under Rule 12(b)(6), the Court views the "allegations of the complaint in the light most favorable to the plaintiff[s], consider[ing] the allegations of the complaint as true, and accept[ing] all reasonable inferences therefrom." *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005) (internal quotation marks and citations omitted). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1965 (2007); *see also Watts v. Florida Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). This rule does not "impose a probability requirement at the pleading stage." *Twombly*, 127 S. Ct. at 1965. Instead, the standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the required element. *Id.*

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment" but rather there must be a "*genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).  Partial summary judgment may be granted where some, but not all, of the issues before the court may be "deemed established for the trial of the case.  This adjudication … serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact."  *1946 Advisory Comm. Notes to* Fed. R. Civ. P. 56(d); *see also* Fed. R. Civ. P. 56(d)(1), (2) ("An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages.").

## ARGUMENT

The basic facts of this case are simple and undisputed:  Hayden Barnes protested the construction of a parking garage on VSU's campus and the Defendants acted in concert to expel him because of his message.  They did so without bothering to employ any of the due process protections adopted by the

University and guaranteed by the Constitution.  Applying settled law to this stark scenario clearly confirms the liability of the various Defendants, as set forth in the Complaint.

## I.    VSU'S EXPULSION OF HAYDEN BARNES CONSTITUTED UNCONSTITUTIONAL RETALIATION FOR HIS EXERCISE OF FREE SPEECH PROTECTED BY THE FIRST AMENDMENT

The Defendants frankly admit that Barnes was expelled from VSU because of nothing more than the use of words in protesting the environmental impact of building a parking garage on campus.  However, their attempt to characterize Barnes' plainly political speech as "veiled threats" cannot overcome bedrock First Amendment protection for such speech.  *See* VSU Defs.' Mem. at 6.

### A.   Barnes' Protest Falls Within the Core Protections of the First Amendment

Hayden Barnes' efforts to alert the VSU community to the environmental impact of the proposed construction of a parking garage through the use of flyers, online postings, and a letter to the editor constituted protected speech in its "most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963). "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270-71 (1941).  Indeed, the First Amendment represents "a profound national

commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

The speech at issue in this case was neither "caustic" nor "unpleasantly sharp," yet it prompted an extreme overreaction from President Zaccari and his minions. While such a response may be consistent with VSU's general disregard of First Amendment values,[6] it is antithetical to well-settled constitutional jurisprudence. The VSU Defendants' lack of enthusiasm for the constitutional guarantee of free expression is captured succinctly in their grudging acknowledgement that "[c]olleges and universities are not immune from the requirements of the First Amendment." VSU Defs.' Mem. at 5.

---

[6] VSU has been tagged with a "Red Alert" as a particularly egregious violator of student speech rights by the nonprofit Foundation for Individual Rights In Education, *see Spotlight: Valdosta State University*, at http://www.thefire.org/index.php/codes/408/print, and has been one of two 2008 higher-education recipients of the Thomas Jefferson Center's "Muzzle Awards," *see 2008 Muzzle Awards*, at http://www.tjcenter.org/muzzles/muzzle-archive-2008/#item07; *see also* Chris Chiego, *Expulsion for protest unfair*, The Red and Black, Jan. 17, 2008, at http://media.www.redandblack.com/media/storage/paper871/news/2008/01/17/Opinions/Expulsion.For.Protest.Unfair-3155230.shtml; Annotated Policies at BARNES 000001.

This major premise of Defendants' argument reveals a gift for understatement that obscures the true state of the law:  Far from simply not being "immune" to the First Amendment, "[t]he college classroom with its surrounding environs, is peculiarly the 'marketplace of ideas.'"  *Healy v. James*, 408 U.S. 169, 180 (1972);  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835 (1995) (universities represent a "background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition"); *Shanley v. N.E. Indep. Sch. Dist.*, 462 F.2d 960, 972 (5th Cir. 1972) ("[T]he purpose of education is to spread, not to stifle, ideas and views.").  "The Constitution guarantees students (and all people) the right to engage not only in 'pure speech,' but 'expressive conduct,' as well."  *Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004).

As a consequence, "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."  *Healy*, 408 U.S. at 180; *see also Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 669-71 (1973).  Even in elementary and secondary schools, where administrators are given somewhat more latitude to enforce order, the law is clear that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 506 (1969).   Such

16

constitutional guarantees unquestionably are sufficiently expansive to protect Barnes' expression of concern about the issues raised by the parking garage.

### B.   The Defendants Illegally Penalized Barnes Because of His Speech

Just as the First Amendment protects freedom of expression, it prohibits actions by state officials to punish individuals for the exercise of that right. *Bennett v. Hendrix*, 423 F.3d 1247, 1255 (11th Cir. 2005) ("This Court and the Supreme Court have long held that state officials may not retaliate against private citizens because of the exercise of their First Amendment rights."); *Georgia Ass'n of Educators v. Gwinnett County Sch. Dist.*, 856 F.2d 142, 145 (11th Cir. 1988) ("The Government may not retaliate against individuals or associations for their exercise of First Amendment rights…."); *see also Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995) ("retaliatory prosecution goes to the core of the First Amendment").  Nevertheless, all agree Barnes was expelled from VSU because of his speech regarding the proposed parking garage.  VSU Defs.' Mem. at 2-3; McMillan Mem. at 2-3.

For purposes of this motion, the relevant question is whether Defendants' actions meet the Eleventh Circuit's test for unconstitutional retaliation.  In *Hendrix*, 423 F.3d at 1250, the court stated that in such a case the plaintiff must show that: (1) his speech or act was constitutionally protected; (2) the defendant's

retaliatory conduct adversely affected the protected speech; and (3) there was a causal connection between the retaliatory actions and the adverse effect on the speech.  Here, this test is easily met.

First, as noted above, Barnes' protest activities are presumptively protected by the First Amendment.  "The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."  *New York Times v. Sullivan*, 376 U.S. at 269.  To the extent the Defendants argue that Barnes' speech activities fall within some exception to normal constitutional protections, they have a substantial burden of proof to show that this is so.  *Id.* at 279-83; *see also Virginia v. Black*, 538 U.S. 343, 364-66 (2003);  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *Texas v. Johnson*, 491 U.S. 397, 408-10 (1989).    In this regard, the VSU Defendants characterize a cartoonish collage on Barnes' Facebook page as a "veiled threat."  VSU Defs.' Mem. at 2.  However, as demonstrated in the next section, this assertion lacks support either in fact or law.

Second, Defendants do not seriously contest the fact that Barnes' expulsion adversely affected his speech.  In this regard, the Eleventh Circuit has adopted the majority rule that a person suffers adverse action "if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the

exercise of First Amendment rights." *Hendrix*, 423 F.3d at 1254. Barnes' expulsion undoubtedly meets this test. Indeed, even a "verbal censure from [a] school official" has been ruled to be sufficient because it "cannot help but have a tremendous chilling effect on the exercise of First Amendment rights." *Holloman*, 370 F.3d at 1268-69; *see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500-501 (4th Cir. 2005) (adversely manipulating student exam schedule in reaction to student criticism constitutes adverse action for purposes of a retaliation claim). Obviously, imposing the ultimate penalty for a student – expulsion from school – far exceeds the type of harm necessary to show adverse impact. *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("since there is no justification for harassing people for exercising their constitutional rights, [the effect on freedom of speech] need not be great in order to be actionable").

Third, the University's retaliatory actions led directly to the adverse impact on Barnes. The VSU Defendants frankly admit that Defendant Zaccari made a decision to "administratively withdraw" Barnes because of his speech. *See* VSU Defs.' Mem. at 6; Expulsion Ltr. With respect to the other Defendants, however, they assert that the Complaint fails to allege "a causal connection" between the adverse impact on Barnes and the actions of Defendants Gaskins, Keppler, Mast,

McMillan and Morgan.  VSU Defs.' Mem. at 8-9; McMillan Mem. at 2-3.  But each of the Defendants participated in the collective decision to expel Barnes.  *Id.*; *see also* Compl. ¶ 51.  This is sufficient to defeat a motion to dismiss.  *See Brown v. Western Conn. State Univ.*, 204 F. Supp. 2d 355, 363-64 (D. Conn. 2002) (holding that § 1983 claims were sufficiently alleged against various officials who did not spearhead alleged retaliatory actions against university student, but who had "direct participation" in the decisionmaking process).

Moreover, each of the individual Defendants assisted Zaccari in various ways to implement his decision to sanction Barnes for exercising his right to speak.  Defendant Mast joined Zaccari in his April 16 meeting with Barnes, and later sought out and provided Zaccari with copies of the Facebook page that was used as pretext for the expulsion.  Statement of Undisputed Facts ¶¶ 16, 17.  He also participated in the May 3 meeting at which the official decision to expel Barnes was made.  Compl. ¶ 51.  Defendant Gaskins assisted Zaccari with finding a way for the University president to bring a complaint against a student, even though no such procedure was provided in the VSU Handbook, even after being warned that such a process would eliminate "due process at the campus level."  Compl. ¶ 46; Pl.'s Ex. F.  Defendants Keppler, Morgan, and McMillan also participated in the May 3 decision to expel Barnes.  Compl. ¶ 51; VSU Def.'s Mem. at 8-9; McMillan

Mem. at 2-3.  Although McMillan, to her credit, repeatedly informed the other

Defendants that Barnes presented no threat either to himself or others, she met with

Defendant Zaccari on various occasions and discussed Barnes' confidential

counseling files.[7]  Consequently, Defendants' arguments that there is no causal

connection between their actions and Barnes' injury are wrong.[8]

### C. Defendants' Pretextual Claims Regarding Campus Security Cannot Justify the Expulsion

The VSU Defendants' primary defense is that expulsion of Barnes was

necessary because Zaccari interpreted statements on his Facebook webpage as

"veiled threats" and because of Plaintiff's supposed "erratic behavior."  VSU

Defs.' Mem. at 2, 3, 6.  Directly comparing Barnes to "the killer at Virginia Tech,"

---

[7] Compl. ¶¶ 39, 42, 47-49, 59; Zaccari/McMillan Materials.  Release of confidential and medical information in retaliation for free speech is "sufficiently adverse to chill a person of ordinary firmness."  *Bloch v. Ribar*, 156 F.3d 673, 680-81 (6th Cir. 1998).  By making Barnes' counseling status a condition of his reinstatement to VSU, Defendants made the public disclosure of this sensitive information inevitable.

[8] The VSU Defendants' argument that allegations as to individual defendants are inadequate under a theory of "vicarious liability" has it exactly backwards.  VSU Defs.' Mem. at 9.  This is not a case in which an uninvolved administrator was sued because of unconstitutional actions by a subordinate.  *E.g.*, *Brown v. Smith*, 813 F.2d 1187 (11th Cir. 1987).  Rather, the subordinates actively assisted the supervisor in breaking the law.  *See*, *e.g.*, *Zalter v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) ("A causal connection may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation.").

*id*. at 2, the Defendants assert that his speech about the parking garage was "not protected by the First Amendment." *Id*. at 5. That's their story, and they are sticking to it. But there are a couple of problems with this stratagem: There is no factual support whatsoever for this shameful attempt to exploit the Virginia Tech tragedy, and even if the Defendants sincerely believed their own tale, the law is against them.

### 1. Lack of Factual Support

All of Barnes' communications that led to his expulsion from VSU focused entirely on his concerns about the construction of the parking garage. His statements in the flyer he distributed on campus, his letter to the editor, and even in the infamous Facebook collage addressed the environmental issues arising from encouraging an increase in automotive traffic and consumption of fossil fuels, and what he saw as the needless expense of committing more than $30 million in student fees to the project. Compl. ¶¶ 24, 27, 35, 36; Pl.'s Exs. B, K; Zaccari/McMillan Materials at BARNES 000044. However, seizing upon the fact that the satirical collage used the term "memorial parking garage" in connection with President Zaccari (as well as the student environmental organization S.A.V.E.), Defendants argue that Barnes has no First Amendment rights at all.

But the record is quite clear that Zaccari was upset that he could not persuade Barnes of the wisdom of his building program, or at least get him to shut up about it. Far from a concern about campus security, on the very day of the Virginia Tech shootings, Zaccari summoned Barnes to a meeting to discuss – in the Defendant's own words – Barnes' "lack of knowledge of how parking garages are financed, .... mandated processes/sequences in the University System of Georgia Master Planning process," and that "[t]he parking decks were an integral part of the accepted Master Plan and based on projected parking needs that documented a deficit of 2,700 parking spots by the year 2014." Zaccari Ltr. to Neely at 2, 6. Defendant Zaccari did not even mention Virginia Tech at the April 16, 2007 meeting, focusing instead on the parking garage and the legacy of his building program. *Id*.; *see also* Pl.'s Ex. K.

In fact, Defendant Zaccari's defense of his actions to the Board makes it quite clear that, more than anything else, he was upset with the fact that Barnes had the temerity to question the University president's judgment. Zaccari acknowledges that he read Barnes' flyer about the proposed construction and was concerned because "it was apparent Mr. Barnes did not understand the funding process for parking decks." Zaccari Ltr. to Neely at 1. Zaccari notes that he then asked the leadership of S.A.V.E. "if they knew about Mr. Barnes and his view

23

points." *Id.* at 2.  After Barnes discontinued the flyers, Defendant Zaccari then became concerned because – as he put it – Barnes "purposefully misrepresented the truth and aggressively asked the various high-ranking state offices and officials to disallow VSU's parking decks." [9]

Because Barnes did not cease raising questions, and out of concern that he might "appear at the Board of Regents meeting . . . and stage a protest," Defendant Zaccari "requested" that Barnes come to his office for the April 16 meeting. Zaccari then engaged in lengthy attempt (one hour and ten minutes) to explain the funding and planning process for parking garages and to offer advice on how to "build relationships," but was disappointed to report that Barnes "was not interested in my views, a fact supported by the student's subsequent statements that mock my attempt to advise and communicate with him." *Id.* at 3.  As a consequence, he viewed Barnes' behavior "as the inability to listen, opposition to the administrative policies of the University and the University system of Georgia, and interested in only promoting self interests." *Id.*

---

[9] Zaccari Ltr. to Neely at 2.  There is nothing in the record to support Defendant Zaccari's characterization of Barnes' questions as "aggressive."  In any event, asking questions of public officials on a matter they are about to decide does not make a citizen a "clear and present danger."

After the Board approved the proposed parking garage, Zaccari claimed that, with the assistance of Defendant Mast, he became aware of Barnes' Facebook postings. *Id*. He asserted that he perceived a dangerous "pattern" that included "aggressive actions with inaccurate information," "telephone calls to state offices," and the Facebook postings. *Id*. Zaccari summed up his complaints about Barnes, informing the Board that "he embarked on a public opposition to the parking decks without gathering pertinent information about the lengthy planning and strategic action required to implement such an expansive project." *Id*. at 6.

Simply put, the fundamental transgression, in Zaccari's view, was that Barnes failed to appreciate his vision regarding the construction project, did not understand the planning process, that he expressed "opposition to the administrative policies of the University," and "purposely misrepresented the truth." *Id*. at 2. But perhaps more painfully on a personal level, Zaccari observed that Barnes "was not interested in my views" and "mock[ed] my attempt to advise and communicate." *Id*. at 3. For these failings, Zaccari claimed the authority to impose summary expulsion.

Despite Defendant Zaccari's professed concerns about safety or security, the defense of his actions to the Board of Regents, and to this Court, leave out important details. Zaccari acknowledged to the Board that he "is not an expert in

assessing the psychological status of an individual," but that he nevertheless "took specific action" against Barnes without bothering with any required hearing procedures or safeguards. *Id.* at 4. The problem with this rationalization, and one he neglected to tell the Board, is that the experts he consulted unanimously and repeatedly confirmed that Hayden Barnes was never a threat to himself or to anyone else. *Compare* Compl. ¶¶ 39, 42, 43, 47-49; Pl.'s Exs. G, H; *with* Zaccari Ltr. to Neely. As Defendant McMillan has confirmed, in response to Zaccari's inquiries, she reported "on multiple occasions that Plaintiff was ***not*** dangerous and had made ***no*** threats." McMillan Mem. at 6 (emphasis in original); *see also* Compl. ¶¶ 39, 42, 47, 49; Pl.'s Exs. G, H.

### 2. Lack of Legal Support

Even if the VSU Defendants could plausibly be considered to have perceived some type of "veiled threat" based on the Facebook collage and the use of the word "memorial," such a scenario falls far short of the type of "true threat" necessary to justify a limit on Barnes' First Amendment rights. VSU's reliance on the World War I vintage "clear and present danger" standard, both in the expulsion notice and in Defendant Zaccari's defense to the Board of Regents, suggests just

how far out to sea the Defendants are on the law.[10]  The current state of First Amendment jurisprudence, as articulated in *Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969) (per curiam), prohibits restrictions on "mere advocacy" and requires the government to prove that the expression it would sanction is intended to incite imminent lawless action *and* is likely to produce such action.  Obviously, use of the word "memorial" on a Facebook page does not meet the test.

Defendants' effort to find some justification for their actions is hampered by their evident confusion as to the applicable law.  They cite *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) even though the "fighting words" doctrine is plainly inapposite here.   VSU Defs.' Mem. at 5.  The "fighting words" doctrine excludes from constitutional protection a very narrow category of epithets "which by their very utterance inflict injury or tend to incite an immediate breach of the peace."  *Chaplinsky*, 315 U.S. at 572.  The doctrine allows the government to restrict such words that might incite its *audience* an immediate and imminent violent reaction through the use of "personally abusive epithets which, when addressed to the ordinary citizen, are … inherently likely to provoke violent reaction." *Cohen v. California*, 403 U.S. 15, 20 (1971).  It would apply to this case

---

[10] *See* Expulsion Ltr. ("you are considered a clear and present danger to this campus");  Zaccari Ltr. to Neely at 5 (citing *Schenck v. United States*, 249 U.S. 47 (1919)).

only if the Defendants were somehow trying to suggest that Barnes' Facebook page was likely to send President Zaccari into a violent rage. Even then, the fighting words doctrine would not govern this case, because it applies only to face-to-face communication.[11]

Defendants fare no better in citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), another incitement case, for the proposition that the First Amendment does not protect "words that create an immediate panic." VSU Defs.' Mem. at 5. To begin with, there is no plausible argument that any communication involving the parking garage – not even the dreaded word "memorial" on the Facebook page – was intended to, or likely to cause, an "immediate panic." Defendants do not even suggest that it does, but merely claim that Defendant Zaccari was concerned "because the word 'memorial' is often used in reference to honoring dead people." *Id*. at 6.

More to the point, the supposedly "threatening" communications cited by the Defendants in this case pale in comparison to the words that the Supreme Court

---

[11] For that reason, Barnes' Facebook page cannot constitute fighting words because "there is simply no in-person confrontation in cyberspace such that physical violence is likely to be instigated." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, No. 06-cv-116, mem. op. at 20 (W.D. Pa. Jan. 31, 2006); *see also Chaplinsky v. New Hampshire*, 315 U.S. at 573 (limitation to face-to-face conduct); *Gay Men's Health Crisis v. Sullivan*, 792 F. Supp. 278, 298 (S.D.N.Y. 1992) (doctrine "limited to face-to-face direct personal insults").

held were constitutionally *protected* in *Claiborne Hardware*.  In that case, in the context of a boycott of segregated stores, the Court held that the First Amendment precluded the imposition of liability on activist Charles Evers for his statement to a black audience that "[i]f we [(proponents of a boycott of white-owned businesses)] catch any of you going in any of them racist stores, we're gonna break your damn neck."  *Claiborne Hardware*, 458 U.S. at 902, 930 ("The chancellor made no finding that Charles Evers or any other NAACP member had either actual or apparent authority to commit acts of violence or to threaten violent conduct. The evidence in the record suggests the contrary.").

Although they do not cite any authority, it appears that Defendants must have intended to rely on the "true threats" doctrine, which excludes from constitutional protection statements through which "the speaker *means* to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003) (emphasis added).  However, such threats must be interpreted within the narrow confines of *Brandenburg* and *Black*.  Language may be considered a "true threat" only where the statement "on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and

imminent prospect of execution." *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976). The "true threat" doctrine applies only to "a serious statement or communication which expresses an intention to inflict injury at once or in the future as distinguished from idle or careless talk, exaggeration, or something said in a joking manner." *United States v. Zavrel*, 384 F.3d 130, 136 (3d Cir. 2004).

To be sure, although the situation is not presented by the facts of this case (and Defendants cite no relevant authority), it is possible for a communication in the school context to exceed the First Amendment's bounds. Typically, this has occurred in the elementary and secondary school setting, where the Constitution provides younger pupils somewhat less protection than it does university students.[12] Thus, in elementary and high school, it is possible to limit student speech when it can be demonstrated that the expression would "materially and substantially" interfere with school order or discipline. *Tinker*, 393 U.S. at 505; *Morse v. Frederick*, 127 S. Ct. 2618 (2007). However, even in this less speech-protective environment an "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508; *Holloman*, 370 F.3d at 1271 ("[W]e cannot simply defer to the specter of

---

[12] *See*, *e.g*., *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) ("the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings").

disruption or the mere theoretical possibility of discord, or even some *de minimis*, insubstantial impact on classroom decorum.").

Accordingly, where student speech has been sanctioned in the secondary school context, it has required the type of direct threats of harm that are not present here.  *E.g.*, *Boim v. Fulton County Sch. Dist.*, 494 F.3d 978 (11th Cir. 2007) (student wrote about murdering her math teacher);  *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765 (5th Cir. 2007) (student wrote about forming a pseudo-Nazi group and mounting Columbine-style shooting attacks on district schools);  *Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.*, 494 F.3d 34 (2d Cir. 2007) (student circulated computer icon of a pistol firing a bullet through the head of his English teacher with the caption "Kill Mr. VanderMolen"), *cert. denied*, No. 07-987, 2008 WL 243683 (Mar. 31, 2008).  Even in these rare and extreme cases – unlike here – the students were only suspended for a brief time or permitted to transfer but were not expelled.  And in each case, the students were accorded their rights to administrative hearings.  *Boim*, 494 F.3d at 982;  *Ponce*, 508 F.3d at 967;  *Wisniewski*, 494 F.3d at 36.

By sharp contrast, Barnes' satiric Facebook collage could not possibly have been punished under relevant case law, even under the less rigorous constitutional scrutiny that has been applied in elementary and secondary schools.  For example,

in *Dwyer v. Oceanport Sch. Dist.*, No. 03-cv-6005, mem. op. at 9-19 (D.N.J. Mar. 31, 2005) (unpublished op.), the district court held that a student website was protected by the First Amendment despite the fact that it contained photographic negative of the school's principal with his head flipped upside down, combined with picture of school with an anarchy symbol and large X superimposed over it. It also included such statements as "[t]he principal, Dr. Amato is not your friend and is a dictator," and "I HATE MAPLE PLACE [SCHOOL]." Nevertheless, the court held that the page did not create a specific threat of disturbance under *Tinker*, and that the "mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected."[13]  Such cases are legion.[14]

---

[13] *Dwyer*, slip op. at 16-17 (quoting *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 264-65 (3d Cir. 2002).  The court also applied the "true threat" doctrine, and held that "it is clear that [the student's] website did not constitute a true threat undeserving of constitutional protection." *Id.* at 14.

[14] *E.g.*, *Bowler v. Town of Hudson*, 514 F. Supp. 2d 168 (D. Mass. 2007) (student poster that included a URL for a website that linked to gruesome videos of beheadings by Islamic militants held protected by the First Amendment); *Cohn v. New Paltz Cent. Sch. Dist.*, 363 F. Supp. 2d 421 (N.D.N.Y. 2005) (student discussions in school cafeteria, of guns and efforts to obtain them held protected under *Tinker* and did not constitute true threats); *Mahaffey ex rel. Mahaffey v. Aldrich*, 236 F. Supp. 2d 779 (E.D. Mich. 2002) (student website that included list of people the author wished "would die" held protected by the First Amendment, and neither justified suspension nor constituted a true threat); *Emmett v. Kent Sch. Dist. No. 415*, 92 F. Supp. 2d 1088 (W.D. Wash. 2000) (student website containing mock "obituaries" of friends, classmates, and others affiliated with his high school held protected by the First Amendment); *Boman v. Bluestem Unified Sch. Dist.*

While the law is clear even in the elementary and secondary school setting, Hayden Barnes is not a high school student and his speech is entitled to full First Amendment protection.  As the Supreme Court highlighted in *Healy*, 408 U.S. at 180, "the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large."  Accordingly, the appropriate test for a "threat" in the context of political advocacy is set forth in *Watts v. United States*, 394 U.S. 705, 707 (1969).  In that case, the Supreme Court held that a statement by draft protestor that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L. B. J." was political hyperbole and not a true threat.  Similarly, in *Black*, 538 U.S. at 363-67, the Court held that the government could not presume that a particular act of symbolic expression (in that case, a burning cross) was intended as a threat, and that it was otherwise protected by the First Amendment.

---

*No. 205*, No. 00-1034-WEB, 2000 WL 297167 (D. Kan. Jan. 28, 2000) (student poster containing phrases such as "I'll kill you if you don't tell me who killed my dog" and "I'll kill you all!" in a school hallway could not be construed as a literal threat);  *D.G. & C.G. v. Indep. Sch. Dist. No. 11*, 2000 U.S. Dist. LEXIS 12197 (N.D. Okla. Aug. 21, 2000) (high school student's poem that included lines about killing a teacher not a true threat);  *Beussink ex rel. Beussink v. Woodland R-IV Sch. Dist.*, 30 F. Supp. 2d 1175 (E.D. Mo. 1998) (vulgar, caustic web page created by a high school student to strongly criticize the school's administration and teachers protected under *Tinker*).

In light of the abundant case law, Defendants' assertion that Barnes' expression "does not constitute protected speech," VSU Defs.' Mem. at 4-6, is plainly absurd. Not only does this doom the motions to dismiss, but the law as applied to the undisputed facts of this case make clear that the Defendants violated Barnes' First Amendment rights. Consequently, this Court should grant summary judgment for the Plaintiff.

## II.   VSU'S EXPULSION OF HAYDEN BARNES WITHOUT NOTICE OR HEARING VIOLATED BOTH SUBSTANTIVE AND PROCEDURAL DUE PROCESS

### A.    The Failure to Provide Notice or a Hearing Is Undisputed

In expelling Hayden Barnes, the Defendants failed to provide even the pretense of actual due process. Even now, the VSU Defendants argue that Barnes received all the process he was due because "Defendant Zaccari notified Plaintiff in writing of his decision to administratively withdraw Plaintiff from school" and outlined the ways Barnes "could avoid such action." VSU Defs.' Mem. at 15-16. They acknowledge that Barnes "did not receive a postdeprivation hearing in the traditional sense" (or in *any* sense, for that matter), but deem that to be acceptable because "Plaintiff was provided an opportunity to answer and address the concerns posed by Defendant Zaccari." *Id*. at 15. According to the Defendants, it is no moment that President Zaccari failed to reinstate Barnes "after he provided the

documentation" demanded in the expulsion notice, because it "does not negate the fact that he was provided an opportunity to address his withdrawal with VSU officials." *Id*. In other words, so long as Barnes was given a chance to complain, it does not matter that nobody was listening.

This bizarre defense argues, in essence, that due process equals whatever procedures the Defendants felt like providing. Such a claim lacks any conceivable basis, and it rests quite uneasily with VSU's undisputed official policies. To begin with, there is no such thing in the student handbook known as an "administrative withdrawal," yet that did not deter the Defendants from simultaneously creating and imposing such a sanction in this case. VSU policies specifically provide that "disciplinary sanctions shall be applied only *after* the requirements of due process, fairness, and reasonableness have been met." Annotated Policies at BARNES 000016.

The provisions governing judicial committees provide that students shall be notified in writing at least five days in advance of the specific charges made against them and the date, time, and place of the required hearing. *Id*. at 000016-19. Students have the right at a hearing to be accompanied by an advisor, to question witnesses, and to obtain a recording of the proceedings. *Id*. In listing the "rights of the student," VSU policies state that "the accused student *shall be*

35

*afforded* all rights required by due process," including (in addition to the above hearing procedures) the right top question one's accusers, the right to present information and call witnesses, the right to question all witnesses and the right to appeal. *Id.* (emphasis added). The Defendants also ignored University procedures governing mental health withdrawals. *Id.* at 000001. They also flouted the policy that guarantees students the right to attend classes and attend VSU functions "until a hearing is held and a decision is rendered."[15]

Notwithstanding the University's official policies, Defendant Zaccari explained to the Board that he decided in this case to rescind the rights that normally would be accorded any student:

> I took what I believed to be appropriate action and minimize campus focus on Mr. Barnes and his documented behavior by not scheduling a judicial hearing. The exigency of the circumstances dictated action that would not invite alarm. A campus hearing would have involved a judicial panel comprised of students and faculty. This format would have alerted the campus of a potential threat, and would have compromised campus safety by exacerbating potential alarm.

---

[15] *Id.* at 000015. The only exception to the right to attend classes pending a hearing is if the student's presence "could create a 'clear and present danger' of material interference with the normal operation of Valdosta State University." *Id.* at 000015-16. However, this exception affects only the ability to attend classes until a hearing takes place; it does not supplant the hearing requirement. Moreover, the exception (when it is met) permits only the use of "temporary protective measures," such as suspension prior to the hearing. *Id.*

Zaccari Ltr. to Neely at 4.  Accordingly, there can be no dispute about Defendants'

failure to provide Barnes to protections spelled out in VSU's policies.

**B.    Barnes' Expulsion Plainly Violated Due Process**

**1. Procedural Due Process**

Defendants' contention that President Zaccari and VSU may simply

dispense with a hearing and associated procedures is nothing short of astonishing.

More importantly, it is obviously wrong.  As one court explained:

> In our system, state-operated schools may not be enclaves of
> totalitarianism. School officials do not possess absolute authority
> over their students.  Students in school as well as out of school are
> "persons" under our Constitution.    They are possessed of
> fundamental rights which the State must respect, just as they
> themselves must respect their obligations to the State.

*Mahaffey*, 236 F. Supp. 2d at 793 (quoting *Tinker*, 393 U.S. at 739).   Here,

however, the Defendants' position is that they may disregard Barnes' due process

rights at will.

Contrary to the Defendants' arguments, it has long been established that

students at public institutions of higher education are entitled to the protections of

due process.  *See*, *e.g.*, *Toledo v. Sanchez*, 454 F.3d 24, 32-33 (1st Cir. 2006) (due

process rights implicated "when a student's future attendance at a public institution

of higher learning is in jeopardy") (citing *Gorman v. University. of R.I.*, 837 F.2d 7

(1st Cir. 1988)), *cert. denied*, 127 S. Ct. 826 (2007); *see also Davis v. Monroe*

*County Bd. of Educ.*, 120 F.3d 1390, 1402-04 (11th Cir. 1997) ("The right to a public education under state law is a property interest protected by the Due Process Clause of the Fourteenth Amendment."), *rev'd and remanded on other grounds*, 526 U.S. 629 (1999).

The Supreme Court has repeatedly held, most notably in *Goss v. Lopez*, 419 U.S. 565 (1975), that due process in the disciplinary context requires, *at a minimum*, notice of the charges against the student and a hearing at which the student is given the opportunity to be heard. As the Eleventh Circuit stated in the educational context, "[a] fair hearing in a fair tribunal is a basic requirement of due process." *Davis*, 120 F.3d at 1402-04. Defendants even admit as much, quoting the Fifth Circuit's pre-*Goss* admonition in *Dixon v. Alabama State Board of Education*, 294 F.2d 150, 159 (5th Cir. 1961), that a student is entitled to present "his own defense against the charges *and to produce either oral testimony or written affidavits of witnesses in his behalf.*" [16] As the First Circuit explained in *Gorman*, 837 F.2d at 13, the student must be given the opportunity to "respond,

_____

[16] VSU Defs.' Mem. at 14 (emphasis added); *see also Goss v. Lopez*, 419 U.S. at 581 (requiring an opportunity to present an alternative version of the facts in the context of a ten-day suspension). *Goss* provides guidance for the formality required in the secondary education context and for temporary suspensions. Greater formality is required at colleges and universities and for expulsions. *See Dixon*, 294 F.2d at 158-59 (setting forth requirements); *see also Goss*, 419 U.S. at 576 n.8.

explain, and defend." However, as the Defendants frankly admit in this case, Hayden Barnes was accorded no such rights.

### 2. Substantive Due Process

In addition to the procedural vacuum, Defendants' actions also violated Barnes' substantive due process rights. Arbitrary official acts that "shock the contemporary conscience" violate the substantive due process rights of citizens. *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). Although "[t]he measure of what is conscience shocking is no calibrated yard stick," *id.*, abuses of power by government officials intended to "oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience," *Johnson v. Newburgh Enlarged School District*, 239 F.3d 246, 252 (2d Cir. 2001); *Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("the substantive due process guarantee protects against government power arbitrarily and oppressively exercised").

The VSU Defendants miss the point in asserting that there is no substantive due process violation because "the alleged right [to higher education] was created by state law." VSU Defs.' Mem. at 10-11. However, this case involves retaliation in the form of a trumped-up expulsion from a state university for the exercise of pure First Amendment rights. Whether or not there is a "right" to education, the Constitution unquestionably protects citizens from arbitrary interference with basic

rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interest, especially his interest in freedom of speech"); *Greenbriar Village, LLC v. Mountain Brook*, 345 F.3d 1258, 1262 n.3 (11th Cir. 2003) (substantive due process protection applies in cases involving retaliation against the exercise of free expression). Such action is inherently arbitrary "since there is no justification for harassing people for exercising their constitutional rights." *Bart*, 677 F.2d at 625.

Defendants' actions in this case reveal an utter contempt for the law. Not only did they conspire to sanction Barnes for nothing more than his speech on a matter of public concern, they summarily canceled his rights to a hearing and created an appeal "process" that sounds like it was crafted by George Orwell and Franz Kafka. Even though President Zaccari had documentation *before the fact* that Barnes represented no danger to himself or others, he nevertheless used a claim of "clear and present danger" as pretext, and informed Barnes he could be readmitted to VSU if he submitted documentation for what Zaccari already knew to be the case – that there was no danger. Yet when Barnes immediately met these arbitrary conditions (that are nowhere to be found in the University's policies), Defendant Zaccari still denied the appeal, claiming without explanation, that he was not "persuaded." All of this is just fine, according to the VSU Defendants,

because Barnes at least was given "an opportunity to address his withdrawal with VSU officials." VSU Def.'s Mem. at 15. However, if such standardless and arbitrary heads-I-win-tails-you-lose actions do not shock the conscience, then nothing does. *Lewis*, 523 U.S. at 849 (actions "intended to injure in some way unjustifiable by any government interest" are those "most likely to rise to the conscience-shocking level").

## C.    Barnes' Due Process Claims Are Not Moot

Defendants' contention that the Board's reversal of the Barnes' expulsion somehow moots his due process claims is plainly wrong. *See* VSU Defs.' Mem. at 16-18. Quite obviously, the Board's decision does not moot Barnes' claims for damages.[17] In this regard, Defendants' argument that state officials acting in their official capacity are not "persons" for purposes of § 1983 damages liability ignores the fact that the Defendants were sued in both their individual and official capacities, as well as the well-recognized *Ex parte Young* exception, which allows

---

[17] *See KH Outdoor, LLC v. Clay County, Fla.*, 482 F.3d 1299, 1303 (11th Cir. 2007), *aff'd on other grounds*, 482 F.3d 1299 (11th Cir. 2007); *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 387-88 (6th Cir. 2005) (First Amendment claims for damages not moot upon graduation from school); *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 218 (3d Cir. 2003) (same); *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) (en banc) (same); *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 72 n.5 (4th Cir. 1983) (dropping of disciplinary charges against University student did not render a due process claim moot because the plaintiff was seeking nominal damages).

for suits against such officials for injunctive relief. *Kentucky v. Graham*, 473 U.S. 159, 167 n.4 (1985).[18]

In any event, the fact that the Board rescinded Barnes' expulsion does not moot the need for injunctive relief. The Complaint seeks both declaratory and injunctive relief, including "such relief as the Court deems just and proper." Such relief would include, at a minimum, reinstating Barnes at VSU, ensuring he does not face further retaliation, and expunging all University records that inappropriately label Hayden Barnes as a "clear and present danger" to VSU or its personnel. In this regard, the complaint alleges an ongoing violation of federal law and seeks relief "properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (internal quotations omitted).

Moreover, it is well established that the voluntary cessation of unconstitutional behavior does not moot a valid claim. *Friends of the Earth Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000). Courts are loath to "leave

---

[18] While a state official sued in his official capacity may not qualify as a "person" for purposes of a § 1983 claim, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989), he still qualifies as a "person" if sued in his individual capacity for damages. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997); *see Hafer v. Melo*, 502 U.S. 21, 27 (1991) (allowing individual capacity suits for damages). He also qualifies if sued in an official capacity for injunctive relief. *See Will*, 491 U.S. at 71 n.10 (allowing official capacity suits for injunctive relief); *Ex Parte Young*, 209 U.S. 123, 159-60 (1908) (Eleventh Amendment does not bar action for injunctive relief against state official).

the defendant free to return to his own ways," *id*., where the challenged conduct

was a continuing or deliberate practice, the cessation of the offending conduct was

not motivated by a genuine change of heart but was done only to avoid suit, and

whether, "in ceasing the conduct, the defendant has acknowledged liability,"

*Sheely v. MRI Radiology Network*, 505 F.3d 1173, 1184 (11th Cir. 2007). Here,

each of these factors undercuts Defendants' argument for mootness. In addition, if

Barnes attempts to return to VSU, there is no assurance whatsoever that

Defendants would not repeat the constitutional violations. *Weinstein v. Bradford*,

423 U.S. 147, 149 (1975) (per curiam); *Federal Election Comm'n v. Wisconsin*

*Right to Life*, 127 S. Ct. 2652, 2662-63 (2007). "Only when the defendant can

demonstrate that there is no reasonable expectation that the wrong will be repeated

are federal courts precluded from deciding the case on mootness grounds."

*Christian Coalition v. Cole*, 355 F.3d 1288, 1291 (11th Cir. 2004) (quotation

marks omitted)).

## III.   VSU'S EXPULSION OF HAYDEN BARNES VIOLATED THE AMERICANS WITH DISABILITIES ACT AND THE REHABILITATION ACT

The VSU Defendants' argument that Barnes failed to state a *prima facie*

claim for damages under the Americans With Disabilities Act ("ADA") and the

Rehabilitation Act ("RA") is frivolous. VSU Defs.' Mem. at 27-28. Under these

disability discrimination statutes, a plaintiff must show that he was excluded from participation in, or denied the benefits of, a program or service offered by a public entity, or subjected to discrimination by the entity.  42 U.S.C. § 12132; 29 U.S.C. § 794(a).  Plaintiff's Complaint alleges that "Defendant's cynical and pretextual use of his [disability] status subjected Barnes to intentional discrimination on the basis of and by reason of his disability, in violation of Title II of the ADA." Compl. ¶ 105.  In particular, "[k]nowing that Barnes had availed himself of counseling services made available to all students by VSU, Zaccari secretly and repeatedly met with Barnes' counselor [Leah McMillan] seeking to justify his decision to expel him."  Compl. ¶ 4; Zaccari/McMillan Materials.  Far from denying the allegations of the Complaint, the Defendants embrace them by arguing as a justification for their actions that the Plaintiff "was under psychiatric care." VSU Defs.' Mem. at 2.

These allegations are sufficient to satisfy Rule 12(b)(6), and the ADA and RA clearly apply to this situation.  A "physical or mental impairment" includes mental or psychological disorders and the definition of "major life activities" includes learning.  *Cf. Kirbens v. Wyo. State Bd. of Medicine*, 992 P.2d 1056 (Wyo. 1999).  Moreover, to prevail under Title II, a plaintiff need not prove that discrimination was the "sole" reason for the adverse action, only a motivating

factor.  *See Baird ex rel. Baird  v. Rose*, 192 F.3d 462 (4th Cir. 1999) (student stated a claim by demonstrating that school excluded her from school performance because of her depression, even if her absenteeism also played a role in the decision).

Defendants' claim that individually named Defendants are improper defendants under the ADA and RA is likewise meritless.  Obviously, this argument does not support dismissal against the named Defendants in their personal capacities, and the official capacity claims may go forward under the doctrine of *Ex Parte Young*.  *Will v. Michigan State Dep't of Police*, 491 U.S. at 71.  *See Clifton v. Georgia Merit System*, 478 F. Supp. 2d 1356, 1362 (N.D. Ga. 2007) (ADA claims against individual defendants in official capacity are indistinguishable from claims against public entity).

Nor are Plaintiffs' claims barred by the Eleventh Amendment.  *United States v. Georgia*, 546 U.S. 151 (2006).  As Defendants acknowledge, the Eleventh Circuit found that Title II of the ADA is valid legislation enacted pursuant to § 5 of the Fourteenth Amendment as applied to public higher education, and that the Eleventh Amendment does not pose a bar to claims against the states.  *Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 959 (11th Cir. 2005).  *See* VSU Def.'s Mem. at 28 n.4.  Similarly, Section 504 of the RA is enforceable

through private causes of action and the States are not immune from federal suits to enforce this provision. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002). Consequently, Defendants' motion to dismiss is meritless.

## IV. VSU'S EXPULSION OF HAYDEN BARNES VIOLATED PLAINTIFF'S CONTRACTUAL RIGHTS

Defendants' argument that it did not have a written contract with Barnes and did not beach any contractual obligations is also baseless. VSU Defs.' Mem. at 21-25. To begin with, it is well established "that a college or university and its students have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins." *Raethz v. Aurora Univ.*, 805 N.E. 2d 696, 699 (Ill. App. 2d Dist. 2004); *Corso v. Creighton Univ.*, 731 F.2d 529, 531 (8th Cir. 1984). In particular, a failure to provide due process to a student pursuant to the educational contract gives rise to a cause of action. *E.g.*, *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976) (graduate student filed suit against various officials of the School of Education of Georgia State University and the University's Board of Regents). This includes breaches of contract arising from a failure to adhere to established disciplinary procedures. *See Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, 573 A.2d 575, 579 (Pa. Super. Ct. 1990); *Corso*, 731 F.2d at 533. Given the detailed procedures for disciplinary proceedings set

forth in VSU's handbook, it is frivolous for the Defendants to assert that there was no "meeting of the minds."  VSU Defs.' Mem. at 22.

Where, as here, the school's policies constitute a written contract, the Defendants implicitly acknowledge that the State of Georgia has waived sovereign immunity.  O.C.G.A. § 50-21-1.  *See*  VSU Defs.' Mem. at 23-24.  A public university, like any state agent, is bound by its own contracts – and VSU is no exception.  Defendants are also wrong to contend that they enjoy immunity from suit in federal court:  the waiver of immunity in O.C.G.A. §. 50-21-1 is expressly comprehensive, applying to "*any* action ex contractu for the breach of any written contract." (emphasis added).  No more is required.  *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1287 (11th Cir. 2003).

## V.    THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants' argument that the individually named defendants are entitled to qualified immunity because they lacked "fair warning" that their actions against Barnes violated a "clearly established" constitutional right is nonsense.  As the Eleventh Circuit made clear in a case the Defendants cite, "[g]overnment officials acting within their discretionary authority are ineligible for qualified immunity from suit when the facts '[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a constitutional right' and 'the

right was clearly established.'" *Hendrix*, 423 F.3d at 1250 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Although Defendants spend several pages trying to suggest that they lacked "fair warning" that their actions meet this standard, *Hendrix* itself makes clear that "this Court has held at least since 1988 that it is 'settled law' that the government may not retaliate against citizens for the exercise of First Amendment rights." *Id*. at 1256. As a consequence, "the defendants were on notice and had 'fair warning' that retaliating against the plaintiffs . . . would violate . . . constitutional rights and, if plaintiffs' allegations are true, would lead to liability under § 1983." *Id*. In making this determination, liability will attach if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *United States v. Lanier*, 520 U.S. 259, 270 (1997). Under the prevailing standard, the Defendants' assertion that "no preexisting case law exists, involving materially similar facts as alleged by Plaintiff," VSU Defs.' Mem. at 37, misses the point. Under the law of this circuit, courts "no longer focus on whether the facts of a case are 'materially similar to prior precedent,'" but look to "whether the facts of the instant case fall within statements of general principle from our precedents." *Holloman*, 370 F.3d at 1278.

Even if the doctrine applied here, qualified immunity cannot provide grounds for dismissal, since it does not preclude suits seeking injunctive relief. *D'Aguanno v. Gallagher*, 50 F.3d 877 (11th Cir. 1995); *cf. New York City Health & Hosps. Corp. v. Perales*, 50 F.3d 129, 135 (2d Cir. 1995) (qualified immunity does not protect against claims for attorney's fees or fines ancillary to prospective relief).    Accordingly, this Court should reject Defendants' motions to dismiss.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied, and Plaintiff's present cross-motion for summary judgment should be granted in its entirety.

Respectfully submitted this 2nd day of May, 2008,

> **/s/ Robert Corn-Revere**
> Robert Corn-Revere
> Brigham J. Bowen
> Lisa B. Zycherman
> Admitted *Pro Hac Vice*
> Attorneys for Plaintiff
> Davis Wright Tremaine LLP
> Suite 200
> 1919 Pennsylvania Avenue, N.W.
> Washington, DC 20006
> 202-973-4200
> Email: bobcornrevere@dwt.com

**_/s/ Cary Stephen Wiggins_**
Cary Stephen Wiggins
Georgia Bar No. 757657
Irma Espino
Georgia Bar No. 558220
Attorneys for Plaintiff
Cook Youngelson & Wiggins
260 Peachtree Street, NW
Suite 401
Atlanta, GA 30303
404-659-2880
Email: cary@cywlaw.com

## <u>CERTIFICATE OF SERVICE AND COMPLIANCE</u>

I hereby certify that on May 2, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.  I also certify, pursuant to LR 7.1.D., that this brief has been prepared in Times New Roman 14-point font.

<u>*/s/ Cary Stephen Wiggins*</u>
Cary Stephen Wiggins
Georgia Bar No. 757657
Attorney for Plaintiff
Cook Youngelson & Wiggins
260 Peachtree Street, NW
Suite 401
Atlanta, GA 30303
404-659-2880
Email: cary@cywlaw.com