EXCERPT:

DEPOSITION OF ROBERT M. O'NEIL

## Page 110

1 a.m. on the release date, they will find the
2 full text posted there.
3     And basically that's it. The
4 followup, as I have said before, has been
5 minimal. We do get occasionally someone who
6 will say, well, sometimes they dig themselves
7 in deeper. I will identify the institution
8 now, it was Stanford on the speech code. Don
9 Kennedy, an old friend, was then president of
10 Stanford. Don wrote, he said, "Well, we never
11 meant to enforce it, we just wanted it on the
12 books."
13     I said, "Don, that doesn't help.
14 That makes it worse. You're a biochemist, not
15 a lawyer, that you just dug yourself in
16 deeper."
17     And sometimes it's of that sort.
18 Occasionally somebody will say, "Well, you
19 didn't emphasize enough the conditions we were
20 dealing with." We get that occasionally.
21   Q   And while I understand your taking
22 deserved pride in the analysis, the selection,
23 investigation of the Muzzle, does the fact
24 that it was awarded to an institution or
25 individual have any probative value?

## Page 111

1   A   That's an excellent question, and
2 it's one our board asks frequently.
3     A couple of answers. One, it seems
4 less likely that the exact same thing will be
5 done by others to the extent that people are
6 aware of it.
7     Early on we cited two elementary
8 school principals, one for suppressing Snow
9 White, the other for suppressing Little Red
10 Riding Hood. I have not seen a subsequent
11 Snow White or Little Red Riding Hood incident.
12 I'd like to think that we may bear some modest
13 responsibility.
14     Second, it serves to make people,
15 readers, viewers, blog accessers out there
16 aware of the range and variety of such
17 incidents, and specifically makes them aware
18 that malefactors come all the way across the
19 political spectrum. That's why in our very
20 first year we cited both the Democratic and
21 Republican National Conventions for
22 suppressing candid discussion of the abortion
23 issue. Republicans, okay, we know about. But
24 we are in Pennsylvania, and it was Governor
25 Casey who desperately wanted in the 1992

## Page 112

1 Democratic Convention to make a speech
2 expressing his pro life views. And they cut
3 him off.
4     But we wouldn't go with that until
5 we talked with Casey's press secretary and
6 said, "Did Governor Casey go to the convention
7 with a speech in which he would express his
8 pro life views and he was prevented from doing
9 so?" And the press secretary said,
10 "Absolutely, I can send you the text of it if
11 you want."
12     That's indicative of the kind of
13 care that we pursue. It's also indicative of
14 the pride that we take -- frankly, it was Jack
15 Kilpatrick for many years and when he retired,
16 Brit Hume succeeded him -- they would make us
17 be fair across the spectrum even if we didn't
18 feel an obligation, but not only feel an
19 obligation, but in the real world there are
20 plenty of wrongdoers on both sides of the
21 political spectrum.
22     The third, I guess it does sometimes
23 stimulate debate about a particular issue on
24 which we've focused. My favorite, I guess, is
25 one that we gave, it was four or five years

## Page 113

1 ago, to the director of the National Zoo
2 because she refused to give to a Washington
3 Post reporter the death certificate for a
4 recently deceased giraffe. She said, "I
5 cannot do that, first, because it would invade
6 the giraffe's privacy. Second, it would
7 invade the confidential relationship between
8 physician and patient," as in between the
9 giraffe and the veterinarian. We said this is
10 not acceptable.
11     Now, you would say that's more of a
12 FOIA issue than a free speech issue, but we
13 thought, you know, suppressing a government
14 document of that sort, the death certificate
15 of a giraffe, which I took my grandchildren a
16 number of times to visit and look up and
17 admire. So it gets people thinking. And we
18 like to believe that it reduces the rate of
19 recurrence that people will be discouraged, so
20 that no zoo director is ever again going to
21 refuse to give a death certificate for a
22 deceased animal to a reporter who wants to
23 know how the animal died.
24     Well, okay, I'd say that's a small
25 victory, but it's the kind of thing that we

**Page 114**

1  like to think we've nurtured.
2  Q  Are you aware of whether any court
3  has admitted in any kind of evidenciary
4  context whether a Muzzle was awarded to
5  anyone?
6  A  Another excellent question.
7  Relatively few -- some of the incidents that
8  do lead to Muzzles are already in litigation
9  at the time the Muzzle is issued.
10  Q  Coming back to that point, do you
11  consider when you're deciding to issue a
12  Muzzle whether there's pending litigation and
13  what effect that might have on the pending
14  litigation?
15  A  We don't at all. And in fact we
16  track litigation, and on maybe half dozen
17  occasions a court has come out differently and
18  has essentially rejected the position that we
19  took with the Muzzle. And we say, well, they
20  made the ultimate decision, we think that
21  there is a First Amendment issue but the judge
22  or the court of appeals ruled otherwise.
23      So we follow, but I would say the
24  pendency or not of litigation has no effect on
25  our Muzzle worthiness judgment. Though we do

**Page 115**

1  feel obligated not only to note the pendency
2  of litigation, but to -- we had one this year,
3  where the case had actually been dismissed
4  three days before the Muzzle was issued. So
5  we update and we put that in the writeup
6  because we feel an obligation not only to say
7  suit has been brought, but if it's been
8  dismissed or decided, we better say that too.
9  Q  Now back to my original question
10  that I interrupted you about, are you aware of
11  any court case in which the fact that a Muzzle
12  was awarded, that that has been introduced as
13  evidence?
14  A  I don't think so. It may have been
15  mentioned at some point, but I certainly am
16  not aware of any judicial opinion that has
17  mentioned a Jefferson Muzzle.
18  Q  Okay. Is that something you would
19  track?
20  A  Yes, because I think we have a push
21  reference service that would send it to us, so
22  we'd know about it.
23  Q  You publicize the issuance of a
24  Muzzle; correct?
25  A  Yes.

**Page 116**

1  Q  How is that publicized?
2  A  To some extent through national
3  media. The Richmond office of the Associated
4  Press is our principal contact. And they put
5  it on the wire after we have a long discussion
6  with somebody in the Richmond AP office. We
7  do provide information to local media as well.
8  Q  And local meaning local where the
9  recipient resides or --
10  A  Yes.
11  Q  -- local in Charlottesville?
12  A  Well, we do that, too, because
13  there's always local interest, it's a
14  Charlottesville-based organization so we get
15  wonderful coverage. Two underground -- not
16  underground, but weekly papers in
17  Charlottesville and they both give us good
18  coverage. The Daily Progress, which is the
19  daily newspaper in Charlottesville, always
20  does a good story.
21      But we also target typically the
22  regional media. And I am sure that Josh would
23  have sent this one both to the Journal
24  Constitution and since, as I mentioned, his
25  parents live in Thomasville, so he probably

**Page 117**

1  had a much better sense of the geography of
2  South Georgia than I do, and probably targeted
3  somebody in the Valdosta area.
4  Q  And the purpose of doing that is --
5  I don't want to put words in your mouth -- but
6  as part of what you did before to identify
7  that this is an issue --
8  A  Yes.
9  Q  -- and hopefully to bring about
10  change?
11  A  Yes, exactly. We think it will be
12  of interest to particularly the people in that
13  region.
14  Q  Does the giving of the Muzzle award
15  ever result in financial contributions or
16  donations to the Jefferson Center?
17  A  I don't think so. We do get
18  contributions, but I can't recall anyone has
19  ever said --
20  Q  "Hey, I just saw this in the paper,
21  good job, here's a contribution"?
22  A  No, I don't think so. Whether
23  indirectly somebody may have been influenced
24  by having seen a Muzzle story, but I can't
25  recall any explicit mention ever or much less

**Page 62**

1 specifically President Zaccari's explanation
2 in his later letter to the board of regents,
3 his explanation for why there was no hearing.
4     The second major part, second
5 section, deals, of course, with the Jefferson
6 Muzzle, not so much the content, but the
7 process by which the Jefferson Muzzles are
8 prepared and issued. And particularly the
9 process that we followed in this case
10 involving the two, the March 4 and April 4
11 letters.
12     So it's the two separate parts, one
13 with two components.
14   Q   So we've identified the two parts
15 and those are the issues to be addressed?
16   A   Yes.
17   Q   What then did you do in terms of
18 your preparation to get to the eventual
19 opinions that you formed?
20   A   These are opinions that basically I
21 had held at the time we prepared and issued
22 the Jefferson Muzzle. Having consulted -- and
23 now I am speaking of documents -- having
24 consulted the legal documents to which I
25 referred toward the end, Pages 14 and 15 in my

**Page 63**

1 statement, I amplified what had been a kind of
2 a skeletal outline.
3     I should add that during this time I
4 was working on three amicus briefs, 4th
5 Circuit, 9th Circuit, and Supreme Court. I am
6 involved in three major projects for the
7 Association of Governing Boards. I had three
8 articles that I had to finish. So the amount
9 of time that I had to devote to this purpose
10 was not limitless. I gave it what I felt was
11 adequate time. As you know, I'm here as a
12 volunteer.
13   Q   I picked up on that.
14   A   So the amount of time that I spent I
15 hoped was adequate for this purpose.
16   Q   Do you have an estimate of how much
17 time you spent on this project?
18   A   Several days, I would say, or parts
19 of several days, yes.
20   Q   I assume that you now have the
21 luxury of not keeping timesheets like many
22 lawyers do?
23   A   That's a luxury that I have always
24 had. I perhaps shouldn't confess here, but
25 it's one thing that's the difference between

**Page 64**

1 teaching and/or nonprofit organization and
2 private practice.
3     I have two sons and a son-in-law who
4 are actively engaged in -- well, my one son is
5 assistant solicitor general, so he keeps a
6 different kind of time sheet. But I have --
7     MR. LaVALLEE: You've got some
8   former government attorneys here so we
9   understand.
10     MR. WILL: We had to keep
11   timesheets in the Attorney's General
12   Office.
13     MR. LaVALLEE: We did.
14     THE WITNESS: He started out,
15   spent four years at Wilmer Cutler, so he
16   kept plenty of timesheets there.
17 BY MR. WILL:
18   Q   I'm sure he did.
19   A   And Wilmer Cutler is very good on
20 pro bono. I have a son-in-law who is a
21 partner in Fulbright and Jaworski. And my
22 youngest son is an associate at Kobre and Kim
23 in the Washington office, and they, believe
24 me, they keep timesheets. And my middle
25 daughter-in-law, she's a prosecutor, who now

**Page 65**

1 is at home taking care of three children. But
2 working for Mr. Morganthal she certainly spent
3 her time on timesheets.
4     So happily it's a luxury that I have
5 always had. And therefore I can't, but
6 certainly there were substantial parts of
7 three days that I devoted to this task. And I
8 did a lot of thinking about it, too. What do
9 I really want to say? What can I contribute?
10 Knowing, as I do, that a lawyer can't appear
11 as an expert witness, maybe on foreign law,
12 but not on constitutional law, what can I
13 contribute that is not a lawyer's role?
14     And these are the two things that I
15 came up with, so that's what's in the
16 statement.
17   Q   And I would imagine that it does
18 involve thinking and putting in context what
19 you know and analyzing the facts. Did you do
20 any other independent research or did you ask
21 any of the students at the Center to do any
22 research for you --
23   A   No.
24   Q   -- have any memos prepared?
25   A   No. The closest I came, as I said,