ORIGINAL

**CONFIDENTIAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 18 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

THOMAS HAYDEN BARNES,

Plaintiff,

-vs-

RONALD M. ZACCARI, *et al.*,

Defendants.

Case No. 1:08-cv-00077-CAP

## PLAINTIFF'S MOTION TO EXCLUDE DR. MATTHEW NORMAN AS AN EXPERT WITNESS

COMES NOW Plaintiff Thomas Hayden Barnes and hereby submits this

Motion to exclude Matthew Norman as an expert witness pursuant to Local Rules

7.2(F) and 26.2C. Plaintiff's Memorandum of Law in support of this Motion is

filed contemporaneously herewith and is incorporated herein by reference.

Respectfully submitted this 18th day of December, 2009.

By: _____*/s/ Robert Corn-Revere*_____
Robert Corn-Revere
Christopher A. Fedeli
Lisa B. Zycherman
Erin N. Reid
Admitted *Pro Hac Vice*
Attorneys for Plaintiff
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006
202-973-4200
Email: bobcornrevere@dwt.com

CONFIDENTIAL

*/s/ Cary S. Wiggins*

Cary S. Wiggins
Georgia Bar No. 757657
Irma Espino
Georgia Bar No. 558220
Attorneys for Plaintiff
Wiggins Law Group
260 Peachtree Street, NW, Suite 401
Atlanta, GA 30303
404-659-2880
Email: cary@wigginslawgroup.com

**CONFIDENTIAL**

## CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that on December 18, 2009, I filed the foregoing with the Clerk of Court and sent a copy of this motion by electronic mail.  I also certify, pursuant to Local Rule 7.1(D), that this motion has been prepared in Times New Roman 14-point font.

*/s/ Robert Corn-Revere*
Robert Corn-Revere
Admitted *Pro Hac Vice*
Attorney for Plaintiff
Davis Wright Tremaine LLP
Suite 200
1919 Pennsylvania Avenue, N.W.
Washington, DC 20006
202-973-4200
Email: bobcornrevere@dwt.com

*/s/ Cary S. Wiggins*
Cary S. Wiggins
Georgia Bar No. 757657
Irma Espino
Georgia Bar No. 558220
Attorneys for Plaintiff
Wiggins Law Group
260 Peachtree Street, NW, Suite 401
Atlanta, GA 30303
404-659-2880
Email: cary@wigginslawgroup.com

**CONFIDENTIAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| THOMAS HAYDEN BARNES, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | |
| | * | Case No. 1:08-cv-00077-CAP |
| RONALD M. ZACCARI, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO EXCLUDE DR. MATTHEW NORMAN
AS AN EXPERT WITNESS**

**CONFIDENTIAL**

Plaintiff Thomas Hayden Barnes, pursuant to Fed. R. Evid. 702, respectfully submits this Memorandum of Points and Authorities in Support of his Motion to Exclude Matthew Norman as an Expert Witness. *First*, the VSU Defendants misrepresented to the Court and to Plaintiff their decision about the need for an expert witness as well as the timeframe in which they retained Dr. Norman. Accordingly, this Court should exclude his expert report and testimony and award costs and fees against the VSU Defendants for misleading the Court and seeking to manipulate the discovery process in violation of Fed. R. Civ. P. 37. *Second*, Dr. Norman's Expert Report and deposition testimony demonstrate that he is not qualified to render an expert opinion on the designated subject matters, that his methodology is unreliable, and that his conclusions are not tied to the case and will not assist the trier of fact. *Third*, the probative value of any opinions Dr. Norman has rendered are substantially outweighed by the danger of unfair prejudice to Plaintiff. Therefore, Plaintiff seeks an Order excluding Dr. Norman as a witness and any evidence of Dr. Norman's opinions and assessing Plaintiff's costs and attorneys' fees against the VSU Defendants.

## I.    BACKGROUND

On August 18, 2009, Defendants Ronald Zaccari, Valdosta State University, Board of Regents of the University System of Georgia, Kurt Keppler, Victor Morgan, and Russ Mast (together "the VSU Defendants") identified Matthew W. Norman, M.D. as an expert witness in what they styled as a "Supplemental Initial

CONFIDENTIAL

Disclosure." [Doc. 136.] The VSU Defendants did not request leave to file the "Supplemental Initial Disclosure" after the close of discovery, nor had they identified Dr. Norman as an expert during the discovery period. (*See* Doc. 47.)

Plaintiff moved to exclude the expert report and testimony of Dr. Norman on the grounds that (1) the expert disclosure failed to comply with the scheduling order and local rules; and (2) the VSU Defendants did not offer any justification for the late and harmful disclosure. (Doc. 139.) Plaintiff outlined "a pattern of discovery abuses by the VSU defendants, which already has been the subject of an order of this Court."[1] (Doc. 139-2 at 9.) In response, the VSU Defendants urged the Court not to exclude Dr. Norman's report and testimony, claiming that Plaintiff had never provided an expert report for his expert witness Dr. Kevin Winders,[2] the VSU Defendants did not have a complete copy of all of the plaintiff's mental health records until June 18,[3] and the VSU Defendants were unable to depose

---

[1] *See generally* Doc. 87 (Order granting Plaintiff's motion to compel and for sanctions).

[2] Fed. R. Civ. P. 26(a)(2)(B) requires expert reports only if the witness is "retained or specially employed to provide expert testimony," and not from a treating physician. *See also* Fed. R. Civ. P. 26 advisory committee's note, 1993 Amendments; Doc. 156 at 3 n.1 (acknowledging Plaintiff's assertion that Dr. Winders "was a treating physician" and "no expert report was required").

[3] *See* Doc. 153 at 9 n.4 (disputing VSU Defendants' claims that Plaintiff withheld medical records).

**CONFIDENTIAL**

Dr. Winders until July 31.[4]  (Doc. 144-3.)  On October 22, this Court denied Plaintiff's motion to exclude Dr. Norman as an expert witness.  (Doc. 156.)

Thereafter, the deposition of Dr. Norman was taken on behalf of the Plaintiff on November 19.  (Doc. 157.)  At the deposition, Dr. Norman revealed that he had been contacted by defendants' counsel at least a month or more before the close of discovery, and that he was retained as defendants' expert on July 6, more than three weeks before the close of discovery.[5]  Although defendants' counsel represented that it circulated an expert report after the close of discovery because of the late deposition (on July 31) of Dr. Winders, Dr. Norman testified he did not review Dr. Winders' deposition until November 14  (Tr. 120:20-25),  and that his review of Dr. Winders' deposition transcript did not form any part of his expert opinion.  (Tr. 120:22-25; *see also* Tr. 91:22-24 (review of Dr. Winders' deposition transcript "did not change my opinion").)

---

[4] *See id.* at 10-11 (disputing VSU Defendants' claims that Plaintiff's counsel did not make Dr. Winders available to be deposed).

[5] *See* Ex. A hereto (Norman Dep. Ex. 5); Ex. B hereto (Norman Dep. Tr. (hereinafter "Tr.") 87:16-19 (Norman's initial contact with attorney Hance some time before July 6); 89:9-13 (on July 6, Norman "agreed to review the records" that would be the sole basis of his expert report); Ex. C hereto (Norman Dep. Ex. 7) (email from Attorney Hance to Norman stating, "[s]ometime in the near future, we will need to disclose you to the other lawyers and parties in this case").

CONFIDENTIAL

## II.    ARGUMENT

### A.    In Addition to Excluding Dr. Norman as an Expert Witness, This Court Should Award Costs and Fees Against the VSU Defendants for Misleading the Court and Plaintiff to Manipulate the Discovery Process

This Court denied Plaintiff's first motion to exclude the expert report and testimony of Dr. Norman in reliance on the VSU Defendants' assertions that they were justified in failing to timely identify Dr. Norman as an expert until August 18, because (1) "the substance of Dr. Winders' expert testimony was never disclosed until he was deposed on July 31, 2009," and Dr. Norman's testimony is necessary to rebut that of Dr. Winders; and (2) "Defendants have shown substantial justification with their explanation of their intentions and interpretations of the Local and Federal Rules; and by showing the demands of the discovery timetable with small firm representation of six (6) clients." (Doc. 144-3 at 18.)  Subsequent discovery has revealed, however, that the VSU Defendants misled Plaintiff and this Court regarding the availability of their expert during the original discovery period, which closed August 1.  Consequently, Plaintiff renews his motion to exclude Dr. Norman's expert report and testimony because it was untimely filed and constitutes an impermissible effort by VSU Defendants to manipulate the discovery process.

A district court has broad discretion in all discovery matters.  *American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1576 (11th Cir. 1985) (quoting *Wyatt v. Kaplan*, 686 F.2d 276 (5th Cir. 1982)).  To excuse the failure to disclose

**CONFIDENTIAL**

an expert witness two elements must be satisfied: (1) there must be substantial justification for the failure; and (2) the failure must be harmless. *See St. Fleurose v. Worldwide Dedicated Services, Inc.*, No. 6:06-cv-1272-Orl-18KRS4, 2007 U.S. Dist. LEXIS 89486 (M.D. Fla. Dec. 5, 2007).

The justifications offered by the VSU Defendants for their untimely disclosure of Dr. Norman as an expert were false and misleading. First, the Court relied heavily on the VSU Defendants' claim that their retention of an expert witness was delayed because Dr. Winders' deposition was scheduled on July 31, the final day of the discovery period. (*See* Doc. 156.) This claim was false, however, because the VSU Defendants retained Dr. Norman at least a month before Dr. Winders' deposition. (*See* Ex. A; Tr.87:16-1.) Dr. Norman was already reviewing pertinent records and rendering his opinions to attorney Hance before Dr. Winders was deposed. (Ex. A; Tr. 90:11-14.)

Moreover, the evidence suggests Dr. Norman never intended to rely on Dr. Winders' deposition transcript to form his opinions in this case. In July, Dr. Norman reviewed Dr. Winders' records and treatment notes to learn the basis of Dr. Winders' opinions and then formulated his opinion and report in reliance on those records and other documentary evidence. (Ex. A; Tr. 90:11-14.) Dr. Norman testified that, notwithstanding the availability of Dr. Winders' deposition transcript on August 27, he did not review the transcript until November 14. (Tr. 120:20-25.) Dr. Norman further testified that his review of Dr. Winders'

**CONFIDENTIAL**

deposition transcript did not form any part of his expert opinion as expressed in the expert report (Tr. 120:22-25), and that his review of Dr. Winders' deposition transcript "did not change my opinion." (Tr. 91:22-24.) Accordingly, VSU Defendants' claim that they would be unfairly harmed by an order excluding Dr. Norman's expert report and testimony because he did not have an opportunity to review Dr. Winders' deposition testimony should be disregarded.

Second, contrary to VSU Defendants' prior claims to this Court, their late expert witness disclosure was not due to being overwhelmed by the "demands of the discovery timetable," but rather was part of what appears to be an intentional effort to manipulate the discovery process. The VSU Defendants retained Dr. Norman as an expert a month before the close of discovery and then strategized to identify him as an expert after the close of the discovery period. (*See* Ex. C). After the close of discovery, VSU Defendants waited another three weeks before identifying their expert and submitting his expert report as a "Supplemental Initial Disclosure." (*See* Doc. 136.) The VSU Defendants' efforts to evade discovery deadlines and then mislead Plaintiff and this Court as to the reasons for their delay are part of an ongoing pattern of discovery abuses in this proceeding and should not be tolerated.[6] (Doc. 139-2 at 9.)

---

[6] *See generally* Doc. 87 (Order granting Plaintiff's motion to compel and for sanctions).

**CONFIDENTIAL**

In light of supplemental discovery revealing that the VSU Defendants' grounds for identifying Dr. Norman as an expert witness and submitting his expert report after the close of discovery were false and misleading, Plaintiff respectfully requests that this Court exclude Dr. Norman as a witness and award costs and fees against the VSU Defendants.

### B.    Dr. Norman's Testimony and Expert Report Are Inadmissible Because They Fail to Meet the *Daubert* Requirements

Admissibility of expert testimony is a preliminary question for the court governed by Fed. R. of Evid. 104(a) and 702.  In interpreting the requirements of Fed. R. Evid. 702, the Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594-95 (1993), established that, for expert testimony to be admissible, it must be both relevant and reliable.  "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion...." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

### 1.    Dr. Norman's Testimony and Expert Report Do Not Meet the "Reliability" Requirement of *Daubert*

Dr. Norman's testimony and expert report are inadmissible because they are unreliable.  In *Daubert*, the Supreme Court considered the following non-exclusive, non-dispositive factors to determine reliability: (1) whether the methodology is testable or has been tested; (2) whether it has been subject to peer review and publication; (3) its error rate; (4) whether standards controlling the

**CONFIDENTIAL**

technique's operation exist; and (5) whether it has been accepted in the proper scientific community. *See Daubert*, 509 U.S. at 593-94.

In performing the gatekeeping task, trial courts must be vigilant in demanding that scientific experts employ in the courtroom the same level of intellectual rigor that characterizes the practice of their profession in the relevant field. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The Supreme Court suggested that an expert's testimony must "be scientific ... knowledge [implying] a grounding in the methods and procedures of science [and connoting] more than subjective belief or unsupported speculation." *See Daubert*, 509 U.S. at 589-90 (internal quotations and footnote omitted). Experts who fall short of this exacting standard will not be permitted to bring their aura of expertise into the courtroom to merely serve as "hired guns" for their respective parties and opine on issues of credibility which fall solely within the jury's province, and outside the witness' area of expertise.

Because Dr. Norman has failed to fulfill the minimum requirements for a scientifically reliable psychological assessment as outlined in his own report and deposition testimony, the Court must find that Dr. Norman's opinion fails to satisfy the reliability prong under *Daubert*.

**CONFIDENTIAL**

a.   **Dr. Norman Is Not Qualified to Testify Because His Practice As a "Hired Gun" Is Contrary to The Standards of His Area of Expertise**

The *Clinical Handbook of Psychiatry and the Law*, which Dr. Norman relies on in his report, provides: "An expert witness who agrees to conduct an evaluation should do so with the explicit understanding that the conclusion may not conform to the outcome desired by the attorney."[7] Notwithstanding his profession's goal of objectivity in the area of offering expert opinions, Dr. Norman's experience as an expert forensic psychiatrist is the very definition of a "hired gun." Since he opened his practice in 2000, Dr. Norman has been hired as an expert witness "*[o]ver 500*" times. (Tr. 32:20-22) (emphasis added). However, Dr. Norman can recall *only one* instance where he was engaged to provide an expert opinion and upon reviewing the facts he reached a conclusion that he could not provide the opinion that was sought. (Tr. 69:15-25.) In that instance, Dr. Norman declined to offer the opinion sought only because of a conflict of interest. (*Id.*) Dr. Norman's past experience demonstrates a profound lack of objectivity when offering an expert opinion.

Moreover, Dr. Norman testified at his deposition that notwithstanding the standard methodology for providing a forensic psychiatric expert opinion, the

---

[7] *See* Ex. D hereto, *Clinical Handbook of Psychiatry and the Law* 350, Thomas G. Gutheil & Paul S. Appelbaum, eds., 3d ed. Lippincott, Williams & Wilkins, Philadelphia 2000 (hereinafter "Gutheil"); *see also* Doc. 136 (Expert Report of Dr. Norman citing Gutheil).

**CONFIDENTIAL**

methodology he employs "depends on the case," and the degree to which the party that hires him "wants to share ... records." (Tr. 70:16-22.) Dr. Norman stated that unless "specifically told to," he does not otherwise perform any independent research before forming an expert opinion in a case. (Tr. 70:23-24.) Indeed, he testified that his position on not performing independent research is in conflict with the methodology set forth by the treatise on forensic psychiatry he relies on in support of his expert report. (Tr. 73:23-75:23.) In light of Dr. Norman's deviations from the standards and methods of his profession, he is unqualified to offer an expert opinion in this case.

### b.    Dr. Norman's Opinions on Future Dangerousness Are Inherently Unreliable

In the field of forensic psychiatry, opinions on future dangerousness are not "known to reach reliable results," Fed. R. Evid. 702 advisory committee's note (2000 amends.), and should be excluded. The Gutheil text (on which Dr. Norman relies) cautions that, "prediction of dangerousness is a fundamentally unreliable endeavor...." (Ex. D at 67; *see also* Tr. 211:16-23). Dr. Norman testified that he agreed with the Gutheil text's statement that "threats against others ... are an extremely common event," and "[i]t would be unreasonable, unethical, and surely impossible to respond to every one of such threats as though it represented an acute and present danger to others...." (*Id.*; Tr. 212:23-213:6.) Nevertheless, Dr. Norman engages in such an analysis in this case, utilizing only the records provided to him by the VSU Defendants' counsel. Each of Dr. Norman's "future

**CONFIDENTIAL**

dangerousness" opinions are *per se* inadmissible because they opinion on a topic that his profession finds "unreliable."

c.    **Dr. Norman's "Record Review" Is Unreliable and Contrary to the Standard Methodology Required By His Field of Expertise**

Dr. Norman's expert report and testimony failed to conform with the standard practices and methodology in his profession including his failures to conduct an in-person evaluation of Mr. Barnes or perform any independent research. In sum, Dr. Norman testified at his deposition that, after 4.2 hours of reviewing the records hand-picked for him by VSU Defendants' counsel, he was able to reach the conclusions that were later memorialized in his expert report. (*See* Tr. 90:15-19.) Dr. Norman's methodology in this case is deplorable and his unreliable opinions are inadmissible.

A review of the literature relied on by Dr. Norman specifically requires that "the clinician should use as many sources as possible, including talking to the patient as well as the police, relatives, the patient's therapist, and the primary-care physician. Past medical and criminal records should be obtained."[8]  At his deposition, Dr. Norman confirmed that "[m]ore data is helpful" when providing an expert opinion. (Tr. 16:11-12.) In the present case, Dr. Norman has not been "as careful as he would be in his regular professional work outside his paid litigation

---

[8] *See* Ex. E hereto, *Principles and Practice of Forensic Psychiatry* 439 (Richard Rosner, ed., Oxford University Press, New York 1998).

**CONFIDENTIAL**

consulting," Fed. R. Evid. 702 advisory committee's note (2000 amends.), and because he failed to employ the appropriate methodology in this case his expert report and testimony unreliable and inadmissible.

First, Dr. Norman failed to conduct a direct examination of Mr. Barnes, notwithstanding the fact that it is his common practice to do so. Specifically, Dr. Norman testified that, of the approximately 50 cases in which he has been asked to testify (Tr. 32:6-12), eight of them involved predicting dangerousness (Tr. 37:14-38:3), and in each of those eight cases, Dr. Norman conducted an in-person evaluation of the subject of his dangerousness assessment. (Tr. 38:4-8.) Dr. Norman agreed that it was his standard practice to do so because it "adds more data" (Tr. 38:9-12), and "[a]s a clinician you can form a more informed opinion with more data." (Tr. 41:1-2.) Dr. Norman has not even reviewed the videotaped deposition of Mr. Barnes (Tr. 104:16-24), and admits that, if he had interviewed Mr. Barnes, he could have reached a different conclusion. (Tr. 40:18-22.)

In the past, Dr. Norman has testified as to the importance of conducting an in-person examination before offering an psychological opinion. For example, in *Mastrilli v. Prison Health Services*, a case involving a suicide in a Gwinnet County, Georgia jail, Dr. Norman testified on behalf of the defendant, Prison Health Services, and opined as to whether there was evidence that the inmate had

**CONFIDENTIAL**

posed a suicide risk.[9]  Significantly, during his deposition in that case, Dr. Norman declined to offer an opinion on the inmate's mental and medical condition on admission because "I didn't examine her."[10]  Similarly, in *State v. Vento*, Dr. Norman was asked to provide a future dangerousness assessment at a bond hearing for a criminal defendant who had threatened his wife on numerous occasions, including threatening to decapitate her.[11]  In providing his opinion that, if released, the defendant would not harm himself, his wife, or any other citizen, Dr. Norman explained his methodology, stating: "For any forensic evaluation I ask for some portion of discovery.  I will review those materials and then sit down and meet the with the defendants.  And I met with Mr. Vento for a little over two hours to conduct the evaluation and then prepared a report."[12]

In light of the fact that he has never examined or even met Mr. Barnes, Dr. Norman qualifies the findings in his expert report by stating: "All opinions formulated are based only on record view and not a direct examination of the Plaintiff, Mr. Thomas Hayden Barnes."  (Doc. 136 (Norman Rep. at 8).)  At his deposition, Dr. Norman acknowledged that,  by qualifying his opinions in such a manner he believed he resolved the "ethical" concerns presented by his failure to

---

[9] *See* Ex. F hereto, Norman Dep. Ex. 9 (*Mastrilli v. Prison Health Services, Inc.*, Civil Action No. 02-C-7075-4, 2004 Depo. Trans. LEXIS 16015; 1 Exp. Wit. 177816 (Ga. State Ct., Gwinnett County Aug. 11, 2004)).

[10] *Id.*; *see also* Tr. 151:17-24.

[11] *See* Ex. G hereto, Norman Dep. Ex. 20 (*State v. Vento*, Criminal Action No. 08-B-03735-8Q, (Gwinnett Super. Ct. Oct. 10, 2008)).

[12] *Id.* at 3; *see also* Tr. 221:14-19.

**CONFIDENTIAL**

examine Mr. Barnes. (Tr. 152:23-153:3.) While Dr. Norman may be confident in his ethics, his opinions are wholly unreliable under Fed. R. Evid. 702.

Dr. Norman also did not meet with any of the Defendants or witnesses in this case (Tr. 100:20-24), or review any of the numerous deposition transcripts in this proceeding, other than Dr. Winders'. (Tr. 103:17-22.) Dr. Norman acknowledged that "he might want to review" the deposition of Barnes' mother, because, if he learned that Mr. Barnes has a supportive family, it would reduce his concern about Barnes being potentially violent. (Tr. 256:2-257:12.) However, Dr. Norman failed to investigate whether Barnes had such a support system at the time he was expelled and, consequently, such considerations are not reflected in his expert report. Instead, Dr. Norman relied entirely on the documents VSU Defendants' counsel selected for him to review.

Contrary to his own literature, Dr. Norman has not satisfied each of the critical components that he believes constitute a thorough psychological evaluation, and has not applied the same level of intellectual rigor in this case that characterizes the general practice of expert forensic psychology. Accordingly, Dr. Norman's testimony and expert report should be excluded because they are not reliable under *Daubert*.

### 2. Dr. Norman's Testimony and Expert Report Do Not Meet the "Relevance" Requirement of *Daubert*

Fed. R. Evid. 702 also requires a demonstration of relevance, "whether expert testimony proffered in the case is sufficiently tied to the facts of the case

**CONFIDENTIAL**

that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (internal quotations omitted). "This entails a preliminary assessment of whether the reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. The "helpfulness" standard in Rule 702 requires "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-92. This element is often described as one of "fit." *Id.* at 591.

There are inconsistencies or a lack of "fit" between the data and information on which Dr. Norman relied, and the issues in this case that he is offered to testify on. Conclusions of the type offered by Dr. Norman would hinder, rather than assist, the trier of fact. Accordingly, the Court should exclude Dr. Norman as an expert witness in this case.

### a. Dr. Norman's Reasonable Person Opinion Is Inadmissible

Preliminarily, this Court has already found that an opinion as to whether a reasonable person would perceive a risk from Barnes' speech activities should be rejected in this proceeding as such testimony is not beyond the understanding of the average lay person and will not assist the trier of fact. "It is an abuse of discretion 'to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue.'" *United States v. Gaskell*, 985 F.2d 1056, 1063 (11th Cir. 1993) (*per curiam*); *accord United States v. Garber*, 607 F.2d 92, 95-97 (5th Cir. 1979) (*en*

**CONFIDENTIAL**

*banc*). Therefore, Dr. Norman's "reasonable person" opinion should likewise be excluded from this proceeding.

Plaintiff identified Professor Robert O'Neil as an expert in this proceeding to offer an opinion on whether a reasonable university president would perceive a risk from Barnes' speech activities, but the Court ruled in two separate orders that such testimony was not "beyond the understanding of the average lay person and [would] not help the trier of fact." [Doc. 156 at 7; *see also* Doc. 160 at 2-3.] The Court's rationale for excluding Professor O'Neil must be equally applied to Dr. Norman's proffer of an expert opinion on the identical issue. Consequently, the reasonable person opinion offered by Dr. Norman should likewise be excluded from this proceeding because the court has already ruled that such testimony is inadmissible.

Even if, *arguendo*, this Court did not exclude Dr. Norman's "reasonable person" opinion based on its earlier rulings, Dr. Norman's "reasonable person" does not meet the relevance standard expressed in *Daubert* because it relies on the perspective of an unreasonable person. Dr. Norman admits that his "reasonable person" standard relies on the presumption that many people unfairly stigmatize people with mental illness, despite warnings from the U.S. Surgeon General that such assumptions are unfounded.[13]  (Tr. 24:21-23.)  Dr. Norman agrees with the

---

[13] *See* Ex. H hereto, *Mental Health: A Report of the Surgeon General,* Chapter 1, http://www.surgeongeneral.gov/library/mentalhealth/chapter1/sec1.html.

**CONFIDENTIAL**

Surgeon General Report's finding that stigmatization of mental illness is inexcusably used to discriminate (Tr. 26:7-12), and, moreover, that the public overestimates the possibility that a mentally ill person might be violent. (Tr. 27:15-29:7.)[14] Further, Dr. Norman acknowledged that "a reasonable person can make a determination on dangerousness," but that they "will have a ... lower threshold of dangerousness." (Tr. 128:15-21; *see also* Tr. 129:20-130:7.) Dr. Norman's opinion, therefore, presumes that his "reasonable person" is going to perceive a danger where there isn't one. There is no rational basis for a person to fear violence from people who are mentally ill, and such a bias is not presumed under the law, therefore, Dr. Norman's "reasonable person" opinion is irrelevant to this case and, consequently, inadmissible.

Furthermore, Dr. Norman's "reasonable person" standard is unduly narrow. Dr. Norman stated at his deposition that his "reasonable person" opinion only considered whether a reasonable person in Zaccari's position would have deemed Barnes to be dangerous. (Tr. 136:1-9.) Dr. Norman did not consider the opinions of the other Defendants in his analysis (Tr. 136:24-137:5), and agreed that those Defendants who did not find Barnes to be dangerous were not unreasonable. (Tr. 133:14-20.) Thus, Dr. Norman's constricted version of a "reasonable person" does not "fit" the facts in this case and should be excluded.

---

[14] *Id.* at 2.

**CONFIDENTIAL**

Dr. Norman's reliance on eleven factors as the basis of his "reasonable person" opinion is irrelevant and unreliable because his analysis irrationally lends the same weight to every factor, notwithstanding the fact that the factors do not, in and of themselves, indicate future dangerousness. (*See* Tr. 157:3-21.) For example, Dr. Norman acknowledged that the first factor listed in his report, a letter Dr. Winders sent to VSU in August 2006 supporting Mr. Barnes' request for accommodations under the Americans with Disabilities Act, contained nothing to suggest that Mr. Barnes was dangerous or that he was not getting treatment. (Tr. 162:1-5.) Moreover, Dr. Norman acknowledged that overall, he did not believe that a reasonable person reading this letter would think that Barnes was dangerous – even though Dr. Norman cited the letter as a basis for his opinion that a "reasonable person" who reviewed the letter could determine that Barnes presented a risk of future dangerousness. (Tr. 162:18-21; 163:22-24.) Similarly, Dr. Norman admitted that his third factor, an email from Mr. Barnes to the VSU coordinator for ADA accommodations, did not constitute an indication of dangerousness "in and of itself." (Tr. 172:2-4.) In the same vein, Dr. Norman testified that his fourth factor, a flyer Barnes created expressing environmental concerns due to a proposed parking garage on the VSU campus, was not an indicator of violence, but only demonstrated that Barnes "disagreed with the university's position." (Tr. 158:14-22; *see also* Tr. 173:23-174:2.) Similarly, notwithstanding his reliance on Barnes' Facebook collage as the fifth factor in his dangerousness analysis, Dr. Norman

CONFIDENTIAL

acknowledged that the collage was not an indication of mental illness. (Tr. 176:18-177:1.) In addition, Dr. Norman stated that the collage had not been sent directly to Zaccari and, therefore, stated that "it would be more concerning … if he had actually sent it to him…." (Tr. 180:23-181:4.) Dr. Norman's expert report, however, did not note these mitigating factors. Such contradictory testimony is highly irrelevant and unreliable under *Daubert*.

Dr. Norman's reliance on his eleven factors is also irrelevant and unreliable because he has not adequately accounted for obvious alternative explanations. *See* Fed. R. Evid. 702 advisory committee's note (2000 amends.) For example, the tenth factor suggests that a letter Barnes sent to Defendant Zaccari on or about April 6, 2007 concerning Pulitzer Prize winning author Jared Diamond's book, *Collapse: How Societies Choose to Fail or Succeed*, could lead a "reasonable person [to] believe [that Barnes'] writings are odd, bizarre, and obsessive." (Doc. 136 at 5.) However, at his deposition, Dr. Norman admitted that he was unfamiliar with the book *Collapse*, and was unaware that it was about environmental damage and how societies fail when they use up natural resources. (Tr. 191:14-25.) Dr. Norman agreed that the subject matter of *Collapse* was the same subject of Barnes' environmental concerns regarding the VSU parking decks (Tr. 192:1-5), and that mentioning the book was directly relevant to a political discussion about environmental impacts. (Tr. 192:6-9.)

**CONFIDENTIAL**

In forming his opinion that Barnes' actions exhibited obsessiveness about the parking garage issue, Dr. Norman's reliance on his eleven factors also proves irrelevant and unreliable.   In particular, Dr. Norman assumes that Defendant Zaccari told Mr. Barnes to stop communicating with him about the parking garages, but he admits that he did not review any documents indicating that in fact occurred.    (Tr. 194:7-11.)    Moreover, Dr. Norman also acknowledges that obsessiveness, by itself, does not equate with dangerousness.  (Tr. 198:1-3.)   In light of the inconsistencies in Dr. Norman's testimony and expert report, the basis of Dr. Norman's obsessiveness finding lacks relevance under *Daubert* because it, admittedly, does not "fit" the facts in this case.

### b.    Dr. Norman's Reasonable Clinician Opinion Is Inadmissible

Preliminarily, Dr. Norman's "reasonable clinician" opinion is inadmissible in this case because it is irrelevant to the decisions taken by the VSU Defendants who are not clinicians.  Whether a "reasonable clinician" would have found Mr. Barnes presented signs of future dangerousness has no bearing on whether the VSU Defendants violated Mr. Barnes' procedural and substantive rights to due process, free speech, and freedom from discrimination on the basis of disability.

Even if, *arguendo*, this Court does not find Dr. Norman's "reasonable clinician" opinion to be *per se* irrelevant and inadmissible, the substance of the opinion should nevertheless be excluded.  Critically, Dr. Norman's opinion that a "reasonable clinician could have deemed Mr. Barnes a clear and present danger on

**CONFIDENTIAL**

or about April and May 2007," is misleading because Dr. Norman's opinion on whether Mr. Barnes posed an "imminent" threat has changed. At his deposition, Dr. Norman testified that he does not "have an opinion on imminence," and would "take the word 'imminent' out" of his opinion. (Tr. 126:3-15.) Accordingly, Dr. Norman's revised opinion lacks relevance and does not "fit" the facts in this case.

Moreover, Dr. Norman found only that a reasonable clinician could have concluded that Barnes was a "danger based on the records review." (Tr. 123:11-13.) However, of the three clinicians who provided their opinion that Barnes was not dangerous in the Spring of 2007, two (Dr. Winders and Defendant McMillan) had significantly more data than the records hand-picked by VSU Defendants' counsel because they had treated and interviewed Mr. Barnes multiple times. The "reasonable clinician" opinion that Dr. Norman offers in this case is inconsistent with his prevailing view that "more data" is better for evaluating the mental health status of an individual.

Dr. Norman declined to opine as to whether Dr. Winders, Dr. Morgan, or Defendant McMillan were reasonable clinicians, even though they all determined that Barnes was not dangerous. (*See* Tr. 141:7-10 (Dr. Winders); 143:14-21 (Dr. Morgan); 143:22-24 (McMillan); 144:12-16 (testifying that it does not affect his opinion one way or the other that none of the clinicians that are actually involved in this case believed that Mr. Barnes was a threat).) Incredibly, Dr. Norman

**CONFIDENTIAL**

believes that his hypothetical "reasonable mental health clinician" carries more weight than the actual clinicians who were involved in this case.

Again, Dr. Norman qualified the factors he relied on in forming his "expert clinician" opinion by stating that in and of themselves they did not predict future violence, but that in context with one another he could opine that a reasonable clinician could find that Barnes presented a risk of future dangerousness. (*See, e.g.,* Tr. 253:7-10 (acknowledging that factor six, resenting authority, in and of itself does not predict violence).) Dr. Norman's methodology reveals an imperfect pseudo-scientific method to reach the conclusion he was asked to reach by VSU Defendants' counsel. As such, the opinion he offers and his underlying findings are wholly unreliable and irrelevant and would not aid the fact-finder in this case.

In addition, Dr. Norman acknowledged that his report and opinion did not account for mitigating facts that would have been known to a reasonable clinician assessing Barnes' possible future dangerousness. For example, Dr. Norman acknowledged that Barnes never made any specific threats against anyone (Tr. 259:12-15; 261:1-3), and that what Dr. Norman has perceived as threats in this case are vague. (Tr. 210:9-11.) Although Dr. Norman acknowledged that vague threats are not as serious as well-formulated threats, Dr. Norman admits that he did not factor this mitigation into his report. (Tr. 261:4-14.) Moreover, Dr. Norman agreed that it is true that, if you look at age as a risk factor (as he does in his expert report), you are likely to see violence occur in the teenage years for people that

present violence based on that factor. (Tr. 240:16-20.) Dr. Norman acknowledged at his deposition, however, that Barnes was not violent towards others when he was a teenager, although this fact is not reflected in his report. (Tr. 241:7-9.) Further, Dr. Norman explained that seeing a counselor or taking medication – all of which he admitted Mr. Barnes did – can also mitigate risk of dangerousness. (Tr. 237:11-16.)

Dr. Norman misread the records in this case and, therefore, reached a different conclusion than the clinicians who evaluated Barnes in April and May 2007. For example, Dr. Norman's ninth factor cites a history of loss of control. Dr. Norman's opinion, based on the available literature, is that Barnes' impulsivity relates to a perceived victimization by authority figures, including family members. (Tr. 265:3-266:6.) Although Dr. Norman relied on findings by Mr. Barnes' treating clinicians, Dr. Winders and Defendant McMillan, that he was impulsive, neither of those clinicians concluded that Barnes presented a threat in terms of violence. Dr. Norman's "reasonable clinician" opinion simply does not "fit" the facts in this case and should be excluded.

### c.    Dr. Norman's Damages Opinion Is Inadmissible

Dr. Norman's opinion on the damages suffered by Mr. Barnes is admittedly wholly unreliable and should be excluded. Dr. Norman qualified his opinion regarding damages in his report and at his deposition, noting that he has not examined Mr. Barnes. (Tr. 155:9-10.) At his deposition, Dr. Norman went

**CONFIDENTIAL**

further, stating that his opinion on damages could change if he examined Mr. Barnes. (Tr. 155:11-13.) Specifically, Dr. Norman asserted that a face-to-face assessment would "add weight to or change that opinion...." (Tr. 278:6-18.) Moreover, Dr. Norman acknowledged that his opinion on damages, qualified by his failure to examine Barnes, goes only to possible psychological harm, but does not rule out emotional harm. (Tr. 156:13-16.) Dr. Norman's damages assessment is, therefore, incomplete, unreliable, and lacks relevancy to this proceeding and consequently should be excluded.

### C.    The Probative Value, If Any, of Dr. Norman's Testimony and Expert Report Is Substantially Outweighed by the Danger of Unfair Prejudice

As the Supreme Court noted in *Daubert*, a trial court judge assessing expert scientific testimony under Fed. R. Evid. 702 should also be mindful of other applicable rules of evidence, notably, Fed. R. Ed. 403. *Daubert*, 509 U.S. at 595. "Rule 403 permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Daubert*, 509 U.S. at 595 (quoting Fed. R. Evid. 403). For the reasons set forth *supra*, the probative value of Dr. Norman's proffered opinions is substantially outweighed by the danger of unfair prejudice to Plaintiff. Most tellingly, Dr. Norman relied on the fact that mental illness is irrationally stigmatized, and that the average person vastly overestimates dangerousness as the basis for his opinion that a "reasonable person" could conclude Barnes was a

**CONFIDENTIAL**

threat. (Tr. 24:21-23; 27:15-29:7). Pandering to discrimination cannot be the basis for an "expert opinion," and admitting such testimony would be highly prejudicial by definition. Accordingly, this Court should exclude Dr. Norman as an expert witness in this case.

WHEREFORE, Plaintiff respectfully requests that this court issue an Order excluding Dr. Norman as witness and any evidence of Dr. Norman's opinions and assessing Plaintiff's costs and attorneys' fees against the VSU Defendants.

Respectfully submitted this 18th day of December, 2009.

By: _____ */s/ Robert Corn-Revere* _____
Robert Corn-Revere
Christopher A. Fedeli
Lisa B. Zycherman
Erin N. Reid
Admitted Pro Hac Vice
Attorneys for Plaintiff
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006
202-973-4200
Email: bobcornrevere@dwt.com


_____ */s/ Cary S. Wiggins* _____
Cary S. Wiggins, Georgia Bar No. 757657
Irma Espino, Georgia Bar No. 558220
Attorneys for Plaintiff
Wiggins Law Group
260 Peachtree Street, NW, Suite 401
Atlanta, GA 30303
404-659-2880
Email: cary@wigginslawgroup.com

CONFIDENTIAL

## CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that on December 18, 2009, I filed the foregoing with the Clerk of Court and sent a copy of this motion by electronic mail. I also certify, pursuant to Local Rule 7.1(D), that this motion has been prepared in Times New Roman 14-point font.

*/s/ Robert Corn-Revere*
Robert Corn-Revere
Admitted *Pro Hac Vice*
Attorney for Plaintiff
Davis Wright Tremaine LLP
Suite 200
1919 Pennsylvania Avenue, N.W.
Washington, DC 20006
202-973-4200
Email: bobcornrevere@dwt.com

*/s/ Cary S. Wiggins*
Cary S. Wiggins
Georgia Bar No. 757657
Irma Espino
Georgia Bar No. 558220
Attorneys for Plaintiff
Wiggins Law Group
260 Peachtree Street, NW, Suite 401
Atlanta, GA 30303
404-659-2880
Email: cary@wigginslawgroup.com

**CONFIDENTIAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| THOMAS HAYDEN BARNES, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | |
| | * | Case No. 1:08-cv-00077-CAP |
| RONALD M. ZACCARI, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

## [PROPOSED] ORDER

Having read and considered Plaintiff's Motion the Exclude Matthew

Norman as an Expert Witness, and for the reasons set forth in Plaintiff's

Memorandum of Law in support of his Motion to Exclude, it is this ____ day of

December, 2009, hereby

ORDERED that Plaintiff's motion to exclude Matthew Norman as an expert

witness is GRANTED.

_____
Charles A. Pannell, Jr.
Judge, United States District Court for
the Northern District of Georgia