# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION



THOMAS HAYDEN BARNES,

       Plaintiff,

v.

RONALD M. ZACCARI, et al.,

       Defendants.

CASE NO.
1:08-cv-00077-CAP

**CONFIDENTIAL**

## DEFENDANT LEAH MCMILLAN'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT UNDER SEAL

COMES NOW LEAH MCMILLAN, a Defendant in the above styled matter, who files this brief in support of her motion for summary judgment as follows:

### I.   INTRODUCTION

**A.   Procedural History**

Plaintiff filed this 42 U.S.C. § 1983 action on January 9, 2008. (Doc. 1). One of the Defendants named in the Complaint is Leah McMillan ("Mrs. McMillan"), a counselor at Valdosta State University's ("VSU") Counseling Center. (Doc. 1, ¶ 14).



In the Complaint, Plaintiff alleges that he was unlawfully expelled from VSU on May 7, 2007, by President Ronald M. Zaccari ("President Zaccari"). (Doc., ¶ 52). In regard to Mrs. McMillan, Plaintiff alleges that with her "assistance" President Zaccari "pursued [a] strategy" of expelling him from VSU in retaliation for his protesting the construction of a parking garage by "represent[ing] [he] posed some kind of danger." (Doc., ¶ 38). Plaintiff additionally contends that Mrs. McMillan attended a meeting "held by Mr. Zaccari" on May 3, 2007, where the decision was made to expel him from VSU. (Doc. 1, ¶ 51). Throughout the remainder of the Complaint, Plaintiff highlights how on multiple occasions Mrs. McMillan reported to President Zaccari that she did not believe Plaintiff was dangerous or threatening and that Mrs. McMillan wrote a letter to President Zaccari and the Board of Regents after Plaintiff's withdrawal regarding the same. (Doc. 1, at ¶¶ 39, 42, 47, 51, 59).

In relation to these allegations, Plaintiff asserted First Amendment retaliation and due process claims against Mrs. McMillan in her individual and official capacities. (Doc. 1, Counts 1-4, pp. 23-28). The Complaint also contained American with Disabilities and Rehabilitation Act claims against Mrs. McMillan in her official capacity. (Doc., Counts 6 & 7, pp. 29-31).

2

Mrs. McMillan filed a motion to dismiss Plaintiff's Complaint on

April 1, 2008. (Doc. 17 & 18). On November 19, 2008, this Court issued an

Order granting in part and denying in part Mrs. McMillan's motion to

dismiss. (Doc. 37). As a result, only two counts of the Complaint remain

against Mrs. McMillan in her individual[1] capacity: Plaintiff's First

Amendment retaliation claim (Count 3) and Plaintiff's procedural and

substantive due process claims (Count 4). (Doc. 37, p. 29).

On December 3, 2008, Mrs. McMillan filed a motion for

reconsideration regarding Plaintiff being allowed to continue with his First

Amendment Retaliation and due process claims. (Doc. 40). Upon

---

[1] Plaintiff filed official capacity claims under Title II of the ADA and
Section 504 of the Rehabilitation Act against Mrs. McMillan. (Doc. 1, ¶¶
105 & 109). The Court has held however that these official capacity claims
are to be construed as against state entity Defendants VSU and the Board of
Regents—who are represented by separate counsel and will be responding to
these claims separately. (Doc. 37, pp. 27-29). As this Court has indicated, a
suit against an individual is not authorized under Title II of the ADA as only
a public entity is subject to liability. (Doc. 37, p. 27); see also Rylee v.
Chapman, 2008 U.S. Dist. LEXIS 61055 at * 20 (N.D. Ga. Aug. 11 2008).
Moreover, as this Court further explained, since the same standards applied
under the ADA are also applied under Section 504 the Rehabilitation Act,
there is no individual cause of action under Section 504 of the Rehabilitation
Act. (Doc. 37, pp. 28-29); Rylee, 2008 U.S. Dist. LEXIS 61055 at * 20
(citing Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98,
107 (2d Cir. 2001) ("Insofar as Garcia is suing the individual defendants in
their individual capacities, neither Title II of the ADA nor § 504 of the
Rehabilitation Act provides for individual capacity suits against state
officials.")

consideration thereof, on December 12, 2008, this Court explained that these claims would be allowed to proceed against Mrs. McMillan for one reason only: Plaintiff alleged Mrs. McMillan "attend[ed] a meeting held by President Zaccari on May 3, 2007, which resulted in the expulsion of Barnes." (Doc. 43, pp. 3-4).

### B.    Factual Background

This case presents layers of facts, involving several individuals, stretched out over a number of years. As a result, each party has their own unique set of facts that needs to be examined for proper adjudication of this matter.

Plaintiff's case against Mrs. McMillan however boils down to one thing: Plaintiff is upset with Mrs. McMillan for discussing Plaintiff's current mental health status without his consent prior to being administratively withdrawn from VSU by President Zaccari. (Barnes Dep., p. 261, lines 18-23). Notably, however, Plaintiff's Complaint does not assert a breach of confidentiality cause of action against Mrs. McMillan. Nor could it, as no legally cognizable breach of confidentiality claim against Mrs. McMillan exists.

In regard to the claims actually asserted in the Complaint, the record evidence makes abundantly clear that Plaintiff's First Amendment retaliation

4

and due process claims against Mrs. McMillan were erroneously and recklessly asserted out of frustration following Plaintiff's administrative withdrawal from VSU by President Zaccari. As Plaintiff has testified "I don't have any specific evidence for [Mrs. McMillan] releasing information prior to my administrative withdrawal in retaliation for my beliefs regarding the parking garage, to my knowledge." (Barnes Dep., p. 262, lines 8-14). Instead, as the evidence shows, Mrs. McMillan repeatedly advocated on Plaintiff's behalf before and after he was administratively withdrawn from VSU—belying any notion that her actions were somehow retaliatory.

Additionally, it is undisputed that President Zaccari alone made the decision to withdraw Plaintiff from VSU and chose to stay the course with his decision despite being provided with a letter of support from Mrs. McMillan following Plaintiff's withdrawal opining that Plaintiff was not a threat and should be allowed to remain at VSU.

Lastly, as for the meeting Plaintiff claims Mrs. McMillan attended on May 3, 2007—where the decision was allegedly made to unlawfully and without due process withdraw him from VSU—the record evidence establishes Mrs. McMillan was at a conference at St. Simons Island and was nowhere near the VSU campus.

5

## I.      Timeline Of Events Pertaining To Mrs. McMillan

Mrs. McMillan is a licensed psychotherapist employed as a staff counselor at the Valdosta State University ("VSU") Counseling Center ("Counseling Center") and as a consultant with Child and Family Guidance of Georgia.  (McMillan Aff., ¶ 2; McMillan Dep., p. 6, lines 14-17, p. 41, line 5).  As a staff counselor at VSU, Mrs. McMillan's job duties involve providing outpatient psychotherapy to individuals and couples.  (McMillan Aff., ¶ 2; McMillan Dep., p. 191, lines 9-15).  Mrs. McMillan averages a caseload of approximately fifty clients and conducts roughly 250 hours worth of therapy per semester at the Counseling Center. (McMillan Aff., ¶ 2; McMillan Dep., p. 157, lines 1-8).

Mrs. McMillan was Plaintiff's psychotherapist while he attended VSU.  (McMillan Aff., ¶ 3; McMillan Dep.,  p. 40, lines 11-13).  Plaintiff began therapy sessions with Mrs. McMillan on September 9, 2005. (McMillan Aff., ¶ 3; McMillan Dep., Counseling Record Dated 9/9/05, Ex. 5; Barnes Dep., p. 229, lines 2-6).  During the fall of 2005, Mrs. McMillan saw Plaintiff in person four times.  (McMillan Aff., ¶ 3; Barnes Dep., p. 229, lines 7-9; McMillan Dep., Counseling Records Dated 9/9/05-9/29/05, Ex. 5).  Plaintiff left VSU in December 2005, but returned in February 2007. (McMillan Aff., ¶ 3; Barnes Dep., p. 229, lines 10-19).  On February 5,

2007, Plaintiff recommenced therapy sessions with Mrs. McMillan and saw her in person nine times during the spring semester. (McMillan Aff., ¶ 3; McMillan Dep., Counseling Records Dated 2/5/07-5/8/07, Ex. 5; Barnes Dep., p. 229, lines 23-25, p. 230, line 1).

At the beginning of their counseling relationship, Plaintiff provided Mrs. McMillan with some notes he had written about himself that referenced things Mrs. McMillan found concerning. (McMillan Aff., ¶ 6, Ex. 1; McMillan Dep., p. 203, lines 18-21, p. 204, lines 7-9, lines 17-21, Bate Stamp Docs 780-82, Ex. 16). Mrs. McMillan talked with Plaintiff regarding her concerns. (McMillan Aff., ¶ 6; McMillan Dep., p. 204, lines 17-25). One of the things referenced by Plaintiff in his notes was that he had previously engaged in some self-directed violence when he was fifteen years old. (McMillan Aff., ¶ 7; McMillan Dep., Ex. 16; Barnes Dep., Ex. 2). At no time however did Plaintiff ever exhibit or acknowledge any current issues with self-directed violence to Mrs. McMillan. (McMillan Aff., ¶ 7; McMillan Dep., p. 179, lines 19-24, p. 180, lines 4-10).

Throughout their therapeutic relationship, Mrs. McMillan asked Plaintiff in several of their sessions whether he was having any self-destructive thoughts. (McMillan Aff., ¶ 7; McMillan Dep., p. 29, lines 16-19, Counseling Records Dated 2/5/07, 2/19/07, 3/7/07, 4/26/07, 5/2/07, Ex.

5). Plaintiff denied all such inquiries. (McMillan Aff., ¶ 7; McMillan Dep., p. 179, lines 19-24, p. 180 lines 9-10).

On September 9, 2005, during Plaintiff's first therapy session with Mrs. McMillan, Plaintiff discussed previously having panic attacks. (McMillan Aff., ¶ 8; McMillan Dep., Counseling Record Dated 9/9/05, Ex. 5). Plaintiff stated that it had been seventeen months since he had a full blown panic attack, but opined that the panic attacks may be coming back. (Id.). Plaintiff also told Mrs. McMillan that he was previously diagnosed with depression, anxiety, and "ADD." (Id.). Plaintiff told Mrs. McMillan that he was taking the antidepressant medication "Lexapro." (Id.; Winders Dep., p. 27, lines 6-19).

Mrs. McMillan was unaware of Plaintiff having any history of violence towards others. (McMillan Aff., ¶ 5; McMillan Dep., p. 179, lines 19-20). At no time did Mrs. McMillan observe any violent or threatening behavior from Plaintiff. (McMillan Aff., ¶ 5; McMillan Dep., p. 180, lines 4-8).

Sometime after Plaintiff's return to VSU in February 2007, Mrs. McMillan started having concerns that Plaintiff needed an increase or change in medication because he appeared to be having mood swings. (McMillan Aff., ¶ 10; McMillan Dep., p. 38, lines 15-17, p. 39, lines 6-10,

8

Counseling Record Dated 3/2/07, Ex. 5; Winders Dep., McMillan Ex. 3).

As a result, on March 2, 2007, Mrs. McMillan called[2] Plaintiff's psychiatrist

to see if he would re-evaluate Plaintiff regarding a possible shift in

diagnosis. (McMillan Aff., ¶ 10; McMillan Dep., p. 38, lines 15-17, p. 39,

lines 6-10, Counseling Record Dated 3/2/07, Ex. 5; Winders Dep., p. 99,

lines 22-25, Phone Message Dated 3/2/07, McMillan Ex. 3). Mrs. McMillan

was only able to speak with a member of Dr. Winders' staff on March 2,

2007, but eventually got through to him on March 16, 2007. (McMillan

Aff., ¶ 10; McMillan Dep., Counseling Record Dated 3/16/07, Ex. 5;

Winders Dep., p. 99, lines 22-25, p. 100, lines 1-4, McMillan Ex. 3). In their

discussion on March 16, 2007, Dr. Winders and Mrs. McMillan discussed

Plaintiff's treatment plan and discussed her concerns regarding a potential

differential diagnosis. (McMillan Aff., ¶ 10, McMillan Dep., Counseling

Record Dated 3/16/07, Ex. 5; Winders Dep., p. 100, lines 5-9, McMillan Ex.

3).

On April 20, 2007, Major Ann Farmer ("Major Farmer") with the

VSU Police Department attended a meeting in President Ronald Zaccari's

---

[2] Mrs. McMillan had written authorization from Plaintiff to speak to Dr.
Winders regarding Plaintiff's treatment from February 5, 2007 through
August 13, 2007. (Winders Dep., p. 97, lines 13-25, p. 98, lines 1-11,
Authorizations For Release Of Records And Information, McMillan Exs. 1
& 2).

("President Zaccari") conference room.[3]  (Farmer Dep., p. 21, lines 1-5, p.

74, lines 7-12, Farmer Notes, Ex. 1; Zaccari Dep., p. 200, lines 19-25).

During this meeting President Zaccari stated that Plaintiff had made

assertive telephone calls to the Governor's office, the Chancellor's office,

and to Board of Regents' members.  (Farmer Dep., p. 19, lines 1-5, lines 20-

23, p. 20, lines 1-6, Ex. 1).    President Zaccari also stated that he previously

had a meeting with Plaintiff regarding his opposition to the VSU parking

deck.  (Id., p. 21, lines 19-25, Ex. 1).  After his previous meeting with

Plaintiff, President Zaccari stated that Plaintiff had sent him an e-mail that

referenced a government shutdown in 1985 and Easter Island.  (Id., p. 22,

lines 8-14, p. 23, lines 8-11, Ex. 1).  Additionally, President Zaccari stated

that his house alarm had gone off that past weekend at 3:00 a.m.  (Id., p. 30,

lines 1-3, Ex. 1).

President Zaccari also stated during the April 20, 2007, meeting that

Plaintiff had posted on the internet via Facebook a copy of a "Zaccari

memorial parking deck" with a picture of President Zaccari.  (Farmer Dep.,

p. 23, lines 20-23, Ex. 1).  A copy of Plaintiff's Facebook collage was

handed out at this meeting.  (Id., p. 23, lines 24-25, p. 24, line 1, Ex. 1;

---

[3] Mrs. McMillan was not at this meeting.  (Farmer Dep., p. 13, lines 24-25,
p. 14, lines 1-5; Zaccari Dep., p. 162, lines 19-20; Tanner Dep., p. 78, lines
13-22; McMillan Dep., p. 13, lines 14-16).

Zaccari Dep., p. 164, lines 1-6, Zaccari Memorial Parking Deck Collage, Ex.

10).  President Zaccari stated that seeing his name and picture associated

with a "memorial" caused him to feel threatened and that in the light of the

recent shootings at Virginia Tech he was concerned.  (Zaccari Dep., p. 134,

lines 7-21; Farmer Dep., p. 31, lines 8-18, p. 32, lines 5-10, Ex. 1).

During the April 20, 2007, meeting Access Office Director Dr.

Kimberly Tanner ("Dr. Tanner) talked about Plaintiff being registered with

her office.[4]  (Farmer Dep., p. 24, lines 18-20, Ex. 1).  Dr. Tanner had

Plaintiff's Access Office file with her at this meeting.  (Farmer Dep., p. 25,

lines 24-25, p. 26, lines 1-4; Tanner Dep., p. 83, lines 14-19).   Dr. Tanner

stated Plaintiff had been diagnosed with depressive disorder, panic disorder,

anxiety, agoraphobia, possible ADHD symptoms, and panic attacks that led

to his complete inability to function and resulted in visits to the emergency

room.  (Farmer Dep., p. 26, lines 6-20, p. 27, lines 11-17, Ex. 1; Zaccari

Dep., p. 280, lines 4-22).  Dr. Tanner also stated that Plaintiff's doctor had

---

[4] As Director of the Access Office, Dr. Tanner made arrangements for
students with disabilities to get access to various services on campus.
(Tanner Dep., p. 5, lines 7-8, lines 23-25, p. 6, lines 1-2).

indicated he should take advantage of on-going counseling.[5]  (Farmer Dep.,

p. 26, lines 17-20, Ex. 1).

"Quite awhile before" this April 20, 2007 meeting ever transpired, Dr.

Tanner had a one-on-one meeting with President Zaccari regarding Plaintiff.

(Tanner Dep., p. 22, lines 22-25, p. 23, lines 1-20, p. 68, lines 1-15).  During

this one-on-one meeting, Dr. Tanner had Plaintiff's Access Office file with

her.  (Id., p. 25, lines 16-18, p. 36, lines 11-13).  President Zaccari asked Dr.

Tanner whether she could provide him information regarding Plaintiff.  (Id.,

p. 23, lines 8-12, p. 24, lines 17-19).   Dr. Tanner[6] shared with President

Zaccari the contents of the letter sent to her office on August 28, 2006, by

Plaintiff's psychiatrist Dr. Winders.  (Id., p. 24, lines 21-25, p. 25, lines 1-

15, p. 36, lines 14-19, p. 37, lines 17-25, p. 38, lines 1-14 ; Defendant VSU's

Responses to Mrs. McMillan's First Request For Production of Documents,

Plaintiff's Access Office File, Letter from Dr. Kevin Winders dated 8/28/06;

Winders Dep., p. 43, lines 16-19, Ex. 3).

---

[5] All of this information regarding Plaintiff was originally stated in a letter
from Dr. Winders to the Access Office on August 28, 2006. (Defendant
VSU's Responses to Mrs. McMillan's First Request For Production of
Documents, Plaintiff's Access Office File, Letter from Dr. Kevin Winders
dated 8/28/06; Winders Dep., p. 43, lines 16-19, Ex. 3).

[6] At no time did Dr. Tanner discuss Plaintiff with Mrs. McMillan.  (Tanner
Dep., p. 93, lines 6-8; McMillan Aff., ¶ 37).

After attending the April 20, 2007, meeting Major Farmer ran a background check on Plaintiff. (Farmer Dep., p. 34, lines 21-25, p. 35, lines 1-3). The background check did not reveal any reports indicating Plaintiff had been in any trouble. (Id., p. 35, lines 1-3). Major Farmer then decided to call the Counseling Center. (Id., p. 36, lines 9-20). At this point, Major Farmer was trying to get as much information as she could about Plaintiff to allow her to make an informed decision on what she needed to do to protect President Zaccari and the University. (Id., p. 37, lines 19-24). Major Farmer believed that she could not yet rule out that Plaintiff posed a danger similar to that of the Virginia Tech shooter—Mr. Cho. (Id., p. 38, lines 3-7).

When Major Farmer called the Counseling Center on April 20, 2007, the secretary connected her to Associate Director Dr. John Grotgen ("Dr. Grotgen"). (Grotgen Dep., p. 11, lines 15-18, Counseling Record Dated 4/20/07, Ex. 1; Farmer Dep., p. 38, lines 8-15). Major Farmer explained to Dr. Grotgen that President Zaccari told her he had been threatened by a student named Hayden Barnes and that the threat was connected to the "Zaccari memorial parking deck." (Farmer Dep., p. 38, lines 20-24, p. 39, lines 4-5; Grotgen Dep., p. 13, lines 24-25, p. 14., lines 1-16, Ex. 1). Major Farmer told Dr. Grotgen that President Zaccari was in fear for his safety and

the VSU campus on account of Plaintiff.  (Grotgen Dep., p. 25, line 25, errata sheet, p. 25, line 25).

Major Farmer asked Dr. Grotgen whether Plaintiff was seeing someone at the Counseling Center.  (Farmer Dep., p. 38, lines 23-24; Grotgen Dep., p. 13, lines 24-25, Ex. 1).  Dr. Grotgen told Major Farmer that he would check and see if the Counseling Center had information that could be relayed to her.  (Grotgen Dep., p. 14, lines 12-13, Ex. 1).  Dr. Grotgen confirmed with his secretary that Plaintiff was a Counseling Center client.  (Id., p. 15, lines 8-18, Ex. 1).  Dr. Grotgen then called Major Farmer back and told her that Mrs. McMillan would be calling her.[7]  (Grotgen Dep., p. 14, lines 14-16, p. 15, line 25, p. 16, line 1, Ex. 1).

Dr. Grotgen then went to Mrs. McMillan and relayed to her the information discussed in his telephone call with Major Farmer.[8]  (Grotgen Dep., p. 16, lines 2-14, Ex. 1; McMillan Aff., ¶ 11; McMillan Dep., p. 9,

---

[7] Dr. Grotgen disclosed to Major Farmer that Plaintiff was a Counseling Center patient.  (Grotgen Dep., p. 25, lines 23-25, p. 26 lines 1-4; McMillan Dep., p. 8, lines 22-24; Farmer Dep., p. 40, line 25, p. 41, lines 1-3).

[8] Prior to it being reported to her by Dr. Grotgen that Plaintiff was allegedly upset about the construction of a parking deck on the VSU campus, Mrs. McMillan had no knowledge of the situation.  (McMillan Aff., ¶ 11; McMillan Dep., p. 9, lines 19-20, p. 58, lines 11-14; Farmer Dep., p. 42, lines 4-8, Ex. 2).

lines 4-8, p. 91, lines 17-25, p. 92, lines 1-16; Counseling Record Dated 4/20/07, Ex. 5). Dr. Grotgen told Mrs. McMillan that President Zaccari felt threatened, was concerned about the safety of the University, and had personal security following him. (Id.). Dr. Grotgen then instructed Mrs. McMillan to call Major Farmer. (Grotgen Dep., p. 26, lines 12-14, Ex. 1; McMillan Aff., ¶ 11; McMillan Dep., p. 9, lines 9-10, Counseling Record Dated 4/20/07, Ex. 5).

Following her phone call with Dr. Grotgen on April 20, 2007, Major Farmer received a telephone call from Mrs. McMillan. (Farmer Dep., p. 41, lines 4-5; McMillan Aff., ¶ 12; McMillan Dep., p. 11, lines 4-5). Major Farmer told Mrs. McMillan she knew Plaintiff was a Counseling Center client and was seeing her. (McMillan Aff., ¶ 12; McMillan Dep., p. 11, lines 4-9). Major Farmer went on to say that she had been in a meeting with President Zaccari where he stated he felt threatened by Plaintiff. (Farmer Dep., p. 41, lines 6-9; McMillan Aff., ¶ 12; McMillan Dep., p. 11, lines 8-9, Counseling Record Dated 4/20/07, Ex. 5). Major Farmer told Mrs. McMillan that she wanted to know if there was anything to indicate that Plaintiff was a threat to himself or anyone else. (Farmer Dep., p. 41, lines 6-11; McMillan Aff., ¶ 12; McMillan Dep., p. 12, lines 7-9).

In response to Major Farmer's inquiry, Mrs. McMillan described the current behaviors she had seen Plaintiff exhibit—grandiose thinking, narcissism at times, manic behavior at times, the tendency to become obsessed with situations, and being paranoid at times. (McMillan Aff., ¶ 12; McMillan Dep., p. 14, lines 13-17, p. 95, lines 5-12, Counseling Record Dated 4/20/07; Farmer Dep., p. 41, lines 13-25, p. 41, line 1, p. 74, lines 14-19, Farmer Notes, Ex. 2). Mrs. McMillan also referenced to Major Farmer that Plaintiff was not only seeing her but a psychiatrist as well. (McMillan Aff., ¶ 12; McMillan Dep., p. 14, lines 13-17; Farmer Dep., p. 41, lines 17-18, Ex. 2). Mrs. McMillan went on to state to Major Farmer that although she had concerns regarding some of Plaintiff's current behaviors, she had seen no evidence that Plaintiff was a threat to harm either himself or anyone else. (McMillan Aff., ¶ 12; McMillan Dep., p. 12, lines 11-19, p. 14, lines 13-17, p. 15, lines 5-10, p. 95, lines 8-9, Counseling Record Dated 4/20/07, Ex. 5; Farmer Dep., p. 41, lines 19-21, Ex. 2).

Mrs. McMillan provided the aforementioned information regarding Plaintiff to Major Farmer for several reasons. (McMillan Aff., ¶ 14; McMillan Dep., p. 15, lines 11-13). First, Mrs. McMillan believed that for Major Farmer to best understand her professional opinion that Plaintiff was not a threat to harm President Zaccari or anyone else, Major Farmer needed

16

context as to why Mrs. McMillan felt the way she did.  (McMillan Aff., ¶ 14; McMillan Dep., p. 12, lines 11-14, p. 14, lines 13-17, p. 15, lines 5-19, Counseling Record Dated 4/20/07, Ex. 5).  Secondly, Mrs. McMillan wanted to protect Plaintiff.  (Id.).  Major Farmer's phone call came four days after the shootings at Virginia Tech and Mrs. McMillan wanted Major Farmer to understand that she had never seen that type of behavior from Plaintiff.  (Id.).  Mrs. McMillan did not want "someone going to his dorm room and snatching him out" or for "anyone going after him."  (McMillan Aff., ¶ 14; McMillan Dep., p. 81, lines 13-17, p. 94, lines 13-15).

After discussing the situation with Mrs. McMillan, Major Farmer found out "exactly what [she] needed to know."  (Farmer Dep., p. 43, line 18).  According to Major Farmer, without[9] discussing her treatment of Plaintiff, Mrs. McMillan effectively communicated that Major Farmer "didn't have to worry about whether Plaintiff was a danger to anyone." (Id., p. 43, lines 16-20).

Although Mrs. McMillan did not believe Plaintiff was a threat to harm either President Zaccari or anyone else, Mrs. McMillan was concerned that

---

[9] At no time did Mrs. McMillan communicate with Major Farmer regarding the specifics of her treatment of Plaintiff.  (McMillan Aff., ¶ 12; McMillan Dep., p. 14, lines 24-25, p. 15, lines 1-2; Farmer Dep., p. 42, lines 23-25, p. 43, lines 1-4).

the person second in command at the VSU Police Department—Major

Farmer—was calling the Counseling Center to investigate whether Plaintiff

was a threat. (McMillan Aff., ¶ 15; McMillan Dep., p. 78, lines 16-22, p.

94, lines 8-12). Moreover, at the time of her telephone call with Major

Farmer on April 20, 2007, Mrs. McMillan did not have the opportunity to

speak with Plaintiff in order to assess the situation. (McMillan Aff., ¶ 15;

McMillan Dep., p. 101, lines 6-9). Therefore, Mrs. McMillan called

Plaintiff after speaking with Major Farmer in order to hear how he was

doing. (McMillan Aff., ¶ 15; McMillan Dep., p. 95, lines 14-18, p. 96, lines

24-25, p. 97, line 1, Counseling Record Dated 4/20/07, Ex. 5). Plaintiff told

Mrs. McMillan he felt fine and apologized for having missed his last

appointment. (McMillan Aff., ¶ 15; McMillan Dep., p. 95, lines 15-18,

Counseling Record Dated 4/20/07, Ex. 5). Plaintiff and Mrs. McMillan then

scheduled their next appointment for April 26, 2007, at 11:00 a.m. (Id.).

Major Farmer attended a second meeting[10] regarding Plaintiff in

President Zaccari's conference room a couple of days after April 20, 2007.

(Farmer Dep., p. 45, lines 9-20, p. 46, lines 14-19, p. 74, lines 21-24, Farmer

Notes, Ex. 3). During this second meeting attended by Major Farmer,

---

[10] Mrs. McMillan was not at this meeting. (McMillan Dep., p. 13, lines 14-16; Farmer Dep., p. 13, lines 24-25, p. 14, lines 1-5, p. 74, lines 21-24, Ex. 3).

President Zaccari discussed speaking with someone at the South Georgia Medical Center regarding Plaintiff having been terminated from his job. (Farmer Dep., p. 48, lines 17-24, Ex. 3). President Zaccari also discussed that he did not believe Plaintiff was going to meet his required 2.0 grade point average to stay in school and that he had received a phone call at his home where the caller asked for the business officer and hung up. (Id., p. 49, lines 10-25, Ex. 3). President Zaccari requested that campus police have someone around his office in case Plaintiff showed up. (Id., p. 49, lines 16-20).

Around lunch time on April 24, 2007, Mrs. McMillan was summoned to President Zaccari's office. (McMillan Aff., ¶ 16; McMillan Dep. p. 17, lines 12-14, p. 106, lines 6-9, Counseling Record Dated 4/24/07, Ex. 5; Zaccari Dep., p. 264, lines 9-10, lines 24-25, p. 265, line 1). The only people present were President Zaccari and Mrs. McMillan. (McMillan Aff., ¶ 16; McMillan Dep., p. 17, lines 13-14; Zaccari Dep., p. 264, lines 20-23). President Zaccari told Mrs. McMillan that he knew she had previously spoken with Major Farmer. (McMillan Aff., ¶ 16; McMillan Dep., p. 17, lines 14-15).

President Zaccari stated to Mrs. McMillan that he was very concerned about Plaintiff and was visibly shaken. (McMillan Aff., ¶ 16; McMillan

Dep., p. 17, lines 17-20).  President Zaccari stated that he had security

following him and he was very concerned for himself and the campus.

(McMillan Aff., ¶ 16; McMillan Dep.,  p. 17, lines 17-20, p. 106, lines 19-

20, Counseling Record Dated 4/24/07, Ex. 5).  President Zaccari stated that

Plaintiff had made indirect threats to him.  (McMillan Aff., ¶ 16; McMillan

Dep., p. 106, lines 9-10, Counseling Record Dated 4/24/07, Ex. 5).

President Zaccari articulated that Plaintiff had posted something on

Facebook regarding a memorial site and a piece regarding the shooter at

Virginia Tech.  (McMillan Aff., ¶ 16; McMillan Dep., p. 106, lines 10-15,

Counseling Record Dated 4/24/07, Ex. 5).

President Zaccari also stated during his one-on-one meeting with Mrs.

McMillan on April 24, 2007, that he had previously met with Plaintiff and

Dean Russ Mast where Plaintiff issued an apology, but thereafter continued

with his communications and blog.  (McMillan Aff., ¶ 16; McMillan Dep.,

p. 106, lines 15-18, Counseling Record Dated 4/24/07, Ex. 5).  Additionally,

President Zaccari told Mrs. McMillan that Plaintiff had contacted numerous

people across the state who were concerned about Plaintiff's behavior.

(McMillan Aff., ¶ 16; McMillan Dep., p. 106, lines 20-22, Counseling

Record Dated 4/24/07, Ex. 5).

In response to President Zaccari's statements during their meeting on April 24, 2007, Mrs. McMillan described to President Zaccari the current behaviors[11] of Plaintiff that she had seen—grandiose thinking, narcissism at times, manic behavior at times, the tendency to become obsessed with situations, and being paranoid at times. (McMillan Aff., ¶ 17; McMillan Dep., p. 106, lines 23-25, p. 107, line 1). Mrs. McMillan explained to President Zaccari that in addition to seeing her, Plaintiff was also seeing a psychiatrist with whom she had already been in contact with regarding a possible re-evaluation and medication change to address Plaintiff's current behaviors.  (McMillan Aff., ¶ 17; McMillan Dep., p. 17, lines 21-25, p. 18, lines 1-3, p. 107, lines 4-6, Counseling Record Dated 4/24/07, Ex. 5).  Mrs. McMillan went on to explain to President Zaccari that although she had concerns regarding some of Plaintiff's current behaviors, she had seen no evidence that Plaintiff was a threat to harm either himself or anyone else.[12]

---

[11] At no time did Mrs. McMillan discuss her treatment of Plaintiff with President Zaccari. (Zaccari Dep., p. 272, lines 19-22; McMillan Aff., ¶ 17; McMillan Dep., p. 48, lines 6-20).

[12] Although President Zaccari has testified that he "did not hear an opinion" from Mrs. McMillan during their one-on-one meeting on April 24, 2007, that Plaintiff "was a non-threat," he acknowledged it was possible he failed to hear such in light of his hearing impairment. (Zaccari Dep., p. 180, lines 11-17, p. 201, lines 11-12).

(McMillan Aff., ¶ 17; McMillan Dep., p. 18, lines 3-6, p. 107, lines 2-4,

Counseling Record dated 4/24/07, Ex. 5).

Mrs. McMillan did not share this information regarding Plaintiff to

President Zaccari in retaliation for Plaintiff's opposition to the construction

of a parking deck at VSU. (McMillan Aff., ¶ 18, ¶ 25).

Mrs. McMillan provided the foregoing information regarding Plaintiff to

President Zaccari during their one-on-one meeting on April 24, 2007, in

good faith and for several reasons. (McMillan Aff., ¶ 19; McMillan Dep., p.

48, lines 14-18). First, Mrs. McMillan believed that for President Zaccari to

best understand her professional opinion that Plaintiff was not threat to

himself or anyone else, he needed context as to why Mrs. McMillan felt the

way she did. (Id.). Therefore, in an attempt to allay President Zaccari's

fears, Mrs. McMillan explained Plaintiff's current behaviors—all of which

she believed were non-threatening. (Id.). Mrs. McMillan also believed that

informing President Zaccari that Plaintiff was seeing a psychiatrist in

addition to her, and that she had been in contact with Plaintiff's psychiatrist

regarding a re-evaluation and possible medication change to address his

current behaviors, would further alleviate any fears President Zaccari might

have that Plaintiff somehow posed a threat. (Id.).

Additionally, Mrs. McMillan's concern for Plaintiff's safety played a large role in her having communicated the foregoing to President Zaccari on April 24, 2007. (McMillan Aff., ¶ 20; McMillan Dep., p. 48, lines 14-18, p. 81, lines 14-17). The conversation Mrs. McMillan had with President Zaccari on April 24, 2007 took place shortly after the shootings at Virginia Tech. (Id.). Mrs. McMillan tried to communicate to President Zaccari that Plaintiff did not pose a similar threat. (Id.). Mrs. McMillan did not want the police snatching Plaintiff out of his dorm room or for anyone going after Plaintiff out of fear that he posed a threat similar to that of the Virginia Tech shooter. (Id.).

On April 25, 2007, Mrs. McMillan contacted Dr. Winders and discussed her having been told by President Zaccari that Plaintiff had threatened him and that the President was concerned.   (McMillan Dep., p. 39, lines 14-19, Counseling Record Dated 4/25/07, Ex. 5; Winders Dep., 4/25/07 Letter To Mrs. McMillan, Ex. 4). Mrs. McMillan also asked Dr. Winders to reevaluate Plaintiff and determine whether he was in need for a medication change and shift in diagnosis. (McMillan Dep., p. 111, lines 10-25, p. 112, lines 1-4, Counseling Record Dated 4/25/07, Ex. 5; Winders Dep., Ex. 4). Dr. Winders then sent Mrs. McMillan a letter on April 25, 2007, wherein he agreed to revaluate Plaintiff. (Winders Dep., Ex. 4).

23

On April 26, 2007, Mrs. McMillan was summoned to President

Zaccari's office for a second time.[13]  (McMillan Aff., ¶ 22; McMillan Dep.,

p. 19, line 25, p. 20, lines 1-5, p. 113, lines 14-17, Counseling Record Dated

4/26/07, Ex. 5).  Dr. Victor Morgan and Dr. Kurt Keppler were also in

attendance.  (Id; Morgan Dep., p. 17, p. 18, lines 17-22; Keppler Dep., p.

162, lines 5-17).   President Zaccari appeared very concerned about Plaintiff

and communicated to the group that he felt personally threatened.

(McMillan Aff., ¶ 22; McMillan Dep., p. 20, lines 7-8, p. 114, lines 1-2.

Counseling Record dated 4/26/07, Ex. 5; Morgan Dep., p. 20, lines 14-24;

Keppler Dep., p. 25, lines 3-25, p. 159, lines 1-4).  President Zaccari stated

that he was not sure what was going on with Plaintiff and opined that his

behavior had been very unpredictable.[14]  (Morgan Dep., p. 19, line 1, p. 20,

---

[13] The only meetings that Mrs. McMillan attended regarding Plaintiff where President Zaccari was present are described herein: one on April 24th and another on April 26th, 2007. (McMillan Aff., ¶ 33; McMillan Dep., p. 19, lines 21-25, p. 20, lines 1-5).  Mrs. McMillan was summoned to both meetings.  (Id.).

[14] Prior to this April 26, 2007, meeting VSU Dean of Students Russ Mast ("Dean Mast") and President Zaccari called Mrs. McMillan to see whether Plaintiff had made his appointment that day. (McMillan Aff., ¶ 23; McMillan Dep., p. 112, lines 13-25, p. 113, lines 1-7, Counseling Record Dated 4/26/07, Ex. 5).  Mrs. McMillan does not know for sure how President Zaccari and Dean Mast knew she was scheduled to meet with Plaintiff that morning.  Mrs. McMillan told both President Zaccari and Dean Mast that Plaintiff was at the time a no show.  (Id.).  Mrs. McMillan did not share

24

lines 1-4).  President Zaccari showed the group various documents Plaintiff

had posted on Facebook.[15]  (McMillan Aff., ¶ 22; McMillan Dep., p. 150,

lines 16-25, Plaintiff's Facebook Postings, Exs. 10 & 11).  President Zaccari

expressed he felt threatened by these documents.  (McMillan Aff., ¶ 22;

McMillan Dep., p. 151, lines 15-25, Exs. 10 & 11; Morgan Dep., p. 20, lines

5-6, lines 14-17).  President Zaccari also stated that he and his wife had been

receiving hang up telephone calls at home.  (Morgan Dep., p. 20, lines 18-

20).  Additionally, President Zaccari stated that he had been involved in a

situation at a prior university where a student had threatened him and his

family and he felt that the present situation with Plaintiff was very similar to

that.  (Morgan Dep., p. 20, lines 7-11).

President Zaccari also indicated during the April 26, 2007, meeting

that he was interested in finding a way to remove Plaintiff from school

because he felt threatened for his safety and that of the VSU campus.

(Morgan Dep., p. 22, lines 17-20).  Mrs. McMillan told President Zaccari

that although she had some concerns about some of Plaintiff's current

---

anything further regarding Plaintiff to either President Zaccari or Dean Mast.
(Id.).

[15] The first time Mrs. McMillan can pinpoint ever seeing Plaintiff's Facebook
blog regarding the construction of the parking deck at VSU was around the
time of this meeting on April 26, 2007.  (McMillan Dep., p. 149, lines 22-
25, p. 150, p. 151, lines 1-22, Ex. 10).

behaviors and wanted to have him re-evaluated, she was not concerned about Plaintiff being a threat to the President or anyone else. (McMillan Aff., ¶ 24; McMillan Dep., p. 20, lines 23-25, p. 21, lines 1-2, p. 35, lines 11-13, Counseling Record Dated 4/26/07, Ex. 5; Morgan Dep., p. 21, lines 3-11, p. 22, lines 21-23, p. 23, lines 7-10; Keppler Dep., p. 163, lines 5-11; Zaccari Dep., p. 290, lines 15-24). Dr. Morgan told President Zaccari that he did not believe Plaintiff could be withdrawn from VSU for mental health reasons due to Mrs. McMillan having stated that Plaintiff had no known history of violence towards others or himself and he was not communicating to her any present desires to harm President Zaccari. (Morgan Dep., p. 22, lines 21-25). Dr. Morgan stated Plaintiff was complying with everything that the Counseling Center was asking of him—seeing his counselor on a regular basis, seeing his psychiatrist, and taking his medication as prescribed by his psychiatrist. (Id., p. 22, line 25, p. 23, lines 1-11).

Before the conclusion of this April 26, 2007, meeting Mrs. McMillan's secretary called the President's office and informed his secretary that Plaintiff had mixed up his appointment time and was waiting for Mrs. McMillan over at the Counseling Center. (McMillan Aff., ¶ 24; McMillan Dep., p. 20, lines 9-22, p. 113, lines 14-24, Counseling Record Dated 4/26/07, Ex. 5; Zaccari Dep., p. 287, lines 9-14). President Zaccari's

secretary then interrupted the meeting and relayed this information to the group.  (Id.).  Before leaving the meeting to go have her session with Plaintiff, Mrs. McMillan urged the group that Plaintiff needed to be allowed to finish his finals.  (McMillan Aff., ¶ 24; McMillan Dep., p. 20, line 22, p. 35, lines 16-21).

The comments Mrs. McMillan made to President Zaccari during the aforementioned April 26, 2007, meeting were not made out of retaliation for Plaintiff's opposition to the construction of a parking deck at VSU. (McMillan Aff., ¶ 25; McMillan Dep., p. 48, lines 14-18; p. 81, lines 14-17). Mrs. McMillan's comments were made in an attempt to allay any fears President Zaccari may have held regarding Plaintiff and to try to help and protect Plaintiff.  (Id.).

During their therapy session on April 26, 2007, for the first time Plaintiff brought up and discussed with Mrs. McMillan his opposition to the construction of the parking deck at VSU.  (McMillan Aff., ¶ 26; McMillan Dep., p. 56, lines 23-25, p. 58, lines 9-14, Counseling Record Dated 4/26/07, Ex. 5).  One of the things Plaintiff and Mrs. McMillan discussed during this session was the Facebook blog Plaintiff had created regarding the construction of the parking deck at VSU.  (McMillan Aff., ¶ 26, Ex. 2; McMillan Dep., p. 58, lines 15-16).  Plaintiff stated he believed President

Zaccari was upset with him over the Facebook blog. (McMillan Aff., ¶ 27; McMillan Dep., p. 58, lines 17-19).

Therefore, Mrs. McMillan talked with Plaintiff regarding the possibility of there being better ways for him to have gone about expressing his views about the parking deck than the Facebook blog he created. (McMillan Aff., ¶ 27; McMillan Dep., p. 57, lines 1-10). Mrs. McMillan did not perceive Plaintiff's Facebook blog as threatening. (McMillan Aff., ¶ 27; McMillan Dep., p. 118, lines 21-24). However, she asked Plaintiff to be careful in the future that the behaviors and mannerisms he used in expressing his views could not be perceived by others as aggressive or threatening. (McMillan Aff., ¶ 27; McMillan Dep., p. 117, lines 23-25, p. 118, line 1). Mrs. McMillan told Plaintiff that she believed he could "catch more flies with honey than with vinegar." (McMillan Aff., ¶ 27; McMillan Dep., p. 57, line 3).

Mrs. McMillan has never been opposed to Plaintiff's having protested the construction of the parking deck at VSU. (McMillan Aff., ¶ 26; McMillan Dep., p. 60, lines 17-18). To the contrary, Mrs. McMillan believed it was appropriate for Plaintiff to have political views and to want to fight what he felt were social injustices. (McMillan Aff., ¶ 26; McMillan Dep., p. 57, lines 3-10). Mrs. McMillan did however believe that the

manner in which Plaintiff's Facebook blog was presented was inappropriate because she perceived it to be disrespectful to President Zaccari. (McMillan Aff., ¶ 26; McMillan Dep., p. 118, lines 21-25, p. 119, lines 1-11).

Mrs. McMillan asked[16] Plaintiff during their April 26, 2007, session whether he was a threat to himself or to others and discussed his possibly having a mood disorder. (McMillan Aff., ¶ 28; McMillan Dep., p. 66, lines 22-25, p. 115, lines 10-24, Counseling Record Dated 4/26/07, Ex. 5). Plaintiff told Mrs. McMillan that he was not a threat to himself, President Zaccari, or anyone else. (McMillan Aff., ¶ 28; McMillan Dep., p. 115, lines 10-12, p. 116, lines 9-12, Counseling Record Dated 4/26/07, Ex. 5). Plaintiff also agreed to be re-evaluated by Dr. Winders. (McMillan Aff., ¶ 28; McMillan Dep., p. 57, lines 15-16. p. 115, lines 20-25, p. 116, lines 1-5, Counseling Record Dated 4/26/07, Ex. 5).

───────────────────

[16] At no time was Mrs. McMillan directed or tasked by President Zaccari to seek out Plaintiff and ask specific questions regarding whether Plaintiff was feeling suicidal or was experiencing any problems. (McMillan Aff., ¶ 21; McMillan Dep., p. 67, lines 13-18; Morgan Dep., p. 73, lines 19-24). Moreover, Plaintiff's therapy session with Mrs. McMillan on April 26, 2007, was not the first time she had asked Plaintiff whether he had any current desires to harm himself or anyone else. (McMillan Aff., ¶ 30; McMillan Dep., p. 29, lines 16-23, p. 67, lines 3-4, Counseling Records Dated 2/5/07, 2/19/07, & 3/7/07, Ex. 5). Mrs. McMillan asked Plaintiff these types of questions periodically throughout their therapeutic relationship. (Id.).

Following Mrs. McMillan's counseling session with Plaintiff on April 26, 2007, she called Dr. Winders. (McMillan Dep., Counseling Record Dated 4/26/07, Ex. 5; Winders Dep., p. 61, lines 22-25, pp. 62, lines 1-6, Lunesta Notepad Dated 4/26/07, Ex. 6). During their conversation, Mrs. McMillan discussed the treatment session she had just had with Plaintiff and shared that Plaintiff had denied having any suicidal or homicidal ideations. (McMillan Dep., Counseling Record Dated 4/26/07, Ex. 5; Winders Dep., p. 62, lines 22-25, Ex. 6). Plaintiff also called Dr. Winders' office on April 26, 2007, and attempted to schedule an appointment. (Winders Dep., p. 102, lines 11-22, p. 103, lines 1-20, Note Dated 4/26/07, McMillan Ex. 5). Plaintiff called Dr. Winder's office again on April 27, 2007, and an appointment was set up for him to see Dr. Winders on April 30, 2007. (Winders Dep., p. 105, lines 23-25, p. 106, lines 1-23, Note Dated 4/27/07, McMillan Ex. 6).

Plaintiff met with Dr. Winders on April 30, 2007. (Winders Dep., p. 55, lines 12-20, p. 106, lines 21-23). During their session, Plaintiff discussed the parking issue at VSU with Dr. Winders and stated that he becomes passionate about things and sometimes does not know when to back off. (Id., p. 56, lines 4-5). Plaintiff also told Dr. Winders that he was having some up and down days, as well as some depression—which he did

not feel was severe.  (Id., p. 56, lines 7-8).  Plaintiff denied having any panic

at the time.  (Id., p. 56, lines 8-9).

Plaintiff also brought a three page memo he had authored with him to

his visit with Dr. Winders on April 30, 2007.  (Winders Dep., p. 56, lines 23-

25, p. 57, lines 1-5, p. 107, lines 17-19, 3 Page Memo, Ex. 5).  Plaintiff

expressed with Dr. Winders that he planned to share this three page memo

with Mrs. McMillan.  (Id., p. 111, lines 5-16, Winders Letter Dated 5/2/07,

Ex. 7).  In Plaintiff's memo, he states that "I understand that school

counselors are in a tough spot right now following Virginia Tech in terms of

risky students.  I am insulted I am thought as one."  (Winders Dep., Ex. 5, p.

1).  Additionally, Plaintiff stated that he can become "obsessive at times"

about his "causes," that he "can be a little paranoid at times," that he has

"social anxiety compounded by poor self-image," and that he often has "a

difficult time figuring out how people see [him]."  (Id.).  Dr. Winders was

concerned with Plaintiff's three page memo because it sounded to him like

Plaintiff was anxious, obsessive, and had low self-esteem.  (Winders Dep.,

61, lines 10-13).  According to Dr. Winders, he thought that Plaintiff

appeared more anxious than the last time he saw him.  (Id., lines 20-21).

On May 2, 2007, Dr. Winders wrote Mrs. McMillan a letter regarding

having seen Plaintiff on April 30, 2007.  (Winders Dep., p. 64, lines 2-10,

31

Winders Letter Dated 5/2/07, Ex. 7).  In his letter to Mrs. McMillan, Dr.

Winders stated that Plaintiff was doing fairly well but had admitted to

having "some unresolved obsessiveness," becoming "over-passionate about

certain issues," having "racing thoughts," and "mood cycling."  (Id., Ex. 7,

p. 1).  As a result of this reevaluation, Dr. Winders increased Plaintiff's

medication to target his symptoms of anxiety, depression, and obsessiveness.

(Id.).    Dr. Winders also concluded that there was "nothing" in his meeting

with Plaintiff that "led [him] to believe [Plaintiff] was dangerous to himself

or others."  (Id.)

Also on May 2, 2007, Plaintiff and Mrs. McMillan had a therapy

session.  (McMillan Aff., ¶ 29; McMillan Dep., p. 124, lines 14-19,

Counseling Record Dated 5/2/07, Ex. 5).  During this session, Plaintiff

discussed with Mrs. McMillan his being offended by her having asked him

during their session on April 26, 2007, whether he was a threat to harm

anyone but he understood Mrs. McMillan's concerns.  (McMillan Aff., ¶ 29;

McMillan Dep. p. 66, lines 6-11, p. 124, lines 19-21, Counseling Record

Dated 5/2/07, Ex. 5).  Mrs. McMillan gave Plaintiff the option of switching

counselors, but Plaintiff stated that he wished to stay with Mrs. McMillan.

(McMillan Aff., ¶ 29; McMillan Dep., p. 66, lines 6-11, p. 124, lines 15-17,

Counseling Record Dated 5/2/07, Ex. 5).  Plaintiff reiterated during this May

2, 2007, session with Mrs. McMillan that he had no suicidal or homicidal ideations and had no desire to harm anyone. (McMillan Aff., ¶ 29; McMillan Dep., p. 125, lines 2-5, Counseling Record Dated 5/2/07, Ex. 5).

During their May 2, 2007, session Mrs. McMillan and Plaintiff also discussed Dr. Winder's decision to increase his medication following the re-evaluation on April 30, 2007. (McMillan Aff., ¶ 31; McMillan Dep., p. 124, line 25, p. 125, line 1, Counseling Record Dated 5/2/07, Ex. 5; Winders Dep., Ex. 7). Additionally, Mrs. McMillan and Plaintiff discussed the possibility of having Mrs. McMillan write a detailed letter to the administration at VSU with supporting documentation stating that she did not believe Plaintiff was a threat to anyone. (McMillan Aff., ¶ 32; McMillan Dep., p. 125, lines 18-20, p. 126, lines 21-23, p. 127, lines 24-25, p. 128, lines 1-4, Counseling Record Dated 5/2/07, Ex. 5). Plaintiff's next appointment with Mrs. McMillan was scheduled for May 10, 2007, at 9:00 a.m. (McMillan Aff., ¶ 32; McMillan Dep., p. 126, lines 4-5, Counseling Record Dated 5/2/07 Ex. 5).

On May 3, 2007, a meeting was held regarding Plaintiff in President Zaccari's office. (Morgan Dep., p. 25, lines 7-13, p. 26, lines 8-9; Farmer Dep., p. 74, line 25, p. 75, lines 1-4, Farmer Notes, Ex. 4; Keppler Dep., p. 150, lines 19-21). Mrs. McMillan was not at this meeting. (McMillan Aff.,

33

¶ 33; McMillan Dep., p. 187, line 25, p. 188, lines 7-20, Counseling Record

Dated 5/3/07, Ex. 5; Tillman Aff., ¶¶ 3-5; Morgan Dep., p. 26, line 7;

Farmer Dep., p. 13, lines 24-25, p. 14, lines 1-5; Zaccari Dep., p. 291, lines

8-10).  Mrs. McMillan was away from the VSU campus the entire day due to

her attendance at a conference at St. Simons Island, which she returned from

on May 6, 2007.  (McMillan Aff., ¶ 33; McMillan Dep., p. 188, lines 7-20;

Tillman Aff., ¶¶ 3-5).

At this May 3, 2007, meeting President Zaccari discussed

administratively withdrawing Plaintiff from VSU.  (Morgan Dep., p. 26,

lines 19-25, p. 27, lines 1-7).   President Zaccari explained to those in

attendance "that he, the President, can withdraw any student from campus if

he feels that they pose a danger and that he is planning to administratively

withdraw Mr. Barnes"—an "administrative withdrawal coming from the

President."  (Id., p. 27, lines 1-7).  Discussion then ensued regarding how to

notify Plaintiff he was being administratively withdrawn.  (Morgan Dep., p.

27, lines 17-20, p. 28, lines 11-17, p. 29, lines 18-21).

There was a third meeting regarding Plaintiff that Mrs. McMillan was

summoned to attend, but this meeting was conducted by University Attorney

Laverne Gaskins.  (McMillan Aff., ¶ 34).  On May 7, 2007, Ms. Gaskins

summoned Mrs. McMillan to her office.  (McMillan Aff., ¶ 34; McMillan

Dep., p. 33, lines 12-15, Counseling Record Dated 5/7/07, Ex. 5).  Dr.

Morgan and Dr. Keppler were also present at this meeting.  (Id.; Gaskins

Dep., p. 11, lines 3-9, lines 20-25, p. 12, lines 1-8; Morgan Dep., p. 31, lines

23-25, p. 32, lines 1-8).  Ms. Gaskins stated during this short meeting that

Plaintiff may be withdrawn from VSU.  (McMillan Aff., ¶ 34; McMillan

Dep., p. 33, line 17, Ex. 5; Morgan Dep., p. 33, lines 12-22).  Mrs. McMillan

stated that she did not believe Plaintiff was a threat to himself or others.

(McMillan Aff., ¶ 34; McMillan Dep., p. 33, lines 18-20).

During the early evening hours on May 7, 2007, Plaintiff called Mrs.

McMillan and informed her that he had received a letter from President

Zaccari administratively withdrawing him from VSU.  (Barnes Dep., p. 232,

lines 12-14, p. 233, lines 9-25, lines 21-25, Zaccari Letter Dated 5/7/07, Ex.

3; Zaccari Dep., Ex. 18; McMillan Dep., p. 133, lines 8-12, Counseling

Record Dated 5/7/07, Ex. 5).  Plaintiff read President Zaccari's letter to Mrs.

McMillan over the phone.  (Barnes Dep., p. 234, lines 9-18; McMillan Dep.,

p. 133, lines 8-25, p. 134, lines 1-11, Counseling Record Dated 5/7/07, Ex.

5).  Mrs. McMillan invited Plaintiff to come to her office the next day so that

they could discuss President Zaccari's letter face to face.  (Barnes Dep., p.

235, lines 20-24; McMillan Dep., p. 134, lines 1-4, Counseling Record

Dated 5/7/07, Ex. 5).  Plaintiff also discussed with Mrs. McMillan the

possibility of her writing a letter on his behalf in response to President

Zaccari's administrative withdrawal letter. (Barnes Dep.,  p. 235, line 25, p.

236, lines 1-5; McMillan Dep., p. 134, lines 1-4, Counseling Record Dated

5/7/07, Ex. 5).

On May 8, 2007, Mrs. McMillan rearranged her schedule in order to

help Plaintiff respond to President Zaccari's administrative withdrawal

letter. (McMillan Dep., p. 137, lines 21-24).  During their meeting on May

8, 2007, Plaintiff asked Mrs. McMillan to write a letter on his behalf to

President Zaccari and the Board of Regents in an attempt to get him

reinstated to VSU.  (Barnes Dep., p. 237, lines 10-18; McMillan Dep., p.

138, lines 1-5, Counseling Record Dated 5/8/07, Ex. 5).  Plaintiff also had

Mrs. McMillan review a rough draft of a letter that his mother sent to

President Zaccari in an attempt to get him reinstated to VSU.  (Barnes Dep.,

p. 238, lines 2-11, p. 239, lines 4-12, p. 240, lines 22-24, Kelly J. Burke

Draft Letter Dated 5/8/07, Ex. 6; McMillan Dep., p. 136, lines 6-7; Burke

Dep., Ex. 12).  Mrs. McMillan believed that if Plaintiff acquired supporting

letters from her and Dr. Winders, Plaintiff would satisfy the conditions set

forth in President Zaccari's administrative withdrawal letter to regain

admittance to VSU.  (McMillan Dep., p. 135, lines 21-25, p. 136, lines 1-5).

Mrs. McMillan then wrote a letter on Plaintiff's behalf to President

Zaccari and the Board of Regents, wherein she once again stated she did not

believe Plaintiff was a threat to harm himself or anyone else.[17]  (Barnes

Dep., p. 246, lines 3-16; McMillan Letter Dated 5/8/07, Ex. 11; McMillan

Dep., p. 145, lines 9-17, McMillan Letter Dated 5/8/07, Ex. 8).  Mrs.

McMillan hand-delivered this letter to President Zaccari on May 8, 2007.

(McMillan Dep., p. 146, lines 8-25, p. 147, lines 1-2; Zaccari Dep., p. 294,

lines 19-25, p. 295, line 1).  Dr. Winders also wrote a letter on Plaintiff's

behalf to President Zaccari on May 8, 2007.  (Winders Dep., p. 68, lines 18-

25, p. 69, lines 1-2, Winders Letter Dated 5/8/07, Ex. 8).  Attached to Mrs.

McMillan's May 8, 2007, letter to President Zaccari and the Board of

Regents was Dr. Winder's letter.   (McMillan Dep., p. 145, lines 20-25).

Plaintiff ultimately appealed his administrative withdrawal to the

Board of Regents.  In doing so, Plaintiff relied on Mrs. McMillan's letter.

(Barnes Dep., p. 246, lines 20-23, p. 247, lines 2-12, lines 24-25, p. 248, p.

249, lines 1-23, Barnes Letter To Board Of Regents Dated 5/21/07, Ex. 12,

---

[17] Plaintiff and Mrs. McMillan executed a number of releases authorizing her
and the Counseling Center to release his records directly to the Office of the
President, Board of Regents, and VSU Student Affairs Office. (Barnes
Dep., p. 236, lines 6-19, p. 237, lines 1-3, p. 243, lines 1-3, lines 8-24, p.
244, lines 1-23, Authorizations For Release Of Records And Information,
Exs. 5, 8, 9, 10).

Barnes Letter To Board Of Regents, Bate Stamped B000358-B000363, Ex.

13).

Additionally, Plaintiff asked Mrs. McMillan to summarize her therapy

notes of her sessions with him to assist in his appeal to the Board of Regents.

(Barnes Dep., p. 250, lines 14-17, p. 251, lines 1-8). To that end, on

December 11, 2007, Mrs. McMillan wrote a letter to Plaintiff's attorney

wherein she summarized her therapy notes from her sessions with Plaintiff.

(Barnes Dep., p. 250-251, p. 252, lines 1-9, McMillan Letter Dated

12/11/07, Ex. 14; McMillan Dep., p. 53, lines 2-15, McMillan Letter Dated

12/11/07, Ex. 2). Mrs. McMillan also assisted Plaintiff's lawyer obtain his

VSU Counseling Center records, which were used to assist with Plaintiff's

appeal to the Board of Regents and with filing this lawsuit. (Barnes Dep., p.

253, lines 8-25, p. 254, lines 10-12, p. 255, lines 12-15, Brigham Bowen

Letter Dated 12/5/07 With Corresponding Authorization, Ex. 15). On

January 17, 2008, the Board of Regents, following its consideration of

Plaintiff's appeal, rescinded President Zaccari's decision to administratively

withdraw Plaintiff from VSU. (Plaintiff's Responses To Mrs. McMillan's

First Request For Admissions, Interrogatories, And Production Of

Documents, Board Of Regents Letter Dated 1/17/08, Bate Stamp #

B000002).

President Zaccari made the final decision to administratively
withdraw Plaintiff from VSU.  (Zaccari Dep., p. 226, lines 8-10, lines 20-21,
line 25, p. 234, lines 19-20, p. 235, lines 4-8, p. 292, lines 23-24; Morgan
Dep., p. 27, lines 1-7, lines 17-20, p. 28, lines 10-17; Farmer Dep., p. 62,
lines 22-24).  At no time did Mrs. McMillan ever recommend to President
Zaccari, or anyone else, that Plaintiff should be administratively withdrawn
from VSU.  (McMillan Aff., ¶ 35; Zaccari Dep., p. 291, lines 14-16).

Despite receiving Mrs. McMillan's May 8, 2007, letter indicating that
Plaintiff was not a threat, President Zaccari continued with his
administrative withdrawal of Plaintiff from VSU.  (Zaccari Dep., p. 249,
lines 7-13, p. 258, lines 4-7, p. 259, lines 14-23, p. 300, lines 3-17,
McMillan Letter Dated 5/8/07, Ex. 23).

## II. ARGUMENT AND CITATION OF AUTHORITY

A. **Summary Judgment Is Warranted On Behalf Of Mrs.
McMillan Due To Her Entitlement To Qualified Immunity.**

Pursuant to the qualified immunity doctrine "government officials
performing discretionary functions generally are shielded from liability for
civil damages insofar as their conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person would have
known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  When deciding
whether entitlement to qualified immunity is appropriate, courts are to

determine (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right was "clearly established" at the time of the defendant's alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). As shown below, Mrs. McMillan is entitled to qualified immunity because Plaintiff cannot show she committed a constitutional violation, nor can he demonstrate she violated any clearly established law.

### 1. Plaintiff Cannot Establish A Constitutional Violation Against Mrs. McMillan.

### i. Plaintiff's First Amendment Retaliation Claim.

A plaintiff must establish three elements to prove a First Amendment retaliation claim: (1) protected speech; (2) retaliatory action that adversely affected his protected speech; and (3) a causal relationship between the protected speech and the retaliatory action. Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005). The causation prong "asks whether the defendant[] was subjectively motivated" by the plaintiff's protected speech. Moulds v. Bullard, 2009 U.S. App. Lexis 18296 at * 14 (11th Cir. Aug. 17. 2009), quoting Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008). The reason for this is that a plaintiff alleging First Amendment retaliation must "do more than make general attacks upon a defendant's motivations and must [instead] articulate affirmative evidence of retaliation to prove the

requisite motive." <u>Colquitt v. Ellegood</u>, 2009 U.S. Dist. Lexis 23305 at *

14-15 (M.D. Fla. March 20, 2009), <u>citing Crawford-El v. Britton</u>, 523 U.S.

574, 600 (1998). Where a plaintiff fails to show a causal relationship

between his protected speech and a defendant's alleged retaliatory action,

summary judgment is appropriate. <u>Marsh v. Florida Dept. of Corrections,</u>

2009 U.S. App. Lexis 10649 at * 8 (11th Cir. May 18, 2009) (upholding

summary judgment where the "complaint fails to allege any facts showing a

causal connection between the defendants' conduct and [plaintiff's having

filed] earlier cases.").

   As set forth above, Plaintiff has baldly characterized "the Defendants'

actions" in this case as having been part of a conspiracy "to expel [him]

from VSU" in "retaliation for [the] exercise of his First Amendment

freedoms." (Doc. 1, Count 3, ¶ 86). The record evidence however shows

that such a claim against Mrs. McMillan must fail.

   To begin, in regard to the second and third prongs of the

aforementioned First Amendment retaliation test, Plaintiff has <u>admitted</u> he

has no evidence that Mrs. McMillan's actions were retaliatory. <u>Bennett</u>, 423

F.3d at 1250 (11th Cir. 2005). As Plaintiff stated in his deposition "I don't

have any specific evidence for [Mrs. McMillan] releasing information prior

to my administrative withdrawal in retaliation for my beliefs regarding the

parking garage, to my knowledge." (Barnes Dep., p. 262, lines 8-14). When asked to produce evidence that Mrs. McMillan's actions were allegedly retaliatory during the course of written discovery, Plaintiff stated that "[u]pon reasonable inquiry, the information known or reasonable obtainable . . . is insufficient to admit or deny" such inquiries. (Plaintiff's Responses To Mrs. McMillan's First Request For Admissions, Interrogatories And Production Of Documents, Response To RFA Nos. 1, 2, 4, 7). Plaintiff failed to supplement these responses.

Additionally, the record evidence establishes that time and time again Mrs. McMillan advocated on Plaintiff's behalf—belying any notion that she somehow retaliated against him for the exercise of his First Amendment rights. Before Plaintiff was administratively withdrawn from VSU by President Zaccari, Mrs. McMillan explained to the President twice in person that she did not believe Plaintiff was a threat to anyone and urged the President to allow Plaintiff to remain enrolled at VSU. (McMillan's Statement of Undisputed Material Facts, ¶¶ 40, 51).[18] Moreover, prior to her being summoned to speak with President Zaccari, upon inquiry from the VSU police department, Mrs. McMillan similarly stated she did not believe

---

[18] In order to ensure an easier reading for the Court, where appropriate, Mrs. McMillan cites to her statement of undisputed material facts where her full citations are set forth in their entirety.

Plaintiff posed a threat.  (Id., ¶ 27).  Additionally, upon being summoned to speak with the University Attorney prior to Plaintiff's administrative withdrawal, Mrs. McMillan stated again that she did not believe Plaintiff posed a threat to himself or others.  (Id., ¶ 72).

Immediately after Plaintiff was administratively withdrawn by President Zaccari, Mrs. McMillan spoke with Plaintiff after hours regarding the situation and arranged to meet with him in person the following morning. (Id. ¶ 73).  When the two met the next day, Mrs. McMillan reviewed a letter of support his mother prepared to send to President Zaccari and also wrote her own letter on Plaintiff's behalf to President Zaccari and the Board of Regents, which she hand-delivered to President Zaccari that afternoon.[19] (Id., ¶¶ 74, 75).  Mrs. McMillan also assisted Plaintiff's attorney in this case obtain his VSU Counseling Center records and went so far as to summarize her therapy notes so that Plaintiff's attorney could better understand them. (Id., ¶ 78).  Plaintiff then turned around and used the letter of support authored by Mrs. McMillan, as well as the documentation she helped him procure, to successfully have his administrative withdrawal overturned by

_____

[19] Mrs. McMillan also made sure that Dr. Winders' letter of support was attached to her's.  (Defendant McMillan's Statement of Undisputed Material Facts, ¶ 76).

the Board of Regents. (McMillan Statement of Undisputed Material Facts, ¶¶ 74-79).

Furthermore, Mrs. McMillan was not even at the May 3, 2007, meeting where Plaintiff contends it was "decided" he be expelled from VSU "without any due process." (Doc. 1, ¶ 51; McMillan's Statement of Undisputed Material Facts, ¶ 70). Instead, Mrs. McMillan attended a conference at St. Simons Island and was away from the VSU campus the entire day. (Id.). The only reason the Court allowed Plaintiff's case to proceed against Mrs. McMillan was due to Plaintiff having alleged Mrs. McMillan was at the May 3, 2007, meeting that "resulted in the expulsion of Barnes." (Doc. 43, pp. 3-4).

The record evidence similarly shows that Plaintiff cannot establish the third prong of the applicable First Amendment retaliation test against Mrs. McMillan either. Bennett, 423 F.3d at 1250. As the evidence demonstrates, Mrs. McMillan did not retaliate against Plaintiff in response to his exercising his First Amendment rights. (McMillan's Statement of Undisputed Material Facts, ¶¶ 28, 32, 33, 41, 42, 45, 54, 56, 57, 58). Instead, Mrs. McMillan's discussion of Plaintiff's current mental health status, upon inquiry from the VSU Police and President Zaccari, was done in an attempt to help and protect Plaintiff—not in retaliation for Plaintiff's opposition to the

construction of a parking garage at VSU.   (Id.).   As a result, Mrs. McMillan's actions were not subjectively motivated out of retaliation for Plaintiff's having exercised his free speech, making it impossible for Plaintiff to show affirmative evidence of retaliation on Mrs. McMillan's behalf.  Moulds, 2009 U.S. App. Lexis 18296 at *14, quoting Smith, 532 F.3d at 1278; Colquitt, 2009 U.S. Dist. Lexis 23305 at *14-15, citing Crawford-El, 523 U.S. at 600.

### ii.  Plaintiff's Due Process Claims.

Plaintiff has also filed procedural and substantive due process claims against the defendants in their individual capacities for "expelling him from VSU" without a "fair and open hearing."  (Doc. 1, Count 4, ¶ 94).[20]  The Court previously held that at the motion to dismiss stage these claims were

---

[20] Mrs. McMillan respectfully submits that Plaintiff's asserted right to an education does not give rise to substantive due process protection as said right is not fundamental.  See Plyler v. Doe, 457 U.S. 202, 223 (1982) ("Nor is education a fundamental right."); Lewis v. Brown, 409 F.3d 1271, 1272-73 (11th Cir. 2005) ("[A]reas in which substantive rights are created only by state law . . . are not subject to substantive due process protection under the Due Process Clause because substantive due process rights are created only by the Constitution.") (internal quotations and citation omitted).  Nor is it a state created right for which substantive due process protection is available, as Plaintiff's administrative withdrawal from VSU constitutes an "executive act" for which substantive due process protection does not apply.  See id. at 1273 ("Executive acts characteristically apply to a limited number of persons (and often to only one person)").  (internal quotations and citation omitted).

viable because Plaintiff had alleged that "the defendants failed to provide
[Plaintiff] with any sort of notice of the May 3 meeting or even an
opportunity to present a defense on his own behalf." (Doc. 37, p. 24).
(Emphasis added). The record evidence however establishes that Plaintiff's
due process claims against Mrs. McMillan must fail as she did not make the
decision (nor did she have the authority) to administratively withdraw
Plaintiff from VSU and to the contrary advocated for him to remain enrolled.

First, Mrs. McMillan did not participate in or attend the May 3rd
meeting where the decision was allegedly made to remove Plaintiff from
VSU. (McMillan's Statement of Undisputed Material Fact, ¶¶ 70, 82).
Moreover, even if Mrs. McMillan could have been there, as a staff counselor
she had no authority to administratively withdraw Plaintiff from VSU. (Id.,
¶ 83).

Secondly, Mrs. McMillan never recommended to President Zaccari
that Plaintiff should be administratively withdrawn from VSU. (Id., ¶ 81).
To the contrary, Mrs. McMillan stated to President Zaccari twice in person
prior to his administrative withdrawal that she did not believe Plaintiff was a
threat to anyone and urged him to allow Plaintiff to stay in school. (Id., ¶¶
40, 51). Additionally, the day after Plaintiff's administrative withdrawal,
Mrs. McMillan hand delivered to President Zaccari a letter addressed to him

and the Board of Regents advocating for Plaintiff to remain enrolled at VSU. (Id., ¶ 75). After receiving Mrs. McMillan's letter of support for Plaintiff, President Zaccari nonetheless made the decision to keep Plaintiff's administrative withdrawal in place—further attenuating any notion that Mrs. McMillan's actions somehow caused Plaintiff to be deprived of his due process rights. (Id., ¶ 84). The decision to withdraw Plaintiff from VSU was President Zaccari's.[21] (Id., ¶ 80).

### iii. Plaintiff Does Not Have A Legally Cognizable Breach Of Confidentiality Claim Against Mrs. McMillan.

Plaintiff's Complaint does not assert a breach of confidentiality cause of action against Mrs. McMillan. Nonetheless, Plaintiff spent a great deal of energy trying to advance this theme during discovery.[22] The bottom line however is that Plaintiff does not have a legally cognizable breach of confidentiality claim against Mrs. McMillan. See Crawford v. The City of

---

[21] President Zaccari has acknowledged that the final call he made to administratively withdraw Plaintiff from VSU was based on his evaluating a number of different things and coming up with a certain conclusion—the conclusion being to withdraw Plaintiff from VSU and to do it in the manner in which it was ultimately carried out. (Zaccari Dep., p. 294, lines 5-9).

[22] Plaintiff apparently has forgotten that he actually suggested that "[h]ad a representative of the administration contacted the VSU Counseling Center, it would have been quickly determined that I was regularly meeting with counselor Ms. Leah McMillan" and "was under the care of a psychiatrist." (Plaintiff's Supplemental Discovery Responses, Bate Stamp No. B002382).

Tampa, 2009 U.S. Dist. Lexis 3491 at * 3 (M.D. Fla. Jan. 9, 2009) ("this

Court previously ruled that no private right of action exists under HIPAA or

the ADA for the unauthorized disclosure of medical records."); citing Acara

v. Banks, 470 F.3d 569, 570-72 (5th Cir. 2006); Reid v. Purkey, 2007 U.S.

Dist. LEXIS 14163 (E.D. Tenn. Feb. 26, 2007) ("HIPAA regulations do not

confer a private right of action on an individual. The plaintiff's only remedy

for an alleged HIPAA violation is to lodge a written complaint with the

Secretary of Health and Human Services, through the Office for Civil

Rights, who has the discretion to investigate the complaint and impose

sanctions, both civil and criminal.").

### 2. Plaintiff Cannot Establish Mrs. McMillan Violated Clearly Established Law.

Even assuming Plaintiff could somehow establish First Amendment

retaliation and due process claims against Mrs. McMillan, she is nonetheless

entitled to qualified immunity from said claims as the law supporting their

existence was not clearly established prior to her conduct.

"For a constitutional right to be clearly established, its contours must

be sufficiently clear that a reasonable official would understand that what he

is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002)

(internal citations and quotations omitted). Indeed, government officials

must have "fair and clear warning" that their conduct violated a

constitutional right before they lose their shield of qualified immunity.
Thomas v. Roberts, 323 F.3d 950, 953 (11th Cir. 2003) (citing Hope, 536
U.S. at 746).

Furthermore, the Supreme Court has held that a "necessary
concomitant" to the question of whether a plaintiff has alleged a violation of
a clearly established federal right is "the determination of whether the
plaintiff has asserted a violation of a constitutional right at all." Siegert v.
Gilley, 500 U.S. 226, 232 (1991). If a defendant has not violated the law at
all, he certainly has not violated clearly established law. See GJR Invs., Inc.
v. County of Escambia, 132 F.3d 1359, 1366-67 (11th Cir. 1998).

As set forth above, the record evidence and well-settled case law
governing this case establishes that Plaintiff has not presented a viable First
Amendment retaliation or due process claim against Mrs. McMillan.
Nevertheless, even if we assume that the evidence could somehow make this
showing, Mrs. McMillan is still entitled to qualified immunity as no official
in her position would have known that her conduct amounted to a
constitutional violation.  (See discussion supra, pp. 39-49).

## III.   **CONCLUSION**

Based upon the foregoing, Mrs. McMillan respectfully requests that this Court grant her motion for summary judgment.

This 23<u>rd</u> day of <u>December</u>, 2009.

_____
Matthew R. LaVallee
Georgia Bar No. 438196
Attorney for Defendant
LEAH McMILLAN

**DALEY, KOSTER & LAVALLEE, LLC**
Overlook I, Suite 160
2849 Paces Ferry Road
Atlanta, GA 30339
(678) 213-2401 (phone)
(678) 213-2406 (facsimile)
mlavallee@dkllaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

THOMAS HAYDEN BARNES,

    Plaintiff,

v.

RONALD M. ZACCARI, et al.,

    Defendants.

CASE NO.
1:08-cv-00077-CAP

## CERTIFICATE OF SERVICE

This is to certify that on December 23, 2009, pursuant to Appendix H of the Court's Local Rules, App H-11, a paper copy of **DEFENDANT LEAH MCMILLAN'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT UNDER SEAL** was filed under seal in person with the Clerk of Court.

Pursuant to this Court's June 18, 2009, Consent Protective Order [Doc. 95], Mrs. McMillan provides notice that on December 23, 2009, a copy of **DEFENDANT LEAH MCMILLAN'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT UNDER SEAL** was served on

51

all counsel of record listed below by electronic means and via United States Mail:

**<u>Attorneys for Plaintiff</u>**
Robert Corn-Revere, Esq.
Chris A. Fedeli, Esq.
Erin Reid, Esq.
Davis Wright Tremaine, LLP
1919 Pennsylvania Ave NW Ste 200
Washington, DC 20006
<u>bobcornrevere@dwt.com</u>
<u>chrisfedeli@dwt.com</u>
<u>erinreid@dwt.com</u>

Cary Stephen Wiggins, Esq.
Cook Youngelson & Wiggins
260 Peachtree St NW Ste 401
Atlanta, GA 30303
<u>cary@wigginslawgroup.com</u>

**<u>Attorney for the Valdosta State University Defendants</u>**
David C. Will, Esq.
Holly Hance, Esq.
Royal Washburn Will
4799 Sugarloaf Parkway
Building J
Lawrenceville, GA 30044
<u>dwill@royallaw.net</u>
<u>hhance@royallaw.net</u>

**<u>Attorney for Defendant Laverne Gaskins</u>**
David R. Smith, Esq.
Brannen Searcy & Smith
PO Box 8002
22 E 34th St
Savannah GA 31412-8002
<u>Dsmith@brannenlaw.com</u>

Matthew R. LaVallee
Georgia Bar No. 438196
Attorney for Defendant
LEAH McMILLAN

**DALEY, KOSTER & LAVALLEE, LLC**
Overlook I, Suite 160
2849 Paces Ferry Road
Atlanta, GA 30339
(678) 213-2401 (phone)
(678) 213-2406 (facsimile)
mlavallee@dkllaw.com