IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THOMAS HAYDEN BARNES,      )
                             )
      Plaintiff,            )
                             )
      v.                 )      Civil Action File No.:
                             )      1:08-CV-0077-CAP
RONALD M. ZACCARI, *et al.,*   )
                             )
      Defendants.       )

---

## BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## THE ACTION

The action complained of is the decision by the then President of Valdosta State University ("VSU"), Dr. Ronald Zaccari, to "administratively withdraw" the Plaintiff from VSU. Specifically, the Plaintiff was advised by letter of May 7, 2007 that he was administratively withdrawn from VSU, and that he would have an opportunity for readmission and continued enrollment upon meeting certain conditions. Exhibit ("Exh.") 1. Plaintiff's counsel, throughout the course of this litigation, has misrepresented and mischaracterized the action, incorrectly referring to it as an "expulsion." An "expulsion" is a specific form of discipline, and is defined in

the VSU Student Handbook as a "permanent severance of the student's relationship with the University." Exh. 2.

The "administrative withdrawal" is clearly not an expulsion. The action did not permanently sever the relationship as it contemplated conditions for Barnes to return to VSU and was not taken for disciplinary reasons.

## THE REMAINING CLAIMS

Barnes' claims under Count 1 and 2 were dismissed by the Court. Document # 37 (Order on Motions to Dismiss, hereinafter "MTDO") at 6-10. Counts 3 and 4 remain with claims against Defendants Zaccari, Keppler, and Mast in their *individual* capacities under § 1983 in the context of alleged violations of the First Amendment and the Due Process Clause. Id at 10-25. Count 5 remains as a claim for breach of contract against only Defendants VSU and the Board of Regents ("BOR"). Id at 26. Counts 6 and 7 remain as Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) claims against Defendants Zaccari, Keppler, Mast, VSU, and BOR (*official* capacities only). Id at 27-29.

## QUALIFIED IMMUNITY

1) Does one take action to mitigate foreseen potential damages, or 2) does one move on with fingers crossed hoping for good fortune? The optimist's argument is alas the inherent trap for the pessimists: in hindsight, mitigated damages yields the

absence of tragic proof that the pessimist was correct; and upon review, the pessimist's actions are seen as throwing the baby out with the bath water. The other inherent trap is this: when the pessimist, with certain duties to act, was correct in his speculations about future tragedy, but takes no action, he becomes the scapegoat of the victims of his own negligence. See Exhs. 3,4,5 (wrongful death actions filed by the parents of two (2) deceased victims of the Virginia Tech Massacre against a panoply of Virginia Tech administrators). The pessimist is thus damned if he does and damned if he doesn't.

In this case, the Optimist has filed a lawsuit against the Pessimists in hopes to teach the Pessimists a lesson. It is far easier for the Optimist to cast the first stone as the Optimist has no duties and asserts rights only. The Optimist has the benefit of hindsight, and shows there is no resulting tragedy. The Pessimists, with the fruits of the discovery process will now demonstrate why they should receive this immunity and deference *as a matter of law*. . . .

To receive qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful act occurred." Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002). Qualified immunity analysis involved two discrete queries. First, we must decide whether the facts alleged, assuming they are true, demonstrate that the defendants violated a

constitutional right.  If this is answered in the affirmative, we proceed to the second inquiry, which it to determine whether the right violated was clearly established. Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004).  That is, liability will attach if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  United States v. Lanier, 520 U.S. 259, 270 (1997).

Here, it is undisputed that each Defendant was acting within his/its discretionary authority.  MTDO at 13.  VSU's general counsel, Defendant Gaskins, stated that the situation presented in the Barnes matter was not one that she had ever encountered before as university counsel.  Gaskins Depo at 190.  In deciding whether Barnes' claims survive summary judgment, we decide whether these Defendants should be penalized for their discretionary acts when they lack proof of an actual tragedy.  The more novel the question, the higher the use of discretion required to answer the question.  A review of the following facts demonstrate President Zaccari's sound exercise of discretion:

THE FACEBOOK COLLAGE & OTHER STRAWS ON THE CAMEL'S BACK

Barnes re-enrolled at VSU to start the new semester in January, 2007. Complaint ("Comp.") at 8.  On March 22, 2007, the VSU newspaper, The Spectator, ran an article about VSU's plans to construct a parking deck on campus.  Comp. at 9.

On March 25, 2007, Barnes posted a series of fliers on the VSU campus expressing his opposition to parking deck. Comp. at 9. On March 26, 2007, members of SAVE, the VSU environmental student group, informed Barnes that President Zaccari was aware of the fliers and wanted to know if SAVE was behind it. Comp. at 10. President Zaccari regularly held an open house wherein his door was open for students to share their opinions with him. Zaccari Aff. at ¶ 2. President Zaccari was familiar with SAVE from this process. Zaccari Aff. at ¶ 3.

Barnes took down the fliers and sent a letter of apology to President Zaccari. Comp. at 10; Exh.6. Based on Barnes behavior at this point, President Zaccari acknowledged that Barnes had resolved his issue with the deck. See Exh. 7. Furthermore, his apology letter reassured President Zaccari that related "the Facebook group and blog have been deleted." Exh. 6.

However, to the contrary, Barnes' re-ignited his Facebook theater to personally include President Zaccari. On April 13, 2007, Barnes posted a collage on his Facebook account entitled "SAVE-Zaccari Memorial Parking Garage." Comp. at 10-11; Exh. 8. On or about April 13, 2007, Barnes called members of the BOR, urging them to stop the construction of the parking deck. Comp. at 11. On April 16, 2007, Barnes phoned Michael Miller, the project manager of the parking garage. Comp. at 11. Upon learning of Barnes' calls, BOR Vice Chancellor Linda Daniels contacted

President Zaccari to ask if Barnes planned to disrupt the BOR meeting the next day. Comp. at 11. Barnes had contacted President Zaccari at some point to request a meeting with him. Zaccari Aff. at ¶ 5. In response to Daniels' concerns, on April 16, 2007, President Zaccari requested that Barnes come to his office to discuss the parking deck. Zaccari Aff. at ¶ 5. Barnes stated, "I will defeat the parking deck," and that he had no interest in utilizing S.A.V.E. or the Student Government Association as an avenue for his mission. Zaccari Aff. at ¶ 6.

At some point, the VSU campus learned of the Virginia Tech mass shooting tragedy, which has occurred earlier in the day on April 16, 2007. Panic ensued on campuses all across the country, and VSU was not alone in their calls from concerned parents and students. Zaccari Aff. at ¶ 7.

Relentless in his vendetta against the parking deck and President Zaccari, later that same day, while the nation was experiencing shock and grieving the loss of student lives at Virginia Tech, Barnes sent President Zaccari two (2) follow up emails convinced that the President was all wrong in his thinking. Comp. at 12-13; Exhs. 9,10. In these emails, Barnes describes what things inspire him to "resort to adversarial tactics," and that he does so when is "see[s] something going forward that fundamentally shakes [his] moral core . . . ." Exh. 9. Barnes could not put it to rest.

He was going to get a reaction out of President Zaccari, one way or another; and accordingly, his behavior escalates.

On April 19, 2007, Barnes' letter to the editor of the VSU Spectator was published. Exh. 11; Comp. at 13. On April 20, 2007, Barnes emailed the President a cryptic email with a sarcastic allusion to a "business plan." Exh. 12. Later that day, President Zaccari is given a copy of Barnes' Zaccari Memorial Facebook collage.

## THE APRIL 20, 2007 STAFF MEETING

The first staff meeting called by President Zaccari occurred on April 20, 2007, and the following were the attendees: Major Ann Farmer (VSU Campus Police), Thressea Boyd (Zaccari's Administrative Assistant), Defendant Gaskins (VSU General Counsel), Dr. Tanner (Director of the VSU Access Office (for disabilities accommodations)), and Defendant Mast (Dean of Students). Farmer Depo. at 13, 18, 21. President Zaccari informed the attendees of his grave fear at Barnes' Facebook collage threat to somehow **memorialize him after his death**, the persistence of Barnes' communications, and the references to Easter Island and lack of a "business plan." Farmer Depo. at 22-23, 30. The President discussed his inability to anticipate what Barnes' next step may be, and the concern that his next step may be an irrational and dangerous one. Farmer Depo at 23,22. President Zaccari also informed the attendees of Barnes' general position opposing the parking deck, certain methods

Barnes had used to communicate that position, and of his first meeting with Barnes at the President's office. Farmer Depo. at 19-20, 21. The President informed the attendees that he had been contacted by Linda Daniels who was concerned that Barnes might disrupt the next BOR meeting. Farmer Depo. at 24.

The attendees also learned that Barnes had started at VSU on academic probation in the Fall of 2005 and remained on it today. Farmer Depo. at 24. The President reviewed Barnes' academic record and Barnes' consistent academic deficiencies were noted. Barnes had attempted many courses and withdrawn from them, had moved around through different academic institutions, had not completed his core curriculum, was taking many courses not focused on completing his elected degree, and had changed majors several times. It was also noted that Barnes had registered for Witchcraft and foreign languages, when he was still lacking his required math courses. Zaccari Aff. ¶ 8.

Dr. Tanner informed the attendees that Barnes was registered at the Access Office. Farmer Depo. at 24. Dr. Tanner showed that Barnes had voluntarily disclosed some psychological disorders, had a long-term psychiatrist (Dr. Kevin Winders), and had been hospitalized for his disorders due to an inability to function. Farmer Depo. at 26.

Major Farmer documented Barnes's full name and date of birth in order to conduct an investigation. Farmer Depo. at 24. The President informed the attendees that his home alarm system had been triggered at 3:00 AM the past weekend due to an unidentified security breach. Farmer Depo. at 30.

After the April 20th meeting, Major Farmer initiated police procedures to protect the campus. Farmer's Depo. at 34. Major Farmer arranged for back-up for President Zaccari's next public appearance for a speech he was to give at Drexel Park, a park near the campus. Farmer Depo. at 34, Morgan Depo at 20. Major Farmer, on her own volition, also made a call to the VSU Counseling Center to inquire into any possibilities of dangerous mental health conditions. Farmer Depo. at 36. No one at the University, nor anyone else, suggested this to Major Farmer. Farmer Depo. at 36. Specifically, Major Farmer stated that she chose to act this way because there was a concern after Virginia Tech that

> "there were different parts of the University that had information about this young man; and whether or not they could have stopped the violence, who knows. . . . But it was certainly worth trying to get as much information as I could possibly could to make an informed decisions or to do what I could do protect the University. For me, I was concerned about Dr. Zaccari; but there was a bigger picture and that was the University. He lived on campus, and I

was trying to see what I could find to see if there were indicators that maybe,

you know, this was going to become bigger problem."

Farmer's Depo. at 37-38.    In response to a question from counsel, "Were you

concerned that he could possibly be a Cho from Virginia Tech?  Hayden Barnes?,"

Major Farmer replied, "I wasn't going to rule it out.  But I had limited information,

and that's why I was trying to get more information."  Farmer Depo. at 38.  After

leaving a message with the Counseling Center, Defendant McMillan phoned Major

Farmer and informed her of the following symptoms regarding Barnes:  1) general

anxiety disorder, 2) panic disorder, 3) sometimes he would get an idea in his head and

he couldn't let it go; 4) seeing a psychiatrist, 5) McMillan was concerned about him,

6) irrational thought pattern, 7) A.D.D., 8) obsession, 9) paranoia, 10) increased

paranoia, 11) increased irrational thoughts, and 12) bipolar schizo-affective disorder.

Farmer Depo at 41-42.  Major Farmer arranged for extra campus police protection for

the President at his next regularly scheduled "open meeting" at his office.  Farmer

Depo at 49, 51.

President Zaccari role as a public servant with overtime commitment as the

final decision maker and senior defender of his campus, became a much bigger deal

after the tragedy at Virginia Tech.  It yielded a daunting increase in responsibilities to

concerned parents and students, and a daunting increase in potential liabilities for

accusations of neglect of duties.  Morgan Depo at 39; Zaccari Aff. ¶ 7; Farmer Depo at 38.  It was *distinctly* a time when the responsibilities of the presidents of universities and other university staff were developing exponential implications and nuances.  Morgan Depo at 39.  In the midst of this post-Virginia Tech massacre atmosphere, Barnes exhibited atypical student behavior.  The more that was learned about Barnes, the more problematic it became.

<u>BARNES, THE HISTORICAL TROUBLEMAKER</u>

The first college Barnes attended was Warren Wilson where he quickly failed out.  Barnes Depo. at 57.  Barnes transferred to VSU for the Fall Semester 2005, where he began on academic probation.  He took a year off at VSU and then re-enrolled for Spring Semester 2007, where he began on academic probation once again.  Barnes Depo. at 59.

On May 2, 2007, twelve (12) days after the Easter Island business plan email, sixteen (16) days after the Virginia Tech Massacre, less than one (1) month after Barnes' posting of the Zaccari Memorial Facebook collage, and prior to the decision being made to withdraw Barnes from VSU, Barnes requested special permission to construct a **weapon**, an African bow with a slinging spear called an atlatl, which he planned to keep in his campus dorm.  Exh. 13.

Barnes became employed as a paramedic with South Georgia Medical Center in Valdosta in the Fall of 2006, and continued working during the beginning the semester in question in this lawsuit. Exh. 14. Barnes was fired from this job on or about February 1, 2007, for several disciplinary reasons including: grave concerns on the ability of Barnes to function as a paramedic without direct supervision, "having to help Barnes find his radio and issued gear, more than once," having a habit of walking away from radio, missing radio traffic even after being counseled about such," and "driving through a red light without even slowing to see if cross traffic was coming." Exh. 14; <u>see also</u> Farmer Depo at 48-49.

These collectively were viewed as potential trouble.

<u>BARNES' MENTAL HEALTH HISTORY</u>

Barnes volunteered to Defendant McMillan a thorough autobiographical statement of his mental health and other related history when he began treatment at the VSU Counseling Center. Exh. 15. In this document he discloses without prompting: 1) being rejected in high school, 2) being deprived of family support and stability, 3) biting himself "hard enough to draw blood on a regular basis," 4) giving himself bloody noses by running in the wall, 5) being expelled from high school, 6) antisocial behavior, 7) psychiatric medication never working, 8) being a "heated and raging liberal activist," 9) "smoking pot two or three times a day," 10) being accused

of rape, 11) a Dean of Students (from a former college) "[having] it out for [his] head," 12) "despis[ing] authority," 13) holding a "deeply held passive-aggressive anger towards anyone or anything that holds sway over [his] life . . . [including] school administrators, the government, etc.," 14) having "unfulfilling relationships," 15) having "addictive tendencies," 16) "dissociative feelings . . . occurring recently with increasing regularity," 17) "being an angry liberal with . . . anarchist tendencies." Exh. 15.    Barnes attached a curriculum vitae that listed as proved accomplishments 1) being "Suspen[ded] for Distribution of Anti-War Fliers," 2) "Violat[ing] . . . school policy prohibiting dissemination of illicit literature," 3) "receiv[ing] detention for refusal to remove campaign button during school hour," 4) being "escorted from Congressional representative's office by Capitol Police," and 5) being "escorted from the lobby of World Bank Headquarters by Secret Service." Exh. 16.

In a letter dated May 17, 2004, to Dr. Winders, Barnes' terrified mother pleads for psychiatric intervention after an incident where Barnes stated that he was "going crazy" and that Barnes had "moved around [her] room like a caged animal, with minimal control." Exh. 17.

Barnes had a history of self-evaluation and self-treating with his assortment of psychiatric drugs. He would stop taking prescribed medication despite doctor's order based on his own self-diagnosis. Barnes Depo at 66, Exhs. 18,19.  He would also

decide to leave therapy treatment whenever he believed that he did not need it anymore. Barnes Depo. at 80.

Barnes communicated with Dr. Kimberly Tanner, Director of the Access Office at VSU, venting to her about, inter alia, his perceived unsuccessful and "tense" meeting with the Director of the General Studies major program at VSU, his frustrations at the Housing Department allegedly reneging on their "guarantee" of his housing space, and finally his specific instructions to Dr. Tanner how she should obtain a faculty member's *promise* to be his mentor, *without knowing Barnes' identity*. Exh. 20.

Barnes record was almost a check list for behavior that university administrators were warned about after the Virginia Tech Massacre and for what mental health clinicians list for propensities for violence. Exh. 21; see also McMillan Depo at 196. Furthermore, President Zaccari was advised to err on the side of caution to campus safety. "[BOR Senior Lawyer Betsey Neely's] advice was you do what you need to do to protect the campus and worry about the lawsuit later, but you do what you need to do to protect that campus." Gaskins Depo at 54; Zaccari Aff. at ¶ 9.

Defendants' Expert Dr. Norman confirms that "a reasonable mental health clinician could have deemed Mr. T. Hayden Barnes a present dangerous person on or about April and May 2007 . . . ." Exh. 21 at 6.

Barnes argues that he had already satisfied the requirements of the letter noticing Barnes of his administrative withdrawal with the letters sent by Dr. Winders and Defendant McMillan in early May 2007. Comp. at 20; see Exh. 22,23,24. Dr. Winders' letters do NOT rule out a potential for danger. See Exh. 22,23; see also Gaskins Depo at 164. One of Winders' letters lists Barnes' "unresolved obsessiveness," being "over-passionate," "racing thoughts," suggested an increase in prescribed psychological drug dosage, and contemplated a potential need for "second opinion." Exh. 22. Dr. Winders' letter of May 8, 2007 contains clues that he had been misinformed about the facts. He states that "Hayden had the insight to 'drop' the anti parking campaign after the Virginia Tech tragedy . . . ." Exh. 23. He also recommends that Hayden be re-enrolled at VSU so that he could "finish this semester." Exh. 23. Barnes did not drop the parking deck issue after the Virginia Tech Massacre, and Barnes had already completed the semester.

McMillan's letter does NOT rule out the potential for danger. Exh. 24. McMillan also discloses that she had "bec[o]me concerned Hayden could be decompensating," and for Barnes' "impulsive behavior, grandiose ideologies,

narcissistic behavior, obsessive behavior and thought[s] . . . and absolute thinking." Exh. 24. Moreover, McMillan's letter was limited to her counseling sessions with him and her experience with him, and, at that point, she did not have the full picture on Barnes. Morgan Depo at 21; McMillan Depo at 201-02. Specifically, Barnes states in his deposition, of his relationship with Defendant McMillan, "There is a lot that [Leah McMillan] doesn't know about me." Barnes Depo at 206. McMillan had, moreover, indicated in her professional records, "that she had also been concerned about changes that -- in his behavior that she might be needing to talk to his psychiatrist about." Morgan's Depo at 38. And that "although she didn't indicate she felt he was a danger to the President or anyone else, she did indicate that she had some concerns that might be decompensating or becoming more disorganized or more impulsive and that the whole issue might have caused him to become more intense in terms of how he dealt with it." Morgan Depo at 38. Defendant McMillan, during this time, had also independently come to the conclusion that Barnes would benefit from a semester off of school in the Summer Semester 2007. McMillan Depo at 224. Moreover, McMillan is not a non-university mental health professional, as required by the withdrawal notice letter to Barnes. Exh. 1. Finally, even if it could be proved that one clinician ruled out Barnes potential for danger, it should be noted that The Virginia Tech shooter was also adjudged by two (2) mental health

professionals to NOT be a danger to himself or others.    Exh. 25 at the 4th,17th,18th,22nd pages.

It is not surprising that Dr. Norman's position is different from that of Dr. Winders and McMillan's assessment of Barnes' potential for dangerousness.    Their opinions are suspect due to their bias toward a therapeutic alliance to their patient. Norman Depo at 146-48.    Dr. Winders had been treating Barnes since he was a boy. Barnes Depo at 62.    Defendant McMillan was indeed motivated to demonstrate professional protection of Barnes, a litigious individual, as she learned in May 2007, as he might be out to tarnish her professional reputation and damage her future livelihood.    Morgan Depo at 37 (where Dr. Morgan discusses a conference call held with McMillan's malpractice insurance carrier and related lawyer).

## THE APRIL 23, 2007 STAFF MEETING

The second meeting called by President Zaccari occurred on or about April 23, 2007, and the following were the attendees:    Major Farmer, Thressea Boyd, Defendant Mast, and Laverne Gaskins.    Farmer Depo at 45.    Recalling          the previous information received at the April 20th meeting the Friday before, the President reported that someone had made anonymous phone calls to the his home. Farmer Depo. at 49.    The male caller spoke softly and repeated several times, without identifying himself, "Is this the business officer?," an obvious reference to Barnes'

previous email to President Zaccari regarding Easter Island and having a "business plan." This caller would then hang up. Farmer Depo. 49; see also Morgan Depo at 20, 58.

Barnes seemed impervious to the fear after the Virginia Tech Massacre occurred and spent no time mourning the nation's loss. Without curbing his aggressions, and less than a week after the Virginia Tech Massacre, while other college students faced real fears for their safety, Barnes was ready on Monday morning (April 23, 2007) to fire off another shot at President Zaccari to prove that he was not a number, he was *a name*. A hand-delivered a letter from Barnes to President Zaccari arrived at the President's office, wherein Barnes demanded to be exempt from the mandatory student fee which he believed to be earmarked for the parking deck construction. Farmer Depo. at 47; Exh. 26. Also within this cryptically delivered letter was a message to President Zaccari that Barnes would be ordering the President a book entitled "Collapse," written by the author of "Gun, Germs, and Steel." Further, Barnes stated, "I am willing to accept and be held responsible for the potential losses that may result . . ." Exh. 26; Farmer Depo. at 47. The security of the President's quarters on campus was compromised by this activity; and the message was bizarre and very poorly timed.

On April 23, 2007, President Zaccari was apprised on the recent postings on Barnes Facebook including a posting from Barnes that he was "cleaning out and rearranging his room and thus, his mind or so he hopes," and a link to an article sympathizing with the mentally ill and mentioning the Virginia Tech shooter; and posting that read: ""Shoot it. Upload it. Get Famous. Project Spotlight is searching for the next big thing. Are you it?"]. Comp. at 14; Exh. 27; Farmer Depo at 49.

## THE MAY 3, 2007 STAFF MEETING

The next meeting President Zaccari called was on May 3, 2007, and the following were in attendance:  Thressea Boyd, Defendant Gaskins, Dr. Morgan (Director of the VSU Counseling Center), Defendant Keppler, Dr. Tanner, Defendant Mast, and Major Farmer.  Farmer's Depo. at 53.  This was not a meeting where there was retaliation against Barnes, as Plaintiff suggests.  To the contrary, it was a meeting called for the President to announce his decision.   Barnes right to appeal the withdrawal at the BOR level was anticipated.  Largely of the President's concern about Barnes' rights is that he, and other attendees, advocated that Barnes would not be withdrawn until after his final exams were completed; and that in his notice of withdrawal letter to Barnes would contemplate Barnes's "readmission and continued enrollment" at VSU.  Farmer's Depo at 57; see also Morgan Depo at 28,29; Exh. 1.

President Zaccari heeded Defendant Gaskins' advice that "the administrative withdrawal could contain requirements or conditions one of which could be re-evaluation in three to four months from now based on information obtained over the summer." Farmer Depo. at 61. President Zaccari's intent was to merely temporarily remove Barnes from campus, only for "a while." Farmer Depo at 61. Specifically, the President wanted a "strong statement from a psychiatrist that supported that the student was not a threat and that if Hayden was removed, he had the right to appeal to Atlanta." Farmer Depo. at 62. During these meetings, no one spoke up to state that Barnes posed no danger to the campus. Gaskins Depo at 136. President Zaccari relayed Betsey Neely's (Attorney for the BOR) support for his concerns for Barnes' dangerousness. Gaskins Depo at 136. There was no retaliation, but rather a focused, reasoned, and rational, yet difficult and unprecedented decision to conduct an administratively withdrawal. Farmer Depo at 62-63.

## THE RISK OUTWEIGHED THE HARM

After the Virginia Tech Massacre occurred, the University received hundreds of phone calls from parents concerned about "copy cat" shooters. President Zaccari wished to avoid any increased attention to the situation especially during finals week. Farmer Depo. at 56. A disturbance would have disrupted and prolonged the semester, and could have prompted irrational reactions from Barnes or action against him.

President Zaccari noted at the May 3, 2007 Staff Meeting that he "didn't want to cause an uproar that could cause a flashpoint." Farmer's Depo. at 57; see generally Aff. Zaccari.

President Zaccari's process and considerations during this time demonstrate a sensitive and calculated approach. Illustrative is President Zaccari's letter to Betsey Neely dated June 21, 2007:

> "I took what I believed to appropriate action and minimize campus focus on Mr. Barnes and his documented behavior by not scheduling a judicial hearing. The exigency of the circumstances dictated action that would not invite alarm. A campus hearing would have involved a judicial panel comprised of students and faculty. This format would have alerted the campus of a potential threat, and would have compr[om]ised campus safety by exacerbating potential harm."

Exh. 28 at 4 of 8. President Zaccari perceived a need to remove Barnes from this situation before he began a new semester, Zaccari Aff. ¶ 10. The new semester would start on May 8, 2007, he was not sure what Barnes was capable of, he wasn't sure that Barnes would strike out immediately or not; he just knew for certain it was imperative that Barnes not worsen and that Barnes needed a cooling off period. Zaccari Aff. at ¶ 10. Even his therapist, Ms. McMillan, was going to recommend that

Barnes take a semester off. McMillian Depo at 224. The need to assure campus safety outweighed the risk of a failure to act. Zaccari Aff. at ¶ 9; see also Exh. 28 at 6 of 8.

On April 26, 2007, at President Zaccari's request, Defendant Gaskins contacted Betsey Neely, to inquire what process should be used in the circumstances he was under with Barnes. Comp. at 16. Neely responded to Gaskins' request that "Once the President has made a decision in a matter, there is no due process at the campus level." Comp. at 16. These three settled on the following format to notice Barnes:

> Dear Mr. Barnes: As a result of recent activities directed towards me by you, included [sic] but not limited to the attached threatening document [(the Facebook collage)], you are considered to present a clear and present danger to this campus. Therefore, pursuant to Board of Regents' policy 1902, you are hereby notified that you have been administratively withdrawn from VSU effective May 7, 2007.

Exh. 1. This letter also informed Barnes that he would be reinstated at VSU after providing: "(1) correspondence from a psychiatrist indicating that he posed no danger to self or others; and (2) documentation from a 'certified mental health professional' indicating that during his tenure at VSU, he would receive ongoing therapy." Exh. 1.

It was decided, as a safety precaution, that a campus police officer would deliver the withdrawal letter on May 7, 2007. Morgan Depo at 29.

## NO CONSTITUTIONAL RIGHT WAS VIOLATED & THERE WAS NO RETALIATION

Under the qualified immunity doctrine, first, the court must decide whether the facts demonstrate that the defendants violated a constitutional right. Kingsland 382 F.3d at 1232. If so, we proceed to the second inquiry, which is to determine whether the right violated was clearly established. Kingsland 382 F.3d at 1232. In answering the first inquiry, we also essentially assess whether the state action constituted a retaliation against the Plaintiff's constitutional rights; and if there was a causal connection sufficient for the § 1983 claims. In order to demonstrate a claim for retaliation, the plaintiff must show that: (1) his speech or act was constitutionally protected; (2) the defendant's retaliatory conduct adversely affected the protected speech; and (3) there was a causal connection between the retaliatory actions and the adverse effect on the speech. Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005). In order to sufficiently state a claim under 42 U.S.C. § 1983, a plaintiff must show a causal connection between a defendant's acts, orders, customs, policies, or breaches of statutory duty, and a deprivation of a right, privilege, or immunity protected by the Constitution or laws of the United States. Zatler v. Wainwright, 802

F.2d 397, 401 (11th Cir. 1986); <u>Little v. City of North Miami</u>, 805 F.2d 962, 965 (11th Cir. 1986)

The issue of whether particular words constitute "fighting" words, that is, words "which by their very utterance inflict injury *or* tend to incite an immediate breach of the peace," <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568, 572 (1942) (emphasis added), depends on the circumstances of their utterance." <u>Lewis v. City of New Orleans</u>, 415 U.S. 130, 135 (1974) (Powell, J., concurring in the result); <u>see also</u> MTDO.

Memorials honor dead people. Exh. 29. The term "memorial" was used by a college student who was familiar with personal computer applications and internet technology. One will find that Microsoft Word gives the following synonym for "memorial": "monument." "Monument" yields the following synonyms: "tombstone," "headstone," "gravestone," "memorial," "shrine." Barnes acknowledges that he understands the meaning of the word "memorial" and that it could be understood that the parking deck would be named for a "dead Dr. Zaccari." Barnes Depo. at 190. Barnes's mother stated in her letter to President Zaccari that "As soon as I saw the caption on the parking garage, 'President Zaccari Memorial Parking Garage,' my heart sank." Exh. 30 at the 5th page.

Barnes paints the picture that President Zaccari reacted the way that he did to teach Barnes a lesson and protect his legacy as president. However, the parking deck project has progressed so far that it was unstoppable. Zaccari Aff. at ¶ 11. All that remained undone in April 2007 was the BOR's official ratification of the project at their next scheduled meeting on April 17, 2007. Zaccari Aff. at ¶ 11. Therefore, any position taken by Plaintiffs to show that President Zaccari's threat rationale was pretextual, based on the fact that the President was in reality only protecting his reputation, fails because the parking deck had the popular vote. Zaccari Aff. at ¶ 11. In fact, the parking deck was built precisely based on overwhelming complaints from students, faculty, visitors, and the neighborhood residents surrounding VSU that there was insufficient parking at VSU. Zaccari Aff. at ¶ 11. If Barnes's stopped the parking deck, Barnes would have been the unpopular one. Zaccari Aff. at ¶ 11.

No one is arguing that Barnes did not have a right to voice his opinion about the parking deck. Rather than the message itself, it was the context, the manner of the delivery, and the circumstances of the delivery that were considered problematic. Words that create a sense of panic are not entitled to constitutional protection. NAACP v. Claiborne Hardware Co., 458 U.S. 886, 927 (1982). "The reason why fighting words are categorically excluded from the protection of the First Amendment is not that their content communicates any particular idea, but that their content

embodies a particularly intolerable (and socially unnecessary) mode of expressing whatever idea the speaker wishes to convey." <u>R.A.V. v. St. Paul</u>, 505 U.S. 377, 933 (1992).

Likewise, there is no evidence of retaliation against these rights, nor is there any causal connection between President's Zaccari's decision and any adverse effect on Barnes' constitutional rights. This had nothing to do with the parking deck, nor Barnes' speech rights. This had to do with Barnes' bizarre behavior, his personal attacks on President Zaccari with persistent emails, calls to his home, and relentless cryptic messages; all occurring within one (1) week of the Virginia Tech Massacre. This was a time when many students feared college campuses and the senses of the campus community were sharpened to predicting bizarre and cryptic behavior, and most hearts were geared to mourning and protecting themselves. Oddly, this is the exact time Barnes desired to construct a weapon and upped the ante to deliver his narcissistic message until he got his desired reaction.

Further proving that there is no evidence of retaliation or a causal connection, Barnes' own testimony reveals he has no evidence of retaliation. Barnes claims that President Zaccari was upset with him (<u>see</u> Comp. at 12); but revealed in his deposition that the only evidence that he had that President Zaccari was upset with him was from two (2) students belonging to the VSU environmental awareness group

called "SAVE." Barnes Depo. at 193-94.    Barnes claims that President Zaccari
iterated that Barnes' exercise of his speech rights against the parking deck were
"entirely unacceptable;" however Barnes later admits in his deposition that President
Zaccari **never actually said it**.    Barnes Depo. at 193-94.    Barnes allegation that
President Zaccari had expressed anger toward him is based solely upon what one
professor supposedly told Barnes.    Barnes Depo. at 126.    Barnes revealed at his
deposition that the only facts that he has "to base the allegation that these people
[Defendants] were acting in retaliation against" Barnes was that there were "President
Zaccari's statements in our meeting" and the mere fact that meetings occurred and
these Defendants were in attendance at these meetings. Barnes Depo. at 193-94.

Barnes testified in his deposition that he "was scared to go back to Valdosta
State University" after he was withdrawn "because [he feared] for [his] personal
safety . . . because of the traumatic experiences that occurred there." Barnes Depo. at
139-140.    When asked if he was so scared, why did he feel confident enough to re-
enter the campus in order to film a Fox News video, Barnes responds, "That was,
again, not the main central campus, but an edge of the campus where the parking
garages were being constructed," and "not on the main campus." Barnes Depo at
140-41.    However, a closer look at the video shows that Barnes had travelled through
the **middle of the campus** and pointed out where his old dorm room was. "My dorm

room um would actually have been right here," while pointing to Converse Hall."

INTERNET                    WEBSITE                    ADDRESS:

http://vids.myspace.com/index.cfm?fuseaction=vids.individual&VideoID=29446659

END OF ADDRESS.  In reality, the area where Barnes points to and describes his former dorm location (Converse Hall) *is* in the main campus.  Converse Hall is adjacent to West Hall (the President's office) and Hopper Hall (Dean of Students Russ Mast's office).  Exh.  31.  Barnes also travels through the area where the parking deck is actively being constructed.  Supra.  He is accompanied by a reporter and a camera crew at all times during this video.  Never once does Barnes look afraid or reveal any sort of reluctance to declare his story of the action VSU took against him, in the very middle of the VSU campus.  Supra.  It appears that Barnes faced no impediment or chilling effect to his ability to express himself on VSU's campus, despite his withdrawal.  Moreover, Barnes even appears to be empowered to speak for his cause.  Barnes could have re-entered, and did re-enter, the VSU campus at any time to engage in non-threatening speech.  There was no retaliation nor was there any violation of Barnes' speech rights.

For argument's sake, we move on to the analysis of whether "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Lanier, 520 U.S. at 270.  It is not clearly established

that temporarily withdrawing a student who 1) requires a cooling off period due to a personal vendetta against the University President, 2) has a mental illness, 3) exhibits bizarre and poorly timed behavior, and 4) who receives due process, constitutes a violation of his First Amendment rights, especially considering he still freely exercised them at all times.

<u>RELIANCE UPON LEGAL ADVICE</u>

As "[t]he principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law," <u>Pearson v. Callahan</u>, No. 07-751(U.S. Sup. Ct. 2009), the court must also consider what the official reasonably believed the law to be. In examining the reasonableness of the official's beliefs and the degree to which the right was clearly established, the court must recognize that "officers are entitled to rely on existing lower court cases without facing personal liability for their actions." *Id.* In addition, officials should be entitled to rely "on state or local law [or] advice of counsel" in most circumstances. <u>See, e.g., Gomez v. Toledo</u>, 446 U.S. 635, 641 (1980) (stating that an official's belief "may be based on state or local law, advice of counsel, administrative practice, or some other factor of which the official alone is aware"); <u>Buckley v. Fitzsimmons,</u> 503 U.S. 259, 276 n6 (1993) (noting that police officers may assert qualified immunity as a defense when they follow a prosecutor's advice)

(citing <u>Burns v. Reed,</u> 500 U.S. 478, 495 (1991)); <u>Wood v. Strickland,</u> 420 U.S. 308, 319 (1975) (noting that school board members "'are entitled to rely on traditional sources for the factual information on which they decide and act'" and must make decisions "in reliance on factual information supplied by others" (citation omitted)); <u>England v. Hendricks,</u> 880 F.2d 281, 284 (10th Cir. 1989) (noting that "where the law is unclear, a police officer is immune if the officer consulted with and relied upon the advice of a county attorney" (citing <u>Lavicky v. Burnett,</u> 758 F.2d 468, 476 (10th Cir. 1985)).

Qualified immunity shields one who pursues an action in reliance on the advice of counsel. "Courts have generally found that the advice of an attorney may be a factor in shielding a defendant from liability under § 1983." <u>Green v. Brantley,</u> 719 F. Supp. 1570, 1583 (N.D. Ga. 1989) (citations omitted). As was the case here, an individual who seeks the advice of counsel before performing official actions is presumably trying to do the right thing. Thus, such an individual is acting reasonably and not irresponsibly, and such reasonable actions are of the type which qualified immunity was designed to protect. <u>See Pearson, supra,</u> No. 07-751 (U.S. Sup. Ct. 2009). Actions taken with the advice of counsel are not "plainly incompetent" or in knowing violation of the law. <u>See Burns v. Reed,</u> 500 U.S. 478, 494-95 (1990) (citations omitted). Such actions are also clearly taken in good faith, and the advice

of counsel provides officials with a reasonable basis for believing that their actions are legal and right, see Gomez, 446 U.S. at 641.  Moreover, if legal counsel had suggested that a certain action be taken, the illegality of that action is probably not "clearly established" as required to defeat the defense of qualified immunity under Pearson.  Last, qualified immunity specially protects those who must make judgment calls in a legally uncertain environment.   Ryder v. United States, 515 U.S. 177, 185 (1995).

President Zaccari sought out legal advice from both Defendant Gaskins, Betsy Neely; and ultimately relied on their advice, particularly that of Neely.

Therefore, Defendants were entitled to qualified immunity.

## **DEFENDANTS KEPPLER & MAST TOOK NO ACTION**

Barnes' claims against Defendants Keppler and Mast are fatally flawed because these Defendants did not participate in the decision to withdraw Barnes.  Therefore, the claims against them for retaliation and under § 1983 fail.

At the meeting on May 3, 2007, President Zaccari made it known to the rest of the staff that he had finalized his decision to withdraw Barnes, and that, aside from the timing and method of notifying Barnes of this decision, that the other members of the VSU faculty did not participate in this decision.   Morgan Depo at 28, 31.  Moreover, once this decision was voiced no member of the faculty voiced any

objections, nor were under any duty to do so. Morgan Depo at 60-61; Aff. of Keppler ¶ 8, Mast ¶ 7.

Today President Zaccari stands by the decision even though his advisory cabinet could not provide him with the traditional means by which students are removed from the University. Defendants Keppler and Mast would be the conduit of information that could potentially support a conduct withdrawal under the conduct cited in the Student Handbook procedures regarding a judicial procedure. But Mr. Mast specifically stated that he had no knowledge or Barnes's mental health history at all. Mast Aff. at ¶ 2. The only information Dr. Keppler knew about Barnes's mental health history was that 1) he assumed that if Ms. McMillan and Dr. Victor Morgan (two VSU employees who reported to him) were in the meetings regarding Barnes's withdrawal, Barnes must be a patient at the VSU Counseling Center; and 2) that based on what was mentioned at the withdrawal meetings, that Barnes had seen a psychiatrist in Savannah, Georgia. Keppler Aff. ¶¶ 2, 3. Neither Mr. Mast's nor Dr. Keppler's traditional roles for conduct withdrawals were triggered or applicable in this situation. Keppler Aff. ¶ 3, Mast Aff. ¶ 3. As the process due to Barnes would not be taking place at the University level, Mast and Keppler were out of the loop. Keppler Aff. at ¶ 3, Mast Aff. at ¶ 3.

Moreover, when Barnes was asked at his deposition what facts he had to based his claim against Mast, Barnes responded,

> "Other than his attendance at the meetings, other than may assumption -- you could say speculation -- that he was aware of President Zaccari's pending actions, my speculation that -- well, my knowledge -- my fact that he is over the judicial process at Valdosta State University, and my speculation that he could have done something to prevent what happened, is the basis. Those are my facts."

Barnes Depo at 197-98. Moreover, discovery has shown that Mr. Mast spoke up during meetings with the President and was concerned about Barnes being able to have due process. Farmer Depo. at 54. Mr. Mast spoke contributed input at these meetings as to what would have occurred had he been overseeing a traditional "disorderly conduct withdrawal," that is a withdrawal that could have occurred in his department as Dean of Students. Farmer Depo. at 28. "Russ [Mast] went into . . . that . . . there would have to be a hearing, some kind of hearing involved." Farmer Depo. at 28, 57. Unfortunately, a hearing panel comprised of student peers would be inappropriate in a situation where mental health records, diagnoses, and tendencies would be a topic of discussions. Zaccari Aff. at ¶ 12.

When Barnes was asked what factual basis he has for any claims he makes against Dr. Keppler, Barnes responded, "Other than the information obtained in my FERPA request, the documents and testimony collected as a party of this suit, and my assumption that he was awake and alert during those meetings, no, I have no other evidence." Barnes Depo. at 200-01.

Barnes carries the burden to show how any documents, testimony, or duties to speak up at meetings, as he has stated above, arise to the level of "retaliation" by Mr. Mast or Dr. Keppler. However, when asked "But sitting here today, you can't think of any of those facts in those documents?," he responded, "No," and fails to meet this burden. Barnes Depo. at 202.

Moreover, Dr. Keppler, as the VSU faculty member to whom Dr. Morgan reported at the May 3, 2007, meeting stated that "the counselors couldn't say that Hayden was a threat because there was nothing to support that Hayden was a threat . . . ." Farmer's Depo at 58 (paraphrasing Dr. Keppler).

The decision was a **presidential** decision appealable to the BOR. Dr. Keppler and Mr. Mast played no role in the withdrawal of Barnes, nor could they have overturned a presidential decision. Keppler Aff. ¶ 4, Mast Aff. ¶ 4. As wisely stated by the Court, "Merely alleging that [a Defendant] assisted in a strategy, without anything more, fails to link that defendant's conduct with the adverse impact upon a

right, privilege, or immunity secured by the United States Constitution or federal law." MTDO at 21. Barnes openly concedes that the decision to withdraw Barnes was President Zaccari's alone; no other Defendant participated in this decision. Comp. ¶ ¶ 1, 5, 51-52.

## DEFENDANT VSU IS AN IMPROPER PARTY

Defendant VSU is not a proper party and is incapable of being sued, as it is not a legal entity. "The Board of Regents is a state agency that governs and manages the University System of Georgia and its member institutions, including the Georgia Institute of Technology ("Georgia Tech"). Georgia Tech is not a separate or distinct legal entity from the Board and, therefore cannot sue or be sued in its own capacity." Board of Regents v. Doe, 278 Ga. App. 878, 630 S.E. 2d 85 (2006); see also McCafferty v. Medical College of Georgia, 249 Ga. 62, 287 S.E. 2d 171 (1982) (The Medical College of Georgia could not be sued; overruled on other grounds in Self v. City of Atlanta, 258 Ga. 78, 377 S.E. 2d 674 (1989)) and Wooden v. Board of Regents of the University System of Georgia, 32 F. Supp. 2d 1370, 1378 (S.D. Ga. 1999) ("Only by a quirk of State law did UGA escape being named as a Defendant here. O.C.G.A. § 20-3-36 (only the Board, not public universities, can sue or be sued)."). Therefore, the Court should summarily dismiss Defendant VSU.

## BARNES RECEIVED PROCEDURAL DUE PROCESS

Barnes' procedural due process claims fail because he received all the process he was due, and he was afforded adequate notice and an opportunity to be heard.

"[W]hether receiving post-graduate education rises to the level of liberty or property interest is an unsettled question." Federov v. Bd. of Regents, 194 F. Supp. 2d 1378-91 (S.D. Ga. 2002). Any protection rights to receiving a post-graduate education is limited by the nature and circumstances of the disciplinary action. For instance, students "have the right to respond [to the charges], but their rights in the academic disciplinary process are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial." Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir. 1987) (citing Goss v. Lopez, 419 U.S. 565, 583 (1975)). In addition, "the adequacy of the notice and the nature of the hearing vary according to an 'appropriate accommodation of the competitive interests involved." Id at 660 (citations and quotations omitted). Thus, the student is not necessarily entitled to a "full-dress hearing, with the right to cross-examine witnesses . . . [but] should be given the opportunity to present to the Board . . . his own defense against charges and to produce either oral or written affidavits of witnesses in his behalf." Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 159 (5th Cir. 1961) (emphasis added).

Here, Barnes argues that he had met the requirements set forth by President Zaccari for returning to VSU contained in the letter noticing his withdrawal. Comp.

at 20; Exh. 1.  However, this argument is unfounded.  As discussed above, Dr. Winders' letters of May 2 and May 8, 2007, do not rule out his dangerousness.  Exh. 22,23,24.  Defendant McMillan's patently caveated letter to the BOR and President Zaccari of May 2, 2007 is not from a non-university health professional, as required by the withdrawal letter.  Cf. Exh. 1.  Any rights that Barnes may have had to any pre-withdrawal campus-level due process were inappropriate under the circumstances.  Zaccari Aff. at ¶ 12.

On May 1, 2007, President Zaccari and Gaskins contacted Neely who advised that the President should do what he needed to do to protect the campus now, and then worry about a potential lawsuit later.  Gaskins Depo at 53,54,55,58,59,61,63.  Neely followed this advice up with a fax confirming that BOR Policy 1902 prohibiting "Disruptive Behavior" to be the basis of the imminent withdrawal.  Gaskins Depo at 55, 70; Exh. 32.

"In the event the President files a complaint against a student for a violation of the Student Code of Conduct and the student wishes to file an appeal, should that appeal go directly to your office or should the President appoint a designee" was the question.  Gaskins Depo at 14.  Gaskins believed that a procedure existed at the BOR level for handling complaints at the University President level.  Gaskins Depo at 18.  Neely responded that an appeal from a Presidential conduct withdrawal would be

handled directly by her office; and that "once the President has made a decision to withdraw a student, there is no due process at the campus level, but rather at the BOR level." Gaskins Depo at 19, 20; Exh. 33.

President Zaccari was aware of the concerns and risks and wished to avoid them, all along placing the safety of the University first in foremost in his mind. "Well, after we must be concerned with First Amendment rights, but first we have to look at the safety issues. Ultimately, we have to have documentation to support that Hayden is a danger and a threat . . . [and be able to] present it to a third party that a threat exits." Farmer's Depo at 55 (quoting Zaccari). President Zaccari acknowledged the risks of deprival of these rights, and felt that the safety needs to the campus outweighed Barnes' minimal loss of a summer mini-mester. Gaskins Depo at 37,38; Zaccari Aff. ¶ 10. Based on this advice, President Zaccari made the decision to conduct a presidential administrative withdrawal under BOR Policy 1902. Gaskins Depo at 153.

BOR Policy 1902 is this:

> Any student . . . who clearly obstructs or disrupts, or    attempt to obstruct or disrupt any teaching, research, administrative, disciplinary, or public service activity, or any other activity authorized to be di scharged or held on any campus of  the University System is considered by  the Board to have

committed an act of gross irresponsibility and shall be subject to disciplinary

procedures, possibly resulting in dismissal . . . ."

Exh. 32. Gaskins witnessed, and that President Zaccari believed, that "Barnes

impacted Dr. Zaccari's ability to perhaps function in the manner that he would prefer

because of concerns for his safety and the safety of the campus community." Gaskins

Depo at 67.

Appeals to the BOR are contemplated in the Bylaws of the BOR. Exh. 34.

Specifically, in the "Appeals" section, it reads, "Any person in the University System

aggrieved by a final decision of the president of an institution may apply to the Board

of Regents without prejudice to his or her position for a review of the decision." Exh.

34. Due process was available to and provided to Barnes after Zaccari's final

decision was rendered. Barnes quickly appealed, having all of his materials and

position sent to the BOR by May 19, 2007. Exh. 35.

Barnes incorrectly claims that he was not afforded procedural rights due him

under BOR Policy Manual Section 1900. Gaskins' Depo at 97. Specifically, Barnes

began his appeal almost immediately after he was withdrawn from VSU. Exh. 35.

Most of these rights listed in Section 1900 never came up because the decision to

withdraw Barnes from VSU was rescinded prior to Barnes having to conduct any

hearing. See Gaskins Depo at 97, Exh. 36. Barnes did not need to "questions his

accusers," "call witnesses," or request a "verbatim transcript" because Barnes did not need a hearing wherein such activities would take place.  See Gaskins Depo at 97. Barnes did have an opportunity to choose "an advisor of his choice" (he had an attorney) as well as "present information on his behalf" (which he did in the same way Zaccari did).  See Gaskins Depo at 97.

The process afforded Barnes was fair, and not one-sided, as President Zaccari was also required to provide support his own decision.  Gaskins Depo at 171.  On May 30, 2007, along with a copy of Barnes's appeal, the BOR gave President Zaccari a quick deadline to submit a response.  Exh. 37.

Any argument that timeliness of the decision to rescind Zac's decision prevented Barnes from receiving due process is unfounded.  The BOR needed time to educate itself as to the new issues that arose after the Virginia Tech Massacre.  See Exh. 38.  There were new responsibilities, interests, and safety issues at stake that needed to considered and given the appropriate weight even to begin to field the issues in Barnes's case in a hearing.  The BOR addressed these issues at meetings, specifically, it was a topic of conversation at the May 23, 2007 Risk Management Task Force meeting.  See Exh. 38.  This was the beginning of the BOR's initiative to crystallize how institutions should deal with mental health issues following the Virginia Tech Massacre.  Gaskins Depo at 159-60.

## BARNES RECEIVED SUBSTANTIVE DUE PROCESS

The Supreme Court is hesitant to expand the reach of substantive due process. McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994) (citing Collins v. City of Harker Heights, 503 U.S. 115 (1992)).  The reluctance applies particularly when the alleged right was created by state law, which is not subject to substantive due process protection . . . because substantive due process rights are created only the Constitution."  Id (citations and quotations omitted).

Attending a public post-secondary school is not a right created by the U.S. Constitution.  See, e.g., Federov, 194 F. Supp. 2d at 1390-91 ("attending dental school is not a fundamental right.  While dentists provide valuable services, their education is not 'implicit in the concept of liberty.'" (citing Palko v. State of Connecticut, 302 U.S. 319, 235 (1937)).

"Conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense."  Waddell v. Hemerson, 329 F.3d 1300, 1305 (11th Cir. 2003).  Conduct justified by any government interest does not rise to the conscience-shocking level.  County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998).

Here, Barnes did not have a substantive due process rights. Assuming *arguendo* that he did, the Defendant's actions were justified by a legitimate government interest.

## DUE PROCESS & MOOTNESS

The United States Supreme Court has held that, ". . . those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." <u>City of Los Angeles v. Lions</u>, 461 U.S. 95, 100 (1983). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any present adverse effects." <u>Etheredge v. Hail</u>, 996 F.2d 1173, 1175 (11th Cir. 1993) (citing <u>O'Shea v. Littleton</u>, 414 U.S. 488. 495-96 (1974)).

In the present case, Barnes no longer presents a live case or controversy regarding any deprivation of his due process rights. Prior to filing the Complaint, Barnes appealed his withdrawal to the BOR, which referred the appeal to the Office of State Administrative Hearings, who scheduled a hearing as early as October 11, 2007. Exh 39. Prior to an administrative hearing on the requested appeal, the BOR rescinded Barnes withdrawal. Because Barnes appealed President Zaccari's decision to an appropriate body, and because this appeal resulted in a reversal of the appealed action, Barnes due process claims are moot. <u>See</u> Exh. 70. Moreover, the Court has

wisely noted with regard to Barnes injunctive relief claims that, "[b]ecause the violations [Barnes] alleges are not ongoing these claims for relief are moot." MTDO at 29.

## CONTRACT CLAIM

Under Georgia law, the enforceability of a contract is determined by whether its terms are expressed in plain and explicit language so as to convey what was agreed upon by the parties. Dibrell Bros. Int'l S.A. v. Banca Nazionale Del Lavorno, 38 F.3d 1571, 1582 (11th Cir. 1994), Lamb v. Decatur Federal Savings & Loan Ass'n, 201 Ga. App. 583, 411 S.E.2d 527, 529 (1991); see O.C.G.A. § 13-3-2 (1982).  A contract is formed only when there is a meeting of the minds. Oldham v. Self, 279 Ga. App. 703, 709, 632 S.E. 2d 446 (2006).

Barnes failed to meet his burden of proof in proving that a contract existed, or that any contract was breached.  The Complaint merely alleged the existence of a contract, but it is impossible to determine what, if anything, was agreed upon, whether there was a duty to perform, or whether any breach has occurred.

Moreover, any breach of contract claim based upon an implied contract is barred by the sovereign immunity of the State of Georgia.  The Georgia Constitution extends sovereign immunity to the State and all of its departments and agencies except as follows:

Except as specifically provided in this Paragraph, sovereign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.

Ga. Const. Art. I § II, ¶ IX(e); see also Woodard v. Laurens County, 265 Ga. 404, 405, 456 S.E. 2d 581 (1995).

The State of Georgia waives sovereign immunity only for breaches of *written* contracts. O.C.G.A. § 50-21-1 ("[S]overeign immunity is waived as to any action ex contract for breach of any *written* contract . . . entered into by the state . . . .")(emphasis added). Accordingly, agencies of the State of Georgia are immune from suit based on implied, or non-written contracts. Merk v. DeKalb County, 226 Ga. App. 191, 193, 486 S.E. 2d 66 (1997); Federov, 194 F. Supp. 2d at 1395.

The burden of demonstrating a waiver of sovereign immunity rests with the plaintiff. Balasco v. County of San Diego, 140 Ga. App. 482 487, 231 S.E. 2d 485 (1976). Barnes argues that the case of Maynard v. Bd. of Regents, 341 F.3d 1281, 1287 (11th Cir. 2003) and O.C.G.A. § 50-21-1 excuses him from this burden. Document 25-2 at 47. This is not so. A closer look at the Maynard case shows that the Eleventh Circuit actually ruled that while Florida law waived sovereign immunity

for suits brought in *state* court under the Florida statute, <u>which is far more broad than its Georgia counterpart</u>: "The Board of Regents is hereby created as a body corporate with all the powers of a body corporate for all the purposes created by, or that may exist under, the provisions of this chapter or laws amendatory hereof and shall ... have power ... to contract and be contracted with, to sue and be sued, and to plead and be impleaded in all courts of law and equity," that such language did <u>not</u> constitute a waiver of Florida's Eleventh Amendment immunity. <u>Maynard</u> at 1287-88 (quoting Fla. Stat. § 240.205(4) (1999)); <u>cf.</u> O.C.G.A. § 50-21-1.

In <u>Maynard</u>, the Eleventh Circuit included its reasoning as a strict approach to the interpretation of the state's sovereign immunity statute:    "Given the Supreme Court's emphasis on the breadth and force of Eleventh Amendment immunity, we do not find the necessary express consent to suit in federal court in this waiver's language." <u>Maynard</u> at 1288 (fn omitted) (citing <u>Edelman v. Jordan</u>, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360-61, 39 L.Ed.2d 662 (1974) ("In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.' ")); (citing <u>Atascadero State Hosp. v. Scanlon</u>, 473 U.S. 234, 241, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985) ("Although a State's general waiver of

sovereign immunity may subject it to suit in state court, it is not enough to waive the immunity guaranteed by the Eleventh Amendment.") (citation omitted)).

Barnes fails to meet his burden that a contract was formed and cannot meet his burden to show that Georgia's immunity under the Eleventh Amendment has been waived.

Even if the Court determines that the State of Georgia has waived its immunity in state court, the State has not waived its Eleventh Amendments immunity from suits in federal court.   "Venue with respect to any such action shall be proper in the Superior Court of Fulton County, Georgia."   O.C.G.A. § 50-21-1(b).   "It is well established that, absent and express waiver by statute, the Eleventh Amendment bars state law claims against a state in federal court."   <u>Maynard v. Bd. of Regents</u> at 1281 (citing and quoting <u>Pennhurst State School & Hosp. v. Halderman</u>, 465 U.S. 89, 98-99 (1984).

## <u>AMERICAN WITH DISABILITIES ACT/REHABILITATION ACT</u>

Counts 7 and 8 under the ADA and RA remain as claims against Defendants Zaccari, Keppler, Mast, VSU, and BOR (*official* capacities only).   This Court has treated claims under the ADA and the RA as one in the same for the purposes of legal arguments.   MTDO at 29.   Furthermore, with the exception of its federal funding requirement, the RA uses the same standards as the ADA, and therefore, cases

interpreting either are applicable and interchangeable.  See, e.g., Cash v. Smith, 231 F.3d 1301, 1305, n.2 (11th Cir. 2000).

## INDIVIDUALS, EVEN IN THEIR OFFICIAL CAPACITIES, ARE INCAPABLE OF BEING SUED UNDER THE ADA AND RA

"Given that a 'public entity' means an agency of the state, the court treats Barnes' claim against all defendants, including individuals in the official capacities, as a claims against the state entities VSU and the Board of Regents."  MTDO at 27.

As VSU is an improper party incapable of being sued, see supra, there can be no claim against VSU, and therefore, the official capacities claims which are reconciled as being claims against VSU must also be dismissed.

Moreover, recently in Rylee v. Chapman, 022709 FED11, 08-15036 (11th Cir. 2009), the Eleventh Circuit reaffirmed its rule that individual liability is impossible under the ADA: "Rylee argues that the district court erred in finding that individuals may not be sued under the ADA. We disagree. The ADA prohibits a 'public entity' from discriminating against a 'qualified individual with a disability' on account of his disability. 42 U.S.C. § 12131. By its terms, the ADA only addresses discrimination by a 'public entity.' In the employment context, this court has held that 'the Disabilities Act does not provide for individual liability, only for employer liability.' Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 2007). . . . The ADA imposes respondeat superior liability on the employer for the discriminatory acts of its

employees. See id at 1010. We therefore conclude that the district court did not err in granting summary judgment in favor of the individually named Appellees." Rylee at 8.

### BARNES DOES NOT ADEQUATELY ALLEGE THAT HE WAS SUBJECTED TO UNLAWFUL DISCRIMINATION BECAUSE OF HIS ALLEGED DISABILITY

In order to state a valid ADA claim for damages, a plaintiff must allege, inter alia, that he was "excluded from participation in or . . . denied benefits of the services, programs, or activities of a public entity," or otherwise "discriminated [against] by such entity . . . by reason of such disability." 42 U.S.C. § 12132; see also Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001). Further, in order to recover compensatory damages under the RA, a plaintiff must demonstrate "intentional discrimination or bad faith." Wood v. President & Trs. of Spring Hill College, 978 F.2d 1214, 1219 (11th Cir. 1992). In other words, "good faith attempts to pursue legitimate ends are not sufficient to support an award of compensatory damages under section 504 [of the RA]. Id.

Assuming arguendo that Barnes has met his burden to prove that he is a qualified individual under the ADA, he nevertheless fails to show that he discriminated against because of his alleged disability. Barnes does not alleged that

he was excluded from participation in or denied the benefits of the services, programs, or activities provided by VSU of because of his alleged disability.

Barnes Complaint further substantiates that he was not discriminated against on the basis of a disability, but was discriminated against on an independent basis: President Zaccari found Barnes' Facebook Collage to be "threatening" and that Barnes presented "a clear and present danger" to the campus. Comp. at ¶ 52. In sum, Barnes' conclusory allegations do not support a showing of intentional discrimination or bad faith on the part of any Defendant on the basis of Barnes' alleged disability; and therefore are inadequate to state a valid claim under Title II of the ADA or Section 504 of the RA.

## PLAINTIFF HAS FAILED TO SHOW THAT HE IS DISABLED OR OTHERWISE A QUALIFIED INDIVIDUAL UNDER THE ADA AND RA

A plaintiff must demonstrate that his ailment affect a major life activity. 29 U.S.C. § 705 (9); 42 U.S.C. § 12102. Plaintiff has failed to meet this burden. Quite the contrary, in fact, Barnes failed to identify his disability at all, instead claiming that he is protected merely because he has "challenges related to anxiety and depression." Comp. at 29. Moreover, Barnes has not attempted to demonstrate nor has he met his burden of proving that his "challenges" limit a "major life activity." See 42 U.S.C. § 12101. Merely having an impairment, standing alone, does not mean that an individual has a disability within the meaning of the Act. Bragdon v. Abbott,

524 U.S. 624 (1998); <u>Gordon v. E.L. Hamn & Associates</u>, 100 F. 3d 907 (11th Cir. 1996). Barnes' own Complaint demonstrates that he was not impaired such as to limit a major life activity. Comp. at 16, 20. Additionally, when asked in his deposition what Barnes considers his disability to be, he answers "anxiety which interferes with my ability to concentrate." When asked if he considers his anxiety to be a symptom that interferes with his major life activities, he responds, "I would not say that they directly interfere with my major life activities." Barnes' Depo at 151.

CONCLUSION

Based on the foregoing, these Defendants respectfully submit that they are entitled to summary judgment on all the remaining claims and ask that summary judgment be granted in their favor.

This 23rd day of December, 2009.

DAVID C. WILL
Georgia Bar No. 760150
Email: dwill@royallaw.net

HOLLY HANCE
Georgia Bar No. 153092
Email: hhance@royallaw.net

**ROYAL – WILL**
4799 Sugarloaf Parkway, Bldg J
Lawrenceville, Georgia 30044
Phone: (770) 814-8022
Fax: (770) 814-8360

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have, this 23rd day of December, 2009, served a true and correct copy of the within and foregoing DEFENDANTS' REQUEST FOR ORAL HEARING ON THEIR MOTION FOR SUMMARY JUDGMENT upon all parties and/or counsel of record by electronic notice and by placing same in the United States Mail, postage prepaid, properly addressed as follows:

**Robert Corn-Revere**
**Christopher A. Fedeli**
**Erin Reid**
Davis Wright Tremaine, LLP
Suite 200
1919 Pennsylvania Avenue, N.W.
Washington, DC 20006

**Irma I. Espino**
**Cary Stephen Wiggins**
Cook Youngelson & Wiggins
260 Peachtree Street, NW
Suite 401
Atlanta, GA 30303

**Matthew R. LaVallee**
**Paul Robert Koster**
Daley, Koster & LaVallee, LLC
2849 Paces Ferry Road
Suite 160
Atlanta, GA 30339

**Mr. David Smith**
Brannen Searcy & Smith
P.O. Box 8002
Savannah, GA 31412-8002


DAVID C. WILL
Georgia Bar No. 760150

**ROYAL – WILL**
4799 Sugarloaf Pkwy, Bldg J
Lawrenceville, GA 30043
Phone:  770-814-8022
Fax:  770-814-8360

## CERTIFICATE OF COMPLIANCE WITH RULE 5.1B

I hereby certify that the foregoing has been prepared with one of the font and point Selections approved by the Court in Local Rule 5.1B, N.D.Ga. This document was prepared using Times New Roman (14pt.).

This 23rd day of December, 2009.

DAVID C. WILL
Georgia Bar No. 760150
Email:  dwill@royallaw.net

**ROYAL – WILL**
4799 Sugarloaf Parkway, Bldg J
Lawrenceville, Georgia 30044
Phone: (770) 814-8022
Fax: (770) 814-8360