IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 2 3 2009

JAMES N. HATTEN, Clerk
By:
Deputy Clerk

THOMAS HAYDEN BARNES,    *
                          *
Plaintiff,                *
                          *
-vs-                      *
                          *    Case No. 1:08-cv-00077-CAP
RONALD M. ZACCARI, *et al.*,  *
                          *
Defendants.               *
                          *

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

Robert Corn-Revere
Chris A. Fedeli
Lisa B. Zycherman
Erin N. Reid
Admitted *Pro Hac Vice*
Davis Wright Tremaine LLP, Suite 200
1919 Pennsylvania Avenue, N.W.
Washington, DC 20006
202-973-4200
Email: bobcornrevere@dwt.com

Cary Stephen Wiggins
Georgia Bar No. 757657
Irma Espino
Georgia Bar No. 558220
The Wiggins Law Group
260 Peachtree Street, NW, Suite 401
Atlanta, GA 30303
404-659-2880
Email: cary@cywlaw.com

December 23, 2009

# TABLE OF CONTENTS

Page

BACKGROUND ................................................................................................................4

STANDARD OF REVIEW................................................................................................27

ARGUMENT ....................................................................................................................28

I.    EXPELLING HAYDEN BARNES FOR HIS PROTEST ACTIVITIES VIOLATED
      THE FIRST AMENDMENT ...................................................................................28

      A.  The First Amendment Prohibits Penalizing University Students for Engaging in
          Free Expression ............................................................................................28

      B.  Barnes' Expulsion is a Classic Case of Unconstitutional Retaliation ........................30

      C.  Defendants' Pretextual Claims Regarding Campus Security Are Entirely Bogus
          And Fall Far Short of the Test for True Threats........................................36

II.   VSU'S EXPULSION OF HAYDEN BARNES VIOLATED BOTH SUBSTANTIVE
      AND PROCEDURAL DUE PROCESS REQUIREMENTS.........................................49

      A.  "Withdrawal" Decisions Must Respect Due Process .................................49

      B.  The Defendants Knowingly Evaded Due Process Requirements..............................54

III.  VSU'S EXPULSION OF HAYDEN BARNES VIOLATED THE AMERICANS
      WITH DISABILITIES ACT AND THE REHABILITATION ACT ...............................60

      A.  Elements of ADA and Rehabilitation Act Claims.....................................61

      B.  Defendants' Actions Clearly Violated the Law........................................62

IV.   VSU'S EXPULSION OF HAYDEN BARNES VIOLATED PLAINTIFF'S
      CONTRACTUAL RIGHTS ....................................................................................67

V.    Each of the Defendants is Liable Under 42 U.S.C. 1983 ................................70

CONCLUSION..................................................................................................................75

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................27

*Baird ex rel. Baird v. Rose*,
  192 F.3d 462 (4th Cir. 1999)........................................................64

*Barnes v. Zaccari, et al.*,
  Order, Civil Action No. 1:08-CV-0077-CAP, p. 26 (N.D. Ga. 2008)...............67

*Bart v. Telford*,
  677 F.2d 622 (7th Cir. 1982)....................................................33, 51

*Beckwith v. City of Daytona Beach Shores, Fla.*,
  58 F.3d 1554 (11th Cir. 1995).......................................................50

*Bennett v. Hendrix*,
  423 F.3d 1247 (11th Cir. 2005)..............................................29, 30, 33

*Bloch v. Ribar*,
  156 F.3d 673 (6th Cir. 1998)........................................................34

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969)...............................................................37

*Bridges v. California*,
  314 U.S. 252 (1941)...............................................................31

*C.B. v. Driscoll*,
  82 F.3d 383 (11th Cir. 1996)........................................................50

*Castle v. Marquardt*,
  632 F. Supp. 2d 1317 (N.D. Ga. 2009)..........................................passim

*Constantine v. Rectors & Visitors of George Mason Univ.*,
  411 F.3d 474 (4th Cir. 2005)....................................................33, 34

*Corso v. Creighton Univ.*,
731 F.2d 529 (8th Cir. 1984)...........................................................................67

*County of Sacramento v. Lewis*,
523 U.S. 833 (1998)........................................................................................51

*Daniels v. Williams*,
474 U.S. 327 (1986)........................................................................................51

*Davis v. Monroe County Bd. of Educ.*,
120 F.3d 1390 (11th Cir. 1997)..................................................................51, 53

*Dixon v. Alabama State Bd. of Educ.*,
294 F.2d 150 (5th Cir. 1961)..........................................................................53

*Doe v. Rains County Indpt. Sch. Dist.*,
66 F.3d 1402 (5th Cir. 1995)..........................................................................71

*Doe v. Taylor Indpt. Sch. Dist*,
15 F.3d 443 (5th Cir. 1994) (*en banc*)............................................................71

*Eberhardt v. Waters*,
901 F.2d 1578 (11th Cir. 1990)......................................................................27

*Edwards v. South Carolina*,
372 U.S. 229 (1963)........................................................................................31

*Eiland v. City of Montgomery*,
797 F.2d 953 (11th Cir. 1986)........................................................................36

*Georgia Ass'n of Educators v. Gwinnett County Sch. Dist.*,
856 F.2d 142 (11th Cir. 1988)........................................................................29

*Goss v. Lopez*,
419 U.S. 565 (1975)..............................................................................34, 52, 53

*Greenbriar Village, LLC v. Mountain Brook*,
345 F.3d 1258 (11th Cir. 2003).......................................................................50

*Healy v. James*,
408 U.S. 169 (1972)..................................................................................28, 29

iii

*Holloman v. Harland,*
    370 F.3d 1252 (11th Cir. 2004)...............................................................29, 33

*Howard v. Fortenberry,*
    723 F.2d 1206 (5th Cir. 1984).........................................................71

*Hudson v. Palmer,*
    468 U.S. 517 (1984)........................................................................54

*Hustler Magazine v. Falwell,*
    485 U.S. 46 (1988)..........................................................................36

*Johnson v. Newburgh Enlarged Sch. Dist.,*
    239 F.3d 246 (2d Cir. 2001)............................................................51

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
    341 U.S. 123 (1951).........................................................................53

*Lucas v. W.W. Grainger, Inc.,*
    257 F.3d 1249 (11th Cir. 2001 .........................................................62

*Mahavongsanan v. Hall,*
    529 F.2d 448 (5th Cir. 1976)............................................................67

*Matthews v. Eldridge,*
    424 U.S. 319 (1976)........................................................................53

*McKinney v. Pate,*
    20 F.3d 1550 (11th Cir. 1994) (en banc) ..............................49, 50, 51

*Milkovich v. Lorain Journal Co.,*
    497 U.S. 1 (1990)............................................................................39

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982)........................................................................38

*New York Times v. Sullivan,*
    376 U.S. 254 (1964)...................................................................30, 31

*Palko v. Connecticut,*
    302 U.S. 319 (1937)........................................................................50

*Papish v. Bd. of Curators of the Univ. of Mo.*,
    410 U.S. 667 (1973)........................................................................29

*Perry v. Sindermann*,
    408 U.S. 593 (1972)........................................................................50

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)........................................................................29

*Shackelford v. Shirley*,
    948 F.2d 935 (5th Cir. 1991)...........................................................38

*Shanley v. N.E. Indep. Sch. Dist.*,
    462 F.2d 960 (5th Cir. 1972)...........................................................29

*Sims v. Adams*,
    537 F.2d 829 (5th Cir. 1976)...........................................................71

*Singer v. Fulton County Sheriff*,
    63 F.3d 110 (2d Cir. 1995)...........................................................29-30

*Snyder v. Phelps*,
    580 F.3d 206 (4th Cir. 2009)...........................................................39

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957)........................................................................29

*Toledo v. Sanchez*,
    454 F.3d 24 (1st Cir. 2006), *cert. denied sub nom. Univ. of P.R. v.
    Toledo*, 127 S. Ct. 826 (2007) ........................................................52

*United States v. Alaboud*,
    347 F.3d 1293 (11th Cir. 2003) .......................................................38

*United States v. Callahan*,
    702 F.2d 964 (11th Cir. 1983) .........................................................38

*United States v. Kelner*,
    534 F.2d 1020 (2d Cir. 1976) ..........................................................37

*United States v. Zavrel,*
   384 F.3d 130 (3d Cir. 2004)................................................................37

*Virginia v. Black,*
   538 U.S. 343 (2003)................................................................37-38

*Watts v. United States,*
   394 U.S. 705 (1969)................................................................38

*Williams v. Bennett,*
   689 F.2d 1370 (11th Cir. 1982)................................................................70

*Zalter v. Wainwright,*
   802 F.2d 397 (11th Cir. 1986)................................................................70

*Zinermon v. Burch,*
   494 U.S. 113 (1990)................................................................53, 54


**STATE CASES**

*Boehm v. Univ. of Pa. Sch. of Veterinary Med.,*
   573 A.2d 575 (Pa. Super. Ct. 1990) ................................................................67

*Kirbens v. Wyo. State Bd. of Medicine,*
   992 P.2d 1056 (Wyo. 1999) ................................................................62

*Raethz v. Aurora Univ.,*
   805 N.E. 2d 696 (Ill. App. 2d Dist. 2004) ................................................................67

*Roland v. Ford Motor Company,*
   288 Ga App 625 (2007) ................................................................68


**FEDERAL STATUTES**

29 U.S.C. § 794(a) ................................................................60, 61

42 U.S.C. § 12102(2) ................................................................62

42 U.S.C. § 12132 ...................................................................... 60, 61, 63

42 U.S.C. §1983 ............................................................................... 70


**STATE STATUTES**

Ga. Code § 43-10A-17(a)(6) ............................................................. 75


**RULES**

Fed. R. Civ. P. 56(c) ....................................................................... 27

Fed. R. Civ. P. 56(d) ....................................................................... 28


**CONSTITUTIONAL PROVISIONS**

First Amendment ...................................................................... Passim

Fourteenth Amendment .............................................................. 4, 52

## Preliminary Statement

Plaintiff Hayden Barnes ("Barnes") was expelled from Valdosta State University ("VSU") without any notice or hearing because he protested the environmental impact of a proposed parking deck. These starkly damning facts are entirely undisputed.[1]

The defendants never have denied that Mr. Barnes' communications about the parking deck were the *sole* reason for terminating him and depriving him of the usual protections of due process guaranteed by the Constitution and enshrined in VSU policies. They have argued only that they were justified in doing so. The VSU Defendants (including former President Ronald Zaccari, Valdosta State University, the Board of Regents, Vice President for Student Affairs Kurt Keppler, and Dean of Students Russ Mast) insist that their ouster of Hayden Barnes was necessary because certain of his communications about the construction project

---

[1] Defendants disagree that Barnes was "expelled" and insist that he was merely "administratively withdrawn," a term nowhere to be found in the policies of VSU or the Board of Regents. Plaintiff stipulates that, when he uses the term "expelled" rather than the clunky bureaucratic euphemism "administratively withdrawn," he means the same thing. There is no material difference for purposes of this case. *See infra* pp. [52-53].

1

constituted "threats" – most notably use of the phrase "S.A.V.E.–Zaccari Memorial Parking Garage" in a satirical collage posted on Facebook.com.[2]

Such claims are sheer nonsense. This Court already has found "the inclusion of the word 'memorial' by its mere utterance in a photo collage … posted on an internet website simply cannot be rationally construed as likely to incite immediate violence, even in the wake of the Virginia Tech tragedy that the defendants allude to in their motion." [Dkt. # 37, Order Denying in Part Defendants' Motions to Dismiss, at 15.] This initial view of the facts has been roundly confirmed on the record compiled in discovery, bolstered by detailed contemporaneous notes and correspondence that document key meetings and discussions.

The undisputed evidence shows that Barnes' peaceful protest about the parking deck sparked immediate criticism and intense monitoring by the University President. Dr. Zaccari's outrage that Barnes would not simply "go away" and accept the "visionary" master plan that included the parking deck – Zaccari's self-proclaimed "legacy" – gave way to a pretextual and shameful campaign to exploit

---

[2] The VSU Defendants initially included Victor Morgan, Director of the Valdosta State University Counseling Center, but plaintiff has moved to dismiss Dr. Morgan from the case. *See* [Dkt. #161] Additionally, VSU counsel Laverne Gaskins originally was among the VSU Defendants, but sought separate representation after discovery commenced. *See* [Dkt. # 67]

the Virginia Tech tragedy to silence a student critic. The scheme was conducted with the assistance of the other defendants and the substantial misuse of confidential information about Barnes in violation of VSU policies and federal law.

While Zaccari claimed that he considered Barnes a "threat," not a single person confronted with the same "evidence" in the weeks following Virginia Tech agreed there was any danger. Quite to the contrary, those who spoke up told President Zaccari in no uncertain terms, both in face-to-face conversations and in writing, that Barnes was no threat to him or to anyone else. Accordingly, after Zaccari was informed that the VSU Counseling Center disagreed with his assertions of alarm and that it would not sign off on any attempt to remove Barnes under VSU's established Mental Health Withdrawal policy, the President sought ways to bypass University and Board policies and concocted a procedure that would not require a hearing or any documentation of the asserted threat.

The remaining individual defendants (Leah McMillan, a counselor at the VSU Counseling Center, and VSU Counsel Lavern Gaskins) do not dispute that Barnes was expelled because of his speech and without due process, but claim only that they are not responsible for the ultimate decision. McMillan argues she is not liable notwithstanding her acknowledged disclosure of counseling information used against Barnes in this case, because she repeatedly told Dr. Zaccari and others

3

that plaintiff was not a threat to Zaccari or anyone else.  Similarly, Gaskins claims

not to be culpable because she repeatedly advised Zaccari and the other defendants

that expulsion for the reasons given, and without a hearing, would violate Barnes'

rights under the First and Fourteenth Amendments as well as the Americans With

Disabilities Act ("ADA").  Nevertheless, she helped craft and implement the

scheme to remove the plaintiff from VSU.

While some defendants may be more sympathetic than others, each had a

share of responsibility for the events that led to this case, and each contributed to

the deplorable outcome.  The record overwhelmingly supports summary judgment

on the plaintiff's claims under the First and Fourteenth Amendments, the ADA, the

Rehabilitation Act, and his contract with VSU.

## BACKGROUND

Plaintiff Hayden Barnes was an undergraduate student at VSU in the spring

semester 2007.    Upon his return to VSU in 2007,[3] Barnes contacted the

university's Access Office in order to obtain educational accommodations under

_____

[3] Although he initially began his studies at Valdosta State as a transfer
student in 2005, he left in 2006 to pursue paramedic training.  Barnes Dep. 55:15-
23 (hereafter Ex. 1).  Barnes is a licensed Paramedic in the State of Georgia. *Id.* at
58:17-59:13.

the ADA.[4]  In addition, Barnes resumed regular sessions with Leah McMillan, a therapist in the VSU Counseling Center, whom he had first met when he was a student in 2005.  McMillan Counseling notes at 1 (hereafter Ex. 20)

On March 22, 2007, the VSU student newspaper, *The Spectator*, ran a story regarding plans to construct a large parking deck on campus.  The structure was a project that arose from a "Master Plan" Dr. Zaccari had helped develop between 2002 and 2004 at the direction of the Board of Regents.  Zaccari letter to Board, June 21, 2007 at 6 (hereafter Ex. 5).  As a consequence, Zaccari described the plan and the proposed parking deck as part of his "legacy." Ex. 1 at 189:10-16.

After reading the *Spectator* story about the planned construction, Barnes became concerned about the environmental impact of encouraging more students to drive to campus.  He posted a flyer at various places on the VSU campus pro-testing the parking garage and suggesting other uses for the resources, including

---

[4] Barnes had been seeing a psychiatrist, Dr. Kevin Winders, since December 2000 because he suffered from anxiety and had bouts of agoraphobia. Winders Dep. 12:23-13:10 (hereafter Ex. 13), Ex. 1 at 63:14-16; Burke Dep. 32:20-33:4 (hereafter Ex. 12).  This background was disclosed in meetings and correspondence with Dr. Kimberly Tanner, who ran the VSU Access Office. Winders letter to VSU Access Office, Aug. 28, 2006 (hereafter Ex. 14); Tanner Dep. 7:7-23 (hereafter Ex. 18). As a consequence, ADA accommodations were provided, such as allowing extended time for test-taking and authorizing a private dorm room.  Ex. 18 at 9:16-10:11; email correspondence between Barnes and Tanner (hereafter Ex. 19).

environmentally friendly alternatives.[5] The flyers urged students to "oppose the parking garage plan" and to "demand alternatives," and it listed telephone numbers for the VSU President, the Board of Regents, and the Governor.

Barnes' flyers prompted an immediate negative reaction from Dr. Zaccari. On March 23, 2007, Zaccari became aware of the flyers and directed Thressea Boyd, his administrative assistant, to find out who posted them. Ex 5 at 1; Zaccari Dep. 49:5-6 (hereafter Ex. 4).  On March 26, Zaccari complained about Barnes to members of Students Against Violating the Environment ("S.A.V.E."), a campus environmental organization. Ex. 5 at 1-2; Ex. 4 at 47:4-9, 50:12-22.  That same day, members of S.A.V.E. contacted Barnes to tell him the University President was angry about the flyers.  *Id.* at 50:12-15, 51:4-5 ("Mr. Barnes received information from the students that I was upset.").

Not wanting to offend Zaccari or "jeopardize any projects that S.A.V.E. had collaborated with him on," Barnes wrote a letter of apology to the President and removed the flyers.  As Barnes later explained, he did not want to offend Zaccari

---

[5] Ex. 22 (flyer).  The flyer suggested other uses for the $30 million earmarked for the project, such as providing textbooks for VSU students, providing health care coverage or Head Start programs for children in Georgia, devoting resources to preserving the rain forest, or aiding victims of Hurricane Katrina. Each alternative was supported by citations to research Barnes had conducted.

and that "this wasn't personal, it was a policy issue." Ex. 1 at 154:1-6, 155:9-11.

However, the mere fact that a student had protested the project was sufficiently

notable to Zaccari, that he had his assistant forward Barnes' letter to the

Chancellor, stating that "Mr. Barnes is withdrawing his opposition to VSU's

parking garage." Ex. 4 at 70:14-71:23; March 26 email from Thressea Boyd to

Beheruz Sethna (hereafter Ex. 24).

The apology notwithstanding, Barnes remained keenly interested in the

issue and did not suggest that he had changed his mind or that he would speak no

further about the proposed construction. Ex. 4 at 69:4-70:7, 71:44-72:4. Shortly

thereafter, he wrote a letter to the editor of the *Spectator* articulating his

opposition to the parking deck, and he also created a satirical collage protesting

the project, which he posted on Facebook.com. [6] The letter to the editor would

later be published on April 19, 2007. *The Spectator* Letter (hereafter Ex. 21).

During this time, Barnes conducted additional research on the proposed

construction and contacted the project manager about obtaining an environmental

_____

[6] The collage included images of a multi-level parking structure, a
bulldozer, a globe flattened by a tire tread, an asthma inhaler, a photo of Zaccari,
and a picture of a public bus under a no-smoking style "not allowed" red circle
and slash. It also included slogans such as "more smog," "bus system that might
have been," "climate change statement for President Zaccari," and "S.A.V.E.-
Zaccari Memorial Parking Garage." Facebook.com collage (hereafter Ex. 25).

impact statement. After speaking to the project manager, he learned the Board was scheduled to vote on the project the following day. Ex. 1 at 156:22-157:3, 160:5-14. Based on this information, Barnes accessed the Board of Regents website to obtain phone numbers so that he could call and state his position on the proposed parking deck. He spoke to several Board members, and respectfully expressed his opposition to the project.[7] Barnes also sent emails that outlined his environmental concerns and proposed alternatives to the project. Barnes' emails to VSU faculty, April 2007 (hereafter Ex. 55).

One Board member he contacted was Vice Chancellor Linda Daniels. She immediately called Dr. Zaccari about the communication from Barnes and urged him to deal with the possible protest at the campus level and to get the student to "see a different perspective."[8] Daniels testified that she wanted to forestall the

---

[7] Ex. 1 at 157:4-158:10, Barnes Appeal to Board of Regents, May 21, 2007 (hereafter Ex. 3). The calls were "not unlike calling your Congressman, where you would call, introduce yourself, state what you have to say." Barnes suggested alternatives to the project such as carpooling or tiered parking rates, restricting freshman cars, and expanding the bus system. Ex. 1 at 157:9-158:1. *See also* Ex. 4 at 99:6-8 ("Q: Insofar as you know, Mr. Barnes' communications with the Board [were] nothing but respectful? A: "That's what I understand, yes.").

[8] Ex. 3 at 2; Ex. 1 at 156:22-157:6; Ex. 16 38:4-39:22, 40:20-41:11. Daniels contacted Zaccari's office within fifteen minutes of receiving an email from Barnes about the proposed parking deck. *Id.* at 38:4-39:22.

possibility of any protest at the April 17, 2007 Board meeting at which the parking deck proposal was to be considered because, in her view, it would only consist of "a very tedious kind of uninformed objections about a parking deck" that "are all very clearly answered by the master plan." Daniels Dep. 40:6-11 (hereafter Ex. 16). The prospect of a student raising questions, according to Daniels, would have been "awkward" for Board members if the person showed up and failed to understand "Board protocol."[9]

Another Board member who Barnes called told him the parking deck proposal "hadn't left the university level." As a consequence, Barnes called President Zaccari's office to discuss the parking deck prior to the scheduled Board vote. Ex. 1 at 160:9-25. He was told to report to the President's office that same day, and to be there "at 5 o'clock sharp." [10]

-----

[9] Ex. 16 at 31:23-33:5. Although Daniels contacted the Georgia Southern University Police Department about the call from Barnes, this was not because she had a security concern. Rather, she considered him to be a "disgruntled student" who might show up at the Board meeting to speak about the parking deck without proper authorization. *Id.* at 42:17-43:12, 45:14-46:16. *See also id.* at 48:5-22 ("it's normal protocol").

[10] Ex. 1 at 161:1-3. The record is somewhat ambiguous about whether Barnes requested the meeting or was "summoned" to the Presidents office, although both may be true. Barnes apparently contacted Zaccari's office at a time when the President had decided already to call the student for a meeting. As

Barnes went to the April 16 meeting with Dr. Zaccari, which was also attended by Dean Mast.[11]  Zaccari was "agitated" because Barnes had not ceased his opposition to the parking deck project, and opened the meeting by complaining that "I thought you had gone away." Ex. 3 at 2.  Zaccari told Barnes his advocacy had "made life hard" for him, and that he "could not forgive" Barnes for his actions. Ex. 1 at 161:20-162:9; 178:9-16.  *See also* Mast Dep. 25:10-12 (hereafter Ex. 10) ("The President was upset that Hayden had went [sic] to the members of the Board of Regents" and "was embarrassed that he did not come and talk to him about that."); *id.* at 28:15-24.

The meeting left Dr. Zaccari unsatisfied, despite the fact he had confirmed Mr. Barnes had no plans to attend the Board meeting the next day or to stage a protest. Ex. 4 at 98:14-18; Ex. 16 at 45:1-13.  He later complained that Barnes only "appeared to listen" and "was not interested in my views, a fact supported by the student's subsequent statements that mock my attempt to advise and communicate with him." Ex. 5 at 3;  Ex. 4 at 114:2-119:23.  Zaccari told the

---

Zaccari explained to the Board, "Following my call with Vice Chancellor Daniels, on April 16, 2007, I requested a meeting with Mr. Barnes." Ex. 5 at 2.

[11]  Ex. 5 at 2; Ex. 10 at 27:3-6  Barnes asked if his girlfriend, Kimberly Chaffee, could attend the meeting, but Zaccari refused, telling Barnes that this is just between "you and me." Ex. 1 at 161:9-15.

Board he "began to view Mr. Barnes' behavior as the inability to listen, opposition to the administrative policies of the University and the University system of Georgia, and interested in only promoting self interests." Ex. 5 at 3;  Ex. 4 at 109:23-111:13, 116:1-119:23.

He was particularly put off by a follow-up email Barnes sent him just after their April 16 meeting, providing data on campus bus systems other universities had used as an alternative to student parking.[12]  The very next day, while Dr. Zaccari attended the Board of Regents Meeting and, at the President's request, inquiries were made into Mr. Barnes' academic status, to determine if there may be grounds for withdrawing him.[13]  Dr. Zaccari even had a copy of Barnes' academic transcript faxed to his office while he was attending the Board meeting. Ex. 4 at 191:10-16;   Faxed copies of Barnes' academic transcript (hereafter Ex. 29)  In

---

[12] Defendant Zaccari was unimpressed that Barnes had conducted research on more environmentally sensitive solutions on other campuses because he said it "had already been considered" in developing the master plan.  Ex. 4 at 123:14-127:17; Barnes email to Zaccari, April 16, 2007 (hereafter Ex. 28).

[13] Ex. 29;  Ex. 4 at 190:1-192:10.  *See also id.* at 192:5-7 ("Q: Do you conduct background checks on all of your students who express political opinions? A: No, only those who concern me.").  *See also* Gaskins Dep. 72:3-8 (Zaccari checked with the Director of Admissions about Hayden's grades);  73:21-74:2, 76:9-20 (Zaccari sought information to see if Hayden could be academically suspended) (hereafter Ex. 8); Ex. 29.

short, Mr. Barnes immediately became a subject of official scrutiny and a target of the university president's ire because he disagreed with Dr. Zaccari.[14]

On April 19, the VSU *Spectator* published the letter to the editor regarding the parking garage that Barnes had written several weeks earlier.[15]  Coincidentally, this was Dr. Zaccari's first day back on campus after the Board meeting, and he read Barnes' letter the day it was published.  Ex. 4 at 205:6-206:7, 207:4-21. Dr. Zaccari summoned to his office Kimberly Tanner, Director of VSU's Access Office for Students with disabilities.  Tanner Dep. 22:24-26:21 (hereafter Ex. 18). Zaccari explained that "the student who had been doing posters . . . had been having communications and they were getting increasingly difficult," and he asked Tanner to "provide him with any supportive information for how to deal with Hayden."  *Id.* 24:8-19.  Tanner disclosed the contents of the Access Office file to

---

[14] In addition to scouring Barnes' academic record, the defendants conducted inquiries into his medical history, his religion, and his registration with the VSU Access Office.  Ex. 8 at 45:9-46:2, 114:19-115:9 (hereafter Ex. 8);  Farmer Dep. 14:12-16:7, 48:17-49:25 (hereafter Ex. 27).  They also inquired into his employment status and investigated whether he has been involved in previous litigation. Ex. 8 at 115:15-116:18.  They also placed him under physical surveillance, and conducted online searches for information about him.  Ex. 27 at 34:21-35:7.  On April 19, Dr. Zaccari's assistant forwarded him an article entitled "Laws Limit Options When a Student is Mentally Ill."  Ex. 4 at 203:3-205:4.

[15] VSU *Spectator* article, April 19, 2007 (hereafter Ex. 21).  *See also* Ex. 3 at 2.

Zaccari, including a letter from Dr. Winders discussing Barnes' medical history and diagnoses. *Id.* at 24:2-25:18.

On April 20, Dr. Zaccari attended a faculty senate breakfast, where he made some remarks about Barnes (without naming him), mentioning that there had been a protest but the Board had approved the parking deck. Ex. 4. at 197:15-200:5. Dr. Michael Noll, one of Barnes' professors who attended, discerned that Barnes was the subject of Zaccari's ire and asked if he could help with the situation. However, Zaccari rejected the offer, and he told Professor Noll that "[t]his is not a faculty senate issue," that "it would be handled from the administration side and the faculty. And I asked him not to discuss it." *Id.* at 198:14-16. He added that the administration would "deal with the student." *Id.* at 199:9-18.

Only later did the focus of Zaccari's campaign shift to Mr. Barnes Facebook.com collage, which he claimed to interpret as a threat. It is still something of a mystery how the Facebook collage came to Defendant Zaccari's attention. Barnes never sent the page to Zaccari or to anyone else. Zaccari has asserted – depending on when he was asked – that Defendant Mast gave it to him (a claim Mast has denied), or that his assistant might have simply given him a copy

at some point on April 20, 2007.[16] Regardless how the satirical collage came to Zaccari's attention, the President ultimately seized upon it as the principal justification for his actions. May 7 withdrawal notice (hereafter Ex. 2).

Later on April 20, Zaccari held his first meeting to "begin the investigation of Mr. Barnes." Ex. 4 at 207:4-11. The meeting was attended by Thressea Boyd, Major Ann Farmer, Russ Mast, Laverne Gaskins and Kim Tanner. Zaccari distributed copies of the Facebook.com collage and claimed he was concerned that Barnes was a threat.[17] Zaccari told the group he already had looked into Barnes' employment status and his grades. Zaccari also complained about Barnes' correspondence regarding the parking garage and noted that he had asked for increased personal security.[18]

---

[16] Ex. 4 at 127:21-130:22. *Compare* Ex. 5 ("Dean Mast provided a copy of a document generated by Mr. Barnes, wherein he had posted my picture on an image of a parking deck with the words, 'S.A.V.E.-Zaccari Memorial Parking Deck.'"), *with* Ex. 10 at 50:17-51:1 (Mast had never seen the Facebook.com collage until Zaccari brought it to the April 20 meeting).

[17] Ex. 27 at 13:17-23, 18:24-34:10; Ex. 18 at 27:3-9, 27:17-28:2; Ex. 10 at 30:1-31:2; Ex. 30 at 1-5.

[18] Ex. 30 at 1-5; Ex. 27 at 14:12-16:7. During the meeting, Farmer told Zaccari that if he filed a formal report, he could obtain a temporary restraining order. Ex. 27 at 30:4-31:17. However, doing so would have required presenting a statement and evidence to a judge, Ex. 8 at 48:10-17, and Zaccari declined to do so. Ex. 27 at 81:11-82:1.

Tanner brought the Access Office file to the meeting and disclosed to the group that Barnes was registered with the Office and that he suffered from "depressive disorder, agoraphobia, ... was on medications but had gone into the hospital ... due to inability to function."[19]    Dr. Tanner also disclosed that Barnes was seeing a Dr. Kevin Winders who practiced with Psychological Consultants, P.C. in Savannah, Georgia.  Ex. 30 at 4;  Ex. 27 at 26:11-16.

After the meeting, Maj. Farmer investigated Zaccari's professed concerns. She called the VSU Counseling Center to determine if Barnes was a patient and "whether or not Hayden may be a problem."  Ex. 27 at 36:7-12.  Maj. Farmer spoke first to Dr. John Grotgen, the Counseling Center's Associate Director, who referred her to Leah McMillan.[20]  She later spoke to McMillan and asked if there was anything to indicate Barnes was a danger to the President.[21]  In response, and without seeking a release, McMillan provided a number of details about Barnes'

---

[19]Ex. 27 at 25:20-26:23;  Major Ann Farmer's contemporaneous notes of the April 20 2007 meeting at 4 (hereafter Ex. 30).  Tanner's account was inaccurate, as Barnes had never been hospitalized for psychological problems.  Ex. 1 at 105:15-20.

[20] Ex. 27 at 38:13-40:7;  Grotgen Dep. 11:16-14:16 (hereafter Ex. 33).  *See* Ex. 20 at 12.

[21] Ex. 27 at 41:4-11.  *See* McMillan Counseling Center Notes at 13 (hereafter Ex. 20) McMillan Dep. 10:23-24 (hereafter Ex. 11).

15

therapeutic history.[22]  Bottom line, however, McMillan confirmed there was no evidence Barnes was a threat to himself or anyone else.  Ex. 27 at 42:19-22.  At that point, Maj. Farmer concluded Leah McMillan "gave me exactly what I needed to know ... that I didn't have to worry about whether or not [Barnes] was a danger to anybody else."[23]

Four days later, on April 24, 2007, Zaccari summoned McMillan to his office to discuss Barnes' advocacy about the parking deck and his treatment history.[24]  Zaccari said he was concerned about Barnes' continued advocacy and claimed Barnes had been making indirect threats against him.  Ex. 20 at 13; Ex. 11 at 106:8-12.  Once again, without seeking a release, McMillan provided details

_____

[22] McMillan told Maj. Farmer that Barnes had a general anxiety disorder, a panic disorder.  Ex. 30 at 6.  *See also* Ex. 27 at 41:14-15.  She added that in the past Barnes had an irrational thought pattern, but there was no evidence of him harming himself or anybody else.  Ex. 27 at 41:18-23.  McMillan also told Farmer she thought Barnes might be suffering from ADD, and that he might be suffering from a bipolar schizo-affective disorder.  Ex. 30 at 6; Ex. 27 at 41:24-25, 42:17-18.  However, McMillan told Maj. Farmer that she was in touch with Barnes' psychiatrist, and that Dr. Winders did not perceive any paranoia or irrational thought.  Ex. 20 at 6; Ex. 27 at 41:15-17.

[23] Ex. 27 at 43:17-20.  *See id.* at 41:20-23 (McMillan told Farmer that there was no evidence that Barnes would harm anybody); 42:19-22 (no evidence he would hurt himself or others); 92:22-25 (on April 20, McMillan told Farmer that Barnes was no threat).

[24] Ex. 11 at 17:12-18:9; Ex. 4 at 170:5-7.  *See also* Ex. 20 at 13.

16

about Barnes' therapeutic history.[25] Nevertheless, she told Zaccari she had "never at anytime observed any behaviors that warranted me being concerned that Mr. Barnes was a threat to himself or anyone else."[26]

After her meeting with Zaccari on April 24, McMillan contacted Dr. Kevin Winders and requested that he reevaluate Barnes in light of Zaccari's asserted concerns.[27] Winders responded in an April 25 letter that, based on his review of Barnes medical file, "there were no threats or no significant confrontations." Winders April 25 letter to McMillan (hereafter Ex. 35). However, Winders volunteered to reevaluate Barnes if McMillan believed it was necessary. *Id.; see also* Ex. 13 at 51:19-55:11. At Defendant McMillan's request, Dr. Winders re-

---

[25] Ex. 11 at 17:21-22. McMillan told Zaccari Barnes was seeing a psychiatrist, *id.* at 17:24-25, and she described certain behaviors that concerned her. *Id.* at 17:22-23. McMillan also told Zaccari she "had been in contact with Dr. Winders regarding a possible re-evaluation of Mr. Barnes and a medication change." *Id.* at 17:24-18:6. *See also* Ex. 4 at 170:18-19. McMillan further disclosed to Zaccari the date and time of Barnes' next appointment, and promised to speak to Barnes about his "behavior and plans for the summer." Ex. 20 at 14.

[26] Ex. 11 at Dep. 17:24-18:6; Ex. 20 at 14. *See also* Ex. 11 at 110:13-15 (Barnes had behaved in a safe way in the past and had expressed "no suicidal or homicidal ideas").

[27] Ex. 11 at 39:14-24; Ex. 13 at 51:19-52:10; Ex. 35.

17

evaluated Barnes in person on April 30, 2007.[28]  In a letter dated May 2, 2007, Dr.
Winders again confirmed that nothing in his re-evaluation of Barnes "led me to
think that he was dangerous to himself or others."[29]

On April 25, 2007, Defendant Keppler and VSU officials who report to him
discussed the situation with Barnes.  Attending the meeting were Dean Mast, Dr.
Keppler, Assistant Dean of Students for VSU Richard Lee, Dr. Tanner and Erin
Sandonato.  Lee Dep. 61:3-7 (hereafter Ex. 36).  At the meeting, Richard Lee, the
Assistant Dean of Students for Student Conduct, reviewed the Code of Conduct
and did not see any place where Barnes's activities were in violation of it.  *Id.* at
61:24-62:25.  Dean Lee said it was the consensus of the group there was no danger
and Zaccari's concern was an "overreaction" to the collage.  Ex. 36 at 75:14-17.

On April 26, 2007, Zaccari directed Defendant Gaskins to contact Elizabeth
Neely, the Board's Vice Chancellor for Legal Affairs, to determine how a
university president could file a complaint against a student "for violation of the
Student Code of Conduct" and what processes would apply to such a situation.

---

[28] Ex. 13 at 64:13-17; *see also* Ex. 12 at 125:14-126:5; May 2, 2007 letter
from Winders to McMillan (hereafter Ex. 42).

[29] May 2, 2007 letter from Winders to McMillan (hereafter Ex. 42).
Winders reconfirmed this conclusion in a telephone conversation with McMillan.
Ex. 20 at 17.  *See also* Ex. 11 at 123-17:18.

April 26, 2007 email from Gaskins to Neely (hereafter Ex. 40). *See also* Ex. 8 at 14:13-19:5; Ex. 4 at 233:7-235:14. Neely responded by cautioning Gaskins that "[i]t is not good practice for the President to be bringing a complaint against any student," as student-conduct issues "should be handled by staff in Student Affairs. Once the President has made a decision in a matter, there is no due process at the campus level." Ex. 40. *See also* Neely Dep. 14:5-16 (hereafter Ex. 41); Ex. 8 at 19:6-11; Ex. 4 at 235:10-20.

That same day, Zaccari summoned Keppler, McMillan, and Dr. Morgan to his office to discuss his investigation of Barnes.[30] Once again, Zaccari showed Keppler, McMillan and Dr. Morgan a copy of the Facebook.com collage created by Barnes. Ex. 11 at 149:22-150:25. And, yet again, the collage was not perceived as threatening. Ex. 11 at 163:4-9. Dr. Morgan told Zaccari the word

---

[30] The meeting was briefly interrupted when it was mistakenly believed Barnes had missed his appointment with McMillan. Morgan Dep. 17:2-3 (hereafter Ex. 38); Ex. 11 at 20:2-5. There had been a mix-up regarding the time for Barnes' appointment, and McMillan's secretary called to say he was at the Counseling Center waiting to meet with her. Ex. 11 at 113:16-114:6. *See also* Ex. 20 at 15. McMillan later met with Barnes and asked if he was thinking about hurting the president. Ex. 20 at 15-16; Ex. 11 at 115:10-13. *See also* Ex. 38 at 52:15-19. Barnes responded that he had made "no direct or indirect threats" to President Zaccari, that he "would not harm [him]self or others." Ex. 20 at 16-17. Barnes was taken aback by the inquiry and later discussed with Dr. Morgan the possibility of changing counselors. Ex. 38 at 52:12-54:15.

"memorial" was not used in a threatening manner, but that Barnes was saying "this is a building that is going to be designated with your name on it; that you're going to be held responsible for the parking garage." Ex. 38 at 21:13-22. *See also* Ex. 11 at 162:10-15. McMillan told Zaccari she did not believe Barnes "was a danger at the present time or had exhibited violent behavior in the past." Ex. 38 at 22:21-23:1. *See also id.* at 23:7-11 (Barnes "is not communicating any present threat towards you or wish to harm you"). Dr. Morgan told Zaccari that Barnes was "seeing his counselor on a regular basis," *id.* at 23:2-4, and that "[i]n my opinion, he's complying with everything we're asking him to do." *Id.* at 22:24-23:1. At that meeting, it was confirmed the Counseling Center staff had no basis for believing "that we have any reason to be able to withdraw [Barnes] for mental health reasons." *Id.* at 22:23-23:15. *See* Keppler Dep. 134:24-140:13 (hereafter Ex. 9); Ex. 11 at 71:18-73:22.

Finding no support for his "threat" claims, Zaccari looked for a process by which he could withdraw Barnes without a hearing or presentation of evidence. It had been determined that if they tried to expel Barnes based on a violation of the student conduct code, they must proceed through a student/faculty review board and "must show" Barnes was a "threat to [the] community or himself." Ex. 30 at 8 (Farmer's meeting notes). *See id.* ("ultimately <u>must</u> have documentation that

20

[Barnes] is a danger/threat) (emphasis in original).  According to Maj. Farmer's notes, Zaccari wondered "how do we present to a [third] party that a threat exists?"  *Id.*  At this point, the discussion focused on the possibility of "administrative withdrawal," which, according to the meeting notes, would not require convening a student/faculty council or from the Counseling Center.  *Id.* at 11.  Ex. 27 at 54:12-57:15 (Zaccari "talked about the administrative withdrawal." With that, "no council was needed" and "[t]hey wouldn't need anything from . . . the Counseling Center.")  Zaccari explained that he avoided procedures such as the Mental Health withdrawal process because he felt it was "cumbersome" and would have required him to present evidence to support his decision.[31]

On May 1, 2007, Zaccari again summoned VSU counsel Gaskins to his office for a conference call with the Board's Vice Chancellor for Legal Affairs, Elizabeth Neely.  Ex. 8 at 56:8-22.  Neely discussed various ways Barnes could be administratively withdrawn.  *Id.* at 61:19-21.  Neely said that, as President of VSU, Zaccari had the authority to administratively withdraw Barnes. *Id.* at 53:22-

---

[31] Ex. 4 at 247:10-248:9.  It was understood that skipping the hearing would place VSU on "precarious legal footing."  Ex. 30 at 11.  As Gaskins explained, they could not proceed without "supported evidence of [a] threat."  As she later told other defendants, "it is not if, but when [Barnes] will ... sue over this."  Ex. 27 at 62:19-21; Ex. 30 at 8-15.

24. However, Gaskins raised "due process concerns [and] ADA concerns" about the process with Neely and Zaccari. Ex. 8 at 58:9-61:1. *See also* Ex. 4 at 236:11-14. She also expressed concerns about violating Barnes' First Amendment rights. Ex. 8 at 60:16-18. But Neely dismissed Gaskins' words of caution, saying, "[w]e'll worry about the lawsuit later."[32]

On May 3, 2007, Defendant Zaccari summoned Defendant Keppler, Thressea Boyd, Defendant Mast, Major Farmer, Police Chief Scott Doner, Defendant Gaskins, Dr. Tanner, Dr. Levy and Dr. Morgan to his office for a meeting on Barnes.[33] Zaccari told the group he had communicated with the Board of Regents and had determined that Board Policy 1902 grants the President the authority to unilaterally "withdraw any student from campus if he feels they pose a danger."[34] Zaccari informed the group that he was planning to administratively withdraw Barnes, despite the fact that some in the meeting

---

[32] Ex. 8 at 68:13-17. Following the telephone call, Neely faxed Gaskins a number of pages containing various Board of Regents Policies as well as a proposed medical withdrawal policy dated August 11, 1983 that was never adopted by VSU. May 1, 2007 fax from Neely to Gaskins (hereafter Ex. 43). *See also* Ex. 41 at 22:11-23:22; Ex. 8 at 52:23-54:17.

[33] Ex. 30 at 10-15. *See also* Ex. 38 at 25:13-26:5; Ex. 27 at 53:12-15; Ex. 9 at 90:5-9.

[34] Ex. 30 at 13; Ex. 27 at 57:11-12. *See also* Ex. 38 at 26:23-27.

continued to raise concerns about the decision.[35]  At this point, the decision had been made, and Zaccari told the group that the only remaining questions were "when to withdraw him and who is going to notify him." Ex. 38 at 26:22-27:7.

On May 4, 2007, Gaskins prepared a memorandum for Zaccari providing a draft of a proposed withdrawal letter.  The memorandum identified policies that "appear to be implicated" and again noted "due process dictates that the student be apprised of what particular policy has been violated, an opportunity to be heard and also be informed of the appeal process."[36]  From these options, Zaccari chose Board Policy 1902 as the policy under which to proceed, and he instructed Gaskins to specify two conditions for Barnes' return to VSU – that he be required to provide (1) "correspondence from a non-university appointed psychiatrist indicating that you are not a danger to yourself and others;" and (2) documentation "from a certified

---

[35] Ex. 30 at 8-15.  Gaskins again raised due process concerns. Ex. 8 at 89:9-12.  *See also* Ex. 38 at 27:2-3; Ex. 27 at 62:20-21.  Keppler said that no one at the Counseling Center could withdraw Barnes for mental health reasons because there was nothing to support that Barnes was a threat. Ex. 30 at 11; *see also* Ex. 27 at 58:18-20.

[36] Draft withdrawal notice and Gaskins memorandum (hereafter Ex. 45).  It listed Valdosta State Student Code of Conduct (Disorderly Conduct); Mental Health Withdrawal; and Board of Regents Policy 1902 (Disruptive Behavior) as potential options that VSU might use to expel Barnes. *See also* Ex. 8 at 138:4-139:19.

mental health professional indicating that during your tenure at Valdosta State you will be receiving on-going therapy." Ex. 8 at 138:10-140:20; Ex. 4 at 232:22-23.

The Administrative Withdrawal notice was delivered to Barnes on May 7. Earlier in the day, Defendant Gaskins met with McMillan, Keppler and Dr. Morgan to discuss the withdrawal. Ex. 8 at 150:13-22; Ex. 11 at 131:9-132:22. At that time, McMillan reiterated to the group that she did not believe that Barnes was a threat. Ex. 11 at 132:19-22. Nevertheless, the notice was delivered by slipping a copy under Barnes' dorm room door. Ex. 1 at 179:4-11. Attaching a printout of Barnes' Facebook.com collage, the notice stated:

> As a result of recent activities directed towards me by you, included [sic] but not limited to the attached threatening document, you are considered to present a clear and present danger to this campus. Therefore, pursuant to Board of Regents' policy 1902, you are hereby notified that you have been administratively withdrawn from Valdosta State University effective May 7, 2007.

Ex. 2. The notice was signed by Dr. Zaccari, and it listed the two conditions for readmission that he had directed Gaskins to include. *Id.*

Although he was shocked to receive the notice, Barnes sought immediately to satisfy the two conditions set forth in the document. He first contacted McMillan to inform her that he had been administratively withdrawn from VSU. Ex. 11 at 133:8-12. He asked if she would write a letter to Dr. Zaccari on his behalf, and she

agreed.[37]   On May 8, 2007, Barnes met with McMillan in her office to discuss the administrative withdrawal.  Ex. 11 at 136:2-5.  Mr. Barnes signed another release giving Defendant McMillan permission to disclose the details of his treatment for purposes of the appeal.  Ex. 11 at 136:8-9; Barnes' May 8, 2007 signed release to McMillan (hereafter Ex. 49).

Barnes also contacted Dr. Winders, told him of the expulsion, and asked for a letter to respond to Zaccari's conditions.  Ex. 13 at 68:24-69 2;  Ex. 1 at 182:20-24. Dr. Winders wrote a letter on May 8, 2007 in which he expressed surprise Barnes had been expelled from school, and noting he had been "in contact with Leah McMillan, a counselor at your university, and she gave me no indication that expulsion was planned." He explained he had conducted an evaluation of Hayden on April 30, 2007" at McMillan's request, and concluded that Barnes was "not a threat to harm himself or anyone else."   Winders May 8, 2007 letter to Zaccari (hereafter Ex. 48).  McMillan likewise wrote a letter in which she set forth her professional opinion that Barnes "is not a threat, indirectly or directly to anyone

---

[37]   Ex. 11 at 134:2-4.   So that McMillan could disclose confidential information regarding his counseling status, Barnes faxed a release to McMillan allowing the "Valdosta State University Counseling Center, and Leah McMillan L.M.F.T. to provide written documentation to the Georgia Board of Regents and President of Valdosta State University attesting that I am not a danger to myself or others." Barnes May 7, 2007 release to McMillan (hereafter Ex. 47).

on the VSU Campus." McMillan letter to Zaccari, May 8, 2007 (hereafter Ex. 50); Ex. 11 at 165:3-6. McMillan hand-delivered a copy of the letter to Zaccari that day. Ex. 11 at 214:22-215:1.

Although University Counsel Gaskins testified that the two letters should have satisfied the conditions set forth in the Withdrawal Notice, defendant Zaccari took no action on them.[38] In fact, Zaccari testified that he felt "blind-sided" by the fact that McMillan had written a letter on Barnes' behalf, and believed the Counseling Center should have communicated with him first since McMillan knew "full well the concern that I had." Ex. 4 at 250:6-17. Accordingly, after reading the letters, and without any consultation with anyone else, Zaccari rejected their conclusions. He simply stuck them in a file and did not notify the Board. *Id.* at 254:4-255:14.

### The Administrative Appeal

On May 21, 2007, Barnes appealed his administrative withdrawal to the Board of Regents. Ex. 3. Under the process, letters were to be sent to Elizabeth Neely, the same Board counsel who had advised Zaccari he had unilateral authority to

---

[38] Ex. 8 at 144:7-21, 154:21-25 (letters should have satisfied the conditions); *id.* at 161:10-169:6 (Zaccari received the letters but continued the expulsion anyway). *See also* Ex. 11 at 135:21-24, 165:10-166:4 (May 8 letters should have resulted in Barnes' reinstatement).

withdraw Barnes. Correspondence from Neely to Barnes and Zaccari regarding Barnes' appeal (hereafter Ex. 52). On June 21, 2007, Defendant Zaccari sent his defense of the Administrative Withdrawal to Ms. Neely. Ex. 5. Zaccari's defense was prepared with the assistance of Gaskins. Ex. 8 at 138:4-139:19.

The Board took no immediate action on the appeal, but instead referred the matter to an Administrative Law Judge in August, 2007. Letter referring Barnes' appeal to ALJ, August 21, 2007 (hereafter Ex. 53). However, after a hearing was scheduled, Barnes was able to secure counsel. On January 9, 2008, Barnes filed the instant action in this Court. *See* Dkt. # 1 (Complaint). On January 17, 2008, the Board of Regents without comment rescinded its decision to expel Barnes. Recission letter (hereafter Ex. 54).

## STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment" but rather there must be a "*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis original). Partial summary judgment may be

27

granted where some, but not all, of the issues before the court may be "deemed established for the trial of the case. This adjudication … serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." *1946 Advisory Comm. Notes to* Fed. R. Civ. P. 56(d). Accordingly, the Federal Rules of Civil Procedure provide that "[a]n interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages." Fed. R. Civ. P. 56(d)(1), (2).

## ARGUMENT

## I.    EXPELLING HAYDEN BARNES FOR HIS PROTEST ACTIVITIES VIOLATED THE FIRST AMENDMENT

The Defendants frankly admit Barnes was "withdrawn" from VSU due to nothing more than use of words protesting the environmental impact of building a parking garage on campus. However, their attempt to characterize Barnes' plainly political speech as a "threat" cannot overcome basic First Amendment protections.

### A.    The First Amendment Prohibits Penalizing University Students for Engaging in Free Expression

"The college classroom, with its surrounding environs, is peculiarly the 'marketplace of ideas.'" *Healy v. James*, 408 U.S. 169, 180 (1972). The Supreme Court has recognized that universities represent a "background and tradition of thought and experiment that is at the center of our intellectual and philosophic

28

tradition." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835 (1995); *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die."). Indeed, the very "purpose of education is to spread, not to stifle, ideas and views." *Shanley v. N.E. Indep. Sch. Dist.*, 462 F.2d 960, 972 (5th Cir. 1972). Accordingly, "[t]he Constitution guarantees students (and all people) the right to engage not only in 'pure speech,' but 'expressive conduct,' as well." *Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004). The "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy*, 408 U.S. at 180; *see also Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 669-71 (1973).

Just as the First Amendment protects freedom of expression, it prohibits actions by state officials to punish individuals for the exercise of that right. The Eleventh Circuit and the Supreme Court have long held state officials "may not retaliate against private citizens because of the exercise of their First Amendment rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1255 (11th Cir. 2005). *See also Georgia Ass'n of Educators v. Gwinnett County Sch. Dist.*, 856 F.2d 142, 145 (11th Cir. 1988); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995)

("retaliatory prosecution goes to the core of the First Amendment"). Such prohibited retaliation may take the form of suspension from school. *E.g.*, *Castle v. Marquardt*, 632 F. Supp. 2d 1317, 1336 (N.D. Ga. 2009).

A First Amendment retaliation claim "depends not on the denial of a constitutional right, but on the harassment [the plaintiff] received for exercising his rights." *Hendrix*, 423 F.3d at 1253. The Eleventh Circuit has articulated a three part test for such a claim. The plaintiff must show that: (1) his speech or act was constitutionally protected; (2) the defendant's retaliatory conduct adversely affected the protected speech; and (3) there was a causal connection between the retaliatory actions and the adverse effect on the speech. *Id.* at 1250 (citations omitted). That test is met easily in this case.

### B. Barnes' Expulsion is a Classic Case of Unconstitutional Retaliation

#### 1. Barnes' Speech Activities Are Constitutionally Protected

"The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions." *New York Times v. Sullivan*, 376 U.S. 254, 269 (1964). In this case, Hayden Barnes' efforts to alert the VSU community to the environmental impact of the proposed construction of a parking garage through the use of flyers, online postings, letters to the university officials, and a letter to the editor constitute protected speech in its

"most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963). Although some parties in this case have referred to Barnes' "actions" regarding the parking deck, all such references relate solely to the plaintiff's peaceful expression of his environmental concerns. [39]

It is evident that Defendant Zaccari had nothing but disdain for Mr. Barnes' views, and he considered the student's position on the parking deck uninformed. Ex. 4 at 89:5-13. *See also* Ex. 27 at 22:4-7. But this does not alter the "prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270-271 (1941). Nor does it matter whether Barnes' speech was sufficiently "informed" on a public issue to satisfy Defendant Zaccari. *See Castle*, 632 F. Supp. 2d at 1335-36. Indeed, the First Amendment represents "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

---

[39] Ex. 2. *See, e.g.*, Ex. 11 at 62:1-12 (when McMillan refers to Hayden's "actions" she is talking about his speech); Ex. 4 at 67:4-12 (Barnes' flyer is confined to his political opinions).

In this case, the speech at issue was neither "caustic" nor "unpleasantly sharp." Quite to the contrary. In his flyer distributed on campus, Mr. Barnes focused entirely on his environmental concerns about the parking deck, and he supported proposed alternatives to the project with research. Ex. 22. The same is true of his letter to the editor of *The Spectator*, Ex. 21, as well as letters he sent to state officials. Ex. 55. In the few telephone conversations Mr. Barnes had with members of the Board of Regents, he focused on his substantive concerns regarding the project, and he was unfailingly polite. Ex. 4 at 99:6-8. Even when Defendant Zaccari confronted Barnes about the flyers he had distributed on campus, Barnes listened quietly and engaged in a civil exchange of views.[40] All of Mr. Barnes' communications focused on the substance of his environmental concerns, and they are fully protected by the First Amendment.

### 2.    Defendants' Actions Punished Hayden Barnes For His Speech

There is no question but that Defendants' actions that culminated in Mr. Barnes' dismissal from VSU adversely affected his right to freedom of expression. A person suffers adverse action "if the defendant's allegedly

---

[40] Ex. 10 at 27:19-28-7 ("Q: In your opinion did Mr. Barnes behave respectfully toward . . . President Zaccari? A: I believe he did."); Ex. 4 at 115:21-25.

32

retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Hendrix*, 423 F.3d at 1254. In this regard, even a "verbal censure from [a] school official" has been ruled to be sufficient because it "cannot help but have a tremendous chilling effect on the exercise of First Amendment rights." [41]

In this case, Zaccari's decision to admonish Barnes merely for expressing an opinion on a public issue in the form of flyers is certainly the type of official scrutiny that would chill the speech activities of a student of "ordinary firmness." *See Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("since there is no justification for harassing people for exercising their constitutional rights, [the effect on freedom of speech] need not be great in order to be actionable"). VSU is a large public university with 11,500 students. To be singled out for special criticism by the University president would be devastating even to the most secure student. Therefore, it is unsurprising that Defendant Zaccari's hostile reaction to the flyers initially caused Barnes to withdraw them, for fear of causing a backlash against the student organization S.A.V.E. Ex. 1 at 154:1-6. When Barnes failed to

---

[41] *Holloman*, 370 F.3d at 1268-69; *see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500-501 (4th Cir. 2005) (adversely manipulating student exam schedule in reaction to student criticism constitutes adverse action for purposes of a retaliation claim).

"go away" and remain silent, Dr. Zaccari immediately put him under surveillance, and sought and obtained confidential information about Barnes from the Access Office and the Counseling Center. *See, e.g.,* Ex. 4 at 181:14-182:13; Ex. 18 at 23:3-24:19; Ex. 11 at 20:2-5; Ex. 8 at 233:25-234:2. Such misuse of confidential information clearly supports a First Amendment retaliation claim. *E.g., Bloch v. Ribar,* 156 F.3d 673, 680-81 (6th Cir. 1998).

But defendants' actions did not end there. Defendant Zaccari enlisted the other defendants in implementing a scheme to remove Mr. Barnes from VSU because of his protected expression. Such drastic adverse action undoubtedly satisfies the test for retaliation. This Court most recently found that a suspension from school of ten days is a "long-term suspension" that "plainly constitutes an adverse effect" in the context of First Amendment retaliation. *Castle,* 632 F. Supp. 2d at 1336. *Goss v. Lopez,* 419 U.S. 565, 584 (1975) (suspension of ten days or longer is a significant adverse consequence). Such serious sanctions for speech obviously satisfy the test for retaliation even though Barnes was not silenced entirely, since "a plaintiff need not actually be deprived of [his] First Amendment rights in order to establish First Amendment retaliation." *Constantine,* 411 F.3d at 500.

### 3. Defendants' Retaliatory Actions Directly Caused the Adverse Impact on Barnes' Speech

There is no question but that the defendants' retaliatory actions led directly to the adverse impact on Barnes. Indeed, the VSU defendants have never denied it, but instead have *insisted* throughout out this case that they had every right to remove Mr. Barnes from VSU – and to do so without any notice or hearing – because of the collage he posted on Facebook.com. In this regard, the principal defense in this case reads like a signed confession.

In any event, the retaliatory actions apply to far more than Mr. Barnes' whimsical use of Facebook. What clearly concerned Zaccari and other of the defendants was that Barnes had expressed an opinion *at all* on the parking deck project. Once the flyers appeared in late March 2007, Defendant Zaccari immediately complained to the student organization S.A.V.E. about them. Ex. 4 at 47:10-13. When this prompted an apology from Barnes, Ex. 23, Zaccari promptly notified the Board of Regents that "Mr. Barnes is withdrawing his opposition to VSU's parking garage." Ex. 24. Later, when Barnes contacted members of the Board to express his environmental concerns, Zaccari was called immediately by Vice Chancellor Linda Daniels to urge him to deal with the possible protest at the campus level and to get Barnes to "see a different perspective." Ex. 16 at 38:4-39:22, 40:20-41:11. Daniels simply sought to prevent the possibility of any protest

35

at the April 17, 2007 Board meeting, which she thought would be "uninformed" and "tedious." Ex. 16 at 31:23-33:5.

However, such communications are fully protected by the First Amendment. "Despite their sometimes caustic nature, from the early cartoon portraying George Washington as an ass down to the present day, graphic depictions and satirical cartoons have played a prominent role in public and political debate." *Hustler Magazine v. Falwell*, 485 U.S. 46, 54 (1988). Political parodies are constitutionally protected even when they are considered outrageous and deeply offensive because "it is clear that our political discourse would have been considerably poorer without them." *Id.* at 55. *See Eiland v. City of Montgomery*, 797 F.2d 953, 959-960 (11th Cir. 1986) (satirical poem criticizing mayor is protected speech). Defendants' reliance on Barnes' satirical collage as the primary justification for his expulsion only exacerbates the constitutional violation in this case.

### C.    Defendants' Pretextual Claims Regarding Campus Security Are Entirely Bogus And Fall Far Short of the Test for True Threats

Defendants' argument that the Facebook.com collage was a "threat" that justified Barnes' summary dismissal is absurd, as this Court has already held. Dkt. # 37, Order Denying in Part Defendants' Motions to Dismiss, at 15. It does not matter whether Defendant Zaccari was genuinely concerned about campus security – a highly dubious proposition even for him – and a sentiment shared by *none* of

the other defendants. Under the First Amendment, Zaccari's fragile sensibilities do not define the limits of free speech.

### 1. Barnes' Expression Was Not a "True Threat" as a Matter of Law

First Amendment law is quite clear that the government cannot restrict "mere advocacy." *Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969) (per curiam). Before it can constitutionally sanction expression on the grounds that it threatens violence, the government must prove that the speech is intended to incite imminent lawless action *and* is likely to produce such action. *Id.* In the context of a "threat," this principle applies only to "a serious statement or communication which expresses an intention to inflict injury at once or in the future as distinguished from idle or careless talk, exaggeration, or something said in a joking manner." *United States v. Zavrel*, 384 F.3d 130, 136 (3d Cir. 2004). Thus, expression may be considered a "true threat" only where the statement "on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976). This narrow doctrine applies only where "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v.*

*Black*, 538 U.S. 343, 359 (2003). *See Shackelford v. Shirley*, 948 F.2d 935, 938-939 (5th Cir. 1991) (First Amendment requires "true threats" to be narrowly defined to include only speech that "falls outside the realm of public dialogue").

In applying this test, Defendant Zaccari's subjective feelings about Barnes' collage are not dispositive. *United States v. Alaboud*, 347 F.3d 1293, 1297 (11th Cir. 2003) ("offending remarks must be measured by an objective standard"). Accordingly, the defendants have the burden to prove that Barnes made a threatening statement "under such circumstances that a reasonable person would construe [it] as a serious expression of an intention to inflict bodily harm." *United States v. Callahan*, 702 F.2d 964, 965 (11th Cir. 1983).

Obviously, use of the word "memorial" on a Facebook page in connection with Defendant Zaccari's photo and other expression about the parking deck does not meet the test. *Compare NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 930 (1982) (statement of boycott organizer that "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck" is not a true threat). Political hyperbole that constitutes "a kind of very crude offensive method of stating a political opposition to the President" does not amount to a threat. *Watts v. United States*, 394 U.S. 705, 708 (1969) (statement that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." is not a true threat).

38

Rhetorical statements "employing 'loose, figurative, or hyperbolic language' are entitled to protection to ensure 'public debate will not suffer for a lack of "imaginative expression" or the "rhetorical hyperbole" which has traditionally added much to the discourse of our nation." *Snyder v. Phelps*, 580 F.3d 206, 220 (4th Cir. 2009) (*quoting Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20-21 (1990)).

In any event, for all of Zaccari's professed concerns about the Facebook.com collage, he never asked Barnes what he meant by the term, nor did he direct anyone on his staff to ask that question. Ex. 4 at 209:9-210:19. Although he cited Webster's dictionary for the meaning of the word "memorial," Zaccari could find no reference to the dead.[42] And the fact that a building might be named in honor of a person carries no ominous connotation of mortality. Dr. Zaccari was aware that twenty-four of the sixty buildings on VSU's campus were named for individuals, and, as recently as 2005, he posed with the smiling (and very much alive) namesake of the Hugh C. Bailey Science Center. Ex. 4 at 217:3-219:11; *VSU Spectator* and *Valdosta Daily Times* articles (hereafter Ex. 56). This is not the stuff of which threats are made.

---

[42] Ex 5. At his deposition, Dr. Zaccari was presented with several standard dictionaries and could not locate a single reference that linked the word "memorial" with "death." Ex. 4 at 213:9-216:9.

39

2.    **The Record Confirms That Barnes' Expression Was Not
      Perceived as a Threat**

The record in this case shows Defendant Zaccari's professed concern with
campus security was a sham, and that his real agenda was to retaliate against
Barnes for his political views.    He castigated Barnes for his flyers and began
investigating him when he would not "go away."    As Zaccari explained to the
Board, he was concerned that Barnes was "mocking" him, that he wouldn't listen,
and that the student manifested "opposition to the administrative policies of the
University and the University System of Georgia."[43]    Even before he dug up the
Facebook collage, Zaccari had begun to look for ways to neutralize Barnes or
banish him from campus.[44]    And, after he had the collage to use as ammunition,
Zaccari specifically avoided recourse to any university policies or judicial
remedies that would have required him to substantiate his concerns.[45]

Ultimately, however, it matters not whether Zaccari's concerns were
genuine, a mere pretense to mask his true purpose, or the product of an overactive
imagination.    The record makes clear no reasonable person could have construed

---

[43] Ex. 5.

[44] Ex. 4 at 190:12-191:6 (Zaccari asked Vice President Louis Levy to review
Barnes' academic record).

[45] Ex. 30;  Ex. 27 at 54:20-57:15;  Ex. 4 at 247:10-248:9.

any of Barnes' communications as a threat, and, in fact, *none* of the other defendants agreed with Zaccari's overheated claims. Defendant Keppler testified he "did not perceive a physical threat" and that he thought Zaccari's security response was "overkill."[46] Dean Mast likewise testified that the word memorial "means many things" and that he did not perceive the collage as a threat.[47] Dean Richard Lee met with both Keppler and Mast and testified the consensus of the group was that there was no danger and Zaccari's concern was an "overreaction" to

---

[46] Ex. 9 at 28:16-20; 152:1-6. *See also id.* at 30:14-19 ("I do believe I said that I thought [the Facebook.com collage] wasn't [a threat]."); 63:8-16 (does not recall anyone but Zaccari suggesting that Barnes was a threat); 76:17-77:2 ("Counselors can't say Barnes is a threat because there is nothing to support Barnes is a threat."); 106:22-24 ("If it was me, I would probably be upset. I would probably want to know what's going on, but I don't think I would believe they were going to come shoot me."); 136:7-10 (Keppler not aware of any mental health professional who expressed the opinion that Barnes was a threat); 138:9-15 (same); 139:3-12 ("I don't believe anybody said [Barnes] was [a threat]."); 163:1-11 ("the counselors didn't think he was a threat"); 167:24-168:9 (Keppler recalls Leah McMillan saying that Barnes was no threat.).

[47] Ex. 10 at 52:4-13. *See id.* at 45:13-46:17 (administrative withdrawal does not relate to a situation where there is a true "clear and present danger"); 51:7-8 ("I don't remember anything about threats to the S.A.V.E. students."); 51:20-23 (Mast cannot recall anyone agreeing the collage was a threat); 55:24-56:3 (Mast does not believe the collage represents a "clear and present danger").

the collage.[48]  University counsel Laverne Gaskins, who met with Zaccari and the others multiple times to deal with the situation, never believed Barnes was a threat. She attended all of the key meetings, and testified no one expressed agreement with Zaccari that Barnes represented a security risk.[49]

Most tellingly, personnel in the VSU Counseling Center, who had direct contact with Barnes and knowledge of his background, uniformly believed Barnes was no threat, as they repeatedly told Zaccari and the others.  Leah McMillan, who provided counseling services to Barnes in nine closed-door sessions, testified she never felt threatened, and that her professional opinion was Barnes presented no danger to Defendant Zaccari or to anyone else.[50]    McMillan confirmed her

---

[48] Ex. 36 at 75:14-17 ("There was a sense in the room … that we don't really think [Barnes is] a threat.  We think maybe this is an overreaction and, hopefully, we can communicate that to the President ….").

[49] Ex. 8 at 136:9-14.  *See also id.* at 46:5-22 and 47:18-48:3 (there was no deliberation about potential for danger); 59:4-10 (no one except Zaccari expressed concern about campus safety or security); 135:25-136:4 (Gaskins never believed Barnes was dangerous).  *See also* Ex. 11 at 163:10-18 (no one at the meeting agreed the collage was a threat, and there was no follow-up discussion).

[50] Ex. 11 at 28:6-29:6.  *See also id.* at 12:10-22 (McMillan told Major Farmer that Barnes was no threat), 14:4-17 ("I did not feel that [Barnes] was a threat to himself or to anyone else"), 15:5-19 (even in the context of the Virginia Tech shootings, McMillan was not "concerned that [Barnes] was a threat to himself or to someone else"); 18:4-6 (McMillan told Zaccari that she "had never at anytime observed any behaviors that warranted me being concerned that

42

observations with Dr. Kevin Winders, who had been Barnes' personal psychiatrist since he was a teenager, and, in every meeting she attended with others at VSU, reaffirmed her conclusion that Barnes was entirely peaceful.[51]  Dr. Victor Morgan likewise confirmed Barnes was no threat, and told Defendant Zaccari that the word "memorial" did not imply a threat to him.  After reviewing the collage, Morgan told Zaccari, "[i]t looks to me as if Hayden is saying that you're going to go down in history.  This is going to be your baby.  This is going to be a building with your

---

Mr. Barnes was a threat to himself or to anyone else"); 27:7-13 (Barnes is a positive person;  McMillan never felt threatened in a closed room with Barnes); 29:9-19 (McMillan never witnessed self-destructive behavior); 30:13-31:25 (McMillan told Dr. Morgan and Kurt Keppler that Hayden was no threat); 33:12-19 (McMillan told Gaskins and others at May 7 meeting that Hayden was no threat); 37:6-8 ("I did not feel that [Barnes] was a threat."); 83:3-84:9 (McMillan told both Major Farmer and Dr. Zaccari in her initial conversations with them that Barnes was no danger to anyone); 134:1-7 (even after getting withdrawal notice, Barnes was rational and was no threat); 138:1-140:12 (same); 149:4-156:17 (McMillan reviewed Facebook pages and did not perceive any threat); 163:4-7 (McMillan thought the collage was disrespectful but not threatening); 163:10-18 (no one at the meeting expressed agreement that the collage was a threat).

[51] Ex. 42; Ex. 8 at 143:4-13 (agrees with Dr. Winders' assessment that Barnes is no danger); 132:19-133:5 (McMillan repeated in May 7 meeting, as in every meeting with the Administration, that Hayden was no threat). *See* Ex. 38 at 34:2-12 (McMillan "on every turn with everyone that I was in her presence with" confirmed "her professional opinion that Barnes was no threat).

name on it."[52] Morgan explained in detail to Zaccari and the other defendants why Barnes was no threat, and that he could not be withdrawn under VSU's medical withdrawal policy.[53]

Although Dr. Zaccari directed the VSU campus police to make inquiries after he learned of the Facebook collage, Major Ann Farmer determined right away that Barnes was not considered a threat to anyone. In her initial inquiry on April 20, 2007, she said Leah McMillan "gave me exactly what I needed to know … that I didn't have to worry about whether or not [Barnes] was a danger to anybody else."[54] Farmer also attended meetings about Barnes called by Zaccari and kept detailed notes. Ex. 30. She reported the "consensus" of the group (apart from Zaccari) that Barnes did not represent a threat to campus security. *E.g.*, Ex. 11 at

---

[52] Ex. 38 at 21:13-22:6; Ex. 11 at 162:7-163:2 (Dr. Morgan told Zaccari at the April 26 meeting that "memorial" was not a threat, and named other buildings named for people on campus); *id.* at 233:7-8 ("I just don't think that the language 'memorial' means that someone is going to harm me."). *See also id.* at 21:6-11 (McMillan told Zaccari that Barnes was no threat to him or to anyone else).

[53] Ex. 38 at 22:10-24:20 ("I said to the President, 'Dr. Zaccari, we cannot remove Hayden from school based on a mental health withdrawal. In my opinion, he's complying with everything we're asking him to do.").

[54] Ex. 11 at 43:17-20. *See id.* at 41:20-23 (McMillan told Farmer that there was no evidence that Hayden would harm himself or anybody else); 42:19-22 (no evidence he would hurt himself or others); 92:22-25 (on April 20 McMillan told Farmer that Hayden was no threat).

57:11-61:23; Ex. 36 at 75:14-17. Farmer testified that, "to me, it was clear that the Counseling Center and the Director of Student Affairs were ... saying ... there was nothing to support that [Barnes] was a threat; nothing to support that there was a mental health issue so that they couldn't use that as a means to take him out of school." Ex. 27 at 95:20-96:1. And, despite the fact that Zaccari had directed campus police to check on Barnes, Major Farmer was never asked her opinion on administrative withdrawal, and gave no advice on the matter.[55]

Simply put, Dr. Zaccari drove the process to oust Barnes by claiming a threat to campus security, but nobody believed him, and he sought no advice on whether an actual threat existed. The other defendants simply facilitated Zaccari's decision to expel Barnes, which they believed was a *fait accompli* that was "beyond [their] pay grade."[56] Zaccari sought advice only on *how* to withdraw

---

[55] Ex. 27 at 80:16-81:10. As early as April 20, Major Farmer told President Zaccari that, if he really believed there was a threat and wanted to file a formal report, she could assist him in getting a restraining order. *See id.* at 30:20-31:1, 77:12-79:3, 97:1-3. However, such a report would have required presenting evidence to a magistrate, and Zaccari did not accept this suggestion. *Id.* at 81:11-82:3. *See* Ex. 8 at 48:10-23.

[56] Ex. 9 at 64:18-24 ("[W]hen your president says he has spoken with some people at the Board of Regents office about this case, you pretty much get the impression that he has talked to people well beyond your pay grade. . . . I did not question it."). *See also id.* at 129:23-130:8 (the case "left my area of responsibility to a higher pay grade"); 150:19-152:25 ("In this particular case, it was beyond my

45

Barnes, and to find a way of doing so without triggering existing campus policies that would require a hearing or any evidence of a danger.

### 3.  Defendants' Actions Belie Any Genuine Concern About Campus Security

However much Dr. Zaccari may claim that he (and he alone) harbored some subjective belief that Barnes' political speech was "threatening," his actions at the time – and those of the other defendants – speak  far louder than words.  Barnes was singled out for unfavorable treatment based on his political views long before any security claims arose, and Dr. Zaccari explored the possibility of academically withdrawing Barnes prior to latching on to the infamous Facebook collage as a "threat."[57]  When Dr. Zaccari called campus police, they immediately determined

---

pay grade."); 178:4-6 ("after Dr. Zaccari had talked with the Board of Regents, it was moot for me to be involved at that point").  *See* Ex. 10 at 31:17-22 (Zaccari informed us of his decision to withdraw Barnes "and that he had . . . made this decision"); 52:4-16 (Mast did not share his opinion with Zaccari that the Facebook.com collage was not a threat "because that "would've been my Vice President's responsibility.");  Ex. 8 at 139: 3-23.

[57] *See, e.g.*, Ex. 27 at 28:1-7 (Dean Mast had already gathered information on Barnes' previous school and his employment); Ex. 29; Ex. 4 at 190:1-192:10 (defendant checked about possible academic withdrawal before learning about Facebook collage).

that Barnes did not constitute a security problem, and found it unnecessary even to interview the student.[58]

It is even more revealing that in implementing the withdrawal decision, defendants' actions were entirely inconsistent with any actual security concerns. The Withdrawal Notice slipped under Barnes' dormitory door on May 7, 2007 described him as a "clear and present danger," yet VSU's makeshift process regarding Barnes thoroughly undermines any such claim.   To begin with, the Notice cites the Facebook collage, which was discovered on April 20, as support for the decision, yet the defendants spent over two weeks conferring and discussing how to implement the expulsion.   Once the Notice was delivered, Barnes was given another four days to vacate the VSU campus. [59]  One reason that was given for the delayed decision was the belief that Barnes should be permitted to finish

---

[58] *See, e.g.,* Ex. 27 at 43:17-20 (after conferring with Leah McMillan on April 20 "I didn't have to worry about whether or not [Barnes] was a danger to anybody else."); *id.* at 34:1-35:13 (after the April 20 meeting, Farmer started to look for "red flags," but "there were no kind of reports where there had been any trouble with Hayden Barnes."); Doner Dep. 21:3-10 (VSU police never interviewed Hayden Barnes) (hereafter Ex. 31).

[59] Memo to staff regarding Barnes' administrative withdrawal, May 9, 2007 (hereafter Ex. 46).

exams before being withdrawn.[60] But if anyone at VSU actually had believed that Barnes was "a clear and present danger" to campus security, he "would [have been] immediately suspended and asked to leave the campus."[61] Moreover, a student who was believed to present a genuine danger would not have been left to his own devices, but would have been escorted off campus by the police.[62]

VSU adopted new campus security policies in the wake of the Virginia Tech tragedy, but the situation involving Barnes was not considered even remotely relevant to the exercise. McMillan and Major Farmer developed a "Threat Response Team," created a procedures manual for dealing with security issues, and

---

[60] Ex. 4 at 178:13-16. Indeed, it was the "consensus" of the VSU Defendants that Barnes should be allowed to finish the term. *See, e.g.*, Ex. 10 at 31:23-32:16.

[61] Ex. 10 at 58:13-59:17; Ex. 9 at 125:7-9 ("When there is a potential dangerous circumstance . . . there is a need to act immediately and quickly."); *See* Ex. 8 at 158:5-21 (the several day lag is inconsistent with claims that Barnes presented a safety issue or an emergency that would justify foregoing a hearing).

[62] *See, e.g.* Ex 8 at 155:22-156:3. If Barnes actually had presented a genuine risk, defendants' actions would have been more likely to precipitate a violent reaction, rather than prevent it. McMillan testified, for example, that if Barnes had been considered dangerous, slipping the Withdrawal Notice under his door, locking him out of his room, and potentially cutting him off from his medication, could have been "the straw that broke the camel's back," and a "triggering event" for violence. Ex. 11 at 166:5-168:2, 179:10-13, 180:20-23. *See also* Ex. 27 at 86:11-87:4 (if there had been any actual danger, giving Barnes a few days to vacate campus could have made it worse). But this possibility was not discussed, as no one at the Counseling Center, or VSU Campus Security, and none of the other VSU Defendants, had any concern that Barnes actually was a threat.

gave on-campus presentations on the policies. Ex. 11 at 169:14-173:20; Ex. 27 at 67:3-23. Both McMillan and Farmer explained that the effort was "not a response to Hayden Barnes," and that the presentation materials were irrelevant to this case. Ex. 11 at 173:16-20; Ex. 27 at 87:10-88:3 (campus presentations on threat assessment had no relevance to the situation that involved Barnes). In short, no one at VSU behaved as if Hayden Barnes might present any risk of violence before the Facebook collage was discovered, at the time of the expulsion, or afterwards.

## II.    VSU'S EXPULSION OF HAYDEN BARNES VIOLATED BOTH SUBSTANTIVE AND PROCEDURAL DUE PROCESS REQUIREMENTS

### A.    "Withdrawal" Decisions Must Respect Due Process

#### 1.    Substantive Due Process

This case involves retaliation in the form of a trumped-up expulsion from a state university for the exercise of pure First Amendment rights. Whether or not there is a "right" to education, the Constitution unquestionably protects citizens from arbitrary interference with fundamental rights. Thus, the substantive component of the Due Process Clause recognizes a limited class of "rights that a state may not remove, regardless of the process, as well as actions that can not be countenanced, regardless of the appropriateness of the process." *McKinney v. Pate*, 20 F.3d 1550, 1560 n.15 (11th Cir. 1994) (en banc); *Castle*, 632 F. Supp. 2d

at 1329. In this regard, "[a] school's decision to suspend a student" violates substantive due process where "the right affected 'is implicit in the concept of ordered liberty.'" *C.B. v. Driscoll*, 82 F.3d 383, 387 (11th Cir. 1996) (*quoting Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).

Freedom of expression is not merely "implicit" in the concept of ordered liberty – it is guaranteed explicitly by the First Amendment. As such, it is well established that substantive due process protection applies in cases involving retaliation against the exercise of free expression. *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1562-63 (11th Cir. 1995) ("the First Amendment's text and two centuries of free speech tradition and jurisprudence provide ample guideposts for courts examining retaliatory discharge claims"). *See Greenbriar Village, LLC v. Mountain Brook*, 345 F.3d 1258, 1262 n.3 (11th Cir. 2003); *McKinney*, 20 F.3d at 1556. Additionally, the government cannot undermine constitutional protections indirectly, by penalizing a citizen's enjoyment of a state-provided privilege. The Supreme Court has made clear that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interest, especially his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Beckwith*, 58 F.3d at 1563. As already

explained, there is no justification for the defendants' suppression of Hayden Barnes' constitutionally-protected expression.

In addition to matters involving the suppression of fundamental rights, the substantive due process guarantee "protects against government power arbitrarily and oppressively exercised." *Daniels v. Williams*, 474 U.S. 327, 331 (1986); Arbitrary official acts that "shock the contemporary conscience" violate the substantive due process rights of citizens. *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998); *McKinney*, 20 F.3d 1556 n.7 (describing this as "[a]n alternate substantive due process test"). Although "[t]he measure of what is conscience shocking is no calibrated yard stick," *id.*, abuses of power by government officials intended to "oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience," *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001). In this regard, there can be no justification "for harassing people for exercising their constitutional rights." *Bart*, 677 F.2d at 625.

### 2.    Procedural Due Process

Students at public institutions of higher education also are entitled to the protections of procedural due process. *Davis v. Monroe County Bd. of Educ.*, 120 F.3d 1390, 1402-04 (11th Cir. 1997) ("The right to a public education under state

law is a property interest protected by the Due Process Clause of the Fourteenth Amendment."); *Castle*, 632 F. Supp. 2d at 1330 (*citing* O.C.G.A. § 20-4-11(2) for the proposition that a public college education is a property interest protected by substantive due process). Such rights are implicated "when a student's future attendance at a public institution of higher learning is in jeopardy" *See, e.g.,* *Toledo v. Sanchez*, 454 F.3d 24, 32-33 (1st Cir. 2006), *cert. denied sub nom. University of P.R. v. Toledo*, 127 S. Ct. 826 (2007).

In this regard, it does not matter whether the VSU defendants characterize what they did to Hayden Barnes as an "expulsion" or as an "administrative withdrawal." This Court has held "the Due Process Clause prohibits a school from imposing a substantial suspension *or expulsion* of a student before hearing the student's side of the story." *Castle*, 632 F. Supp. 2d at 1332 n.14 (emphasis added). Both this Circuit and Georgia law use ten days as a benchmark for distinguishing between "short-term" and "long-term" suspensions.[63] Accordingly, the open-ended "administrative withdrawal" imposed in this case is at least a

---

[63] *Castle*, 632 F. Supp. 2d at 1336 & n.22 (*citing* O.C.G.A. § 20-2-751). *See also Goss v. Lopez*, 419 U.S. 565, 584 (suspension for longer than ten days imposes a significant adverse consequence on the student).

substantial suspension, and more closely resembles an expulsion. Either way, its nomenclature is irrelevant for due process purposes.

In this circumstance, procedural due process "requires notice and an opportunity to be heard." *Castle*, 632 F. Supp. 2d at 1330. *See Matthews v. Eldridge*, 424 U.S. 319, 333 (1976); *Goss v. Lopez*, 419 U.S. 565 (1975). This encompasses both the right to be heard "at a meaningful time and in a meaningful manner." *Eldridge*, 424 U.S. at 333. Thus, at a minimum, "[d]ue process requires notice and some opportunity for a hearing *before* a student at a tax-supported college is suspended for misconduct." *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961) (emphasis added). *See also Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (same); *Goss*, 419 U.S. at 580, 582 (same). "A fair hearing in a fair tribunal is a basic requirement of due process," *Davis*, 120 F.3d at 1402-04, and as Justice Felix Frankfurter observed, "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring). Moreover, the lack of a fair hearing cannot be remedied by providing some avenue of appeal. When procedural due process requires a pre-deprivation opportunity to be heard, "the availability of any post-deprivation hearing is

irrelevant." *Hudson v. Palmer*, 468 U.S. 517, 534 (1984); *Zinermon*, 494 U.S. at 132; *Castle*, 632 F. Supp. 2d at 1333-34.

**B.    The Defendants Knowingly Evaded Due Process Requirements**

The Defendants frankly admit in this case that Hayden Barnes was accorded none of the rights that due process is supposed to provide – no notice, no pre-deprivation hearing, and no guarantee of fairness.   Quite to the contrary, they knowingly and consciously evaded due process protections that are otherwise provided by VSU and Board of Regents official policies.

**1.    VSU Policies Require Notice and a Hearing**

Although the Defendants claimed to rely on Board of Regents Policy 1902 in withdrawing Barnes from VSU,[64] they followed none of the procedural requirements set forth in this or any other university policy.   Board Policy 1902 was adopted in the 1960s to deal with the problem of "disorderly assembly" during student demonstrations.[65]   Specifically, it provides that:

---

[64] *See* Ex. 2 ("pursuant to Board of Regents policy 1902, you are hereby notified that you have been administratively withdrawn from Valdosta State University").

[65] Section 1902 provides that "No one shall assemble on campus for the purpose of creating a riot, or causing destruction of property, or creating a disorderly diversion, which interferes with the normal operation of the University." Ex. 37 at 60.

> Any student, faculty member, or employee, acting individually or in concert with others, who clearly obstructs or disrupts, or attempts to obstruct or disrupt any teaching, research, administrative, disciplinary, or public service activity, or any other activity authorized to be discharged or held on any campus of the University System is considered by the Board to have committed an act of gross irresponsibility and shall be subject to disciplinary procedures, possibly resulting in dismissal or termination of employment.

Ex. 37 at 59-60 (VSU Student Conduct Code – Code of Conduct Violations). However, it also specifies that the policy "should not be construed to deny any student the right of peaceful, non-disruptive assembly." *Id.*

Additionally, Section 401 of the Board's policies authorizes each university to establish policies and procedures governing student discipline. It also provides that "disciplinary sanctions shall be applied only *after* the requirements of due process, fairness, and reasonableness have been met."[66] VSU's implementing policies employ faculty-student judicial committees under the supervision of the Vice President for Student Affairs and the Dean of Students. Ex. 37 at 63. While the Student Handbook provides for the use of various types of judicial committees, the following process is required for all disciplinary proceedings: (1) The accused student must be notified in writing of the specific charges against him, and the

_____

[66] Ex. 37 at 63 (VSU Student Code – Section II) (emphasis added); Policy Manual Section 400 (Student Affairs) (hereafter Ex. 57).

date, time, and location of the hearing;  (2) The accused student has the right to select an advisor for the hearing;  (3)  Notice must be provided at least five days before the hearing;  (4) The accused student has the right to question witnesses;  (5)  All hearings are recorded, and the audio recordings are kept on file; and (6) Hearings must follow VSU's Disciplinary Hearing Procedures. [67]

The hearing procedures are designed to "give cognizance to the test of fairness, justice, truth, and the requirements of due process."  *Id.*  In this regard, they mirror the "Rights of Students," which also are spelled out in the Student Handbook.  In disciplinary proceedings, VSU students are guaranteed "all rights required by due process," including the right to an advisor of one's choice, the right to present a defense, the right to question accusers, the right to call witnesses, the right to remain silent without adverse inferences being drawn, the right to question all witnesses, the right to appeal all sanctions, the right to a verbatim transcript, and the right to attend classes until a decision is rendered.  *Id.* at 62-63.

Even if the withdrawal is not classified as disciplinary in nature, students retain their due process rights.  Thus, under the university's Mental Health

---

[67] Ex. 37 at 64).  *See also* Ex. 37 at 63 (Section II-Disciplinary Process);  Ex. 37 at 64 (Section III-Disciplinary Hearing Procedures;  Ex. 37 at 68 (Section IV-Appeals Procedure).

Withdrawal Procedure, "*[b]efore* a student may be withdrawn for mental health reasons there must *first* be the following chain of events:" (1) A mental health professional determines that a student is a danger to himself or others;  (2)  The mental health professional recommends that the student be withdrawn and an informal hearing is convened; and (3) The student and/or his representative is permitted to present pertinent information at the hearing convened by the Office of the Dean of Students.  VSU Mental Health Withdrawal (hereafter Ex. 39) (emphasis added).  VSU established these procedures "to ensure that the student's legal rights are not violated." *Id. See* Ex. 37 at 68 (Mental Health Withdrawal Procedure was adopted "[t]o ensure that Valdosta State University students receive due process rights").

###    2.    Defendants Concocted a Withdrawal Process That Expressly Avoided Notice, Hearing, or Any Evidentiary Showing

Defendants did not just fail to provide Hayden Barnes with due process as required by the Board Policies, VSU student handbook, and United States Constitution.  Rather, they consciously devised an opaque and arbitrary procedure for the specific purpose of avoiding due process protections.  Once they determined that Barnes could not legally be withdrawn under established policies, they knowingly bypassed due process requirements, making up new rules as they went along.

57

Zaccari worked with Gaskins and a representative of the Board of Regents to create an "administrative withdrawal" process that would permit him to decide unilaterally when a student presented a "clear and present danger" to the university.[68] Zaccari said that he wanted to find a process that would not require the presentation of evidence.[69] The result, which required no notice, hearing, or evidence of any kind, created a situation that, in the words of the Board representative, provided "no due process at the campus level."[70] In its place, Defendant Zaccari personally dictated two conditions for readmission to VSU: Barnes was directed to provide (1) a letter from a psychiatrist indicating that he posed no danger to himself or others, and (2) documentation that he would receive counseling during his tenure at VSU.[71]

Although the two conditions suggested some attempt at "process," even that was a sham. Mr. Barnes provided the required documentation within 24 hours of his expulsion, including letters from his psychiatrist and from McMillan, both

---

[68] Fax from Elizabeth Neely to Laverne Gaskins, May 1, 2007 (hereafter Ex. 43); Ex. 8 at 52:19-53:14.

[69] Ex. 30.

[70] Ex. 40; Ex. 4 at 235:15-20.

[71] Ex. 2; Ex. 8 at 154:4-25; Ex. 4 at 235:15-20.

attesting to the fact that he was no danger to himself or others.[72]  However, under the procedure created by Zaccari and Gaskins, the President was to be the sole judge of whether the conditions had been met.  Ex. 4 at 233:3-17.  Accordingly, Zaccari, who was more than a little surprised to receive the letters, and quite annoyed that McMillan would write a letter approving the student's readmission, said he felt "blind-sided" by their support of Hayden Barnes.[73]  Consequently, despite the fact that the defendant had dictated the conditions of readmission – and because he believed that Barnes would never be able to satisfy them so quickly – President Zaccari simply stuck the letters in a file and ignored them.[74]

The appeal process was equally illusory.  The Board official who had advised Zaccari and Gaskins in creating the evidence-free administrative withdrawal "process," was also directly responsible for overseeing Barnes' administrative appeal, a situation Gaskins described as a violation of due process.  Ex. 8 at 170:8-17.  That process dragged on through three school terms, and attorneys from the state Attorney General's contacted Mr. Barnes directly in their defense of the university system at a time when Mr. Barnes was unrepresented by counsel.  The

---

[72] Ex. 48; Ex. 50.

[73] Ex. 4 at 250:6-15.

[74] Ex. 4 at 250:3-257:5.

Board eventually voted without comment to rescind the "withdrawal," but only after Mr. Barnes secured representation and filed this lawsuit.

Certain of the defendants have acknowledged that Barnes' right to due process was vitiated. University attorney Gaskins acknowledged that due process protections are "not optional" and that "[n]one of the due process rights spelled out in [VSU's] policy were accorded Hayden Barnes." University officials in charge of the school's disciplinary processes agreed with Gaskins' assessment. Ex. 9 at 134:1-11; Ex. 10 at 66:1-3; Ex. 36 at 68:12-69:1. Similarly, Gaskins noted that it violates due process for a primary decision-maker to oversee the appeal, and yet Zaccari in this case pre-cleared his decision with Board counsel Neely to ensure that his conduct "was sanctioned by those who would review the circumstances behind his decision." Ex. 8 at 68:23-70:1. In short, Barnes' due process rights were violated at each stage of review.

## III.  VSU'S EXPULSION OF HAYDEN BARNES VIOLATED THE AMERICANS WITH DISABILITIES ACT AND THE REHABILITATION ACT

The ADA and the Rehabilitation Act prohibit the denial of benefits of a program or service offered by a public entity, or discrimination on the basis of a disability. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). In this case, the defendants' pretextual use of Plaintiff's disability status to expel him from VSU constitutes

both denial of benefits and intentional discrimination based on his disability. Specifically, knowing that Plaintiff had availed himself of counseling services at the VSU campus, the VSU Defendants misused that knowledge to concoct a phony justification for an "administrative withdrawal." McMillan and others aided these efforts by revealing confidential information to the VSU Defendants regarding Mr. Barnes's diagnoses and treatment.

### A.    Elements of ADA and Rehabilitation Act Claims

Plaintiff alleged that the defendants, in their official capacities, intentionally discriminated against him because of his disability and are therefore in violation of Title II of the ADA and the Rehabilitation Act. (Compl. Counts 6 & 7.) In order for a plaintiff to establish a prima facie violation under Title II of the ADA and the Rehabilitation Act, he must demonstrate: (1) that he is a qualified individual with a disability, (2) that the defendants are subject to one of the Acts; and (3) that he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of his disability.[75]

---

[75] Americans with Disabilities Act of 1990, § 202, 42 U.S.C. § 12132; Rehabilitation Act of 1973, § 504(a), 29 U.S.C. § 794(a). As this Court observed in its Order on the motions to dismiss, "the standards used to determine whether a complaint states a cause of action under the Rehabilitation Act shall be the same as

### B.    Defendants' Actions Clearly Violated the Law

### 1.    Barnes is a Qualified Individual

A disability under the ADA is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).  A "physical or mental impairment" includes mental or psychological disorders and the definition of "major life activities" includes learning.  *Cf. Kirbens v. Wyo. State Bd. of Medicine*, 992 P.2d 1056 (Wyo. 1999).  Undisputed facts gleaned through discovery have established that Plaintiff has been diagnosed with certain psychological disorders, which have been recorded by his treating psychiatrist, and his impairment has interfered with several aspects of Plaintiff's life activities, including learning.

Plaintiff was diagnosed in 2000 by his psychiatrist, Dr. Kevin Winders, with "depressive disorder otherwise not specified."  Ex. 13 at 13:7-10; Ex 14.)  Thereafter, Dr. Winders diagnosed Barnes with "Panic Disorder with agoraphobia." Ex. 14; Ex. 13 at 24:13; 44:9 (regarding adding agoraphobia to panic disorder diagnosis); 90:19 (general anxiety disorder diagnosis in Nov.

---

the standards applied under the ADA."  (Dkt. #. 37) (*citing Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)).

2006).)  Plaintiff was treated for these disorders with medication prescribed by his physician and therapy.  Ex. 13 at 84:21; 84:25.  Dr. Winders further determined that Barnes suffers "some tendency towards [Attention Deficit Hyperactivity Disorder], but his anxiety symptoms are affecting his ability to concentrate more than anything else."  Ex. 14; Ex. 13 at 25:13.  Dr. Winders prescribed Plaintiff medication to address his ADHD symptoms.  Ex. 13 at 51:2.  In November 2006, Dr. Winders informed the VSU Access Office that Plaintiff's mental disorders, which result in "panic attacks and anxiety have caused a great deal of difficulty in functioning in school and in life in general."  Ex. 14.  In light of the foregoing, undisputed facts demonstrate that Plaintiff is a qualified individual with a disability under the ADA and the Rehabilitation Act.

## 2.    Defendants Are Subject to the ADA and Rehabilitation Act

This Court already has found that the defendants are subject to the provisions of Title II of the ADA and Section 504 of the Rehabilitation Act. Specifically, this Court found:

> Under Title II of the ADA, a suit against an individual is not authorized; rather, only a "public entity" is subject to liability. 42 U.S.C. § 12132.  However, in an official capacity suit for relief, the real party in interest is the government entity.  Thus, a suit against a state official in his or her official capacity is in effect against a "public entity" and is authorized by § 12132. Given that a "public entity" means an agency of the state, the court treats Barnes's ADA claim against all defendants,

including individuals in their official capacities, as a claim
against the state entities VSU and the Board of Regents. Next,
contrary to the defendants' assertions, the States are subject to
the ADA.

(Dkt. # 37 at 27) (internal citations omitted). The Court further found that "[h]av-

ing already established that Barnes sufficiently pled an ADA claim ... , the court

determines [ ] he has sufficiently pled his Rehabilitation Act claim." (*Id.* at 29.)

### 3.    Plaintiff Was Discriminated Against By Defendants Because of a Disability and Denied the Opportunity to Continue His Education at VSU

To prevail under Title II, a plaintiff need not prove that discrimination was

the "sole" reason for the adverse action, only a motivating factor. *See Baird ex rel.

Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999) (student stated a claim by

demonstrating that school excluded her from school performance because of her

depression, even if her absenteeism also played a role in the decision). However,

undisputed facts revealed during discovery have proved that Defendants acted in

concert to make pretextual use of Plaintiff's disability status to expel him from

VSU, thereby subjecting Barnes to intentional discrimination on the basis of and

by reason of his disability.

Specifically, knowing Plaintiff had availed himself of counseling services at

VSU, Zaccari repeatedly met with Barnes' counselor seeking grounds to justify

expelling Plaintiff. When Barnes did not discontinue his protest of the parking

garage, Dr. Zaccari sought and obtained confidential information about Barnes from the Access Office and the Counseling Center. *See supra* at ___. Upon his return to campus from the Board of Regents meeting at which the parking garage was approved, Zaccari summoned Kimberly Tanner, Director of VSU's Access Office for a meeting, and asked Tanner to "provide him with any supportive information for how to deal with Hayden." Ex. 18 at 22:24-26:21. Tanner disclosed the Access Office file on Barnes to Zaccari, including a letter from Dr. Winders discussing Barnes' medical history and diagnoses. *Id.* at 24:2-25:18. The next day, in a meeting with Boyd, Gaskins, Mast, Tanner and Farmer regarding the Plaintiff, Ex. 27 at 13:20, Tanner disclosed that Barnes registered with the Access Office, *id.* at 24:18, brought Barnes' file to the meeting, *id.* at 26:3, and informed the group that Plaintiff "had a psychological disability." *Id.* at 26:6. Following this April 20 meeting, Farmer called the VSU Counseling Center "to see if I could get any kind of information as to whether or not Hayden may be a problem; to see if I could find out whether or not, you know, he was a patient." *Id.* at 36:9.

Like Tanner, McMillan similarly revealed confidential information to the VSU Defendants regarding Barnes' diagnoses and treatment without obtaining the necessary waiver. She disclosed information to Maj. Farmer regarding Barnes'

condition and treatment at the Counseling Center. Ex. 11 at 11:4-12:22; Ex. 27 at 41:13. Thereafter, McMillan disclosed to Zaccari, among other things, Plaintiff's "current mental health status," "current behaviors," "current diagnosis," and "his possible re-evaluation" by Dr. Winders. Ex. 11 at 48:10-48:13.

Notwithstanding McMillan and others' determinations that Barnes did not pose any kind of threat, the VSU Defendants misused the information they obtained about Barnes's diagnoses as a pretextual basis for his "administrative withdrawal." Although Dr. Morgan cautioned Zaccari that VSU could not "remove Hayden from school based on a mental health withdrawal," Ex. 38 at 22:24, the Defendants devised a plan outside the applicable university policies to expel Barnes, citing his "recent activities" and claiming that he posed a "clear and present danger to [the VSU] campus." Ex. 2. The Notice specifically conditioned Plaintiff's reenrollment on "correspondence from a non-university appointed psychiatrist indicating that you are not a danger to yourself and others," and "[d]ocumentation from a certified mental health professional indicating that during your tenure at Valdosta State you will be receiving on-going therapy." *Id.*

Thus, undisputed facts demonstrate that Defendants exploited Barnes' disability as a pretext to justify expelling him. Defendants' discriminatory actions were illegal and in violation of the ADA and the Rehabilitation Act.

## IV.    VSU'S EXPULSION OF HAYDEN BARNES VIOLATED PLAINTIFF'S CONTRACTUAL RIGHTS

Plaintiff Barnes had a written contract with VSU and the Board of Regents, those defendants breached the written contract, and the breach actually and proximately caused him damages.    It is well established "that a college or university and its students have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins." *Raethz v. Aurora Univ.*, 805 N.E.2d 696, 699 (Ill. App. 2d Dist. 2004); *Corso v. Creighton Univ.*, 731 F.2d 529, 531 (8th Cir. 1984).

In particular, a failure to provide due process to a student pursuant to the educational contract gives rise to a cause of action. *See e.g. Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976) (graduate student filed suit against various officials of the School of Education of Georgia State University and the University's Board of Regents).  This includes breaches of contract arising from a failure to adhere to established university disciplinary procedures. *See Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, 573 A.2d 575, 579 (Pa. Super. Ct. 1990); *Corso,* 731 F.2d at 533.

This Court already has held that "VSU and the Board of Regents, as entities of the state, waived their immunity [from the breach of contract claim] by statute." Dkt. #37, Order on Motion to Dismiss, *citing* O.C.G.A. § 50-21-1(a).  Accordingly,

the only issue remaining is whether the contract was breached resulting in damages to Plaintiff. The claim for breach of contract has been established, and there remains no dispute of material fact on any element of that breach.

Under Georgia law, breach of contract claims require that "a plaintiff show the breach of a contract and damages." *Roland v. Ford Motor Co.*, 288 Ga. App. 625, 629 (2007). In the present case, the Board's and VSU's policies and provisions, including those in the VSU Code of Conduct, establish a binding agreement between these Defendants and each VSU student. Incorporated into this agreement is an obligation to follow the procedures established for student discipline and expulsion. *See* Ex. 37; Ex. 39. Similarly, the VSU Counseling Center enters a contract with students to preserve the confidentiality of their counseling files. Counseling Center intake form (hereafter Ex. 32); Ex. 11 at 75:9-76:2.

Plaintiff Barnes has demonstrated that both VSU and the Board of Regents violated their agreement with him by disregarding the contractual procedures in place. Ex. 8 at 95:10-97:20 ("None of the due process rights spelled out in the policy were accorded Hayden Barnes. The policies are not optional. There are no circumstances the hearing procedure should have been disregarded. Ultimately, a student is entitled to a hearing."); Ex. 41 at 14:5-18:1. Additionally, VSU

68

breached its contract with Barnes by disclosing the contents of his Access Office and Counseling Center files without a waiver.

If the withdrawal had been made for disciplinary reasons, VSU and the Board of Regents were required by to conduct a hearing concerning Barnes' administrative withdrawal in order to adhere to their contractual obligations. Ex. 36 at 68:12-69:1; 71:24-72:3. *See also* Ex. 8 at 84:13-25, 85:1-86:4 (Barnes was not provided due process under the Code of Conduct despite the fact that Gaskins reinforced the requirements in writing. "I wanted to emphasize to him in writing that the student was entitled to due process. We had policies in place that could be utilized to satisfy process concerns."). The same is true if VSU had sought to withdraw Barnes for mental health reasons. The required procedures were not followed. Ex. 8 at 89:15-92:15. *See also* Ex. 11 at 71:18-73:22; 135:12-20; Ex. 38 at 22:23-23:1 ("I said to the President, 'Dr. Zaccari, we cannot remove Hayden from school based on a mental health withdrawal. In my opinion, he's complying with everything we're asking him to do.").[76]

---

[76] Additionally, VSU and the Board of Regents did not follow any extra-contractual civil, criminal, or police procedures which may have allowed their actions against the Plaintiff without a hearing. Ex. 31 at 21:3-10, 26:12-25. No grounds for such procedures outside of the contract were present. Ex. 27 at 41:20-23, 42:19-22, 43:17-20.

Defendants' actions in failing to provide the procedures and rights guaranteed by their own policies have imposed substantial economic damages upon Barnes, as well as significant mental anguish. Complaint [Dkt. # 1] at ¶¶ 101-102. Defendants have not disputed that these damages occurred, the precise extent of which may be determined at a damages trial. For all these reasons, the breach of contract claim should be granted.

## V.    Each of the Defendants is Liable Under 42 U.S.C. 1983

Dr. Zaccari undoubtedly was the driving force that led to the withdrawal of Hayden Barnes from VSU, and he asserted ultimate authority for the decision. But he did not act alone. Each of the defendants participated in, and contributed to, the series of events that led to Mr. Barnes' ouster. *See, e.g., Zalter v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) ("A causal connection may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation.").

For purposes of Section 1983 analysis, it does not matter whether the other defendants had a "vote" in the final decision. The inquiry into causation must focus on "the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation." *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982). A state official "is

subject to Section 1983 liability when he breaches a duty imposed by state or local law, and this breach causes plaintiff's constitutional injury." *Sims v. Adams*, 537 F.2d 829, 831 (5th Cir. 1976). In this regard, a finding of liability "does not specifically require 'personal participation'" in the constitutional violation. *Id.* Section 1983 liability attaches where an act or omission under color of state law breaches a legal duty and deprives a person of a federally secured right or interest. *Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402, 1411-12 (5th Cir. 1995). While this analysis usually is associated with defendants in supervisory positions, such is not always the case. *See id.* at 1413 ("We have never suggested ... that only supervisors can be held liable for a failure to act that results in a constitutional injury."). Courts have found that "control can exist in other ways." *Id.* "[I]f a 'real nexus' exists between the activity out of which the violation occurs and the teacher's duties and obligations as a teacher, then the teacher's conduct is taken under color of state law." *Doe v. Taylor Indep. Sch. Dist*, 15 F.3d 443, 452 (5th Cir. 1994) (en banc). In this regard, "a right of legal control over the persons or events giving rise to the injury complained of" was critical where a state-law duty to act was action "under color of state law." *Id.* at 1413, 1414-15. *See also Howard v. Fortenberry*, 723 F.2d 1206, 1213 (5th Cir. 1984), vacated in part, 728 F.2d 712 (5th Cir. 1984).

71

In this case, Dr. Zaccari has acknowledged that he made the decision to administratively withdraw Mr. Barnes from the University. Ex. 2; Ex. 4 at 226:20-25 ("I made the decision to withdraw Mr. Barnes."). But he convened a number of meetings with other defendants that he later claimed were for the purpose of seeking their advice. *See* Ex. 5 at 4 ("I sought the advice of the members of the President's administrative unit"); Ex. 4 at 172:11-174:11. He also sought and received confidential information about Barnes from other defendants. Ex. 11 at 17:21-18:6; Ex. 18 at 24:10-25:23.

Through their acts and omissions, each of the defendants bears responsibility for the deprivation of Mr. Barnes' federal rights. For example, among the VSU defendants, Vice President Keppler and Dean Mast have an obligation to ensure Ex. 9 at 134:12-23 (student disciplinary procedures and due process protections are responsibilities of the office of the Vice President for Student Affairs). Indeed, Keppler described his obligation to be an "advocate" for student rights, and that he and Dean Mast are "experts in trying to make sure students are heard, supported, encouraged, and advocated for." *Id.* at 89:17-23. *See also id.* at 29:5-8 ("My responsibility is to be an advocate and supporter and provide services and programs for students at the institution in those 14 units.").

Here, however, Keppler and Mast acquiesced in a process that they knew violated Barnes' rights because they concluded that the decision was not for them to second-guess.[77] Their passivity in response to a blatant disregard of student rights drains all meaning from what it means to be an "advocate." As Vice President Keppler so memorably described his disengagement, the matter "was beyond my pay grade." Ex. 9 at 152:19-25.

Other defendants were less cowardly in handling Dr. Zaccari's unconstitutional demand to remove a student, but they are no less culpable for the egregious result. Although University Counsel Gaskins warned that the proposed course of conduct implicated Barnes' rights under the First Amendment, Due Process Clause, and the ADA, Ex. 8 at 27:22-32:22, she nevertheless assisted in implementing the withdrawal decision. Gaskins knew that VSU and the Board planned to withdraw Barnes with full knowledge that doing so would violate his rights. *See, e.g., id.* at 28:9-13, 68:9-17 ("we will worry about the lawsuit later").

---

[77] Ex. 9 at 134:1-11 (Q: "Was Board of Regents Policy 401 that requires due process and fairness followed in this case?" A: "No, it was not."); *id.* at 64:18-24 ("As Vice President of Student Affairs, when your president says he has spoken with some people at the Board of Regents office about this case, you pretty much get the impression that he has talked to people well beyond your pay grade. . . . I did not question it."); Ex. 10 at 65:16-67:6 (rights set forth in the student handbook were not provided to Barnes); *id.* at 7:20-8:5 (Dean of Students handles issues involving student discipline and withdrawals).

Yet, she actively assisted Zaccari in drafting the Withdrawal Notice, and assisted him afterward in defending his decision to the Board. *Id.* at 171:14-179:9; Drafts of Zaccari's appeal to the Board of Regents (hereafter Ex. 51)

Although Gaskins' efforts to advise Zaccari of his legal obligations were laudible, her professional obligations did not end there. Georgia Bar rules require that when an attorney for an organization is aware that a proposed action will lead to a violation of law "which reasonably might be imputed to the organization," the lawyer is ethically bound to ask for reconsideration, to seek a second opinion for presentation to higher authorities, or to refer the matter to a higher authority in the organization, "including the highest authority that can act" on the organization's behalf. Ga. Rules of Prof. Conduct § 1.13(b). If the organization persists in a course of conduct that clearly is contrary to law and the organization's legitimate interests, Bar rules permit the attorney to resign from the matter. *Id.* at § 1.13(c). However, Gaskins did none of these things, and continued to help defend actions that she knew to be illegal.

Leah McMillan similarly failed to adhere to her professional obligations. As she testified, the student's "contract" with the VSU Counseling Center obligates her to protect the confidentiality of those she counsels. Ex. 11 at 74:9-80:5. Indeed, she acknowledged it is necessary to obtain a waiver from a student in order

to communicate with the school's administration about whether the student is a threat.[78]  Doing so is not just a matter of professional courtesy – it is a condition of a therapist's license with the State of Georgia.[79]   Here, however, McMillan knowingly disclosed details of Barnes' medical history and treatment, on more than one occasion, without first obtaining a waiver.  *See supra* __.   Although McMillan later tried to make up for her lapse in professional conduct, the information she disclosed was a central part of the illegal scheme to expel Barnes.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment should be granted in its entirety.

---

[78] Ex. 11 at 126:18-128:20.  Indeed, McMillan did seek such a waiver after the fact, when Barnes asked her to write such a letter on his behalf.  *Id.* at 134:2-4, 136:8-9.

[79] *See* Ga. Code § 43-10A-17(a)(6) ("unprofessional conduct shall . . . include any departure from, or the failure to conform to, the minimal standards of acceptable and prevailing practice of the specialty"); *id.* § 43-10A-17(a)(8) (a therapist shall not violate any federal or state rule or regulation "which statute, law, or rule or regulation relates to . . . the practice of the specialty").

Respectfully submitted this 23rd day of December, 2009,

By: Robert Corn-Revere /il (with express permission)
Robert Corn-Revere
Christopher A. Fedeli
Lisa B. Zycherman
Erin N. Reid
Admitted *Pro Hac Vice*
Attorneys for Plaintiff
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW
 Suite 200
Washington, DC 20006
Email: bobcornrevere@dwt.com


By:
Irma Espino
Georgia Bar No. 558220
Attorneys for Plaintiff
Wiggins Law Group
Suite 401
260 Peachtree Street, NW
Atlanta, GA 30303
404-659-2880
Email: irma@wigginslawgroup.com

## CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that on December 23, 2009, I filed the foregoing with the

Clerk of the Court and sent a copy of this motion by electronic mail to all counsel

of record.  I also certify, pursuant to LR 7.1(D), that this memorandum has been

prepared in Times New Roman 14-point font.

By: *Robert Corn-Revere* (with express permission)
Robert Corn-Revere
Christopher A. Fedeli
Lisa B. Zycherman
Erin N. Reid
Admitted *Pro Hac Vice*
Attorneys for Plaintiff
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW
 Suite 200
Washington, DC 20006
Email: bobcornrevere@dwt.com


By: *[signature]*
Irma Espino
Georgia Bar No. 558220
Attorneys for Plaintiff
Wiggins Law Group
Suite 401
260 Peachtree Street, NW
Atlanta, GA 30303
404-659-2880
Email: irma@wigginslawgroup.com

1