6/18/09

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| THOMAS HAYDEN BARNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action File No.: |
| | ) | 1:08-CV-0077-CAP |
| RONALD M. ZACCARI, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT VALDOSTA STATE UNIVERSITY'S RESPONSE TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT VALDOSTA STATE UNIVERSITY

COMES NOW Defendant Valdosta State University, by and through the undersigned counsel, and submits the following objections and responses to Plaintiff's First Interrogatories and Requests for Production of Documents to it:

### PRELIMINARY STATEMENT

Defendant's response to Plaintiff's First Interrogatories and Request for Production of Documents has been prepared in full compliance with the Federal

Rules of Civil Procedure, pursuant to a reasonable and duly diligent search for information properly requested. To the extent that Plaintiff's requests attempt to require Defendant to obtain information not in its possession, custody or control, Defendant objects to the requests as seeking to compel Defendant to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure and as imposing an undue burden and expense on Defendant.

Defendant reserves all rights to object regarding the confidentiality, relevancy, materiality, or admissibility of the information and documents disclosed pursuant to Plaintiff's First Interrogatories and Requests for Production of Documents. Defendant has not completed preparation for the trial of this matter, and the information provided is without prejudice to Defendant's rights to make further objections and present additional information and documents which are hereafter learned that are relevant to this action and called for by Plaintiff's First Interrogatories and Requests for Production of Documents.

Defendant does not concede that any of the responses and/or documents that are produced pursuant to this request will be admissible evidence at trial.

Further, Defendant does not waive any objections, whether or not stated herein, to Plaintiff using such responses and/or documents at trial.

## **GENERAL OBJECTIONS**

### 1.

This Defendant objects to the Instructions set out in Plaintiff's Interrogatories and Requests for Production of Documents to the extent that they impose greater actions or duties than those required by the Federal Rules of Civil Procedure.

### 2.

Defendant objects to the Plaintiff's Interrogatories and Requests for Production of Documents to Defendant to the extent that the Plaintiff seeks to obtain information that is protected by the attorney-client privilege or attorney work product doctrine.

### 3.

Defendant objects to the Plaintiff's Interrogatories and Requests for Production of Documents to Defendant to the extent that the Plaintiff seeks information and documents prepared in anticipation of litigation or for use at trial by Defendant and its attorneys.

4.

Defendant objects to Plaintiff's Interrogatories and Requests for Production of Documents to Defendant to the extent that Plaintiff seeks to obtain information that will not be admissible at trial and which is not reasonably calculated to lead to the discovery of admissible evidence.

5.

Defendant objects to Plaintiff's Interrogatories and Requests for Production of Documents to Defendant as they are overly broad, unduly burdensome, oppressive and expensive.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

Without waiving the above-referenced objections, Defendant responds to the numbered Interrogatories and Requests for Production of Documents as follows:

### INTERROGATORIES

INTERROGATORY NO. 1: Identify each person having discoverable information that you believe supports a position that You have taken or intend to take in this action, and set forth the subject matter of the information possessed by that person.

**RESPONSE:** Defendant VSU objects to this Interrogatory on the grounds that it seeks the discovery of mental impressions and legal theories concerning this litigation that request this Defendant to draw legal conclusions for the benefit of the Plaintiff, which exceeds the scope of permissible discovery. Subject to the foregoing objection, and without waiving same, this Defendant answers as follows:

- Ronald Zaccari, rationale, reasons behind withdrawal of Plaintiff

- Leah McMillan, support for rationale, reasons behind withdrawal of Plaintiff

- Richard Lee, communications to the Defendant regarding First Amendments rights on campus; about Defendant's knowledge of, and experiences with, the Free Expression Area and the Student Handbook.

- Staff of the VSU Information Technology Dept. – email documentation, hard drive documentation for tangible evidence not contained in paper format (for request for production)

- Honey Coppage, Records Custodian of VSU, personnel conduit for contents of Plaintiff's Student file at VSU (for request for production)

- **Donnie Morris – traveling Evangelist – to testify as to the Plaintiff's behavior on the Free Expression Area on VSU's campus.**
- **Dr. Louis Levy, VSU VP for Academic Affairs – academic status of Plaintiff**
- **Mr. James Black. Former VSU VP for Finance and Administration**
- **Ms. Thressea Boyd, VSU Assistant to the President**
- **Ms. Melinda Cutchens, VSU Senior Administrative Secretary to the President**
- **Ms. Elizabeth E. Neely, Board of Regents, Office of Legal Affairs – advice given to President Zaccari**
- **Ann Farmer, VSU Police**
  - **Each of the above individuals can attest to President Zaccari's genuine concern for campus safety and were aware of Zaccari's daily actions prior to and following the VT shootings and related aftermath.**

INTERROGATORY NO. 2: If You intend to rely upon any documents or other tangible things to support a position that You have taken or intend to take in the action, provide a brief description, by category and location, of each such

document and other tangible thing, and identify all persons having possession, custody, or control of them.

**RESPONSE**: Defendant VSU objects to this Interrogatory on the grounds that it seeks the discovery of mental impressions and legal theories concerning this litigation that request this Defendant to draw legal conclusions for the benefit of the Plaintiff, which exceeds the scope of permissible discovery. Subject to the foregoing objection, and without waiving same, this Defendant answers as follows:

All documents provided by the above-listed Departments of VSU are being provided in the Responses to the Request for Production of Documents below. They include records and emails pertaining to the Plaintiff.

INTERROGATORY NO. 3: Specifically identify and describe all Communications between you and the other Defendants regarding the Plaintiff.

**RESPONSE**: There were no communications between this Defendant per se, and the other Defendants concerning the Plaintiff, as the communications themselves were between the individual Defendants.

INTERROGATORY NO. 4:  To the extent that you contend that Plaintiff was a threat to VSU campus security, set forth all bases for this claim, identify any communications supporting your contention, and name the sources of such communications, the date, time and substance of such communications, and all witnesses thereto.

**RESPONSE:  Defendant VSU objects to this Interrogatory on the grounds that it seeks the discovery of mental impressions and legal theories concerning this litigation that request this Defendant to draw legal conclusions for the benefit of the Plaintiff, which exceeds the scope of permissible discovery.  Subject to the foregoing objection, and without waiving same, this Defendant answers as follows:**

**President Zaccari was the individual who made the final decision to withdraw Plaintiff from the university based his perceived threat to campus.  To the extent that such decision was within Zaccari's discretionary authority and to the extent that Zaccari's action are binding on VSU, VSU reserves the right to rely on all documents, rationales, communications, and theories Zaccari will rely on to support his decision.**

INTERROGATORY NO. 5: Specifically identify all VSU rules, policies and procedures for subjecting a student to expulsion, including but not limited to any relevant sections of the VSU Student Code of Conduct.

**RESPONSE:** **Defendant VSU objects to this Interrogatory on the grounds that it seeks the discovery of mental impressions and legal theories concerning this litigation that request this Defendant to draw legal conclusions for the benefit of the Plaintiff, which exceeds the scope of permissible discovery. Subject to the foregoing objection, and without waiving same, this Defendant answers as follows:**

**See page 49 and 65 of the Student Handbook and other pertinent sections.**

INTERROGATORY NO. 6: Specifically identify any and all VSU students who were expelled from VSU during Defendant Zaccari's tenure as President of the University, and describe the reason why they were expelled, how the decision to expel the students was made, and how the students were notified by You or Zaccari that they were expelled.

**RESPONSE:** **Expulsion is a disciplinary sanction provided for in the Student Handbook, which contains the procedures. Documents of any**

individuals expelled during the tenure of President Zaccari will be provided.

INTERROGATORY NO. 7: Specifically identify all VSU rules, policies and procedures that empower the VSU President to determine that a student is a "clear and present danger" to campus security.

**RESPONSE: Defendant VSU objects to this Interrogatory on the grounds that it seeks the discovery of mental impressions and legal theories concerning this litigation that request this Defendant to draw legal conclusions for the benefit of the Plaintiff, which exceeds the scope of permissible discovery. Subject to the foregoing objection, and without waiving same, this Defendant answers as follows:**

**Appendix D, page 68, of the Student Handbook was in place at the time Plaintiff was withdrawn from VSU, which is the Mental Health Withdrawal procedures.**

**The current student handbook now has a procedure for withdrawal based on a student being a "clear and present danger" to the campus, which is contained Appendix B, page 65.**

INTERROGATORY NO. 8: Specifically describe all meetings, discussions, or actions in which any current or former employee of VSU participated in connection with the decision to "administratively withdraw" Plaintiff from VSU.

**RESPONSE: Defendant VSU objects to this Interrogatory on the grounds that it seeks the discovery of mental impressions and legal theories concerning this litigation that request this Defendant to draw legal conclusions for the benefit of the Plaintiff, which exceeds the scope of permissible discovery. Subject to the foregoing objection, and without waiving same, this Defendant answers as follows:**

**The other parties named in this lawsuit, and the other individuals these parties have mentioned as being involved, are the individuals involved in the decision of President Zaccari to withdraw the Plaintiff from VSU. To the extent that such involvement was within was within the scope of employment of these individuals, if at all, VSU reserves the right to rely on all documents, rationales, communications, and theories such individuals will rely on to prove or support such involvement.**

INTERROGATORY NO. 9:   Specifically identify and describe all Communications by and between any current or former employee of VSU and Defendant Zaccari in connection with the decision to "administratively withdraw" Plaintiff from VSU.

**RESPONSE:  See VSU's response to Interrogatory No. 2, No. 4, and Interrogatory No. 8 above.**

INTERROGATORY NO. 10:   Specifically identify all VSU rules, policies, and procedures that empower the VSU President to decide unilaterally when a student no longer represents a "clear and present danger" to campus security.

**RESPONSE:   See VSU's Response to Interrogatory No. 7.   See testimony of the other Defendants, communications from the Board of Regents, and communications from Laverne Gaskins, attached in VSU's responses to the Request for Production of Documents below.   See also VSU's Responses to Interrogatory No. 4, No. 7, and No. 8.**

INTERROGATORY NO. 11:  Specifically identify all communications which you are aware regarding Plaintiff's request to construct atlatl for a VSU

archeology class project, naming the parties to the communications and setting

forth the date on which you became aware of the communications.

**RESPONSE:**

**See Defendant VSU's responses to the Request for Production contained in
the VSU Student file of the Plaintiff, specifically emails between the
Plaintiff and Richard Lee. The date on which VSU became aware of the
communication(s) is "not applicable."**

INTERROGATORY NO. 12:   Specifically identify all communications

between any current or former employee or agent of VSU and Defendant

McMillan regarding Plaintiff.

**RESPONSE:   See VSU's response to Interrogatory No. 8 above, as
specific to Defendant McMillan.   See also emails and other documents
produced in VSU's responses to the Request for Production of Documents
below, as specific to McMillan.**

INTERROGATORY NO. 13:   Specifically identify and describe all

communications directed to or made by any current or former employee or agent

of VSU regarding Plaintiff's treatment at the VSU counseling center.

**RESPONSE:** See VSU's response to Interrogatory No. 8 above, as specific to Vic Morgan and McMillan. See also emails and other documents produced in VSU's responses to the Request for Production of Documents below, as specific to Morgan and McMillan.

INTERROGATORY NO .14:    Specifically identify and describe all communications between any current or former employee or agent of VSU and Defendant Zaccari during the period prior to April 20, 2007 throughthe present concerning Plaintiff including, but not limited to, communications setting forth Zaccari's concerns about Plaintiff's protests about the construction of parking garages on the VSU campus.

**RESPONSE:** See VSU's response to Interrogatory No. 8, as specific to Zaccari. See also VSU's responses to the Request for Production of Documents below, as specific to such communications.

INTERROGATORY NO. 15:    Specifically identify and describe all communications between you and any other person concerning a May 3, 2007 meeting between any current or former employee or agent of VSU, Defendant

Zaccari, and others concerning Plaintiff Thomas Hayden Barnes, and name all others present at that meeting.

**RESPONSE:  See VSU's response to Interrogatory No. 8, as specific to such meeting.  See also VSU's responses to the Request for Production of Documents below, as specific to such meeting.**

INTERROGATORY NO. 16:    Specifically identify and describe all communications by and between any two or more current or former employees or agents of Valdosta State University concerning Plaintiff's appeal of his expulsion from VSU to the BOR.

**RESPONSE:   No such communications exist as Plaintiff was not expelled.  However, VSU believes that Plaintiff intends to inquire about the appeal of his withdrawal.  See VSU's response to Interrogatory No. 4 and No. 8, as specific to Plaintiff's appeal.  See also VSU's responses to the Request for Production of Documents below, as specific to Plaintiff's appeal.**

INTERROGATORY NO. 17: Specifically identify all communications from the board of regents or nay employee of the Board of Regents concerning Defendant Zaccari's decisions to retire from his job as President of VSU earlier that previously announced.

**RESPONSE:**

**Defendant Zaccari did not retire early.**


INTERROGATORY NO. 18: Specifically identify all communications from any individual employed by the State of Georgia, or anyone affiliated with the State of Georgia, including but not limited to the Governor, state legislators, other state elected officials and other high ranking state officials, concerning Defendant Zaccari's decision to retire from his job as President of VSU earlier than previously announced.

**RESPONSE:**

**Defendant Zaccari did not retire early.**

## REQUESTS FOR PRODUCTION OF DOCUMENTS

<u>REQUEST FOR PRODUCTION NO. 1</u>:    Produce all documents identified in your responses to the preceding Interrogatories, and identify which Interrogatory or Interrogatories to which the document relates.

**RESPONSE: All such documents will be produced.**

<u>REQUEST FOR PRODUCTION NO. 2</u>:    Produce all documents containing or relating to any of the Communications described in response to Interrogatories 1 through 18 above.

**RESPONSE: All such documents will be produced.**

<u>REQUEST FOR PRODUCTION NO. 3</u>:  Produce all documents relating to concerns that Plaintiff posed a safety threat to himself or any VSU employee, agent, or student.

**RESPONSE: All such documents will be produced.**

<u>REQUEST FOR PRODUCTION NO. 4</u>:  Produce all documents relating to communications between any current or former employee of VSU or any of

your agents and Defendant McMillan regarding McMillan's treatment of Plaintiff at the VSU counseling center.

**RESPONSE: All such documents will be produced.**

REQUEST FOR PRODUCTION NO. 5: Produce all documents relating to past incidents of student violations of VSU campus security policies from 2002 to the present.

**RESPONSE: All such documents will be produced.**

REQUEST FOR PRODUCTION NO. 6: Produce all documents relating to any past incident, from 2002 to the present in which a student has been expelled or "administratively withdrawn" because of concern about campus security.

**RESPONSE:  No other student has been administratively withdrawn because of a concern of campus security.  Records of individuals expelled from 2002 will be produced.**

REQUEST FOR PRODUCTION NO. 7: Produce all documents relating to any students who have been sanctioned, reprimanded, fined, or questioned by

any current of former employee of VSU, the University, or nay branch of the Division of Student Affairs for speech or political activities.

**RESPONSE:  None exists.**

REQUEST FOR PRODUCTION NO. 8:  Produce all documents relating to any formal or informal student complaints received by any current or former employee of VSU, the University, or any branch of the Division of Student Affairs during the tenure of President Zaccari concerning the University's restraints on student political speech.

**RESPONSE:  None exists.**

REQUEST FOR PRODUCTION NO. 9:  Produce all documents relating to any students who have been expelled by the University during the tenure of Zaccari as President of VSU, including students whose expulsions were reversed.

**RESPONSE:        Any and all documents related to expelled students will be produced.**

REQUEST FOR PRODUCTION NO. 10: Produce all documents relating to any students who have been sanctioned, reprimanded, fined, or questioned by the University during the tenure of President Zaccari for speech or political activities.

**RESPONSE: None exists.**

REQUEST FOR PRODUCTION NO. 11: Produce all documents and correspondence relating to any formal or informal accusations during the tenure of President Zaccari of due process violation by VSU.

**RESPONSE: None exists.**

REQUEST FOR PRODUCTION NO. 12: Produce all documents and correspondence relating to University policy concerning the disclosure of confidential student academic and non academic records to other members of the University community.

**RESPONSE: See Student Handbook Sections on disclosure of student records. All such documents will be produced.**

REQUEST FOR PRODUCTION NO. 13:  Produce all documents relating to any formal or informal student complaints received by any current or former employees of VSU, the University, or any branch of the Division of Student Affairs during the tenure of President Bailey concerning the University's restraints on student political speech.

**RESPONSE:**      **No such documents are believed to exist.**

REQUEST FOR PRODUCTION NO. 14:  Produce all documents and correspondence relating to University policies regarding student use of the Internet and social networking sites.

**RESPONSE:  See former Student Handbook page 62 and current Student Handbook page 64.  See also VSU Responses RPDS – Emails communications policy.  All such documents will be produced.**

REQUEST FOR PRODUCTION NO. 15:  Produce all documents on which you rely in support of Your contention that Plaintiff was a threat to VSU campus security.

**RESPONSE:  All such documents will be produced.**

<u>REQUEST FOR PRODUCTION NO. 16</u>:    All documents and correspondence concerning Barnes' request to construct an atlatl for a VSU archeology class project.

**<u>RESPONSE</u>:  See VSU's response to Request for Production No. 11. See also VSU Responses to RPDS – Barnes' Student File – 4.  All such documents will be produced.**

<u>REQUEST FOR PRODUCTION NO. 17</u>:  Produce all documents in your possession relating to the shootings at Virginia Polytechnic Institute and State University in April 2007.

**<u>RESPONSE</u>:  All such documents will be produced.**

<u>REQUEST FOR PRODUCTION NO. 18</u>:  Produce all documents relating to VSU's rules, policies, and procedures for administrative withdrawal of students.

**<u>RESPONSE</u>:  All such documents will be produced.**

<u>REQUEST FOR PRODUCTION NO. 19</u>:   Produce all documents and correspondence relating to University policy concerning the disclosure of

confidential student medical records to other members of the University community.

**RESPONSE:  See VSU's Response to Request for Production No. 12. All such documents will be produced.**

REQUEST FOR PRODUCTION NO. 20:  Produce all documents relating to VSU's rules, policies and procedures for expulsion of students.

**RESPONSE:  All such documents will be produced.**

REQUEST FOR PRODUCTION NO. 21:  Produce all documents relating to communications between You and Defendant McMillan regarding Plaintiff.

**RESPONSE:     All documents reflecting communications involving Defendant McMillan will be produced.**

Respectfully submitted this _18th_ day of June, 2009.

                                    DAVID C. WILL
                                    Georgia Bar No. 760150
                                    Email:  dwill@royallaw.net

**ROYAL WASHBURN WILL**
4799 Sugarloaf Parkway, Building J
Lawrenceville, Georgia 30044
Phone: (770) 814-8022
Fax: (770) 814-8360

**EXHIBIT 7**

6/18/09

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

THOMAS HAYDEN BARNES,     )
                               )
       Plaintiff,          )
                               )
       v.               )      Civil Action File No.:
                               )      1:08-CV-0077-CAP
RONALD M. ZACCARI, *et al.*,    )
                               )
       Defendants.     )

## DEFENDANT GEORGIA BOARD OF REGENTS' RESPONSE TO

## PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR

## PRODUCTION OF DOCUMENTS TO DEFENDANT GEORGIA BOARD

## OF REGENTS

COMES NOW Defendant Georgia Board of Regents, by and through the undersigned counsel, and submits the following objections and responses to Plaintiff's First Interrogatories and Requests for Production of Documents to it:

## PRELIMINARY STATEMENT

Defendant's response to Plaintiff's First Interrogatories and Request for Production of Documents has been prepared in full compliance with the Federal

Rules of Civil Procedure, pursuant to a reasonable and duly diligent search for information properly requested. To the extent that Plaintiff's requests attempt to require Defendant to obtain information not in its possession, custody or control, Defendant objects to the requests as seeking to compel Defendant to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure and as imposing an undue burden and expense on Defendant.

Defendant reserves all rights to object regarding the confidentiality, relevancy, materiality, or admissibility of the information and documents disclosed pursuant to Plaintiff's First Interrogatories and Requests for Production of Documents. Defendant has not completed preparation for the trial of this matter, and the information provided is without prejudice to Defendant's rights to make further objections and present additional information and documents which are hereafter learned that are relevant to this action and called for by Plaintiff's First Interrogatories and Requests for Production of Documents.

Defendant does not concede that any of the responses and/or documents that are produced pursuant to this request will be admissible evidence at trial.

Further, Defendant does not waive any objections, whether or not stated herein, to Plaintiff using such responses and/or documents at trial.

## GENERAL OBJECTIONS

1.

This Defendant objects to the Instructions set out in Plaintiff's Interrogatories and Requests for Production of Documents to the extent that they impose greater actions or duties than those required by the Federal Rules of Civil Procedure.

2.

Defendant objects to the Plaintiff's Interrogatories and Requests for Production of Documents to Defendant to the extent that the Plaintiff seeks to obtain information that is protected by the attorney-client privilege or attorney work product doctrine.

3.

Defendant objects to the Plaintiff's Interrogatories and Requests for Production of Documents to Defendant to the extent that the Plaintiff seeks information and documents prepared in anticipation of litigation or for use at trial by Defendant and its attorneys.

4.

Defendant objects to Plaintiff's Interrogatories and Requests for Production of Documents to Defendant to the extent that Plaintiff seeks to obtain information that will not be admissible at trial and which is not reasonably calculated to lead to the discovery of admissible evidence.

5.

Defendant objects to Plaintiff's Interrogatories and Requests for Production of Documents to Defendant as they are overly broad, unduly burdensome, oppressive and expensive.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

Without waiving the above-referenced objections, Defendant responds to the numbered Interrogatories and Requests for Production of Documents as follows:

### INTERROGATORIES

INTERROGATORY NO. 1:  Identify each person having discoverable information that you believe supports a position that You have taken or intend to take in this action, and set forth the subject matter of the information possessed by that person.

**RESPONSE:**    In addition to relying on the persons identified by other Defendants, Vice Chancellor Linda Daniels and Elizabeth Neely are believed to have discoverable information relating to the Plaintiff, his administrative withdrawal and his appeal to the Board of Regents.

INTERROGATORY NO. 2:  If You intend to rely upon any documents or other tangible things to support a position that You have taken or intend to take in the action, provide a brief description, by category and location, of each such document and other tangible thing, and identify all persons having possession, custody, or control of them.

**RESPONSE:**    The Board of Regents has not determined what specific documents it will rely on to support its position(s).  It is producing all documents in its custody pertaining to the Plaintiff and his claims, and may rely on documents produced by other Defendants, specifically including Valdosta State University.

INTERROGATORY NO. 3:  Identify and describe all communications between You and any Person concerning any matter alleged in the Complaint.

**RESPONSE**:     The only communications are believed to be those between Elizabeth Neely and Dr. Zaccari, Linda Daniels and Dr. Zaccari, and those between the Plaintiff and the Board of Regents, and those between his attorneys and the Board of Regents.

**INTERROGATORY NO. 4**:   Specifically identify and describe all Communications between You and Plaintiff, other than documents exchanges through Litigation.

**RESPONSE**:     The only direct communications with the Plaintiff are believed to be the communications received by the Board of Regents from the Plaintiff concerning his opposition to the parking deck.

**INTERROGATORY NO. 5**:   Specifically identify and describe all meetings, discussions, or actions in which you participated in connection with the decision to "administratively withdraw" the Plaintiff from VSU.

**RESPONSE**:     This defendant is not aware of any "meetings," but Elizabeth Neely did have discussions with Dr. Zaccari concerning the decision to administratively withdraw the Plaintiff from VSU.

INTERROGATORY NO. 6:    Specifically identify and describe all Communications concerning Plaintiff's correspondence to Board members in advance of the April 16, 2007 BOR meeting regarding construction of a parking facility.   Specifically include any and all discussions of the March 24, 2007 email from Plaintiff Barnes concerning the parking facilities copying the Board Chancellor, and discussions of the subsequent correspondence between Defendant Zaccari, Thressea H. Boyd, and Beheruz Sethna.   In addition, specifically identify and describe all Communications concerning Plaintiff's Communications with Board members Allan Vigil and Richard Tucker.

**RESPONSE:    Following receipt of the Plaintiff's correspondence, inquiry was made by Linda Daniels to Dr. Zaccari to ascertain if the Plaintiff was expected to attend the Board of Regents meeting. The Board of Regents does not have records that would relate to the Plaintiff's direct communications with Board members Allen Vigil and Richard Tucker.**

INTERROGATORY NO. 7:    Specifically identify and describe all Communications by and between Board Vice Chancellor Linda Daniels and Defendant Zaccari concerning Plaintiff's interest, Communications concerning, or potential presence at the April 16, 2007 BOR meeting. In addition, identify

and describe any and all subsequent Communications be any party relating to or discussing the previously-described Communications between Daniels and Zaccari.

**RESPONSE:**        **See response to Interrogatory No. 6, above.**


INTERROGATORY NO. 8: Specifically identify and describe all Communications by and between Defendant Gaskins and Betsy Neely concerning or relating to Plaintiff or the University's and the Board's policies and procedures, or recommendations or suggestions, concerning administration responses, initiation of, or involvement in complaints concerning violations of the Student Code of Conduct. Specifically include any and all discussions of the April 26, 2007 email from Betsy Neely to Defendant Gaskins concerning appeal procedures from President Zaccari's planned expulsion of Plaintiff Barnes. In addition, identify and describe any and all subsequent Communications by any party relating to or discussing the previously-described Communications between Gaskins and Neely.

**RESPONSE: The only communication between Elizabeth Neely and Defendant Gaskins is believed to be the April 16, 2007 email. Ms. Neely**

spoke by telephone with **Dr. Zaccari. President Zaccari did not plan to expel the Plaintiff. The Plaintiff was not expelled.**

INTERROGATORY NO. 9: Specifically identify and describe all Communications by and between Dr. Winders, Defendant McMillan, and the BOR or any individual Board members concerning or relating to Winders or McMillan's professional opinions concerning Plaintiff. In addition, identify and describe any and all subsequent Communications by any party relating to or discussing the previously-described Communications between Winders, McMillan, and the BOR or any Board member.

**RESPONSE:** **No direct communications of which the Board is aware. Correspondence from Defendant McMillan and Dr. Winder was subsequently included in the package of materials sent by Valdosta State University in connection with the Plaintiff's appeal.**

INTERROGATORY NO. 10: Specifically identify and describe all Communications by and between the BOR or any Board member, or between the BOR or any Board member and any other party concerning Plaintiff's appeal to the BOR of his "administrative withdrawal" from VSU.

Page 9 of 20

**RESPONSE:  The Board is not aware of any such communication.**

INTERROGATORY NO. 11:  Specifically identify and describe all Communications by and between the BOR or any Board member and Defendant Zaccari concerning Defendant Zaccari's decision to "administratively withdrawal" Plaintiff from VSU.

**RESPONSE:  The Board is not aware of any communication between Board members and Dr. Zaccari concerning the administrative withdrawal. Elizabeth Neely communicated with Dr. Zaccari before the decision was made and subsequent to the decision, when she requested materials concerning the Plaintiff's appeal to the Board.**

INTERROGATORY NO. 12:  Specifically identify and describe all Communications by and between the BOR or any Board member, or between the BOR or any Board member and any other party concerning the BOR's August 7, 2007 hearing and referral to an Administrative Law Judge at the Office of State Administrative Hearings of Plaintiff's appeal of his "administrative withdrawal" from VSU.

**RESPONSE:  None of which the Board is aware.**

Page 10 of 20

INTERROGATORY NO. 13:   Specifically identify and describe all Communications by and between the BOR or any Board member, or between the BOR or any Board member and any other party concerning the BOR's December 17, 2007, motion for a continuation of the scheduled hearing so that it could reevaluate Barnes' appeal.

**RESPONSE:  None of which the Board is aware.**


INTERROGATORY NO .14:   Specifically identify and describe all Communications by and between the BOR or any Board member, or between the BOR or any Board member and any other party concerning the BOR's decision to rescind the "administrative withdrawal" of Plaintiff Barnes.

**RESPONSE:  None of which the Board is aware.**


INTERROGATORY NO. 15:   Specifically identify and describe all Communications by and between the BOR or any Board member, or between the BOR or any Board member and any other party, concerning Plaintiff Thomas Hayden Barnes.   In addition, specifically identify and describe all Communications by and between the BOR or any Board member, or between the BOR or any Board member and any other party, concerning the May 8, 2007

letter from Leah McMillan to the members of the BOR and Defendant Zaccari concluding that Plaintiff Barnes was "not a threat . . . to anyone on the VSU campus."

**RESPONSE:  None other than as previously identified.**

INTERROGATORY NO. 16:  Specifically identify and describe all Communications by and between the BOR or any Board member and Defendant Zaccari, concerning Plaintiff Thomas Hayden Barnes.  Specifically identify and describe any Communications concerning the April 16, 2007 email from Linda Daniels to President Zaccari regarding Plaintiff Barnes.

**RESPONSE:  None other than as previously described.**

## REQUESTS FOR PRODUCTION OF DOCUMENTS

REQUEST FOR PRODUCTION NO. 1:    Produce all documents containing or relating to any of the Communications described in response to Interrogatories 1 through 16 above.

**RESPONSE:  All documents will be produced.**

REQUEST FOR PRODUCTION NO. 2: Produce all documents relating to any past incident from 2002 to the present in which a student at any university or college in the University System of Georgia has been expelled or "administratively withdrawn" because of concerns about campus security.

**RESPONSE:  The Board is not aware of any persons who were administratively withdrawn because of concerns about campus security. The Board will make available records on all individuals who have been expelled from 2002 to the present.**

REQUEST FOR PRODUCTION NO. 3:  Produce all documents on which you rely in support of the contention that Plaintiff was a threat to VSU campus security.

**RESPONSE:  The Board has not made that contention.**

REQUEST FOR PRODUCTION NO. 4: Produce all documents that set forth or explain VSU's policies governing campus security.

**RESPONSE:   No such documents are believed to be in the possession of the Board of Regents.**

REQUEST FOR PRODUCTION NO. 5: Produce all documents relating to VSU's response to the April 2007 shootings at Virginia Polytechnic Institute and State University.

**RESPONSE:    No such documents are believed to be in the possession of the Board of Regents.**

REQUEST FOR PRODUCTION NO. 6: Produce all documents relating to Your and VSU's policies and procedures for administrative withdrawal or expulsion of students and for the review and/or appeal of administrative withdrawal or expulsion decisions.

**RESPONSE: All such documents will be produced.**

REQUEST FOR PRODUCTION NO. 7: Produce all documents relating to any students who have been administratively withdrawn by the University during the tenure of President Zaccari, including students who were admitted back into the University.

**RESPONSE: To the knowledge of the Board, no student other than the Plaintiff has been administratively withdrawn during the tenure of President Zaccari.**

REQUEST FOR PRODUCTION NO. 8: Produce all documents relating to any students who have been expelled by the University during the tenure of President Zaccari, including students whose expulsions were reversed.

**RESPONSE: The Board does not have all such documents, but believes that they are in the possession of Valdosta State University. All will be disclosed.**

REQUEST FOR PRODUCTION NO. 9: Produce all documents relating to the University's administrative withdrawal of Barnes, including any and all documents relating to Defendant Zaccari's actions, deliberations, and communications with any other persons regarding same.

**RESPONSE: Any such documents in the possession of the Board will be disclosed.**

REQUEST FOR PRODUCTION NO. 10: Produce all documents relating to Barnes' tenure as a student at Valdosta State University.

**RESPONSE: Any such documents in the possession of the Board will be disclosed.**

REQUEST FOR PRODUCTION NO. 11:    Produce all documents, including those confidential in nature and protected by doctor-patient privilege, concerning Barnes' medical history and treatment while enrolled at Valdosta State University.

**RESPONSE:**    **No such documents are in the possession of the Board of Regents.**

REQUEST FOR PRODUCTION NO. 12:  Produce all documents relating to VSU's policies on student speech and political activity.

**RESPONSE:  No such documents are believed to be in possession of the Board.**

REQUEST FOR PRODUCTION NO. 13:  Produce all documents relating to any students who have been sanctioned, reprimanded, fined, or questioned by the University during the tenure of President Zaccari for speech or political activities.

**RESPONSE:    No such documents exist, as no students have been sanctioned, reprimanded, fined or questioned for speech or political activities.**

REQUEST FOR PRODUCTION NO. 14: Produce all documents relating to any formal or informal student complaints during the tenure of President Zaccari concerning the University's restraints on student speech or political activities.

**RESPONSE: The Board is not aware of any such documents.**

REQUEST FOR PRODUCTION NO. 15: Produce all documents and correspondence concerning Barnes' request to use an atlatl for a VSU archeology class project.

**RESPONSE:    No such documents are believed to be in the possession of the Board of Regents.**

REQUEST FOR PRODUCTION NO. 16: Produce all documents and correspondence relating to VSU policies regarding student use of the Internet and social networking sites.

**RESPONSE:    No such documents are believed to be in the possession of the Board of Regents.**

<u>REQUEST FOR PRODUCTION NO. 17</u>:   Produce all documents, correspondence, or communications relating to any students in the University System of Georgia, who have been sanctioned, reprimanded, fined, or questioned for speech or political activities.

**<u>RESPONSE</u>:     No students have been sanctioned, reprimanded, fined, or questioned for speech or political activities.**

<u>REQUEST FOR PRODUCTION NO. 18</u>:   Produce all documents and correspondence relating to VSU and BOR policies concerning the disclosure of confidential student medical records to other members of the University community.

**<u>RESPONSE</u>:   The Board does not have such a policy, and does not have possession of any such policy that may exist at Valdosta State University.**

<u>REQUEST FOR PRODUCTION NO. 19</u>:   Produce all documents relating to any formal or informal VSU student complaints during the tenure of President Bailey at VSU concerning restraints on student speech or political activities.

**RESPONSE:** **The Board is not aware of any such documents in its possession.**

REQUEST FOR PRODUCTION NO. 20: Produce all documents relating to any formal or informal VSU student complaints during the tenure of President Bailey at VSU concerning restraints on student speech or political activities.

**RESPONSE:** **The Board is not aware of any such documents in its possession.**

REQUEST FOR PRODUCTION NO. 21: Produce all documents containing or relating to VSU's policy on disorderly assembly and conduct and any other violations of Section 1902 of the Valdosta State University handbook.

**RESPONSE:** **The Board is not aware of any such documents in its possession.**

REQUEST FOR PRODUCTION NO. 22: Produce all documents relating to communications between You and Leah McMillan regarding Plaintiff.

**RESPONSE:** **The only documents relating to the Plaintiff are included in the materials relating to his appeal and will be produced.**

Page 19 of 20

Respectfully submitted this ___ day of June, 2009.


DAVID C. WILL
Georgia Bar No. 760150
Email: dwill@royallaw.net

**ROYAL WASHBURN WILL**
4799 Sugarloaf Parkway, Building J
Lawrenceville, Georgia 30044
Phone: (770) 814-8022
Fax: (770) 814-8360

**EXHIBIT 8**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

THOMAS HAYDEN BARNES,          CASE NUMBER
   Plaintiff,                    1:08-CV-00077-CAP
vs.
RONALD M. ZACCARI, et al,
   Defendants.
_____/

DEPOSITION OF
LAVERNE GASKINS, ESQ.

JUNE 12, 2009
10:05 A.M.

VALDOSTA STATE UNIVERSITY CENTER
1500 NORTH PATTERSON STREET
SOUTH BUILDING, ROOM 1149
VALDOSTA, GEORGIA

SARAH E. WILLIAMS, FPR, CCR, RPR



**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
404.351.4577

## Page 5

1   THEREUPON,
2        LAVERNE GASKINS, ESQ.,
3   having been first duly sworn, was examined and testified as
4   follows:
5        EXAMINATION
6   BY MR. CORN-REVERE:
7   Q   Good morning.
8   A   Good morning.
9   Q   I'm Bob Corn-Revere. This is Erin Reid. We
10  represent Hayden Barnes in the case. Today I'll be asking
11  you a number of questions in this deposition.
12       MR. LaVALLEE: Bob, I'm sorry to intervene right
13  away, but we didn't do any stipulations as to how to
14  handle things.
15       MR. CORN-REVERE: I'm sorry. I had mentioned it
16  earlier but forgot to bring it up again.
17       Standard stipulation as to objections.
18       MR. LaVALLEE: Form of the question --
19       MR. CORN-REVERE: Yes. Right.
20       MR. LaVALLEE: -- and responsiveness of the answer?
21       MR. CORN-REVERE: Yes. Right.
22       MR. SMITH: There's one thing I'd like to add to
23  that. I expect that a good portion, if not most, of the
24  questioning of Ms. Gaskins in this deposition today is
25  going to involve communications that occurred while she

## Page 6

1   was serving in the capacity as attorney for Valdosta
2   State University --
3        MR. CORN-REVERE: Yes.
4        MR. SMITH: -- and counseling with the folks who
5   were her clients at the time.
6        That, obviously, raised concerns of attorney-client
7   privilege which were raised at the beginning of this
8   case.
9        I've seen information and material that you
10  provided that indicated to me that that privilege is
11  waived during pre-suit administrative appeal of the
12  withdrawal of the plaintiff in this case.
13       And that's my understanding. We responded to
14  discovery on that basis to this point, and that's also
15  the basis I intend to proceed on the deposition.
16       But the attorney for all those folks who were
17  clients at that time, Dave Will, is here today. I'll
18  just say if he sees a question that seeks to invade what
19  he perceives as an attorney-client privilege that has not
20  been waived, I encourage him to make that because I don't
21  intend to. I'm proceeding under the assumption that
22  privilege has been waived.
23       MR. CORN-REVERE: Okay. Thank you for that
24  clarification. And, in fact, many of the questions today
25  will be based on the supplemental response to

## Page 7

1   interrogatories and document production that was provided
2   earlier this week by you.
3        If any of that material raises potential objections
4   that we haven't already discussed, it might be good to
5   discuss that now.
6        MR. WILL: For the record, we do not waive the
7   privilege to the extent it has not already been waived.
8   For documents that were produced in the administrative
9   proceeding to the extent it has been waived, that's a
10  waiver.
11       But for communications that have not been, we
12  reserve the right to raise that privilege. Even if we
13  allow it for purposes of today's hearing, we reserve the
14  right to seek a ruling that it was not waived as part of
15  the earlier proceedings.
16       We don't want to delay your -- or impede your
17  cross-examination of the Defendant but may want to
18  preserve that for later ruling by the court.
19       MR. CORN-REVERE: Okay. I appreciate your
20  position. Also, for the record I'll state that many of
21  the documents that we received as part of the
22  supplemental production were documents that we had seen
23  previously during the administrative phase of the
24  proceeding.
25       So, I'm not aware of any that would raise a new

## Page 8

1   privilege issue that hasn't already been subject to a
2   waiver argument.
3        MR. LaVALLEE: We'll just take it as it comes then.
4        MR. CORN-REVERE: Absolutely.
5   BY MR. CORN-REVERE:
6   Q   Could you state your name for record.
7   A   Laverne Lewis Gaskins.
8   Q   And your address?
9   A   3805 Sedgefield Drive, Valdosta, Georgia, 31605.
10  Q   Okay. Have you been deposed before?
11  A   No.
12  Q   Okay. Let me just say a few things at the
13  beginning that may help in just the process as we go
14  forward.
15       I'll be asking you a series of questions as, I'm
16  sure, your lawyer has explained.
17       Please, even if you understand where the question
18  might be going, let me finish the complete question so that
19  we can get it down on the record for transcription.
20       By the same token, any answers should be made
21  verbally so they can also be made on the record. It's hard
22  to record when you nod your head or something like that.
23       If at any point when I ask you a question, if you
24  don't understand the question, please ask me to clarify.
25  I'll be happy to do that. Or if you have any other

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

Page 9

questions about what I've asked, you can ask me that, too.
Okay. I think that covers that.
Could you tell us your occupation.
A I'm an attorney.
Q Okay. Who is your employer?
A Board of Regents of the University System of Georgia at Valdosta State University.
Q You're employed directly by the Board of Regents?
A We all are.
Q And what is your relationship to Valdosta State University?
A I'm in-House Counsel. University Attorney.
Q What are your duties as In-House Counsel for Valdosta State?
A I provide legal advice to the entire campus. That includes faculty, administrators, and staff. I also work with the Office of the Attorney General in the event there's litigation.
MR. SMITH: Okay. If I could interrupt a minute, the folks at the other end of the table are having a little trouble hearing you. You need to speak up if you can.
THE WITNESS: Okay. All right.
BY MR. CORN-REVERE:
Q Okay. Now I'm not asking you to talk about any

Page 10

advice you may have been given, but can you tell us what you did to prepare for today's deposition?
A I reviewed some records and spoke with my counsel.
Q Okay. Can you tell us which records you reviewed?
A I reviewed the responses to the discovery request and the supplemental responses.
MR. CORN-REVERE: Okay. Let's mark for identification three exhibits: First, a copy of the complaint in this case; secondly, a copy of the first responses to request for interrogatories and document production; and, third, the supplemental response.
(The documents were marked for identification as Plaintiff's Exhibit Numbers One, Two, and Three).
BY MR. CORN-REVERE:
Q Okay. I'm not going to have a lot of questions about these right now. We may refer to them later on in the deposition.
But let me just ask you, generally: For the responses to discovery, did you review the questions and answers in both the initial response to interrogatories and the supplemental response?
A Yes.
Q And did you approve those answers?
A Yes. And they were answered to the best of my ability and recollection, correct.

Page 11

Q Okay. Having reviewed them now, is there anything that you would amend or change to those responses?
A (Reviewing document.) There is one amendment. It's my understanding that there was a meeting between myself and Leah McMillan that took place on or about May 7th. It was brought to my attention.
I think that a meeting did take place based on my review of some records. I can't remember the content of that meeting or that discussion.
Q Okay.
A Yeah. But I'm looking to see exactly where that response was to discovery requests. I think the response was -- the question was how many meetings I had with Leah McMillan, and I think there's one particular meeting that I did not recall at the time that I responded to these discovery requests.
Q I see. So there were more meetings than you had originally disclosed?
A Just that one meeting.
Q Okay. Do you know if anyone else was present at that meeting on May 7th?
A I believe Dr. Morgan.
Q And who is he?
A He is the supervisor for Leah McMillan, and he works at our Counseling Center, as well.

Page 12

Q Anyone else?
A I believe Dr. Keppler.
Q I'm sorry?
A Dr. Kurt Keppler.
Q And what is his position?
A He's Vice President of Student Affairs.
Q Was there no one else at the meeting?
A Not that I can recall.
Q Okay. Let's mark as Deposition Exhibit Number Four an email dated April 26th, 2007.
(The document was marked for identification as Plaintiff's Exhibit Number Four.)
THE WITNESS: (Reviewing document.)
BY MR. CORN-REVERE:
Q Have you seen this document before?
A Yes, I have.
Q Can you tell us what it is?
A It's an email that was sent to Dr. Ronald Zaccari, and it reflects a communication between myself and Betsy Neely.
At that time she was -- I believe her title was Assistant Vice Chancellor of Legal Affairs at the Board of Regents; and it's dated April the 26th, 2007.
Q Okay. Now at the top of this page -- and this is the condition in which we received it -- there's a fax stamp

## Page 13

1 that's dated February 25th, 2009. Do you know what that
2 refers to?
3 A It's when it was -- it appears as if it's been
4 faxed.
5 Q Okay. Do you have any recollection of when or what
6 may have been faxed?
7 A It may have been faxed -- I cannot identify the
8 faxed number, but it may have been faxed to the office of
9 the Attorney General.
10 Q Okay.
11 A I can identify it. It looks like it's a
12 404-651-5304 number. So that tells you exactly where it was
13 faxed to.
14 Q Okay. Now looking at this sequence of emails --
15 again, correct me if I'm misunderstanding this -- it appears
16 that you received a response to a question from Elizabeth
17 Neely, and that response is dated April 26th, 2007.
18 But the initial question that you sent to Elizabeth
19 Neely is undated. Or at least I don't detect a date on
20 here.
21 A Uh-huh.
22 Q Do you know if these were sent in response to the
23 same day or were they different days?
24 A I can't testify to that because, as you can see,
25 this was printed out by myself.

## Page 14

1 The information you have reflected in this document
2 is a function of the computer system; and the computer
3 system, apparently, did not indicate when this email was
4 forwarded from myself.
5 Q Okay. But do you have an independent recollection
6 of when you might have first contacted Elizabeth Neely?
7 A Via email.
8 Q But do you know when? I mean, just by your own
9 recollection.
10 A No, no. I can't recall that, no.
11 Q Okay. Looking at your message to Elizabeth Neely,
12 could you tell us -- well, what were you asking her for?
13 A Well, the President was going to file -- he had
14 some concerns about Hayden Barnes, and at that time he
15 wanted to know whether or not it would be proper for the
16 matter to be disposed of in his office.
17 It specifically states, "Our appeal process
18 provides that decisions of the Judicial Board may be
19 appealed to the President.
20 "In the event the President files a complaint
21 against a student for a violation of the Student Code of
22 Conduct and the student wishes to file an appeal, should
23 that appeal go directly to your office or should the
24 President appoint a designee?"
25 Q Okay.

## Page 15

1 A In other words, if I can -- if my memory serves me
2 correctly, he had a concern about the conduct of Hayden
3 Barnes.
4 Q "He" meaning President Zaccari?
5 A President Zaccari. And he wanted to know whether
6 or not that matter should be handled by Dr. Levy or himself.
7 Q How did he convey these concerns to you?
8 A We were just in his office. He said, "I need you
9 to ask Betsy Neely a question."
10 Q Okay. Did he call you to his office for a meeting
11 on this subject?
12 A I can't testify to that because I can't recall, but
13 it's not unlikely. I mean, it's likely that he would've
14 done that.
15 Q Was anyone else present when he made this request?
16 A I don't recall that.
17 Q Did President Zaccari describe the nature of his
18 concerns about Hayden Barnes?
19 A At what point in time?
20 Q During this exchange when he asked you to contact
21 Elizabeth Neely.
22 A I can't recall the specifics of that conversation,
23 and for me to testify to that would be just speculation.
24 Q Okay. Did he simply ask what is the procedure for
25 the President to remove a student?

## Page 16

1 MR. WILL: I object to the form of the question. I
2 believe the witness has already said she had to speculate
3 as to the nature of the conversation, and I object to
4 speculative questions.
5 BY MR. CORN-REVERE:
6 Q You can answer.
7 A Repeat the question.
8 Q Did President Zaccari simply ask you what the
9 procedure was for removing a student with the President
10 initiating the complaint?
11 A It's more likely than not that he would've gone
12 into some limited detail about his concerns about a
13 particular student.
14 Q But you don't recall what those concerns might've
15 been at that time?
16 A At that point in time, no. But, again, I could
17 speculate and respond to that question.
18 Q I don't need you to speculate. Hopefully, we'll
19 have some documents later that well help refresh your
20 recollection on that.
21 A Sure.
22 Q Did you consider this an unusual request?
23 A Yes.
24 Q Why?
25 A Because the President is a part of the appeal



Page 17

1  process in the campus.  So if he's involved in the decision-
2  making process about the suspension of a student, the
3  question is:  Where does that student appeal that decision
4  on campus to?
5      Q    Okay.  Had President Zaccari ever asked you about
6  this kind of procedure in the past?
7      A    No.
8      Q    Did President Zaccari ask you to provide an answer
9  based on your own analysis of what the procedure would be?
10     A    I can't recall specifically if that question was
11 posed to me.
12     Q    I see.
13     A    I can't --
14     Q    I'm sorry.  Go ahead.
15     A    I can't recall specifically.  Again -- I'm sorry --
16 your name?
17     Q    Bob.
18     A    Bob.  We're talking about events that took place in
19 2007.
20     Q    Yeah.
21     A    Okay.
22     Q    As I said, hopefully, the documents, themselves,
23 well help jog some distant memories.
24     A    Sure.
25     Q    I just noted the language you used in presenting

Page 18

1  the question that Dr. Zaccari had directed you to pose a
2  question to Elizabeth Neely.
3      Is it your recollection that that was all you'd
4  been asked to do:  To pose that question to someone from the
5  Board of Regents?
6      A    In the context of this particular event based on
7  this email?  Is that your question?
8      Q    Yes.
9      A    The email reflects the question or concern that
10 Dr. Zaccari asked me to present to the Board of Regents at
11 that point in time.
12     Q    Uh-huh.  Thinking about it today, based on your
13 knowledge of the University procedures, can you think of a
14 procedure that would justify having the President file a
15 complaint against a student?
16     A    I think perhaps the best course of action would be
17 for the Board of Regents of the University System of Georgia
18 to handle complaints involving presidents of universities.
19     Q    Does such a procedure exist today?
20     A    Not to my knowledge.  I don't think it's a -- I
21 think hierarchy allows for that to take place, even if I
22 cannot recall and share a particular policy or procedure.
23 The structure of the University System of Georgia, I would
24 believe, would allow for that.
25     By way of example, if I had a concern or anybody as

Page 19

1  campus had a concern who was a direct report to the
2  President, the hierarchy would allow me to make some
3  communications and contacts with Dr. Zaccari's superior.
4      Q    I see.  Let's look now at the response that you
5  received in answer to your question.
6      This was what Elizabeth Neely wrote back to you,
7  just looking at the second sentence, "It is not good
8  practice for the President to be bringing a complaint
9  against any student.  That should be handled by staff in
10 Student Affairs.  Once the President has made a decision in
11 the matter, there is no due process at the campus level."
12     A    Uh-huh.
13     Q    And you received that response on April 26th, 2007.
14     How do you interpret that answer in response to
15 Dr. Zaccari's question?
16     A    Well, there appears to be a little bit of
17 contradiction.
18     Q    Could you explain that?
19     A    Well, she says in the first sentence, "In this
20 case, the appeal should be directed straight to our office."
21 But she's not saying he should not be involved in the
22 process first and foremost.  She's just saying "The appeal
23 should be directed straight to our office."
24     So she's acknowledging the President on the campus
25 level can be involved in some complaint process involving

Page 20

1  the student.  It's just that, as a qualifier, "The appeal
2  should be directed straight to our office."
3      And then she says, you know, by the way, "It's not
4  good practice for the President to be bringing a complaint
5  against any student."
6      She says, "It's not good practice."  She doesn't
7  say there's a prohibition.
8      Q    Right.
9      A    But she says, "It's not good practice."
10     Q    Does she say why it's not a good practice?
11     A    No, not in the email.
12     Q    Isn't there no due process at the campus level?
13 Isn't that her conclusion?
14     A    "Once the President has made a decision in this
15 matter, there is no due process at the campus level."
16     That is what she stated; and in terms of what she
17 meant by that, I can't testify to that because I'm not Betsy
18 Neely.
19     Q    What is your understanding of that sentence, the
20 last sentence of her response, when you received it?
21     A    If the President is involved in the decision-making
22 process -- she is suggesting he can't -- the student can't
23 have due process at the campus level.
24     But that first sentence says, of course, he can be
25 a part of the process; it's just that the appeal has to go

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

Page 25

1    Q    Do you know if there were formal meetings in which
2    you were invited to come discuss this topic with him?
3    A    When you say formal meetings, how do you define
4    formal meeting?
5    Q    You were invited to come to his office or summoned
6    to his office.
7    A    It is the nature and practice -- it was the nature
8    and practice of our professional relationship that when he
9    wanted to discuss an issue with me, he would simply call my
10   office. And my office is close in physical proximity to his
11   office. So if I'm in the office and he wants to see me, I
12   walk down to the office.
13         So it's not a formal kind of arrangement in the
14   sense that he would schedule an appointment to see me. If
15   the President of the University wants to talk to me, I get
16   up and I go down there.
17   Q    Okay.
18   A    So I don't have a documented history of all the
19   times he's requested to see me over a period of some five or
20   six years that he was there, no.
21   Q    I see. So there's no kind of appointment book or
22   some physical record of meetings?
23   A    Well, if we have -- if there is a scheduled meeting
24   or if my secretary has been told to put down a particular
25   time that Dr. Zaccari wants to see me, that would be perhaps

Page 26

1    on my calendar, but the nature of those communications would
2    not be.
3         So, you know, it would just be -- like this meeting
4    is -- I think she put down attorney's meeting.
5    Q    Well, it's that.
6    A    Yeah. But what, you know, do you -- what is it?
7    You know, having a deposition or having a party?
8    Q    But is it your testimony that you have no
9    recollection of any scheduled meetings with Dr. Zaccari to
10   discuss Hayden Barnes?
11   A    When I responded to the discovery request, because
12   I could not recall events that took place with absolute
13   accuracy -- events that took place in 2007 -- I relied on
14   documents that were in place so I could go through those
15   documents and generate the two dates that are reflected in
16   the discovery responses.
17         No, I could not recall those dates independently
18   while sitting in my office at my desk and looking at the
19   interrogatory. I couldn't pull up the date and just write
20   it down and say, yeah, I remember that particular date
21   because there was nothing unusual about me having a meeting
22   with Dr. Zaccari in front of other people.
23         It's a very, very, very common experience that I
24   couldn't draw independently without reviewing some
25   documents. You know, some time frame. So, that's why you

Page 27

1    see very often "on or about"
2    Q    Okay. You mentioned, though, that you were able to
3    identify dates of two meetings from looking at documents to
4    refresh your recollection.
5         Do you remember which documents those were?
6    A    No.
7    Q    Can you tell me which two meetings you're referring
8    to in that answer?
9    A    Well, on the response to interrogatory number
10   three, I said on or about May 1st, 2001, there was a
11   telephone conversation with Betsy Neely; and then on or
12   about May 4th there was a meeting.
13         And, in addition to that, in my responses to the
14   first interrogatories and request for production of
15   documents, there's a reference to a May 3rd meeting.
16   Q    Okay. In this first paragraph in response to
17   interrogatory number three, you say that in general
18   discussions about what could be done to remove the perceived
19   threat that you advised Dr. Zaccari of the Constitutional
20   guarantees of due process requirements and ADA concerns that
21   apply to withdrawals.
22         Can you describe the concerns that you expressed
23   about those issues?
24   A    Anytime a student is suspended -- I generally don't
25   get involved in suspension of students unless there is, you

Page 28

1    know, some legal implication that I'm called upon to ask a
2    particular question.
3         But, generally speaking, students are afforded all
4    the Constitutional guarantees of due process.
5         I'm of the opinion and I advised that if a student
6    is to be removed from campus, he's entitled to due process;
7    that is, an opportunity to understand the nature of the
8    complaint against him and an opportunity to be heard.
9         I also expressed to him the possibility that Hayden
10   Barnes could raise some Constitutional challenges under the
11   First Amendment if he believes -- Hayden that is -- that
12   because of his communications that there was an effort to
13   stifle his freedom of expression.
14         And because Dr. Zaccari shared with me that he had
15   access to information from the Counseling Center about
16   Hayden, necessarily there's also a possibility that Hayden
17   could raise some ADA challenges: Americans with
18   Disabilities Act.
19         To what extent he could raise those challenges, I
20   can't share that with you because I don't know of the nature
21   and the history of Hayden's psychological concerns. I've
22   never had a sit-down talk with my counselor to understand
23   the full extent of the nature of his problems.
24   Q    Okay. Let's look at each part of your answers in a
25   little bit more detail.



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

Page 29

1    You told Dr. Zaccari, according to your testimony,
2    that you explained that Hayden Barnes could raise First
3    Amendment challenges to an expulsion because of his free
4    speech rights.
5        What precisely did you tell him about that, if you
6    recall?
7    A    Well, I'm going to testify in generalities because
8    I didn't have a tape recorder; nor did I document every
9    single thing that came out of my mouth.
10   Q    I understand.
11   A    But, in general terms, Dr. Zaccari expressed to me
12   some concerns that he had with Hayden's comments at a
13   particular meeting at the Board of Regents relative to a
14   parking deck.
15       And sometime during this time frame, Hayden also
16   generated a picture of Dr. Zaccari beside a parking deck and
17   made references to it being a memorial or memoriam. I'd
18   have to actually look at it again. It's been quite a while
19   since I've seen it.
20       So those comments, Hayden could raise some issues
21   of First Amendment protection. In other words, "I'm just
22   expressing myself."
23   Q    I see. And you also discussed due process
24   protections. What did you tell Dr. Zaccari about the due
25   process issue?

Page 30

1    A    He was made fully aware of policies and procedures
2    that existed on campus relative to the suspension of
3    students. And, as a matter of fact, I provided those copies
4    to him.
5        I can't recite verbatim the policy, the number, the
6    content without having it in front of me.
7    Q    I'm sorry. I missed the last part.
8    A    I can't recite verbatim the policy number or the
9    content of the policy without having it in front of me.
10   Q    Okay. I believe it was your testimony that you
11   believe that students who are to be suspended have a right
12   to full information about what the nature of the charge is
13   and an opportunity to respond. Is there anything else?
14   A    An opportunity to be heard and present their side
15   of whatever it is.
16   Q    Uh-huh. And you apprised Dr. Zaccari that that is
17   a due process requirement for any kind of suspension?
18   A    He was made fully aware of what Hayden was entitled
19   to under due process.
20   Q    And last I think you mentioned that Dr. Zaccari had
21   said something about information he had about Hayden based
22   on his use of the Valdosta State Counseling Center. Is that
23   correct?
24   A    Uh-huh.
25   Q    What did Dr. Zaccari tell you that he knew about

Page 31

1    Hayden?
2    A    I vaguely recall he said he had some concerns about
3    him missing appointments and -- that's the extent of what
4    I'm able to recall at this point in time.
5        But missing appointments and his behavior at this
6    particular meeting at the Board of Regents caused him some
7    concern.
8    Q    Did any of this strike you as unusual?
9    A    Unusual in what sense?
10   Q    Does the President of the University usually know
11   what the habits of a student is with respect to the
12   Counseling Center?
13   A    I've worked with three presidents thus far, and I
14   can only speak to my experience with Dr. Zaccari in that
15   context.
16       I cannot and I will not make generalizations about
17   presidents and what is generally their response to students.
18       But I was a bit concerned about his communications
19   with the Counseling Center.
20   Q    Could you expand on that? What do you mean by a
21   bit concerned?
22   A    In a past life I used to be a psychotherapist. My
23   undergrad degree is in psychology, and I have a Master's in
24   counseling.
25       And at one point in time I was employed as a high

Page 32

1    school guidance counselor. And then for a very, very brief
2    period in my life I was employed as a psychotherapist under
3    the direction of a psychiatrist. It was many, many, many
4    year ago.
5        So I know that communications between counselors
6    and their patients are protected.
7    Q    By protected, you mean they're supposed to be
8    confidential?
9    A    Yes, unless there are certain extenuating
10   circumstances that allow for that information to be shared.
11   Q    Let me back up a little bit on the earlier part of
12   your answer.
13   A    Can I finish that response?
14   Q    Oh, sure. Absolutely.
15   A    And if Hayden presented a danger to himself or to
16   others, then those communications may be shared.
17   Q    How might they be shared?
18   A    To the appropriate authorities.
19   Q    We'll get back to that, but let me backtrack a
20   little bit first to an earlier part of your response.
21       You've said you've worked for three university
22   presidents, is that correct?
23   A    Uh-huh.
24   Q    Have you ever had an occasion in the past where a
25   university president knew the habits of the student with



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

Laverne Gaskin  6/12/2009
12 (Pages 41 to 44)

## Page 41

1  it in the response.
2      Do you know if anyone else besides Dr. Zaccari
3  perceived a security problem?
4      A    I don't recall.  I recall that -- I want to also
5  offer that these events happened shortly around the time of
6  Virginia Tech, shortly after Virginia Tech, these meetings
7  and concerns that Dr. Zaccari expressed to me.
8      Dr. Zaccari shared with me a particular document
9  that reflected Hayden making statements about -- on his
10  Facebook page shoot 'em up, load 'em up, or something like
11  that.  Then you have this memorial to Dr. Zaccari.  Parking
12  deck memorial.
13     Plus, Dr. Zaccari shared that when he was in West
14  Virginia a student did threaten to slit his throat.
15     Q    Not Hayden Barnes.
16     A    No, not Hayden Barnes.  But I'm saying there was a
17  history in his higher education experience with a student in
18  the past that, apparently, he recalls very vividly.
19     There was some judicial process with that student.
20  I think the student actually was charged, I think.  I don't
21  know.
22     Q    Do you know when this student in West Virginia
23  would've made such a threat to Dr. Zaccari?
24     A    No, I don't.
25     Q    Do you know how many years before that was?

## Page 42

1      A    No, I don't.
2      Q    Okay.  But it's your recollection that the student
3  that had threatened to slit Dr. Zaccari's throat was
4  accorded due process?
5      A    I don't know anything about that.
6      Q    You said there was a judicial process.
7      A    No.  I meant I think the student -- if I recall
8  correctly, Dr. Zaccari shared he was charged criminally.
9      Q    So that would've involved due process?
10     A    Outside the context of higher education.  Again,
11  you have to ask him the details of that particular incident.
12     Q    Now I believe it was your testimony that
13  Dr. Zaccari had looked for ways to remove the threat.
14     Did he ask you for recommendations or did he simply
15  direct you to find a way to expel Hayden Barnes?
16     A    During the course of that meeting, he reviewed
17  Hayden's academic record.  He shared that he had reviewed
18  Hayden's academic record.  The information had been provided
19  to him.
20     He conferred with the Vice President of Student
21  Affairs; and he also conferred during the course of that
22  meeting with Russ Mast, who is the Dean of Students.  He
23  also conferred with Vick Morgan, and he also conferred with
24  Ann Farmer.  She's our Assistant Chief of Police.
25     Q    When you say that he conferred with the individuals

## Page 43

1  you just named, was it your understanding that this was a
2  single meeting or separate meetings?
3      A    The only one I can speak to is the meeting that I
4  was in attendance at and those individuals I identified were
5  in the room.
6      Q    This all occurred during a meeting where you were
7  present with these named individuals to discuss Hayden
8  Barnes?
9      A    Right.  And also Kimberly Tanner.
10     Q    Who is she?
11     A    She's with the access office.
12     Q    What does the access office do?
13     A    The access office is a place where those
14  individuals who have identified disabilities go to, to make
15  certain that if there are any additional accommodations,
16  resources, that are requested, we make certain that we
17  satisfy those requests and any other support services they
18  can provide.
19     Q    Okay.  Do you recall when this meeting took place?
20     A    (Reviewing document.)  It was in April of 2007.
21     Q    So just to place it in time, it would have taken
22  place after your initial email inquiry to Elizabeth Neely.
23     A    Uh-huh.
24     Q    But before you received a fax in response from
25  Elizabeth Neely.

## Page 44

1      A    Correct.
2      Q    I expect a meeting like that would not have
3  happened on a weekend.  Is that correct?
4      A    No.  It would not have happened on a weekend.
5      Q    Okay.  How long did this meeting last?
6      A    I can't recall.
7      Q    Was this meeting in Dr. Zaccari's office?
8      A    Yes, in his suite.  Conference room, yes.
9      Q    Did Dr. Zaccari ask for recommendations from this
10  group about what to do about Hayden Barnes?
11     A    No.
12     Q    What did he do?
13     A    He sat at the head of the table and discussed his
14  concerns about Hayden's behavior.  I recall he did most of
15  the talking, and I recall that policies were shared with
16  him.
17     Q    What policies are those?
18     A    The policy from the Student Code of Conduct so he
19  could be aware of the process for suspending a student.
20     And he asked for information from Kimberly Tanner
21  about anything relative to this student and -- that's all I
22  recall.
23     Q    Do you recall whether or not the information he
24  asked Ms. Tanner about was of a confidential nature?
25     A    I don't recall.

**WHEELER REPORTING**
*Court Reporting • Video • Litigation Support*
**404.351.4577**

## Page 45

1  Q     Do you recall anything about the information that
2  he asked about?
3  A     Say that again.
4  Q     Do you recall any of -- the nature of the
5  information that he asked Ms. Tanner about?
6  A     I believe Ms. Tanner had some files, and I think
7  she shared that he was a registered student there in her
8  office.
9        Dr. Zaccari also shared that he had access to
10  information about Hayden's employment history.
11  Q     So, is it correct to say that as of April 2007
12  Dr. Zaccari had been conducting an investigation about
13  Hayden Barnes?
14        MR. WILL:  Object to the form of question.
15        THE WITNESS:  I don't know that I would
16  characterize it as an investigation, but I will say that
17  it appears as if he was soliciting information about this
18  particular student.
19  BY MR. CORN-REVERE:
20  Q     Okay.  So he had looked into Hayden's employment
21  history?
22  A     Yes.
23  Q     He had looked at his Facebook page?
24  A     Yes.
25  Q     He asked someone from the access office about

## Page 46

1  Hayden's file?
2  A     Yes.
3  Q     You mentioned that Dr. Zaccari did most of the
4  talking and expressed his concerns.
5        Did anyone else at the meeting express concerns
6  about Hayden Barnes?
7  A     In terms of?
8  Q     Was anyone else talking about Hayden Barnes
9  presenting some kind of threat?
10  A     No.
11  Q     This was just the President of the University
12  conveying to the group the information that he had in his
13  possession.  Is that correct?
14  A     Primarily.
15  Q     Was the information presented more as a conclusion
16  rather than an invitation for discussion?
17  A     I can't recall.
18  Q     Well, do you recall if anyone else present at this
19  meeting raised similar concerns about Hayden Barnes?
20  A     In terms of being a potential threat?
21  Q     Yes.
22  A     No, I don't recall anyone sharing that.
23  Q     Okay.  You mentioned earlier that Dr. Zaccari had
24  said something about Hayden's Facebook page.  Did he show
25  you copies of the Facebook page?

## Page 47

1  A     Yes, he did.
2  Q     Did he show you copies of the Facebook page before
3  this meeting?
4  A     No.  I don't recall.
5  Q     Do you know if copies of the page were present at
6  this meeting for people to look at?
7  A     He had it in the meeting.
8  Q     Was everyone given their own copy to look at?
9  A     No.  No, I don't -- no.
10  Q     So the copy in the meeting was Dr. Zaccari's copy?
11  A     If someone else had a copy of their own, I was not
12  aware of it.  It's just like everyone sitting around this
13  room can't speak to all the documents in every single file
14  in front of every person.
15  Q     Was the copy of the Facebook page passed around at
16  this meeting for discussion?
17  A     No.  I don't recall that.
18  Q     Okay.  So there was no deliberation at the meeting
19  about whether or not Hayden Barnes, in fact, was a threat,
20  was there?
21  A     No.
22  Q     So is that why in your response to interrogatory
23  number three you described that the discussion of
24  Plaintiff's behavior and the possible threat was as
25  perceived by Zaccari?

## Page 48

1  A     Yes.
2  Q     And not by anyone else?
3  A     Yes.
4  Q     Did Dr. Zaccari ever ask you if you agreed that
5  Hayden Barnes presented some kind of danger?
6  A     No.
7  Q     Do you know if he asked anybody else if Hayden
8  Barnes presented some kind of danger?
9  A     Not to my knowledge.  I'm unaware of that.
10  Q     Did anyone else at the meeting make recommendations
11  about what could be done to remove the threat presented by
12  Hayden Barnes?
13  A     I recall Ann Farmer mentioning that if he was
14  concerned about his safety and well-being, perhaps she could
15  investigate it and maybe secure a protective order that
16  would involve going to the Magistrate's office and taking
17  out a complaint.
18  Q     So had Dr. Zaccari followed Ann Farmer's advice, it
19  would once again involve some form of due process?
20  A     Yes.
21  Q     And so far as you know, that recommendation was not
22  followed?
23  A     Not to my knowledge.
24  Q     Do you know why that recommendation was not
25  followed?

Laverne Gaskin  6/12/2009

14 (Pages 49 to 52)

Page 49

1    A    I don't know.
2    Q    Let's look briefly at Exhibit Number Two on page
3    two.
4    A    Uh-huh.
5    Q    In response to interrogatory number one --
6    A    Uh-huh.
7    Q    -- you name a number of people, including Dr. Louis
8    Levy, Vice President for Academic Affairs; Jim Black, former
9    Vice President of Finance Administration; Scott Sikes, Vice
10   President of Institutional Advancement; Dr. Marcia Krotseng,
11   former Associate Vice President of Strategic Research and
12   Analysis; and then in the next paragraph, Scott Doner,
13   University Police Chief, J. Burns Newsome, Assistant Vice
14   Chancellor of Legal Affairs as individuals who may have
15   information about the Hayden Barnes' case.
16   A    Uh-huh.
17   Q    Can you describe what information you were
18   referring to in this response?
19   A    Dr. Zaccari later shared after Hayden had been
20   withdrawn that during the course of a Vision meeting --
21   Dr. Zaccari had a meeting that generally took place before
22   cabinet. Cabinet consists of various people who are
23   employed at the University in upper-level positions.
24        But the Vision Team consisted of what he considered
25   his senior administrative team, and they would discuss

Page 50

1    things that were of importance and various issues before
2    cabinet meeting.
3        And the individuals identified in response to
4    interrogatory number one are the individuals who would
5    typically attend those Vision meetings.
6        During the course of one of those Vision meetings,
7    Dr. Zaccari shared with me that they discussed Hayden
8    Barnes; and it was the recommendation of -- well, I don't
9    want to use the word recommendation.
10       As a result of one of those meetings, they agreed
11   to just -- the best course of action would be just to
12   monitor Hayden's behavior.
13       I can't speak to when this meeting took place; if
14   every individual identified in response to interrogatory
15   number one -- if they were present because I was not a part
16   of this group.
17   Q    Okay.
18   A    But this is something Dr. Zaccari shared with me.
19   Q    Do you recall when he shared that information with
20   you?
21   A    No.
22   Q    Just going back over this list of names, can you
23   identify which of these names or which of these individuals
24   are members of the Vision Team?
25   A    Yes. Dr. Louis Levy -- all of his vice presidents.

Page 51

1    All the vice presidents: Dr. Louis Levy, Jim Black, Scott
2    Sikes. And Dr. Marcia Krotseng is not a Vice President, but
3    she was a part of the Vision Team.
4    Q    Is there anyone else on the Vision Team?
5    A    No. I think that takes care of it.
6    Q    Do you know if the meeting of the Vision Team
7    occurred before or after Mr. Barnes was expelled?
8    A    It was before.
9    Q    And it's your understanding that the Vision Team
10   recommended to President Zaccari that they simply monitor
11   Hayden Barnes' activities?
12   A    I can't say they recommended to Dr. Zaccari because
13   I was not there, and I don't know whether or not it was the
14   consensus of the group; but I do know as a result of one of
15   those discussions during the course of the Vision Team
16   meeting that decision was made.
17   Q    I see. Was this information about the Vision Team
18   available to you before the meeting, the earlier meeting you
19   described with -- let me see if I can get everybody
20   (reviewing document) -- Russell Mast, Victor Morgan, Ann
21   Farmer, Kimberly Tanner. You know, that meeting where you
22   discussed --
23   A    I don't know. I can't recall.
24   Q    Okay. You list in the response to interrogatory
25   number one the individuals who are not part of the Vision

Page 52

1    Team.
2        What's your understanding of their involvement in
3    this subject to the answer listed in the interrogatory?
4    A    Scott Doner is University Police Chief, and it's
5    likely that Dr. Zaccari would've communicated with him and
6    Ann Farmer. They work closely together.
7        Ann Farmer would not have taken the initiative to
8    attend meetings without consulting with Scott Doner. So my
9    thinking is that Scott Doner was consulted, and then at
10   times when he could not be present at a meeting, Ann Farmer
11   was there. She's the Assistant Chief of Police.
12       Burns Newsome is the Assistant Vice Chancellor for
13   Legal Affairs. From time to time Dr. Zaccari would consult
14   with the Office of Legal Affairs without my knowledge.
15       So, there's a chance that he may have consulted
16   with him about this matter, but I don't have any
17   documentation of that.
18   Q    So your response to the interrogatory is that in
19   your judgment it was likely he consulted with Burns Newsome.
20   A    Yeah.
21   Q    Okay.
22   A    It's not likely. Possibly.
23       MR. CORN-REVERE:  Okay. Let's mark as Gaskins
24   Deposition Exhibit Number Five a fax document from
25   Elizabeth Neely to Laverne Gaskins.

WHEELER
REPORTING

Court Reporting • Video • Litigation Support

404.351.4577

## Page 53

1     (The document was marked for identification as
2     Plaintiff's Exhibit Number Five).
3     BY MR. CORN-REVERE:
4     Q     Have you had a chance to look this document over?
5     A     (Reviewing document.)  Yes.
6     Q     Can you identify it for the record?
7     A     It's a document that was faxed to my office
8     following a telephone conference call with Betsy Neely.
9     Q     Okay.  So looking at the cover page where in the
10    comments it says, "Per our discussion" --
11    A     Uh-huh.
12    Q     -- is that referring to the earlier conference call
13    to talk about this issue?
14    A     Yes.
15    Q     Okay.  Did this conference call also take place on
16    May 1st, 2007?
17    A     (Reviewing documents.)  I recall it took place on
18    or about May 1st, 2007.
19    Q     Okay.  I ask that because the date of the cover
20    letter on the fax sheet says May 1st, 2007.
21          So it's your recollection that it was either on
22    that day or might have been the day before?
23    A     I believe it was May 1st, 2007.
24    Q     Okay.
25    A     And you see at the top, I believe, that this was

## Page 54

1     faxed May 1st, 2007.
2     Q     Yes.  Okay.  What prompted the telephone call that
3     this is in response to?
4     A     Dr. Zaccari wanted to make certain that the Board
5     of Regents of the University System of Georgia's Office of
6     Legal Affairs was fully aware of his concerns and possible
7     action; and he wanted to confer with Betsy Neely, who was
8     the senior lawyer at that time, to get her advice.
9           And her advice was you do what you need to do to
10    protect the campus and worry about the lawsuit later, but
11    you do what you need to do to protect that campus.
12          And she said you can administratively withdraw the
13    student, and she faxed me this information for me to share
14    with Dr. Zaccari.
15    Q     Is it correct to say that the phone call you just
16    described and this fax was a follow-up to the earlier email
17    that we discussed?
18    A     Right.
19    Q     So after Elizabeth Neely responded to your email
20    and you passed that along to Dr. Zaccari, it was agreed to
21    set up a phone call to discuss those issues.  Is that how it
22    happened?
23    A     Repeat that again.
24    Q     Okay.  Is it correct to say that after your initial
25    email exchange, which you forwarded on to Dr. Zaccari, that

## Page 55

1     it was decided to set up a call to discuss those questions?
2     A     No.  The telephone call took place on Dr. Zaccari's
3     own initiative.  I think there was a gap between the initial
4     email and the telephone call.
5           Once again, the reason Dr. Zaccari felt, I believe,
6     a need to involve Betsy Neely was because any decision
7     that's made on the campus level --
8     Q     Go ahead.
9     A     I want to feel like someone's listening to me.
10    Q     I'm listening.
11    A     Okay.  Any decision that's made on the campus level
12    and there's an appeal -- there is a concern -- it would go
13    to Betsy Neely's office.
14          So he wanted her to be involved in, essentially,
15    the decision-making process so he could have some level of
16    assurance that what he was doing was the proper route to
17    take.
18    Q     Okay.  I think I understand that.  I'm just trying
19    to get the sequence of events correctly.
20    A     Uh-huh.
21    Q     So that looking back at Exhibit Four, which is the
22    email exchange --
23    A     Yes.
24    Q     -- it was your testimony and the date stamp on the
25    email is April 26th.

## Page 56

1     A     Uh-huh.
2     Q     Okay.  And then at some point on or about that
3     date, you passed along this exchange to Dr. Zaccari and
4     said, "I would like to discuss the matter with you."
5     A     Uh-huh.
6     Q     Is that correct?
7     A     (Nods head.)
8     Q     Then after you passed this along to Dr. Zaccari, a
9     decision was made to set up a phone call that resulted in
10    this fax being sent to you.  Is that the sequence?
11    A     When you're saying a decision was made -- he wanted
12    to see me.  I went down to his office; and he says he's
13    going to put Betsy Neely on speaker, and that's what
14    happened.
15          So when you say a decision was made, I can't state
16    and I can't testify that that email precipitated the phone
17    call to Betsy Neely in my presence.
18          Following that email to Dr. Zaccari, he could have
19    very well contacted Betsy Neely and I'm not aware of that.
20    Q     I see.  But sometime after this email exchange,
21    then you were asked to join Dr. Zaccari in a phone
22    conversation with Betsy Neely.
23    A     Yes.
24    Q     Okay.  I'm sorry if I'm asking the same thing or if
25    I'm just getting confused, but did you know about the phone



## Page 57

1  call before it was going to happen?

2  A    No.

3  Q    Okay.  You were in your office and then received a

4  request to join Dr. Zaccari for a phone call with Betsy

5  Neely?

6  A    No.  The request would not have been worded that

7  way.  The request would've been, "Hi, Verna.  This is" --

8  whomever -- "please tell Laverne Dr. Zaccari wants to see

9  her."

10  Q    And who would've placed that call to you?

11  A    My assistant would have said, "Ms. Gaskins,

12  Dr. Zaccari wants to see you."

13  Q    Okay.

14  A    So, you know, I don't necessarily know the nature

15  of the discussion prior to going down there.

16  Q    I understand.

17  A    Nor would I say, "What's he want to talk to me

18  about?"

19  Q    Right.  I'm just trying to figure out what

20  happened.

21  A    Yeah.

22  Q    The phone call was in process when you arrived in

23  Dr. Zaccari's office?

24  A    No.  I vaguely recall him dialing -- well, he

25  didn't dial; his assistant would've dialed.

## Page 58

1  Q    Okay.  So you were asked to join Dr. Zaccari; and

2  after you got to his office, a call was placed to Elizabeth

3  Neely.  Is that what happened?

4  A    Yes.

5  Q    Okay.

6  A    Based on my recollection.

7  Q    Yes.  What else do you recall about that telephone

8  conversation?

9  A    I raised due process concerns, the ADA concerns.

10  And Betsy said, "Well, Dr. Zaccari, you need to do what you

11  need to do to protect yourself and the campus community."

12  Q    Okay.  Do you have a more detailed recollection of

13  the concerns that you expressed about due process and ADA

14  problems?

15  A    No.  They were just very basic and general in

16  nature.  A student has a right to be heard.  An opportunity

17  to be heard.

18  And I could never tell someone else that whatever

19  causes them concern or fear for their safety and the safety

20  of the campus community is incorrect, because I can't

21  superimpose my response to something and pretend as if I'm

22  someone else.

23  I do believe that Dr. Zaccari firmly felt

24  threatened by Hayden Barnes, and I do believe that was a

25  constant thing and during this entire episode that he

## Page 59

1  expressed a genuine fear of Hayden Barnes in terms of his

2  safety and the safety of the campus community.  That never

3  wavered.

4  Q    But, so far as you know, no one else expressed that

5  same concern.  Isn't that right?

6  A    Not in my presence.

7  Q    Do you know if Dr. Zaccari consulted with anyone

8  else about whether or not those concerns were justified?

9  A    No.  I'm not aware of any, not to suggest that he

10  didn't.  I'm just not aware.

11  Q    When you expressed your concerns about due process

12  issues, was there a discussion of those concerns in this

13  conference call?

14  A    Dr. Zaccari represented to Betsy that Hayden

15  presented a threat to himself and the campus community.

16  So, in response to that threat, Betsy felt like the

17  primary concern should be that of Dr. Zaccari and the campus

18  community.  Take care of that first.

19  Q    Okay.  Does Valdosta State University have a

20  protocol to deal with threats to campus security?

21  A    We have policies in place that speak directly to

22  removal of students.

23  Q    Okay.

24  A    And I can't recite those policies verbatim without

25  the benefit of having them in front of me.

## Page 60

1  Q    We'll get to them.

2  A    Okay.

3  Q    But is there any policy or protocol other than the

4  ones you mentioned in your interrogatory answers that exists

5  to deal with threats to the campus community?

6  A    Of course, you know, there's always the campus

7  police if there's an indication of criminal behavior.

8  Q    Right.

9  A    Yeah.

10  Q    But I'm speaking in terms of policies.

11  A    Yes.

12  Q    And so far as you know, the ones that exist are the

13  ones you've listed in your interrogatory answers.  Is that

14  correct?

15  A    Yes.

16  Q    Okay.  Did you discuss your First Amendment

17  concerns during the call with Elizabeth Neely?

18  A    I discussed all of those concerns.

19  Q    Okay.  Did she respond to your concerns about the

20  First Amendment problems?

21  A    I don't recall.

22      MR. LaVALLEE:  Objection to form.

23  BY MR. CORN-REVERE:

24  Q    Did you also raise your concerns about the

25  Americans with Disability Act?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

Page 61

1    A    Yeah, I recall.
2    Q    Was there any discussion on that call of May 1st
3  about the ADA?
4    A    From Betsy Neely?
5    Q    Yes.
6    A    I vaguely recall that while she recognized those
7  concerns and those concerns were legitimate and valid,
8  ultimately the safety of the campus community was foremost
9  in her mind based on representations that had been made to
10  her by Dr. Zaccari.
11    Q    Let's look at this exhibit, the fax that you got
12  from Elizabeth Neely.
13    A    Sure.
14    Q    The second page of the exhibit --
15    A    Uh-huh.
16    Q    -- can you tell me the significance of this page?
17    A    She had been made -- Elizabeth Neely had been made
18  aware of the fact that Hayden Barnes had been seeing Leah
19  McMillan; and, you know, she entertained during her
20  discussions various ways that Hayden could be
21  administratively withdrawn.  So she sent us this
22  information.
23    Q    What was Elizabeth Neely told about Hayden's use of
24  the Counseling Center?
25        MR. LaVALLEE:  Object to the form.

Page 62

1        THE WITNESS:  In the course of the conversation, I
2  vaguely recall -- he said that he was missing
3  appointments.  I'm sorry.  I just can't recall.
4  BY MR. CORN-REVERE:
5    Q    Was Leah McMillan's name specifically mentioned on
6  this call with Ms. Neely?
7    A    I don't recall that.
8    Q    Is it accurate to say that Elizabeth Neely was
9  simply told that Hayden was using the VSU counseling
10  facilities?
11    A    In addition to other information, yes.
12    Q    Okay.  What other information was that?
13    A    Once again, Dr. Zaccari shared with Betsy the
14  incident at the Board of Regents meeting.  It was a meeting
15  that I've already discussed -- testified to -- and also the
16  Facebook page.
17    Q    Well, if there was an incident at the Board of
18  Regents meeting, Elizabeth Neely should've been aware of it,
19  shouldn't she?
20    A    I don't know.
21        MR. WILL:  I object to the form of the question.
22  Calls for speculation.
23  BY MR. CORN-REVERE:
24    Q    Wouldn't Elizabeth Neely have been present at any
25  meeting of the Board of Regents?

Page 63

1        MR. WILL:  Same objection.  Calls for speculation.
2        THE WITNESS:  I don't know.  I don't know if she
3  attends every single Board of Regents meeting.
4  BY MR. CORN-REVERE:
5    Q    Do you know for a fact if Hayden Barnes ever went
6  to a meeting of the Board of Regents?
7    A    I don't know that.
8    Q    Getting back to this page of the exhibit, I believe
9  your testimony -- and correct me if I'm mistaking it -- was
10  that this was information that Elizabeth Neely sent to
11  provide options for how Hayden Barnes might be withdrawn
12  from school.  Is that correct?
13    A    Based on the information that was shared during
14  that telephone conversation and based on the fact she felt
15  like the primary concern was that of the campus community in
16  terms of safety and the safety of Dr. Zaccari, of course,
17  she said the student could be admin-stratively withdrawn;
18  and she provided this information consistent with that.
19    Q    Okay.  This first page after the cover sheet, do
20  you have an understanding of which of these policies may
21  have been relevant to withdrawal of a student?
22    A    No.  I don't know whether or not this was sent in
23  error, because it clearly deals with auditors, transient
24  students, the referral of students to institutions and
25  rights to refuse admission.  I think this might've been sent

Page 64

1  in error.
2    Q    Looking at the last two pages of this exhibit, it
3  appears to be a memorandum from the Executive Secretary of
4  the Board of Regents.  Two pages.
5        Can you tell me if Valdosta State ever adopted a
6  medical withdrawal policy based on this memorandum?
7    A    I can't tell you that because you'll see at the top
8  it's dated 1983.
9    Q    Yes.
10    A    And this is well before my employment with the
11  University.  So I don't know whether or not as a result of
12  this memorandum that a medical withdrawal policy was adopted
13  in response to this.
14    Q    Uh-huh.  Have you read this exhibit?  These two
15  pages?
16    A    Yes.
17    Q    Okay.  Do you have an understanding of what it
18  means?
19    A    It means that a student can be administratively
20  withdrawn from a campus if it is in the judgment of the
21  physician or if the student causes or interferes with the
22  right of members of the college community or with the
23  exercise of proper activities or functions of college or
24  it's personnel.
25    Q    Right.  You're reading from the last page with



Page 65

1     proposed language for student medical withdrawals.  Is that
2     correct?
3     A     Right.  But that's my understanding of it.
4     Q     Okay.  That's the policy if it were adopted.
5           Isn't it true that the first page of the memorandum
6     says here's suggested language that your campus may adopt if
7     the faculty chooses to do so?
8     A     Yes.
9     Q     Do you know if such a policy was ever adopted?
10    A     I would have to review our policies to see if there
11    was a policy adopted.  My response to your question is it's
12    likely that the campus did adopt a policy.  But I can't
13    speak to whether or not the campus adopted a policy in 1983
14    or 1984 in response to this memo because I was not here.
15    Q     Right.
16    A     But we do have a policy in place that speaks to
17    withdrawal of students for medical reasons.
18    Q     Okay.  If a policy were adopted in 1983 or
19    whenever, it would appear in the student handbook, wouldn't
20    it?
21    A     Yes.
22    Q     Can you tell me where in the student handbook there
23    is a medical withdrawal policy?
24    A     No.  I can't because I didn't commit to memory the
25    student handbook policy.

Page 66

1     Q     Looking at the final page of this exhibit, if such
2     a policy had been adopted, it would say -- I mean, this
3     exhibit suggests that -- actually, let me back up.  Strike
4     that.
5           Let's look at both the first page and the second
6     page of this exhibit.  It has a number of highlighting marks
7     that make this exhibit a little bit hard to read.
8           When you received it, did it have the highlighting
9     on it already?
10    A     Yes.  I received it just as you have it.
11    Q     Okay.  So just to be clear:  The highlighting
12    wasn't added after this was sent to you by Betsy Neely.
13    A     No.  Well -- repeat that.
14    Q     Let me put it this way.  You didn't do the
15    highlighting, did you?
16    A     Right.
17    Q     Okay.  Does the policy suggest that a hearing
18    should precede a medical withdrawal?
19    A     (Reviewing document.)  Except in emergency
20    situations.
21    Q     Does it define what emergency situations are?
22    A     The emergency situations are not defined in this
23    document.
24    Q     Okay.  Do you believe that emergency situations
25    would require immediate action?

Page 67

1     A     Emergency situations would require immediate
2     action.
3     Q     Okay.  According to this policy, if it were
4     adopted, doesn't this require consultation with the campus
5     physician and consultation with the student's parents and
6     personal physician?
7     A     Or --
8     Q     Continue.
9     A     Or "A student may be administratively withdrawn
10    from the college when in the judgment of" -- I believe it's
11    highlighted; I can't read that -- "causes the student to
12    interfere with the rights of other members of the college
13    community."  So it's either/or.
14    Q     And in what way did Hayden Barnes interfere with
15    the rights of other members of the college community?
16    A     I can't speak to that.
17    Q     You don't know?
18    A     No.  I do believe that Hayden Barnes impacted
19    Dr. Zaccari's ability to perhaps function in the manner that
20    he would prefer because of concerns for his safety and the
21    safety of the campus community.
22    Q     Uh-huh.  And I think I asked before:  Do you know
23    if Dr. Zaccari actually consulted with anybody about his
24    concerns?
25    A     I don't know.

Page 68

1     Q     In your May 1st conversation with Dr. Zaccari and
2     Elizabeth Neely, did Ms. Neely ask if Valdosta State had, in
3     fact, adopted a medical withdrawal policy?
4     A     No.  I don't recall her asking that question
5     specifically.
6     Q     But it's your recollection that she simply said
7     that Mr. Barnes could be administratively withdrawn pursuant
8     to this policy.
9     A     I don't recall those exact words.  I recall that
10    she said Hayden may be administratively withdrawn; you need
11    to be concerned about the safety of campus and the campus
12    community and yourself.  That's what your major concern
13    needs to be, and we'll worry about the lawsuit later.
14          And you can put that in quotation marks:  "We'll
15    worry about the lawsuit later."
16    Q     That was an exact phrase?
17    A     "We'll worry about the lawsuit later."
18    Q     Okay.  Looking at the top of this final page of the
19    exhibit, it says "A student may be administratively
20    withdrawn."
21          Do you know if that phrase, "administratively
22    withdrawn," appears in any other policy?
23    A     I can't recall.  Once again, Dr. Zaccari wanted to
24    make certain that his conduct was sanctioned by those
25    individuals who would review the circumstances behind his



## Page 69

1  decision.
2      And Betsy Neely's review of the matter is reflected
3  on the document that -- it was appealed to her, and she said
4  that we'll have an administrative hearing.
5      So she's part of the decision-making process, and
6  the appeal went to her, as well.
7   Q   She was part of the decision-making process in how
8  Hayden Barnes was to be expelled and she was part of the
9  appeals process?  Is that your testimony?
10  A   Yes.  Typically, what happens is if there is a
11 decision made by the president of any institution with some
12 exceptions -- grade appeals, they don't handle those kinds
13 of things -- the decision is appealable to the Board of
14 Regents.
15      And the Office of Legal Affairs, they're charged
16 with the responsibility of reviewing matters on campuses,
17 reviewing decisions, and making an appropriate determination
18 about the course of action.
19      And you will see that the matter was appealed to
20 the Board of Regents, and she rendered her decision in that
21 appeal.
22  Q   Given that you had earlier expressed concerns about
23 due process, is it in your view consistent with due process
24 for someone to be both a primary decision-maker and a
25 decision-maker of the appeal of that initial decision?

## Page 70

1   A   No.
2   Q   After this fax arrived, I assume that -- or is it
3  correct to assume that a decision was made about how to
4  proceed with Hayden Barnes?
5   A   I'm sorry.  Repeat that.
6      MR. CORN-REVERE:  Could you read that back.
7      (The requested portion was read back by the Court
8  Reporter.)
9      THE WITNESS:  I think the decision was made
10 following that telephone conversation with Betsy Neely.
11 BY MR. CORN-REVERE:
12  Q   Okay.  Was the process based on this policy in the
13 fax?
14  A   Based on what Dr. Zaccari wanted.  I can't say it
15 was based on that policy because I don't know whether or not
16 that's a valid policy.
17      That was information that was sent to Betsy -- sent
18 to us by Betsy for Dr. Zaccari to understand that he can be
19 administrative -- a student can be administratively
20 withdrawn from a campus.
21  Q   Okay.  So it was based on this exchange whether or
22 not it was a policy.
23  A   Right.
24  Q   Let's look at Exhibit Number Two.  What I'm looking
25 for is the response to interrogatory number six, which

## Page 71

1  appears at pages four and five.
2   A   (Reviewing document.)  Uh-huh.
3   Q   Okay.  And the interrogatory was asking you to
4  "identify all VSU rules, policies, and procedures for
5  subjecting a student to 'Administrative Withdrawal'
6  including, but not limited to, any relevant sections of the
7  VSU Student Code of Conduct."  And I believe you list five
8  possible policies.
9   A   Uh-huh.
10  Q   One is the Valdosta State Student Code of Conduct,
11 secondly, the Board of Regents of the University System of
12 Georgia Medical Withdrawal Policy.
13  A   Uh-huh.
14  Q   Third, the Board of Regents of the University of
15 Georgia Mental Health Withdrawal.
16      Fourth, Board of Regents of the University System
17 of Georgia Policy 1902.
18      And, fifth, Board of Regents of the University
19 System of Georgia policy on Administrative Withdrawals.
20      Is that correct?
21  A   Yes.
22  Q   Is this still your understanding of what policies
23 and procedures apply to this situation?
24  A   Yes.
25  Q   Are there any others not included in this answer

## Page 72

1  that you can think of that would apply?
2   A   No.  I can't think of any.
3   Q   You mentioned earlier that when Dr. Zaccari was
4  gathering information about Hayden Barnes he had looked into
5  his grades.
6   A   Yes.  He had a conversation with Walter Peacock.
7   Q   Who is Walter Peacock?
8   A   He's over Admissions.
9   Q   What is his position in Admissions?
10  A   Director.  I can't recall.  Director.
11  Q   Excuse me one second.
12  A   Okay.
13      MR. CORN-REVERE:  (Reviewing documents.)  Can we go
14 off the record just a minute?
15      (Discussion off the record.)
16      MR. CORN-REVERE:  Let's mark these as Deposition
17 Exhibits Number Six and Seven.  First, a single sheet
18 and, second, a four-page document.
19      (The documents were marked for identification as
20 Plaintiff's Exhibit Numbers Six and Seven.)
21      THE WITNESS:  (Reviewing documents.)
22 BY MR. CORN-REVERE:
23  Q   Have you had a chance to look at these two new
24 exhibits?
25  A   I'm looking at them now.  Exhibit six, I've never



**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
**404.351.4577**

## Page 73

1  seen this before.

2     Q     Okay.

3     A     I don't recall ever seeing this before.

4     Q     Okay.  You're anticipating my question.

5     First of all, I believe right before the break we

6  were talking about the fact that Dr. Zaccari had sought

7  information on Hayden Barnes' grades.  Is that correct?

8     A     Yes.

9     Q     Okay.  Looking at this Exhibit Number Six, it says,

10  "President Zaccari, the following is the information I

11  received from Chuck Hudson regarding T. Hayden Barnes," and

12  then it lists grades in a number of classes.

13     A     Uh-huh.

14     Q     Is that a fair characterization of what the

15  exhibits says?

16     A     Yes.

17     Q     Okay.  Is this the kind of information that you

18  understood Dr. Zaccari was seeking about Hayden Barnes?

19     A     This is the first time I've ever seen this exhibit.

20  I don't know where it's from.

21     I think Dr. Zaccari, if I recall correctly, wanted

22  to know whether or not Hayden would've been academically

23  suspended.

24     Q     Right.  So you had testified earlier that

25  Dr. Zaccari had sought out information about Hayden's

## Page 74

1  grades.

2     A     Right.

3     Q     And is this the kind of information that would be

4  responsive to that request?

5     A     I guess.  I guess so.  I mean, I don't know who

6  it's from.  I don't know anything about it.

7     Q     It says that this is information received from

8  Chuck Hudson.  Do you know who Chuck Hudson is?

9     A     Chuck Hudson is the registrar.  So, obviously, it

10  came from someone else other than Chuck Hudson.

11     Q     Uh-huh.  I believe you mentioned a name earlier.

12  Was it a Mr. Peacock?

13     A     Yes.

14     Q     And if I understand this exhibit correctly, the

15  grades show that Mr. Barnes was not on academic probation.

16     A     According to this document?

17     Q     Yes.

18     A     Let's see.  Let's see what it says.  "Overall GPA

19  is 1.93.  Probation is based on institutional GPA."  It

20  says, "Therefore, he is no longer on academic probation."

21  So this is what this document says.

22     Q     Okay.  Look at Exhibit Number Seven.

23     A     Uh-huh.

24     Q     It's a document -- there's a heading about

25  two-thirds of the way down the page that says "Academic

## Page 75

1  Probation and Suspension."  Do you see that?

2     A     Yes.

3     Q     Have you seen this before?

4     A     No.

5     Q     Okay.  Well, I'll just mention this is a document

6  that we received in response to our discovery requests.  So

7  it's something that came from --

8     MR. LaVALLEE:  When?

9     MR. CORN-REVERE:  I'm sorry?

10     MR. LaVALLEE:  Whose discovery requests, do you

11  know?

12     MR. CORN-REVERE:  I can't tell you right now.  It

13  came as part of a response to discovery in this case.

14     THE WITNESS:  But you don't know where it came

15  from?  It didn't come from me.

16  BY MR. CORN-REVERE:

17     Q     Okay.

18     A     I don't recall seeing it.  I mean, it looks like

19  something that was maybe Xeroxed out of -- I can't say.  I

20  don't know what it is.

21     Q     Okay.

22     A     It talks about the Honors Program.

23     Q     Well, it says -- if you look at page two, it does

24  say that -- it talks about "Stages of Progress with Minimum

25  Grade Point Averages Required" at VSU.

## Page 76

1     So is it your understanding there's a policy at VSU

2  about what your grades need to be to avoid academic

3  probation?

4     A     As is the case with every institution within the

5  University System of Georgia, correct.

6     Q     Okay.  It's not an accusation.  I'm just trying to

7  find out.

8     A     I know.

9     Q     So when you testified that Dr. Zaccari was looking

10  into Hayden's grades --

11     A     Uh-huh.

12     Q     -- was it your understanding that he was looking to

13  see if he could dispose of Hayden Barnes simply based on his

14  grades?

15     A     It's my understanding that he was trying to discern

16  whether or not the whole issue of him being on campus would

17  be moot if he were no longer on campus because of being

18  under academic suspension.

19     Q     Is that a yes?

20     A     Yes.

21     Q     Okay.  Now also right before the break we listed

22  the other five policies.  So I guess this would be a sixth

23  possible policy for withdrawing Hayden Barnes.

24     The other five were the Student Code of Conduct,

25  Medical Withdrawal, Mental Health Withdrawal, Board Policy



**WHEELER REPORTING**
*Court Reporting • Video • Litigation Support*
**404.351.4577**

Page 81

1    prevailing standards of the University community?
2        A    Are we applying the Miller test to obscenity?  If
3    we're applying the Miller test --
4        Q    It's your policy.
5        A    It's not a policy that I created.  I don't draft
6    policy on campus.  I may assist and provide legal input; but
7    if the prevailing community standards of the University
8    community, if this was drafted in be consistent with the
9    Miller test, the Supreme Court case, no, I don't recall
10   anything that would satisfy that three-prong test for
11   obscenity.
12       Q    Okay.
13       A    There involved no sexual comments or drawings to my
14   knowledge.
15       Q    Okay.  Based on your initial testimony about what
16   you do in your job for the University and for the Board of
17   Regents, is part of your responsibility to interpret and
18   help apply University policies?
19       A    Part of my job includes taking a particular set of
20   facts and making a determination of whether or not we are
21   acting consistently with a particular policy.
22       Q    Okay.  So that would be a yes?
23       A    Yes.
24       Q    On the next page, page 41, do you see paragraph 7?
25   And, again, I'm not suggesting you're the one that did any

Page 82

1    highlighting.  I'm trying to find out how the highlighting
2    is there myself.
3        But paragraph seven says, "Verbal or sexual
4    harassment, terroristic threats or abuse, and sexual assault
5    are prohibited."
6        A    Yes.  I see that.
7        Q    Okay.  Is this part of the Student Code of Conduct
8    relevant to the case of Hayden Barnes?
9        A    Perhaps from the perspective of Dr. Zaccari.
10   Perhaps he could make the argument that his behavior may
11   rise to the level of being considered terroristic threats.
12       Q    Okay.  You mentioned earlier interpreting paragraph
13   five under the Supreme Court's case of Miller versus
14   California.  What is the applicable test according to the
15   Supreme Court for making a terroristic threat?
16       A    I don't recall.
17       Q    Do you have a sense of the threshold for how
18   threatening language must be to be considered a terroristic
19   threat?
20       A    I think if the person feels there is a reasonable
21   threat to safety or harm that's based on objective
22   information, that that person, I think, can make a plausible
23   argument that there's a possibility of a threat.
24       Q    Okay.  Is that purely subjective based on the
25   person who hears the language or would an objective view

Page 83

1    have to be applied to the language?
2        A    I think an objective view and it has to be based on
3    objective information combined with a subjective review of
4    that objective information; because whether or not a person
5    feels threatened or whether or not a person is in fear of
6    their safety and well-being is subjective, and it can be
7    based on objective information and data.
8        Your threshold for feeling threatened may be
9    different from mine.
10       Q    Okay.  But, again, in considering the First
11   Amendment concerns you had expressed to Dr. Zaccari, whether
12   or not someone could be punished for a threat just doesn't
13   depend on a subjective reaction of a person, does it?
14       MR. WILL:  Object to form of the question.
15       THE WITNESS:  My First Amendment concerns to
16   Dr. Zaccari were rooted in the fact that Hayden could
17   make the argument that the Administration was seeking to
18   interfere with his freedom of expression.
19   BY MR. CORN-REVERE:
20       Q    Okay.  But there is a process for sorting this out,
21   isn't there?  For whether or not a threat is actionable?
22       A    By "process," do you mean we look at the policy?
23       Q    In the Student Code of Conduct, it describes a way
24   of determining whether or not something is actually a
25   threat.

Page 84

1        A    Well, what happens generally is the concern is
2    routed through the Student Judicial Process; and during that
3    process, you have triers of facts.  It consists of students
4    who have been appointed to review cases, and they make a
5    determination of whether or not violations of the Student
6    Code of Conduct took place.
7        Q    Okay.
8        A    And we don't supply them, based on my
9    understanding, with a grid of what you must find in the
10   event A, B, and C are present.
11       They are aware of the policy and they apply the
12   policy to the facts at hand.
13       Q    Okay.  Let's look at pages 42 and 43 of this
14   exhibit where it describes under Appendix B, "Rights of
15   Students."
16       A    Uh-huh.
17       Q    Is that the process you just described for
18   providing students with due process?
19       A    Yes.
20       Q    Is that what should have been applied to any claim
21   that Hayden Barnes violated the Code of Conduct?
22       A    Yes.
23       Q    And that was not applied in this case.  Isn't that
24   right?
25       A    Right.



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

## Page 85

1  Q    Okay.  Next on page 43, in the first column under
2  Section II, Disciplinary Process, the first paragraph
3  states, "Section 401 of the Board of Regents policies
4  authorizes each institution to develop appropriate policies
5  and procedures to discipline students/organizations for the
6  violation of Valdosta State University's rules.
7      "In accordance with this responsibility,
8  disciplinary sanctions shall be applied only after the
9  requirements of due process, fairness, and reasonableness
10  have been met.
11      "The aim of any disciplinary action is the
12  redirection of student behavior toward the achievement of
13  their academic goals."
14      Is that in your view an accurate summary of the
15  requirements of due process under this Code of Conduct?
16  A    Yes.
17  Q    And that was not followed in this case?
18  A    No.
19  Q    Are these the policies that you advised Dr. Zaccari
20  to follow in this case?
21  A    The policies that I advised him to follow were
22  actually given to him.  I'd have to reference the document I
23  know that you're probably going to ask me questions about.
24  The letter that was eventually sent to Hayden Barnes, I
25  referenced the policy at the very top.

## Page 86

1      Once again, I wanted to emphasize to him in writing
2  that the student was entitled to due process.  We had
3  policies in place that could be utilized to satisfy due
4  process concerns.
5  Q    Okay.  Looking at page 45 of this exhibit --
6  A    Yes.
7  Q    -- in the center column at the top under paragraph
8  G --
9  A    Uh-huh.
10  Q    -- it says, "Forced Withdrawal:  From the academic
11  course within which the offense occurred, without credit for
12  the course."
13      Actually, that's from a list of possible
14  disciplinary measures that may be imposed.
15  A    Uh-huh.
16  Q    Is it your understanding that the due process
17  procedures that you just described are required before a
18  student may be forced to withdraw from a course?
19  A    Right.  A student is entitled to due process,
20  period.
21      MR. CORN-REVERE:  Okay.  Let's mark for
22  identification Exhibit Nine with the cover page Student
23  Code of Conduct.
24      (The document was marked for identification as
25  Plaintiff's Exhibit Number Nine).

## Page 87

1  BY MR. CORN-REVERE:
2  Q    Again, this may be another form of what we have
3  just looked at, but I just had a couple of questions about
4  this.
5  A    (Reviewing document.)
6  Q    If we could look -- I'm sorry.
7  A    These policies appear in several places.  You have
8  it on the web, then in the book.  So --
9  Q    Right.  They're the same policies, but they are
10  republished in various forms.  Is that right?
11  A    Uh-huh.
12  Q    Looking at page 60 of this copy under the heading
13  E, "Disorderly Conduct," there's some writing surrounding
14  some of these policies.
15      Paragraph E5, a circle around it and number 6 for
16  the next paragraph and the same with the next paragraph on
17  7.
18      Do you know who did this writing?
19  A    No.  In this case, it doesn't concern sexual
20  harassment.
21  Q    Right.  Turn to -- these may have been taken out of
22  order.  Page 59.  At the bottom of the second column,
23  there's a heading D.
24  A    It's out of order, but I see the second column.
25  Q    Yeah.  These got transposed.

## Page 88

1  A    D?
2  Q    Actually, pages 59 and 60.  And the section I'm
3  interested in begins on the bottom of page 59:  Disorderly
4  Assembly.
5      Is this an expression of Board of Regents Policy
6  Section 1902?
7  A    I would have to have the Board of Regents policy
8  before me to say yes or no.
9  Q    Okay.  Well, it does say in the first paragraph,
10  "The Board of Regents Policy Manual Section 1902 regarding
11  disorderly assembly states."
12  A    At the time this was produced, it's reasonable that
13  they pulled from the Board of Regents Policy the exact
14  language and cut and pasted it.
15  Q    I see.  There's a paragraph two and three that
16  says, "No student or group of students shall obstruct the
17  free movement of people about the campus, interfere with the
18  use of University facilities, or materially interfere with
19  the normal operation of the University."
20      And then paragraph three:  "The abuse or
21  unauthorized use of sound amplification equipment indoors or
22  outdoors during classroom hours is prohibited."
23      And then in parentheses:  "Any use of sound
24  amplification equipment must be cleared through the Student
25  Life Office."



WHEELER
REPORTING
*Court Reporting • Video • Litigation Support*
**404.351.4577**

## Page 89

1  Is it fair to say that this policy under
2  "Disorderly Assembly" really relates to unruly student
3  demonstrations?
4  A    Student demonstrations that have not been approved
5  through the process that we have on campus for securing
6  venues for freedom of expression. Yes, those students could
7  fall within this category provided those conditions had been
8  met.
9  Q    Okay. And if a student were to violate in some way
10  this policy on disorderly assembly, would that student also
11  be entitled to due process protections?
12  A    I would say yes.
13  Q    Okay. Let's look at page 68.
14  A    (Reviewing document.) You said 68?
15  Q    Yes. Hopefully, they're in order now.
16  So at the bottom of column one and going over to
17  column two, it says, "To ensure that Valdosta State
18  University students receive due process rights, Valdosta
19  State University has initiated the following Mental Health
20  Withdrawal Procedure." And then it lists the conditions.
21  This is one of the possible procedures that you
22  listed as being applicable to the situation regarding Hayden
23  Barnes?
24  A    Uh-huh.
25  Q    Is this the procedure that the University should

## Page 90

1  have followed in this case?
2  A    This is the procedure that the University may have
3  followed.
4  Q    Okay.
5  A    And it was not followed.
6  Q    Okay. Is this one of the procedures you were
7  referring to when you advised Dr. Zaccari to respect
8  Mr. Barnes' due process rights?
9  A    If I had a copy of the letter and could compare it
10  to the policy that I cited in the letter, then my answer
11  would be yes if it's the same policy number.
12  Q    Okay. And just to make sure it's clear, none of
13  these procedures were followed in this case, were they?
14  A    No.
15  Q    I'm sorry?
16  A    No.
17  Q    Again, even where it's clear what I'm going to ask
18  you, wait for the question to be finished.
19  Based on what you know about the case, if these
20  procedures had been followed, do you think Hayden Barnes
21  would've been expelled from Valdosta State University?
22  A    I don't know.
23  Q    Well, let's look at the policies. Under the Mental
24  Health Withdrawal, it says, number one, "The Student
25  displays behavioral indicators which are determined by a

## Page 91

1  mental health professional to be of danger to
2  himself/herself or others."
3  Q    Do you know if any mental health professional
4  determined that Mr. Barnes was a danger to anybody?
5  A    Based on what Dr. Zaccari represented to me,
6  apparently, there was something during the course of his
7  conversations with his counselor that led him to believe
8  that there was a concern for the safety of himself and the
9  campus community.
10  Q    Earlier when you were talking about meetings that
11  you're now aware took place to supplement your interrogatory
12  answers, you described a meeting that included Leah
13  McMillan. Isn't that right?
14  A    Uh-huh.
15  Q    Did Ms. McMillan at any point in that meeting
16  express her opinion on whether or not Mr. Barnes was a
17  danger to anybody?
18  A    No. Leah McMillan did not discuss particulars of
19  Hayden Barnes' therapy session with me.
20  Q    Okay. The second part of the mental health policy
21  says, "When a mental health professional recommends that a
22  student needs to be withdrawn from school for mental health
23  reasons, an informal hearing will then be set up to
24  determine whether or not the student should be withdrawn."
25  A    Uh-huh.

## Page 92

1  Q    Is that a correct statement of policy?
2  A    Yes. Based on the reading of the policy and based
3  on what's presented before me.
4  Q    Yes. Was any informal hearing ever set up in this
5  case?
6  A    Not to my knowledge.
7  Q    And then finally it says, "In this informal hearing
8  conducted by the Office of the Dean of Students, the student
9  or his or her representative may present any pertinent
10  information that he or she believes will have a bearing on
11  the particular case."
12  A    Uh-huh.
13  Q    Do you know whether or not Mr. Barnes was ever
14  given the opportunity to present such information?
15  A    Not to my knowledge.
16  MR. CORN-REVERE: Okay. I'd like to mark as
17  deposition Exhibit Number Ten another copy of the various
18  policies.
19  (The document was marked for identification as
20  Plaintiff's Exhibit Number Ten.)
21  BY MR. CORN-REVERE:
22  Q    Again, I apologize if the orders seem strange with
23  our documents. Some were combined and some weren't. But
24  once the witness has had a chance to take a look at it,
25  we'll just ask what it is.

## Page 93

1    A    (Reviewing document.)

2    Q    Now, again, I'll just say this is something we

3    received in discovery. It appears to be a group of partial

4    pages from various policies, but the front page of this

5    includes the mental health policy that we were just

6    discussing.

7        And, again, the copy that we have has various

8    markings showing that it had been highlighted at some point.

9        There's also handwriting at the bottom that says,

10   "Copy to Dr. Zaccari 5-2-07." Have you seen this document

11   before?

12   A    The reason I'm hesitating, I've seen this document

13   before because it's, obviously, from the Code of Conduct, I

14   believe.

15       But the handwriting at the bottom, I recognize that

16   to be what I believe to be my assistant's handwriting. So

17   at my directive she must've given Dr. Zaccari a copy of this

18   document.

19   Q    I see. And so this would have coincided with the

20   phone call and fax that you exchanged with Elizabeth Neely

21   and then your follow-up discussions with Dr. Zaccari. Is

22   that correct?

23   A    It would've coincided.

24   Q    Okay. And based on what you expressed as being

25   concerns about due process rights, this would have been

## Page 94

1    support for what you had said in those meetings?

2    A    Yes.

3    Q    Is the highlighting on this copy yours?

4    A    It would be reasonable to say I would've

5    highlighted this.

6    Q    Okay. But you have no independent recollection as

7    you sit here today?

8    A    No.

9        MR. CORN-REVERE: Then let's mark as deposition

10   Exhibit Number 11 a document entitled Student Handbook.

11       (The document was marked for identification as

12   Plaintiff's Exhibit Number 11.)

13       MR. CORN-REVERE: David, this may be more of what

14   we got from you in the supplemental response, but it is

15   something on the cover that says Student Handbook, Volume

16   2.

17   BY MR. CORN-REVERE:

18   Q    Now, again, if you don't mind, just flip through

19   this.

20       I understand you testified earlier that these

21   various policies appear in various places, and I assume that

22   the Student Handbook is one of the places that the various

23   policies might show up.

24       I really just want to ask you if there are any

25   policies that we haven't discussed that may be included in

## Page 95

1    the Student Handbook.

2    A    Not that I can recall.

3    Q    Okay. That's all I had about that one.

4        MR. CORN-REVERE: Next let's mark for indication

5    Gaskins Exhibit Number 12 part of the Board of Regents

6    Policy Manual; Section 1900.

7        (The document was marked for identification as

8    Plaintiff's Exhibit Number 12.)

9    BY MR. CORN-REVERE:

10   Q    Again, I'll just say these are documents that we

11   received in discovery. They appear to be printouts from the

12   web site showing Board of Regents policies.

13       The front page of this has a date of May 10th,

14   2007. The pages behind it show a date of May 8th, 2007.

15       Let me just ask: Are these documents, documents

16   you've seen before?

17   A    Yes.

18   Q    Would these have been the kind of documents that

19   you provided to Dr. Zaccari in May 2007 in this case?

20   A    Yes.

21   Q    Let me put it directly: Did you provide

22   Dr. Zaccari with the documents in this exhibit?

23   A    I believe that I did.

24   Q    Okay. And on the front page, in the second

25   paragraph, it has Section 1902, "Disruptive Behavior."

## Page 96

1    A    Uh-huh.

2    Q    Okay. Now is it your understanding that that

3    policy relates to unruly or violent demonstrations on

4    campus?

5    A    If it means, "Any student...who clearly obstructs

6    or disrupts or attempts to obstruct or disrupt any teaching,

7    research, administrative, disciplinary, or public service

8    activity," yes, that would fall within that category.

9    Q    Do these policies set forth the due process that

10   should be followed in a case like this one?

11   A    The Policy Manual was not in the Board of Regents

12   1902.

13   Q    Right. 1902 just sets forth one of the things that

14   can be disciplined.

15   A    Yes.

16   Q    But if you look at pages -- the last four pages, I

17   guess, of this exhibit -- also printed out on that date,

18   May 8th, 2007 -- it lists the hearing procedure, the appeals

19   process and other issues, including mental health

20   withdrawal.

21   A    Uh-huh.

22   Q    And the rights of students. Are these the policies

23   that should have governed in this case?

24   A    These are policies that should've been considered

25   in making a determination about the situation at hand.



## Page 97

1    Q    So these policies are optional?

2    A    No.  These policies should've been considered.

3    Q    Under what circumstances can they be disregarded?

4    A    There are no circumstances the hearing procedure

5    should be disregarded.  Ultimately, a student is entitled to

6    a hearing.

7    Q    Okay.  On the final page of this exhibit where it

8    lists "Rights Of The Students" and it includes:

9    "The right to an advisor of one's choice;

10   "The right to present information on one's behalf;

11   "The right to question one's accusers;

12   "The right to call witnesses on one's behalf;

13   "The right to remain silent and have no inference

14   of responsibility drawn from one's silence;

15   "The right to question all witnesses;

16   "The right to be appeal all sanctions; and

17   "The student may also have a verbatim transcript

18   made at one's own expense," and it goes on.

19   Were any of those rights accorded Hayden Barnes?

20   A    No.

21   MR. CORN-REVERE:  Let's mark as Exhibit 13 the

22   Policy Manual:  Section 400.

23   (The document was marked for identification as

24   Plaintiff's Exhibit Number 13.)

25   THE WITNESS:  (Reviewing document.)

## Page 98

1    BY MR. CORN-REVERE:

2    Q    Have you had a chance to take a look at this?

3    A    I'm looking at it now.

4    Q    Okay.  Now, again, this appears to be a printout

5    from the web site showing Board of Regents Policies.  This

6    is not a printout that appears to be printed out in May of

7    2007.  The date at the bottom shows that it's current.

8    And I don't think we received this in discovery.  I

9    may have printed this out.  My memory is hazy, even from

10   more recent times.

11   A    That's okay

12   Q    I just want to ask a couple of things about it.

13   Looking at the bottom of page one --

14   A    Yes.

15   Q    -- where it talks about the policy regarding

16   "Students With Disabilities," when you advised Dr. Zaccari

17   that there may be ADA concerns, was this the policy that you

18   were referring to?

19   A    No.  It was just my general understanding of the

20   law.

21   Q    I see.  So general ADA concerns but you weren't

22   referring to this section.

23   A    Yes.

24   Q    But it refers to, in substance, the same issue,

25   doesn't it?

## Page 99

1    A    Yes.

2    Q    Okay.  Is it your understanding that it would

3    violate this policy if a student opportunity were denied

4    because of his use of the Counseling Center?

5    A    If the student has a documented disability and he

6    was singled out for unfavorable treatment, then, yes, it

7    would be a violation of the Americans with Disability Act.

8    That unfavorable treatment being defined as being

9    denied services or -- yeah, being denied services on campus.

10   Q    Okay.  Would a violation of a student's right to

11   confidentiality also violate the Americans with Disabilities

12   Act?

13   A    It depends on how confidential information was

14   shared.  If that confidential information was shared because

15   the student presented a threat to himself or to others, then

16   no.

17   Q    Okay.  Well, let's make it less theoretical.

18   Earlier you testified that Dr. Zaccari shared with you his

19   knowledge that Hayden Barnes used the Counseling Center,

20   right?

21   A    Uh-huh.

22   Q    And I believe it was your testimony that his

23   sharing that information made you concerned.  Isn't that

24   right?

25   A    Yes.

## Page 100

1    Q    Was your concern that that information could be a

2    violation of confidentiality under the Americans with

3    Disabilities Act?

4    A    Not the fact that the student may have consulted

5    the Counseling Center; it's the fact that there was a

6    likelihood that there may have been further discussions

7    along those lines.

8    Q    And that might have been a violation of the ADA.

9    A    Yes.

10   MR. CORN-REVERE:  Let's mark as Deposition Exhibit

11   Number 14 a document entitled Bylaws of the Board of

12   Regents.

13   (The document was marked for identification as

14   Plaintiff's Exhibit Number 14.)

15   BY MR. CORN-REVERE:

16   Q    Again, I'll just mention this isn't something we

17   received in discovery.  It's simply a statement.  I'll let

18   you tell me what it is.  My question isn't whether or not

19   you've seen this specific document before but whether or not

20   you have seen the Bylaws of the Board of Regents before and

21   if that's what this appears to be.

22   A    I have seen the Bylaws of the Board of Regents

23   before, and this appears to be a draft version of the

24   Bylaws.

25   Q    Okay.  Look at Section 8 involving appeals.  It



## Page 113

1  that Hayden Barnes would be expelled?

2      A.    Nobody knew the outcome of the meeting until the

3  President made his decision.

4      Q.    Well, that may be so, but the email suggests that

5  people generally had an awareness that that's where it was

6  leading.

7          MR. SMITH:  Object to the form of the question.

8          THE WITNESS:  I don't know what people were

9      thinking or how people thought about this, whatever the

10     case may be.

11 BY MR. CORN-REVERE:

12     Q.    And I understand.  We'll have to ask the author of

13 this email what they may have been thinking.

14         But when you were being called into meetings of

15 this type, did you have an understanding of what was going

16 to happen to Hayden Barnes?

17     A.    No, not until the President made a decision.

18         MR. CORN-REVERE:  Let's mark for identification

19     Exhibit 17, and this is an article on legal developments.

20         (The document was marked for identification as

21     Plaintiff's Exhibit Number 17.)

22 BY MR. CORN-REVERE:

23     Q.    These are a couple pages from a publication

24 entitled Campus Legal Advisor.  I can represent to you that

25 these are pages that we received as part of a request during

## Page 114

1  the administrative proceeding, so they were papers that were

2  affiliated with Mr. Barnes' student file.

3          Have you seen these pages before?

4      A.    I don't recall ever seeing these exact pages, but I

5  am familiar with the publication.

6      Q.    Were you asked to do any legal research on whether

7  or not it would be permissible to expel Mr. Barnes?

8      A.    Because I serve in the role as University Attorney,

9  I gave advice on legal parameters that must be respected

10 prior to the removal of Mr. Barnes.

11         Now whether or not that included this document, I

12 can't recall.  And whether or not I reviewed this document,

13 I can't recall, as well.  I can't recall.

14     Q.    Do you have any idea whose writing appears on this?

15 There's some underlinings and some sort of line notations on

16 the exhibit.

17     A.    Because it's not unique, I can't identify who this

18 belongs to.  It's just a scribbling.

19     Q.    Sure.  Okay.  You testified earlier that President

20 Zaccari had begun to collect information about Hayden

21 Barnes.  Is that right?

22     A.    Yes.

23     Q.    And it included information like his employment

24 history, his grades,

25         Do you know of anything else -- and, thirdly, he

## Page 115

1  was getting information on his experience with the

2  Counseling Center.

3          MR. LaVALLEE:  Object to the form.

4          MR. WILL:  Join in the objection.

5  BY MR. CORN-REVERE:

6      Q.    Is there anything else that you're aware of that

7  Dr. Zaccari was -- information that Dr. Zaccari was

8  gathering about Hayden Barnes?

9      A.    No.  I don't recall any other information.

10         MR. CORN-REVERE:  Let's mark as Deposition Exhibit

11     Number 18 a news article.

12         (The document was marked for identification as

13     Plaintiff's Exhibit Number 18.)

14 BY MR. CORN-REVERE:

15     Q.    This is a one-page exhibit dated December 29th,

16 2005, with the headline "College Student Sues Auction Site

17 Ebay and Online Payment Site PayPal."

18         Okay.  Have you seen this exhibit before?

19     A.    This document brings to my attention that I recall

20 the President's assistant, Theresa Boyd, sharing this

21 information during the course of one of those two meetings.

22 I can't recall which meeting.

23         Because of this document, I now recall she was

24 present at one of those meetings.

25     Q.    Theresa Boyd, the President's assistant was

## Page 116

1  present?

2      A.    Right.

3      Q.    At one of the meetings that we described earlier?

4      A.    Right.

5      Q.    Okay.  Was it at that meeting she shared this

6  document?

7      A.    Yes.

8      Q.    Okay.  Now, if I'm remembering correctly, that

9  meeting was to discuss, first, President Zaccari's concerns

10 about his security and, secondly, what methods may be used

11 to expel Hayden Barnes and, thirdly, because you brought it

12 up, your concerns about the Constitutional, due process, and

13 ADA issues that might arise.

14         Can you tell me what relevance an article about a

15 suit against PayPal may have had to those subjects?

16     A.    I can't.  I just recall her sharing this during the

17 course of that meeting.  When I say "sharing," I mean saying

18 that Hayden Barnes had sued someone in the past.

19     Q.    Was there any characterization of Mr. Barnes

20 because he had engaged in litigation in the past?

21     A.    I don't recall.

22     Q.    When this information was shared with the group,

23 was there any follow-up discussion?

24     A.    No.

25         MR. CORN-REVERE:  And next let's mark four

Page 129

1    MR. CORN-REVERE: We can take a few minutes for her
2    to read over the article.
3         MR. SMITH: She doesn't have to read the article.
4         MR. WILL: I object to the form of the question.
5    BY MR. CORN-REVERE:
6    Q    You're not going to take a look at the article?
7    A    I'm not going to read it. I'm not an expert in the
8    field of psychology.
9    Q    Okay. Well, I understand there hasn't been an
10   interest in actually reading the article in this case.
11   Let's look at the advertisement.
12        MR. LaVALLEE: Objection to colloquy, counsel.
13   BY MR. CORN-REVERE:
14   Q    This next reference, "Shoot It, Upload It, Get
15   Famous," do you have an understanding of what this refers
16   to?
17   A    No.
18   Q    So for purposes of the meeting in early May where
19   Dr. Zaccari brought in this exhibit, did you have an
20   understanding then of what this referred to?
21        MR. LaVALLEE: Objection to form. Please give
22   context to what meeting you're talking about.
23        MR. CORN-REVERE: If the witness were able to
24   identify a specific meeting, then I'd do that. I would
25   say the May 3rd meeting, but she hasn't been able to do

Page 130

1    that; and she suggested that these exhibits were brought
2    up at more than one meeting.
3         Since she's been rather fuzzy on how many meeting
4    there actually were and amended her answers even today as
5    to how many meetings there actually were, I think it's a
6    little much to identify a specific meeting.
7         MR. LaVALLEE: I would appreciate that when you ask
8    questions regarding meetings, I ask that you put it in
9    the context of what meeting you're talking about.
10   BY MR. CORN-REVERE:
11   Q    How many meetings did you discuss these exhibits,
12   Exhibits 21 and 22, with Dr. Zaccari?
13   A    I can recall vaguely perhaps these documents were
14   present during the course of two, perhaps three meetings.
15   Q    Okay. And in three meetings, you never read this
16   article?
17   A    I glanced over it.
18   Q    Did you gain some understanding of what was being
19   written in this article?
20   A    My focus was ultimately the student is entitled to
21   due process. If there's a concern about safety and issues
22   relative to his conduct, all this will come out during the
23   course of a hearing.
24        So it was not my place to read an article and make
25   a determination of whether or not Hayden Barnes was a threat

Page 131

1    to the campus or Dr. Zaccari, personally, because ultimately
2    my advice always has been and still is he was entitled to a
3    hearing. Have a hearing and allow Hayden Barnes to account
4    for documents on his web page.
5    Q    Okay. And the same goes for the advertisement that
6    was associated with the salon.com article? Is that true?
7    A    He can offer -- Mr. Barnes can offer up whatever he
8    wanted to say.
9    Q    If he had a hearing.
10   A    Yes.
11   Q    Let's look at Exhibit 22. You've testified that
12   you've also seen this previously.
13   A    Yes.
14   Q    This is an exhibit that Dr. Zaccari provided at the
15   meetings in early May to discuss what to do about Hayden
16   Barnes. Is that correct?
17   A    Yes.
18   Q    Did Dr. Zaccari describe his concerns about this
19   exhibit?
20   A    Yes. He was concerned about the use of the word
21   "memorial."
22   Q    What was his concern about that?
23   A    Memorial meant paying homage to someone that was
24   deceased.
25   Q    Where did he get that interpretation?

Page 132

1    A    I don't know.
2    Q    Did he say?
3    A    No.
4    Q    Do you know if anybody bothered to look up the
5    dictionary definition of memorial?
6    A    I don't know.
7    Q    The use of that one word was the basis on which
8    Hayden Barnes was described as being dangerous? Is that
9    really what this is about?
10   A    No. My testimony was that Dr. Zaccari had access
11   to information about Hayden Barnes' history in terms of
12   communications he had with Leah.
13        Then it was a combination of that, along with
14   concerns that he had as it relates to Exhibit One; and, in
15   addition to that, he had some concerns about his behavior
16   during the course of that meeting at the Board of Regents.
17        So, Exhibit 22, in and of itself, I don't think,
18   was a single, solitary basis that he used to make a decision
19   to have him administratively withdrawn. I think it was a
20   combination of issues, concerns, and information.
21   Q    Uh-huh. I think you testified before -- again,
22   correct me if I'll wrong -- that Dr. Zaccari did not
23   characterize his conversations with Leah McMillan about
24   Hayden Barnes.
25   A    Correct.



Laverne Gaskin  6/12/2009
35 (Pages 133 to 136)

## Page 133

1    Q    But it was in combination of that information and
2    these exhibits that his concerns were given credence?
3    A    His concerns weren't given credence by anybody. I
4    don't understand. Given credence by whom?
5    Q    Well, as I understand it, Hayden Barnes was
6    expelled because he was perceived he was perceived to be a danger either to
7    Dr. Zaccari or to the campus.
8    A    Uh-huh.
9    Q    And you're telling me -- again, correct me if I'm
10   wrong -- that nobody looked into the fact or the suggestion
11   that he actually was a danger.
12       MR. WILL:  I object to the form of the question.
13       THE WITNESS:  I'm sure the police department
14   assessed the situation, Scott Doner and Ann Farmer, in
15   consultation with Dr. Zaccari.
16   I wasn't privy to whatever series of communications
17   he may have had with them.
18       BY MR. CORN-REVERE:
19   Q    So you have no direct knowledge of communications
20   with the police department and Dr. Zaccari. Is that your
21   testimony?
22   A    I have no direct knowledge, correct.
23   Q    Okay. Now earlier you testified that at one of the
24   meetings that Ann Farmer was present. Is that correct?
25   A    Yes.

## Page 134

1    Q    And if I understood your testimony, Ann Farmer's
2    recommendation to Dr. Zaccari was that if he had concerns
3    about security, he could get a restraining order.
4    A    Perhaps.
5    Q    Was that the recommendation she gave?
6    A    Yes, uh-huh.
7    Q    And so far as you know, Dr. Zaccari did not follow
8    that recommendation.
9    A    Not to my knowledge.
10   Q    And are you aware of any other communications
11   between Dr. Zaccari and the police department?
12   A    No. I'm not aware of any direct -- I don't have
13   direct knowledge of any communications.
14   Q    Okay. In discussing either Exhibits 21 or 22 at
15   the early May meetings in which Dr. Zaccari made them
16   available to the group, did you express any concerns about
17   the fact that these exhibits might be protected by the First
18   Amendment?
19   A    Yes.
20   Q    What did you say?
21   A    I said Hayden could challenge any action that you
22   take based on First Amendment grounds: Freedom of
23   expression. He could argue that he's entitled to have
24   something of this sort posted anywhere he chooses. This
25   includes Exhibit 21, as well.

## Page 135

1    Q    Okay. But as I understand your earlier testimony,
2    the advice you got from the Board of Regents was do what you
3    need to do and worry about the lawsuit later.
4    A    I didn't receive that advice. That was advice that
5    was given to Dr. Zaccari.
6    Q    Right. But that was the advice he was given in
7    your phone call with Elizabeth Neely on May 1st, 2007. Is
8    that correct?
9    A    The time that I testified the conversation took
10   place, right.
11       MR. CORN-REVERE:  We're up to 23. Okay. Let's
12   mark as Exhibit 23 a memo from Laverne Gaskins to
13   Dr. Zaccari.
14       (The document was marked for identification as
15   Plaintiff's Exhibit Number 23.)
16       BY MR. CORN-REVERE:
17   Q    Before we get to that exhibit, let me just ask one
18   follow-up question about the concerns that Dr. Zaccari had
19   expressed about Hayden Barnes based on what he had learned
20   from the Counseling Center.
21       Would it change or would it affect your opinion
22   about whether or not Hayden Barnes was dangerous if you knew
23   that President Zaccari had been told by Leah McMillan that
24   Mr. Barnes was no danger?
25   A    I never had an opinion that Hayden was dangerous,

## Page 136

1    so it would not affect my opinion because I never had an
2    opinion that he was dangerous. I always had a strong
3    opinion that he was entitled to an opportunity to be heard
4    and he was entitled to due process.
5        If the individuals who were listening to the facts
6    as they were presented determined that he was a danger to
7    the campus, then that was a determination for that body to
8    make.
9    Q    Okay. But for those bodies that did meet -- and
10   I'm referring to the meetings of early May, either May 3rd
11   or May 7th, 2007, where the subject of Hayden Barnes came
12   up -- did anyone express agreement with Dr. Zaccari that
13   Mr. Barnes was dangerous in some way?
14   A    No.
15   Q    Did you have any follow-up conversations with any
16   of the participants at those meetings of whether or not
17   Mr. Barnes was a danger?
18   A    No.
19   Q    And in your phone conference with Elizabeth McNeely
20   (sic) on May 1st, 2007, did Ms. McNeely (sic) express any
21   agreement or disagreement with the proposition that
22   Mr. Barnes was in some way dangerous?
23   A    She seemed to support Dr. Zaccari's representation
24   that he was a danger to the campus and to himself.
25       I also vaguely recall shortly after his withdrawal

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

## Page 137

1  from campus I was at the Board of Regents and I had lunch
2  with Betsy Neely and another attorney from another
3  institution.  One or two attorneys.  I just can't remember.
4      But I remember expressing some concerns about the
5  facts of the case and the fact that he didn't have a
6  hearing, and Betsy reemphasized the fact that he appeared to
7  be a danger to Zaccari and the campus community based on
8  representations made by Dr. Zaccari.
9      Q      Did she say what information she had for making
10  that determination other than Dr. Zaccari's claims?
11      A      No, she didn't.
12      Q      Do you know independently whether or not she had
13  any information?
14      A      No.
15      Q      Okay.  But in that conversation over lunch with
16  Betsy McNeely (sic), was she --
17      A      By the way, it's Betsy Neely.
18      Q      Sorry.  Sorry.  In that conversation, she
19  discounted your concerns about due process based on the
20  perceived danger?  Is that a fair characterization?
21      A      Yes.
22      Q      Okay.  Let's look at Exhibit 23 and also, in
23  conjunction with that, Exhibit 3, your supplemental answer
24  to interrogatory three.
25      A      (Reviewing document.)

## Page 138

1      Q      In the second paragraph on page three, the
2  supplemental answer --
3      A      Uh-huh.
4      Q      -- you state, "On May 4th, 2007, this Defendant
5  prepared a memorandum for Zaccari providing a draft of a
6  proposed withdrawal letter requested by Defendant Zaccari
7  together with a statement from this Defendant setting out
8  the requirements of due process implicated in any withdrawal
9  and providing copies of policies dealing with the withdrawal
10  issue.  Defendant Zaccari later directed this Defendant to
11  revise the proposed letter prepared for Defendant Zaccari's
12  signature and this Defendant did so."
13      Is that revised answer or supplemental answer to
14  interrogatory three a description of the document that
15  appears here as Exhibit 23?
16      A      Yes, it is.
17      Q      Can you describe -- strike that.
18      What did Dr. Zaccari say to you when he requested
19  this memo?
20      A      I made a decision -- these are not his exact words.
21  But, generally speaking, I made a decision to
22  administratively withdraw Hayden, and I need to have a
23  little draft that reflects that; and he included items one
24  and two.
25      Q      I'm sorry?

## Page 139

1      A      One and two in terms of what he wanted to have as a
2  condition for his continued enrollment.
3      Q      Okay.  Just so your answer is clear, the top half
4  of this memorandum, Number 23, is a transmittal from you to
5  Dr. Zaccari explaining that this is a response to his
6  request and in the bottom half under the line that says
7  "draft" is a copy of the proposed withdrawal notice that
8  would go to Mr. Barnes.  Is that correct?
9      A      Right.  And I wanted to, once again, emphasize to
10  the President that the student was entitled to due process.
11  The student was entitled to a hearing and an opportunity to
12  be heard and then a determination could be made as to
13  whether or not he should be administratively withdrawn.
14      And I did that as one last attempt to emphasize the
15  advice that I had consistently given him about this student.
16      And I have been oftentimes called upon by all three
17  Presidents to draft documents, letters, correspondences.
18  But I wanted to make certain that he understood very clearly
19  what my advice was in this matter.
20      And while certainly I am -- I would draft the
21  letter if you request that of me, but this is my advice.  So
22  the letter, the bottom part, is a written manifestation of
23  the decision he made.
24      Q      Okay.
25      A      And the top part is, once again, my emphasized

## Page 140

1  advice.
2      Q      Okay.  Do you believe Dr. Zaccari understood your
3  advice?
4      A      Yes, I do.
5      Q      And just to follow up on something you said a
6  moment ago, in the second half of the proposed notice of
7  withdrawal, these two conditions -- first, "A correspondence
8  from a psychiatric or psychologist indicating that you are
9  not a danger to yourself and others," and, secondly,
10  "Documentation from a certified mental health professional
11  indicating that during your tenure at Valdosta State you
12  will be receiving ongoing therapy."  Those two conditions
13  were dictated by Dr. Zaccari?
14      A      Yes, it was.
15      Q      Did he prescribe the exact wording to be used?
16      A      No.
17      Q      Okay.  How did he tell you to characterize these
18  conditions?
19      A      He told me what to put as a condition, and I just
20  wrote it on a piece of paper and went to my office and typed
21  it.
22      Q      Did he give any indication of what policy of the
23  University this was intended to be based on?
24      A      No.
25      Q      Let's look at the top half of the memorandum which

Laverne Gaskin  6/12/2009
37 (Pages 141 to 144)

## Page 141

1    is your advice to Dr. Zaccari.
2        Your second sentence says, "You should note that
3    due process dictates that the student be apprised of what
4    particular policy has been violated, an opportunity to be
5    heard and also be informed of the appeal process."
6        Now it appears that someone at some point
7    highlighted that language.
8    A    (Nods head.)
9    Q    Do you know -- rather, is this your highlighting?
10   A    This right here?
11   A    Yes.
12   A    I would not have highlighted this.
13   Q    Okay.  But you don't know how the highlighting came
14   to be on this document?
15   A    No.
16   Q    Okay.  Was this document delivered to anyone other
17   than Dr. Zaccari?
18   A    No.
19   Q    Now after your discussion of the due process
20   issues, you indicate, "My research has led me to the
21   following policies that appear to be implicated."
22   A    I want to correct something.  In the interest of
23   efficiency, in the past I have given his support staff the
24   letter, itself, following his review.
25       So instead of them typing it all over again, they

## Page 142

1    can just take the Word document and make the changes instead
2    of his support staff looking at this and typing this all
3    over.
4    Q    They have a Word document they can work from?
5    A    Right.
6    Q    Okay.  Back to my previous question:  You say in
7    your transmittal on Exhibit 23, "My research has led me to
8    the following policies that appear to be implicated."
9        Can you describe what research you're referring to
10   here?
11   A    I was just researching the existing policies at the
12   University level and also Board of Regents regarding
13   behavior that the matter of Hayden Barnes dealt with.
14   Q    Okay.  And as you have attached the same for your
15   review and consideration, did you attach to this memorandum
16   copies of the policies that are listed here?
17   A    Yes.
18   Q    Okay.  I notice this memo does not list the Medical
19   Withdrawal Policy that was discussed in your May 1st
20   telephone conference with Elizabeth Neely and Dr. Zaccari.
21       Is there a reason why it's not included here?
22   A    That was already given to him, and that policy as
23   it was presented to me from Betsy's office didn't exist in
24   that form at Valdosta State.
25   Q    Okay.  Is there some other form that it existed in

## Page 143

1    at Valdosta State?
2    A    I don't recall.  I'd have to actually get the --
3    Q    Okay  Just taking what you say here, your research
4    led you to believe that relevant policies were the Valdosta
5    State Student Code of Conduct, specifically Section E (7)
6    related to disorderly conduct, mental health withdrawal and
7    then separately Board of Regents Policy 1902, disruptive.
8    behavior.
9    A    Uh-huh.
10   Q    So it's really those three policies that were
11   possibly candidates --
12   A    Yes.
13   Q    -- for justifying the administrative withdrawal of
14   Hayden Barnes.
15   A    Yes.
16   Q    Were these presented to Dr. Zaccari as options to
17   choose from?
18   A    Not in the context that Hayden was entitled to a
19   hearing.  Hayden was entitled to hearing; and whether or not
20   he chose to use the Mental Health Withdrawal over and above
21   a Disorderly Conduct or both was a decision that needed to
22   be made by the Office of Judicial Affairs.  Typically,
23   that's what happened.
24   Q    If there had been a hearing.
25   A    Right.

## Page 144

1    Q    Okay.  But since there was no hearing, this was a
2    decision that was made solely by Dr. Zaccari.  Is that
3    correct?
4    A    Yes.
5    Q    Now since Dr. Zaccari added the conditions to be
6    included in this proposed withdrawal notice, did you have an
7    understanding of what Mr. Barnes would have to do to comply
8    with these conditions?
9    A    Yes.
10   Q    What was your understanding?
11   A    He needed a correspondence from a psychiatric or
12   psychologist indicating he was not a danger to himself or
13   others, and then he had to have documentation from a
14   certified mental health professional indicating that during
15   his tenure he will be receiving ongoing therapy.
16   Q    Is it your opinion that if Mr. Barnes provided
17   those two types of documentation he would be readmitted
18   to --
19   A    Yes.
20   Q    -- Valdosta State?
21   A    Yes.
22   Q    After you sent this memorandum in Exhibit 23 to
23   Dr. Zaccari, did you discuss the notice of withdrawal with
24   him?
25   A    Discuss this?

## Page 149

1   A   Yes.

2       MR. CORN-REVERE:  Let's mark as Exhibit 24 a

3   two-page document dated May 7th, 2007, which is the

4   withdrawal notice to Hayden Barnes.

5       (The document was marked for identification as

6   Plaintiff's Exhibit Number 24.)

7   BY MR. CORN-REVERE:

8   Q   Okay.  As I mentioned, this is a two-page exhibit.

9   The front page is the notice of withdrawal and the back page

10  is another copy of the collage that we discussed earlier.

11  Have you seen this before?

12  A   Yes.

13  Q   When was the first time you saw a copy of the

14  withdrawal notice for Hayden Barnes?

15  A   More than likely I would've received a copy on

16  May 7th.

17  Q   Okay.  Now I believe you testified earlier there

18  was a meeting on May 7th, 2007:  The same day that the

19  withdrawal notice was sent to Hayden Barnes.  Is that

20  correct?

21  A   Uh-huh.

22  Q   Do you know if the meeting took place before or

23  after Hayden Barnes was expelled?

24  A   I recall that -- the meeting with whom?

25  Q   Well, you referred to the meeting with -- well,

## Page 150

1   actually, let me back up.

2       The May 7th meeting is the one that you indicated

3   this morning was a correction of your earlier interrogatory

4   responses that you had become aware of a meeting on May 7th

5   that you had previously not recalled.

6       That's the meeting I'm referring to.  A meeting on

7   May 7th, 2007, to talk about Hayden Barnes.

8   A   I believe that meeting took place first and then

9   the administrative withdrawal letter came later.

10  Q   Okay.  Was a copy of the withdrawal letter made

11  available at that May 7th meeting?

12  A   No, because I don't think it existed at that time.

13  Q   What was the purpose of the May 7th meeting in

14  2007?

15  A   I can't recall the specifics, but it's likely it

16  was to discuss Hayden Barnes.

17  Q   Okay.  I believe you testified earlier that Leah

18  McMillan was present at that meeting.

19  A   Yes.

20  Q   Do you recall who else was present?

21  A   Yes.  I believe Dr. Keppler and Dr. Morgan.

22  Q   Anyone else?

23  A   No.  I don't recall anyone else.

24  Q   So it was -- actually, I should ask,

25       Was Dr. Zaccari present at that meeting?

## Page 151

1   A   No.

2   Q   So it was Dr. Keppler, Dr. Morgan, you, and Leah

3   McMillan at the May 7th, 2007, meeting?

4   A   Right.  Then there was another meeting, I believe,

5   with Dr. Zaccari later on that day.

6   Q   So there were two meetings on May 7th?

7   A   Perhaps, yes.

8   Q   Did the meeting with Dr. Zaccari take place before

9   or after Hayden Barnes was expelled?

10  A   When it was brought to my attention there may have

11  been a meeting on May 7th, I looked at my calendar and I see

12  there's a meeting with: Leah, Morgan and -- I can't recall

13  the last person.  Leah, Morgan and Keppler.

14      And then I also saw later that day Dr. Zaccari.

15  Once again, the nature of the meeting is not -- it wasn't on

16  the calendar.

17  Q   So, in preparing for this deposition, you looked at

18  the calendar for May 7th, 2007 --

19  A   Uh-huh.

20  Q   -- and noticed that you had participated in two

21  separate meetings on that date?

22  A   Right.

23  Q   Do you recall what time of day the two meetings

24  were?

25  A   I think the first one was at, like, 8:30 in the

## Page 152

1   morning or 9 based on that calendar.

2   Q   Okay.

3   A   And the other one was, like, ten o'clock.  But,

4   once again, I can't say that the meeting at ten was to

5   discuss Hayden with Dr. Zaccari because it doesn't say.

6   Q   I see.  At the earlier meeting on May 7th, the one

7   attended by Dr. Keppler, Dr. Morgan, Leah McMillan, and you,

8   was there any discussion about whether Hayden Barnes

9   actually presented a danger to campus?

10  A   I don't recall.

11  Q   Was there any discussion of the recommendation by

12  the Vision Team that Mr. Barnes' activities just be

13  monitored instead of his being expelled?

14  A   I never had any direct communication with the

15  Vision Team.

16  Q   So there was no discussion of any other

17  alternative?

18  A   I don't know what they discussed.

19  Q   You've testified earlier that Ann Farmer had

20  suggested that one alternative would be to seek a

21  restraining order on Mr. Barnes.

22  A   Uh-huh.

23  Q   Was there any discussion about that alternative at

24  the May 7th meeting, the early morning meeting, with

25  Dr. Keppler, Dr. Morgan, Leah McMillan, and you pursuing

## Page 153

1    that option instead of expelling Mr. Barnes?
2    A    Not that I recall.
3    Q    Looking at Exhibit Number 24, the final withdrawal
4    notice that was sent to Hayden Barnes, were you notified by
5    anybody when this was sent to Mr. Barnes?
6    A    No.
7    Q    Do you know how it was delivered to Mr. Barnes?
8    A    I think I was later told that it was -- no, I can't
9    remember.  I can't remember.
10   Q    Let's look at Exhibits 23 and 24 together for a
11   moment.
12   A    Uh-huh.
13   Q    There appear to be some additions to language you
14   initially proposed.  The original draft reads -- in the
15   second line of paragraph one of the withdrawal notice --
16   "Therefore, you are hereby notified that you have been
17   administratively withdrawn from Valdosta State University
18   effective May 6, 2007."
19        The actual version, the corresponding sentence
20   says, "Therefore, pursuant to Board of Regents Policy 1902,
21   you are hereby notified that you have been administratively
22   withdrawn from Valdosta State University effective May 7,
23   2007."
24        Is it your understanding that Dr. Zaccari selected
25   the Board of Regents Policy 1902 as being the operative

## Page 154

1    provision under which this administrative withdrawal would
2    happen?
3    A    I believe that's the case.
4    Q    In looking at the conditions that Dr. Zaccari had
5    dictated for the withdrawal notice, the first draft
6    condition calls for "a correspondence from a psychiatric or
7    psychologist indicating that you are not a danger to
8    yourself or others."
9        The final version reads "a correspondence from a
10   non-university appointed psychiatrist indicating that you
11   are not a danger to yourself and others."
12   A    Uh-huh.
13   Q    Again, is it your understanding that Dr. Zaccari
14   modified that condition to focus on a non-university
15   appointed psychiatrist?
16   A    Yes.  I believe that to be the case.
17   Q    Okay.  And then the second condition appears to be
18   unchanged between the draft and the final version.  And,
19   then again, the final provision for the appeal to the Board
20   of Regents appears to be unchanged.
21        Now, again, is it your understanding that once
22   Mr. Barnes received this and provided the correspondence
23   called for in these two conditions that he should have been
24   readmitted to the University?
25   A    Yes.

## Page 155

1    Q    Did Dr. Zaccari ever discuss with you how the
2    withdrawal notice should be delivered to Mr. Barnes?
3    A    I don't recall.
4    Q    Do you know if any other university official ever
5    discussed how a withdrawal notice of this type should be
6    delivered?
7    A    No, I don't recall.
8    Q    Is there a policy or protocol for dealing with
9    students that are potentially dangerous when they are
10   expelled?
11   A    Student Code -- the Student Code of Conduct
12   dictates that all matters related to student withdrawals be
13   routed through the Student Office of Judicial Affairs.
14        And my office typically -- we're not involved in
15   student suspensions, only when there was a legal issue that
16   needs my attention.
17        So the routine is student disciplinary procedures
18   are routed through the Student Judicial Affairs Office.
19   Q    But what about a situation where a student
20   represents some kind of danger?  Isn't there a policy for
21   getting campus police involved?
22   A    If a student is committing a crime or represents a
23   danger to others and himself, then, yes, the police would be
24   involved.
25   Q    Wouldn't they be -- strike that.

## Page 156

1        In a situation like that, would you expect the
2    police to be asked to escort the student off campus?
3    A    Perhaps, yes.
4    Q    Do you know of any situations in which that's
5    occurred?
6    A    I do not know.
7    Q    But it didn't happen in this case, did it?
8    A    I can't speak to whether or not it did or didn't
9    because I don't know.
10        MR. CORN-REVERE:  Okay.  Let's mark this one-page
11   exhibit as Gaskins Deposition Exhibit Number 25.  It's a
12   one-page memorandum from Dr. Zaccari to various members
13   of the VSU staff.
14        (The document was marked for identification as
15   Plaintiff's Exhibit Number 25).
16   BY MR. CORN-REVERE:
17   Q    Have you had a chance to look at this exhibit?
18   A    Yes.
19   Q    Have you seen this memorandum before?
20   A    I believe I have.
21   Q    Okay.  Can you describe what it is?
22   A    It's a letter written to Dr. Zaccari -- from
23   Dr. Zaccari to Jim Black, Scott Doner, Tom Hardy, Chuck
24   Hudson, Kurt Keppler, Louis Levy, and Russ Mast regarding
25   the administrative withdrawal of Hayden Barnes, Thomas

Page 157

1    Hayden Barnes, effective November -- I'm sorry, effective
2    May 9th.
3        He's notifying various departments that the student
4    has been administratively withdrawn and he's given 48 hours
5    to leave Converse Residence Hall and his courses dropped.
6        He is to receive a full refund for housing, meal
7    plans, and other charges.
8    Q    Just one thing I'm curious about. The withdrawal
9    notice, itself, was May 7th and this memorandum from
10   Dr. Zaccari is dated May 9th.
11       Do you know why there's a two-day difference
12   between the actual withdrawal notice and then this
13   memorandum to various members of the administration?
14   A    No, I don't.
15   Q    I notice that you're not on the distribution list.
16   When did you first see this memorandum?
17   A    I can't recall, but I have seen it before.
18   Q    Did you see it based on what you remember today
19   around the time that it was issued in May of 2007?
20   A    I can't recall.
21   Q    Okay.
22   A    I didn't get it directly.
23   Q    Right. So, just in terms of the sequence of
24   timing, Mr. Barnes was administratively withdrawn May 7th
25   and then two days later this memorandum was issued.

Page 158

1        And based on this memorandum, there was another 48
2    hours for Mr. Barnes to vacate campus.
3    A    Apparently so based on the reading of this
4    document.
5    Q    I believe earlier when we were talking about the
6    medical withdrawal policy, the one that you discussed with
7    Betsy Neely and Dr. Zaccari on the May 1st, 2007, call and
8    the one that was shown in the fax that Betsy Neely sent you
9    that the condition in which a student would not be required
10   to have a hearing or a notice of a physician or the family
11   involved would be if there was some emergency situation. Is
12   that correct?
13   A    Based on that document, yes.
14   Q    Yes. Does it suggest to you that expelling a
15   student and giving him several days to leave campus is
16   indicative of an emergency?
17   A    No.
18   Q    So this would be inconsistent with any claims that
19   Mr. Barnes actually represented some danger to the campus or
20   to Dr. Zaccari.
21   A    It is inconsistent.
22   Q    Based on this memorandum where Mr. Barnes' courses
23   are dropped and he's simply given a refund for his -- for
24   housing, meal plans, and other charges, what is the impact
25   on his standing as a student?

Page 159

1    A    I don't know.
2    Q    Did you ever discuss this memorandum with
3    Dr. Zaccari?
4    A    No. I didn't write this, and I don't recall
5    discussing this.
6        MR. CORN-REVERE: Let's mark as Exhibit 26 a
7    one-page agenda.
8        (The document was marked for identification as
9    Plaintiff's Exhibit Number 26.)
10   BY MR. CORN-REVERE:
11   Q    This is a document that we received from you as
12   part of your response to our request for production of
13   documents. Can you identify this document?
14   A    This is an agenda for the Risk Management Task
15   Force meeting that was held at the Board of Regents office
16   on May the 23rd of 2007.
17   Q    Did you attend this meeting?
18   A    Yes. I believe I did.
19   Q    Okay. What about this document or about the
20   meeting that it memorializes is relevant to Hayden Barnes?
21   A    I don't know the relevancy. Off the top of my
22   head -- I don't know whether or not this was just sent in
23   error, but it reflects that certainly Betsy Neely was
24   spearheading an initiative to crystalize how institutions
25   should deal with mental health issues following the Virginia

Page 160

1    Tech incident.
2        MR. SMITH: If I can state for the record, unless
3    I'm mistaken, this document was produced in response to a
4    request for all communications between this witness and
5    Betsy Neely. It didn't restrict it to this case, so this
6    may have nothing to do with this.
7        MR. CORN-REVERE: Okay. Thank you for your
8    clarification.
9        THE WITNESS: Thank you.
10   BY MR. CORN-REVERE:
11   Q    Looking at item four on the agenda where Betsy
12   Neely is listed as discussing student mental health issues
13   related to the Virginia Tech incident, do you recall from
14   attending that meeting whether or not she discussed the
15   Hayden Barnes case?
16   A    No.
17   Q    You don't recall?
18   A    I don't recall her discussing the Hayden Barnes
19   case, and it's unlikely she would have.
20   Q    Uh-huh.
21   A    This is a meeting attended by a variety of people
22   from various campuses.
23   Q    Yeah. Do you recall what Betsy Neely did talk
24   about in this agenda item?
25   A    Student Mental Health Issues related to the



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

Page 161

1 Virginia Tech incident.

2 Q But beyond the title, you don't have any separate

3 recollection?

4 A Huh-uh. No.

5 MR. CORN-REVERE: Next I'd like to mark two

6 exhibits as Exhibit 27 and Exhibit 28.

7 (The documents were marked for identification as

8 Plaintiff's Exhibit Number 27 and 28.)

9 BY MR. CORN-REVERE:

10 Q Looking first at Exhibit 27, it's a letter on

11 Valdosta State University stationery addressed to the Board

12 of Regents and to the Office of the President; and it's from

13 the Counseling Center and signed by Leah McMillan. Have you

14 seen this letter before?

15 A Yes.

16 Q Okay. When did you first see it?

17 A On or about May 8th. I'm referring to Exhibit

18 Number 27.

19 Q Yes.

20 A And Exhibit 28 about May 8th.

21 Q Okay. So on May 7th, Mr. Barnes was expelled and

22 on May 8th, these two letters, the first from Leah McMillan

23 and the second from Kevin Winders, were delivered to the

24 University and you saw them on May 8th.

25 A Uh-huh. On or about.

Page 162

1 Q Okay. Do you have an understanding of what these

2 letters say?

3 A Yes.

4 Q And what's your understanding?

5 A The one from Kevin Winders says, essentially, that

6 he conducted an evaluation on Hayden on April the 30th,

7 2007; and he understood that the post Virginia Tech period

8 is difficult for all universities.

9 He said, "However, Hayden had insight to drop the

10 anti-parking garage campaign after the Virginia Tech

11 tragedy," and he's not aware of any specific threats made by

12 him.

13 He says based on the information that he has, he

14 thinks Hayden's main issue is being obsessive. He also

15 concludes that it's impossible for him to predict the

16 future, but he doesn't think he's violent or any more a

17 threat to harm someone than any other student.

18 Q Okay.

19 A That's Dr. Winders.

20 Q Right. Do you know who Dr. Winders is?

21 A No.

22 Q Okay.

23 A He's a psychiatrist, apparently, in Savannah.

24 Q Right. Were you aware that Dr. Winders was

25 Mr. Barnes' personal psychiatrist?

Page 163

1 A No.

2 Q Okay. And Exhibit 27, have you seen that one

3 before?

4 A Yes. This is a letter drafted by Leah McMillan who

5 is one of the counselors in our center.

6 Q Uh-huh.

7 A And she, essentially, lays out circumstances of her

8 association with Hayden as a result of permission she has

9 received from Hayden to make this communication.

10 And she says in her professional opinion as a

11 counselor that Hayden is not a threat indirectly or directly

12 to anyone at the campus. This includes the President,

13 staff, faculty, students and others and himself.

14 And she directed this information to Dr. Zaccari,

15 as well as Board of Regents.

16 Q Okay. Do you know whether or not Dr. Zaccari

17 received these letters?

18 A I believe he did.

19 Q Did you discuss these letters with Dr. Zaccari?

20 A I recall a discussion of these letters. The extent

21 and nature of the discussion, I can't recall.

22 Q Do you know when that conversation took place?

23 A I'm going to say on or about May 8th. And the

24 reason I had to have had perhaps maybe discussion with him

25 is because these letters were directed to his office. For

Page 164

1 me to get a copy of them, he would've given a copy of them

2 to me.

3 Q And do you recall anything about the conversation?

4 A No, I don't.

5 Q Okay. Looking back at Exhibit 24, the withdrawal

6 notice, do you have an opinion on whether or not these

7 letters satisfy the conditions set forth in the withdrawal

8 notice?

9 A Well, the withdrawal notice states that if he

10 provided documentation from a non-university appointed

11 psychiatrist, which Dr. Kevin Winders is, indicating that he

12 is not a danger to himself or others, that would satisfy the

13 first prong of that condition.

14 And Kevin Winders says, "It is impossible to

15 predict the future, but I don't think he is violent or any

16 more of a threat to harm someone other than any other

17 student." Whether or not that satisfies that prong, I don't

18 know.

19 I will add that I vaguely recall that this document

20 was forwarded to Betsy Neely's office.

21 Q And how did you become aware of that?

22 A I'm just recalling that there was this discussion

23 about this last sentence.

24 Q Which last sentence are you referring to?

25 A Dr. Kevin Winders: "It's impossible to predict



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

Laverne Gaskin  6/12/2009
43 (Pages 165 to 168)

## Page 165

1    the future, but I don't think he's violent or any more of a
2    threat or harm to someone other than the student." (sic)
3    Q    Well, just to read from it so the record is clear,
4    it says, "It is impossible to predict the future, but I
5    don't think he is violent or any more of a threat to harm
6    someone than any other student."
7    A    Than any other student.
8    Q    Okay. When that was communicated to Betsy Neely,
9    it was your understanding that there was an emphasis placed
10   on that sentence?
11   A    I vaguely recall that.
12   Q    Do you know who placed an emphasis on that
13   sentence?
14   A    I think Betsy -- I think I had a conversation with
15   Betsy about this letter. A telephone conversation, I think.
16   Q    Do you know when that phone call would've taken
17   place?
18   A    No. I'm going to say on or about May 5th. It may
19   have been a conversation in his office. I simply can't
20   recall.
21   Q    In whose office?
22   A    I just can't recall. You know, I'm just thinking
23   about something. This is dated May 8th. And then after the
24   administrative withdrawal, during the time that Hayden
25   Barnes contacted the Board of Regents and an appeal was

## Page 166

1    requested, it may have been during that time frame.
2         It may not have been contemporaneous to May 8th,
3    but it was during that time frame Hayden contacted the Board
4    of Regents making inquiries about his appeal process; and
5    that information may have surfaced in that context.
6         But I do recall that Betsy was aware of this
7    letter, but I'm unable to recall the conditions under which
8    the discussion took place.
9         I can't recall whether or not it was a day or two
10   after May 8th or maybe it was a few days before the appeal
11   was scheduled to be received or maybe it was after the phone
12   call from Hayden Barnes or perhaps Hayden sent this to Betsy
13   and then Betsy's contacting us about it.
14   Q    Okay. Well, just looking at Exhibit 24, the
15   withdrawal notice --
16   A    Uh-huh.
17   Q    -- the last sentence says, "However, because this
18   matter directly concerns me, should you elect to appeal my
19   decision, you should submit your written appeal within
20   twenty days of receipt of this letter to the Board of
21   Regents at the following address."
22   A    Uh-huh.
23   Q    So the process that you're describing now, is it
24   your understanding that that would've been part of the
25   appeal to the Board of Regents?

## Page 167

1    A    This document?
2    Q    At some point you had a discussion with Betsy
3    Neely. Is it your understanding as you sit here today that
4    that conversation took place as part of the appeal of
5    President Zaccari's decision to the Board of Regents?
6    A    Not necessarily, because there was a point in time
7    that Hayden contacted the Board of Regents and he was
8    concerned about his case being heard in a particular time
9    frame.
10        And I vaguely recall a conversation with that
11   office about the matter. There was a delay of some sort
12   between the time that he requested the matter be appealed
13   and the time that it was actually heard by the Board of
14   Regents. So it was sometime within that time frame.
15        But, no, as a part of the appeal process, telephone
16   conversations are not a part of the appeal process.
17   Q    Right.
18   A    Okay.
19   Q    I didn't mean to suggest that the telephone
20   conversation was part of the appeal, itself.
21        What I was trying to ask is whether or not that
22   conversation took place during the time in which the appeal
23   was being made to the Board of Regents.
24   A    By Hayden Barnes?
25   Q    Well, the telephone conversation that you had with

## Page 168

1    Betsy Neely.
2    A    I can't testify to that.
3    Q    Okay. So right now you have no recollection of
4    when you talked to her about this May 8th letter from
5    Dr. Winders?
6    A    Right. And I can't recall whether or not it was
7    generated because Hayden had supplied this information first
8    and foremost or whether or not this was faxed to the Board
9    of Regents along with this letter. (Indicating.)
10   Q    Okay. And that's a letter from Dr. Winders.
11        Then Exhibit 27, the letter from Leah McMillan, did
12   you form an opinion whether or not this letter complied with
13   the second condition of the withdrawal notice?
14   A    (Reviewing document.) She states, "However, if
15   Hayden returns to VSU in the future, I will be more than
16   willing to continuing seeing him in the VSU Counseling
17   Center."
18        So this suggests to me that in terms of the
19   Counseling Center, a counselor was willing and able and
20   ready to provide services that would've satisfied number
21   two.
22   Q    Okay. Just so we're clear on the sequence of
23   events, the withdrawal notice was delivered to Hayden Barnes
24   on May 7th. Exhibit 27 and 28, the two letters in response,
25   were delivered to Dr. Zaccari and the Board of Regents a day



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

Page 169

1   later on May 8th.
2        And then the following day, on May 9th, Dr. Zaccari
3   circulated a letter to the administration indicating that
4   Mr. Barnes was in any event withdrawn from school.
5   A    Yes.
6   Q    That's the sequence.
7        MR. CORN-REVERE: Let's mark as Exhibit 29 a letter
8   from Betsy Neely to Zaccari.
9        (The document was marked for identification as
10       Plaintiff's Exhibit I Number 29)
11  BY MR. CORN-REVERE:
12  Q    This is a two-page letter under the letterhead of
13  the Board of Regents of the University System of Georgia,
14  specifically Elizabeth E. Neely, addressed to Dr. Ronald M.
15  Zaccari. Have you seen this letter before?
16  A    Yes.
17  Q    Could you identify it for the record?
18  A    It is a letter from Betsy Neely. She's the
19  Associate Vice Chancellor for Legal Affairs, and she was
20  charged with responsibility for investigating all
21  applications for review.
22       Hayden Barnes submitted a request for a review, an
23  appeal, and she was directing the President to supply
24  specific information.
25  Q    Okay. So, to make sure that I understand what

Page 170

1   happened, Elizabeth Neely recommended the process to
2   Dr. Zaccari for administrative withdrawal of Hayden Barnes.
3   Is that right?
4   A    Correct.
5   Q    And that's the process that in the end he chose to
6   use for dealing with Hayden Barnes.
7   A    Correct.
8   Q    And then the appeal, which goes to the Board of
9   Regents, is overseen by the same Elizabeth Neely who
10  recommended the administrative withdrawal process in the
11  first place.
12  A    Yes.
13  Q    Is that right?
14  A    (Nods head.)
15  Q    In your opinion, does this comport with principles
16  of due process?
17  A    No.
18  Q    Did Dr. Zaccari at any point ask you to assist in
19  his appeal before the Board of Regents?
20  A    Yes.
21  Q    What did Dr. Zaccari ask you to do?
22  A    He wanted me to review a document that he had
23  drafted because he wanted to have a full opportunity to
24  fully explain why he made the decision that he did,
25  understanding, of course, my strong feelings about due

Page 171

1   process, and gave me a detailed response to Betsy Neely to
2   review.
3   Q    Okay. At what point -- strike that.
4        Did Dr. Zaccari ask you to draft his response for
5   him?
6   A    No. He drafted it and I reviewed it.
7   Q    Okay. Was the draft that you reviewed
8   substantially complete or were there blanks in the text
9   or -- can you describe the document that you saw?
10  A    It was not in complete form when I first received
11  it. There were some modifications made.
12  Q    Did you recommend the modifications?
13  A    Some modifications I recommended.
14  Q    Do you remember the approximate date in which
15  Dr. Zaccari approached you to help with the appeal?
16  A    No. He understood, of course, that it had to be
17  before June 29th. That document, that is.
18  Q    Right. I believe Exhibit 29 gives June 29th as the
19  deadline. 2007.
20       MR. CORN-REVERE: Let's mark as Deposition Exhibits
21  Numbers 30, 31 and 32, three documents that appear to be
22  successive versions of the response.
23       (The documents were marked for identification as
24  Plaintiff's Exhibit Numbers 30, 31, and 32.)
25  BY MR. CORN-REVERE:

Page 172

1   Q    Have you had a chance to look at the exhibits?
2   A    Yes.
3   Q    Can you identify them for the record?
4   A    These are draft documents of Dr. Zaccari's response
5   to Hayden's request for an appeal.
6   Q    Okay. Looking at the first draft, Exhibit Number
7   30, the date at the top is June 11th, 2007.
8   A    Uh-huh.
9   Q    Does that refresh your recollection of when you may
10  have first seen a draft of Dr. Zaccari's response?
11  A    On or about June 11th?
12  Q    2007, yes.
13  A    Yes.
14  Q    Okay. Do you recall whether or not this first
15  draft dated June 11th is one that you saw at that time?
16  A    Yes.
17  Q    Okay. You testified a moment ago, I believe, that
18  you had recommended some changes in the response.
19       Are any of the changes you suggested reflected in
20  the handwritten notes on this draft?
21  A    I would have to look at the final to see. I'm on
22  Exhibit 30.
23  Q    Right. But do you recognize the writing?
24  A    This is Dr. Zaccari's handwriting.
25  Q    In every case?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

Page 173

1  A    Yes.
2  Q    Okay. Did you make any notes on the draft that
3  Dr. Zaccari gave you and give it back to him?
4  A    The blanks -- Dr. Zaccari drafted this response and
5  gave it to me to present in a proper format for the appeal
6  of Hayden Barnes.
7        I took that information and put it in the proper
8  format. And then the blanks that you see there, those are
9  blanks that I had because I requested from him for
10  clarification sake that he had to include this information,
11  as well.
12  Q    Which information are you referring to?
13  A    Like, number two: On, blank, of 2007, I was
14  informed that flyers were posted across the campus and
15  Mr. Barnes was the author of that document.
16        Because I was not party to these communications or
17  this information didn't come directly from me, I needed him
18  to supply the missing information.
19        So, what you're seeing here on June 11th is a
20  product of Dr. Zaccari giving me something in very, very
21  rough form; and I'm putting it in the format that's expected
22  from the Board of Regents. But in reading his information,
23  it is not clear enough.
24  Q    I see.
25  A    He's got -- you know, there's not enough -- dates

Page 174

1  are missing.
2  Q    Am I correct that there were an earlier draft that
3  you looked at and you recommended changes, and those changes
4  are reflected in this document, Exhibit Number 30?
5  A    My changes that I recommended are, for example, we
6  need the date of -- on item number one, for example, it says
7  Thomas Hayden Barnes enrolled on -- what -- having
8  transferred from what to what? Okay?
9  Q    Uh-huh.
10  A    That's preliminary information that needs to be
11  outlined in Dr. Zaccari's response to Betsy Neely.
12        Then, for example, number four. It says blank. I
13  need to know about a meeting that he had with S.A.V.E. He
14  wanted to include information about the S.A.V.E. meeting.
15  Well, you need to put the date that you had the S.A.V.E.
16  meeting in there for clarity sake so the reader can
17  understand the context in which you had this in.
18        So what I did -- what you're seeing is -- the
19  overwhelming information contained in this information is
20  Dr. Zaccari's. I have blanks. I'm sending it to him. He's
21  reviewing it, and he's making changes of his own document.
22  Q    Yes.
23  A    In addition to recognizing that information needs
24  to be included in there, as well.
25  Q    I think I understand. So, as part of your

Page 175

1  revisions to put his response to the Board of Regents in the
2  correct form --
3  A    Form, uh-huh.
4  Q    -- you added paragraphs or language that called for
5  the filling in of specific facts like dates or other
6  information so that it would be in the correct form. Is my
7  understanding correct?
8  A    Yes. And, in addition to that, some of this
9  information I just felt as if it wasn't relevant.
10        The decision to withdraw Hayden Barnes had already
11  been made and that decision was involved. The same
12  individual is going to be reviewing this report.
13        So, for example, on page -- I'm on Exhibit 30, page
14  five. He talks about his evaluations by the Chancellor's
15  office places his work in the top five among thirty-five
16  college and university presidents and stuff like that.
17        I remember suggesting to him that I didn't know if
18  he needed to have that in there because it has no bearing on
19  the issue at hand.
20  Q    Uh-huh.
21        MR. CORN-REVERE: Could we go off the record just
22  one moment?
23        (Discussion off the record.)
24  BY MR. CORN-REVERE:
25  Q    Were there any other deletions that you recall that

Page 176

1  you recommended to Dr. Zaccari?
2  A    I think there were some, but I can't recall.
3  Q    Did Dr. Zaccari ask for your input on any of the
4  factual statements made in the letter?
5  A    I asked for his input because some of these facts I
6  could not speak to because I wasn't there.
7        For example, on page two of Exhibit 32, item six,
8  includes, "On April the 16th, 2007, I received a telephone
9  call from Vice Chancellor Linda Daniels asking for a
10  description of his physical appearance." Well, I can't
11  speak to those facts.
12  Q    Yeah.
13  A    Because I wasn't there.
14  Q    Okay. Let me just go back for a minute with these
15  three exhibits.
16        Exhibit 30 you've identified as a draft of
17  June 11th. The Exhibit 31 appears to be a later draft. It
18  is dated at the top June 18th, 2007.
19        Can you identify that document for the record?
20  A    I'm sorry. What exhibit?
21  Q    Thirty-one. It's dated June 18th.
22  A    It's a draft.
23  Q    Yes. Have you seen this document before?
24  A    Yes, uh-huh.
25  Q    Yes?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

Laverne Gaskin  6/12/2009
46 (Pages 177 to 180)

## Page 177

1   A   Yes.
2   Q   Okay. After your initial recommendations and your
3   review of the June 11th draft, did Dr. Zaccari also ask you
4   to look at the June 18th draft?
5   A   Yes.
6   Q   And then just for authentication purposes, looking
7   at Exhibit 32, can you identify that document for the
8   record?
9   A   This is what was ultimately sent to Betsy Neely.
10  Q   So this is the final product?
11  A   I believe it is the final document signed by
12  Dr. Zaccari.
13  Q   And this was sent to the Board of Regents actually
14  ahead of the deadline: June 21st instead of June 29th.
15      Okay. Looking back on Exhibit 30, do you recognize
16  any other changes that you suggested on that draft?
17  A   You want me to look at 30 or 31?
18  Q   I just want to make sure that I haven't missed
19  anything on the first draft. So if there are any other
20  changes you suggested that I haven't already covered --
21  A   Exhibit 30 is not the same as Exhibit 31. There
22  have been modifications. So what you see in Exhibit 30, 31
23  and 32 is a progressive modification to the point we get to
24  a final document, which is Exhibit 32.
25      But if you look at Exhibit 31, you will see that

## Page 178

1   it's certainly not in its final form because if you look at
2   page six of eight, in the second paragraph, it says my point
3   XXX in there because that information needs to be in there.
4   Q   Yes. And, of course, on page one in paragraph one,
5   there are still some blanks.
6   A   Yeah.
7   Q   Okay. In looking at this June 18th draft, Exhibit
8   31 --
9   A   Uh-huh.
10  Q   -- were you also asked to review the draft at this
11  stage and make recommendations?
12  A   The June 18th?
13  Q   Yes.
14  A   Yes.
15  Q   And did you make any recommended changes in this
16  draft?
17  A   I may have. I don't recall specifically. But,
18  once again, Dr. Zaccari was the primary author of this
19  document. I just made modifications here and there.
20  Q   Looking at it today, does it refresh your
21  recollection on any of the modifications you might have
22  suggested?
23  A   No.
24  Q   Do you recall whether or not you made any
25  recommendations about deletions at this point?

## Page 179

1   A   I don't recall.
2   Q   And looking at Exhibit 32 --
3   A   Okay.
4   Q   -- this is the final copy of the response in the
5   appeal that Dr. Zaccari sent to the Board of Regents.
6   A   Uh-huh.
7   Q   Did Dr. Zaccari ask you to review this before it
8   was sent?
9   A   I believe he did.
10  Q   Did you make any recommendations to the final
11  version before it was delivered to the Board of Regents?
12  A   I may have.
13  Q   Do you recall any of the recommendations that you
14  made?
15  A   No.
16  Q   Did you review any of the factual claims that were
17  made in the letter?
18  A   I relied on his representations of the factual
19  claims. This was his response to the appeal.
20  Q   Okay. Based on your earlier testimony about the
21  meetings that you attended with Dr. Zaccari and with other
22  members of the administration in late April 2007 and in
23  early May 2007, particularly May 3rd and May 7th, 2007,
24  would you take a look at paragraph 13 on page 4 of Exhibit
25  32?

## Page 180

1   A   (Reviewing document.)
2       MR. LaVALLEE: What page?
3       MR. CORN-REVERE: Page four.
4       MR. LaVALLEE: Thank you.
5       MR. CORN-REVERE: It's the first full paragraph.
6   Paragraph number 13.
7   BY MR. CORN-REVERE:
8       Q   It begins about five lines down, middle of the
9   line: "I sought the advice of the members of the
10  President's administrative unit consisting of Dr. Kurt
11  Keppler, Vice President of Student Affairs; Dr. Louis Levy,
12  Vice President of Academic Affairs; Mr. James Black, Vice
13  President of Finance and Administration; Mr. Scott Sikes,
14  Vice President of Institutional Advancement, and Dr. Marsha
15  Krotseng, Associate Vice President for Strategic Research
16  and Analysis.
17      "The administrative unit, along with Mr. Scott
18  Doner, VSU's Police Chief, and Ms. Ann Farmer, Assistant
19  Chief of Police, I collectively decided that VSU take
20  necessary steps to minimize as much as possible any security
21  risks."
22      I'm not asking you to say whether or not
23  Dr. Zaccari may have independently taken those steps; but in
24  the meetings that you attended in late April and early May
25  2007, did Dr. Zaccari seek anybody's advice on what to do

**EXHIBIT 9**