IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 2 3 2009

JAMES

THOMAS HAYDEN BARNES,          )
                               )
        Plaintiff,             )
                               ) CASE NUMBER
   vs.                         )
                               ) 1:08-CV-00077-CAP
RONALD M. ZACCARI, et al.,)
                               )
        Defendants.            )


DEPOSITION OF

LINDA DANIELS


July 2, 2009

10:05 a.m.


Georgia Board of Regents
Suite 7059
270 Washington Street
Atlanta, Georgia


Amanda Upton, CCR-B-1523




**Original**

**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
404.351.4577

1        INDEX TO EXAMINATIONS

2             Examination                          Page

3

4   Examination by Mr. Fedeli                        4

5

6                        - - -

7

8                  INDEX TO EXHIBITS

    Plaintiff's
9    Exhibit              Description               Page

10       1            Press release                  9

11       2            Executive Order               11

12       3            Six page document             34

13       4            Email forwarded from
                      Linda Daniels to
14                    Ronald Zaccari                38

15       5            Letter from Dr. Zaccari
                      to Ms. Neely                  41
16

17       6            Three page document          48

18

19

20

21

22
         (Photocopies of Exhibits 1 through 6 have been
23    attached to the original transcript.)

24

25

                                                 Page 2

1                    APPEARANCES OF COUNSEL

2

3    On behalf of the Plaintiff:

4         CHRISTOPHER A. FEDELI, Esq.
          Davis, Wright & Tremaine, LLP
5         Suite 200
          1919 Pennsylvania Avenue, NW
6         Washington, DC 20006-3402
          202-973-4200
7

8    On behalf of the Defendant Laverne Gaskins:

9         DAVID R. SMITH, Esq.
          Brannen, Searcy & Smith, LLP
10        22 East Thirty-Fourth Street
          Savannah, Georgia 31412
11        912-234-8875

12
     On behalf of the Defendant McMillan:
13
          MATTHEW R. LaVALLEE, Esq.
14        Daley, Koster & LaVallee, LLC
          Suite 160
15        2849 Paces Ferry Road
          Atlanta, Georgia 30339
16        678-213-2401

17
     On behalf of all Defendants except Gaskins &
18   McMillan:

19        DAVID C. WILL, Esq.
          Royal Washburn Will
20        Building J
          4799 Sugarloaf Parkway
21        Lawrenceville, Georgia 30044
          770-814-8022

22
     Also Present:
23
          Ms. Erin Reid
24

25                         - - -

                                                  Page 3

```
1              (Reporter disclosure made pursuant to
2         Article 10.B. of the Rules and Regulations of
3         the Board of Court Reporting of the Judicial
4         Council of Georgia.)
5                    LINDA DANIELS,
6    having been first duly sworn, was examined and
7    testified as follows:
8              MR. FEDELI:  Before we get started, I just
9         wanted to clarify with counsel we're agreeing to
10        the usual stipulations today.
11             Objections are reserved except for form or
12        privilege.  And if you wanna make them at the
13        time, witness can answer the question if she
14        understands.
15             MR. LaVALLEE:  Yeah.
16             MR. SMITH:  That's fine.
17             MR. WILL:  Yes.  And Ms. Davis would like
18        to read and sign her deposition.
19                       EXAMINATION
20   BY MR. FEDELI:
21        Q.   Ms. Daniels, please state your name and
22   your current address for the record.
23        A.   Okay.  My name is Linda Daniels.  I live
24   at 545 East Ponce de Leon, Decatur, Georgia.
25        Q.   Have you ever had your deposition taken
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    before?

2         A.    No, I have not.

3         Q.    Okay.  Do you understand how a deposition

4    works generally?

5         A.    I think so.  I think it was explained to

6    me this morning.

7         Q.    Okay.  Basically I'll ask you questions.

8    You know, and you can answer to the extent that you

9    know the answer.

10              If you don't, that's fine to say that you

11   don't know.  The deposition's being transcribed by a

12   court reporter.

13              So any answers you give should be verbal,

14   yes, no.  Head nods can't be recorded.  Is there any

15   reason why you would not be able to give complete and

16   accurate testimony today?

17        A.    No.

18        Q.    Did you review any documents in

19   preparation for today's deposition?

20        A.    No documents, no.

21        Q.    Did you speak with your attorney before

22   the deposition?

23        A.    Yes, I did.

24        Q.    What's your current occupation?

25        A.    I am an architect by trade.  I'm the vice

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    chancellor for facilities here at the board of

2    regents.

3         Q.    And how long have you held that position?

4         A.    I've been the vice chancellor for about

5    six years now.

6         Q.    Okay.  And as vice chancellor what are

7    your primary job responsibilities?

8         A.    I'm basically the chief facilities officer

9    for the university system, all thirty-five

10   institutions.  The system office reports directly to

11   the regents.

12             So at a conceptual level I advise and

13   counsel the board of regents on facilities issues and

14   run the system level staff office for facilities,

15   advising campuses who also have facilities offices.

16        Q.    Prior to your current position, what were

17   you doing?

18        A.    I -- I've been with the board of regents

19   for seventeen years.  Prior to being vice chancellor,

20   I was the assistant vice chancellor for design and

21   construction.

22             Prior to that, I was the director of

23   campus master planning.  Prior to that, I was a staff

24   architect here at the board of regents.  And prior to

25   that, I was in private practice as an architect.

1      Q.    Okay.  So you've been practicing as an
2   architect for how many years?
3      A.    Since about '82 is when I got my
4   registration.
5      Q.    Okay.
6      A.    No.  That was when I graduated.  So it
7   would have been about three more years before I
8   actually had my registration.
9      Q.    Okay.  So about '85?
10     A.    Yeah.
11     Q.    In your current role with the board of
12   regents, how would you describe your relationship
13   with the presidents of the university systems?
14     A.    Professional respect.  Sometimes it's a
15   tug and pull relationship.  They report to the
16   chancellor.
17          I report up to the structure to the
18   chancellor, so I'm not in a boss of them
19   relationship.
20          I'm in more of a collegial relationship, a
21   lot of times advising them on facilities matters,
22   architectural issues.
23          Many instances I'm working with more of
24   the facilities staff, the chief business officers, as
25   we do more public/private ventures.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1        So most presidents deal with me as it
2    relates to the strategic planning and development of
3    facilities on their campus, how do they get
4    facilities, how do they get on the priority list, how
5    do they get financing if state funding isn't
6    appropriate.
7        So I have a lot of dealings with the
8    presidents and through my staff provide technical
9    expertise to them.
10       Q.    So would you say the strategic facilities
11   planning for the colleges, is it done jointly with
12   the board of regents or is it done more locally?  How
13   would you describe that?
14       A.    It's an ongoing process.  And it involves
15   campus -- development of campus master plans.  And
16   more recently we've begun to develop the -- to
17   integrate the campus master plans into a statewide
18   plan.
19       We've really only had the strategic
20   statewide planning since the capital program has been
21   developed, which is in the last three to five years.
22       Q.    So it sounds like it's a collaborative
23   process between the local universities and the board
24   of regents facilities planning, this -- these type of
25   matters?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     A.    Yes, it is.

2     Q.    Okay.  I'm going to introduce a document.

3           MR. FEDELI:  And, counselors, if it's okay

4     with you, I'm just gonna mark one exhibit number

5     for the stenographer, and then I'll pass around

6     just copies for you.

7           MR. WILL:  That's fine.

8           MR. FEDELI:  Mark this Exhibit 1.

9           (Plaintiff's Exhibit No. 1 was marked for

10    identification.)

11    BY MR. FEDELI:

12    Q.    Appears to be a press release discussing

13    Linda Daniels, your appointment to your current

14    position; is that correct?

15    A.    Uh-huh (affirmative).

16    Q.    Have you seen this document before?

17    A.    I'm -- yes.

18    Q.    Would you like to take a second just to

19    familiarize yourself with it?

20    A.    Sure.

21          Okay.  That's me.

22    Q.    Okay.  So according to this press release,

23    you oversaw a two billion dollar capital improvement

24    program for facilities planning in your prior

25    position before you were promoted to --

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A.    Right.

2          Q.    -- your current position?

3      A.    That's -- that's the ongoing amount of

4  work across the entire university system.

5          Q.    And is that -- when you say it's the

6  ongoing amount of work, for any given period of years

7  or --

8      A.    That would have been the active -- number

9  of active projects at the time that -- that this

10  article was going on.

11          Q.    And that's what you were overseeing in

12  your prior position?

13      A.    Correct.

14          Q.    And when you were promoted to your current

15  position, did the responsibilities expand beyond

16  that --

17      A.    Yes.    There were -- not in number of

18  projects because that was the entire capital program.

19  But the vice chancellor for facilities oversees not

20  only design and construction but real estate

21  development and planning, the development of our new

22  public/private ventures program as well as the new

23  evolution in the last, say, six to seven years of

24  maintenance and operation as a system level

25  initiative.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1           So we've got environmental health and

2    safety, public safety, maintenance and operation of

3    facilities that we are providing more system level

4    expertise.

5           Historically that has been handled at the

6    campus level.  And the board became more and more

7    interested in having a system level perspective and

8    more of a system wide approach.

9           And so that -- it was a broadening of

10   responsibilities beyond design and construction, not

11   the same increase as -- an assistant vice chancellor

12   still oversees the active capital program under me.

13       Q.    And you're familiar with the VSU parking

14   garage program that's the subject of this litigation,

15   correct?

16       A.    Yes.

17       Q.    And would that have been part of this

18   overall strategic plan that you just discussed?

19       A.    Yes.

20       Q.    Okay.

21           (Plaintiff's Exhibit No. 2 was marked for

22       identification.)

23   BY MR. FEDELI:

24       Q.    Exhibit 2, this is a Executive Order from

25   Governor Sonny Perdue.  Are you familiar with this

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    document?

2         A.    I'm familiar with this form.

3         Q.    Okay.  How are you familiar with this

4    form?

5         A.    This is -- this looks like the typical

6    form when a building was requested to be demolished

7    that there's a policy about how you go through the

8    demolition process.

9              It does require action at the board level.

10   There's a certain level of delegated authority the

11   vice chancellor has.  For over that it goes to the

12   board.

13             But, in any case, once it meets our

14   criteria for being demolished, we forward it to the

15   governor.  And this is the typical executive order

16   that's -- that's the fallout of that.

17        Q.    And typically would you be mentioned in

18   this kind of executive order by name?

19        A.    The vice -- whoever the current vice

20   chancellor is, yes.

21        Q.    Which would have been you for the past

22   several years?

23        A.    Correct.

24        Q.    And you're mentioned in this order.  The

25   governor cites your opinion concerning the proper

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    use, correct?

2         A.    Uh-huh (affirmative).

3         Q.    How often would you say the governor

4    issues executive orders citing your opinions on

5    matters of facilities?

6         A.    I know it's for demolitions -- I don't

7    have a -- I don't -- I can't really pull a number out

8    of the hat.

9              I'd kind of have to think through what are

10   all of the things that we have to get the governor's

11   authorization for.

12        Q.    What are some of the things that you would

13   have to get the governor's authorization for?

14        A.    Obviously demolitions.  There are other --

15   when we're going to let someone else rent or use our

16   property, we have to declare it no longer

17   advantageously useful to allow for the transition.

18             So it's typically real estate types of

19   transactions that still require an interaction with

20   the governor's office.

21        Q.    Would purchases be included?

22        A.    No.  The board of regents can authorize

23   purchases of property.

24        Q.    And constructions?

25        A.    Yes.  We can -- the board can do

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    constructions.

2         Q.    I'd like to talk a little bit about

3    Valdosta State University and some of your

4    experiences with the parking garage project.

5              When did the -- that project first begin?

6    When was it first conceived?

7         A.    I don't have a direct recollection of

8    that.  Typically what happens is master planning

9    happens at the campus level.  And those needs are

10   identified.

11             And then a component exploration of how

12   can we meet the campus needs, whether it's classroom,

13   parking.  The master planning exercise will typically

14   identify those kinds of needs.

15             I do -- I do recall that there was a

16   meeting where myself and a number of my staff members

17   went to Valdosta and we heard the university's

18   presentation of the overall master planning needs.

19             And they -- they had done a very

20   comprehensive job of documenting projected growth and

21   that sort of thing.  I just remember being impressed

22   at the level of master planning that they'd done.

23        Q.    And the parking garage was part of that

24   presentation?

25        A.    It was the parking garage, health center

Page 14

1    and dormitories were -- were the key components that

2    I recall from that.

3         Q.   And do you remember approximately when

4    that was?

5         A.   No.  But it's on my calendar.

6         Q.   So for a project such as the parking deck

7    the school would -- the local university would put

8    together a plan and at some point, you know, would it

9    be presented to you?

10        A.   That is correct.  Ultimately all projects

11   have to be authorized by the board.  So that's why it

12   comes up to the system level.

13        Q.   And you've talked a little bit about your

14   involvement in the process.  How else would you

15   describe your involvement beyond hearing a

16   presentation from the local universities?  Would you

17   present it to the board of regents as well?

18        A.   My personal involvement with the project,

19   is that -- is that the question?

20        Q.   Your role -- professional role in the --

21   in this whole procedure from plans to implementation.

22        A.   The main point that I would get involved

23   is once it's been thoroughly vetted by the staff and

24   it's ready to go to the board for presentation

25   because I'm sort of the face of the facilities office

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    with the board.

2              So that's probably when -- when I would

3    have as I was preparing for my board meeting that I

4    would have, you know, personally looked -- just

5    looked over the documents and...

6         Q.   And typically --

7         A.   And when I mean documents, I just mean the

8    request for a board authorization.

9         Q.   Do you ever have comments, feedback on the

10   plans as submitted to you?

11        A.   Most of our feedback on the concept of a

12   building, parking deck, whatever it is, happens at

13   the campus master planning level.

14             And then as projects come forward we would

15   review them upon an ad hoc basis if they weren't in

16   the master plan.

17             But, as a general rule, we would simply

18   follow-up, you know, this is in accordance with the

19   master plan.  It just goes into sort of the process

20   of design and construction if that's appropriate.

21             If it's a public/private venture, then the

22   campus would initiate through their foundation both

23   the financing mechanism as well as the design and

24   construction component.

25        Q.   So there would be occasions where you

                                              Page 16

1   would communicate back to the campus level concerning

2   the plans for -- that they are seeking authorization

3   to in some instances?

4        A.    On -- certainly on general obligation bond

5   funded projects we would.  On public/private venture

6   projects typically we ground lease the property to

7   foundations.

8             And parking decks in the recent past have

9   all been what we call public/private venture

10   projects.

11        Q.    Could you break that down for me a little

12   bit?  You know, I'm not familiar with all the --

13   obviously the terminology.  I'm familiar with some of

14   it, but not all of it.

15             So the -- your involvement would depend on

16   the type of project, is that --

17        A.    My office's involvement depends on the

18   type of project.  So if it's a public/private

19   venture, which is something that has a revenue stream

20   outside of state appropriations, our public/private

21   ventures group would have been more involved.

22             And typically that has to do with ground

23   leasing the property to the affiliated organization,

24   which would be a foundation.

25             If it's general obligation bond funded,

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    the design and construction division would be more

2    involved in the review of more of the details of the

3    project itself.

4              But the key is back -- tying it back to

5    the campus documenting the strategic need for the

6    facilities typically through the master planning

7    process.

8        Q.    So the two categories you just discussed,

9    public/private ventures?

10       A.    Uh-huh (affirmative).

11       Q.    And then the second one was?

12       A.    General obligation, GO bond funding.

13       Q.    And compared to public/private ventures,

14   are the general obligation bond funding projects

15   purely public?

16       A.    No.   General obligation -- yes, they're

17   state general obligation bond funds.   And they're

18   reserved for much more traditional academics

19   buildings, library buildings, things that do not have

20   a revenue stream associated with them.

21       Q.    Does your involvement in either project

22   differ depending on which category it's in?

23       A.    Yes, it does.

24       Q.    And how is that?

25       A.    In a conceptual way, the initial



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    conformance with the master plan is the key

2    component.  When you go into the alternate funding

3    sources, because general obligation bonds are state

4    funds, that's been the legacy role where we're

5    required to review the drawings and work with the

6    state construction division.

7              On public/private ventures, that's a

8    mechanism to get alternatively financed projects

9    where they can be appropriately used.

10             In other words, it's gotta have that

11   separate revenue stream, user fees of a parking deck

12   or dorms.  It would be obviously rental payments and

13   that sort of thing.

14             So there's a different board action

15   required because the board of regents -- the State of

16   Georgia university -- the university system doesn't

17   borrow money.

18             It works through the State of Georgia's

19   general obligation bonds.  But our foundations can

20   borrow money related to public/private venture

21   projects.  And that -- that is the mechanism.

22             So we have to ground lease the property to

23   the foundation because the board owns all of the

24   property that the campus is on.

25             And when we want a facility that the State

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   is not going to build but that's needed by the

2   institution, we'll ground lease the property for the

3   term of the bonds and typically work with a local

4   development authority on that.

5          But the board has to, obviously, approve

6   that that this is in accordance with our desires for

7   Valdosta State's growth.

8       Q.    So when the board is reviewing or

9   approving one of these public/private ventures and

10  they have to ground lease the property; is that

11  correct?

12      A.    Uh-huh (affirmative).

13      Q.    That seems to be that it would be a more

14  involved process from what you've described; is that

15  correct?

16      A.    Well, it's a -- it's a -- it's a different

17  involvement from the financing piece.  There's a

18  whole bunch of more documentation that goes on to

19  meet the requirements of getting outside financing.

20          It's -- it's more -- not necessarily

21  streamlined.  But the same kinds of things happen.

22  But there's a whole separate state agency that does

23  that for general obligation bonds.

24      Q.    Which agency is that?

25      A.    GSFIC, the Georgia State Financing and

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     Investment Commission.

2         Q.    And are you the primary interface between

3     the board of regents and the GSFIC?

4         A.    Well, I'm the head of the facilities

5     office.  And I would certainly be a primary interface

6     with the head of GSFIC.

7              But it's a -- it's a larger staff

8     interaction than a whole bunch of personal

9     conversations between the two of us.

10        Q.    Of course.  Who's the current head of the

11    GSFIC?

12        A.    A gentleman by the name of Steve Stancil.

13        Q.    How long has he been in that position, if

14    you know?

15        A.    I believe just two -- two years -- maybe

16    two or three but...

17        Q.    Do you remember who was in that position

18    prior to Steve Stancil?

19        A.    Prior to Steve Stancil, they had an

20    interim director Kevin -- I can't remember his last

21    name.  The last permanent person prior to that was

22    Gina then Abrams.  Her name is Gina Evans now.

23        Q.    So the VSU parking garage would have been

24    a public/private venture --

25        A.    Uh-huh (affirmative).

                                              Page 21



1        Q.    -- that would have required this approval

2    and additional action by the board of regents

3    concerning the ground lease property and coordination

4    with the GSFIC?

5        A.    Not coordination with the GSFIC.   The

6    ground lease and foundation is strictly by the board

7    of regents.   GSFIC is involved in the GO bond

8    projects.

9        Q.    So for the private/public ventures the

10    ground lease property would be done exclusively by

11    the board of regents for the most part?

12        A.    Uh-huh (affirmative).

13        Q.    And what other processes were involved in

14    those projects with the board of regents?

15        A.    The ground lease is -- is the official

16    action that takes place, you know, presentation and

17    project approval, initiation as a public/private

18    venture.

19            Typically we present an information item

20    to the board saying this is what we've identified as

21    the needs of the campus, the best funding source is

22    local financing.

23            And, therefore, that's their nod to

24    proceed with a public/private venture project.   And

25    it comes back to us in the form of a ground lease and

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    then in many instances an in tandem or ultimate

2    rental agreement back for us to operate the facility.

3        Q.    And when you say it comes back to you in

4    the form of a ground lease, who does it come back

5    from?

6        A.    The campus.

7        Q.    Anything else the board of regents would

8    do in case of a public/private venture request?

9        A.    Be a resource to the campus, I mean, just

10   -- we're a sounding board if they have questions as

11   they're working with their program manager, outside

12   -- whatever outside consultants that they hire.

13            We're doing these all over the system so

14   -- and we have a lot of experience.  So we're a

15   resource to the local facilities office there at the

16   campus.

17            But, as a general rule, they run the

18   projects with the consultants that they've hired

19   through their foundation.

20       Q.    Anything else you would do in particular

21   on this kind of request?

22            MR. WILL:  I'm sorry.  What kind of

23        request?

24   BY MR. FEDELI:

25       Q.    Public/private ventures.

                                           Page 23

1         A.    Occasionally I get calls from the

2    financing people.  Engage the chief financial officer

3    here in those as well.  That's not required.

4              Sometimes they do their thing on the

5    financing side and don't feel like they need to ask

6    any questions.  I -- I don't particularly remember if

7    I got a call on this one or not.

8         Q.    who are the financing people?

9         A.    The -- when the local development

10   authority goes out for financing, you'll have bond

11   counsel and -- selling of bonds at a local

12   development authority a myriad of lawyers, more

13   lawyers than I can name because everybody's got

14   lawyers at those financings (SIC), the foundation

15   representation.

16        Q.    So primarily it would be the local campus

17   financing authorities?

18        A.    Well, typically a local development

19   authority is the source of the bonds.

20        Q.    Could you tell me what a local development

21   authority is?

22        A.    Like a -- a local development authority,

23   economic developments -- anyone who's authorized to

24   sell bonds.

25        Q.    And you would occasionally interface with

                                              Page 24

1     them?

2         A.    No.   I really don't personally have any

3     interface with them.   But it goes on during the

4     financing process.

5              So my executive director for

6     public/private ventures I'm sure would have some

7     dealings with the various -- at least the bond

8     counsels and the various counsels for all of those

9     entities.

10        Q.    And the CFO's would occasionally call you

11    on these public/private ventures?

12        A.    They certainly might.   Usually on

13    technical financing questions I have to refer them to

14    Marty Nance, the director of finance.

15             But just for general discussions about who

16    else is doing this -- a lot of times they'll talk to

17    me sort of up front, you know, is another -- is a

18    similar campus of the same size doing parking decks,

19    how are they making it work, what kind of fees are

20    associated with it.

21             Or it might be the same kind of question

22    about a student center or whatever they're thinking

23    about dealing with.

24             In the earlier stages when you don't need

25    a lot of the technical expertise -- but has this been

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   done before, you know, who all is doing it, who else

2   could I talk to in the system that's doing it, those

3   are more of the general kinds of conversations that I

4   have.

5        Q.    Is it the CFO's from -- from which entity

6   again?

7        A.    From the institution.

8        Q.    From the colleges?

9        A.    Right.

10       Q.    So once the request comes in to you, the

11   next step is it -- you know, do you present it to the

12   board; is that right?

13       A.    Uh-huh (affirmative).

14       Q.    And how does that process usually work?

15       A.    The presentation to the board?

16       Q.    Uh-huh (affirmative).

17       A.    There's a lot of groundwork by the staff

18   in -- in advance to make sure that the financing is

19   coming -- you know, falling into place, that we're

20   prepared to close the deal, that the documents are --

21   you know, that we're comfortable with the design and

22   that sort of work.  And once -- once we have that

23   signoff, we just take it to the board.

24             And so I would say it's our, quote,

25   standard board preparation.  There's a request from

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    the president, please, bring this item forward, you

2    know, we've done all of the submittals and due

3    diligence and met with your office and -- and we're

4    ready -- we'd like to go forward at this board

5    meeting.  And we'd put the documentation together and

6    take it to the board.

7         Q.    So the preparations you just described,

8    what would they include?  They would include

9    PowerPoints, scale models?  What kind of preparations

10   specifically?

11        A.    Typically the campus and program manager

12   have a -- it's usually about a half day meeting where

13   they come up and share a presentation.

14             It could be a PowerPoint presentation.  It

15   might be the construction documents that they flip

16   through.  There might be renderings or drawings, that

17   -- that level.

18             But usually the staff has been engaged and

19   reviewed it as the documents have been evolving.

20   It's not -- it's not like they show up when -- they

21   go away and do the project and then show up one day,

22   it's done and we're supposed to stamp off.

23             There's -- there's an iterative process

24   during the course of this.  And this is kind of the

25   final culmination presentation, if you will.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q.    About how long would the preparations for

2    this presentation go on?

3    A.    For the board presentation or for the

4    presentation -- the final presentation as we get

5    ready for the board meeting?

6    Q.    And I'm not sure I understand the

7    difference.  So there are two presentations?

8    A.    There's a presentation to the staff to get

9    us comfortable with recommending to the board.  The

10   board doesn't see floor plans and drawings.

11        They don't get into the technical is this

12   -- is this building structural steel or concrete or

13   anything like that.

14        By the same time we take it to them it's

15   more of, we've previously introduced this project to

16   you in concept as being in accordance with the master

17   plan and the anticipated growth of the campus, we've

18   now worked through the development of the project,

19   the financing of the project, there's a pro forma

20   that says how the project will cash flow itself in a

21   way that's satisfactory to the board.

22        So we have a package of due diligence.

23   It's -- what the requirements of that package are,

24   I'm sure, are on our Web site.

25        And once we have that stuff, we make the

Page 28

1    recommendation to the board, this is a go, we as the

2    staff recommend this.

3        Q.    So from start to finish of the process you

4    described, about how long does that usually take?

5        A.    It's not -- I can't give any typical

6    thing.  The size and -- these projects run the gamut

7    from -- from A to Z.

8              And I don't think that you can say there's

9    a typical amount of time that any given project

10   takes.

11             Some projects will run into financing

12   questions.  They have to rethink their financing.

13   There's any myriad of variables that could change by

14   months.

15       Q.    What's the longest that one of these has

16   ever taken?

17       A.    I don't know.

18       Q.    Rough estimate?  Two years, five years?

19       A.    No.  Typically public/private ventures,

20   they figure out if they're gonna cash flow in a

21   shorter time than that.  But I really -- I couldn't

22   take a guess.

23             I would say anywhere from fourteen months

24   to two years is more of the average range, if there

25   was an average.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1        Q.    Do you remember about how long this

2    process that you've just described was going on for

3    the VSU development --

4        A.    I really don't.  I see a lot of these.

5    And I just -- I don't.

6        Q.    Do you remember discussing the project

7    with President Zaccari at the time?

8        A.    I remember -- 'cause I try to sit in on

9    the -- the big final presentation and the initial

10   kind of kickoff to sort of see what was envisioned at

11   the beginning and then how -- how did it all come

12   together, and then people kind of fill me in on what

13   -- what happened in between.

14              So I know I would have seen him at at

15   least the kickoff meeting and the -- the big staff

16   meeting before we decided, are we ready to go before

17   the board or not.

18              And I -- it's one of a whole series of

19   projects that were done as a grouping of

20   public/private ventures.

21              And I -- I just remember being very

22   impressed at how comprehensively they were able to

23   address the master plan and to get a significant kind

24   of I guess bang for the buck by bundling these

25   projects and using one program manager.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1        Q.     From your perspective, how involved was

2    President Zaccari in this project?

3        A.     I -- I would say he was very involved

4    along with a whole slew of people.  It's a very --

5    it's a very engaging process on any given campus.

6              And I think -- I didn't see anything

7    different in President Zaccari's involvement.  It's

8    typically something presidents have to get engaged in

9    when there's gonna be a significant building

10   development so...

11       Q.     Do you remember when you first became

12   aware that there was some student/faculty concern

13   over the parking garages of VSU?

14       A.     I -- I don't.  I remember there was

15   concern.  I don't remember exactly at what point in

16   the project that was.

17       Q.     How would you have become aware of the

18   concerns?

19       A.     Campus could have given us a heads up.

20   Occasionally we'll get, you know, calls to the system

21   office from people.

22              But I don't -- I don't remember that

23   happening on this instance.  I do remember having a

24   phone conversation with President Zaccari.

25              I can't remember if I initiated it or if

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    he initiated it.  But I do -- I remember a

2    conversation that there was a student had written a

3    letter to some regents.

4              And I was concerned as we were getting

5    ready for the board meeting was -- was there any fear

6    that the student might show up at the board meeting

7    and not understand board protocol, that you have to

8    get on the board agenda to present.

9              It's fairly typical when you get

10   disgruntled students or citizens that start

11   contacting either the board or our office or the

12   campus gives us a heads up that there -- that there

13   is concern.

14             When somebody contacts either our office

15   or the board, I will typically call the president to

16   try to get a debriefing.

17             So I can't remember in this instance if I

18   called him 'cause I'd heard something or if he said,

19   by the way, Linda, we've got a student in particular

20   that's written to some regent sort of -- so I can't

21   remember who was giving who a heads up.

22             But I remember vaguely the conversation of

23   there's certainly a particular student.  And my

24   concern was if someone is going to show up can

25   someone from Valdosta be at the meeting because

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    it's -- you know, we don't want board members to be
2    in an awkward position of having to call down a
3    public -- you know, a citizen in a board meeting to
4    say, you're out of order, you're not allowed to speak
5    at this meeting.
6            We would try to mitigate that in advance
7    and make sure that that person knows there's an
8    official protocol, they have to go through the
9    secretary of the board.
10           So I was just asking -- I remember asking
11   Dr. Zaccari, can somebody from Valdosta be at this
12   meeting in case this student shows up so that we can
13   at least kind of monitor behavior.
14           And that's -- that's just sort of typical
15   when we've had somebody who's upset about something
16   that the board is considering.
17       Q.   And you had this conversation with Dr.
18   Zaccari.  And what was his response?
19       A.   He said he didn't -- he didn't think that
20   the student was gonna show up but he would be happy
21   to send a representative to the board meeting since
22   they were interested in the board agenda item anyway
23   so...
24       Q.   Did he send a representative?
25       A.   You know, I can't remember.  But I assume


WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    that he did.  I think I would have remembered if he
 2    didn't.
 3         Q.   And you were at the board meeting,
 4    correct?
 5         A.   Yes, I was.
 6              MR. FEDELI:  Let me call this Exhibit 3.
 7              (Plaintiff's Exhibit No. 3 was marked for
 8         identification.)
 9    BY MR. FEDELI:
10         Q.   Have you seen this document before?
11         A.   Can I look over it?  I don't -- I don't
12    think so.  But if I read it --
13         Q.   You may.
14         A.   -- it might come back to me.
15              MR. LaVALLEE:  Is this something that was
16         produced in discovery?
17              MR. WILL:  Yes.  We're off the record.
18              (Discussion off the record.)
19              MR. WILL:  Go back on.
20              THE WITNESS:  Was the question am I
21         familiar with this document specifically?
22    BY MR. FEDELI:
23         Q.   Yes.
24         A.   And the answer to that is no.
25         Q.   You don't recall having seen this document
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    before?

2        A.    I remember the concept of a, you know, a

3    passionate student talking about, you know,

4    perceptions of the parking deck not being needed.

5            But I don't remember this specific

6    document.  I may have seen it, but I just don't

7    remember it.

8        Q.    Do you know who -- I'm not sure if I'm

9    gonna pronounce this correctly.  But Beheruz --

10       A.    Beheruz Sethna.

11       Q.    Yeah.

12       A.    He is the president of the University of

13   West Georgia.  And I believe at this point in time he

14   was interim chief academic officer here.

15           So he was in a temporary appointment to

16   the chancellor's office as -- as staff in academic

17   affairs.

18       Q.    You said a moment ago you were familiar

19   with the -- you know, the general situation that this

20   email represents.

21           Did you -- would you have discussed it

22   with another member of the board of regents?

23       A.    I probably would have discussed it with

24   whoever was chairman of the real estate committee at

25   that time.

1                   I cannot say definitely.  But I believe

2        that was Regent Martin NeSmith.  He was my chairman

3        for a couple of years consecutively.

4                   But I'm not sure exactly the time frame of

5        this or -- or -- but, anyway, whoever was chairman of

6        the board of regents, if -- if there were letters --

7        and it was my understanding that similar to letters

8        to the chancellors that the letter was written to

9        some regents.

10                  Typically regents will contact the

11       chairman and say, you know, is staff dealing with

12       this.

13                  And so my -- although I don't remember a

14       specific conversation, my standard protocol with

15       these kinds of things is that I would talk to the

16       chairman and I'd tell him that I -- you know, I've

17       had a conversation with the president, we -- if we

18       think someone is gonna show up at the board meeting

19       or not, if they've made an official request or not to

20       the secretary to speak and assure them that we're

21       trying to work on it at the campus level to get it

22       resolved so that -- that it doesn't rise to something

23       that might disrupt a board meeting.

24           Q.   Would that have been the nature of your

25       conversation with Martin NeSmith?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1          A.     Uh-huh (affirmative).

2          Q.     In this instance?

3          A.     Right.  We typically just remind the

4     chairman that the protocol is to look to the

5     secretary of the board to handle -- if a meeting is

6     interrupted by someone in the public to look to the

7     secretary of the board is -- is the best way to

8     handle that.

9          Q.     And these are -- this is a -- a

10    procedural --

11         A.     Kind of a procedure, just sort of a best

12    practice that we've come -- come to use.

13         Q.     Roberts Rules of Order type stuff --

14         A.     Oh --

15         Q.     -- yes?

16         A.     -- well, the board definitely has to run

17    -- run by Roberts Rules of Order.  But you just wanna

18    remind -- remind people 'cause they -- they're

19    voluntary board members and they rotate in and out of

20    these positions so...

21         Q.     So it's to preserve decorum at the board

22    of regents' meeting?

23         A.     Yeah.

24                MR. FEDELI:  That's Exhibit 4.

25
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1           (Plaintiff's Exhibit No. 4 was marked for
2      identification.)
3  BY MR. FEDELI:
4      Q.    Email from Linda Daniels to Ronald
5  Zaccari.  Are you familiar with this document?
6      A.    I'm gonna read it over again because it's
7  addressed to me, so I'm assuming that I got it.
8      Q.    Okay.
9      A.    And I do understand the -- the gist of it
10 is more of the same.  But, you know, it's not like
11 being I've seen this before.  So, if you don't mind,
12 could I read it over again?
13     Q.    Not at all.
14     A.    Yeah.  This is -- this is ringing as I've
15 read this before.
16     Q.    What is this document?
17     A.    It -- it looks like an email to me from
18 Hayden Barnes about his objections to the parking
19 deck.
20     Q.    And is it also an email you forwarded?
21     A.    Yes.  I forwarded it on to President
22 Zaccari.
23     Q.    And how long between the time that you
24 received it and forwarded it?
25     A.    Looks like the same day to me.

Page 38

```
1        Q.    Is that about fifteen minutes difference?
2        A.    15:33:09 to 3:49, whatever that difference
3   is.  Please don't make me do math.
4        Q.    I think 15:33 would be 3:33; is that
5   correct?
6        A.    (No response.)
7        Q.    And would you typically forward emails
8   like this to the president of a university?
9        A.    Yes, I would.
10       Q.    And why is that?
11       A.·   We typically rely very much on the
12   campuses to deal with these things at the campus
13   level.
14             And we want them to be aware -- I don't
15   know what the timing of this is in relation to a
16   board meeting.
17             But based on all of the other things that
18   we've been saying -- you know, when you get something
19   like this, you wanna know that the -- either, you
20   know, what can the campus tell you about it, if you
21   don't know about it, or what are they doing to -- to
22   deal with it.  So...
23       Q.    And what kind of things would campuses
24   usually do to deal with this?
25       A.    Well, they would try to address student
```

Page 39

1    groups.  I mean, you know, it just depends if this

2    was an individual student or is this maybe an active

3    campaign with an organized group of students and/or

4    faculty who have a problem that, you know, they would

5    try to reach out and try to communicate.

6              I think communication is the thing that

7    we're trying to encourage that, you know, please help

8    them understand this is a very tedious kind of

9    uninformed objections about a parking deck which are

10   things that I feel were all very clearly answered by

11   the master plan.

12             I think many of us in design and

13   construction recognized how positive the master

14   planning effort and the development of these

15   facilities were towards the growth to meet enrollment

16   targets at Valdosta.

17             But sometimes lay people or students, I

18   mean, you know, they just have a different

19   perspective.

20             They don't have an overarching

21   perspective.  And it's, you know, our goal to say to

22   the campus, can you help them understand, can you

23   bring them together in a group or if this is an

24   individual student get other students to kind of talk

25   to them and help them see a different perspective or

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    that there at least is a different perspective and,

2    you know, hopefully just try to calm them down.

3    They're students.  They're kids.

4        Q.    So it is your preference and I assume the

5    board of regents' preference that these sorts of

6    matters be handled at the campus level?

7        A.    Yes.

8        Q.    And that would be the reason for your

9    communicating with Dr. Zaccari about this particular

10   student?

11       A.    Uh-huh (affirmative).

12             (Plaintiff's Exhibit No. 5 was marked for

13             identification.)

14   BY MR. FEDELI:

15       Q.    Exhibit 5, a letter from Dr. Zaccari to

16   Ms. Neely.  Have you seen this document before?

17       A.    I don't recall this document.

18       Q.    I'd like to call your attention to Page 2,

19   roman numeral six.  Could you read that paragraph?

20   To yourself that's fine.

21       A.    Okay.

22       Q.    So this describes a conversation between

23   President Zaccari and you?

24       A.    Yes, probably the conversation when I was

25   asking if someone from Valdosta -- or when I thought

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    I had asked if someone from Valdosta could be at the

2    board meeting to just give us a heads up if we saw

3    him.

4         Q.    On the day of this conversation, this is

5    the same date as the email we were just looking at,

6    yes?

7         A.    Yes.

8         Q.    Would this conversation have taken place

9    after that email in all likelihood?

10        A.    I don't know what else to say other than I

11   guess.  I don't know.

12        Q.    That's fine.

13        A.    Before, after.

14        Q.    You've recounted some of the -- what you

15   recall that conversation would have been about

16   earlier in your testimony.

17             Do you recall asking President Zaccari for

18   a description of Hayden Barnes?

19        A.    Probably.

20        Q.    Can you explain this reference to the

21   Georgia Southern University Police Department?

22        A.    Yes.  The upcoming board meeting was at

23   Georgia Southern University.  Two out of the ten or

24   however many board meetings a year happen at campuses

25   as opposed to in this office, which is the normal

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    meeting place for the board of regents.

2            And so, similarly, if we had had the

3    meeting here at the board of regents, we would have

4    contacted Capital Police downstairs and, again,

5    either tried to give a description of the possible

6    person that might cause a disruption or put the

7    assigned police officer in touch with the

8    representative from the campus who could identify the

9    person and just, you know, sit sort of quietly across

10   the room, this is the person that we know has

11   expressed some concern and let them monitor the

12   situation.

13           So the meeting was going to be at Georgia

14   Southern.  And there are appropriate resource for

15   that.

16      Q.    So you would have shared this information

17   with President Zaccari?

18      A.    Uh-huh (affirmative).

19      Q.    Call your attention to the following

20   paragraph, paragraph seven.

21      A.    Uh-huh (affirmative).

22      Q.    Following his, President Zaccari's, call

23   with you, he requested a meeting with Mr. Barnes

24   which took place that same day.

25      A.    Uh-huh (affirmative).

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q.    Did you request that President Zaccari do

2    that meeting?

3      A.    I don't think I would have made that

4    detailed of a request.  I think -- I mean, my -- I

5    would have just said to the president, you know, is

6    the university reaching out, is there -- is this a

7    broader concern, is this an individual, you know, how

8    is the university handling it.  So I don't -- I

9    certainly don't recall advising him to meet or not

10   meet with anybody.

11     Q.    Was your impression following the call

12   that he would take steps promptly to kind of deal

13   with this issue?

14     A.    I guess my impression was, you know, that

15   he felt like his staff was working on this but in

16   light of it being raised up to the board's level that

17   if he needed to get more personally involved he

18   would.

19     Q.    Okay.  I'd like to turn to the board of

20   regents' meetings that occurred on the following day

21   and -- the following two days as a matter of fact,

22   April 17th and 18th.

23           You attended those meetings, correct?

24     A.    This doesn't have anything to do with this

25   correspondence.  Yes, I was at those meetings.

Page 44

1      Q.    Was Hayden Barnes present at those

2    meetings?

3      A.    I honestly can't tell you if he was or

4    not.  I -- I had a more pressing issue that I was

5    working on that erupted at that meeting related to

6    Georgia Tech and the naming of a building and a

7    multi-million dollar donation.

8           And I ended up having to run around and do

9    a lot of committee work that normally is all done in

10   advance.  And it was -- and I was trying to do it.

11          And so I just assumed that the other

12   situation was taking care of itself or that if it

13   wasn't somebody would give me a heads up.

14     Q.    So did Hayden Barnes or the VSU parking

15   garage protest come up at all at these meetings?

16     A.    I don't remember them coming up.  I

17   honestly don't.  My committee chair might have asked

18   me do -- you know, the heads up you gave me about

19   someone might be here to protest, do I know anything

20   about it.  And I, you know -- I just don't remember

21   anything coming up at the meeting about it.

22     Q.    But that might have been a typical

23   conversation during the course of a meeting --

24     A.    Not a public conversation.  More of a, you

25   know, the committee chair coming up to me in advance

Page 45

1     and saying, you know, is anything coming to fruition

2     on our concerns about -- or, you know -- you know, so

3     I -- I don't think he showed up because I guess I

4     would have remembered somebody coming up and saying,

5     yes, he is here.  But I don't remember that.

6          Q.    So it may have been prior to the meeting

7     that the conversation -- the topic came up of Hayden

8     Barnes?

9          A.    Right.  It wouldn't have been a part of

10    the public meeting where I'm chairing the meeting and

11    having the -- you know, the Roberts Rule of Order.

12          It wouldn't have come up like that.  It

13    would have just been during lunch beforehand or

14    whatever you would have said, is anybody here from

15    Valdosta and do we know if the student's gonna be

16    here to protest.

17          Q.    That's just to the best of your

18    recollection?  It wasn't something that was discussed

19    in formal proceedings, in the minutes of the meeting

20    that there was --

21          A.    To my knowledge it wasn't.  I mean, to my

22    recollection it wasn't.

23          Q.    Do you remember following these meetings

24    discussing either Hayden Barnes or the VSU parking

25    garage protest with anyone else on the board of

                                              Page 46

1    regents or your -- your real estate individual?

2         A.    I don't remember anything like that, no.

3         Q.    Did you ever discuss Hayden Barnes with

4    Elizabeth Neely at any time?

5         A.    I don't have a specific recollection of

6    that.  It wouldn't have been unusual if -- you know,

7    if there was gonna be some follow-up.

8              I have a -- I have a nagging feeling that

9    I sort of knew this was sort of around but it wasn't

10   erupting up to the point of being a -- you know, a

11   fire that needed to be put out.  It was simmering, I

12   guess.

13        Q.    Typically this might be the kind of thing

14   that you would in some circumstances discuss with

15   Elizabeth Neely; is that correct?

16        A.    Only -- I mean, she might have questioned

17   me on what I remember about it or what happened.

18   Because once it sort of gets past the, you know, this

19   is part of the master plan, we're going to do this,

20   we know this is the right thing to do, that's kind of

21   my area of expertise is to keep the project going.

22             So it's certainly not unusual for her to

23   contact me if something's going on in legal that

24   either originated in or had some connection to

25   facilities.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          But I just -- I don't -- I don't remember

2     having much of a conversation with her about it other

3     than maybe -- I don't know -- I don't remember having

4     a conversation.

5          Q.   Do you remember having any further

6     conversations with President Zaccari?

7          A.   I don't remember specific conversations.

8     But, again, that perception that I have that this was

9     kind of simmering it's the kind of thing like, you

10    know, it's -- it's evolving on campus my assumption

11    is it's taking care of itself or it's working -- you

12    know, it's working itself out.

13         And it didn't get to the point that it

14    kind of -- you know, we didn't have people chaining

15    themselves to trees or disrupting construction

16    services that would kind of elevate it to a level of

17    a fire that needed to be put out.

18         It's just -- you know, it's a disgruntled

19    student, the campus is dealing with it and its normal

20    protocol.  They might be dealing with legal.  But it

21    just wasn't something that had facilities-related

22    issues.

23              (Plaintiff's Exhibit No. 6 was marked for

24         identification.)

25    BY MR. FEDELI:

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q.    Call this Exhibit 6, article in the

2   Chronicle of Higher Education, Paving Paradise.  I

3   call your attention to Page 2 of this document which

4   contains the substance of the article.

5           Have you seen this article before?

6      A.    I don't remember this article, no.  Huh-uh

7   (negative).

8      Q.    Page 1 of this article really quick, if

9   you could take a look, the date of this article

10  appears to be August 5th, 2005.  Does that appear

11  correct?

12     A.    Where does that --

13           MR. WILL:  First page.

14           THE WITNESS:  Oh, the first page.  Okay.

15     8-5, yes.

16  BY MR. FEDELI:

17     Q.    So this would have been about two years

18  prior to the incidents we've been discussing?

19     A.    Uh-huh (affirmative).

20     Q.    And what is this article talking about?

21     A.    This is talking about -- my recollection

22  is it happened at the same time that Valdosta was

23  struggling with parking pressures and complaints from

24  the community about students parking in

25  neighborhoods.

Page 49

1          And Valdosta was looking for some surface

2     lot solutions to relieve the pressures of the student

3     parking and antagonizing their sort of town-gown

4     relations.

5          Q.    And were you in your current position at

6     this time?

7          A.    Yes, I was.

8          Q.    And did this issue ever present itself to

9     you at this time?

10         A.    Yes, it did.

11         Q.    So what do you recall having been decided?

12         A.    I recall seeing a proposal for a portion

13     of parking on the main lawn.  I recall that my

14     office's response was this is not an appropriate

15     location for expansive parking, we need to work on

16     some other solution to address your pressing parking

17     needs.

18         Q.    And it appears from this article that

19     there were protests at this time, 2005 --

20         A.    Uh-huh (affirmative).

21         Q.    -- concerning the proposed parking

22     construction?

23         A.    Uh-huh (affirmative).

24         Q.    Were you aware of those?

25         A.    Uh-huh (affirmative).

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1        Q.    Were you aware that they caused VSU and

2    President Zaccari to rescind the original plan for

3    the parking garage?

4        A.    Not parking garage; this -- the paved

5    parking --

6        Q.    Sorry.

7        A.    -- the paving of the lawn.

8        Q.    Right.

9        A.    The article does imply that the student

10   petition resulted in a scaled-back version being

11   done.  And a scaled-back version was accomplished.

12            I think the campus listened to -- again,

13   the first project that was put out was a proposal to

14   solve a problem.

15            This proposed solution was objected to by

16   the students by -- when they submitted it to our

17   office, we also suggested that we thought the amount

18   was too intrusive on the lawn and that it needed to

19   be scaled back.  But we certainly understood they had

20   a pressing parking problem.

21            And we -- we felt like we had actually a

22   very positive give-and-take in coming up to a

23   solution that satisfied both the students, the

24   president and, you know, the -- everyone involved.

25   But I didn't know there was an article on it quite

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    frankly, which is kind of interesting.

2        Q.    So this pressing parking problem, as you

3    described it, at VSU was going on since 2005?

4        A.    My recollection is the master plan clearly

5    documented it.  And that -- you know, how -- how long

6    it was going on before the master plan came -- the

7    master planning exercises and looking at strategic

8    planning when Zaccari became president, you know, I

9    don't know how long that was going on.

10            I wasn't aware of it.  I just know that

11    campuses are always having parking problems that

12    they're trying to solve.  And we strongly encourage

13    them to look at a master planning process for that

14    solution.

15        Q.    When was the master planning?

16        A.    I don't -- I don't know the exact date.

17    We'd have to look it up.  But master planning is an

18    ongoing process.  It's not like you do it once in

19    your lifetime and it's Ten Commandments of all time.

20            It's -- it is required as an ongoing

21    process as -- if a campus is growing quickly,

22    enrollment growth, for whatever reason, we would

23    encourage campuses to do master plans more often.

24            Typically when you get a new president,

25    they want to at least vet, review and possibly update

Page 52

```
 1     their master plan.
 2             So I couldn't -- I couldn't tell you if --
 3     it could have been that master planning was going on
 4     during this time and this was just an interim
 5     solution.  But I don't know.
 6        Q.    What's the relationship between this
 7     paving parking garage, the parking project, and the
 8     actual parking garage that came two years later?
 9        A.    To me the only relationship is the fact
10     that a university this size grows.  It's got dramatic
11     pressures on parking.
12             It's a very, very well documented
13     university problem across this country.  And so the
14     fact that they had parking needs that needed to be
15     met, this was sort of a precursor of -- of the
16     problem, kind of a notice -- of putting everyone on
17     notice this is getting more and more problematic.
18             And I -- I can only assume it resulted in
19     some sort of planning that documented the overall
20     parking need and tried to come up with a more
21     comprehensive long-term solution that resulted in
22     these decks.
23        Q.    A moment ago you mentioned there were
24     complaints from neighborhoods or neighborhood groups
25     about students parking in the area.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A.     Uh-huh (affirmative).

2      Q.     How did you become aware of that?

3      A.     President Zaccari.

4      Q.     The complaints would have come to him?

5      A.     Uh-huh (affirmative).  To my knowledge we

6  did not have any direct complaints to us.  The

7  president made us aware of the kinds of complaints

8  they were getting from the city and having to tow

9  students and -- as the justification for both -- you

10  know, on an incremental basis needing to pave the

11  front entrance of the campus and -- and then as part

12  of our give-and-take, you know, this is not a

13  long-term solution.

14            So I'm sure there was some sort of

15  analysis and number crunching done associated with

16  the master plan and the evolution of these

17  public/private venture projects that came out of it.

18     Q.     So President Zaccari might have heard from

19  the city as well about the parking problems, students

20  parking illegally?

21     A.     Uh-huh (affirmative).  Because a lot of

22  time the residents will call the city to complain,

23  come tow these cars away, these people don't live in

24  our neighborhood.  So I -- I mean, the city can zone

25  and they can also prohibit parking and what not.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1              But they've got to balance that town-gown
 2    relationship too because they rely on the university
 3    as an economic engine.
 4              So we wanna bring people together to work
 5    to, if we've got all of these cars, how are we gonna
 6    deal with them.
 7         Q.    Right.  So this is a bit of a politically
 8    sensitive issue this parking situation at VSU; was
 9    that right?
10         A.    I don't know that I would -- I would just
11    say it's just a pressing concern at all universities.
12    I don't know the politics per se.
13              MR. FEDELI:  Take a break.
14              (Recess from 11:15 a.m. to 11:25 a.m.)
15              MR. FEDELI:  I don't have any further
16         questions right now.  I may wanna have some
17         questions after your direct, if that's okay with
18         you guys.
19              MR. LaVALLEE:  I don't have any questions.
20              MR. SMITH:  No questions.
21              MR. WILL:  No questions.
22              MR. FEDELI:  Then we're done.
23              (Deposition concluded at 11:25 a.m.)
24              (Pursuant to Rule 30(e) of the Federal
25         Rules of Civil Procedure and/or O.C.G.A.
```

Page 55

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1        9-11-30(e), signature of the witness has been

2        reserved.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1                    C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5

6             I hereby certify that the foregoing

7        transcript was taken down, as stated in the

8        caption, and the questions and answers thereto

9        were reduced to typewriting under my direction;

10       that the foregoing pages 1 through 56 represent

11       a true, complete, and correct transcript of the

12       evidence given upon said hearing, and I further

13       certify that I am not of kin or counsel to the

14       parties in the case; am not in the regular

15       employ of counsel for any of said parties; nor

16       am I in anywise interested in the result of said

17       case.

18            This, the 12th day of July, 2009.

19

20                    /s/ Amanda Upton

21             AMANDA UPTON, CCR-B-1523

22

23

24

25
```

Page 57

```
 1                  COURT REPORTER DISCLOSURE

 2

 3          Pursuant to Article 8.B. of the Rules and
        Regulations of the Board of Court Reporting of the
        Judicial Council of Georgia which states: "Each court
 4      reporter shall tender a disclosure form at the time
        of the taking of the deposition stating the
 5      arrangements made for the reporting services of the
        certified court reporter, by the certified court
 6      reporter, the court reporter's employer, or the
        referral source for the deposition, with any party to
 7      the litigation, counsel to the parties or other
        entity.  Such form shall be attached to the
 8      deposition transcript," I make the following
        disclosure:
 9
            I am a Georgia Certified Court Reporter.  I am
10      here as a representative of Wheeler Reporting
        Company, Inc.  Wheeler Reporting Company, Inc. was
11      contacted to provide court reporting services for the
        deposition.  Wheeler Reporting Company, Inc. will not
12      be taking this deposition under any contract that is
        prohibited by O.C.G.A. 15-14-37(a) and (b).
13
            Wheeler Reporting Company, Inc. has no
14      contract/agreement to provide reporting services with
        any party to the case, any counsel in the case, or
15      any reporter or reporting agency from whom a referral
        might have been made to cover this deposition.
16      Wheeler Reporting Company, Inc. will charge its usual
        and customary rates to all parties in the case, and a
17      financial discount will not be given to any party to
        this litigation.
18

19

20
                        AMANDA UPTON, CCR-B-1523
21
                        July 12, 2009
22

23

24

25

                                                   Page 58
```

**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
*404.351.4577*

1     DEPOSITION OF:  LINDA DANIELS/AMU

2          I do hereby certify that I have read all
questions propounded to me and all answers given by
3     me on July 2, 2009, taken before Amanda Upton, and
that:

4
          1)  There are no changes noted.
5          2)  The following changes are noted:

6          Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure and/or the Official Code of Georgia
7     Annotated 9-11-30(e), both of which read in part:
Any changes in form or substance which you desire to
8     make shall be entered upon the deposition...with a
statement of the reasons given...for making them.
9     Accordingly, to assist you in effecting corrections,
please use the form below:

10

11    Page No.         Line No.         should read:

12
      Page No.         Line No.         should read:
13

14    Page No.         Line No.         should read:

15
      Page No.         Line No.         should read:
16

17    Page No.         Line No.         should read:

18
      Page No.         Line No.         should read:
19

20    Page No.         Line No.         should read:

21
      Page No.         Line No.         should read:
22

23    Page No.         Line No.         should read:

24
      Page No.         Line No.         should read:
25

                                                  Page 59

```
 1    DEPOSITION OF:  LINDA DANIELS/AMU

 2    Page No.        Line No.        should read:

 3
      Page No.        Line No.        should read:
 4

 5    Page No.        Line No.        should read:

 6
      Page No.        Line No.        should read:
 7

 8    Page No.        Line No.        should read:

 9
      Page No.        Line No.        should read:
10

11    Page No.        Line No.        should read:

12
      Page No.        Line No.        should read:
13

14
      If supplemental or additional pages are necessary,
15    please furnish same in typewriting annexed to this
      deposition.
16

17
                      LINDA DANIELS
18
      Sworn to and subscribed before me,
19    This the        day of           , 20    .

20
      Notary Public
21    My commission expires:

22
      Please forward corrections to:
23
                  Wheeler Reporting Company, Inc.
24                Suite 250, 1600 Northside Drive
                      Atlanta, Georgia  30318
25                      404-351-4577
```

Page 60

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

EXHIBIT

Daniels 7/2/09



# Board of Regents of the University System of Georgia
*"Creating A More Educated Georgia"*

# Linda Daniels Named University System's Vice Chancellor for Facilities

ATLANTA -- (July 9) – Linda M. Daniels, a registered architect and a long-time member of the Board of Regents' facilities staff, has been named vice chancellor for facilities for the University System of Georgia, following a national search.

Daniels, who has served as assistant vice chancellor for design and construction for the System since 1998 and a member of the University System Office staff since 1992, will assume her new duties on July 16.

Daniels' appointment fills a vacancy created by the retirement of William K. Chatham, who served as vice chancellor from 1996 through 2001. George B. Wingblade, who has been serving as interim vice chancellor for facilities since January, will return to his duties at South Georgia College once Daniels takes up her new post.

"We are excited about the dedication, commitment, knowledge and energy that Linda will bring to this critical position," Senior Vice Chancellor for External Activities and Facilities Tom Daniel said in announcing the appointment. "Her many years of experience working with campus facilities colleagues throughout the University System should serve her extremely well as she moves to this new level of responsibility."

Daniels has 24 years of experience in the facilities arena, including the long-range planning, master planning and maintenance of buildings and campuses. As assistant vice chancellor for design and construction, Daniels oversees an active capital improvement program of over $2 billion. She manages five program managers who serve as liaisons for the 34 USG campuses and also hires and supervises outside consultants for various projects. She worked her way up at the University System Office from project architect (1992-1995) to director of planning (1995-1998).

As director of planning, Daniels managed the implementation of a System-wide campus master-planning process to ensure that facilities plans for each campus are continually updated and that they are in step with the Board of Regents' Strategic Plan. Daniels worked with an architectural firm to create an innovative master-planning template that guided each campus in creating its master plan. The template won a national award in 2001 from the Society for College and University Planning (SCUP) and the American Institute of Architects. Prior to joining the Board of Regents staff, Daniels worked as an architect at the Atlanta office of Rosser, Finch, Alexander, Barnes, Rothschild and Paschal International, from 1984 to 1992, where her major projects included jails and detention centers.

Daniels holds degrees in environmental design and architecture from Auburn University's College of Architecture. For the first two years after she graduated in 1982, she worked as an intern architect at Yielding and Wakeford Architects, in Albany, Ga. While an undergraduate, Daniels completed an internship with the Historic American

Buildings Survey, in Washington, D.C., worked as a cooperative education student for Tiller/Butner/Rosa Architects, in Montgomery, Ala., and served as a teaching assistant in Auburn University's freshman design program.

<div align="center">

#   #   #   #   #

**BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA**
270 WASHINGTON ST., SW  -  ATLANTA, GA 30334  -  404-656-2250  -  FAX 404-651-9301

**return to top**  |  **2002 News Releases**  |  **News Archive**

</div>

---

©2009 Board of Regents of the University System of Georgia

**Contact USG | Disclaimer | Privacy**

270 Washington Street, S.W., Atlanta, GA 30334

U.S.A.

Last modified: December 16, 2006

Content Source: Office of Media and Publications





# THE STATE OF GEORGIA

## EXECUTIVE ORDER

---

## BY THE GOVERNOR:

**WHEREAS:** There currently exists at Georgia Southern University, Bulloch County, Statesboro, Georgia buildings known as Building 802 and Building 806 (the "Buildings"); and

**WHEREAS:** The Board of Regents at its meeting on May 9, 2001, adopted a policy authorizing the Chancellor or Vice Chancellor for Facilities to declare buildings, structures and other improvements no longer advantageously useful to the University System of Georgia. Said Buildings are included within this policy; and

**WHEREAS:** It is the opinion of Ms. Linda M. Daniels, Vice Chancellor for Facilities of the Board of Regents of the University System of Georgia, that the Buildings can no longer be advantageously used by Georgia Southern University or the University System of Georgia and should be demolished and removed.

**NOW, THEREFORE, BY THE POWER VESTED IN ME AS GOVERNOR OF THE STATE OF GEORGIA, IT IS HEREBY**

**ORDERED:** That the Board of Regents of the University System of Georgia is hereby authorized to demolish and remove the Buildings from Georgia Southern University, Bulloch County, Statesboro, Georgia.

**IT IS FURTHER**

**ORDERED:** That the appropriate staff of Georgia Southern University, Bulloch County, Statesboro, Georgia, acting under the approval of the Board of Regents of the University System of Georgia, are hereby authorized to demolish the Buildings and to have all building materials removed from the premises by public works contract; all said demolition and removal to be performed as expeditiously as possible.

This 25$\underline{\text{th}}$ day of April, 2006.

_____
GOVERNOR

LI08218780



**Thressea H. Boyd**

| | |
|---|---|
| 'rom: | Beheruz Sethna [Beheruz.Sethna@usg.edu] |
| ;ent: | Monday, March 26, 2007 4:39 PM |
| To: | Thressea H. Boyd |
| Cc: | Demetra Morgan |
| Subject: | Re: [Fwd: [Fwd: Re: Proposed Parking Garage @ VSU]] |

Excellent. Thank you Ms. Boyd.

Demetra, if you have other letters, could you send them to Dr. Zaccari so that he may
respond in like manner. Ms. Boyd, please request him to use a phrase something like:
Thank you for your letter to the Chancellor. Since this is a campus matter, it is
appropriate that I respond.

Thanks.

A brief message from my BlackBerry Handheld.

-----Original Message-----
From: "Thressea H. Boyd" <thboyd@valdosta.edu>
Date: Mon, 26 Mar 2007 16:25:52
To:<Beheruz.Sethna@usg.edu>
Subject: FW: [Fwd: [Fwd: Re: Proposed Parking Garage @ VSU]]

Dr. Sethan,


In response to Mr. Hayden Barnes correspondence to Chancellor Davis I am attaching a
letter from Mr. Barnes to President Zaccari which was hand delivered to our office today.
As you will note Mr. Barnes is withdrawing his opposition to VSU's parking garage.  Mr.
Barnes has met with members of VSU's SAVE (Students Against Violating the Environment)
group and plans to work in partnership with this student organization.  The SAVE
organization has had productive meetings with President Zaccari and VSU administrators an
Mr. Barnes is agreeable to work with this group to voice his concerns.


Please let me know if you have any questions or need further information.


Sincerely,



Thressea H. Boyd

Assistant to the President

Valdosta State University

Valdosta, GA 31698

229-333-5952

229-333-7400 (Fax)

thboyd@valdosta.edu. <mailto:thboyd@valdosta.edu>

1

LI08218780

**¨ ¯essea H. Boyd**

---

From:       Thressea H. Boyd [thboyd@valdosta.edu]
Sent:       Monday, March 26, 2007 4:26 PM
To:         'Beheruz.Sethna@usg.edu'
Subject:    FW: [Fwd: [Fwd: Re: Proposed Parking Garage @ VSU]]
Attachments: Letter from Hayden Barnes.pdf

. Sethan,

response to Mr. Hayden Barnes correspondence to Chancellor Davis I am attaching a letter from Mr. Barnes to President
ccari which was hand delivered to our office today.  As you will note Mr. Barnes is withdrawing his opposition to VSU's park
rage.  Mr. Barnes has met with members of VSU's SAVE (Students Against Violating the Environment) group and plans to
partnership with this student organization.  The SAVE organization has had productive meetings with President Zaccari and
5U administrators and Mr. Barnes is agreeable to work with this group to voice his concerns.

ease let me know if you have any questions or need further information.

ncerely,

ressea H. Boyd
ssistant to the President
aldosta State University
aldosta, GA 31698
9-333-5952
   333-7400 (Fax)
ooyd@valdosta.edu

---

om: Ronald M. Zaccari [mailto:rzaccari@valdosta.edu]
nt: Monday, March 26, 2007 3:42 PM
: 'Thressea H. Boyd'
bject: FW: [Fwd: [Fwd: Re: Proposed Parking Garage @ VSU]]

om: Beheruz Sethna [mailto:Beheruz.Sethna@usg.edu]
nt: Monday, March 26, 2007 10:04 AM
: Ron Zaccari
bject: [Fwd: [Fwd: Re: Proposed Parking Garage @ VSU]]

on, please let me know what's going on.  I would pefer that these issues be handled at the institutional level, but
ey are writing to the Chancellor, Demetra is asking me to respond.  Your thoughts, please?  Thanks.

------ Original Message ------
abject: [Fwd: Re: Proposed Parking Garage @ VSU]
  Date: Mon, 26 Mar 2007 08:54:37 -0400
From: Demetra Morgan <demetra.morgan@usg.edu>
    To: Beheruz Sethna <beheruz.sethna@usg.edu>

eheruz -

ooks like there is a campaign against the parking garage at Valdosta.  I will forward each of the e-mails (doesn't

LT08218780

pear to be quite as many as the insurance ones). Will you respond or do you think Ron Z should respond to all? let me know.

anks.

metra

----- Original Message --------
Subject:Re: Proposed Parking Garage @ VSU
    Date:Sat, 24 Mar 2007 15:23:10 -0400
    From:Hayden Barnes <thbarnes@valdosta.edu>
        To:Melissa Benton <mjbenton@valdosta.edu>
        CC:gtwaggen@valdosta.edu, chand@valdosta.edu, rcarter@valdosta.edu, dcunning@valdosta.edu,
            jblack@valdosta.edu, mlancaster@valdosta.edu, "Thomas J. Manning" <tmanning@valdosta.edu>,
            president@valdosta.edu, sbdasing@valdosta.edu, tdsimmon@valdosta.edu, jrfisher@valdosta.edu,
            jvasseur@valdosta.edu, bergstrm@valdosta.edu, glrhymes@valdosta.edu, rgoddard@valdosta.edu,
            kcolwell@valdosta.edu, jjbarnett@valdosta.edu, mjbenton@valdosta.edu, ecbrevik@valdosta.edu,
            asantas@valdosta.edu, "Michael Noll" <mjnoll@valdosta.edu>, chancellor@usg.edu,
            ahhancoc@valdosta.edu, srgunnin@valdosta.edu
    eferences:<000501c76e34$60500480$dc8f12a8@it00668>

agree, I think walking can do wonders. There are many, many benefits
sociated with a daily fitness walk: weight management; lower risks of
rt attack, stroke, cancer, sleep apnea, and osteoarthritis; lower blood
sure; boost in HDL ('good cholesterol') and reduction in LDL ('bad
olesterol'); stress relief, the list goes on...

other health concern related to the parking garage plan is increased
issions. How many inner-city children are being diagnosed with asthma and
her respiratory ailments these days? I believe the latest statistic was
ose to 30 - 40%. I've noticed just in the last couple years as an EMT and
en Paramedic more and more children having emergency respiratory
acerbations, often while playing outside out the afternoon near the
creased afternoon traffic. These parking garages will back right up to
or residential areas with lots of children. One of these children, an
ght-year-old boy, I know well. Despite aggressive management of his
spiratory condition (one which is common among poor, black, inner-city
ildren exposed to the constant barage of carcinogenic toxic exhaust), he
s frequent respiratory distress. This is really not uncommon, but lately,
his case the hypoxemia associated with his respiratory distress is
ducing violent seizures.

w many members of the VSU community suffer respiratory ailments? If the
e Faber Health Center does any sort of data analysis, they could probably
ve us an idea among the students.

ank you for your support,

ayden Barnes, NREMT-P
ass of 2009
hropology Major
barnes@valdosta.edu

----- Original Message ------
rom: "Melissa Benton" <mjbenton@valdosta.edu>

LI08218780

: "'Hayden Barnes'" <thbarnes@valdosta.edu>
: Saturday, March 24, 2007 12:49 PM
ct: RE: Proposed Parking Garage @ VSU

Mr. Barnes,
Your point about walking is an excellent one. There is strong
epidemiological research supporting regular physical activity (i.e.
walking)
for health promotion. If this research can be of benefit to you in making
your case, please let me know and I'll forward some references.

As a leader in South Georgia, VSU could be said to have a commitment to
health promotion for its students as well as the community. We should
lead
by example. Encouraging students and ourselves to walk is a way to do so.
Construction of a large and unsightly parking garage is not.

Best wishes,

Melissa J. Benton, PhD, RN, CNS
Assistant Professor
College of Nursing
Valdosta State University
Valdosta, GA 31698
229-245-3775
mjbenton@valdosta.edu


.oraham Lincoln once said, "A person's true character is reflected when
they
adhere to strong personal values even when it is believed nobody is
watching."

-----Original Message-----
From: Hayden Barnes [mailto:thbarnes@valdosta.edu]
Sent: Saturday, March 24, 2007 12:37 AM
To: Thomas J. Manning; rcarter@valdosta.edu; gtwaggen@valdosta.edu;
bergstrm@valdosta.edu; kcolwell@valdosta.edu; mjbenton@valdosta.edu;
sbdasing@valdosta.edu; jjbarnett@valdosta.edu; jvasseur@valdosta.edu;
dcunning@valdosta.edu; jrfisher@valdosta.edu; chand@valdosta.edu;
asantas@valdosta.edu; mlancaster@valdosta.edu; jblack@valdosta.edu;
rgoddard@valdosta.edu; ecbrevik@valdosta.edu; 'Michael Noll';
glrhymes@valdosta.edu; tdsimmon@valdosta.edu; president@valdosta.edu
Subject: Re: Proposed Parking Garage @ VSU

If you take note of other parking garages though, almost 30% - 50% of each
'level' is taken up by ramps, stairwells, elevators, and concrete
partitions. I postulate that a four level parking deck would only increase
the number of parking spaces 200%- 250%.

And even if we were able to maximize space and achieve a 400% increase in
parking spaces (and even if it were only to cost $15 million or $10
million
or only $5 million), IT WOULD STILL BE A BAD IDEA. The planned locations
or

these decks only reach capacity for about half an hour a day in the late
morning. By 2pm when I work out at the Rec Center, the lot there is more
than 50% empty. When students (and their parents) whine about parking,

LI08218780

they
~~nt to be able to park and walk 20 steps to class. Well that's
reasonable

(almost as unreasonable as a $30,000,000 parking garage) and I'll be the
first to say most students are lazy, including me.

VSU wants (and has the potential to be) a research-level institution. Not
only does that require tough financial decisions and investments in
faculty,

equipment, facilities, etc. but if you look at the major public research
universities in Georgia (UGA, GSA, and GT to name a few), they too
restrict
on-campus vehicles, ironic, huh?

I have begun coordinating a decentralized but goal-driven strategy between
interested parties on campus to defeat the parking deck plan. While I
maintain that the burden of proof lies on the administration, we have
begun
compiling cost benefit-analyses of alternatives, including a wider bus
system to major apartment complexes to present to the university community
and the Board of Regents. I have been in touch with the USG Chancellor,
the
office of Governor Purdue, and local state legislators (all three of whom
serve on the higher education committee and/or budget committee). We are
going to stop these things from being built, whether they cost $30,000,000
or $20,000, they are a bad idea and better money spent elsewhere.

Hayden Barnes, NREMT-Paramedic
Class of 2009, Anthropology Major
thbarnes@valdosta.edu

----- Original Message -----
To: "Hayden Barnes" <thbarnes@gmail.com>
Sent: Friday, March 23, 2007 3:38 PM
Subject: Re: Proposed Parking Garage @ VSU


You've got some interesting arguments, and if these alternatives
haven't been considered by the admin., they should be. In the 1970s as
an undergraduate at the Univ of (36,000 students), we weren't
allowed to have a car on campus until we became Juniors.

One thing I might alter in your argument is the part about parking
decks squandering land, when in fact they actually reduce the footprint
by a factor that nearly equals the number of levels. A parking lot is
the worst waste of land imaginable, but going up rather than out is
actually advantageous in that regard. The cost part of the
equation--as you point out--is a different thing altogether!


Petra Morgan
Executive Assistant to the Chancellor
Board of Regents, University System of Georgia
270 Washington Street, SW
Atlanta, Georgia  30334
Phone  (404) 463-0739

LI08218780

x .  (404) 657-6979

iting a More Educated Georgia"

bsite:  http://www.usg.edu

LI08218780



**Ronald M. Zaccari**

**From:** Linda Daniels [Linda.Daniels@usg.edu]
**Sent:** Monday, April 16, 2007 3:49 PM
**To:** USG President - Valdosta State University
**Subject:** [Fwd: Parking Decks at VSU]


-------- Original Message --------
**Subject:** Parking Decks at VSU
   **Date:** Mon, 16 Apr 2007 15:33:09 -0400
   **From:** Hayden Barnes <thbarnes@gmail.com>
   **To:** <linda.daniels@usg.edu>


Response to "Parking decks to be built at VSU"

We must look past our own selfish desires for more convenient parking
options and examine the overlooked issues associated with the proposed
parking decks.

I have a lot of questions about the parking deck plans which I would like to
see answered and hope you will to.

1. Have there been any alternatives explored to building two large,
expensive, and ugly parking decks on campus? Parking decks to do not produce
income and while they might aid in attracting students to our University who
want to bring their vehicles to campus, they do not add to the academic
value of the University. Parking decks are a waste of valuable University
real estate. I think the decision to build these parking decks is going to
be looked down upon by future generations who are going recognize them for
what they are, a bad investment.

2. Has there been a study done assessing the impact of these parking decks on
the local environment? Is there a plan to make these studies easily
accessible to the University community or will they be filled away in a
drawer over in Auxiliary Services? This are going to be one of the largest
construction projects and biggest investments every taken on by the
university (yeah a parking deck, ironic, huh?) Construction waste, noise
pollution, and increased car emissions all have to be taken into
consideration, in addition to the destruction of habitat. While the rest of
the world is cutting back  and investing in innovative solutions to solve
the climate crisis, VSU seems to be doing the opposite.

3. Speak of which, have there been any initiatives to cut down on current
vehicle usage; carpooling boards, extending the campus bus system to
outlying apartment complexes in the city, and dare I say, restricting cars?

Let me stop here and tell you a story. I survived my freshmen year without
a vehicle at a small college, 800 students, in the mountains of Western
North Carolina. Rather than detracting from the college experience, it
allowed me to build deeper relationships with those around me including
relationships with people I normally wouldn't hang out or party with. I
think campus life would greatly benefit from fewer people leaving campus and

LI08218780

greater investments in campus activities. Imagine what CAB could do with just $15,000, the price of one parking space. Canyou say more laser tag?

4. Do we want to continue coming across as a commuter college? I think VSU has the potential to be a major economic engine for South Georgia and will host pioneering research one day. The question is, do we want to see that happen in five years or twenty? We have to make the tough decisions and investments now to see that come to that fruition in the future.

5. Can't we all think of better ways to spend $30 million dollars on campus? I think you could think of a few off the top of your head right now. I was thinking building new dorms which use geothermal climate control, composting toilets, environmentally friendly building materials, gray water recycling, rain water collection, and permaculture gardens. How about a food co-op or converting all the campus vehicles to bio-diesel?

I call upon the administration to answer these questions, publicly and quickly, in the VSU Spectator, in particular regarding the environmental impact of parking decks.

I call upon the Faculty Senate and SGA to press for answers to these questions and any of your own you might have.

I call upon students, faculty, and staff to think about what you are willing to sacrifice for cleaner air, a more vibrant campus life, and a world-renowned University.

The ultimate decision to build these parking decks rests with the Board of Regents. You can email the Board of Regents at http://www.usg.edu/contact/ or give the Chancellor a call at (404) 656-2202.

T. Hayden Barnes
Class of 2009
Anthropology Major


Linda M. Daniels, Architect
Vice Chancellor for Facilities
The University System of Georgia/Board of Regents
270 Washington St., S.W.
Atlanta, Georgia 30334-1450
phone  (404) 656-2243
fax  (404)657-7433

LI08218780





**Ronald M. Zaccari**

*Office of the President*

**VALDOSTA**
S T A T E
UNIVERSITY™
*Building for Our Next Century*
*1906-2006*

June 21, 2007

Ms. Elizabeth E. Neely
Associate Vice Chancellor for Legal Affairs
Board of Regents of the University System of Georgia
270 Washington Street, S.W.
Atlanta, Georgia 30334

RE:    Application for Review
       Thomas Hayden Barnes
       Valdosta State University

Dear Ms. Neely:

This letter serves as a response to the above referenced matter and the following is a chronology of events pertinent to your investigation.

## HISTORY

1. Thomas Hayden Barnes enrolled in Valdosta State University on August 14, 2005 having transferred as a sophomore from Warren Wilson College, Swannanoa, North Carolina.

2. On March 23, 2007, I was informed by my Administrative Assistant that flyers opposing planned parking decks had been posted across campus and that Mr. Barnes was the author of the document. (See Attachment #1) At that time, I had never met Mr. Barnes nor had I heard any previous information about any opposition to the parking decks. Upon reading the flyer, it was apparent Mr. Barnes did not understand the funding process for parking decks nor was he aware that no state funds could be used to finance the projects.

3. Prior to the referenced flyer's appearance, I had several productive meetings with a campus student group known as S.A.V.E (Students Against Violating the Environment) and we had accomplished excellent partnerships and related actions steps leading to positive efforts to initiate recycling and discussions about other environmental projects. I view the S.A.V.E. organization as a productive means of discussing student issues and working harmoniously on behalf of Valdosta State University. On March 26, 2007, I

LI08218780

asked the leadership of the group if they knew about Mr. Barnes and his view points. They knew Mr. Barnes, but stated he left the organization to pursue his own agenda. The students were concerned that Mr. Barnes' approach was confrontational rather than pursuing open dialogue with the administration.

4. On or about March 26, 2007, following my meeting with S.A.V.E, I received a correspondence from Mr. Barnes (see Attachment #2) stating his apologies and his intent to remove the flyers and discontinue public opposition.

5. Several days prior to the April 17 and 18, 2007 Board of Regents' meeting, Mr. Barnes immediately reversed his decision to discontinue public opposition. I was informed by Vice Chancellor Linda Daniels that Mr. Barnes had been contacting the Governor's office, the Chancellor's office, and members of the Board of Regents. Mr. Barnes had voiced his opinions and requested referenced offices and individuals to immediately disallow the parking decks. When asked by those with whom he had personal telephone contact if he had met with the VSU president and discussed his view points, his response was that he had. His response represented an abuse of the truth as I had never engaged in any conversation with Mr. Barnes. Other than the correspondence of a short-lived apology, I had never met or interacted with this student. Mr. Barnes' actions led to a series of what I consider to be erratic behavior. Without regard to accurate information and open dialogue with individuals who could have provided valuable data about VSU's parking needs and related planning, he purposely misrepresented the truth and aggressively asked the various high-ranking state offices and officials to disallow VSU's parking decks.

6. On April 16, 2007, I received a telephone call from Vice Chancellor Linda Daniels asking for a description of his physical appearance. I related to Vice Chancellor Daniels that I had never met Mr. Barnes, nor could I relate any specific information about the student. There was a concern that Mr. Barnes would appear at the Board of Regents meeting scheduled days later at Georgia Southern University and stage a protest. The Georgia Southern University Police department was alerted by Vice Chancellor Linda Daniels to a possible public protest.

7. Following my call with Vice Chancellor Daniels, on April 16, 2007, I requested a meeting with Mr. Barnes and required VSU's Dean of Students, Mr. Russ Mast, to be present for the meeting. Mr. Barnes arrived at my office on April 16, 2007 at the appointed time (5:00 pm). He requested that another VSU student (his girlfriend) be permitted to participate in the meeting. I refused his request because the meeting did not involve the actions of his girlfriend.

The meeting lasted for approximately one hour and ten minutes. The topics discussed included his lack of knowledge of how parking decks are financed, required business models (public/private partnerships), mandated processes/sequences in the University System of Georgia Master Planning process, and procedures for Board of Regents approval. I explained that no state funds are permitted to construct the proposed decks. Although he appeared to listen, my attempt to provide an overview resulted in his

LI08218780

suggestion that rather than building parking decks, the funds should be diverted to such projects such as Amazon Rain Forest Protection and housing for Katrina Hurricane victims. When I explained the business plan involved borrowing funds through a long-term bond with external lenders, he had no response. I again emphasized that state funds could not be used to construct parking facilities and outlined that private/public partnerships required a conduit of funds into the project to pay the lenders over a prescribed period of the bond agreement. When asked why he failed to communicate his concerns through the VSU Student Government Association, he stated, "they are no help to my cause."

The remaining time was spent attempting to redirect his energies in a more positive direction and recommending ways in which to build relationships that would assist in coalescing individuals and engaging people to support his view points. I suggested that his current approach drives people in opposing directions. I stated that I wanted to advise him as I would in mentoring my own two sons. He was not interested in my views, a fact supported by the student's subsequent statements that mock my attempt to advise and communicate with him.

8. On Friday, April 20, 2007, Mr. Barnes sent an email to me (see Attachment #3) referencing Easter Island and mocking the meeting's discussion of required business plans. I began to view Mr. Barnes' behavior as the inability to listen, opposition to the administrative policies of the University and the University System of Georgia, and interested in only promoting self interests. No other views, other than his own, appeared to be of interest.

9. VSU's entries on the Board of Regents' meeting agenda (April 17-18, 2007) were approved, including the parking decks. Several days following the BOR meeting, Dean Mast provided a copy of a document generated by Mr. Barnes, wherein he had posted my picture on an image of a parking deck with the words, "S.A.V.E.- Zaccari Memorial Parking Deck" (see Attachment #4).

10. He additionally posted and made reference to the shooter of the April 16, 2007 Virginia Tech slayings (see Attachment #5). The topic of Attachment #5 is focused on the misunderstandings of people who suffer from psychological disorders. Also, included on the second page of the article referenced in Attachment # 5 is a reference to "Shoot it. Upload it. Get famous. Project Spotlight is searching for the next big thing. Are you it?"

11. An additional entry on Attachment #5 was brought to my attention by my Administrative Assistant that referenced Mr. Barnes' personal statement, "Hayden is cleaning out and rearranging his room and thus, his mind, or so he hopes".

12. At this point in the chronology of events, a pattern emerged in the student's behavior. First, a flurry of aggressive actions with inaccurate information, then a written apology followed by an immediate reversal, telephone calls to state offices and Board of Regents, posting my picture as "memorial", and reference to the Virginia Tech shooter. These were documented sequential signs that indicated possible threats to me and the campus.

LI08218780

Since I am not an expert in assessing the psychological status of an individual, but have the appointed responsibility as VSU president and the safety of the campus, I took specific action.

13. The first step was to alert VSU Campus Police on or about April 20, 2007 of the student's behavior and the potential risk if we fail to monitor his actions. Due to the heightened awareness of the Virginia Tech shooting and the national focus on "what should have been done", "what could have been done", "what university presidents must do to protect and possibly prevent such incidents", and "what signs of overt student behavior should immediately be addressed", I sought the advice of the members of the President's administrative unit consisting of Dr. Kurt Keppler, Vice President of Student Affairs, Dr. Louis Levy, Vice President of Academic Affairs, Mr. James Black, Vice President of Finance and Administration, Mr. Scott Sikes, Vice President of Institutional Advancement and Dr. Marsha Krotseng, Associate Vice President for Strategic Research and Analysis. The administrative unit, along with Mr. Scott Doner, VSU's Police Chief and Ms. Ann Farmer, Assistant Chief of Police and I collectively decided that VSU take necessary steps to minimize as much as possible any security risks. Due to the near ending of the Spring academic semester (approximately one week from final examination schedule), it was decided that we monitor Mr. Barnes' student activities and place high security on my public appearances. Non-uniformed campus officers were assigned to patrol my private residence during my off-campus hours, protect my wife and me from potential danger, and uniformed officers were placed on high alert to protect the campus as it concluded the 2007 Spring Semester of classes. My daily schedule was monitored by campus safety officers.

During this timeframe, there were a number of high profile/public events at which I was scheduled to speak, including a weekend Earth Day rally (requested by the S.A.V.E organization), six Commencement Exercises, and the final baseball game for a forty-year career VSU coach.

With high security and monitoring of Mr. Barnes' student activities, appropriate action was taken which allowed the semester to come to a conclusion without alarming the campus that a potentially dangerous situation was brewing, one that could have interrupted final examination schedules. Immediately following the Virginia Tech shooting, the VSU campus received numerous telephone calls from concerned parents inquiring as to what measures VSU was undertaking to protect the campus. Inherent in these inquires were concerns of "copy cat" behaviors.

I took what I believed to be appropriate action and minimize campus focus on Mr. Barnes and his documented behavior by not scheduling a judicial hearing. The exigency of the circumstances dictated action that would not invite alarm. A campus hearing would have involved a judicial panel comprised of students and faculty. This format would have alerted the campus of a potential threat, and would have comprised campus safety by exacerbating potential alarm.

LI08218780

## ISSUE ON APPEAL

Essentially, Mr. Barnes contends that his actions were not intended to be construed as a threat of physical harm toward myself or others; rather, he was simply exercising his First Amendment Rights. Additionally, Mr. Barnes maintains that he was never informed of the reason he was removed from the University.

## DISCUSSION

As with all students, Mr. Barnes is free to enjoy all his constitutional guarantees. However, with this freedom comes the expense of responsibility. It is my understanding, that it is a well settled principal of law that the First Amendment was never intended to bestow upon anyone the right to make a cognizable threat of physical harm.[1] Mr. Barnes takes a questionable approach in advancing the notion that his use of the word "memorial" as reflected in Attachment 4 was an unintentional use of the word. Webster's Dictionary defines the word as "something that is a reminder of ...some person." The common usage and understanding of this word in our society is in recognition of someone deceased.[2] Indeed, even Mr. Barnes' mother agreed that after she viewed the web posting she understood why I would be concerned. (See Attachment # 6, paragraph 3, line 1.)

His mother dismisses the student's actions as "passionate" and references her son as "intelligent", yet asks that VSU dismiss his reference to "memorial" as not knowing its true definition and that he is naïve about such understandings.

If one is to believe that Mr. Barnes has a history of activism regarding complex political issues, then, necessarily, one must conclude that his convenient explanation of his use of the word "memorial" is disingenuous. Further, Mr. Barnes asserts that his web page has limited access and therefore was not intended for my viewing. However, a web site has the potential of being viewed by hundreds. Ultimately, whether or not I viewed the site before or after others is immaterial to the fact that I perceived its contents as a threat of physical harm. However, Mr. Barnes made an affirmative effort to use a particular word to convey the full implication of its meaning. While in retrospect, Mr. Barnes may concede that his actions were inappropriate, I dealt with the facts as they were presented at that time. Accordingly, Mr. Barnes should not expect to be insulated with the protection of the constitution while he engages in disruptive, threatening behavior.

Mr. Barnes and his behavior focus primarily on himself and his views. No one's opinion or appointed office appear to be of value, and authority is something he counters at every possible opportunity with an attitude that "I'll get in your face". He does not follow any protocol, but expects everyone else to follow his protocol and whatever suits his current need and points of view.

---

[1] "The most stringent protection of free speech would not protect a man falsely shouting fire in a theatre and causing panic." *Schenck v. United States* (1919)

[2] For example, we honor our fallen military persons on Memorial Day.

LI08218780

My actions were not taken in response to the student's opposition to the proposed parking decks. The parking decks had been discussed and endorsed for several years through intense planning with campus governance groups such as the Student Government Association, Faculty Senate, Council of Classified Staff Affairs, and the President's Cabinet. Additionally, an appointed campus Master Plan Committee endorsed the parking decks through a mandated Board of Regents Ten-year Master Plan update that the University System of Georgia directed me to conduct when I assumed the VSU presidency in January, 2002. The revised Master Plan was done in concert with the Facilities Office of the University System of Georgia, external consultants, and the VSU campus. A twenty-four month period of hard work and a campus master plan were endorsed and accepted at the May, 2004 meeting of the Board of Regents. Extensive campus dialogue took place at all levels of open campus governance and public forums were held to discuss the pros and cons of the proposed Master Plan. External consultants were hired to conduct extensive research about VSU's ten-year growth and the projected facility and parking needs to serve current and future students, faculty, and staff.

My point: The parking decks were an integral part of the accepted Master Plan and based on projected parking needs that documented a deficit of 2,700 parking spots by the year 2014. Mr. Barnes was not enrolled at VSU when the external consultants engaged the campus in the revised Master Plan; however, he embarked on a public opposition to the parking decks without gathering pertinent information about the lengthy planning and strategic action required to implement such an expansive project. Had he requested the information in a logical inquiry, my staff and I would have supplied the information. Although Mr. Barnes opposed the parking decks, his opinion was not accepted as a mainstream voice; thus, I had no concern about his position. Obviously, his voice had no impact on the Board of Regents' decision to approve the construction of the two decks (approval took place at the April, 2007 meeting of the Board of Regents).

Indeed, Mr. Barnes recently displayed behavior that is in keeping with the observation that his focus is primarily on his concerns. The Board of Regents does not have a regularly scheduled meeting in July. Yet, following his appeal of this matter to the Board of Regents, Mr. Barnes, sent a communication to the VSU's Director of Housing, complaining, among other things, that the Board was "stone-walling" his appeal. (See Attachment # 7.)

Mr. Barnes' inclusion of my picture on his web site, coupled with the Virginia Tech tragedy, and his subsequent posting of an article wherein the author expresses "empathy with the shooter", culminated in the need to make a decision in the interest of my safety and that of the campus community.

I seek to dismantle obstacles that interfere with an individual's ability to pursue and fulfill his or her goals in an environment that is conducive for achievement. Consistent with this philosophy, I carefully weighed Mr. Barnes' interest in continuing his enrollment at VSU against the competing interest of campus safety. In the final analysis, based on the foregoing series of events, I determined that the overall interests of the

LI08218780

campus community were paramount to that of Mr. Barnes'.

As university administrators, we must try to understand how and why such events such as the Virginia Tech shootings happen and to consider carefully what precautions we can take to prevent them. I made my decision based on the belief that I was at risk and there was a real threat to my safety, the safety of my spouse, the safety of my administrative staff, and there existed a potential campus threat such as the one that occurred on the Virginia Tech campus, April 16, 2007.

As I am not an expert in the field of mental health, and because of my concern for campus safety, I felt it necessary to defer to the experts and incorporated their input as a condition for Mr. Barnes readmission to the University. Hence, my request for a professional evaluation was included in his administrative withdrawal and as a condition for readmission.

Mr. Barnes' behavior was disruptive to the administrative operation of the University and he was fully informed of the reason for his removal as set forth in Attachment #8.

## RECOMMENDATION

My decision and the actions of VSU personnel permitted the campus to complete its Spring Semester. Mr. Barnes was able to complete his course work, and now he is given the opportunity to assess his behavior patterns, seek help, and decide whether he wants to return to VSU, transfer to another institution, and in general function on any post-secondary institution in order to achieve a college degree.

My actions were not intended to permanently withdraw the student from Valdosta State University, but to request the student to seek professional psychiatric assistance and allow VSU's administrative staff to assess his request for continued enrollment. He has the opportunity to present requested information for reevaluation of his readmission.

In closing, I offer the following quote from the May 11, 2007 edition of the Chronicle of Higher Education:

*"After the tears, the makeshift memorials, and the intensely painful series of funerals, higher education must come to grips with the fact that it had its own September 11. It will never be, nor should it be, the same again at our nation's colleges and universities."*

Let's look at September 11 and its aftermath. Let's review all of the reports that state how we should have paid more detailed attention to signs, analyzed more carefully apparent signs and pieces of information, and developed more proactive approaches to preventing such events and similar future events. Those are the underlying premises from which VSU took the action that is now under appeal. Those are the very reasons

LI08218780

why VSU stands firm on its actions and decisions. The campus was able to come to a point of resolution with safety, the continued effective regional mission firmly in place, and the successful completion of classes and final examinations. Mr. Barnes was able to complete his academic work and receive final grades. He now has the opportunity to present a case for readmission to Valdosta State University.

The unfortunate outcome in this appeal is that the student fails to understand that he must be responsible for his actions and words. He is in this situation because he chose to place himself squarely in a critical path – one of his own creation.

Sincerely,

Ronald M. Zaccari,
President

**Fedeli, Chris**

| | |
|---|---|
| **From:** | ephost@epnet.com |
| **Sent:** | Wednesday, June 24, 2009 8:52 PM |
| **To:** | Corn-Revere, Bob; Fedeli, Chris; Reid, Erin |
| **Subject:** | 2005 VSU Parking Petition |



Comments:
As requested.

## Record: 1

| | |
|---|---|
| **Title:** | Paving Paradise. |
| **Authors:** | Varsalona, Devin |
| **Source:** | Chronicle of Higher Education; 8/5/2005, Vol. 51 Issue 48, pA7-A7, 1/6p |
| **Document Type:** | Article |
| **Subject Terms:** | *PARKING lots<br>*UNIVERSITIES & colleges<br>*EDUCATION<br>VALDOSTA State University (Valdosta, Ga.) |
| **Geographic Terms:** | VALDOSTA (Ga.)<br>GEORGIA<br><br>NAICS/Industry Codes611699 All Other Miscellaneous Schools and Instruction<br>611710 Educational Support Services<br>923110 Administration of Education Programs<br>812930 Parking Lots and Garages<br>611310 Colleges, Universities, and Professional Schools |
| **People:** | ZACCARI, Ronald M. |
| **Abstract:** | The article presents information on the attitude of the president of Valdosta State University towards the renovation plans for the university. More green and less gravel was the plan of Ronald M. Zaccari for Valdosta State University. Everyone loved the university president's plans, says junior Ashley L. Zahn, but in June students were dismayed to find that sometimes gravel would win out. That was when the administration posted plans online to turn a large portion of their beloved front lawn into a faculty parking lot to accommodate a space crunch. Zahn collected more than 300 student signatures on a petition to stop the construction before it began. |
| **Full Text Word Count:** | 232 |
| **ISSN:** | 00095982 |
| **Accession Number:** | 17868241 |
| **Persistent link to this record (Permalink):** | http://proxygsu-ken1.galileo.usg.edu/login?url=http://search.ebscohost.com/login.aspx?direct=true&db=a9h&AN=17868241&site=ehost-live |

| | |
|---|---|
| **Cut and Paste:** | \<A href="http://proxygsu-ken1.galileo.usg.edu/login?url=http://search.ebscohost.com/login.aspx?direct=true&db=a9h&AN=17868241&site=ehost-live">Paving Paradise.\</A> |
| **Database:** | Academic Search Complete |

Section: SHORT SUBJECTS

# Paving Paradise

More green, less gravel: That was Ronald M. Zaccari's grand idea for Valdosta State University's second century. Everyone loved the university president's plans, says junior Ashley L. Zahn, but in June students were dismayed to find that sometimes gravel would win out.

That's when the administration posted plans online to turn a large portion of their beloved front lawn into a faculty parking lot to accommodate a space crunch.

"The front lawn is the only place that's common and central to everyone, no matter who they are," Ms. Zahn says. "The administration can't understand how highly we value our front lawn."

Ms. Zahn collected more than 300 student signatures on a petition to stop the construction before it began.

Even though administration officials say they had already consulted with students, Mr. Zaccari quickly moved to quell the controversy.

A week after Ms. Zahn began her petition, he called a meeting with the junior and a few other students in which he agreed to scale back the parking lot to leave most of the lawn intact.

Scott H. Sikes, vice president for university advancement, says that university officials were eager to please the petitioners. "Students are the reason we all have jobs," he says. "We care about them a lot, and we all love our lawn."

By Devin Varsalona

The Chronicle of Higher Education: (http://chronicle.com) 1-800-728-2803 Copyright of Chronicle of Higher Education is the property of Chronicle of Higher Education and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.
The link information above provides a persistent link to the article you've requested.

Persistent link to this record: Following the link above will bring you to the start of the article or citation.

Cut and Paste: To place article links in an external web document, simply copy and paste the HTML above, starting with "\<A HREF"

6/30/2009

If you have any problems or questions, contact Technical Support at
http://support.epnet.com/contact/askus.php or call 800-758-5995.

This e-mail was generated by a user of EBSCOhost who gained access via the KENNESAW STATE
UNIV account. Neither EBSCO nor KENNESAW STATE UNIV is responsible for the content of this e-mail.