IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 23 2009

THOMAS HAYDEN BARNES,                    CASE NUMBER

    Plaintiff,                           1:08-CV-00077-CAP

vs.

RONALD M. ZACCARI, et al,

    Defendants.
_____/

DEPOSITION OF

CHIEF HOWARD SCOTT DONER

JULY 8, 2009

2:00 P.M.

VALDOSTA STATE UNIVERSITY
OAK STREET PARKING DECK
AUXILIARY SERVICES DEPARTMENT
CONFERENCE ROOM
VALDOSTA, GEORGIA

SARAH E. WILLIAMS, FPR, CCR, RPR

Page 1





WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                   A P P E A R A N C E S

 2

 3      On behalf of Plaintiff:

 4      CHRISTOPHER FEDELI, ESQ.
        ERIN N. REID, ESQ.
 5      Davis Wright Tremaine, LLP
        Suite 200
 6      1919 Pennsylvania Avenue, N.W.
        Washington, D.C.   20006-3402
 7

 8      On behalf of Defendant Gaskins:

 9      DAVID R. SMITH, ESQ.
        Brannen, Searcy & Smith, LLP
10      22 East 34th Street
        Savannah, Georgia  31401
11

12      On behalf of Zaccari, VSU, Board of Regents, Keppler,
                             Mast and Morgan:
13
        HOLLY HANCE, ESQ.
14      Royal Washburn Will
        4799 Sugarloaf Parkway
15      Building J
        Lawrenceville, Georgia   30044
16

17      On behalf of McMillan:

18      MATTHEW R. LaVALLEE, ESQ.
        Daley, Koster & LaVallee, LLC
19      2849 Paces Ferry Road
        Suite 160
20      Atlanta, Georgia   30339

21

22

23

24

25
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                    I N D E X
 2   Examination by Mr. Fedeli                    4
 3
 4
 5                    E X H I B I T S
 6   Defendants'
 7   1     Letter, 6/21/07 to Neely from Zaccari      11
 8   2     Memo, 5/9/07 to Staff from Zaccari         14
 9   3     Withdrawal Letter, 5/7/09 to Barnes from Zaccari15
10   4     Article, Jan 2006, Campus Legal Advisor    21
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
404.351.4577

1     THEREUPON,

2                          CHIEF HOWARD SCOTT DONER

3     having been first duly sworn, was examined and testified as

4     follows:

5                          EXAMINATION

6     BY MR. FEDELI:

7        Q     Would you, please, state your full name for the

8     record.

9        A     Howard Scott Doner.

10       Q     And what is your current address?

11       A     Home address?

12       Q     Yes.

13       A     3107 Wild Oaks Circle, Valdosta, Georgia, 31605.

14       Q     My name is Chris Fedeli.  I'm an attorney for

15    Hayden Barnes.  I'll be taking the deposition today.

16             Have you ever had your deposition taken before?

17       A     Yes.  In this particular incident?

18       Q     Any incident.

19       A     Yes, I have.

20       Q     How many times about?

21       A     Two or three.

22       Q     And what were the circumstances?

23       A     Civil cases.

24       Q     Civil cases involving the University?

25       A     No.

                                                        Page 4



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     Q     With a business matter or were they personal

2     matters?

3     A     They were nonpersonal.  I guess you could say they

4     were business matters.

5     Q     And when were they approximately?

6     A     Ten, fifteen years ago.  Dealt with restaurants in

7     Atlanta over landscape.

8     Q     And were you in law enforcement at the time?

9     A     Yes.

10    Q     Did your need to give depositions arise from your

11    role as law enforcement?

12    A     No.

13    Q     What did it arise from?

14    A     It arised (sic) of whether or not the plants were

15    actually dead or not on the property in my opinion.  All

16    they did was ask me what my opinion was of the plants that

17    had been planted there.

18          I just happened to live near the restaurant.  I

19    drove by it every day.  I said, yeah, it looked like when

20    they planted them, they were alive and eventually they died.

21    My guess is they didn't get watered.  That's pretty much it.

22          That's the only one I can actually recall.  I'm

23    trying to think if there was another one.  No, I believe

24    that's the only other one I've given a deposition before.

25    Q     Sounds like you were a witness in that case.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A     That's pretty much it.  I don't know what happened,
 2   if they settled out of court or not.  I don't know.
 3      Q     Okay.  Today's deposition is being transcribed.  So
 4   since it's been ten or fifteen years since your last
 5   deposition, just general background:  Make sure you give
 6   your answers in a verbal response.  You know, head nods will
 7   not be recorded.
 8      A     Okay.
 9      Q     Is there any reason why you would not be able to
10   give full testimony today?
11      A     Not that I'm aware of.
12      Q     Did you review anything in preparation for this
13   deposition?
14      A     No.
15      Q     Discuss anything with your lawyers?
16      A     Yes.
17      Q     Okay.  When was that?
18      A     Yesterday.  Well, Tuesday night.  Yeah, Tuesday
19   night.
20      Q     What is your current occupation and title?
21      A     Director of University Police.
22      Q     And prior to that, what was your occupation?
23      A     Director of University Police.
24      Q     And did you have a job before you were the Director
25   of University Police?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    Yes, I did.

2    Q    What was that?

3    A    I was a Lieutenant at Emory University Police

4    Department.

5    Q    And before being a Lieutenant at the Emory Police

6    Department, did you have a job before that?

7    A    Sergeant.

8    Q    At which police department?

9    A    Emory.

10   Q    And prior to joining the Emory Police Department,

11   what positions did you --

12   A    Had odds and ends jobs.  Worked for Caldwell

13   Temporary.

14   Q    About what year did you start at Emory?

15   A    1980.

16   Q    Okay.  So, you've been in law enforcement at the

17   university setting for --

18   A    Twenty-nine years.

19   Q    Twenty-nine years, okay.  And you're role here at

20   Valdosta is, essentially, Chief of the police force.  Is

21   that correct?

22   A    Correct.

23   Q    Are you aware of the situation that's the subject

24   of today's litigation, the incident with Hayden Barnes back

25   in 2007?

WHEELER
REPORTING
Court Reporting ▪ Video ▪ Litigation Support
404.351.4577

1      A      To a degree.

2      Q      I understand that you were out of town for part of

3   the -- during part of the events that gave rise to this

4   case.  Is that correct?

5      A      Correct.  Most of it.

6      Q      When do you remember first learning about a

7   situation concerning Hayden Barnes?

8      A      I guess when I got back into town.  I guess it was

9   pretty much the last meeting they had.  That's really about

10  all I can remember in regard to that.

11     Q      Did you attend that meeting?

12     A      Yes, I did.

13     Q      And that would've been back right when you got into

14  town?

15     A      Uh-huh.

16     Q      And where was that meeting?

17     A      It was in the President's conference room.

18     Q      And do you remember who else was in attendance?

19     A      I can remember some.  I'm not sure I can remember

20  all.

21     Q      Who are some of them?

22     A      Dr. Zaccari, Theresa Boyd, Dr. Keppler, Dr. Levy.

23  I think Lavern may have been in there.  Gaskins.  That's

24  about all I can remember.  There may have been a few other

25  people in there.  I think Russ Mast was in there.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      Q      And this would've been around May 3rd.  Is that
 2    right?
 3      A      I don't know.  I don't recall the date.
 4      Q      Do you recall the trip that caused you to be out of
 5    town?
 6      A      No.  I probably could look it up on the travel but
 7    no.  It would've been a conference.  That was in May.  I
 8    don't know this for a fact, but I'm going to assume I was at
 9    Saint Thomas University in Minnesota.  I think that may be
10    correct.  I'm not sure.
11      Q      This meeting you attended when you got back, was
12    Ann Farmer also there?
13      A      I don't recall.  I don't think she was.  She may
14    have been.  I don't know.  I don't recall.
15      Q      How did you learn about this meeting?  Did somebody
16    call you and invite you?
17      A      Yeah.  Dr. Zaccari's office.  It probably was
18    Theresa Boyd.
19      Q      So, was that the first time you learned of Hayden
20    Barnes?
21      A      Yeah.
22      Q      So, did you speak at all at this meeting?
23      A      No, not that I recall.
24      Q      Did President Zaccari run any ideas by you, that
25    kind of thing?
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1       A       He showed me a picture.  It was a photocopy.  I

2    can't recall what was on it.  It was a parking deck, but

3    that was about all I can recall from that.

4       Q       What else was discussed at this meeting that you

5    can recall?

6       A       A letter that would need to be delivered.

7       Q       And what was that letter?

8       A       I'm not sure exactly what was in the letter because

9    it was discussed with Student Affairs.

10      Q       It was a letter pertaining to Hayden Barnes,

11   though?

12      A       I would assume so.

13      Q       About how long did the meeting last?

14      A       Maybe an hour.

15      Q       Did anybody present discuss matters of police

16   procedure at all?

17      A       I believe we were asked to deliver it and that was

18   about it.  But as far as police procedure, that's the only

19   thing I'm aware of was we were asked to deliver it.

20      Q       So, you were asked to have the Police Department

21   deliver the letter?

22      A       Uh-huh.

23      Q       Who asked you?

24      A       I'm going to say it was Dr. Zaccari, but I'm not

25   100 percent sure that it was him that specifically said

1    that.  That would be my guess.

2        Q    Did he give you any special instructions about the

3    delivery of the letter?

4        A    No, not that I recall.

5        Q    Did he give you an address?

6        A    No, not me.  Not that I recall.  I guess Ms. Farmer

7    was there and may have discussed it with her.  I was kind of

8    like on the outskirts of the whole thing because I really

9    didn't know what was going on.

10           (The document was marked for identification as

11       Plaintiff's Exhibit Number One.)

12   BY MR. FEDELI:

13       Q    Exhibit one.  This is a June 21, 2007 letter from

14   Dr. Zaccari to Elizabeth Neely at the Board of Regents.

15   Have you seen this letter before?

16       A    I don't know.

17       Q    I call your attention to page four of the letter,

18   the section that starts with the number 13.  In the middle

19   of here you're mentioned as someone who participated in the

20   decision to minimize security risks --

21       A    Uh-huh.

22       Q    -- on the VSU campus.

23       A    Uh-huh.  Okay.

24       Q    And then the following sentence discusses

25   monitoring Mr. Barnes' student activities and placing high

Page 11

1     security on public appearances.

2        A     I'm familiar with two things in regard to that.

3        Q     And what are those two things?

4        A     One, he asked for protection at Drexel Park, and

5     there was a Board of Regents meeting at Georgia Southern

6     that he -- we didn't have anything to do with Georgia

7     Southern, but I was aware that the Board of Regents was

8     concerned or he was concerned somehow with that meeting.

9        Q     Okay.  Right at the first sentence of this

10    paragraph 13 here, first step was to alert VSU campus police

11    on or about April 20 of the student's, Hayden Barnes,

12    behavior and potential risk.

13             Did you become aware of Hayden Barnes at this time?

14       A     Not that I recall.

15       Q     What were the necessary steps that you, along with

16    Dr. Zaccari and Ann Farmer, took to minimize possible

17    security risks?

18       A     The incidents that I recall --

19       Q     Just those two instances?

20       A     -- that I mentioned earlier.

21       Q     Okay.  When was the first time you remember

22    speaking to Ann Farmer about Hayden Barnes?

23       A     When I got back from the trip.

24       Q     Was it before or after the meeting that we had just

25    talked about?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A     Before.

2      Q     Okay.  And how did that conversation go?

3      A     Basically, she advised me of the incidents at

4   Drexel Park and Georgia Southern.

5      Q     Okay.  Did she tell you about what was going on

6   with Hayden Barnes, in general?

7      A     Just that there was a concern.  The President had a

8   concern.

9      Q     Concern meaning, you know, concerned -- what kind

10   of concern?

11     A     I guess -- I don't know how to really answer that

12   question to be honest with you.  It was just said there was

13   a concern.  I didn't think much of it at that particular

14   time but to the point, obviously, that he was concerned

15   about himself in regard to having someone at the park.

16     Q     So, it was a concern for his personal safety?

17     A     I would assume so, yes.

18     Q     Based on this student, Hayden Barnes?

19     A     Yes.

20     Q     Did Ann Farmer ever ask you about helping

21   Dr. Zaccari obtain a restraining order against Hayden, if

22   you can remember?

23     A     I believe it was mentioned.

24     Q     And what did you say?

25     A     At that particular point -- it had to do with

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     because he was a student at that particular time.  I'm sure

2     that it had to go through Student Affairs as to what

3     actually could be done and what couldn't be done.

4        Q    That was your opinion?

5        A    That's my opinion.

6           MR. FEDELI:  Exhibit Two.

7           (The document was marked for identification as

8     Plaintiff's Exhibit Number Two.)

9     BY MR. FEDELI:

10       Q    May 9th, 2007, memorandum from Ronald Zaccari to

11    staff.  Have you seen this document before?

12       A    Yes.

13       Q    And were you aware of the decision memorialized in

14    this document to withdraw Hayden Barnes?

15          MS. HANCE:  Object to form.

16    BY MR. FEDELI:

17       Q    Did you know of this administrative withdrawal

18    prior to receiving this document?

19       A    It was discussed at the meeting.

20       Q    Do you remember Dr. Zaccari asking you about your

21    assistance with administratively withdrawing the student

22    beyond delivering the letter at any other time?

23          MS. HANCE:  Object to form.

24    BY MR. FEDELI:

25       Q    Any other conversations with Dr. Zaccari other than

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      that one meeting about Hayden Barnes?

2          A     Not that I recall.

3          Q     This memo seems to indicate Mr. Barnes will be

4      given 48 hours to vacate Residence Hall.  Is that standard

5      procedure for this kind of withdrawal as far as you know?

6          A     Yes.

7          Q     And why is that?

8          A     We've had students that have been caught with

9      marijuana in their room, and they're normally given 48 hours

10     to vacate a room for breaking a housing contract.

11                (The document was marked for identification as

12          Plaintiff's Exhibit Number Three.)

13     BY MR. FEDELI:

14         Q     May 7th, 2007, letter from Zaccari to Hayden

15     Barnes.  Chief Doner, have you ever seen this before?

16         A     (Reviewing document.)  I don't believe so.  Doesn't

17     ring a bell with me.

18         Q     Could you take a look at that first sentence of the

19     letter.  "As a result of recent activities directed towards

20     me by you," et cetera, et cetera, "You are considered to

21     present a clear and present danger to this campus."

22                Ever seen that phrase used in a withdrawal of a

23     student before?

24         A     I have a question.

25                MS. HANCE:  For Chris or for me?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1              THE WITNESS:  For you.
2              MS. HANCE:  Okay.
3     BY MR. FEDELI:
4        Q    The proper procedure is just answer it to the best
5     of your knowledge; and if you want to take a break later, we
6     can.
7        A    Okay.
8              MS. HANCE:  I mean, you can say what you're
9     thinking.  I mean --
10             THE WITNESS:  Okay.  The answer is no.  But I don't
11    generally see those because they're delivered by Student
12    Affairs.
13             I don't generally see them.  So, if somebody has
14    pretty much delivered an administrative letter, I'm not
15    aware of it because it's handled through Student Affairs.
16             It's more of an administrative type thing than it
17    is a legal thing, a law thing with campus police.  So,
18    no, I have not.
19    BY MR. FEDELI:
20       Q    What's your understanding of the use of that
21    phrase:  Clear and present danger to the campus?
22       A    That it's possible to be an immediate threat.
23             MS. HANCE:  Did you still need to speak with me?
24             THE WITNESS:  No.  That was the only thing.  I
25    mean, it's hard for me to say if Student Affairs has used
```

Page 16

CHIEF HOWARD SCOTT DONER 7/8/2009

```
1      that term before because I'm not generally privy to their
2      information.
3   BY MR. FEDELI:
4      Q    I think that answers the question.
5           Do you know why a student who was considered to be
6   a clear and present danger to the campus was given 48 hours
7   to vacate the Residence Hall?
8           MS. HANCE:  Object to form.
9   BY MR. FEDELI:
10     Q    You can answer the question if you understand.
11     A    Okay.  We've mentioned that before.  That's normal,
12  standard procedure for a student that's administratively
13  been removed.
14     Q    Is it standard procedure for your Police Department
15  if you receive information that a student is an immediate
16  danger to cause violence to give them 48 hours?
17     A    That's --
18          MS. HANCE:  Object to form.
19          THE WITNESS:  It's been the same.  I mean, 48 hours
20      has been the standard thing we've gotten for anybody
21      that's been kicked out of school for anything.  That's
22      standard.
23  BY MR. FEDELI:
24     Q    Well, what about in a different context?  What if
25  one of your police officers encountered a student, you know,
```

Page 17

**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
*404.351.4577*

 1    threatening to carry out a shooting on campus in broad

 2    daylight.  Would they get 48 hours?

 3            MS. HANCE:  Object to form.  I don't really see

 4        where you're going with this.

 5    BY MR. FEDELI:

 6        Q    You can answer my question if you understand it.

 7        A    I don't understand what you're trying to get at.  I

 8    mean, the 48 hours is the standard for just about everything

 9    that I'm familiar with.

10        Q    Does your Department ever arrest students?

11        A    Yes.

12        Q    And when do they do that?

13            MS. HANCE:  Object to form.

14    BY MR. FEDELI:

15        Q    For example?

16        A    I could go get the records but, I mean, geez.  I

17    couldn't even begin to tell you how many we've arrested.

18    But, yeah, we do it.

19        Q    And your officers arrest students whenever they see

20    a student committing a crime, correct?

21            MS. HANCE:  Object to form.

22            THE WITNESS:  We don't always arrest.  We can issue

23        a citation.

24    BY MR. FEDELI:

25        Q    If it was a violent crime?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     A     Yes.

2     Q     Yes, they would be arrested?

3     A     Yes.

4     Q     What is your procedure for when a complaint is made

5     regarding a student making threats of violence?

6     A     Well, we have several choices.

7     Q     What are they?

8     A     They can contact us and fill out a police report.

9     They can contact a minister.  They can contact counseling.

10    They can contact Student Affairs.  They can contact their

11    Dean.

12    Q     And when you say "they," you're talking about the

13    student or the person being threatened, correct?

14    A     The complainant, yes.

15    Q     Okay.  Was one of those options a minister, you

16    said?

17    A     Yes.

18    Q     You mean a religious figure?

19    A     Yes.

20    Q     And if they decided they wanted the police to deal

21    with it, what would your procedures be?

22    A     We would take a police report.

23    Q     And then what would you do?

24    A     It would be turned over to an investigator.

25    Q     An investigator within your Department, correct?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    Correct, if it occurred on campus.

2    Q    And what kind of steps would the investigator

3    usually take?

4    A    He would interview the complainant, find out more

5    information.

6    Q    Okay.  What else?

7    A    From there it would depend on what information was

8    gathered.  He may go talk to the suspect or the people that

9    were involved and gather whatever witness information; and

10   if they felt that, more or less, a crime had been committed,

11   then he'd probably go get a warrant.

12   Q    And what if a crime had not been committed but

13   there was a danger or a threat of one?  What would happen

14   then?

15   A    Student Affairs.  The report would be turned over

16   to Mr. Richard Lee.  Well, Judicial Affairs.  They've got a

17   whole separate thing that we're not -- how they deal with

18   students, we're not privileged to.

19   Q    And so that would be one option, referring to

20   Student Affairs?

21   A    Right.

22   Q    And would there be an option of assisting with

23   getting a restraining order against the student?

24   A    Anyone that asks us for one, we would assist.

25   Q    You would assist.  To your knowledge, were any of



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    these procedures followed for Hayden Barnes?

2        A    Not to my knowledge, no.

3        Q    No one from your police -- from your police force

4    interviewed Hayden Barnes to your knowledge?

5        A    No.

6        Q    So, it wasn't really an investigation.

7             MR. LaVALLEE:  Object to the form.

8    BY MR. FEDELI:

9        Q    You can answer.

10       A    Not that I'm aware of.

11            (The document was marked for identification as

12       Plaintiff's Exhibit Number Four.)

13   BY MR. FEDELI:

14       Q    This is Exhibit Four.  Article, January 2006,

15   Training Campus Security in Disabilities Can Lessen

16   Liability.  This is a publication of the Campus Legal

17   Advisor.

18            Chief Doner, have you ever seen this article

19   before?

20            MS. HANCE:  Where did you get this from, Chris?

21            MR. LaVALLEE:  That's a good question.

22            MS. HANCE:  Did we produce it to you?

23            MR. FEDELI:  You know, I'm not a hundred percent

24   sure, but I can check on that.

25            MS. HANCE:  Let's just kind of slow down for a

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1        second so we can all read it.
 2             (Pause.)
 3             THE WITNESS:  Okay.
 4   BY MR. FEDELI:
 5        Q    Okay.  You're actually quoted in here, right?
 6        A    Yes.
 7        Q    And what were you talking about in this article?
 8        A    Basically, students that are on drugs that are
 9   prescribed by a doctor or students that are deaf or that are
10   blind or whatever, we don't necessarily know about that.
11   But going through training, we can recognize those signals.
12             We can also take some type of sign language so that
13   we can communicate with our deaf students or hearing
14   impaired.
15             MS. HANCE:  Which quote are you talking about?  I
16        mean, you say you notice he's quoted in here.  I mean,
17        there are several quotes.
18             MR. FEDELI:  I was asking for however Chief Doner
19        would like to ask (sic) it.
20             MS. HANCE:  What?
21             MR. FEDELI:  I wasn't asking about a particular
22        quote.
23             MS. HANCE:  Okay.  So, what was your initial
24        question and then --
25             MR. FEDELI:  I think he's already answered it.  We
```

Page 22

```
 1      can keep going on, though.
 2             MS. HANCE:  Are you going to keep asking about this
 3      article?
 4             MR. FEDELI:  Yes.
 5             MS. HANCE:  Okay.
 6   BY MR. FEDELI:
 7      Q    Does this article also talk about general
 8   protections that should be in place for any student with a
 9   disability?
10             MS. HANCE:  Object to form.
11             THE WITNESS:  Could you repeat the question for me,
12      please?
13   BY MR. FEDELI:
14      Q    This article seems to talk about, you know, how
15   police generally -- in particular, police at VSU -- learn to
16   treat individuals and students with disabilities.  Is that
17   correct?
18      A    Correct.
19      Q    And do you have a training program in place at VSU
20   for that?
21      A    Basically, for the handicapped in regards to
22   getting students that are in wheelchairs down steps.
23      Q    And do police officers receive training beyond
24   that?
25      A    In the Police Academy.
```

Page 23

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    How about at VSU?

2    A    We've had some with the Office of Access Service in

3    regard to deaf students and in regard to blind students.

4    Q    Okay.  And in paragraph four of this letter, of

5    this article, rather, his -- meaning your officers -- go

6    through a training course to help them learn about various

7    disabilities and understand how they can affect behavior.

8         Do you know what that refers to?

9    A    I'm referring to the deaf and blind students.

10   Before we had our fire alarms changed to have the -- I

11   forget what you call it -- flashing lights, if someone were

12   standing out in the hallway, to make sure that they notifies

13   us of a deaf student or of a student that's in a wheelchair.

14   Q    Just so I understand correctly, the training is for

15   dealing with deaf and blind students or students in a

16   wheelchair.  Is that correct?

17   A    True.

18   Q    Any other disabilities covered?

19   A    Not that I'm aware of, no.

20   Q    So, your officers don't go through a training

21   course for learning about disabilities beyond blindness,

22   lack of hearing and being in a wheelchair?

23        MS. HANCE:  Object to form.  Asked and answered.

24   BY MR. FEDELI:

25   Q    You can answer if you understand.



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     A     Yes.

2     Q     Yes, they --

3     A     Do.

4     Q     They do?  And what is that training?

5     A     At the Police Academy.

6     Q     I see.  And that Police Academy training which

7  officers in your police force would have gone through and

8  you verify that -- correct?

9     A     Yes.

10    Q     -- will have covered a broader range of

11  disabilities.  Is that right?

12    A     Yes.

13    Q     So, by that training that your officers have, would

14  they usually inquire about any disabilities of a target of

15  an investigation?

16          MS. HANCE:  I'm sorry.  Can you repeat that

17     question?  Can you read it?

18          (The requested portion was read back by the Court

19     Reporter.)

20          MS. HANCE:  Object to form.

21          THE WITNESS:  I'm not clear on what you're trying

22     to get at.  In regards to an investigation, I'm -- can

23     you rephrase it some way?

24  BY MR. FEDELI:

25    Q     I'll break it down for you.  The officers get some

Page 25

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1     training on disabilities in the Police Academy, right?
 2         A     Yes.
 3         Q     And the purpose of that training is to learn how to
 4     deal with, you know, people who have disabilities and the
 5     various rules applicable under the Americans with
 6     Disabilities Act, correct?
 7               MS. HANCE:  Object to form.
 8     BY MR. FEDELI:
 9         Q     Is that your understanding of the training?
10         A     I'm going to say no.
11         Q     What is your understanding of the training?
12         A     That they go through certain types of things that
13     deal with mental disorders or types of things like that.
14     They learn how to deal with that and things to be aware of
15     and things to look for.
16         Q     And when it comes to mental disorders, that's
17     something that they're trained to be aware of and to look
18     for in doing their routine police work, correct?
19               MS. HANCE:  Object to form.
20               THE WITNESS:  Yes.
21     BY MR. FEDELI:
22         Q     Did anybody from your Police Department inquire or
23     investigate into Hayden Barnes' mental disabilities or --
24         A     Not that I'm aware of.
25         Q     You testified earlier that you were present at a
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    meeting where you saw a collage of some sort.  Is that

2    right?

3        A    Oh, the photograph, yes.

4        Q    Yeah.  Did you have anyone in your Department

5    initiate an investigation upon seeing that collage?

6        A    No.

7        Q    Why not?

8        A    It had already been shown, I believe, to Major

9    Farmer.  She would've been aware of that.

10       Q    So, you had assumed that Major Farmer initiated an

11   investigation?

12            MS. HANCE:  Object to form.

13   BY MR. FEDELI:

14       Q    Did you assume that?

15       A    I really didn't assume anything at that particular

16   time.

17       Q    Did you ask Ms. Farmer if she had initiated an

18   investigation?

19       A    No.

20       Q    Did you ask her if she was going to have the

21   student arrested?

22       A    No.

23       Q    Did you ask her if she was going to have a

24   restraining order taken out against the student?

25       A    No.

Page 27

1    Q    In your 29 years at the University, have you ever

2    had a situation where you have had to -- or anyone in your

3    Department has had to get a restraining order against

4    students making threats to teachers?

5    A    Not a -- no.

6    Q    Have you ever had cases where students were making

7    threats?

8    A    Yes.

9    Q    To teachers?

10   A    Yes.

11   Q    How many cases would you say about?

12   A    Two or three.

13   Q    How were those dealt with?

14   A    Administratively.

15   Q    Through the Dean's office or the Office of Student

16   Affairs?

17   A    Correct.

18   Q    So, we've talked about your conversations with Ann

19   Farmer and the meeting you attended where you spoke to

20   Dr. Zaccari about Hayden Barnes.

21        Did you have any other conversations about Hayden

22   Barnes with anybody else?

23        MS. HANCE:  Object to form.  I mean, there's a lot

24   of time that that could cover.  Can you be more specific?

25        MR. FEDELI:  Yeah, sure.

```
 1    BY MR. FEDELI:
 2       Q    During, you know, the time in question:  2007, May,
 3    and going forward through the rest of the year.
 4       A    Not that I recall.
 5       Q    Twenty-nine years of campus law enforcement, ever
 6    have a situation similar to the Hayden Barnes' situation
 7    come up?
 8            MS. HANCE:  Object to form.  Can you talk about
 9       which aspect, Chris?
10    BY MR. FEDELI:
11       Q    Similar set of facts, I guess.
12            MS. HANCE:  Can you be more specific?
13    BY MR. FEDELI:
14       Q    You can answer.
15       A    I guess what I'm getting at is no situation is ever
16    the same.  I have had somewhat similar situations, but I
17    can't say that I've ever had anything that's exactly the
18    same, no.
19       Q    Any case where a president of a university has
20    asked you to take police action against a student?
21       A    That's broad.
22       Q    A student who is making violent threats.
23            MS. HANCE:  Object to form.  Can you be more
24       specific?
25    BY MR. FEDELI:
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1       Q       You can answer.

2       A       When you say violent threats, I mean, specific --

3    can you give me --

4       Q       However you understand the term violent threats to

5    mean.

6       A       I've had presidents that have asked me to

7    investigate a particular thing in regard to that.  I had a

8    threat at Emory in regard to Bishop Desmond Tutu, and that

9    was investigated.

10              Turned out we couldn't figure out who was doing it.

11   We assumed it was a student but couldn't figure out

12   anything.

13      Q       What was the threat in that case?

14      A       Death.

15      Q       And how was that threat communicated?

16      A       It was communicated in an anonymous letter, and we

17   assumed because there was a contingent of some students

18   voicing an opinion about having him at a graduation speech

19   that something would be done.

20      Q       And the letter, without asking you for specifics,

21   said something to the effect of, "We're going to assassinate

22   you"?

23      A       I'm not really sure because I didn't specifically

24   see the letter.  I was an officer at the time.

25      Q       But it was a pretty explicit threat?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      I would assume so, yes.

2      Q      Any other cases along those lines?

3      A      Nothing that I can recall off the top of my head,

4    no.

5             MR. FEDELI:  Can we take a short break?

6             MR. SMITH:  Sure.

7             (A recess was taken.)

8    BY MR. FEDELI:

9      Q      Chief Doner, did you talk to anybody during our

10   break just now?

11     A      I talked to Mr. Rob and I talked to Tim and I

12   talked to the lady that came in here outside that said she

13   had a message for -- to call Dr. Morgan and we were all

14   trying to figure out who -- whether it was for me or whether

15   it was for Leah.  It was probably for Leah.

16     Q      Okay.  Did you talk about this case or the matters

17   being discussed here?

18     A      No.  Well, Mr. Rob asked me if I was in here and I

19   said yes.  But other than that --

20     Q      Okay.  Do you have anything to add to the

21   information we've discussed in the last hour about, you

22   know, this case?  Any other information you can think of?

23     A      No.

24             MR. FEDELI:  You guys have any questions?

25             MR. LaVALLEE:  I have zero questions.

Page 31

```
1              MR. SMITH:  I have none.
2              (The deposition concluded at 2:50 p.m.)
3              (Pertaining to  Federal Rules of Civil Procedure
4     and/or O.C.G.A. 9-11-30(e), the deponent and/or a party
5     having requested the right to review the deposition,
6     making corrections and/or changes and signing, for that
7     purpose the errata pages have been annexed hereto.)
8
9
10
11
12
13                              .
14
15
16
17
18
19
20
21
22
23
24
25
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1                  C E R T I F I C A T E

2    STATE OF GEORGIA:

3    COUNTY OF LOWNDES:

4           I hereby certify that the foregoing transcript was

5    taken down, as stated in the caption, and the questions and

6    answers thereto were reduced to typewriting under my

7    direction; that the foregoing pages 1 through 32 represent a

8    true, complete, and correct transcript of the evidence given

9    upon said hearing, and I further certify that I am not of

10   kin or counsel to the parties in the case; am not in the

11   regular employ of counsel for any of said parties; nor am I

12   in any way interested in the result of said case.

13          This, the 18th day of July, 2009.

14

15

16          /s/ Sarah Williams

17   SARAH WILLIAMS, FPR, RPR, CCR B1653

18

19

20

21

22

23

24

25

                                                      Page 33

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                          DISCLOSURE
 2    STATE OF GEORGIA         Deposition of:  CHIEF HOWARD DONER
 3    COUNTY OF LOWNDES:    Date:  JULY 8, 2009
 4         Pursuant to Article 10.B of the Rules and Regulations
 5    of the Board of Court Reporting of the Judicial Council of
 6    Georgia, I make the following disclosure:
 7         I am a Georgia Certified Court Reporter.  I am here as a
 8    representative of Wheeler Reportings.  I am not disqualified
 9    for a relationship of interest under the provisions of
10    O.C.G.A. §9-11-28 (c).
11         Wheeler Reporting was contacted by the offices of Matt
12    LaVallee, Esq., to provide court reporting services for this
13    deposition.  Wheeler Reporting will not be taking this
14    deposition under any contract that is prohibited by O.C.G.A.
15    §15-14-37 (a) and (b).
16         Wheeler Reporting has no exclusive contract to provide
17    reporting services with any party to the case, any counsel
18    in the case, or any reporter or reporting agency from whom a
19    referral might have been made to cover this deposition.
20         Wheeler Reporting will charge its usual and customary
21    rates to all parties in the case, and a financial discount
22    will not be given to any party to this litigation.
23                         _____
                           Sarah Williams, CCR, FPR, RPR.
24                                   CCR No.  B1653
25
```

**WHEELER
REPORTING**
Court Reporting • Video • Litigation Support
404.351.4577

1           DEPOSITION OF CHIEF HOWARD DONER/SEW

2           I do hereby certify that I have read all questions

3    propounded to me and all answers given by me on the 8th day

4    of July, 2009, taken before Sarah Williams, FPR, CCR, RPR,

5    and that:

6         1) __✓__        There are no changes noted.

7         2) ____ The following changes are noted:

8           Pursuant to Rule 30(e) of the Federal Rules of

9    Civil Procedure and/or the Official Code of Georgia

10   Annotated 9-11-28(c), both of which read in part:  Any

11   changes in form or substance which you desire to make shall

12   be entered upon the deposition...with a statement of the

13   reasons given...for making them.  Accordingly, to assist you

14   in effecting corrections, please use the form below:

15   Page No.        Line No.        should read:

16   _____

17   Page No.        Line No.        should read:

18   _____

19   Page No.        Line No.        should read:

20   _____

21   Page No.        Line No.        should read:

22   _____

23   Page No.        Line No.        should read:

24   _____

25



**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
*404.351.4577*

```
 1  :           DEPOSITION OF CHIEF HOWARD DONER/SEW
 2     Page No.        Line No.        should read:
 3     _____
 4     Page No.        Line No.        should read:
 5     _____
 6     Page No.        Line No.        should read:
 7     _____
 8     Page No.        Line No.        should read:
 9     _____
10     Page No.        Line No.        should read:
11     _____
12     Page No.        Line No.        should read:
13     _____
14
15              If supplemental or additional pages are necessary,
16     please furnish same in typewriting annexed to this
17     deposition.
18
19     _____
20     HOWARD SCOTT DONER
21
22     Sworn to and subscribed before me,
       this the  4TH  day of  August  , 2009.
23
24     _____
       Notary Public
25     My commission expires:
```

Notary Public, Lowndes County, Georgia
My Commission Expires March 28, 2011

Page 36

**WHEELER**
**REPORTING**
*Court Reporting • Video • Litigation Support*

*404.351.4577*

LI08218780



VALDOSTA
STATE
UNIVERSITY.
*Building for Our Next Century*
1906-2006

**Ronald M. Zaccari**

Office of the President

June 21, 2007


Ms. Elizabeth E. Neely
Associate Vice Chancellor for Legal Affairs
Board of Regents of the University System of Georgia
270 Washington Street, S.W.
Atlanta, Georgia 30334

RE:    Application for Review
       Thomas Hayden Barnes
       Valdosta State University

Dear Ms. Neely:

This letter serves as a response to the above referenced matter and the following is a
chronology of events pertinent to your investigation.

**HISTORY**

1. Thomas Hayden Barnes enrolled in Valdosta State University on August 14, 2005
having transferred as a sophomore from Warren Wilson College, Swannanoa, North
Carolina.

2. On March 23, 2007, I was informed by my Administrative Assistant that flyers
opposing planned parking decks had been posted across campus and that Mr. Barnes was
the author of the document. (See Attachment #1)  At that time, I had never met Mr.
Barnes nor had I heard any previous information about any opposition to the parking
decks. Upon reading the flyer, it was apparent Mr. Barnes did not understand the funding
process for parking decks nor was he aware that no state funds could be used to finance
the projects.

3.   Prior to the referenced flyer's appearance, I had several productive meetings with a
campus student group known as S.A.V.E (Students Against Violating the Environment)
and we had accomplished excellent partnerships and related actions steps leading to
positive efforts to initiate recycling and discussions about other environmental projects. I
view the S.A.V.E. organization as a productive means of discussing student issues and
working harmoniously on behalf of Valdosta State University.  On March 26, 2007, I

DEFENDANT'S
EXHIBIT
*Zaccari*
NO.   1-8-09
PENGAD 800-631-6989

LI08218780

asked the leadership of the group if they knew about Mr. Barnes and his view points. They knew Mr. Barnes, but stated he left the organization to pursue his own agenda. The students were concerned that Mr. Barnes' approach was confrontational rather than pursuing open dialogue with the administration.

4. On or about March 26, 2007, following my meeting with S.A.V.E, I received a correspondence from Mr. Barnes (see Attachment #2) stating his apologies and his intent to remove the flyers and discontinue public opposition.

5. Several days prior to the April 17 and 18, 2007 Board of Regents' meeting, Mr. Barnes immediately reversed his decision to discontinue public opposition. I was informed by Vice Chancellor Linda Daniels that Mr. Barnes had been contacting the Governor's office, the Chancellor's office, and members of the Board of Regents. Mr. Barnes had voiced his opinions and requested referenced offices and individuals to immediately disallow the parking decks. When asked by those with whom he had personal telephone contact if he had met with the VSU president and discussed his view points, his response was that he had. His response represented an abuse of the truth as I had never engaged in any conversation with Mr. Barnes. Other than the correspondence of a short-lived apology, I had never met or interacted with this student. Mr. Barnes' actions led to a series of what I consider to be erratic behavior. Without regard to accurate information and open dialogue with individuals who could have provided valuable data about VSU's parking needs and related planning, he purposely misrepresented the truth and aggressively asked the various high-ranking state offices and officials to disallow VSU's parking decks.

6. On April 16, 2007, I received a telephone call from Vice Chancellor Linda Daniels asking for a description of his physical appearance. I related to Vice Chancellor Daniels that I had never met Mr. Barnes, nor could I relate any specific information about the student. There was a concern that Mr. Barnes would appear at the Board of Regents meeting scheduled days later at Georgia Southern University and stage a protest. The Georgia Southern University Police department was alerted by Vice Chancellor Linda Daniels to a possible public protest.

7. Following my call with Vice Chancellor Daniels, on April 16, 2007, I requested a meeting with Mr. Barnes and required VSU's Dean of Students, Mr. Russ Mast, to be present for the meeting. Mr. Barnes arrived at my office on April 16, 2007 at the appointed time (5:00 pm). He requested that another VSU student (his girlfriend) be permitted to participate in the meeting. I refused his request because the meeting did not involve the actions of his girlfriend.

The meeting lasted for approximately one hour and ten minutes. The topics discussed included his lack of knowledge of how parking decks are financed, required business models (public/private partnerships), mandated processes/sequences in the University System of Georgia Master Planning process, and procedures for Board of Regents approval. I explained that no state funds are permitted to construct the proposed decks. Although he appeared to listen, my attempt to provide an overview resulted in his

suggestion that rather than building parking decks, the funds should be diverted to such projects such as Amazon Rain Forest Protection and housing for Katrina Hurricane victims. When I explained the business plan involved borrowing funds through a long-term bond with external lenders, he had no response. I again emphasized that state funds could not be used to construct parking facilities and outlined that private/public partnerships required a conduit of funds into the project to pay the lenders over a prescribed period of the bond agreement. When asked why he failed to communicate his concerns through the VSU Student Government Association, he stated, "they are no help to my cause."

The remaining time was spent attempting to redirect his energies in a more positive direction and recommending ways in which to build relationships that would assist in coalescing individuals and engaging people to support his view points. I suggested that his current approach drives people in opposing directions. I stated that I wanted to advise him as I would in mentoring my own two sons. He was not interested in my views, a fact supported by the student's subsequent statements that mock my attempt to advise and communicate with him.

8. On Friday, April 20, 2007, Mr. Barnes sent an email to me (see Attachment #3) referencing Easter Island and mocking the meeting's discussion of required business plans. I began to view Mr. Barnes' behavior as the inability to listen, opposition to the administrative policies of the University and the University System of Georgia, and interested in only promoting self interests. No other views, other than his own, appeared to be of interest.

9. VSU's entries on the Board of Regents' meeting agenda (April 17-18, 2007) were approved, including the parking decks. Several days following the BOR meeting, Dean Mast provided a copy of a document generated by Mr. Barnes, wherein he had posted my picture on an image of a parking deck with the words, "S.A.V.E.- Zaccari Memorial Parking Deck" (see Attachment #4).

10. He additionally posted and made reference to the shooter of the April 16, 2007 Virginia Tech slayings (see Attachment #5). The topic of Attachment #5 is focused on the misunderstandings of people who suffer from psychological disorders. Also, included on the second page of the article referenced in Attachment # 5 is a reference to "Shoot it. Upload it. Get famous. Project Spotlight is searching for the next big thing. Are you it?"

11. An additional entry on Attachment #5 was brought to my attention by my Administrative Assistant that referenced Mr. Barnes' personal statement, "Hayden is cleaning out and rearranging his room and thus, his mind, or so he hopes".

12. At this point in the chronology of events, a pattern emerged in the student's behavior. First, a flurry of aggressive actions with inaccurate information, then a written apology followed by an immediate reversal, telephone calls to state offices and Board of Regents, posting my picture as "memorial", and reference to the Virginia Tech shooter. These were documented sequential signs that indicated possible threats to me and the campus.

LI08218780

Since I am not an expert in assessing the psychological status of an individual, but have the appointed responsibility as VSU president and the safety of the campus, I took specific action.

13. The first step was to alert VSU Campus Police on or about April 20, 2007 of the student's behavior and the potential risk if we fail to monitor his actions. Due to the heightened awareness of the Virginia Tech shooting and the national focus on "what should have been done", "what could have been done", "what university presidents must do to protect and possibly prevent such incidents", and "what signs of overt student behavior should immediately be addressed", I sought the advice of the members of the President's administrative unit consisting of Dr. Kurt Keppler, Vice President of Student Affairs, Dr. Louis Levy, Vice President of Academic Affairs, Mr. James Black, Vice President of Finance and Administration, Mr. Scott Sikes, Vice President of Institutional Advancement and Dr. Marsha Krotseng, Associate Vice President for Strategic Research and Analysis. The administrative unit, along with Mr. Scott Doner, VSU's Police Chief and Ms. Ann Farmer, Assistant Chief of Police and I collectively decided that VSU take necessary steps to minimize as much as possible any security risks. Due to the near ending of the Spring academic semester (approximately one week from final examination schedule), it was decided that we monitor Mr. Barnes' student activities and place high security on my public appearances. Non-uniformed campus officers were assigned to patrol my private residence during my off-campus hours, protect my wife and me from potential danger, and uniformed officers were placed on high alert to protect the campus as it concluded the 2007 Spring Semester of classes. My daily schedule was monitored by campus safety officers.

During this timeframe, there were a number of high profile/public events at which I was scheduled to speak, including a weekend Earth Day rally (requested by the S.A.V.E organization), six Commencement Exercises, and the final baseball game for a forty-year career VSU coach.

With high security and monitoring of Mr. Barnes' student activities, appropriate action was taken which allowed the semester to come to a conclusion without alarming the campus that a potentially dangerous situation was brewing, one that could have interrupted final examination schedules. Immediately following the Virginia Tech shooting, the VSU campus received numerous telephone calls from concerned parents inquiring as to what measures VSU was undertaking to protect the campus. Inherent in these inquires were concerns of "copy cat" behaviors.

I took what I believed to be appropriate action and minimize campus focus on Mr. Barnes and his documented behavior by not scheduling a judicial hearing. The exigency of the circumstances dictated action that would not invite alarm. A campus hearing would have involved a judicial panel comprised of students and faculty. This format would have alerted the campus of a potential threat, and would have comprised campus safety by exacerbating potential alarm.

## ISSUE ON APPEAL

Essentially, Mr. Barnes contends that his actions were not intended to be construed as a threat of physical harm toward myself or others; rather, he was simply exercising his First Amendment Rights. Additionally, Mr. Barnes maintains that he was never informed of the reason he was removed from the University.

## DISCUSSION

As with all students, Mr. Barnes is free to enjoy all his constitutional guarantees. However, with this freedom comes the expense of responsibility. It is my understanding, that it is a well settled principal of law that the First Amendment was never intended to bestow upon anyone the right to make a cognizable threat of physical harm.[1] Mr. Barnes takes a questionable approach in advancing the notion that his use of the word "memorial" as reflected in Attachment 4 was an unintentional use of the word. Webster's Dictionary defines the word as "something that is a reminder of ...some person." The common usage and understanding of this word in our society is in recognition of someone deceased.[2] Indeed, even Mr. Barnes' mother agreed that after she viewed the web posting she understood why I would be concerned. (See Attachment # 6, paragraph 3, line 1.)

His mother dismisses the student's actions as "passionate" and references her son as "intelligent", yet asks that VSU dismiss his reference to "memorial" as not knowing its true definition and that he is naïve about such understandings.

If one is to believe that Mr. Barnes has a history of activism regarding complex political issues, then, necessarily, one must conclude that his convenient explanation of his use of the word "memorial" is disingenuous. Further, Mr. Barnes asserts that his web page has limited access and therefore was not intended for my viewing. However, a web site has the potential of being viewed by hundreds. Ultimately, whether or not I viewed the site before or after others is immaterial to the fact that I perceived its contents as a threat of physical harm. However, Mr. Barnes made an affirmative effort to use a particular word to convey the full implication of its meaning. While in retrospect, Mr. Barnes may concede that his actions were inappropriate, I dealt with the facts as they were presented at that time. Accordingly, Mr. Barnes should not expect to be insulated with the protection of the constitution while he engages in disruptive, threatening behavior.

Mr. Barnes and his behavior focus primarily on himself and his views. No one's opinion or appointed office appear to be of value, and authority is something he counters at every possible opportunity with an attitude that "I'll get in your face". He does not follow any protocol, but expects everyone else to follow his protocol and whatever suits his current need and points of view.

---

[1] "The most stringent protection of free speech would not protect a man falsely shouting fire in a theatre and causing panic." *Schenck v. United States* (1919)
[2] For example, we honor our fallen military persons on Memorial Day.

LI08218780

My actions were not taken in response to the student's opposition to the proposed parking decks. The parking decks had been discussed and endorsed for several years through intense planning with campus governance groups such as the Student Government Association, Faculty Senate, Council of Classified Staff Affairs, and the President's Cabinet.    Additionally, an appointed campus Master Plan Committee endorsed the parking decks through a mandated Board of Regents Ten-year Master Plan update that the University System of Georgia directed me to conduct when I assumed the VSU presidency in January, 2002.  The revised Master Plan was done in concert with the Facilities Office of the University System of Georgia, external consultants, and the VSU campus.  A twenty-four month period of hard work and a campus master plan were endorsed and accepted at the May, 2004 meeting of the Board of Regents.  Extensive campus dialogue took place at all levels of open campus governance and public forums were held to discuss the pros and cons of the proposed Master Plan.  External consultants were hired to conduct extensive research about VSU's ten-year growth and the projected facility and parking needs to serve current and future students, faculty, and staff.

My point:  The parking decks were an integral part of the accepted Master Plan and based on projected parking needs that documented a deficit of 2,700 parking spots by the year 2014.  Mr. Barnes was not enrolled at VSU when the external consultants engaged the campus in the revised Master Plan; however, he embarked on a public opposition to the parking decks without gathering pertinent information about the lengthy planning and strategic action required to implement such an expansive project.  Had he requested the information in a logical inquiry, my staff and I would have supplied the information. Although Mr. Barnes opposed the parking decks, his opinion was not accepted as a mainstream voice; thus, I had no concern about his position.  Obviously, his voice had no impact on the Board of Regents' decision to approve the construction of the two decks (approval took place at the April, 2007 meeting of the Board of Regents).

Indeed, Mr. Barnes recently displayed behavior that is in keeping with the observation that his focus is primarily on his concerns.  The Board of Regents does not have a regularly scheduled meeting in July. Yet, following his appeal of this matter to the Board of Regents, Mr. Barnes, sent a communication to the VSU's Director of Housing, complaining, among other things, that the Board was "stone-walling" his appeal. (See Attachment # 7.)

Mr. Barnes' inclusion of my picture on his web site, coupled with the Virginia Tech tragedy, and his subsequent posting of an article wherein the author expresses "empathy with the shooter", culminated in the need to make a decision in the interest of my safety and that of the campus community.

I seek to dismantle obstacles that interfere with an individual's ability to pursue and fulfill his or her goals in an environment that is conducive for achievement. Consistent with this philosophy, I carefully weighed Mr. Barnes' interest in continuing his enrollment at VSU against the competing interest of campus safety. In the final analysis, based on the foregoing series of events, I determined that the overall interests of the

LI08218780

campus community were paramount to that of Mr. Barnes'.

As university administrators, we must try to understand how and why such events such as the Virginia Tech shootings happen and to consider carefully what precautions we can take to prevent them. I made my decision based on the belief that I was at risk and there was a real threat to my safety, the safety of my spouse, the safety of my administrative staff, and there existed a potential campus threat such as the one that occurred on the Virginia Tech campus, April 16, 2007.

As I am not an expert in the field of mental health, and because of my concern for campus safety, I felt it necessary to defer to the experts and incorporated their input as a condition for Mr. Barnes readmission to the University. Hence, my request for a professional evaluation was included in his administrative withdrawal and as a condition for readmission.

Mr. Barnes' behavior was disruptive to the administrative operation of the University and he was fully informed of the reason for his removal as set forth in Attachment #8.


RECOMMENDATION

My decision and the actions of VSU personnel permitted the campus to complete its Spring Semester. Mr. Barnes was able to complete his course work, and now he is given the opportunity to assess his behavior patterns, seek help, and decide whether he wants to return to VSU, transfer to another institution, and in general function on any post-secondary institution in order to achieve a college degree.

My actions were not intended to permanently withdraw the student from Valdosta State University, but to request the student to seek professional psychiatric assistance and allow VSU's administrative staff to assess his request for continued enrollment. He has the opportunity to present requested information for reevaluation of his readmission.

In closing, I offer the following quote from the May 11, 2007 edition of the Chronicle of Higher Education:

*"After the tears, the makeshift memorials, and the intensely painful series of funerals, higher education must come to grips with the fact that it had its own September 11. It will never be, nor should it be, the same again at our nation's colleges and universities."*

Let's look at September 11 and its aftermath. Let's review all of the reports that state how we should have paid more detailed attention to signs, analyzed more carefully apparent signs and pieces of information, and developed more proactive approaches to preventing such events and similar future events. Those are the underlying premises from which VSU took the action that is now under appeal. Those are the very reasons

LI08218780

why VSU stands firm on its actions and decisions.  The campus was able to come to a point of resolution with safety, the continued effective regional mission firmly in place, and the successful completion of classes and final examinations. Mr. Barnes was able to complete his academic work and receive final grades.  He now has the opportunity to present a case for readmission to Valdosta State University.

The unfortunate outcome in this appeal is that the student fails to understand that he must be responsible for his actions and words.  He is in this situation because he chose to place himself squarely in a critical path -- one of his own creation.


Sincerely,

Ronald M. Zaccari,
President



**VALDOSTA**
**STATE**
UNIVERSITY
*Building for Our Next Century*
*1906-2006*

**Ronald M. Zaccari**
*Office of the President*

<u>MEMORANDUM</u>

**To:**   Mr. James Black, Vice President for Finance and Administration
Mr. Scott Doner, Director of University Police
Dr. Thomas Hardy, Director of Housing
Mr. Chuck Hudson, Registrar
Dr. Kurt Keppler, Vice President for Student Affairs
Dr. Louis Levy, Vice President for Academic Affairs
Mr. Russ Mast, Dean of Students

**From:**   Ronald M. Zaccari

**RE:**   Administrative withdrawal of Mr. Thomas Hayden Barnes
VSU Student ID #870220374

**Date:**   May 9, 2007

Effective May 9, 2007 Mr. Thomas Hayden Barnes, VSU student, has received notification that he has been administratively withdrawn as a Valdosta State University student.  Mr. Barnes will be given 48 hours to vacate (5 p.m. May 11, 2007) form Converse Residence Hall and his entire May semester courses dropped without penalty.  He is to receive full refund for housing, meal plans, and other charges.



**Location** 117 West Hall • **Address** 1500 N. Patterson St. • Valdosta, GA 31698-0180
**Phone** 229.333.5952 • **Fax** 229.333.7400 • **Web** www.valdosta.edu • **E-mail** rzaccari@valdosta.edu
A Regional University of the University System of Georgia & an Equal Opportunity Institution



VALDOSTA
S T A T E
UNIVERSITY
*Building for Our Next Century*
1906-2006

**Ronald M. Zaccari**
*Office of the President*

**May 7, 2007**

**Mr. T. Hayden Barnes**
**VSU Box 8106**
**Valdosta, GA 31698**

Dear Mr. Barnes:

As a result of recent activities directed towards me by you, included but not limited to the attached threatening document, you are considered to present a clear and present danger to this campus. Therefore, pursuant to Board of Regents' policy 1902, you are hereby notified that you have been administratively withdrawn from Valdosta State University effective May 7, 2007.

Provided that you satisfy any and all necessary academic requirements at that time of application, your readmission to this University and continued enrollment at this institution is conditioned upon your submitting the following:

1.  A correspondence from a non-university appointed psychiatrist indicating that you are not a danger to yourself and others.

2.  Documentation from a certified mental health professional indicating that during your tenure at Valdosta State you will be receiving on-going therapy.

Generally, decisions of the University may be appealed to my office. However, because this matter directly concerns me, should you elect to appeal my decision, you should submit your written appeal within twenty (20) days of receipt of this letter to the Board of Regents at the following address:

**Board of Regents of the University System of Georgia**
**270 Washington St. S.W.**
**Atlanta, Georgia 30334**



Sincerely,

Ronald Zaccari
President

Location 117 West Hall • Address 1500 N. Patterson St. • Valdosta, GA 31698-0180
Phone 229.333.5952 • Fax 229.333.7400 • Web www.valdosta.edu • E-mail rzaccari@valdosta.edu
A Regional University of the University System of Georgia & an Equal Opportunity Institution

CAMPUS
LEGAL ADVISOR

| Training Tools | **5** |

## Training campus security in disabilities can lessen liability

### Officers, emergency staff are often first responders to nonclassroom situations

With growing numbers of college students with psychological and other hidden disabilities, the likelihood of one of them being caught in an emergency has increased.

How well your institution's security officers handle incidents may depend on two things: how well they are trained to deal with disabilities and how much they know about the person involved.

The first issue is the simpler of the two to overcome. Improving police handling of students with disabilities can be done through training, says **H. Scott Doner**, police chief at **Valdosta State University** in Georgia.

His officers go through a training course to help them learn about various disabilities and understand how they can affect behavior.

Officers also have at-hand information on counseling centers and crisis centers where students can get immediate assistance, he says.

"We can call someone and say, 'We have a situation with a John Doe. Where do we take him for help?'" Doner explains.

The second issue is much more complicated, given privacy laws and the unwillingness of some students to disclose their disabilities, he said.

"It presents a situation that is a tough challenge. Our job is to help, but everyone wants his right to privacy. There is a gray area here on how much we can know," says Doner, a former president of **International Association of Campus Law Enforcement Administrators**.

It is best for students to self-disclose because given the world situation, any peculiar action on campus is going to

raise concerns, says **John Denny**, director of disability services at the **University of Florida**.

"I tell the students if they disclose to the right people, the first option is to get them to the mental health or counseling center. Otherwise, the first call could be to the police, and they may wind up being handcuffed. And that can exacerbate a situation," Denny says.

It's not necessary for police to know a student's medical history, but it is important to know the signs of a disability and what he might be going through at the moment, Doner says.

Medical bracelets or similar forms of identification are a big help when students have a disability such as epilepsy or a heart condition, he adds.

"It can tell us this student is not having a drug overdose and that it is something else that needs immediate attention," Doner says.

Denny's office compiles a list of students who have disclosed their disabilities and uses it to assist first responders in an emergency if the situation warrants it.

It's essential that the security office work with the disability services office to create an atmosphere of trust so students feel comfortable disclosing their information, Denny says.

DS offices can assist by taking part in training sessions and providing the name of a contact who can talk to police, Doner says.

"That gives us another avenue to get students the help they need," he notes.  ■

> ### TRAINING TOOLS
> This regular feature puts the law into easy-to-understand terms.

---

### Failure to train officers is viable claim under ADA in shooting incident

Police departments can be sued under the **Americans with Disability Act** if they have not properly trained officers on how to interact with disabled individuals, a District Court in Pennsylvania ruled.

That means your security department can be sued, too. The ruling adds to the debate among courts concerning the extent to which the ADA should regulate police conduct.

**Ryan K. Schorr**, who had bipolar disorder, was shot and killed by an officer from the **West Shore Regional Police Department** in November 2000.

Schorr had been involuntarily committed to a hospital before escaping and returning to his apartment. He was killed during a confrontation that arose when police officers returned to his apartment to take him into custody.

**Stephen S. Pennington** of Philadelphia's **Center for**

**Disability Law and Policy** says the death resulted from inadequate police training. The lawsuit claims violations of Title II of the ADA and the **Rehabilitation Act**, and it adds a due process claim under 42 USC § 1983.

When the defendant, **West Shore Regional Police Commission**, moved for dismissal, the fate of the Title II claim looked dim. A magistrate judge recommended the case be dismissed.

Instead, the District Court determined that the complaint stated a viable claim under Title II. The court said properly executing involuntary commitment warrants, and modifying practices to accommodate the subjects of warrants, are included in "programs, services or activities of a public entity" under Title II. Therefore the court denied the police commission's motion to dismiss the ADA claim.  ■

© 2005 LRP Publications · Reproduction Prohibited
1531-3999/05/$5.00+$3.75

DEFENDANT'S
EXHIBIT
Doner
NO. 4-1-8-09