IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

THOMAS HAYDEN BARNES,                    CASE NUMBER

    Plaintiff,                           1:08-CV-00077-CAP

vs.

RONALD M. ZACCARI, et al,

    Defendants.
_____/


DEPOSITION OF

MAJOR ANN FARMER


JULY 8, 2009

9:10 A.M.



VALDOSTA STATE UNIVERSITY
OAK STREET PARKING DECK
AUXILIARY SERVICES DEPARTMENT
CONFERENCE ROOM
VALDOSTA, GEORGIA



SARAH E. WILLIAMS, FPR, CCR, RPR


Page 1





WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1               A P P E A R A N C E S

2

3     On behalf of Plaintiff:

4     CHRISTOPHER FEDELI, ESQ.
      ERIN N. REID, ESQ.
5     Davis Wright Tremaine, LLP
      Suite 200
6     1919 Pennsylvania Avenue, N.W.
      Washington, D.C.   20006-3402
7

8     On behalf of Defendant Gaskins:

9     DAVID R. SMITH, ESQ.
      Brannen, Searcy & Smith, LLP
10    22 East 34th Street
      Savannah, Georgia   31401
11

12    On behalf of Zaccari, VSU, Board of Regents, Keppler,
                      Mast and Morgan:
13
      HOLLY HANCE, ESQ.
14    Royal Washburn Will
      4799 Sugarloaf Parkway
15    Building J
      Lawrenceville, Georgia   30044
16

17    On behalf of McMillan:

18    MATTHEW R. LaVALLEE, ESQ.
      Daley, Koster & LaVallee, LLC
19    2849 Paces Ferry Road
      Suite 160
20    Atlanta, Georgia   30339

21

22

23

24

25

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                    I N D E X

 2   Examination by Mr. LaVallee            4

 3   Examination by Mr. Smith              71

 4   Examination by Mr. Fedeli             73

 5

 6

 7                  E X H I B I T S

 8   Defendants'

 9   1    Notes of Farmer re:  First Mtg w/Zaccari    74

10   2    Notes of Phone Call w/McMillan              74

11   3    Notes of Farmer re:  Second Mtg w/Zaccari   74

12   4    Notes of Farmer re:  Third Mtg w/Zaccari    75

13   5    Letter, 6/21/07 from Zaccari to Neely       78

14   6    Letter, 5/7/07 Admin. Withdrawal Letter     83

15   7    Memo, 5/9/07 from Zaccari to Staff          86

16   8    Article, 9/11/07...Campus Violence          87

17   9    PowerPoint Presentation - Campus Violence   87

18

19

20

21

22

23

24

25
```

**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
404.351.4577

```
 1            MR. LaVALLEE:  Pursuant to notice and upon
 2     agreement of counsel, this will be the deposition of
 3     nonparty Ann Farmer.
 4            It is being taken pursuant to the Federal Rules of
 5     Civil Procedure and for all purposes allowable under the
 6     Federal Rules.
 7            Objections, except for the form of the question or
 8     the responsiveness of the answer, will be reserved until
 9     time of trial or until this deposition is sought to be
10     used in evidence.
11            Would you swear in the witness.
12     THEREUPON,
13                       MAJOR ANN FARMER,
14     having been first duly sworn, was examined and testified as
15     follows:
16                         EXAMINATION
17     BY MR. LaVallee.
18     Q     Good morning, Ms. Farmer.
19     A     Good morning.
20     Q     Matthew LaVallee, Attorney for Leah McMillan.
21            Before I get into my questions with you, one of the
22     things that you have available to you is after the
23     deposition is taken, you can, you know, have it sent to you
24     and review it and, you know, sign off on it.  Would you like
25     to reserve that right to do that?
```

Page 4

1      A     Yes, I would.

2      Q     Okay.  Great.

3            (Discussion off the record.)

4   BY MR. LaVALLEE:

5      Q     Would you take us through, if you would, your

6   educational background.

7      A     I have an Associate of Arts degree from what used

8   to be DeKalb Community College.  I have a Bachelor of

9   Science degree from Georgia State University.  I worked on a

10  Masters Degree at Georgia State, and I'm currently working

11  on a Masters in Public Administration here at Valdosta

12  State.

13     Q     Those degrees or institutions that you attended,

14  what type of degrees did you get?  What was the discipline?

15     A     Well, my Bachelors of Science, my concentration was

16  in urban studies with a minor in criminal justice.

17     Q     And that was from where?

18     A     That was from Georgia State University.

19     Q     Okay.

20     A     And when I worked on my Masters, I did not attain

21  my degree at Georgia State in my Masters; but my

22  concentration was criminal justice, and here it's public

23  administration.

24     Q     All right.  So, you're currently taking classes

25  towards getting a public administration Masters Degree --

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    Masters.

2    Q    -- from Valdosta State University?

3    A    Yes.

4    Q    All right.  How about your previous law enforcement

5    history?  Would you take us through that.

6    A    I worked for Emory University Police Department for

7    approximately eight to eight and a half years.

8         Then I worked as a Senior Investigator for the

9    DeKalb County District Attorney's office for about eight

10    years, and I have been here at Valdosta State as the

11    Assistant Director of their police department for -- it

12    seems like just yesterday but for about eleven years, going

13    on twelve.

14    Q    So, it would appear that the lion's share of your

15    law enforcement work has been in the context of working at a

16    university, correct?

17    A    Yes.

18    Q    Okay.  What job titles did you hold at Emory at

19    their police department?

20    A    I was an officer, and then I became a shift

21    Sergeant.

22    Q    So, you would've been promoted to shift Sergeant?

23    A    Yes.

24    Q    Give me an idea of what your, like, date-to-day

25    duties were when you were an officer at the Emory Police

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Department.

2        A    We did -- on campus we were responsible for the

3    safety and security of the University property and property

4    owned by the University.

5            Emory University is a large campus.  We were

6    nestled within DeKalb County.  We were also sworn as

7    deputies for DeKalb County, so we were able to effect

8    arrests or serve warrants in DeKalb County on our cases.

9            But we did traffic control.  We did accidents,

10   theft, felony cases.  Your basic, typical police department

11   work for the University.

12       Q    Investigations from time to time?

13       A    Yes.

14       Q    Okay.  When you became a shift Sergeant, was that

15   more of a desk job or were you out in the field?

16       A    No.  Still out in the field, and I was responsible

17   for a shift of people.  It was more of a management position

18   for those people; but at the time, we didn't have a large

19   staff so it was a working Sergeant's position.  So, I also

20   answered calls and did the regular duties, as well.

21       Q    My father was a law enforcement officer.  When he

22   became a Sergeant, one of the things he hated was that he

23   was pushing paper and wasn't out doing stuff.  That's why I

24   asked that.

25       A    Okay.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Let me ask you:  As a DeKalb County Investigator,

2    what type of things did you do with that job?

3    A    I was initially hired -- for the first 18 to 24

4    months, I did nothing but child molestation and child cases,

5    child murders.  Anything having to do with children.  That

6    was my specialty, if you will, for them.

7         Following that period of time, I worked on major

8    felony cases that also predominantly focused on sexual

9    assaults against adults.

10        But I did work on -- the only thing that changed

11   was I didn't work on murders.  We had a special group of

12   investigators that focused on murder cases, but I did some

13   of everything.

14   Q    Which D.A -- did you work for --

15   A    I worked for Bob Wilson and I worked for J. Tom

16   Morgan.

17   Q    Okay.  Great.  Were there any ADA's that you were

18   specifically assigned to that you can recall?

19   A    Ann Long, Jeff Brickman, Mike McDaniel, Jim

20   Richter, J. Tom Morgan when he was just an ADA.

21   Q    All right.  So, let me fast forward a little bit

22   past that to VSU.  You say you've been here 11 years?

23   A    Right.

24   Q    Can you take us where you started and up to where

25   you are now?

WHEELER
REPORTING
*Court Reporting • Video • Litigation Support*
404.351.4577

```
 1     A     Basically, I came in and applied as Assistant
 2   Director, a Major position here at the University.  I have
 3   been responsible for the day-to-day operations of the Police
 4   Department.
 5         Initially, my first couple of years, my boss was
 6   involved in the vice presidency and presidency of the
 7   International Association of Campus Law Enforcement
 8   Administrators.  So, he was gone anywhere from a week to two
 9   weeks every month, so I ran the department in his absence.
10     Q     What time frame are we talking about when you were
11   running the office in his absence?
12     A     Well, I still do that now.  You know, I apologize.
13   I don't know --
14     Q     That's okay.
15     A     -- my exact start year, but it was my first two
16   years that I was here.
17     Q     All right.
18     A     And since that period of time, I am the number two
19   person.  So everybody eventually reports to me.  Depending
20   upon our staffing throughout the last 11 years, I have been
21   responsible for the Patrol Division.  I've been responsible
22   for supervising the Investigators.  I've helped with
23   investigations.
24         I help with hiring decisions, disciplinary
25   decisions, termination decisions.
```



WHEELER REPORTING

Court Reporting • Video • Litigation Support

404.351.4577

```
1              I work with the budget.  Pretty much some of
2     everything within the Department.
3         Q    Do you still roll up your sleeves and do good
4     old-fashioned police work here at the University?
5         A    Yes, sir.
6         Q    Well, let's talk about that in the context of our
7     case.  I want to take you back to the spring of 2007.
8              Did you conduct an investigation on behalf of the
9     Valdosta State University Police Department in early
10    April 2007 regarding Hayden Barnes?
11        A    Yes.
12        Q    Okay.  Could you explain for us what the impetus
13    for that investigation you conducted was?
14        A    At that point in time, I became involved when my
15    boss was out of town.  I was contacted by Dr. Zaccari's, I
16    guess you would call her, administrative coordinator.  I
17    don't know exactly what her title was at the time but
18    Theresa Boyd.
19             There was a meeting; and when they learned Chief
20    Doner was out town, they wanted me to attend.
21        Q    Can I interrupt right quick?
22        A    Yes.
23        Q    When you say your boss is out of town, you're
24    referring to Chief Doner, correct?
25        A    Yes.  I went to that meeting.  At that point in
```

Page 10

1    time, Hayden Barnes was discussed.  That's how I initially

2    became involved.

3        Q    Okay.  When Ms. Boyd called you on the phone, what

4    did she tell you in regard to where you have to go; what

5    type of meeting this is.  Do you recall that?

6        A    I recall that it was -- well, I'm going to refer to

7    my notes.

8        Q    Sure.

9        A    Sorry.

10       Q    That's okay.  You need to quit apologizing.

11       A    Okay.

12       Q    What are you referring to right now?

13       A    I have a tendency to take notes.  I knew that I had

14   notes.  I just have not been able to locate them.

15            I found them yesterday at about 5:15.  I finally

16   found them.  I've been looking for them.  We moved our

17   office in October, so everything was packed up; and I

18   probably have still about six or seven boxes in my office

19   that still have not been unpacked.  So, I've been trying to

20   locate my notes.

21            But I did take notes.  I was involved in three

22   meetings in my boss's absence, and I had notes that I had

23   made during those meetings; so, that's what I'm referring

24   to.

25       Q    Okay.  So let me just try to put this in focus.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          What you're referring to now are your own personal

2     notes that pertain to your investigation into Hayden Barnes?

3          A     I don't understand the question.

4          Q     Okay.  When we get this deposition transcript and,

5     you know, someone reads it -- you're referring to your

6     notes -- I want to make sure the record is clear as to what

7     notes you're looking at, referring to.

8          A     These are my -- I guess you could say these are my

9     notes from the meeting, itself, that I used to reference

10    what was doing on and what I needed to do.

11         Q     Sure.  From all three meetings?

12         A     Yes.

13         Q     Okay.  Great.  So, my initial question to you was,

14    I believe -- gosh, I don't remember what my initial

15    questions was.

16              MR. LaVALLEE:  Would you read it back?

17              (The requested portion was read back by the Court

18         Reporter.)

19              THE WITNESS:  Yes.

20    BY MR. LaVALLEE:

21         Q     When Theresa Boyd called you, what is it that she

22    stated?

23         A     Basically, what she told me was that -- she called

24    me at 8:25 on the morning she called.  I did not put the

25    date down.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          She said that there was going to be a meeting in
2    the President's conference room and that I needed to attend.
3    As far as I can remember, that's all she said.
4         Q    Okay.  Do you have a date?
5         A    No.
6         Q    All right.
7         A    It was prior to April 20th.
8         Q    Okay.  So early April --
9         A    Probably within a week to 10 days of the 20th.
10        Q    Okay.  So, within a week to ten days of the 20th,
11   Ms. Boyd called you and said you need to attend a meeting in
12   the President's conference room.
13          Did she tell you what the subject of the meetings
14   was going to be about?  I mean, was Hayden Barnes referenced
15   in her telephone call to you?
16        A    I don't believe so, but I don't remember.
17        Q    Okay.  Well, let's go to that first meeting.  Tell
18   me who, what, where and how; who was there; what was
19   discussed.
20        A    I can remember, for sure, that the President was
21   there.  Theresa Boyd was there.  Lavern Gaskins was there.
22   Russ Mast was there.  I was there.  Those are the people
23   that I'm positive was there.
24        Q    Was Leah McMillan there?
25        A    No.  Leah was not at any of the meetings that I

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    attended.

2       Q     Okay.  So, when we're talking about the three

3    meetings you attended that pertained to Hayden Barnes, Leah

4    McMillan wasn't at any of those meetings?

5       A     No.

6       Q     So, you've given us kind of a rundown of who was

7    there.  Explain to us what happened at that meeting.

8       A     Basically, we were brought in.  Dr. Zaccari -- my

9    notes were short on this particular meeting.  He talked

10   about -- let me just make sure that this is --

11      Q     Take your time.

12      A     (Reviewing documents.)  He talked about -- he

13   brought up Hayden Barnes' name.  He talked about -- in my

14   notes, I put down notations of what was talked about.

15            One of the things had something to do with

16   reimbursement for a hundred dollars for the parking garage.

17   Hayden wanted to be exempt from the mandated fee.

18            There was some kind of a letter.  I don't know if

19   it was that letter or not.  I was not clear on that.  I

20   hadn't seen anything or heard anything about Hayden Barnes

21   before this day.

22            There was some kind of a letter that was put into

23   Melinda Kutchen's desk in-box.

24      Q     Who is Melinda Kutchens?

25      A     She was one of the secretaries up front.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     Q     Up front meaning?

2     A     In the front of his office.  Dr. Zaccari had three.

3  She did not recall seeing Hayden or anybody come in and

4  leave the letter, but a letter appeared in her box.

5           Dr. Zaccari talked about Hayden.  He said that he

6  had spoken with somebody at South Georgia Medical Center

7  about Hayden and that Hayden had been given a three-month

8  probationary -- a probation from October '06 until the first

9  of February of '07.  He was released from the job due to a

10  lack of competence and skills.  They reported him for

11  walking away from the radio and driving through a red light.

12           He worked as an E.M.T., I believe.

13     Q     Uh-huh.

14     A     No progress on his skills based on action plans.

15  There were comments from his direct supervisor -- I don't

16  know who that was -- that were disturbing.  There was no

17  discussion of what that meant, and I do not know who the

18  supervisor was.

19           At that point in time, he talked about him

20  withdrawing from a math class.  He was getting two A.s and

21  an F. and felt that he wasn't going to meet the 2.0 GPA.

22           He said there was something on Facebook, had pasted

23  an article in sympathy.  Dr. Zaccari said that on Friday --

24  and I'm guessing it was the Friday before -- that a white

25  male caller had called his home, had asked if this was the

Page 15

1    business officer.  The person was speaking softly.  So he

2    asked him to repeat it; and he repeated, "Is this the

3    business officer," and then whoever was calling hung up.

4         There was going to be an open day on Thursday, and

5    Dr. Zaccari had asked if we could have somebody from our

6    department there just in case Hayden came and there was any

7    kind of a disturbance.

8    Q    Let me ask you this:  He's explaining all these

9    things to you, listing all these things to you about Hayden

10   Barnes.  Did he put it in context in regard to why he was

11   telling you all these things?

12   A    Well, now that I've gone through those notes --

13   because I have not read them completely really before

14   today -- I think that probably my notes on the 20th came --

15   this may have been the second meeting, and the ones on the

16   20th were the first; because there's more information from

17   the one on the 20th.  So, I'm sorry if I confused anybody.

18   Q    That's okay.  Why don't we do this.  The meeting

19   that we just talked about --

20   A    Right.

21   Q    -- before we got into your notes, I think we had

22   that as being the first meeting.

23   A    Correct.

24   Q    And you just read your notes from what you thought

25   was the first meeting, but now you're telling me you think

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    that was from the second meeting.

2       A    Yes.

3       Q    Why don't we do this.  Why don't we take a quick

4    timeout.  Why don't you review your notes, and we will start

5    back with the first meeting.

6       A    Yes.

7       Q    Okay.

8       A    Sorry.

9            MR. LaVALLEE:  Let's go off the record.

10           (Discussion off the record.)

11           MR. LaVALLEE:  Let's go back on the record.

12   BY MR. LaVALLEE:

13      Q    Ms. Farmer, have you had a chance to review your

14   notes now?

15      A    Yes.

16      Q    Okay.  Great.  Let's go back.  Let's go back to the

17   point in time -- we're talking early April where Theresa

18   Boyd called you, indicated to you that the President wanted

19   you to attend a meeting in his conference room and we're at

20   that first meeting.

21           There were three meetings, if I understand

22   correctly from your previous testimony, that you attended

23   that pertained to Hayden Barnes, correct?

24      A    Yes.

25      Q    Let's talk about that first meeting.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A     Okay.

2      Q     Is there anything different now from what you

3    testified earlier in regard to who was there?

4      A     No.

5      Q     Okay.  So, all the same people that you testified

6    earlier that were present at this first meeting, you're

7    still sure about that, correct?

8      A     Yes.

9      Q     And you're still sure that Ms. McMillan wasn't at

10   that meeting or any of these three meetings, correct?

11     A     Correct.  The only difference is there was another

12   person at this meeting:  Kimberly Tanner.

13     Q     Okay.

14     A     And my notes -- because I know you have copies, I

15   may refer to her as Special Services, but that is Kimberly

16   Tanner.  She was at the meeting.

17     Q     So, in your notes when you say Special Services,

18   that's your way of --

19           MS. HANCE:  The Access Office.

20           THE WITNESS:  Right.  Uh-huh.

21   BY MR. LaVALLEE:

22     Q     All right.  So, now let's get to the who, what,

23   where, how.  What was discussed by President Zaccari?

24     A     Okay.  He discussed the fact that he had had some

25   encounter with Hayden Barnes.  As I said before, I didn't



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      know who Hayden Barnes was.

2              He discussed that Barnes had begun distributing --

3      the distribution of fliers on campus; that he had assertive

4      telephone calls with the Governor's office, calls to the

5      Chancellor's office, calls to the Board of Regents members.

6              He felt that that was out of the ordinary for a

7      student.  Dr. Zaccari had a meeting with S.A.V.E. on campus.

8      That's a student environmental group.  He talked about

9      having a good working relationship with them and that this

10     weekend he was supposed to be speaking at Drexel Park to

11     support S.A.V.E. on campus.  He said he was going to be

12     speaking at noon, and then Mayor Fretti was going to speak

13     after him.

14         Q     Can I interrupt you real quick?

15         A     Uh-huh.

16         Q     When he was talking about these phone calls that he

17     believed that Hayden Barnes had made, did he indicate what

18     Hayden had said during these phone calls; what the substance

19     of those conversations were?

20         A     He did later on in the conversation.  (Reviewing

21     document.)  He said that Hayden had had contact with two

22     Regents.  I guess he had attempted to call other Regents,

23     but they didn't deal with him.

24         Q     About what?

25         A     Well, he didn't really say what the content of what

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   he was trying to talk to them about was but that the Regents

2   that did talk to him felt that he was irrational.

3           He said that when he was at a meeting at Georgia

4   Southern, Dr. Zaccari had spoken with six members of the

5   Board -- and I don't know who those six members were -- and

6   that they were concerned about Hayden Barnes' rationale.

7       Q    Okay.  I'm just trying to get an understanding from

8   what you may have heard or learned at that first meeting in

9   regard to what Hayden was saying or doing that the President

10  felt was irrational.

11      A    At that meeting, the best way I can describe it, it

12  was as though I was included but after the fact as though

13  maybe there had been other discussions.

14          Obviously, this is something that had been going

15  on, but we were not privy to; so, there was information I

16  just didn't have.

17      Q    Okay.

18      A    And, you know, usually when I take notes, anything

19  that's really specific, I'll write down.  But these were

20  areas that I really did not have -- I just figured it was

21  something else that was happening that we weren't privy to.

22  So, it was a generalized this-is-what's-been-going-on and

23  that was it.

24      Q    Okay.  And this first meeting, this was -- I think

25  you said you didn't know the date of the first meeting that



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    was --

 2    A     Right, but actually I have these notes dated as

 3    4-20-07.

 4    Q     Okay.  So, this first meeting was 4-20-07?

 5    A     Yes.

 6    Q     Okay.  Great.  Was there anything else that you can

 7    recall President Zaccari stating?

 8    A     He talked about the fact that when he had spoke to

 9    six members of the Board of Regents, he was asked whether or

10    not he had spoken directly with Hayden because Hayden had

11    told them, talking to them, that he had spoken to the

12    President but he wasn't getting anywhere.

13          After that meeting, Theresa Boyd called to have

14    Hayden --

15    Q     Let's just stick to this meeting.

16    A     Right.  That's what I'm saying.  Dr. Zaccari is

17    explaining what happened.

18    Q     Okay.

19    A     He said that Theresa had called Hayden to have

20    Hayden come to his office with Dean Mast; that Hayden had

21    arrived with his girlfriend.  The President refused to let

22    the girlfriend in the meeting but met with Hayden and Russ.

23          They met for over an hour.  The President tried to

24    make Hayden understand that his tactics weren't good, and he

25    tried to mentor him on how to go about it.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          And what he was talking about was his opposition to

2     the building of the parking deck; that there was a -- more

3     of a direct -- a path to take to get your voice heard.

4          He centered about getting people coalesced.  The

5     President didn't feel that Hayden understood state and

6     auxiliary funding.  The President asked Hayden about his

7     next step and Hayden said he didn't know.

8          But the President said that Hayden's next step

9     happened on Monday, the week of the 20th, where he sent an

10    email to Dr. Zaccari.

11         He told Dr. Zaccari in the email he wanted him to

12    read some kind of -- read about some kind of a government

13    shutdown in 1985 where a young man who won an election in

14    Cincinnati caused a lot of trouble and makes this out --

15    this guy out to -- and I didn't finish.

16         But I read the article, and it made the individual

17    out to be -- that his tactics were good tactics to

18    accomplish his goal.

19    Q      This meeting that President Zaccari referenced

20    during the 4-20-07 meeting, specifically the one that he had

21    with Russ Mast and himself and Hayden, did you say his

22    girlfriend was or was not present?

23    A      That he wouldn't let her into the meeting.

24    Q      Okay.  So your understanding from President

25    Zaccari, there was three present --



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    Yes.

2    Q    -- in the meeting?

3    A    Yes.

4    Q    Did he give a date?  Obviously, it had to have been

5    before 4-20-07.

6    A    I don't recall him giving a date.

7    Q    Okay.  Go ahead.

8    A    He talked about that very morning, I guess the

9    20th, an email came to him and it made -- from Hayden and it

10   made reference to Easter Island and how there was no

11   business plan.

12        That related back to whatever conversation he had

13   when he was trying to explain to Hayden a manner in which to

14   get his voice heard and having a plan.  That was the

15   reference about the business plan.

16   Q    A voice heard concerning?

17   A    About his -- I guess his opposition to the building

18   of the parking deck.

19   Q    Hayden Barnes?

20   A    Hayden Barnes, yeah.  And the President went on to

21   say that now he had -- on his Facebook, on Hayden's Facebook

22   account, a copy of the Zaccari memorial parking deck with a

23   picture of Dr. Zaccari.  I had not seen it.

24   Q    Did he show it to you at that April 20th meeting?

25   A    At that time they had a copy, I believe, that they

Page 23

1     passed around the table.  His secretary -- well, she's not

2     his secretary, but Theresa Boyd did make me copies of emails

3     and the picture from the Facebook page.

4          Q     Would that have been --

5          A     After the meeting.

6          Q     -- following the first meeting?

7          A     Following the meeting.

8          Q     On April 20th?

9          A     Right, uh-huh.

10         Q     Okay.

11         A     Dr. Zaccari talked about Hayden being accepted at

12    VSU on probation in the fall of '05.  I got Hayden's full

13    name and his date of birth.

14               Dr. Zaccari made reference to three faculty members

15    sending emails by Hayden.  I didn't know what that was

16    talking about.  I just made a note of that.

17         Q     Uh-huh.

18         A     Then Kimberly Tanner was there, and she talked

19    about Hayden being registered at her office.

20         Q     I'm sorry.  I know you said this already --

21         A     I'm sorry.

22         Q     You need to quit apologizing.

23         A     Okay.

24         Q     Her office was again -- what was her office?

25         A     The technical name for it is the Access Office.



1    I've also referred to it as Special Services, so I guess

2    that gets a little confusing.

3            The Access Office offers special services to

4    students who need assistance.  If it's somebody with a

5    learning disability, they have an area there where they can

6    give them tests.

7            If they have difficulty in a classroom setting,

8    they can set it up with professors to help them do that or

9    help them get assistance with studying, if they have issues

10   with studying problems or disabilities, whether they're

11   physical or, I guess, mental.

12           But they are the kind of the catch-all that works

13   with individuals that have special needs, so I always refer

14   to it as Special Needs.

15   Q    Students here at campus.

16   A    Right.

17   Q    And Kimberly Tanner works at that office.

18   A    Yes.  She's in charge of that office.

19   Q    So, she spoke up and said something at the meeting?

20   A    She had a file.  She said that he was registered

21   with her office.  In order to get the services from her

22   office, the students have to come to her.  They have to seek

23   her out and register is my understanding.

24   Q    And when you say she had a file, is it your

25   understanding that she had Hayden Barnes' file from her

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    office?

2        A      Yes.

3        Q      Okay.  So, physically had it there at the meeting?

4        A      Yes.

5        Q      All right.

6        A      She said that he had a psychological disability;

7    that in August of 2006, thought it was a depressive

8    disorder, agoraphobia, panic disorder.  May have had some

9    symptoms of ADHD; that he was on medications but had gone

10   into the hospital at some point due to an inability to

11   function; that he was seeing a Dr. Kevin Winders.

12       Q      Everyone says his name different by the way.

13       A      Oh, do they?

14       Q      That's okay.  We can talk about that later.

15       A      With Psychological Consultants, P.C., in Savannah,

16   Georgia.

17              She said that when they had received his letter

18   that they felt that Hayden was better and could come to VSU

19   and that the doctor had stated that he needed to take

20   advantage of ongoing counseling.

21              She said that in her file, I guess, it noted that

22   he was a Buddhist -- I wrote that down; I don't know why --

23   that he was allowed in due to advanced placement testing.

24              MS. HANCE:  Do you know what letter that's

25       referencing right there?  "Was better and could come to

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      VSU."

2            THE WITNESS:  I don't know, for sure.  It was

3      something in her file.  I don't know if it was -- I don't

4      really know.

5            Rust Mast spoke up --

6      BY MR. LaVALLEE:

7      Q      Let me just take a quick time-out.

8      A      I'm sorry.

9      Q      Please quit saying you're sorry.

10     A      Okay.

11     Q      All of what you just told me was information that

12     Kimberly Tanner provided to the participants at that

13     meeting, correct?

14     A      Yes.

15     Q      And that information she was gleaning from the file

16     that she had pertaining to Hayden Barnes from her office.

17     A      Yes.

18     Q      Okay.  Was there anything else that you have down

19     or that you can recall about what Kimberly Tanner may have

20     said or divulged about Hayden Barnes?

21     A      No.

22     Q      All right.  Now I think you were going to move on

23     to --

24     A      Russ Mast.

25     Q      -- something Russ Mast said.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      At that point in time, he talked about the fact
2      that Hayden prior to coming to VSU had been at Warren Wilson
3      College at North Carolina.  It was an environmental college
4      or that's what they focused on, environmental issues, at
5      that college.  I wasn't familiar with it.  I just wrote it
6      down.  And he had worked with South Georgia Medical Center
7      with the EMS group.  So, he was an E.M.T.
8             Rust referred back to the picture that had been
9      passed around about the memorial and had said that that was
10     a veiled threat; that it could be used as a basis for a
11     disorderly conduct withdrawal.
12            But Russ went into -- I know that he went into the
13     fact that, with that, there would be -- there would have to
14     be a hearing, some kind of a hearing involved.
15            He spoke about some of their procedures; and I
16     really did not understand them, so I did not make a notation
17     about that.  I didn't really have any contact before about
18     the different types of withdrawals from school.
19     Q      Refresh my memory.  I know Russ Mast, obviously, is
20     a defendant in this case.  But what's his role here at the
21     University?
22     A      He's the Dean of Students.
23     Q      All right.  And he would've been back in April of
24     2007, right?
25     A      Yes.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1    Q     All right.
2    A     But then when he talked about that, Dr. Zaccari
3    brought up that Linda Daniels was so concerned about some
4    kind of interaction about Hayden -- I'm guessing she
5    received one of the phone calls -- that she alerted Georgia
6    Southern Police Department that there could be a disruption
7    at their Board of Regents meeting that was taking place at
8    Georgia Southern.
9    Q     So we are clear for the record, Linda Daniels is
10   who?
11   A     I believe that she's a member of the Board of
12   Regents.
13   Q     Okay.  And it was explained by President Zaccari at
14   this meeting --
15   A     Uh-huh.
16   Q     -- that Linda Daniels had concern in regard to a
17   phone call Hayden Barnes had made to the Board of Regents.
18   A     Yes.
19   Q     Did she give any particulars about what he may have
20   said to the Board of Regents that was cause for concern to
21   President Zaccari?
22   A     She, obviously, talked to Dr. Zaccari about it, but
23   Dr. Zaccari -- I didn't get it from him at that meeting what
24   they discussed.
25   Q     All right.  Okay.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      Dr. Zaccari also made mention of an alarm at his

2    home at 3:00 a.m. the past weekend; that no one was at home

3    at that time.

4            And during the course of this meeting, I talked to

5    Dr. Zaccari about doing a police report.  I let him know

6    that if he was concerned about things like an alarm at his

7    office -- he said that nobody had gain entry into the home.

8            He said that he and his wife were not there but

9    that, anything like that, if he was concerned, he needed to

10   alert the police department where he lived, which would have

11   been the Valdosta Police Department.  Telephone calls,

12   anything like that, where he felt concerned, he needed to

13   make a report.

14           During the course of his conversation with us, he

15   made it clear that he was concerned about the memorial

16   parking deck.  He took it very seriously in terms of, to

17   him, it indicated that it was something that would be done

18   after his death.

19      Q      Uh-huh.

20      A      And I mentioned to him that if he had a formal

21   report, that he could certainly get a T.P.O., a temporary

22   restraining order, a protection order --

23      Q      Right.

24      A      -- but that I knew Lavern, because Lavern was

25   sitting there, could help him get that or our department

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    could get that but to let us know.

2      Q    When did he -- President Zaccari specifically say

3    that he felt Hayden Barnes posed a threat to him and to the

4    campus?

5      A    In those words?

6      Q    Either in those words or tell me what words he

7    used.

8      A    Well, I know that he felt that -- I felt that he

9    felt that Hayden was a threat when he talked about the fact

10   that he believed that when he was referring to the memorial

11   parking deck that it was something to refer to after

12   Zaccari's death, not as a living memorial.  So, to me, that

13   indicated that Zaccari felt threatened.

14     Q    All right.  So your perception, having sat there

15   and listened to him and, in particular, in regard to this

16   picture about the parking deck, you perception was that

17   President Zaccari felt threatened by Hayden Barnes.

18     A    Yes.

19     Q    Was it just because of the parking deck picture

20   with his name on the side of it saying Zaccari Memorial

21   Parking Deck --

22          MS. HANCE:  Object to form.

23   BY MR. LaVALLEE:

24     Q    -- or was it just that?

25          MS. HANCE:  Object to form.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    BY MR. LaVALLEE:

2        Q    Subject to her objection, you can answer the

3    question.

4        A    I guess I'm not clear.

5        Q    Okay.  I believe what you testified to is that your

6    impression was that President Zaccari felt personally

7    threatened by the picture that Hayden Barnes had put

8    together that referred to the parking deck as the Zaccari

9    memorial parking deck, right?

10       A    Yes.

11       Q    Okay.  We've got that down.

12       A    Right.

13       Q    Is there anything else that you took from that

14   meeting which you believe caused him concern about Hayden

15   Barnes?

16            MS. HANCE:  Object to form.

17            MR. LaVALLEE:  What's the basis for your objection?

18            MS. HANCE:  I don't think she understands what you

19       asked the first time, and I feel like you asked the same

20       question all over again.

21            MR. LaVALLEE:  Well, she answered the question, so

22       that means she understood it.

23   BY MR. LaVALLEE:

24       Q    You're fine.  It's just what lawyers do.  I'll ask

25   the question again.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1       You've already testified that President Zaccari was
2   concerned about the memorial parking deck reference.
3       Was there anything else -- based on your being at
4   the meeting and hearing what everyone was saying, taking
5   everything in, was there anything else that you picked up on
6   that you believed caused him concern vis-a-vis Hayden
7   Barnes?
8       MS. HANCE:   Object to form.
9   BY MR. LaVALLEE:
10  Q    You can answer subject to her objection.
11  A    Okay.  At some point -- and I did not note it in my
12  notes and it could have been at this meeting; it could have
13  been at another meeting.  I looked through and it's not in
14  here.  I don't know if it was knowledge I had prior to this
15  meeting.
16      It was a small basis of knowledge that there had
17  been some other incident that Dr. Zaccari had been involved
18  in at another college where he worked where either he or his
19  wife had been threatened by a student or someone that worked
20  at the school.
21      I do not know any details more than that.  I know
22  that it came from Dr. Zaccari.  My way of feeling at the
23  time -- and why I think it came from this meeting is because
24  we never had a reason to talk about it before -- was that it
25  must've come from this meeting because I felt that whatever

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    was going on with Hayden -- I don't have a better way to say

2    it -- pushed those buttons.

3         And I also wasn't aware -- you know, there had

4    already been another meeting.  So I was not clear if

5    something had happened in that first meeting that added to

6    the Facebook that may have made him more concerned.  I just

7    know that, you know, he was concerned about his safety.

8    Q    Okay.  Is there anything else you can recall anyone

9    saying during this April 20th, 2007, meeting?

10   A    No.

11   Q    Well, after this meeting was through, did you

12   conduct any investigation into Hayden Barnes?

13   A    After this was through, I went back to the office.

14   I asked -- number one, I knew that he was going to this

15   S.A.V.E. program at Drexel Park coming up that Sunday.

16        I went back.  I asked -- I want to say it was --

17   David Kennedy who worked in my department to see if we could

18   get some people together to come in and provide extra

19   security at the park just in case Hayden Barnes showed up

20   and there was some kind of a disruption.

21        I ran a check through our records person to see if

22   he could pull up any reports with Hayden Barnes' name on

23   them.  I know that we had one or two reports, but they

24   were -- in one of the reports, he may have been a victim of

25   something on campus but nothing -- there were no kind of



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    reports where there had been any trouble with Hayden Barnes.

2    That's what I was looking for, if we had negative

3    experiences with him before.

4        Q    I mean, why were you --

5        A    At this point I was looking to see what I could get

6    that would indicate that we had red flags on Hayden Barnes

7    on campus, so I checked with the police reports.

8        Q    When you say red flags, is it fair to say you were

9    trying to figure out whether this guy posed a threat to the

10   University?

11       A    Yes.

12       Q    And to President Zaccari?

13       A    Yes.

14       Q    Okay.

15       A    On my notes I had made a notation when Russ Mast

16   had said that he worked at South Georgia Medical Center.  I

17   had made a note to check with Mr. Powers, who's in charge of

18   security at South Georgia Medical Center, to see if I could

19   get any information from him; but I did not do that.

20            There was something else.  I'm sorry.  During that

21   meeting somebody brought something up about a prior employee

22   at VSU, a Dr. Hardy.  Dr. Hardy at one point had been an

23   Equal Opportunity Program Director here.  And someone -- I

24   do not who it was -- had mentioned that there had been some

25   kind of run-in between Hayden and Dr. Hardy.  But that's all



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    that was said.

2              That was something else I was looking for when I

3    asked for the record check to see if we had had a report.

4    Dr. Hardy had left VSU before Hayden had come here.  So, I

5    didn't know if it was associated with another school he had

6    gone to, but it wasn't associated with VSU.

7              And I also called the Counseling Center.

8       Q    All right.  Why did you call the Counseling Center?

9       A    I called the Counseling Center to see if I could

10   get any kind of information as to whether or not Hayden may

11   be a problem; to see if I could find out whether or not, you

12   know, he was a patient.

13             And, if he was a patient, I didn't care, you

14   know -- from this standpoint, I wasn't looking to see what

15   his problems were; I was just looking to see if he could be

16   a danger and a threat.

17             This all came after Virginia Tech, so I was seeing

18   what I could see from all of the places that, you know,

19   might have contact with him and know if there was anything

20   dangerous about him.

21      Q    Did anyone suggest to you that you should call the

22   Counseling Center?

23      A    No.

24      Q    So you just called --

25      A    I put it in my notes to call Vic Morgan.  And after

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    that -- on that first meeting and that's what I -- I called

2    the Counseling Center.

3        Q    Okay.  So, your calling the Counseling Center,

4    would it be fair to say, could be fishing?

5        A    Yes.

6        Q    And, you know, you brought up Virginia Tech.  How

7    did that influence how you conducted this investigation of

8    Hayden Barnes?

9        A    Even prior to this, I would've taken it seriously

10   from a law enforcement standpoint because I have a personal

11   interest in workplace violence and how to prevent it.

12            But certainly after Hayden Barnes, it was a good

13   indication of how there is a lot of information that is not

14   communicated.  Certainly, it was clear that there were

15   different parts of the University that had information about

16   this young man; and whether or not they could have stopped

17   the violence, who knows.

18       Q    We're talking about Virginia Tech.

19       A    Right.  Virginia Tech.  But it was certainly worth

20   trying to get as much information as I could possibly could

21   to make an informed decision or to do what I could do to

22   protect the University.

23            For me, I was concerned about Dr. Zaccari; but

24   there was a bigger picture and that was the University.

25            He lived on campus, and I was trying to see what I

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    could find to see if there were indicators that maybe, you

2    know, this was going to become a bigger problem.

3        Q    Were you concerned that he could possibly be a Cho

4    from Virginia Tech?  Hayden Barnes?

5        A    With the limited amount of information I had, I

6    wasn't going to rule it out.  But I had limited information,

7    and that's why I was trying to get more information.

8        Q    When you called the Counseling Center, would that

9    have been on April the 20th, as well?

10       A    Uh-huh.

11       Q    2007?  All right.  When you called the Counseling

12   Center, who did you first talk to?

13       A    John -- well, you always get a secretary.  I asked

14   for Vic Morgan, but he wasn't available so they gave me John

15   Grotgen.

16       Q    Okay.

17       A    And I do not remember exactly what I said to John,

18   but --

19       Q    What do you recall to the best of your memory?

20       A    I know that I would've asked him whether or not

21   Hayden Barnes -- that we had received a complaint from the

22   President that he had been threatened by a student, Hayden

23   Barnes; and I was calling to see whether or not Hayden

24   Barnes might be seeing someone at the Counseling Center.

25       Q    Did you reference Mr. Barnes' opposition to the

Page 38

```
 1    parking garage to Mr. Grotgen?

 2       A     No.  I don't recall doing that.

 3       Q     You don't recall?

 4       A     I may have told him that there was -- the threat

 5    was connected to the Zaccari memorial parking deck.

 6       Q     All right.

 7       A     I may have made reference to that.  I'm not

 8    positive.

 9       Q     Did Mr. Grotgen confirm that Mr. Barnes was

10    receiving counseling at the Center?

11       A     I don't remember.  Usually, what would happen -- in

12    my experience when I had done this before, if they didn't

13    know, they would have to check records.

14             So I don't know if he knew, for sure, offhand or if

15    he had to check and get back with me.  I know that we -- I

16    think that he said that he would get back to me, but I'm not

17    positive.

18       Q     Okay.  So, you called the Counseling Center and you

19    discussed Mr. Barnes with John Grotgen.

20       A     (Nods head.)

21       Q     And what did he say or what did he do in response

22    to your telling him that information?

23       A     I got a call back from Leah McMillan.

24       Q     Okay.  Did Mr. Grotgen tell you that Leah McMillan

25    would be calling you or --
```



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      I don't remember.

2      Q      -- do you recall?

3      A      I don't remember.

4      Q      Okay.  So, after you explained this information to

5   Dr. Grotgen, do you remember anything that he said during

6   the telephone call?

7      A      No.

8      Q      All right.  Following your telephone call with

9   Dr. Grotgen, who called you or did anybody call you from the

10   Counseling Center?

11      A      Leah McMillan.

12      Q      All right.  And -- give me one second.  Let me just

13   rewind real quick on one thing, and then we'll get to your

14   conversation with Ms. McMillan.

15            Did you tell John Grotgen that President Zaccari

16   felt personally threatened by Hayden Barnes?

17      A      Well, I told him that a threat had been made and

18   what the threat -- I believe I told him that there had been

19   a threat made to the President.  I think that I may have

20   told him about the Zaccari memorial, but I'm not positive.

21   I'm sure I would've said that we got a report that a student

22   had threatened Dr. Zaccari.

23      Q      And the student -- you didn't relay that the

24   student was Hayden Barnes?

25      A      Well, I gave him the name to see whether or not he

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1    was being seen at the Counseling Center.
2        Q    The name Hayden T. Barnes (sic), right?
3        A    Right.
4        Q    So, Ms. McMillan calls you.  What did you say to
5    Ms. McMillan once she called you?
6        A    To the best that I can remember, I told her that I
7    had been in a meeting with the President; that I was
8    checking on a student, Hayden Barnes, because the President
9    felt that Hayden had threatened him.  I wanted to know if
10   there was anything to indicate that Hayden was a danger, if
11   she was seeing him.
12       Q    What did she tell you?
13       A    (Reviewing document.)  She told me that she started
14   seeing Hayden on the 5th of February; that he had a general
15   anxiety disorder, a panic disorder; that sometimes he would
16   get an idea in his head and he couldn't let it go; that he
17   usually comes in for his visits; that Leah speaks to his
18   psychiatrist at home; that she was concerned about him; that
19   in the past he had had an irrational thought pattern, but
20   there was no evidence of harm for him -- him harming himself
21   is what that meant -- or him harming anybody else; that when
22   she started seeing him, he had some irrational thought
23   pattern.
24            She thought that maybe there was some A.D.D.; that
25   sometimes when he obsessed about something, he would get
```

Page 41

1    really obsessed with it.  A little paranoia.  I put down is

2    irrational behavior here but that he had not shared any of

3    the information about the parking deck with her.

4        Q    So, when you put it into context and described

5    Mr. Barnes' opposition to the parking garage, Ms. McMillan

6    said --

7        A    She didn't know anything about it; that he had

8    never discussed that.

9             She told me he had missed his last appointment;

10   that he usually came once a week or once every two weeks;

11   that he wasn't a no-show in that he called when he missed to

12   tell her that he was sorry for missing the appointment and

13   they rescheduled.

14       Q    Okay.

15       A    She said that the psychiatrist had not seen any

16   increase in paranoia or irrational thought like she has, and

17   she thought that perhaps she had mentioned a bipolar

18   schizo-affective disorder.

19            But what was important to me, what I really wanted

20   to know, was whether or not there was anything to indicate

21   that he would hurt himself or others.  She said there was no

22   evidence of that, and that was the end of our conversation.

23       Q    At anytime during the conversation, did

24   Ms. McMillan discuss any specifics regarding her therapeutic

25   treatment with Mr. Barnes?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    No.  I didn't ask for that.  I didn't want to know

2    it.

3    Q    And she didn't provide it?

4    A    No.

5    Q    At anytime during the conversation that you had

6    with Ms. McMillan on April the 20th, 2007, do you believe

7    that she improperly disclosed any confidential information

8    regarding Mr. Barnes?

9    A    No.

10   Q    Why do you say that?

11   A    Because in a situation where you have somebody that

12   may be a threat to the University or individuals on the

13   University, there's a provision which allows us to ask for

14   and share information in regard to whether or not somebody

15   is a danger.

16       In terms of what Leah told me, she didn't give me

17   too much and she didn't give me too little.  She gave me

18   exactly what I needed to know, and that was from what had

19   been indicated to her; that I didn't have to worry about

20   whether or not he was a danger to anybody else.

21   Q    And was that pretty much it as far as your

22   conversation with Ms. McMillan?

23   A    Yes.

24   Q    Did you have any follow-up conversations with her

25   pertaining to Mr. Barnes?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      Not that I can remember.

2      Q      All right.  Did you share the information that you

3   gleaned or gathered from your conversation with Ms. McMillan

4   to anyone else?

5      A      I can't remember if I -- I can't remember.

6      Q      Okay.  We talked about that first meeting

7   pertaining to Hayden Barnes on April the 20th, 2007.

8             Could you talk to me about the second meeting,

9   because you said there were three meetings you attended.

10     A      Right.  There was a second meeting from what I can

11  tell from my notes.Could.

12            we take a break?  Do I have -- I mean, I can

13  answer this question but can we take a break?

14     Q      Yeah.  The way it works is I asked the question,

15  you answer it and then we can take a break.  Absolutely.

16     A      There was a second meeting.  I don't have the date

17  for it.  It had something to do with Hayden seeking

18  reimbursement for a hundred dollars for the parking garage.

19  It was connected to a fee, and he wanted to be exempt from

20  the mandated fee.

21            I had in my notes -- there must've been a

22  discussion about potential losses, but that didn't mean

23  anything to me.

24     Q      Potential losses?  What's that --

25     A      I don't know if that was connected to the parking

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    deck fees.  I don't really know.  I just marked it down.
 2    Sometimes if it doesn't pertain to me, I don't --
 3        Q    I'm the same way.  Why don't we do this.  You've
 4    indicated you want to take a break.  Let's take a break.
 5    We'll come back and we'll talk about that second meeting.
 6        A    Okay.  Sorry.
 7             (A recess was taken from 10:20 a.m. to 10:45 a.m.)
 8    BY MR. LaVALLEE:
 9        Q    Ms. Farmer, we left off talking about the second
10    meeting that you said that you attended which pertained to
11    Hayden Barnes in the spring of 2007.
12             I think you said that you couldn't remember the
13    exact date for the second meeting.
14        A    Correct.
15        Q    Obviously, it was after April the 20th.
16        A    Right.
17        Q    Okay.  Do you remember if it was a week, a couple
18    of days?  Is there any way you could best-guess it?
19        A    I think it was a couple of days.
20        Q    And who was at the second meeting?
21        A    I believe that it was the -- at least the same
22    people that were at the first with the exception of Kimberly
23    Tanner.  I don't remember Kimberly Tanner being there.
24        Q    Okay.  And how did you know about this meeting?
25    How did you get invited to it?  Would you explain that?
```



1     A     I got a call from Theresa Boyd to come to another

2  meeting at the President's conference room.

3     Q     Okay.  And do you remember what time of day it was?

4     A     I have on my notes that she called at 8:25 in the

5  morning, so it would've been -- the meeting would've taken

6  place after that, but it would've been in the morning.

7     Q     And when we were talking about the first meeting

8  when we first started off today, you said 8:25, as well?

9     A     Right.  That's what I was talking about was this

10  second.

11     Q     Do you remember, the first meeting on April the

12  20th, about what time of day that was summoned?

13     A     No.

14     Q     Okay.  But your notes reflect that the second

15  meeting kicked off around 8:25.

16     A     Okay.  Well, that's when she called.  It would've

17  been in the morning.

18     Q     And where was it held?

19     A     At the President's conference room.

20     Q     Okay.  Why don't you explain for us how that

21  meeting got kicked off and what was said and done at that

22  meeting.

23     A     Okay.  I thought of this, about my notes, while we

24  were on break.

25           There was some kind of a letter that Hayden had

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    sent.  Or an email.  I refer to it as a letter in the notes.

2    But something about wanting to be reimbursed a hundred

3    dollars for the parking garage.  He wanted to be exempt from

4    the mandatory fee, which was a hundred dollars for students;

5    and that money would go to pay for the parking deck.

6        Q    Uh-huh.

7        A    There was some discussion about potential losses,

8    but I don't remember what that was in reference to.

9             Some kind of a P.S. about ordering a copy of Jared

10   Diamond's book, Collapse.  I don't remember what that was in

11   reference to.

12            The letter had ended up in Melinda Kutchens' in-box

13   on her desk, but they were not clear how the letter got in

14   there.  Melinda didn't remember him coming in to leave the

15   letter.  It didn't come in with the regular mail.  They

16   didn't know how it showed up.

17       Q    Okay.  So, the letter that you're talking about

18   that was authored -- it was authored by Hayden Barnes?

19       A    Yes.

20       Q    And it referenced --

21       A    Wanting to be --

22       Q    I've seen the letter.  I don't have it in front of

23   me.

24       A    Okay.  Wanting to be reimbursed for his fee for the

25   parking deck.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1     Q     All right.  And the book -- you said there was a
 2   P.S. that referenced some book --
 3     A     Right.
 4     Q     -- by a Mr. Diamond?
 5     A     Right.  But I don't know what that was in reference
 6   to.
 7     Q     And it's your understanding or you learned from
 8   that meeting that that letter and the book appeared in the
 9   desk drawer of --
10     A     Not the desk drawer.  It's like an in-box on
11   Melinda's --
12     Q     Sure.  One of those two-tier type deals?
13     A     Yes.  And it was on her desk, but it was for
14   Dr. Zaccari.  I guess they get mail, and that's where they
15   put his.
16     Q     Okay.
17     A     Dr. Zaccari talked about speaking with someone at
18   South Georgia Medical Center.  He didn't say who that was.
19           He talked about Hayden having been put on three
20   months' probation from October 2006 until the first of that
21   following February; that he was released because of a lack
22   of competence and skills.
23           They had reported Hayden from walking away from the
24   radio and driving through a red light.  There was no
25   progress on skills based on action plans they had for him.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     There were comments from the direct supervisor that he was
2     disturbing, but I do not know what those comments were.
3            Dr. Zaccari discussed the fact that Hayden had
4     withdrawn from his math class; that he was getting two A's
5     and one F and that he didn't believe that Hayden was going
6     to meet the 2.0 GPA required to stay in school.
7            He said that there was an article that had been
8     pasted into Facebook in sympathy.  I didn't get the rest of
9     that, but there was another article in Facebook.
10           He made reference to the fact that on Friday at
11    5:47 he had received a phone call at his home where the
12    caller asked if it was the business officer.  The caller
13    spoke softly.  He asked him to repeat and the person, I
14    believe, repeated, "Is this the business officer," and then
15    hung up.
16           The President mentioned that on Thursday he had an
17    open day and he had asked if he could possibly have somebody
18    up around his office in case Hayden Barnes came.  It was an
19    open time for students to come in and ask questions, and he
20    was concerned about Hayden showing up.
21           Those are all the notes that I have from that
22    meeting.  I know that I did go back and I did arrange for, I
23    believe, two officers to be in plain clothes in that area in
24    case Hayden showed up and there was a problem.  Only if
25    there was a problem.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     Q     Okay.  All of these different things that you're
2  relaying to us that President Zaccari mentioned during the
3  second meeting, did he indicate where he got this
4  information from?
5     A     No.  All I know is that he spoke to someone he knew
6  at South Georgia Medical Center.  He did not give us that
7  name.
8     Q     All right.  So, the information that he was
9  providing y'all pertaining to Hayden Barnes and the South
10  Georgia Medical Center, President Zaccari stated he received
11  from someone he knew that worked there?
12     A     Yes.
13     Q     Okay.  And what was that information that he
14  provided concerning Hayden Barnes and the South Georgia
15  Medical Center?
16     A     It had to do with Hayden getting a three-month
17  probation between October '06 and the first of that
18  February; that he was released from the job for lack of
19  competence and skills.  He had been reported for walking
20  away from a radio and driving through a red light; that
21  there was no progress on his skills based on action plans
22  and comments from a direct supervisor were that he was
23  disturbing.
24     Q     Okay.  When this meeting started, did President
25  Zaccari say something akin to, well, we're here today to

Page 50



1    discuss, blank, or this is the purpose of the meeting?

2           Was there any type of introductory remarks such as

3    that coming from Dr. Zaccari?

4    A     I don't know.  I don't remember.

5    Q     Okay.  Anybody else speak during this meeting?

6    A     Not that I have noted.  Not that I can remember.

7    Q     Okay.  So nothing from your notes and no

8    independent recollection that you can remember?

9    A     Not that there was anything of any importance.

10   Q     Whether it's important or not --

11   A     Right.  But, I mean, I didn't note anything so I

12   don't remember.

13   Q     Okay.  And based on what President Zaccari had

14   stated during that meeting, it caused you to do -- blank.

15   Would you fill in the blank?

16   A     Well, it made me certainly get -- go back to the

17   office and make arrangements for extra people to be at West

18   Hall when he had his open session.

19   Q     Okay.

20   A     I know that -- and I do not remember when I had

21   this discussion with him.  I know that I had asked

22   Dr. Zaccari if he wanted somebody with him on campus all the

23   time and he did not, but he did at this function want

24   somebody close by just in case.

25   Q     All right.  Is there anything else to discuss about



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     that second meeting that you can recall?

2        A     No.

3        Q     Okay.  Let's go to the third meeting.

4        A     Okay.

5        Q     Let's start off with whether you have it in your

6     notes or you have it up in your brain the date of that third

7     meeting.

8        A     I do not know the date.  I can tell you people that

9     spoke.

10       Q     Okay.  Let's try to, the best we can, come up with

11    at least our best guess.

12       A     It would've been within two weeks of April 20th.

13       Q     Within two weeks?

14       A     It would've been within two weeks.

15       Q     Okay.  Are you aware that he was administratively

16    withdrawn from the University?

17       A     Yes.

18       Q     Would it have been, this third meeting, before

19    that?

20       A     Yes, prior to that.

21       Q     Do you believe this third meeting was within the

22    month of April?  I always forget to bring calendars with me.

23       A     Right.

24       Q     It's a bad habit.  I need to do a better job with

25    that.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1       A       I do not know.  It was prior to graduation.  Hold

2   on.  (Reviewing documents.)  I know that Dr. Zaccari was

3   making a trip to Europe for ten days on the Friday that

4   was -- this was before that Friday that President Zaccari

5   left for a trip to Europe.

6       Q       Do you remember what day of the week it was?

7       A       No.

8       Q       Okay.  Well, I think we've -- if you can't

9   remember, you can't remember; but I think we've done a

10  pretty good job of narrowing it down.  Who was at the third

11  meeting?

12      A       Dr. Zaccari, Theresa Boyd, Lavern Gaskins, Vic

13  Morgan, Dr. Keppler, Kimberly Tanner.  I believe that Russ

14  Mast was there.  And those are the only ones that I remember

15  being there, for sure.

16      Q       Okay.

17      A       Somebody else could have been there, but I didn't

18  write them down.

19      Q       And you stated earlier that Mrs. McMillan wasn't at

20  any of these meetings?

21      A       No.

22      Q       All right.  Well, give us the details.  What was

23  said by who and -- why don't we start from there.

24      A       Basically, Lavern Gaskins and the President -- it

25  was, basically -- all these meetings started with



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Dr. Zaccari talking.

2        Q    Okay.

3        A    So, he let us know that he had updates from the

4    System Office Legal Affairs Department.  And, once again,

5    they discussed things that I was not a hundred percent clear

6    on.  These were administrative things that we don't deal

7    with.  I don't deal with.

8             And there could have been discussions prior between

9    other parties present so that they may have understood more

10   than I did.

11       Q    All you can do is testify on what you know.

12       A    Right.  What I know.  He said that if they were

13   going to go through a conduct withdrawal that they would

14   have to convene a student/faculty review.

15            I know that Russ Mast was there.  Russ was

16   concerned about Hayden being able to have due process and

17   that, in doing the student faculty review process, it was

18   like a hearing kind of thing.  They would have to get people

19   together for that.

20            Then the President said if it was an administrative

21   withdrawal, they would have to show a threat to the

22   community or to him and that later on -- you know, there was

23   a conversation that took place.  I know Russ was involved in

24   it, for sure, about, you know, his -- about Hayden's rights

25   in regard to being taken out of school.



1    Q    Now you say there was a conversation later on after

2    this third meeting?

3    A    No, no, no.

4    Q    Or during the meeting?

5    A    During the meeting.

6    Q    Just trying to keep it in context.

7    A    Right.  I'm sorry.

8    Q    You're okay.

9    A    So, the President had said, "Well, later we must be

10   concerned with First Amendment rights, but first we have to

11   look at the safety issue.  Ultimately, we have to have

12   documentation to support that Hayden is a danger and a

13   threat."

14        And he posed the question:  How do we present to a

15   third party that a threat exists?

16        The President felt that Hayden's activities were

17   out of the norm:  The fliers, a letter of apology, then

18   calls to others, meaning the Governor's office, the Board of

19   Regents.

20        He called each Regent, and administration staff may

21   have spoken to him or he was refused access.  He was

22   referring to those regents that didn't have one-on-one

23   conversations with him.

24        He said Georgia Southern was notified by the

25   Regents that during the Board of Regents meeting there may

Page 55

```
 1    be a disruption.  The posting of the deck on the web site

 2    with reference to the president, Dr. Zaccari said he became

 3    alarmed; and he was taking the strictest definition of

 4    memorial equating to his being dead.

 5           Hayden's posting on his Facebook of articles

 6    sympathetic to Virginia Tech were a concern to him.

 7           And then following all of that, the extra

 8    protection that he needed, the City watching, threatening

 9    letters being sent to the Mayor and Mrs. Simons.

10    Mrs. Simons is the wife of the Police Chief for the City of

11    Valdosta.  And I don't know what those -- what that was in

12    reference to.  I had not heard anything about that prior.

13           The alarm activation at three o'clock was a concern

14    to Dr. Zaccari.

15    Q      The alarm activation --

16    A      At his home.

17    Q      -- at his home?

18    A      Right.  He was concerned about that, especially

19    considering that Chief Simons lives near by him in their

20    subdivision.

21           He felt threatened because -- he was concerned

22    about the focus of attention now being turned on Hayden.

23    Facebook had photos of a faculty member notated as friend.

24    I didn't understand what relevance that had.

25           President Zaccari wanted to wait and help Hayden by
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    letting Hayden get through his exams, which ended that

2    Friday.  So, that may be an indicator of the week that we

3    had the meeting.

4           He said that Betsy Neely at the System Office had

5    asked him, "Why not let him go now," but that he didn't want

6    to cause an uproar that could cause a flashpoint.

7           He felt that if Hayden didn't make his grade point,

8    then he could come back the summer but that he couldn't come

9    back fall semester and that he could still come back in

10   January of '08.

11          He talked about the administrative withdrawal.

12   With that, there was no council needed.  They wouldn't need

13   anything from -- he always called the Counseling Center the

14   Comprehensive Counseling Center, but it left the campus in a

15   precarious legal footing.

16          And Lavern Gaskins said that there was a need to

17   include references to Hayden's mental health; that you

18   couldn't go without supportive evidence of a threat.

19   Q     Step back.  What was the part of your notes that

20   you're talking about where President Zaccari referenced

21   counseling or the Counseling Center?

22   A     When he was talking about an administrative

23   withdrawal.  With that, he didn't have to have -- you know,

24   they were talking about the conduct withdrawal earlier; that

25   there would need to be a faculty/student hearing or review.

Page 57



1          What I understood he was talking about was that in

2    an administrative withdrawal, you didn't have to have that

3    kind of a hearing and you didn't have to have anything from

4    the Counseling Center.

5    Q      Pertaining to --

6    A      Pertaining to Hayden Barnes.

7    Q      I'm sorry.  You answered my question.

8    A      Okay.  Then he discussed making it effective for

9    that Friday, I guess, when the exams were over and that

10   Hayden would have to be moved out by tomorrow at noon while

11   the weekend graduations took place.

12          And then the following Monday, commencement was

13   done and grades were turned in.  Housing gives 72 hours to

14   move a student out.

15          On Friday the President would be going to Europe

16   for ten days and the President wanted housing to help him

17   get Hayden moved out.

18          Dr. Keppler spoke up.  He said that the counselors

19   couldn't say that Hayden was a threat because there was

20   nothing to support that Hayden was a threat; that Morgan

21   said that Hayden's psychiatrist said on Tuesday that Hayden

22   was rational; that they had upped his medications, anxiety

23   and panic disorder with no threat to himself or others and

24   Vic believed that that was what his personal physician would

25   say.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1            And per the President, he hadn't had any contact

2    with Hayden during most of the spring semester.

3            Vic said that Hayden was taking his medication, had

4    never stated in writing or verbally that he was suicidal or

5    a threat to anyone.

6            Kimberly Tanner asked if hospitalization would be

7    necessary with this disorder, and he said no; that the

8    initial letter indicated -- no.  He said no, but then she

9    said -- I believe that she said that the initial letter

10   indicated one, if not more, hospitalizations but the letter

11   was given to the Special Services Office.

12       Q     Okay.  You're saying that Kim Tanner brought up

13   the --

14       A     Hospitalization.

15       Q     -- issue of hospitalization?

16       A     Uh-huh.

17       Q     Of Hayden Barnes?

18       A     Uh-huh.

19       Q     I don't understand that.

20       A     Well, Vic Morgan was talking about Hayden having an

21   anxiety and panic disorder.

22       Q     Uh-huh.

23       A     And the question was:  Would hospitalization be

24   necessary with this disorder?

25       Q     That's the question that Kim Tanner posed --



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      Yes.

2      Q      -- in response to Vic Morgan saying what it is that

3   you said he just said?

4      A      Right.

5      Q      And I'm sorry.  Vic Morgan's response to Kim Tanner

6   was --

7      A      Was no.  And the initial letter -- I don't know

8   what that was -- indicated one, if not more,

9   hospitalizations but that the letter had been given to

10   Special Services.

11      Q      What letter?

12      A      Whatever letter he was referring to.  I don't know.

13   I never -- I don't know what that letter was.

14      Q      Okay.

15      A      I'm guessing that that -- this is a guess on my

16   part.  Initially, when he was allowed to come to school at

17   VSU, there was a letter from a physician saying that -- that

18   I had talked about before saying that he was on medication

19   and encouraged to take advantage of counseling, but he could

20   come to school.  I'm thinking that that's the letter they're

21   referring to.

22      Q      Okay.  That letter that you're thinking they're

23   referring to, could you explain to me -- because you were

24   there -- how you believe that played a role in the

25   conversation?  I want to try to understand that a little bit

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    better.

2        A    Well, this was just my perception.  In the earlier

3    meeting when Kimberly talked about her file --

4        Q    In that first meeting.

5        A    Right -- and there being a letter in there which

6    indicated there had been one or more hospitalizations --

7    when they brought up the initial letter indicating one, if

8    not more, hospitalizations, that's what I connected it back

9    to.

10       Q    Okay.

11       A    Then Lavern asked, "Do we act on the administrative

12   withdrawal?"

13            Vic Morgan said, "Hayden follows what is asked of

14   him by the Counseling Center."

15            The President said that his wife was concerned that

16   he had a need for extra protection.  He was unsettled about

17   public speaking now or in going out.

18       Q    Okay.

19       A    Someone -- and I'm not sure; it could have been the

20   President or Lavern -- said an administrative withdrawal

21   would contain requirements or conditions, one of which could

22   be a re-evaluation in three to four months from now based on

23   information obtained over the summer.

24            The President was concerned about getting Hayden

25   off campus for a while.  The President said he wanted a



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    strong statement from a psychiatrist that supported that the

2    student was not a threat and that if Hayden was removed, he

3    had the right to appeal to Atlanta.

4           Dr. Keppler said that he felt that they needed to

5    go the route of the GPA, which meant to me the hope that he

6    would not make his 2.0 GPA and that that would take him out

7    of school.

8           Kimberly Tanner said that she had seen Hayden that

9    day and that Hayden had told her that he thought that he

10   made his 2.0 GPA.

11          Vic Morgan then said that Hayden was enrolled in

12   classes for May Mester and for the summer and -- and I don't

13   know what this referred to but that they couldn't connect

14   the letters to Hayden.  It was just the timing of receiving

15   the letters.

16   Q     What letters?

17   A     I don't know.  I don't know what that referred to.

18   Q     Okay.

19   A     Dr. Zaccari said that he needed to meet with Lavern

20   on Monday to work out the conditions.  Lavern said it is not

21   "if" but "when" will he sue over this.

22          The President said that he was focusing on the

23   unknowns and that he was making the administrative decision

24   because he didn't know what was going on with Hayden.

25          Vic Morgan said that the focus should only be on



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    what Hayden had done to draw attention to himself and the
2    President, and Lavern said an emergency withdrawal must rest
3    on mental health with a clear and present danger.
4         At that point they discussed whether the letter
5    should go certified mail or have the police deliver it.  The
6    decision was made for our department to deliver it; that the
7    letter was coming from the President's office and that once
8    the letter was delivered that we would need to notify the
9    President's office as soon as possible to let them know that
10   the letter had been delivered.  That was it.
11   Q    Okay.  Let me try to clarify one point.
12   A    Okay.
13   Q    I think I have it clear.  I think the record will
14   be clear, but I just want to make doubly sure.  This is the
15   only chance I get to talk to you.
16        Did Dr. Morgan state any hospitalizations or did
17   Kimberly Tanner give that information regarding previous
18   hospitalizations?
19   A    I believe that it was -- I believe that it was
20   Kimberly Tanner.  I think that what happened was she was
21   asking would hospitalization be necessary with this
22   disorder, and the answer that Vic gave was "no."
23        And then she talked about the initial letter
24   indicating one, if not more, hospitalizations and that that
25   letter had been given to her office; or Vic may have said



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    that the letter was given to their office; that he didn't
 2    have that.
 3        Q    Okay.  So the issue about --
 4        A    Hospitalizations.
 5        Q    -- previous hospitalizations --
 6        A    That is brought up --
 7        Q    -- was broached by Kim Taylor.
 8        A    Yes.
 9        Q    I'm sorry for talking at the same time.  My
10    apology.  It's my fault.
11             Is there anything else about that third meeting
12    that you can recall?
13        A    Nope.
14        Q    By chance, was that third meeting on May the 3rd,
15    2007?
16        A    I don't know the date.
17        Q    You don't know the date?
18        A    I just know that it was coming up to that weekend
19    when they were going to be finishing their exams and the
20    President was going out of town.
21        Q    Okay.  Let me just go back to one other thing, and
22    I'll talk to Leah real quick and then I think -- I don't
23    think these folks have any questions for you.
24        A    Thanks.  I really appreciate that.
25        Q    I made a funny.  I was being very sarcastic there.
```

Page 64



1         MS. HANCE:  He was kidding.

2    BY MR. LaVALLEE:

3    Q    I want to go back to just a couple of things.  I'll

4    be very brief.

5         When we were talking about the time that you called

6    the Counseling Center and your testimony was -- and, please,

7    tell me if I'm mixing anything up.

8         I believe your testimony was that you believe you

9    initially talked to a secretary who then got you in touch

10   with Dr. John Grotgen, right?

11   A    Yes.

12   Q    And we had discussed how you came to learn that

13   Hayden Barnes was receiving counseling at the Counseling

14   Center.  Do you remember us discussing that?

15   A    Somewhat.

16   Q    Okay.  And I believe you stated that you could not

17   recall exactly whether Dr. John Grotgen had confirmed to you

18   that he was receiving counseling -- "he" being Hayden

19   Barnes -- at the Counseling Center.  Is that correct?

20   A    Right.

21   Q    During the course of this lawsuit -- actually, I

22   believe it was during Leah McMillan's deposition --

23   Mr. Barnes' attorney, one of his attorneys, entered into

24   evidence a counseling record notation by John Grotgen.

25        In that notation, he indicates that he called Ann

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    back to advise that Leah McMillan would be calling him

2    later.  That's what his notes say.

3        A    Okay.

4        Q    Do you have any reason to dispute his having

5    indicated that in his progress notes?

6        A    No.  I just don't remember.

7        Q    Okay.  You've had a chance to work with

8    Ms. McMillan over the years, have you not?

9        A    Yes.

10        Q    Could you describe that context, under what

11    circumstances, on what projects that you've had the occasion

12    to work with Ms. McMillan?

13        A    Here at the University?

14        Q    Well, yeah, here at the University.

15        A    Okay.  Well, since she came to work at the

16    University, our department and I have worked with her with

17    various programs, especially involving education in terms of

18    working with her with the Take Back The Night programs.

19        Q    What's that?

20        A    It's for sexual assault awareness.  They have a

21    program here that every year they put on a program in the

22    evening, and they have candles and they have rape survivors

23    that come and speak to the students.  They take a walk

24    outside.

25             They have a different program each year, but each

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    year they do that.  It's in cooperation with The Haven Rape
2    Crisis Center and with the University.
3              We worked together on developing a campus and
4    workplace violence awareness program for the University that
5    we teach together each semester.
6              We have worked together on the -- it's called ATAP.
7    It's a threat assessment professionals group out of Atlanta.
8    We've worked with them.
9              We have worked together in the past year on
10   developing and getting a Threat Response Team together for
11   the campus and getting them together for that.
12   Q     What was the impetus for that?  How did that come
13   to fruition?
14   A     Prior to Leah coming to the University, I had had
15   an interest in Threat Assessment Teams and Threat Response
16   Teams and employee assistance programs for employees and had
17   talked with Human Resources a number of times about that.
18             I had taught one class, workplace violence, prior
19   to Leah coming to work for us.
20             But once Leah came to work and once -- I guess you
21   could say that Virginia Tech was the main impetus we,
22   together, got a lot more support in terms of putting on
23   classes and developing the program.  We saw it as a need.
24             Leah helped approach our Training and Development
25   Department here on campus and the head of Human Resources,

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    and we were able to work with them and they were supportive

2    of us putting on these classes.

3        Q    Okay.  Is there anything else you have had the

4    occasion to work with her on?  I mean, that's a lot.

5        A    We have worked together with students on campus

6    here who have been assaulted, either sexually or physically.

7    When we have had students that present themselves as

8    suicidal, I've worked with Leah and others.

9             We have done a lot of work together.  I can't think

10   of everything.

11       Q    I think you intimated earlier that you had worked

12   with her prior to --

13       A    Yes.

14       Q    -- VSU?

15       A    Yes.

16       Q    Could you describe that?

17       A    She worked as an advocate with The Haven rape

18   crisis center.  We had worked together there.

19       Q    Is that here in Valdosta?

20       A    Yes, it is.  And we worked with them and Leah to

21   come out to the University and teach classes to our police

22   officers on the proper response to sexual assaults; how they

23   needed to respond and work with victims.

24       Q    Has Leah ever given you any reason to doubt her

25   professional opinion on any given matter?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1      A      No.

2      Q      And when you spoke to her on April the 20th during

3    that telephone conversation, did you have any reason to

4    doubt or dispute anything she was telling you?

5      A      No.

6      Q      Why is that?

7      A      She's never given me any indication before that I

8    couldn't trust what she said.

9      Q      Do you believe she's trustworthy?

10     A      I mean, she's very professional.  I mean, she -- we

11   have had situations before where confidentiality was

12   involved.  She's really steadfast in trying to protect

13   victims and information.  I don't really have the words.

14            But she's always been trustworthy.  She's very

15   upfront.  She doesn't sway from her opinions.  I find her to

16   be very trustworthy.

17     Q      All right.

18            MR. LaVALLEE:  Could I have one moment?

19            (Discussion off the record.)

20   BY MR. LaVALLEE:

21     Q      One last thing I wanted to -- just have it in my

22   notes that I wanted to try to understand a little bit

23   better.

24            I believe it was from the second meeting that you

25   were a participant to which involved Hayden Barnes.
```

Page 69



```
1        A       (Reviewing document.)

2        Q       And during the second meeting, we were talking

3   about who was there, what was said; and I had in my notes

4   you were indicating a conversation -- not that you had but

5   that you were able to hear in on -- where Russ Tanner

6   said --

7        A       Russ Mast.

8        Q       Russ Mast.  He had said something about Hayden

9   Barnes and a hospital.  Could you take me back to that?  I

10  just want to make sure I have that clear as to what it is

11  you heard him say.

12              MS. HANCE:  First, confirm if you remember the way

13       he says it.

14              MR. LaVALLEE:  Objection to whatever it is you just

15       said.

16              THE WITNESS:  Okay.  It was not the second meeting.

17       It was the first.

18  BY MR. LaVALLEE:

19       Q       It was the first.

20       A       I was confused initially, and I thought it was the

21  second meeting.  We got that straightened out, but it was

22  the first meeting when he had talked about the fact that

23  Hayden had gone to school at Warren Wilson; that he had a

24  private room in Converse Hall and that he had worked with

25  South Georgia Medical Center EMS as an E.M.T.
```

Page 70



```
 1      Q     All right.  Did Russ indicate or did you get an
 2   understanding as to where Russ had obtained that information
 3   from?  About Hayden working as an E.M.T. somewhere?  Was
 4   that apparent?
 5      A     I don't remember.
 6      Q     And his comment concerning "that," that being
 7   Hayden's working as an E.M.T., I think you said, at Warren
 8   Wilson?
 9      A     No, at South Georgia Medical Center.
10      Q     Okay.  That was information that you were made
11   privy to during the first meeting?
12      A     Yes.
13      Q     Which was --
14      A     On the 20th.
15      Q     -- on the 20th.
16            MR. LaVALLEE:  That's all the questions I have.
17            THE WITNESS:  Okay.
18            MR. LaVALLEE:  Thank you.
19            THE WITNESS:  You're welcome.
20                              EXAMINATION
21   BY MR. SMITH:
22      Q     Ms. Farmer, we were introduced at the beginning of
23   the deposition.  I'm David Smith.  I represent Lavern
24   Gaskins.  I have a few questions about the third meeting you
25   talked about.
```

Page 71

1       A       Okay.

2       Q       As I understood your testimony, at that meeting the

3    possibility got brought up or discussed about what would be

4    required for a suspension or withdrawal based on a violation

5    of the code of conduct.

6       A       Correct.

7       Q       And it was discussed at the meeting that if that

8    were the route chosen, there would have to be a student/

9    faculty committee hearing before that could be done.

10      A       Right.

11      Q       And then the other possibility for a withdrawal

12   that was discussed was a mental health withdrawal.  And, as

13   I understood your testimony, what was discussed then was for

14   that to take place there would have to be some indication

15   that a student posed a risk to himself or to the campus,

16   correct?

17      A       Correct.

18      Q       And I think you also stated that Ms. Gaskins

19   pointed out for the administrative withdrawal for mental

20   health reasons to be an emergency, one without a hearing,

21   that there would have to be evidence of a clear and present

22   danger posed by the student.

23              MS. HANCE:   Object to form.

24   BY MR. SMITH:

25      Q       Is that correct?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     A     Could you ask that again?

2     Q     Sure.  Am I right that at that meeting when the

3     mental health withdrawal was discussed, Lavern Gaskins made

4     the point that for an emergency withdrawal to occur, one

5     without a hearing, there would have to be some citation to

6     evidence that the student posed a clear and present danger?

7     A     Yes.

8     Q     And I think you also said that after the decision

9     was made that an emergency mental health withdrawal would be

10    pursued that Ms. Gaskins made the comment that she expected

11    the student to file suit over that?

12    A     Yes.

13          MR. SMITH:  That's all.  Thank you, ma'am.

14                        EXAMINATION

15    BY MR. FEDELI:

16    Q     Ms. Farmer, hi.  My name is Chris Fedeli.  I'm a

17    lawyer for Hayden Barnes, and I'm going to have a few

18    questions for you.

19          MR. LaVALLEE:  Chris, do you want to sit here?

20    You're more than welcome.

21          (Discussion off the record and recess from 11:26

22    a.m. to 11:40 a.m.).

23    BY MR. FEDELI:

24    Q     Ms. Farmer, coming back from our break, my name is

25    Chris Fedeli.  I'm an attorney for Hayden Barnes.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1       A       Okay.

2       Q       And I have a few questions for you this morning.

3    First, I'd like to go back over some of the -- I'm not going

4    to go back over everything they just talked to you about but

5    kind of ask about a few of the things.

6               I'd like to introduce your notes into the record

7    for the deposition.  I'm going to call this Exhibit One.

8    These are your notes from the first meeting that we've been

9    talking about, correct?

10      A       Yes, sir.

11              (The document was marked for identification as

12      Plaintiff's Exhibit Number One.)

13   BY MR. FEDELI:

14      Q       And then I'm going to introduce Exhibit Two, and

15   these are your notes from the phone call with Leah McMillan

16   Is that right?

17      A       Yes, sir.

18              (The document was marked for identification as

19      Plaintiff's Exhibit Number Two.)

20   BY MR. FEDELI:

21      Q       And I'm going to introduce Exhibit Three, and these

22   are your handwritten notes from what you call the second

23   meeting?

24      A       Yes, sir.

25      Q       Okay.  And then I'm going to introduce Exhibit

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A     Okay.

2      Q     And I have a few questions for you this morning.

3   First, I'd like to go back over some of the -- I'm not going

4   to go back over everything they just talked to you about but

5   kind of ask about a few of the things.

6            I'd like to introduce your notes into the record

7   for the deposition.  I'm going to call this Exhibit One.

8   These are your notes from the first meeting that we've been

9   talking about, correct?

10     A     Yes, sir.

11           (The document was marked for identification as

12     Plaintiff's Exhibit Number One.)

13  BY MR. FEDELI:

14     Q     And then I'm going to introduce Exhibit Two, and

15  these are your notes from the phone call with Leah McMillan

16  Is that right?

17     A     Yes, sir.

18           (The document was marked for identification as

19     Plaintiff's Exhibit Number Two.)

20  BY MR. FEDELI:

21     Q     And I'm going to introduce Exhibit Three, and these

22  are your handwritten notes from what you call the second

23  meeting?

24     A     Yes, sir.

25     Q     Okay.  And then I'm going to introduce Exhibit

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Four, and these are your handwritten notes from the third

2    meeting that took place around May 3rd, 4th, somewhere

3    around there.

4        A    Yes, sir.

5        Q    And I have just a few questions about these notes

6    beyond what you've already talked about with them.

7             On your phone call with -- let's back up.  Let's

8    come to this later.

9        A    Okay.

10            (The documents were marked for identification as

11       Plaintiff's Exhibit Numbers Three and Four.)

12   BY MR. FEDELI:

13       Q    What are your policies or your Police Department's

14   policies usually for dealing with student expulsions or

15   withdrawals?

16            MS. HANCE:  Object to form.

17   BY MR. FEDELI:

18       Q    Does your Department have policies on how to deal

19   with handling students who are being expelled or withdrawn?

20       A    We don't deal with expelling.  I don't know what

21   you're asking.  I mean we're -- we don't do that.

22       Q    You don't usually get involved in removing students

23   from campus?

24       A    In removing students from campus, if we're

25   requested, if our department is requested to assist, we

Page 75



1    will.

2       Q      Okay.   And --

3       A      Does that answer -- I'm not sure what your question

4    was.

5       Q      Who would request that your Department assist in

6    removing students?

7       A      It could be Student Affairs if there's a

8    disciplinary problem with a student.   It could be the

9    Housing Department on campus.   They all fall under Student

10   Affairs.

11            Those would be the main departments if it had to do

12   with moving a student out.

13      Q      And when you say removing a student from campus, is

14   that the term you would use in the Police Department?

15      A      Normally, it would be just us standing by while a

16   student left.

17            Where we have had situations where housing has --

18   we have situations where housing has a student that, because

19   of a judicial sanction is having to be removed from the

20   dorms -- what happens is, if the student poses no problem

21   for Student Affairs or Housing, we are not even requested to

22   be there.

23            If it's a situation where there has been some kind

24   of problem with the student, they may ask us to have an

25   officer come over to stand by.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    So, this would be an escort?

2    A    Right.

3    Q    You'd be escorting the student out of the dorm?

4    A    Right.  That would be the best --

5    Q    All right.  Have they ever asked you to arrest

6    students in those circumstances?

7    A    To arrest them?  No.

8    Q    And do you ever arrest students?

9    A    We do arrest students.  We're a regular police

10    department.  So, if there's an infraction, an arrestable

11    offense, we do arrest students.

12    Q    Okay.  How about getting restraining orders against

13    students?  Is that something you're involved in?

14    A    Our Department can be.  When we've had assaults in

15    the past, whether they've been physical or sexual assaults,

16    we worked with the students in connecting them with the

17    people that would help them get a restraining order or a

18    temporary protective order.

19    Q    And you do this on behalf of one student

20    complaining against another student?

21    A    Right.  Or complaining --

22         MS. HANCE:  Object to form.

23    BY MR. FEDELI:

24    Q    You can answer.

25    A    Or where it's a student with a complaint against a



1    nonstudent.

2        Q    Ever have someone in administration ask for a

3    restraining order against a student?

4        A    Not that I can recall, no.

5        Q    If that happened, would that be something your

6    department would handle?

7        A    It would be something we could assist them with.

8        Q    And when you say assist, you said you put them in

9    touch with the proper people.  Who would that be?

10       A    If it involved a situation involving domestic

11   violence or some kind of physical assault of a sexual

12   nature, we would put them in touch with the people at The

13   Haven.  The Haven has advocates that will walk them through

14   the process.

15            And if it were a situation that involved

16   harassment -- the majority of instances where we've had that

17   in the past, it's been something that's occurred off campus

18   but has involved one of our students.

19            What we do is we put them in touch with the victim

20   advocates with either the State Court or the District

21   Attorney's office, and they help them go through that.

22            We've referred people to Georgia Legal Affairs

23   downtown.  They help people obtain those orders.

24       Q    Okay.  And have you ever helped students obtain

25   protective orders against someone who's making threats

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    against them?  Violent threats?

2        A    I have not, personally, but my investigators have,

3    yes.

4            MR. FEDELI:  This will be Exhibit Five.

5            (The document was marked for identification as

6        Plaintiff's Exhibit Number Five)

7    BY MR. FEDELI:

8        Q    It's a June 21 letter from Dr. Zaccari to Elizabeth

9    Neely.  Ms. Farmer, have you ever seen this before?

10       A    No, sir.

11       Q    You can take a quick look at it to familiarize

12   yourself with this letter.

13       A    (Reviewing document.)

14           MS. HANCE:  It's a pretty long letter.  How

15       familiar are you talking?

16           MR. FEDELI:  Just a quick look.  I'm really only

17       going to ask her about a couple of things here.

18   BY MR. FEDELI:

19       Q    Okay.  Ms. Farmer?

20       A    Yes, sir.

21       Q    I'll call your attention to page four, paragraph

22   thirteen of the letter.

23       A    Uh-huh.

24       Q    In this paragraph -- and I'll let you read it while

25   I'm talking -- basically, Dr. Zaccari said he relied on your

Page 79

1     advice and those of other people in his decision to

2     administratively withdraw Hayden Barnes.  Can you read the

3     whole thing and make sure you agree with that

4     characterization.

5         A     Okay.  (Reviewing document.)

6         Q     And what I'm referring to is paragraph 13 really

7     runs to the bottom of this page.  That whole thing.

8         A     Oh, okay.  (Reviewing document.)

9               MR. LaVALLEE:  Are you asking her to read paragraph

10        13 starting on page 4 until -- where?

11              MR. FEDELI:  End of page four.

12              MR. LaVALLEE:  Okay.

13              (Pause.)

14              THE WITNESS:  Okay.

15    BY MR. FEDELI:

16        Q     Would you say that Dr. Zaccari's characterization

17    to some extent anyway -- obviously, there are a lot of

18    names -- relying on your advice in his ultimate decision to

19    minimize campus focus of Mr. Barnes by doing this emergency

20    withdrawal without a hearing --

21              MS. HANCE:  Object to form.

22    BY MR. FEDELI:

23        Q     -- what advice do you think he's relying on there

24    that might've come from you?

25              MS. HANCE:  Object to form.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1              THE WITNESS:  In terms of making the decision about
 2         the withdrawal?
 3    BY MR. FEDELI:
 4         Q     Yeah.  What advice did you supply that you think he
 5    might be referring to here?
 6         A     None.
 7         Q     None.  Did you ever --
 8         A     I mean, I -- well, I wasn't asked my thoughts on
 9    his being withdrawn, so I offered no opinion on his
10    withdrawal.
11         Q     Okay.  Did you ever offer an opinion about the
12    possibility of getting a restraining order?
13         A     Yes, I did.
14         Q     And when was that?
15         A     It was during the first meeting when he said
16    that -- when he talked about the fact that he thought that
17    Hayden had threatened him with that flier, and I told him at
18    that meeting that we would certainly be willing to take a
19    formal police report and that in terms of -- if he felt that
20    there was a risk to him that he needed to consider getting a
21    restraining order, we would be happy to help do that for
22    him.  But Lavern Gaskins was in the meeting.  Lavern knows
23    how to do that and you could have her assist you if you need
24    it.
25         Q     What did he say?
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A     Nothing.

2      Q     Anybody else say anything?

3      A     No.

4      Q     Did you discuss any of these issues concerning

5   Hayden Barnes with Scott Doner?

6      A     Chief Doner was not -- initially, he was not in

7   town.  I attended the three meetings because he was not

8   here.  I'm not sure which trip he was on, but he was not in

9   the state.  In those situations, I really don't talk to him

10  because there's nothing he can do.

11         So, I did fill him in when he returned, and it was

12  at that point that I was no longer a party to any meetings

13  or discussions.  He would have been.

14     Q     He returned after the third meeting?  Is that what

15  you're saying?

16     A     Yes.

17     Q     Okay.  And that's when you would've filled him in?

18     A     Right.

19     Q     Did he say anything at that time when you filled

20  him in on this Hayden Barnes situation?

21     A     Not that I can recall.

22     Q     Didn't say anything to you?

23     A     Not that I remember.

24     Q     Didn't say he was going to contact anybody?

25     A     No, not that I remember.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Didn't ask you to follow up or take any actions?

2    A    No, because -- well, I don't know why he didn't,

3    but at that point the decision had already been made.

4    Q    Okay.  This would've been mid May about when you

5    would've had this conversation with Chief Doner?

6    A    I really -- I don't know.  It would've been after

7    that third meeting.  And he was back before -- he was back

8    before the letter was delivered to Barnes, so it would've

9    been that same week.

10    Q    Okay.  So, it would've been right before the actual

11    administrative withdrawal of Hayden?

12    A    Right.  Before that letter was delivered.

13    Q    When you had that conversation with Chief Doner?

14    A    Right.

15    Q    Okay.

16         MR. FEDELI:  While we're on the subject, call this

17    Exhibit Six.

18         (The document was marked for identification as

19    Plaintiff's Exhibit Number Six.)

20    BY MR. FEDELI:

21    Q    This is the May 7, 2007, letter to Hayden Barnes

22    from President Zaccari.  Is that what you have or did I give

23    you the wrong thing?

24         MS. HANCE:  I just have this.  She has this.

25         MR. FEDELI:  You have the wrong one.  Sorry.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          MS. HANCE:  Here you go.

2          (Discussion off the record.)

3     BY MR. FEDELI:

4      Q     Ms. Farmer, have you seen this letter before?

5      A     No, sir.

6      Q     I call your attention to the first paragraph of

7     this letter from Dr. Zaccari to Hayden Barnes.

8            "As a result of recent activities," et cetera, et

9     cetera, "You are considered to present a clear and present

10    danger to this campus."

11           Do you know what that means?

12     A     I don't know how he meant it.  Is that what you're

13    asking?

14     Q     Yes.  Is that a phrase that you use in law

15    enforcement?

16          MS. HANCE:  Object to form.

17          THE WITNESS:  Sometimes, yes, sir.

18    BY MR. FEDELI:

19     Q     When would you use that phrase?

20     A     If an individual was clearly a danger; that there

21    was something that was imminent and impending and was

22    clearly what I or we presume to be a threat.

23     Q     And by "threat," you mean about to commit a crime?

24     A     Correct.  But I can't speak on behalf of

25    Dr. Zaccari.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     Q     Understood.  When were you first notified that the
2  decision had been made to administratively withdraw Hayden
3  Barnes?
4     A     At that last meeting, it was discussed that -- it
5  seemed like at the end of the meeting the decision had
6  already been made, so that's when I knew.
7          MR. FEDELI:  Exhibit Seven.
8          (The document was marked for identification as
9     Plaintiff's Exhibit Number Seven.)
10  BY MR. FEDELI:
11    Q     May 9, 2007, memorandum, President Zaccari to
12  staff.  Ms. Farmer, have you ever seen this memorandum
13  before?
14    A     No.
15    Q     It looks like Chief Doner was copied on this.
16    A     Right.
17    Q     He ever share that with you?
18    A     I don't believe so.  I don't remember seeing it.
19    Q     This indicates that Mr. Barnes has been
20  administratively withdrawn.  It's President Zaccari
21  informing his staff of that decision, correct?
22    A     Yes, sir.
23    Q     And he also seems to say that Mr. Barnes will be
24  given 48 hours to vacate from Residence Hall.
25    A     Yes, sir.

Page 85

1     Q     Do you know why that is?

2     A     No, sir.

3     Q     Have you ever seen a directive like that before?

4     A     I may have in regard to some of our other students

5  who have been taken out of the Residence Hall, but I

6  don't -- in those situations, we may get a copy from the

7  Judicial Affairs Office just letting us know that the

8  student's still in school but out of the dorms.  I just get

9  them and put them in a case file.  I don't really read them

10  verbatim.

11     Q     And do you know why they usually give students a

12  few days to vacate the dorms?

13     A     So that they can get all their belongings together,

14  turn in their keys and other items.

15     Q     Wouldn't 48 hours be a lot of time for a clear and

16  present danger to manifest itself?

17           MS. HANCE:  Object to form.

18  BY MR. FEDELI:

19     Q     In your opinion.

20     A     In my opinion, yes.

21     Q     And if a student were considered a dangerous threat

22  to campus or an individual, would this action of removing

23  him from the dorms prevent that threat?

24           MS. HANCE:  Object to form.

25           THE WITNESS:  Not necessarily.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1   BY MR. FEDELI:

 2       Q      Could it aggravate the threat?

 3              MS. HANCE:  Object to form.

 4              THE WITNESS:  It could.

 5   BY MR. FEDELI:

 6       Q      Okay.

 7              (The document was marked for identification as

 8       Plaintiff's Exhibit Number Eight.)

 9   BY MR. FEDELI:

10       Q      This is a September 11, 2007, article entitled

11   Faculty, Staff Seminars Address Campus Violence.

12   Ms. Farmer, have you seen this before?

13       A      No.

14       Q      There's a mention of your name in here, paragraph

15   four:  "University Police Assistant Director, Ann Farmer,

16   and VSU Counselor, Leah McMillan."

17       A      Uh-huh.

18       Q      This is part of the work that you described earlier

19   with Leah McMillan --

20       A      Yes.

21       Q      -- as general awareness.  This followed a few

22   months after the situation with Hayden Barnes.  Is that

23   correct?

24       A      Yes.

25       Q      Any relationship to that?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     A     No.

2     Q     His name ever come up in this?

3     A     Never.

4           (The document was marked for identification as

5     Plaintiff's Exhibit Number Nine.)

6     BY MR. FEDELI:

7     Q     Exhibit Nine.  This is a PowerPoint presentation,

8     Campus Violence, Valdosta State University, facilitators,

9     Major Ann Farmer and Leah McMillan.

10    A     Yes.

11    Q     Do you recognize this document?

12    A     Yes.

13    Q     And what was this document used for?

14    A     It's used to put on our Campus Violence class.

15    It's a PowerPoint presentation we utilize.

16    Q     And when did you first put on this class?

17    A     I actually don't remember the first date that we

18    put this on.  I know I put one on not using this prior to

19    Leah coming to work at the University, but I don't remember

20    the first date that we taught a class.

21    Q     What year about was the first time this PowerPoint

22    presentation was used?

23    A     (Reviewing document.)  I really don't know.  I

24    don't remember.  I'm looking to see if it's noted in here

25    but -- I don't know.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q     Best guess would've been prior to 2005?

2    A     That we used this?

3    Q     Yes.

4    A     I don't really --

5          MS. HANCE:  Object to form.

6          THE WITNESS:  I'd have to check with Training and

7    Development to see when we did our first class.  I really

8    don remember.

9    BY MR. FEDELI:

10    Q     About how long have you been doing the class?

11    A     Since the first -- I don't mean to be smart, but I

12   can't tell you exactly how long.  I don't keep up with that.

13   I mean, we teach it.  I could call Training and Development

14   and get a date from when we first did a class, but we've

15   done several classes.

16    Q     I understand.  Not to press you on this point, but

17   if you could give me a ball park, whether it's five, ten,

18   fifteen years you've been doing this.

19          MS. HANCE:  Objection.  Asked and answered.  She

20    doesn't know.

21   BY MR. FEDELI:

22    Q     Okay.

23    A     I'm at the age where yesterday, five years ago -- I

24   don't remember.  I'm sorry.

25    Q     Okay.  That's fair enough.  Let's move on.  We'll

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    go back to your notes.

2    A    Okay.

3    Q    What we have marked as Exhibit Two, this would be

4    your phone call to Leah McMillan, correct?

5    A    Uh-huh.  Yes, sir.

6    Q    You testified earlier that you had received what

7    you believe to be kind of a credible complaint about Hayden

8    Barnes, along with information that he was receiving

9    counseling, correct?

10        MR. LaVALLEE:  Object to form.  Misstates her prior

11    testimony.

12        THE WITNESS:  I'm not clear on your question, I

13    think.

14    BY MR. FEDELI:

15    Q    Prior to this call, you were aware both that

16    someone, Dr. Zaccari, had complaints about Hayden Barnes.

17    A    Correct.

18    Q    And you were also aware, you became aware, you

19    spoke earlier, that he was receiving counseling.

20    A    Prior to the phone call, I knew that there was a

21    discussion at the first meeting where a doctor had indicated

22    to the University that he should continue or take advantage

23    of ongoing counseling; but I did not know that he was in

24    counseling at that time.

25    Q    Prior to getting this call?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      Right.   I didn't know that he was in counseling

2    here on campus.  I did not.

3      Q      So, you learned that he was in counseling as a

4    result of this call?

5      A      Yes.

6              MR. LaVALLEE:  Objection to form.

7    BY MR. FEDELI:

8      Q      You also testified earlier that you needed to ask

9    these questions and felt that you were entitled to this

10   information because there was a threat or a complaint about

11   a potential for violence from this individual?

12             MS. HANCE:  Object to form.

13   BY MR. FEDELI:

14     Q      Is that fair?

15     A      I think it would be more fair to say that as part

16   of my job, once you receive -- once I receive a complaint

17   regarding any kind of a threat or problem between two

18   people, I try to get as much information as possible to see

19   whether or not there is a validity to that threat and what

20   supporting factors exist that would support or take away the

21   validity.

22     Q      So, this would be part of your investigation?

23     A      Yes.

24     Q      As part of that investigation, one of the things

25   you would ask someone who told you they were giving

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    counseling to a student is, "Is this person a violent
 2    threat?"
 3              MS. HANCE:  Object to form.
 4              THE WITNESS:  Not necessarily.
 5    BY MR. FEDELI:
 6       Q    No?  Would you -- you wouldn't necessarily ask if a
 7    person who is the subject of your investigation presents a
 8    violent threat?
 9              MS. HANCE:  Object to form.
10              THE WITNESS:  I don't recall ever asking anybody if
11         somebody was a violent threat.
12              I have asked is this person in counseling; is there
13         any problem that would indicate they would be a threat to
14         themselves or others.  I have asked that before.
15    BY MR. FEDELI:
16       Q    Okay.  Did you ask that on this call?
17       A    I do not remember exactly what I asked.  I know I
18    did ask if he was in counseling with her.  I did tell her
19    that there had been a threat made to Dr. Zaccari; was there
20    anything that would indicate that he was a problem.  I
21    usually use the term "problem."
22       Q    At some point in this call, as I recall from your
23    earlier testimony, Ms. McMillan answered that question:
24    "No, he does not present a threat," right?
25       A    Right.
```

Page 92

1    Q    Did you ask at anytime whether Hayden had A.D.D.?

2    A    No.  She told me that information.

3    Q    Do you remember asking whether he had obsessive

4    thoughts?

5    A    No.

6    Q    Asked whether he was a little paranoid?

7    A    No.

8    Q    Would that usually be part of your investigation?

9    A    In terms of --

10    Q    In terms of questions you would usually ask in

11    investigations of this type.

12    A    Sometimes maybe, maybe not.  I believe that the

13    information, though, went towards, especially in terms of an

14    explanation as to -- because he could be this way -- he had

15    not mentioned anything about the parking deck and that if he

16    was, if -- well, that was the way I took it.  If he was

17    obsessed about the parking deck, she would've heard about it

18    because of his pattern.

19    I mean, to me, that explained -- I didn't have to

20    go back and ask.  To me, it explained -- in my own opinion,

21    if he was truly obsessive, if he had irrational thoughts, it

22    certainly would've -- she would've been telling me that he

23    had talked about Dr. Zaccari or had made a threat or had

24    done something and that did not exist.

25    Q    Leah didn't tell you anything about his concerns

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    over the parking deck?
 2        A    No.  She said he had not shared any of that
 3    information with her.
 4        Q    But you did ask?
 5        A    Yes.  I believe I did.  I know I told her about the
 6    parking deck.
 7        Q    Okay.  Your notes from -- I believe this is meeting
 8    three, correct?
 9        A    Yes, sir.
10        Q    And our Exhibit Four.  Turning to page four of this
11    document --
12        A    (Reviewing document.)  Okay.
13        Q    This first paragraph up top --
14        A    Yes.
15        Q    -- could you read that for me?
16        A    Administrative withdrawal.
17             MR. LaVALLEE:  What are we looking at?  Four?
18             MR. SMITH:  Page four.
19             MR. LaVALLEE:  My bad.  I'm sorry.
20             THE WITNESS:  Administrative withdrawal.  One, no
21    Council needed.  Two, nothing from Comprehensive
22    Counseling Center but leaves campus in precarious legal
23    footing.
24    BY MR. FEDELI:
25        Q    What's your recollection of that discussion from
```

Page 94

1    your notes?

2        A    In the discussion of the different types of

3    withdrawal, the administrative withdrawal meant that there

4    didn't have to be any kind of a hearing, the faculty --

5    student/faculty hearing.  There didn't need to be one, and

6    they didn't need any kind of documentation from the

7    Counseling Center.

8        Q    And what about that third part?

9        A    Well, that it left the campus in a liability

10   setting.

11       Q    Who was speaking about this subject?

12       A    I believe that it was Dr. Zaccari talking about

13   that.  And my notation on the left, Lavern inputted that

14   there was a need to include references to Hayden Barnes'

15   mental health; that you couldn't go without supported

16   evidence of a threat.

17       Q    Was there any discussion about why there would be a

18   liability situation and precarious legal footing with this

19   option?

20       A    Well, obviously, as Dr. Keppler and Vick Morgan

21   added to the conversation, to me, it was clear that the

22   Counseling Center and the Director of Student Affairs were,

23   basically, saying Hayden was -- there was nothing to support

24   that he was a threat; nothing to support that there was a

25   mental health issue so that they couldn't use that as a

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    means to take him out of school.

2        Q    Anything else you recall about that conversation?

3        A    I don't know what you're looking for.

4        Q    That's fine.  You testified earlier you have helped

5    students get restraining orders before.

6             Could you have helped get a restraining order in

7    this case against Hayden Barnes?

8             MS. HANCE:  Object to form.  It misstates her prior

9        legal testimony.

10            And, as far as help, would you just be a little bit

11       more clear when you ask that question?

12            MR. FEDELI:  Sure.

13   BY MR. FEDELI:

14       Q    You testified earlier about working with students

15   on restraining orders, correct?

16       A    Correct.

17       Q    And it was putting them in touch with the right

18   people and getting them the right information to get a

19   restraining order.

20       A    Correct.

21       Q    Did you ever have to testify or have any of your

22   officers testify in court for that purpose?

23       A    I believe that we have.  I don't -- I have not had

24   to do that, personally, because I have officers and

25   investigators.  I believe that they have, yes.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Had President Zaccari asked you to help do that, is

2  there any reason why you wouldn't have done that?

3    A    No.  There's no reason I wouldn't have if he asked.

4    Q    You mentioned earlier that you worked with Leah

5  McMillan on a few different occasions, talking to her about

6  patients and she's always been very protective of

7  confidentiality, correct?

8    A    Yes.

9    Q    Do you remember any of those other occasions that

10  you've worked with Leah McMillan on this issues?

11    A    Most of the cases would've been sexual assault

12  cases.  There have been times that I called because

13  information came to us saying that a student may have been

14  assaulted on campus but we don't have a report; that I have

15  called and asked whether or not there had been a sexual

16  assault.

17         Per the protocol that we operate under with The

18  Haven rape crisis center and with the Crisis Center, she

19  doesn't give us a name; but we do get a report from The

20  Haven and from the Counseling Center, from Leah, that will

21  indicate whether or not a student -- we don't get the

22  names -- whether or not a student has been assaulted,

23  whether or not it took place on campus or off campus.

24         But unless a student has given her permission to

25  give us contact information, we don't -- she won't give that

Page 97

1    to us.

2        Q    Okay.  So, in those cases when you've worked with

3    Ms. McMillan, the student would consent to her disclosure of

4    information for the purpose of aiding a criminal

5    investigation, correct?

6        A    Correct.

7        Q    Any other times beyond the sexual assaults we've

8    talked about that you've spoken to Ms. McMillan about a

9    student?

10       A    That I can remember in specific, no.  I know that

11   in the past I have contacted the Counseling Center about

12   students that may be presenting with -- or we have somebody

13   who we were out on who is threatening to harm themselves.

14            We have called to see if the student is being seen

15   at the Counseling Center so that we can have -- if they are,

16   their counselor can come to them and assist us with those

17   students.

18       Q    About how many times have you had those

19   conversations?

20       A    With the Counseling Center?

21       Q    (Nods head.)

22       A    I'd say maybe, guessing, about a dozen times over

23   the course of my working here.

24       Q    Those are with different students?

25       A    Yes, sir.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1      Q    And in each case were the facts similar to the
2   Hayden Barnes situation?  Was it a complaint about the
3   student?
4           MS. HANCE:  Object to form.
5           THE WITNESS:  Ask me again.  I'm sorry.
6   BY MR. FEDELI:
7      Q    Well, what prompted those twelve conversations to
8   the Counseling Center?
9      A    Usually because there's an incident that occurred
10  or occurring.
11     Q    What kind of incident?
12     A    The same thing that I said.  You know, if we have
13  an officer out on the scene with a student who is
14  threatening to kill themselves, who is upset, visibly upset
15  but hasn't committed a crime where we wouldn't necessarily
16  have them committed on a 1013 but they are --
17     Q    A 1013?
18     A    An involuntary commitment -- where we might see the
19  need for them to have somebody come over and counsel with
20  them to help them through their crisis.
21     Q    Suicide threats, involuntary commitments.  Any
22  other times when you talked to the Counseling Center?
23          MR. LaVALLEE:  Objection to form.  I don't think
24      she just testified about involuntary commitments that
25      prompted any discussions with the Counseling Center.  I
```

Page 99



```
 1      think that misstates her testimony.

 2           MR. FEDELI:  I don't believe it does, but we can

 3      read it back.

 4           THE WITNESS:  I think I was talking about the

 5      fact -- if we had a situation that didn't hit the level

 6      of an involuntary commitment.

 7           If we have an involuntary commitment where we're

 8      going to take somebody in, we don't notify the Counseling

 9      Center.

10           But on a situation where it's not at that level,

11      someone has not committed a crime or actually tried to

12      harm themselves but they're threatening or they're

13      extremely upset, we do contact the Counseling Center.

14      BY MR. FEDELI:

15      Q      Okay.  Do you remember any cases where a student

16      was, I guess, making threats similar to this one where you

17      had to contact the Counseling Center to find out whether he

18      was really a danger or not?

19      A      Not that I remember but it doesn't mean that it

20      hasn't happened.  I just don't remember offhand.

21      Q      Earlier you mentioned that President Zaccari said

22      he was concerned for his own safety.

23      A      Yes.

24      Q      Did he also say that he believed Hayden was a

25      threat to the campus?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     A     I don't remember that.

2     Q     Did you believe President Zaccari was scared for
3     his safety?

4     A     Yes.

5     Q     Why didn't you arrest Hayden?

6     A     The President -- in order for us to go forward with
7     an arrest, the President would need to make a formal police
8     report.  He would need to be willing -- not willing but a
9     participant in terms of doing that.

10         It was my understanding, especially from what he
11    said at the third meeting, that his concern was removing
12    himself from contact with Hayden Barnes and not damaging his
13    academic well-being, if you will.

14         At the time, you know, like any other case, if
15    Dr. Zaccari had wanted to go forward with prosecution and
16    attempting to get a warrant, we would've followed through
17    with that.

18    Q     Why didn't you do a 1013 with Hayden?  Why didn't
19    you involuntarily commit him when President Zaccari
20    communicated this fear to you?

21         MS. HANCE:  Object to form.

22         THE WITNESS:  It would not have been appropriate
23         for me to initiate a 1013.  The crime would've had to
24         have been in front of me.  This was something that had
25         not been.

Page 101

```
1              This is something that came to our attention after
2         the fact.  And because of that gap, a 1013 on our part
3         would not have been appropriate.  That would've been
4         something a physician or -- well, a physician would've
5         had to handle.  But it was not appropriate at that point
6         for our department to do that.
7              MR. FEDELI:  Take a quick break?
8              (Discussion off the record and a recess was taken
9         from 12:33 p.m. to 12:36 p.m.)
10   BY MR. FEDELI:
11        Q    Ms. Farmer, just a couple of basic questions.  I
12   can't remember if Mr. LaVallee asked you.  Have you had your
13   deposition taken before?
14        A    No.
15        Q    And thinking for a moment about, you know,
16   everything we've talked about this morning, do you have
17   anything really to add about the information we've
18   discussed?
19        A    I don't think so, no.
20        Q    Is there any reason why the information you gave
21   today might not have been complete or accurate?  You have
22   enough sleep, anything like that?
23        A    No, but no reason it wouldn't have been.
24             MR. FEDELI:  All right.
25             (Deposition concluded at 12:34 p.m.)
```

**WHEELER
REPORTING**
Court Reporting • Video • Litigation Support
**404.351.4577**

1              (Pertaining to  Federal Rules of Civil Procedure

2     and/or O.C.G.A. 9-11-30(e), the deponent and/or a party

3     having requested the right to review the deposition,

4     making corrections and/or changes and signing, for that

5     purpose the errata pages have been annexed hereto.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WHEELER
REPORTING**
Court Reporting • Video • Litigation Support
**404.351.4577**

1                    C E R T I F I C A T E

2   STATE OF GEORGIA:

3   COUNTY OF LOWNDES:

4          I hereby certify that the foregoing transcript was

5   taken down, as stated in the caption, and the questions and

6   answers thereto were reduced to typewriting under my

7   direction; that the foregoing pages 1 through 102 represent

8   a true, complete, and correct transcript of the evidence

9   given  upon said hearing, and I further certify that I am

10  not of kin or counsel to the parties in the case; am not in

11  the regular employ of counsel for any of said parties; nor

12  am I in any way interested in the result of said case.

13          This, the 16th day of July, 2009.

14

15

16         /s/ Sarah Williams

17         SARAH WILLIAMS, FPR, RPR, CCR B1653

18

19

20

21

22

23

24

25

                                                    Page 104

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                          DISCLOSURE

 2   STATE OF GEORGIA            Deposition of: MAJOR ANN FARMER

 3   COUNTY OF LOWNDES:    Date:  July 8, 2009

 4        Pursuant to Article 10.B of the Rules and Regulations

 5   of the Board of Court Reporting of the Judicial Council of

 6   Georgia, I make the following disclosure:

 7        I am a Georgia Certified Court Reporter.  I am here as a

 8   representative of Wheeler Reporting.  I am not disqualified

 9   for a relationship of interest under the provisions of

10   O.C.G.A. §9-11-28 (c).

11        Wheeler Reporting was contacted by the

12   offices of Daley, Koster & LaVallee to provide court

13   reporting services for this deposition.  Wheeler Reporting

14   will not be taking this deposition under any contract that

15   is prohibited by O.C.G.A. §15-14-37 (a) and (b).

16        Wheeler Reporting has no exclusive contract to provide

17   reporting services with any party to the case, any counsel

18   in the case, or any reporter or reporting agency from whom a

19   referral might have been made to cover this deposition.

20        Wheeler Reporting will charge its usual and customary

21   rates to all parties in the case, and a financial discount

22   will not be given to any party to this litigation.

23                          _____
                            Sarah Williams, CCR, FPR, RPR.
24                               CCR No.  B1653

25
```

Page 105

1            DEPOSITION OF MAJOR ANN FARMER/SEW

2            I do hereby certify that I have read all questions

3    propounded to me and all answers given by me on the 8th day

4    of July, 2009, taken before Sarah Williams, FPR, CCR, RPR,

5    and that:

6        1) ___/___        There are no changes noted.

7        2) _____  The following changes are noted:

8            Pursuant to Rule 30(e) of the Federal Rules of

9    Civil Procedure and/or the Official Code of Georgia

10   Annotated 9-11-28(c), both of which read in part:  Any

11   changes in form or substance which you desire to make shall

12   be entered upon the deposition...with a statement of the

13   reasons given...for making them.  Accordingly, to assist you

14   in effecting corrections, please use the form below:

15   Page No.        Line No.        should read:

16   _____

17   Page No.        Line No.        should read:

18   _____

19   Page No.        Line No.        should read:

20   _____

21   Page No.        Line No.        should read:

22   _____

23   Page No.        Line No.        should read:

24   _____

25

Page 106

1                    DEPOSITION OF MAJOR ANN FARMER/SEW

2       Page No.        Line No.        should read:

3       _____

4       Page No.        Line No.        should read:

5       _____

6       Page No.        Line No.        should read:

7       _____

8       Page No.        Line No.        should read:

9       _____

10      Page No.        Line No.        should read:

11      _____

12      Page No.        Line No.        should read:

13      _____

14

15              If supplemental or additional pages are necessary,

16      please furnish same in typewriting annexed to this

17      deposition.

18

19      _____

20      ANN FARMER

21

22      Sworn to and subscribed before me,
        this the 8th day of Sept,        , 2009.
23

24      _____
        Notary Public
25      My commission expires:
        Notary Public, Lowndes County, Georgia
        My Commission Expires March 28, 2011

                                                        Page 107