IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 23 2009

JAMES N. HATTEN, Clerk
By: Deputy Clerk

THOMAS HAYDEN BARNES,

    Plaintiff,

vs.

RONALD M. ZACCARI, et al,

    Defendants.

_____/

CASE NUMBER

1:08-CV-00077-CAP

DEPOSITION OF

LAVERNE GASKINS, ESQ.

JUNE 12, 2009

10:05 A.M.

VALDOSTA STATE UNIVERSITY CENTER
1500 NORTH PATTERSON STREET
SOUTH BUILDING, ROOM 1149
VALDOSTA, GEORGIA

SARAH E. WILLIAMS, FPR, CCR, RPR



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577



Original

```
 1                    A P P E A R A N C E S

 2

 3      On behalf of Plaintiff:

 4      ROBERT CORN-REVERE, ESQ.
        ERIN N. REID, ESQ.
 5      Davis Wright Tremaine, LLP
        Suite 200
 6      1919 Pennsylvania Avenue, N.W.
        Washington, D.C.   20006-3402
 7

 8      On behalf of Defendant Gaskins:

 9      DAVID R. SMITH, ESQ.
        Brannen, Searcy & Smith, LLP
10      22 East 34th Street
        Savannah, Georgia  31401
11

12      On behalf of Zaccari, VSU, Board of Regents, Keppler,
                            Mast and Morgan:
13
        DAVID C. WILL, ESQ.
14      HOLLY HANCE, ESQ.
        Royal Washburn Will
15      4799 Surgarloaf Parkway
        Building J
16      Lawrenceville, Georgia  30044

17
        On behalf of McMillan:
18
        MATTHEW R. LaVALLEE, ESQ.
19      Daley, Koster & LaVallee, LLC
        2849 Paces Ferry Road
20      Suite 160
        Atlanta, Georgia   30339
21

22      Also Present:  Ronald M. Zaccari, Defendant

23                              Leah McMillan, Defendant

24

25
```

1                    I N D E X

2    Examination by Mr. Corn-Revere                5

3    Examination by Mr. LaVALLEE                  185

4    Examination by Mr. Will                      190

5

6                   E X H I B I T S

7    Plaintiff's

8    1        Complaint                              10

9    2        Request/Interrog. and Doc. Production   10

10   3        Supplemental Response                  10

11   4        Email to RZ from LG 4/26/09            12

12   5        Fax to LG from EN 5/1/07               53

13   6        List of Grades to RZ                   72

14   7        Re: "Academic Probation and Suspension"  72

15   8        Student Code of Conduct pg. 39-48      78

16   9        Student Code of Conduct (Excerpts)     86

17   10       Student Handbook                       92

18   11       Student Handbook, Volume 2             94

19   12       BOR Policy Manual:  Section 1900       95

20   13       Policy Manual:  Section 400            97

21   14       Bylaws of Board of Regents            100

22   15       Disciplinary Statistics              103

23   16       Email from L.Hammond to T.Hardy 5/2/07  109

24   17       Article on Legal Developments        113

25   18       News Article 12/29/05 re: Ebay/PayPal  115

1                    E X H I B I T S (Continued)

2      19        Flyer re: Parking Garage              116

3      20        Letter to Editor re: Parking Garage   116

4      21        Facebook pages                        116

5      22        Collage from Facebook                 116

6      23        Memo to RZ from LG 5/4/07             135

7      24        Letter to HB from RZ                  149

8      25        Memo to Staff 5/9/07                  156

9      26        BOR Agenda 5/3/09                     159

10     27        Letter from L. Hammond 5/8/07         161

11     28        Letter from Winder 5/8/07             161

12     29        Letter from Neely to Zaccari          169

13     30        Draft of Response from RZ             171

14     31        Draft of Response from RZ             171

15     32        Response to BOR from RZ               171

16     33        Memo from RZ to staff                182

17

18     Defendant McMillan's

19     1         McMillan's Response to Plaintiff Interrog.186

20

21

22

23

24

25

```
 1   THEREUPON,
 2                       LAVERNE GASKINS, ESQ.,
 3   having been first duly sworn, was examined and testified as
 4   follows:
 5                       EXAMINATION
 6   BY MR. CORN-REVERE:
 7       Q     Good morning.
 8       A     Good morning.
 9       Q     I'm Bob Corn-Revere.  This is Erin Reid.  We
10   represent Hayden Barnes in the case.  Today I'll be asking
11   you a number of questions in this deposition.
12             MR. LaVALLEE:  Bob, I'm sorry to intervene right
13       away, but we didn't do any stipulations as to how to
14       handle things.
15             MR. CORN-REVERE:  I'm sorry.  I had mentioned it
16       earlier but forgot to bring it up again.
17             Standard stipulation as to objections.
18             MR. LaVALLEE:  Form of the question --
19             MR. CORN-REVERE:  Yes.  Right.
20             MR. LaVALLEE:  -- and responsiveness of the answer?
21             MR. CORN-REVERE:  Yes.  Right.
22             MR. SMITH:  There's one thing I'd like to add to
23       that.  I expect that a good portion, if not most, of the
24       questioning of Ms. Gaskins in this deposition today is
25       going to involve communications that occurred while she
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    was serving in the capacity as attorney for Valdosta

2    State University --

3         MR. CORN-REVERE:  Yes.

4         MR. SMITH:  -- and counseling with the folks who

5    were her clients at the time.

6         That, obviously, raised concerns of attorney-client

7    privilege which were raised at the beginning of this

8    case.

9         I've seen information and material that you

10    provided that indicated to me that that privilege is

11    waived during pre-suit administrative appeal of the

12    withdrawal of the plaintiff in this case.

13         And that's my understanding.  We responded to

14    discovery on that basis to this point, and that's also

15    the basis I intend to proceed on the deposition.

16         But the attorney for all those folks who were

17    clients at that time, Dave Will, is here today.  I'll

18    just say if he sees a question that seeks to invade what

19    he perceives as an attorney-client privilege that has not

20    been waived, I encourage him to make that because I don't

21    intend to.  I'm proceeding under the assumption that

22    privilege has been waived.

23         MR. CORN-REVERE:  Okay.  Thank you for that

24    clarification.  And, in fact, many of the questions today

25    will be based on the supplemental response to

1    interrogatories and document production that was provided

2    earlier this week by you.

3         If any of that material raises potential objections

4    that we haven't already discussed, it might be good to

5    discuss that now.

6         MR. WILL:  For the record, we do not waive the

7    privilege to the extent it has not already been waived.

8    For documents that were produced in the administrative

9    proceeding to the extent it has been waived, that's a

10   waiver.

11        But for communications that have not been, we

12   reserve the right to raise that privilege.  Even if we

13   allow it for purposes of today's hearing, we reserve the

14   right to seek a ruling that it was not waived as part of

15   the earlier proceedings.

16        We don't want to delay your -- or impede your

17   cross-examination of the Defendant but may want to

18   preserve that for later ruling by the court.

19        MR. CORN-REVERE:  Okay.  I appreciate your

20   position.  Also, for the record I'll state that many of

21   the documents that we received as part of the

22   supplemental production were documents that we had seen

23   previously during the administrative phase of the

24   proceeding.

25        So, I'm not aware of any that would raise a new

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     privilege issue that hasn't already been subject to a
2     waiver argument.
3          MR. LaVALLEE:  We'll just take it as it comes then.
4          MR. CORN-REVERE:  Absolutely.
5     BY MR. CORN-REVERE:
6     Q     Could you state your name for record.
7     A     Laverne Lewis Gaskins.
8     Q     And your address?
9     A     3805 Sedgefield Drive, Valdosta, Georgia, 31605.
10    Q     Okay.  Have you been deposed before?
11    A     No.
12    Q     Okay.  Let me just say a few things at the
13    beginning that may help in just the process as we go
14    forward.
15         I'll be asking you a series of questions as, I'm
16    sure, your lawyer has explained.
17         Please, even if you understand where the question
18    might be going, let me finish the complete question so that
19    we can get it down on the record for transcription.
20         By the same token, any answers should be made
21    verbally so they can also be made on the record.  It's hard
22    to record when you nod your head or something like that.
23         If at any point when I ask you a question, if you
24    don't understand the question, please ask me to clarify.
25    I'll be happy to do that.  Or if you have any other

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    questions about what I've asked, you can ask me that, too.
2    Okay.  I think that covers that.
3              Could you tell us your occupation.
4    A     I'm an attorney.
5    Q     Okay.  Who is your employer?
6    A     Board of Regents of the University System of
7    Georgia at Valdosta State University.
8    Q     You're employed directly by the Board of Regents?
9    A     We all are.
10   Q     And what is your relationship to Valdosta State
11   University?
12   A     I'm In-House Counsel.  University Attorney.
13   Q     What are your duties as In-House Counsel for
14   Valdosta State?
15   A     I provide legal advice to the entire campus. That
16   includes faculty, administrators, and staff.  I also work
17   with the Office of the Attorney General in the event there's
18   litigation.
19             MR. SMITH:  Okay.  If I could interrupt a minute,
20        the folks at the other end of the table are having a
21        little trouble hearing you.  You need to speak up if you
22        can.
23             THE WITNESS:  Okay.  All right.
24   BY MR. CORN-REVERE:
25   Q     Okay.  Now I'm not asking you to talk about any

1  advice you may have been given, but can you tell us what you

2  did to prepare for today's deposition?

3     A    I reviewed some records and spoke with my counsel.

4     Q    Okay.  Can you tell us which records you reviewed?

5     A    I reviewed the responses to the discovery request

6  and the supplemental responses.

7         MR. CORN-REVERE:  Okay.  Let's mark for

8        identification three exhibits:  First, a copy of the

9        complaint in this case; secondly, a copy of the first

10       responses to request for interrogatories and document

11       production; and, third, the supplemental response.

12        (The documents were marked for identification as

13       Plaintiff's Exhibit Numbers One, Two, and Three).

14  BY MR. CORN-REVERE:

15     Q    Okay.  I'm not going to have a lot of questions

16  about these right now.  We may refer to them later on in the

17  deposition.

18        But let me just ask you, generally:  For the

19  responses to discovery, did you review the questions and

20  answers in both the initial response to interrogatories and

21  the supplemental response?

22     A    Yes.

23     Q    And did you approve those answers?

24     A    Yes.  And they were answered to the best of my

25  ability and recollection, correct.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

Q Okay. Having reviewed them now, is there anything that you would amend or change to those responses?
A (Reviewing document.) There is one amendment. It's my understanding that there was a meeting between myself and Leah McMillan that took place on or about May 7th. It was brought to my attention.
I think that a meeting did take place based on my review of some records. I can't remember the content of that meeting or that discussion.
Q Okay.
A Yeah. But I'm looking to see exactly where that response was to discovery requests. I think the response was -- the question was how many meetings I had with Leah McMillan, and I think there's one particular meeting that I did not recall at the time that I responded to these discovery requests.
Q I see. So there were more meetings than you had originally disclosed?
A Just that one meeting.
Q Okay. Do you know if anyone else was present at that meeting on May 7th?
A I believe Dr. Morgan.
Q And who is he?
A He is the supervisor for Leah McMillan, and he works at our Counseling Center, as well.

1      Q      Anyone else?

2      A      I believe Dr. Keppler.

3      Q      I'm sorry?

4      A      Dr. Kurt Keppler.

5      Q      And what is his position?

6      A      He's Vice President of Student Affairs.

7      Q      Was there no one else at the meeting?

8      A      Not that I can recall.

9      Q      Okay.  Let's mark as Deposition Exhibit Number Four

10     an email dated April 26th, 2007.

11            (The document was marked for identification as

12     Plaintiff's Exhibit Number Four.)

13            THE WITNESS:  (Reviewing document.)

14     BY MR. CORN-REVERE:

15     Q      Have you seen this document before?

16     A      Yes, I have.

17     Q      Can you tell us what it is?

18     A      It's an email that was sent to Dr. Ronald Zaccari,

19     and it reflects a communication between myself and Betsy

20     Neely.

21            At that time she was -- I believe her title was

22     Assistant Vice Chancellor of Legal Affairs at the Board of

23     Regents; and it's dated April the 26th, 2007.

24     Q      Okay.  Now at the top of this page -- and this is

25     the condition in which we received it -- there's a fax stamp

Page 12

1   that's dated February 25th, 2009.  Do you know what that
2   refers to?

3       A    It's when it was -- it appears as if it's been
4   faxed.

5       Q    Okay.  Do you have any recollection of when or what
6   may have been faxed?

7       A    It may have been faxed -- I cannot identify the
8   faxed number, but it may have been faxed to the office of
9   the Attorney General.

10      Q    Okay.

11      A    I can identify it.  It looks like it's a
12  404-651-5304 number.  So that tells you exactly where it was
13  faxed to.

14      Q    Okay.  Now looking at this sequence of emails --
15  again, correct me if I'm misunderstanding this -- it appears
16  that you received a response to a question from Elizabeth
17  Neely, and that response is dated April 26th, 2007.

18           But the initial question that you sent to Elizabeth
19  Neely is undated.  Or at least I don't detect a date on
20  here.

21      A    Uh-huh.

22      Q    Do you know if these were sent in response to the
23  same day or were they different days?

24      A    I can't testify to that because, as you can see,
25  this was printed out by myself.

1          The information you have reflected in this document

2     is a function of the computer system; and the computer

3     system, apparently, did not indicate when this email was

4     forwarded from myself.

5     Q     Okay.  But do you have an independent recollection

6     of when you might have first contacted Elizabeth Neely?

7     A     Via email.

8     Q     But do you know when?  I mean, just by your own

9     recollection.

10    A     No, no.  I can't recall that, no.

11    Q     Okay.  Looking at your message to Elizabeth Neely,

12    could you tell us -- well, what were you asking her for?

13    A     Well, the President was going to file -- he had

14    some concerns about Hayden Barnes, and at that time he

15    wanted to know whether or not it would be proper for the

16    matter to be disposed of in his office.

17         It specifically states, "Our appeal process

18    provides that decisions of the Judicial Board may be

19    appealed to the President.

20         "In the event the President files a complaint

21    against a student for a violation of the Student Code of

22    Conduct and the student wishes to file an appeal, should

23    that appeal go directly to your office or should the

24    President appoint a designee?"

25    Q     Okay.

1    A    In other words, if I can -- if my memory serves me

2    correctly, he had a concern about the conduct of Hayden

3    Barnes.

4    Q    "He" meaning President Zaccari?

5    A    President Zaccari.  And he wanted to know whether

6    or not that matter should be handled by Dr. Levy or himself.

7    Q    How did he convey these concerns to you?

8    A    We were just in his office.  He said, "I need you

9    to ask Betsy Neely a question."

10   Q    Okay.  Did he call you to his office for a meeting

11   on this subject?

12   A    I can't testify to that because I can't recall, but

13   it's not unlikely.  I mean, it's likely that he would've

14   done that.

15   Q    Was anyone else present when he made this request?

16   A    I don't recall that.

17   Q    Did President Zaccari describe the nature of his

18   concerns about Hayden Barnes?

19   A    At what point in time?

20   Q    During this exchange when he asked you to contact

21   Elizabeth Neely.

22   A    I can't recall the specifics of that conversation,

23   and for me to testify to that would be just speculation.

24   Q    Okay.  Did he simply ask what is the procedure for

25   the President to remove a student?

1          MR. WILL:  I object to the form of the question.  I

2     believe the witness has already said she had to speculate

3     as to the nature of the conversation, and I object to

4     speculative questions.

5  BY MR. CORN-REVERE:

6     Q     You can answer.

7     A     Repeat the question.

8     Q     Did President Zaccari simply ask you what the

9  procedure was for removing a student with the President

10 initiating the complaint?

11    A     It's more likely than not that he would've gone

12 into some limited detail about his concerns about a

13 particular student.

14    Q     But you don't recall what those concerns might've

15 been at that time?

16    A     At that point in time, no.  But, again, I could

17 speculate and respond to that question.

18    Q     I don't need you to speculate.  Hopefully, we'll

19 have some documents later that well help refresh your

20 recollection on that.

21    A     Sure.

22    Q     Did you consider this an unusual request?

23    A     Yes.

24    Q     Why?

25    A     Because the President is a part of the appeal

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    process in the campus.  So if he's involved in the decision-

2    making process about the suspension of a student, the

3    question is:  Where does that student appeal that decision

4    on campus to?

5        Q    Okay.  Had President Zaccari ever asked you about

6    this kind of procedure in the past?

7        A    No.

8        Q    Did President Zaccari ask you to provide an answer

9    based on your own analysis of what the procedure would be?

10       A    I can't recall specifically if that question was

11   posed to me.

12       Q    I see.

13       A    I can't --

14       Q    I'm sorry.  Go ahead.

15       A    I can't recall specifically.  Again -- I'm sorry --

16   your name?

17       Q    Bob.

18       A    Bob.  We're talking about events that took place in

19   2007.

20       Q    Yeah.

21       A    Okay.

22       Q    As I said, hopefully, the documents, themselves,

23   well help jog some distant memories.

24       A    Sure.

25       Q    I just noted the language you used in presenting

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    the question that Dr. Zaccari had directed you to pose a
2    question to Elizabeth Neely.
3            Is it your recollection that that was all you'd
4    been asked to do:  To pose that question to someone from the
5    Board of Regents?
6    A      In the context of this particular event based on
7    this email?  Is that your question?
8    Q      Yes.
9    A      The email reflects the question or concern that
10   Dr. Zaccari asked me to present to the Board of Regents at
11   that point in time.
12   Q      Uh-huh.  Thinking about it today, based on your
13   knowledge of the University procedures, can you think of a
14   procedure that would justify having the President file a
15   complaint against a student?
16   A      I think perhaps the best course of action would be
17   for the Board of Regents of the University System of Georgia
18   to handle complaints involving presidents of universities.
19   Q      Does such a procedure exist today?
20   A      Not to my knowledge.  I don't think it's a -- I
21   think hierarchy allows for that to take place, even if I
22   cannot recall and share a particular policy or procedure.
23   The structure of the University System of Georgia, I would
24   believe, would allow for that.
25           By way of example, if I had a concern or anybody on



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    campus had a concern who was a direct report to the
 2    President, the hierarchy would allow me to make some
 3    communications and contacts with Dr. Zaccari's superior.
 4        Q    I see.  Let's look now at the response that you
 5    received in answer to your question.
 6             This was what Elizabeth Neely wrote back to you,
 7    just looking at the second sentence, "It is not good
 8    practice for the President to be bringing a complaint
 9    against any student.  That should be handled by staff in
10    Student Affairs.  Once the President has made a decision in
11    the matter, there is no due process at the campus level."
12        A    Uh-huh.
13        Q    And you received that response on April 26th, 2007.
14             How do you interpret that answer in response to
15    Dr. Zaccari's question?
16        A    Well, there appears to be a little bit of
17    contradiction.
18        Q    Could you explain that?
19        A    Well, she says in the first sentence, "In this
20    case, the appeal should be directed straight to our office."
21    But she's not saying he should not be involved in the
22    process first and foremost.  She's just saying "The appeal
23    should be directed straight to our office."
24             So she's acknowledging the President on the campus
25    level can be involved in some complaint process involving
```

Page 19

1    the student.  It's just that, as a qualifier, "The appeal

2    should be directed straight to our office.

3            And then she says, you know, by the way, "It's not

4    good practice for the President to be bringing a complaint

5    against any student."

6            She says, "It's not good practice."  She doesn't

7    say there's a prohibition.

8    Q    Right.

9    A    But she says, "It's not good practice."

10   Q    Does she say why it's not a good practice?

11   A    No, not in the email.

12   Q    Isn't there no due process at the campus level?

13   Isn't that her conclusion?

14   A    "Once the President has made a decision in this

15   matter, there is no due process at the campus level."

16           That is what she stated; and in terms of what she

17   meant by that, I can't testify to that because I'm not Betsy

18   Neely.

19   Q    What is your understanding of that sentence, the

20   last sentence of her response, when you received it?

21   A    If the President is involved in the decision-making

22   process -- she is suggesting he can't -- the student can't

23   have due process at the campus level.

24           But that first sentence says, of course, he can be

25   a part of the process; it's just that the appeal has to go

1    to her office.  That's what I meant it's contradictory.

2        Q    Right.  Looking at the top line where you've

3    forwarded this to Dr. Zaccari, do you recall whether or not

4    you forwarded the email on the same day?  On April 26th,

5    2007?

6        A    Knowing my practice and my behavior, I would have

7    if I received it -- unless, of course, she sent the email to

8    me on April the 26th, like, after 5:30.  So the next morning

9    when I arrived on campus and I would open my email, if I saw

10   it, like, eight o'clock -- eight o'clock in the morning -- I

11   would've sent it on.

12       Q    Okay.  So either on April 26th or April 27th, 2007,

13   you believe you sent this on to Dr. Zaccari?

14       A    Right.  I would not have just sat on it.

15       Q    Yeah.  Now in your message to Dr. Zaccari, you say

16   see the message below and that you would like to discuss the

17   matter with him.

18       A    Uh-huh.

19       Q    Do you recall whether or not you did discuss this

20   email exchange with Dr. Zaccari?

21       A    Yes, I believe I would have.  When that discussion

22   may have taken place, I just simply can't recall.

23            And, also, as you can see, I forwarded it to him so

24   he's fully aware of her responses.

25       Q    Since you've described your practice as not sitting

Page 21

 1    on things and this would've been forwarded right away, what

 2    would your usual practice have been in any follow-up

 3    discussions with the President in response to a request like

 4    this?

 5        A    Whenever his schedule permitted.

 6        Q    Uh-huh.

 7        A    I would've got an appointment and gone down there

 8    and talked to him.

 9        Q    Based on past practice, would you think that would

10    be within a matter of days?

11        A    Yes.

12        Q    Okay.

13        A    Unless, of course, this April -- okay.  That's a

14    Thursday.  And if the email was forwarded Friday morning,

15    for example, then, you know -- if he was out of town,

16    Monday, then --

17        Q    Very good.  That is a Thursday.

18        A    See how good my memory is?  No, the date is right

19    here.

20        Q    Okay.  So it might've been that week; it might've

21    been the next week?

22        A    In terms of the meeting?

23        Q    Yes.

24        A    Oh, yeah.

25        Q    Okay.  So, at some point there was a meeting.  Do

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    you recall that meeting?

2        A    No.

3        Q    Do you recall ever getting a reaction from

4    Dr. Zaccari to this exchange?

5        A    No.

6        Q    Let's look now at Exhibit Three, I believe.  Your

7    supplemental response to interrogatory number three.

8        A    You said number three?

9        Q    Yes.

10       A    What exhibit are we looking at?

11       Q    Exhibit Number Three.

12       A    (Reviewing document.)  Which one did you say?

13       Q    Interrogatory number three?

14       A    Right.

15       Q    Beginning on page two.

16       A    Uh-huh.  (Reviewing document.)

17       Q    It may help if I just -- for purposes of asking

18   questions, I'll just read this first paragraph for the

19   record.

20            The question is: "Identify and describe all

21   communications between you and any person concerning any

22   matter alleged in the Complaint."

23            First paragraph of the response says, "This

24   Defendant first became aware of any issue involving the

25   Plaintiff after Defendant Zaccari received copies of the

Page 23

1    Plaintiff's Facebook materials and expressed his concern
2    over their meaning.
3            "This Defendant kept no record of the exact date
4    and time of subsequent communications; but, on several
5    occasions thereafter, Defendant Zaccari expressed to this
6    Defendant his fear for his personal safety and the safety of
7    the campus community in the context of Plaintiff's behavior
8    as perceived by Zaccari.
9            "In general discussions about what could be done to
10   remove the perceived threat posed by Plaintiff, this
11   Defendant advised Zaccari of the Constitutional guarantees
12   afforded students, including due process requirements, as
13   well as ADA concerns and applicable policies and procedures
14   relative to withdrawals."
15           Does that paragraph refresh your recollection about
16   any of the exchanges we've just been discussing about the
17   email with Elizabeth Neely?
18   A       Not in terms of specific dates and times of
19   meetings, no.  But I stand by the response.
20   Q       Okay.  Now you said there were several subsequent
21   communications with Dr. Zaccari.
22   A       Uh-huh.
23   Q       Can you tell us how many times you met to discuss
24   this with him?
25   A       No.  Not exact, no.

Page 24

1    Q    Do you know if there were formal meetings in which

2    you were invited to come discuss this topic with him?

3    A    When you say formal meetings, how do you define

4    formal meeting?

5    Q    You were invited to come to his office or summonsed

6    to his office.

7    A    It is the nature and practice -- it was the nature

8    and practice of our professional relationship that when he

9    wanted to discuss an issue with me, he would simply call my

10   office.  And my office is close in physical proximity to his

11   office.  So if I'm in the office and he wants to see me, I

12   walk down to the office.

13        So it's not a formal kind of arrangement in the

14   sense that he would schedule an appointment to see me.  If

15   the President of the University wants to talk to me, I get

16   up and I go down there.

17   Q    Okay.

18   A    So I don't have a documented history of all the

19   times he's requested to see me over a period of some five or

20   six years that he was there, no.

21   Q    I see.  So there's no kind of appointment book or

22   some physical record of meetings?

23   A    Well, if we have -- if there is a scheduled meeting

24   or if my secretary has been told to put down a particular

25   time that Dr. Zaccari wants to see me, that would be perhaps

1    on my calendar; but the nature of those communications would
2    not be.
3           So, you know, it would just be -- like this meeting
4    is -- I think she put down attorney's meeting.
5      Q    Well, it's that.
6      A    Yeah.  But what, you know, do you -- what is it?
7    You know, having a deposition or having a party?
8      Q    But is it your testimony that you have no
9    recollection of any scheduled meetings with Dr. Zaccari to
10   discuss Hayden Barnes?
11     A    When I responded to the discovery request, because
12   I could not recall events that took place with absolute
13   accuracy -- events that took place in 2007 -- I relied on
14   documents that were in place so I could go through those
15   documents and generate the two dates that are reflected in
16   the discovery responses.
17          No, I could not recall those dates independently
18   while sitting in my office at my desk and looking at the
19   interrogatory.  I couldn't pull up the date and just write
20   it down and say, yeah, I remember that particular date
21   because there was nothing unusual about me having a meeting
22   with Dr. Zaccari in front of other people.
23          It's a very, very, very common experience that I
24   couldn't draw independently without reviewing some
25   documents.  You know, some time frame.  So, that's why you

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    see very often "on or about."

2       Q    Okay.  You mentioned, though, that you were able to

3    identify dates of two meetings from looking at documents to

4    refresh your recollection.

5           Do you remember which documents those were?

6       A    No.

7       Q    Can you tell me which two meetings you're referring

8    to in that answer?

9       A    Well, on the response to interrogatory number

10   three, I said on or about May 1st, 2001, there was a

11   telephone conversation with Betsy Neely; and then on or

12   about May 4th there was a meeting.

13          And, in addition to that, in my responses to the

14   first interrogatories and request for production of

15   documents, there's a reference to a May 3rd meeting.

16      Q    Okay.  In this first paragraph in response to

17   interrogatory number three, you say that in general

18   discussions about what could be done to remove the perceived

19   threat that you advised Dr. Zaccari of the Constitutional

20   guarantees of due process requirements and ADA concerns that

21   apply to withdrawals.

22          Can you describe the concerns that you expressed

23   about those issues?

24      A    Anytime a student is suspended -- I generally don't

25   get involved in suspension of students unless there is, you

1    know, some legal implication that I'm called upon to ask a
2    particular question.
3         But, generally speaking, students are afforded all
4    the Constitutional guarantees of due process.
5         I'm of the opinion and I advised that if a student
6    is to be removed from campus, he's entitled to due process;
7    that is, an opportunity to understand the nature of the
8    complaint against him and an opportunity to be heard.
9         I also expressed to him the possibility that Hayden
10   Barnes could raise some Constitutional challenges under the
11   First Amendment if he believes -- Hayden that is -- that
12   because of his communications that there was an effort to
13   stifle his freedom of expression.
14        And because Dr. Zaccari shared with me that he had
15   access to information from the Counseling Center about
16   Hayden, necessarily there's also a possibility that Hayden
17   could raise some ADA challenges:  Americans with
18   Disabilities Act.
19        To what extent he could raise those challenges, I
20   can't share that with you because I don't know of the nature
21   and the history of Hayden's psychological concerns.  I've
22   never had a sit-down talk with his counselor to understand
23   the full extent of the nature of his problems.
24   Q    Okay.  Let's look at each part of your answers in a
25   little bit more detail.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          You told Dr. Zaccari, according to your testimony,

2     that you explained that Hayden Barnes could raise First

3     Amendment challenges to an expulsion because of his free

4     speech rights.

5          What precisely did you tell him about that, if you

6     recall?

7     A     Well, I'm going to testify in generalities because

8     I didn't have a tape recorder nor did I document every

9     single thing that came out of my mouth.

10    Q     I understand.

11    A     But, in general terms, Dr. Zaccari expressed to me

12    some concerns that he had with Hayden's comments at a

13    particular meeting at the Board of Regents relative to a

14    parking deck.

15         And sometime during this time frame, Hayden also

16    generated a picture of Dr. Zaccari beside a parking deck and

17    made references to it being a memorial or memoriam.  I'd

18    have to actually look at it again.  It's been quite a while

19    since I've seen it.

20         So those comments, Hayden could raise some issues

21    of First Amendment protection.  In other words, "I'm just

22    expressing myself."

23    Q     I see.  And you also discussed due process

24    protections.  What did you tell Dr. Zaccari about the due

25    process issue?

1    A    He was made fully aware of policies and procedures

2    that existed on campus relative to the suspension of

3    students. And, as a matter of fact, I provided those copies

4    to him.

5         I can't recite verbatim the policy, the number, the

6    content without having it in front of me.

7    Q    I'm sorry. I missed the last part.

8    A    I can't recite verbatim the policy number or the

9    content of the policy without having it in front of me.

10   Q    Okay. I believe it was your testimony that you

11   believe that students who are to be suspended have a right

12   to full information about what the nature of the charge is

13   and an opportunity to respond. Is there anything else?

14   A    An opportunity to be heard and present their side

15   of whatever it is.

16   Q    Uh-huh. And you apprised Dr. Zaccari that that is

17   a due process requirement for any kind of suspension?

18   A    He was made fully aware of what Hayden was entitled

19   to under due process.

20   Q    And last I think you mentioned that Dr. Zaccari had

21   said something about information he had about Hayden based

22   on his use of the Valdosta State Counseling Center. Is that

23   correct?

24   A    Uh-huh.

25   Q    What did Dr. Zaccari tell you that he knew about

Page 30

1    Hayden?

2       A    I vaguely recall he said he had some concerns about

3    him missing appointments and -- that's the extent of what

4    I'm able to recall at this point in time.

5            But missing appointments and his behavior at this

6    particular meeting at the Board of Regents caused him some

7    concern.

8       Q    Did any of this strike you as unusual?

9       A    Unusual in what sense?

10      Q    Does the President of the University usually know

11   what the habits of a student is with respect to the

12   Counseling Center?

13      A    I've worked with three presidents thus far, and I

14   can only speak to my experience with Dr. Zaccari in that

15   context.

16           I cannot and I will not make generalizations about

17   presidents and what is generally their response to students.

18           But I was a bit concerned about his communications

19   with the Counseling Center.

20      Q    Could you expand on that?  What do you mean by a

21   bit concerned?

22      A    In a past life I used to be a psychotherapist.  My

23   undergrad degree is in psychology, and I have a Master's in

24   counseling.

25           And at one point in time I was employed as a high

1   school guidance counselor.  And then for a very, very brief

2   period in my life I was employed as a psychotherapist under

3   the direction of a psychiatrist.  It was many, many, many

4   year ago.

5          So I know that communications between counselors

6   and their patients are protected.

7   Q     By protected, you mean they're supposed to be

8   confidential?

9   A     Yes, unless there are certain extenuating

10  circumstances that allow for that information to be shared.

11  Q     Let me back up a little bit on the earlier part of

12  your answer.

13  A     Can I finish that response?

14  Q     Oh, sure.  Absolutely.

15  A     And if Hayden presented a danger to himself or to

16  others, then those communications may be shared.

17  Q     How might they be shared?

18  A     To the appropriate authorities.

19  Q     We'll get back to that, but let me backtrack a

20  little bit first to an earlier part of your response.

21         You've said you've worked for three university

22  presidents.  Is that correct?

23  A     Uh-huh.

24  Q     Have you ever had an occasion in the past where a

25  university president knew the habits of the student with

Page 32

1    respect to the Counseling Center?

2         MR. LaVALLEE:  Object to form.  Misstates prior

3      testimony.

4    BY MR. CORN-REVERE:

5      Q    Do you understand the question?

6      A    Could you repeat it?

7      Q    Sure.  Let's break it down.  You've testified that

8    you've worked with three university presidents.  Is that

9    correct?

10     A    Yes.

11     Q    Has any one of those university presidents ever

12   indicated to you that he had knowledge of a particular

13   student's use of the Counseling Center?

14        MR. LaVALLEE:  Objection to form.

15   BY MR. CORN-REVERE:

16     Q    You can answer.

17     A    I've never had an experience that the president was

18   aware that the student prior to Dr. Zaccari -- Hugh Bailey

19   to my knowledge never shared with me he was aware a student

20   was receiving counseling, but that is not to suggest it

21   didn't happen.  I was just not aware that he knew of a

22   particular student --

23     Q    I'm asking about your experience.  Is it correct to

24   say that no university president before this exchange with

25   Dr. Zaccari --

1    A    Before Dr. Zaccari?

2    Q    Yes.

3    A    No.  Before Dr. Zaccari.

4    Q    Yes.

5    A    No.

6    Q    Did Dr. Zaccari indicate this kind of knowledge on

7    any other occasion?

8    A    That he was aware of a student --

9    Q    Of a student's use of the Counseling Center.

10   A    I don't recall.  No.

11   Q    Well, it seems like an unusual thing; the kind of

12   thing you might recall.

13        MR. LaVALLEE:  Objection to form.

14        THE WITNESS:  My response is:  No, I do not recall

15        any conversation with Dr. Zaccari where he made

16        references to a student receiving services from the

17        Counseling Center.

18   BY MR. CORN-REVERE:

19   Q    So far as you know --

20   A    Yes.

21   Q    -- this inquiry about Hayden Barnes was the only

22   time any university president you've worked with has

23   indicated knowledge of a student's use of the Counseling

24   Center.  Is that correct?

25        MR. LaVALLEE:  Object to form.

Page 34



1           THE WITNESS:  Prior to Dr. Zaccari, no.

2    BY MR. CORN-REVERE:

3       Q     If I'm being unclear, let me try and correct that.

4             This inquiry about Hayden Barnes was unique in that

5    you've never had a university president ask you about a

6    student's use of the Counseling Center before?

7             MR. WILL:  I object to the form of the question.

8       First of all, it's asked and answered.  Two, it misstates

9       her previous testimony.

10            MR. CORN-REVERE:  I think it's possible to do

11      objections without suggesting answers.

12            MR. WILL:  I can do that, but she's not my witness.

13      I'm just trying to make it clear.  But I do object to you

14      mischaracterizing her testimony, period.

15   BY MR. CORN-REVERE:

16      Q     Am I mischaracterizing your testimony?

17      A     You said Dr. Zaccari asked me about Hayden using

18   the Counseling Center.

19      Q     I said he indicated his knowledge --

20      A     Indicated his knowledge.

21      Q     -- of Hayden's use of the Counseling Center.

22      A     Uh-huh.

23      Q     Is that the only time that's ever happened with

24   you; that a university president has ever indicated such

25   knowledge?

Page 35

1    A     Prior to Dr. Zaccari, yes.

2    Q     And Dr. Zaccari did it only with respect to Hayden

3  Barnes, so far as you know?

4    A     So far as I know.

5    Q     Now you mentioned, I believe, that this caused you

6  concern with respect to the Americans with Disabilities Act.

7  Is that correct?

8    A     Yes.

9    Q     Can you describe your concerns?

10    A     The concern was he could raise that perhaps he was

11  being treated in a discriminatory fashion because he had

12  whatever mental disability, psychological concern.  I'm

13  speaking in vague terms because, again, I have not seen

14  Hayden Barnes' psychological record.

15         I offered advice so he could be aware that that

16  challenge could be raised.

17    Q     Well, let me ask in more general terms then.

18         What is the University's policy with respect to the

19  Americans with Disabilities Act and use of the campus

20  Counseling Center?

21    A     There is no prohibition against anybody using the

22  Counseling Center.  I don't understand your question.

23    Q     Can you describe Valdosta State University's

24  policies under the ADA and discrimination against students

25  who use the Counseling Center?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      The policy of Valdosta State University and Board
2   of Regents of the University System of Georgia is we do not
3   discriminate against students.  We don't engage in
4   discriminatory conduct.
5      Q      Would it be consistent with University policy for a
6   student to be denied services on campus because of their use
7   of the Counseling Center?
8      A      I don't understand your question.
9      Q      What about my question don't you understand?
10     A      I don't understand the question so I can respond
11  appropriately and concisely to the question that you have
12  presented.
13            MR. WILL:  I object.  The question is vague and not
14        being capable of being understood by the witness or the
15        lawyers.
16  BY MR. CORN-REVERE:
17     Q      If a student were to be denied services on campus
18  because of their use of the Counseling Center, in your
19  opinion would that violate University policy under the ADA?
20     A      I think it would be perhaps discriminatory
21  treatment, but I would have to know the full range of the
22  facts to understand how that decision would be made.
23            But, in general terms, that would be discriminatory
24  treatment.
25     Q      Okay.  When you expressed these concerns about

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    First Amendment, due process and ADA issues, did Dr. Zaccari

2    respond?

3        A    Yes.

4        Q    What did he say?

5        A    He had some concerns about the safety of the campus

6    community and the safety of his person.

7        Q    What were his concerns?

8        A    He was concerned that Hayden may engage in violent

9    activity.  Specifically, he did not share.  He had concerns

10   about his safety and the safety of the campus community.

11           At one point he had police officers visiting his

12   office, and he shared with me that they went into the

13   restroom prior to his going in because he had some real

14   concerns about Hayden Barnes.

15       Q    Help me understand your answer.

16           He had police go into the restroom because of his

17   concerns about Hayden Barnes?

18       A    That's what he shared with me.

19       Q    Did he tell you anything more than that?

20       A    He had concerns about Hayden Barnes' behavior and

21   he appeared to be erratic.  The student, that is.

22       Q    Uh-huh.

23       A    In the sense that at that meeting at the Board of

24   Regents, his behavior, Hayden Barnes' behavior, was

25   questionable to the extent that he conveyed to me --

1    Dr. Zaccari -- that he had a conversation with the Vice

2    Chancellor of Facilities, Linda Daniels; and Linda Daniels

3    expressed to him some concerns about that student to the

4    extent that Dr. Zaccari began to make some inquiries into

5    who this person was.

6        Q     What did that have to do with the restroom?

7        A     Dr. Zaccari shared that with me about the officers

8    going into the restroom during this time frame.

9        Q     Which time frame is that?

10       A     I'm talking about the time frame immediately

11   preceding Hayden's administrative withdrawal.  He was

12   expressing to me concerns he had for his safety and for the

13   safety of the campus community.

14       Q     Do you recall whether this was in April 2007 when

15   you were in contact with Elizabeth Neely or in May 2007

16   around the time that Hayden was withdrawn from school?

17       A     It wasn't after -- it was not after Hayden was

18   withdrawn from school.  It was before.

19       Q     But do you recall whether it was April 2007 or

20   May 2007?

21       A     No, no, no.  I can't recall.

22       Q     What else did Dr. Zaccari tell you about Hayden

23   Barnes' appearance at the Board of Regents meeting?

24       A     I just recall he said the student was there and his

25   behavior caused him concern.  Specifics and details, I don't

Page 39

1    know.  I can't recall.  I shouldn't say I don't know.  I

2    just can't recall specifics and details about what Hayden

3    did during the course of this meeting at the Board of

4    Regents.

5         He had some concerns about the parking deck --

6    Hayden -- and expenditures.  I can't recall.

7    Q    Okay.  When you expressed your concerns about the

8    First Amendment, due process, and ADA problems to

9    Dr. Zaccari, was anyone else present?

10   A    During -- well, no, I don't recall anyone being

11   present at one of those meetings.  But at one of the

12   meetings, of course, those issues were raised again which

13   was during the telephone conference with Betsy Neely.

14   Q    Okay.  We'll get to that.

15   A    All right.

16   Q    Are there any other meetings where you recall these

17   issues being raised?

18   A    Yes, during those two meetings that I made

19   reference to in responses to discovery.

20   Q    Looking back at that supplemental response to

21   interrogatory number three --

22   A    Uh-huh.

23   Q    -- that I previously read into the record, you

24   described the concerns Dr. Zaccari expressed for his

25   personal safety as perceived by Zaccari.  That's how you put

1    it in the response.

2         Do you know if anyone else besides Dr. Zaccari

3    perceived a security problem?

4    A    I don't recall.  I recall that -- I want to also

5    offer that these events happened shortly around the time of

6    Virginia Tech, shortly after Virginia Tech, these meetings

7    and concerns that Dr. Zaccari expressed to me.

8         Dr. Zaccari shared with me a particular document

9    that reflected Hayden making statements about -- on his

10   Facebook page shoot 'em up, load 'em up, or something like

11   that.  Then you have this memorial to Dr. Zaccari.  Parking

12   deck memorial.

13        Plus, Dr. Zaccari shared that when he was in West

14   Virginia a student did threaten to slit his throat.

15   Q    Not Hayden Barnes.

16   A    No, not Hayden Barnes.  But I'm saying there was a

17   history in his higher education experience with a student in

18   the past that, apparently, he recalls very vividly.

19        There was some judicial process with that student.

20   I think the student actually was charged, I think.  I don't

21   know.

22   Q    Do you know when this student in West Virginia

23   would've made such a threat to Dr. Zaccari?

24   A    No, I don't.

25   Q    Do you know how many years before that was?

```
 1      A     No, I don't.

 2      Q     Okay.  But it's your recollection that the student

 3   that had threatened to slit Dr. Zaccari's throat was

 4   accorded due process?

 5      A     I don't know anything about that.

 6      Q     You said there was a judicial process.

 7      A     No.  I meant I think the student -- if I recall

 8   correctly, Dr. Zaccari shared he was charged criminally.

 9      Q     So that would've involved due process?

10      A     Outside the context of higher education.  Again,

11   you have to ask him the details of that particular incident.

12      Q     Now I believe it was your testimony that

13   Dr. Zaccari had looked for ways to remove the threat.

14            Did he ask you for recommendations or did he simply

15   direct you to find a way to expel Hayden Barnes?

16      A     During the course of that meeting, he reviewed

17   Hayden's academic record.  He shared that he had reviewed

18   Hayden's academic record.  The information had been provided

19   to him.

20            He conferred with the Vice President of Student

21   Affairs; and he also conferred during the course of that

22   meeting with Russ Mast, who is the Dean of Students.  He

23   also conferred with Vick Morgan, and he also conferred with

24   Ann Farmer.  She's our Assistant Chief of Police.

25      Q     When you say that he conferred with the individuals
```



1    you just named, was it your understanding that this was a

2    single meeting or separate meetings?

3        A    The only one I can speak to is the meeting that I

4    was in attendance at and those individuals I identified were

5    in the room.

6        Q    This all occurred during a meeting where you were

7    present with these named individuals to discuss Hayden

8    Barnes?

9        A    Right.  And also Kimberly Tanner.

10       Q    Who is she?

11       A    She's with the access office.

12       Q    What does the access office do?

13       A    The access office is a place where those

14   individuals who have identified disabilities go to, to make

15   certain that if there are any additional accommodations,

16   resources, that are requested, we make certain that we

17   satisfy those requests and any other support services they

18   can provide.

19       Q    Okay.  Do you recall when this meeting took place?

20       A    (Reviewing document.)  It was in April of 2007.

21       Q    So just to place it in time, it would have taken

22   place after your initial email inquiry to Elizabeth Neely.

23       A    Uh-huh.

24       Q    But before you received a fax in response from

25   Elizabeth Neely.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1       A       Correct.

2       Q       I expect a meeting like that would not have

3   happened on a weekend.  Is that correct?

4       A       No.  It would not have happened on a weekend.

5       Q       Okay.  How long did this meeting last?

6       A       I can't recall.

7       Q       Was this meeting in Dr. Zaccari's office?

8       A       Yes, in his suite.  Conference room, yes.

9       Q       Did Dr. Zaccari ask for recommendations from this

10  group about what to do about Hayden Barnes?

11      A       No.

12      Q       What did he do?

13      A       He sat at the head of the table and discussed his

14  concerns about Hayden's behavior.  I recall he did most of

15  the talking, and I recall that policies were shared with

16  him.

17      Q       What policies are those?

18      A       The policy from the Student Code of Conduct so he

19  could be aware of the process for suspending a student.

20              And he asked for information from Kimberly Tanner

21  about anything relative to this student and -- that's all I

22  recall.

23      Q       Do you recall whether or not the information he

24  asked Ms. Tanner about was of a confidential nature?

25      A       I don't recall.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    Q    Do you recall anything about the information that
 2  he asked about?
 3    A    Say that again.
 4    Q    Do you recall any of -- the nature of the
 5  information that he asked Ms. Tanner about?
 6    A    I believe Ms. Tanner had some files, and I think
 7  she shared that he was a registered student there in her
 8  office.
 9         Dr. Zaccari also shared that he had access to
10  information about Hayden's employment history.
11    Q    So, is it correct to say that as of April 2007
12  Dr. Zaccari had been conducting an investigation about
13  Hayden Barnes?
14         MR. WILL:  Object to the form of question.
15         THE WITNESS:  I don't know that I would
16      characterize it as an investigation, but I will say that
17      it appears as if he was soliciting information about this
18      particular student.
19  BY MR. CORN-REVERE:
20    Q    Okay.  So he had looked into Hayden's employment
21  history?
22    A    Yes.
23    Q    He had looked at his Facebook page?
24    A    Yes.
25    Q    He asked someone from the access office about
```

1    Hayden's file?

2       A      Yes.

3       Q      You mentioned that Dr. Zaccari did most of the

4    talking and expressed his concerns.

5              Did anyone else at the meeting express concerns

6    about Hayden Barnes?

7       A      In terms of?

8       Q      Was anyone else talking about Hayden Barnes

9    presenting some kind of threat?

10      A      No.

11      Q      This was just the President of the University

12   conveying to the group the information that he had in his

13   possession.  Is that correct?

14      A      Primarily.

15      Q      Was the information presented more as a conclusion

16   rather than an invitation for discussion?

17      A      I can't recall.

18      Q      Well, do you recall if anyone else present at this

19   meeting raised similar concerns about Hayden Barnes?

20      A      In terms of being a potential threat?

21      Q      Yes.

22      A      No.  I don't recall anyone sharing that.

23      Q      Okay.  You mentioned earlier that Dr. Zaccari had

24   said something about Hayden's Facebook page.  Did he show

25   you copies of the Facebook page?

Page 46

1      A      Yes, he did.

2      Q      Did he show you copies of the Facebook page before

3   this meeting?

4      A      No.  I don't recall.

5      Q      Do you know if copies of the page were present at

6   this meeting for people to look at?

7      A      He had it in the meeting.

8      Q      Was everyone given their own copy to look at?

9      A      No.  No, I don't -- no.

10     Q      So the copy in the meeting was Dr. Zaccari's copy?

11     A      If someone else had a copy of their own, I was not

12  aware of it.  It's just like everyone sitting around this

13  room can't speak to all the documents in every single file

14  in front of every person.

15     Q      Was the copy of the Facebook page passed around at

16  this meeting for discussion?

17     A      No.  I don't recall that.

18     Q      Okay.  So there was no deliberation at the meeting

19  about whether or not Hayden Barnes, in fact, was a threat,

20  was there?

21     A      No.

22     Q      So is that why in your response to interrogatory

23  number three you described that the discussion of

24  Plaintiff's behavior and the possible threat was as

25  perceived by Zaccari?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    Yes.

2    Q    And not by anyone else?

3    A    Yes.

4    Q    Did Dr. Zaccari ever ask you if you agreed that

5    Hayden Barnes presented some kind of danger?

6    A    No.

7    Q    Do you know if he asked anybody else if Hayden

8    Barnes presented some kind of danger?

9    A    Not to my knowledge.  I'm unaware of that.

10   Q    Did anyone else at the meeting make recommendations

11   about what could be done to remove the threat presented by

12   Hayden Barnes?

13   A    I recall Ann Farmer mentioning that if he was

14   concerned about his safety and well-being, perhaps she could

15   investigate it and maybe secure a protective order that

16   would involve going to the Magistrate's office and taking

17   out a complaint.

18   Q    So had Dr. Zaccari followed Ann Farmer's advice, it

19   would once again involve some form of due process?

20   A    Yes.

21   Q    And so far as you know, that recommendation was not

22   followed?

23   A    Not to my knowledge.

24   Q    Do you know why that recommendation was not

25   followed?

Page 48

1       A       I don't know.

2       Q       Let's look briefly at Exhibit Number Two on page

3       two.

4       A       Uh-huh.

5       Q       In response to interrogatory number one --

6       A       Uh-huh.

7       Q       -- you name a number of people, including Dr. Louis

8       Levy, Vice President for Academic Affairs; Jim Black, former

9       Vice President of Finance Administration; Scott Sikes, Vice

10      President of Institutional Advancement; Dr. Marcia Krotseng,

11      former Associate Vice President of Strategic Research and

12      Analysis; and then in the next paragraph, Scott Doner,

13      University Police Chief; J. Burns Newsome, Assistant Vice

14      Chancellor of Legal Affairs as individuals who may have

15      information about the Hayden Barnes' case.

16      A       Uh-huh.

17      Q       Can you describe what information you were

18      referring to in this response?

19      A       Dr. Zaccari later shared after Hayden had been

20      withdrawn that during the course of a Vision meeting --

21      Dr. Zaccari had a meeting that generally took place before

22      cabinet.  Cabinet consists of various people who are

23      employed at the University in upper-level positions.

24              But the Vision Team consisted of what he considered

25      his senior administrative team, and they would discuss

Page 49

1    things that were of importance and various issues before

2    cabinet meeting.

3         And the individuals identified in response to

4    interrogatory number one are the individuals who would

5    typically attend those Vision meetings.

6         During the course of one of those Vision meetings,

7    Dr. Zaccari shared with me that they discussed Hayden

8    Barnes; and it was the recommendation of -- well, I don't

9    want to use the word recommendation.

10        As a result of one of those meetings, they agreed

11   to just -- the best course of action would be just to

12   monitor Hayden's behavior.

13        I can't speak to when this meeting took place; if

14   every individual identified in response to interrogatory

15   number one -- if they were present because I was not a part

16   of this group.

17   Q    Okay.

18   A    But this is something Dr. Zaccari shared with me.

19   Q    Do you recall when he shared that information with

20   you?

21   A    No.

22   Q    Just going back over this list of names, can you

23   identify which of these names or which of these individuals

24   are members of the Vision Team?

25   A    Yes.  Dr. Louis Levy -- all of his vice presidents.

Page 50

1  All the vice presidents: Dr. Louis Levy, Jim Black, Scott
2  Sikes. And Dr. Marcia Krotseng is not a Vice President, but
3  she was a part of the Vision Team.

4      Q    Is there anyone else on the Vision Team?

5      A    No. I think that takes care of it.

6      Q    Do you know if the meeting of the Vision Team

7  occurred before or after Mr. Barnes was expelled?

8      A    It was before.

9      Q    And it's your understanding that the Vision Team

10  recommended to President Zaccari that they simply monitor

11  Hayden Barnes' activities?

12     A    I can't say they recommended to Dr. Zaccari because

13  I was not there, and I don't know whether or not it was the

14  consensus of the group; but I do know as a result of one of

15  those discussions during the course of the Vision Team

16  meeting that decision was made.

17     Q    I see. Was this information about the Vision Team

18  available to you before the meeting, the earlier meeting you

19  described with -- let me see if I can get everybody

20  (reviewing document) -- Russell Mast, Victor Morgan, Ann

21  Farmer, Kimberly Tanner. You know, that meeting where you

22  discussed --

23     A    I don't know. I can't recall.

24     Q    Okay. You list in the response to interrogatory

25  number one the individuals who are not part of the Vision

Page 51

1    Team.

2         What's your understanding of their involvement in

3    this subject to the answer listed in the interrogatory?

4         A    Scott Doner is University Police Chief, and it's

5    likely that Dr. Zaccari would've communicated with him and

6    Ann Farmer.  They work closely together.

7         Ann Farmer would not have taken the initiative to

8    attend meetings without consulting with Scott Doner.  So my

9    thinking is that Scott Doner was consulted; and then at

10   times when he could not be present at a meeting, Ann Farmer

11   was there.  She's the Assistant Chief of Police.

12        Burns Newsome is the Assistant Vice Chancellor for

13   Legal Affairs.  From time to time Dr. Zaccari would consult

14   with the Office of Legal Affairs without my knowledge.

15        So, there's a chance that he may have consulted

16   with him about this matter, but I don't have any

17   documentation of that.

18        Q    So your response to the interrogatory is that in

19   your judgment it was likely he consulted with Burns Newsome.

20        A    Yeah.

21        Q    Okay.

22        A    It's not likely.  Possibly.

23        MR. CORN-REVERE:  Okay.  Let's mark as Gaskins

24   Deposition Exhibit Number Five a fax document from

25   Elizabeth Neely to Laverne Gaskins.

Page 52

1           (The document was marked for identification as

2       Plaintiff's Exhibit Number Five).

3   BY MR. CORN-REVERE:

4       Q    Have you had a chance to look this document over?

5       A    (Reviewing document.)  Yes.

6       Q    Can you identify it for the record?

7       A    It's a document that was faxed to my office

8   following a telephone conference call with Betsy Neely.

9       Q    Okay.  So looking at the cover page where in the

10  comments it says, "Per our discussion" --

11      A    Uh-huh.

12      Q    -- is that referring to the earlier conference call

13  to talk about this issue?

14      A    Yes.

15      Q    Okay.  Did this conference call also take place on

16  May 1st, 2007?

17      A    (Reviewing documents.)  I recall it took place on

18  or about May 1st, 2007.

19      Q    Okay.  I ask that because the date of the cover

20  letter on the fax sheet says May 1st, 2007.

21           So it's your recollection that it was either on

22  that day or might have been the day before?

23      A    I believe it was May 1st, 2007.

24      Q    Okay.

25      A    And you see at the top, I believe, that this was

Page 53

1    faxed May 1st, 2007.

2        Q    Yes.  Okay.  What prompted the telephone call that

3    this is in response to?

4        A    Dr. Zaccari wanted to make certain that the Board

5    of Regents of the University System of Georgia's Office of

6    Legal Affairs was fully aware of his concerns and possible

7    action; and he wanted to confer with Betsy Neely, who was

8    the senior lawyer at that time, to get her advice.

9            And her advice was you do what you need to do to

10   protect the campus and worry about the lawsuit later, but

11   you do what you need to do to protect that campus.

12           And she said you can administratively withdraw the

13   student, and she faxed me this information for me to share

14   with Dr. Zaccari.

15       Q    Is it correct to say that the phone call you just

16   described and this fax was a follow-up to the earlier email

17   that we discussed?

18       A    Right.

19       Q    So after Elizabeth Neely responded to your email

20   and you passed that along to Dr. Zaccari, it was agreed to

21   set up a phone call to discuss those issues.  Is that how it

22   happened?

23       A    Repeat that again.

24       Q    Okay.  Is it correct to say that after your initial

25   email exchange, which you forwarded on to Dr. Zaccari, that

Page 54

```
 1    it was decided to set up a call to discuss those questions?
 2        A    No.  The telephone call took place on Dr. Zaccari's
 3    own initiative.  I think there was a gap between the initial
 4    email and the telephone call.
 5              Once again, the reason Dr. Zaccari felt, I believe,
 6    a need to involve Betsy Neely was because any decision
 7    that's made on the campus level --
 8        Q    Go ahead.
 9        A    I want to feel like someone's listening to me.
10        Q    I'm listening.
11        A    Okay.  Any decision that's made on the campus level
12    and there's an appeal -- there is a concern -- it would go
13    to Betsy Neely's office.
14              So he wanted her to be involved in, essentially,
15    the decision-making process so he could have some level of
16    assurance that what he was doing was the proper route to
17    take.
18        Q    Okay.  I think I understand that.  I'm just trying
19    to get the sequence of events correctly.
20        A    Uh-huh.
21        Q    So that looking back at Exhibit Four, which is the
22    email exchange --
23        A    Yes.
24        Q    -- it was your testimony and the date stamp on the
25    email is April 26th.
```

1       A       Uh-huh.

2       Q       Okay.  And then at some point on or about that

3    date, you passed along this exchange to Dr. Zaccari and

4    said, "I would like to discuss the matter with you."

5       A       Uh-huh.

6       Q       Is that correct?

7       A       (Nods head.)

8       Q       Then after you passed this along to Dr. Zaccari, a

9    decision was made to set up a phone call that resulted in

10   this fax being sent to you.  Is that the sequence?

11      A       When you're saying a decision was made -- he wanted

12   to see me.  I went down to his office; and he says he's

13   going to put Betsy Neely on speaker, and that's what

14   happened.

15              So when you say a decision was made, I can't state

16   and I can't testify that that email precipitated the phone

17   call to Betsy Neely in my presence.

18              Following that email to Dr. Zaccari, he could have

19   very well contacted Betsy Neely and I'm not aware of that.

20      Q       I see.  But sometime after this email exchange,

21   then you were asked to join Dr. Zaccari in a phone

22   conversation with Betsy Neely.

23      A       Yes.

24      Q       Okay.  I'm sorry if I'm asking the same thing or if

25   I'm just getting confused, but did you know about the phone

Page 56

1    call before it was going to happen?

2        A    No.

3        Q    Okay.  You were in your office and then received a

4    request to join Dr. Zaccari for a phone call with Betsy

5    Neely?

6        A    No.  The request would not have been worded that

7    way.  The request would've been, "Hi, Verna.  This is" --

8    whomever -- "please tell Laverne Dr. Zaccari wants to see

9    her."

10       Q    And who would've placed that call to you?

11       A    My assistant would have said, "Ms. Gaskins,

12   Dr. Zaccari wants to see you."

13       Q    Okay.

14       A    So, you know, I don't necessarily know the nature

15   of the discussion prior to going down there.

16       Q    I understand.

17       A    Nor would I say, "What's he want to talk to me

18   about?"

19       Q    Right.  I'm just trying to figure out what

20   happened.

21       A    Yeah.

22       Q    The phone call was in process when you arrived in

23   Dr. Zaccari's office?

24       A    No.  I vaguely recall him dialing -- well, he

25   didn't dial; his assistant would've dialed.

Page 57

1    Q    Okay.  So you were asked to join Dr. Zaccari; and

2  after you got to his office, a call was placed to Elizabeth

3  Neely.  Is that what happened?

4    A    Yes.

5    Q    Okay.

6    A    Based on my recollection.

7    Q    Yes.  What else do you recall about that telephone

8  conversation?

9    A    I raised due process concerns, the ADA concerns.

10  And Betsy said, "Well, Dr. Zaccari, you need to do what you

11  need to do to protect yourself and the campus community."

12    Q    Okay.  Do you have a more detailed recollection of

13  the concerns that you expressed about due process and ADA

14  problems?

15    A    No.  They were just very basic and general in

16  nature.  A student has a right to be heard.  An opportunity

17  to be heard.

18         And I could never tell someone else that whatever

19  causes them concern or fear for their safety and the safety

20  of the campus community is incorrect, because I can't

21  superimpose my response to something and pretend as if I'm

22  someone else.

23         I do believe that Dr. Zaccari firmly felt

24  threatened by Hayden Barnes, and I do believe that was a

25  constant thing and during this entire episode that he

Page 58

1    expressed a genuine fear of Hayden Barnes in terms of his

2    safety and the safety of the campus community.  That never

3    wavered.

4        Q    But, so far as you know, no one else expressed that

5    same concern.  Isn't that right?

6        A    Not in my presence.

7        Q    Do you know if Dr. Zaccari consulted with anyone

8    else about whether or not those concerns were justified?

9        A    No.  I'm not aware of any, not to suggest that he

10   didn't.  I'm just not aware.

11       Q    When you expressed your concerns about due process

12   issues, was there a discussion of those concerns in this

13   conference call?

14       A    Dr. Zaccari represented to Betsy that Hayden

15   presented a threat to himself and the campus community.

16            So, in response to that threat, Betsy felt like the

17   primary concern should be that of Dr. Zaccari and the campus

18   community.  Take care of that first.

19       Q    Okay.  Does Valdosta State University have a

20   protocol to deal with threats to campus security?

21       A    We have policies in place that speak directly to

22   removal of students.

23       Q    Okay.

24       A    And I can't recite those policies verbatim without

25   the benefit of having them in front of me.

1    Q    We'll get to them.

2    A    Okay.

3    Q    But is there any policy or protocol other than the

4  ones you mentioned in your interrogatory answers that exists

5  to deal with threats to the campus community?

6    A    Of course, you know, there's always the campus

7  police if there's an indication of criminal behavior.

8    Q    Right.

9    A    Yeah.

10   Q    But I'm speaking in terms of policies.

11   A    Yes.

12   Q    And so far as you know, the ones that exist are the

13 ones you've listed in your interrogatory answers.  Is that

14 correct?

15   A    Yes.

16   Q    Okay.  Did you discuss your First Amendment

17 concerns during the call with Elizabeth Neely?

18   A    I discussed all of those concerns.

19   Q    Okay.  Did she respond to your concerns about the

20 First Amendment problems?

21   A    I don't recall.

22        MR. LaVALLEE:  Objection to form.

23 BY MR. CORN-REVERE:

24   Q    Did you also raise your concerns about the

25 Americans with Disability Act?

Page 60

1    A    Yeah, I recall.

2    Q    Was there any discussion on that call of May 1st

3    about the ADA?

4    A    From Betsy Neely?

5    Q    Yes.

6    A    I vaguely recall that while she recognized those

7    concerns and those concerns were legitimate and valid,

8    ultimately the safety of the campus community was foremost

9    in her mind based on representations that had been made to

10    her by Dr. Zaccari.

11    Q    Let's look at this exhibit, the fax that you got

12    from Elizabeth Neely.

13    A    Sure.

14    Q    The second page of the exhibit --

15    A    Uh-huh.

16    Q    -- can you tell me the significance of this page?

17    A    She had been made -- Elizabeth Neely had been made

18    aware of the fact that Hayden Barnes had been seeing Leah

19    McMillan; and, you know, she entertained during her

20    discussions various ways that Hayden could be

21    administratively withdrawn.  So she sent us this

22    information.

23    Q    What was Elizabeth Neely told about Hayden's use of

24    the Counseling Center?

25    MR. LaVALLEE:  Object to the form.

Page 61

1          THE WITNESS:  In the course of the conversation, I
2      vaguely recall -- he said that he was missing
3      appointments.  I'm sorry.  I just can't recall.
4   BY MR. CORN-REVERE:
5      Q    Was Leah McMillan's name specifically mentioned on
6   this call with Ms. Neely?
7      A    I don't recall that.
8      Q    Is it accurate to say that Elizabeth Neely was
9   simply told that Hayden was using the VSU counseling
10  facilities?
11     A    In addition to other information, yes.
12     Q    Okay.  What other information was that?
13     A    Once again, Dr. Zaccari shared with Betsy the
14  incident at the Board of Regents meeting.  It was a meeting
15  that I've already discussed -- testified to -- and also the
16  Facebook page.
17     Q    Well, if there was an incident at the Board of
18  Regents meeting, Elizabeth Neely should've been aware of it,
19  shouldn't she?
20     A    I don't know.
21          MR. WILL:  I object to the form of the question.
22      Calls for speculation.
23  BY MR. CORN-REVERE:
24     Q    Wouldn't Elizabeth Neely have been present at any
25  meeting of the Board of Regents?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                MR. WILL:  Same objection.  Calls for speculation.
 2                THE WITNESS:  I don't know.  I don't know if she
 3           attends every single Board of Regents meeting.
 4      BY MR. CORN-REVERE:
 5           Q     Do you know for a fact if Hayden Barnes ever went
 6      to a meeting of the Board of Regents?
 7           A     I don't know that.
 8           Q     Getting back to this page of the exhibit, I believe
 9      your testimony -- and correct me if I'm misstating it -- was
10      that this was information that Elizabeth Neely sent to
11      provide options for how Hayden Barnes might be withdrawn
12      from school.  Is that correct?
13           A     Based on the information that was shared during
14      that telephone conversation and based on the fact she felt
15      like the primary concern was that of the campus community in
16      terms of safety and the safety of Dr. Zaccari, of course,
17      she said the student could be administratively withdrawn;
18      and she provided this information consistent with that.
19           Q     Okay.  This first page after the cover sheet, do
20      you have an understanding of which of these policies may
21      have been relevant to withdrawal of a student?
22           A     No.  I don't know whether or not this was sent in
23      error, because it clearly deals with auditors, transient
24      students, the referral of students to institutions and
25      rights to refuse admission.  I think this might've been sent
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    in error.

2        Q    Looking at the last two pages of this exhibit, it

3    appears to be a memorandum from the Executive Secretary of

4    the Board of Regents.  Two pages.

5            Can you tell me if Valdosta State ever adopted a

6    medical withdrawal policy based on this memorandum?

7        A    I can't tell you that because you'll see at the top

8    it's dated 1983.

9        Q    Yes.

10       A    And this is well before my employment with the

11   University.  So I don't know whether or not as a result of

12   this memorandum that a medical withdrawal policy was adopted

13   in response to this.

14       Q    Uh-huh.  Have you read this exhibit?  These two

15   pages?

16       A    Yes.

17       Q    Okay.  Do you have an understanding of what it

18   means?

19       A    It means that a student can be administratively

20   withdrawn from a campus if it is in the judgment of the

21   physician or if the student causes or interferes with the

22   right of members of the college community or with the

23   exercise of proper activities or functions of college or

24   it's personnel.

25       Q    Right.  You're reading from the last page with



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   proposed language for student medical withdrawals.  Is that

2   correct?

3       A    Right.  But that's my understanding of it.

4       Q    Okay.  That's the policy if it were adopted.

5            Isn't it true that the first page of the memorandum

6   says here's suggested language that your campus may adopt if

7   the faculty chooses to do so?

8       A    Yes.

9       Q    Do you know if such a policy was ever adopted?

10      A    I would have to review our policies to see if there

11  was a policy adopted.  My response to your question is it's

12  likely that the campus did adopt a policy.  But I can't

13  speak to whether or not the campus adopted a policy in 1983

14  or 1984 in response to this memo because I was not here.

15      Q    Right.

16      A    But we do have a policy in place that speaks to

17  withdrawal of students for medical reasons.

18      Q    Okay.  If a policy were adopted in 1983 or

19  whenever, it would appear in the student handbook, wouldn't

20  it?

21      A    Yes.

22      Q    Can you tell me where in the student handbook there

23  is a medical withdrawal policy?

24      A    No.  I can't because I didn't commit to memory the

25  student handbook policy.

Page 65

1    Q    Looking at the final page of this exhibit, if such

2   a policy had been adopted, it would say -- I mean, this

3   exhibit suggests that -- actually, let me back up.  Strike

4   that.

5        Let's look at both the first page and the second

6   page of this exhibit.  It has a number of highlighting marks

7   that make this exhibit a little bit hard to read.

8        When you received it, did it have the highlighting

9   on it already?

10   A    Yes.  I received it just as you have it.

11   Q    Okay.  So just to be clear:  The highlighting

12  wasn't added after this was sent to you by Betsy Neely.

13   A    No.  Well -- repeat that.

14   Q    Let me put it this way.  You didn't do the

15  highlighting, did you?

16   A    Right.

17   Q    Okay.  Does the policy suggest that a hearing

18  should precede a medical withdrawal?

19   A    (Reviewing document.)  Except in emergency

20  situations.

21   Q    Does it define what emergency situations are?

22   A    The emergency situations are not defined in this

23  document.

24   Q    Okay.  Do you believe that emergency situations

25  would require immediate action?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    Emergency situations would require immediate
2    action.
3    Q    Okay.  According to this policy, if it were
4    adopted, doesn't this require consultation with the campus
5    physician and consultation with the student's parents and
6    personal physician?
7    A    Or --
8    Q    Continue.
9    A    Or "A student may be administratively withdrawn
10   from the college when in the judgment of" -- I believe it's
11   highlighted; I can't read that -- "causes the student to
12   interfere with the rights of other members of the college
13   community."  So it's either/or.
14   Q    And in what way did Hayden Barnes interfere with
15   the rights of other members of the college community?
16   A    I can't speak to that.
17   Q    You don't know?
18   A    No.  I do believe that Hayden Barnes impacted
19   Dr. Zaccari's ability to perhaps function in the manner that
20   he would prefer because of concerns for his safety and the
21   safety of the campus community.
22   Q    Uh-huh.  And I think I asked before:  Do you know
23   if Dr. Zaccari actually consulted with anybody about his
24   concerns?
25   A    I don't know.

Page 67

```
 1      Q     In your May 1st conversation with Dr. Zaccari and
 2   Elizabeth Neely, did Ms. Neely ask if Valdosta State had, in
 3   fact, adopted a medical withdrawal policy?
 4      A     No.  I don't recall her asking that question
 5   specifically.
 6      Q     But it's your recollection that she simply said
 7   that Mr. Barnes could be administratively withdrawn pursuant
 8   to this policy.
 9      A     I don't recall those exact words.  I recall that
10   she said Hayden may be administratively withdrawn; you need
11   to be concerned about the safety of campus and the campus
12   community and yourself.  That's what your major concern
13   needs to be, and we'll worry about the lawsuit later.
14           And you can put that in quotation marks:  "We'll
15   worry about the lawsuit later."
16      Q     That was an exact phrase?
17      A     "We'll worry about the lawsuit later."
18      Q     Okay.  Looking at the top of this final page of the
19   exhibit, it says "A student may be administratively
20   withdrawn."
21           Do you know if that phrase, "administratively
22   withdrawn," appears in any other policy?
23      A     I can't recall.  Once again, Dr. Zaccari wanted to
24   make certain that his conduct was sanctioned by those
25   individuals who would review the circumstances behind his
```

Page 68

1    decision.

2           And Betsy Neely's review of the matter is reflected

3    on the document that -- it was appealed to her, and she said

4    that we'll have an administrative hearing.

5           So she's a part of the decision-making process, and

6    the appeal went to her, as well.

7       Q    She was part of the decision-making process in how

8    Hayden Barnes was to be expelled and she was part of the

9    appeals process?  Is that your testimony?

10      A    Yes.  Typically, what happens is if there is a

11   decision made by the president of any institution with some

12   exceptions -- grade appeals, they don't handle those kinds

13   of things -- the decision is appealable to the Board of

14   Regents.

15          And the Office of Legal Affairs, they're charged

16   with the responsibility of reviewing matters on campuses,

17   reviewing decisions, and making an appropriate determination

18   about the course of action.

19          And you will see that the matter was appealed to

20   the Board of Regents, and she rendered her decision in that

21   appeal.

22      Q    Given that you had earlier expressed concerns about

23   due process, is it in your view consistent with due process

24   for someone to be both a primary decision-maker and a

25   decision-maker of the appeal of that initial decision?

```
 1      A      No.
 2      Q      After this fax arrived, I assume that -- or is it
 3    correct to assume that a decision was made about how to
 4    proceed with Hayden Barnes?
 5      A      I'm sorry.  Repeat that.
 6             MR. CORN-REVERE:  Could you read that back.
 7             (The requested portion was read back by the Court
 8      Reporter.)
 9             THE WITNESS:  I think the decision was made
10      following that telephone conversation with Betsy Neely.
11    BY MR. CORN-REVERE:
12      Q      Okay.  Was the process based on this policy in the
13    fax?
14      A      Based on what Dr. Zaccari wanted.  I can't say it
15    was based on that policy because I don't know whether or not
16    that's a valid policy.
17             That was information that was sent to Betsy -- sent
18    to us by Betsy for Dr. Zaccari to understand that he can be
19    administrative -- a student can be administratively
20    withdrawn from a campus.
21      Q      Okay.  So it was based on this exchange whether or
22    not it was a policy.
23      A      Right.
24      Q      Let's look at Exhibit Number Two.  What I'm looking
25    for is the response to interrogatory number six, which
```

Page 70

1    appears at pages four and five.

2       A    (Reviewing document.)  Uh-huh.

3       Q    Okay.  And the interrogatory was asking you to

4    "Identify all VSU rules, policies, and procedures for

5    subjecting a student to 'Administrative Withdrawal'

6    including, but not limited to, any relevant sections of the

7    VSU Student Code of Conduct."  And I believe you list five

8    possible policies.

9       A    Uh-huh.

10      Q    One is the Valdosta State Student Code of Conduct;

11   secondly, the Board of Regents of the University System of

12   Georgia Medical Withdrawal Policy.

13      A    Uh-huh.

14      Q    Third, the Board of Regents of the University of

15   Georgia Mental Health Withdrawal.

16           Fourth, Board of Regents of the University System

17   of Georgia Policy 1902.

18           And, fifth, Board of Regents of the University

19   System of Georgia policy on Administrative Withdrawals.

20           Is that correct?

21      A    Yes.

22      Q    Is this still your understanding of what policies

23   and procedures apply to this situation?

24      A    Yes.

25      Q    Are there any others not included in this answer

Page 71

1    that you can think of that would apply?

2        A    No.  I can't think of any.

3        Q    You mentioned earlier that when Dr. Zaccari was

4    gathering information about Hayden Barnes he had looked into

5    his grades.

6        A    Yes.  He had a conversation with Walter Peacock.

7        Q    Who is Walter Peacock?

8        A    He's over Admissions.

9        Q    What is his position in Admissions?

10       A    Director.  I can't recall.  Director.

11       Q    Excuse me one second.

12       A    Okay.

13           MR. CORN-REVERE:  (Reviewing documents.)  Can we go

14       off the record just a minute?

15           (Discussion off the record.)

16           MR. CORN-REVERE:  Let's mark these as Deposition

17       Exhibits Number Six and Seven.  First, a single sheet

18       and, second, a four-page document.

19           (The documents were marked for identification as

20       Plaintiff's Exhibit Numbers Six and Seven).

21           THE WITNESS:  (Reviewing documents.)

22    BY MR. CORN-REVERE:

23       Q    Have you had a chance to look at these two new

24    exhibits?

25       A    I'm looking at them now.  Exhibit six, I've never

Page 72

1    seen this before.

2        Q    Okay.

3        A    I don't recall ever seeing this before.

4        Q    Okay.  You're anticipating my question.

5             First of all, I believe right before the break we

6    were talking about the fact that Dr. Zaccari had sought

7    information on Hayden Barnes' grades.  Is that correct?

8        A    Yes.

9        Q    Okay.  Looking at this Exhibit Number Six, it says,

10   "President Zaccari, the following is the information I

11   received from Chuck Hudson regarding T. Hayden Barnes," and

12   then it lists grades in a number of classes.

13       A    Uh-huh.

14       Q    Is that a fair characterization of what the

15   exhibits says?

16       A    Yes.

17       Q    Okay.  Is this the kind of information that you

18   understood Dr. Zaccari was seeking about Hayden Barnes?

19       A    This is the first time I've ever seen this exhibit.

20   I don't know where it's from.

21            I think Dr. Zaccari, if I recall correctly, wanted

22   to know whether or not Hayden would've been academically

23   suspended.

24       Q    Right.  So you had testified earlier that

25   Dr. Zaccari had sought out information about Hayden's

1    grades.

2        A     Right.

3        Q     And is this the kind of information that would be

4    responsive to that request?

5        A     I guess.  I guess so.  I mean, I don't know who

6    it's from.  I don't know anything about it.

7        Q     It says that this is information received from

8    Chuck Hudson.  Do you know who Chuck Hudson is?

9        A     Chuck Hudson is the registrar.  So, obviously, it

10   came from someone else other than Chuck Hudson.

11       Q     Uh-huh.  I believe you mentioned a name earlier.

12   Was it a Mr. Peacock?

13       A     Yes.

14       Q     And if I understand this exhibit correctly, the

15   grades show that Mr. Barnes was not on academic probation.

16       A     According to this document?

17       Q     Yes.

18       A     Let's see.  Let's see what it says.  "Overall GPA

19   is 1.93.  Probation is based on institutional GPA."  It

20   says, "Therefore, he is no longer on academic probation."

21   So this is what this document says.

22       Q     Okay.  Look at Exhibit Number Seven.

23       A     Uh-huh.

24       Q     It's a document -- there's a heading about

25   two-thirds of the way down the page that says "Academic

                                                    Page 74

```
 1     Probation and Suspension."  Do you see that?
 2        A     Yes.
 3        Q     Have you seen this before?
 4        A     No.
 5        Q     Okay.  Well, I'll just mention this is a document
 6     that we received in response to our discovery requests.  So
 7     it's something that came from --
 8              MR. LaVALLEE:  When?
 9              MR. CORN-REVERE:  I'm sorry?
10              MR. LaVALLEE:  Whose discovery requests, do you
11         know?
12              MR. CORN-REVERE:  I can't tell you right now.  It
13         came as part of a response to discovery in this case.
14              THE WITNESS:  But you don't know where it came
15         from?  It didn't come from me.
16     BY MR. CORN-REVERE:
17        Q     Okay.
18        A     I don't recall seeing it.  I mean, it looks like
19     something that was maybe Xeroxed out of -- I can't say.  I
20     don't know what it is.
21        Q     Okay.
22        A     It talks about the Honors Program.
23        Q     Well, it says -- if you look at page two, it does
24     say that -- it talks about "Stages of Progress with Minimum
25     Grade Point Averages Required" at VSU.
```

Page 75

1          So is it your understanding there's a policy at VSU

2     about what your grades need to be to avoid academic

3     probation?

4     A     As is the case with every institution within the

5     University System of Georgia, correct.

6     Q     Okay.  It's not an accusation.  I'm just trying to

7     find out.

8     A     I know.

9     Q     So when you testified that Dr. Zaccari was looking

10    into Hayden's grades --

11    A     Uh-huh.

12    Q     -- was it your understanding that he was looking to

13    see if he could dispose of Hayden Barnes simply based on his

14    grades?

15    A     It's my understanding that he was trying to discern

16    whether or not the whole issue of him being on campus would

17    be moot if he were no longer on campus because of being

18    under academic suspension.

19    Q     Is that a yes?

20    A     Yes.

21    Q     Okay.  Now also right before the break we listed

22    the other five policies.  So I guess this would be a sixth

23    possible policy for withdrawing Hayden Barnes.

24          The other five were the Student Code of Conduct,

25    Medical Withdrawal, Mental Health Withdrawal, Board Policy

1    or of Regents Policy of 1902, and the Policy on

2    Administrative Withdrawals.

3        A    Okay.  All of those policies are particular to

4    conduct.  This is, obviously, particular to academic

5    standing.  Exhibits Seven and Six speak to academic

6    standing.

7        Q    Okay.  Right.  But the one thing they have in

8    common is that they are different ways that could be used to

9    get rid of Hayden Barnes.  Isn't that right?

10            MR. LaVALLEE:  Objection to form.

11            MR. WILL:  I object to the form, as well.

12            THE WITNESS:  It's not a question of getting rid of

13        Hayden Barnes.  If Hayden, like all other students within

14        the University System of Georgia and Valdosta State -- if

15        they are not performing to academic standards, it doesn't

16        matter who they are or whatever discussion there may have

17        been about the student.  That student would voluntarily

18        remove themselves from campus based on academic

19        performance.

20            This is something particular to a student and not

21        to anyone else outside of the student's performance.

22    BY MR. CORN-REVERE:

23        Q    Let me put the question in a somewhat more neutral

24    way.

25            The one thing these six policies have in common is

```
 1    they are all ways in which Mr. Barnes could be withdrawn
 2    from Valdosta State University.
 3        A     Correct.
 4              MR. CORN-REVERE:  I'd like to mark for
 5    identification Exhibit Number Eight, and it's a multipage
 6    document with a cover page that says, "Student Code of
 7    Conduct."
 8              (The document was marked for identification as
 9    Plaintiff's Exhibit Number Eight.)
10              THE WITNESS:  (Reviewing document.)
11    BY MR. CORN-REVERE:
12        Q     Okay.  I'll just mention this is a document that we
13    received from you as part of your supplemental response.
14              MR. SMITH:  Let me state for the record that this
15    exhibit is just a portion of the student handbook that we
16    produced.
17    BY MR. CORN-REVERE:
18        Q     Why don't we actually introduce all of these -- or
19    mark all of them right now, because there are several.
20        A     Did your office add the emphasis to Exhibit Eight?
21        Q     We'll get to that.
22        A     Okay.
23              MR. CORN-REVERE:  And, David, in response to your
24    earlier statement, I know that there's also a Student
25    Handbook -- and we'll get to that -- that you produced.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   BY MR. CORN-REVERE:

2      Q    Let's first start with this exhibit that says at

3   the top of the page "Student Code of Conduct."

4           And just for identification purposes, this exhibit

5   runs from -- it begins on page 39 and runs through page 48.

6           Okay.  Have you had a chance to look at that

7   exhibit?

8      A    Yes.  Emphases have been added.

9      Q    I wanted to ask you that.  This exhibit does have

10  marks that show highlighting in certain places.  This is the

11  condition in which we received it.  I wanted to ask you if

12  you knew who did the highlighting.

13     A    No.

14     Q    Okay.  Looking on page one in the first column

15  where it says "Appendix A" --

16     A    Uh-huh.

17     Q    -- the highlighted portion says, "However,

18  additional rules and regulations may be developed under

19  established procedures during the school year as required

20  for the general well-being of Valdosta State University."

21     A    Yes.

22     Q    Do you know if any additional rules have been

23  adopted to deal with the situation involving Hayden Barnes?

24     A    Not to my knowledge.

25     Q    Looking at pages 40 and 41 of the same document --

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1      A      Uh-huh.  (Reviewing document.)

2      Q      -- there's a Section E on the third column,

3   beginning on the third column of page 40 going over to the

4   next page.

5      A      Yes.

6      Q      And, again, I don't know.  Do you know who did the

7   highlighting of this?

8      A      No.  And the reason it stands to reason that I

9   didn't do the highlighting is because, as you can clearly

10  discern under 5E, it talks about obscenity.

11     Q      Yes.  Under Section 5, the highlighted portion

12  says, "Conduct and/or expressions which are obscene or which

13  are blatantly offensive to the prevailing standards of the

14  University community are prohibitive."

15            Am I understanding you correctly that you believe

16  that that section does not apply to Hayden Barnes?

17     A      No.  What I'm trying to figure out, first and

18  foremost, is why these particular parts of this document is

19  highlighted and emphasized.

20     Q      I was hoping you could tell me.

21     A      I can't.

22     Q      Okay.  Fair enough.  But to get back to the

23  question that I just asked, based on your knowledge of what

24  happened in this case, do you know of any language of Hayden

25  Barnes that was obscene or blatantly offensive to the
```

Page 80

```
 1    prevailing standards of the University community?
 2        A    Are we applying the Miller test to obscenity?  If
 3    we're applying the Miller test --
 4        Q    It's your policy.
 5        A    It's not a policy that I created.  I don't draft
 6    policy on campus.  I may assist and provide legal input; but
 7    if the prevailing community standards of the University
 8    community, if this was drafted in be consistent with the
 9    Miller test, the Supreme Court case, no, I don't recall
10    anything that would satisfy that three-prong test for
11    obscenity.
12        Q    Okay.
13        A    There involved no sexual comments or drawings to my
14    knowledge.
15        Q    Okay.  Based on your initial testimony about what
16    you do in your job for the University and for the Board of
17    Regents, is part of your responsibility to interpret and
18    help apply University policies?
19        A    Part of my job includes taking a particular set of
20    facts and making a determination of whether or not we are
21    acting consistently with a particular policy.
22        Q    Okay.  So that would be a yes?
23        A    Yes.
24        Q    On the next page, page 41, do you see paragraph 7?
25    And, again, I'm not suggesting you're the one that did any
```

1   highlighting.  I'm trying to find out how the highlighting

2   is there myself.

3          But paragraph seven says, "Verbal or sexual

4   harassment, terroristic threats or abuse, and sexual assault

5   are prohibited."

6   A      Yes.  I see that.

7   Q      Okay.  Is this part of the Student Code of Conduct

8   relevant to the case of Hayden Barnes?

9   A      Perhaps from the perspective of Dr. Zaccari.

10  Perhaps he could make the argument that his behavior may

11  rise to the level of being considered terroristic threats.

12  Q      Okay.  You mentioned earlier interpreting paragraph

13  five under the Supreme Court's case of Miller versus

14  California.  What is the applicable test according to the

15  Supreme Court for making a terroristic threat?

16  A      I don't recall.

17  Q      Do you have a sense of the threshold for how

18  threatening language must be to be considered a terroristic

19  threat?

20  A      I think if the person feels there is a reasonable

21  threat to safety or harm that's based on objective

22  information, that that person, I think, can make a plausible

23  argument that there's a possibility of a threat.

24  Q      Okay.  Is that purely subjective based on the

25  person who hears the language or would an objective view

1    have to be applied to the language?

2        A    I think an objective view and it has to be based on

3    objective information combined with a subjective review of

4    that objective information; because whether or not a person

5    feels threatened or whether or not a person is in fear of

6    their safety and well-being is subjective, and it can be

7    based on objective information and data.

8        Your threshold for feeling threatened may be

9    different from mine.

10       Q    Okay.  But, again, in considering the First

11   Amendment concerns you had expressed to Dr. Zaccari, whether

12   or not someone could be punished for a threat just doesn't

13   depend on a subjective reaction of a person, does it?

14            MR. WILL:  Object to form of the question.

15            THE WITNESS:  My First Amendment concerns to

16       Dr. Zaccari were rooted in the fact that Hayden could

17       make the argument that the Administration was seeking to

18       interfere with his freedom of expression.

19   BY MR. CORN-REVERE:

20       Q    Okay.  But there is a process for sorting this out,

21   isn't there?  For whether or not a threat is actionable?

22       A    By "process," do you mean we look at the policy?

23       Q    In the Student Code of Conduct, it describes a way

24   of determining whether or not something is actually a

25   threat.

Page 83

1    A    Well, what happens generally is the concern is
2    routed through the Student Judicial Process; and during that
3    process, you have triers of facts.  It consists of students
4    who have been appointed to review cases, and they make a
5    determination of whether or not violations of the Student
6    Code of Conduct took place.
7    Q    Okay.
8    A    And we don't supply them, based on my
9    understanding, with a grid of what you must find in the
10   event A, B, and C are present.
11        They are aware of the policy and they apply the
12   policy to the facts at hand.
13   Q    Okay.  Let's look at pages 42 and 43 of this
14   exhibit where it describes under Appendix B, "Rights of
15   Students."
16   A    Uh-huh.
17   Q    Is that the process you just described for
18   providing students with due process?
19   A    Yes.
20   Q    Is that what should have been applied to any claim
21   that Hayden Barnes violated the Code of Conduct?
22   A    Yes.
23   Q    And that was not applied in this case.  Isn't that
24   right?
25   A    Right.

Page 84

1    Q    Okay.  Next on page 43, in the first column under

2    Section II, Disciplinary Process, the first paragraph

3    states, "Section 401 of the Board of Regents policies

4    authorizes each institution to develop appropriate policies

5    and procedures to discipline students/organizations for the

6    violation of Valdosta State University's rules.

7         "In accordance with this responsibility,

8    disciplinary sanctions shall be applied only after the

9    requirements of due process, fairness, and reasonableness

10   have been met.

11        "The aim of any disciplinary action is the

12   redirection of student behavior toward the achievement of

13   their academic goals."

14        Is that in your view an accurate summary of the

15   requirements of due process under this Code of Conduct?

16   A    Yes.

17   Q    And that was not followed in this case?

18   A    No.

19   Q    Are these the policies that you advised Dr. Zaccari

20   to follow in this case?

21   A    The policies that I advised him to follow were

22   actually given to him.  I'd have to reference the document I

23   know that you're probably going to ask me questions about.

24   The letter that was eventually sent to Hayden Barnes, I

25   referenced the policy at the very top.

Page 85

1          Once again, I wanted to emphasize to him in writing
2     that the student was entitled to due process.  We had
3     policies in place that could be utilized to satisfy due
4     process concerns.
5          Q     Okay.  Looking at page 45 of this exhibit --
6          A     Yes.
7          Q     -- in the center column at the top under paragraph
8     G --
9          A     Uh-huh.
10         Q     -- it says, "Forced Withdrawal:  From the academic
11    course within which the offense occurred, without credit for
12    the course."
13         Actually, that's from a list of possible
14    disciplinary measures that may be imposed.
15         A     Uh-huh.
16         Q     Is it your understanding that the due process
17    procedures that you just described are required before a
18    student may be forced to withdraw from a course?
19         A     Right.  A student is entitled to due process,
20    period.
21         MR. CORN-REVERE:  Okay.  Let's mark for
22    identification Exhibit Nine with the cover page Student
23    Code of Conduct.
24         (The document was marked for identification as
25    Plaintiff's Exhibit Number Nine).

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    BY MR. CORN-REVERE:
 2        Q    Again, this may be another form of what we have
 3    just looked at, but I just had a couple of questions about
 4    this.
 5        A    (Reviewing document.)
 6        Q    If we could look -- I'm sorry.
 7        A    These policies appear in several places.  You have
 8    it on the web, then in the book.  So --
 9        Q    Right.  They're the same policies, but they are
10    republished in various forms.  Is that right?
11        A    Uh-huh.
12        Q    Looking at page 60 of this copy under the heading
13    E, "Disorderly Conduct," there's some writing surrounding
14    some of these policies.
15             Paragraph E5, a circle around it and number 6 for
16    the next paragraph and the same with the next paragraph on
17    7.
18             Do you know who did this writing?
19        A    No.  In this case, it doesn't concern sexual
20    harassment.
21        Q    Right.  Turn to -- these may have been taken out of
22    order.  Page 59.  At the bottom of the second column,
23    there's a heading D.
24        A    It's out of order, but I see the second column.
25        Q    Yeah.  These got transposed.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    D?

2    Q    Actually, pages 59 and 60.  And the section I'm

3  interested in begins on the bottom of page 59:  Disorderly

4  Assembly.

5         Is this an expression of Board of Regents Policy

6  Section 1902?

7    A    I would have to have the Board of Regents policy

8  before me to say yes or no.

9    Q    Okay.  Well, it does say in the first paragraph,

10  "The Board of Regents Policy Manual Section 1902 regarding

11  disorderly assembly states."

12    A    At the time this was produced, it's reasonable that

13  they pulled from the Board of Regents Policy the exact

14  language and cut and pasted it.

15    Q    I see.  There's a paragraph two and three that

16  says, "No student or group of students shall obstruct the

17  free movement of people about the campus, interfere with the

18  use of University facilities, or materially interfere with

19  the normal operation of the University."

20         And then paragraph three: "The abuse or

21  unauthorized use of sound amplification equipment indoors or

22  outdoors during classroom hours is prohibited."

23         And then in parentheses: "Any use of sound

24  amplification equipment must be cleared through the Student

25  Life Office."

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          Is it fair to say that this policy under

2    "Disorderly Assembly" really relates to unruly student

3    demonstrations?

4        A      Student demonstrations that have not been approved

5    through the process that we have on campus for securing

6    venues for freedom of expression.  Yes, those students could

7    fall within this category provided those conditions had been

8    met.

9        Q      Okay.  And if a student were to violate in some way

10   this policy on disorderly assembly, would that student also

11   be entitled to due process protections?

12       A      I would say yes.

13       Q      Okay.  Let's look at page 68.

14       A      (Reviewing document.)  You said 68?

15       Q      Yes.  Hopefully, they're in order now.

16              So at the bottom of column one and going over to

17   column two, it says, "To ensure that Valdosta State

18   University students receive due process rights, Valdosta

19   State University has initiated the following Mental Health

20   Withdrawal Procedure."  And then it lists the conditions.

21              This is one of the possible procedures that you

22   listed as being applicable to the situation regarding Hayden

23   Barnes?

24       A      Uh-huh.

25       Q      Is this the procedure that the University should

Page 89

1    have followed in this case?

2      A    This is the procedure that the University may have

3    followed.

4      Q    Okay.

5      A    And it was not followed.

6      Q    Okay.  Is this one of the procedures you were

7    referring to when you advised Dr. Zaccari to respect

8    Mr. Barnes' due process rights?

9      A    If I had a copy of the letter and could compare it

10   to the policy that I cited in the letter, then my answer

11   would be yes if it's the same policy number.

12     Q    Okay.  And just to make sure it's clear, none of

13   these procedures were followed in this case, were they?

14     A    No.

15     Q    I'm sorry?

16     A    No.

17     Q    Again, even where it's clear what I'm going to ask

18   you, wait for the question to be finished.

19          Based on what you know about the case, if these

20   procedures had been followed, do you think Hayden Barnes

21   would've been expelled from Valdosta State University?

22     A    I don't know.

23     Q    Well, let's look at the policies.  Under the Mental

24   Health Withdrawal, it says, number one, "The Student

25   displays behavioral indicators which are determined by a

1    mental health professional to be of danger to

2    himself/herself or others."

3         Do you know if any mental health professional

4    determined that Mr. Barnes was a danger to anybody?

5    A    Based on what Dr. Zaccari represented to me,

6    apparently, there was something during the course of his

7    conversations with his counselor that led him to believe

8    that there was a concern for the safety of himself and the

9    campus community.

10   Q    Earlier when you were talking about meetings that

11   you're now aware took place to supplement your interrogatory

12   answers, you described a meeting that included Leah

13   McMillan.  Isn't that right?

14   A    Uh-huh.

15   Q    Did Ms. McMillan at any point in that meeting

16   express her opinion on whether or not Mr. Barnes was a

17   danger to anybody?

18   A    No.  Leah McMillan did not discuss particulars of

19   Hayden Barnes' therapy session with me.

20   Q    Okay.  The second part of the mental health policy

21   says, "When a mental health professional recommends that a

22   student needs to be withdrawn from school for mental health

23   reasons, an informal hearing will then be set up to

24   determine whether or not the student should be withdrawn."

25   A    Uh-huh.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Is that a correct statement of policy?

2    A    Yes.  Based on the reading of the policy and based

3    on what's presented before me.

4    Q    Yes.  Was any informal hearing ever set up in this

5    case?

6    A    Not to my knowledge.

7    Q    And then finally it says, "In this informal hearing

8    conducted by the Office of the Dean of Students, the student

9    or his or her representative may present any pertinent

10   information that he or she believes will have a bearing on

11   the particular case."

12   A    Uh-huh.

13   Q    Do you know whether or not Mr. Barnes was ever

14   given the opportunity to present such information?

15   A    Not to my knowledge.

16        MR. CORN-REVERE:  Okay.  I'd like to mark as

17        deposition Exhibit Number Ten another copy of the various

18        policies.

19        (The document was marked for identification as

20        Plaintiff's Exhibit Number Ten.)

21   BY MR. CORN-REVERE:

22   Q    Again, I apologize if the orders seem strange with

23   our documents.  Some were combined and some weren't.  But

24   once the witness has had a chance to take a look at it,

25   we'll just ask what it is.

```
 1     A     (Reviewing document.)
 2     Q     Now, again, I'll just say this is something we
 3   received in discovery.  It appears to be a group of partial
 4   pages from various policies, but the front page of this
 5   includes the mental health policy that we were just
 6   discussing.
 7           And, again, the copy that we have has various
 8   markings showing that it had been highlighted at some point.
 9           There's also handwriting at the bottom that says,
10   "Copy to Dr. Zaccari 5-2-07."  Have you seen this document
11   before?
12     A     The reason I'm hesitating, I've seen this document
13   before because it's, obviously, from the Code of Conduct, I
14   believe.
15           But the handwriting at the bottom, I recognize that
16   to be what I believe to be my assistant's handwriting.  So
17   at my directive she must've given Dr. Zaccari a copy of this
18   document.
19     Q     I see.  And so this would have coincided with the
20   phone call and fax that you exchanged with Elizabeth Neely
21   and then your follow-up discussions with Dr. Zaccari.  Is
22   that correct?
23     A     It would've coincided.
24     Q     Okay.  And based on what you expressed as being
25   concerns about due process rights, this would have been
```

Page 93

```
1    support for what you had said in those meetings?
2        A     Yes.
3        Q     Is the highlighting on this copy yours?
4        A     It would be reasonable to say I would've
5    highlighted this.
6        Q     Okay.  But you have no independent recollection as
7    you sit here today?
8        A     No.
9              MR. CORN-REVERE:  Then let's mark as deposition
10       Exhibit Number 11 a document entitled Student Handbook.
11             (The document was marked for identification as
12       Plaintiff's Exhibit Number 11).
13             MR. CORN-REVERE:  David, this may be more of what
14       we got from you in the supplemental response, but it is
15       something on the cover that says Student Handbook, Volume
16       2.
17   BY MR. CORN-REVERE:
18       Q     Now, again, if you don't mind, just flip through
19   this.
20             I understand you testified earlier that these
21   various policies appear in various places, and I assume that
22   the Student Handbook is one of the places that the various
23   policies might show up.
24             I really just want to ask you if there are any
25   policies that we haven't discussed that may be included in
```

Page 94

1    the Student Handbook.

2        A    Not that I can recall.

3        Q    Okay.  That's all I had about that one.

4            MR. CORN-REVERE:  Next let's mark for indication

5        Gaskins Exhibit Number 12 part of the Board of Regents

6        Policy Manual: Section 1900.

7            (The document was marked for identification as

8        Plaintiff's Exhibit Number 12.)

9    BY MR. CORN-REVERE:

10       Q    Again, I'll just say these are documents that we

11   received in discovery.  They appear to be printouts from the

12   web site showing Board of Regents policies.

13           The front page of this has a date of May 10th,

14   2007.  The pages behind it show a date of May 8th, 2007.

15           Let me just ask:  Are these documents, documents

16   you've seen before?

17       A    Yes.

18       Q    Would these have been the kind of documents that

19   you provided to Dr. Zaccari in May 2007 in this case?

20       A    Yes.

21       Q    Let me put it directly:  Did you provide

22   Dr. Zaccari with the documents in this exhibit?

23       A    I believe that I did.

24       Q    Okay.  And on the front page, in the second

25   paragraph, it has Section 1902, "Disruptive Behavior."

Page 95

1    A    Uh-huh.

2    Q    Okay.  Now is it your understanding that that

3  policy relates to unruly or violent demonstrations on

4  campus?

5    A    If it means, "Any student...who clearly obstructs

6  or disrupts or attempts to obstruct or disrupt any teaching,

7  research, administrative, disciplinary, or public service

8  activity," yes, that would fall within that category.

9    Q    Do these policies set forth the due process that

10  should be followed in a case like this one?

11    A    The Policy Manual was not in the Board of Regents

12  1902.

13    Q    Right.  1902 just sets forth one of the things that

14  can be disciplined.

15    A    Yes.

16    Q    But if you look at pages -- the last four pages, I

17  guess, of this exhibit -- also printed out on that date,

18  May 8th, 2007 -- it lists the hearing procedure, the appeals

19  process and other issues, including mental health

20  withdrawal.

21    A    Uh-huh.

22    Q    And the rights of students.  Are these the policies

23  that should have governed in this case?

24    A    These are policies that should've been considered

25  in making a determination about the situation at hand.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    So these policies are optional?

2    A    No.  These policies should've been considered.

3    Q    Under what circumstances can they be disregarded?

4    A    There are no circumstances the hearing procedure

5    should be disregarded.  Ultimately, a student is entitled to

6    a hearing.

7    Q    Okay.  On the final page of this exhibit where it

8    lists "Rights Of The Students" and it includes:

9         "The right to an advisor of one's choice;

10        "The right to present information on one's behalf;

11        "The right to question one's accusers;

12        "The right to call witnesses on one's behalf;

13        "The right to remain silent and have no inference

14   of responsibility drawn from one's silence;

15        "The right to question all witnesses;

16        "The right to be appeal all sanctions; and

17        "The student may also have a verbatim transcript

18   made at one's own expense," and it goes on.

19        Were any of those rights accorded Hayden Barnes?

20   A    No.

21        MR. CORN-REVERE:  Let's mark as Exhibit 13 the

22   Policy Manual:  Section 400.

23        (The document was marked for identification as

24   Plaintiff's Exhibit Number 13.)

25        THE WITNESS:  (Reviewing document.)

Page 97



1    BY MR. CORN-REVERE:

2      Q     Have you had a chance to take a look at this?

3      A     I'm looking at it now.

4      Q     Okay.  Now, again, this appears to be a printout

5    from the web site showing Board of Regents Policies.  This

6    is not a printout that appears to be printed out in May of

7    2007.  The date at the bottom shows that it's current.

8            And I don't think we received this in discovery.  I

9    may have printed this out.  My memory is hazy, even from

10   more recent times.

11     A     That's okay.

12     Q     I just want to ask a couple of things about it.

13   Looking at the bottom of page one --

14     A     Yes.

15     Q     -- where it talks about the policy regarding

16   "Students With Disabilities," when you advised Dr. Zaccari

17   that there may be ADA concerns, was this the policy that you

18   were referring to?

19     A     No.  It was just my general understanding of the

20   law.

21     Q     I see.  So general ADA concerns but you weren't

22   referring to this section.

23     A     Yes.

24     Q     But it refers to, in substance, the same issue,

25   doesn't it?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      Yes.

2      Q      Okay.  Is it your understanding that it would

3    violate this policy if a student opportunity were denied

4    because of his use of the Counseling Center?

5      A      If the student has a documented disability and he

6    was singled out for unfavorable treatment, then, yes, it

7    would be a violation of the Americans with Disability Act.

8             That unfavorable treatment being defined as being

9    denied services or -- yeah, being denied services on campus.

10     Q      Okay.  Would a violation of a student's right to

11   confidentiality also violate the Americans with Disabilities

12   Act?

13     A      It depends on how confidential information was

14   shared.  If that confidential information was shared because

15   the student presented a threat to himself or to others, then

16   no.

17     Q      Okay.  Well, let's make it less theoretical.

18   Earlier you testified that Dr. Zaccari shared with you his

19   knowledge that Hayden Barnes used the Counseling Center,

20   right?

21     A      Uh-huh.

22     Q      And I believe it was your testimony that his

23   sharing that information made you concerned.  Isn't that

24   right?

25     A      Yes.

1    Q    Was your concern that that information could be a

2    violation of confidentiality under the Americans with

3    Disabilities Act?

4    A    Not the fact that the student may have consulted

5    the Counseling Center; it's the fact that there was a

6    likelihood that there may have been further discussions

7    along those lines.

8    Q    And that might have been a violation of the ADA.

9    A    Yes.

10        MR. CORN-REVERE:  Let's mark as Deposition Exhibit

11    Number 14 a document entitled Bylaws of the Board of

12    Regents.

13        (The document was marked for identification as

14    Plaintiff's Exhibit Number 14.)

15    BY MR. CORN-REVERE:

16    Q    Again, I'll just mention this isn't something we

17    received in discovery.  It's simply a statement.  I'll let

18    you tell me what it is.  My question isn't whether or not

19    you've seen this specific document before but whether or not

20    you have seen the Bylaws of the Board of Regents before and

21    if that's what this appears to be.

22    A    I have seen the Bylaws of the Board of Regents

23    before, and this appears to be a draft version of the

24    Bylaws.

25    Q    Okay.  Look at Section 8 involving appeals.  It



```
 1    begins on page ten and goes over to the next page.
 2        A    My page number is not clear.
 3        Q    Yeah.  The ten is cut off.  But the last two pages
 4    of the document.
 5        A    (Reviewing document.)  Okay.
 6        Q    Essentially, it says, "Any person in the University
 7    System aggrieved by a final decision of the president of an
 8    institution may apply to the Board of Regents without
 9    prejudice to his or her position for a review of the
10    decision," and then it goes on.
11             Does this policy of the Board of Regents supplant
12    the other due process policies that we've discussed?
13             Let me put it another way.  Because it's possible
14    to appeal a decision of a university president, Board of
15    Regents, is the university free to ignore all of the other
16    policies of the Student Code of Conduct or the rights of
17    students?
18        A    No.
19        Q    So the fact that Hayden Barnes was given the right
20    to ultimately appeal his expulsion to the Board of Regents
21    doesn't change the fact that he was denied due process at
22    the university level.
23        A    Correct.
24        Q    Also, in the event of an appeal to the Board of
25    Regents, if the Board of Regents, itself, participated in
```

Page 101

1    the decision that is being appealed, is that a denial of due

2    process?

3        A    It compromises due process.

4             MR. CORN-REVERE:  I think this is a good breaking

5        point for lunch.  I have a couple of more questions about

6        policies, but I think that -- just looking at the time,

7        it's almost one o'clock.  I think it probably makes sense

8        to have lunch now and then reconvene after that.

9             THE WITNESS:  What time are we talking?

10            MR. CORN-REVERE:  How long will the deposition go?

11            THE WITNESS:  No, the time you want to reconvene.

12            MR. CORN-REVERE:  Would forty-five minutes work for

13       everybody?  Or we can -- we can do a half hour,

14       forty-five minutes or an hour.

15            THE WITNESS:  I'm for a half hour.

16            (Discussion off the record.)

17            (A lunch recess was held from 12:55 p.m. to 2:48

18       p.m.)

19   BY MR. CORN-REVERE:

20       Q    Will you take a look at Exhibit Number One which is

21   the complaint.

22       A    Uh-huh.

23       Q    And I'd just like to focus on paragraph 51 that

24   appears on page 17.

25       A    Uh-huh.



1     Q     Okay.  And paragraph 51 states:  On May 3rd, 2007,

2     Zaccari held  a meeting regarding Barnes which, on

3     information and belief, Gaskins, Mast, McMillan, and Keppler

4     attended.  At this meeting, Defendants, led by Zaccari,

5     decided unilaterally and without any due process due to

6     Barnes pursuant to the Constitution or to VSU and/or Board

7     policies to expel Barnes from VSU.

8     A     Uh-huh.

9     Q     Do you agree with that statement?

10    A     Well, let's see.  I agree.  There was a meeting on

11    or about May 3rd, and I agree that the people reflected in

12    paragraph number 51 were in attendance at that meeting.

13          And I agree that Dr. Zaccari made a decision

14    without due process to Barnes to expel Barnes from Valdosta

15    State.

16          I agree that it was not a joint decision.  It was

17    made by all the attendees.  I agree that the individuals

18    listed in paragraph number 51 -- Gaskins, Mast, McMillan,

19    and Keppler -- could not have collectively made this

20    decision to expel Barnes.  Dr. Zaccari was vested with the

21    full authority to do so.

22          MR. CORN-REVERE:  Okay.  Let's mark as Deposition

23      Exhibit Number 15, I believe, a single sheet called

24      Disciplinary Statistics.

25          (The document was marked for identification as

Page 103

```
1        Plaintiff's Exhibit Number 15).
2    BY MR. CORN-REVERE:
3        Q    Have you had a chance to look at that?
4        A    I'm looking at it now.  (Reviewing document.)
5        Q    And I'll represent for the record this is something
6    that I found on the web, on the Valdosta State web site,
7    that lists what are described as disciplinary statistics for
8    years 2007 and 2008.
9             Correct me if I'm wrong, but this appears to be
10   just a tally of the different kinds of disciplinary actions
11   that have occurred on campus during that time period.  Is
12   that --
13       A    This appears to be a tally of disciplinary statics
14   for the year 2007/2008.
15       Q    Looking down the first column --
16       A    Uh-huh.
17       Q    -- about the middle of the column, there's a
18   category called "Disorderly Assembly."
19       A    Yes.
20       Q    And this reports that there were zero instances of
21   findings of disorderly assembly during this time period.  Is
22   that a correct understanding of what this --
23       A    I can't speak to this document in terms of the
24   accuracy of the document because I didn't compile it, so I
25   can't speak to the representations that's reflected in the
```

Page 104

1    document.

2        Q    Right.  But that is an accurate understanding of

3    what this reflects, if it's accurate:  That there were zero

4    incidences of disorderly assemblies during this time period.

5        A    The record, as I see it, reflects that reportedly

6    for 2007/2008 there were zero incidences of disorderly

7    assembly as reflected by this document.

8        Q    Okay.  Now looking back at Exhibit 12, which is the

9    Board of Regents Policy 1902.

10       A    (Reviewing documents.)  Yes.

11       Q    Okay.  Would it be correct to infer that this

12   category called "Disruptive Behavior" corresponds to in this

13   count on the disciplinary statistics the category called

14   "Disorderly Assembly"?

15       A    Perhaps.

16       Q    Do you see another category that a finding of a

17   violation of Section 1902 might fall under?

18       A    Drugs, alcohol, disorderly conduct, academic

19   dishonesty may result in disruptive behavior; falsification

20   of I.D. may result in disruptive behavior; use of

21   explosives; false alarms.  Just about all the categories.

22   Well, maybe not animal zoning.

23       Q    So, basically, you can count anything under

24   anything.  Is that --

25       A    If it's disruptive behavior.

Page 105

1    Q    Right.  Let's look back at, I believe it is,

2   Exhibit Eight.

3    A    (Reviewing document.)

4    Q    I apologize.  Let's just go off the record a little

5   bit.  I'm looking for documents.

6         (Discussion off the record.)

7   BY MR. CORN-REVERE:

8    Q    Here it is.  I'm sorry.  It was, in fact, Exhibit

9   Eight.

10        On page two of the Exhibit Eight and in the middle

11  column where it refers to Disorderly Assembly and Board of

12  Regents Policy Section 1902, again this describes unruly

13  riots, disorderly assemblies.  I see that's the title of it:

14  Disorderly Assembly.

15        Does this reference from the Student Code of

16  Conduct suggest to you that the statistics that are kept by

17  the University and reported on Exhibit 15 are referring to

18  violations of Board of Regents Policy Section 1902?

19   A    Not exclusively, no.

20   Q    Really.

21   A    Because disorderly assembly refers to any student,

22  faculty -- I'm sorry.  I need to correct that.

23        This disorderly assembly could fit into this

24  definition of the Board of Regents.  Any student that

25  disrupts or attempts to obstruct or disrupts any teaching,

Page 106

1    research -- yes, disorderly assembly fits into this

2    definition.

3        Q    Okay.  So it would make sense then, if I understand

4    this correctly, that if there had been any findings of

5    disorderly assembly during this period, it would be reported

6    as part of these statistics reported on Exhibit 15.

7        A    I can't speak to the accuracy of the statics, nor

8    can I speak to whether or not the tally is a reflection of

9    this definition of disorderly assembly as it relates to

10   those incidents and how these incidents were divided up in

11   these categories.

12          You can have an offense that can include several

13   layers, and I don't know whether or not if the primary

14   conduct issue was related to alcohol they chose to list it

15   under alcohol as opposed to anything else.

16       Q    Okay.

17       A    I'm not trying to be difficult --

18       Q    I'm sorry to make this unclear through just using

19   hypothetical questions, but let's focus on the question in

20   this case.

21          As I understand it, Hayden Barnes was expelled

22   specifically by reference to Section 1902.  Isn't that

23   correct?

24          MR. WILL:  I object to the form of the question.

25   BY MR. CORN-REVERE:

Page 107

1      Q      You can answer.

2      A      Hayden Barnes was expelled -- administratively

3  withdrawn because of a perceived threat to the campus

4  community.

5      Q      But the withdrawal notice referred to Section 1902,

6  didn't it?

7      A      I'd have to look at it first before I can say yay

8  or nay.

9      Q      Okay.  We'll actually get to that.  But if the

10  withdrawal notice referred to expulsion pursuant to Section

11  1902, shouldn't it have shown up on this list of

12  disciplinary statistics?

13      A      Perhaps.

14      Q      Okay.  Of course, if it was a secret proceeding,

15  there's a reason why it wouldn't show up on a list of

16  statistics, wouldn't it?

17           MR. LaVALLEE:  Objection.

18           MR. WILL:  I object to the form of the question.

19           MR. CORN-REVERE:  I understand.

20  BY MR. CORN-REVERE:

21      Q      Let's turn back to Exhibit Number Three.  Again,

22  it's the supplemental answer to interrogatory number three

23  that is on pages two and three.

24      A      Uh-huh.  (Reviewing document.)

25      Q      Again, just to -- given the questions that we've

Page 108

1    had about the number of meetings that took place, the second

2    paragraph of the answer here describes the meeting by

3    speakerphone with Elizabeth Neely on May 1st.  The next

4    paragraph speaks of a meeting with Dr. Zaccari in which

5    you've described your concerns.

6            And then you describe two other meetings in which

7    you participated with Dr. Zaccari and Defendants Keppler,

8    Mast, and Morgan.

9            And then I believe you amended your answer earlier

10   this morning in which you said there was an additional

11   meeting on May 7th to discuss Hayden Barnes.

12           So, that makes at least five meetings in which you

13   participated to discuss how to deal with the situation

14   involving Hayden Barnes.  Is that correct?

15       A    The meeting of May 7th, I can't speak to the

16   subject matter and the content of that meeting because I

17   can't recall it.

18           MR. CORN-REVERE:  Okay.  Let's mark as Deposition

19       Exhibit Number 16 a one-page email.

20           (The document was marked for identification as

21       Plaintiff's Exhibit Number 16.)

22   BY MR. CORN-REVERE:

23       Q    This is, again, a document that we, I believe,

24   received as part of the administrative proceeding before the

25   litigation.  It's a one-page email from a Leighia Hammond.

Page 109

1    A    Yeah.

2    Q    To Thomas Hardy regarding "Meeting re: Hayden

3    Barnes." Have you seen this email before?

4    A    No.

5    Q    Okay. It's dated May 2nd, 2007, and it states:

6    "Tom: Melinda from the President's Office just called and

7    ask that I attend a meeting re: Hayden Barnes tomorrow.

8         "She asked to attend since you are out of the

9    office the rest of the week. She didn't give me details.

10   So, I asked if I needed to bring his file or what I needed

11   to be prepared. Then she finally said this student may be

12   asked to leave the University effective Friday. She said

13   that Russ, Scott Doner and others would be there.

14        "I wanted you to be aware, and I also wanted to see

15   if there is anything in particular that I should know about

16   this student. I do recall him causing some problems, but I

17   will have to pull his file to refresh my memory."

18        Do you know what meeting this is referring to?

19   A    I believe this is the meeting that took place on

20   May 4th. I believe May 4th.

21   Q    Okay. So that's the meeting that is --

22   A    Perhaps, uh-huh.

23   Q    Okay. If you're correct in that assumption, that

24   would be the meeting you described in your response,

25   supplemental response to interrogatory number three.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    Uh-huh.

2    Q    Now your response describes this as a subsequent

3    conversation on or about May 4th in which you advised

4    Dr. Zaccari of your concerns about the Constitutional rights

5    afforded students.

6    A    Uh-huh.

7    Q    Was that a separate meeting or is that the same as

8    the two meetings you're referring to in the next paragraph

9    of your answer to interrogatory number three?

10    A    I think Leighia Hammond perhaps was in attendance

11    at that May 4th meeting, and I recalled to the best of my

12    ability everyone who was there.  So, apparently, she was

13    there, as well; but I just don't recall her being there.

14    Q    I see.

15    A    Or perhaps this is a meeting that took place

16    between Russ, Kurt, Scott Doner, and others.  I just can't

17    seem to place her visually in that room on May 4th.

18    Q    Okay.

19    A    But that doesn't mean to suggest she wasn't there.

20    I just can't seem to pull her up.

21    Q    Right.  And, again, I'm sorry if I'm confusing

22    things.  But when you refer to the May 4th date in this

23    initial paragraph in interrogatory number three --

24    A    Uh-huh.

25    Q    -- on May 4th you advised Dr. Zaccari of the

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    Constitutional and due process problems -- and then in the
 2    next paragraph you talk about participating in the meeting
 3    with Defendant Zaccari, Defendant Keppler, Mast, and Morgan,
 4    are you referring to the same thing?
 5            I mean, are you referring to a meeting on May 4th
 6    with these other defendants in which you also advised
 7    Dr. Zaccari of the Constitutional problems or were they
 8    separate events?
 9    A     When I talk about the Constitutional issues and
10    concerns, it was in that larger meeting.
11    Q     Okay.  And did anyone else in that meeting discuss
12    those concerns?
13    A     I was the person raising due process and things of
14    that nature.  I can't recall if anyone else chimed in.
15    Q     Okay.  Now looking at this Exhibit 16 --
16    A     Uh-huh.
17    Q     -- where it says there's going to be a meeting
18    tomorrow -- yeah, first line, there will be a meeting
19    tomorrow.  So May 3rd or 4th, depending on when the meeting
20    took place.
21    A     Okay.
22    Q     The email goes on to say that the student may be
23    asked to leave the university.
24            Based on your participation in these events, was it
25    generally known that the outcome of all this was going to be
```

Page 112

 1    that Hayden Barnes would be expelled?

 2       A    Nobody knew the outcome of the meeting until the

 3    President made his decision.

 4       Q    Well, that may be so, but the email suggests that

 5    people generally had an awareness that that's where it was

 6    leading.

 7            MR. SMITH:  Object to the form of the question.

 8            THE WITNESS:  I don't know what people were

 9       thinking or how people thought about this, whatever the

10       case may be.

11    BY MR. CORN-REVERE:

12       Q    And I understand.  We'll have to ask the author of

13    this email what they may have been thinking.

14            But when you were being called into meetings of

15    this type, did you have an understanding of what was going

16    to happen to Hayden Barnes?

17       A    No, not until the President made a decision.

18            MR. CORN-REVERE:  Let's mark for identification

19       Exhibit 17, and this is an article on legal developments.

20            (The document was marked for identification as

21       Plaintiff's Exhibit Number 17.)

22    BY MR. CORN-REVERE:

23       Q    These are a couple pages from a publication

24    entitled Campus Legal Advisor.  I can represent to you that

25    these are pages that we received as part of a request during

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    the administrative proceeding, so they were papers that were

2    affiliated with Mr. Barnes' student file.

3           Have you seen these pages before?

4    A    I don't recall ever seeing these exact pages, but I

5    am familiar with the publication.

6    Q    Were you asked to do any legal research on whether

7    or not it would be permissible to expel Mr. Barnes?

8    A    Because I serve in the role as University Attorney,

9    I gave advice on legal parameters that must be respected

10   prior to the removal of Mr. Barnes.

11          Now whether or not that included this document, I

12   can't recall.  And whether or not I reviewed this document,

13   I can't recall, as well.  I can't recall.

14   Q    Do you have any idea whose writing appears on this?

15   There's some underlinings and some sort of line notations on

16   the exhibit.

17   A    Because it's not unique, I can't identify who this

18   belongs to.  It's just a scribbling.

19   Q    Sure.  Okay.  You testified earlier that President

20   Zaccari had begun to collect information about Hayden

21   Barnes.  Is that right?

22   A    Yes.

23   Q    And it included information like his employment

24   history, his grades.

25          Do you know of anything else -- and, thirdly, he

Page 114

1    was getting information on his experience with the
2    Counseling Center.
3              MR. LaVALLEE:  Object to the form.
4              MR. WILL:  Join in the objection.
5    BY MR. CORN-REVERE:
6       Q    Is there anything else that you're aware of that
7    Dr. Zaccari was -- information that Dr. Zaccari was
8    gathering about Hayden Barnes?
9       A    No.  I don't recall any other information.
10             MR. CORN-REVERE:  Let's mark as Deposition Exhibit
11       Number 18 a news article.
12             (The document was marked for identification as
13       Plaintiff's Exhibit Number 18).
14   BY MR. CORN-REVERE:
15      Q    This is a one-page exhibit dated December 29th,
16   2005, with the headline "College Student Sues Auction Site
17   Ebay and Online Payment Site PayPal."
18             Okay.  Have you seen this exhibit before?
19      A    This document brings to my attention that I recall
20   the President's assistant, Theresa Boyd, sharing this
21   information during the course of one of those two meetings.
22   I can't recall which meeting.
23             Because of this document, I now recall she was
24   present at one of those meetings.
25      Q    Theresa Boyd, the President's assistant was

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    present?

2        A    Right.

3        Q    At one of the meetings that we described earlier?

4        A    Right.

5        Q    Okay.  Was it at that meeting she shared this

6    document?

7        A    Yes.

8        Q    Okay.  Now, if I'm remembering correctly, that

9    meeting was to discuss, first, President Zaccari's concerns

10   about his security and, secondly, what methods may be used

11   to expel Hayden Barnes and, thirdly, because you brought it

12   up, your concerns about the Constitutional, due process, and

13   ADA issues that might arise.

14            Can you tell me what relevance an article about a

15   suit against PayPal may have had to those subjects?

16       A    I can't.  I just recall her sharing this during the

17   course of that meeting.  When I say "sharing," I mean saying

18   that Hayden Barnes had sued someone in the past.

19       Q    Was there any characterization of Mr. Barnes

20   because he had engaged in litigation in the past?

21       A    I don't recall.

22       Q    When this information was shared with the group,

23   was there any follow-up discussion?

24       A    No.

25            MR. CORN-REVERE:  And next let's mark four

Page 116

```
 1        exhibits.  These will be 19, 20, 21, and 22.
 2             (The documents were marked for identification as
 3        Plaintiff's Exhibit Numbers 19, 20, 21, and 22.)
 4   BY MR. CORN-REVERE:
 5        Q    Just for the record, Exhibit 19 is a copy of a
 6   flyer about the parking garage that was distributed on the
 7   VSU campus.
 8             Exhibit 20 is a letter to the editor about the
 9   parking garage that was published in the Spectator.
10             Exhibit 22 -- I'm sorry.  Twenty-one is a printout
11   from pages of Facebook from Mr. Barnes.
12             And Exhibit Number 22 is a printout also from
13   Facebook of a collage.
14             Have you had a chance to look those exhibits over?
15        A    Yes.
16        Q    Have you seen them before?
17        A    Yes.
18        Q    You've seen all of them?
19        A    In the context of this lawsuit and the
20   administrative hearing -- in anticipation and preparation of
21   the administrative hearing.
22        Q    Let's look at Exhibit 19, which is the flyer.  Is
23   there anything that appears to be threatening about this?
24        A    From my perspective?  No.
25        Q    Okay.  How about from the perspective of a
```

Page 117

1     reasonable person?

2          A     In Exhibit Number 19, no.

3          Q     Do students at Valdosta --

4          A     Let me qualify that.  If you have an allergy to

5     dust and pollution, then maybe perhaps you may feel

6     threatened.  But that's a reasonable person with a unique

7     health problem.

8          Q     Why do you say that someone with allergies might

9     feel threatened?

10         A     Well, you know, because it says dust, more

11    pollution -- to assume everything in here is factually

12    accurate.

13         Q     Oh.  So they would feel threatened by the

14    construction of the parking garage.  It's not that they

15    would feel threatened by this flyer, right?

16         A     No.  The flyer is not threatening.

17         Q     Okay.

18         A     The flyer is not threatening.

19         Q     Okay.  Do students at Valdosta State have a right

20    under the First Amendment to distribute flyers like this?

21         A     They have a right to distribute flyers provided

22    they follow established protocol for posting signs and

23    documents and things of that nature.  We have a sign policy.

24         Q     Do you know if Hayden Barnes was ever accused of

25    violating the sign policy?

Page 118

1     A     I don't know if he was.

2     Q     Do you know if his expulsion was based on any

3   concerns of his violation of the sign policy?

4           MR. WILL:  I object to the form of the question.

5           THE WITNESS:  I don't recall any discussion of the

6     violation of the sign policy as a basis for his

7     administrative withdrawal.

8   BY MR. CORN-REVERE:

9     Q     But this is an example of pure political speech,

10   isn't it?

11          MR. LaVALLEE:  Objection to form.

12          THE WITNESS:  I don't know if it's an example of

13    "pure."  It's an example of political speech.

14   BY MR. CORN-REVERE:

15    Q     Let's look at Exhibit 20.  Have you had a chance to

16   look that over?

17    A     Yes.

18    Q     Have you seen this before?

19    A     Yes.

20    Q     Have you read it before?  The whole thing?

21    A     Yes.  I've read it before.  I didn't commit it to

22   memory but, yes, I've read it before.

23    Q     Okay.  Is it fair to characterize this as a

24   complaint about the same issues that are raised in the

25   flyer:  Problems with the parking garages?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A      In essence, yes, it's complaining about the parking
 2   garage.
 3      Q      So this would be an example of political speech, as
 4   well, wouldn't it?
 5             MR. LaVALLEE:  Objection to form.
 6             THE WITNESS:  Yes.  In the sense that he's saying
 7      the money could be better spent somewhere else, yes.
 8   BY MR. CORN-REVERE:
 9      Q      Okay.  Is there anything that you perceive to be
10   threatening about this letter to the editor?
11      A      This letter is not threatening.
12      Q      Okay.  Do you think any reasonable person could
13   find this letter to be threatening?
14             MR. LaVALLEE:  Objection to the form.
15             THE WITNESS:  I don't think this letter is
16      threatening.
17   BY MR. CORN-REVERE:
18      Q      Did President Zaccari provide any of the materials
19   in Exhibits 18, 19 -- I'm sorry, 19, 20, 21 or 22 in the
20   meetings you had with him to talk about Hayden Barnes?
21      A      I recall Exhibit 22 and I recall Exhibit 21.
22      Q      So the Facebook pages of Exhibits 21 and 22 --
23      A      Uh-huh.
24      Q      -- were provided.  Did everyone have a copy or was
25   it just Dr. Zaccari who held a copy?
```

Page 120



1        A        Once again, I don't remember; but I recall that

2     these two exhibits were presented during that meeting.

3        Q        Did Dr. Zaccari explain why he thought that there

4     was something threatening about them?

5        A        As to Exhibit 21, he was concerned about the

6     statement that -- page one of Exhibit 21 -- is "cleaning out

7     and rearranging his room and, thus, his mind, or so he

8     hopes."

9               He was concerned about that in terms of what he

10    meant by cleaning out his mind.

11              And then he was further concerned about what

12    appeared to be a sympathetic harshening on the part of the

13    shooter at Virginia Tech --

14       Q        Uh-huh.

15       A        -- on page two.  "I'm mentally ill, but I'm no mass

16    killer."  In other words, this appears to be a reposting

17    about what someone else said about the shooter at Virginia

18    Tech, so Hayden posted it on his site.  Some concerns about

19    that.  Let's see what else is here.

20              (Reviewing document.)  Yeah.  I'm on page four, the

21    reposting of this article.

22       Q        Uh-huh.

23       A        Then on page five in his handwriting, Dr. Zaccari's

24    handwriting, he says, "This reference concerns me:  Shoot

25    it.  Upload it.  Get Famous," in the middle in close

1    proximity to an article that's sympathetic to the Virginia

2    Tech shooter.

3        Q    Did you actually read this article?

4        A    No, I did not.

5        Q    So, your understanding that this was sympathetic to

6    the shooter of Virginia Tech is based on Dr. Zaccari's

7    representation of what it meant?

8        A    That's what Dr. Zaccari --

9        Q    Did anyone at the meeting read this article?

10           MR. LaVALLEE:  Objection to form.  Can we get some

11       context of what meeting it is we're talking about?  I

12       think we're mingling meetings.

13   BY MR. CORN-REVERE:

14       Q    Okay.  The meeting at which Dr. Zaccari brought

15   these exhibits in and characterized the meaning of that

16   article, did -- so far as you know, has anyone else read

17   that article?

18       A    I don't know if anyone else read that article.

19       Q    But you didn't.

20       A    I glanced over it.  I don't know if anyone read it

21   completely.  You'd have to ask them and get their testimony

22   about whether or not they read it.

23       Q    But based on the concerns that Dr. Zaccari

24   expressed, his concern was based on a characterization that

25   this article was sympathetic to the shooter at Virginia

Page 122

1    Tech?

2        A    Yes.

3        Q    And this is his handwriting on page four of the

4    exhibit next to the display ad?

5        A    I recognize that as being his handwriting.

6        Q    Okay.  Let's look at the first page of this

7    exhibit.  There's a notation "via hand" -- and I can't make

8    out the next word.  But it says, by Pres 4-26 -- and I

9    imagine it's '07.  Do you recognize that notation?

10       A    No.

11       Q    Did Dr. Zaccari deliver or have delivered to you

12   copies of this exhibit?

13       A    I believe I had a copy of it -- I was provided a

14   copy during that meeting and, if not that meeting, shortly

15   thereafter.  In other words, if there was one copy of this

16   document after the meeting, he may have directed his

17   assistant to make a copy for me.

18       Q    Okay.  Just, again, to be as precise as we can and

19   to respond to Mr. LaVallee's concern about identifying which

20   meeting we're talking about, can you tell me if it was the

21   meeting of May 4th, 2007 in which Dr. Zaccari presented this

22   information to the group?

23            MR. LaVALLEE:  Objection to the form.

24            THE WITNESS:  I can't tell you exactly what meeting

25       these documents were presented because I simply can't

Page 123

1      recall.

2    BY MR. CORN-REVERE:

3      Q     But is it accurate to say it was one of the

4    meetings in the early part of May 2007 that the group was

5    together to talk about Hayden Barnes and Dr. Zaccari brought

6    these exhibits with him?

7              MR. LaVALLEE:  Object to form.

8              THE WITNESS:  It is accurate to state that these

9         documents were presented during the course of one or two

10        of those major meetings.  Those two large meetings that

11        were referenced in my responses.

12   BY MR. CORN-REVERE:

13     Q     The May meetings?  May 4th or 7th that --

14     A     Yes.  May 4th or 7th.

15     Q     You testified a moment ago that one of the

16   references on Exhibit 21 that, evidently, concerned

17   Dr. Zaccari was the reference that Hayden Barnes is cleaning

18   out and rearranging his room and, thus, his mind, or so he

19   hopes.

20            Did he explain to you why that reference was

21   concerning to him?

22     A     I vaguely recall he mentioned the fact that he was

23   cleaning out his mind, and he felt like perhaps there was

24   something there but he -- I can't recall specifically.

25     Q     Did he say what that was?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A      No.
 2      Q      Just sort of a vague feeling that this reference
 3  was dangerous?
 4      A      It's not that he was vague.  It's just that I can't
 5  recall specifically what he said that made him concerned
 6  about this.
 7             I recall his reference to this because I just
 8  remember, you know, rearranging his room and, thus, his
 9  mind.  Cleaning out his mind, rearranging his room.
10      Q      But nothing about a student rearranging his room is
11  inherently dangerous, is it?
12      A      A student rearranging his room is not inherently
13  dangerous if we are assuming everything in his room is not
14  dangerous.
15      Q      Sure.  If the student had weapons in his room, that
16  would be one thing.  That's not what we're talking about
17  here, is it?
18      A      Huh-uh.
19      Q      Was there ever any discussion that Hayden Barnes
20  had weapons?
21      A      No.  I don't recall a discussion of that sort.
22      Q      Looking at this reference to cleaning out his room
23  or rearranging his room and, thus, his mind, does it give
24  you any concerns about Hayden Barnes?
25      A      No.
```

Page 125

1      Q     Do you think a reasonable person reading this

2    reference would have reason to feel concerned?

3            MR. LaVALLEE:  Objection to form.

4            THE WITNESS:  Perhaps not.

5    BY MR. CORN-REVERE:

6      Q     Under what conditions would a reasonable person be

7    likely to feel concerned over this?

8            MR. WILL:  I object to the form of the question.

9            THE WITNESS:  Well, you know, we bring with us

10    history.  So we can't assume that all reasonable people

11    are alike and have similar histories.

12            If a person has had a history with someone who's

13    had issues with his mind, for example -- this is just a

14    hypothetical -- then perhaps that person would read this

15    and have some reason for pause or concern.

16            When you say a reasonable person, a reasonable

17    person does not encompass the fact that we are all

18    similar so, therefore, there is only one way to react to

19    a set of circumstances.  I would not read this and be

20    concerned at all.

21    BY MR. CORN-REVERE:

22      Q     Well, you know, you testified earlier that you have

23    a background in guidance counseling and psychotherapy.

24      A     Many years ago.

25      Q     Okay.  Do you believe that there is a stigma

Page 126

1    attached to being mentally ill in America?

2        A    Not to the extent it was many, many years ago.

3        Q    Well, if people read a statement that says someone

4    is cleaning out his mind and they assume it's negative

5    because he has psychological issues, wouldn't you call that

6    a stigma?

7        A    Yes.  But I'm trying to qualify the degree of the

8    stigma.  Our society has evolved to the point that it's not

9    stigmatizing to acknowledge that you do have some issues

10   that may require professional consideration.

11       Q    How evolved was our society in 2007?

12            MR. LaVALLEE:  Objection to form.

13            MR. WILL:  Object to the question.

14            THE WITNESS:  I'm not going to represent that I'm

15       an expert in psychotherapy or psychology.

16   BY MR. CORN-REVERE:

17       Q    Okay.  Well, let's look to the next reference.

18   There is a link to it on page two to this salon.com article,

19   "I'm Mentally Ill but I'm No Mass Killer," and then the

20   linked article is also part of this exhibit.

21            Was it understood or did you understand at the time

22   that this was not an article that Hayden Barnes had written

23   but one that he had simply decided to provide a link to?

24       A    Yes.

25       Q    Have you had a chance to look over this article

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    while we're sitting here?

2        A    Not really, no.

3        Q    Well, to look at just the front page of this

4    article, under headline, the subheading says, "Will people

5    with schizoaffective disorder be lumped in with psychotic

6    murderers?"

7            Doesn't that suggest that the focus of this article

8    is a fear that people will discriminate against people with

9    psychological issues because of the Virginia Tech shooter?

10       A    I think it suggests that generalizations will be

11   perhaps made.

12       Q    People will be more afraid of people who see

13   counselors because of what happened at Virginia Tech?

14           MR. WILL:  Object to form.

15           THE WITNESS:  I can't speculate as to that.

16   BY MR. CORN-REVERE:

17       Q    Isn't that exactly what happened in this case?

18           MR. WILL:  Objection to form.

19           THE WITNESS:  No.  I didn't testify to that.

20   BY MR. CORN-REVERE:

21       Q    Can you point to anything in this article that

22   suggests a sympathy with the shooter at Virginia Tech?

23           MR. SMITH:  I'm going to object.  She said she

24       hasn't read the article.  She can't reference something

25       she hasn't read.

Page 128

1          MR. CORN-REVERE:  We can take a few minutes for her

2     to read over the article.

3          MR. SMITH:  She doesn't have to read the article.

4          MR. WILL:  I object to the form of the question.

5   BY MR. CORN-REVERE:

6     Q    You're not going to take a look at the article?

7     A    I'm not going to read it.  I'm not an expert in the

8   field of psychology.

9     Q    Okay.  Well, I understand there hasn't been an

10  interest in actually reading the article in this case.

11  Let's look at the advertisement.

12         MR. LaVALLEE:  Objection to colloquy, counsel.

13  BY MR. CORN-REVERE:

14    Q    This next reference, "Shoot It, Upload It, Get

15  Famous," do you have an understanding of what this refers

16  to?

17    A    No.

18    Q    So for purposes of the meeting in early May where

19  Dr. Zaccari brought in this exhibit, did you have an

20  understanding then of what this referred to?

21         MR. LaVALLEE:  Objection to form.  Please give

22    context to what meeting you're talking about.

23         MR. CORN-REVERE:  If the witness were able to

24    identify a specific meeting, then I'd do that.  I would

25    say the May 3rd meeting, but she hasn't been able to do

Page 129

1        that; and she suggested that these exhibits were brought
2        up at more than one meeting.
3               Since she's been rather fuzzy on how many meeting
4        there actually were and amended her answers even today as
5        to how many meetings there actually were, I think it's a
6        little much to identify a specific meeting.
7               MR. LaVALLEE:   I would appreciate that when you ask
8        questions regarding meetings, I ask that you put it in
9        the context of what meeting you're talking about.
10   BY MR. CORN-REVERE:
11       Q     How many meetings did you discuss these exhibits,
12   Exhibits 21 and 22, with Dr. Zaccari?
13       A     I can recall vaguely perhaps these documents were
14   present during the course of two, perhaps three meetings.
15       Q     Okay.  And in three meetings, you never read this
16   article?
17       A     I glanced over it.
18       Q     Did you gain some understanding of what was being
19   written in this article?
20       A     My focus was ultimately the student is entitled to
21   due process.  If there's a concern about safety and issues
22   relative to his conduct, all this will come out during the
23   course of a hearing.
24               So it was not my place to read an article and make
25   a determination of whether or not Hayden Barnes was a threat

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1     to the campus or Dr. Zaccari, personally, because ultimately
 2     my advice always has been and still is he was entitled to a
 3     hearing.  Have a hearing and allow Hayden Barnes to account
 4     for documents on his web page.
 5        Q    Okay.  And the same goes for the advertisement that
 6     was associated with the salon.com article?  Is that true?
 7        A    He can offer -- Mr. Barnes can offer up whatever he
 8     wanted to say.
 9        Q    If he had a hearing.
10        A    Yes.
11        Q    Let's look at Exhibit 22.  You've testified that
12     you've also seen this previously.
13        A    Yes.
14        Q    This is an exhibit that Dr. Zaccari provided at the
15     meetings in early May to discuss what to do about Hayden
16     Barnes.  Is that correct?
17        A    Yes.
18        Q    Did Dr. Zaccari describe his concerns about this
19     exhibit?
20        A    Yes.  He was concerned about the use of the word
21     "memorial."
22        Q    What was his concern about that?
23        A    Memorial meant paying homage to someone that was
24     deceased.
25        Q    Where did he get that interpretation?
```

Page 131

1      A      I don't know.

2      Q      Did he say?

3      A      No.

4      Q      Do you know if anybody bothered to look up the

5   dictionary definition of memorial?

6      A      I don't know.

7      Q      The use of that one word was the basis on which

8   Hayden Barnes was described as being dangerous?  Is that

9   really what this is about?

10     A      No.  My testimony was that Dr. Zaccari had access

11  to information about Hayden Barnes' history in terms of

12  communications he had with Leah.

13         Then it was a combination of that, along with

14  concerns that he had as it relates to Exhibit One; and, in

15  addition to that, he had some concerns about his behavior

16  during the course of that meeting at the Board of Regents.

17         So, Exhibit 22, in and of itself, I don't think,

18  was a single, solitary basis that he used to make a decision

19  to have him administratively withdrawn.  I think it was a

20  combination of issues, concerns, and information.

21     Q      Uh-huh.  I think you testified before -- again,

22  correct me if I'll wrong -- that Dr. Zaccari did not

23  characterize his conversations with Leah McMillan about

24  Hayden Barnes.

25     A      Correct.

Page 132

1      Q     But it was in combination of that information and
2    these exhibits that his concerns were given credence?
3      A     His concerns weren't given credence by anybody.  I
4    don't understand.  Given credence by whom?
5      Q     Well, as I understand it, Hayden Barnes was
6    expelled because he was perceived to be a danger either to
7    Dr. Zaccari or to the campus.
8      A     Uh-huh.
9      Q     And you're telling me -- again, correct me if I'm
10   wrong -- that nobody looked into the fact or the suggestion
11   that he actually was a danger.
12             MR. WILL:  I object to the form of the question.
13             THE WITNESS:  I'm sure the police department
14        assessed the situation, Scott Doner and Ann Farmer, in
15        consultation with Dr. Zaccari.
16             I wasn't privy to whatever series of communications
17        he may have had with them.
18   BY MR. CORN-REVERE:
19     Q     So you have no direct knowledge of communications
20   with the police department and Dr. Zaccari.  Is that your
21   testimony?
22     A     I have no direct knowledge, correct.
23     Q     Okay.  Now earlier you testified that at one of the
24   meetings that Ann Farmer was present.  Is that correct?
25     A     Yes.

Page 133

1      Q      And if I understood your testimony, Ann Farmer's
2  recommendation to Dr. Zaccari was that if he had concerns
3  about security, he could get a retraining order.
4      A      Perhaps.
5      Q      Was that the recommendation she gave?
6      A      Yes, uh-huh.
7      Q      And so far as you know, Dr. Zaccari did not follow
8  that recommendation.
9      A      Not to my knowledge.
10     Q      And are you aware of any other communications
11 between Dr. Zaccari and the police department?
12     A      No.  I'm not aware of any direct -- I don't have
13 direct knowledge of any communications.
14     Q      Okay.  In discussing either Exhibits 21 or 22 at
15 the early May meetings in which Dr. Zaccari made them
16 available to the group, did you express any concerns about
17 the fact that these exhibits might be protected by the First
18 Amendment?
19     A      Yes.
20     Q      What did you say?
21     A      I said Hayden could challenge any action that you
22 take based on First Amendment grounds:  Freedom of
23 expression.  He could argue that he's entitled to have
24 something of this sort posted anywhere he chooses.  This
25 includes Exhibit 21, as well.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q     Okay.  But as I understand your earlier testimony,
2    the advice you got from the Board of Regents was do what you
3    need to do and worry about the lawsuit later.
4      A     I didn't receive that advice.  That was advice that
5    was given to Dr. Zaccari.
6      Q     Right.  But that was the advice he was given in
7    your phone call with Elizabeth Neely on May 1st, 2007.  Is
8    that correct?
9      A     The time that I testified the conversation took
10   place, right.
11          MR. CORN-REVERE:  We're up to 23.  Okay.  Let's
12       mark as Exhibit 23 a memo from Laverne Gaskins to
13       Dr. Zaccari.
14          (The document was marked for identification as
15       Plaintiff's Exhibit Number 23.)
16   BY MR. CORN-REVERE:
17     Q     Before we get to that exhibit, let me just ask one
18   follow-up question about the concerns that Dr. Zaccari had
19   expressed about Hayden Barnes based on what he had learned
20   from the Counseling Center.
21          Would it change or would it affect your opinion
22   about whether or not Hayden Barnes was dangerous if you knew
23   that President Zaccari had been told by Leah McMillan that
24   Mr. Barnes was no danger?
25     A     I never had an opinion that Hayden was dangerous,

Page 135

```
1    so it would not affect my opinion because I never had an
2    opinion that he was dangerous.  I always had a strong
3    opinion that he was entitled to an opportunity to be heard
4    and he was entitled to due process.
5              If the individuals who were listening to the facts
6    as they were presented determined that he was a danger to
7    the campus, then that was a determination for that body to
8    make.
9       Q    Okay.  But for those bodies that did meet -- and
10   I'm referring to the meetings of early May, either May 3rd
11   or May 7th, 2007, where the subject of Hayden Barnes came
12   up -- did anyone express agreement with Dr. Zaccari that
13   Mr. Barnes was dangerous in some way?
14      A    No.
15      Q    Did you have any follow-up conversations with any
16   of the participants at those meetings of whether or not
17   Mr. Barnes was a danger?
18      A    No.
19      Q    And in your phone conference with Elizabeth McNeely
20   (sic) on May 1st, 2007, did Ms. McNeely (sic) express any
21   agreement or disagreement with the proposition that
22   Mr. Barnes was in some way dangerous?
23      A    She seemed to support Dr. Zaccari's representation
24   that he was a danger to the campus and to himself.
25              I also vaguely recall shortly after his withdrawal
```

Page 136

1    from campus I was at the Board of Regents and I had lunch

2    with Betsy Neely and another attorney from another

3    institution.  One or two attorneys.  I just can't remember.

4         But I remember expressing some concerns about the

5    facts of the case and the fact that he didn't have a

6    hearing, and Betsy reemphasized the fact that he appeared to

7    be a danger to Zaccari and the campus community based on

8    representations made by Dr. Zaccari.

9    Q    Did she say what information she had for making

10   that determination other than Dr. Zaccari's claims?

11   A    No, she didn't.

12   Q    Do you know independently whether or not she had

13   any information?

14   A    No.

15   Q    Okay.  But in that conversation over lunch with

16   Betsy McNeely (sic), was she --

17   A    By the way, it's Betsy Neely.

18   Q    Sorry.  Sorry.  In that conversation, she

19   discounted your concerns about due process based on the

20   perceived danger?  Is that a fair characterization?

21   A    Yes.

22   Q    Okay.  Let's look at Exhibit 23 and also, in

23   conjunction with that, Exhibit 3, your supplemental answer

24   to interrogatory three.

25   A    (Reviewing document.)

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    In the second paragraph on page three, the

2  supplemental answer --

3    A    Uh-huh.

4    Q    -- you state, "On May 4th, 2007, this Defendant

5  prepared a memorandum for Zaccari providing a draft of a

6  proposed withdrawal letter requested by Defendant Zaccari

7  together with a statement from this Defendant setting out

8  the requirements of due process implicated in any withdrawal

9  and providing copies of policies dealing with the withdrawal

10  issue.  Defendant Zaccari later directed this Defendant to

11  revise the proposed letter prepared for Defendant Zaccari's

12  signature and this Defendant did so."

13         Is that revised answer or supplemental answer to

14  interrogatory three a description of the document that

15  appears here as Exhibit 23?

16    A    Yes, it is.

17    Q    Can you describe -- strike that.

18         What did Dr. Zaccari say to you when he requested

19  this memo?

20    A    I made a decision -- these are not his exact words.

21  But, generally speaking, I made a decision to

22  administratively withdraw Hayden, and I need to have a

23  little draft that reflects that; and he included items one

24  and two.

25    Q    I'm sorry?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A     One and two in terms of what he wanted to have as a

2   condition for his continued enrollment.

3      Q     Okay.  Just so your answer is clear, the top half

4   of this memorandum, Number 23, is a transmittal from you to

5   Dr. Zaccari explaining that this is a response to his

6   request and in the bottom half under the line that says

7   "draft" is a copy of the proposed withdrawal notice that

8   would go to Mr. Barnes.  Is that correct?

9      A     Right.  And I wanted to, once again, emphasize to

10   the President that the student was entitled to due process.

11   The student was entitled to a hearing and an opportunity to

12   be heard and then a determination could be made as to

13   whether or not he should be administratively withdrawn.

14          And I did that as one last attempt to emphasize the

15   advice that I had consistently given him about this student.

16          And I have been oftentimes called upon by all three

17   Presidents to draft documents, letters, correspondences.

18   But I wanted to make certain that he understood very clearly

19   what my advice was in this matter.

20          And while certainly I am -- I would draft the

21   letter if you request that of me, but this is my advice.  So

22   the letter, the bottom part, is a written manifestation of

23   the decision he made.

24      Q     Okay.

25      A     And the top part is, once again, my emphasized

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    advice.

2       Q      Okay.  Do you believe Dr. Zaccari understood your
3    advice?

4       A      Yes, I do.

5       Q      And just to follow up on something you said a
6    moment ago, in the second half of the proposed notice of
7    withdrawal, these two conditions -- first, "A correspondence
8    from a psychiatric or psychologist indicating that you are
9    not a danger to yourself and others;" and, secondly,
10   "Documentation from a certified mental health professional
11   indicating that during your tenure at Valdosta State you
12   will be receiving ongoing therapy."  Those two conditions
13   were dictated by Dr. Zaccari?

14      A      Yes, it was.

15      Q      Did he prescribe the exact wording to be used?

16      A      No.

17      Q      Okay.  How did he tell you to characterize these
18   conditions?

19      A      He told me what to put as a condition, and I just
20   wrote it on a piece of paper and went to my office and typed
21   it.

22      Q      Did he give any indication of what policy of the
23   University this was intended to be based on?

24      A      No.

25      Q      Let's look at the top half of the memorandum which

Page 140

```
 1     is your advice to Dr. Zaccari.

 2             Your second sentence says, "You should note that

 3     due process dictates that the student be apprised of what

 4     particular policy has been violated, an opportunity to be

 5     heard and also be informed of the appeal process."

 6             Now it appears that someone at some point

 7     highlighted that language.

 8     A       (Nods head.)

 9     Q       Do you know -- rather, is this your highlighting?

10     A       This right here?

11     Q       Yes.

12     A       I would not have highlighted this.

13     Q       Okay.  But you don't know how the highlighting came

14     to be on this document?

15     A       No.

16     Q       Okay.  Was this document delivered to anyone other

17     than Dr. Zaccari?

18     A       No.

19     Q       Now after your discussion of the due process

20     issues, you indicate, "My research has led me to the

21     following policies that appear to be implicated."

22     A       I want to correct something.  In the interest of

23     efficiency, in the past I have given his support staff the

24     letter, itself, following his review.

25             So instead of them typing it all over again, they
```

Page 141

1    can just take the Word document and make the changes instead

2    of his support staff looking at this and typing this all

3    over.

4        Q    They have a Word document they can work from?

5        A    Right.

6        Q    Okay.  Back to my previous question:  You say in

7    your transmittal on Exhibit 23, "My research has led me to

8    the following policies that appear to be implicated."

9             Can you describe what research you're referring to

10   here?

11       A    I was just researching the existing policies at the

12   University level and also Board of Regents regarding

13   behavior that the matter of Hayden Barnes dealt with.

14       Q    Okay.  And as you have attached the same for your

15   review and consideration, did you attach to this memorandum

16   copies of the policies that are listed here?

17       A    Yes.

18       Q    Okay.  I notice this memo does not list the Medical

19   Withdrawal Policy that was discussed in your May 1st

20   telephone conference with Elizabeth Neely and Dr. Zaccari.

21            Is there a reason why it's not included here?

22       A    That was already given to him, and that policy as

23   it was presented to me from Betsy's office didn't exist in

24   that form at Valdosta State.

25       Q    Okay.  Is there some other form that it existed in

Page 142

1   at Valdosta State?

2       A    I don't recall.  I'd have to actually get the --

3       Q    Okay.  Just taking what you say here, your research

4   led you to believe that relevant policies were the Valdosta

5   State Student Code of Conduct, specifically Section E.(7)

6   related to disorderly conduct, mental health withdrawal and

7   then separately Board of Regents Policy 1902, disruptive.

8   behavior.

9       A    Uh-huh.

10      Q    So it's really those three policies that were

11  possibly candidates --

12      A    Yes.

13      Q    -- for justifying the administrative withdrawal of

14  Hayden Barnes.

15      A    Yes.

16      Q    Were these presented to Dr. Zaccari as options to

17  choose from?

18      A    Not in the context that Hayden was entitled to a

19  hearing.  Hayden was entitled to hearing; and whether or not

20  he chose to use the Mental Health Withdrawal over and above

21  a Disorderly Conduct or both was a decision that needed to

22  be made by the Office of Judicial Affairs.  Typically,

23  that's what happened.

24      Q    If there had been a hearing.

25      A    Right.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q     Okay.  But since there was no hearing, this was a

2   decision that was made solely by Dr. Zaccari.  Is that

3   correct?

4      A     Yes.

5      Q     Now since Dr. Zaccari added the conditions to be

6   included in this proposed withdrawal notice, did you have an

7   understanding of what Mr. Barnes would have to do to comply

8   with these conditions?

9      A     Yes.

10     Q     What was your understanding?

11     A     He needed a correspondence from a psychiatric or

12  psychologist indicating he was not a danger to himself or

13  others, and then he had to have documentation from a

14  certified mental health professional indicating that during

15  his tenure he will be receiving ongoing therapy.

16     Q     Is it your opinion that if Mr. Barnes provided

17  those two types of documentation he would be readmitted

18  to --

19     A     Yes.

20     Q     -- Valdosta State?

21     A     Yes.

22     Q     After you sent this memorandum in Exhibit 23 to

23  Dr. Zaccari, did you discuss the notice of withdrawal with

24  him?

25     A     Discuss this?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      Q     Yes.
 2      A     I don't recall.  Normally what happens if he asks
 3   me to draft something, I'll send it to him and he'll review
 4   it and make any revisions he chooses.
 5            It's likely that we perhaps had another meeting;
 6   but I can't recall specifics in terms of date, time.  It's
 7   likely we would've had one, perhaps.
 8      Q     You mentioned what is normally the case, and I
 9   believe earlier you testified that other presidents of the
10   University have asked you to draft certain documents.
11      A     Uh-huh.
12      Q     What is the normal practice with respect to
13   documents that the President of the University asks you to
14   draft?
15      A     "I need you to draft a response for this particular
16   issue."
17            I would draft it.
18            "Could you, please, research this matter and draft
19   a response."
20            You know, a handwritten note, sticky.  And during
21   the course of a conversation, "I need something drafted."
22            I'll draft it and send it to him.  Sometimes I will
23   put it on a disk, depending on who is actually going to do
24   the typing, or sometimes just send it by email.
25            During the first president, his assistant had some
```

Page 145

```
 1   adjustments with technological advancements.
 2       Q    I take your meaning.  But is it normally the
 3   practice that if there are revisions to be made in the
 4   documents that you draft for the President that you're then
 5   sent edits and you implement those edits?
 6       A    Not necessarily.  It could be a combination of a
 7   couple of things.  The president could edit himself and send
 8   it off and just send me a copy.
 9            MR. WILL:  Could we go off the record for a moment?
10            (Discussion off the record.)
11   BY MR. CORN-REVERE:
12       Q    Okay.  Back on the record.  Looking again at --
13            MR. WILL:  Could we have just one minute?
14            (A recess was taken 3:15 p.m. to 3:18 p.m.
15   Ms. Holly exits the room.)
16   BY MR. CORN-REVERE:
17       Q    Okay, back on the record.  Again, continuing with
18   our discussion of Exhibit 23, you were mentioning the
19   drafting process; and I believe you started by saying
20   "normally, what happens is" and something about the
21   drafting.
22            Was the drafting of this memo in some way different
23   from the normal practice?
24       A    My emphasis of the law at the top.
25       Q    I'm sorry.  I didn't understand.
```

Page 146

1      A      I emphasized the law at the top to make certain

2    that it blended in with the draft so it was very clear in

3    his mind that I'm advising him, once again, the student is

4    entitled to the hearing.

5      Q      Is that different from what your normal practice

6    is?

7      A      Yes.

8      Q      How is it different from your normal practice?

9      A      Normally, I would have the draft of the letter and

10   then perhaps I might've told him in a separate email or I

11   may not have put in writing my advice.

12     Q      I see.  Also, where you mentioned that Dr. Zaccari

13   had dictated the two conditions for readmission, was that in

14   some way different from the normal practice?

15     A      No.  He had asked that I draft a letter and "this

16   is what I want it to say," you know.

17     Q      But in a case like this where you are looking at

18   which university policies apply to a situation, is it usual

19   for the President to then dictate which policies would

20   apply?

21     A      No.

22     Q      So in that respect, Dr. Zaccari's naming of these

23   two conditions was unusual?

24     A      Yes.

25     Q      Now, again, you listed possible policies that could

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   apply in the top half of the memo.

2          Was it your understanding that Dr. Zaccari would

3   simply pick which one or other of the policies he wanted to

4   include in the actual withdrawal notice?

5      A    No.  It was given to him with the understanding

6   that this is a matter that needs to be routed through the

7   Student Judicial Affairs Office, because necessarily the

8   policies implicated that process and not a process that the

9   President would administratively withdraw a student.

10     Q    Your memo to Dr. Zaccari is dated May 4th, 2007.

11  Do you know the date on which Dr. Zaccari asked you to draft

12  the memo?

13     A    No.

14     Q    Okay.  And the ultimate withdrawal notice was

15  issued on May 7th, 2007.  Did you discuss this draft with

16  Dr. Zaccari between May 4th when you wrote it and May 7th

17  when the actual notice was sent out?

18     A    It's possible, yes.

19     Q    Do you have a recollection as to you sit here today

20  whether or not you had such a discussion?

21     A    No.

22     Q    So after you delivered the memo represented by

23  Exhibit 23 to Dr. Zaccari, he or someone else at his

24  direction took what you produced and produced the final

25  withdrawal notice?

1      A      Yes.

2             MR. CORN-REVERE:   Let's mark as Exhibit 24 a

3      two-page document dated May 7th, 2007, which is the

4      withdrawal notice to Hayden Barnes.

5             (The document was marked for identification as

6      Plaintiff's Exhibit Number 24.)

7   BY MR. CORN-REVERE:

8      Q      Okay.  As I mentioned, this is a two-page exhibit.

9   The front page is the notice of withdrawal and the back page

10  is another copy of the collage that we discussed earlier.

11  Have you seen this before?

12     A      Yes.

13     Q      When was the first time you saw a copy of the

14  withdrawal notice for Hayden Barnes?

15     A      More than likely I would've received a copy on

16  May 7th.

17     Q      Okay.  Now I believe you testified earlier there

18  was a meeting on May 7th, 2007:  The same day that the

19  withdrawal notice was sent to Hayden Barnes.  Is that

20  correct?

21     A      Uh-huh.

22     Q      Do you know if the meeting took place before or

23  after Hayden Barnes was expelled?

24     A      I recall that -- the meeting with whom?

25     Q      Well, you referred to the meeting with -- well,

Page 149

1    actually, let me back up.

2         The May 7th meeting is the one that you indicated

3    this morning was a correction of your earlier interrogatory

4    responses that you had become aware of a meeting on May 7th

5    that you had previously not recalled.

6         That's the meeting I'm referring to:  A meeting on

7    May 7th, 2007, to talk about Hayden Barnes.

8    A    I believe that meeting took place first and then

9    the administrative withdrawal letter came later.

10   Q    Okay.  Was a copy of the withdrawal letter made

11   available at that May 7th meeting?

12   A    No, because I don't think it existed at that time.

13   Q    What was the purpose of the May 7th meeting in

14   2007?

15   A    I can't recall the specifics, but it's likely it

16   was to discuss Hayden Barnes.

17   Q    Okay.  I believe you testified earlier that Leah

18   McMillan was present at that meeting.

19   A    Yes.

20   Q    Do you recall who else was present?

21   A    Yes.  I believe Dr. Keppler and Dr. Morgan.

22   Q    Anyone else?

23   A    No.  I don't recall anyone else.

24   Q    So it was -- actually, I should ask.

25        Was Dr. Zaccari present at that meeting?

1      A     No.

2      Q     So it was Dr. Keppler, Dr. Morgan, you, and Leah

3   McMillan at the May 7th, 2007, meeting?

4      A     Right.   Then there was another meeting, I believe,

5   with Dr. Zaccari later on that day.

6      Q     So there were two meetings on May 7th?

7      A     Perhaps, yes.

8      Q     Did the meeting with Dr. Zaccari take place before

9   or after Hayden Barnes was expelled?

10     A     When it was brought to my attention there may have

11  been a meeting on May 7th, I looked at my calendar and I see

12  there's a meeting with Leah, Morgan and -- I can't recall

13  the last person.  Leah, Morgan and Keppler.

14           And then I also saw later that day Dr. Zaccari.

15  Once again, the nature of the meeting is not -- it wasn't on

16  the calendar.

17     Q     So, in preparing for this deposition, you looked at

18  the calendar for May 7th, 2007 --

19     A     Uh-huh.

20     Q     -- and noticed that you had participated in two

21  separate meetings on that date?

22     A     Right.

23     Q     Do you recall what time of day the two meetings

24  were?

25     A     I think the first one was at, like, 8:30 in the

Page 151

```
 1    morning or 9 based on that calendar.

 2       Q     Okay.

 3       A     And the other one was, like, ten o'clock.  But,

 4    once again, I can't say that the meeting at ten was to

 5    discuss Hayden with Dr. Zaccari because it doesn't say.

 6       Q     I see.  At the earlier meeting on May 7th, the one

 7    attended by Dr. Keppler, Dr. Morgan, Leah McMillan, and you,

 8    was there any discussion about whether Hayden Barnes

 9    actually presented a danger to campus?

10       A     I don't recall.

11       Q     Was there any discussion of the recommendation by

12    the Vision Team that Mr. Barnes' activities just be

13    monitored instead of his being expelled?

14       A     I never had any direct communication with the

15    Vision Team.

16       Q     So there was no discussion of any other

17    alternative?

18       A     I don't know what they discussed.

19       Q     You've testified earlier that Ann Farmer had

20    suggested that one alternative would be to seek a

21    restraining order on Mr. Barnes.

22       A     Uh-huh.

23       Q     Was there any discussion about that alternative at

24    the May 7th meeting, the early morning meeting, with

25    Dr. Keppler, Dr. Morgan, Leah McMillan, and you pursuing
```

Page 152

1    that option instead of expelling Mr. Barnes?

2        A    Not that I recall.

3        Q    Looking at Exhibit Number 24, the final withdrawal

4    notice that was sent to Hayden Barnes, were you notified by

5    anybody when this was sent to Mr. Barnes?

6        A    No.

7        Q    Do you know how it was delivered to Mr. Barnes?

8        A    I think I was later told that it was -- no, I can't

9    remember.  I can't remember.

10       Q    Let's look at Exhibits 23 and 24 together for a

11   moment.

12       A    Uh-huh.

13       Q    There appear to be some additions to language you

14   initially proposed.  The original draft reads -- in the

15   second line of paragraph one of the withdrawal notice --

16   "Therefore, you are hereby notified that you have been

17   administratively withdrawn from Valdosta State University

18   effective May 6, 2007."

19            The actual version, the corresponding sentence

20   says, "Therefore, pursuant to Board of Regents Policy 1902,

21   you are hereby notified that you have been administratively

22   withdrawn from Valdosta State University effective May 7,

23   2007."

24            Is it your understanding that Dr. Zaccari selected

25   the Board of Regents Policy 1902 as being the operative

Page 153

1      provision under which this administrative withdrawal would

2      happen?

3          A      I believe that's the case.

4          Q      In looking at the conditions that Dr. Zaccari had

5      dictated for the withdrawal notice, the first draft

6      condition calls for "a correspondence from a psychiatric or

7      psychologist indicating that you are not a danger to

8      yourself or others."

9              The final version reads "a correspondence from a

10     non-university appointed psychiatrist indicating that you

11     are not a danger to yourself and others."

12         A      Uh-huh.

13         Q      Again, is it your understanding that Dr. Zaccari

14     modified that condition to focus on a non-university

15     appointed psychiatrist?

16         A      Yes.  I believe that to be the case.

17         Q      Okay.  And then the second condition appears to be

18     unchanged between the draft and the final version.  And,

19     then again, the final provision for the appeal to the Board

20     of Regents appears to be unchanged.

21             Now, again, is it your understanding that once

22     Mr. Barnes received this and provided the correspondence

23     called for in these two conditions that he should have been

24     readmitted to the University?

25         A      Yes.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Did Dr. Zaccari ever discuss with you how the
2    withdrawal notice should be delivered to Mr. Barnes?
3    A    I don't recall.
4    Q    Do you know if any other university official ever
5    discussed how a withdrawal notice of this type should be
6    delivered?
7    A    No.  I don't recall.
8    Q    Is there a policy or protocol for dealing with
9    students that are potentially dangerous when they are
10   expelled?
11   A    Student Code -- the Student Code of Conduct
12   dictates that all matters related to student withdrawals be
13   routed through the Student Office of Judicial Affairs.
14        And my office typically -- we're not involved in
15   student suspensions, only when there was a legal issue that
16   needs my attention.
17        So the routine is student disciplinary procedures
18   are routed through the Student Judicial Affairs Office.
19   Q    But what about a situation where a student
20   represents some kind of danger?  Isn't there a policy for
21   getting campus police involved?
22   A    If a student is committing a crime or represents a
23   danger to others and himself, then, yes, the police would be
24   involved.
25   Q    Wouldn't they be -- strike that.

```
 1              In a situation like that, would you expect the
 2    police to be asked to escort the student off campus?
 3         A     Perhaps, yes.
 4         Q     Do you know of any situations in which that's
 5    occurred?
 6         A     I do not know.
 7         Q     But it didn't happen in this case, did it?
 8         A     I can't speak to whether or not it did or didn't
 9    because I don't know.
10              MR. CORN-REVERE:  Okay.  Let's mark this one-page
11         exhibit as Gaskins Deposition Exhibit Number 25.  It's a
12         one-page memorandum from Dr. Zaccari to various members
13         of the VSU staff.
14              (The document was marked for identification as
15         Plaintiff's Exhibit Number 25).
16    BY MR. CORN-REVERE:
17         Q     Have you had a chance to look at this exhibit?
18         A     Yes.
19         Q     Have you seen this memorandum before?
20         A     I believe I have.
21         Q     Okay.  Can you describe what it is?
22         A     It's a letter written to Dr. Zaccari -- from
23    Dr. Zaccari to Jim Black, Scott Doner, Tom Hardy, Chuck
24    Hudson, Kurt Keppler, Louis Levy, and Russ Mast regarding
25    the administrative withdrawal of Hayden Barnes, Thomas
```

Page 156

```
 1    Hayden Barnes, effective November -- I'm sorry, effective
 2    May 9th.
 3            He's notifying various departments that the student
 4    has been administratively withdrawn and he's given 48 hours
 5    to leave Converse Residence Hall and his courses dropped.
 6            He is to receive a full refund for housing, meal
 7    plans, and other charges.
 8    Q     Just one thing I'm curious about.  The withdrawal
 9    notice, itself, was May 7th and this memorandum from
10    Dr. Zaccari is dated May 9th.
11            Do you know why there's a two-day difference
12    between the actual withdrawal notice and then this
13    memorandum to various members of the administration?
14    A     No, I don't.
15    Q     I notice that you're not on the distribution list.
16    When did you first see this memorandum?
17    A     I can't recall, but I have seen it before.
18    Q     Did you see it based on what you remember today
19    around the time that it was issued in May of 2007?
20    A     I can't recall.
21    Q     Okay.
22    A     I didn't get it directly.
23    Q     Right.  So, just in terms of the sequence of
24    timing, Mr. Barnes was administratively withdrawn May 7th
25    and then two days later this memorandum was issued.
```

Page 157

1        And based on this memorandum, there was another 48

2   hours for Mr. Barnes to vacate campus.

3        A     Apparently so based on the reading of this

4   document.

5        Q     I believe earlier when we were talking about the

6   medical withdrawal policy, the one that you discussed with

7   Betsy Neely and Dr. Zaccari on the May 1st, 2007, call and

8   the one that was shown in the fax that Betsy Neely sent you

9   that the condition in which a student would not be required

10  to have a hearing or a notice of a physician or the family

11  involved would be if there was some emergency situation.  Is

12  that correct?

13       A     Based on that document, yes.

14       Q     Yes.  Does it suggest to you that expelling a

15  student and giving him several days to leave campus is

16  indicative of an emergency?

17       A     No.

18       Q     So this would be inconsistent with any claims that

19  Mr. Barnes actually represented some danger to the campus or

20  to Dr. Zaccari.

21       A     It is inconsistent.

22       Q     Based on this memorandum where Mr. Barnes' courses

23  are dropped and he's simply given a refund for his -- for

24  housing, meal plans, and other charges, what is the impact

25  on his standing as a student?

Page 158

1       A     I don't know.

2       Q     Did you ever discuss this memorandum with

3  Dr. Zaccari?

4       A     No.  I didn't write this, and I don't recall

5  discussing this.

6             MR. CORN-REVERE:  Let's mark as Exhibit 26 a

7        one-page agenda.

8             (The document was marked for identification as

9        Plaintiff's Exhibit Number 26.)

10  BY MR. CORN-REVERE:

11      Q     This is a document that we received from you as

12  part of your response to our request for production of

13  documents.  Can you identify this document?

14      A     This is an agenda for the Risk Management Task

15  Force meeting that was held at the Board of Regents office

16  on May the 23rd of 2007.

17      Q     Did you attend this meeting?

18      A     Yes.  I believe I did.

19      Q     Okay.  What about this document or about the

20  meeting that it memorializes is relevant to Hayden Barnes?

21      A     I don't know the relevancy.  Off the top of my

22  head -- I don't know whether or not this was just sent in

23  error, but it reflects that certainly Betsy Neely was

24  spearheading an initiative to crystallize how institutions

25  should deal with mental health issues following the Virginia

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    Tech incident.
 2              MR. SMITH:  If I can state for the record, unless
 3         I'm mistaken, this document was produced in response to a
 4         request for all communications between this witness and
 5         Betsy Neely.  It didn't restrict it to this case, so this
 6         may have nothing to do with this.
 7              MR. CORN-REVERE:  Okay.  Thank you for your
 8         clarification.
 9              THE WITNESS:  Thank you.
10    BY MR. CORN-REVERE:
11         Q    Looking at item four on the agenda where Betsy
12    Neely is listed as discussing student mental health issues
13    related to the Virginia Tech incident, do you recall from
14    attending that meeting whether or not she discussed the
15    Hayden Barnes case?
16         A    No.
17         Q    You don't recall?
18         A    I don't recall her discussing the Hayden Barnes
19    case, and it's unlikely she would have.
20         Q    Uh-huh.
21         A    This is a meeting attended by a variety of people
22    from various campuses.
23         Q    Yeah.  Do you recall what Betsy Neely did talk
24    about in this agenda item?
25         A    Student Mental Health Issues related to the
```

Page 160

1  Virginia Tech incident.

2      Q    But beyond the title, you don't have any separate

3  recollection?

4      A    Huh-uh.  No.

5           MR. CORN-REVERE:  Next I'd like to mark two

6      exhibits as Exhibit 27 and Exhibit 28.

7           (The documents were marked for identification as

8      Plaintiff's Exhibit Number 27 and 28.)

9  BY MR. CORN-REVERE:

10     Q    Looking first at Exhibit 27, it's a letter on

11 Valdosta State University stationery addressed to the Board

12 of Regents and to the Office of the President; and it's from

13 the Counseling Center and signed by Leah McMillan.  Have you

14 seen this letter before?

15     A    Yes.

16     Q    Okay.  When did you first see it?

17     A    On or about May 8th.  I'm referring to Exhibit

18 Number 27.

19     Q    Yes.

20     A    And Exhibit 28 about May 8th.

21     Q    Okay.  So on May 7th, Mr. Barnes was expelled and

22 on May 8th, these two letters, the first from Leah McMillan

23 and the second from Kevin Winders, were delivered to the

24 University and you saw them on May 8th.

25     A    Uh-huh.  On or about.

Page 161

1    Q    Okay.  Do you have an understanding of what these
2    letters say?
3    A    Yes.
4    Q    And what's your understanding?
5    A    The one from Kevin Winders says, essentially, that
6    he conducted an evaluation on Hayden on April the 30th,
7    2007; and he understood that the post Virginia Tech period
8    is difficult for all universities.
9         He said, "However, Hayden had insight to drop the
10   anti-parking garage campaign after the Virginia Tech
11   tragedy," and he's not aware of any specific threats made by
12   him.
13        He says based on the information that he has, he
14   thinks Hayden's main issue is being obsessive.  He also
15   concludes that it's impossible for him to predict the
16   future, but he doesn't think he's violent or any more a
17   threat to harm someone than any other student.
18   Q    Okay.
19   A    That's Dr. Winders.
20   Q    Right.  Do you know who Dr. Winders is?
21   A    No.
22   Q    Okay.
23   A    He's a psychiatrist, apparently, in Savannah.
24   Q    Right.  Were you aware that Dr. Winders was
25   Mr. Barnes' personal psychiatrist?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    No.

2    Q    Okay.  And Exhibit 27, have you seen that one

3    before?

4    A    Yes.  This is a letter drafted by Leah McMillan who

5    is one of the counselors in our center.

6    Q    Uh-huh.

7    A    And she, essentially, lays out circumstances of her

8    association with Hayden as a result of permission she has

9    received from Hayden to make this communication.

10        And she says in her professional opinion as a

11   counselor that Hayden is not a threat indirectly or directly

12   to anyone at the campus.  This includes the President,

13   staff, faculty, students and others and himself.

14        And she directed this information to Dr. Zaccari,

15   as well as Board of Regents.

16   Q    Okay.  Do you know whether or not Dr. Zaccari

17   received these letters?

18   A    I believe he did.

19   Q    Did you discuss these letters with Dr. Zaccari?

20   A    I recall a discussion of these letters.  The extent

21   and nature of the discussion, I can't recall.

22   Q    Do you know when that conversation took place?

23   A    I'm going to say on or about May 8th.  And the

24   reason I had to have had perhaps maybe discussion with him

25   is because these letters were directed to his office.  For

Page 163



1    me to get a copy of them, he would've given a copy of them

2    to me.

3        Q    And do you recall anything about the conversation?

4        A    No, I don't.

5        Q    Okay.  Looking back at Exhibit 24, the withdrawal

6    notice, do you have an opinion on whether or not these

7    letters satisfy the conditions set forth in the withdrawal

8    notice?

9        A    Well, the withdrawal notice states that if he

10   provided documentation from a non-university appointed

11   psychiatrist, which Dr. Kevin Winders is, indicating that he

12   is not a danger to himself or others, that would satisfy the

13   first prong of that condition.

14           And Kevin Winders says, "It is impossible to

15   predict the future, but I don't think he is violent or any

16   more of a threat to harm someone other than any other

17   student."  Whether or not that satisfies that prong, I don't

18   know.

19           I will add that I vaguely recall that this document

20   was forwarded to Betsy Neely's office.

21       Q    And how did you become aware of that?

22       A    I'm just recalling that there was this discussion

23   about this last sentence.

24       Q    Which last sentence are you referring to?

25       A    Dr.  Kevin Winders:  "It's impossible to predict

Page 164

1    the future, but I don't think he's violent or any more of a

2    threat or harm to someone other than the student." (sic)

3        Q    Well, just to read from it so the record is clear,

4    it says, "It is impossible to predict the future, but I

5    don't think he is violent or any more of a threat to harm

6    someone than any other student."

7        A    Than any other student.

8        Q    Okay.  When that was communicated to Betsy Neely,

9    it was your understanding that there was an emphasis placed

10   on that sentence?

11       A    I vaguely recall that.

12       Q    Do you know who placed an emphasis on that

13   sentence?

14       A    I think Betsy -- I think I had a conversation with

15   Betsy about this letter.  A telephone conversation, I think.

16       Q    Do you know when that phone call would've taken

17   place?

18       A    No.  I'm going to say on or about May 8th.  It may

19   have been a conversation in his office.  I simply can't

20   recall.

21       Q    In whose office?

22       A    I just can't recall.  You know, I'm just thinking

23   about something.  This is dated May 8th.  And then after the

24   administrative withdrawal, during the time that Hayden

25   Barnes contacted the Board of Regents and an appeal was

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    requested, it may have been during that time frame.

2         It may not have been contemporaneous to May 8th,

3    but it was during that time frame Hayden contacted the Board

4    of Regents making inquiries about his appeal process; and

5    that information may have surfaced in that context.

6         But I do recall that Betsy was aware of this

7    letter, but I'm unable to recall the conditions under which

8    the discussion took place.

9         I can't recall whether or not it was a day or two

10   after May 8th or maybe it was a few days before the appeal

11   was scheduled to be received or maybe it was after the phone

12   call from Hayden Barnes or perhaps Hayden sent this to Betsy

13   and then Betsy is contacting us about it.

14   Q    Okay.  Well, just looking at Exhibit 24, the

15   withdrawal notice --

16   A    Uh-huh.

17   Q    -- the last sentence says, "However, because this

18   matter directly concerns me, should you elect to appeal my

19   decision, you should submit your written appeal within

20   twenty days of receipt of this letter to the Board of

21   Regents at the following address."

22   A    Uh-huh.

23   Q    So the process that you're describing now, is it

24   your understanding that that would've been part of the

25   appeal to the Board of Regents?

Page 166

1      A      This document?

2      Q      At some point you had a discussion with Betsy

3   Neely.  Is it your understanding as you sit here today that

4   that conversation took place as part of the appeal of

5   President Zaccari's decision to the Board of Regents?

6      A      Not necessarily, because there was a point in time

7   that Hayden contacted the Board of Regents and he was

8   concerned about his case being heard in a particular time

9   frame.

10          And I vaguely recall a conversation with that

11   office about the matter.  There was a delay of some sort

12   between the time that he requested the matter be appealed

13   and the time that it was actually heard by the Board of

14   Regents.  So it was sometime within that time frame.

15          But, no, as a part of the appeal process, telephone

16   conversations are not a part of the appeal process.

17      Q      Right.

18      A      Okay.

19      Q      I didn't mean to suggest that the telephone

20   conversation was part of the appeal, itself.

21          What I was trying to ask is whether or not that

22   conversation took place during the time in which the appeal

23   was being made to the Board of Regents.

24      A      By Hayden Barnes?

25      Q      Well, the telephone conversation that you had with

Page 167

1     Betsy Neely.

2        A     I can't testify to that.

3        Q     Okay.  So right now you have no recollection of

4     when you talked to her about this May 8th letter from

5     Dr. Winders?

6        A     Right.  And I can't recall whether or not it was

7     generated because Hayden had supplied this information first

8     and foremost or whether or not this was faxed to the Board

9     of Regents along with this letter.  (Indicating.)

10       Q     Okay.  And that's a letter from Dr. Winders.

11             Then Exhibit 27, the letter from Leah McMillan, did

12    you form an opinion whether or not this letter complied with

13    the second condition of the withdrawal notice?

14       A     (Reviewing document.)  She states, "However, if

15    Hayden returns to VSU in the future, I will be more than

16    willing to continuing seeing him in the VSU Counseling

17    Center."

18             So this suggests to me that in terms of the

19    Counseling Center, a counselor was willing and able and

20    ready to provide services that would've satisfied number

21    two.

22       Q     Okay.  Just so we're clear on the sequence of

23    events, the withdrawal notice was delivered to Hayden Barnes

24    on May 7th.  Exhibit 27 and 28, the two letters in response,

25    were delivered to Dr. Zaccari and the Board of Regents a day

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    later on May 8th.

2            And then the following day, on May 9th, Dr. Zaccari

3    circulated a letter to the administration indicating that

4    Mr. Barnes was in any event withdrawn from school.

5    A    Yes.

6    Q    That's the sequence.

7            MR. CORN-REVERE:  Let's mark as Exhibit 29 a letter

8        from Betsy Neely to Zaccari.

9            (The document was marked for identification as

10       Plaintiff's Exhibit Number 29).

11   BY MR. CORN-REVERE:

12   Q    This is a two-page letter under the letterhead of

13   the Board of Regents of the University System of Georgia,

14   specifically Elizabeth E. Neely, addressed to Dr. Ronald M.

15   Zaccari.  Have you seen this letter before?

16   A    Yes.

17   Q    Could you identify it for the record?

18   A    It is a letter from Betsy Neely.  She's the

19   Associate Vice Chancellor for Legal Affairs, and she was

20   charged with responsibility for investigating all

21   applications for review.

22           Hayden Barnes submitted a request for a review, an

23   appeal, and she was directing the President to supply

24   specific information.

25   Q    Okay.  So, to make sure that I understand what

Page 169



```
 1    happened, Elizabeth Neely recommended the process to
 2    Dr. Zaccari for administrative withdrawal of Hayden Barnes.
 3    Is that right?
 4        A    Correct.
 5        Q    And that's the process that in the end he chose to
 6    use for dealing with Hayden Barnes.
 7        A    Correct.
 8        Q    And then the appeal, which goes to the Board of
 9    Regents, is overseen by the same Elizabeth Neely who
10    recommended the administrative withdrawal process in the
11    first place.
12        A    Yes.
13        Q    Is that right?
14        A    (Nods head.)
15        Q    In your opinion, does this comport with principles
16    of due process?
17        A    No.
18        Q    Did Dr. Zaccari at any point ask you to assist in
19    his appeal before the Board of Regents?
20        A    Yes.
21        Q    What did Dr. Zaccari ask you to do?
22        A    He wanted me to review a document that he had
23    drafted because he wanted to have a full opportunity to
24    fully explain why he made the decision that he did,
25    understanding, of course, my strong feelings about due
```

Page 170

```
 1    process, and gave me a detailed response to Betsy Neely to

 2    review.

 3        Q    Okay.  At what point -- strike that.

 4             Did Dr. Zaccari ask you to draft his response for

 5    him?

 6        A    No.  He drafted it and I reviewed it.

 7        Q    Okay.  Was the draft that you reviewed

 8    substantially complete or were there blanks in the text

 9    or -- can you describe the document that you saw?

10        A    It was not in complete form when I first received

11    it.  There were some modifications made.

12        Q    Did you recommend the modifications?

13        A    Some modifications I recommended.

14        Q    Do you remember the approximate date in which

15    Dr. Zaccari approached you to help with the appeal?

16        A    No.  He understood, of course, that it had to be

17    before June 29th.  The document, that is.

18        Q    Right.  I believe Exhibit 29 gives June 29th as the

19    deadline.  2007.

20             MR. CORN-REVERE:  Let's mark as Deposition Exhibits

21        Numbers 30, 31 and 32, three documents that appear to be

22        successive versions of the response.

23             (The documents were marked for identification as

24        Plaintiff's Exhibit Numbers 30, 31, and 32.)

25    BY MR. CORN-REVERE:
```

Page 171

1    Q    Have you had a chance to look at the exhibits?

2    A    Yes.

3    Q    Can you identify them for the record?

4    A    These are draft documents of Dr. Zaccari's response

5    to Hayden's request for an appeal.

6    Q    Okay.  Looking at the first draft, Exhibit Number

7    30, the date at the top is June 11th, 2007.

8    A    Uh-huh.

9    Q    Does that refresh your recollection of when you may

10   have first seen a draft of Dr. Zaccari's response?

11   A    On or about June 11th?

12   Q    2007, yes.

13   A    Yes.

14   Q    Okay.  Do you recall whether or not this first

15   draft dated June 11th is one that you saw at that time?

16   A    Yes.

17   Q    Okay.  You testified a moment ago, I believe, that

18   you had recommended some changes in the response.

19        Are any of the changes you suggested reflected in

20   the handwritten notes on this draft?

21   A    I would have to look at the final to see.  I'm on

22   Exhibit 30.

23   Q    Right.  But do you recognize the writing?

24   A    This is Dr. Zaccari's handwriting.

25   Q    In every case?

```
1      A     Yes.

2      Q     Okay.  Did you make any notes on the draft that

3   Dr. Zaccari gave you and give it back to him?

4      A     The blanks -- Dr. Zaccari drafted this response and

5   gave it to me to present in a proper format for the appeal

6   of Hayden Barnes.

7           I took that information and put it in the proper

8   format.  And then the blanks that you see there, those are

9   blanks that I had because I requested of him for

10  clarification sake that he had to include this information,

11  as well.

12     Q     Which information are you referring to?

13     A     Like, number two:  On, blank, of 2007, I was

14  informed that flyers were posted across the campus and

15  Mr. Barnes was the author of that document.

16          Because I was not party to these communications or

17  this information didn't come directly from me, I needed him

18  to supply the missing information.

19          So, what you're seeing here on June 11th is a

20  product of Dr. Zaccari giving me something in very, very

21  rough form; and I'm putting it in the format that's expected

22  from the Board of Regents.  But in reading his information,

23  it is not clear enough.

24     Q     I see.

25     A     He's got -- you know, there's not enough -- dates
```

Page 173

1    are missing.

2       Q    Am I correct that there were an earlier draft that

3    you looked at and you recommended changes, and those changes

4    are reflected in this document, Exhibit Number 30?

5       A    My changes that I recommended are, for example, we

6    need the date of -- on item number one, for example, it says

7    Thomas Hayden Barnes enrolled on -- what -- having

8    transferred from what to what?  Okay?

9       Q    Uh-huh.

10      A    That's preliminary information that needs to be

11    outlined in Dr. Zaccari's response to Betsy Neely.

12           Then, for example, number four.  It says blank.  I

13    need to know about a meeting that he had with S.A.V.E.  He

14    wanted to include information about the S.A.V.E meeting.

15    Well, you need to put the date that you had the S.A.V.E

16    meeting in there for clarity sake so the reader can

17    understand the context in which you had this in.

18           So what I did -- what you're seeing is -- the

19    overwhelming information contained in this information is

20    Dr. Zaccari's.  I have blanks.  I'm sending it to him.  He's

21    reviewing it, and he's making changes of his own document.

22       Q    Yes.

23      A    In addition to recognizing that information needs

24    to be included in there, as well.

25       Q    I think I understand.  So, as part of your

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    revisions to put his response to the Board of Regents in the
2    correct form --
3        A    Form, uh-huh.
4        Q    -- you added paragraphs or language that called for
5    the filling in of specific facts like dates or other
6    information so that it would be in the correct form.  Is my
7    understanding correct?
8        A    Yes.  And, in addition to that, some of this
9    information I just felt as if it wasn't relevant.
10        The decision to withdraw Hayden Barnes had already
11   been made and that decision was involved.  The same
12   individual is going to be reviewing this report.
13        So, for example, on page -- I'm on Exhibit 30, page
14   five.  He talks about his evaluations by the Chancellor's
15   office places his work in the top five among thirty-five
16   college and university presidents and stuff like that.
17        I remember suggesting to him that I didn't know if
18   he needed to have that in there because it has no bearing on
19   the issue at hand.
20        Q    Uh-huh.
21        MR. CORN-REVERE:  Could we go off the record just
22   one moment?
23        (Discussion off the record.)
24   BY MR. CORN-REVERE:
25        Q    Were there any other deletions that you recall that

1    you recommended to Dr. Zaccari?

2        A    I think there were some, but I can't recall.

3        Q    Did Dr. Zaccari ask for your input on any of the

4    factual statements made in the letter?

5        A    I asked for his input because some of these facts I

6    could not speak to because I wasn't there.

7            For example, on page two of Exhibit 32, item six,

8    includes, "On April the 16th, 2007, I received a telephone

9    call from Vice Chancellor Linda Daniels asking for a

10   description of his physical appearance." Well, I can't

11   speak to those facts.

12       Q    Yeah.

13       A    Because I wasn't there.

14       Q    Okay.  Let me just go back for a minute with these

15   three exhibits.

16           Exhibit 30 you've identified as a draft of

17   June 11th.  The Exhibit 31 appears to be a later draft.  It

18   is dated at the top June 18th, 2007.

19           Can you identify that document for the record?

20       A    I'm sorry.  What exhibit?

21       Q    Thirty-one.  It's dated June 18th.

22       A    It's a draft.

23       Q    Yes.  Have you seen this document before?

24       A    Yes, uh-huh.

25       Q    Yes?

Page 176

1      A      Yes.

2      Q      Okay.  After your initial recommendations and your

3   review of the June 11th draft, did Dr. Zaccari also ask you

4   to look at the June 18th draft?

5      A      Yes.

6      Q      And then just for authentication purposes, looking

7   at Exhibit 32, can you identify that document for the

8   record?

9      A      This is what was ultimately sent to Betsy Neely.

10     Q      So this is the final product?

11     A      I believe it is the final document signed by

12  Dr. Zaccari.

13     Q      And this was sent to the Board of Regents actually

14  ahead of the deadline:  June 21st instead of June 29th.

15           Okay.  Looking back on Exhibit 30, do you recognize

16  any other changes that you suggested on that draft?

17     A      You want me to look at 30 or 31?

18     Q      I just want to make sure that I haven't missed

19  anything on the first draft.  So if there are any other

20  changes you suggested that I haven't already covered --

21     A      Exhibit 30 is not the same as Exhibit 31.  There

22  have been modifications.  So what you see in Exhibit 30, 31

23  and 32 is a progressive modification to the point we get to

24  a final document, which is Exhibit 32.

25           But if you look at Exhibit 31, you will see that

Page 177

```
 1    it's certainly not in its final form because if you look at

 2    page six of eight, in the second paragraph, it says my point

 3    XXX in there because that information needs to be in there.

 4        Q    Yes.  And, of course, on page one in paragraph one,

 5    there are still some blanks.

 6        A    Yeah.

 7        Q    Okay.  In looking at this June 18th draft, Exhibit

 8    31 --

 9        A    Uh-huh.

10        Q    -- were you also asked to review the draft at this

11    stage and make recommendations?

12        A    The June 18th?

13        Q    Yes.

14        A    Yes.

15        Q    And did you make any recommended changes in this

16    draft?

17        A    I may have.  I don't recall specifically.  But,

18    once again, Dr. Zaccari was the primary author of this

19    document.  I just made modifications here and there.

20        Q    Looking at it today, does it refresh your

21    recollection on any of the modifications you might have

22    suggested?

23        A    No.

24        Q    Do you recall whether or not you made any

25    recommendations about deletions at this point?
```

Page 178

1     A     I don't recall.

2     Q     And looking at Exhibit 32 --

3     A     Okay.

4     Q     -- this is the final copy of the response in the

5  appeal that Dr. Zaccari sent to the Board of Regents.

6     A     Uh-huh.

7     Q     Did Dr. Zaccari ask you to review this before it

8  was sent?

9     A     I believe he did.

10    Q     Did you make any recommendations to the final

11 version before it was delivered to the Board of Regents?

12    A     I may have.

13    Q     Do you recall any of the recommendations that you

14 made?

15    A     No.

16    Q     Did you review any of the factual claims that were

17 made in the letter?

18    A     I relied on his representations of the factual

19 claims.  This was his response to the appeal.

20    Q     Okay.  Based on your earlier testimony about the

21 meetings that you attended with Dr. Zaccari and with other

22 members of the administration in late April 2007 and in

23 early May 2007, particularly May 3rd and May 7th, 2007,

24 would you take a look at paragraph 13 on page 4 of Exhibit

25 32?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1     A     (Reviewing document.)

 2           MR. LaVALLEE:  What page?

 3           MR. CORN-REVERE:  Page four.

 4           MR. LaVALLEE:  Thank you.

 5           MR. CORN-REVERE:  It's the first full paragraph.

 6     Paragraph number 13.

 7  BY MR. CORN-REVERE:

 8     Q     It begins about five lines down, middle of the

 9  line:  "I sought the advice of the members of the

10  President's administrative unit consisting of Dr. Kurt

11  Keppler, Vice President of Student Affairs; Dr. Louis Levy,

12  Vice President of Academic Affairs; Mr. James Black, Vice

13  President of Finance and Administration; Mr. Scott Sikes,

14  Vice President of Institutional Advancement, and Dr. Marsha

15  Krotseng, Associate Vice President for Strategic Research

16  and Analysis.

17           "The administrative unit, along with Mr. Scott

18  Doner, VSU's Police Chief, and Ms. Ann Farmer, Assistant

19  Chief of Police, and I collectively decided that VSU take

20  necessary steps to minimize as much as possible any security

21  risks."

22           I'm not asking you to say whether or not

23  Dr. Zaccari may have independently taken those steps; but in

24  the meetings that you attended in late April and early May

25  2007, did Dr. Zaccari seek anybody's advice on what to do
```

Page 180



1     about Hayden Barnes?

2        A     In the course of that meeting?

3        Q     Yes.

4        A     My recollection was that he discussed concerns and

5     there was mention of policy and due process.

6        Q     You mentioned policy and due process?

7        A     Yeah.

8        Q     Did Dr. Zaccari seek your advice on that?

9        A     I gave it to him anyway.  I mean --

10       Q     Right.  But the question is:  Did he ask you for

11    advice about what to do about due process issues?

12       A     I felt like because I was there that was going to

13    be my role, so I offered it up.

14       Q     But he didn't ask you --

15       A     I can't recall if he did.

16       Q     Did he, in the meetings that you witnessed, ask the

17    advice of other members of the administration about what he

18    should do?

19       A     Specifically, he didn't say, "What do you think I

20    should do?"

21             He would say, "You know, this student is presenting

22    a problem.  I have some concerns."

23             And then the atmosphere was such that people could

24    offer up their take on whatever he was saying.

25             But, no, he didn't take a poll, and there was not a

Page 181

```
 1    voting or final recommendation as a result of the people who
 2    attended those meetings.
 3        Q    Well, apart from the advice that you've testified
 4    that you offered --
 5        A    Yes.
 6        Q    -- involving due process and Constitutional issues,
 7    did anybody else in the meetings you attended offer advice
 8    to Dr. Zaccari about how he should respond to the situation?
 9        A    Well, again, I remember Ann Farmer's comments about
10    the protective order.
11        Q    I see.  And do you know if there was, in the
12    meetings that we were just discussing, any recommendation
13    from the Counseling Center about what to do about Hayden
14    Barnes?
15        A    No.  I don't recall anything.
16             MR. CORN-REVERE:  Okay.  Bear with me while I
17        try --
18             MR. LaVALLEE:  Sure.
19             (Pause)
20             (The document was marked for identification as
21        Plaintiff's Exhibit Number 33)
22    BY MR. CORN-REVERE:
23        Q    This is an one-page memorandum, and it's another
24    copy of the memorandum from Dr. Zaccari of May 9th, 2007.
25    Have you looked at this exhibit?
```

Page 182

1      A     This is the first time I've seen this with the

2    writing at the bottom.

3      Q     Okay.  And I'll just represent for the record the

4    only difference between this and the earlier exhibit of this

5    memorandum that so far as I know exist is this handwritten

6    note at the bottom.

7            It is your testimony that you have not seen this

8    before?

9      A     Yes.

10     Q     Okay.  There are two in this handwritten note sets

11   of initials.  One is M.F.R. and then the note directed to

12   them by someone, apparently C.L.H.  Do you know who those

13   initials represent?

14     A     M.F.R.?

15     Q     Yes.

16     A     No.

17     Q     Okay.  You don't recognize anyone on the staff or

18   in the administration of Valdosta State University who those

19   initials fit?

20     A     M.F.R.  No.

21     Q     I'm not suggesting you should.  I just don't know.

22     A     No.  You know, I'm pretty sure if I had a list of

23   all the employees and I match a name with these initials,

24   maybe I could come up with something but not off the top of

25   my head.

1    Q    Okay.  The note, itself, reads, "M.F.R., spoke with
2    Theresa Boyd on May 9th for clarification.  May semester or
3    all of summer?  Answer, all of summer.  What about fall
4    schedule?  Leave it intact."  And then the initials C.L.H.
5         Does this -- well, let me just ask:  What does this
6    note mean to you?
7    A    I don't know.  A conversation took place with
8    Theresa Boyd on May 9th for clarification of something
9    regarding May semester or all of the summer.
10   Q    Okay.  So that there's context, I mean, the memo,
11   itself, is the one where Dr. Zaccari explained that Hayden
12   Barnes had been withdrawn from school and that he would
13   get -- he would lose his semester courses.  They would be
14   dropped without penalty, but he would get a refund for
15   housing.
16        The note suggests, at least to me and I'll ask you,
17   that there was a follow-up question about how long the
18   suspension or the withdrawal would last.
19        In reading this note, does that -- what does it
20   mean to you when you read this note?
21   A    It's not enough information.
22   Q    Uh-huh.
23   A    It says something about may semester or all of
24   summer.  We don't have the benefit of knowing who C.L.H. is
25   or M.F.R.

Page 184

1    Q    I was hoping you could tell me.

2    A    So, it would just be an absolute guess on my part.

3    Q    Uh-huh.  Does this appear to be speculation about

4    how long the suspension would last?

5    A    Perhaps, yes.

6         MR. CORN-REVERE:  Let me just run through my notes

7    for a minute.  We can go off the record.

8         (Discussion off the record.)

9         MR. CORN-REVERE:  That's all the questions that I

10   have.

11                        EXAMINATION

12   BY MR. LaVALLEE:

13   Q    Hello, Ms. Gaskins.  Matthew LaVallee.  We met

14   earlier.  As you know, I represent Ms. McMillan.  I'm going

15   to be incredibly brief.

16        There's been a lot of discussion about meetings in

17   this case as they relate to Hayden Barnes.  I only care

18   about meetings that you attended that Ms. McMillan was in

19   attendance in, as well.

20        Let's go back to April and May of 2007.  What

21   meetings were you in which Ms. McMillan was in that

22   pertained to Hayden Barnes?

23   A    The one that I recall which was brought to my

24   attention was May 7th.  It was only because it was brought

25   to my attention as a result of some of the responses to the

Page 185

1    discovery.

2        Q    Okay.  Do you mind if I refresh your recollection

3    with those?

4        A    Sure.

5        Q    I went ahead and marked this as McMillan Number

6    One.  I wasn't sure if we wanted to continue in line or not.

7    I guess it doesn't matter.  And I don't know how many copies

8    I have. There you go, Ms. Gaskins.

9            (The document was marked for identification as

10       Defendant McMillan's Exhibit Number One.)

11   BY MR. LaVALLEE:

12       Q    Ms. McMillan's Exhibit Number One is a copy of her

13   responses to plaintiff's first interrogatories and request

14   for production of documents.

15           I'd like to refer you to -- I believe it's

16   interrogatory number 12 located on page 16.  Let me know

17   when you get to page 16, please.

18       A    Okay.

19       Q    In interrogatory number 12, "Identify and describe

20   all communications between you and Defendant Laverne Gaskins

21   regarding your treatment of Plaintiff at the VSU Counseling

22   Center."

23           Would you, please, read that response and then let

24   me know when you're done.

25       A    I'm done.

1     Q     Okay.  Does that refresh your recollection?

2     A     Yes, it does.

3     Q     Okay.  When you were discussing the May 7th, 2007,

4  meeting which Ms. McMillan was in attendance --

5     A     Uh-huh.

6     Q     -- is this that meeting?

7     A     Yes.

8     Q     Okay.  Is there any other meeting in April or

9  May 2007 which you were in attendance in which Ms. McMillan

10 was also in attendance in pertaining Hayden Barnes?

11    A     I don't recall any, no.

12    Q     Well, the reason why I asked you that is prior to

13 lunch break, I had not seen anywhere in your discovery

14 responses or any mentioning of Ms. McMillan being in

15 attendance at the May 3rd, 2007, meeting.

16    A     Uh-huh.

17    Q     And I believe -- I'd like to refresh your

18 recollection or redirect you to Exhibit Number One, which is

19 a copy of the complaint.

20    A     Okay.

21    Q     In particular, paragraph 51.

22    A     Yes.  (Reviewing document.)

23    Q     I believe you said earlier upon examination by

24 Mr. Corn-Revere that Ms. McMillan was in attendance at this

25 meeting that's described in paragraph 51.

Page 187

1        A     Uh-huh.

2        Q     Was that a mistake?

3        A     Let me get something to, I think, clarify.

4     (Reviewing documents.)

5        Q     Okay.

6        A     We have two Leahs on campus.  We have Leah McMillan

7     and we have Leighia Hammond.

8              Plaintiff's Exhibit Number 16 makes references to

9     Leighia Hammond attending a meeting scheduled for May 3rd.

10    It's an email that says May 2nd, 2007.  "I will attend this

11    meeting tomorrow," which will be May 3rd, 2007.

12             In drafting these responses -- it's been a long

13    time since 2007.

14       Q     Sure.

15       A     It's conceivable that I had this Leah in mind and

16    not Leah McMillan, and I may have offered McMillan because

17    in my mind I saw Leah.

18       Q     Sure.  Well, now that we have a chance to take a

19    look at paragraph 51 of Plaintiff's Complaint, do you now

20    disagree that Ms. McMillan was in attendance at that

21    meeting?

22       A     I can't recall if she was there.  I just can't

23    visualize her being there.  I just can't recall if she was

24    there or not.  I simply can't visualize her in that room.  I

25    can visualize Dr. Morgan, but I can't visualize Leah.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    All right.  So you couldn't dispute her testifying

2    that she was not there, correct?

3    A    No.

4    Q    And you're not saying that she wasn't there; you're

5    just saying you don't remember if she was there or not,

6    right?

7    A    I can't visualize her.

8    Q    So that's yes, right?

9    A    Uh-huh.

10   Q    So the only meeting that you are 100 percent sure

11   that Ms. McMillan was at which pertained to Hayden Barnes

12   prior to his being administratively withdrawn from the

13   University was that meeting of May 7th, 2007, correct?

14   A    Again, the only reason I recall it is because it

15   was brought to my attention as a result of your discovery

16   responses.

17   Q    Sure.

18   A    And I checked the calendar and, sure enough, her

19   name was there.

20   Q    Okay.  I'm not fussing.  I'm just wanting to make

21   sure.

22   A    Sure.

23   Q    Because it's incredibly important to my client

24   which meeting she was at and which meeting she wasn't.

25   A    Sure.

Page 189

```
 1      Q      Just to recap, the May 7th, 2007, meeting is the
 2   only meeting that you can recall that Ms. McMillan was at
 3   and you were at that pertained to Hayden Barnes.
 4      A      Correct.
 5             MR. LaVALLEE:  That's all.  Thank you.
 6             MR. WILL:  I have just a few questions.  I'll stay
 7      here if I can keep my seat.
 8                          EXAMINATION
 9   BY MR. WILL:
10      Q      Mr. Corn-Revere had asked you a series of questions
11   in which he referred to Mr. Barnes as being expelled.  He
12   was not expelled, was he?
13      A      No.  He was administratively withdrawn.
14      Q      And, unlike expulsion, which is a permanent
15   sanction, the administrative withdrawal letter clearly said
16   he could return under certain circumstances, correct?
17      A      That's correct.
18      Q      Now the situation presented by Mr. Barnes was one
19   that you had not encountered in your career here as a
20   Counselor at the University.
21      A      Correct.
22             MR. CORN-REVERE:  Object to form.
23   BY MR. WILL:
24      Q      And you did not have any clearly established
25   precedence to rely on in how to deal with this situation,
```

Page 190

```
 1    did you?
 2            MR. CORN-REVERE:   Object to the form.
 3            THE WITNESS:   That's correct.
 4    BY MR. WILL:
 5       Q    I'm sorry?
 6       A    That's correct.
 7            MR. WILL:   Thank you very much.
 8            (The deposition concluded at 4:40 p.m.)
 9            (Pertaining to  Federal Rules of Civil Procedure
10       and/or O.C.G.A. 9-11-30(e), the deponent and/or a party
11       having requested the right to review the deposition,
12       making corrections and/or changes and signing, for that
13       purpose the errata pages have been annexed hereto.)
14
15
16
17
18
19
20
21
22
23
24
25
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1                    C E R T I F I C A T E

2    STATE OF GEORGIA:

3    COUNTY OF LOWNDES:

4        I hereby certify that the foregoing transcript was

5    taken down, as stated in the caption and the questions and

6    answers thereto were reduced to typewriting under my

7    direction; that the foregoing pages 1 through 192 represent

8    a true, complete, and correct transcript of the evidence

9    given  upon said hearing, and I further certify that I am

10   not of kin or counsel to the parties in the case; am not in

11   the regular employ of counsel for any of said parties; nor

12   am I in any way interested in the result of said case.

13            This, the 23rd day of June, 2009.

14

15

16            /s/ Sarah Williams

17       SARAH WILLIAMS, FPR, RPR, CCR B1653

18

19

20

21

22

23

24

25

```
1                        DISCLOSURE
2   STATE OF GEORGIA          Deposition of: Laverne Gaskins
3   COUNTY OF LOWNDES:    Date:  June 12, 2009
4        Pursuant to Article 10.B of the Rules and Regulations
5   of the Board of Court Reporting of the Judicial Council of
6   Georgia, I make the following disclosure:
7        I am a Georgia Certified Court Reporter.  I am here as a
8   representative of Wheeler Reporting.  I am not disqualified
9   for a relationship of interest under the provisions of
10  O.C.G.A. §9-11-28 (c).
11       Wheeler Reporting was contacted by the
12  offices of Mr. Corn-Revere to provide court reporting
13  services for this deposition.  Wheeler Reporting will not be
14  taking this deposition under any contract that is prohibited
15  by O.C.G.A. §15-14-37 (a) and (b).
16       Wheeler Reporting has no exclusive contract to provide
17  reporting services with any party to the case, any counsel
18  in the case, or any reporter or reporting agency from whom a
19  referral might have been made to cover this deposition.
20       Wheeler Reporting will charge its usual and customary
21  rates to all parties in the case, and a financial discount
22  will not be given to any party to this litigation.
23       _____
24                        Sarah Williams, CCR, FPR, RPR.
                                CCR No.  B1653
25
```

LAVERNE GASKINS, ESQ. 6/12/2009

```
1              DEPOSITION OF LAVERNE GASKINS/SEW
2           I do hereby certify that I have read all questions
3    propounded to me and all answers given by me on the 12th day
4    of June, 2009, taken before Sarah Williams, FPR, CCR, RPR,
5    and that:
6           1) ____         There are no changes noted.
7           2) ____  The following changes are noted:
8              Pursuant to Rule 30(e) of the Federal Rules of
9    Civil Procedure and/or the Official Code of Georgia
10   Annotated 9-11-30(e), both of which read in part:  Any
11   changes in form or substance which you desire to make shall
12   be entered upon the deposition...with a statement of the
13   reasons given...for making them.  Accordingly, to assist you
14   in effecting corrections, please use the form below:
15   Page No.        Line No.        should read:
16   _____
17   Page No.        Line No.        should read:
18   _____
19   Page No.        Line No.        should read:
20   _____
21   Page No.        Line No.        should read:
22   _____
23   Page No.        Line No.        should read:
24   _____
25
```

1          DEPOSITION OF LAVERNE GASKINS/SEW

2    Page No.        Line No.        should read:

3    _____

4    Page No.        Line No.        should read:

5    _____

6    Page No.        Line No.        should read:

7    _____

8    Page No.        Line No.        should read:

9    _____

10   Page No.        Line No.        should read:

11   _____

12   Page No.        Line No.        should read:

13   _____

14

15          If supplemental or additional pages are necessary,

16   please furnish same in typewriting annexed to this

17   deposition.

18

19   _____

20   LAVERNE GASKINS

21

22   Sworn to and subscribed before me,
     this the      day of            , 2009.
23

24   _____

     Notary Public
25   My commission expires: