IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

THOMAS HAYDEN BARNES,                    CASE NUMBER

    Plaintiff,                          1:08-CV-00077-CAP

vs.

RONALD M. ZACCARI, et al,

    Defendants.

_____/

DEPOSITION OF

DR. KURT J. KEPPLER

JULY 28, 2009

9:04 A.M.

VALDOSTA STATE UNIVERSITY
OAK STREET PARKING DECK
AUXILLARY SERVICES DEPARTMENT
CONFERENCE ROOM
VALDOSTA, GEORGIA

SARAH E. WILLIAMS, FPR, CCR, RPR

Page 1





WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1                    A P P E A R A N C E S

2

3     On behalf of Plaintiff:

4     ROBERT CORN-REVERE, ESQ.
      ERIN N. REID, ESQ.
5     Davis Wright Tremaine, LLP
      Suite 200
6     1919 Pennsylvania Avenue, N.W.
      Washington, D.C.   20006-3402
7

8     On behalf of Defendant Gaskins:

9     DAVID R. SMITH, ESQ.
      Brannen, Searcy & Smith, LLP
10    22 East 34th Street
      Savannah, Georgia   31401
11

12    On behalf of Zaccari, VSU, Board of Regents, Keppler,
                         Mast and Morgan:
13
      DAVID C. WILL, ESQ.
14    Royal Washburn Will
      4799 Sugarloaf Parkway
15    Building J
      Lawrenceville, Georgia   30044
16

17    On behalf of McMillan:

18    MATTHEW R. LaVALLEE, ESQ.
      Daley, Koster & LaVallee, LLC
19    2849 Paces Ferry Road
      Suite 160
20    Atlanta, Georgia   30339

21

22

23

24

25

                                                    Page 2

1                          I N D E X

2      Examination by Mr. Corn-Revere                    4

3      Examination by Mr. LaVallee                     161

4      Examination by Mr. Smith                        175

5      Re-Examination by Mr. Corn-Revere               176

6

7                          E X H I B I T S

8      Plaintiff's

9      1        The Chronicle of Higher Education        12

10     2        "Unofficial Biography of Robert...."     18

11     3        Keppler Responses to Interrog...         36

12     4        Ann Farmer's Handwritten Notes           73

13     5        Flyer - "An Issue of Convenience..."     92

14     6        Letter to Editor                         93

15     7        Collage - S.A.V.E. - Zaccari Memorial... 93

16     8        Facebook Page                           107

17     9        Admin. W/Drawal Letter - 5/7/07         108

18     10       Email - Hardy to Hammond, Mast, etc     114

19     11       Student Handbook - Volume I             118

20     12       Policy Manual:  Section 400             140

21     13       Memo from R.Z. to Black, Doner....      142

22     14       Letter to Barnes 5/11/07 from Sandonato 145

23     15       Letter to Neely from Zaccari - 6/21/07  147

24

25

**WHEELER**
**REPORTING**
*Court Reporting • Video • Litigation Support*
**404.351.4577**

```
 1    THEREUPON,

 2                      DR. KURT KEPPLER,

 3    having been first duly sworn, was examined and testified as

 4    follows:

 5                          EXAMINATION

 6    BY MR. CORN-REVERE

 7      Q     Could you, please, state your name for the record.

 8      A     Kurt J. Keppler.

 9      Q     Okay.  Good morning, Dr. Keppler.  My name is Bob

10    Corn-Revere.  I represent the plaintiff, Hayden Barnes, in

11    this case and with me is my associate, Erin Reid.

12            Today we'll be asking a number of questions in the

13    deposition about the case.  Now let me just ask for

14    starters:  Have you been deposed before?

15      A     No.

16      Q     Okay.  So, let me just go through a few

17    introductory remarks to sort of give you a sense of how this

18    will work.

19            First of all -- again, we'll use the standard

20    stipulations.  The only objections are if there's a question

21    of privilege or form of the question.

22            MR. CORN-REVERE:  And I assume you'll want the

23    witness to review and sign the deposition?

24            MR. WILL:  Yes.

25    BY MR. CORN-REVERE:
```

Page 4



1    Q    Okay.  This is for the purpose of gathering
2    information for the lawsuit; and, in the course, I'll be
3    asking a number of questions.
4         You may get a sense as I'm asking a question of
5    what I'm going to ask, but this is different from a usual
6    conversation in that everything is being transcribed by the
7    court reporter.
8         So, please, even if you understand where the
9    question is going, let me finish it so that it appears
10   concisely on the transcript and then give your answer.
11        If for any reason I'm unclear or you don't
12   understand my question, please let me know that you don't
13   understand it and I'll try and rephrase it in a way that is
14   understandable.
15        Please make sure that all of your answers are
16   verbal so that they can, again, appear on the transcript.
17   Nodding your head or saying "uh-huh" doesn't show up very
18   well on the transcript.
19        So, do you have any other questions before we
20   begin?
21   A    No.
22   Q    Okay.  Did you do anything to prepare for today's
23   deposition?
24   A    Just David told me what room we'd be in and where
25   I'd be sitting and sort of the same kinds of things that you

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    just did.

2        Q    Okay.  Did you review any documents before this

3    morning related to the case?

4        A    No.

5        Q    Did you talk to any of the other defendants in this

6    case?

7        A    Yes.

8        Q    Who did you talk to?

9        A    Russ Mast and I are probably in four meetings a day

10   together, so he knew I was this afternoon.

11       Q    You spoke to him?

12       A    Yes.

13       Q    When did you speak to him?

14       A    Yesterday afternoon.

15       Q    Okay.  What was the substance of your conversation?

16       A    Basically, as to the time of who's going when and

17   are you going to come listen to me and am I going to come

18   listen to you, that kind of thing.

19       Q    Did you talk about any of the issues in the case?

20       A    We just talked about what it would be like; what

21   the process would be; how long we thought it would take.

22   Have you ever done this before, kind of thing.

23       Q    Okay.  Did you talk about Hayden Barnes or the

24   administrative withdrawal in this case?

25       A    We talked a little about trying to go through our

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      recollection of the process since it's been so long.

2             You know, what meeting did you go to, what meeting

3      did I go, that kind of thing.

4      Q      Did that conversation help refresh your

5      recollection?

6      A      A little bit.  It's still a little fuzzy.

7      Q      Now you mentioned it's been a long time ago.  And

8      just as we go through this, it will become clearer; but the

9      events of this administrative withdrawal happened just about

10     two years ago.  Isn't that right?

11     A      Let's see.  It would've been the spring -- yeah, a

12     little over two.  Two years, I guess.

13     Q      Okay.  So, two years isn't that long ago, is it?

14     A      I guess it depends on your perspective.

15     Q      I guess it does.  To a two-year-old, that's a long,

16     long time.  But guys like us, that's not so long, is it?

17     A      Well, we've had a change in president.  We've had a

18     lot of growth in the university.  We've had a lot of new

19     things happen.  It's a pretty busy place.

20     Q      But this was a pretty unusual occurrence, wasn't

21     it, this administrative withdrawal?  It would be pretty

22     memorable, wouldn't it?

23     A      I guess it was an unusual occurrence.  I'm not sure

24     that I have a lot of memories about it.

25     Q      Well, perhaps some of the documents that we look at



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    today will help refresh your recollection.  Did you talk to
 2    anyone else other than Russ Mast about the deposition or
 3    about the issues of the administrative withdrawal?
 4        A    No.  You mean -- excuse me.  You mean yesterday or
 5    ever?
 6        Q    Let's just confine it to in preparation for this
 7    deposition.
 8        A    No.
 9        Q    When was the last time you talked to Dr. Zaccari?
10        A    Three, four, five months ago.  I honestly don't
11    know which of those it is.  Quite a while.  I played golf
12    with him in the football fundraiser.  When was that?  April.
13        Q    Okay.  Have you spoken with Dr. Zaccari about the
14    issues in this litigation?
15        A    After the event occurred, you mean?  Like in the
16    last two years?
17        Q    Yes.
18        A    No.
19        Q    You've never spoken with him about this litigation?
20        A    Not since the -- I spoke with him during the time
21    when it was in the public eye.  Maybe in that two-, three-,
22    four-week period.
23             I've never spoken with him about it since he has
24    left the university.
25        Q    Okay.  And I believe you testified you haven't
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    spoken to any of the other defendants about it?

2        A    Well, you asked me if I talked to any of the

3    defendants about it in preparation for this case.

4        Q    Yes.  And I'm confining the question just to that.

5        A    Yes.  That is correct.

6        Q    Okay.  Now how is your memory generally?

7        A    I think it's quite good.

8        Q    Okay.  And, again, I'm just asking this so it's on

9    the record.  Please don't take offense at it.

10           Are you on any medication or anything that would

11   affect your memory in any way?

12       A    No.

13       Q    Okay.  Any conditions like Alzheimer's that would

14   affect your memory?

15       A    No.

16       Q    Okay.  Could you, please, describe what your

17   position is with the university.

18       A    Sure.  Vice President for Student Affairs.  Details

19   as to what that means or just title or what?

20       Q    Well, let's start with the title.  How long have

21   you been in that position?

22       A    Almost exactly seven years.  I came here in July of

23   2002.

24       Q    Okay.  And now can you tell me what that position

25   entails?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    Yes.  It entails most of the departments that
2    relate to the out-of-class components of the students'
3    education.
4         I have 14 different units ranging from things like
5    student life to Greek life to orientation to campus
6    recreation, student organizations, financial aid, career
7    services, counseling services, special events and planning,
8    testing services.
9         I always feel like I'm going to forget one.
10   Access, Students with Disabilities Services, health
11   education and health promotions, cooperative education.  And
12   I hope I have them all.
13   Q    Okay.  How about student disciplinary procedures?
14   A    That's part of the Dean of Students' Office.
15   Reports through the Dean of Students to me, correct.
16   Q    And as a supervisor of the Dean of Students, how
17   would you describe your responsibility with respect to
18   student discipline?
19   A    Well, obviously, the area of student discipline is
20   in Student Affairs, so I would be involved in such things as
21   reviewing the Code of Conduct draft and making sure that we
22   have publicized our appropriate things on the web site.
23        I would be involved in the hiring and firing
24   processes of staffing.  Mr. Lee, who is our Conduct Officer,
25   reports to Dean Mast.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          There are, I guess, sort of traditional kinds of

2    things where Mr. Lee might share with me, cc'd copies of

3    policies, questions or case questions or things like that.

4       Q    Would you say that -- is it Mr. Lee or Dr. Lee?

5       A    Mr. Lee.

6       Q    Okay.  Would you say that Mr. Lee routinely keeps

7    you informed of events that are under his jurisdiction?

8       A    He keeps me informed of events.  He does not keep

9    me informed of the details within the events.

10          He might say, "I have a case right now that I'm

11   working on.  I have two hearings on Friday.  The Judicial

12   Board is meeting this Friday."

13          And then he would give me a copy, a hard copy of

14   the results of the case that I would put in the file from

15   the Judicial Board.  Or if it was a hearing with him, I

16   would get, I guess, a for-the-record copy.

17      Q    And you keep files of such things when they're sent

18   to you?

19      A    Yes.  Interestingly now, as you got to earlier, a

20   lot of it is electronic.  So, most of it is kept on a

21   computer rather than a hard copy, but I do keep computer

22   files.

23      Q    Are they kept on your personal computer?

24      A    Uh-huh.

25      Q    In the course of this case, we served a number of

Page 11

1    requests for production of documents.  Were you asked to

2    review your computer files to see --

3        A    Yes.

4        Q    Please, let me finish the question.

5        A    I'm sorry.

6        Q    You correctly assumed where I was going with that

7    question, whether or not you reviewed your computer files to

8    see if you had documents that were responsive to the

9    request.  And I believe your answer was yes?

10       A    Yes.

11       Q    Again, it's just a process thing of trying to

12   finish the questions --

13       A    Sure.

14       Q    -- and then answer after that.  Is Mr. Lee good at

15   his job?

16       A    I think he's very thorough and very current.  Keeps

17   very active in his professional association, follows a

18   Listserv with other schools.  So, yes, I would say so.

19       Q    Do you trust his judgment?

20       A    Yes, I do.

21            MR. CORN-REVERE:  Let's mark as Keppler Deposition

22   Exhibit Number One an article from The Chronical of

23   Higher Education dated August 5, 2005.

24            (The document was marked for identification as

25   Plaintiff's Deposition Exhibit Number One.)

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1              THE WITNESS:   (Reviewing document.)

2    BY MR. CORN-REVERE:

3      Q     Would you, please, take a look at that, and then

4    I'll have a few questions for you.

5      A     (Reviewing document.)  I have completed it.

6      Q     Okay.  Have you had a chance to read the article?

7      A     Yes.

8      Q     It talks about a plan in 2005 to create a parking

9    lot on the university lawn.  Are you familiar with that plan

10   to create a parking lot?

11     A     Yes.  I would say it was to create a small section

12   of the lawn to extend the existing parking lot.  I don't

13   believe it was to create an additional parking lot.

14     Q     I see.  But in building that, it would've used up a

15   portion of what was --

16     A     Correct.

17     Q     -- then used for the university lawn.  Is that

18   right?

19     A     Yes.

20     Q     Okay.  Does the article correctly report that there

21   was a student protest over the extension of the parking lot?

22     A     I don't recall a student protest, but I do recall

23   this student that was -- actually, this student I know well.

24           And I recall a conversation with the student about

25   a petition.  If you're saying, you know, were there people

Page 13

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    with signs and shouting and those kinds of things, I don't

2    believe there was a protest.

3    Q    No.  Let me be clear about the word "protest."  I

4    know that because of the '60s, it has certain connotations.

5    But here, as the article suggests, there was a petition

6    drive asking for the university to change its plans with

7    respect to the parking lot.

8         And I believe your answer was that you were

9    familiar with the petition drive?

10   A    Yes.  That's correct.

11   Q    Okay.  Could you describe what happened then?

12   A    I recall the student government president -- not

13   the individual in this article.  This student is another

14   student leader.

15        The student in this article actually going on to

16   the front lawn with myself and with Dean Mast, probably a

17   few other people, but I don't recall -- and the president --

18   and actually taking out the -- I guess you would call them

19   architectural draft sheets.  I don't know what the official

20   form is.

21        We looked at the parking lot.  We looked at the

22   front lawn.  The president described what portion of the

23   front lawn might need to be used for extension of the

24   current parking lot.

25        I recall there was some discussion about exactly

**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
404.351.4577

1    how many parking spaces might be gained and how much land

2    might be lost.

3         And at the end of the conversation, he said he

4    would look into it and develop some more data on exactly

5    what the pros and cons of doing that were; and then it was

6    stopped.  It never happened.  We never did that project.

7    Q    So, is it fair to say that the decision to cancel

8    that project resulted from the petition drive started by a

9    student?

10   A    I think it resulted from the conversation with

11   those students that was a very positive and, I guess,

12   friendly conversation that perhaps there could be a

13   compromise or an alternative and that the number of spots

14   gained in this particular situation would not even put a

15   dent in the current parking situation and that since the

16   lawn had such a historic value to the university that

17   perhaps there may be an alternative.

18   Q    Okay.  Was there a change in the master plan for

19   the university after this event in 2005 that led to the

20   construction of the parking garage that Mr. Barnes

21   protested?

22   A    I honestly don't know.  The conversations of

23   parking decks were actively involved in master plan

24   discussions from the first week I was on this campus in

25   2002.  There was always a discussion of our parking

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    situation.
 2            I don't believe there was anybody that had a really
 3    strong feeling for how it would be solved.  I think a lot of
 4    people realized that there was going to have to be a series
 5    of things done to help it along.
 6            I think probably the most important aspect of the
 7    whole situation -- parking doesn't fall under me, so I'm far
 8    from an expert -- was that we have a historic district to
 9    the north and to the east, and we have a cemetery to the
10    west; so, the options were quite limited.
11       Q    I see.  Have you ever been involved in any student
12    discipline matters that arose from the exercise of freedom
13    of speech?
14            MR. WILL:  Object to the form of the question.
15            THE WITNESS:  I didn't hear you.
16            MR. WILL:  I object to the form of the question.
17       That's for the record.
18    BY MR. CORN-REVERE:
19       Q    If you understand the question, you can answer.
20       A    Have I ever been -- let me repeat the question.
21       Q    Sure.  Well, let's have the Court Reporter read the
22    question back.
23            (The requested portion was read back by the Court
24       Reporter.)
25            THE WITNESS:  I've been involved in hundreds of
```

Page 16



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      freedom of speech issues at four universities but never a
2      student discipline matter.
3   BY MR. CORN-REVERE:
4      Q      What kinds of freedom of speech issues were you
5   involved with?
6      A      Oh, I've gone to seminars.  I've listened to
7   speakers at presentations at conferences.  I've actually
8   even been in classes where that's been the topic of
9   conversation.
10           I have even taught at one time in my graduate
11  school days a course in local government.
12           So, I guess I've known about the First Amendment
13  and freedom of speech my whole career.
14     Q      Does the phrase "clear and present danger" have any
15  meaning to you?
16     A      Yes, it does.
17     Q      Do you know what its historic origins are?
18     A      Maybe not.
19     Q      Well, I'm asking just because you talked about your
20  familiarity with First Amendment issues.
21           I guess my question is:  Do you think that the,
22  quote, clear and present danger, closed quote, doctrine is
23  one that the Supreme Court continues to recognize?
24           MR. WILL:  I object to the form of the question.
25      It calls for a legal conclusion.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          MR. CORN-REVERE:  Again, the witness talked about
2      his familiarity in his entire career with First Amendment
3      issues.  I'm just trying to find out what his basic
4      knowledge it.
5          MR. WILL:  He hasn't established any basis for
6      Supreme Court doctrine.  I believe it calls for a legal
7      conclusion.
8          MR. CORN-REVERE:  You've got your objection on the
9      record.  Does the witness understand the question?
10         THE WITNESS:  Would you repeat the question?
11         (The requested portion was read back by the Court
12     Reporter.)
13         THE WITNESS:  I don't claim to be an expert in
14     Constitutional law.  I'm familiar with, you know, the
15     various aspects of freedom of speech but perhaps not all
16     the legal details.
17         I do believe 100 percent in the idea that in a
18     college campus everybody should be able to express what they
19     believe, and it is no problem to me for anyone to do so.
20         MR. CORN-REVERE:  Okay.  Let's mark as Keppler
21     Deposition Exhibit Number Two, an article from the VSU
22     Spectator entitled:  The Unofficial Biography of Robert
23     Carlos Cortez Zaccari.
24         (The document was marked for identification as
25     Keppler Deposition Exhibit Number Two.)

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1              THE WITNESS:  (Reviewing document.)  This is going
 2       to be difficult for me to read.
 3    BY MR. CORN-REVERE:
 4       Q     I understand.  I have to squint.
 5       A     To tell you the truth, it's very difficult for me
 6    to read.  (Reviewing document.)
 7              Okay.  I've completed it.  I must be honest.  If I
 8    had my reading glasses, I'd be able to see it better.
 9       Q     I had to squint even with my reading glasses, but I
10    think some of my questions won't require a detailed
11    knowledge of everything in the text.
12              Let me just ask first:  Have you seen this article
13    before?
14       A     When you gave it to me, I read the first couple of
15    paragraphs and I did not recognize it.  As I got through it,
16    I remembered a little bit more about it.  I don't know if
17    I've actually read it before, but I've heard about it.
18       Q     Can you tell us what you remember about this
19    article?
20       A     Well, I think I just did.  I mean, I remember a
21    conversation about it.  I remember some people thought it
22    was funny; some people thought it perhaps was in bad taste.
23       Q     Who did you have a conversation with about the
24    article?
25       A     I don't recall.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Did you ever speak to Dr. Zaccari about it?

2    A    I don't think so.  If I did, it was probably in a

3    pretty casual situation.

4    Q    Do you remember if your conversation was with other

5    VSU personnel?

6    A    I don't know who else it could've been with, so I

7    guess it would have to have been.

8    Q    Do you recall whether or not there was a

9    disciplinary proceeding as a result of this article?

10   A    I don't believe so.  I think -- you have to

11   understand:  This is the kind of thing that I would have,

12   you know, dealt with for 20 some years; and actually I find

13   it kind of harmless and humorous.  So, I couldn't care less.

14   It goes with the student paper.

15   Q    Uh-huh.  And they have First Amendment rights, so

16   this is not a controversy.  Isn't that right?

17   A    It isn't to me.

18   Q    Okay.

19   A    I've been called a lot worse.

20   Q    Well, let's look at it a little bit more closely.

21   You see there are a coupe of photographs associated with the

22   article.  Rather badly Photoshop photographs, it appears.

23        Does that appear to be Dr. Zaccari's face in either

24   one of those photographs?

25   A    That's the intent, I'm sure.  Yes.

Page 20



1     Q     So, you recognize Dr. Zaccari here?

2     A     Uh-huh.

3     Q     And just to summarize -- and correct me if you have

4    a different understanding -- but this appears to be a parody

5    that pokes fun at President Zaccari.  Isn't that right?

6     A     Yes.

7     Q     Okay.  Let me read the last paragraph of the

8    article.  Again, I'm going to have the strain to do it.  The

9    text is rather bad.

10           It says, "Now it was time for students to start a

11   revolution and rise against the powers that celebrate the

12   corruption of their leader.  Students were ready to shoot

13   the man down, but they simply enticed (sic) his very own

14   beliefs and kicked him in the nuts."

15           MR. WILL:  I think it's enacted.

16   BY MR. CORN-REVERE:

17    Q     Enacted?  Let me start over, so I make sure this

18   quote is as accurate as I can make it.  Try again.

19           "Now it was time for students to start a revolution

20   and rise against the powers that celebrate the corruption of

21   their leader.  Students were ready to shoot the man down,

22   but they simply enacted his very own beliefs and kicked him

23   in nuts."

24           Does it appear I read that accurately?

25    A     As close as I can tell, yes.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Okay.  And you would describe this as a harmless

2    parody?

3    A    I'm not saying that it's in the greatest taste in

4    the world; but, yes, I don't think there was any intent

5    other than to tease, criticize and be sarcastic about the

6    role of the individual.

7    Q    And doing something like that is okay under VSU

8    policies, isn't it?

9    A    Absolutely.

10   Q    Okay.  And it's protected by the First Amendment?

11   A    Right.

12   Q    When did you first become aware of the issues that

13   led to the administrative withdrawal of Hayden Barnes?

14   A    Oh, I recall a meeting where the president

15   mentioned that he had a student that was in disagreement

16   with the idea of a parking deck; that he wanted to have a

17   one-on-one conversation with that student and that he was

18   looking forward to sort of having a compromise or a

19   positive, you know, let's shake our hands and agree to

20   disagree kind of thing.

21        Then I recall him telling me at that time that he

22   thought the meeting went very well.  Then I believe it was

23   Facebook or MySpace or something came out with a series of

24   statements about the president from the student that he

25   spoke with and that he was very disappointed because he

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    thought that they had had a positive meeting.

2           I think that's pretty much the gist of it; that he

3    was concerned that the student would refer to him, if I'm

4    correct, as the memorial deck or the Zaccari memorial deck

5    or something along those lines and felt it was a concern to

6    him for his personal safety.

7    Q    Do you remember when this conversation took place?

8    Or was this more than one conversation?

9    A    I think it might've been two conversations.  I

10   don't recall how they separate.  I guess the first one

11   would've been before he actually had the conversation with

12   the student, and the second one would've been after he had

13   the conversation with the student.

14          I can't imagine they were more than a few days

15   apart.  I know it was at the end of the school year.

16   Q    Okay.

17   A    April-ish.

18   Q    Now this conversation where Dr. Zaccari was looking

19   forward to the meeting with Mr. Barnes, do you know when

20   that might've occurred?

21   A    Yeah, in that same period of time.  I mean, the

22   only time that I recall having conversations about this

23   whole incident was in that end-of-school-year period.

24          So, I don't know if we're talking about three days

25   or six days or nine days, but it was a relatively

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    concentrated period towards the end of April.

2        Q    Now these were conversations that you had with

3    Dr. Zaccari.  Is that correct?

4        A    Well, there were other people along.  But, yes,

5    Dr. Zaccari.

6        Q    These conversations took place at meetings with

7    Dr. Zaccari?

8        A    I said I think I had one meeting.  I believe the

9    second one was either on the walk to a meeting or after

10   leaving a meeting where he just mentioned that he was having

11   this follow-up conversation.

12            And Dr. Zaccari sort of -- in my opinion,

13   Dr. Zaccari prided himself on having an open-door policy and

14   wanting to talk to students.  Rarely did I know when these

15   occurred and what they were about.

16            He had, I believe, a monthly, what he called

17   students-can-show-up day.  I believe he had a monthly -- I

18   don't know how you'd call it -- faculty-can-show-up day kind

19   of thing where you can just come in and talk to him.  Rarely

20   do I know what occurred, who came or what was talked about.

21       Q    After these conversations, do you recall what

22   happened with Mr. Barnes?

23       A    Do you mean directly after the conversation what

24   happened or what was involved?

25       Q    Just based on your recollection now sitting here,

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    what happened with respect to the withdrawal of Mr. Barnes

 2    after your conversations with Dr. Zaccari?

 3       A    I believe he was frightened.  I don't believe that

 4    it is my responsibility or my best judgment to determine

 5    whether he should've been frightened or if he really was

 6    frightened, but he was sincere in his appearance to be

 7    frightened.

 8            He told me that he was going to confer with the

 9    Board of Regents' attorney to see what appropriate

10    procedures might take place.

11            He had mentioned to me that he had received phone

12    calls at home in the middle of the night.  He had no idea

13    what happened because the people would hang up when he

14    dropped the phone or when he hung up the phone.

15            And it was clear to me that he was very concerned

16    about the personal safety of his self and family.

17            And I believe in my opinion that he was also

18    concerned about the personal safety of his campus.  I think

19    that may have been due to the proximity of the Virginia Tech

20    situation that occurred roughly, I guess, in a matter of

21    days before these conversations.

22       Q    So, let me see if I understand your answer.

23            You believe that Dr. Zaccari's expression of

24    concern was genuine.  Is that right?

25       A    Yes, I do.  To him.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1     Q     Right.  But you formed no opinion on your own
 2   whether or not his concern was well-founded.  Is that a
 3   correct statement of what you just testified?
 4     A     I've been dealing with students for 20-some years.
 5   My understanding of students who may be eccentric or who may
 6   have difference in opinions or may even be what you might
 7   perceive as activists, it's part of my training.  I'm used
 8   to it.  It doesn't bother me.  I know how to deal with it.
 9         I'm not president of the university, and I'm not in
10   that situation; so, how I would respond or how he would
11   respond, it's unfair for me to say.
12     Q     Well, actually, I think it's quite fair for you to
13   say.  How would you respond to the situation?
14         MR. WILL:  I believe that's an improper question.
15     That's a hypothetical question to a fact witness.  I
16     object to the form of the question.
17   BY MR. CORN-REVERE:
18     Q     Okay.  If you understand the question, you can
19   answer it.
20     A     I think what I said is clear.  I have for many
21   years dealt with students who had various opinions that were
22   controversial, different, unusual, whatever.
23         And as part of my responsibility and training, my
24   role is non-judgmental.  I don't care.  I don't care what
25   you look like.  I don't care what you say.  I don't care how
```

Page 26

1   you respond.  It's just college.

2      Q     So, it didn't raise a concern in your mind?

3      A     It raised a concern in my mind that he was

4   genuinely scared and frightened and, I think, sincerely

5   worried.  Yeah, that raised a concern in my mind.

6      Q     But you didn't look into it further on your own to

7   determine whether or not it was well-founded.  Is that

8   right?

9      A     Well, I had the information that everybody else

10  had.  I saw the Facebook page.  I knew about the -- what he

11  perceived as the compromise meeting that took place that he

12  thought went well; and then, I guess, after the comments

13  came out in the MySpace or Facebook page, he was

14  disappointed because they were totally different than what

15  he had said he thought came out of the meeting.

16         You know, is that -- again, I can't put myself in

17  the role of a president when there's 12,000 students that

18  I'm responsible for and I make the final judgment.  As a

19  student affairs professional, I would have a different

20  opinion.

21     Q     You said you saw the same materials everyone else

22  did, right?

23     A     I don't know what materials everybody else saw.

24     Q     Okay.  I understand.  Other people may have seen

25  different things.  But you did testify that you saw

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    materials like the Facebook page.

2        A    I did see the Facebook page, yes.

3        Q    And you formed no impression on your own of whether

4    or not that constituted a threat?

5        A    I understand from reading that material when you

6    look at it from the perspective of the president and see the

7    word memorial and see the kinds of things that were written

8    after you had what you thought was a positive meeting where

9    you would think that there's not consistency here and this

10   is not what I took out of that previous meeting, I can

11   understand why you would be disappointed and upset.

12            I don't know what happened in that conversation.

13   I'm not privy to what happened in that conversation.

14            I can clearly tell you that I don't believe that

15   Dr. Zaccari was anything but genuine over his concern.

16       Q    Right.  But that wasn't my question.  My question

17   was:  In looking at the materials yourself, did you perceive

18   a threat?

19       A    I did not.  Physical threat, if that's what your

20   question was.  Did I perceive a physical threat?  I did not.

21       Q    I believe you testified at the beginning of the

22   series of questions that you didn't perceive it as a part of

23   your responsibility to determine whether or not there was a

24   threat.  Is that a fair statement of what you said?

25            MR. WILL:  I object to the form of the question

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      because it is not.

2    BY MR. CORN-REVERE:

3      Q    Well, the witness can tell me if I am not correctly

4    stating --

5      A    I hope that is not what I said.  My responsibility

6    is to be an advocate and supporter and provide services and

7    programs for students at the institution in those 14 units

8    that I believe I dictated to you previously.

9           Certainly, from time to time over the years, I am

10   asked advice from presidents to other vice presidents to

11   deans about, you know, student situations and things like

12   that.

13          And, so, I certainly think it is my responsibility

14   to be aware of what's a key issue and a concern on campus,

15   and I'm not the least bit afraid to share that

16   responsibility.

17     Q    Okay.  But as the university official responsible

18   ultimately for student discipline matters, isn't it your

19   responsibility to determine whether or not a situation

20   represents a threat?

21     A    I can give an opinion.  I am not an expert in being

22   able to judge a person's danger.

23          But I think it's certainly appropriate for me to be

24   asked opinions and to give my point of view as it might be

25   in the case of Dean Mast and Mr. Lee who have gone through

Page 29

1   many of these kinds of situations before.

2          It's a different situation, I believe, in my

3   opinion when the president is the person bringing forth the

4   concern.

5   Q    Let me try and be more clear about the way I phrase

6   the questions.

7          Is it your responsibility as head of the

8   administrative official in charge of student discipline to

9   offer an opinion on whether or not a situation creates a

10  threat on campus?

11  A    I would say that it is my responsibility to

12  respond, to be aware, to know what the situations are and to

13  know what the processes are.

14  Q    Were you asked your opinion about whether or not

15  this Facebook collage represented a threat?

16  A    I honestly don't remember.  I do believe that I

17  said that I thought that it wasn't.  But that's to me.  I

18  believe that if it was me, I wouldn't have perceived it as a

19  threat to me.

20  Q    I understand.  Who did you say -- strike that.

21         Who did you tell your opinion that you believe the

22  Facebook collage didn't represent a threat?

23  A    I don't know who was present.  Whoever would've

24  been at that meeting.  I probably may or may not have heard

25  what was said.  I only recall being at one "planned" meeting

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    about this discussion.

2        Q    Were there any unplanned meetings?

3        A    The only other thing I can tell you about is the

4    conversation that I've already shared where we talked about

5    the -- I had planned to have a one-on-one discussion with

6    the student who what opposed to the parking deck.  I think

7    it's clear -- well --

8        Q    Did you ever meet with Dean Mast and Mr. Lee to

9    discuss the Hayden Barnes situation at a meeting where

10   President Zaccari was not present?

11       A    No.

12       Q    You don't recall a meeting around April 24th or

13   25th to discuss this situation?

14       A    I don't recall a planned meeting.  You know, there

15   may have been some chatter in the hallway kind of thing.

16   But, no, I don't recall any meeting.

17            I think all of us, you know, were concerned about

18   the situation, but we really didn't know a great deal about

19   it.

20            I mean, to this day on July -- what is it -- 28th,

21   29th, I have never met the student in question.  I don't

22   know what the student in question looks like.  I've never

23   talked to the student in question.  I've never conversed

24   with the student in question in an email.

25            I have very little involvement whatsoever in any of



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    this.  I guess the legal term would be what other people

2    said.  Hearsay.  What other people said.

3        Q    Okay.  Isn't why the university generally has

4    hearings in disciplinary matters so you can see the student

5    involved?

6              MR. WILL:  Object to the form of the question.

7              THE WITNESS:  I've never attended a university

8        hearing in 24 years of my career.

9    BY MR. CORN-REVERE:

10       Q    That's not my question.  When you have disciplinary

11   hearings for students, isn't the reason for a hearing is to

12   give the opportunity to a student to appear and speak?

13       A    Absolutely.

14       Q    All right.  So, a hearing would enable those in

15   charge of making disciplinary decisions to assess whether or

16   not that student was, in fact, dangerous, wouldn't it?

17             MR. WILL:  Object to the form of the question.

18   BY MR. CORN-REVERE:

19       Q    You can answer if you understand the question.

20       A    You'll have to repeat the question because I'm not

21   sure I do.

22             MR. CORN-REVERE:  Could you read it back.

23             (The requested portion was read back by the Court

24       Reporter.)

25             MR. WILL:  I object to the question.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1         MR. CORN-REVERE:  You've already objected.  It's on

2     the record.

3         MR. WILL:  Let's go off the record for just a

4     moment.  Would you step out of the room for a minute?

5         THE WITNESS:  Yes.

6         (Discussion off the record.)

7         MR. WILL:  I further object because you're calling

8     for an opinion about dangerousness, which he said he's

9     not capable of giving.  Thank you.

10        MR. CORN-REVERE:  Before we bring the witness back

11    in, let me just say --

12        MR. WILL:  Do you still want this on the record?

13        MR. CORN-REVERE:  Yes, it is on the record.  This

14    whole case is about people assessing dangerousness.

15        You know, for you to suggest that that's an area we

16    can't get into is highly improper.  It has no basis in

17    objection, and I will be inquiring into witnesses' opinions

18    on whether or not they think Mr. Barnes was dangerous.

19        MR. WILL:  The testimony he's already given said he

20    does not have the capability of determining

21    dangerousness.  I can have it read back if --

22        MR. CORN-REVERE:  So, do you object to repetitive

23    statements on the record?

24        MR. WILL:  What I object to is you trying to get

25    him to give an opinion about dangerousness when he's

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          already said he's not capable of doing this.

2                    MR. CORN-REVERE:  Okay.  Enough of this.

3                    MR. WILL:  And it does call for a conclusion beyond

4          the expertise of a lay witness.  That's why I object.

5                    Now the record -- let the record reflect that

6          during this colloquy the witnesses have not been in the

7          room, only the lawyers.

8                    MR. CORN-REVERE:  Witness.

9                    MR. WILL:  Witness.

10                   MR. LAVALLEE:  Y'all done?

11                   (Witness returns.)

12                   MR. WILL:  I believe my objection is on the record.

13         You may go ahead and answer the question, or have the

14         Court Reporter read it back.

15                   (The requested portion was read back by the Court

16         Reporter.)

17                   THE WITNESS:  I'm not sure that the hearing

18         process, by being physically in a room, would have any

19         bearing on that.

20                   If the question is why do we have hearings, the

21         hearing is designed to give the accused, a university

22         student, a chance to express his or her point of view and

23         have people support his or her point of view and make sure

24         that all the facts are aware so that the appropriate process

25         of determining the results is taken care of.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          In our situation, like many other situations, there

2     is a tiered process.  I don't know if you want me to go into

3     the process.

4          A student has the right to a hearing when they want

5     to say that they're innocent with a Student Judicial Board.

6          If the question was would it be normal procedure

7     for an administrator, like myself, to go in and watch those

8     proceedings, the answer would be no.  I do not go in and

9     watch the proceedings of a Student Judicial Board.

10          But I believe that the process of the hearing is

11     designed to have a student share their side of the situation

12     before the Student Judicial Board.

13          The student may choose to say that they are guilty

14     and that they do not want a hearing, in which case they sit

15     down with Mr. Lee and discuss what might be an appropriate

16     sanction.

17          If they choose to not like that sanction, then they

18     have a chance to appeal that sanction.

19     BY MR. CORN-REVERE:

20     Q     Okay.  Do you know if Mr. Barnes was offered the

21     opportunity for a hearing in this case?

22     A     My understanding is -- and I think you asked me

23     this earlier -- is that it was the decision that was brought

24     up from conversations with Dr. Zaccari and the Board of

25     Regents' attorney that an administrative withdrawal was the

Page 35

1     appropriate process in this situation.

2            I never saw the letter that indicated what was

3     stated in the description of what the student needed to do

4     or should do in order to be -- to complete whatever that --

5     I don't know what the statement said.

6     Q     Okay.  Do you know who made the decision that an

7     administrative withdrawal was the appropriate process in

8     this case?

9     A     Yes.

10    Q     And who is that?

11    A     The President in consultation with the Board of

12    Regents' attorney.

13    Q     Which Board of Regents' attorney was that?

14    A     I believe her name is Ms. Neely.

15           MR. CORN-REVERE:  Let's mark for identification

16    Keppler Exhibit Number Three.

17           (The document was marked for identification as

18    Plaintiff's Exhibit Number Three.)

19           THE WITNESS:  (Reviewing document.)

20    BY MR. CORN-REVERE:

21    Q     And if the witness will take a look at that,

22    please.

23    A     You want me to read this?

24    Q     You don't have to read every word.  You can look

25    through it.  If there are particular parts that I want to

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    draw your attention to, then I'll have you read it.

2    Generally, to look at it and see if you can identify it.

3    A     Okay.  (Reviewing document.)  Okay.

4    Q     Now I'll be asking you a series of questions about

5    this document, and I want to be clear at the outset.

6         In the questions I am not asking you for any advice

7    that your attorneys may have given you about this document,

8    and that includes Ms. Currea (phonetic) when she represented

9    you and now Mr. Will.

10        But I do have questions about the preparation of

11   this document and some of the answers in there.  Is that

12   clear?

13   A     Okay.

14   Q     Okay.  Can you identify this document?

15   A     Yes.

16   Q     Have you seen it before?

17   A     Yes.

18   Q     Okay.  Did you provide or write the answers

19   contained in these answers to interrogatories?

20   A     I provided the verbal responses to the questions.

21   I assume the attorneys took my verbal responses and put it

22   on paper.

23   Q     Okay.  How did you respond?  Was it by email?  Was

24   it in a phone call?  In what form were your verbal

25   responses?

**WHEELER
REPORTING**
Court Reporting • Video • Litigation Support
*404.351.4577*

1    A    Similar -- in a casual meeting like this.  There

2  wasn't any court reporter or any attorneys around.  Just

3  chatted.

4    Q    I see.  And that was with Mr. Will?

5    A    I believe it was with Mr. Will and his assistant.

6    Q    Okay.  Ms. Hance?

7    A    Is that her name?

8         MR. WILL:  (Nods head.)

9         THE WITNESS:  Yes.  Holly.

10  BY MR. CORN-REVERE:

11   Q    Yes.  So, just so I understand the process, you

12  would read the questions in the interrogatories, the two of

13  you would discuss the answers and she would take notes?

14   A    I don't know if she taped it or took notes.  I'm

15  not familiar with how it went.  I answered the questions.

16   Q    Okay.  So, it was just a face-to-face meeting and

17  you provided the answers.

18   A    Right.

19   Q    And then they were recorded in this response to

20  interrogatories.

21   A    I guess so, yes.

22   Q    Okay.  Were you offered an opportunity to review

23  this document and sign it before it was sent to opposing

24  counsel?

25   A    I recall reviewing the document, yes.  I don't

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    remember if I signed it or not.  I'm sure if I was asked to,

2    I did.

3        Q     Okay.  If you could look at the last couple of

4    pages, do you see your signature anywhere here?

5        A     (Reviewing document.)  Where am I to be looking?

6        Q     At the end of the document.

7        A     I don't see a signature.

8        Q     Now are you aware that under the Federal Rules of

9    Civil Procedure interrogatory answers are required to be

10   given by the person to whom they are directed to be complete

11   and under oath?  Has anyone explained that to you?

12       A     I'm not sure I understand the question.

13       Q     Okay.  Do you understand that when you give

14   responses to an interrogatory like this that the rules under

15   which we operate require that the answers be complete and

16   that they are provided under oath?

17       A     Well, I knew what I was saying was to be the truth,

18   if that's what you're getting at.

19       Q     Okay.  That's what I'm asking.  But you weren't

20   asked to then look at this and sign?

21       A     I recall looking at this.  I don't recall how much

22   effort I put into looking at it or whether I signed it or

23   not.  I do know that when I got done reading it, I felt that

24   it was representative of what I did.

25       Q     Okay.  Let's look at page four and the top of page

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    five.

 2    A      (Reviewing document.)

 3    Q      Interrogatory Number one, I'll just go ahead and

 4    read this.  It says, "Identify each person -- "

 5            MR. LAVALLEE:  Bob, where are you?

 6            MR. CORN-REVERE:  Page four, top of five, starting

 7    with Interrogatory Number One.

 8    BY MR. CORN-REVERE:

 9    Q      It says, "Identify each person having discoverable

10    information that you believe supports the position you have

11    taken or intend to take in this action and disclose the

12    substance of the information possessed by that person."

13            Okay.  And following there's an answer.

14            Does this incorporate what you told Ms. Hance in

15    your meeting?

16    A      Well, obviously, those are not my exact words

17    because I'm not familiar with some of those exact words.

18    But, obviously, I was trying to give the general response to

19    the question.

20    Q      Okay.

21    A      I'm not sure you're aware, and perhaps it is or

22    isn't appropriate to realize, I have very little knowledge

23    of what the heck is going on in this particular situation.

24            I mean, I did not have a whole lot of involvement,

25    and most of what I'm telling you is what I've heard as
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1     hearsay from other people.
2             I was present in one, possibly two meetings.
3        Q    Uh-huh.
4        A    So, my recollection is not particularly strong in a
5     lot of these details.
6        Q    Okay.  So, in terms of the parties that may have
7     information, it's just the other parties that are named in
8     the lawsuit and anyone that may have been at those meetings?
9        A    Right.
10       Q    Do you remember who attended those meetings?
11       A    I can probably make some statements of who I knew
12    was there.  There were probably some people that I think
13    might've been there, and there would probably be some people
14    I might even have wrong.
15            I think Russ Mast was there.  I know the president
16    was there.  I'm a little unclear as to who was there from
17    the standpoint of other people, whether Vic Morgan was
18    there; Leah was there.  I don't remember if Kimberly Tanner
19    was there or if Laverne Gaskins was there.
20       Q    Okay.
21       A    The whole thing probably lasted about 15 minutes.
22       Q    Do you know what meeting -- strike that.
23            Do you know when that meeting took place?
24       A    Sometime towards the end of the semester.  I
25    suppose in late April.  It wasn't far from finals.
```

Page 41

1    Q    Okay.  It was just one meeting?

2    A    Like I said, I know that there were two meetings,

3    and I'm unclear as to whether I attended both or not.  Maybe

4    I did.  I don't remember.

5    Q    Okay.  Do you know who Linda Daniels is?

6    A    I do.

7    Q    Who is she?

8    A    She is the Vice Chancellor for Facilities for the

9    University System of Georgia.  I believe that is the correct

10   title.

11   Q    Do you have any knowledge of whether or not

12   Ms. Daniels ever expressed an opinion about Mr. Barnes?

13   A    Do I have any knowledge as to whether --

14   Q    If you know.

15   A    No.

16   Q    Do you know who Kimberly Tanner is?

17   A    Yes, I do.

18   Q    Who is she?

19   A    She's a Director of the Access Office for Students

20   with Disabilities.

21   Q    Did she attend these meetings?

22   A    She may have.  I don't recall.

23   Q    Okay.  Do you remember if anyone took notes at

24   these meetings?

25   A    I didn't.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1     Q      That's not my question.
 2     A      I don't know.  There's a good possibility that
 3   everybody else did.  I didn't.
 4     Q      Okay.
 5     A      This was not a formal meeting with an agenda.  This
 6   was a discussion.
 7     Q      How did the meeting get called?  How did you come
 8   to be aware of the meeting?
 9     A      Well, I guess I got aware of it like I do with all
10   my meetings.  It's on my calendar and I go.  I don't know if
11   somebody called my secretary or what, but I went.
12     Q      Okay.  Do you know how much notice you got before
13   the meeting took place?
14     A      Well, it was a pretty short period of time during
15   this whole process.  So, I can't imagine it would've been
16   more than a couple of three, four days.  I don't know.
17   That's details that I don't remember.
18     Q      Okay.  Do you know a former student named Jonathan
19   Stroble?
20     A      Yes, I do.
21     Q      Who is Mr. Stroble?
22     A      A former student leader.  A former student body
23   president.  Currently a counselor for our Admissions Office.
24     Q      Okay.  Do you know if he has any knowledge with
25   respect to this case?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A      Well, he was one of the people, as I mentioned
 2   earlier, in this discussion that talked about the front lawn
 3   situation with the president and the young lady whose name
 4   is in the article that you gave me.
 5            I know he is aware of the front lawn situation.  If
 6   he was Student Government President at the time, he
 7   certainly read The Spectator and certainly was aware of what
 8   was going on.
 9            So, I'm making an assumption -- well, no, I'm not
10   going to make an assumption because that isn't fair.  I
11   don't know if he was aware.  I assume he was aware.
12      Q      Aware of what?
13      A      You know, the Facebook page or, you know, the whole
14   parking deck situation, whatever pertained to this
15   situation.
16            I don't believe Mr. Stroble knew details about the
17   particular student unless the student and him had
18   conversation.
19      Q      But you, yourself, have no direct knowledge of what
20   Mr. Stroble may have known?
21      A      Huh-uh.
22            MR. WILL:  That's a no?
23            THE WITNESS:  No.  I'm sorry.
24   BY MR. CORN-REVERE:
25      Q      Was it your impression that the information about
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   Mr. Barnes' Facebook page was common knowledge among the

2   students?

3       A    I don't know if it was common knowledge.  I do know

4   that students are very astute with how they use Facebook on

5   anything.  So, you know, it can shoot through a campus very

6   quickly.

7       Q    Do you know a former student named Jimmy Fields?

8       A    Yes, I do.

9       Q    Who is Mr. Fields?

10      A    He's a former student.  He was a student government

11  senator earlier in my tenure.  He, basically, has had a

12  variety of part-time jobs on campus, been involved in some

13  student organizations.

14           Never been an officer but been a student of which

15  I've talked to before.

16      Q    Do you know if he had any involvement in the

17  administrative withdrawal of Mr. Barnes?

18      A    No, I don't.

19      Q    You never spoke to Mr. Fields about the

20  administrative withdrawal?

21      A    You mean like the details of the administrative

22  withdrawal?

23      Q    Anything.

24      A    I don't recall.  I don't know the details of the

25  administrative withdrawal, so --

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Okay. Let's look at page five of Exhibit Number
2    Three.
3         Interrogatory Number Two asks, "If you intend to
4    rely upon any documents or other tangible things to support
5    a position you have taken or intend to take in the action."
6         And just to skip ahead, the answer is, "At the
7    present time I don't know which documents I intend to rely
8    on to support my positions."
9         This, I believe, was submitted in June. Has your
10   answer changed since it was provided in this answer to
11   interrogatories?
12   A    Let me read it here. If the question is: Have I
13   looked at documents and plan to use documents to support my
14   positions, no, I do not and have not.
15   Q    Okay. Let's look at page six, Interrogatory Number
16   Three, which asks, "Specifically identify and describe all
17   communications between you and any person concerning any
18   matter alleged in the complaint."
19        And the substantive part of the response says, "The
20   only communications are with my attorneys and the meetings
21   where I was summoned into Dr. Zaccari's office."
22        Is that a complete response?
23   A    As I said to you before, there may have been times
24   where I said what's happening; what's going on with other
25   people.

Page 46

1    You've got my data from my computer.  There were no
2    communications for the record that you haven't already
3    received that indicate anything about this case.  I know
4    very little about this case, sir.
5    Q    Okay.  Well, I'm just asking because earlier you
6    testified that you had a conversation with Dr. Zaccari
7    before his initial meeting with Mr. Barnes.
8    So, that would've been some time before any
9    meetings where you were summoned to Dr. Zaccari's office.
10   A    The name of the student wasn't mentioned.  I didn't
11   know who this student was.  He said, "I'm going to talk to
12   this student this afternoon."
13   I believe I told you he sees students monthly on a
14   walk-in basis.  That would not be an unusual comment for him
15   to tell me.  He may be talking to a student every month
16   about something.
17   Sometimes he shared with me that he had a
18   conversation about a student that was positive.  Sometimes
19   he shared with me that he had a conversation about a student
20   who had a concern.  That would not be a red flag to me.
21   That was common practice.
22   Q    Okay.  At some point later after you had meetings
23   with Dr. Zaccari, you understood that the student that he
24   was referring to was Hayden Barnes.  Isn't that right?
25   A    Related to that meeting?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Yes.

2    A    Yes.  That's correct.

3    Q    Okay.  So, that would've been included or should've

4    been included in the answer to this interrogatory, right?

5    A    That there was a sentence or two -- no, I don't

6    believe so, because I didn't know at that time that that was

7    Hayden Barnes.

8    Q    But at the time you answered this interrogatory,

9    you did know it was Hayden Barnes.

10   A    Oh, I see what you're saying.  I did know that he

11   had a one-on-one meeting, yes.  It was not any intention to

12   not mention that I didn't realize it was anything of any

13   consequence.

14   Q    I'm not suggesting otherwise.  I'm just trying to

15   make sure that the answer is complete.

16        Are there any other conversations that may have

17   escaped your attention at the time that would provide a more

18   complete answer to that interrogatory?

19   A    No.  As I've said before, in my role with 12,000

20   students, I rarely have situations where I'm specifically

21   dealing one-on-one with a student.

22        I hear from people about students often without

23   names being mentioned.  So, I had very little information

24   about this situation.

25   Q    And just to make sure that I understood your

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   earlier testimony, I believe you said you never had a

2   meeting with Dr. Lee -- Mr. Lee and Dr. Mast and perhaps

3   others out of the presence of Dr. Zaccari to discuss the

4   Hayden Barnes situation.

5       A    Are you asking me if I had a meeting with Dean Mast

6   and Richard Lee as a three-some discussing the Barnes

7   situation?

8       Q    There may have been others present, too.

9       A    I don't recall a meeting that I ever had without

10  Dr. Zaccari present where we sat down and discussed this in

11  an organized fashion.

12          There may have been times when I was walking around

13  campus or I was chatting with students -- you have to

14  understand:  I have an hourly meeting with Dean Mast every

15  single week of the year for 52 weeks.

16          So, would it be possible that this subject got

17  brought up in one of those 52-plus hours of conversation?

18  It might've got brought up, but we never sat down and

19  analyzed this case or talked about it.

20          I think the only things we've ever said is how

21  disappointed we were that it got to the point that it did.

22      Q    Why were you disappointed?

23      A    Well, that's kind of obvious.  I don't think

24  anybody wants to see a situation where there's a lawsuit.  I

25  mean, it's an unfortunate and disappointing circumstance.  I

**WHEELER
REPORTING**
*Court Reporting • Video • Litigation Support*
*404.351.4577*

```
 1    don't know anybody that ever jumped up and down and was glad
 2    about one.
 3        Q    I don't know of anyone who jumped up and down and
 4    was glad about an expulsion, either.  I mean, you could've
 5    been referring to that.
 6             MR. WILL:  I object to the form of the question to
 7        the extent that you're referring to any expulsion was
 8        right to the plaintiff.
 9             MR. CORN-REVERE:  Rule 11 clearly says that you are
10        not supposed to suggest answers in your objections.
11             MR. WILL:  I am not -- once again, would you excuse
12        us, please?  It's about -- we've been going an hour and
13        15 minutes.  Can we take a break?
14             MR. CORN-REVERE:  Yes.
15             (A recess was taken from 10:13 a.m. to 10:26 a.m.)
16             MR. CORN-REVERE:  Let's go back on the record.  I
17        actually don't recall what the last question was.  Could
18        you read back the last question and answer?
19             (The requested portion was read back by the Court
20        Reporter.)
21    BY MR. CORN-REVERE:
22        Q    Would you say that the situation was also
23    disappointing because it led to the administrative
24    withdrawal of Mr. Barnes?
25        A    Yes, sir, I would.
```

**WHEELER
REPORTING**
Court Reporting • Video • Litigation Support
404.351.4577

1     Q      Okay.  And what would you say was disappointing

2   about that?

3     A      I think that anytime you are a young person in

4   college, your goal was to finish and to graduate and to

5   succeed.

6            Obviously, it would be disappointing for me to see

7   any of our students that weren't able to achieve those

8   goals.

9            My purpose is to help students be successful, not

10  to have things like this happen to them.

11           Although, I must admit from your previous question,

12  I didn't realize or I didn't know that there was an

13  expulsion.

14           I thought administrative withdrawal offered

15  alteratives to -- like I said, I never read the letter.  But

16  I was under the impression that there were circumstances

17  where he could've returned.

18    Q      Okay.  Well, let's talk about that for a minute.

19  Because it is a subject of an ongoing dispute between

20  Mr. Will and myself.

21           I use the term expulsion; he uses the term

22  administrative withdrawal, and there's a question in the

23  case of whether or not there's a real difference between the

24  two.

25           In helping us clear up that dispute, can you

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    identify based on your experience anywhere in the policies

2    of VSU that refer to administrative withdrawals?

3        A      You mean in our handbook?

4        Q      Yes.

5        A      Yes.  There's an administrative withdrawal.

6        Q      What is that?

7        A      There's also a medical or a hardship withdrawal.

8        Q      Uh-huh.  And can you describe the administrative

9    withdrawal and the process for that?

10       A      I'd have to look at the book.  I would hate to

11   describe it and be wrong.

12       Q      Okay.  I'm sorry.  It's unfair to ask in the

13   abstract, but we will get to the student handbook.

14       A      I can tell you that I often will -- and actually

15   Dean Mast's office does this, so I wouldn't do it

16   personally.

17            But we often will withdraw students at their choice

18   because of medical or personal reasons.  A withdrawal will

19   prevent them from getting "F's."  It will allow them to get

20   a "W" or even in some cases a "W.F.," which is better for

21   their academic record.

22            So, it depends if you're synonymously referring to

23   an administrative withdrawal and a medical withdrawal.  But

24   there are times when withdrawing a student is in their best

25   interest.

Page 52



1      Q      Well, let's follow that up a little bit.  If a

2   student finds it impossible to continue with a class, a

3   student may request an administrative withdrawal.  Is that

4   what happens?

5      A      Well, that -- again, I don't want to try to use

6   semantics, but that would be referred to as hardship

7   withdrawal.  You can argue that that's relatively the same

8   thing.  But they have to provide documentation if there's

9   some reason.

10          But, yes, there are times when a student would

11   request such a thing.

12      Q      And are there procedures for when an administrative

13   withdrawal is involuntary on the student's part?

14      A      I believe -- and, again, this is hearsay on my

15   part, but I believe that's what the president was talking to

16   Ms. Neely about.  I have never had an administrative

17   withdrawal personally in my career.

18      Q      Okay.  But, I guess, just to return to the question

19   that I asked:  Do you know if the student policies as they

20   currently exist have a procedure for an involuntarily

21   administrative withdrawal?

22      A      There is a discussion in the book about an

23   involuntarily administrative withdrawal that I'm aware of.

24      Q      And do you know what the procedures are for that?

25      A      I told you that I'd probably have to look at the

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   book.

2      Q   That's fair.  I think we got into this line of

3   questioning as I was in the midst of finishing up another

4   one.  So, let me see if I can pick up that thread again.

5          Forgive me if I'm repeating myself, but do you

6   recall a meeting on or about April 24th or 25th with other

7   administrators that may have included Dean Mast and Mr. Lee

8   to discuss Mr. Barnes' administrative withdrawal?

9      A   I don't recall a meeting when Mr. Lee was present.

10   It may be a bad memory on my part.  I do recall a meeting

11   that I described to you before.  If Mr. Lee was there, I

12   just don't remember it.  But it's possible he was.

13      Q   If Mr. Lee testified to a meeting in which you

14   discussed the administrative --

15      A   Then I would believe him.

16      Q   Excuse me?

17      A   I would believe him.

18      Q   Okay.  And you would have no basis for disputing

19   that testimony?

20      A   Huh-uh.

21      MR. WILL:  No?

22      THE WITNESS:  No.

23      MR. CORN-REVERE:  Let's read that back.  I just

24   want to make sure that the record is clear on that.

25      (The requested portion was read back by the Court

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Reporter.)

2          THE WITNESS:  I also believe that it would make

3      sense that Mr. Lee would recollect that before me because

4      it would've made a large impression on him, and it's his

5      specific duty, of which I have many; and I just may not

6      have the same recollection as him.  If he said that's the

7      case, that's probably the case.

8  BY MR. CORN-REVERE:

9      Q     Just as the chain of command, Mr. Lee would be the

10     official with more direct responsibility for student issues

11     like that?

12     A     He is our Assistant Dean for Student Conduct.  He

13     is the administrator that is responsible for carrying out

14     all disciplinary action.

15     Q     Okay.  So, if someone brought a complaint

16     suggesting that a student were somehow erratic or dangerous,

17     it would be Mr. Lee's responsibility to deal with that

18     situation?

19     A     Yes.  Mr. Lee and then the appeal or anything

20     related to that would go to Dean Mast.

21     Q     Okay.  And, again, I apologize if I'm asking the

22     question again.  Did you ever have a conversation with Kim

23     Tanner about Hayden Barnes?

24     A     That's an interesting question.  I could've had a

25     conversation with Kim Tanner about Hayden Barnes that I

Page 55

1    didn't even know that I had; because usually when I talk to

2    Kim Tanner, she refers to "I have a student."  She usually

3    doesn't give me the name.

4        Q    Okay.  But you have no specific recollection as we

5    sit here today --

6        A    She was at that meeting that we discussed

7    previously.

8        Q    Okay.

9        A    At least I get the impression that she was at that

10   meeting.

11       Q    And, again, I hate to keep harping on this, but let

12   me finish the question even if you know what I'm going to

13   ask --

14       A    Yes.

15       Q    -- and then we'll have a clean back and forth on

16   the record.

17            So, to repeat, you don't recall having a specific

18   conversation with Kim Tanner about the administrative

19   withdrawal of Hayden Barnes?

20       A    We probably talked as we walked out of that

21   meeting.  But did we sit down at a table and say, "Let's

22   discuss the Barnes case"?  No.

23       Q    When you say "that meeting," is that the meeting of

24   May 3rd, 2007?

25       A    I don't know when the meetings were.  I told you

Page 56

1    they were all at the end of April period before finals.

2        Q    So, it would've been end of April 2007 or early May

3    2007?  Sometime in that time period?

4        A    Yes.  I'm sorry.

5        Q    It's an unnatural way to communicate; but, sadly,

6    that's what we have to do.

7        A    That's probably the appropriate way to communicate.

8        Q    Let's look back at Exhibit Number Three at pages

9    six and seven.

10       A    (Reviewing document.)

11       Q    And let me direct your attention to Interrogatories

12   Number Four, Five and Six.

13       A    (Reviewing document.)

14       Q    Okay.  Looking at page six, starting with

15   Interrogatory Number Four, where it asks to identify and

16   describe communications between you and President Zaccari

17   regarding the plaintiff, your response is, "I did not have

18   any communications with Dr. Zaccari concerning the

19   plaintiff."

20            Now is that statement accurate?

21       A    Outside the meetings, you mean?

22       Q    Any communications.

23       A    The only communications that I had with Dr. Zaccari

24   were the conversations that we've already talked about:

25   Those meetings.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          Dr. Zaccari never, one time in my entire life ever

2     called me on the phone and said, "I'd like to talk about

3     Hayden Barnes."

4          He never one time in his life sent me an email

5     about Hayden Barnes.

6          He never stopped me at my house.  Called me.  We've

7     never had a conversation about Hayden Barnes outside the

8     ones that I've shared with you.

9          Interestingly, since the time that Dr. Zaccari has

10    left this institution and all that has gone on throughout

11    all of this stuff, I have not said one word to him at one

12    time about this case.

13    Q     Okay.  But in addition to the two meetings that you

14    described in this response, there was the conversation where

15    he told you he was --

16    A     That little --

17    Q     Please.  I'm sorry.  I don't mean to interrupt.

18    But, please, let me finish the question.

19    A     I'm sorry.

20    Q     In addition to those meetings, there was a

21    conversation you had where he was talking about an upcoming

22    meeting with Mr. Barnes.  Is that right?

23    A     I don't believe he even used the name of the

24    student in the meeting.  He said he was going to have a

25    meeting about a student who was concerned about the parking

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    situation.

2            So, I guess I'm making the assumption that that was

3    the same student, because there was a follow-up that I told

4    you earlier that he thought that meeting was positive.

5        Q    Uh-huh.  Was that follow-up conversation at one of

6    the two meetings that you mentioned --

7        A    Correct.

8        Q    -- in this answer?  But at the time you provided

9    this answer, you understood the student that he was

10   referring to was Hayden Barnes.  Is that right?

11       A    At the time I presented this, yes.

12       Q    Okay.  And then the next interrogatory, Number

13   Five.

14       A    (Reviewing document.)

15       Q    So, is it fair to assume that your answer is the

16   same:  That your communications with Dr. Zaccari focused on

17   those two meetings in which the administrative withdrawal of

18   Hayden Barnes was discussed?

19       A    Yes.

20       Q    Okay.

21       A    I don't even think Dr. Zaccari was interested in

22   having my opinion shared.  I think he deliberately felt like

23   I shouldn't be involved.

24       Q    Can you explain that answer?

25       A    No.  I don't know why.  I just think he -- and

Page 59

```
 1    you're going to have a conversation later today.  He had a
 2    meeting once with Russ Mast.  I might've been out of town.
 3    I might've been unavailable.  I think he got the information
 4    from Russ, and I was sort of out of the loop.
 5    Q      How do you know about that meeting?
 6    A      How do I know about it?
 7    Q      Yeah.
 8    A      Because he told me.
 9    Q      He --
10    A      Russ.
11    Q      Russ Mast told you about a meeting he had with
12    Dr. Zaccari?
13    A      Uh-huh.
14    Q      Do you know when that meeting took place?
15    A      I have no idea.  I mean, I do know.  In that period
16    of time somewhere, but I have no idea.
17    Q      So, in late April 2007 or early May 2007,
18    Dr. Zaccari met with Russ Mast to talk about Hayden Barnes?
19    A      Yes.
20    Q      What did Dean Mast tell you about that meeting?
21    A      Very little.
22    Q      Do you recall any of the substance of that
23    conversation?
24    A      No.  I think he just said, "The President asked me
25    questions about our procedures and, you know, what the
```

Page 60

1    appropriate mechanisms were for these kinds of situations."

2            And then I'm sure Russ told him.

3    Q    Okay.  And that was the extent of your conversation

4    with Dean Mast about it?

5    A    Yes.  There has been very little conversation with

6    him about this, as well.

7    Q    Okay.  Now you testified a moment ago that you

8    didn't think Dr. Zaccari wanted your opinion about Hayden

9    Barnes.  Is that a fair characterization of what you said?

10   A    Well, that's what I said.  I am not sure that it is

11   a fair characterization of what I meant.  "Wanted" might not

12   have been the best word.

13          I think that he just didn't include me in any

14   additional conversations.  It may have been on purpose; it

15   may not have been on purpose, but I had very little to

16   say about this.  I had very little involvement in this

17   situation.

18   Q    Do you know if Dr. Zaccari was relying on the

19   opinions of others?

20   A    No, I don't.

21   Q    Did he ask your opinion about whether or not to

22   withdraw Mr. Barnes?

23   A    He asked during that meeting what our options were,

24   and all I recall at that time was describing what our

25   policies stated.

Page 61

1    Q      Okay.

2    A      It may not have been me that said it.   Somebody at

3    the meeting described the policy.

4           It's pretty clear that Dr. Zaccari was in charge of

5    the meeting.

6    Q      Okay.  Did he seek opinions of others in the

7    meeting while you were present?

8    A      I honestly don't know if he said, so and so, how do

9    you feel about X?  So and so, how do you feel about Y?

10          I got the impression, in my opinion, that he had

11   pretty much discussed the situation with the people that he

12   felt was appropriate, which I assume partially was Ms. Neely

13   and the Board of Regents.

14   Q      Did anyone else in the meetings where you were

15   present express an opinion about whether or not Mr. Barnes

16   was a threat?

17   A      I don't recall discussion of Mr. Barnes being a

18   threat.  I think there was concerns -- and I said this

19   earlier -- and all of us -- I mean, we all were very

20   concerned simply because of what had happened recently with

21   Virginia Tech.

22          And I think there was all concerns, you know, we

23   want to make sure that we have all I's dotted and T's

24   crossed.

25          I don't think there was this, oh, this student

Page 62

1    needs to be -- I know, personally, I did not tell him that I

2    thought this student should be expelled or whatever term you

3    want to use.  Administratively withdrawn.

4        Q    Did anyone else in your presence at those meetings

5    express the opinion other than Dr. Zaccari that

6    Mr. Barnes --

7        A    I don't recall.

8        Q    I'm sorry.  Let me finish the question.  Did anyone

9    else at those meetings in your presence, other than

10   Dr. Zaccari, express the opinion that Mr. Barnes should be

11   withdrawn?

12       A    I don't believe so.

13       Q    Did anyone else at those meetings express the

14   opinion that they believed that Mr. Barnes was a threat?

15       A    I don't believe so.  Or "I don't recall" may be a

16   better answer.

17       Q    You testified, I believe, that it was clear that

18   Dr. Zaccari was in charge of the meeting.  Is that a fair

19   characterization?

20       A    Well, he's the president.  When the President calls

21   the meeting, the President is in charge, yes.

22       Q    But apart from the general pecking order, was

23   Dr. Zaccari running the meeting?

24       A    Yes.

25       Q    Okay.  Was he the only one that expressed opinions?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    I think we just talked about that.  I don't recall
2  anybody specifically saying an opinion.  I think people were
3  concerned about the situation.  There may have been fact
4  finding and things like that.  But I don't recall anybody
5  saying this student needs to be X or Y.
6    Q    Was Dr. Zaccari seeking options from those at the
7  meetings about how to deal with the situation?
8    A    I think he was, more or less, giving us information
9  of what he had attained from his conversations.
10   Q    Conversations with whom?
11   A    I assume with Ms. Neely.  You mentioned before that
12 he had a conversation with Associate Chancellor Linda
13 Daniels.
14   Q    Again, I want to just find out what conversations
15 you might be aware of.  So --
16   A    All I know is that he spoke with people at the
17 Board of Regents office about this case.
18        As Vice President of Student Affairs, when your
19 president says he has spoken with some people at the Board
20 of Regents office about this case, you pretty much get the
21 impression that he has talked to people well beyond your pay
22 grade.
23   Q    So, you don't question it?
24   A    I did not question it, no.
25   Q    Okay.  Let's look at Interrogatory Number Six.

Page 64

1    Just to put your response in the record, "I did not

2    participate in the decision to administratively withdraw the

3    plaintiff from VSU.

4           "I was present at the meeting where President

5    Zaccari announced that he was going to administratively

6    withdraw the president (sic) from VSU based on advice given

7    to him that he could do so."

8           Did I read that correctly?

9    A      I believe you did, yes.

10   Q      Okay.  Now I see that in your answer that you put

11   the term "administratively withdrew" in quotes.

12          Is there a reason why you put that in quotes?

13   A      I didn't put it in quotes.

14          MR. WILL:  If I may, I'll be happy to say it on the

15   record.  When it was prepared, the question had

16   "administratively withdrawn" in quotes above it.  So, the

17   answer was put in quotes just to go with the question.

18          MR. CORN-REVERE:  So, this is the lawyer's

19   recharacterization of the answer rather than quotes that

20   you used?

21          MR. WILL:  Basically, well -- do you want me to --

22          MR. CORN-REVERE:  I want the witness to address the

23   question.

24          MR. WILL:  Well, no.  I'm telling you, basically,

25   my secretary types up all the questions in the format

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    that you asked them.  She copies your question, and then

2    the answer tracks the language in the question asked.

3         MR. CORN-REVERE:  Well, the question says

4    administratively withdrawn.

5         MR. WILL:  That's right.  And, so, the answer does,

6    too, because they're both in quotes.  That's why it was

7    done that way.  That was something that my secretary did,

8    because that's how she does it.

9         MR. CORN-REVERE:  Okay.  Well, let's look at the

10   substance of your answer.

11        THE WITNESS:  I have no idea what the quotes mean

12   in the answer.  There's your answer.  I don't know what

13   it does.  I have no idea what makes that statement any

14   different.

15   BY MR. CORN-REVERE:

16   Q    Okay.  Well, let's look at the substance.  You say

17   you didn't participate in the decision to withdraw the

18   plaintiff.

19        When you gave that answer, what did you mean by not

20   participating?

21   A    I did not say that I agreed, supported, recognized,

22   felt there was details to administratively withdraw.  I

23   listened.

24   Q    Uh-huh.  And you say you were at the meeting where

25   Dr. Zaccari simply announced his decision.  Isn't that what

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    happened?
 2        A     I believe that would be a fair characterization,
 3    yes.
 4        Q     Okay.  Help me out with this then.  Why was there a
 5    meeting?  What was the purpose of it?
 6              MR. LAVALLEE:  I'm going to object to the form in
 7         that we're talking about, again, more than one meeting.
 8         Could you try to put it in context?
 9              THE WITNESS:  I have no idea which is which.
10              MR. CORN-REVERE:  Let me just be clear about my
11         question.
12              MR. WILL:  I join in the objection.
13    BY MR. CORN-REVERE:
14        Q     You have testified to two different meetings.
15        A     I testified to one that I remember.
16        Q     Please, let me finish my question.  I believe in
17    response to Interrogatory Number Five, you said you were
18    present at two meetings when President Zaccari expressed his
19    concerns about plaintiff's conduct.
20        A     Yes.  That's correct.
21        Q     And then Interrogatory Number Six, you said that
22    you were present at a meeting --
23        A     Right.
24        Q     -- where President Zaccari announced his decision
25    to withdraw the plaintiff.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1        If the meetings weren't to get your advice or that

2    of others present at the meeting, do you know why the

3    meetings were called?

4        A    No.  I think there could -- now I'm being asked to

5    make assumptions, so I don't know --

6        Q    Well, I'm just asking what you know.

7        A    It could have been that he wanted to get our

8    impression on how to do what he wanted to do, what procedure

9    would be appropriate.  That kind of thing.

10        It was very clear to me at that particular time

11    that he had determined his decision and that there was

12    nothing that I or anybody else at that meeting was going to

13    do to change it.

14        He also is a very gracious and professional

15    individual, and he may have thought that it was appropriate

16    to share what his decision was to that group of people for

17    professional courtesy.  I don't know.  I'm just basing my

18    opinion.

19        If you're asking me if I would've stood up and

20    stomped on the table and said that this is absolutely

21    ridiculous; I don't believe that we're doing the right thing

22    here, would I have stopped him from making this decision?  I

23    don't believe it would have had an impact.

24        Q    Do you believe that the university was doing the

25    right thing here?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A      That would not have been the decision I would've
 2   made.
 3      Q      Well, I'm just asking you what you believe.
 4      A      And I told you.  That would not have been the
 5   decision that I would've made.
 6      Q      You formed no belief about whether or not this was
 7   right or wrong?
 8             MR. WILL:  I believe he has already answered the
 9      question.
10             THE WITNESS:  I don't think it is what I would've
11      done, because it is not what I think should've been done.
12   BY MR. CORN-REVERE:
13      Q      That's clear.
14      A      That does not mean that I have the facts and
15   details and information to have made the decision that
16   Dr. Zaccari did.
17             Based on what I know and what my values and beliefs
18   are, I would not have made that decision.
19      Q      Okay.  But did Dr. Zaccari bring materials to the
20   meetings to pass around to explain why he felt concerned?
21      A      The only materials that I recall ever seeing was
22   that Facebook stuff.
23      Q      Okay.  And based on seeing what Dr. Zaccari
24   presented to you, if it had been your decision, you would've
25   made a different decision.  Is that right?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A     Yes.  But I've also told you earlier in this

2   discussion that my role and experience is different than

3   his.

4      Q     Okay.

5      A     Based on what I would've done.  That would not have

6   been what I would've done.

7      Q     Did you offer options for how the university

8   might've treated this situation other than administratively

9   withdrawing Mr. Barnes?

10     A     At that meeting that you're discussing right now, I

11  just got done saying I didn't believe there was any purpose

12  in making options.

13           I think at the first meeting when he asked what do

14  we do in these situations, there may have been some

15  conversations about we could've had, you know, a judicial

16  process and those kinds of things; and those options were

17  available at that time.

18     Q     Okay.  At that first meeting, did you offer any

19  options like having some sort of judicial process?

20     A     Yes.  We told them -- we, basically, defined our

21  policy.

22     Q     Okay.  So, you laid out for him what the student

23  handbook provides, and then Dr. Zaccari chose what course to

24  follow.  Is that right?

25     A     What he did at that time is say, "I'm very

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    concerned about this, and I need to confer with legal
2    advice."
3        Q    Okay.
4        A    At that time -- I think it's pretty clear to
5    everybody I'm not a shy person and I'm not afraid to state
6    my points of view.
7            But I'm also not going to jump up and down and tell
8    the President and the Board of Regents' attorneys that they
9    are wrong and that I'm right and that they need to do what I
10   said because Kurt Keppler is in charge here.
11           If that's what you expected me to do, I didn't do
12   that.
13       Q    Do you know Laverne Gaskins?
14       A    Yes, I do.
15       Q    Who is she?
16       A    She's the university attorney.
17       Q    Was she present at the meetings where you discussed
18   the administrative withdrawal of Hayden Barnes?
19       A    I don't remember if she was present at both because
20   I can't remember if I was present at both, but I believe
21   that she was present at, at least one.
22       Q    Do you recall whether or not she expressed any
23   opinions on what course the university should follow?
24       A    As I said before, at the first meeting I think we
25   did discuss what the policies were.  I don't recall anybody

Page 71

```
1    saying, "This is what we must do," no.
2        Q    Apart from the specific statement, "This is what we
3    must do," do you recall Ms. Gaskins expressing any opinion
4    on what would be an appropriate course of action?
5        A    I don't recall.  I'm sure she had things to say
6    about the options, yes.
7        Q    Is that based on recollection or is that opinion
8    based on supposition?
9        A    Supposition.
10       Q    But sitting here today, you don't have a separate
11   recollection of what Ms. Gaskins may or may not have said?
12       A    No.
13       Q    And if she were to testify that she did advise the
14   president that there should be some form of due process,
15   would you be in a position to dispute that?
16       A    I don't recall that.
17       Q    Okay.  Excuse me for a second.
18            (Pause)
19            (Discussion off the record.)
20            MR. CORN-REVERE:  Are we up to Exhibit Four?
21            MR. WILL:  Yes.
22            MR. CORN-REVERE:  Let's mark as Exhibit Number Four
23   a number of handwritten notes.
24            THE WITNESS:  Would it be possible if I took 30
25   seconds to run to the restroom?
```

Page 72

1          MR. CORN-REVERE:  Absolutely.  Let's go off the
2     record.
3          (A recess was taken from 10:55 a.m. to 10:57 p.m.)
4          (The document was marked for identification as
5     Plaintiff's Exhibit Number Four.)
6   BY MR. CORN-REVERE:
7     Q    We just marked as Exhibit Number Four a number of
8   handwritten notes.  And I'll just tell you:  These are notes
9   that were produced to us as part of the document production
10  by the university.
11         They were notes taken by Ann Farmer of campus
12  police of the meetings involving Mr. Barnes.
13         I won't ask you to read through everything, because
14  the handwritten notes are a little hard.  But I will direct
15  your attention to certain places in the notes and give you
16  an opportunity to look at them, and then we can go through
17  some questions.
18         MR. LAVALLEE:  Are these all the same exhibit?
19         MR. CORN-REVERE:  Yes.  These are all the same
20    exhibits.  They may relate to certain or different
21    meetings.  There is one exhibit that has the date at the
22    top, 4-20-07, which, I assume, relates to a meeting that
23    took place on April 20th, 2007.
24         There's another one that is undated with the
25    designation at the top "Dr. Zaccari."  And it is my

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    understanding that those notes came from a meeting in early
2    May 2007.
3            But, again, this is what was produced to us and
4    representations made to us.
5            I really just want to let the witness take a look
6    at certain parts and see if that helps jog his memory.
7            THE WITNESS:  While he's doing that, I'm going to
8       just get some paper clips.
9            MR. CORN-REVERE:  I've got some Post-It notes, if
10       that'll help.
11           THE WITNESS:  So, you want me to go through these
12       and start to --
13   BY MR. CORN-REVERE:
14       Q    Well, that's not fair to you to have you sort of
15   read them randomly.
16           Take the document that starts with "Dr. Zaccari" in
17   the upper left-hand corner looking at it.  Yes, that's the
18   one.  And let's go to page -- the fourth page.
19       A    The fourth piece of paper or the fourth side?
20       Q    The fourth side.
21       A    Okay.
22       Q    Okay.  Up in the left-hand corner, it has the
23   notation that says, "Laverne" and some writing.
24       A    Uh-huh.
25       Q    And on the right-hand column it has, "Admin

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Withdrawal."

2        A    Okay.

3        Q    Okay.  First of all, under the designation that

4    says, "Laverne" -- I'll just read this notation into the

5    record, and then we can see if this helps refresh your

6    recollection.

7            It says, "Need to include references to D's" -- I

8    assume that refers to Mr. Barnes -- "mental health.  Can't

9    go without supported evidence of threat."

10       A    Tell me where you are.

11       Q    Right here.  This note.  (Indicating.)

12       A    Okay.

13       Q    Does seeing that note help refresh your

14   recollection of whether or not Ms. Gaskins expressed an

15   opinion as to what was required to justify an administrative

16   withdrawal?

17       A    Okay.  I'm sorry?

18           MR. CORN-REVERE:  Could you read back the question.

19           (The requested portion was read back by the Court

20       Reporter.)

21           THE WITNESS:  Yeah.  I've never seen these notes

22       before, but I don't have any reason to believe they're

23       not correct.

24   BY MR. CORN-REVERE:

25       Q    Right.  But seeing those notes today, and

Page 75

1    understanding that you didn't write them, does it help bring

2    back a memory of yours about that meeting and about what

3    happened at that meeting?

4        A    I do recall the conversation about the timing and

5    that it was almost graduation and that, you know, there was

6    finals going on and that kind of thing.

7              After I read this, I do remember that.

8        Q    Okay.  And do you remember any more details about

9    that?

10       A    No.  I'm even looking at what I said down here.

11       Q    Yeah.  Let's focus on that now, too.  There's a

12   note that has your name, Keppler.

13       A    Uh-huh.

14       Q    And, again, understanding that the reference -- the

15   abbreviation "D" for -- I don't know why "D" was chosen but,

16   apparently, that refers to Mr. Barnes.

17             This note says, "Counselors can't say Barnes is a

18   threat because there is nothing to support that Barnes is a

19   threat."

20             Does that note reflect the comment that you made at

21   the meeting?

22       A    I don't remember it, but it doesn't sound like it

23   would be philosophically opposed to what I would believe.

24       Q    So, did you have any knowledge about whether the

25   counselors perceived if Mr. Barnes was a threat?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A     It's my interpretation from what I've seen here and

2    from what I believe that they did not.

3    Q     Okay.  And does this refresh your recollection

4    about what transpired at that meeting?

5         MR. LAVALLEE:  Objection to form.  What meeting?

6         MR. CORN-REVERE:  The meeting reflected in these

7    notes.

8         MR. LAVALLEE:  There's several meetings reflected

9    in these notes.

10   BY MR. CORN-REVERE:

11   Q     You can answer the question.

12   A     The meeting is not clear in my mind.  I'm trying as

13   hard as possible to try to remember the meeting, and it is

14   not particularly clear in my mind.

15         Based on the fact that I am to assume that these

16   notes are correct -- which, I guess, we don't know -- that

17   does not sound like something that I wouldn't -- it sounds

18   like something that would be consistent to my view.

19   Q     I see.  And, again, I'm sorry that this set of

20   notes in the group that we've provided doesn't have a date

21   on them.

22         As I understand it, you attended two meetings at

23   which Dr. Zaccari was present.  One was an earlier meeting

24   where you discussed procedures; and the second meeting, if I

25   understand your testimony correctly, was the meeting where

Page 77

1    Dr. Zaccari announced his decision.

2        A    Yes.

3        Q    Okay.  With that understanding and having looked at

4    some of these notes, do you have a belief about which of

5    those two meetings these notes would relate to?

6        A    I'd have to go through these and read them more

7    thoroughly and look.  Are all these pieces of paper relating

8    to the same thing or are you specifically talking --

9        Q    I don't think that we have to go through all of

10   them.  I really just want to focus your attention on certain

11   of them.

12            I guess my question is really just whether or not

13   you can tell from looking at this whether this was the first

14   meeting you attended or the second meeting you attended.

15            And feel free if you'd like to take a few minutes.

16   We can stop the record and take a look at the notes more

17   extensively, if you'd like, if that would help.

18       A    Well, I probably should read them, yes.

19       Q    Okay.

20            (Pause)

21            MR. LAVALLEE:  By the way, these are notes of a

22   cop.  Typically, that is what they'll do with a "D."

23            MR. CORN-REVERE:  For defendant?

24            MR. LAVALLEE:  Yes.

25            MR. CORN-REVERE:  Well, I assumed that was true,

Page 78

1    but I hesitated to call a student a defendant who isn't

2    charged with a crime.

3        MR. LAVALLEE:  Well, again, I have represented

4    enough police officers to know that is just their

5    shorthand way of referring to subjects of investigation.

6        MR. CORN-REVERE:  I tend to know them only as

7    defendants.

8        (Pause.)

9        THE WITNESS:  Okay.  I guess I've looked at this as

10   close as I can.

11   BY MR. CORN-REVERE:

12   Q    Okay.  And, understand, I'm not asking you to vouch

13   for the accuracy of these notes.  They're not your notes.

14   A    I couldn't.

15   Q    I know.  So, I'm not asking you to.  I'm just

16   asking, I guess, a couple of things.

17        The first is, having reviewed the notes, does this

18   helps you remember which of the two meetings they relate to?

19   A    I honestly don't know.  There are close together.

20   I guess I would look by the way this is talking that this is

21   not where he has absolutely said you must do this or you

22   must do that.  So, it looks like it may have come from the

23   first one, but I don't know.

24   Q    My second question is whether or not, having looked

25   at these notes, if it helps you remember the events of the

Page 79

1    meetings about Hayden Barnes.

2        A    I do recall that conversation that I just shared

3    with you about the timing.

4             I have no idea what this statement applied to me --

5    "Tried to go the route of the GPA" -- means.  I don't know

6    what that means at all.

7        Q    Let's look at that.

8        A    I have no clue what that means.

9        Q    Okay.  It's on the second-to-last-page.  There is

10   another note with your name attached that says, "Tried to go

11   the route of the GPA."

12            Seeing that note, does that jog a recollection

13   about any conversation you had at that meeting?

14       A    I think there was a discussion that any

15   conversations that were had between the president and the

16   student should not occur in the middle of his finals,

17   because we should give him every opportunity to be

18   successful in his finals.  That's the only thing I can think

19   of.

20       Q    Okay.  Is it possible that relates to a suggestion

21   that if there's a way to withdraw the student academically

22   that that would be another option?

23       A    It's possible that we could've looked at that.

24   Obviously, a student who is not eligible academically -- but

25   they're not withdrawn.  They're put on probation.  It's a

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    totally different set of rules, so I don't know how that

2    would play out here.

3        Q      Right.  But if the goal is simply to make the

4    student leave, that would be another way of doing it,

5    wouldn't it?

6        A      It depends on if it was his first probation or his

7    second probation and all different kinds of things that I'm

8    not privy to.  I mean, if it was his first probation, he

9    wouldn't be leaving.

10       Q      Okay.  That's fair.  But if you have a way to get

11   rid of a student and you're just brainstorming about

12   options, wouldn't one option be looking to see if the

13   student is flunking out?

14       A      I guess it could be an option.  I don't know how it

15   would play out because there's no process.  Either you have

16   the grades or you don't have the grades.  Either you're on

17   probation or you're not on probation.

18           There is no administrative decision-making in that

19   process.  It's clear-cut.  You're on probation.  Is it your

20   first probation?  Is it your second probation?

21           Also, I'm student affairs, not academic affairs.

22   I'm not privy to all the specifics of the academic side of

23   the house.

24           Yes, theoretically, a student who was on a multiple

25   probation would be asked to leave the campus for a certain



**WHEELER**
**REPORTING**
*Court Reporting • Video • Litigation Support*
*404.351.4577*

1    amount of time.  I don't know if it's a semester or two

2    semesters or whatever, but it's not an expulsion.

3        Q    Do you know whether or not Dr. Zaccari tried to

4    gather information on Hayden Barnes' grades?

5        A    I can interpret from this that grades were,

6    obviously, brought up.

7        Q    So, is it your understanding that one of the

8    options being discussed at this meeting was whether or not

9    to simply flunk Hayden Barnes out the school?

10            MR. WILL:  Object to the form of the question.

11            THE WITNESS:  I'd have to answer your question in

12       two ways, if that's acceptable.

13            Was there a suggestion to have somebody give him

14    grades that he didn't deserve?  That's ridiculous.

15   BY MR. CORN-REVERE:

16       Q    No, that's not my question.

17       A    That's the way it sounded.

18            MR. WILL:  That's the way it appeared.

19   BY MR. CORN-REVERE:

20       Q    Let me rephrase it then.  Was one of the options

21    discussed at this meeting was to determine whether or not

22    Mr. Barnes could be withdrawn for academic reasons rather

23    than for reasons that related to allegations of a threat?

24       A    My interpretation would be that the possibility, if

25    he was academically eligible, would have him in a situation

Page 82

1    where he would be on probation and that would give

2    Dr. Zaccari more time to figure out what to do next.

3          MR. LAVALLEE:  Bob, if I may -- and I'm not trying

4    to frustrate your deposition.  You weren't here when we

5    did Ann Farmer's deposition, correct?

6          MR. CORN-REVERE:  That's right.

7          MR. LAVALLEE:  These notes that you're using right

8    now, they were entered in the record during Ms. Farmer's

9    deposition.

10          MR. CORN-REVERE:  Yes.

11          MR. LAVALLEE:  And the notes that you're reading

12    from right now, she testified, were pertaining to the

13    May 3rd meeting.

14          MR. CORN-REVERE:  That is very helpful.  Thank you.

15    Okay.  And I understand that these were also entered in

16    depositions yesterday?  Or at least they were discussed

17    in depositions?

18          MR. LAVALLEE:  I discussed them, yes.

19          MR. CORN-REVERE:  So, this was clearly described as

20    the May 3rd meeting?

21          MR. LAVALLEE:  I believe so.  I don't have a

22    verbatim recollection from yesterday.

23          MR. CORN-REVERE:  I wasn't here, so I appreciate

24    the clarification.

25          THE WITNESS:  And I don't know what that means.  Is

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      that the fist or second meeting:  May 3rd?

2    BY MR. CORN-REVERE:

3      Q    If your first meeting was in late April -- and I

4    don't know that it was -- but if it was, then this would be

5    a subsequent meeting.

6      A    Okay.  I didn't even know -- I mean, I think the

7    important thing for you to be aware of from the standpoint

8    of me is I'm sitting here trying to help, and I didn't even

9    know that these existed.

10     Q    Neither did we until two weeks ago.

11     A    And it's hard for me to give you an opinion on a

12   person who's not on my staff, who I rarely talk to and

13   whether or not the handwritten notes that they made were

14   appropriate to what happened on that particular day.

15          I have no reason to believe that they aren't.  I

16   have no reason to believe that she would put things down

17   that weren't true, but I have no idea if this is what an

18   individual said or didn't say.

19     Q    And that's a very fair point.  I'm not asking you

20   to vouch for these notes or their accuracy or anything else.

21          But they are notes that were provided to us as a

22   representation of things that happened at the meeting.

23          All I'm really asking is does this help you

24   remember what happened at the meeting.

25     A    I think it helps me remember that in my mind and, I

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    think in a lot of people's mind, there was a lot of

2    processing of what could be done to not make this not be the

3    end result that it was.

4        Q    But I believe you testified that Dr. Zaccari had

5    made his decision regardless of that processing.

6        A    I've worked with the man for seven years.  I have a

7    pretty good idea how he operates, and I have the utmost

8    respect for him.  I think he was an outstanding president.

9            But I also know there are times when he had decided

10   what he wanted to do, and I knew when it was appropriate to

11   try to convince him elsewheres.  Else -- what's the word.

12       Q    Otherwise?

13       A    Otherwise.  I don't believe this was the

14   appropriate process where that was going to be very

15   effective.

16           But I've also told you that I didn't sit in his

17   shoes; and I'm not aware of what he was going through,

18   because I'm not sure that we were privy to all that he knew.

19       Q    I'm just trying to get a sense here of the

20   decision-making process.

21           And is it fair to say that Dr. Zaccari had decided

22   what he wanted to do, and you didn't feel you would be able

23   to dissuade him?

24       A    I didn't believe I would be able to dissuade him.

25           I do believe that we wanted to give him as much

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    information -- we didn't know much.  I think that's the part

2    that's so unclear.  We didn't know much.

3        Q    Okay.

4        A    And anything that I know about this case I learned

5    from someone else.

6        Q    Okay.

7        A    Because I didn't -- outside of sitting in on these

8    two meetings that we've discussed.  That's the issue of it.

9             But I also have a lot of respect and admiration for

10   the other people that were involved, so I'm not going to say

11   that if any of those people told you that something

12   happened -- it probably did.

13       Q    Okay.  Looking back at Exhibit Number Three, your

14   answer to Interrogatory Number Six -- it's on page seven of

15   that exhibit -- where you say, "I did not participate in the

16   decision to administratively withdraw the plaintiff from

17   VSU."

18       A    (Reviewing document.)

19       Q    Now, again, I'm not trying to put words in your

20   mouth, but it just looks from the discussion that took place

21   at this meeting that that's participation.

22       A    That's not the way I look at it.

23       Q    Okay.  Well, that's what I'm trying to find out.

24       A    This is a university which has a bureaucracy.  I

25   mean, when you would use the word "participate" to me, I

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    would think committees and votes and minutes and official

2    motions and Keppler says and so and so said.  And none of

3    that happened.

4         Keppler didn't have a vote.  Keppler didn't say, "I

5    think we ought to do this."  That's what I would talk about

6    "participate."

7         Obviously, Ann Farmer has me down as saying two

8    things in this meeting, which is two things more than I

9    remembered; and I don't think either of them say much,

10   except the one about the threat is consistent with what I,

11   personally, believe.

12        But I don't see that as participating.

13   Participating would mean:  What's your opinion?  How do you

14   vote?  What do you think I ought to do?

15   Q    So, just to be clear, at this meeting Dr. Zaccari

16   never went around the room and asked people what they

17   thought about what should be done?

18   A    Did he say, "Kurt, how do you think I should handle

19   this situation?"  No.

20   Q    Did he ask anyone else the same thing?

21   A    No.  Now they may have made comments, but he didn't

22   say, "I want your individual opinions.  We're going to put

23   together a democratic decision here."

24   Q    So, if this meeting were considered to be analogous

25   to a student disciplinary hearing, at a hearing you would've

WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    actually had a vote.  Isn't that right?

2                 MR. WILL:  I object to the form of the question.

3    BY MR. CORN-REVERE:

4        Q    Is that a difference between what occurs at a

5    hearing and what happened at this meeting?

6        A    At the university a judicial hearing on our campus,

7    by definition, goes to the Student Judicial Board.  It has

8    nothing to do with administrators.  So, I would not have a

9    vote, because I would not be on the Board participating.

10                 They go into a room like this by themselves and

11   they deliberate, which is probably one of your legal terms;

12   and then they come back with a finding and a sanction.

13                 Now, in their findings and in their sanctions, I

14   would agree.  I imagine there's some kind of a going around

15   the room and saying it's five to three in favor of acquittal

16   or whatever.  I don't know.

17                 But that did not happen at this meeting, nor did I

18   anticipate it happened at this meeting; and that's what I

19   would say I mean by participation.

20                 Did I have anything to do with the final decision

21   in this case?  Obviously, not.  If I would've had any

22   decision in this case, I would've jumped on his back and

23   said, "Please, don't do this."

24                 But I also, again, for the 43rd time, need to make

25   it clear that it isn't fair to me -- fair to him for me to

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    make his decision, because I did not have his facts.

2           To this day, I don't know what happened; and I

3    don't think you or anybody else does.

4    Q      So, you just have the facts that he presented to

5    you?

6    A      And my experience of dealing with students who

7    disagree with points of view.  And I don't take it the same

8    way he does, which I had that conversation with you earlier.

9    Q      Yeah.

10   A      I'm used to having students say negative or

11   unfortunate or disappointing things, and it does not bother

12   me.

13   Q      Well, that kind of goes with the territory of being

14   at a university, doesn't it?

15   A      It may go with the territory of being in Student

16   Affairs.  I don't think it goes with the territory of being

17   some other people.  My responsibility at the university is a

18   little different.  So is a counselor's.  So is a Dean of

19   Students'.

20          We are, by nature, advocates.  We are, by nature,

21   experts in trying to make sure students are heard,

22   supported, encouraged and advocated for.  I think we do an

23   absolutely excellent job at it.

24   Q      Okay.  Let's look back at Exhibit Three, page

25   eight.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      (Reviewing document.)

2      Q      And I'm looking at Interrogatories Number Seven and

3   Number Eight.

4      A      Uh-huh.

5      Q      Your response to Interrogatory Number Seven says,

6   in relevant part, "I was present at the meeting on May 3rd,

7   2007.  I believe the following persons were also present:

8   Dr. Zaccari, Russ Mast, Louis Levy, Laverne Gaskins, Ann

9   Farmer, Victor Morgan, Theresa Boyd and me."

10          Does seeing this answer refresh your recollection

11   about which meeting we're talking about when we discussed

12   those notes?

13      A      Yes.  It was much closer to the time when I had

14   these conversations.  And, you know, you were asking me at

15   the very beginning of this meeting today how much did I

16   prepare.  I guess you can see.  I did not review this.  So,

17   yes, this does help.

18      Q      Okay.  So, it's your testimony that the notes we've

19   been discussing refer to the May 3rd meeting you attended?

20      A      Uh-huh.

21      Q      Okay.  And Interrogatory Number Eight, it asks to,

22   "Identify and describe communications by and between you and

23   Defendant Zaccari in connection with the decision to

24   administratively withdraw plaintiff from VSU."

25          And your response is, "I did not have any



1    communications with the president concerning the decision to

2    administratively withdraw the plaintiff from VSU."

3              Now that statement is not accurate, is it?

4        A    If these notes are accurate, obviously, I said a

5    few things during that meeting.  I don't remember them.

6              If the response is "did I have any communications

7    outside of that meeting," it's an accurate response.

8              Obviously -- I guess I looked at the word by

9    Webster definition of communications.  I think letters,

10   notes, phone calls.  I didn't have any of those.

11             Did I talk about it at the meeting?  Yes.

12       Q    Okay.  And then just --

13       A    There's no attempt to deceive.  I looked at

14   communications and I said, nope.  Nobody sent me a letter.

15   Nobody called me on the phone.  Nobody sent me an email.

16   Did I discuss it at the meeting?  I guess I did.

17       Q    No.  Let me be clear.  When I ask questions like

18   that, it's not to suggest that you're trying to deceive

19   anybody.  As you pointed out, these events did happen

20   sometime ago.

21       A    Okay.

22       Q    And I am trying to make sure the information we get

23   is complete.  That's why I'm going through this.

24       A    It helps to review.

25       Q    And just to close the loop on that, on page nine,

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Interrogatories Nine and Ten, it asks you to identify and

2    describe communications between you and employees of

3    Valdosta State University.

4         And you respond to both interrogatories, "None that

5    I recall."

6         Is your answer to those interrogatories really

7    referring to communications other than those at the meeting?

8    A    (Nods head.)  Yes, sir.  Sorry.

9    Q    Okay.  So, no other written communications or

10   anything else is what you're --

11   A    Yes.

12   Q    Okay.  I think we're finally done with that

13   exhibit.

14        Let's mark as Keppler Deposition Exhibit Number

15   Five a flyer with the heading:  An Issue of Convenience or a

16   Moral Question.

17            (The document was marked for identification as

18        Plaintiff's Exhibit Number Five.)

19            THE WITNESS:  (Reviewing document.)

20   BY MR. CORN-REVERE:

21   Q    And actually while we're doing this, let's mark the

22   next couple of exhibits, as well.  We'll talk about those

23   together.

24        Number Six will be a letter to the editor from The

25   Spectator with the headline:  Response to Parking Decks to



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    be Built at VSU.

2            And Exhibit Seven will be a collage with the

3    heading:  S.A.V.E. - Zaccari Memorial Parking Garage.

4            (The documents were marked for identification as

5        Plaintiff's Exhibit Numbers Six and Seven.)

6            THE WITNESS:  (Reviewing documents.)

7    BY MR. CORN-REVERE:

8        Q    Have you had an opportunity to -- I'm sorry.  They

9    are still being distributed.

10       A    This is one packet?

11       Q    Well, it's three different exhibits.  We'll talk

12   about them each in turn.

13       A    (Reviewing documents.)  Okay.

14       Q    Okay.  Have you had a chance to glance at those

15   exhibits?

16       A    Uh-huh.

17       Q    Okay.  Let's start with Number Five.

18       A    Uh-huh.

19       Q    The flyer entitled "An Issue of Convenience or a

20   Moral Question." have you seen this before?

21       A    I think so.  It's interesting that the -- I think

22   so.  The phone number isn't the -- oh, okay.  Okay.

23       Q    Can you describe the context in which you think you

24   might've seen it before?

25       A    I'm trying to remember if I actually saw it while

                                                    Page 93

1    they were being distributed or if one showed up in my office

2    or something like that.

3          A lot of times I'll get stuff that's on the

4    bulletin boards around campus just for curiosity sake.  So,

5    that may have been when.

6        Q    Okay.  Now there's a handwritten note down in the

7    lower right corner that says --

8        A    "This was posted all over campus."  I probably saw

9    it posted all over campus.

10       Q    Do you have any idea whose notation that might be?

11       A    No.

12       Q    Okay.  Do you know if this flyer was provided to

13   the group in the meetings that you had with Dr. Zaccari?

14       A    I honestly don't remember.

15       Q    Okay.

16       A    I find the flyer rather meaningless or harmless.

17   It's just a group of students who are opposed to the parking

18   deck.

19       Q    Okay.  You short-circuited my next question.

20            Let's look at Exhibit Number Six.

21            Wait, before we do that, let me ask you:  Did you

22   ever discuss this flyer with Dr. Zaccari?

23       A    This particular flyer?

24       Q    Yes.

25       A    I don't think so.  I don't recall it.

Page 94



```
 1            You have to understand that I, personally, don't
 2    like parking decks, either.  So, I mean, I would look at
 3    this and say fine.
 4            But I also worked at Georgia State and Virginia
 5    Commonwealth where the whole campus is parking decks;
 6    because when your campus grows and you're in a compact
 7    situation, you don't have a choice.  I sort of see it as a
 8    necessary evil.  It's part of 2009, you know.
 9       Q    Right.  Do you recall ever discussing this flyer
10    with anyone else who was present at the meetings with
11    Dr. Zaccari to discuss Hayden Barnes?
12       A    I don't even know if this flyer came from Hayden
13    Barnes.
14       Q    Okay.  Now let's look at Exhibit Number Six.
15       A    It's interesting.  I know you didn't ask this
16    question, but it might be relevant.
17            We have a very active environmental group on campus
18    called S.A.V.E. of which I have worked very closely with and
19    admire their work immensely.
20            And they see me as an environmentalist.  So, I
21    mean, in all intents and purposes, they may have put this on
22    my desk and given it to me, "Don't you agree with this,
23    Dr. Keppler?"  I might even say, "Yeah.  I'm not a big fan
24    of this, either."
25            This kind of stuff is not particularly bothersome
```

Page 95

1    to me.

2        Q     Okay.  Exhibit Number Six is a letter to the editor

3    to The Spectator.  Have you seen this before?

4        A     Well, I read The Spectator every week.  So, I

5    assume when it was written I must've read it.

6        Q     Okay.  And feel free to read the letter as much

7    as --

8        A     Although, I also am out of town sometimes, so I

9    guess it wouldn't be fair to say that I read every

10   Spectator.

11       Q     Do you have recollection of seeing this letter to

12   the editor by Hayden Barnes in connection with the meetings

13   that were called to discuss the administrative withdrawal of

14   Hayden Barnes?

15       A     I don't remember.  It wouldn't have impacted me.  I

16   mean, it's a person's opinion.  It's a "so what."

17       Q     And now let's look at Exhibit Number Seven.

18       A     In fact, I probably agree with most of what it

19   says.

20             Okay.  This is the Facebook stuff, I think, right?

21       Q     Yeah.  Have you seen this before?

22       A     Yes.  And I know that one of the key elements in

23   this whole situation is that word "memorial."

24       Q     Why is that?

25       A     Because I think in a lot of people's opinions --

Page 96

1     and I believe in Dr. Zaccari's opinion -- "memorial" refers

2     to something that is done after you've died.

3             "Memorial" means some posthumous kind of

4     recognition.  You know, the Lincoln Memorial, the Washington

5     Memorial, whatever.  That's what I've been told.

6     Q     Is that your own view of what the word means?

7     A     Well, it does mean that.  And it could be very,

8     very upsetting if it said the Keppler Memorial Parking Deck.

9     I would not be happy with that, either.

10            But, again, I have sort of thick skin.  Over the

11    years I probably would've just kind of said "whatever."

12            It's comparing apples to bananas how I would

13    respond and how he would respond.

14    Q     But did anyone at the meeting say they looked up

15    the meaning of the word memorial?

16    A     I recall discussing that memorial was referred to

17    as something that you did for someone that was deceased.

18    Q     Who expressed that opinion?

19    A     I'm not sure which one.

20    Q     Did anyone take issue with that opinion at the

21    meeting?

22    A     Well, there's definitions for memorial that are

23    different than that.  I don't know if they were taken up at

24    that meeting.  Memorial can be used in different words.

25            But in most cases in a university -- you have to

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    remember:  We're all university people.  You usually don't
2    recognize people while they're alive.  You usually don't
3    give names to people while they're alive, but that's not
4    always the case.
5        Q    That's an interesting question.  Are there any
6    buildings on the VSU campus named for living people?
7        A    Yes, there are.  In fact, Dr. Zaccari named one for
8    a living person.
9        Q    So, it's not uncommon on this campus for there to
10   be --
11       A    It's uncommon because I think there's only one.  I
12   know the Bailey Science Center.  I'm trying to think.  My
13   initial impression is there's one.  There may be more.
14       Q    Anyone discuss those at this meeting?
15       A    I'm not even sure if the Bailey Science Center was
16   called the Bailey Science Center at that time.  That's a
17   recent -- you said earlier two years didn't seem like that
18   long ago.  Actually, I don't know if the Bailey Science
19   Center was 2006 or 2007 or 2008 or 2005.
20       Q    Uh-huh.
21       A    But, yes, there is.  But I think differently.  I
22   mean --
23       Q    Yeah.  Now did you first see this Exhibit Number
24   Seven at the May 3rd meeting with Dr. Zaccari?
25       A    Either at that meeting or right before.  I never

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      went on the Facebook page or anything like that or looked at

2      it.  I don't usually go on Facebook pages.

3             The only way I would've seen it is if somebody

4      would've showed it to me.

5      Q      But you are a member of Facebook, aren't you?

6      A      I'm an inactive member of Facebook.

7      Q      But based on your experience with Facebook, is it

8      your understanding that to get access to your profile and

9      your page you have to affirmatively agree to be someone's

10     friend?

11     A      It depends if it's -- I don't know.  It depends if

12     it's on your wall or it depends if it's inside.  You have

13     access -- I know like my son has asked me to be his friend.

14     My daughter hasn't.  I've been on my daughter's page, and I

15     can see what she has visible; but I can't see what she has

16     hidden.

17            So, I guess the answer to your question is you can

18     see what they let the general public see, and then there are

19     parts of their page that you have to be a friend to see.

20            I know Facebook, but I'm not a technological

21     wizard.

22     Q      Okay.  You testified a moment ago that it was the

23     word "memorial" that gave people concerns.  In particular,

24     Dr. Zaccari.

25     A      It gave Dr. Zaccari concerns definitely.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   Q      Do you know if it raised concerns for the
2   organization S.A.V.E.?
3   A      I'm not sure how S.A.V.E. would respond.  I know
4   that S.A.V.E. wasn't particularly interested in having a --
5   S.A.V.E. had been very involved on campus probably the last
6   half decade.  They didn't get actively involved in this
7   parking deck thing.
8          And I think S.A.V.E. was very interested in working
9   with the president rather than being antagonistic, so they
10  may have thought strategically it didn't make much sense to
11  challenge the president; they would be more successful in
12  trying to compromise with him.
13  Q      In terms of this exhibit where you've testified
14  there was a perception that the term Zaccari Memorial
15  Parking Garage may have been interpreted as a threat by the
16  President.
17         Wouldn't it also, under that logic, be reasonable
18  to say that this is also a threat on S.A.V.E.?
19  A      That's not the way I read it, and I'm not saying
20  other people read it the way we read it.
21         But I read it as -- S.A.V.E. is the beginning word
22  that indicates that they're saying there is a Zaccari
23  Memorial Parking Deck.
24         The question I don't know is, is that S.A.V.E.'s
25  terminology or not.

Page 100

1    Q    Uh-huh.  But did anyone at the meeting suggest
2    there was a need to go warn the student environmental
3    organization that someone might be out to get them because
4    they had used the word "memorial"?
5    A    I don't think anybody thought anybody was out to
6    get S.A.V.E.  I never talked to S.A.V.E. about this.
7    Q    Okay.  And did anyone at the meeting other than
8    Dr. Zaccari suggest that the word "memorial" actually
9    represented a threat?
10   A    I don't remember.  I understand why -- how it
11   could.
12   Q    You understand what Dr. Zaccari told you about his
13   perception, right?
14   A    Yes.  It's a valid perception.  Memorial is used as
15   a -- to recognize a deceased person.  That's a fact.
16   Q    Did anyone actually consult a dictionary on the
17   meaning of memorial?
18   A    I didn't.  I don't know what other people did.
19   Q    Did anyone at the meeting say that they did?
20   A    I honestly don't know.  Specific statements at that
21   meeting are not that clear in my head.
22   Q    Okay.  Now one last question about this exhibit or
23   maybe a couple.
24        And that is:  This is a document, Exhibit Number
25   Seven, that was presented at the meeting called by

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Dr. Zaccari to discuss what to do about Hayden Barnes.

2              MR. LAVALLEE:  What meeting are we talking about?

3              MR. CORN-REVERE:  I assume we're talking about the

4         May 3rd meeting, if the witness can help us clarify

5         that -- I mean, Matt, you helped us understand what those

6         notes related to and --

7              MR. LAVALLEE:  I wasn't helping.  I mean, I was

8         just stating a fact based on when that particular set of

9         notes was entered into evidence and what the person who

10        authored those notes stated about the notes.

11             MR. CORN-REVERE:  Okay.

12             MR. LAVALLEE:  You know, it's your question.  I'm

13        just trying to make sure that the record is clear about

14        what meeting.

15             MR. CORN-REVERE:  I appreciate the clarification.

16   BY MR. CORN-REVERE:

17        Q    Can you tell us whether or not this was something

18   that was discussed at the May 3rd meeting that you've

19   testified about?

20        A    I've already told you that meeting is not that

21   clear in my mind.  I've learned more from reading these

22   notes than anything else.

23             I assume that this was discussed at that meeting,

24   but I don't remember for sure.

25        Q    Okay.  Based on what you do recollect, do you know

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1  how this collage came to be in Dr. Zaccari's possession?

2      A     Huh-uh.  I don't know if he went on Facebook or if

3  some -- it could be that one of the S.A.V.E. students

4  brought it to him.  It could be -- I don't know.  It would

5  be unfair for me to guess.

6      Q     I'm not asking you to guess.

7      A     Yeah.

8      Q     But based on your experience with Facebook, isn't

9  it true that someone would actually have to affirmatively

10 seek out the information to get it if this was posted there?

11     A     Right.  One of those friends, if you will, I guess,

12 would've had to have that information.

13     Q     Okay.  So, unlike the flyer, which we've seen as

14 Exhibit Number Five which was distributed on campus, this

15 Facebook page, Exhibit Number Seven, is something that

16 people would actually have to go get on their own?

17     A     It depends on where it was posted.  I mean, if it

18 was on that -- what do they call it -- wall, I guess, it's

19 public domain.  I don't know.

20     Q     Right.  But even if it's on the wall and not

21 behind --

22           MR. WILL:  I think what he's saying is as opposed

23      to being on campus and distributed, you have to get on a

24      computer and look for it.

25           THE WITNESS:  Oh, yes.  I'm digging in further than

Page 103

1      I need to.  Yes, it doesn't just exist.  You would have
2      to go onto the Facebook page of where it was, yes.
3            MR. WILL:  Thanks.
4            THE WITNESS:  I don't know the intricate details of
5      how Facebook works.  All I know is that the word gets out
6      really fast.
7  BY MR. CORN-REVERE:
8      Q     Very quickly things become yesterday's news.
9            Just as we're looking at this Exhibit Number Seven,
10  let's look back at Exhibit Number Two for a moment.
11     A     That's the one I can't read?
12     Q     Yeah.  This is the parody from The Spectator about
13  the "Unofficial Biography of Robert Carlos Cortez Zaccari."
14     A     Okay.
15     Q     Just looking at these two exhibits side by side,
16  which of the two appears more threatening?
17     A     Well, I think it depends -- obviously, you're
18  asking my opinion?
19     Q     Yes.
20     A     I pretty much blow off anything that's in the
21  student newspaper under the editorial as college students
22  being college students.  So, this makes very little
23  difference to me.
24            MR. WILL:  That would be a reference to Number Two?
25            THE WITNESS:  Number Two.  I mean, big deal.  Bad

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1        taste.  Probably a little bit immature.

2                And I would imagine the generation that you're

3        in -- I apologize for saying this, but I think it's true.  I

4        think the generation that you're in probably responds

5        differently.  I think the younger you are, you're less

6        likely to be offended by that.

7                So, I can see why Dr. Zaccari might not think

8        that's not quite so cool.  This doesn't bother me much.  And

9        I'm not sure this bothers me that much, either, outside the

10       fact that memorial does sort of look personal.  This is

11       personal.  This is dumb college fun.

12       BY MR. CORN-REVERE:

13       Q    So, college fun includes the phrase "students were

14       ready to shoot the man down"?

15       A    No.  I said it's in bad taste.

16                You know, you asked me earlier what I thought of

17       the First Amendment and free press.  This is free press, and

18       he had the right to put it there and so is this.

19       Q    So, when you say, "so is this," you're saying that

20       Exhibit Number Seven, the Facebook collage, is also an

21       example of free of press and that the person has the right?

22       A    What it is -- you have to understand that my

23       background is psychology.

24                How you feel is -- I can't control how you feel.  I

25       might think that you feel inappropriately, but you feel that

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    way.
 2              I don't know why or what reasons Dr. Zaccari had to
 3    feel the way he did.  All I can say is I believe he felt it.
 4         Q    Yeah.  But you disagree with the perception that
 5    this represented a threat.
 6         A    No.  I can see where he would see it as a threat.
 7              I can also see where it may not have been intended
 8    to be that way.
 9         Q    But I'm asking about your perception right now.
10    You did not perceive this as a threat.  Isn't that right?
11              MR. WILL:  I believe he's already answered the
12         question.
13              THE WITNESS:  I'm just trying to be as fair and
14         honest as I can possibly be.
15              I believe beyond a shadow of a doubt -- throwing in
16    a little legal terminology there --
17    BY MR. CORN-REVERE:
18         Q    You might not want to do that.
19         A    -- that Dr. Zaccari believed that this was
20    threatening to him.
21         Q    But that's not my question.
22         A    If it was me, I would probably be upset.  I would
23    probably want to know what's going on, but I don't think I
24    would believe they were going to come shoot me.
25         Q    Let's mark as Exhibit Number Eight a series of
```

Page 106

1    pages from Facebook.

2              (The document was marked for identification as

3         Plaintiff's Exhibit Number Eight.)

4              THE WITNESS:  (Reviewing document.)

5    BY MR. CORN-REVERE:

6         Q    Have you had a chance to look at this Exhibit

7    Number Eight?

8         A    Briefly.

9         Q    Again, I'm not asking you to read every word.  I

10   just want to find out as a threshold matter if you have seen

11   this exhibit before.

12        A    It doesn't look familiar.

13        Q    Okay.  Do you recall whether or not Facebook pages

14   like this were discussed at either the May 3rd meeting with

15   Dr. Zaccari or the other meeting that you attended where

16   Dr. Zaccari discussed the administrative withdrawal of

17   Hayden Barnes?

18        A    Well, I did tell you that I recall the Facebook

19   page that you showed me before, Exhibit Seven or whatever it

20   was.  I don't recall these Facebook pages being discussed.

21   I don't recall seeing these before.

22        Q    Okay.

23        A    I don't even know where -- are these from Hayden

24   Barnes' Facebook pages?  I don't know where they are from.

25        Q    Again, I just wanted to find out if you had seen



1    them or if you had a recollection.  If you don't, you don't.

2       A    Uh-huh.

3       Q    Let's mark as Exhibit Number Nine a two-page

4    document dated May 7th, 2007, which is the Notice of

5    Administrative Withdrawal.

6              (The document was marked for identification as

7        Plaintiff's Exhibit Number Nine.)

8              THE WITNESS:   (Reviewing document.)

9    BY MR. CORN-REVERE:

10      Q    Now before we actually talk about this exhibit, I

11   just wanted to backtrack to something you had said earlier.

12          You mentioned in discussing some of the

13   conversations about the administrative withdrawal that

14   Dr. Zaccari had expressed concerns about calls to his house

15   and various other matters that bothered him?

16      A    He mentioned to me once that he had received calls

17   in the middle of the night; and when he answered the phone,

18   there wasn't anybody there.

19      Q    Okay.  Did he tell you who placed those calls?

20      A    No.

21      Q    Did he say he thought that Hayden Barnes had placed

22   those calls?

23      A    No.  He may have inferred it, but he didn't say it.

24      Q    Okay.  Did he give you any reason to believe that

25   it might've been Hayden Barnes that placed calls like that?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      Well, I think it was just in the timing.  The fact
2   that it was the same timing.  He could've made that
3   inference; but he didn't tell me, "I believe that Hayden
4   Barnes called me."
5           I think he also told me at one time that somebody
6   threw something against the side of his house.
7      Q      Uh-huh.  But were those occurrences something that
8   came up during the May 3rd meeting regarding the withdrawal
9   of Hayden Barnes from the university?
10     A      I think so.  Or maybe the other one.  I don't know.
11     Q      Uh-huh.  And did anyone else express the opinion
12   that it might have been Hayden Barnes doing these things?
13     A      I don't know.  It might've been.  I don't know if
14   anybody knew or could say.
15          Again, the majority of people in these kinds of
16   roles have had this kind of thing happen to them.  So, we
17   all know that it's frightening and disappointing, but we all
18   usually know that you're never going to learn a great deal
19   more about it.  So --
20     Q      So, it's the sort of thing that just happens from
21   time to time?
22     A      I wouldn't want to downplay it as a "big deal."
23   It's just one of those things you live with, I guess.
24     Q      And I'm not trying to suggest that it's not
25   something to be concerned about.  But just in your

```
 1    experience with universities, it's the kind of thing that
 2    can occur from time to time just as part of the job?
 3        A    Unfortunately, yes.
 4        Q    Now let's look at Exhibit Number Nine.  This is the
 5    notice to Mr. Barnes about his administrative withdrawal.
 6             Have you seen this document before?
 7        A    I'm trying to think if I've actually seen a
 8    physical copy.
 9             I've been told what was in it, but I don't know if
10    I've actually seen it.  There's nothing in it that terribly
11    surprises me, so maybe I have.
12        Q    Okay.  And attached to the letter is another copy
13    of the collage that we talked about in the earlier exhibit.
14        A    Uh-huh.
15        Q    Looking at the first paragraph of the letter, it
16    says, "Pursuant to Board of Regents Policy 1902, you are
17    hereby notified that you have been administratively
18    withdrawn from Valdosta State University."
19             Can you tell me what Board Policy 1902 is?
20        A    I have no idea.
21        Q    Okay.  Is this the provision you were referring to
22    earlier in the student handbook when you were talking about
23    an administrative withdrawal?
24        A    I don't know.
25        Q    Okay.  Looking at the following paragraphs where it
```

Page 110

1    says that there are certain conditions under which

2    Mr. Barnes might return to the university -- do you see

3    those?

4        A    Number one and two, you mean?

5        Q    Yes.

6        A    Uh-huh.

7        Q    Are these conditions that you recognize from VSU's

8    student policies for readmission to the university?

9        A    No.  I've never seen this done before, so there is

10   no precedent.

11       Q    And the final paragraph says, "Normally, decisions

12   would be appealed to the President, but in this case it

13   should be appealed to the Board of Regents."

14            Is it your -- go ahead.

15       A    No.  I'm supposed to wait until you finish.

16       Q    I thought you might have some insight to add.

17            By having the appeal go directly to the Board of

18   Regents, does that mean that there was no administrative

19   process on campus that Mr. Barnes could've availed himself

20   of?

21       A    I can only give you my opinion.  I believe that

22   because the president is the final campus appeal, when the

23   president is the one making the accusation, it is only

24   appropriate or -- I guess appropriate isn't right.  It

25   logistically makes sense that you would go to the next

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    appeal.

2           If I was filing charges, I would not hear an appeal

3    against myself.

4           So, I assume since he is the one who is concerned,

5    he's certainly not going to send you to his subordinate, so

6    he sent it to his supervisor.

7      Q    So, this means there would be no due process at the

8    university level, doesn't it?

9      A    It means that the Board of Regents would be the one

10   to respond to a president's accusation.

11     Q    So --

12     A    In this letter.  I mean, that's the way I interpret

13   it.  I don't know -- I mean, we're talking about the same

14   thing here.

15          If I'm involved in a case and I'm in an appeal,

16   obviously, I'm not going to get appealed to about my own

17   situation.

18          And I assume that's why that was the case.  If he's

19   involved with it -- he is normally the university's appeal.

20   So, then it goes to the next level of appeal, I guess, which

21   would be the Board of Regents.

22     Q    Okay.  So, because of the unprecedented way in

23   which this was done, there is no appeal process on campus

24   for this administrative withdrawal?

25     A    There most definitely would be an appeal process if

                                                      Page 112



1    it came from somebody lower in the chain.  If it came from a

2    faculty member, it would go through the appropriate -- I

3    don't know.

4         I think he called the Board of Regents and said if

5    the president has a concern and you can't appeal to the

6    president, who do you appeal to?  And they said, "The Board

7    of Regents."

8    Q    I think you may have assumed my question in your

9    answer.

10         Because of the unprecedented way in which this was

11   done -- meaning the President brings the complaint -- there

12   was no one to appeal to on campus.

13   A    Correct.  I don't know of a circumstance -- I may

14   be incorrect.  But I don't know a circumstance where you

15   would appeal down in the chain of command.  You would appeal

16   up in the chain of command.

17   Q    Yeah.  And you've never seen a situation in which

18   the university president was the one to bring the complaint?

19   A    That's correct.

20   Q    Do you know how this notice was delivered to

21   Mr. Barnes?

22   A    It's a letter.  I don't know if it was certified or

23   if it was hand delivered.  I assume one of those two.

24   Q    Okay.

25   A    I think at the time he was a resident on campus, so

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    it probably went to his -- yeah, went to his VSU P.O. Box.

2    I guess the answer to your question is no, because I'm

3    making an assumption.

4        Q    Yes.  No need to make an assumption, just if you

5    know.  If you know.

6        A    I apologize for making an assumption.  I don't

7    know.  I'm guessing.

8        Q    Okay.  Let's mark as Exhibit Number 10 a series of

9    emails.

10            (The document was marked for identification as

11       Plaintiff's Exhibit Number 10.)

12            THE WITNESS:  (Reviewing document.)

13   BY MR. CORN-REVERE:

14       Q    Okay.  Take a look at that when you get a chance.

15       A    (Reviewing document.)

16       Q    And I'll just tell you for the record that this is

17   a series of emails that we received in response to a FERPA

18   request from Mr. Barnes' files; and it included a number of

19   documents, including this email chain, the first of which,

20   at the bottom of the page, is from Thomas Hardy to Russ

21   Mast, Kurt Keppler, Victor Morgan.  And then there were some

22   cc's.

23       A    Uh-huh.

24       Q    Now that you have had a chance to look at that --

25       A    Uh-huh.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q     -- can you tell me if you've seen this email

2    before?

3    A     Obviously, if it was sent to me, I did.

4    Q     Do you recall getting it?

5    A     I guess I do now that I think about it.  I didn't

6    until I saw it.

7    Q     Okay.  What do you remember now based on seeing

8    this email?

9    A     Well, Tom Hardy is our housing person.  This is

10   saying that the letter must've been delivered directly to

11   his room, which is one of the two things I said to you.

12         So, I guess what he's saying is, hopefully, I at

13   least received a copy so they know what to do next.

14         He must've had housing slip it under the door or

15   posted to the door or something like that.  Again, I'm

16   making inferences.

17   Q     Well, the letter was, in fact, slipped under his

18   door.

19         Let me just ask:  For a withdrawal notice to be

20   slipped under a student's door, is that process consistent

21   with a concern that a student might be dangerous?

22   A     I'm not sure I understand the question.

23   Q     Well, if a student is considered to be a threat --

24   A     Uh-huh.

25   Q     -- or dangerous, do you think it would be more

Page 115

1    likely to precipitate a problem or less likely to

2    precipitate a problem if a withdrawal notice is simply

3    slipped under his door?

4        A    As opposed to calling him up in person or -- I'm

5    not --

6        Q    Or perhaps having campus security escort him off

7    campus?  I mean, how would you deal with a situation where

8    there's actually the perception of a threat?

9        A    That's a different question.  Now you're asking me

10   how I would do it.

11           MR. WILL:  That's a compound question, too.

12   BY MR. CORN-REVERE:

13       Q    I'm asking you for your judgment.  Do you think it

14   was more likely to create a danger or less likely to create

15   a danger if you simply slip a note under a student's door

16   saying they're cut off?

17       A    I really don't know.  I mean, sometimes bringing

18   campus security into a situation is the wrong thing to do

19   because then it gets people even more nervous when there is

20   people with authority.  So, you could argue that it could go

21   either way.

22           I probably would've wanted to do it in person.  I

23   would want to have a face-to-face but that's not neither

24   here nor there.

25       Q    I just suggested the possibility of campus

Page 116

1    security.  But might there be other ways to do it?  Is

2    that --

3        A    I think that you're -- correct me if I disagree,

4    but you're asking me often if I approve of the way it was

5    handled; and I wasn't the person that had the right to

6    approve the way it was handled.  So, I can only tell you how

7    I would've handled it.

8        Q    Actually, that's what I want to know.  How would

9    you have handled the situation?

10        A    I just told you.  I think if it would've been me,

11    the best thing for me in my style and my experience, which

12    doesn't mean that it's the best thing for anybody else, is I

13    probably would've done it face-to-face.

14        Q    Why would you have done it that way?

15        A    Because I think it would've been less

16    confrontational and it may have even resulted in a chance to

17    clarify some of the things.

18        Q    Okay.

19        A    Sometimes writing is not clear.  Now that doesn't

20    mean that my way is right.

21        Q    And, again, I'm just simply asking how you would've

22    handled it if it had been your decision.

23        MR. CORN-REVERE:  Actually, we're going to go into

24    a few questions about the student handbook.  This might

25    be a good time to take a short break.  It's up to the

Page 117

```
 1    witness.
 2              MR. WILL:  Let's go off the record for just a
 3         minute.
 4              (Discussion off the record.)
 5              (A recess was taken from 11:58 a.m. to 12:13 p.m.)
 6    BY MR. CORN-REVERE:
 7         Q    Let's mark as Deposition Exhibit Number 11 the
 8    Student Handbook Volume I.
 9              (The document was marked for identification as
10         Plaintiff's Exhibit Number 11.)
11              THE WITNESS:  (Reviewing document.)  If would were
12         technologically inclined, you would've brought this
13         compact disk.
14    BY MR. CORN-REVERE:
15         Q    That's true.  But then we would've each had to have
16    computers in front of us and my highlighter would've been
17    useless.
18              I assume you're familiar with this document.
19         A    Yeah.  I wouldn't be able to recite it to you
20    backwards and forwards, but I'm pretty familiar with the
21    majority of it.
22         Q    Let's start with page six.
23         A    Uh-oh.  Did I say something bad in my letter?
24         Q    Let me just start by saying that it's a very
25    handsome likeness.
```

Page 118

1           But I just wanted to ask you about what you have
2    written -- I assume this is something you've written --
3    starting the fourth paragraph down, that says, "National
4    research shows that students graduate quicker and with
5    better grades if they maintain campus involvement.  Student
6    Affairs urges students to get involved in campus
7    organizations and activities."
8           Do you see that?
9    A    I sure do.
10   Q    Okay.  Do you believe that's true?
11   A    Absolutely.
12   Q    Okay.  Does that include involvement in political
13   issues?
14   A    Absolutely.
15   Q    Now earlier I believe you testified that without
16   the student handbook in front of you, you wouldn't be able
17   to name the policy that relates to administrative
18   withdrawal.
19          And now with this document, I was wondering if you
20   could direct us to the place in the student policies where
21   we might find administrative withdrawal.
22   A    Oh, brother.  Richard Lee could probably --
23   (Reviewing document) -- I'm sorry.  Bear with me.  You have
24   multiple documents with you here.
25   Q    Sure.  Take the time you need.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      If you start on page 57, that is the student code
2    of conduct, which is a separate document from the student
3    handbook.
4           It's put together on the compact disk in the same
5    file under two different headings.  So, when you staple it
6    together, you're really looking at two different documents,
7    although they certainly can be used as a combination.
8           The handbook is more information about the
9    university's life, and then the code of conduct is more on
10   the disciplinary process.
11     Q      Sure.  And I would've been happy to lug less paper
12   down here or rather, to be more accurate, to have Erin lug
13   less paper down here; but I didn't want to leave off part of
14   it that might have been more important.
15          I agree the part of this document beginning at page
16   57 labeled student code of conduct is the one I will have
17   other questions about, but is that where we would find it,
18   if we are to find the part about administrative withdrawal,
19   in that section?
20     A      I'm struggling right now to pluck it directly off.
21   I'm getting confused between the processes and the actual
22   wording.
23     Q      Okay.  Rather than have you just sort of thrum
24   through it, let me start by asking questions about policies
25   that have been named in this proceeding; and we'll see if we

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    can find somewhere in there a process that relates to an

2    administrative withdrawal.

3            Could you look at page 59.

4    A    Uh-huh.

5    Q    At the lower right corner of the page, section D,

6    labeled Disorderly Assembly, do you see that?

7    A    Uh-huh.

8    Q    Okay.  And this purports to state the Board of

9    Regents Policy Manual Section 1902.

10   A    That's what I didn't know by number.

11   Q    Okay.  Now just for way of refresher, this is the

12   policy that was named in President Zaccari's May 7th, 2007,

13   notice of withdrawal, right?

14   A    Uh-huh.

15   Q    So, in Exhibit Number Nine, the Withdrawal Notice

16   relied on Policy 1902.

17           Looking at this exhibit now, can you tell me

18   whether or not Policy 1902 relates to administrative

19   withdrawal?

20   A    Can you tell me when this was Xeroxed?

21           MS. REID:  Saturday?

22           THE WITNESS:  Okay.  I just want to make sure it's

23    not five years old or something because we change it

24    every year.

25           MS. REID:  This is the version that we received on

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      the disk --

2             THE WITNESS:  Okay.  Cool.

3             MS. REID:  -- from Dave Will's office.  So,

4      whatever version of the student code of conduct that is.

5             THE WITNESS:  Okay.  Your question again?  Is this

6      the part of the handbook that relates to --

7    BY MR. CORN-REVERE:

8      Q      Administrative withdrawal.

9      A      It is.

10     Q      Okay.  Where would we find that in the policy on

11   disorderly assembly?

12     A      I'm sorry?

13     Q      Where does this policy on disorderly assembly refer

14   to administrative withdrawal?

15     A      The Board of Regents (mumbling) --

16     Q      I know you're sort of reading quickly.  If it would

17   help, I can read the language into the record and then ask

18   you to respond to it.

19     A      Whatever you think is easiest.

20     Q      Okay.  So, it simply states:  "The Board of Regents

21   B.O.R., Policy Manual Section 1902 --

22     A      Uh-huh.

23     Q      -- regarding disorderly assembly states, 'Any

24   student, faculty member, administrator or employee acting

25   individually or in concert with others who clearly obstructs

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    or disrupts or attempts to obstruct or disrupt any teaching,

2    research, administrative or disciplinary or public service

3    activity or any other activity authorized to be discharged

4    or held on any campus of the University System is considered

5    by the Board to have committed an act of gross

6    irresponsibility and shall be subject to disciplinary

7    procedures possibly resulting in dismissal or termination of

8    employment.'"

9            And then it refers to the Board of Regents minutes

10   of 1968 and 1969 and 1970 and '71.

11   A     Uh-huh.

12   Q     Does that describe a process for administrative

13   withdrawal?

14   A     It's unclear to me.  I mean, the Board of Regents

15   is -- my interpretation is that the manual is saying that

16   the Board has the authority to do what you read based on the

17   statements that are in here.

18           Whether or not the situation with the president and

19   Betsy Neely identifies correctly with this is, you know,

20   another question.

21   Q     I know.  But earlier I believe you testified that

22   we would find a policy on administrative withdrawal in the

23   student handbook, and I'm just trying to figure out which

24   policy that might be.

25   A     I guess we're talking about two different things.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     Q     I think we are.

2     A     I tried to talk about how a student can withdraw

3   for medical reasons for personal reasons; and that's not

4   part of the discipline.  That's part of the student rights

5   section.

6     Q     So, when you were referring earlier to

7   administrative withdrawal, you were not referring, if I

8   understand your testimony, to a disciplinary procedure.

9     A     Administrative withdrawal, in my interpretation --

10   I mean, you have to understand.  If I was called on the spot

11   and asked to do what you're doing right now, I'd make sure

12   that I had my ducks in row and I'd check out and I'd read

13   and I'd have this done; but I have two people that do that

14   in my office that already have that under control.

15           An administrative withdrawal could mean a series of

16   things.

17     Q     Okay.

18     A     And a lot of it is depending on how you interpret

19   it.  We have an opportunity here called a hardship

20   withdrawal.

21           A hardship withdrawal is generally an opportunity

22   for a student to withdraw from the university because of a

23   medical or physical or personal hardship.

24           Mother passed away.  House burned down.  A bad

25   thing happened to them.  We allow them a hardship withdrawal



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    so that it doesn't affect them.
 2            The Board of Regents 1902, which I don't claim to
 3    be an expert on, I believe, details that administrative
 4    withdrawal is a decision that can be made when there is a
 5    clear -- no, that's your term, clear and present --
 6    Q    Not my term.
 7    A    It's a legal term.  When there is a potential
 8    dangerous circumstance where there is a need to act
 9    immediately and quickly.
10            It's never been done that I know of before this
11    instance.  That's why, I hate to say it, I'm probably not
12    very adept at describing it.
13    Q    Okay.  Well, again, I'm just trying to find out
14    what administrative withdrawal is.
15            As I understand your testimony -- correct me if I'm
16    getting this wrong -- you suggested that that is something
17    that is part of the student rights section of the handbook
18    and would relate to certain things like a hardship
19    withdrawal --
20    A    I misinterpreted it.  I think that's one of the
21    reasons why I need to make sure that what I say is what I
22    say.
23            A hardship withdrawal, a medical withdrawal, those
24    are more advantageous to the student.  They're not a
25    disciplinary thing.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          My understanding of the administrative withdrawal

2      from 1902, which I'm not familiar with because I've never

3      seen it used before, is more when the individual is a

4      perceived danger or threat.

5          Q    Okay.  So, does the term administrative withdrawal

6      appear in this section?

7          A    In that section you're pointing at?

8          Q    Yeah, in the description of Board Policy Section

9      1902.  Does it refer to an administrative withdrawal?

10         A    Not in the part that is placed in this writing

11     here.  Whether it appears in the entire 1902, I don't know.

12         Q    Well, this is 1902.

13         A    But is it the complete thing?

14         Q    Yes.

15         A    I don't know.  I'm not an attorney.  I don't know.

16         Q    Again, I'm not trying to ask for a legal opinion.

17         A    You're getting me off my area of expertise.

18         Q    I'm just trying to understand your earlier

19     testimony when you say --

20         A    My earlier testimony is real simple.  When the

21     Board of Regents' attorney says to my president that a

22     particular section of the Board of Regents Policy is -- it

23     doesn't matter.  Whatever it is, it is.

24          My attempt to try to challenge that is pretty much

25     shot.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Okay. So, would it be correct to say that when you
2    refer to this as an administrative withdrawal, it was
3    because of your understanding that that is the way in which
4    the attorney for the Board of Regents described it to
5    President Zaccari?
6    A    The attorney described to the president that there
7    was an opportunity for administrative withdrawal. This is a
8    process that I am unfamiliar with.
9    Q    Okay.
10   A    My idea of administrative withdrawal is what I
11   shared with you before. It tends to be more to the
12   advantage of the student based on medical or illness or
13   trauma.
14   Q    Okay. So, this Board Policy 1902, as we've just
15   described it, it is in contrast a disciplinary procedure
16   used to deal with circumstances of gross irresponsibility.
17   Is that right.
18   A    The way it is reading here is, basically, it's
19   saying that anybody -- we've read it a thousand times.
20        If you disrupt the institution or obstruct the
21   institution from the teaching, research or processes, that
22   they -- you have a chance to -- it is possible that you can
23   be discharged or held at the campus, University System, as
24   considered by the Board to have committed an act of gross
25   irresponsibility.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1           That is my understanding of what the attorney of

2    the Board of Regents told the president was the rationale

3    for an administrative withdrawal.

4       Q     Okay.

5       A     That's all I know.

6       Q     Okay.  But do you have any separate understanding

7    of where we might find the term administrative withdrawal in

8    the student handbook?

9       A     Outside of what we have talked about with the

10   withdrawal for medical and purposes like that?

11      Q     (Nods head.)

12      A     Not off the top of my head.

13      Q     Looking at the next section just beneath the part

14   describing Board Policy 1902, there's a section "E" labeled

15   Disorderly Conduct.

16           Based on your understanding of the administrative

17   withdrawal of Mr. Barnes, do you think that this section on

18   disorderly conduct applies to what happened?

19      A     Do I, personally, think that?

20      Q     Yes.

21      A     No.

22      Q     Okay.  Let's move to page --

23      A     I interpreted disorderly conduct -- that's neither

24   here nor -- I'm going too far.

25      Q     Well, feel free to answer.

Page 128

1       A       Disorderly conduct is drunkenness or you're doing
2    all of these various things here.
3               Now, I guess, in theory, with the appropriate
4    analysis of this number five, there's other things besides
5    just disorderly -- disorderly conduct is broader than just
6    being obnoxious.
7       Q       Okay.  So, you're referring to this language that
8    appears in number five, that says, "Conduct and/or
9    expressions which are obscene or which are blatantly
10   offensive to the prevailing standards of the university
11   community are prohibited."
12      A       Right.  But if I were interpreting this in my role
13   as vice president, a student would be charged with violating
14   section E; and he or she would then have the chance to:  A,
15   except that responsibility and meet with the chief judicial
16   officer and identify appropriate sanction or, B, deny
17   responsibility and have the right to a hearing.
18      Q       I see.
19      A       In this discipline process that you're reading here
20   is how our office would -- student affairs, not our
21   office -- the judicial office would process through these
22   cases.
23              As I told you now three or four times, this whole
24   thing got different because it's the president
25   prosecuting -- bringing the charges.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

DR. KURT J. KEPPLER 7/28/2009

1    Q    Okay.

2    A    I don't know how else to explain that.

3    Q    I know.  I just want to understand.  When you used

4    the term "that it got different," are you suggesting that it

5    became something that was not governed by the processes that

6    we see spelled out in the student handbook here?

7    A    I'm saying that it left my area of responsibility

8    to a higher pay grade.

9    Q    Okay.  That's fair enough.

10   A    I know.  I know.  And we've talked about it before,

11   and I've said this three or four times.

12        I'm not aware of all that happened in those

13   conversations, and I don't know all the things that the

14   president felt or perceived that the prosecutor did.

15        He may have perceived the prosecutor did 20

16   things -- Mr. Barnes.  He may have perceived that Mr. Barnes

17   did 20 things that I'm not aware of.

18        What I am aware of in my role, I would've run

19   through the system exactly the way it is; and he would've

20   had a chance to have a hearing.

21   Q    Okay.  And that's not what happened here.

22   A    That's not what happened.

23   Q    And, again, I'm not asking you to justify --

24   A    And I think that's pretty clear that that's how I

25   feel if you ask anybody on campus.

Page 130



1       Q       Okay.  Again, because you've pointed out this
2    language in number five under disorderly conduct, the
3    conduct or expressions which were obscene, let's look back
4    at Exhibit Seven.  That's the collage.
5       A       Uh-huh.  (Reviewing document.)
6       Q       In your judgment -- again, I'm not asking you for
7    what Dr. Zaccari might've been thinking, but in your
8    judgment do you see anything in this collage that is
9    obscene?
10      A       In my judgment, no.
11      Q       Do you see anything in this collage which is
12   blatantly offensive to the prevailing standards of the
13   university community?
14      A       That's a difficult question; but I would think that
15   based on my opinion, even the word "memorial" is possibly --
16   as offensive as it is, would probably not qualify as
17   obscene.
18              Although, if I understand the law -- and I don't --
19   but I believe Justice Stewart said, "I don't know what
20   obscenity is, but I know it when I see it."
21              That's about the closest you can come to defining
22   it, I believe, right?
23      Q       Funny thing about that expression.  He said it in a
24   1964 opinion called Jacobellis versus Ohio.
25              Later on in 1974, Justice Stewart, oddly enough,

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    decided he couldn't know obscenity when he saw it and
2    changed his mind.  But that's an aside.
3        A     All I would say to your question is that I believe
4    that my level of resiliency towards obscenity would probably
5    be larger than the average person because of the jobs that
6    I've held and the roles that I've played.
7        Q     In any event, this wasn't the provision that the
8    administrative withdrawal was based on, was it?
9        A     No.  I wish that I could tell you what the
10   conversation was with that, but I don't know.
11       Q     Again, I am not asking you to imagine what people
12   might've been feeling.
13             And, in fact, if President Zaccari had simply been
14   pretending to be upset, that's certainly possible, too.  You
15   wouldn't have known that, would you?
16       A     I wouldn't have known.  But I've also worked with
17   him seven years, and I think I have a pretty good idea of
18   the man's emotional state from budget cuts to board meetings
19   to everything.  I don't believe that there was any
20   pretending in this particular situation.  I think it was
21   sincere.
22       Q     Okay.  Let's look at page 62 and 63.
23       A     (Reviewing document.)
24       Q     If I understood your testimony correctly, you said
25   that if this had been your decision that you would've simply

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    followed the policies that are laid down in the student
2    handbook.
3            Are these policies listed under Appendix B, rights
4    of student, that begins at the bottom of page 62 and then
5    continues on to the next page -- are those the processes
6    you're referring to?
7    A     Yeah.  If a student chooses to have a Judicial
8    Committee hearing -- remember, they don't have to choose.
9    They can waive their right to a hearing.
10   Q     Yes.
11   A     But if they chose the right to have a hearing, they
12   have a right to those following letters there.
13   Q     Okay.
14   A     I think I need to be clear.  We don't perceive, nor
15   I don't believe any university perceives, judicial hearings
16   to be a legal proceeding.  It is an administrative hearing.
17           So, our terminology should not be compared to legal
18   terminology.  In fact, if anything, we probably need to be a
19   little careful because sometimes I think people can assume
20   that we're reciting the law.  We're not reciting the law.
21   We are reciting a series of procedures and policies.
22   Q     Right.  But don't those procedures create what you
23   think of as due process at the university level?
24   A     Yes.
25   Q     Looking at the bottom of the first column on page



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1      63, it says under Section 401 of the Board of Regents
2      policies:  In accordance with" -- skipping down a couple of
3      lines -- "In accordance with this responsibility,
4      disciplinary sanctions shall be applied only after the
5      requirements of due process, fairness and reasonableness
6      have been met."
7            Is that a fair statement of your policy?
8      A     It is.
9      Q     Okay.  Was that the policy that was followed in
10     this case?
11     A     No, it was not.
12     Q     And just below that it says, "The President has
13     delegated the function of student discipline to the Vice
14     President for Student Affairs and he, in turn, designates
15     the Dean of Students Office and its staff to handle the
16     day-to-day disciplinary process."
17     A     Uh-huh.  Yes.
18     Q     Okay.  So, in other words, the delegation of
19     responsibility comes to you and then through you to others
20     in your office?
21     A     Correct.  And to the best of my understanding, this
22     has been followed in any one of those cases that's ever come
23     before us.
24     Q     Let's move on to page 68 and 69.  Actually, let's
25     just look at page 68 at the bottom of the first column where
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    it says "mental health withdrawal."

2      A      Which I refer to sometimes as hardship withdrawal.

3      Q      So, when you're referring to a hardship withdrawal

4    as an administrative withdrawal, you're really thinking of

5    the mental health withdrawal policy?  Is that right?

6      A      Yes.

7      Q      Have you had a chance to look over what's required

8    for the mental health withdrawal policy?

9      A      Yes.

10     Q      Do you believe that the conditions for a mental

11   health withdrawal were met in the case of Hayden Barnes?

12     A      I guess my answer is the same.  It depends on how

13   much of the situation I wasn't privy to, because I don't

14   believe I was privy to it all.

15          But based on what I know, there is a possibility

16   that there could have been this option.

17          But what I also don't know is, you know, if

18   someone -- one of those minor areas in disorderly conduct

19   may have been appropriate which could've led to a code of

20   conduct hearing.

21          And there could've been a resulting not guilty

22   which could've made this as a secondary option, if that

23   makes sense.

24     Q      Well, let's look at the specific requirements

25   because I think it will make it easier to address that

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    question specifically.

2         The first condition for mental health withdrawal --

3    and this is, again, looking at page 68 at the top of the

4    second column -- says, "The student displays behavioral

5    indicators which are determined by a mental health

6    professional to be of danger to himself or others."

7         Are you aware of any mental health professional

8    that expressed the opinion that Hayden Barnes was a threat

9    to safety on campus?

10    A    I'm not aware of it.

11    Q    Okay.  I mean, that's my question because, you

12    know, you were at the meetings.  And if someone expressed

13    it, I'm asking what you are aware of.

14    A    I think I've made it really clear.  The decision

15    that was made would not have been the one I made.  I did not

16    have an opportunity to influence any more than I did.

17         And I am also not aware of what stuff occurred that

18    made that decision that never got to my level.  It could be

19    that there's 15 things that happened that I don't know

20    about, and maybe it was the right decision.

21    Q    Please understand --

22    A    Based on what I know, I would've followed this.

23    Q    Okay.  Please understand.  I'm not asking you to

24    justify the decision.  I'm just asking for information that

25    you may be aware of or you may not be aware of about the

Page 136

1   conditions that were met.

2           Again, with respect to this first condition, are

3   you aware of any mental health professional that expressed

4   the opinion that Hayden Barnes was a danger to himself or to

5   others?

6       A    I don't believe anybody directly felt that --

7   expressed verbally that Hayden Barnes was, you know, going

8   to be the next Mr. Cho.

9           But I also believe that everybody was very

10  concerned about the whole situation.

11          And whether it's fair or unfair, I think the timing

12  of the situation probably made people even more alert.

13      Q    Okay.  But the answer to my question, though, is

14  that you're not aware of any mental health professional that

15  expressed the opinion that Mr. Barnes was a danger to

16  himself or others?

17      A    I do know -- I don't know the details, but I do

18  know that Mr. Barnes' therapist from home had talked to

19  either the university or the university attorney or

20  somebody.

21      Q    How are you aware of that?

22      A    From hearing the president mention it in that one

23  meetings that we had that there had been some conversation

24  or some discussion about the fact that there was another

25  therapist.  I have no idea what he said, what it meant.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     Q     So, is it your testimony the details of Mr. Barnes'
2     mental health background was discussed at the May 3rd
3     meeting?
4     A     No.  That's is not what I said.
5     Q     That's why I am asking.  I want to find out --
6     A     I said I believe there was a conversation with
7     another therapist.  I have no idea what that conversation
8     entailed.
9     Q     Okay.  Getting back to my question about the mental
10    health withdrawal policy --
11    A     Yes.
12    Q     -- are you aware of any statement by a mental
13    health professional that suggested Mr. Barnes was a danger
14    to himself or others?
15    A     No, I'm not.
16    Q     Okay.  And looking back briefly at Exhibit Four,
17    which are the notes from the May 3rd meeting --
18    A     (Reviewing document.)  Oh, this mess again?
19    Q     Yeah.
20    A     Which one?
21    Q     This is the one which has on the front page of it
22    "Dr. Zaccari" written in upper left-hand corner.  And then
23    on the fourth facing page --
24    A     Uh-huh.
25    Q     -- there's a comment with your name written next to

Page 138

1     it.

2         A     Uh-huh.

3         Q     Which states, "Counselors can't say Barnes is a

4     threat because there is nothing to support that Barnes is a

5     threat."

6               Do you have any recollection of whether or not

7     anyone from the Counseling Center suggested Mr. Barnes was a

8     threat?

9         A     I believe I just said that.  I don't believe

10    anybody said that he was -- I don't believe anybody said

11    this guy is definitely, without a shadow of a doubt, a

12    danger to this university or other people.

13        Q     Okay.  Let's look at number two under the mental

14    health withdrawal policy.

15              It says, "When a mental health professional

16    recommends that a student needs to be withdrawn from school

17    for mental health reasons, an informal hearing will then be

18    set up to determine -- "

19        A     Page please?

20        Q     I'm sorry.  Page 68 of Exhibit 11 under mental

21    health withdrawal policy.

22        A     Uh-huh.

23        Q     Condition number two.

24        A     Uh-huh.

25        Q     "When a mental health professional recommends that

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    a student needs to be withdrawn from school for mental

2    health reasons, an informal hearing will then be set up to

3    determine whether or not a student should be withdrawn."

4         Was there ever a discussion in any of the meetings

5    you attended on whether or not there should be such an

6    informal hearing for a mental health withdrawal?

7    A    I don't recall that discussion, but it was never

8    something that the president suggested.

9    Q    Okay.  And then finally, third, it talks about, "In

10   this informal hearing conducted by the Office of the Dean of

11   Students, the student or his representatives may present any

12   pertinent information that he or she believes will have a

13   bearing on the particular case."

14        Now I take it that condition is academic in this

15   case because no such hearing was ever convened.  Isn't that

16   right?

17   A    Yes.  There's a difference between an informal

18   hearing and a formal hearing, and I think we've shared that

19   already.

20        MR. CORN-REVERE:  Okay.  Let's mark as Keppler

21        Deposition Exhibit Number 12 a section of Board of

22        Regents of the University System of Georgia Policy

23        Manual, Section 400, Student Affairs.

24             (The document was marked for identification as

25        Plaintiff's Exhibit Number 12.)

Page 140

1          THE WITNESS:  (Reviewing document.)

2    BY MR. CORN-REVERE:

3      Q      Now this is a multi-page document, but I really

4    just have a question about the front page.

5          So, I'm particularly interested in -- on page one,

6    Section 401.05:  Students with Disabilities.

7      A      (Reviewing document.)  Okay.

8      Q      My question is:  what does that policy mean to you?

9      A      What does the policy mean to me?

10     Q      Uh-huh.  What does it require of the university in

11   your opinion?

12     A      Well, first of all, it requires us to follow ADA

13   and that the modifications that need to be made that are

14   required, that are not beyond ridiculousness, need to be

15   taken care of.

16          I'm familiar with ADA.  I have an office that I

17   have an extreme amount of respect for that they advocate on

18   behalf of this, and I feel very comfortable that they do

19   everything they can to do so.

20     Q      If the university imposed a sanction on a student

21   because he was using the university Counseling Center, would

22   that be consistent with this policy?

23          MR. WILL:  I'm sorry.  Can you repeat the question?

24          THE WITNESS:  I don't understand.

25   BY MR. CORN-REVERE:

Page 141

```
1     Q     If a student -- read it back.
2           (The requested portion was read back by the Court
3     Reporter.)
4           THE WITNESS:  No.
5           MR. CORN-REVERE:  Let's mark as Deposition Exhibit
6     Number 13 a one-page memorandum from Ronald Zaccari to a
7     list of recipients.
8           (The document was marked for identification as
9     Plaintiff's Exhibit Number 13.)
10          THE WITNESS:  (Reviewing document.)  Okay.
11    BY MR. CORN-REVERE:
12    Q     Have you had a chance to take a look at that
13    exhibit?
14    A     Uh-huh.
15    Q     Could you identify it for the record?  Could you
16    tell us what it is?
17    A     It's a letter from the president to a series of
18    university administrators telling them that Mr. Barnes had
19    been administratively withdrawn and that he needed to leave
20    the university in two days and he should receive a full
21    refund.
22    Q     Okay.  So, this is dated May 9th, 2007?
23    A     Uh-huh.
24    Q     So, this memorandum, if the date is accurate,
25    would've been sent two days after Mr. Barnes was notified of
```

Page 142

1    his administrative withdrawal.  Is that correct?

2        A     The note that went under the door, if it was dated

3    May 7, that's correct, yes.

4        Q     Okay.  Do you recall receiving this memorandum?

5        A     Yeah, I think so.  I don't remember it; but after I

6    read it, it's clear that I received it.

7        Q     Okay.

8        A     I think it verifies everything I've said.  We just

9    were told what happened.

10       Q     Yeah.  Looking just at the time period, the

11   administrative withdrawal went out May 7th; this memo came

12   out two days later.  And then, according to the text of this

13   memo, Mr. Barnes was given then another 48 hours to vacate

14   the premises.

15             Is that consistent with a belief that Mr. Barnes

16   represented a threat to campus safety or security?

17       A     In other words, why didn't they say he needs to

18   leave in five minutes?

19       Q     Yeah.

20       A     I think -- I mean, all I can do is assume.  Again,

21   I'm not sure that that's the appropriate thing to do at this

22   time.  Part of it was school wasn't in session and the only

23   people that were on campus at that time are the people that

24   live in the twelve-month housing, which is a 95-bed hall

25   that he lives in, in a 500-bed hall a mile on the other side

Page 143

1    of campus.

2          It may have been -- again, I'm basing this on an

3    assumption -- that the president and whoever advised him

4    thought that it was appropriate to give him time to pack up

5    and leave because there wasn't anybody else on campus.

6    Q     Again, I'm not asking you justify the decision.

7    I'm not asking you to imagine what others might've been

8    thinking.

9          But if you believed the student was really

10   dangerous, is this how you would've handled it?

11   A     I think we've already said this.

12         If I believed that the student was really

13   dangerous, I would've been more concerned about getting the

14   student help and getting the appropriate authorities

15   involved with the student.  I would've talked to the student

16   in person, and I would've probably had the student get some

17   medical attention.

18   Q     But you don't know that getting that kind of

19   attention would've been appropriate specifically for

20   Mr. Barnes, do you?

21   A     I don't know the specifics, no.

22   Q     Okay.

23   A     I guess that's the hardest part for me when I

24   answer these questions is I don't know what the delta is

25   between the level of information that I have and the level

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    of information that Dr. Zaccari has.

2        Q    Okay.  And, again, you know --

3        A    Delta is an appropriate word.

4        Q    Why do you say that?

5        A    Because it's a math word that I know, and I'm not

6    sure that other people use it that way.

7        Q    But, again, just to be clear, we're not trying to

8    have you explain or justify someone else's actions.  What

9    we're doing really is gathering information about what it is

10   that did happen and to find out who knows what happens and

11   what they can tell us about it.

12            So, when I ask these questions, it's really just

13   trying to get at that.

14            MR. CORN-REVERE:  Let's mark as Exhibit Number 14,

15       a one-page letter dated May 11, 2007.

16            (The document was marked for identification as

17       Plaintiff's Exhibit Number 14.)

18            THE WITNESS:  (Reviewing document.)

19   BY MR. CORN-REVERE:

20       Q    Have you had a chance to look at that?

21       A    Yes, sir.

22       Q    Have you seen it before?

23       A    Well, obviously, I'm copied on it.

24       Q    Well, sometimes I see things that I'm copied on

25   that I don't recall seeing.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      You know, I don't recall a lot of these things, but
2    I have confidence that they occurred because I trust the
3    people.
4      Q      Okay.  So, could you identify this for the record?
5      A      It's a memo or a letter actually asking Mr. Barnes
6    to leave his place of residence by Monday or what looks like
7    three days -- looks like he received something on a Friday
8    and was told he had to be out on a Monday.
9      Q      Okay.  So, this was, I guess, just a follow-up to
10   make sure that Mr. Barnes was leaving campus on the timeline
11   laid out in the earlier memorandum?
12     A      That's what it appears, yes.
13     Q      Okay.  And is the reason that you appear in the
14   "cc" line because you're generally kept apprised of --
15     A      Supervisor of the supervisor.  Dr. Hardy is the
16   individual who wrote this letter's supervisor and I am
17   Dr. Hardy's supervisor.  Protocol when writing a memo would
18   be to copy a supervisor.
19     Q      So, this is simply so you would have a complete
20   file on what happened?
21     A      I guess, yes.
22     Q      Okay.  Do you recall anything else about this
23   exhibit?
24     A      Huh-uh.  No.  Sorry.
25            MR. CORN-REVERE:  Let's mark as Keppler Exhibit

Page 146



```
 1        Number 15 -- and I believe, the final exhibit -- a
 2     multi-page letter dated June 21st 2007, from Ronald
 3     Zaccari to Elizabeth Neely.
 4             (The document was marked for identification as
 5     Plaintiff's Exhibit Number 15.)
 6             THE WITNESS:  (Reviewing document.)  Do you want me
 7     to read these eight pages?
 8  BY MR. CORN-REVERE:
 9     Q     No.  I'll direct you to a couple of places in the
10  letter that we can talk about.  If you want to read the
11  eight pages, feel free.
12             First, I want to find out if it's a document you've
13  seen.  Have you had a chance to see what it is?
14     A     Uh-huh.
15     Q     Have you seen this letter before?
16     A     No.
17     Q     In the course of the administrative appeal with
18  Mr. Barnes, this letter was never shared with you?
19     A     Not that I'm aware of.
20     Q     Okay.  Let's look at page four.
21     A     (Reviewing document.)
22     Q     This is the letter that Dr. Zaccari wrote to the
23  Board of Regents --
24     A     Uh-huh.
25     Q     -- after Mr. Barnes appealed the case.  Beginning
```

Page 147

1    at paragraph 13, I'll read part of this into the record.

2         A     Uh-huh.

3         Q     It states, "The first step was to alert VSU campus

4    police on or about --

5              MR. WILL:  Could we take a short break?  I've got

6         Mr. Mast calling me.  I need to take a call and let him

7         know what we're doing.

8              MR. CORN-REVERE:  Okay.  We'll go off the record.

9              THE WITNESS:  Gives me a chance to read.

10             MR. CORN-REVERE:  Sure.

11             (A recess was taken from 12:56 p.m. to 11:57 p.m.)

12   BY MR. CORN-REVERE:

13        Q     Just picking up where I was reading, this is page

14   four of Exhibit 15 beginning with the paragraph labeled

15   paragraph number 13.

16        A     Uh-huh.

17        Q     "The first step was to alert VSU campus police on

18   or about April 20th, 2007, of the student's behavior and the

19   potential risk if we fail to monitor his actions.

20             "Due to the heightened awareness of the Virginia

21   Tech shooting and the national focus on what should've been

22   done, what could've been done, what university presidents

23   must do to protect and possibly prevent such incidents and

24   what signs of overt student behavior should immediately be

25   addressed, I sought the advice of members of the president's

Page 148

1    administrative unit consisting of Dr. Kurt Keppler, Vice

2    President of Students Affairs; Dr. Louis Levy, Vice

3    President of Academic Affairs; Mr. James Black, Vice

4    President of Finance And administration; Mr. Scott Sikes,

5    Vice President of Institutional Advancement; and Dr. Marsha

6    Krotseng, Associate Vice President for Strategic Research

7    And analysis.

8           "The administrative unit, along with Mr. Scott

9    Doner, VSU's Police Chief, and Ms. Ann Farmer, Assistant

10   Chief of Police, and I collectively decided that VSU take

11   necessary steps to minimize as much as possible any security

12   risk."

13          Did I read that accurately?

14   A     That's what's here, yes.

15   Q     Is that statement correct?

16   A     Oh, I guess it depends on how you interpret it.

17   It's a potpourri of every administrator on campus.

18          I don't know if he means individually or

19   collectively or if he refers to that meeting that we had.

20          I mean, I believe that he sincerely wanted to get

21   opinions of what other people thought, and I believe that

22   when it first started -- when I say "it," I mean this series

23   of incidents -- that he probably was unsure of what to do

24   and asked some people some opinions.

25   Q     Well, let's just talk about you, because I know you

Page 149

1     can't really answer for the others.

2          A     I already told you.  The advice I gave consisted of

3     being at those two meetings, and most of what I did at those

4     meetings was listen.  There is a couple of things that they

5     say I said at those meetings that I can't say I didn't say.

6               I remember saying a couple of things when he asked

7     us about our current process and describing the hearings.

8               I do recall him mentioning the timing and it being

9     on a weekend and, you know -- he did a lot of what you would

10    call brainstorming, but I don't know what he ever -- I

11    wasn't privy to the final decision.

12              He might've said, you know, should I put the letter

13    under the door or should I mail it or should I hand deliver

14    it.  Well, obviously, it got put under the door.  I didn't

15    know --

16         Q     Well, correct me if I'm wrong, but didn't you say

17    earlier that Dr. Zaccari wasn't interested in your advice?

18         A     See, you're looking at this on the 20th of April.

19    He says that he sought our advice.  When we met on the 3rd

20    of May, I could've said that I wanted to do anything and it

21    wouldn't have made any difference.

22              My advice was not a part of the process of the

23    decision.  I think I have made that very clear.

24         Q     What it says here, "I sought the advice of members

25    of the president's administrative unit consisting of" --

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    including, Dr. Kurt Keppler."

2          Did Dr. Zaccari seek your advice about what to do

3    about Hayden Barnes?

4    A     Not outside of those meetings.

5    Q     But in the meetings did he seek your advice?

6    A     Did he ever say, "Kurt Keppler, what should I do?"

7    No, he never did.

8    Q     Okay.  Well, again, I'm just trying to figure out

9    what happened.

10   A     I don't know how much more clear I can be about

11   this.  I didn't have a say in this decision.  I tried to

12   make my point.  I realized that I didn't have a choice.

13         I admire and respect this man for a dedicated and

14   long career.  I do not want to defame his character.  He is

15   a hard working and a terrific individual.

16         He did make a decision that I don't necessary agree

17   with.  End of story.  I wish it didn't happen.  I wouldn't

18   have liked to see it happen that way.

19         But I completely understand that he had more

20   details than I did, and maybe he did have reasons to fear

21   for his life.

22   Q     But not that you're aware of.

23   A     But not that I'm aware of.

24   Q     And not that were discussed at the meetings you

25   attended, right?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    He did talk about having a person -- this, I will

2    say.  He did talk about having a person go with him to that

3    Arbor Day talk -- or whatever you call it -- when he spoke

4    to the S.A.V.E. people.  He did have a person with him.

5    Q    So --

6    A    I thought that perhaps that was overkill.

7    Q    You should be careful what you say.  Somebody might

8    take that as a threat.

9    A    I can't say enough -- and I feel like I've shared

10   this enough times.

11         I can't tell you what he knew, and I can't tell you

12   what he feels -- felt.  I can only tell you what I know and

13   what I felt, and I wouldn't have done it this way; and I

14   don't think I had any opportunity at that point to sway him

15   another direction.

16   Q    Okay.

17   A    And I do not believe that I was involved in or

18   asked an opinion to make the final decision.  I think he

19   respects me.  I think in 99 percent of the things that

20   happened on this campus during his tenure he would've asked

21   me an opinion.

22         In this particular case, it was beyond my pay

23   grade.  It was with the Board of Regents people, and I did

24   not have a whole lot to say, nor did any of these other

25   people.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1           And I don't understand that list of people there
2   because that list of people there, basically, is the
3   president's cabinet.  I mean, that had nothing to do with
4   the group that went to the meetings.  I mean, that wasn't
5   the group of people that went to meetings.
6           I don't know how -- I find it hard to believe that
7   he asked the Vice President of Finance or the Vice President
8   of Academic Affairs or the strategic planning person to
9   advise him on the decision.
10          I think he was just saying that as a group -- "when
11  it first hit me, I wanted to know what to do."  Then he made
12  up his mind of what to do.  Stuff happened.
13      Q    Well, again, I'm not asking you to justify what he
14  did or to even understand what was in his mind.  I'm trying
15  to understand the different bits of information that we've
16  gotten --
17      A    In a way, you're trying to tell me that I was
18  involved in the decision because it says in paragraph 13
19  that I was involved in the decision, and I was not involved
20  in the decision.
21      Q    Well, that's what I'm trying to just make sure I
22  understand based on the different bits of information we've
23  gotten.
24          I mean, again, in your interrogatory answer you
25  say, categorically, you were not involved in the decision to

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    withdrawal Mr. Barnes.  You testified earlier, I believe,

2    that Dr. Zaccari was not seeking your advice.

3            I'm looking at this letter where Dr. Zaccari says

4    directly to the Board of Regents, "I sought the advice of

5    members of the president's administrative unit," and he

6    listed you among them.

7            So, again, I'm just trying to figure out --

8    A     I don't know what that means.

9            MR. WILL:  We're talking right now, but there's no

10    question on the table.

11            THE WITNESS:  I'm sorry.

12    BY MR. CORN-REVERE:

13    Q     Well, you interrupted by question.

14            I'm trying to figure out how this is consistent

15    with your earlier testimony and your interrogatory answers

16    saying that you did not participate.

17            And, again, I'm not trying to say that you did.

18    I'm trying to ask you what this means.

19    A     I don't know.

20            MR. WILL:  Wait.  You made a statement, but you

21    still haven't asked the question.

22            MR. CORN-REVERE:  Could you read it back.

23            MR. WILL:  You can read the whole thing back, but

24    there's no question in there.

25            (The requested portion was read back by the Court

Page 154

1     Reporter.)

2   BY MR. CORN-REVERE:

3     Q     Did you participate in the decision to

4   administratively withdraw Hayden Barnes or not?

5     A     No.

6     Q     Okay.  Where this letter goes on to say that the

7   administrative unit, along with the campus police, quote,

8   collectively decided, closed quote, that VSU take

9   necessarily steps.

10          Is it your understanding that this was a collective

11   decision or a unilateral decision?

12     A     Oh, I would think that it was a unilateral

13   decision, but I think that he had probably some help in

14   terms of the procedural process he used after he made his

15   decision.

16     Q     So, advice that you've testified to earlier from

17   the Board of Regents and from university counsel --

18     A     Or whether to drop it under the door or whether to

19   do it on this day or that day or whether to do it during

20   finals -- I mean, I think you can probably state that that

21   all was advice.

22          But I think the difference is the decision to

23   administratively withdraw, whatever the heck that means and

24   wherever the heck it came from, we assume that it was a very

25   valid conversation with Betsy Neely.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          That decision was a decision that was not going to

2     be altered by me or any peer at this institution.

3          Q     So, the actual decision of whether to withdraw

4     Mr. Barnes was not a collective decision.  Is that your

5     testimony?

6               MR. WILL:  I believe he's already answered it.

7               THE WITNESS:  That's it.

8     BY MR. CORN-REVERE:

9          Q     That's a yes?

10         A     Yes.

11         Q     At the bottom of page four, the final paragraph

12    reads, "I took what I believed to be appropriate action and

13    to minimize campus focus on Mr. Barnes and his documented

14    behavior by not scheduling a judicial hearing.

15              "The exigency of the circumstances dictated action

16    that would not invite alarm.  The campus hearing would have

17    involved a judicial panel comprised of students and faculty.

18    This format would have alerted the campus of a potential

19    threat and would have comprised" -- I think he means

20    compromised; it says comprised -- "campus safety by

21    exacerbating potential harm."

22              Do you see where it says that?

23         A     Uh-huh.

24         Q     That's a yes?

25         A     Yes.  I'm sorry.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q   Okay.  Do you agree with that statement that

2  convening a campus hearing to decide the withdrawal issue

3  would have created a bigger security problem?

4    A   I'm not sure that it matters in my -- if you're

5  asking my opinion, I'm sure that matters.  I think that if

6  there was a significant security issue as a result of that,

7  it could've been prepared for.

8        I don't think that, if it was me, I would've

9  altered the hearing for that reason.  I would not have

10  altered the hearing for that reason.

11        However, it's possible.  I mean, it's not that

12  that's not -- it's conceivable that it could've happened.  I

13  don't think any of us can predict or judge what would've

14  happened if that occurred.

15    Q   Right.  But we've looked at the university policy

16  for mental health withdrawals, and that policy specifically

17  requires such a hearing, doesn't it?

18    A   Well, it has a series of processes that may or may

19  not require a hearing.  But, yes, it gives the student an

20  opportunity to choose a hearing or not choose a hearing.

21    Q   Are you thinking of the mental health withdrawal

22  policy?

23    A   Mental health -- we've gone over this mental health

24  policy, like, five times.

25    Q   Okay.  We don't need to belabor that.  We've

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    already covered that.

2      A    We've agreed on what the mental health policy is,

3    right?

4      Q    Yes.

5      A    Okay.  I'm with you.

6      Q    Okay.  And then last on page seven.

7      A    (Reviewing document.)

8      Q    It reads, "I am not an expert in the field of

9    mental health; and because of my concern for campus safety,

10   I felt it necessary to defer to the experts and incorporated

11   their input as a condition for Mr. Barnes' readmission to

12   the university."

13          Did I read that accurately?

14     A    That's what's here.

15     Q    In the meetings you attended with Dr. Zaccari, did

16   he appear to defer to the mental health experts?

17          MR. WILL:  I object to the form of the question.

18   BY MR. CORN-REVERE:

19     Q    You can answer.

20     A    I don't think that the meetings were designed to

21   get at whose expertise was what.

22          I think he wanted to know the lay of the land and

23   what was out there; and I think after he heard what we said,

24   he conferred with legal experts.

25          I honestly believe and still believe to this day

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      that he sincerely believed that the campus and perhaps

2      himself or his wife or family was, indeed, in danger and

3      that he was very concerned that this was so serious that it

4      could've been worse if there had been a hearing.

5          Q      And that's --

6          A      That said, that's not what I would've done.  That's

7      all I can say.

8          Q      Again, neither of those things were my question.

9      My question was:  In the meetings you attended, did you

10     witness Dr. Zaccari deferring to mental health experts?

11             MR. WILL:  I object to the form of the question to

12         the extent that it's referring to this taken out of

13         context and --

14             MR. CORN-REVERE:  That is a speaking objection.  It

15         is specifically foreclosed by the Federal Rules of Civil

16         Procedure, and the witness can answer the question.

17             THE WITNESS:  I'm trying to remember the question;

18         and I hate to say it, but you're going to have to repeat

19         it back to me now.

20             MR. CORN-REVERE:  Can you read back the question.

21             (The requested portion was read back by the Court

22         Reporter.)

23             THE WITNESS:  I think in the meetings that I

24         attended Dr. Zaccari was interested in fact finding.  I

25         don't believe he was interested in gathering our opinions

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      of how the case should be resolved.

2    BY MR. CORN-REVERE:

3      Q    Okay.  I don't know if it's necessary to refer

4    again to the notes that Ann Farmer took at the May 3rd

5    meeting, but I believe the comment attributed to you was

6    that the Counseling Center won't support a mental health

7    withdrawal because they don't perceive a threat.  Do you

8    remember that?

9      A    Is that the statement that was in there?

10     Q    Yes.

11     A    As I said before, that would be consistent with

12   what I would believe; that the Counseling Center would not

13   be involved in such a decision unless they felt that it was

14   absolutely essential, and they didn't.

15     Q    I'm sorry.  That last statement, what were you

16   saying?

17     A    I'm stating that what I said is correct.

18          MR. CORN-REVERE:  If we can just take a two-minute

19     break.  I want to see if there's anything else.  I think

20     I'm done.  Let's go off the record.

21          (Discussion off the record.)

22          MR. CORN-REVERE:  I'm finished with questions.

23          (A lunch recess was taken from 1:16 p.m. to 2:23

24     p.m.)

25   //////////

Page 160

```
1                        EXAMINATION
2    BY MR. LAVALLEE:
3       Q     Dr. Keppler, my name is Matthew LaVallee.  I
4    represent the Defendant Leah McMillan in this case.  I have
5    some questions for you today as pertains to this lawsuit.
6              And what I want to do -- I know it's been a long
7    time.  Two years.  You're a busy man.  A lot of things go on
8    in your schedule.
9              And, so, I want to go back to April 2007, okay?
10      A     (Nods head.)
11      Q     There's been discussions here today about meetings,
12   and there's been discussion here today about conversations
13   you may have had with President Zaccari.
14      A     (Nods head.)
15      Q     What I want to focus on are meetings that you
16   attended that pertained to Leah -- let me rephrase that.
17            I want to discuss meetings that you attended that
18   pertained to Hayden Barnes that Ms. McMillan was in.  Okay?
19      A     (Nods head.)
20      Q     My understanding from testimony that's been given
21   in this case is that there was a meeting on April 26th which
22   was attended by Ms. McMillan, Dr. Morgan, President Zaccari
23   and you.  That's been the testimony of both Ms. McMillan and
24   Dr. Morgan in this case.
25            Do you recall attending such a meeting?
```

Page 161

1      A     I don't recall it, but I'm sure it's the case if
2   they said it was.
3      Q     Okay.  Well, let me see if I can jog your memory a
4   little further; and, if I can't, then so be it.
5            According to the testimony in this case, President
6   Zaccari summoned Ms. McMillan and Dr. Morgan to this meeting
7   on April 26th.
8            And the testimony has been that you also attended
9   that meeting.  It would've been in the president's office.
10  Does that help jog your recollection at all?
11     A     Well, any meeting that we had would've been in the
12  president's office.  So, I came along as help?  Support?
13     Q     Well, I don't know the reason for your having been
14  there.  All I know is that the testimony so far in this case
15  has been that you were there.
16     A     I guess if that's what the testimony is, that's
17  probably correct.  I won't dispute it.
18     Q     Okay.  Do you recall being in a meeting that
19  Ms. McMillan was present?
20     A     I think -- was she not present at any of the
21  others?
22     Q     Well, the way this works is I can ask you
23  questions --
24     A     I know she was present at one or more of the
25  meetings that I was at.  Which one, I don't remember.

Page 162

1    Q    All right.  Well, if Leah and Dr. Morgan testified

2    that you were present at an April 26th, 2007, meeting, that

3    was --

4    A    There's no reason to believe I wasn't.

5    Q    Okay.  And if Leah has testified that she told

6    President Zaccari during that meeting that she did not

7    believe that Mr. Barnes was a threat to either him or the

8    campus, would you dispute that?

9    A    No.  And it's kind of what my point was in the Ann

10   Farmer notes, I think; that the counselors didn't think he

11   was a threat.

12   Q    All right.  I'm sorry for the pregnant pause.  I'm

13   just reading my notes.

14        Ms. McMillan never discussed her treatment of

15   Mr. Barnes with Dr. Zaccari in your presence, did she?

16   A    (Shakes head.)

17        MR. WILL:  Object to the form of the question.

18   BY MR. LAVALLEE:

19   Q    I'll rephrase it.

20   A    Okay.

21   Q    Do you recall ever being part of a meeting where

22   Leah McMillan talked about Mr. Barnes' treatment with

23   Dr. Zaccari?

24   A    No.  I could probably -- may I provide more

25   information?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q      No.  No, not right now.  I'm sorry to be short with
2   you.
3      A      That's fine.  I'm doing what I'm supposed to do.
4      Q      And you don't have any recollection of ever
5   attending any meeting with President Zaccari which
6   Ms. McMillan attended where the whole issue of
7   administrative withdrawal took place, do you?
8      A      I don't recall that word being used a great deal
9   until the final say when the conversations with Neely took
10  place.
11     Q      The May 3rd meeting that we talked about earlier
12  today?
13     A      Yes.  I don't remember those dates, but whatever
14  the last one was.
15     Q      Okay.  There's another meeting that I want to talk
16  to you about.  It's my understanding that you were there.
17  It hasn't come up today, however.
18             In particular, I'm referring to a meeting that
19  would've taken place in Ms. Gaskins' office on May the 7th,
20  2007.
21             Do you recall ever being summoned by Ms. Gaskins to
22  appear at her office on May the 7th, 2007?
23     A      May the 7th.  That was the day that a decision was
24  made.
25     Q      Yes, sir.  That was the day that the administrative

Page 164

1    withdrawal letter was authored.  Was dated.

2        A      I don't remember it.  If people say I was there, I

3    probably was.  It sounds terrible, but I just don't remember

4    when all these things fall together.

5        Q      What the testimony has been is that Ms. Gaskins

6    summoned Ms. McMillan and Dr. Morgan to her office on May

7    the 7th, 2007; and you also appeared at that given date and

8    time.

9              And you're telling me you don't recollect that at

10   all?

11       A      Well, I don't remember it, but that doesn't mean

12   that it didn't happen.

13       Q      Okay.  And the testimony has been that Ms. Gaskins

14   gave the folks who were in attendance which, based on the

15   testimony was Ms. McMillan, Dr. Morgan and you, that

16   Mr. Barnes may be administratively withdrawn.  Doesn't jog

17   any memory?

18       A      That was the day that the letter was put under the

19   door?

20       Q      That's the day that the administrative withdrawal

21   letter was dated, yes, sir.

22       A      And that conversation was that maybe she discussed

23   it with us?

24       Q      No.  What the testimony has been is that

25   Ms. Gaskins had a meeting on that day attended by

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Ms. McMillan, Dr. Morgan and you and that she gave y'all a
2    heads-up that that may be happening.
3        A    Okay.
4        Q    And you're telling me you don't have an independent
5    recollection of that meeting.
6        A    No.  But, I mean, I think that would be consistent.
7    I could see her saying that it's about to happen, yes.
8        Q    Okay.  So, you wouldn't dispute that that --
9        A    No.
10       Q    -- meeting took place?
11       A    No.
12       Q    Correct?
13       A    No.  I would've disputed it if it would've taken
14   place beforehand, but there was no discussion about that
15   before the decision was made.
16       Q    Okay.  I'm a little confused about what you just
17   said.
18       A    If you would've said that I had a meeting with her
19   in April or something like that before this decision was
20   made by the president, I would've said no way; but I can
21   picture being in this meeting after everything had happened
22   and we were just told it happened.
23       Q    Well, what the testimony -- and I understand where
24   there could be a little bit of confusion here because,
25   apparently, it all happened on the same day.  The letter,

Page 166

1     the administrative withdrawal letter is dated May 7th.

2     A     Right.

3     Q     And the testimony has been that that same day,

4     apparently, sometime in the morning Ms. Gaskins had summoned

5     Leah --

6     A     Okay.

7     Q     -- Dr. Morgan and you to her office and gave you a

8     heads-up that he --

9     A     Okay.

10    Q     -- meaning Hayden Barnes, may be administratively

11    withdrawn.

12    A     Okay.

13    Q     That is what the testimony has been.  So, the

14    testimony has been that that meeting took place before the

15    actual letter was provided.

16    A     I guess I would have no reason to dispute that.

17    Q     Okay.  And you don't have any independent

18    recollection of --

19    A     No.

20    Q     -- what was said in that meeting?

21    A     No.

22    Q     Correct?

23    A     Not in detail, no.

24    Q     Okay.  Do you recall Leah telling Ms. Gaskins that

25    she did not believe the plaintiff was a threat to himself or

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    to anyone else?

2        A    I recall Leah saying that at some point.  Whether

3    it was to Ms. Gaskins or someone else, I don't remember; but

4    I do recall Leah saying that she has -- she didn't believe

5    that he was a threat.

6        Q    who would she have been saying that to?

7        A    She could've said it to me or Vic or anybody else

8    in one of those meetings or maybe even the president, but I

9    do recall her saying that.

10       Q    Okay.

11       A    I'm having a hard time putting face to face in some

12   of these things.

13       Q    Sure.  well, the testimony in this case is that

14   those were the only two meetings that you and Leah McMillan

15   attended at the same time:  The April 26th meeting -- not to

16   steal a page from Mr. Corn-Revere, but --

17       A    Let you finish.

18       Q    Yeah, let me just finish that question.

19            The testimony has been that -- and I'll make no

20   bones about it.  I mean, primarily it's been from my client,

21   but it's also been from folks like Mr. Morgan and other

22   people who have been deposed so far in this case -- that

23   there are only two meetings that you and Ms. McMillan

24   attended at the same time.

25            One would've been the April 26th meeting in



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    President Zaccari's office that we just talked about; the

2    second being the May 7th, 2007, meeting that was at

3    Ms. Gaskin's office.

4           Do you have any reason to dispute that those were

5    the only two meetings that you attended with Ms. McMillan

6    that pertained to Hayden Barnes?

7    A     No.  And if I said that she was at a meeting that

8    she wasn't, it's probably my misunderstanding.

9    Q     I don't think you have.

10   A     Okay.

11   Q     The meeting that you referenced earlier today where

12   Dr. Lee was present, Ms. McMillan wasn't at that meeting,

13   correct?

14   A     I think he referenced a meeting -- that there was a

15   meeting with Russ Mast and Richard Lee that I don't remember

16   the specifics of.  But she wasn't at that meeting, no.

17   Q     Okay.  Have you seen the lawsuit in this case?

18   A     You mean the --

19   Q     A copy of the complaint?

20   A     No.

21   Q     You haven't?

22   A     Well, I haven't read it if I've seen it.

23   Q     You have reviewed this lawsuit as some point in

24   time, correct?

25   A     I have a pretty good idea of what's going on, but I

Page 169

1    thought you meant have I sat down and read the thing from

2    cover to cover; and the answer to that would be no.

3        Q    Well, maybe there hasn't been a point in time where

4    you have read it from cover to cover, but has there been a

5    point in time where you sat down and you looked at the

6    lawsuit?

7        A    I have a pretty good idea of what was said, but I

8    don't know the legal formalities of what the charges are or

9    anything that was said.

10       Q    Oh, sure.  I'm not asking for any of that.  I'm

11   trying to establish -- well, I'm asking has been a point in

12   time where you sat down and looked at the lawsuit.  I'm not

13   asking whether you read it verbatim.

14       A    I would say that I perused it.

15            MR. LAVALLEE:  Fair enough.  This has been entered

16       into the record umpteen times in this case, so I'm just

17       going to refresh the witness' recollection with it.

18            MR. CORN-REVERE:  That's fine.

19   BY MR. LAVALLEE:

20       Q    I'm showing you a copy of the lawsuit, and what I'd

21   like to do is have you read paragraph 51 to yourself; and

22   when you're finished, let me know because I want to ask you

23   about that particular --

24            MR. CORN-REVERE:  Since I haven't memorized it, at

25       some point --

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1        MR. LAVALLEE:  Sure.  Absolutely.  I'm sorry.  You

2    know me.  I usually have copies for everyone.

3        MR. CORN-REVERE:  You didn't bring enough to share

4    with the rest of us?

5        MR. LAVALLEE:  I did not bring enough of the

6    complaint.  I figured you all would have one on hand

7    somewhere.

8        MR. CORN-REVERE:  I think we have one.

9        (Discussion off the record.)

10       MR. LAVALLEE:  This is Dave Smith's copy.  I'm

11   going to leave this with Dr. Keppler.  Not leave it but

12   present it to him while I ask him about this paragraph.

13   BY MR. LAVALLEE:

14   Q    Dr. Keppler, are you finished?

15   A    Yes, I am.

16   Q    Can we switch real quick?

17   A    Yeah.

18   Q    I'm going to read paragraph 51 into the record.

19   Paragraph 51 reads, "On May the 3rd, 2007, Zaccari held a

20   meeting regarding Barnes which, on information and belief,

21   Gaskins, Mast, McMillan and Keppler attended.

22        "At this meeting Defendants led my Zaccari decided

23   unilaterally and without any process due to Barnes pursuant

24   to the Constitution or to VSU and/or Board policies to expel

25   Barnes from VSU."

Page 171

1           Did I read that correctly?

2      A    Uh-huh.

3      Q    Okay.

4           MR. LAVALLEE:  Do we need to stop, Bob?

5           MR. CORN-REVERE:  If we could just pause long

6      enough to bring the food in.

7           MR. LAVALLEE:  Sure.  Let's just go off the record

8      momentarily.

9           (Discussion off the record.)

10     BY MR. LAVALLEE:

11     Q    I had asked you to take a look at paragraph 51 in

12     the complaint, and then I read it into the record.  I'd like

13     to ask you a couple of follow up questions --

14     A    Okay.

15     Q    -- as pertains to paragraph 51.  Again, Leah

16     McMillan was not present at this May 3rd, 2007, meeting,

17     correct?

18     A    Well, you just said that she was present at a

19     May 7th meeting, right?

20     Q    Yes, sir.

21     A    So, I would assume that that would be correct.

22          MR. CORN-REVERE:  I am going to object to the form

23     of the question, even if it's a little late.

24     BY MR. LAVALLEE:

25     Q    Let me ask you this again as it pertains to

Page 172

1   paragraph 51.  That one sentence there indicates that this
2   decision was made unilaterally.  Do you agree with that?
3       A    This is going to sound funny, but define what you
4   mean by unilaterally.
5       Q    It's not my lawsuit.  I don't know exactly.  Let me
6   just tell you my impression of this paragraph.  I'm sure
7   it's going to lead to an objection.
8           MR. CORN-REVERE:  I'll object already and save you
9       the trouble.
10          MR. LAVALLEE:  That's fine.
11          THE WITNESS:  Then I'll try to answer your
12      question.
13          MR. WILL:  Wait until he asks a question.
14  BY MR. LAVALLEE:
15      Q    Yeah.  Let me go back.  To me, this paragraph 51
16  insinuates or just flat-out says that this was a collective
17  decision that Mr. Barnes was going to be expelled from VSU.
18  Do you agree or disagree with that sentiment?
19      A    I would disagree.
20      Q    Okay.  Why?
21      A    Because I believe the President had his mind made
22  up to do it and it didn't make any difference what anybody
23  else said, and I've already gone into a series of details as
24  to why I think he did that.
25      Q    Yes, sir, you have.

Page 173

1      A      In my interpretation, even though -- back to what I
2    just said:  To this day I'm not sure that he was expelled.
3            I still believe, the way I interpreted what
4    happened, that there was some opportunities for him to
5    return; but that's beside the point.
6      Q      Well, suffice it to say, I very much disagree with
7    paragraph 51.  It's not my lawsuit.  These aren't my
8    allegations.  I just wanted you to comment on that
9    particular paragraph of the lawsuit.
10     A      Yeah.  I believe very strongly that I could say
11   anything I wanted at that point and it wouldn't have done
12   any good.
13     Q      All right.
14     A      For reasons we've already discussed --
15     Q      Yes, sir.
16     A      -- many times.
17     Q      We have.  We have.  We have.
18            Would you agree that President Zaccari and
19   President Zaccari alone had the power to administratively
20   withdrawal Hayden Barnes?
21     A      Yes, I believe the president has the power.  I
22   think it became even more evident to me when the Board of
23   Regents was involved.
24     Q      Okay.  Well, you wouldn't have had the power to
25   administratively withdraw him.

Page 174

```
1      A     No.  Correct.

2      Q     Leah McMillan wouldn't have had the power to

3   administratively withdraw Hayden Barnes, correct?

4      A     Correct.

5      Q     The only one to your knowledge that would've had

6   the power to administratively withdraw Mr. Barnes would be

7   President Zaccari, correct?

8      A     Yes.  I still don't believe that he may not have --

9   in my opinion, he may not have done it without the

10  conversation with the Board of Regents' attorney.

11     Q     Sure.  And only President Zaccari and the Board of

12  Regents can testify to that.

13     A     I can't tell you that.

14     Q     I'm not asking you to.

15           MR. LAVALLEE:  That's all the questions I have.

16  Thank you.

17           MR. SMITH:  I do have one short easy one.

18                          EXAMINATION

19  BY MR. SMITH:

20     Q     You were asked a question by Mr. Corn-Revere about

21  whether there were any buildings on campus here at VSU that

22  were named after living people, and you named the Bailey

23  Science Center.

24     A     Right.

25     Q     Is that known as a memorial building?
```

**WHEELER
REPORTING**
*Court Reporting • Video • Litigation Support*
*404.351.4577*

```
 1    A    No.
 2              MR. SMITH:  Thank you.
 3              MR. CORN-REVERE:  I just have a couple of
 4         follow-ups.
 5                        RE-EXAMINATION
 6    BY MR. CORN-REVERE:
 7         Q    Let's go back to the infamous paragraph 51 of the
 8    complaint.
 9              Mr. LaVallee just asked you whether or not you
10    thought it was a unilateral decision, and I believe your
11    answer was that it was a decision made by Dr. Zaccari and
12    nothing that you or anybody else would've said would've made
13    a difference.  Is that a fair characterization?
14         A    On May 3rd, 2007, it wouldn't have made any
15    difference what anybody said.
16         Q    Okay.  Is it fair to say that your testimony is
17    that it was a unilateral decision by Dr. Zaccari to do the
18    administrative withdrawal?
19         A    It may have had to do with his conversations with
20    the Board of Regents.  I've said that a number of times.
21              Now if I was a fly on the wall and knew what was
22    going on in those meetings, I could offer more; but I don't
23    know what happened during those meetings.
24         Q    Okay.  And, again, when you say that the President
25    has the power to administratively withdrawal a student,
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    that's based on your understanding of Board Policy 1902?
 2        A     I don't believe I said that.  I think I said the
 3    president with conversation with the Board of Regents gives
 4    me the indication that he has power.
 5              My whole recollection of this whole process changes
 6    when the University System of Georgia's head counsel becomes
 7    involved.
 8        Q     Does the involvement of the counsel from the Board
 9    of Regents cancel the policies that you have in place at
10    VSU?
11        A     No.  It tells me that my opportunity to have input
12    has probably ended.
13        Q     Okay.  So, the involvement of the university --
14    excuse me.  The involvement of the Board of Regents' counsel
15    doesn't change whether or not policy was followed; it
16    changes, as I understand your testimony --
17        A     My role.
18        Q     -- whether or not you think it makes a difference
19    for you to speak up.
20              MR. LAVALLEE:  Objection to the form.
21              THE WITNESS:  I think that -- the way I can read
22         that question is:  Do I not have the guts to stand up and
23         say what I think is appropriate.
24              I think that's an inappropriate statement.  I think
25         I've been involved in a long enough experience of how
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1        large organizations run to know that I had opportunities.
 2             And whatever the dates were in April and the times
 3        we got together to share our points of view on May 7th,
 4        after May 3rd -- whatever the date it was -- after
 5        Dr. Zaccari had talked with the Board of Regents, it was
 6        moot for me to be involved at that point.
 7   BY MR. CORN-REVERE:
 8        Q    Okay.  But the involvement of counsel for the Board
 9   of Regents doesn't change the substance of Board Policy
10   1902, does it?
11        A    No.
12             MR. LAVALLEE:  I'm going to object.  I didn't get
13        into Rule 1902 during my cross of this witness.  I don't
14        see how --
15             MR. CORN-REVERE:  You asked whether or not there
16        was a unilateral decision and whether or not the
17        president had the authority to administratively withdraw
18        the student.  These are legitimate follow-ups.
19             MR. LAVALLEE:  Is respectfully disagree.
20   BY MR. CORN-REVERE:
21        Q    And just one last follow-up:  Does the involvement
22   of an attorney for the Board of Regents alter the mental
23   health withdrawal policy set forth in the VSU student
24   handbook?
25        A    No.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1              MR. LAVALLEE:  Same objection.
2              THE WITNESS:  I think the thing that makes a
3       difference to me -- I feel like I'm constantly repeating
4       myself.  I apologize.  I'm going to do it anyway.
5              1902 is a Board of Regents policy.  Board of
6       Regents' attorney is involved.  I respectfully assume
7       that they know what the heck they're talking about.
8   BY MR. CORN-REVERE:
9       Q     Okay.
10      A     Just as if I would assume that if you had a
11  supervisor's supervisor, you would probably listen to that
12  person, as well.
13      Q     Right.  But under Board Policy 1902, if a student
14  is accused of gross misconduct, then as a disciplinary rule
15  that would be handled by the student disciplinary code as
16  spelled out in the VSU handbook, wouldn't it?
17             MR. LAVALLEE:  Objection to form.
18             THE WITNESS:  Do you want me answer the question?
19  BY MR. CORN-REVERE:
20      Q     You can answer the question.
21      A     Yes.  I think we've already discussed that the
22  difference here lies in the fact that the person making the
23  charges and accusation was the president.
24      Q     I think that's enough of paragraph 51.  Sounds like
25  there would be aliens coming from there.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1              MR. LAVALLEE:  Objection to colloquy of counsel.

 2              MR. CORN-REVERE:  Excuse me?

 3              MR. LAVALLEE:  I said objection to colloquy of

 4       counsel.

 5              MR. CORN-REVERE:  Sorry.

 6   BY MR. CORN-REVERE:

 7       Q     During the examination by Mr. LaVallee, you

 8   testified that it is possible that there are more than the

 9   two meetings involving discussion of Mr. Barnes' case that

10   you may have been a party to.

11              MR. LAVALLEE:  Objection.  He didn't say that.

12   BY MR. CORN-REVERE:

13       Q     Well, let's review.  In your long discussion and

14   recharacterization of testimony, you described an April 26th

15   meeting at which you suggested that.

16              MR. LAVALLEE:  The records makes crystal clear.

17   BY MR. CORN-REVERE:

18       Q     Basically, you were describing other people's

19   testimony.  Let's talk about the dates.

20              April 26th was one; May 3rd was the other, and then

21   there is a third meeting in Ms. Gaskins office that took

22   place on May 7th.

23              And as I understand your testimony, you have no

24   reason to doubt the testimony of others that you were

25   present at those three meetings.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    I don't have any reason to doubt it.  Don't

2    recollect at all.

3    Q    Okay.  Is it possible that you may have attended a

4    fourth meeting that other testimony has brought out in

5    depositions on April 24th or 5th with Dean Mast and Mr. Lee

6    to discuss the potential administrative withdrawal of Hayden

7    Barnes?

8         MR. WILL:  I object to the form of the question

9    because that's been asked and answered during your

10   initial cross.

11        MR. CORN-REVERE:  Well, I think during this

12   cross-examination, Mr. LaVallee was able to, by a long

13   recharacterization of testimony, elicit potential

14   memories about more than the two meetings that were

15   identified in the answers to interrogatories.  I'm just

16   asking if it's possible there was a fourth meeting.

17        THE WITNESS:  I don't know.  All I know is no

18   matter how many meetings there were and how many meetings

19   I remember, I know what I said or didn't say; and I never

20   had the input to change this direction.

21        MR. CORN-REVERE:  Okay.  I have nothing further.

22        MR. WILL:  Thank you, Gentlemen.

23        (Deposition concluded at 2:53 p.m.)

24        (Pertaining to  Federal Rules of Civil Procedure

25   and/or O.C.G.A. 9-11-30(e), the deponent and/or a party

Page 181

1    having requested the right to review the deposition,

2    making corrections and/or changes and signing, for that

3    purpose the errata pages have been annexed hereto.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1              C E R T I F I C A T E
 2    STATE OF GEORGIA:
 3    COUNTY OF LOWNDES:
 4              I hereby certify that the foregoing transcript was
 5    taken down, as stated in the caption, and the questions and
 6    answers thereto were reduced to typewriting under my
 7    direction; that the foregoing pages 1 through 181 represent
 8    a true, complete, and correct transcript of the evidence
 9    given  upon said hearing, and I further certify that I am
10    not of kin or counsel to the parties in the case; am not in
11    the regular employ of counsel for any of said parties; nor
12    am I in any way interested in the result of said case.
13              This, the 20th day of August, 2009.
14
15
16         /s/ Sarah Williams
17         SARAH WILLIAMS, FPR, RPR, CCR B1653
18
19
20
21
22
23
24
25
```

Page 183

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                    DISCLOSURE
 2   STATE OF GEORGIA          Deposition of:  Kurt Keppler
 3   COUNTY OF LOWNDES:   Date:  July 28, 2009
 4       Pursuant to Article 10.B of the Rules and Regulations
 5   of the Board of Court Reporting of the Judicial Council of
 6   Georgia, I make the following disclosure:
 7       I am a Georgia Certified Court Reporter.  I am here as a
 8   representative of Valdosta Court Reporters.  I am not
 9   disqualified for a relationship of interest under the
10   provisions of O.C.G.A. §9-11-28 (c).
11       Wheeler Court Reporting was contacted by the offices of
12   Robert Corn-Revere, Esq., to provide court reporting
13   services for this deposition.  Wheeler Court Reporting will
14   not be taking this deposition under any contract that is
15   prohibited by O.C.G.A. §15-14-37 (a) and (b).
16       Wheeler Court Reporting has no exclusive
17   contract to provide reporting services with any party to
18   the case, any counsel in the case, or any reporter or
19   reporting agency from whom a referral might have been
20   made to cover this deposition.
21       Wheeler Court Reporting will charge its usual and
22   customary rates to all parties in the case, and a financial
23   discount will not be given to any party to this litigation.
24                          _____
                            Sarah Williams, CCR, FPR, RPR.
25                                CCR No.  B1653
```

Page 184



1          DEPOSITION OF DR. KURT KEPPLER/SEW

2          I do hereby certify that I have read all questions

3    propounded to me and all answers given by me on the 28th day

4    of July, 2009, taken before Sarah Williams, FPR, CCR, RPR,

5    and that:

6          1) _____          There are no changes noted.

7          2) __✓__  The following changes are noted:

8          Pursuant to Rule 30(e) of the Federal Rules of

9    Civil Procedure and/or the Official Code of Georgia

10   Annotated 9-11-28(c), both of which read in part:  Any

11   changes in form or substance which you desire to make shall

12   be entered upon the deposition...with a statement of the

13   reasons given...for making them.  Accordingly, to assist you

14   in effecting corrections, please use the form below:

15   Page No.        Line No.        should read:

16   __23__          __5/6__      ~~it was a~~ concerned for his personal safety

17   Page No.        Line No.        should read:

18   __24__          __17__          monthly open house

19   Page No.        Line No.        should read:

20   __30__          __17__          But that is my opinion.

21   Page No.        Line No.        should read:

22   __31__          __5/6__     DR. Zaccari planned to have ... the student who ~~was~~ opposed

23   Page No.        Line No.        should read:

24   __34__          __27__          facts are clear

25

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

DR. KURT J. KEPPLER 7/28/2009

```
1              DEPOSITION OF DR. KURT KEPPLER/SEW

2     Page No.        Line No.        should read:

3       48             11         not my intention

4     Page No.        Line No.        should read:

5       48             19/20      Specifically only

6     Page No.        Line No.        should read:

7       58             6          house office

8     Page No.        Line No.        should read:

9       69             10         Based on what I knew
                                  I don't think ....
10    Page No.        Line No.        should read:

11      85             6          seven six

12    Page No.        Line No.        should read:

13      85             11         otherwise

14

15              If supplemental or additional pages are necessary,

16    please furnish same in typewriting annexed to this

17    deposition.

18

19

20    DR. KURT KEPPLER

21

22    Sworn to and subscribed before me,
      this the 29 day of Sept        , 2009. Michael S. McKinley
23                                              NOTARY PUBLIC
           M McKinley   9/29/09                Lowndes County, GEORGIA
24                                             My Comm. Exp Jan 31, 2012
      Notary Public
25    My commission expires:
```

Page 186

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

DR. KURT J. KEPPLER 7/28/2009

1    DEPOSITION OF DR. KURT KEPPLER/SEW

2    Page No.          Line No.          should read:

3    *88*              *14*              *Some kind of discussion*

4    Page No.          Line No.          *happening in the room*
                                          should read:

5    *100*             *20*              *we I*

6    Page No.          Line No.          should read:

7    *105*             *22-24*           *I have an academic*

8    Page No.          Line No.          *background in psychology*
                                          should read:

9    _____          _____          *-- cannot control how*
                                          *others feel.*

10   Page No.          Line No.          should read:

11   *109*             *22*              *I wouldn't assume it*

12   Page No.          Line No.          *was a big deal.*
                                          should read:

13   *127*             *21*              *( I believe the word*

14                                        *"service" is missing-*

15              If supplemental or additional pages are necessary, *teaching, research and service )*

16   please furnish same in typewriting annexed to this

17   deposition.

18
19   _____
20   DR. KURT KEPPLER

21

22   Sworn to and subscribed before me,
     this the *29* day of *Sept*          , 2009.
23
                                  Michael S. McKinley
24   *M McKinley*                 NOTARY PUBLIC
     _____  Lowndes County, GEORGIA
25   Notary Public               My Comm. Exp Jan 31, 2012
     My commission expires:

                                                    Page 186

**WHEELER**
**REPORTING**
Court Reporting • Video • Litigation Support
*404.351.4577*

DR. KURT J. KEPPLER 7/28/2009

```
1              DEPOSITION OF DR. KURT KEPPLER/SEW

2    Page No.        Line No.        should read:

3    129             1               ts  could be

4    Page No.        Line No.        should read:

5    130             8               to those at a higher
                                     administrative level.
6    Page No.        Line No.        should read:

7    145             3               Delta may not be a
                                     clear word.
8    Page No.        Line No.        should read:

9    150             4               There are

10   Page No.        Line No.        should read:

11   152             9               Say this enough — and I
                                     feel like I've shared this
12   Page No.        Line No.        should read:
                                     many times already
13   ──────────────────────────────────

14   155             23/27           whatever that means
                                     and wherever it came from
15            If supplemental or additional pages are necessary,

16   please furnish same in typewriting annexed to this

17   deposition.

18

19   _____Kurt J. Keppler_____

20   DR. KURT KEPPLER

21

22   Sworn to and subscribed before me,
     this the  29  day of  Sept  2009
23                                Michael S. McIntyre
                                  NOTARY PUBLIC
24   M McIntyre                   Lowndes County, GEORGIA
                                  My Comm. Exp Jan 31, 2012
25   Notary Public
     My commission expires:

     165             3               Eliminate— "it sounds terrible"
     179             7               know what they are talking
                                     about
```

Page 186

**WHEELER**
**REPORTING**
Court Reporting • Video • Litigation Support
404.351.4577