IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

THOMAS HAYDEN BARNES,                    CASE NUMBER

    Plaintiff,                          1:08-CV-00077-CAP

vs.

RONALD M. ZACCARI, et al,

    Defendants.
_____/


DEPOSITION OF

RICHARD LEE, SR.


JULY 27, 2009

1:05 P.M.



VALDOSTA STATE UNIVERSITY
OAK STREET PARKING DECK
AUXILIARY SERVICES DEPARTMENT
CONFERENCE ROOM
VALDOSTA, GEORGIA



SARAH E. WILLIAMS, FPR, CCR, RPR


Page 1





WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                 A P P E A R A N C E S

 2

 3    On behalf of Plaintiff:

 4    CHRISTOPHER FEDELI, ESQ.
      ERIN N. REID, ESQ.
 5    Davis Wright Tremaine, LLP
      Suite 200
 6    1919 Pennsylvania Avenue, N.W.
      Washington, D.C.   20006-3402
 7

 8    On behalf of Defendant Gaskins:

 9    DAVID R. SMITH, ESQ.
      Brannen, Searcy & Smith, LLP
10    22 East 34th Street
      Savannah, Georgia  31401
11

12    On behalf of Zaccari, VSU, Board of Regents, Keppler,
                        Mast and Morgan:
13
      DAVID WILL, ESQ.
14    Royal Washburn Will
      4799 Sugarloaf Parkway
15    Building J
      Lawrenceville, Georgia  30044
16

17    On behalf of McMillan:

18    MATTHEW R. LaVALLEE, ESQ.
      Daley, Koster & LaVallee, LLC
19    2849 Paces Ferry Road
      Suite 160
20    Atlanta, Georgia  30339

21

22

23

24

25
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1                        I N D E X

2    Examination by Mr. Fedeli

3

4                      E X H I B I T S

5    1        Free Expression Area Documents          13

6    2        Free Expression Area Documents          21

7    3        Free Expression Area Documents.         27

8    4        Free Expression Area Documents          29

9    5        Free Expression Area Documents          36

10   6        "Silent Vigil" emails                   38

11   7        FIRE - Victory for Free Speech Article  42

12   8        Composite of Various Emails             45

13   9        Email 5/2/07, Barnes to Lee re:  Atlatl 55

14   10       Email 5/2/07, Barnes to Lee re:  Atlatl 55

15   11       Email 5/2/07, Barnes to Lee re:  Atlatl 55

16   12       Facebook Page re:  S.A.V.E. - Memorial... 63

17   13       Student Handbook Excerpt - Volume II    66

18

19

20

21

22

23

24

25

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    THEREUPON,

 2                        RICHARD LEE, SR.,

 3    having been first duly sworn, was examined and testified as

 4    follows:

 5                        EXAMINATION

 6    BY MR. FEDELI:

 7        Q     Would you, please, state your full name for the

 8    record.

 9        A     Richard C. Lee, Senior.

10        Q     And what is your current address?

11        A     5921 Bird Hall Road, Hahira, Georgia, 31632.

12        Q     Okay.  My name is Chris Fedeli.  I'll be taking

13    your deposition today.  Have you ever had your deposition

14    taken before?

15        A     No.  I don't believe so.  Been in court a time or

16    two but not a deposition, I don't believe.

17        Q     Do you understand how a deposition works?

18        A     I do.

19        Q     If you don't know the answer to a question I'm

20    going to ask, it's certainly okay for you to say that you

21    don't know.

22              However, because it's being transcribed, I ask that

23    you give verbal responses to your questions, yes or no, as

24    opposed to head nods.

25              Is there any reason you would not be able to give
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    complete and accurate testimony here today?

2        A    Not that I'm aware of.

3        Q    What did you review in preparation for today's

4    deposition?

5        A    Just thought about the conversation I had with

6    Mr. Will yesterday.  We met and talked about the layout of

7    the format.  I should say the format of the proceedings

8    today and how it would go.  Kind of put us at ease, that

9    kind of thing.  That's pretty much it.

10        Q    Did you discuss the deposition or the case with

11    anybody else at VSU?

12        A    No.

13        Q    What's your current occupation?

14        A    I am the Assistant Dean of Students for student

15    conduct at VSU.

16        Q    What was your occupation prior to that?

17        A    Well, I've been at VSU 20 -- soon to be 21 years.

18    Six and a half -- the first six and a half years, I was the

19    co-op coordinator.  Job developer, cooperative education.

20            And in then this job from 1994, to date.

21    August 1994 to date, which is about 15 years.  You mean

22    prior to VSU or just at VSU?

23        Q    Well that covers VSU, correct?

24        A    Yes.

25        Q    How about prior to VSU?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A      I worked for Wiles Vending Corporation.  I was an

 2   operations manager for four years.  I worked in television

 3   for four years, roughly four years, as an operations

 4   manager/production manager for a local television station.

 5           And prior to that was at Valdosta State, my first

 6   time here.  I was in the bookstore.  I was one of the

 7   assistant managers there for general merchandise.  That was

 8   '75 to '80, '79, somewhere around in there.

 9      Q      What's your educational background?

10      A      I have a BFA in Speech Communication,

11   Organizational Communication; and I have a Masters in Public

12   Administration, both from VSU.

13      Q      And when did you complete those degrees?

14      A      I'll have to think about the undergraduate one.

15   The undergraduate, I believe, was in '81; and my Masters was

16   in the summer of '90, I think.  It may have it backwards.  I

17   might be -- no, it's '81 and '90, yeah.

18      Q      So, what are you responsibilities in your current

19   job at VSU?

20      A      Well, my primary responsibility, of course, is

21   working with students that have allegedly violated our

22   student code conduct.

23           I get reports from our police department.  I get

24   reports from faculty members, students, staff.  Just

25   wherever.  Off-campus police.  A bevy of people send me
```

**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
**404.351.4577**

1   reports.  And then, of course, I evaluate them in light of

2   the code, contact the student; and then we go from there in

3   the process.

4          One of the more fun things I do is I am the campus

5   ministries liaison, so I work with a lot of the campus

6   ministries on campus and the things that they do.

7          Another thing I do is I'm the advisor for Alpha

8   Lambda Delta, a freshman honor society which is, basically,

9   students who in their first semester at VSU have 3.5 or

10  better and have completed 12 hours successfully.  And those

11  are pretty bright kids and fun to work with.

12    Q    So, the honor society, students who are in some

13  sort of trouble administratively --

14    A    To be determined.

15    Q    To be determined, yeah.  And the third area you

16  mentioned was with campus ministries.

17    A    Campus ministries.  And, fourth, other duties as

18  assigned.  You know how that goes.

19    Q    Other duties as assigned.

20    A    And other committees and things that I'm asked to

21  do.  And I can't remember all of them off the top of my head

22  to be honest with you.

23    Q    In the fourth category is one of those items you

24  were assigned at one time is the Free Expression Zone

25  administration?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      Yeah.  I inherited that in '94 when I came here.

2   There was a policy in place then, and I inherited that

3   process, yes.

4      Q      So, what can you tell me about that policy that you

5   had at one time?

6      A      Well, basically, it was a pretty simple policy.

7   Time, place and location.  You know, not content relating or

8   anything like that.

9             We had a designated area that was, basically, the

10  center of the campus which is called the Quad.

11            We didn't at one time have a stage there, but we

12  eventually built a stage there for the facilitation of

13  discussion and players, concerts, whatever.

14            But, basically, what would happen is a student

15  organization or particularly off-campus people that would

16  come and want to use or campus for espousing whatever it is

17  that they wanted to talk about, either political, religious

18  or whatever.

19            It was for, you know, being able to delineate when

20  and where and what time that they could do their expression.

21            So, there was a reservation process, basically,

22  that they went through and filled out a form; and we made

23  sure that space was available, and they did their thing.

24  The same would apply to students.

25      Q      Same policy applied to off-campus speakers as



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    students wishing to --

2    A    Right.  Students and staff and faculty, people on

3    campus were, of course, given first priority to the use of

4    the area.

5         And a lot of student organizations would, through

6    event services, register for the quad.  It might not be a

7    freedom of expression activity.  It might just be a game or

8    an activity that they were having out there.

9         But if somebody wanted to have some sort of a

10   statement or presentation or whatever, they typically would

11   go through my office, through the Dean of Students' office

12   to do that.

13   Q    So, they would reserve the space ahead of time --

14   A    They would.

15   Q    -- through your office typically?

16   A    Forty-eight hour advance notice typically.  That

17   was the requirement.

18   Q    And if no one had scheduled a reservation for that

19   particular time, what happened to the space?  Was it just --

20   A    It was vacant.  It wasn't used.

21   Q    People could walk through, play Frisbee or anything

22   else?

23   A    Yeah.  Good bit of that.  Meeting a boyfriend or

24   meeting a girlfriend or a lunch date or whatever.

25        At earlier time frame -- we had a twelve-to-one and

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    we had a five-to-six time frame which, of course, in our
 2    view were the heaviest traffic times.
 3              They were nonclass times usually, and there were
 4    people going and coming to Palms or going and coming to
 5    their residence hall -- Langdale, which was a very large
 6    residence hall.
 7              So the twelve-to-one and the five-to-six seemed to
 8    make sense, and they could do one or both for as many days
 9    as they wanted to.  So, there wasn't any time constraints on
10    that.  Duration, I guess.
11              Eventually, we modified the policy over time now to
12    not have that time limitation on it or really even the
13    location, but we still have the reservation process in place
14    where people use it.
15              And we encourage them to use that.  You know,
16    that's usually the place they want anyhow, because it's
17    right in the dead center of the campus and it's a high
18    traffic area.
19       Q    So, you mentioned a second ago that you changed the
20    policy over time.  We'll come back to that in a minute.
21              But I'm kind of curious to know when you were doing
22    it and it was more of a fixed policy, did you ever get any
23    requests for speech demonstrations in other areas outside of
24    that particular designated area?
25       A    I can't recall.  There may have been a time or two
```

WHEELER
REPORTING
*Court Reporting • Video • Litigation Support*
*404.351.4577*

1   where somebody wanted to use the front lawn or possibly in
2   front of the library.  That may have been in the earlier
3   years before we modified the thing, but that's the only
4   other couple of places.
5        You know, we've had a number of people come on
6   campus and go there or go to another location and start
7   using the place without any reservation or whatever.
8        So, I guess, you know, they might've wanted to use
9   it there or whatever.  But we make them aware of the policy
10  and say, okay, here is the policy that you need to use and
11  we'll be happy to work with you on it.
12       Some choose to use it and some choice not to.  Some
13  went out on the curb, what they call the right-of-ways,
14  common area, and continued their message from there.
15  Q    And what happened typically in those cases where
16  they didn't confine their activities to the zone?
17  A    Like I said, the vast majority of them that I
18  recall -- and these are -- I guess a specific example is, I
19  call them, traveling preachers or traveling ministers,
20  whatever you want to call it.
21       They would come.  They make a circuit through a lot
22  of schools.  They might be on their own schedule, so they
23  might not either have been aware of or whatever.  So, we
24  make them aware of the policy.
25       And they said, "Well, I'll just go over there on

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1 the corner," and this is -- what do you call it -- common

2 area, right of way.

3   "Go ahead.  Suit yourself."

4   A number of times that took place.

5  Q Did you ever find yourself in the position of

6 discouraging people from doing their demonstrations kind of

7 outside this area?  The quad?

8  A Not that I'm aware of.  I'm pretty -- I'm an

9 elected official.  I know about peoples' rights to vocalize

10 their opinion.  As a matter of fact, I'll probably hear from

11 them tomorrow night about something that we've acted on.

12   But, no, I'm a pretty firm believer about their

13 right to express themselves within reason, not causing

14 disturbance or anybody being hurt or any damage being done

15 or anything like that.

16  Q What's you're elected position?

17  A I'm a District 11 County Commission here in Lowndes

18 County.

19  Q How often are those elections held?

20  A Every four years.

21  Q So, you're an incumbent?

22  A I am an incumbent.  I was elected in '93 to '96,

23 was unelected in '96, was reelected in 2000, and have been

24 here ever since.

25   I guess I would be back up in 2010, would be my

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    next reelection bid.
 2           (The document was marked for identification as
 3    Plaintiff's Exhibit Number One.)
 4    BY MR. FEDELI:
 5    Q    We're going to introduce some documents.  I'll talk
 6    about this a little bit now.  This is going to be Exhibit
 7    One.
 8    A    Okay.
 9    Q    And for the convenience of us all, I'm going to
10    call this Wesley Foundation, David Scott, Free Speech Zone
11    documents.
12           It's a few documents, so I'm not going to -- for
13    the purposes of this discussion, I'm not going to say that
14    these were all necessarily one attachment or a single
15    document, but it'll speed things up if we discuss them
16    together.
17           So, could you take a look -- have you seen this
18    document before?  This first page?
19    A    Yes.
20    Q    And what does this look like to you?
21    A    Well, it looks like David -- let's see.  He's gone
22    know.  I can't think of his name.
23    Q    David Scott?
24    A    Scott, yes.  David Scott who was the Wesley
25    Foundation or Methodist Student Center Director, and he was
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     contacting us about getting the free speech area reserved so
2     that they could use it.

3        Q      Okay.  And what is the Wesley Foundation?

4        A      It's a Methodist student organization on campus.

5        Q      And David Scott was their student?

6        A      No.  He was their Director/Coordinator, so he was
7     not a student.

8        Q      So he was an advisor?  An off-campus advisor?

9        A      Yeah.  He's a coordinator for a campus ministry.
10    He's not a VSU employee.  Wasn't a student, either.

11       Q      And campus ministries, is that a term for a student
12    group at VSU?

13       A      Well, it's a collection of students groups.
14    It's -- you know, you have the Baptist Collegiate Ministry.
15    You have the Wesley Foundation.  You have the Presbyterian
16    Student Center and others.  F.C.A. is an organization.

17       Q      Take a look at page two of this document I just
18    handed you.

19       A      Okay.  (Reviewing document.)

20       Q      This is titled VSU Free Expression Area Reservation
21    Form.

22       A      Okay.

23       Q      Does this look familiar to you?

24       A      It does.

25       Q      And is this the type of document we were discussing



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   a few moments earlier for reserving the free speech zone?

2       A      It is.

3       Q      How often did you see requests from the Wesley

4   Foundation to use the free speech --

5       A      Oh, gosh.  They used it frequently.  I couldn't

6   estimate a number of times.  During the course of David's

7   stay here, he used it a number of times.

8       Q      I call your attention to page three of this

9   document.

10      A      (Reviewing document.)  Okay.  This?

11      Q      Yes.  It would be this one.

12      A      Okay.

13      Q      What is this document?

14      A      This is actually -- what happens in the process is

15  they come in and want to use it and either email or call.

16  But, typically, I'll call over at Events Services who is

17  kind of the keeper of the facilities on campus as far as

18  reservations are concerned.  And, particularly, this, as

19  well.

20          So, I called and say here's the date.  Here's the

21  requested dates and the times.  Are they available?  And

22  they'll either say, yes, they are or, no, they're not.

23          And if there's a conflict -- we, typically, do not

24  have two events going on at the same time, particularly if

25  somebody wants to use it for this function.  We don't have

Page 15



```
 1    other organizations having their activities out there.

 2            So, I guess what this is then is the confirmation

 3    of that discussion saying, okay, got you in the system.

 4    He's good to go or that group is good to go for those dates

 5    and times.

 6        Q    Who generates this report?

 7        A    Event Services on campus.

 8        Q    And is that a different office than your office?

 9        A    It is.

10        Q    The reservation requests are typically directed to

11    your office or to Event Services?

12        A    You know, you're talking about people coming to

13    request or students or what?  I need clarification what

14    you're asking about.

15        Q    People filing these VSU free expression reservation

16    forms, such as page two.

17        A    Okay.  Somebody, obviously, off campus, a non-VSU

18    person, might come to my office.  They might come to their

19    office.  They might go to the police department.  They may

20    go to a number of different places because they probably

21    don't know where to go.

22            More often than not, they come to my office.  If

23    they're aware of the policy, they'll come to my office

24    because it clearly says you go to the Dean of Students to

25    start the process.
```

Page 16

1          Sometimes they'll go to Event Services or somebody

2     may inadvertently direct them to Event Services because they

3     think they're reserving a space.  They, in turn, send them

4     to me.  Say, okay, the process starts with the Dean's

5     office.  You know, what date, what time.  And now what

6     location.  Back then, it was, of course, the free expression

7     area which was designated.

8     Q     So, the process in place was for these requests to

9     come first to the Dean's office and for the Dean's office to

10    coordinate with the --

11    A     Event Services.

12    Q     Event Services Office.  And then once it came back

13    to the Events Services office, you would communicate to the

14    person making the request that they could use the spot?

15    A     Right.

16    Q     That was the policy?

17    A     Yeah.  Yes.

18    Q     Was that policy usually followed during the time

19    that you were --

20    A     To the best of my knowledge, it was.  I've been

21    here the entire time of it that I've been involved with it.

22          And I guess the top cover is the example of a

23    completed form.  You know, there are occasions when I didn't

24    get the person's form faxed back to me or something like

25    that, but they had met with me.  They had followed the

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    procedure.  We had confirmed the availability and locked it
2    in for them.
3            So, this is something that we would always ask them
4    to have on their person, so if anybody had any questions
5    about them out there saying or doing whatever they were
6    doing, this was their authorization for that.
7        Q    When you say "this," you're talking about the
8    document, page-
9        A    It was page two.
10       Q    Page two?
11       A    Yeah.
12       Q    And that's an authorization because it's signed by
13   the appropriate --
14       A    Basically, all the parties, yeah.  Me.  The person
15   under me on this is the Events Services representative that
16   filled it out or put it into the system over there; and, of
17   course, the person above me is the requester.
18       Q    What do you remember about the kind of speech the
19   Wesley Foundation engaged in when they reserved the zone?
20       A    Well, they would've musical bands out there.  They
21   would have what I call contemporary Christian bands.  You
22   know, singing praise and worship kind of stuff that they
23   would do.
24           Occasionally, they would share the Word, the Bible.
25   They would, you know, do their own delivery of a message of


WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    a Christian orientation and focus, interact with students.

2          You know, when the students would come to listen to

3    them and listen to their music, they'd tell them what they

4    wanted them to hear.

5      Q    What kinds of interaction would you describe with

6    the students?

7      A    What do you mean by that?  With this particular --

8          MR. WILL:  I object to the form of the question

9    because I believe it's vague.

10         THE WITNESS:  I'm not sure what you're asking me

11    exactly.

12   BY MR. FEDELI:

13     Q    Do you recall anything, in particular, that they

14   would say to students that -- while they were giving their

15   speeches?

16         MR. WILL:  Are you talk about the Wesley group?

17         MR. FEDELI:  Yes.

18         THE WITNESS:  Oh.  Well, like I said, they're

19    Methodists, so their presentation would have that bent to

20    it or that tenor to it.  It was Christ based.

21         A lot of times I guess it would be evangelical or

22    -- what do they call it.  Yeah, evangelical.  It would

23    be, you know, telling kids about Christ, you know, and

24    hoping that they would respond positively to their

25    message.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    I don't recall any kind of antagonism or anything
2    like that, if that's what you mean. Anything like that,
3    no.
4    BY MR. FEDELI:
5    Q    Did you ever observe them speak at the Zone?
6    A    Yes.
7    Q    About how often?
8         MR. WILL: How often did he observe it?
9         MR. FEDELI: Yes.
10         THE WITNESS: Oh, there's no definitive way to tell
11    you how many times I observed it.
12         What I attempt to do is, when I know someone has
13    reserved this spot, go out there at some point every day
14    that they reserved it and just kind of monitor the
15    situation; because sometimes some of the people that come
16    and the messages that they share can be somewhat
17    inflammatory with our students.
18         So, I want to make sure that everybody is safe,
19    sound, secure and everybody's within the frameworks and
20    the boundaries that are set for this kind of discourse.
21         We also, typically, have University police
22    circulating around the campus. When they know -- they
23    get a copy of this. Other key administrators on campus
24    get a copy of this so it's a heads-up: we have these
25    events going on at campus. Just thought you'd want to

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1      know.
2            So, you know, the police are there in case you have
3      an inflammatory type of speaker, which we have from time
4      to time.  Street preachers they call them.  Evangelists.
5      Q     Did you ever witness any inflammatory type speech
6      from the Wesley Foundation?
7      A     No.
8      Q     Did you ever get any complaints about them?
9      A     No.
10           (The document was marked for identification as
11     Plaintiff's Exhibit Number Two.)
12   BY MR. FEDELI:
13     Q     Exhibit Two, this is a similar set of documents
14     relating to Donnie Morris' request for free speech zone
15     usage.
16     A     Okay.
17     Q     Looking at page one of this document, does this
18     look familiar to you?
19     A     It does.
20     Q     Is this an email from you to Russ Mast and Kurt
21     Keppler, along with -- well, I guess, several people in the
22     C.C. line?
23     A     Right.  Right.  Correct.
24     Q     And what was this email about?
25     A     This was, Basically, alerting folks that we had a
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    speaker on campus, that was coming to our campus and wanted

2    to reserve and had reserved, I believe -- yes, reserved the

3    date and time and place.

4        Q    And so did you typically send out emails similar to

5    this when somebody would reserve the free speech zone?

6        A    I would do my best to alert folks that folks would

7    be using the area so everybody wasn't surprised, you know.

8    People on campus hate surprises, so I just wanted to give

9    them and a heads-up.

10       Q    Okay.  Does this email say something about a court

11   date for this particular speaker?  I'm looking at the third

12   sentence.

13       A    It does.

14       Q    And what's that in reference to?

15       A    It was in reference to a court proceeding that

16   Mr. Morris and another gentlemen had brought against our

17   campus relative to the use of the free speech area; and we

18   had gone to court over that matter.

19            He took issue, I guess, with our policy and our

20   producer and the fact that we had one; and we had vetted it

21   through our, you know, attorney and also the attorney at the

22   Board of Regents level; and they'd all said it's fine.

23            And so we stuck to our process, and he came once or

24   twice -- I think he came initially, and that's when he was

25   asked had he reserved.  He had not.  He said he didn't have

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    to.  We said, yes, you do.

 2             I asked him to come by and meet with me.  I don't

 3    believe we actually met that time.  He did come back the

 4    second time and we met.

 5             I explained the policy to him.  And I'm trying to

 6    remember.  I don't think he ever actually went through the

 7    policy after that conversation we had.

 8             But, the next thing we know, we're getting a letter

 9    from somebody saying that we're being charged with a

10    violation of rights, I guess, relative to freedom of speech.

11    Q      Do you remember the outcome of that court case?

12    A      VSU was upheld.  The policy that we had was upheld

13    in, I believe, the Middle District Court, Federal Court,

14    that we had a policy that was sound and it was upheld.

15    Q      And who were the attorneys that you spoke to at

16    that time, if you remember?

17    A      Oh, gosh.  Of course, we had Lavern Gaskins who was

18    the campus attorney.  I cannot remember the young lady's

19    name that was from the, I think, A.G.'s office.

20             There was a young lady that was the attorney for

21    the A.G.'s office, but I do not remember her name.

22    Q      If I mentioned a name, would you -- might you

23    remember it?

24    A      I might.  It's been a long time ago.

25    Q      Was it -- does it sound like it might've been Betsy
```

Page 23



 1    Neely?

 2        A    Now Betsy Neely, I believe, is the Board of

 3    Regents' attorney.  And, of course, I've talked to Betsy

 4    over time about our policy and asked them how is it; is it

 5    okay.  And they indicated it was.

 6             Now I don't remember in this particular case

 7    whether I talked to Betsy or not.  I may have.  It's been a

 8    long time ago.

 9        Q    At the A.G.'s office, might you have spoken to

10    Chris Currea?

11        A    Is that a male or a female?  Because I don't know.

12        Q    A female.

13        A    It may have been her.  There were two or three

14    people, I think, that were involved when we went up to Macon

15    to a hearing, and there was two or three attorneys.

16        Q    If you will, take a quick look at the rest of the

17    pages in this document.

18        A    Okay.

19        Q    You can see we have a number of reservation

20    documents from Donnie Morris.

21        A    Okay.

22        Q    How often would you say Donnie Morris spoke at the

23    VSU campus generally?

24        A    Well, I haven't added it up, but I would

25    estimate -- let's see what you've got here.  I was going to

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     say a half dozen times, but that may be a little much. It

2     might be more like three or four times actually.

3     Q    And you watched him speak at least on one of those

4     occasions?

5     A    Oh, yeah. Pretty much every time, because this

6     message that he would have would always be -- it would get

7     students worked up. They would -- he would say things that

8     would make them unhappy and displeased with him.

9         Of course, there would be comments from the

10    students towards the message that he was trying to deliver.

11        So, yeah, I would always go out there and monitor

12    the situation as I would ask the university police to

13    monitor for the safety of both the speaker and the students.

14    Q    So Donnie Morris is one of these inflammatory

15    speakers.

16    A    I think that's a safe comment to make; that he was

17    one of several traveling ministers, I think is the simplest

18    way to put it, that I understand go around to various

19    college campuses with a pretty in-your-face kind of gospel

20    message that they use; and, you know, students can get kind

21    of upset about it.

22    Q    Could I ask you to characterize some of the

23    comments he would make that would upset students?

24    A    Well, it was kind of general accusations that the

25    young women that would go by would be a prostitute or

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    whores.  Some of the young men that would go by, they would

2    be fornicators and drunkards and drug users and -- well, I

3    won use that one.  They would relieve themselves.  The guys

4    would relieve themselves.

5        It was really kind of in-your-face comments that he

6    would make.

7        But, to my recollection, he never directed it at

8    any individual students.  It was his -- you know, you all

9    are kind of in a group, and I'm trying to help you come to

10   the error of your ways, see the error of your ways with this

11   message and turn away from it.

12       There would be some people that would make it a lot

13   of -- they'd turn it into a comical kind of situation and

14   play off of him.

15       And some people from the campus ministries might go

16   there and want to try and counteract it with a more loving

17   kind of approach.

18       And then there would be others that they would kind

19   of get inflamed, and we'd have to monitor and make sure that

20   they didn't do something.  So, we'd have to have campus

21   police nearby.

22       And it always seemed to work.  I can't remember too

23   many incidents -- people would, of course -- a college

24   campus is a revolving door of sorts.  So, you've got new

25   students every fall, new students every spring.

Page 26

1          And so the pastors would be somebody that comes on
2     a somewhat regular basis.  Annually maybe.  Once a year.
3     Maybe twice a year some of them.  But you'd see different
4     students.
5          And some of the newer students would really get
6     worked up.  Some of the older students would remember him
7     from last year, and they would not be so worked up.
8          So, we just monitored it and tried to make sure
9     nobody got out of line and got hurt, but we didn't never
10    monitor anything they were saying.  I mean, mess with
11    anything they're saying.
12    Q    So, it's safe to say that you got some complaints
13    about Donnis Morris.
14    A    Oh, yes.  Well, he and others like him.  Faculty
15    would call because they didn't know about him.  Some
16    students come by the Dean's office.  Why is this guy here?
17    Why do we let him do this?  Well, we let him do it because
18    he has a right to do it.  Here's the policy.
19          (The document was marked for identification as
20     Plaintiff's Exhibit Number Three.)
21    BY MR. FEDELI:
22    Q    Exhibit Three, this is a similar set of materials
23    concerning the group Bibles for America.
24    A    Uh-huh.
25    Q    Do you recognize this email, the first page?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    I do.

2    Q    And is this a similar heads-up to a number of

3    people that the Bibles for America group would be speaking?

4    A    Yes.

5    Q    So what can you tell me about this group?

6    A    I don't know a lot about them.  I think they've

7    been here once, maybe twice to our campus.  I don't know if

8    you have a second instance in here or not.  I'm thinking

9    that they may have been here twice.

10        But what they have is a big motor home, and it's

11   painted up with their -- you know, their name and all on it.

12        And they drive up on a campus, and they have a

13   similar message.  They're out sharing faith.  It's a little

14   different from Gideons.  You know, the Gideons organization.

15   They hand out little New Testaments and such.

16        They give the whole Bible.  It's similar in that

17   respect that they both are handing out copies of the Bible.

18   These people do the whole Bible.  I think the Gideons do

19   just the New Testament.

20        They had that big bus, so they had the reserve --

21   we had to really handle some logistics there for them to get

22   into the area near the Freedom of Expression area, the

23   closest we could get them in there.  They couldn't drive the

24   bus up there on the Quad.

25    Q    So, they had to reserve the Free Expression area at



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    least once?

2        A    They did.

3        Q    Would you characterize these speakers as

4    inflammatory at all?

5        A    No.

6        Q    So, they weren't really like Donnie Morris in terms

7    of their message or their delivery?

8        A    Well, I would say maybe -- delivery, no.  Their

9    message was kind of the same.  I mean, there are -- you

10   know, these are errors of your ways.  Here's an answer to

11   that through Christ.

12           Here's some reading material that will help you get

13   to Christ and turn from the error of your ways.

14           It was, of course, a evangelistic message like

15   Mr. Morris, but their delivery was markedly different.

16       Q    Anybody complain about this group?

17       A    Not that I recall other than maybe delivery people

18   trying to get over there to Food Services that day because

19   that bus was a huge thing.

20           (The document was marked for identification as

21   Plaintiff's Exhibit Number Four.)

22   BY MR. FEDELI:

23       Q    Exhibit Four, what I'll call Ryan Powell Free

24   Speech Zone documents.

25       A    Okay.  (Reviewing document.)

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Do you remember Ryan Powell applying to and given

2    permission to speak in the Free Speech Zone?

3    A    Do I remember him?  Probably not, no.  He,

4    obviously, did apply and did reserve the Zone; but I don't

5    know him as a person.  I think he was an individual student

6    actually.

7    Q    These documents reserving the Free Speech Zone,

8    does this -- this is your signature on the --

9    A    It is.

10   Q    -- Dean of Students?

11   A    Right.

12   Q    So.  You would've approved this speaker.

13   A    Right.

14   Q    Do you remember every going to watch him or might

15   you have gone to see him speak at one point?

16   A    Like I said, my intent and practice is to go check

17   in on those folks just to make sure everything's going all

18   right, because I've notified University Police and others;

19   and University Police is kind of my backup, so to speak.

20   They're the ones that are around the general area when these

21   events are taking place.

22        They're, of course, empowered to intervene if

23   something goes awry.  Probably a more appropriate person --

24   people actually to do that than me.  I'm not going to likely

25   run into the middle of a bunch of fighting students and be

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    able to stop something if something broke down.

2         But I do my best to get by each of these students,

3    and, one, see if the person showed up; two, make sure things

4    are going all right; and, three, make sure that they're

5    abiding by their reservation. Say "we'll do it twelve to

6    one" and still there at three, you know.

7    Q    So, based on what you've testified to, it's

8    probable that at some point you saw Ryan Powell speak. You

9    just -- the name doesn't ring a bell for you?

10   A    No.

11   Q    Is that right?

12   A    Right. And I don't -- I don't know this student, I

13   don't believe. He's one of many that have come in and

14   followed this process and reserved space.

15   Q    So, page one of this document says religious

16   expression.

17   A    Uh-huh.

18   Q    So, is it fair to assume he might've had a similar

19   message to the previous three groups that we've discussed?

20   A    I would an assume that. I don't recall what his

21   message was.

22   Q    Okay. You're familiar with a student named Hayden

23   Barnes either directly or indirectly, correct?

24   A    I am.

25   Q    Do you recall if Hayden Barnes ever had a



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    disagreement with any of these religious speakers that we've
2    been discussing or any others?
3        A     My recollection of that is -- and I'm not
4    absolutely sure if it were in -- was in the fall of 2005 or
5    whether it was in the spring of 2007.
6            When I reviewed the information in my reservation
7    thing, reservation list, the appearance is that in the fall
8    of 2005 we had Mr. Morris on campus one October maybe.
9    2005.
10           He was out there, and folks were listening.  Some
11   were talking; some were yelling; some were, you know,
12   interacting with him as they usually do.  And, of course,
13   police were there and everybody was around.
14           And we had a group of students that were sitting
15   really close to the stage.  Of course, a lot of them will
16   stand right in front of him and have interchange with him.
17           But they were relatively close to the stage, and
18   some of them were sitting down and some -- they kind of
19   looked like African or Indian kind of drums.  Little skin
20   drums, you know.  You know, bongo-ing, playing music,
21   whatever you want to call it.  Kind of being disruptive to
22   what was going on.
23           And so I walked up there to check on the activities
24   of that day and saw that going on and said, you know, that's
25   not right.  We need to let the guy say his peace.  If they

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    want to say something, they can say it later.

2           So, I walked over there and introduced myself to

3    the students in question and identified myself and said, you

4    know, "What's going on?  What's the deal here?"

5           And they were playing their music.  I said, "Look,

6    guys, in all fairness, this guy has followed this policy,

7    our policy for using this space.  He's followed the

8    procedure.  This is his time to say what he's going to say.

9    He'll be here for a period of time and then leave, and what

10   y'all are doing is being kind of discourteous to him and

11   disruptive to him."

12          The appearance was they were trying to drown him

13   out.

14          So, you know, they indicated they could do what

15   they wanted to do or whatever.

16          And I identified myself.  Said, "No, we don't

17   really think you can.  You know, we need for you to cool it

18   and either move somewhere else and do your thing or quit

19   doing this and listen to what he's got to say."

20          And went through, you know, two or three students

21   identifying themselves, and Mr. Barnes was one of them.

22          And I had recently had an email a couple of weeks

23   beforehand -- this is what makes me think it was the fall of

24   '05.

25          I had an email from Dr. Keppler who had somehow

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    gotten an email from Mr. Barnes that he was having a campus
2    event or demonstration or something about the war.  I think
3    it was the war in Iraq, 2005.
4          And, you know, of course, he didn't care for that
5    or whatever; and he was going to have an event about it.
6    That was the first I heard of it is the email coming to me.
7          And so eventually I sent Mr. Barnes an email
8    saying, "Hey, here's the policy and procedure.  You know, if
9    you've had this event, you know, you should've followed this
10   policy and procedure to do it.
11         "It's a simple policy and procedure.  We want
12   everybody to, you know, have their peace, but follow this
13   procedure and we're cool."
14         And then I think -- the reason I say that is
15   because that came before the Morris instance, and that's
16   probably why he registered with me.  Because in 2005, I
17   don't think -- I don't think he was on my radar screen at
18   all.
19         But, you know, I'd had that communication from the
20   Vice President saying there may be this event and, you know,
21   then the event must've taken place.  I don't recall seeing
22   it or going to it.
23         But after the date, I sent the email and said,
24   "Hey, if you had a successful event, wished you'd had
25   followed the procedure.  Here it is.  Do it in the future."

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1           Like I said, a week or ten days later -- a
2    relatively short period of time later -- Mr. Morris was here
3    doing his thing.
4           That's when I was talking with the students and,
5    you know, was talking with them.  Mr. Barnes identified
6    himself, and I went, oh, this must be the guy I just talked
7    with on the email a week or two ago.
8           But, other than that, I don't recall anything in
9    the spring or fall where I would've had any interaction with
10   him.
11   Q    So, on the day you talked to him when he was -- he
12   and others were banging their bongo drums in the vicinity of
13   Mr. Morris, how did the conversation unfold?  What happened
14   afterwards?
15   A    Well, I think -- I'm pretty sure -- you know, they
16   weren't happy about me telling them they couldn't play their
17   drums and do that, but they did abide by what I was asking
18   them to do.  They didn't keep on doing it.
19          But what they did, I think, is they moved over a
20   way off of the edge of the Quad over around, I'm thinking --
21   I'm thinking it was that Ashley-Converse breezeway area.  I
22   think they moved over there as a group, but I think he
23   continued to play his drums and stuff over there, which was
24   cool.  He was off the Quad and away from the -- from
25   Mr. Morris.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      Q     And so you asked them to kind of give him some
 2   space, and it sounds like they did.
 3      A     They did.
 4      Q     Okay.  Anything else you remember about that day
 5   and conversation with Hayden Barnes?
 6      A     Nope.  I mean, I wouldn't even characterize it as a
 7   conversation.  We had a brief exchange there where I said,
 8   "Hey, guys, this is who I am.  This is what he's doing.
 9   He's following the process.  Please let the man have his
10   due.  He's only going to be here for a little while."
11           And, by the way, what I will often say to these
12   kids when I got out there and talk to them or they come up
13   to me and say, "Mr. Lee, are you going to let those guys say
14   that stuff, I'll say, "You want to point-counterpoint?  Come
15   see me.  We'll set you up a time to do their point, your
16   counterpoint.  If you want to do that, we'll set you up and
17   do all you want to do.  Say all you want to say."
18           (The document was marked for identification as
19      Plaintiff's Exhibit Number Five.)
20   BY MR. FEDELI:
21      Q     Exhibit Five is a similar set of documents.  We'll
22   call these the Jena 6 Vigil Free Speech Zone documents.
23      A     Okay.
24      Q     Page one, do you recognize this document?
25      A     I do.
```

Page 36



1    Q    And this looks like an email from you to several

2    VSU administrators.  Is that right?

3    A    That's correct.

4    Q    And this is about a student who wants to do a

5    silent vigil in support of the Jena 6 incident.  Is that

6    correct?

7    A    That's correct.

8    Q    What else can you tell me about this?

9    A    Well, obviously, she came in and reserved the site.

10   They followed the procedure.  They went out and used the

11   Quad and spoke about that and was really a very controlled

12   sort of vigil.

13        As a matter of fact, I think they had a silent

14   portion of their presentation where everything was -- I'm

15   guessing there was probably 15, 20 students out there at any

16   one time; and it was all about, you know, just solidarity

17   for the event that was going on over at -- was it

18   Mississippi or -- was it Louisiana?  Louisiana.

19   Q    So, you observed this event?

20   A    I did.

21   Q    And it went off without any inflammatory --

22   A    Without a hitch.  Yeah, without a hitch.  I don't

23   think anybody was upset or whatever about it.

24   Q    Anything else you remember about this event?

25   A    Not really.

**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
**404.351.4577**

```
 1              (The document was marked for identification as
 2         Plaintiff's Exhibit Number Six.)
 3    BY MR. FEDELI:
 4         Q    Exhibit Six, Free Speech Zone documents related to
 5    Hayden Barnes, Iraq War Protest.
 6         A    That's probably what I was talking about a minute
 7    ago.
 8         Q    I believe so.
 9         A    (Reviewing document.)  Yeah.  This is the email
10    that I followed up with him.
11         Q    And this first email we're talking about here is
12    when you informed Hayden that he should've reserved the Free
13    Speech Zone before giving his protest on the Iraq war?
14         A    Right.
15         Q    Did you hear from him in response to this email?
16         A    I don't have any copy of communication of him
17    responding on it.  I don't recall him responding to me on
18    it.
19         Q    Page two of this document appears to be an email
20    from Hayden Barnes to several members of the press and, I
21    guess, the administration, including Russ Mast --
22         A    Uh-huh.
23         Q    -- about a planned silent vigil against the Iraq
24    war.
25         A    Right.  This was what -- like I said a moment ago,
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    this was what was given to me -- yeah, Russ.  Okay.  Russ

2    must've forwarded this to me -- Kurt was aware of it --

3    about this proposed event on campus.  And, again, like a

4    heads-up type of communication.

5            And let's see.  That was on the 14th, the 27th --

6    I'm not sure -- the thing I'm uncertain about here is

7    whether it actually took place.

8            I'm thinking that it must have, because I respond

9    to him "hope your vigil was successful."  But I don't

10   remember it.  I don't remember the event.

11           I've thought about it and thought about it and

12   tried to remember.  I can only assume that the event took

13   place and there weren't any problems; because, if there were

14   problems, I would have other communication or other things

15   to tell me that there were.

16           So, this communique to him was, more than anything,

17   for awareness.  "Mr. Barnes, you do have a policy in your

18   student handbook about the use of this area for this kind of

19   speech.  Appreciate you doing it in the future."

20   Q     And do you remember about when Russ Mast would've

21   forwarded this email to you?

22   A     Well, it had to have been around this time, I

23   guess.  I around the -- was it Friday the 14th of '05?  It

24   had to have been around that time, I guess.

25   Q     Talk to Russ Mass about it at all at that time?

Page 39



```
 1      A      I don't remember our conversation on this four
 2   years ago.
 3      Q      There's also a notation here on this email from
 4   Russ Mass.  Kurt, 560 --
 5      A      That's my handwriting, and that's probably
 6   Dr. Keppler's cell phone number.  I may have called him to
 7   make him aware that this event was on the horizon, but
 8   that's what that would be about more than likely.
 9      Q      And why would you have called Kurt Keppler?
10      A      Well, because he's a need-to-know-person about
11   events that occur on campus.  He's not by immediate
12   supervisor, but he's above Russ.  He's our Vice President
13   for Students Affairs.  All things of student life outside
14   the classroom, he needs to be aware of these things.  Again,
15   people hate surprises.
16      Q      So, is Russ Mast your immediate supervisor?
17      A      Yes.  He's the Dean of Students.
18      Q      And Russ Mast reports to Kurt Keppler.
19      A      Yes, sir.
20      Q      So you probably gave Kurt a phone call.
21      A      I may have.  I'm not sure whether I did or not.
22   But if I wrote the number down there, I may have given him a
23   call.  You know, "just want to let you know we have this
24   possible event that's going to take place."
25      Q      Remember talking to anybody else about this protest
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    after this?

2        A      No.  This is not an uncommon thing, you know, for

3    students to have meetings or protests and things like that.

4    So, no, it didn't draw any particular attention to -- well,

5    later on, like I said a minute ago, Mr. Morris was on campus

6    and when I asked those students to stop doing that and asked

7    them to identify themselves, Mr. Barnes identified himself

8    as one of them.

9            So, that was a connection, you know, there later

10   back to this.  "Oh, I think I've already emailed this guy

11   about our policies and procedures."  Anyhow --

12       Q      Did you talk to Russ Mast or Kurt Keppler about

13   Hayden's banging the bongo drums on that day?

14       A      It's probably likely that I said, "Yeah, I had some

15   guys out there making noise and disrupting the speaker and I

16   had to talk to them."

17           But I'm not absolutely sure that I did, but it's

18   likely that I spoke to them and said I had to go out and

19   talk to some guys about the drums while a speaker was

20   talking.

21       Q      And that would've been with Russ Mast or Kurt

22   Keppler --

23       A      More than likely Russ, because he's the one that

24   interact with frequently during the day.

25               (The document was marked for identification as



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Plaintiff's Exhibit Number Seven.)

2   BY MR. FEDELI:

3      Q      Exhibit Seven is a press release from the

4   Foundation for Individual Rights in Education.  Have you

5   seen this?

6      A      That's some small type.  Let me read it for a

7   minute.  (Reviewing document.)

8             I think I have seen this.  I'm not sure, but I

9   think I may have read this.  I know that, you know, we were

10  on their -- on their list and we took steps to modify our

11  policy, and then we were off their list.  So --

12     Q      So, when you say that you were "on their list," you

13  mean they had concerns about the Free Speech Zone?  Is that

14  right?

15     A      They took issue with our policy.  And, you know,

16  they had their point of view about the policy that was in

17  place prior to the one that's in place now and felt that it

18  needed modification; and, ultimately, it was modified and,

19  apparently, they were happy with the modification.

20     Q      What were those modifications?

21     A      Well, like I said earlier, the time or the duration

22  of speech where we'd have, like, a twelve-to-one or a

23  five-to-six, that's been done away with.  Basically, a

24  person can have more time.

25             If someone wants to go to a different place on

Page 42

1    campus, you know, and use a different area of the campus as

2    opposed to the Quad or the formally Free Speech Area -- it's

3    now called the General Public Form Venue.  It's a mouthful,

4    but that's what it is now.

5         You know, subject to its availability and also

6    subject to it not being disruptive to classes or people

7    going about their daily business, so to speak, of the

8    institution.

9         So, you know, the area was changed and the duration

10   was changed, but you still have to reserve.  You still have

11   to follow our policy to reserve the space with a 48-hour

12   advance notice.  It's just more flexible about the time and

13   the location.

14   Q    And the FIRE organization was, apparently, pleased

15   with the change in policy.

16   A    It appears so.

17   Q    So, essentially, students at VSU now have more

18   flexibility in terms of where and when they do these

19   officially-sanctioned requests to speak on their issues,

20   correct?

21   A    That's correct.

22   Q    How has the new policy been working out?

23   A    It's working fine.  I think we've had -- I'd have

24   to go back and see exactly when that changed.  We've had a

25   few folks who have reserved it since then.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          Nobody has really sought any additional or
2     different location, because I think once they --
3     particularly if they've come here before, they realize that
4     is a very high-profile center of the campus, where-the-
5     action-is location on the Quad.
6          And that was always something that perplexed me
7     about that.  If they actually came and looked at our site
8     and knew where it was, why would they think that that was
9     problematic?
10          But, in any event, rarely have I had people ask for
11     any other location than where it is now.
12          And we would look into that.  We seriously consider
13     it.  And if it didn't create a problem with classes and the
14     flow of the university, then, very likely, it would be
15     granted.
16     Q     With this new policy, have you had cases where
17     students have forgotten to make a reservation in advance to
18     do their demonstration?
19     A     I don't -- I don't recall any after-the-fact sort
20     of thing.  I just don't recall any.
21     Q     Was there discussion around this decision to change
22     the policies for the Free Speech Zone?
23     A     What do you mean by that?  I'm not sure what you
24     mean.
25     Q     Did you have a discussion with anybody else at the

Page 44

1    college about revising that policy?

2        A    Well, of course, the Dean of Students is involved.

3    The Vice President of Students Affairs is involved.

4             Of course, we've got a new president.  He wanted us

5    to look at the policy and the procedure and analyze it and

6    see if there was any way that we could correct or modify,

7    whatever it is, they wanted to.  So, we came up with what we

8    came up with and that was acceptable.

9        Q    So --

10       A    The policy was modified.

11       Q    So, the new president of VSU was partly involved in

12   instigating the policy change?

13       A    I would say that he was very interested in it being

14   addressed and, you know, tasked us with the process.

15       Q    Who is the current president of VSU?

16       A    Patrick Schloss.  J. Schloss.

17       Q    And part of the reason for changing this policy was

18   the -- I guess the heat you were getting from FIRE.  No pun

19   intended.  Is that right?

20       A    I guess you could say that.  I guess you could jump

21   to that conclusion.

22             (The document was marked for identification as

23        Plaintiff's Exhibit Number Eight.)

24   BY MR. FEDELI:

25       Q    This is Exhibit Eight.  These are documents

Page 45



1    relating to a correspondence about a dorm incident with

2    Hayden Barnes.  Do you recognize this starting with the

3    email on the first page?

4        A    Okay.  (Reviewing documents.)

5             (Pause.)

6        A    Yeah, I do.

7        Q    What was this incident about?

8        A    Well, this clarified something for me.

9             Let me read over this again real quick and make

10   sure I'm correct on it.  (Reviewing documents.)

11             (Pause)

12       A    Let me go back to the original incident here.

13   (Reviewing document.)  Okay.  I'm trying to find out if

14   there was a housing incident report attached to this.

15             But my recollection of this email or my emails, I

16   guess, to Mr. Barnes is we had a housing official, Jason

17   Sininger, who, I believe, at the time -- Jason is actually

18   somewhat of a counterpart of mine in housing.  He would

19   handle all things discipline, I guess, that didn't come to

20   me, so to speak, in housing.

21             And it appears -- my recollection is somewhat

22   foggy, but there was an event or incident that took place in

23   one of the residence halls; and it involved a student who

24   was either under the influence or had some sort of medical

25   condition or -- something happened where the person was in a

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    bad way, so to speak.

2           And I guess the R.A. on the hall was involved and

3    there was -- like the first-line supervisor person in a

4    residence hall is an R.A., which is also a student, usually;

5    and then next person in line would be the Hall Director.

6    And I'm not sure if that person was involved in this

7    particular incident or not.

8           But there was a student who was in a bad way,

9    either overly intoxicated or either having some health

10   issues, like maybe a diabetes thing.  Something went wrong.

11          Well, apparently, Mr. Barnes was in the vicinity

12   and helped.  You know, went to the aid of this student.

13   And, apparently, because of this background -- it talks

14   about him being a paramedic or something down here.  He had

15   this kind of background, so he wanted to help in the

16   process.

17          And the discussion I recall was that he may have

18   said, you know, "You might need this kind of medication

19   and" -- you know, maybe getting a little over the top on how

20   far he should've helped.

21          And so the point of Mr. Sininger's contact, who was

22   either the Hall Director or -- either acting as the Hall

23   Director or acting as a disciplinary guy for housing -- was

24   to, hey, contact that student, ask him to come in; i.e,

25   Mr. Barnes.  Ask him to come in.  Let me explain our

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    policies and procedures, housing's policies and procedures,
2    about what happens in a situation like this.
3            Well, Jason's email was met with the response --
4    I've got to see which page that is.  But Mr. Barnes kind of
5    fired back to him -- is it on page two maybe?  Let's see.
6            "Mr. Sininger, please do not send me letters
7    threatening holds on my account.  I have done nothing wrong.
8    I have attached statement regarding incident of 2-6."
9            Okay.  February 6th.
10           "If my statement doesn't sufficiently clarify my
11   role, we'll set up a meeting and I'll arrange to have an
12   attorney present, if necessary," which was kind of an
13   over-the-top response to the supervisor in housing saying,
14   hey, let's get together and talk about what's going on.
15           In other words, he was saying, "I'm not going to
16   meet with you."
17           And this is not uncommon.  From time to time
18   somebody in housing goes -- particularly, R.A.s because
19   they're student to student.  Students to student -- students
20   don't always give another student their due when they're in
21   their supervisory role.
22           And sometimes they don't give the R.H.D, the
23   director, their due.  So, I guess I was kind of backup in
24   this scenario where Mr. Sininger forwarded Mr. Barnes'
25   communication to me and said, "Hey, Richard, can you help me

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    get this guy come in and talk with me and let him understand

2    what's going on?"

3         And I believe that must be my communication to

4    Mr. Barnes here on the top where I told him who I was again;

5    thanked him for helping the student but told him he

6    shouldn't be -- you know, even though he's trained, he

7    should let our people -- i.e., the university police and

8    then they usually called the SGMC, the hospital, you know,

9    to come and attend to the student.

10        You know, because you could have liability issues.

11   He could have liability issues.  The school could have

12   liability issues.  It could be a bad situation and go south

13   on him, so don't do that.

14        Then I told him who Mr. Sininger was and that he

15   needed to respond to him when he asked him to come in, and I

16   cited an aspect of our Code of Conduct that I thought was

17   applicability:  You know, your failure to cooperate, which

18   is under our disorderly conduct portion of the Code.

19        And if you wanted to discuss it further, I'd be

20   glad to talk with him.

21        And I don't recall Mr. Barnes calling me about

22   this.  I'm trying to see did he respond to me.  (Reviewing

23   document.)  I don't think he did.  Mr. Barnes, that is,

24   didn't respond to me.

25   Q    Right.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A      I remembered this incidence, but I wasn't sure if

 2   it was back in '05 or in '07; so, this clarifies it for me.

 3      Q      Looks like it was in '07.

 4      A      Yeah.  February '07.

 5      Q      Page six of the email threads I gave you --

 6      A      One, two, three, four, five, six.  (Reviewing

 7   document.)

 8      Q      -- appears to be a handwritten note on this page.

 9      A      That's five, I think.  Yeah, I was just trying to

10   think -- like you're asking me today when I might've had any

11   interaction with the student.  That's my note.

12      Q      That's your note?

13      A      Yeah.

14      Q      What does it say?

15      A      My first instance with him.  I do not have or

16   remember receiving a response of any kind, meaning a

17   response to the email that I sent to him about this topic.

18      Q      Did you ever hear anything further from

19   Mr. Sininger about this incident?

20      A      I may have talked to him, you know, just in passing

21   because we see -- we would see each other all the time.  I

22   think he thanked me for following up on it with the student.

23             I'm not sure whether they ever got together to be

24   honest with you.  At this point in time, I guess they did;

25   but I'm not sure, though.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    So, you never heard anything that Hayden did in

2    response to getting your email?

3    A    Right, either with me or with him.  "Him" being

4    Sininger.  I don't recall him either emailing or calling

5    me -- Hayden either emailing or calling me back about my

6    communication with him.

7         I don't know whether he got with Jason or not and

8    followed up with him.

9    Q    So, your note that we were just discussing that you

10    read starts off saying, "My first incident with him."  You

11    mean Hayden Barnes?

12    A    Yes, uh-huh.

13    Q    And based on what we've been talking about today,

14    this was actually your third incident with Hayden Barnes.

15    Isn't that right?

16    A    I guess it would be now.  I didn't recall the

17    incident back in the fall of '05.  He was here spring and

18    fall of '05; and that was that one isolated situation back

19    there.

20         This would be bordering on a disciplinary incident,

21    to me; so, I guess that's what I was thinking.  This was my

22    first disciplinary situation with him.

23    Q    So, by February 2007, those two back-to-back

24    incidents with Hayden pretty much faded from your mind by

25    then.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     A     That's a fair statement, yeah.

2     Q     Well, now kind of looking at the three incidents

3  altogether, was your experience with Hayden consistent each

4  time?

5     A     Consistent?

6          MR. WILL:  Object to the form of the question.  I'm

7     not sure of the question.  It's vague.

8          THE WITNESS:  I'm not sure what that means.

9  BY MR. FEDELI:

10    Q     When there was a situation requiring attention with

11 Hayden, you spoke to him about it and it ended.  That was

12 your experience in each case.

13    A     Yes, uh-huh.

14    Q     When did you first become aware that there was a

15 situation -- strike that actually.

16          Aside from the three events that we've talked

17 about, did you have any other conversations or emails with

18 Hayden Barnes about anything else?

19    A     I did.  I had one other email communication with

20 him; and now, in the context of this, it appears to have

21 been -- it might've been before this.  I'm not sure on the

22 date.

23          But it seems to me that I did have one email that I

24 was able to round up that was in February of '07.  I'm not

25 sure if it was in front or behind this.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          But he actually contacted me.  It must've been
2    behind -- after this because I guess now we'd had
3    communications about policies and procedures, and I guess he
4    was wanting to make sure he was covering his bases or
5    whatever.
6          But he contacted me about some form of old-timey
7    weapon or something.  I can't remember the name of it.
8    Atlatl.  Atala.  Something like that.  It was a hardwood
9    bow, sling.  Something you could throw arrows with or
10   something you could throw a spear with or whatever.
11         Apparently, he was real excited about it and
12   thought it was a cool thing, and he wanted to make one and
13   have one in his room.
14         And when I got that email, I says, "I don't think
15   that's a good idea, and let me tell you why."
16         Maybe I didn't have his full-blown dossier.  But
17   the point is:  We have students bringing soft -- what do you
18   call those soft pellet guns?  Soft guns?
19         MR. WILL:  Airsoft?
20         THE WITNESS:  Airsoft.  They bring in Airsoft guns.
21   Sometimes they bring those paintball guns.  You know,
22   they have stuff in their rooms that they shouldn't have.
23         And here was, in my opinion, something that could
24   end up being perceived as a weapon that he might be --
25   you know, it might've assigned to him or attributed to

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

 1     him that he had a weapon in his room, you know.

 2          And I said, hey, I don't think that's a good idea,

 3     particularly in the current climate of things.  You know,

 4     we've had numerous campus incidents around the nation and

 5     weapons in residence halls and things that could be

 6     perceived as weapons.

 7          And I guess maybe I was a little proactive or

 8     trying to be proactive in my communication with him then

 9     to -- I don't think that would be a good idea.

10          And I can't remember whether we had much of a back

11     and forth.  I think he did respond to me a time or two on

12     that with, you know, "No, no.  This is why I want to do

13     it," and whatever?

14          My recollection, in the final analysis, was I

15     really don't think that would be a good idea for you to

16     do that.  Let's not go there as far as for safety sake.

17          And as far as I know, he didn't do that.  He didn't

18     create this weapon or this thing that he wanted to make.

19     Q     So, this was the fourth --

20     A     Yeah, I guess, in the aggregate, yeah, it would be

21     the fourth interaction with him.

22     Q     I have three emails that I'll call Exhibits Nine,

23     Ten and Eleven.  These are about the -- I think it's called

24     an Atlatl.

25          (The documents were marked for identification as

Page 54

```
 1        Plaintiff's Exhibit Numbers Nine, Ten and Eleven.)
 2             THE WITNESS:  Good.  You can pronounce it.  I never
 3        could pronounce the thing.  (Reviewing document.)  Okay.
 4    BY MR. FEDELI:
 5        Q    And this appears to be the conversation we're
 6    discussing.
 7        A    Yeah, that's it.  How do you say that again?
 8        Q    I believe it's Atlatl.
 9        A    Is that right?
10             MR. WILL:  I believe it's close.  Atlatl.
11    BY MR. FEDELI:
12        Q    So, this is the first email I handed you.  It has a
13    handwritten note on it, correct?
14        A    Yes.
15        Q    Is that from you?
16        A    Yes.
17        Q    What does that say?
18        A    This was a second contact.  I thought there was an
19    email reply, but it is not in the records.  I did speak with
20    him over phone and said it was not permitted.
21             I believe that's what I told you.
22        Q    Yup.  And when you talked to him over the phone,
23    how did that conversation go?
24        A    Oh, it was fine.  He was, "Mr. Lee, I'm not going
25    to have a weapon," you know.  "I'm not going to do anything
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    like that." I said, "I know but we've just got all kinds of

2    stuff going on, on campuses; and it's better to be safe than

3    sorry. We don't want the University Police" -- I'm not sure

4    of the timing on it, but I did have this Airsoft situation I

5    was telling you about where the kids were playing around

6    with them in the room.

7         The guns look pretty real and, Lord, the police

8    came in on them and everything. It was just -- I didn't

9    want something like that to happen.

10   Q    What happened in the Airsoft case?

11   A    They lost their housing over it because they had --

12   you know, it was a weapon on the campus.

13        You know, things like that over time that I've had

14   to deal with, I thought in the current climate of anything

15   that could be perceived as a weapon on campus, we might not

16   want to go there. So, I'd appreciate if you wouldn't do

17   that, especially when I looked at these pictures here and

18   saw them. I said, oh, goodness. If it's any one of these

19   things, we might have a problem here.

20   Q    This is Exhibit 11 we're referring to?

21   A    Yes. If you look at these pictures back there, I'm

22   thinking, oh, my goodness.

23        You know, with something like this, if somebody is

24   visiting in his room and gets upset about something and

25   reaches up there and starts whacking somebody or stabbing

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1    them with it -- who's going to get blamed for it?
2    Mr. Barnes.
3         Its in his -- obviously, the person that did the
4    hitting and stabbing, but Mr. Barnes had it in his room.  It
5    could be a problem.
6    Q    So, you had this phone call with him, said -- you
7    know, communicated to him what you've told us.  What was his
8    response or reaction?
9    A    Well, like I said, we had a conversation.  He
10   wasn't, you know, hostile or anything on the phone or giving
11   me a real hard time.  He was pretty adamant that "I'm not
12   going to do anything" or "I'm not going to have any weapons
13   in my room."
14        I was pretty adamant:  "I would encourage you not
15   to do that.  Please don't do that.  We don't want to create
16   problems for you and for me."
17   Q    So, it was your understanding after that phone call
18   that he was not going to build this --
19   A    I would be safe to say that, yes.  I didn't go by
20   his room and check to see if he'd done it.
21   Q    You never heard anything further after that phone
22   call.
23   A    No.
24   Q    Did you discuss this exchange you had with him with
25   anybody else?
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A       Probably Russ.  Probably mentioned something to

 2   him.  Again, I run these kinds of things by the Dean when I

 3   have a student doing something of a residence hall,

 4   particularly that might be a safety concern.  I try to bring

 5   him in the loop.

 6      Q       What did Russ say when you mentioned it?

 7      A       "Damn" or something, you know.  You know, what do

 8   you say?  Oh, God.  Oh, man.  Here we go again.

 9      Q       So just kind of --

10      A       Here we go on.

11      Q       Kids will be kids kind of reaction?

12      A       Here's somebody else that -- some odd thing that

13   somebody was going to do in the residence hall.  Just about

14   nothing new under the sun, but every now and then something

15   new comes along.  An Atlatl was a first.  I don't think I've

16   ever had one of those requests.

17      Q       Keeps your job interesting, right?

18      A       Never a dull moment.

19      Q       Mention it to anybody else other than Russ Mast, do

20   you think?

21      A       I don't recall mentioning it to anybody else.  May

22   have.  I don't recall it.

23      Q       So, these four exchanges we've now discussed, is

24   that substantially all the communications you've had with

25   Hayden Barnes that you can remember?
```

Page 58

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1      A      It is that I recall, yes.
2      Q      So when did you -- actually, let's take a -- this
3    is a good stopping point if we want to take a few minutes'
4    break?
5      A      All right.
6             (Recess from 2:27 p.m. to 2:37 p.m.)
7    BY MR. FEDELI:
8      Q      So, when did you first become aware that Hayden
9    Barnes was protesting a parking garage on campus?
10     A      I think it was the latter part of April.  Maybe
11   around the 20th of April, somewhere around that range.
12     Q      And how did you become aware of it?
13     A      Well, I think initially Russ talked to me and said
14   Mr. Barnes is upset about the parking deck issue and he's,
15   you know, been emailing the President and expressing his
16   disdain, basically, for the parking deck.
17     Q      So Russ Mast would've brought it up with you?
18     A      I believe so.  You know, it kind of filtered down,
19   I guess, to him as it does.  A lot of times it's like me.
20   It lands on his desk or lands my desk and share it with me.
21     Q      So, when you and Russ discussed this parking deck
22   protest, did you recall some of these prior events with
23   Hayden Barnes at that time?
24     A      You mean the -- I guess the February incident.
25   It's safe to say, yeah, I had had some communication with
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    him.

2        Q    Did you and Russ discuss that at the time?

3        A    I don't recall a discussion definitively about,

4    hey, he's had these other two things.

5             It was two in my mind then.  Of course, the thing

6    back in the fall, too.

7        Q    Yeah.  So, what was your initial impression from

8    Russ Mast about Hayden's parking garage protest?

9        A    Well, that he's pretty passionate about his

10   feelings about it, and he was using whatever method and

11   process he could to promote his unhappiness about it.

12       Q    Did it raise any Free Speech Zone concerns for you

13   at that time?

14       A    No.

15       Q    Who else did you talk to about it at this time, I

16   guess, other than Russ Mast?

17       A    Well, at some point I'm sure we had a conversation

18   with Dr. Keppler, because all three of us talk about cases

19   and things like that.

20            But that's the only ones that I could think of that

21   I might've had any communication with -- would've been Russ

22   and Dr. Keppler.  And, again, it's on the radar screen, so

23   we're wondering about it.

24       Q    So, you and Russ and Dr. Keppler might've had a

25   meeting with the three of you where this came up?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      A meeting?  No, I don't recall a meeting with just

2    the three of us about it.

3            There was eventually a meeting -- I think it was

4    around the 25th of April.  I was there.  I think Russ was

5    there.  Dr. Keppler was there.  I think Vic Morgan was there

6    and Kimberly Tanner and Erin Sandonato, who was an R.H.D. in

7    the residence hall.

8            I'm trying to remember whether Lavern was there or

9    not.  I don't know whether it was in her conference room or

10   whether it was in Dr. Keppler's conference room.  I'm not

11   really sure.  I'm pretty confident of the people that I

12   mentioned were there.

13           And the purpose, of course, was, I think, at that

14   point the Facebook issue had come on the radar screen.

15   Maybe before that it was just some emails or a call or the

16   guy's voicing his opposition.

17           But now this new thing has happened where he's put

18   something up on Facebook and it's frightening to the

19   President.

20           You know, we met as a group of folks that would, I

21   guess, evaluate what's been shared with us; i.e, I'm feeling

22   threatened or this guy is doing something that may be

23   threatening to the safety and security of the campus.

24           We talk about it.  I'm there with the handbook, and

25     saying, "I don't see it.  Honestly, I don't see it in the

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1        Code of Conduct."

2              Is he outspoken?  Yeah.  Is he passionate about his

3        position?  Yeah.

4              But I don't really see anything.  And, of course, I

5        wasn't threatened by him or anything.  I'm not sure that

6        anybody else in the room was, either.

7              But the discussion, I think, was around, well, what

8        is our policies and procedures, which we talked about.

9        You know, the handbook and, you know, if somebody is up

10       on disciplinary charges, you know, you evaluate the

11       report against the Code of Conduct; and you say is

12       there -- are there appropriate violations that you could

13       conceivably assign to the situation.  To the report.

14             And based on the information I had, probably the

15       only thing that might have been a violation was repeated

16       violations.

17             And I say that only in light of the couple of prior

18       communications we've had, but neither one of those

19       warranted disciplinary action.  But it was succession of

20       contact with him there that might've been a repeated

21       violation.

22             But as far as what we were there to talk about, I

23       didn't see anything in the Code of Conduct; and I kind of

24       got the impression from the room that pretty much

25       everybody else felt the same way.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1      Q     So, the Facebook collage, I'm going to call this
2   Exhibit 12.
3             (The document was marked for identification as
4      Plaintiff's Exhibit Number 12.)
5   BY MR. FEDELI:
6      Q     This is what we are talking about here?
7      A     (Reviewing document.)  Yeah.  That's not a good
8   copy.  But, yeah, that's, basically, it.
9             You know, this S.A.V.E. -- I guess Hayden was
10  involved in S.A.V.E.  That's a campus activist, kind of,
11  ecology sort of thing.
12            The Zaccari Memorial Parking Garage, I think, was
13  what Dr. Zaccari was concerned about.
14     Q     And this is what was discussed at this -- you said
15  it was about an April 25th meeting.
16     A     Yeah.  Like I said, what -- you know, kind of --
17            MR. WILL:  What's the question?
18  BY MR. FEDELI:
19     Q     The question was:  This document was discussed at
20  this April 25th meeting?
21     A     Yeah.  I mean, this was like it was a new level of
22  concern, I guess, that came as a result of this.
23            And was there anything to be concerned about or a
24  cause for action, I guess?
25     Q     And you indicated you didn't see a violation of the
```

Page 63

1    Student Code of Conduct.

2        A    I didn't and I don't recall specific comments from

3    other people.

4            But I kind of got the impression in the room that

5    everybody thought that he was just very passionate about his

6    point of view.  You know, he's, obviously, technically

7    savvy.  He's using the Facebook.  He's using things he had

8    at his disposal to communicate his concerns.

9            And the President felt threatened by it, but I

10   don't really -- I didn't get the impression that anybody in

11   room felt that it warranted anything to feel threatened, but

12   he did.  We're not him, okay?

13       Q    Who else was -- you mentioned a bunch of names that

14   were at this April 25th meeting.  Was Dr. Zaccari one of

15   them?

16       A    No.  No.

17       Q    So, this was a meeting of administrators excluding

18   Dr. Zaccari?

19       A    Correct.

20       Q    Was this the first meeting on the subject of Hayden

21   Barnes you remember attending?

22       A    I think it's the only one I remember.  It's the

23   only one I recall going to was this one.

24       Q    Did you ever meet with Dr. Zaccari about Hayden

25   Barnes?

Page 64



```
1       A      No.  No, I did not.

2       Q      So, what was -- tell me a little bit more.  You've

3    told us a good deal about what was discussed at this

4    meeting, and you mentioned the general consensus was that

5    there -- you know, either there wasn't a violation or wasn't

6    anything else to be concerned about based on what you knew

7    at the time.

8       A      You know --

9              MR. WILL:  So what's the question?

10   BY MR. FEDELI:

11      Q      Is that accurate?  What I just said?

12      A      Repeat your question, please.

13      Q      Is that an accurate characterization of what you

14   told us about the meeting?  The consensus was there was

15   either no violation or no concern?

16      A      Yeah, I think that's an accurate statement.  And I

17   think the purpose was, of course, to communicate to -- you

18   know, I guess Dr. Keppler was there to kind of, you know,

19   get the feedback from his staff to say, well, what should

20   I -- what should be presented or how -- what should we

21   communicate to the President?

22             And I would assume that that's the communication

23   that he took to Dr. Zaccari the next time whenever they met

24   and whoever else may have been, you know, helping him

25   determine what he was going to do, if anybody.
```

Page 65

```
1       Q      Any other comments from any of the other people
2   present that you remember in particular?
3       A      No, not really.
4       Q      And did you -- I'll enter Exhibit 13, as well.
5              (The document was marked for identification as
6       Plaintiff's Exhibit Number 13.)
7   BY MR. FEDELI:
8       Q      It's student handbook section.  You probably
9   recognize this.  It's just excerpts that --
10      A      Yes, sir.  As a matter of fact, we're working on it
11  right now again.
12      Q      I attached an excerpt here that deals with a
13  disorderly assembly policy on the right-hand column.
14      A      D?
15      Q      Yeah.
16      A      Okay.
17      Q      It cites B.O.R. Policy Manual Section 1902.
18      A      Uh-huh.
19      Q      Was the discussed at the April 25th meeting?
20      A      No.
21      Q      Was --
22      A      Not that I recall.
23      Q      Okay.  Was any other section of the Student
24  Handbook or Student Code of Conduct discussed at that
25  meeting?
```

**WHEELER REPORTING**
*Court Reporting • Video • Litigation Support*
**404.351.4577**

```
 1       A      The only part that I recall having discussions
 2    about were the -- what types, if any, kind of violations
 3    might apply to the situation.
 4            And, like I said, you'd probably have to look at --
 5    look for something in disorderly conduct from my vantage
 6    point.
 7            Possibly the repeated violation if -- you know,
 8    because of the other couple of times that I had interaction
 9    with him.  But, again, those weren't really violations of
10    the Code of Conduct.  They were kind of interactions I had
11    with him.  We didn't have a violation going on, per se.
12            So, we would've probably talked about, you know, if
13    a student were charged with some aspect, some Code
14    violation, then the normal procedure that would be
15    followed -- and this probably was talked about actually --
16    you know, here's what the Code of Conduct says.
17            It says there's a report or an incident report, you
18    know.  There are alleged violations of the Code of Conduct.
19    There's a contact with the student about that.
20            And, you know, you have a mind meld or a meeting
21    with him and say, "Hey, I got this report.  Let's talk about
22    it."
23            You're determining whether there is responsibility
24    or no responsibility.
25            You know, a student might say they are responsible.
```

Page 67

1      About 85, 90 percent of students I meet with probably are in
2      that group.
3              The vast majority say, "I'm responsible.  I see
4      what you're saying and how it relates to this incident.  I
5      am responsible.  Where do we go from here?
6              That would probably be an administrative hearing.
7      It would probably be handled as an administrative hearing,
8      which means I unconditionally accept responsibility for my
9      actions.  Then there would be sanctions forthcoming or
10     recommendation from myself or the Dean, depending on what it
11     is.
12             The only thing is, if I'm not responsible, then
13     there would probably be a disciplinary hearing; and that
14     would result in the charges put together, presented to the
15     student.
16             And the student would say meet at this place, date,
17     and time and, you know, you'll be able to do like what the
18     Rights of Students say.  That is, what are the charges?
19     Who's making the charges?  And be able to air it out, so to
20     speak, and determine whether or not the person's
21     responsible.
22             And we have two hearing panels that do sort of
23     thing.  We have the S.G.A. Judicial Council, which is an
24     all-student panel; or we have the VSU Judicial Committee --
25     Disciplinary Committee, excuse me, which is five faculty

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    members and two of my student justices.

2          MR. WILL:  Will you repeat that last question for

3    me, please?

4          (The requested portion was read back by the Court

5    Reporter.)

6    BY MR. FEDELI:

7    Q    And you mentioned a second ago --

8          MR. WILL:  I object to the responsiveness of the

9    answer, because I don't believe you ever answered his

10   question.  Whatever you said didn't address that.

11         MR. FEDELI:  Are you objecting to my question?

12         MR. WILL:  I'm objecting to the responsiveness of

13   the answer.

14         Well, you didn't say what we're going to do today.

15   Usually, we object to the form of the question or

16   responsiveness of the answer.

17         You asked a question about policy.  I don't know

18   what he said but didn't answer that question.

19         Now if you want the question answered, fine.  But

20   y'all are having some kind of conversation on two

21   different plains here.

22         You were asking about a policy, and I don't know

23   what the hell that was.

24         MR. FEDELI:  Well, I'm going to continue asking

25   questions along that line, so it'll come out eventually.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1              MR. WILL:  Okay.
 2    BY MR. FEDELI:
 3        Q    So, my follow-up question to you was:  You
 4    mentioned the judicial hearings that you have in case
 5    students is contesting whether he's responsible.
 6        A    Uh-huh.
 7        Q    Are students involved this those hearings as a jury
 8    type --
 9        A    We don't have a jury.  It's a peer review process.
10        Q    Okay.  And how does that work?
11        A    Well, if they go before the S.G.A. Judicial
12    Council, then there are eleven justices usually, if they're
13    all there.
14              They hear the charges of the Code of Conduct.  They
15    hear any witnesses.  They read over the materials that are
16    presented in the case.
17              You know, they do three things.  What are the
18    facts.  They try to gather the facts.
19              The second thing is what -- is the student
20    responsible or not, you know, based on what's being
21    presented in their estimation.  Is this student responsible
22    or not for what's being alleged?
23              And if they are not responsible, then, of course,
24    they say, "We find you not responsible," and that's it.
25              If they find them responsible to one or more of the
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    charges, then they'll make a recommendation to the Dean of

2    Students' Office to implement it.  It is appealable.  You

3    know, it can be appealed.

4        Q    So, it's a fairly detailed set of procedures

5    involved whenever a student is accused of violating a Code

6    of Conduct, correct?

7        A    That's -- it is what it is.  Yeah, there's a

8    process.

9        Q    And, you know, you've described it, I think, in

10   some detail, which is sufficient for me.

11            And are you -- generally, are you familiar with

12   cases where students have been accused of wrongdoing and

13   this policy has not been followed?  The one you just

14   described?

15            In other words, would he not be given a hearing or

16   anything like that?  Any cases that you can remember where

17   that was not the case?

18            MR. WILL:  Object to the form of the question.

19   BY MR. FEDELI:

20       Q    You can answer if you understand.

21       A    A case?  Well, I'm not sure what you're getting at.

22   Can you rephrase it?

23       Q    Yeah.  Let rephrase the question.

24            Generally, in your experience when a student is

25   accused of violating a Code of Conduct, do the procedure

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   that you just described follow either one of the two types
2   of hearing you just discussed?
3       A    Yes.
4       Q    So, let's get back to Hayden Barnes for a second if
5   we could.  You had this meeting that you spoke about on the
6   24th.
7            Was that the -- was that the next time you had
8   discussed him after first hearing about it from Russ Mast?
9       A    That would be -- yeah, I believe so.  Because, like
10  I said, it was a pretty short span of time.
11           The 20th.  Then either the 24th or 25th when we met
12  to discuss the policies and procedures and that sort of
13  thing.
14      Q    And the 20th would've been when you first heard
15  about it from Russ, you think?
16      A    Thereabouts, yeah.
17      Q    And when was the next time you discussed Hayden
18  Barnes with anybody after that?
19      A    Oh, gosh.  Well, there was, I think, of course, the
20  action that took place, you know, ultimately.  I was made
21  aware of the action that took place relative to his removal
22  from the institution, so --
23      Q    And how were you made aware of it?
24      A    It was a verbal.  You know, there's the action
25  that's going to take place.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          I think the term used was administrative withdrawal

2     or something, and the President initiated that.  So --

3          Q     And who told you about it?

4          A     I would think it would be Russ, because I'm trying

5     to think back in that time frame; because he came back and

6     said, "Here's the status of things.  Hayden is going to be

7     administratively withdrawn."

8          Q     So, nobody had asked you about giving Hayden a

9     hearing at any time?

10         A     No.

11         Q     Did you have a conversation with Russ Mast about

12    Hayden Barnes at that time?

13         A     What do you mean?

14         Q     When he told you that he had been administratively

15    withdrawn, did you and he talk about it beyond that exchange

16    of information?

17         A     Well, he said the President has done what he's

18    done.  You know, he's made a decision and he's taken the

19    action that he's taken.

20         Q     And you didn't really comment at that time?

21         A     Well, I mean, it wasn't really a whole lot to

22    comment about.

23               You know, he made a decision that, I guess, in his

24    opinion the student was a threat to him and/or the campus;

25    and this was the course of action that he was going to take.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    And following hearing about that, did you have a
2  reaction at that time?  Did you think one thing or the other
3  about it?
4    A    Well, I guess I hated it.  You know, I just felt
5  like, well, I wish he hadn't done it.
6    Q    And why is that?
7    A    Well, I just felt like that it was maybe an
8  overreaction to the situation.  And, why, I don't know.  I'm
9  not in Dr. Zaccari's skin.
10         So, you know, he's -- he had some concerns, I
11  guess, for his safety, for campus safety.  He decided to
12  make the decision that he made, and there we are.  That's
13  that.
14   Q    So, at the meeting on -- going back to the meeting
15  on April 24th, at some point, I guess, free speech came up
16  at this meeting?  Is that correct?
17         MR. LAVALLEE:  Objection to the form.
18         MR. WILL:  I object to the form.
19         MR. LAVALLEE:  He's never stated it was
20   definitively April 24th.
21         MR. WILL:  I was going to say that's right.  He
22   never testified anything about that.
23  BY MR. FEDELI:
24   Q    You can respond to the question if you understood
25  what I asked, unless you have a disagreement with it.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     A     I don't recall a discussion of free speech issues,

2     you know.

3     Q     And was there any time during the event that took

4     place, your discussions with Mr. Dr. Mast and Dr. Keppler

5     and others, that you were asked about free speech issues as

6     they related to the collage, Hayden Barnes' protest?

7     A     Well, other than what I've already expressed to

8     you, I felt like the young man was passionate about his

9     feelings and his beliefs and that, you know, he was very

10    vocal about it and everything.

11          But I didn't feel that he was a threat.  And, you

12    know -- like I said in the meeting, we talked about what

13    types of violations.

14          There was a sense in the room from the folks that

15    were there that we don't really think he's a threat.  We

16    think maybe this is an overreaction and, hopefully, we can

17    communicate that to the President and he'll consider that.

18    Q     Did you think this was probably protected free

19    speech at the time?

20          MR. WILL:  Object to the form of the question.

21    Calls for a legal conclusion.

22    BY MR. FEDELI:

23    Q     You can answer.  In your experience, you know, as

24    somebody who dealt with freedom of expression issues at VSU.

25    A     I would probably not have asked him to come in for

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     that.

2              MR. FEDELI:  Okay.  I'd like to take a quick

3         60-second break, if that's okay with everybody.

4              THE WITNESS:  Okay.

5              (Recess from 3:03 p.m. to 3:04 p.m.)

6              MR. FEDELI:  I don't have any further questions at

7         this time.  I'll reserve the right to recross after you

8         gentlemen are done.  But I'll turn it over.

9              MR. SMITH:  I have no questions.

10             MR. LAVALLEE:  I've got one question.  I highly

11        doubt there will be recross on this.

12                              EXAMINATION

13    BY MR. LAVALLEE:

14        Q     This April 25th that you said you attended, Leah

15    McMillan wasn't at that meeting, was she?

16        A     I don't believe so.  I don't recall her being

17    there.

18             MR. WILL:  No questions:

19             (The deposition concluded at 3:04 p.m.)

20             (Pertaining to  Federal Rules of Civil Procedure

21        and/or O.C.G.A. 9-11-30(e), the deponent and/or a party

22        having requested the right to review the deposition,

23        making corrections and/or changes and signing, for that

24        purpose the errata pages have been annexed hereto.)

25

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1                    C E R T I F I C A T E

2    STATE OF GEORGIA:

3    COUNTY OF LOWNDES:

4           I hereby certify that the foregoing transcript was

5    taken down, as stated in the caption, and the questions and

6    answers thereto were reduced to typewriting under my

7    direction; that the foregoing pages 1 through 76 represent a

8    true, complete, and correct transcript of the evidence given

9    upon said hearing, and I further certify that I am not of

10   kin or counsel to the parties in the case; am not in the

11   regular employ of counsel for any of said parties; nor am I

12   in any way interested in the result of said case.

13          This, the 20th day of August, 2009.

14

15

16          /s/ Sarah Williams

17          SARAH WILLIAMS, FPR, RPR, CCR B1653

18

19

20

21

22

23

24

25

**WHEELER
REPORTING**
*Court Reporting • Video • Litigation Support*
*404.351.4577*

```
1                           DISCLOSURE
2    STATE OF GEORGIA          Deposition of:  RICHARD LEE, SR.
3    COUNTY OF LOWNDES:   Date:  JULY 27, 2009
4         Pursuant to Article 10.B of the Rules and Regulations
5    of the Board of Court Reporting of the Judicial Council of
6    Georgia, I make the following disclosure:
7         I am a Georgia Certified Court Reporter.  I am here as a
8    representative of Valdosta Court Reporters.  I am not
9    disqualified for a relationship of interest under the
10   provisions of O.C.G.A. §9-11-28 (c).
11        Wheeler Court Reporting was contacted by the
12   offices of Chris Federli, Esq., to provide court reporting
13   services for this deposition.  Wheeler Court Reporting will
14   not be taking this deposition under any contract that is
15   prohibited by O.C.G.A. §15-14-37 (a) and (b).
16        Wheeler Court Reporting has no exclusive
17   contract to provide reporting services with any party to
18   the case, any counsel in the case, or any reporter or
19   reporting agency from whom a referral might have been
20   made to cover this deposition.
21        Wheeler Court Reporting will charge its usual and
22   customary rates to all parties in the case, and a financial
23   discount will not be given to any party to this litigation.
24                        _____
                          Sarah Williams, CCR, FPR, RPR.
25                                CCR No.  B1653
```

Page 78



**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
**404.351.4577**

1         DEPOSITION OF RICHARD LEE, SR./SEW

2              I do hereby certify that I have read all questions

3    propounded to me and all answers given by me on the 27th day

4    of July, 2009, taken before Sarah Williams, FPR, CCR, RPR,

5    and that:

6         1) ____        There are no changes noted.

7         2) ☒  The following changes are noted:

8              Pursuant to Rule 30(e) of the Federal Rules of

9    Civil Procedure and/or the Official Code of Georgia

10   Annotated 9-11-28(c), both of which read in part:  Any

11   changes in form or substance which you desire to make shall

12   be entered upon the deposition...with a statement of the

13   reasons given...for making them.  Accordingly, to assist you

14   in effecting corrections, please use the form below:

15   Page No.        Line No.        should read:
16   6               1               For Wildes

17   Page No.        Line No.        should read:     I'm
18   7               14              No, not in trouble, an advisor

19   Page No.        Line No.        should read:
20   11              12              Some choose Not to

21   Page No.        Line No.        should read:
22   12              17              District 2 Commissioner

23   Page No.        Line No.        should read:
24   22              20              Procedure and the fact...

25

**WHEELER**
**REPORTING**
Court Reporting • Video • Litigation Support
**404.351.4577**

1       DEPOSITION OF RICHARD LEE, SR./SEW

2   Page No.        Line No.        should read:

3   _26_            _3_             _Won't use that..._

4   Page No.        Line No.        should read:

5   _31_            _10_            Yes, I probably saw speak
                                    No, I don't recall him.

6   Page No.        Line No.        should read:

7   _40_            _11_            Not my immediate

8   Page No.        Line No.        should read:

9

10  Page No.        Line No.        should read:

11

12  Page No.        Line No.        should read:

13

14

15          If supplemental or additional pages are necessary,

16  please furnish same in typewriting annexed to this

17  deposition.

18

19  _Richard Lee Sr._

20  RICHARD LEE, SR.

21

22  Sworn to and subscribed before me,
    this the        day of              , 2009.

23

24  _Rebecca L. Taylor_

    Notary Public

25  My commission expires:

Notary Public, Lowndes County, Georgia
My Commission Expires June 27, 2010

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577