FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

THOMAS HAYDEN BARNES,                    CASE NUMBER

    Plaintiff,                           1:08-CV-00077-CAP

vs.

RONALD M. ZACCARI, et al,

    Defendants.
_____/

DEPOSITION OF

RUSS MAST

JULY 28, 2009

3:10 P.M.

VALDOSTA STATE UNIVERSITY
OAK STREET PARKING DECK
AUXILLARY SERVICES DEPARTMENT
CONFERENCE ROOM
VALDOSTA, GEORGIA

SARAH E. WILLIAMS, FPR, CCR, RPR

Page 1





WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1                          A P P E A R A N C E S

2

3        On behalf of Plaintiff:

4        ROBERT CORN-REVERE, ESQ.
         ERIN N. REID, ESQ.
5        Davis Wright Tremaine, LLP
         Suite 200
6        1919 Pennsylvania Avenue, N.W.
         Washington, D.C.   20006-3402
7

8        On behalf of Defendant Gaskins:

9        DAVID R. SMITH, ESQ.
         Brannen, Searcy & Smith, LLP
10       22 East 34th Street
         Savannah, Georgia   31401
11

12       On behalf of Zaccari, VSU, Board of Regents, Keppler,
                              Mast and Morgan:
13
         DAVID C. WILL, ESQ.
14       Royal Washburn Will
         4799 Sugarloaf Parkway
15       Building J
         Lawrenceville, Georgia   30044
16

17       On behalf of McMillan:

18       MATTHEW R. LaVALLEE, ESQ.
         Daley, Koster & LaVallee, LLC
19       2849 Paces Ferry Road
         Suite 160
20       Atlanta, Georgia   30339

21

22

23

24

25

                                                          Page 2

1                          I N D E X

2     Examination by Mr. Corn-Revere                    4

3     Examination by Mr. Smith                         67

4     Examination by Mr. LaVallee                      69

5     Re-Examination by Mr. Corn-Revere                70

6

7

8                        E X H I B I T S

9     1      Chronicle of Higher Ed. Doc                8

10    2      "Unofficial Biography of Robert..."       10

11    3      Comm. Board Meeting Overview, 11/7/06     11

12    4      Comm. Board Transcribed Minutes           17

13    5      Ann Farmer's Handwritten Notes            33

14    6      Mast's Responses to Interrog...           37

15    7      Flyer "An Issue of Convenience or..       46

16    8      Letter to Editor                          46

17    9      Collage/S.A.V.E. - Zaccari Memorial...    46

18    10     Facebook Pages of Barnes                  51

19    11     May 7, 2007, Letter of Admin. Withdrawal 53

20    12     May 9, 2007, Email to VSU Staff           56

21    13     June 21, 2007, Ltr. to Neely from Zaccari 59

22

23

24

25

Page 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WHEELER
REPORTING**
Court Reporting • Video • Litigation Support
**404.351.4577**

1    THEREUPON,

2                              RUSS MAST,

3    having been first duly sworn, was examined and testified as

4    follows:

5                              EXAMINATION

6    BY MR. CORN-REVERE:

7        Q    Good afternoon, Dr. Mast.   I --

8        A    Russ.   I'm not a doctor.

9        Q    Good afternoon, Mr. Mast.

10       A    Good afternoon.

11       Q    I'm sorry for the delay in getting started with the

12   deposition.  My name is Bob Corn-Revere.  This is my

13   associate, Erin Reid, and together we represent Hayden

14   Barnes who is the plaintiff in this case.

15            In the course of this deposition, we'll just be

16   asking you a number of questions that will be transcribed on

17   the record; and I'll talk a little bit more about that in a

18   bit.

19            MR. CORN-REVERE:  First, just for counsel, I assume

20       we're going to be relying on the same stipulations as

21       before, limiting objections to the form of the question

22       and to questions of privilege.

23            I assume, Mr. Will, that the witness will want to

24       review and sign the deposition transcript.

25            MR. WILL:  The witness does want to read and sign

                                                          Page 5

```
 1          the deposition.  We will generally limit our objections
 2          to that.  If further objections need to be made, I
 3          reserve the right to make them.
 4                    MR. CORN-REVERE:  I have no doubt that you.
 5                    MR. WILL:  Not just to the form of the questions.
 6     BY MR. CORN-REVERE:
 7          Q    Okay.  Mr. Mast, have you been deposed before?
 8          A    No.
 9          Q    Okay.  Then let me just go through a little bit of
10     the process to try and give you a sense what was to expect.
11                    I'll be asking you a series of questions, and then
12     you'll respond for the record.
13                    A couple of things about that.  One is, you know,
14     sometimes it's going to be really obvious where I'm going
15     with the question.  In normal conversation, people will tend
16     to answer the question even before the speaker gets to the
17     end of the question.
18                    In depositions what we're trying to do is get just
19     a clean transcript where you have a full question followed
20     by a full answer.
21          A    Uh-huh.
22          Q    So, if you could try and wait until you hear the
23     end of the question, then provide an answer, that will help
24     with making a clear deposition transcript.
25                    The other pointer about that is for any responses
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    in a deposition, they need to be made verbally --

2    A    Correct.

3    Q    -- rather than nodding your head or saying uh-huh

4    or huh-uh, because that doesn't show up very well on a

5    transcription.

6         So, with those in mind, do you have any questions

7    for me before we begin?

8    A    No, I do not.

9    Q    Okay.  I believe you said you have not been deposed

10   before.  Is there any reason why you wouldn't be able to

11   understand questions or respond?  Any difficulties in that

12   way?

13   A    Not that I know of.

14   Q    Okay.  Again, the difficulty may with on my end.  I

15   may ask an unclear question.  So, if you hear me ask an

16   unclear question or for any reason you don't understand it,

17   please let me know and I'll try and rephrase the question in

18   a way that is more understandable.

19   A    Okay.

20   Q    Okay.  What current position?

21   A    Dean of Students.

22   Q    Could you describe your responsibilities as the

23   Dean of Students.

24   A    My office handles student discipline, student life,

25   which encompasses things like homecoming, parents weekend,



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    campus recreation programs, Greek life, parents' council and

2    then hardship withdrawals for students who may have to leave

3    at the end of the semester.  Maybe a parent has passed away

4    or something like that.  We assist them in that process of

5    being able to leave campus.

6        Q    Uh-huh.  Did you do anything to prepare for today's

7    deposition?

8        A    I met with my attorney, and I read over the

9    original complaint, I guess.  The legal document.

10        Q    Did you meet with any of the other defendants?

11        A    No.

12        Q    Before discussing what happened with Hayden Barnes,

13    let's go back a few years.

14            Do you recall a student protest about the building

15    of a parking lot on the school lawn?

16        A    A student protest?

17        Q    Yes.

18        A    Can you clarify.  You mean like a --

19        Q    Petition drive?

20        A    Petition drive?  No.  I remember some students met

21    with the president about front lawn parking -- I guess you'd

22    call it lot.  But I don't remember a protest.

23        Q    Okay.  Well, let's mark as Mast Deposition Exhibit

24    Number One -- actually, again, using again the exhibit that

25    we had as Keppler Number One, if you'll take a look at that.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1              (The document was marked for identification as
2         Plaintiff's Exhibit Number One.)
3              THE WITNESS:  (Reviewing document.)
4    BY MR. CORN-REVERE:
5         Q    This is a one-page article.  It's a 2005 article
6    from The Chronical of Higher Education dated August 5th,
7    2005.
8         A    (Reviewing document.)  Okay.
9         Q    Okay.  Have you had a chance to look that article
10   over?
11        A    Uh-huh.  I've read it.
12        Q    And I believe you said that you recall students had
13   met with President Zaccari about the building of this
14   parking lot.
15        A    Correct.  Student leaders met with him.
16        Q    What can you tell us about that?
17        A    It was a meeting.  I don't know the date.  It was
18   on the front lawn of campus with some student government
19   association leaders.  I don't remember.
20             There was three or four students, and then they
21   discussed -- they preferred not to have parking on the front
22   lawn, and then that was about it.
23        Q    What happened as a result of that meeting?
24        A    As a result -- what do you mean?
25        Q    Of the meeting with Dr. Zaccari.
```

**WHEELER
REPORTING**
Court Reporting • Video • Litigation Support
*404.351.4577*

1       A       There was no -- the parking lot went just to the

2    sidewalk where it is now.  It did not go on the front lawn.

3       Q       Okay.  So, as a result of this meeting with the

4    students, the university changed its plans with respect to

5    building the parking lot?

6       A       I assume -- well, I shouldn't say assume.  I didn't

7    make that call.

8       Q       Okay.  Now the article says that there was a

9    petition drive and more than 300 student signatures on the

10   petition.

11           Do you have any separate knowledge of that

12   yourself?

13      A       I don't.

14      Q       Okay.  But do you have any reason to doubt the

15   article in The Chronical in Higher Education?

16      A       I have no reason to doubt.

17      Q       I believe you mentioned in your position as Dean of

18   Students that one of your responsibilities was student

19   discipline?

20      A       I'm Assistant Dean that handles the majority of our

21   student discipline issues.

22      Q       Okay.  Have you ever been involved in a situation

23   in which a student was disciplined for the exercise of First

24   Amendment rights?

25      A       Not that I recall.

Page 10

1          MR. CORN-REVERE:  Let's mark as Mast Deposition

2     Exhibit Number Two an article entitled The Unofficial

3     Biography of Robert Carlos Cortez Zaccari.

4          (The document was marked for identification as

5     Plaintiff's Exhibit Number Two.)

6          THE WITNESS:  (Reviewing document.)  Okay.

7  BY MR. CORN-REVERE:

8     Q     Have you had a chance to look that exhibit over?

9     A     I have.

10    Q     Have you seen it before?

11    A     I've seen it a few years ago, yes.

12    Q     What can you tell us about it?

13    A     It was an article that was ran in the school

14  newspaper, The Spectator.

15    Q     Is that all you remember?

16    A     Well, this was -- the advisor for the student

17  newspaper, Dr. Pat Miller, had requested the Communications

18  Board to temporarily suspend her student editors so the Com

19  Board can meet and question the students.

20          And I'm not sure it was about this article.  She

21  had just made that request as their advisor.

22    Q     You don't know if the request was made based on the

23  fact that they had published this article?

24    A     I'd have to go back and look at her letter to the

25  Com Board, but they were temporarily suspended as editors.

Page 11

1    Q    Because of something they wrote in the newspaper?

2    A    I don't have would have -- I don't know.  The

3    advisor, as I stated, asked us to temporarily suspend them;

4    and she is the media advisor.  I'm not.

5    Q    Okay.  And is that what happened?

6    A    Temporarily.  And then the students resigned their

7    position before the Com Board finished their meeting that

8    day.

9    Q    Do you know why they resigned?

10   A    I have no idea.

11        MR. CORN-REVERE:  Let's mark as Mast Deposition

12   Exhibit Number Three minutes of a meeting dated

13   November 17th, 2006, from the Valdosta State University

14   Web Site.

15        (The document was marked for identification as

16   Plaintiff's Exhibit Number Three.)

17        THE WITNESS:  (Reviewing document.)

18   BY MR. CORN-REVERE:

19   Q    Have you had a chance to take a look at that

20   exhibit?

21   A    Uh-huh.  That's the minutes from the meeting in

22   2006.

23   Q    Which meeting is that?

24   A    The communications Board.  The Campus

25   Communications Board to be specific.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q      Just reading the first line of the second

2    paragraph, it states:  "Russ Mast, the Chair, stated that

3    the reason for the called meeting of Communications Board

4    was to address the temporary suspension of Johnna

5    Pinholster, Editor-in-chief of The Spectator; David Rodock,

6    Opinion/Darkside Editor for The Spectator; and Kerry Laster,

7    News Editor, on Wednesday."

8           Is that a fair statement of what that hearing was

9    about?

10     A      Correct.  And it also states that this was not a

11   disciplinary action through the Dean of Students' office.

12     Q      And, nevertheless, the students were accorded a

13   hearing?

14     A      They were given an opportunity to state to the

15   entire Communications Board.

16     Q      In the third paragraph, it says, "Dr. Miller stated

17   that she received notice that there was possible legal

18   action against The Spectator regarding the Darkside article

19   'The Unofficial Biography of Robert Carlos Cortez Zaccari'

20   that ran in the November 9, 2006, edition of The Spectator."

21          I have a couple of questions based on that

22   statement.

23          First of all, does this refresh your recollection

24   about the reasons why the students were suspended?

25     A      They were suspended at the question of their

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    advisor, Dr. Miller.

2        Q    And do you know why Dr. Miller requested they be

3    suspended?

4        A    That would be in her letter to me or to the Board.

5    I don't have that with me.  But Dr. Miller is the advisor.

6    I just Chair the Board.  I did not make the recommendation.

7    She did that as their advisor.

8        Q    Right.  But do you understand why the

9    recommendation was made?

10       A    It states here that she believed there was an

11   issue, I guess, regarding legal action; but she did not

12   share that with me what that legal action --

13       Q    You chaired the meeting and you don't have an

14   understanding of why they were being suspended?

15       A    I believe she'd asked that because maybe they

16   didn't follow their bylaws and constitution of The

17   Spectator.

18       Q    Okay.  Would that be because of the publication of

19   the article "The Unofficial Autobiography (sic) of Robert

20   Carlos Cortez Zaccari"?

21            MR. WILL:  I object to the form of the question.

22       You may answer if you would.

23            THE WITNESS:  I'm not sure what you're asking, sir.

24   BY MR. CORN-REVERE:

25       Q    Was the reason Dr. Miller requested that the



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    student editors be suspended because of the publication of

2    the article "The Unofficial Biography of Robert Carlos

3    Cortez Zaccari"?

4         MR. WILL:  Once again, I object.  Just to make it

5    clear, you're calling for this witness to speculate.

6         MR. CORN-REVERE:  This witness chaired the meeting.

7         MR. WILL:  I believe he already said he didn't know

8    this; that they were suspended by somebody else.

9         THE WITNESS:  They were temporarily suspended by

10   the Board, correct, on the request of their advisor,

11   Dr. Miller.

12   BY MR. CORN-REVERE:

13   Q    And you were present for the discussions during

14   this meeting?

15   A    Yes.

16   Q    Do you have any recollection of what those

17   discussions were?

18   A    No, I do not.  I'd have to go back and look at

19   Dr. Miller's letter, as I stated before, and read through

20   the entire minutes.

21   Q    Okay.  We can do that.

22   A    But as I stated, the three students, before the

23   meeting was done, resigned their positions.  I can't speak

24   for those three students or the rest of the Board or the

25   school newspaper.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    You just chaired the meeting.

2    A    Correct.

3    Q    Okay.  Referring to the statement that I read

4    earlier that Dr. Miller said she had received notice that

5    there was possible legal action against The Spectator, do

6    you know what that was about?

7    A    I do not.

8    Q    Do you know who might've threatened legal action?

9    A    I do not.

10    Q    Is it possible Dr. Zaccari threatened legal action?

11         MR. WILL:  I object to the form of the question.

12    He already said -- he's answered the question.

13         MR. CORN-REVERE:  And that's the last speaking

14    objection I'm going to get from you.

15         MR. WILL:  Off the record one more time.

16         (Discussion off the record.)

17    BY MR. CORN-REVERE:

18    Q    I believe your testimony was that you didn't know

19    the reason why there might be potential legal action against

20    The Spectator.  Is that correct?

21    A    That's correct.  That information was not shared

22    with me.

23    Q    Did anyone at the meeting you attended say whether

24    or not Dr. Zaccari had threatened legal action?

25    A    No.

Page 16

1     Q      Did you ever speak with Dr. Zaccari about this
2     article?
3     A      No, I did not.
4     Q      Did you ever speak with Dr. Zaccari about this
5     disciplinary hearing?
6     A      The Communications Board?
7     Q      Yes.
8     A      No, I did not.
9     Q      Okay.  Looking at the fourth paragraph -- and
10    forgive me if I'm repeating myself; we've had an
11    interruption -- "Dr. Miller stated that she had no other
12    option in temporarily suspending the Editors of The
13    Spectator regarding the November 9th article in the Darkside
14    section of The Spectator.  Do you see that statement?
15    A      Fourth paragraph?
16    Q      Yes.
17    A      Correct.
18    Q      Okay.  Do you recall Dr. Miller saying that at the
19    hearing?
20    A      I believe so.  I'd have to look at -- I mean, this
21    is in the minutes he said it.  And also an audio recording.
22    Q      Do you know what that means:  No other option?
23    A      No, I do not.
24    Q      Okay.  Looking at the last full paragraph before we
25    get to the bullet points at the bottom --

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1       A       Okay.

2       Q       -- there's a statement that says:  "This could be

3   hearing heard in its entity on the official recorded minutes

4   of the November 17, 2006, Communications Board Meeting which

5   is located in the Dean of Students' office."

6               Do you though what's referring to?

7       A       There's a CD ROM copy.  Audio copy.

8       Q       Okay.  So, when you have Communications Boards

9   meetings like this, it is typically recorded and archived?

10      A       The last few years we've done that, both audio and

11  written minutes, both.

12              MR. CORN-REVERE:  Let's mark as Mast Deposition

13      Exhibit Number Four the transcript.

14              (The document was marked for identification as

15      Plaintiff's Exhibit Number Four.)

16  BY MR. CORN-REVERE:

17      Q       Okay.  Just to give you some background, we

18  received as a response to our document requests a copy of

19  the audio recording of the November 17th, 2006, hearing.

20              This is, I guess you'd called it, an unofficial

21  transcript that was made based on that audio recording.

22              I'm not going to ask you to vouch for whether or

23  not every word was properly transcribed; but in looking at

24  this, hopefully, this will help clarify some of the things

25  that were discussed at that hearing.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1              Have you had a chance to take a look at this?
 2      A      Last several pages.
 3      Q      If you'd like more time, let me know?
 4      A      (Reviewing document.)   It appears to be related to
 5      the Com Board meeting.
 6      Q      Okay.  Does this help refresh your recollection
 7      about what happened at that Com Board meeting?
 8      A      No.  I'd have to read through the entire document
 9      and listen to the minutes again, sir.  It's been almost
10      three years ago.
11      Q      Okay.  Well, let's look at the third paragraph of
12      the first page.
13              This is a statement that on the transcript is
14      attributed to you.  It says, "Just a quick overview.
15      Wednesday night I temporarily suspended three editors, being
16      David, who is the Opinion/Darkside Editor; John, who's the
17      Editor-in-chief; and Kerry, who is the News Editor for The
18      Spectator A."
19              And John was meant to be Johnna.
20      A      Uh-huh.
21      Q      "And on the same evening, I appointed Adam McDonald
22      and Danielle Greene as Co-Editors.  That way, we had The
23      Spectator go out for their edition Thursday morning."
24              Do you see that?
25      A      I see it.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      Q      Okay.  So, is it correct to say that it was an
 2   action by you that resulted in the suspension of the
 3   editors?
 4      A      On the recommendation in writing of their advisor,
 5   Dr. Miller.  She also recommended those two individuals,
 6   Adam McDonald and Danielle Greene, to serve as co-editors.
 7      Q      Okay.  And was that suspension based on the
 8   publication of the article parodying President Zaccari --
 9      A      It was based on the letter from Dr. Miller asking
10   that they be temporarily suspended from those Editor
11   positions at that time.
12      Q      Was there any other reason why they were suspended?
13      A      No.  Dr. Miller requested it.  She is their
14   advisor.
15      Q      I direct your attention to page -- on the fifth
16   page.  The fifth facing page?
17      A      (Reviewing document.)  Dr. Miller on the left?
18      Q      Yes.
19      A      Okay.
20      Q      Yes.  That's the one.  Have you had a chance to
21   look at that?
22      A      I'm sorry.  Do you want me to read that?
23      Q      Yeah.  Why don't you read that statement.
24      A      Okay.  (Reviewing document.)
25             (Pause)
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      I've read it.

2      Q      Okay.  Let me read that statement that is contained

3   in the transcript:  It says, "Here's where I'm going with

4   that, is that they're part of this community with us and

5   this university.  It's an ongoing battle.  We're trying to

6   recruit students to this University; and when parents and

7   guests visit our community and see stuff like that, they

8   question what kind of institution we are.  They won't take

9   at face value what they read in the Darkside opinion column.

10  They really don't know about all the good things our

11  students do.

12          "They see that one negative, in my opinion, and

13  judge us based on that, and the judging will be about the

14  quality of the students of this institution.  So --"

15          Do you recall what you were talking about there?

16     A      I do not.  I'd have to listen to the entire

17  transcript again.

18     Q      Really?

19     A      Uh-huh.  Really.  I'd have to read the whole

20  transcript and listen to the audio.

21     Q      Let's go to page ten, again the tenth facing

22  page --

23     A      (Reviewing document.)

24     Q      About the middle of the page, do you see that

25  reference?  (Indicating)  It's minute six on the tape.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     There are some time designations.

2           MR. WILL:  It's the first paragraph right after six

3     in brackets.  Is that correct?

4     BY MR. CORN-REVERE:

5     Q     Yes?

6     A     Okay I've read the paragraph.

7     Q     Let me just read that for the record.

8           "Has the Darkside this year because, I'll be honest

9     with you, this semester seems, to me, more of a -- I know

10    it's satirical, but your attack against the individuals and

11    groups on campus that I find in poor test (sic):  'Kill the

12    parking guy,' 'the binge drinking,' 'the sorority girls are

13    shuts."

14          "I mean, it goes on and on; and I'm just asking as

15    a member of this university:  Is that in good taste?"

16          Is that an accurate --

17    A     I would, as I said before, have to listen to the

18    audio again; but I could confirm it if I listened to the

19    audio of the entire transcript again.

20    Q     From seeing this transcript, do you have any

21    recollection of what you might've been talking about there?

22    A     I'd have to listen to the entire audio again, sir.

23    The Darkside is satirical.  That's what it's there for.  One

24    person may find it's in poor taste, the other may not.

25    That's the students' right.  School newspaper.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    So, why is it the students were suspended?

2    A    On the advice and recommendations of their advisor,

3    Dr. Pat Miller.

4    Q    Let's flip to the back of the transcript.  It's the

5    fourth-to-the-last page.

6    A    (Reviewing document.)

7    Q    And there's a statement attributed to you right

8    about the middle of the page.  (Indicating)  Do you see it

9    on your copy?

10            MR. WILL:  Next to the last page?

11            MR. CORN-REVERE:  Fourth to the last.

12            MR. WILL:  Fourth to the last.

13            THE WITNESS:  (Reviewing document.)  I've read that

14       sentence or two.

15    BY MR. CORN-REVERE:

16    Q    Okay.  And just to read it for the record, it

17    states, "I do want to state for the record that it was

18    brought up.  Dr. Zaccari warned me about this article."

19    A    I believe that's an incorrect statement because

20    I've never talked to Dr. Zaccari about that article or the

21    Communications Board.

22    Q    Your memory has improved.

23    A    I'm sorry?

24            MR. WILL:  I object to the question.  I think that

25       was improper, Mr. Corn-Revere.

Page 23

1    BY MR. CORN-REVERE:

2       Q     If when listen to the audio transcripts of that

3    hearing --

4       A     Uh-huh.

5       Q     -- and we find that statement, would you still

6    consider it to be an incorrect statement?

7       A     I would.

8       Q     Is it your opinion today that you were simply

9    misstating facts in 2006?

10      A     It looks like there's some words missing here.

11   Dr. Zaccari never talked to me about this newspaper article

12   or the Communications Board.

13      Q     When did you first learn about the controversy

14   involving Hayden Barnes and his protest of the proposed

15   construction of the parking garage at Valdosta State?

16      A     Specific date?

17      Q     No.  Just --

18      A     I was invited to a meeting at the President's

19   office -- I believe it was April, around the 16th -- where

20   Mr. Barnes and Dr. Zaccari were in attendance.  I received a

21   call to come over to the President's office.

22      Q     Do you have an opinion about why you would've been

23   included in a meeting like that?

24      A     Probably because the Vice President of Students

25   Affairs was not available.  Usually, he would've been the

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    person to go and meet with the President with a student, not

2    me.  I would've been the next in line if the Vice

3    President's not available.

4        Q    Okay.  Would you describe what happened then?

5        A    At the meeting?

6        Q    Sure.

7        A    Hayden Barnes and Dr. Zaccari had a discussion

8    about parking decks, and Hayden did not support the

9    construction of the parking decks.

10            The President was upset that Hayden had went to the

11   members of the Board of Regents and to say that he was

12   embarrassed that he did not come and talk to him about that.

13            Hayden did tell the President that he did contact

14   members of the Board of Regents and that he did tell -- he

15   did tell President Zaccari at the time that he told the

16   members he did speak to the President but that was the first

17   time the two of them actually discussed the parking decks in

18   person was that day.  I got that impression of the meeting.

19       Q    You don't know that for a fact.

20       A    I don't know that for a fact, but that's the first

21   I know about parking decks and Hayden and Dr. Zaccari.

22       Q    That date that you've identified, April 16th --

23       A    Right.

24       Q    -- 2007?

25       A    There was a flyer before then that was posted, but

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    I did not know who posted that flyer until that day.

2        Q    So, at the April 16th meeting you first became

3    aware of the flyers about the parking decks authored by

4    Hayden Barnes?

5        A    Correct.

6        Q    Okay.

7        A    They were posted March 25th on our campus.  I just

8    know that because that was Who's Who Sunday for our

9    students.  Who's Who for seniors and graduate students.

10   Same day, because we were on campus on Sunday.

11       Q    So, that would've been --

12       A    On march 25th, 2007.

13       Q    On March 25th, 2007.

14       A    Right.

15       Q    So, that's two years and about four months?  Five

16   months ago?

17       A    I believe that sounds correct.

18       Q    Okay.

19       A    And I remember because it was Who's Who.  We do

20   who's who once a year, always on Sunday.

21       Q    And you saw the flyers yourself?

22       A    Yes, sir, I did.

23       Q    But at the time you didn't know who authored them?

24       A    No, I did not.

25       Q    Okay.  You first became aware of that on

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    April 16th, 2007?

2        A    That's correct.

3        Q    Who-all was a participant in that April 16th

4    meeting?

5        A    The only individuals in the room when I was there

6    was myself, Dr. Zaccari and Hayden Barnes.

7        Q    Had there been a request by Mr. Barnes to include

8    his girlfriend in the meeting.

9        A    I do not know about that.

10       Q    Okay.  How long did that meeting last?

11       A    My best guess, 30 minutes, 40 minutes I was there.

12       Q    Did you say anything in the meeting?

13       A    I'd asked Hayden if he had talked to Student

14   Government Association as the student representation on

15   campus.  But mainly I listened to the two of them, and they

16   disagreed on the purchase of the parking deck.

17       Q    Okay.  Was the discussion focused entirely on the

18   parking decks and whether or not it was a good idea?

19       A    Majority of it.  Hayden, I believe, gave some

20   suggestions to the President -- I don't remember all the

21   suggestions of alternatives to the parking deck.

22            The President listened to him but did say he

23   thought the best way to do it is to go through the chain of

24   command and not straight to the Board of Regents.

25       Q    Was the discussion between the two of them civil?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1      A      In my opinion, it was civil.  They disagreed with
2    each other.
3      Q      Sure.  But people can disagree.
4      A      People can disagree, I agree.
5      Q      In your opinion did Mr. Barnes behave respectfully
6    toward the President Zaccari?
7      A      I believe he did.
8      Q      And his approach in the meeting was to offer
9    alternatives to building the parking garages?
10     A      Correct.  He had a list with him, and I don't
11   remember all of them he named; but he had a list of ideas.
12     Q      Okay.  You mentioned that most of the meeting what
13   focused on parking garages, and I guess there might've been
14   other things discussed, as well.
15            Do you recall what else might've been discussed?
16     A      Just the Board of Regents, contacting them and the
17   President not being aware.  That's the main things I'm
18   aware.  Those two topics.
19     Q      Did you hear President Zaccari say anything about
20   why he felt embarrassed by what Mr. Barnes had done?
21     A      He just said he was embarrassed by his actions.
22     Q      Did you hear President Zaccari say, "I can't
23   forgive you for this"?
24     A      I don't remember.  He may have.  I do not remember.
25     Q      In talking about the parking garages, did President
```

Page 28

1    Zaccari describe them as his legacy?

2        A    I do not remember.  There was a discussion about

3    how the process went, how they're approved by the students

4    and how it went through The Foundation and all that; but I

5    don't remember anything about a legacy.

6        Q    Okay.  How did the meeting conclude?

7        A    I think it was more of a agree to disagree on how

8    it should be done.  And when they left, I assumed it was a

9    done issue.

10       Q    Did President Zaccari ask you to follow up on this

11   meeting in any way?

12       A    No, he did not.

13       Q    Okay.  After Mr. Barnes left, did you remain with

14   President Zaccari --

15       A    No.  I left at the same time.

16       Q    Did you and President Zaccari have any subsequent

17   conversation about the meeting that had taken place on --

18       A    The 17th?

19       Q    -- April 16th?

20       A    Sixteenth?  No.

21       Q    What happened after April 16th that you're aware of

22   that --

23       A    I was called to two meetings in the President's

24   office where there was a group of individuals.  One was in

25   April, and I can't give you -- I don't know the exact date.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    The last one was May the third.  The prior meeting was about

2    two weeks before that.

3        Q    Who else attended those meetings?

4        A    The first meeting that I attended was Dr. Zaccari,

5    Theresa Boyd, Leah McMillan, Dr. Keppler, Dr. Levy, Kimberly

6    Tanner, myself, Ann Farmer and Attorney Lavern Gaskins.

7        Q    What took place at that meeting?

8        A    The President voiced his concerns over Hayden

9    Barnes' Facebook account and his personal safety and several

10   times referred to the Virginia Tech tragedy.

11       Q    Was there any discussion of this?

12       A    There was some, but I was not part of the

13   discussion.  I believe I was there maybe as the second in

14   command to the Vice President.  I don't speak for the

15   Division when the Vice President is there.

16       Q    Did anyone but Dr. Zaccari express an opinion on

17   potential security issues?

18       A    Not that I'm aware of.

19       Q    I believe you said there was some discussion.  If

20   they didn't discuss the security issues, what was discussed

21   at the meeting?

22       A    The main thing was the Facebook account and then

23   the threats and then Virginia Tech was discussed.

24       Q    Okay.  When you say "the threats," what are you

25   referring to?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A      The personal safety.  He was feeling threatened by
 2   the Facebook account.
 3      Q      Okay.  Was there anything else that Dr. Zaccari
 4   said he felt threatened by?
 5      A      Not at that meeting that I remember.
 6      Q      Okay.  How long did that meeting last?
 7      A      I don't know.
 8      Q      Were any decisions made at that meeting?
 9      A      Not that I'm aware of.
10      Q      Okay.  I believe you said the second meeting took
11   place on May 3rd --
12      A      May 3rd, 2007.  Those in attendance were
13   Dr. Zaccari, Dr. Keppler, Dr. Levy, Lavern Gaskins, Kimberly
14   Tanner, Scott Doner, Ann Farmer, Theresa Boyd, Dr. Morgan
15   and myself.
16      Q      What took place at that meeting?
17      A      At the meeting the President, Dr. Zaccari, informed
18   us that through his conversation with the University
19   Attorney and the Central Office Attorney that he was going
20   to withdraw Hayden Barnes from the university and that he
21   had been made this decision.  This meeting was to discuss
22   the best way to inform Mr. Barnes.
23             I also remember at the meeting it was recommended
24   that Hayden be allowed to finish his final exams.
25      Q      Did he say why?
```

Page 31

1    A    Did who say what?  I'm sorry.

2    Q    Did Dr. Zaccari say why he should be --

3    A    I believe that was the consensus of the Vice

4    President and the President to let the student finish his

5    final exams.  Didn't say why.  Let the student finish final

6    exams is a good thing.

7    Q    Even if they are a threat?

8    A    No.

9    Q    So, if there were a real threat, then --

10   A    Well, I can't speak on behalf of the President.

11   Q    Well, let me ask your opinion.  If a student

12   provides a real threat, does it make sense to let them

13   finish exams?

14   A    If there is a real threat, verifiable threat, based

15   on University Police and others on campus -- if there's a

16   true threat, then no, if there's a danger to our students.

17   Q    I believe you just said that the decision to permit

18   Mr. Barnes to finish final exams was a consensus decision of

19   the Vice President's and Dr. Zaccari.

20   A    (Nods head.)

21   Q    Was that consensus decision reached at that May 3rd

22   meeting?

23   A    Yes, it was.

24   Q    So, the decision followed a discussion among the

25   participants of the meeting and then a decision?

Page 32



1    A    There was not much of a discussion.  The President
2    led most of the discussion that day.
3    Q    Okay.  Did you hear others express opinions about
4    what should happen with Mr. Barnes?
5    A    No.
6    Q    Can you tell me what the basis is then for your
7    describing this as a consensus decision?
8    A    From the Vice President.  The President said
9    that if -- or asked the opinion of the Vice President -- I
10   can't remember which one -- "Should we allow him to take
11   final exams?"  And they agreed; let him finish final exams.
12   Q    Did individuals at the meeting express opinions
13   that you heard about that?
14   A    No.  A lot of folks did not say a word during that
15   meeting.
16   Q    Is it fair to say that at this meeting Dr. Zaccari
17   simply announced the decision that he had made?
18   A    That would be a fair statement:  That he had made
19   the decision to withdraw Hayden from school.
20   Q    Did he say what University policy this was based
21   on?
22   A    He did not.  He just said based on advice of
23   counsel, University counsel, and Board of Regents' attorney.
24   Q    Did he provide a name for the attorney from the
25   Board of Regents?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1     A     Betsy Neely.

2     Q     Did he characterize any of the advice he had gotten

3   for that decision --

4     A     No, he did not.

5     Q     In support of that decision?

6     A     He just said based upon advice from counsel.

7     Q     Did you understand that to also mean the advice of

8   the University counsel?

9     A     That was my impression because he said both

10   counsels in that statement.

11     Q     Did you take notes at either this meeting or the

12   April 26th meeting?

13     A     I don't believe I did.

14     Q     Do you know if anyone else took notes at any of

15   these meetings?

16     A     I do not remember, sir.  There was a large group.

17   Some folks could have.  I don't remember.

18           MR. CORN-REVERE:  Let's mark as Deposition Exhibit

19     Number Five a copy of the notes previously identified as

20     the notes of Ann Farmer used in the previous deposition.

21           (The document was marked for identification as

22     Plaintiff's Exhibit Number Five.)

23           THE WITNESS:  (Reviewing document.)  Are these all

24     together?

25           MR. WILL:  They're one exhibit.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1   BY MR. CORN-REVERE:

 2      Q    It's one exhibit.

 3      A    Is it one meeting?

 4      Q    These are notes that were taken at more than one

 5   meeting.  One is labeled -- I've actually lost my copy of

 6   that page temporarily.  The April 26th meeting.  Bear with

 7   me a second.

 8           (Pause)

 9      Q    I'm sorry.  It's labeled April 20th, 2007.

10      A    (Reviewing document.)

11      Q    They're one exhibit, but they do relate to

12   different meetings.

13           These were provided to us in response to our

14   document requests, and they were discussed at the deposition

15   of Ann Farmer.

16           Again, I'm not going to ask you to read through

17   everything.  It's hard to read someone else's handwriting,

18   although this is really quite good writing.

19           Let's look at the one labeled 4-20-07 and, if you

20   could, turn to the fourth page which is the

21   second-to-last-page.

22      A    (Reviewing document.)

23      Q    Let me direct your attention to the bottom, lower

24   right corner of that page.

25      A    Uh-huh.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q      There appears a notation with your name, Mast, and

2    next to that is written "veiled threat.  Could be used as

3    basis for disorderly conduct for withdrawal."

4    A      Okay.

5    Q      Do you see that note?

6    A      I see it.

7    Q      Did you make any comments at that meeting that

8    related to the possibility of using a veiled threat as a

9    justification to withdraw Mr. Barnes under the disorderly

10   conduct policies?

11   A      I do not remember that, sir.

12   Q      Do you remember any comments you made at the

13   meeting of April 20th, 2007?

14   A      I do not.

15   Q      Do you know what the purpose of the May -- I'm

16   sorry, April 20th, 2007, meeting was?

17   A      The purpose?

18   Q      Yes.

19   A      My impression, the President was expressing his

20   concerns over the Facebook account, his personal safety and

21   then he referred to Virginia Tech several times.

22   Q      Were any decisions made at that meeting?

23   A      Not that I'm aware of.

24   Q      Let's look at the notes that have previously been

25   identified as the notes from the May 3rd meeting.  They are

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      the ones that have Dr. Zaccari in the upper right corner.

2              MR. WILL:  Left.

3      BY MR. CORN-REVERE:

4          Q     Right, because I'm backwards here.  But left, thank

5      you.

6          A     This is the May 3rd meeting?

7          Q     Yes.

8          A     Okay.

9          Q     And I believe you attended this meeting with

10     Dr. Keppler?

11         A     Yes, I did.

12         Q     Do you recall any comments that Dr. Keppler made

13     during the course of this meeting?

14         A     No, I do not.  I'm sure he may have spoken, but I

15     don't remember everything he said at that meeting.

16         Q     Okay.  Correct me if I'm wrong, but I believe you

17     characterized this meeting as the one in which Dr. Zaccari

18     came to announce his decision --

19         A     That's correct.

20         Q     -- to withdraw Mr. Barnes?

21         A     He led the discussion.  You're correct.

22         Q     Let's --

23         A     You're talking about the May 3rd meeting, am I

24     correct?

25         Q     Yes.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      How best way to identify Mr. Barnes that he was

2    withdrawing him from school.

3      Q      Uh-huh.  On the fourth page about three-fourths of

4    the way down the page, in these notes Ms. Farmer refers to

5    Mr. Barnes as "D."  I think as defendant.  But I'll refer to

6    him as Mr. Barnes.

7            There's a note with Dr. Keppler's name next to it;

8    and the note says, "Counselors can't say Barnes is a threat

9    because there's nothing to support that Barnes is a threat."

10   Do you see that comment?

11     A      I see that comment.

12     Q      Do you recall Dr. Keppler saying anything that

13   approximates what is noted here in the notes of Ann Farmer?

14     A      I do not remember.  You'd have to ask Dr. Keppler

15   if he said that.  If Dr. Keppler said he said it, I would

16   believe that.

17     Q      You have no reason to doubt that Dr. Keppler said

18   that.

19     A      Correct.

20            MR. CORN-REVERE:  Let's mark as Mast Deposition

21         Number Six a copy of Defendant Russ Mast's Responses to

22         Plaintiff's First Interrogatories and Requests for

23         Production of Documents.

24            (The document was marked for identification as

25         Plaintiff's Exhibit Number Six.)

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1              THE WITNESS:   (Reviewing document.)
2    BY MR. CORN-REVERE:
3        Q     Have you had a chance to look over that document?
4        A     Yes.
5        Q     Do you recognize it?
6        A     I do.
7        Q     These are the responses to interrogatories and
8    document requests that you've provided in this case?
9        A     It appears to be that, yes, sir.
10       Q     I'm going to ask you a few questions about this;
11   and when I do that, I want to be clear.  I'm not asking you
12   about any conversations you may have had with your attorney.
13             I'm not asking for any legal advise that you have
14   gotten about your participation in this case, but I do just
15   want to ask a few questions about just the process by which
16   this information is gathered.
17       A     Okay.
18       Q     Were you sent a copy of the original
19   interrogatories and document requests submitted by the
20   plaintiff?
21       A     I believe so from -- it was an email attachment.
22   PDF file.
23       Q     Okay.
24       A     I do not remember the name of the first attorney.
25       Q     Ms. Currea.   (Phonetic)
```

Page 39

1    A     I believe there was one before that.

2    Q     DeBrae' Kennedy?

3    A     That sounds -- yeah, DeBrae' Kennedy.

4    Q     Yeah.  How did you provide answers in response to
5    the interrogatories?

6    A     By my best recollection of when the meetings were.
7    What I remembered that transpired.

8    Q     But did you sit in a meeting with counsel and
9    provide --

10   A     No.

11   Q     -- answers --

12   A     No, sir.

13   Q     What was your process?

14   A     I said in a room by myself at my house with the
15   door shut and went through each question and answered to the
16   best of my ability.

17   Q     Okay.  And then after you had done all the answers,
18   you sent it back to --

19   A     Sent it back.  That's correct.

20   Q     Okay.  And then the material that you sent were
21   compiled into a document, this document, and sent back to
22   us, the opposing counsel.  Is that your understanding of the
23   process?

24   A     That is my understanding.

25   Q     After you wrote down your answers and sent them off

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    to your attorney, were you given an opportunity to read the

2    final document before it was submitted and approve the

3    answers?

4         A    I believe I was.

5         Q    Did you review this in final form?

6         A    I do not remember this final form or not.

7         Q    Were you asked to sign --

8         A    I believe I was asked to sign something, but I

9    don't remember.

10        Q    Okay.  But your signature does not appear on this

11   document, does it?

12        A    On this document?  No, sir.  I do not see it.

13        Q    Let's look at page seven of this, Interrogatory

14   Number six.

15             The interrogatory asks:  "Specifically identify and

16   describe all meetings, discussions or actions in which you

17   participated in connection with the decision to

18   'administratively withdraw' the Plaintiff from VSU."

19             And your response is:  "I did not have any

20   discussions with anyone regarding the decision to

21   administratively withdraw from Barnes.  As stated above,

22   Dr. Zaccari informed those in attendance on May 3rd that he,

23   Dr. Zaccari, mad the decision to administratively withdraw

24   Mr. Barnes from Valdosta State University.  I did not

25   participation in the decision."

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1            Did I read that correctly?

2    A    That is correct.

3    Q    Okay.  Is this accurate?

4    A    That is accurate.

5    Q    Okay.  You never had a discussion with anybody

6  about the decision to withdraw Mr. Barnes?

7    A    No.  I mean, I did not make that decision.

8    Q    Okay.  So, you were at the meeting on May 3rd but

9  that was more of just an announcement.

10   A    I was told what was going to happen.

11   Q    Okay.  And I believe you testified that you

12  participated in a meeting or you attended a meeting on

13  April 20th, 2007.

14   A    Correct.

15   Q    And you also attended the meeting on --

16   A    May 3rd.

17   Q    -- May 3rd.

18   A    Correct.

19   Q    Were there any other meetings about the withdrawal

20  of Mr. Barnes in which you participated?

21   A    In which I participated?

22   Q    Yes.

23   A    Not that I'm aware of.  Two group meetings on

24  April 20th and May 3rd.

25   Q    Did you ever have any meetings on this subject in

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    which Dr. Zaccari was not present?

2        A    Withdrawing Mr. Barnes?

3        Q    Yes.

4        A    No, sir.

5        Q    Do you recall a meeting near the end of April,

6    April 24th/April 25th, in which you met with Dr. Keppler and

7    Richard Lee to discuss the withdrawal of Mr. Barnes?

8        A    I don't remember.  That doesn't mean it may not

9    have happened, but I don't remember it.  I meet with

10   Dr. Keppler and Dean Lee quite frequently.

11       Q    Okay.  But you have no independent recollection of

12   a meeting --

13       A    No.

14       Q    -- in which you discussed -- please let me finish

15   the question.

16       A    I'm sorry.  Go ahead.

17       Q    You have no independent recollection of a meeting

18   in which you met with those other two gentlemen to discuss

19   the withdrawal of Mr. Barnes?

20       A    I do not.

21       Q    If --

22       A    But I'm not saying it did not happen.

23       Q    Okay.  If another participant in a meeting

24   testified that it did take place, would you have any reason

25   to dispute that?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A     No.

 2      Q     Who is Kim Tanner?

 3      A     I believe she -- she is the Director of our Access

 4   office.

 5      Q     I believe you testified that she attended one or

 6   more of these meetings about Mr. Barnes?

 7      A     Yes.  I believe she was at both meetings.

 8      Q     Did she -- excuse me.  Strike that.

 9            Did you hear Ms. Tanner say anything in either of

10   those meetings about the withdrawal of Mr. Barnes?

11      A     I don't remember Ms. Tanner saying anything.

12      Q     Did you ever have a separate conversation with

13   Ms. Tanner about Mr. Barnes?

14      A     No, I have not.

15      Q     And forgive me if I've covered this, but have you

16   ever had a separate conversation with Mr. Lee about the

17   withdrawal of Mr. Barnes?

18      A     The administrative withdrawal of Mr. Barnes?

19      Q     Yes.

20      A     Not to my knowledge.  My office did not process or

21   handle an administrative withdrawal for Mr. Barnes.

22      Q     Let me ask you about that because I -- if I

23   understand you correctly, your office is responsible for

24   student discipline.

25      A     That is correct.
```

Page 44

1    Q    And was it just your testimony that the withdrawal
2    of Mr. Barnes didn't fall under the category of student
3    discipline?
4    A    I'm saying that the Dean of Students Office did not
5    handle the student discipline in this case at all.
6    Q    Okay.  This was handled directly by Dr. Zaccari?
7    A    That is correct, sir.
8    Q    Let's turn to page 11 of Exhibit Six.
9    A    (Reviewing document.)
10   Q    And this is the Request for Production of Documents
11   Number Five at the bottom of the page.
12   A    Okay.
13   Q    It says, "Produce all documents relating to VSU's
14   rules, policies, and procedures for administrative
15   withdraw" -- it says withdraw, but it's supposed to say
16   withdrawal -- of students."
17        And your response is:  "To my knowledge, there is
18   no such policy or procedure in place for 'administrative
19   withdrawal.'  There is a procedure in place for temporary
20   suspension in the VSU student handbook."
21   A    Correct.
22   Q    Okay.  Can you expand on the first part of that
23   answer that there is no policy for administrative
24   withdrawal?
25        I mean, wasn't the decision in this case one

Page 45

1    imposing an administrative withdrawal?

2        A    Correct, by the President.  But my office has never

3    done an administrative withdrawal.  We have done temporary

4    suspensions of students for felonious acts --

5        Q    What's the difference?

6        A    To me, a clear and present danger.  A student

7    carrying a weapon on campus would be a danger to our

8    students.

9        Q    Okay.  So, the temporary suspension that you've

10   just mentioned --

11       A    Uh-huh.

12       Q    -- is a situation that would present a clear and

13   present danger.

14       A    That is correct.

15       Q    Okay.  And that's different from an administrative

16   withdrawal.

17       A    Correct.

18       Q    I believe you testified that you first saw the

19   flyers about the parking decks on campus before the April

20   16th meeting with Dr. Zaccari and Hayden Barnes.  Is that

21   correct.

22       A    That's correct.  March 24th, 2007.

23            MR. CORN-REVERE:  Okay.  Let's mark as Mast

24       Deposition Exhibit Number Seven a flyer with the heading

25       "An Issue of Convenience or a Moral Question."

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1              (The document was marked for identification as
 2       Plaintiff's Exhibit Number Seven.)
 3              THE WITNESS:   (Reviewing document.)
 4              MR. CORN-REVERE:   Just for efficiency sake, let's
 5       mark the Letter to Editor of The Spectator as Exhibit
 6       Eight.
 7              (The document was marked for identification as
 8       Plaintiff's Exhibit Number Eight.)
 9              MR. CORN-REVERE:   And let's mark the Facebook
10       collage as Exhibit Nine.
11              (The document was marked for identification as
12       Plaintiff's Exhibit Number Nine.)
13       BY MR. CORN-REVERE:
14       Q     Let's just talk about Exhibit Seven for a minute.
15       A     Seven?  Okay.
16       Q     Have you had a chance to look at the flyer?
17       A     Yes.
18       Q     Is this the flyer you saw on campus or March 24th,
19       2007?
20       A     March 24th?  That's correct.  A Sunday.
21       Q     Actually, there's a note down at the bottom --
22       A     It says 25th.  That may be the wrong date.  But
23       whenever Sunday was.  It was on Sunday.
24       Q     That's pretty good for two and a half years ago to
25       have it that close to the date.
```

Page 47

1      A      This is the flier.  That is correct.

2      Q      Did you ever see this in any location other than

3  when you simply saw it on campus?

4      A      I saw it at several locations on campus:  Nevins

5  Hall, University Center, posted outside of buildings on

6  campus that day.

7      Q      Okay.

8      A      There were several.

9      Q      I believe you testified that at the April 16th

10  meeting with Dr. Zaccari, Mr. Barnes suggested a number of

11  alternatives --

12      A      Correct.

13      Q      -- to the parking garage.

14          Are the alternatives listed on this flyer the kinds

15  of things that he raised with Dr. Zaccari, if you can

16  remember?

17      A      I don't remember.  This could be.  He had a list,

18  as I stated, of several items.

19      Q      Okay.  Is there anything threatening about this

20  flyer?

21      A      Not to me.

22      Q      Anything in this flyer that should make a college

23  administrator upset?

24      A      Only putting it all over places that we have to

25  clean up.  Another than that --

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q     Okay.  So, potential littering?

2    A     There's a sign posting a policy that students are

3    allowed to post on campus.  Just make sure we don't damage

4    school property.

5    Q     Fair enough?

6    A     That's all we ask.

7    Q     Sure.  And let's look at Exhibit Eight.

8    A     Okay.

9    Q     And I'll just tell you for the record, this is a

10   letter to the editor Mr. Barnes published in The Spectator

11   in April 2007.

12   A     Okay.

13   Q     Do you recall ever seeing this letter before?

14   A     Yes.

15   Q     And in what context?

16   A     It was in the school newspaper.  We have a lot of

17   letters to the editor in the school newspaper.

18   Q     Did you read it at the time?

19   A     I probably did.  I try to read the paper, the

20   school paper every week when it comes out on Thursday.

21   Q     Is there anything inflammatory in this letter to

22   the editor?

23   A     I'd have to read the whole article or letter again.

24   I don't remember anything.  (Reviewing document.)

25   Q     Was this article ever brought to your attention by

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1   Dr. Zaccari?
 2       A     This article?  No, sir.
 3       Q     Okay.  Do you know if this article was discussed at
 4   either the April 20th meeting or the May 3rd meeting
 5   regarding Mr. Barnes?
 6       A     I don't remember it being discussed at either one
 7   of those two meetings, sir.
 8       Q     But I believe you testified at those meetings there
 9   was discussion of Mr. Barnes' Facebook postings.
10       A     Correct.
11       Q     Okay.  Let's look at Exhibit Nine.  Have you seen
12   this before?
13       A     I have.
14       Q     Okay.  Can you identify it?
15       A     It is -- looks like a Facebook page from Hayden
16   Barnes' Facebook account.
17       Q     First of all, do you know how Dr. Zaccari came into
18   possession of a copy of this collage?
19       A     I do not.  It was stated in the complaint that I
20   had given it, and I did not; and I have never had a Facebook
21   account to this day.  So, I don't even know how to get on
22   there.  My kids could tell you, but I cannot.
23       Q     Okay.
24       A     But this was shared at that meeting.
25       Q     Dr. Zaccari brought it to the meeting?
```

Page 50



1    A    Yes, sir.

2    Q    What did he say about it?

3    A    That he felt threatened by the term there,

4    "memorial parking garage."

5    Q    Did Dr. Zaccari also express concern for the safety

6    of the student environmental group S.A.V.E.?

7    A    I don't remember anything about threats to the

8    S.A.V.E. students.

9    Q    Because the heading says, "S.A.V.E. - Zaccari

10    Memorial Parking Garage."

11    A    Right.

12    Q    So, conceivably this could be a blanket threat not

13    just to Dr. Zaccari but to the organization, as well, if you

14    interpret it that way.

15    A    That's up to the individual's interpretation.

16    Q    Yes.  Was there any discussion at either the

17    April 20th meeting or the May 3rd meeting of whether or not

18    this was a reasonable concern of security?

19    A    I'm not sure I'm following you on that question.

20    Q    Did anyone either agree or disagree with

21    Dr. Zaccari's assumption that the use of the word "memorial"

22    represented some sort of threat?

23    A    I honestly don't remember.

24    Q    And I believe you characterized the May 3rd meeting

25    as one in which Dr. Zaccari, basically, announced his

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    decision.

2        A    Right.  I don't believe this document was given on

3    the May 3rd.  It was on the other meeting.

4        Q    Was there discussion at the April 20th meeting

5    whether or not this represented some kind of threat?

6        A    There may have been.  I don't remember.  Not for

7    me.

8        Q    Did you form a conclusion, personally, about

9    whether or not this represented some kind of threat?

10       A    I don't see it as a threat.  Memorial means many

11   things, so --

12       Q    Did you share your opinion with Dr. Zaccari?

13       A    No, I did not.

14       Q    Why not?

15       A    That would, in my opinion, would've been my Vice

16   President's responsibility.

17            MR. CORN-REVERE:  Okay.  And let's mark as Mast

18       Deposition Exhibit Number Ten another series of Facebook

19       pages.

20            (The document was marked for identification as

21       Plaintiff's Exhibit Number Ten.)

22            THE WITNESS:  (Reviewing document.)

23   BY MR. CORN-REVERE:

24       Q    Have you had a chance to take a lot at that

25   exhibit?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      Yeah.  I'm trying to understand what it is.  I'm

2    not a big, as I say, Facebook person.

3      Q      Believe me, I'm with you on that one.

4      A      It looks like -- I guess what you call discussion

5    groups or whatever.  And looks like an article after that.

6      Q      Okay.  Have you ever seen this before?

7      A      No, I have not.

8      Q      Did anyone at either the April 20th meeting about

9    Hayden Barnes or the May 3rd meeting make reference to these

10   Facebook pages?

11     A      I don't remember.  I remember the other Facebook.

12     Q      So, the discussion at those meetings that you

13   testified about earlier all would've been related to the

14   collage.  Is that correct?

15     A      That's correct.  I've never seen this before.  This

16   document before.

17     Q      Okay.

18            MR. WILL:  You good?

19            THE WITNESS:  Yeah.  I just need to get a drink of

20     water and use the bathroom.

21            (A recess was taken from 4:33 p.m. to 4:35 p.m.)

22   BY MR. CORN-REVERE:

23     Q      I want to follow up on one of the earlier questions

24   that I asked you about the meetings that took place.

25            I believe I asked you whether or not you had a

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    meeting around April 24th or April 25th with Dr. Keppler and

2    Richard Lee and perhaps others to discuss the administrative

3    withdrawal.  And let me just be more general about the

4    question.

5         Was there any meeting around that time to discuss

6    any issue involving Hayden Barnes whether or not the

7    question of an administrative withdrawal came up?

8         A    I don't remember one.

9         Q    Okay.  So, no conversation with either of those

10   gentlemen regarding Hayden Barnes?

11        A    Not that I remember.  I'm just being honest.  Not

12   that I remember.

13        Q    Again, only if you remember.  I'm not asking you to

14   speculate on something you don't remember.

15        A    Uh-huh.

16        Q    And also on May 7th, 2007, is it possible you

17   attended a meeting with Lavern Gaskins talking about

18   implementing the administrative withdrawal?

19        A    I did not meet with Attorney Gaskins.

20            MR. CORN-REVERE:  Okay.  Let's mark as Mast

21   Deposition Exhibit Number 11 a May 7, 2007, notice of

22   withdrawal.

23            (The document was marked for identification as

24   Plaintiff's Exhibit Number 11.)

25            THE WITNESS:  (Reviewing document.)

Page 54

```
 1    BY MR. CORN-REVERE:

 2      Q    Dean Mast, have you had a chance to look at this

 3    exhibit?

 4      A    Yes, I have.

 5      Q    Have you seen this before?

 6      A    I have not seen this before.

 7      Q    You've never seen the notice of withdrawal to

 8    Hayden Barnes?

 9      A    No, I did not get this letter.  I received a letter

10    stating that Mr. Barnes had been withdrawn, but I did not

11    get this letter.

12      Q    I see.  Could you look at the first paragraph of

13    this letter?

14      A    Okay.  (Reviewing document.)

15      Q    It says, "As a result of recent activities directed

16    towards me by you, included but not limited to attached

17    threatening document, you are considered to present a clear

18    and present danger to this campus.  Therefore, pursuant to

19    Board of Regents Policy 1902, you are hereby notified that

20    you have been administratively withdrawn from Valdosta State

21    University effective May 7th, 2007."

22           Did I read that correctly?

23      A    You did.

24      Q    Looking at this whole exhibit, including the

25    collage attached at the back that we've already discussed,
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    do you see anything here that presents a clear and present

2    danger?

3       A      In these two documents?  No, sir, I do not.

4       Q      Do you know what Board of Regents Policy 1902 is?

5       A      I do not.

6       Q      Okay.  In the case of a disciplinary action against

7    a student, generally what kinds of rights are provided to

8    the student to respond?

9       A      In a typical student judicial -- student code of

10   conduct, the student is told what -- sort of, what parts of

11   the code they have violated.

12            Then they're given a right to either an

13   administrative hearing or a judicial hearing, depending on

14   the nature of the alleged misconduct.

15            Some may be more serious where we would give it to

16   a student judicial or a university-wide judicial board.

17            And a student has the right in those hearings,

18   administrative hearing, for a student accepting

19   responsibility, which are majority of the cases we have.

20            "I yelled at my professor."

21            "I copied a paper I wasn't supposed to."

22            A more serious one would be maybe have a fight

23   between a couple of residents.  Excessive -- students who

24   may cheat.  "I've done it more than once."  Plagiarized.

25   They would go to the University-wide Judicial Board.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1              A more serious one:  Carrying a handgun on campus.
 2     Q     In looking at this Exhibit Number 11 --
 3     A     Uh-huh.
 4     Q     -- do you see any provision for any kind of
 5  administrative hearing?
 6     A     It says he should appeal the decision to the Board
 7  of Regents.
 8     Q     Is that an unusual process for a student discipline
 9  action?
10     A     Yes, sir.
11     Q     What's unusual about it?
12     A     In the cases that my office handles, an appeal from
13  the Student Judicial Board or the University Judicial Board
14  would go to the President of the university and then would
15  go to the Board of Regents.
16              MR. CORN-REVERE:  Okay.  Let's mark as Mast
17      Deposition Exhibit Number 12 an one-page memorandum dated
18      May 9th, 2007.
19              THE WITNESS:  (Reviewing document.)
20               (The document was marked for identification as
21      Plaintiff's Exhibit Number 12.)
22  BY MR. CORN-REVERE:
23     Q     Have you had a chance to review that?
24     A     Yes, I have.
25     Q     Have you received the exhibit before?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      Yes, I did receive this.

2      Q      Okay.  Can you identify it for the record?

3      A      It's a May 9th memo notifying the above-mentioned

4    individuals, Mr. Black, Mr. Doner, Dr. Hardy, Mr. Hudson,

5    Dr. Keppler, Dr. Levy and myself, Russ Mast, that Hayden

6    Barnes had been administratively withdrawn from Valdosta

7    State University; and it states he's given 48 hours to

8    vacate his residence hall.

9      Q      Is this unusual to get a memorandum from the

10   University President regarding a withdrawal of a student?

11     A      I've never received a memorandum from a University

12   president regarding a withdrawal.

13     Q      And just looking at the time line -- first, the

14   notice of withdrawal is May 7th.  This memorandum marked as

15   Exhibit 12 is May 9th, and Mr. Barnes is given May 11th to

16   be off campus.  We have a series of five days.

17            Is this consistent with the conclusion that

18   Mr. Barnes represented a threat to campus?

19     A      I'm not sure what your question is there, sir.

20     Q      Let me put it this way.

21     A      Okay.

22     Q      In dealing with student discipline matters --

23     A      Correct.

24     Q      -- say someone does represent a clear and present

25   danger -- I believe you gave examples earlier of someone

Page 58

```
1    brandishing a gun.  Would you give them five days to leave
2    campus if you --
3        A    No, I would not.  They would be immediately
4    suspended and asked to leave the campus.
5             There have been students who have been through the
6    judicial process that are not of a serious nature that are
7    given time to move out of the residence hall.
8        Q    When you say not a serious nature, what do you
9    mean?
10       A    Not a threat to the students or the campus.
11       Q    Okay.  What kind of infractions are you talking
12   about?
13       A    If a student -- had one last year that tried to
14   manufacture and sell methamphetamines out of a residence
15   hall.
16       Q    That was a clear and present danger?
17       A    Yes, sir.
18       Q    Okay.  So, he was immediately --
19       A    He was immediately asked to leave the campus.
20       Q    Okay.  But I may have gotten this backwards, but I
21   believe you were talking about other examples that were not
22   serious matters.
23       A    Continued fighting with your roommate.  Not
24   following visitation policies.  A number of parking tickets.
25       Q    Okay.  So in examples like that --
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     A     Someone who doesn't want to follow the rules; and

2  their peers, the Student Government Association Judicial

3  Board, has said, "you're no longer a student at campus but

4  we'll give you time to move your things out."

5     Q     Okay.  Now looking at Exhibit 11 for a minute --

6     A     Uh-huh.

7     Q     -- you noted that the appeal goes to the Board of

8  Regents.

9          Were you aware of an appeal of Mr. Barnes'

10 withdrawal that did go to the Board of Regents?

11    A     I was informed by my Vice President that there was

12 an appeal that would probably go to the Board of Regents.

13    Q     Okay.  Did you learn any details about the appeal?

14    A     No.

15         MR. CORN-REVERE:  Let's mark as Mast Deposition

16    Exhibit Number 13 a letter from Ronald Zaccari dated

17    June 21st, 2007, to Elizabeth Neely.

18         (The document was marked for identification as

19    Plaintiff's Exhibit Number 13.)

20         THE WITNESS:  Okay.  I've reviewed this.  Briefly

21    reviewed this.

22 BY MR. CORN-REVERE:

23    Q     Okay.  Have you seen this letter before?

24    A     No, sir.  I have not.

25    Q     Okay.  I just have a couple of questions.  Again,

Page 60

1    I'm not asking you, you know, so much to verify anything

2    that Dr. Zaccari has written in this letter, but let me

3    direct your attention to page four, the first full paragraph

4    that is numbered 13.

5    A    (Reviewing document.)  Okay.

6    Q    Okay.  Will you take a look at that?

7    A    (Reviewing document.)

8    Q    A looking around the middle of that paragraph, it

9    states:  "I sought the advise of the members of the

10   President's administrative unit consisting of Dr. Kurt

11   Keppler, Vice President of Student; Dr. Louis Levy, Vice

12   President of Academic; Mr. James Black, Vice President of

13   Finance and Administration; Mr. Scott Sikes, Vice President

14   of Institutional Advancement; and Dr. Marsha Krotseng,

15   Associate Vice President for Strategic Research and

16   Analysis.

17          "The administrative unit, along with Mr. Scott

18   Doner, VSU's Police Chief, and Ms. Ann Farmer, Assistant

19   Chief of Police, and I collectively decided that VSU take

20   necessary steps to minimize as much as possible any security

21   risks."

22          Do you see that?

23   A    Yes, I see that.

24   Q    Okay.  Based on the meetings you attended, was it

25   your understanding that this was a collective decision made



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      by a group to withdraw Mr. Barnes?

2          A      My understanding, Dr. Zaccari made that very clear

3      in the May 3rd meeting that he had made the decision to

4      withdraw Mr. Barnes.

5          Q      Okay.  So, do you think this statement in

6      Dr. Zaccari's letter is inaccurate?

7          A      I can't speak for Dr. Zaccari.  These are members

8      of his administrative team at that time.  I can't speak of

9      their behalf.

10         Q      Okay.  Well, I'm not asking you to speak on their

11     behalf.  I'm really asking more about your impressions

12     formed in the meetings that you attended and whether or not

13     it's consistent with what you see described here.

14         A      Okay.

15              MR. WILL:  I believe that's been asked and

16         answered.  I object to the form of the question.

17     BY MR. CORN-REVERE:

18         Q      You can answer.

19         A      As I stated, Dr. Zaccari made it very clear on May

20     3rd that he made the decision.  This information was not

21     shared at that meeting.

22              MR. CORN-REVERE:  Okay.  And then finally let's

23         mark as Mast Deposition Exhibit Number 14 a copy of the

24         Student Handbook, Volume One.

25              (The document was marked for identification as

1      Plaintiff's Exhibit Number 14.)

2    BY MR. CORN-REVERE:

3      Q     And I'm really going to be asking questions about

4    the Student Code of Conduct which appears at pages --

5    beginning at page 57.

6      A     Okay.  (Reviewing document.)

7      Q     And, first, on pages 59 and 60 there's a section

8    under heading D, Disorderly Assembly.  Do you see that?

9      A     Yes, I see it .

10     Q     And this describes Board of Regents Policy Manual

11   Section 1902, which I believe was referenced in the May 7th,

12   2007, notice of withdrawal.

13     A     (Reviewing document.)  Okay.

14     Q     Looking at the description of Policy 1902 here, do

15   you have any impression whether or not the Policy applies in

16   the circumstances involving Mr. Barnes?

17     A     In this case, what I read here or this section, it

18   does not.

19     Q     Would you describe this section as an

20   administrative withdrawal policy?

21     A     I'm not sure what I would call it to be honest with

22   you.  The last sentence says, "This section should not be

23   construed to deny any student the right of peaceful,

24   non-disruptive assembly per the policy."

25     Q     And the next policy, disorderly conduct, is under

Page 63

```
 1    heading E on page 60.  I believe you testified earlier that
 2    there were circumstances that you've confronted as
 3    University Dean responsible for student discipline --
 4         A    Correct.
 5         Q    -- that rose to the level of clear and present
 6    danger.  Is that a fair statement?
 7         A    That is a fair statement.
 8         Q    Okay.  Would the circumstances you were describing
 9    ones that fell under this disorderly conduct policy?
10         A    Clear and present -- disorderly conduct, I would
11    think, is not as severe as a clear and present danger.
12         Q    I'm sorry.  Which policy would cover clear and
13    present danger?
14         A    Violation of outside law could be used.
15         Q    Where are you reading?
16         A    On page 62.  Violation of local, state or federal
17    law.  Repeated violation would be someone -- oh, that's not
18    a clear and present danger.
19              Fire safety, messing with fair safety equipment,
20    could be a safety concern to our campus under fire safety.
21    Set fires to the rooms.  Explosives would be considered --
22    it could under Number Seven:  Harassment, terroristic
23    threats, abuse, sexual assault.
24         Q    Anything else?
25         A    Well, there could be more.  I have to go piece by
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    piece here.  (Reviewing document.)  Maybe number five,
 2    extreme circumstances maybe.
 3        Q    Number five?
 4        A    We have some streakers around campus that don't
 5    want to stop.  I've had that before.
 6        Q    Number five, you're referring to obscene conduct?
 7        A    Obscene, yeah.  Falsification of records possibly.
 8    If they lied on their admissions application to the
 9    university.  Could be that they have a felony record and
10    they checked they have never been arrested.  Those are some
11    examples.
12        Q    Okay.  So, would any of the policies you've just
13    described relate to circumstances that we find here with
14    Mr. Barnes?
15        A    In my opinion, no.
16        Q    Now in the event of a student disciplinary problem,
17    does that trigger the Rights of Students under Appendix B?
18        A    That's correct.
19        Q    And looking at page --
20        A    Unless a student has admitted and they would rather
21    have an administrative hearing when they admit
22    responsibility.
23        Q    Yes, but that would be at the student's option.
24        A    That's the student's option.  You are correct.
25        Q    Okay.  And looking at the heading on page 63 under
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    disciplinary process, it says, "In accordance with this

2    responsibility, disciplinary sanctions shall be applied only

3    after the requirements of due process, fairness and

4    reasonableness have been.  Do you see that?

5        A    Are you on page 63?

6        Q    Yes.

7        A    Yes, I see that.

8        Q    Okay.  Is that the good summary of VSU's policy

9    when it comes to due process rights?

10       A    In my opinion, it is.

11       Q    Were these rights accorded Mr. Barnes in this case?

12       A    The handbook was not followed in this case.  The

13   student handbook procedures.

14       Q    So would that be a yes?

15       A    Yes.

16       Q    Could you please turn to page 68.

17       A    (Reviewing document.)

18       Q    At the bottom of the first column where it says

19   mental health withdrawal --

20       A    Uh-huh.

21       Q    -- does your office also oversee this kind of

22   withdrawal from the --

23       A    Yes.  My office would handle this kind of

24   withdrawal from the campus.

25       Q    Okay.  Now the withdrawal of Mr. Barnes did not

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     involve a mental health withdrawal, did it?

2        A     No, it did not.

3        Q     Okay.  Looking at the conditions spelled out here

4     in the student handbook, would Mr. Barnes' situation have

5     qualified for a mental health withdrawal?

6        A     In my opinion, no.

7              MR. CORN-REVERE:  Can we go off the record for just

8        two minutes?  I want to step outside and confer, and we

9        may be close to finished.

10             (A recess was taken from 5:03 p.m. to 5:05 p.m.)

11             MR. CORN-REVERE:  I have no further questions.

12             MR. WILL:  I'm afraid my colleagues will probably

13        ask you something.

14             MR. LAVALLEE:  I think Dave wants to go first.

15             THE WITNESS:  Yes.

16                          EXAMINATION

17     BY MR. SMITH:

18        Q     My name is David Smith.  I'm represent Lavern

19     Gaskins in this case.

20        A     Okay.

21        Q     I have just few questions for you.

22        A     Okay.

23        Q     I think you testified that when Dr. Zaccari came in

24     and announced, basically, the decision he'd made, he advised

25     that that was based on advise he'd gotten from the Board of

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    Regents Counsel and from the University Counsel?
 2        A    That's the impression that I got.  The attorneys.
 3        Q    Did he say what advice he got from which
 4    attorney --
 5        A    No, he did not.
 6        Q    -- or what specifically each one had told him?
 7        A    No.
 8        Q    Did you hear -- at either of the meetings you were
 9    present at, did you hear Lavern Gaskins offer any
10    information about what procedural rights or niceties would
11    have to be followed for a withdrawal --
12        A    I don't remember that discussion in the meeting.
13        Q    Okay.  Did you hear any discussions from
14    Ms. Gaskins about what would be required for a withdrawal
15    without a hearing?  What would have to be found to justify
16    that?
17        A    Not in the two meetings I was in that she attended.
18        Q    And my understanding from your testimony is at the
19    May 3rd that you went to, the impression you got was that
20    Dr. Zaccari had made the decision and was not soliciting
21    input on what should be --
22        A    That's correct.
23        Q    And you made a comment at one point that a census
24    was reached, and my understanding is that was on "when" the
25    withdraw would occur and not "whether" it would occur.  Is
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    that right?

2       A    Correct.  When -- the opportunity to allow

3    Mr. Barnes to take his final exams.

4           MR. SMITH:  That's all I have.  Thank you.

5           MR. LAVALLEE:  Do you mind if inquire from here?

6           THE WITNESS:  No.

7                              EXAMINATION

8    BY MR. LAVALLEE:

9       Q    My name is Matthew LaVallee.  I represent Leah

10   McMillan in the case.  I will slide over, though, so we can

11   at least look at each other.

12          I just want to ask you a couple question as it

13   pertains to the April 20th, 2007, meeting you said you

14   attended.

15          I think you mentioned earlier that Leah McMillan

16   was at this meeting.  Is that correct?

17      A    I said Leah.  I believe it was McMillan.  There's

18   another Leah on campus in the Division.  There's a Leighia

19   Hammond.  And I wrote Leah, and there's two Leah's in the

20   Division of Student Affairs.

21      Q    Well, it's interesting that you make that

22   distinction because Ms. Gaskins made the same mistake in her

23   deposition.  She confused Ms. Hammond with Ms. McMillan.

24      A    I may have.

25      Q    Okay.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1       A       I wrote Leah.  There are two Leahs in the division.

2       Q       So, you don't know, for sure, whether Ms. McMillan

3   was at this April 20 meeting.

4       A       I do not.

5       Q       If Ms. McMillan stated she was not at this meeting,

6   do you have any reason not to believe her?

7       A       No, I do not.

8       Q       If Ms. Farmer stated Ms. McMillan was not at the

9   April 20th meeting, do you have any reason not to believe

10  her?

11      A       No, I have no reason.

12              MR. LAVALLEE:  That's all I have.

13                        RE-EXAMINATION

14  BY MR. CORN-REVERE:

15      Q       Let me just ask one quick follow-up.

16              In answering Mr. LaVallee's questions just now

17  about the April 20th, 2007, you said that you wrote Leah.

18      A       Right.

19      Q       Talking about the meeting.  Did you take notes at

20  that meeting?

21      A       I didn't take notes.  When I wrote Leah on the

22  response.

23      Q       On the interrogatory response?

24      A       Yes.

25              MR. CORN-REVERE:  That's all I have.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          MR. WILL:  Thank you very much.

2          (Deposition concluded at 5:10 p.m.)

3          (Pertaining to  Federal Rules of Civil Procedure

4     and/or O.C.G.A. 9-11-30(e), the deponent and/or a party

5     having requested the right to review the deposition,

6     making corrections and/or changes and signing, for that

7     purpose the errata pages have been annexed hereto.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1                   C E R T I F I C A T E
2    STATE OF GEORGIA:
3    COUNTY OF LOWNDES:
4              I hereby certify that the foregoing transcript was
5    taken down, as stated in the caption, and the questions and
6    answers thereto were reduced to typewriting under my
7    direction; that the foregoing pages 1 through 70 represent a
8    true, complete, and correct transcript of the evidence given
9    upon said hearing, and I further certify that I am not of
10   kin or counsel to the parties in the case; am not in the
11   regular employ of counsel for any of said parties; nor am I
12   in any way interested in the result of said case.
13             This, the 20 day of August, 2009.
14
15
16        /s/ Sarah William
17        SARAH WILLIAMS, FPR, RPR, CCR B1653
18
19
20
21
22
23
24
25
```

Page 72

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                              DISCLOSURE
 2     STATE OF GEORGIA           Deposition of:  Russ Mast
 3     COUNTY OF LOWNDES:   Date:  July 28, 2009
 4          Pursuant to Article 10.B of the Rules and Regulations
 5     of the Board of Court Reporting of the Judicial Council of
 6     Georgia, I make the following disclosure:
 7          I am a Georgia Certified Court Reporter.  I am here as a
 8     representative of Wheeler Court Reporting.  I am not
 9     disqualified for a relationship of interest under the
10     provisions of O.C.G.A. §9-11-28 (c).
11          Wheeler Court Reporting was contacted by the
12     offices of Mr. Corn-Revere, Esq., to provide court reporting
13     services for this deposition.  Wheeler Court Reporting will
14     not be taking this deposition under any contract that is
15     prohibited by O.C.G.A. §15-14-37 (a) and (b).
16          Wheeler Court Reporting has no exclusive
17     contract to provide reporting services with any party to
18     the case, any counsel in the case, or any reporter or
19     reporting agency from whom a referral might have been
20     made to cover this deposition.
21          Wheeler Court Reporting will charge its usual and
22     customary rates to all parties in the case, and a financial
23     discount will not be given to any party to this litigation.
24                        _____
                          Sarah Williams, CCR, FPR, RPR.
25                                   CCR No.  B1653
```

Page 73



RUSS MAST 7/28/2009

```
1                    DEPOSITION OF RUSS MAST/SEW
2              I do hereby certify that I have read all questions
3       propounded to me and all answers given by me on the 28th day
4       of July, 2009, taken before Sarah Williams, FPR, CCR, RPR,
5       and that:
6              1) ____        There are no changes noted.
7              2)  √     The following changes are noted:
8                    Pursuant to Rule 30(e) of the Federal Rules of
9       Civil Procedure and/or the Official Code of Georgia
10      Annotated 9-11-28(c), both of which read in part:  Any
11      changes in form or substance which you desire to make shall
12      be entered upon the deposition...with a statement of the
13      reasons given...for making them.  Accordingly, to assist you
14      in effecting corrections, please use the form below:
15      Page No.        Line No.        should read:
16       10              20              My assistant Dean . . . . .
17      Page No.        Line No.        should read:
18       13              25              They were suspended at the request of their
19      Page No.        Line No.        should read:
20       24              24              Probably because the Vice President of Student
21      Page No.        Line No.        should read:
22       27              16              disagreed on the construction of the parking deck
23      Page No.        Line No.        should read:
24       31              21              had made this decision, the meeting was to discuss
25
```

Page 74

WHEELER
REPORTING
Court Reporting · Video · Litigation Support
404.351.4577

RUSS MAST 7/28/2009

```
1                    DEPOSITION OF RUSS MAST/SEW
2      Page No.        Line No.        should read:
3       40             14              I sat in a room by myself at my house
4      Page No.        Line No.        should read:
5       43             8               Add "We did not discuss withdrawing Hayden Barnes
6      Page No.        Line No.        should read:
7       43             22              Add "We did not meet to discuss withdrawing
                                       Hayden Barnes"
8      Page No.        Line No.        should read:
9                                      _____
10     Page No.        Line No.        should read:
11                                     _____
12     Page No.        Line No.        should read:
13                                     _____
14
15              If supplemental or additional pages are necessary,
16     please furnish same in typewriting annexed to this
17     deposition.
18
19     _Russell F. Mast_____
20     RUSS MAST
21
22     Sworn to and subscribed before me,
       this the 28 day of Sept.        2009.
23
24     _Rebecca L. Taylor_____
       Notary Public
25     My commission expires:
```

Notary Public, Lowndes County, Georgia
My Commission Expires June 27, 2010

Page 75

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577