IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

Dec 23 2009

THOMAS HAYDEN BARNES,                    CASE NUMBER

    Plaintiff,                           1:08-CV-00077-CAP

vs.

RONALD M. ZACCARI, et al,

    Defendants.
_____/


DEPOSITION OF

DR. RONALD ZACCARI


JULY 29, 2009

9:07 A.M.



VALDOSTA STATE UNIVERSITY
OAK STREET PARKING DECK
AUXILLARY SERVICES DEPARTMENT
CONFERENCE ROOM
VALDOSTA, GEORGIA



SARAH E. WILLIAMS, FPR, CCR, RPR


Page 1



**Original**

**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                    A P P E A R A N C E S

 2

 3    On behalf of Plaintiff:

 4    ROBERT CORN-REVERE, ESQ.
      ERIN N. REID, ESQ.
 5    Davis Wright Tremaine, LLP
      Suite 200
 6    1919 Pennsylvania Avenue, N.W.
      Washington, D.C.   20006-3402
 7

 8    On behalf of Defendant Gaskins:

 9    DAVID R. SMITH, ESQ.
      Brannen, Searcy & Smith, LLP
10    22 East 34th Street
      Savannah, Georgia  31401
11

12    On behalf of Zaccari, VSU, Board of Regents, Keppler,
                         Mast and Morgan:
13
      DAVID C. WILL, ESQ.
14    HOLLY HANCE, ESQ.
      Royal Washburn Will
15    4799 Sugarloaf Parkway
      Building J
16    Lawrenceville, Georgia   30044

17
      On behalf of McMillan:
18
      MATTHEW R. LaVALLEE, ESQ.
19    Daley, Koster & LaVallee, LLC
      2849 Paces Ferry Road
20    Suite 160
      Atlanta, Georgia   30339
21

22

23

24

25

                                                      Page 2
```

1                          I N D E X

2    Examination by Mr. Corn-Revere                    4

3    Examination by Mr. LaVallee                     263

4

5                        E X H I B I T S

6    Plaintiff's

7    1         Chronicle Article of 8/5/05            14

8    2         "Unofficial Biography of..."           24

9    3         Minutes of Comm. Board                 29

10   4         Email 5/30/07 Neely to Zaccari         38

11   5         6/21/07 From Zaccari to Neely          54

12   6         Flyer                                  60

13   7         Email from Boyd to Sethna              70

14   8         Email from Daniels to Zaccari          99

15   9         Email from Barnes to Zaccari          123

16   10        Collage                               133

17   11        Face Book pages                       133

18   12        VSU Transcript for Barnes             178

19   13        Student Academic Transcript           178

20   14        Note to Zaccari re: Barnes GPA        178

21   15        Email from K. Boyd to T. Boyd         203

22   16        Letter to the Editor                  205

23   17        Valdosta Daily Times/Spectator Article 217

24   18        Withdrawal letter                     231

25   19        Email from Gaskins to Neely           233

                                              Page 3

```
 1                    E X H I B I T S

 2   Plaintiff's (Cont'd)

 3   20        Fax 5/1/2002 From Neely to Gaskins      237

 4   21        Memo from Gaskins to Zaccari            242

 5   22        Memo from Gaskins to Zaccari            243

 6   23        Letter From Zaccari to Board            248

 7   24        Letter from Winders to Zaccari          248

 8   25        Memo to Admin. Staff from Zaccari       257

 9

10   Defendant McMillan's

11   26        Deft. Zaccari Resp/Plaintiff's First Interrog.273

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
404.351.4577

```
 1              MR. WILL:  In response to the request from
 2       Plaintiff's counsel, I had agreed to withdraw a portion
 3       of the response to Interrogatory Number Three where we
 4       had objected to conversations that Dr. Zaccari had with
 5       counsel.
 6              And, so, for the purposes of doing that today, we
 7       are waiving that.  Withdrawing it.  I'll be happy to
 8       confirm it in writing to you, but feel free to ask about
 9       any conversations he had with counsel, including
10       Ms. Gaskins or Ms. Neely.
11              MR. CORN-REVERE:  Thank you for that clarification.
12       I don't think it will be necessary to put it in writing,
13       and it is on the record of this deposition.
14              Could you swear the witness.
15       THEREUPON,
16                       DR. RONALD ZACCARI,
17       having been first duly sworn, was examined and testified as
18       follows:
19                       EXAMINATION
20       BY MR. CORN-REVERE:
21       Q      Could you, please, state your name for the record.
22       A      Ronald Zaccari.
23       Q      Good morning, Dr. Zaccari.  My name is Bob
24       Corn-Revere as you know.
25              Along with the my associate, Erin Reid, we
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    represent Hayden Barnes in this matter.  We'll be conducting

2    today's deposition by asking you a series of questions and

3    asking you to answer them for the record.

4           Your answers will be transcribed by the court

5    reporter; and then at the conclusion of the deposition, you

6    will have an opportunity to review the transcript and THEN

7    sign it.  I assume that is something you'll want to do.

8           MR. WILL:  Yes.

9           MR. CORN-REVERE:  Before we go further, just to

10   confirm on the record, we will have the standard

11   stipulations as to objections.  That is, objections will

12   be reserved except as to form or questions of privilege.

13   Are we all agreed on that?

14           MR. LaVALLEE:  Yep.

15           MR. WILL:  Yes.

16   BY MR. CORN-REVERE:

17   Q     Okay.  Dr. Zaccari, have you been deposed before?

18   A     No.

19   Q     But I do know that you've attended a number of the

20   depositions in this case, so you're probably fairly familiar

21   with the process.

22           But just for purposes of clarification, let me go

23   through a couple of points right at the outset.

24           As I mentioned before, I'll be asking you a series

25   of questions and asking you to respond.

Page 6

1          It may be painfully obvious when I get halfway
2     through a question what I am going to ask, but I would ask
3     of you to be patient and wait for the end of the question
4     before you answer so that the transcript will clearly
5     reflect what the full question is and then the full answer
6     is.
7          In normal, everyday conversation, people often talk
8     over each other; and we'll try to avoid that.  It is not a
9     very natural way to communicate, but it is the process for
10    depositions.
11         I would also ask that you make sure that your
12    answers are made verbally so that you have a clear answer on
13    the record.  Quite often people will simply nod their heads
14    or something like that in response to a question, but that
15    doesn't show up too well on a deposition transcript.
16         Are there any questions that you have before we
17    begin?
18    A     Not a question.  I think a point of reference.  I
19    have a severe hearing problem.  I have the latest technology
20    in both my ears.  There are times when I may not clearly
21    hear everything that you say.
22         At times you may see me trying to adjust the
23    hearing systems.  There are four different settings.  So,
24    while we're going through this, you may see some adjustments
25    going on.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          It's only because I'm trying to get the right level
2     to clearly hear everything that's being asked or said.
3     Q     Okay.  Well, thank you for making that clear at the
4     outset.  I will endeavor to be as clear as I can and as
5     articulate as I can in asking questions.
6          If for any reason you don't hear what I say, please
7     ask me to repeat it.
8          As well, if the question is simply unclear because
9     of, you know, an error on my part in phrasing a question,
10    please let me know that you don't understand the question;
11    and I will try and rephrase it so that you do understand it.
12    A     Thank you.
13    Q     Now are there any other reasons why you may have
14    difficulty hearing or being able to respond to questions
15    that we should know about?
16    A     No.
17    Q     Are you on any kind of medication that may affect
18    your ability --
19    A     No.
20    Q     -- to answer questions?  And, again, I don't mean
21    to be rude; but, please, let me finish the question --
22    A     Okay.
23    Q     -- and then respond.
24    A     Okay.
25    Q     What is your current address?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A       3 St. Andrews Circle, Valdosta, Georgia, 31605.

 2      Q       What is your current occupation?

 3      A       Retired.

 4      Q       And what was your occupation before that?

 5      A       President of Valdosta State University.

 6      Q       How long did you have that position?

 7      A       Six point five years.

 8      Q       How would you describe your job responsibilities as

 9    the President of Valdosta State?

10      A       Responsibility for a budget of about $132 million

11    annually.  Responsibility for the operation -- the

12    day-to-day operation of the institution.

13              Basically, the governance of the operation of a

14    regional university within University System of Georgia.

15      Q       Okay.  In the time that you were President of

16    Valdosta State, was parking on campus a problem?

17      A       Yes.

18      Q       Could you describe that?

19      A       Well, we had a lot of complaints from people in the

20    community, especially the neighborhoods that surrounded the

21    university because of the lack of parking, surface parking

22    on the campus.

23              City Council received a great deal of complaints

24    about students parking in their driveways, parking on their

25    lawns, blocking access to their homes.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1             It was a problem before I arrived in January of
2      2002.  It was part of the master plan discussion that was
3      approved by the Board of Regents in 1999.
4             Students constantly complained about the lack of
5      accessibility and the lack of parking.  The campus was
6      surrounded by historic neighborhoods.  The university really
7      had no place to acquire adequate land that would be
8      contiguous to the university that would provide that type of
9      parking facilities or spaces to support the growing
10     enrollment at Valdosta State University.
11            I arrived in 2002.  There were approximately 7800
12     students.  When I finished, we were close to 11,000.  So, it
13     was a dramatic increase.
14            The Board of Regents have required the universities
15     to support growing number of students attending the
16     University System of Georgia, and we were directed to begin
17     master planning and strategic planning to increase
18     facilities and parking.
19            As I submitted in earlier statements, that master
20     plan was approved by the Board of Regents in May of 2004
21     after 18 months of planning on campus.
22            So, the master plan showed documentation that we
23     were about 2200 parking spaces below what we would need to
24     sustain the operation of the institution and prepare for the
25     growth of the university.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          I hope that addresses your question that there was

2     a need.

3     Q     No.  That's fine.  Actually, it reminded of

4     something that I neglected to ask before getting to that.

5     And that is:  Did you do anything to prepare for today's

6     deposition?

7     A     Yes.

8     Q     What did you do?

9     A     I read through materials that were submitted and

10    had a meeting with Holly Hance yesterday.

11    Q     Okay.  Now I'm not going to get into any

12    conversations you may have had with current counsel.  I'm

13    not going to ask you about any privileged conversations.

14    But did you talk to anyone else in preparation for this

15    deposition?

16    A     No.

17    Q     Did you talk to any of the other defendants in this

18    case?

19    A     No.

20    Q     Have you spoken with any of the other defendants in

21    this case recently?

22    A     No.  Just a casual "hello."

23    Q     To which of the defendants?

24    A     I saw Russ Mast.  He was going into a meeting last

25    week, and I was in the parking lot.  I was getting into my

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    vehicle and I said hello.
 2        Q    Which of the documents did you review before
 3    today's deposition?
 4        A    Interrogatories.
 5        Q    Your interrogatories?
 6        A    Yes.
 7        Q    Anything else?
 8        A    I looked at a calendar of events that began with
 9    the posting of the flyers and through the calendar up to the
10    point of the withdrawal letter.  From the point of March
11    23rd to May the 7th, I went through the chronology of
12    events.
13        Q    Anything else?
14        A    Some of the policies that govern the institution.
15        Q    Do you remember which policies those are?
16        A    I looked at Policy 1902, the Board of Regents
17    statement.
18        Q    Anything else?
19        A    Academic probation, suspension.
20        Q    Did you look at the administrative withdrawal
21    policy?
22        A    That's 1902.
23        Q    Anything else referred to as an administrative
24    withdrawal?
25        A    No.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q      Did you review any other policies?

2      A      The medical withdrawal policy.

3      Q      Is that the VSU medical withdrawal policy?

4      A      That's the one that was dated 1983 from the Board

5    of Regents.

6      Q      But I guess my question is:  Is that a policy that

7    has been adopted by Valdosta State University?

8      A      No.

9      Q      Did you review any other policies?

10     A      No.

11     Q      Did you review any other documents other than the

12   interrogatories, the calendar event and the policies you

13   just mentioned?

14     A      No.  I reviewed the letter that I sent to Betsy

15   Neely in terms of the application of -- for review that

16   Mr. Barnes submitted his appeal, and I was directed by the

17   Board of Regents to respond.  That's the letter that is

18   dated June 21st, 2007.

19     Q      Did you read that letter in detail?

20     A      Yes.

21     Q      I believe you testified that ever since you assumed

22   the position of President at Valdosta State that parking had

23   been a problem at the university and that you and the Board

24   of Regents had taken steps to address the parking problem.

25   Is that correct?

1      A     Yes.

2      Q     From time to time, did you propose the creation of

3  new parking lots?

4      A     Yes.  Are you talking -- is the question about a

5  surface parking lot, or are you talking about a parking deck

6  facility?

7      Q     Actually, my question was very general.  It was any

8  kind of parking facility whether a surface parking lot or a

9  parking deck.

10     A     Yes.  Both.

11     Q     Okay.  Were there many such proposals?

12     A     The proposals came through the master planning

13  process which engaged the campus and the community.

14     Q     Was there a proposal in 2005 to build a parking

15  lot -- by that, I mean a surface parking lot -- on the lawn

16  of the university?

17     A     No.  There was never a plan to build a parking lot

18  on the front lawn of Valdosta State University.

19           MR. CORN-REVERE:  Let's mark as Zaccari Deposition

20      Exhibit Number One an article from the Chronicle of

21      Higher Education dated August 5, 2005.

22           (The document was marked for identification as

23      Plaintiff's Exhibit Number One.)

24           THE WITNESS:  (Reviewing document.)

25  BY MR. CORN-REVERE:

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Have you had a chance to review that exhibit?

2    A    Yes.

3    Q    Okay.  Now the article from August 2005 describes a

4    plan to build a parking lot on the front lawn.

5         Is this article incorrect?

6    A    Yes, it is incorrect.

7    Q    Could you tell me how it is incorrect?

8    A    It is incorrect in the sense that the parking lot

9    that is now present on the campus was the parking lot we

10   were referring to, which was an expansion of the faculty

11   parking lot.

12        It included the increase of about 15 to 20 cars so

13   that we could have a gated entrance for the faculty when

14   they came in for their daily class schedules.

15        And then in the evening it was open for student

16   parking.  So, that is far from building a parking lot on the

17   front lawn of the campus.

18        Ms. Zahn, obviously, misinterpreted the fact that

19   we were expanding the parking lot by about 20-some

20   automobiles in order to have a new access and put the new

21   traffic lights in on Patterson Avenue.

22        So, there was never any plan to build a large

23   parking lot and do away with the front lawn.

24   Q    Just to make sure I understand, there was a plan to

25   expand a parking lot on the front lawn.  Is that right?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1       A       To expand the current parking lot, not to build.
2    This article leads the reader to believe, in my opinion,
3    that we were doing away with all the green space in the
4    front part of the campus and turning it into a parking lot.
5            You asked earlier, "Is it incorrect?"  It is
6    incorrect.
7       Q       Okay.  Could you point to the part of the
8    article -- or describe for me the part of the article that
9    suggests that the entire front lawn was going to be paved
10   over.
11      A       Well, it says, "They were dismayed to find that
12   sometimes gravel would win out."  There was no gravel to be
13   included in this plan.
14           (Reading) When the administration posted plans to
15   turn a large portion of their beloved -- it was not a large
16   portion.  It was -- I'm not going to project what portion.
17           But to enlarge the parking lot for one row of
18   additional cars is not, in my opinion, a large portion of
19   the beloved front lawn.
20      Q       Okay.  Am I correct in saying that your testimony
21   is that the article got some of the details of the plan
22   wrong?
23      A       I would say that the article that was in the
24   Chronicle was totally unfocused in the exact activity that
25   was going to be included in the discussions in the master
```

Page 16

1    plan.

2        Q    Okay.  Now the article also talks about a student

3    named Ashley Zahn who collected signatures on a petition --

4        A    Yes.

5        Q    -- to oppose the plan to expand the parking area in

6    the front lawn.

7             Do you remember that happening?

8        A    Well, I want to correct your question, if I may.

9        Q    Please do.

10       A    Her petition was to the perception that we were

11   going to do away with the entire front lawn, not to expand

12   the parking lot by an additional row of cars.

13       Q    Okay.  So, Ms. Zahn was incorrect in her

14   assumptions about what the university's plans were?

15       A    That's what I'm saying, yes.

16       Q    Okay.  But, nevertheless, she did submit a

17   petition --

18       A    Yes.

19       Q    -- to the university to stop the construction.  Is

20   that right?

21       A    She developed a petition based on her

22   misunderstanding of what was going to happen.  I am hoping

23   that you are going to follow-up with another question.

24            We met with Ms. Zahn out on the front lawn and

25   showed the projected design of the increase in parking lot.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    I think that clarified.  But, basically, Ms. Zahn,

2    obviously, contacted the Chronicle of Higher Education

3    before she had an analysis of exactly what was going on, and

4    that resolved the issue.

5        Q    What makes you think Ms. Zahn contacted the

6    Chronicle?

7        A    She contacted the Chronicle from what I understood.

8        Q    Well, she is quoted in the Chronicle, but do you

9    have other information that suggests she called the

10   Chronicle office?

11       A    I understood that she did in my conversation with

12   her.  She may not have.

13       Q    Okay.  She didn't tell you one way or other?

14       A    Well, that was -- I don't remember clearly whether

15   she told me, but my understanding was that she made the

16   contact.

17       Q    So, after the petition drive was conducted, what

18   happened?  You met with Ms. Zahn --

19       A    And other student government representatives out

20   there showing the projected drawing of the increase of the

21   additional row of cars and how the lot would be used for

22   student support.

23            After five o'clock in the evening, the gates are

24   open and the students would be able to come in there and

25   park and enjoy the front lawn and the activities that they

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     usually enjoyed out there.

2            In my opinion, it settled an issue that we were not

3     going to gravel or pave the entire front lawn.

4       Q     When the petition was submitted, did you summon

5     Ms. Zahn to your office?

6       A     No.

7       Q     How did this meeting get arranged to discuss the

8     petition with her?

9       A     I believe the downtown newspaper had picked up what

10    was going to happen and, of course, higher education

11    environment, people begin to talk.

12           So, Ms. Zahn's idea that we were going to tear out

13    the front lawn started moving across campus.

14           So, I met with student government leaders and

15    arranged a meeting on the front lawn to have the reporter

16    from downtown, as well as Ms. Zahn and some student

17    government leaders, to clarify exactly what we were going to

18    do, show how it integrated to the master plan that was

19    approved by the Board of Regents and that that project had

20    to go through approval by the Board of Regents and the

21    preliminary plans had been given the go-ahead.

22           So, these changes were well outlined in the master

23    plan, and I have testified before in my reactions to the

24    master plan that was developed over 18 months.

25           This was a charge that I was given by the Board of

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Regents.  A new president comes in, the president must begin

2    a new strategic plan, must begin a new master plan.

3           I testified earlier this morning that in 1999 the

4    master plan was approved when Dr. Bailey was the President.

5    When I came in in 2002, I was directed to do a master plan

6    projecting ten years out.

7           I had appointed faculty to the master plan

8    committee.  I had students that were elected by the student

9    government association to be a part of that committee.

10          I had staff representatives appointed or elected by

11   the staff counsel.

12          I had administrators.  I had people from the

13   community representing the historic neighborhoods, and I had

14   the city manager from Valdosta as part of that master plan

15   committee.

16          We had many open fora.  We brought people to open

17   discussions.  We had public presentations for the community.

18   We had public presentations open for faculty and staff and

19   students and presented updates on the master plan.

20          I gave presentations to the faculty senate meetings

21   about the master plan and what was going to occur as a part

22   of the accepted 2004 master plan.

23          My point is this:  Everything that -- all of the

24   advance renovation and new facilities for the university

25   were outlined in that master plan projecting to 2014.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1              So, if a student takes something out of context and

2     begins a petition, first reaction is try to clarify the

3     situation.  So, that's what we did.

4        Q      So, it's fair to say that a great deal of work went

5     into the development of the master plan?

6        A      Yes.

7        Q      And you gathered a great deal of information in

8     fashioning the master plan and how it should be consistent

9     with the university's goals?

10       A      Yes.

11       Q      Was this 2005 expansion of the faculty parking on

12    the university lawn part of that master plan?

13       A      I believe it was, yes.

14       Q      And it, I believe, was your testimony that Ms. Zahn

15    was mistaken in bringing this petition drive?

16              MR. WILL:  Objection.  Form of a question.

17    BY MR. CORN-REVERE:

18       Q      Let me try and clarify.

19              Ms. Zahn was mistaken in her understanding of what

20    was proposed --

21       A      Yes.

22       Q      -- which she petitioned against the creation of

23    this expansion?

24       A      Yes.

25       Q      Did her petition concern you?

Page 21



```
 1     A     No.   I don't think it concerned me in the sense it
 2     was -- the publicity coming out of it was inaccurate, so I
 3     felt that we needed to clarify exactly what was going on.
 4     Q     So, if a student comes to you with incorrect facts,
 5     in this case the proper response was simply to counter that
 6     with the real facts.   Is that right?
 7     A     We sought clarification because it was not
 8     consistent with the master plan.   That's what she was
 9     saying.
10           The master plan was a reference that was important,
11     and we never had an intention to close off the front lawn as
12     was projected by the petition and the articles in the local
13     newspaper, as well as the Chronicle.
14     Q     What happened after you met with Ms. Zahn and with
15     other students leaders?
16     A     Nothing.   It was resolved.
17     Q     After you explained the actual intentions, they
18     dropped their petition drive?
19     A     Nothing happened from that point forward.   It was
20     resolved.
21     Q     Were any changes made in the planned parking lot on
22     the lawn?
23     A     We may have made some minor modifications.
24           For example, we felt it was necessary that there be
25     a sidewalk leading from the front entrance of the
```

Page 22

```
 1    university, which is now there so that the students would

 2    not have to walk through the parking lot and would be able

 3    to safely walk around the parking area and then into the

 4    pedestrian walkway area.

 5        Q    Let me direct your attention to the second-to-last

 6    paragraph of Exhibit One.

 7        A    (Reviewing document.)

 8        Q    Where it reads, "A week after Ms. Zahn began her

 9    petition, he" -- meaning Dr. Zaccari -- "called a meeting

10    with the junior and a few other students in which he agreed

11    to scale back the parking to leave most of the lawn intact."

12             Did I read that correctly?

13        A    You read it correctly.

14        Q    Is the statement correct?

15        A    No.

16        Q    What's wrong with it?

17        A    Because we never intended to put a parking lot on

18    most of the lawn.

19        Q    Okay.  But did you scale back the plans at all in

20    constructing the expansion?

21        A    I wouldn't say "scaled back."  We may have

22    reconfigured it, but I think the same number of parking

23    spots were included.

24        Q    But you did make some changes in the parking lot

25    design?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1       A       Minor modifications, yes.

2       Q       During the time you were President of Valdosta

3   State University, are you aware of any instances in which a

4   student was sanctioned or disciplined for the exercise of

5   First Amendment rights?

6       A       No.

7       Q       Let's mark as Zaccari Deposition Exhibit Number Two

8   an article from the Spectator entitled "The Unofficial

9   Biography of Robert Carlos Cortez Zaccari."

10              (The document was marked for identification as

11      Plaintiff's Exhibit Number Two.)

12              MR. WILL:  It's hard to read so take your time.

13      We've already had that discussion in the previous

14      depositions.

15              (Pause)

16  BY MR. CORN-REVERE:

17      Q       Have you had a chance to look at that exhibit?

18      A       It's kind of difficult to read.

19      Q       Yes.  It is, unfortunately, difficult to read.

20              Can you identify that exhibit for the record?

21      A       I remember it.  I do remember it was posted in the

22  Spectator, yes.

23      Q       So, you've seen this article before?

24      A       Yes.

25      Q       Did you see it at the time that it was published in

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    the Spectator?

2       A    Yes.

3       Q    What was your reaction to it when you saw it?

4       A    I didn't have much of a reaction to it.  It was a

5    student writing in the university newspaper, and I assumed

6    it was a parody on his thoughts.

7            He wrote it.  It was published in the newspaper,

8    and there was no reaction to it other than students do that.

9       Q    Is publishing a parody like this something that the

10   students have a First Amendment right to do?

11           MR. WILL:  I object to the form of the question.

12   BY MR. CORN-REVERE:

13      Q    Do you understand the question?

14      A    It appeared.  It was in the newspaper.  Nothing was

15   said about it or done about it.

16      Q    Does this appear to be your photograph that appears

17   in this parody?

18      A    It is my photograph.

19      Q    I mean, admittedly, it's a terrible Photoshop job.

20   But, again, it does appear to be your photograph that's been

21   pasted over other photographs.  Is that right?

22      A    Yes.

23      Q    Now in reading this article -- and I understand

24   it's difficult to read this small print, and it's kind of

25   fuzzy.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          But did you see anything in this parody that you

2     considered to be threatening personally?

3     A     No.

4     Q     Did you read the last paragraph of the parody?

5     A     (Reviewing document.)

6     Q     Just so we have it on the record, let me read it.

7          The last paragraph reads, "Now, it was time for

8     students to start a revolution and to rise against the

9     powers that celebrate the corruption of their leader.

10    Students were ready to shoot the man down, but they simply

11    enacted his own very beliefs and kicked him in the nuts."

12         Did I read that correctly?

13    A     Yes.

14    Q     Do you see anything in that that you consider to be

15    personally threatening?

16    A     I think it was a student's opinion.  I didn't think

17    it was threatening in a sense that I had no understanding

18    who Kerry Laster was.

19    Q     Kerry Laster meaning the author of the article.

20    A     That's what it says here.  I had no information

21    about him.  I didn't know who he was.  He was a student

22    journalist writing for the Spectator staff and that was his

23    entry.

24    Q     So, this is a perfectly acceptable form of

25    parody to you?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    I didn't say it was acceptable.  I said it was --
2    nothing was done nor any investigation done in what was
3    behind it.

4    Q    Did you ever have a conversation with Dr. Pat
5    Miller, the Spectator advisor, about this article?

6    A    I asked her about it, yes.

7    Q    Can you tell us what you recall about that
8    conversation?

9    A    I asked her if this was within a format of
10   acceptable student journalism.  Is this the kind of thing
11   that we wanted to represent at the university.

12        And she said that this was the type of thing that
13   if a student journalist wanted to write it, there wasn't
14   much that could be done about it.

15        Clarification.  Move on.

16   Q    Did you suggest to Dr. Miller that something should
17   be done about the article?

18   A    No.

19   Q    Did you have a conversation about this article with
20   any other administrator at Valdosta State?

21   A    I may have discussed it with the Academic Vice
22   President.

23   Q    And who is that?

24   A    Dr. Louis Levy.  L-E-V-Y.

25   Q    Do you remember the conversation with Dr. Levy

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    about the article?

2       A    No.

3       Q    Did you discuss it with anyone else?

4       A    I don't believe so.  Not that I remember.

5       Q    Did you discuss it with Dean Mast?

6       A    I do not remember.

7       Q    Did you ever discuss the possibility of legal

8    action on the basis of this article?

9       A    No.

10      Q    With anyone?

11      A    No.

12      Q    Did you ever hear of anyone who did suggest that

13   this article might be the basis of legal action?

14      A    No.

15      Q    Do you know whether or not Dr. Miller took some

16   sort of corrective action after this article was published?

17      A    I don't know what she did.

18      Q    Do you know whether or not the editors responsible

19   for this article were suspended?

20      A    No.

21      Q    Would it surprise you to learn that they were?

22      A    Well, what would be -- what was the suspension

23   about?  If I don't know what the suspension was, what was it

24   about?

25           MR. WILL:  You can't ask questions.  He gets to ask

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1      the questions.
2            MR. CORN-REVERE:  Don't worry.  I wasn't in danger
3      of answering.
4            But we will mark now as Deposition Exhibit Number
5      Three the minutes from a November 17th, 2006, meeting of
6      the Campus Communications Board.
7            (The document was marked for identification as
8      Plaintiff's Exhibit Number Three.)
9      BY MR. CORN-REVERE:
10     Q     I'd ask the witness to take a look at that.
11     A     (Reviewing document.)
12           (Pause)
13     A     Okay.  I've completed reading it.
14     Q     Okay.  Let me just ask a few questions about it.
15     Are you now aware that the editors responsible for the
16     article were, in fact, suspended?
17     A     If they were, I go back to my earlier point.  I did
18     not know why Dr. Miller moved forward with that suspension
19     recommendation other than the fact that someone believed it
20     was in poor taste.
21           And I do not really understand a section here.  It
22     says, "They stated that they knew that the article was in
23     poor taste.  It was meant as a test for Leah Cassoria to see
24     if she would run it."
25           So, obviously, there was something going on
```

WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    internally between the staff writers and the editor, Leah,
 2    about how far they could go with something that would allow
 3    the editor to run it without any kind of a negative
 4    feedback.
 5           So, obviously, there was negative feedback.
 6    Obviously, some people thought it was done in very poor
 7    taste.
 8           And Dr. Miller, obviously, according to the meeting
 9    minutes, recommended suspension or removal of the
10    individuals.
11    Q     Were you one of the people that thought that the
12    article was done in poor taste?
13    A     Obviously, I think it was -- it was the type of
14    article that represents the university.  Yeah, I did think
15    it was done in poor taste, yes.
16    Q     Okay.  Was that the substance of your conversation
17    with Dr. Miller about the article:  To convey your belief
18    that the article was in poor taste?
19    A     I told her that I -- I asked, again, about
20    journalism rights and to have the discussion about was this
21    the type of -- was it intended to be a creative writing
22    piece?
23           If it was a creative writing piece, then,
24    obviously, it was very different.
25           And that's what I understood:  That this was an
```



1    individual, Mr. Laster, that took this and wanted to create

2    it in such a way that he thought it was a creative writing

3    piece.

4            So, again, not having any understanding of

5    Mr. Laster; never had an opportunity to interact with him.

6            So, that was his entry.  And why Dr. Miller wanted

7    to go forth with the suspension, what was going on

8    internally with the interactions between the editor -- or I

9    should say among all the Spectator writers and the editor, I

10   have no idea.

11   Q     Well, actually, I was just asking about your

12   conversation with Dr. Miller.

13           MR. WILL:  You need to listen to the question and

14       answer the question.  If you don't hear it, ask him to

15       repeat it.

16   BY MR. CORN-REVERE:

17   Q     Yeah.  So, my question was:  You had a conversation

18   with Dr. Miller about whether or not the article was in poor

19   taste, if I understood your testimony.

20           And at the beginning of your answer, you said that

21   part of what you talked about was, I believe you phrased it,

22   "journalism rights."  Is that correct?

23   A     Yes.  It's within the university structure and

24   university newspapers, yes.

25   Q     Okay.  What did you mean by journalism rights?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      What I mean is how students can write articles and
2   how the university has some response to what goes in, if it
3   gets to that borderline where there's a question about it.
4            People -- an example:  People from the community
5   read the university newspaper, and I would get calls at the
6   President's office about "how can you allow the students to
7   use those words."  Or how can you --
8            I mean, this doesn't represent higher education.
9   This represents something else.
10           And, so, we would respond saying, "It's within the
11  journalism rights of the student newspaper to say -- to use
12  certain kinds of words."
13           That's what I meant by the journalism rights.
14     Q      Okay.  Did you receive calls about this article?
15     A      No.  I don't believe I received any calls.
16     Q      So, you initiated this conversation with Dr. Miller
17  on your own?
18     A      I asked -- I asked her about the article, yes.
19  About what was the intent.
20     Q      Did you summon Dr. Miller to your office for that
21  conversation?
22     A      When you use the word "summon" --
23     Q      Did you invite Dr. Miller to your office for that
24  conversation?
25     A      I had a conversation with her.  I'm not sure if it

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    was in my office or at some other venue or meeting.  But I
2    did talk to her about it, yes.
3        Q     Did you have just one conversation or more than one
4    conversation?
5        A     Don't remember.
6        Q     Do you recall how long it lasted?
7        A     No.
8        Q     In your conversation about journalism rights, did
9    you suggest that this article may have crossed the boundary
10   beyond what journalism rights would permit?
11       A     I thought it was done in poor taste.  I don't think
12   it went across the journalism -- if it was intended to be a
13   creative writing piece.
14       Q     But did you ask the question whether it might cross
15   the boundary beyond journalism rights?
16       A     I asked how -- I asked how such articles go through
17   an approval process before they are printed.
18            My understanding was the editor had to approve all
19   of the entries submitted by the Spectator staff writers --
20   primarily the students -- and that the editor had some
21   approval rights, and then Dr. Miller sat as a faculty
22   advisor but tried to stay out of that interaction.
23            That's why I'm somewhat concerned here that this
24   statement -- that there was something going on inside among
25   the students and the editor, also a student testing her.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Testing her on what? I don't know.

2       Q    Okay.

3       A    They said that the article was in poor taste. The

4    students admitted it was in poor taste, but it was meant for

5    a test for Leah.

6            So, maybe the President was used as a conduit to

7    test Leah.

8       Q    Let me try and summarize questions that I think may

9    have been asked. And if I'm getting it wrong, please

10   correct me.

11           But based on your testimony, is it fair to say that

12   you asked Dr. Miller, first, what the approval process was

13   for articles; and, secondly, how this article got approved?

14           Is that a fair summary?

15      A    No. I would eliminate your second point. I asked

16   her what was the process -- what was this article about?

17      Q    Did I just get the sequence wrong?

18      A    No. I didn't ask about the approval process. I

19   asked what was this about. She said it was a creative

20   writing piece.

21      Q    And that was the end of the conversation?

22      A    Again, that's a long time ago. I think that was

23   the issue: What was this article? Was it within what she

24   expected in terms of faculty advisor or the type of writing

25   that goes into the university newspaper?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1     Q      How did the topic of journalism rights get into the
 2   topic?
 3     A      That's a major topic across all of higher
 4   education.  There are constant inquiries about student
 5   entries in university newspapers, whether they go too far
 6   beyond a particular line of getting into issues that just
 7   don't represent student journalism.
 8            And it often becomes contentious.  There is other
 9   universities where there were always issues about
10   credibility.
11            For example, if a student ran an article about a
12   particular topic, they were expected to do in-depth
13   research, understand what they're talking about and present
14   it so readers would understand what's behind the article and
15   the statements.
16            But if a student simply gave an impression, gave an
17   opinion that was not backed by data and accurate
18   information, then it seemed not to fit student journalism;
19   because at some point in their professional careers, they
20   would have an opinion but it should be based on facts.
21            So, there's always this incessant dialogue with
22   newspapers and administration about the quality of the
23   research and when they put items into the newspaper, it has
24   credibility.  It's always been an issue.
25     Q      I think that's an excellent answer in terms of
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    journalism and censorship controversies across the county,
 2    and I do want to ask you something about that; and then I'd
 3    like to get back to your conversation with Dr. Miller.
 4            But with respect to your general answer, you said
 5    that one of the problems is if student opinions are not
 6    backed by data or facts.
 7            Is it your opinion that if a student opinion is not
 8    backed by accurate data or facts that that goes beyond
 9    journalism rights?
10    A    That's why the discussion with Dr. Miller was how
11    does this institution -- so, we're not generalizing across
12    higher education.
13            How does this institution approach this type of
14    work and the research that should go behind it?
15            And I think she openly discussed that, and I didn't
16    have any problem with it.
17    Q    Okay.  And, again, with your conversation with
18    Dr. Miller, how did journalism rights come into it?
19            MR. WILL:  I believe he's answered that.
20    BY MR. CORN-REVERE:
21    Q    I'm not sure I understood his answer.
22    A    We talked about journalism rights because it is a
23    question that comes up all the time.
24            Does this type of writing fit what Valdosta State's
25    Spectator -- is this the kind of work that we want to
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    represent?
 2             How does it fit into the student's journalism
 3    rights?
 4        Q    Looking at Exhibit Number Three, if you could look
 5    at the third paragraph, the second sentence states,
 6    "Dr. Miller stated that she had 'no other option' in
 7    temporarily suspending the editors of the Spectator
 8    regarding the November 9th article in the Darkside section
 9    of the Spectator."
10             MR. WILL:  I think it's actually paragraph four.
11             MR. CORN-REVERE:  I wasn't counting the list of
12    participants.
13    BY MR. CORN-REVERE:
14        Q    Do you see that sentence there?
15        A    I see it.
16        Q    Is it possible in your opinion that Dr. Miller
17    reached the conclusion that she had no other option but to
18    seek suspension as a result of her conversation with you?
19             MR. WILL:  I object to the form of the question.
20    Calls for speculation.
21             THE WITNESS:  No.
22    BY MR. CORN-REVERE:
23        Q    You don't know if it's possible?
24             MR. WILL:  Once, again, I object.
25             THE WITNESS:  No.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    BY MR. CORN-REVERE:
 2        Q    Did anyone ever report to you that the editors of
 3    the Spectator had been suspended?
 4        A    It came to my attention.
 5        Q    How did it come to your attention?
 6        A    I don't remember.  It wasn't anything in formal
 7    writing presented to me.
 8        Q    Did Dr. Miller tell you?
 9        A    Don't remember.
10        Q    In describing the materials that you reviewed in
11    preparation for today's deposition, you mentioned the letter
12    that you sent to Elizabeth Neely dated June 21, 2007.
13        A    Yes.
14        Q    Was that your response to Mr. Barnes'
15    administrative appeal in this case?
16        A    Yes.  It's the information that they requested.
17             MR. CORN-REVERE:  Let's mark as Zaccari Deposition
18        Exhibit Number Four a May 30th, 2007, letter from
19        Elizabeth E. Neely to President Zaccari.
20             (The document was marked for identification as
21        Plaintiff's Exhibit Number Four.)
22             THE WITNESS:  (Reviewing document.)
23    BY MR. CORN-REVERE:
24        Q    Have you had a chance to read that exhibit?
25        A    Yes.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Could you identify it for the record?

2    A    It's a letter that you made reference to in your

3 presentation of Exhibit Four.  It was a letter from

4 Elizabeth Neely to me on May -- dated May 30th of 2007.

5    Q    Okay.  And it was your understanding that this was

6 the letter from the Board asking for your official response

7 to the administrative appeal filed by Mr. Barnes?

8    A    Yes.

9    Q    Is that Ms. Neely's signature on the letter?

10    A    Yes.

11    Q    Now before you received this letter, had you

12 previously spoken to Ms. Neely about Mr. Barnes?

13    A    I had a -- yes, because this was -- this was dated

14 May 30th.  So, obviously, I had discussions with Ms. Neely

15 prior to this because the letter of withdrawal

16 administratively withdrawing Mr. Barnes was dated May 7th.

17 So, obviously, I had conversations prior to this date.

18    Q    What were those conversations?

19    A    I had a discussion with Ms. Neely about the events

20 that were unfolding at Valdosta State University and my

21 concerns about what was taking place and asked her opinion

22 about those concerns.

23    Q    Do you know when this conversation took place?

24    A    It was in my office by telephone with Ms. Neely.

25    Q    Around what date?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A     I believe that had to be the week of March -- the
 2    week of April the 23rd.  Somewhere between the 23rd and the
 3    27th of April.  I would frame it into that week.
 4      Q     You called Ms. Neely?
 5      A     I did.
 6      Q     Did you have more than one conversation with her?
 7      A     I had one conversation that I think was more
 8    substantive in terms of what was happening on the campus and
 9    my concerns.
10            MR. WILL:  The question was did you have more than
11        one conversation.
12            THE WITNESS:  I may have had two, but the first one
13        was more time than the second.
14    BY MR. CORN-REVERE:
15      Q     Did both of those conversations take place the week
16    of April 23rd and the 27th?
17      A     I don't know when the second one took place, but I
18    know -- I believe the first took place during the 23rd to
19    the 27th.
20      Q     Okay.  And of the two conversations, I believe your
21    testimony was that the first one was the more substantive
22    conversation.
23      A     Yes.
24      Q     What did you talk about in that first conversation?
25      A     We talked about my concerns with what we were
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    learning about Mr. Barnes.

2        Q    What did you tell her?

3        A    You're asking to dissect this entire chronology by

4    this question from the beginning to the end?

5            MR. WILL:  What he's saying is what did you tell

6    Betsy in that conversation.

7            THE WITNESS:  I discussed that we had some

8    circumstances that I felt were necessary for her to hear

9    and to get some advice about what the president of one of

10   the institutions within the system might do because there

11   was a growing concern, especially in my office and some

12   other administrators.  University officials, I would will

13   call them.

14           And immediately following the Virginia Tech

15   shootings on April the 16th, there were issues coming

16   out.

17           Each day more and more information was coming out

18   from Virginia Tech in terms of what happened; what the

19   administration did not do; what the administration

20   should've done?

21           Could this thing have been prevented?  What are the

22   circumstances by which we look at issues that were coming

23   out of the Virginia Tech?

24           And if one remains silent of things that are going

25   on, is that the same as investigating and finding out and

Page 41

1     making some decisions about safety of the campus, about

2     safety of the students, about safety of others?

3           And that's what the conversation was about.  What

4     does a university president do?

5           Circumstances that were prevalent at the time --

6     it's very difficult to go back and resurrect how we were

7     all reeling from what happened at Virginia Tech.

8           And this was a very difficult time for presidents

9     across the country to understand the safety of their

10    campuses and what to do.

11          And I was asking Ms. Neely's opinion about how to

12    handle a growing concern.

13    BY MR. CORN-REVERE:

14    Q     Okay.  So, it's fair to say that you sought

15    Ms. Neely's advice on how you should handle a situation on

16    your campus?

17    A     Yes.

18    Q     Just to pick up on something that you just said,

19    you said, "We were all reeling from what happened at

20    Virginia Tech."

21          That was on April 16th, 2007, right?

22    A     Yes.

23    Q     Do you remember what time of day that happened?

24    A     I believe it was about 10:00 a.m.  It was early in

25    the morning, and then the second shootings followed

Page 42

1    immediately after that.  So, there was a series of shootings
2    that followed.
3          So, it was in the morning hours, I'd say, between
4    8:00 a.m. and 12:00 noon.
5    Q    When did you first learn about it?
6    A    We heard about it, of course, immediately.
7    Probably early afternoon, 1:30, 2:00.
8    Q    So, I assume if you were all reeling from what
9    happened at Virginia Tech, you must have cleared your
10   calendar just to deal with that crisis on April 16th, right?
11   A    We were still getting the details coming in, so it
12   was not -- I'm talking -- moving from the 23rd back to the
13   16th.
14   Q    No, no.  Because you referred to Virginia Tech and
15   you said that that happened on April 16th, I'm just trying
16   to find out what your response was on that date.
17   A    Obviously, we were all shocked, but there was no
18   information coming in.
19   Q    Okay.  Again, you set aside time on April 16th to
20   find out more about what was happening at Virginia Tech?
21   A    No.  I don't remember that I specifically set time
22   aside on the 16th.  I had meetings that afternoon.
23   Q    About Virginia Tech?
24   A    No.  I had no meetings about Virginia Tech.  I had
25   a meeting on the 16th with the S.A.V.E. organization, and I



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    had a meeting at 5:00 p.m. with Mr. Barnes.

2        Q    Well, what did you do about Virginia Tech on the

3    16th?

4        A    We weren't doing anything about it on the 16th

5    because we had very little information about what was going

6    on other than there was a shooting on the campus and people

7    were killed.  That's it.

8        Q    Right.  And you learned about that in the early

9    afternoon.  And then did you just sort of put off for

10   several days consideration of what happened at Virginia

11   Tech, or did you devote energies to it on the 16th?

12       A    I did not devote any immediate energy on the 16th

13   because we had very little information.

14       Q    Getting back to your conversation with Ms. Neely,

15   you said that there were two of them.

16            Were they both directed toward asking her advice

17   about what to do on your campus with respect to Mr. Barnes?

18       A    The first one.

19       Q    What was the second --

20       A    The second was simply a follow-up of some other

21   things that -- details possibly that we were learning about

22   Mr. Barnes.

23       Q    Did you take Ms. Neely's advice about how to handle

24   the situation with Mr. Barnes?

25       A    I made no decisions during my conversations with



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Ms. Neely about the outcome of the administrative

2    withdrawal.

3        Q    But after your conversations with Ms. Neely, did

4    you take her advice on how to handle the situation?

5        A    Her advice was that I needed to take the position

6    that I felt would keep my campus and others safe, and that's

7    what I kept in mind as I continued to gather information.

8            Final decision on that administrative withdrawal

9    was not made until several weeks after my discussions with

10   Ms. Neely.

11       Q    And did the actions take into account and implement

12   the advice you'd gotten from Ms. Neely?

13       A    The earlier statement that I made that I needed --

14   as the President of the university, I was empowered to make

15   the decision that I felt was important for my campus; and I

16   did that.

17       Q    But you also called for advice from Ms. Neely at

18   the Board of Regents in making that decision, right?

19       A    I asked Ms. Neely about the circumstances and what

20   does one do in this relationship to what was going on at my

21   university and what was going on with learning about

22   Mr. Barnes.

23           This was early in the week of April 23rd.

24           When all of this was -- when I say "all of this" --

25   when Mr. Barnes was initiating some activity that I thought

Page 45

1    was resolved.

2          I'll give you what I mean specifically so I hope we

3    can put this in the right chronological order.

4    Q    Okay.

5    A    If I go back to the day that the flyers first

6    appeared on campus, that was March the 23rd.  That's a

7    Friday.

8          I don't know when the flyers were posted; but when

9    we came in to open the university that morning, the flyers

10   were posted around campus.

11         My administrative assistant brought one in and

12   said, "These flyers are posted at different locations across

13   the campus."  It was the flyer that you've seen many times,

14   and it's in the exhibits.

15         Nothing was done on that day, the 23rd of March.

16   On the 26th, I had a meeting with the S.A.V.E. organization

17   about -- this was a scheduled meeting that was five or six

18   weeks earlier scheduled to talk about the recycling program

19   and some partnerships that we were developing with the city

20   on recycling.

21         And also we were working with the S.A.V.E.

22   organization to do a major conference of students from all

23   over the Southeastern United States for environmental

24   concerns on the university.

25         I was helping to sponsor that program for the



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    S.A.V.E. organization.  Had a great relationship with those

2    young people.  Very, very proud of the work that they had

3    done.

4           Following that meeting, my understanding is two of

5    the officers contacted Mr. Barnes and said that the

6    President was somewhat concerned about the posting of the

7    flyers and what was -- did S.A.V.E. have knowledge of it?

8    Were they involved in it?  What was their stance since they

9    were the environmental student organization on campus?

10          When I asked them in the meeting, "Do you know

11   Mr. Barnes?"  I had never met him.

12          Said, "Oh, that's just Mr. Barnes.  He's does

13   things on his own.  He wants to go his own way."

14          MR. WILL:  We're getting a little far afield of

15       what the question was.

16          THE WITNESS:  Well, I'm thinking the chronology is

17       important.

18          So, on the 26th Mr. Barnes delivered an apology,

19       and I accepted that apology, not in writing but to the

20       Chancellor.

21          The Chancellor's office was notified that

22       Mr. Barnes had sent the apology, and we were moving

23       forward in a positive direction.

24          Now from that time forward, no reaction from

25       Mr. Barnes.  No concerns.  I thought we had genuinely had



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1        an opportunity to move forward.  I know your question
 2        is --
 3   BY MR. CORN-REVERE:
 4        Q     If I could stop you there for just a second?
 5        A     Sure.
 6        Q     Because you've said a couple of things that I think
 7   could benefit from some clarification.
 8              You mentioned that you'd never had any contact with
 9   Mr. Barnes, and you became aware of the flyers on campus.
10              How did you find out that the flyers came from
11   Mr. Barnes?
12        A     I don't -- when I asked the question, "who's the
13   author," I think it came -- someone knew Mr. Barnes had done
14   it, so it came via my administrative assistant who said the
15   author is Mr. Barnes.
16        Q     So, you learned about the connection between
17   Mr. Barnes and the flyers before your scheduled meeting of
18   March 26th with the S.A.V.E. organization.  Is that what
19   you're saying?
20        A     Yes.
21        Q     Did you make an inquiry about who was the author of
22   the flyers?
23        A     I've said they knew who it was.
24        Q     Well, S.A.V.E. might've known who it was.
25              MR. WILL:  But the question is:  Did you make an
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      inquiry.

2            THE WITNESS:  Did I make an inquiry?

3      BY MR. CORN-REVERE:

4      Q      Yes.

5      A      Yes.  I asked my administrative assistant about who

6      posted the flyers.

7      Q      Okay.  So, you saw the flyers on campus.  You then

8      went to your administrative assistant and said, "Can you

9      find out who's responsible for the flyers?"

10           Is that how it happened?

11     A      I believe that would be a fair sequence, yes.

12     Q      How long before the March 26th meeting did you make

13     that inquiry about the flyers?

14     A      I think I asked about it on the 23rd when they had

15     first appeared.

16     Q      And you got a response from your administrative

17     assistant the same day or thereabout?

18     A      Could've been the 26th.  The following Monday.

19     Q      Okay.  But before the meeting with S.A.V.E.?

20     A      Yes.

21     Q      And at the meeting with S.A.V.E., you brought up

22     the subject of the flyers and Mr. Barnes to the members of

23     that student organization?

24     A      I brought up the flyers because the organization

25     deals with the environment.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1              "Are you aware of the flyer and was it a part of
2    your organization?  Do you agree with the fact that the
3    parking garages should not move forward as outlined in the
4    master plan?"
5              And they knew Mr. Barnes was the author somehow.
6    And I asked him -- I asked them, "Well, what about
7    Mr. Barnes?  Did he ever -- was he part of your
8    organization?  Did he participate?  Do you know why this is
9    an issue?"
10             And that's when they said he was at one time a part
11   of the organization but decided to go off on his own.
12   Q    I believe you testified that members of S.A.V.E.
13   suggested to Mr. Barnes that the President was concerned
14   about the flyers.  Is that right?
15   A    Yes.
16   Q    Did you express concern to the members of S.A.V.E.
17   about the flyers?
18   A    Concern?  I asked questions as an inquiry about
19   where the initiative was coming from.
20   Q    And is it your understanding that based on your
21   discussion of the flyers members of S.A.V.E. then went to
22   talk to Mr. Barnes to say that you'd had that discussion?
23   A    That's what I -- that's what I understood happened.
24   Q    Is it your understanding that as a result of your
25   conversation with S.A.V.E. and S.A.V.E.'s conversation with
```

Page 50

1    Mr. Barnes that then resulted in an apology from Mr. Barnes

2    about the flyers?

3        A    I don't know what prompted the apology, but it

4    appears that Mr. Barnes received information from the

5    students that I was upset.

6            Whether that caused him to write the apology or

7    what the reason, the apology came in and Chancellor's office

8    was notified that issues had been resolved in the campus'

9    opinion and we were moving forward.

10       Q    You notified the Chancellor's office of Mr. Barnes'

11   apology?

12       A    Yes.

13       Q    Why?

14       A    Because Mr. Barnes had written a letter to the

15   Chancellor and the Chancellor always -- the University

16   System, when they receive something, they always go

17   immediately to the campus to get clarification of what's

18   going on.

19           So, when Mr. Barnes' letter arrived, the

20   administrative assistant said, "What's going on?  What's the

21   opposition or the -- trying to shut down the parking decks?"

22           Said, "We don't know."

23           So, did the inquiry.  Talked with S.A.V.E.  That's

24   the only thing that we did at that point.

25           And when the apology came in, I said -- the

Page 51

```
 1    Chancellor's office administrative assistant was notified,

 2    and we spoke very positively about Mr. Barnes then.  We

 3    thought everything was resolved.  He made the apology.  We

 4    went on.

 5          Now nothing was said about the flyers, the

 6    opposition.  No action was taken.  Nothing happened until

 7    about April 13th.

 8    Q    Okay.  We'll get to that.  I mean, I want to return

 9    back to the question at hand.

10          MR. WILL:  What the original question was about.

11          THE WITNESS:  All right.

12    BY MR. CORN-REVERE:

13    Q    First, again, in terms of notifying the

14    Chancellor's office, was it your practice to notify the

15    Chancellor's office anytime a student expressed an opinion

16    publicly on a matter of public policy?

17    A    We were asked what was it about.  I had to respond.

18    That was part of my responsibility to respond.

19          MR. WILL:  What he's asked you was:  Was it your

20          practice as a general rule --

21          THE WITNESS:  Yes.

22          MR. WILL:  -- to respond to the Chancellor when

23          anybody --

24          THE WITNESS:  Yes.

25          MR. WILL:  -- had communication?
```

Page 52

```
 1              THE WITNESS:  Yes.
 2    BY MR. CORN-REVERE:
 3       Q     Okay.  In this case, was there heightened concern
 4    about student opinion because of the petition drive that had
 5    happened in 2005 --
 6       A     No.
 7       Q     -- with respect to -- let me finish the question --
 8    the petition drive that happened in 2005 with respect to the
 9    parking lot on the lawn?
10       A     No.
11       Q     So this was, again, just a matter of your standard
12    practice of notifying the Chancellor's office when there was
13    an opinion on a matter of public policy?
14       A     The Chancellor contacted my office for a response.
15    I did not initiate a response.
16       Q     But, nevertheless, you sent information about the
17    apology on to the Chancellor's office?
18       A     Yes.
19       Q     I know this has been a bit of a detour, but I want
20    to get back to the question about your contacts with
21    Elizabeth Neely.
22              After she advised you on how to handle the
23    situation on campus with respect to Mr. Barnes, did you
24    follow her advice in implementing the administrative
25    withdrawal of Mr. Barnes?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A     I said earlier I did not make any decisions about
 2   the administrative withdrawal at the time that I spoke with
 3   Betsy Neely.
 4      Q     No, but my question is --
 5            MR. WILL:  Can we go off the record for just a
 6      minute?
 7            MR. CORN-REVERE:  Okay.
 8            (Discussion off the record.)
 9            MR. CORN-REVERE:  Could you read the question back.
10            (The requested portion was read back by the Court
11      Reporter.)
12            THE WITNESS:  I did not implement the
13      administrative withdrawal at that point.
14   BY MR. CORN-REVERE:
15      Q     The question is:  After she advised you -- not at
16   the time but after she advised you, did you follow her
17   advice when you issued the administrative withdrawal to
18   Mr. Barnes?
19      A     Yes.
20      Q     I'm sorry?
21      A     Yes.
22            MR. CORN-REVERE:  Let's go off the record.
23            (A recess was taken from 10:30 a.m. to 10:42 a.m.)
24   BY MR. CORN-REVERE:
25      Q     Let me ask you to take a look again at Exhibit
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    Number Four.  This is the May 30th, 2000, (sic) letter from
 2    Elizabeth Neely.
 3                (Discussion off the record.)
 4                MR. CORN-REVERE:  I apologize.  It is May 30th,
 5    2007.  I don't know if something notable happened to me
 6    on May 30th, 2000.
 7                (Discussion off the record.)
 8                THE WITNESS:  I have reviewed the document.
 9    BY MR. CORN-REVERE:
10    Q    Okay.  And I really just have a simple question.
11         After you spoke with Elizabeth Neely about the
12    process on campus, then it was also Elizabeth Neely to whom
13    you were asked to submit your response in the administrative
14    appeal.  To the same person.  Is that right?
15    A    That's what Exhibit Four documents.
16                MR. CORN-REVERE:  Okay.  Let's mark as Zaccari
17    Deposition Exhibit Number Five a June 21st, 2000, (sic)
18    letter from Ronald -- what am I doing?  June 21st, 2007,
19    letter from --
20                MR. WILL:  Let's change that stipulation to
21    anything --
22                MR. CORN-REVERE:  I get dates wrong.  Fortunately,
23    the witness is very good on dates, and so he'll correct
24    me.  Let's start over on this.
25                Let's mark as Zaccari Deposition Exhibit Number
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1        Five a June 21st, 2007, letter from Ronald M. Zaccari to

2     Elizabeth E. Neely.

3             (The document was marked for identification as

4     Plaintiff's Exhibit Number Five.)

5             THE WITNESS:   (Reviewing document.)

6   BY MR. CORN-REVERE:

7     Q     Now I think this exhibit is probably easy for you

8   to identify.   I believe you testified that you reviewed this

9   letter in preparation for the deposition.

10    A     Yes.

11    Q     And this is a letter that you wrote to the Board of

12  Regents in defense of the decision to administratively

13  withdraw Mr. Barnes?

14    A     Yes.

15    Q     In reviewing this deposition exhibit today, do you

16  believe that this is a complete defense to the decision to

17  withdraw Mr. Barnes?

18    A     This is the --

19            MR. WILL:  Object to the form of the question.  You

20     can answer the question.

21            THE WITNESS:  This is the response that I prepared

22     for information to the Board of Regents, yes.

23  BY MR. CORN-REVERE:

24    Q     Okay.  But looking at this today, are there any

25  issues that, in retrospect, you think you should have
```

Page 56

1    addressed in this letter that you left out?

2        A    No.  These are the facts that I presented at that

3    time.  June 21st, 2007.

4        Q    Okay.  But are there any other facts or

5    circumstances that now, sitting here today, you feel you

6    should have included in this letter that you did not?

7        A    No.

8        Q    So, this is a complete defense to the decision to

9    withdraw Mr. Barnes.

10              MR. LaVALLEE:  Object to the form.

11              MR. WILL:  Object to the form.

12   BY MR. CORN-REVERE:

13       Q    Do you understand the question?

14       A    It's information that I provided at the time to

15   respond to the inquiry about the appeal.

16       Q    If you could write this letter today, is there any

17   other information that you would include?

18       A    No.

19              MR. LaVALLEE:  Objection to form.

20   BY MR. CORN-REVERE:

21       Q    Did you write this letter?

22       A    I did.

23       Q    Did anyone help you prepare it?

24       A    No.  This was primarily my response, and I believe

25   counsel reviewed it for its' format but not the content.



1    Q    Did you do research for purposes of preparing this
2    letter?
3    A    Research in the sense that I tried to get as much
4    accurate information in it, yes.
5    Q    Could you describe the research that you conducted?
6    A    (Reviewing document.)
7         (Pause).
8    A    Well, some of the documents that I would have as we
9    started a more investigation into Mr. Barnes.  So, the
10   answer is:  I researched to put the format together.
11        I'm looking on the bottom of page five.  That
12   would've been assistance in the discussion part from Laverne
13   Gaskins.
14   Q    Are you talking about the citation to the legal
15   case?
16   A    Yes.
17   Q    Okay.  Anything else?
18   A    No.
19   Q    So, your research was confined mainly to looking at
20   the documents that you reviewed in the process of deciding
21   to withdraw Mr. Barnes?
22   A    Yes.
23   Q    Did you review university policies with respect to
24   discipline or administrative withdrawal?
25   A    Yes.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Which policies did you review?

2    A    Policy 1902.

3    Q    Board Policy 1902?

4    A    Yes.  Board policy.

5    Q    Anything else?

6    A    The 1983 medical withdrawal letter that was sent or

7    that we had on record.

8    Q    Did you rely heavily on the 1983 medical withdrawal

9    policy?

10   A    No.

11   Q    Anything else?

12   A    No.

13   Q    Could you look on Exhibit Five at the paragraph

14   that is numbered two on the first page.

15        The first sentence reads, "On March 23rd, 2007, I

16   was informed by my administrative assistant that flyers

17   opposing planned parking decks had been posted across campus

18   and that Mr. Barnes was the author of the document."

19        Did I read that correctly?

20   A    Yes.

21   Q    Who is your administrative assistant?

22   A    Theresa Boyd.  B-O-Y-D.

23   Q    Did you become aware of the flyers on your own

24   before Ms. Boyd informed you about them, or did you first

25   become aware of them because Ms. Boyd brought them to your

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1    attention?
2       A    I became aware of them when they were brought to my
3    attention by Ms. Boyd.
4       Q    Was it at that point you asked her to find out who
5    had written the flyers?
6       A    I may have.
7       Q    And she reported back to you that it was
8    Mr. Barnes?
9       A    Yes.
10      Q    Do you know who she spoke with to find that out?
11      A    No.
12      Q    How long did it take her to get back to you on
13   that?
14      A    Possibly earlier afternoon.
15      Q    The same day?
16      A    The same day.
17           MR. CORN-REVERE:  Let's mark as Zaccari Deposition
18   Exhibit Number Six a copy of the flyer.
19           (The document was marked for identification as
20      Plaintiff's Exhibit Number Six.)
21   BY MR. CORN-REVERE:
22      Q    Just to be clear, I will be referring to Exhibit
23   Five for some time now.  I will be interspersing that with
24   certain other exhibits that are referred to in Exhibit Five.
25           Is Exhibit Six the flyer that you were referring
```

Page 60



1    to?

2        A    Yes.

3        Q    At the bottom in the lower right-hand corner, there

4    is a marginal note in handwriting that says, "Found posted

5    all over campus on Sunday, March 25th, 2007."

6             Do you see that?

7        A    I see that.

8        Q    Do you know whose handwriting that is?

9        A    I do not.

10       Q    Looking at Exhibit Five, you state, "Upon reading

11   the flyer, it was apparent Mr. Barnes did not understand the

12   funding process for parking decks, nor was he aware that

13   state funds could be used to -- that no state funds could be

14   used to finance the projects."

15            Do you see that?

16       A    Yes.

17       Q    Were you concerned about the flyers?

18       A    I wasn't overly concerned about the flyers.  I was

19   a little bit confused about why an individual would do this

20   without any discussion with the administration or without

21   possibly going through the conduits that the university or

22   students usually have discussions about concerns they had.

23            So, it was a question of why suddenly would these

24   appear across the campus.  I wasn't overly concerned.  I was

25   just -- it was just an inquiry.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    But you were concerned that the information

2    contained in the flyers was inaccurate.  Is that fair to

3    say?

4    A    That's what I stated, yes.

5    Q    Following up on what you just said, is it your

6    belief that for a student to express an opinion on a matter

7    of public policy that they have to go through certain

8    channels?

9    A    That's not what I said.

10   Q    Then please correct me.  What was --

11   A    I said that I was surprised.  There are conduits

12   that are available to raise issues that were not followed or

13   considered.

14        But, again, there was no opposition to posting the

15   flyers.

16   Q    Okay.  So, students may freely express opinions on

17   matters of politics or public policy just as a matter of

18   right.  Is that correct?

19   A    That's correct.

20   Q    And, yet, you thought it was necessary to find out

21   who wrote the flyer?

22   A    Yes.

23   Q    Why?

24   A    I wanted to inquire about who had written it so

25   possibly we could get some of the facts straightened out so

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1       that there was a greater awareness on the author's part

2       about how the decks were funded and how they came into

3       existence.

4           Q       So, in seeking out Mr. Barnes' name in connection

5       with the flyers, it was your intent to correct his

6       misunderstandings about the project?

7           A       It was not my intent to do anything other than to

8       try to clarify what was stated in the flyer.

9           Q       I'm a little confused.  How is that different from

10      the question I asked?

11          A       The author was suggesting that we take the funds

12      that were dedicated to the parking deck and put them some

13      other place, which could not take place.

14              The funds that were directed to the parking deck

15      came from the students.  They approved the parking decks.

16              The fee was approved only for the parking deck, not

17      for any other option.

18              So, all of these options here that were listed on

19      the flyer could not be done.

20              I was just trying to clarify how the funding for

21      the decks came into existence and how the funds were

22      dedicated only to the construction of the deck.

23              So, that was my first thought; that there was some

24      confusion about -- there were no state funds.  There were no

25      federal funds.  These were all student generated fees that

Page 63

1    were going into the construction of the deck.

2        Q    So, was it your belief that Mr. Barnes' suggestions

3    as alternatives to the parking garage were unrealistic?

4        A    These were.

5        Q    Is that a yes?

6        A    Yes.

7        Q    In the spring of 2007, was it your belief that

8    Mr. Barnes was the only unrealistic student on the Valdosta

9    State University campus?

10       A    I wouldn't say that.

11       Q    Okay.  Well, were there other examples of

12   unrealistic students on campus that you felt an obligation

13   to identify and clarify their views?

14       A    Not that were brought to my attention as this

15   flyer, obviously, because we were going to the Board of

16   Regents with a very important vote on the 17th and the 18th

17   of April.

18       Q    Okay.  That context is helpful then, because it

19   makes it -- it helps me understand your response; and, that

20   is, if the policy that a student is protesting may relate to

21   an important vote, then it, if I understand your testimony,

22   may result in a different reaction from your office than

23   simply a student expressing an unrealistic political

24   opinion.

25       A    I disagree with that reaction.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Okay. Well, again, I'm just asking. I just want
2    to find out if I'm misstating. And, please, correct me and
3    tell me what's wrong about that statement.
4         MR. WILL: I object to the form of it. I'm not
5         sure I understand it now.
6    BY MR. CORN-REVERE:
7    Q    Okay. Well, is it your testimony that your
8    reaction to this flyer was conditioned, in part, by the fact
9    that the Board was going to vote on this issue?
10   A    My reaction to the flyer was because the author did
11   not have the facts correct about the parking deck funding.
12   Q    And was it your belief that the author should be
13   provided with the correct facts about the parking decks?
14   A    I took absolutely no action to this other than
15   finding out who the author was. I took no action.
16   Q    That's not my question. My question was: Was it
17   your belief that the author of this flyer should be provided
18   with the correct facts about this project?
19   A    That wasn't my immediate reaction, no.
20   Q    Okay. What was your immediate reaction?
21   A    The author was confused about the funding.
22   Q    Why is that a problem?
23   A    It's not a problem.
24   Q    I guess -- have you had the occasion to see
25   expressions of other political opinions on the Valdosta

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    State University campus during the time you were President

2    where you believed that the student was expressing an

3    opinion based on inaccurate facts?

4        A    I'm not sure what you're referring to.  Who -- what

5    kind of statements are you referring to?

6        Q    Well, I'm trying to find out if there are other

7    instances in which you sought out the identities of student

8    speakers so that you could correct their misimpressions.

9        A    Have I seen entries?

10            MR. WILL:  No.  He said did you seek out any other

11       students who had expressed some incorrect facts and you

12       wanted to correct those facts for them.

13            THE WITNESS:  I don't remember seeking out any

14       particular student.

15   BY MR. CORN-REVERE:

16       Q    Except this one.

17       A    I talk to a lot of students.  I have Open Day, and

18   there are a lot of opportunities to speak to students about

19   issues.  So, there are ways for me to communicate through

20   student government and others.

21            So, to say I sought out Mr. Barnes in a singular

22   context would not be my answer.

23       Q    Okay.  Well, let me ask it this way.  Are there

24   other occasions in which you directed your administrative

25   assistant to find out who expressed a political opinion on

Page 66

1    campus?

2      A     I don't remember any specific student for that

3    reason.

4      Q     Looking back at Exhibit Six, the flyer, is there

5    anything in this document that you find threatening?

6      A     No.

7      Q     I'm sorry?

8      A     No.

9      Q     Whether or not it's mistaken, is it fair to say

10   that this document is just confined to the political

11   opinions that are stated here?

12     A     Yes.

13     Q     Let me follow-up.  I think you mentioned this

14   earlier.  Did you contact the organization S.A.V.E. about

15   this flyer?

16     A     No.

17     Q     Then how did it come to be that you discussed the

18   flyer with members of that organization?

19     A     Earlier testimony, I referenced that I had a

20   meeting scheduled at least four or five weeks in advance on

21   the day we discussed it.  I think it was --

22     Q     March 26th?

23     A     Twenty-sixth.  The meeting had been scheduled.  We

24   met every four or five weeks to talk about environmental

25   issues.  I did not call the meeting specifically to talk

Page 67

1    about the parking deck.

2           We talked in the meeting about lots of different

3    issues, and that's when I asked about the flyer.

4       Q    Were you the person who first raised the issue of

5    the flyer in that meeting?

6       A    I believe that I did, yes.

7       Q    Do you recall the duration of the meeting?

8       A    No.

9       Q    Do you recall the duration of your conversation

10   about the flyer?

11      A    No.

12      Q    It was during that conversation that you asked

13   members of the S.A.V.E. organization about Mr. Barnes?

14      A    I did.

15      Q    And after that conversation, it is your

16   understanding, if I correctly understand your testimony,

17   that members of S.A.V.E. then spoke to Mr. Barnes and

18   suggested that you were concerned about the flyers.

19      A    That's what I understand took place.  I don't have

20   any awareness of a meeting or a contact with Mr. Barnes.

21      Q    Okay.

22      A    That was never mentioned to me or given to me.  My

23   understanding is that they contacted him.

24      Q    Did you ask them to contact him?

25      A    No.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Did they tell you on their own that they were going

2    to contact him?

3    A    No.

4    Q    But after some conversation that Mr. Barnes had

5    with members of S.A.V.E., I believe your testimony was you

6    received an apology from Mr. Barnes.

7    A    Yes.

8    Q    What was the substance of the apology?

9    A    That he was going to take down the flyers and that

10   he was sorry that his opposition to the parking deck may

11   have hurt the good work that S.A.V.E. had done with the

12   President's office and some of the progress we were making

13   on environmental issues and that -- I think that's the basic

14   outline of what he said.

15   Q    Is it fair to say that his apology was to make sure

16   that his actions didn't reflect negatively on S.A.V.E.?

17   A    Well, I mean, I would say that was what he stated.

18   That was on that particular date.

19   Q    Okay.  Did the apology say that he changed his mind

20   about the parking decks?

21   A    No.

22   Q    Did the apology say that he would never say

23   anything publicly again about the parking decks?

24   A    No.

25   Q    Did the apology say that he wouldn't write a letter

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     to the editor about the parking decks?

2        A      No.

3        Q      Did the apology say he'd cancel his Facebook

4     account?

5        A      Didn't know anything about the Facebook account.

6        Q      Okay.  So that would be a no?

7        A      It's a no.

8        Q      I believe you testified earlier that after you

9     received the apology from Mr. Barnes, you then communicated

10    that fact to the Board of Regents.

11       A      Clarification to the University System of Georgia.

12       Q      Okay.  Please, if my question is based on an

13    incorrect premise, please correct me.

14             MR. CORN-REVERE:  Let's mark then as Zaccari

15       Deposition Exhibit Number Seven an email from Theresa

16       Boyd to Beheruz Sethna.

17             (The document was marked for identification as

18       Plaintiff's Exhibit Number Seven.)

19    BY MR. CORN-REVERE:

20       Q      Have you had a chance to look at this exhibit?

21       A      Yes.

22       Q      Have you seen it before?

23       A      Yes.

24       Q      Please identify it for the record.

25       A      It's a piece of correspondence email from my

Page 70

1     assistant, Theresa Boyd, to Beheruz Sethana who was the

2     acting Vice Chancellor for Academic Affairs.

3         Q     Was this email sent at your direction?

4         A     I believe Ms. Boyd and I talked about it, and it

5     was in response to the inquiry that came in about opposition

6     to the deck or to the decks.  And I would say I asked her to

7     do that, yes.

8         Q     Okay.  When you sent this or directed that this

9     email be sent, was it your understanding that the

10    controversy about the parking decks had ended?

11        A     Yes.

12        Q     So, is it fair to say this was reporting the good

13    news to the University System that they didn't have to worry

14    about student dissent about the parking garage?

15        A     I sent it to give the facts that we received an

16    apology and we're moving on.

17        Q     Did you see that as good news?

18        A     I did.

19        Q     Why?

20        A     It was simply that the author of the flyer had come

21    to some resolution and was not going to pursue any other

22    additional reactions to the parking deck.  I thought that

23    was good news.

24        Q     Didn't you testify just a few minutes ago that you

25    didn't understand the apology as Mr. Barnes changing his



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    mind but, rather, he was apologizing for the possibility of

 2    having a negative impact on the organization S.A.V.E.  Is

 3    that a fair statement?

 4       A     That's in the right, yes, context.

 5       Q     Let's look back at Exhibit Number Five, which is

 6    your letter to Ms. Neely.  Directing your attention to

 7    paragraph five on page two of that exhibit, could you take a

 8    look at that?

 9       A     (Reviewing document.)  Okay.  I've read it.

10       Q     Is there anything you'd change about that paragraph

11    today?

12       A     No.

13       Q     Let's look at the first sentence which reads,

14    "Several days prior to the April 17th and 18th, 2007, Board

15    of Regents meeting, Mr. Barnes immediately reversed his

16    decisions -- his decision to discontinue public opposition."

17             Did I read that correctly?

18       A     Yes.

19       Q     What decision by Mr. Barnes are you referring to

20    here?

21       A     His apology that he was going to discontinue any

22    further opposition.

23       Q     But that wasn't what the apology said, was it?

24       A     Yeah, I believe that's what it said.

25       Q     At the risk of covering ground we've already
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    covered but just to make sure we're -- I understand your

2    answer:  Didn't you testify that Mr. Barnes was not saying

3    that he had changed his mind about the parking garage,

4    right, in the apology?

5        A    The apology did not reflect that he had changed his

6    mind.  He was going to discontinue public posting or

7    opposition.

8        Q    And didn't you testify that he wasn't -- he did not

9    say he would not write letters to the editor?

10       A    That's right.

11       Q    Okay.  So, the apology, as you've testified before,

12   was to ensure that the organization S.A.V.E. did not receive

13   a bad rap for the fact that he was speaking on his own.

14       A    That's not the way I interpreted the apology.

15       Q    Okay.  Then let me ask you, again.  How did you

16   interpret the apology?

17       A    As I said before, that he was going to discontinue

18   any public opposition.

19       Q    He said he'd withdraw the flyers, right?

20       A    Uh-huh.  Yes.

21       Q    But the apology did not say that he wouldn't speak

22   out publicly on the parking garage in other venues, did it?

23       A    It did not state that.

24       Q    So, in this Exhibit Number Five when you say that

25   Mr. Barnes immediately reversed his decision to discontinue



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    public opposition, that's not accurate, is it?

2        A    It was accurate in the way I interpreted the

3    apology.

4        Q    Okay.  So, when you say he reversed his decision to

5    discontinue public opposition, that does not include letters

6    to the editor?

7        A    It didn't say he would never write letters or take

8    other approaches.  I assumed that what he meant was he's

9    backing off, and the university is moving forward.

10       Q    Okay.  I'm kind of getting mixed messages here.

11            You're aware that Mr. Barnes did not state that he

12   was not going to take any public positions about the parking

13   garage.

14       A    Yes.

15       Q    And yet when he did other acts like contacting

16   members of the Board of Regents or publishing a letter to

17   the editor, you later interpreted that as a reversal of his

18   decision.  Is that right?

19       A    That's the way I interpreted it, yes.

20       Q    I think that's about as much as I can ask about

21   that.

22            Looking further in this paragraph five, you state

23   that, "Mr. Barnes had voiced his opinions and requested

24   referenced offices and individuals to immediately disallow

25   the parking decks."

Page 74

```
 1              Is that right?
 2      A      Yes.
 3      Q      Is there anything wrong with Mr. Barnes expressing
 4   that opinion?
 5      A      No.
 6      Q      Then why is it in this letter?
 7      A      Because those are the facts.  I thought, again,
 8   through my interpretation that there was a discontinuance of
 9   public opposition.
10              I was surprised to learn from the system office
11   that Mr. Barnes was contacting the Governor's office, the
12   Chancellor's office, again, and members of the Board of
13   Regents.
14              It was very surprising to me that there was at one
15   point an opportunity for us to move forward with the
16   university and would be no additional opposition, and
17   suddenly I was surprised to learn that there were telephone
18   calls going out to various members and state officials.
19              I thought that was a reversal of the message that I
20   gleaned from the apology.
21      Q      You just wanted him to go away?
22      A      No.  It was a dichotomous message.  It had
23   nothing -- just go away.  It was a dichotomous message.
24              "I apologize.  I'm not going to do this."  And then
25   suddenly, it happened again.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Didn't you earlier testify that you understood the
2    apology as simply not wanting to have a negative impact on
3    S.A.V.E., and so he withdrew the flyers?
4    A    I said that I interpreted the apology as not only
5    in support of S.A.V.E. and their work with the President but
6    an apology that there was going to be a cease and desist of
7    this whole opposition.  I read that in the apology.
8    Q    Okay.  So, you understood it to be that he would
9    not write letters to the editor.
10        MR. WILL:  I object to the form of the question.
11        That's already been asked and answered to the best of his
12        abilities.
13        MR. CORN-REVERE:  Well, I understand.  I guess I'm
14        just confused because I'm getting different answers from
15        the witness.  They appear to contradict.
16        MR. WILL:  I thought we had moved on past the
17        letters to the editor and we were inquiring about
18        something else.
19        MR. CORN-REVERE:  I thought we had, too.  That's
20        why I'm getting confused as to why this apology is being
21        interpreted in different ways.
22    BY MR. CORN-REVERE:
23        Q    Looking at the statement, "Mr. Barnes had voiced
24    his opinions and requested referenced offices and
25    individuals to immediately disallow the parking decks,"

Page 76

```
 1    isn't this something that citizens are allowed to do in a
 2    democracy?
 3        A     He has a right to do that, yes.
 4        Q     Now the next statement here you say, "when asked by
 5    those with whom he had personal telephone contact if he had
 6    met with the VSU President and discussed his viewpoints, his
 7    response was that he had.  His response represented an abuse
 8    of truth as I have never engaged in any conversation with
 9    Mr. Barnes."
10              Could you explain what you mean by that statement?
11              MR. WILL:  Which one?
12              MR. CORN-REVERE:  The two I just read.
13              MR. WILL:  That's what I mean.
14              MR. CORN-REVERE:  Let me quote it for the record
15        and then ask for your response.
16              MR. WILL:  You want to just read it one sentence at
17        a time?
18              MR. CORN-REVERE:  We can do it that way, sure.
19    BY MR. CORN-REVERE:
20        Q     Let me start with the first sentence.  "when asked
21    by those with whom he had personal telephone contact if he
22    had met with the VSU President and discussed his viewpoints,
23    his response was that he had."
24              Do you see that?
25        A     Yes.
```

Page 77



1    Q    What is this statement based on?

2    A    Mr. Barnes was able to have dialogue with several

3    of the Board of Regents.  Some returned his call; others did

4    not.

5         But those who did asked a typical question when

6    students contact Regents.  And the question was:  I know

7    this is a campus matter; have you talked with the President

8    about this?  He said he had.

9         At that point I did not have any recollection that

10   we had discussed that and that we didn't have -- we didn't

11   have those discussions.

12   Q    Okay.  Which of the members of the Board of Regents

13   told you that Mr. Barnes had claimed to have spoken to you?

14   A    I met with the Board of Regents at Georgia Southern

15   on the 17th and 18th.  It's common practice to meet with

16   Board of Regents members, casual interactions, discussions.

17        And several of the Regents mentioned that they had

18   been contacted by Mr. Barnes.  The Regents, obviously, knew

19   that the parking decks would be -- were on the agenda for

20   that day and said they had talked with him and --

21        MR. WILL:  I believe he's asking you which ones.

22   Which individual Regents.

23   BY MR. CORN-REVERE:

24   Q    Yeah.  And I'll get to that, but I just wanted to

25   clarify given your most recent answer.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          Because at the beginning of the paragraph, it says
2    several days prior to the April 17th and 18th Board of
3    Regents meeting that Mr. Barnes reversed his decision and
4    you were informed by Vice Chancellor Linda Daniels that
5    Mr. Barnes had been contacting the Governor's office.
6        A     Yeah.
7        Q     Now is this statement about Mr. Barnes' claims to
8    have talked to you based on conversations you had before the
9    Board of Regents meeting, or was that a result of
10   conversations that you had later on at the Board of Regents
11   meeting?
12       A     If I understand your -- try to rephrase it so I
13   have a better understanding of what you're trying to get to.
14       Q     Okay.  When you say that Mr. Barnes claimed to have
15   spoken to you, did you get that impression from
16   conversations with Board members before April 17th and 18th?
17       A     Well, this was on the 17th of April where I talked
18   with the Board of Regents members before the Board meeting.
19          They asked if we had discussions at the university
20   with Mr. Barnes, and I said at that point that I had not
21   talked with Mr. Barnes at that particular point.
22       Q     Okay.  Which of the members of the Board of Regents
23   did you speak with about Mr. Barnes?
24       A     I think Mr. Vigil was one of the individuals, and
25   there was one other one.  I don't recall which one it was,

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    but there were, I think, two.
 2           Some of the Regents said they had heard from him
 3    but couldn't returned the call.
 4      Q    Want about Linda Daniels?
 5      A    Did I talk with her is your question?
 6      Q    Yes.  Did you talk with Linda Daniels about
 7    Mr. Barnes?
 8      A    She called me about Mr. Barnes, yes.
 9      Q    Okay.  We'll get to that phone call.
10           But did you talk to her at the Board of Regents
11    meeting about Mr. Barnes?
12      A    I may have talked with her about Mr. Barnes, yes.
13      Q    Did Ms. Daniels claim that Mr. Barnes had said he
14    had talked to you?
15      A    No.  She didn't make that claim.
16      Q    Okay.  So, it was other people at the Board of
17    Regents who, according to this, said that Mr. Barnes had
18    claimed to speak with you about the parking deck issue?
19      A    Yes.
20      Q    Now just to be clear, you don't know what
21    Mr. Barnes told them or didn't tell them, do you?
22      A    Told who?
23      Q    Members of the Board of Regents in those
24    conversations.
25      A    No.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1       Q      So, this statement in Exhibit Five is based on

2   second-hand accounts that you received from one or two Board

3   members?

4       A      Yes.

5       Q      Is it possible that the Board members may have

6   misunderstood what happened with Mr. Barnes?

7       A      I can't speak to --

8              MR. WILL:  I object to the form of the question

9       because it calls for speculation.

10  BY MR. CORN-REVERE:

11      Q      Do you understand the question?

12             MR. WILL:  Now you can go.

13             THE WITNESS:  I can't speak for the Board of

14      Regents.

15             MR. CORN-REVERE:  Now there is a well-trained

16      witness.

17  BY MR. CORN-REVERE:

18      Q      In this circumstance, you had taken steps to find

19  out who had prepared the flyers.  You spoke with the student

20  organization, and you've testified Mr. Barnes communicated

21  to you by mail or email about the parking garage situation.

22             Is it conceivable that that could have been

23  construed as a communication with the President?

24             MR. WILL:  I object to the form of the question.

25             MR. CORN-REVERE:  I know.

Page 81

1    BY MR. CORN-REVERE:

2       Q     You may answer.

3       A     No.

4       Q     It's not conceivable?

5       A     That he made contact with the President?  I don't

6    believe -- no.  That's not the type of communication that I

7    was referring to here; that he had met and discussed, no.

8       Q     But is it possible that's the kind of communication

9    that the Board member was referring to?

10            MR. WILL:  I object to the form of the question.

11            THE WITNESS:   I don't know what the Board members

12       believed that represented.

13   BY MR. CORN-REVERE:

14      Q     The reason I ask -- and it may sound picky.  But

15   the next line you say, "His response represented an abuse of

16   the truth as I had never engaged in any conversation with

17   Mr. Barnes."

18            You're calling Mr. Barnes a liar here, right?

19      A     I said misrepresented the truth, yes.

20      Q     He lied.

21      A     Yes.

22      Q     But you don't know that he lied, do you?

23      A     No.

24      Q     And you don't know what the Board members

25   understood, do you?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      I referred to it as the word "met," not

2   communicated.

3      Q      Other than the correspondence, right, you had never

4   met with him.

5             But you don't know what the Board members

6   understood, do you?

7      A      Where do you see that correspondence?

8      Q      In the middle of paragraph five after the sentence

9   that talks about an abuse of truth, you say, "Other than the

10  correspondence of a short-lived apology, I had never met or

11  interacted with this student."

12     A      Yes.

13     Q      Okay.  So, there was communication between the two

14  of you on the issue of the parking decks, right?

15     A      I received his concern, yes.

16     Q      All right.  But you have no idea whether or not

17  Mr. Barnes lied to a member of the Board of Regents, do you?

18            MR. WILL:  I object to the form of the question.

19            THE WITNESS:  Again, my interpretation was that he

20     did not meet with me and we did not have the discussion

21     that was intended by the Board of "have you discussed

22     this; have you met with the President."

23  BY MR. CORN-REVERE:

24     Q      My question is whether or not you know what members

25  of the Board were thinking.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      I don't have any understanding of what they were

2   thinking when they said the suggestion was to meet with the

3   President.

4      Q      So, you don't know, personally, whether or not

5   Mr. Barnes lied to anybody.

6      A      It appeared that he was not giving the Board of

7   Regents the knowledge that I would've intended him to say:

8   "I will take your suggestion.  I will try to meet with the

9   President, and I will try to have a discussion about my

10  concerns."

11     Q      I'm not sure I understand your answer.  Could you

12  read back the question?

13            (The request portion was read back by the Court

14     Reporter.)

15            THE WITNESS:  No.

16  BY MR. CORN-REVERE:

17     Q      In the next line of paragraph five of Exhibit Five,

18  you state, "Mr. Barnes' actions led to a series of what I

19  consider to be erratic behavior."

20            Did I read that correctly?

21     A      Yes.

22     Q      Could you explain what you meant by that?

23     A      This is the period of time when I believed that

24  Mr. Barnes had apologized and then the telephone calls to

25  the Board of Regents, the inquiries from Vice Chancellor

1    Linda Daniels, and we had a little bit -- I got concerned

2    about where Mr. Barnes was headed with, again, what I

3    thought was a reversal of the apology.  My interpretation of

4    the apology.

5         And a series of emails started on about the 20th

6    of -- about the 20th of April.

7    Q    Just in following your response here, in paragraph

8    five after you talked about erratic behavior, the next

9    sentence details a number of allegations.

10        Were these what you meant by erratic behavior?

11   A    Yes.

12   Q    Okay.  So, let's read that statement for the

13   record.

14        It says, "Without regard to accurate information

15   and open dialogue with individuals who could have provided

16   valuable data about VSU's parking needs and related

17   planning, he purposely misrepresented the truth and

18   aggressively asked the various high-ranking state offices

19   and officials to disallow VSU's parking decks."

20        Did I read that correctly?

21   A    Yes.

22   Q    Is this what you meant by erratic behavior?

23   A    No.  The erratic behavior is more of the sequential

24   events.

25   Q    We'll get to the sequential events.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      That's what I mean.

2      Q      I'm sorry.  I didn't mean to interrupt.  Go ahead.

3      A      That's what I mean.  This is the response on June

4      the 21st, 2007.  What I was referring there is the total

5      sequences that you want to get to later phases that led to

6      inquiry and the decision that formed the administrative

7      withdrawal.  That's what I meant --

8      Q      Okay.

9      A      -- by that sentence.

10     Q      But I want to understand this sentence in your

11     letter of defense.

12             You say, "Without regard to accurate information

13     and open dialogue with individuals who could have provided

14     valuable data about VSU's parking needs and related

15     planning, he purposely misrepresented the truth."

16             What should Mr. Barnes have done to get accurate

17     information and engage in open dialogue?

18     A      Could've met with members of the administration.

19     Done some research about why parking decks were being

20     considered in the first place for approval.

21             He could've asked what data represents the number

22     of parking spots deficiencies as related to the total

23     enrollment of the university.

24             He could've investigated the mandates that we were

25     under in the master plan of the growth of the University

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    System of Georgia to help sustain the current, as well as

2    projected, use of land in all the university -- colleges and

3    universities within the state.

4          He could've researched how the funding and the bond

5    covenants were developed; how the business plans were very

6    well received in bond ratings and about the tremendous

7    amount of work leading up to the construction of two parking

8    facilities on Valdosta State and how it fit the future of

9    the university.

10    Q    Anything else?

11    A    Well, I could probably go on for another five

12    minutes.

13    Q    Okay.  Are all of those things you just listed

14    prerequisites for a student to be able to express his

15    opinion on a matter of public policy?

16    A    What I said was he could've done it.  It could've

17    made much more sense for an individual to understand what

18    was going on at the institution where he was enrolled.

19    Q    Right.

20    A    It didn't seem that -- I'm just -- that's what I

21    meant.

22    Q    I'm sorry that I interrupted.  Were you about to

23    say something else?

24    A    That's what I meant by the statement that he could

25    have been informed about goals at the institution and how it



WHEELER REPORTING

Court Reporting • Video • Litigation Support

404.351.4577

1    relates to the future of the university and the planning for
2    the parking facilities.
3            There was no understanding of that.  It was my
4    opinion he simply wanted to say we're going to kill these
5    things and that was his position point.
6            I was looking for a student to have some kind of
7    strong rationale for why he's calling the Governor's office
8    and the Board of Regents about -- if you're opposed to the
9    decks, do you understand why the university is moving that
10   way?  And then your opposition is fine.
11           It was not the opposition; it was the understanding
12   about why the facilities were necessary.  That was --
13   Q    Okay.  So, was it your view that Mr. Barnes'
14   understanding and rationale were insufficient for him to be
15   contacting members of the Board of Regents?
16   A    Yes.
17   Q    Next you say, "He purposefully misrepresented the
18   truth."
19           In that statement are you referring to the earlier
20   discussion that we had about whether or not he had spoken to
21   you?
22   A    No.  I'm referring there that he didn't have the
23   facts about why the parking decks should not be built, and
24   the discussion was not about the need; it was a discussion
25   about his position.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Okay.  So, you wouldn't say he purposely
2    misrepresented the truth.
3         Is it fair to say that you're simply saying that he
4    was wrong about the parking decks?
5    A    He was wrong, and he was wrong about the way he
6    represented the position of Valdosta State.  It was his
7    position.  He didn't have the facts.  It was misrepresented,
8    yes.
9    Q    Misrepresented or misinformed?
10   A    A combination of.
11   Q    Okay.  So, his opinions, according to you, were
12   simply not well founded?
13   A    Yes.
14   Q    And then the last line says, "And he aggressively
15   asked various high-ranking state offices and officials to
16   disallow VSU's parking decks."
17        What do you mean by the term "aggressively"?
18   A    Making telephone calls to the high-ranking
19   officials.  I think that is a rather aggressive step to say
20   "disallow parking decks" and having no defensive rationale
21   other than the fact that he didn't want them.
22   Q    Okay.  So, the fact of making phone calls in your
23   view is aggressive.  Is that right?
24   A    It's aggressive behavior.  It's atypical for
25   students to do those things.

Page 89

1    Q    Do you know what his demeanor was on any of those

2    calls according to conversations you had with members of the

3    Board?

4    A    I don't know what his demeanor was.  Those

5    interpretations would not be delivered to me by the Board of

6    Regents.

7    Q    But no one told you that this student called and he

8    behaved aggressively on the phone, did they?

9    A    Not in that context, but I would say that he was

10   very clear that he didn't want them done.  The parking decks

11   done.

12   Q    He had a strong opinion about what should be done

13   about the parking garage, right?

14   A    He had a strong opinion, yes.

15   Q    In talking about these calls, did any member of the

16   Board of Regents suggest that Mr. Barnes was anything but

17   respectful in his conversations about the parking decks?

18   A    No.

19   Q    Is there any problem with a student approaching

20   high-ranking officials and asking for a change in policy?

21   A    No.

22   Q    Let's look at paragraph six of Exhibit Five where

23   you state that you received a telephone call from Vice

24   Chancellor Linda Daniels asking for a description of

25   Mr. Barnes' physical appearance.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1           Do you remember that telephone call?

2      A    Yes.

3      Q    Can you describe it?

4      A    When inquiries go into the University System of

5      Georgia -- whether it's a letter, an email, personal

6      visit -- and it relates to a campus, one of the 35

7      institutions within the system, the first response is to

8      contact the campus and talk with university officials.

9           The Board of Regents received the telephone calls.

10     They called Vice Chancellor Linda Daniels because the

11     telephone calls were in reference to capital construction

12     projects, which fall under the authority of Vice Chancellor

13     Daniels.  The parking decks were related to her immediate

14     responsibility.

15          When the Regents called Linda Daniels, they asked,

16     "Would you inquire with the President of VSU what's going

17     on," because they were a little bit confused.

18     Q    Confused?

19     A    Confused, yeah.  Why this sudden barrage of emails

20     and telephone calls that we're getting.  And the Governor's

21     office did, basically, the same thing.

22          They're not going to call the President.  Regents,

23     typically, do not call the President.  It is all funneled

24     back through the University System office.

25          So, the person who is responsible, Linda Daniels,

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    called and she said -- she asked, "Do you know Mr. Barnes?"

2    I couldn't relay much information.

3            There was concern -- she had a concern, as I've

4    stated here in paragraph six, that there may be a protest by

5    Mr. Barnes at Georgia Southern University and wanted to know

6    if I could describe his physical appearance.  I could not.

7            And my understanding was that the Georgia Southern

8    Police Department was alerted that there might be a possible

9    public protest, and they wanted to make sure that they

10   understood what might go on.  That's what the telephone call

11   was about.

12           To recap:  Regents had called her.  Governor's

13   office had called and wanted to know by contacting VSU what

14   the issues were.

15   Q    Okay.  Now you said the Governor's office had

16   called?  How do you know that?

17   A    My understanding was Mr. Barnes called the

18   Governor's office, and the Governor's office asked the

19   University System office to inquire on what was going on

20   about Valdosta State parking facilities.

21   Q    And when you say they wanted to know what was going

22   on, did you understand that to mean that they wanted to know

23   why a student had an opinion about the project?

24   A    Wanted to know the facts of why the inquiry.  Why

25   the call.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Okay.  When you spoke with Vice Chancellor Linda
2    Daniels, what time of day was that, if you remember?
3    A    I don't remember.
4    Q    How long did the call last?
5    A    I'd say -- I would say a brief period of time.
6    Within ten minutes, less.
7    Q    Did Vice Chancellor Daniels explain why she thought
8    Mr. Barnes might stage a protest?
9    A    No.
10   Q    Was it your understanding that the concern about a
11   protest related to just the fact that Mr. Barnes had
12   expressed his opinion to Board members.
13   A    I don't know why she -- that was the inquiry from
14   the Board of Regents.
15   Q    Okay.  So, she just called to say is this guy going
16   to protest and what does he look like.  Is that it?
17   A    Yes.
18   Q    Did she suggest whether or not she thought there
19   was a probability there might be a protest?
20   A    No.
21   Q    Did she discuss whether or not she thought others
22   besides Mr. Barnes may join him in the protest?
23   A    No.
24   Q    It was just to ask what was going on?
25   A    Yes.

Page 93

1    Q    You state here in paragraph six, "There was a

2    concern that Mr. Barnes would appear at the Board of Regents

3    meeting scheduled days later at Georgia Southern University

4    and stage a protest."

5    A    Yes.

6    Q    And that statement relates only to the question

7    Ms. Daniels asked you.

8    A    Yes.

9    Q    And nothing else?

10    A    That's right.

11    Q    And then the next sentence is, "The Georgia

12    Southern University Police Department was alerted by Vice

13    Chancellor Linda Daniels to a possible public protest."

14    A    Yes.

15    Q    Is that based on what Ms. Daniels told you on that

16    call?

17    A    Said that -- yes, to alert the police department

18    that there may be a protest.  It says possible public

19    protest.

20    Q    Did she tell you why she contacted the police

21    department?

22    A    No.

23    Q    So, you don't know that there was any concern about

24    security at the Board meeting based on what Ms. Daniels told

25    you.

Page 94

```
1      A      That's correct.

2      Q      Would there be a problem if Mr. Barnes had showed

3   up at the Board meeting and staged a protest?

4      A      Don't know.

5      Q      Well -- but people have a right to do that kind of

6   thing at public meetings, don't they?

7      A      I'll try to answer your first question.

8             MR. WILL:  I thought the first question was a

9         little vague because I'm not sure what you mean by

10        "problem."

11  BY MR. CORN-REVERE:

12     Q      Well, I mean, Exhibit Five here says, "There was a

13  concern that Mr. Barnes would appear at the protest."

14  That's pretty vague, too.  I don't know what "concern"

15  means.

16            And, as I understand the testimony, it doesn't

17  appear there was a concern that there was a security

18  problem.  So, I'm trying to find out what the concern is.

19            Is there a concern that people might express

20  opinions at a public meeting of the Board of Regents?

21     A      I believe that was the intent, but the statement --

22  the question from Linda Daniels was, "Do you believe that

23  there will be a protest staged?"I said I couldn't determine

24  that.

25            And, so, the contact with the Georgia Southern
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Police Department was saying, "There may be a possible
2    protest."  That was the concern.
3        Q    I guess my question is:  Why is that a police
4    matter?
5        A    You're asking -- I don't have the answer to that
6    question.
7        Q    And I'm just --
8        A    I didn't make the telephone call.
9        Q    I know.  But you have put this in this letter
10   defending your actions to the Board of Regents.  So, the
11   fact has some relevance to you, and I'm trying to find out
12   what you understand the concern to be about the possibility
13   that Mr. Barnes may stage a protest.
14       A    I didn't make the call to Georgia Southern.  I was
15   simply asked if I think there would be a public protest.  I
16   didn't know.  I could not answer that.
17       Q    But it sometimes happens that people are concerned
18   about protests simply because they don't want to hear
19   contrary points of view.
20            MR. LaVALLEE:  Objection to form.
21            MR. CORN-REVERE:  I'm not finished with the
22       question.
23            MR. LaVALLEE:  Well, it's not a question.
24            MR. CORN-REVERE:  Not yet because you interrupted.
25            MR. LaVALLEE:  No, it's colloquy.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1              MR. CORN-REVERE:  It is now.

2     BY MR. CORN-REVERE:

3        Q     Let me start again.  Sometimes people are concerned

4     about protests because they don't like hearing contrary

5     points of view.

6              Is that how you understood Ms. Daniels when she

7     expressed concern about a possible public protest?

8              MR. WILL:  I object to the form of the question but

9        go ahead.

10             THE WITNESS:  No.

11    BY MR. CORN-REVERE:

12       Q     Then what did you understand her concern to be?

13             Well, let me backup.  Did you have an understanding

14    of what her concern was?

15       A     I put it in the context of -- Board of Regents

16    meetings are usually held in Atlanta.  And this being on one

17    of the public universities, just to alert the campus -- I

18    think the tenor of this opposition -- and I can't speak for

19    Ms. Daniels but to alert the campus that if there were to be

20    a protest that they would be aware of it.

21             It's an alert.  It wasn't an intervention.  It was

22    an alert.  I believe that was the intent of the telephone

23    call.  I didn't make it so I don't know.

24             But I can assertively state that I don't believe

25    that it was a concern that he was going to do it.  It was an

```
 1    awareness to the university campus that there may be.
 2    That's what the call was.
 3       Q    If Mr. Barnes had come to the Board of Regents
 4    meeting and sought to speak with individual Board members
 5    before their vote, would it have been in your opinion
 6    necessary for the police to be involved?
 7            MR. WILL:  Object to the form of question.
 8    BY MR. CORN-REVERE:
 9       Q    I'm sorry, what was the answer?
10       A    I can't answer that.
11       Q    You don't know?
12       A    Well, creating a circumstance that did not happen,
13    I can't react to it.
14       Q    Okay.  So, it's your understanding Mr. Barnes did
15    not attend the Board meeting.  Is that correct?
16       A    That's correct.
17       Q    So, there was no public protest?
18       A    That's correct.
19       Q    I just have a few more questions, and then it might
20    make sense to break for lunch.
21            MR. WILL:  Whenever you reach a convenient breaking
22       point.
23            MR. CORN-REVERE:  Yeah.
24    BY MR. CORN-REVERE:
25       Q    When Ms. Daniels called you, did she describe
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1    Mr. Barnes' advocacy on the issue of parking decks?

2        A    No.

3        Q    Did she say whether or not Mr. Barnes was

4    aggressive in his advocacy?

5        A    No.

6        Q    Insofar as you know, Mr. Barnes' communications

7    with the Board was nothing but respectful?

8        A    That's what I understand, yes.

9             MR. CORN-REVERE:  Let's mark as Zaccari Deposition

10       Exhibit Number Eight an email from Linda Daniels to

11       President Zaccari.

12            (The document was marked for identification as

13       Plaintiff's Exhibit Number Eight.)

14            THE WITNESS:  (Reviewing document.)

15            (Pause)

16   BY MR. CORN-REVERE:

17       Q    Have you had a chance to review that exhibit?

18       A    Yes.

19       Q    Can you identify it for the record?

20       A    It's an email from Hayden Barnes to Linda Daniels,

21   reference parking decks at VSU.

22       Q    This is dated April 16th, 2007?

23       A    Yes.

24       Q    So, is this an email that Ms. Daniels forwarded to

25   you?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A      I believe so.  She sent it to me on the 16th at
 2   3:49 p.m.
 3      Q      Okay.  So, there's no message from Ms. Daniels.
 4   It's just forwarding an original message that is from Hayden
 5   Barnes from April 16th at 3:33 p.m.  Does that look right?
 6      A      3:49, yeah.
 7      Q      Well, 3:49 is the time that Ms. Daniels forwarded
 8   it to you?
 9      A      Right.
10      Q      But, evidently, from the time stamp on the email,
11   it appears that she had received it from Mr. Barnes some 15,
12   16 minutes earlier.  Does that look right?
13      A      Yes.
14      Q      Did Ms. Daniels describe this email in her phone
15   conversation with you?
16      A      I don't believe so.
17      Q      Okay.  So, these were separate events.  You had a
18   phone conversation at some point during the day, and then
19   separately Ms. Daniels forwarded you this email that
20   Mr. Barnes had sent to her.
21      A      I can't pinpoint that specifically.  One appeared
22   before the other.
23      Q      Okay.  It may have been that you got the call first
24   and later you got the email --
25      A      Or vice versa.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q      -- or it may be that you got the email and later

2    got a call?

3      A      Uh-huh.

4      Q      You have no independent recollection of that?

5      A      No.

6      Q      What did you do when you received this email from

7    Ms. Daniels?

8      A      Read it.  Tried to understand it.  Had some inquiry

9    about issues that had already been discussed for several

10   years through the master plan about the need, the support

11   and thought, again, that it was asking questions that could

12   have been answered very easily through discussions with the

13   master planning process.  The research had been done.  The

14   need.

15            I thought it was going over some information that

16   was readily available.  Asking high-ranking officials in

17   Atlanta to ask questions that could have been answered at

18   the university very easily.

19     Q      Okay.  And you thought it was inappropriate for

20   Mr. Barnes to --

21     A      No.  I didn't say it was inappropriate.  I just

22   said that the questions could've been readily answered on

23   the campus.

24     Q      Looking back at Exhibit Five, which is your letter

25   to Ms. Neely, paragraph seven, it says, "Following my call

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1     with Vice Chancellor Daniels on April 16th, 2007, I
 2     requested a meeting with Mr. Barnes and required VSU's Dean
 3     of Students, Mr. Russ Mast, to be present for the meeting."
 4          Do you see that?
 5     A    Yes.
 6     Q    And then the meeting that you've described took
 7     place at 5:00 p.m. on April 16th?
 8     A    Yes.
 9     Q    Okay.  Based on these things, let me see if I
10     understand the sequence of events.
11          You spoke with Ms. Daniels, and you received this
12     forwarded email; and then you contacted Mr. Barnes to set up
13     a meeting.  Your office contacted Mr. Barnes.  Is that
14     correct?
15     A    Mr. Barnes contacted my office and requested a
16     meeting.  I was following up his request that we meet.  That
17     was the only time that I could meet on that day.
18          And I believe to everyone's calendar that five
19     o'clock was the time.  He requested the meeting.
20     Q    Do you know when Mr. Barnes submitted the meeting
21     request to your office?
22     A    Yes.
23     Q    When was that?
24     A    I believe it was that morning.
25     Q    The morning of April 16th, 2007?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    I believe that was the date. I can't pinpoint it.

2    Q    Do you know when the five o'clock meeting was

3   scheduled on April 16th?

4    A    I believe my administrative assistant worked

5   through my schedule, Mr. Barnes' schedule and Mr. Mast's

6   schedule and that -- because I had a meeting with S.A.V.E.

7   already scheduled prior to that, that we moved it to the

8   5:00 p.m.  Mr. Barnes agreed to be there, and that's when we

9   met.

10    Q    Okay.  Then help me figure out what you have in

11   this letter to Ms. Neely.  It says, "After your call with

12   Vice Chancellor Daniels, you requested a meeting with

13   Mr. Barnes."

14    A    To follow-up on his request.

15    Q    Okay.  So, Mr. Barnes at some point had requested a

16   meeting.

17    A    Yes, sir.

18    Q    And then you got a call from Ms. Daniels; and then,

19   after that, you called Mr. Barnes back to set up the five

20   o'clock meeting.  Is that what happened?

21    A    Try and put -- try and put the request and the

22   follow-up to the call from Linda Daniels.

23         And it was the next day -- my understanding, the

24   next day there was a -- perhaps, even that evening, we had

25   to leave to drive to Georgia Southern for an early morning

1    meeting at the Board of Regents.

2          So, basically, I was going to be gone from campus

3    for several days, so, we tried to get it in at the

4    conclusion.

5          Their offices usually close at 5:00 p.m., but we

6    wanted to meet that evening before leaving for Georgia

7    Southern.

8     Q    Okay.  Do you know if the meeting was already on

9    your schedule when you received this forwarded email from

10   Ms. Daniels that is Exhibit Number Eight?

11    A    I believe that it was -- they were working on

12   trying to put it together.

13    Q    Did you have a chance to read the email that

14   Mr. Barnes wrote that had been forwarded to you by

15   Ms. Daniels?

16    A    You mean just now or --

17    Q    Just now, yes.

18    A    Yes.

19    Q    Or even then.  Did you read it at the time?

20    A    Yes.  I already stated that I've read it.

21    Q    Okay.  And then you have read it again now.  Do you

22   find anything in Mr. Barnes' email expressing his opinion to

23   be aggressive?

24    A    Not aggressive.  I said misinformed.

25    Q    And in that email, he simply asks for students,

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    faculty, staff and the Board to ponder the issues that are
 2    raised in his email?
 3        A    Yes.
 4        Q    Do you know why Ms. Daniels -- strike that.
 5             MR. WILL:  Thank you.
 6    BY MR. CORN-REVERE:
 7        Q    Ms. Daniels was the architect for the Board of
 8    Regents, right?
 9        A    She's a licensed architect.  As part of the, I'm
10    assuming, responsibility of being Vice Chancellor for
11    facilities is she would have to be a licensed architect.
12        Q    Okay.  And in that capacity, was Ms. Daniels
13    involved in developing the master plan for building,
14    construction --
15        A    Every step of the way.
16        Q    Was it because of her role with the Board of
17    Regents that she called you about the Hayden Barnes' letter?
18        A    She called me because the Board of Regents called
19    her when they didn't know what was going on at Valdosta
20    State.
21        Q    I guess my question is:  Was she the designated
22    person because of her involvement with the master plan?
23        A    Yeah.
24        Q    I mean, would that be her job?
25        A    Yes.  That seems logical.
```

Page 105



1              MR. CORN-REVERE:  I think this might be a good

2       breaking point.  If you want to go off the record, we can

3       break for lunch.

4              MR. WILL:  All right.

5              (A lunch recess was taken from 12:05 p.m. to 1:22

6       p.m.)

7    BY MR. CORN-REVERE:

8       Q     Before lunch, I guess, we were talking about the

9    contacts that you had, Dr. Zaccari, with Linda Daniels at

10   the Board of Regents.

11             And as I recall in one of your answers before

12   lunch, you talked about how they had received, I believe the

13   quote was, a barrage of emails and phone calls.

14             Can you explain what you mean by that?

15      A     Are you referring to Linda Daniels?  The System

16   office?

17      Q     Or perhaps even -- just so we clarify the

18   reference, you had talked about a barrage of emails and

19   phone calls; and I just wanted to find out more about what

20   you were talking about when you made that reference.

21      A     I was referencing the telephone calls from the

22   Board of Regents, who, in turn, called Linda Daniels after

23   the telephone calls initiated by Mr. Barnes.

24             And then from that point, Governor's office calling

25   the System office and the follow-up that I had to do to

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    address those particular telephone calls.

2            I referenced the emails that were exchanged.   The

3    email that Mr. Barnes initially sent.

4            So, what I'm saying is that I had to respond to the

5    System office as a result.   I used the word to encompass --

6    tried to holistically present -- there were a lot of

7    correspondence and reactions that we had to follow-up to on

8    campus.

9        Q    Okay.   How many calls are there in a barrage?   I'm

10   just trying to get a sense of what you're referring to.

11           MR. WILL:   I object to the form of the question.

12   BY MR. CORN-REVERE:

13       Q    What did you mean when you used the word "barrage"?

14       A    More than what we typically have to respond to in

15   the President's office.

16       Q    Okay.   Do you have a sense of how many calls you

17   typically have to respond to so we have a basis of

18   comparison?

19       A    It varies so frequently.   A barrage would mean --

20   I'm not going to put a number on it.   I'm just going to say

21   more than frequently.   Than usual.

22       Q    Okay.   And with respect to emails, if one email is

23   sent to six or ten recipients, would that be a barrage?

24       A    Can't put a number on it.

25       Q    Okay.   Well, again, when you're talking about a

Page 107

1    barrage of emails, were you talking about a number of

2    individual different emails with different text, or were you

3    talking about one email that may have been copied to many

4    people?

5        A    Barrage can also mean the frequency coming in

6    simultaneously.  Not only the differences but

7    simultaneously.  So, it's all sort of like a lot of

8    variables converging at one point.

9             So, you're sitting in the President's office, and

10   you get a call from the Chancellor.  That captures your

11   attention immediately.

12            What's the call about?  Why is the Chancellor

13   calling for -- the individual President's office?

14            So, I acknowledge that Board of Regents members are

15   calling the System office trying to respond to a student's

16   inquiries in opposition to parking decks.

17            Obviously, you want to try to understand what's

18   going on.

19       Q    Okay.

20       A    And following that, the telephone calls from Linda

21   Daniels with concerns about what was going on.  She was

22   following up to her responsibilities to respond to the Board

23   of Regents.

24            Obviously, she wants to do an excellent job when

25   the Board of Regents calls in and says, "What's going on?"

Page 108



1    She has to embark on some inquiry to give an explanation to

2    the Board of Regents.

3           That's what I meant by barrage.  Simultaneous.  Not

4    so much expanded numbers but a lot of activity occurring

5    simultaneously.

6    Q    So, just to focus more tangibly on the exhibits we

7    have had, Exhibit Number Eight was the email that Linda

8    Daniels forwarded to you?

9    A    Yes.

10   Q    And, so, is it your understanding that a barrage of

11   emails would be this one email sent to a number of different

12   public officials, including members of the Board of Regents?

13   A    I don't know what was sent to the public officials.

14   All I know is responding to the inquiries.

15   Q    You testified that you requested a meeting with

16   Mr. Barnes on April 16th, 2007?

17   A    Yes.

18   Q    Did that meeting take place?

19   A    Yes.

20   Q    Can you tell us what happened at that meeting?

21   A    It's well outlined in my response, but I will give

22   you a brief explanation.

23   Q    If you want to start with a brief explanation, then

24   we can look at some of the specifics in your response.  That

25   would help.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    We met.  I asked about his opposition to the

2    parking deck.  I attempted to explain the background of how

3    we arrived at the approval of the construction of the

4    parking decks.

5         The bonding, funding, the conduit of student fees

6    going into the construction of the parking decks.

7         I talked sincerely to him about trying a different

8    approach in making his points known.  Trying to get on the

9    positive side of things, to use leadership skills to get

10   things done in a positive direction.

11        I mentioned to him my own sons who were age 45 and

12   43.  I was trying to counsel with Mr. Barnes, as I would my

13   two sons, that there are other ways of achieving productive

14   results.

15        He  listened.  I don't think he responded extremely

16   well.

17   Q    What do you mean by that?

18   A    I don't think he was assimilating the facts and the

19   issues of the business operations of the university's side.

20   Q    So, you didn't persuade him of your view?

21   A    I didn't.  No, I didn't persuade him of anything,

22   in my opinion.  It was nonresponsive.  It was like, "I'm not

23   talking to you.  I'm listening to you.  I'm here."

24        I asked him about his approach.  I'm not saying I

25   wasn't stern, but I wasn't angry.

Page 110

1     Q     Uh-huh.

2     A     I wasn't upset.  I was simply trying to make a

3    point that I didn't understand his actions and also, I

4    believe, Mr. Mast asked him -- Mr. Barnes, that is -- why he

5    didn't go through some of the usual procedures that students

6    avail themselves to have their opinions and voice heard.

7           And Mr. Barnes reacted that they can't -- they

8    don't represent him.  They don't do anything.  He was going

9    off on his own.

10          So, it was a meeting.  The first time I've had a

11   chance to meet the student.  I, again, tried to establish

12   some type of zone in which we could have -- start some type

13   of productive discussion, but that's not what happened.

14    Q     When Mr. Barnes arrived in your office for the

15   meeting, did he ask if his girlfriend could join you in the

16   meeting?

17    A     Yes.

18    Q     What did you say?

19    A     No.

20    Q     Why?

21    A     I said it was -- the discussion was going to be

22   among three individuals:  Dean Mast, Mr. Barnes and myself.

23    Q     When you asked Mr. Barnes to join you in his

24   office, did you gesture to him to come in?

25    A     I always -- I usually meet people out in the lobby



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    and invite them into my office.

2           I don't remember if I gestured or started moving to

3    the back section of the office.

4    Q    Okay.  The reason I ask is because you described

5    your tone in the meeting as stern, and I wonder if you might

6    have summoned him to the meeting by, you know, wagging your

7    finger to come in or pointing at him or something like that.

8           What's your recollection of that?

9    A    I do not have any recollection that I did anything

10   that would be demeaning.

11   Q    Okay.  But when the meeting began, you characterize

12   your tone in the meeting as stern?

13   A    Stern, not -- not typical in the sense of, you

14   know, sitting down and having -- most of my meetings, I

15   don't get into this level of discussion.  It's usually on a

16   very positive note.

17          And, so, it was a little bit different.  I was

18   simply inquiring with some questions about where are you

19   coming from, what is this about, let me have some

20   opportunity to share with you some thoughts that I have

21   about the issue.

22          My focus was on the hard work that the university

23   community had done; the arduous process of going through 18

24   months of planning and consensus building with the

25   community, neighborhoods, as well as the campus; getting the

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     Board of Regents to understand a ten-year project of moving

2     the university in new directions.

3          And I simply asked, you know, why this sudden

4     intervention by your views that don't seem to fit the

5     mainstream of the rest of the university.

6          He has a right to do that.  And, again, I

7     emphasized -- there was -- there were three weeks there was

8     no activity involved after that meeting.  Everything in my

9     opinion was resolved and moving on.

10    Q     When you refer to that meeting, are you talking

11    about the April --

12    A     The 16th.

13    Q     So, everything was fine for three weeks after the

14    April 16th meeting?

15    A     There wasn't much going on after that.

16    Q     As a university President, can you understand how

17    it might be intimidating to an undergraduate student for the

18    university President to have a stern talk with them about

19    their political views?

20    A     Why would that -- no.

21    Q     Really?

22    A     No.

23    Q     Is that a frequent occurrence?

24    A     No.

25    Q     Were you ever an undergraduate student?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    Yes.

2    Q    Can you imagine how you would feel if the

3    university President called you into his office to ask for

4    you to account for your political views?

5    A    He was called in my office because he requested the

6    meeting, and we had a discussion about his views, yes.  I

7    simply -- the question was:  Did he understand all of the

8    work and projects leading up to his opposition, not the

9    opposition; did he understand the earlier parts of it.

10   Q    Okay.  Again, I'm still confused because your

11   letter to the Board of Regents says, "I requested a

12   meeting" -- you requested the meeting with Mr. Barnes?

13        MR. WILL:  I believe he's already answered that

14        this morning before the break.

15        THE WITNESS:  There's documentation somewhere in

16        the file that he requested a meeting with me.

17   BY MR. CORN-REVERE:

18   Q    Did Mr. Barnes tell you why he requested the

19   meeting with you?

20   A    No.

21   Q    Now you said the meeting lasted for approximately

22   an hour and ten minutes; and the topics discussed included

23   his, Mr. Barnes', lack of knowledge on how parking decks are

24   financed, required business models, public/private

25   partnerships, mandated processes, sequences in the

Page 114

1    University System of Georgia master planning process and

2    procedures for the Board of Regents' approval.

3              I take it that these were topics that you brought

4    up in the meeting.  Is that correct?

5    A      I brought up some of those points to explain why I

6    thought the flyer didn't make a lot of sense when it's

7    trying to divert funds into other activities that could not

8    be funded.

9              So, I thought a clarification of his points would

10   help to understand where the university stood in terms of

11   the construction.

12   Q      Is it fair to say that you did most of the talking

13   in this meeting?

14   A      When you say "most," you mean what?

15   Q      More than half?

16   A      What?

17   Q      More than half?

18   A      Probably did more than half.

19   Q      Seventy percent?

20   A      More than half.

21   Q      Okay.  Was Mr. Barnes disrespectful to you in the

22   meeting?

23   A      Disrespectful, no.

24   Q      Did he act aggressive in any way?

25   A      No.

Page 115

```
 1     Q      Now, on the last sentence of page two, you say that

 2   Mr. Barnes appeared to listen.

 3          What did you mean by that?

 4     A      Nonresponsive.

 5     Q      Meaning he didn't talk after you made these points?

 6     A      He seemed to be uninterested in talking about it.

 7     Q      I'm sorry?

 8     A      He was not interested -- it appeared to me that he

 9   was not interested in any of the points that I was making.

10     Q      So, when you say, "he appeared to listen," are you

11   intending to mean that he wasn't listening?

12     A      Yes.

13     Q      Did that annoy you?

14     A      Not particularly.  Annoyed, no.  Puzzled, yes.

15     Q      And you say here that you attempted to redirect his

16   energies.  In what way?

17     A      I thought I've already covered that.  Trying to

18   take his activities and find a more positive conduit to work

19   within the university structure to get things done and to

20   make his voice heard in positive ways that could really work

21   with him and understand his concerns.

22          The first time I heard the concern was to have a

23   flyer stuck on the door.  I understand he has the right to

24   do that, but the puzzling and confusing part was there,

25   obviously, are better ways for us to handle these kinds of
```

Page 116

1    discussions.  That's what I wanted to -- that's what I hoped

2    for, but that's not what I experienced.

3        Q     Okay.  And, so, if I understand your testimony,

4    your goal of the meeting was to redirect his energies into

5    what you viewed as a more productive discussion of the

6    issues.

7        A     No.  It was an opportunity for us to hear what the

8    issues were.  But, again, he was nonresponsive.  Really

9    didn't want to talk about the points of view that I brought

10   up.  The nonresponsive demeanor.

11       Q     Okay.  But, again, I'm trying to figure out what

12   you mean in this letter to the Board of Regents where in the

13   first sentence of the first full paragraph on page three,

14   you say, "The remaining time was spent attempting to

15   redirect his energies in a more positive direction."

16       A     Uh-huh.

17       Q     So, was your goal to get him to cease doing the

18   kind of advocacy he was doing and instead engage in the

19   issue of the parking garage in a way that you thought would

20   have been more constructive?

21       A     I made some recommendations in a way -- university

22   environment works in a positive way.

23       Q     And was it your hope that he would accept your

24   recommendations?

25       A     Well, obviously, I was hoping that we could make



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    some progress in understanding about the construction of the

2    parking facilities based on a lot of planning, yes.  That

3    was my intent.

4       Q    And then the last sentence of that paragraph on

5    page three says, "He was not interested in my views, a fact

6    supported by the student's subsequent statements that mock

7    my attempt to advise and communicate with him."

8            Do you see that sentence?

9       A    Where is that, sir?

10      Q    It is the last sentence of the first full paragraph

11   on page three right before paragraph numbered eight.

12      A    (Reviewing document.)  Yes, I see that.

13      Q    Okay.  Is that an accurate statement --

14      A    Yes.

15      Q    -- of your position?

16      A    Yes.

17      Q    Why was it a problem for Mr. Barnes not to be

18   interested in your views?

19      A    I answered -- I can't answer that for him.

20      Q    Why was it a problem for you?

21      A    As I say, he wasn't listening to my opinion.

22      Q    And you feel he should have been listening to you?

23      A    I thought that's why he wanted the meeting.

24      Q    Okay.  And I take it you also wanted to meet with

25   him because of the call you got from Ms. Daniels.  Is that

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    right?

 2        A      Yes.

 3        Q      So, you had goals for this meeting in terms of

 4    redirecting his energies.  Isn't that right?

 5        A      I was hoping it would be far more productive than

 6    it turned out to be.

 7        Q      Are students required to be interested in your

 8    views?

 9        A      No.

10        Q      Are students not permitted to mock you?

11        A      He obviously did it.

12        Q      Well, obviously -- let's talk about what's obvious

13    or not.

14               What did you mean by "mocking your attempt to

15    advise and communicate with him?"

16        A      Again, he was disinterested -- it's the reverse.

17    He was disinterested, and I just felt that it was -- by his

18    expressions and body language, it was -- what I had to say

19    was of very little value or interest to him; that he was

20    more interested in his own views than anyone else.

21        Q      So, in other words, he wasn't persuaded by your

22    presentation.

23        A      Didn't appear to be.

24        Q      Let's look at paragraph eight on page three.

25        A      (Reviewing document.)
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     Q     You mentioned an email that Mr. Barnes sent to you

2   that references Easter Island, and you characterize it as,

3   quote, mocking the meeting's discussion of required business

4   plans, closed quote.

5     A     Yes.

6     Q     What did you mean by that?

7     A     Obviously, as outlined we spent a lot of time

8   talking about the funding processes for the projects.

9           The email said something about a business plan at

10  Easter Island.

11          So, my assumption was he did not listen; he did not

12  care about the business plans and put the references

13  together about a business plan on Easter Island.

14          To me, it was unintelligible about what he meant by

15  Easter Island business plan.  But the business plan

16  referenced seemed, to me, that he took away from the

17  meeting -- "I didn't really care what you have to say about

18  business plans."  That's what I meant by --

19    Q     Did you know -- I'm sorry.  I don't want to cut off

20  your answer.

21    A     Go ahead.

22    Q     Do you recall whether or not that email made

23  reference to a book by the author Jared Diamond, the title

24  of which is Collapsed or Collapse?

25    A     I remember that reference.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Okay.  Do you know that book?

2    A    No.

3    Q    Do you understand the reference to Easter Island as

4    being a reference to the problem with environmental

5    degradation?

6    A    I didn't make that connection.

7    Q    Have you subsequently searched for the book by

8    Mr. Diamond?

9    A    No.  Mr. Barnes made a reference that he was

10   getting a copy to me.  I didn't receive it.

11   Q    Did you consider that to be a threatening gesture?

12   A    I thought it was out of the ordinary.  I didn't

13   quite understand the meaning of it.  So, I wouldn't say it

14   was a threat, but it was an indicator.

15   Q    And indicator of what?

16   A    It's an indicator of something that I had not

17   experienced with students.

18   Q    Do you think it's out of place for a student on a

19   university campus to offer a professor or an administrator a

20   copy of a book that discusses a public issue?

21   A    That might be so.  I'm talking about my experience

22   at the time with Mr. Barnes.

23   Q    And I'm trying to understand why the recommendation

24   or even the offer to send you a book would be taken as

25   anything other than an interest in spreading knowledge?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    I didn't take it that -- I didn't say I didn't --

2  was disinterested in the book.  I was interested in the

3  approach.

4    Q    Okay.  And you considered the email to be mocking

5  you?

6    A    Yes.

7    Q    The next line states in paragraph eight, "I began

8  to view Mr. Barnes' behavior as the inability to listen,

9  opposition to the administrative policies of the university

10  and the University System of Georgia and interested in

11  promoting -- in only promoting self interests."

12        Did I read that correctly?

13    A    Yes.

14    Q    Does that accurately state your position?

15    A    Yes.

16    Q    Is there anything wrong with a student opposing the

17  administrative policies of a university of the University

18  System of Georgia?

19    A    No.

20    Q    I'm sorry?

21    A    I said no.

22    Q    What do you mean by the expression "only promoting

23  self interests"?  And what's the problem with that?

24    A    I felt that he was closed to listening to other

25  points of view that would help describe his opposition to

Page 122

1     the master planning process and to the university goals and

2     objectives as approved by the Board of Regents.  That's what

3     I meant by that statement.

4          Q     Okay.  So, is it fair to say your concern was that

5     you felt that Mr. Barnes wasn't open to persuasion on this

6     issue?

7          A     He wasn't open to anything that, basically, was

8     going on.

9          Q     Okay.  And then the final statement in that

10    paragraph is, "No other views other than his own appeared to

11    be of interest."

12                And that's your position?

13         A     Yeah.

14                MR. CORN-REVERE:  Let's mark as Zaccari Deposition

15         Exhibit Number Nine an email from Hayden Barnes to

16         President Zaccari.

17                (The document was marked for identification as

18         Plaintiff's Exhibit Number Nine.)

19                THE WITNESS:  (Reviewing document.)

20    BY MR. CORN-REVERE:

21         Q     Have you had a chance to look at this exhibit?

22         A     I've seen it.  I've read it.

23         Q     And this email was sent to you on April 16th, 2007?

24         A     Yes.

25         Q     Do you remember receiving it at the time?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     A     Yes.

2     Q     Did you have a reaction to it?

3     A     Yes.

4     Q     What was that reaction?

5     A     In reference to different campuses not
6  understanding the internal operations of parking and shuttle
7  services and the density of land use and the number of
8  parking lots that would be adjacent to or remote to the
9  university, there's no understanding what these references
10 are about.

11          Again, I don't want to generalize by saying these
12 work at other campuses in different geographic locations and
13 under different circumstances in terms of land continuous or
14 remote to the main campus of the university.

15          The other reaction was that Valdosta State does
16 have remote parking.  We do have a shuttle service, and
17 students at Valdosta State took very little advantage of the
18 opportunity to use the remote lots and the shuttle service
19 that we had available with our busing system.

20    Q     Okay.  So, the letter -- the email to you states,
21 "President Zaccari, below I have listed schools I have found
22 which utilize some form of remote parking facilities.  Most,
23 if not all, provide shuttle service to and from these remote
24 parking lots."

25          And that lists different universities, about 14 of

Page 124

1    them, that have those.

2         Your reaction to that was that Mr. Barnes failed to

3    understand the parking situation at Valdosta State so that

4    these examples weren't relevant to the issue?

5         Convoluted question.  Let me rephrase it.

6         MR. WILL:   Thank you.

7    BY MR. CORN-REVERE:

8    Q    First of all, just stating what this email is, is

9    it fair to characterize it as his sharing with you examples

10   of other campuses that use remote parking?

11   A    It's a list.

12   Q    Okay.  And your reaction was that -- correct me if

13   I'm misstating your testimony -- was that this failed to

14   come to grips with the situation at Valdosta State.?

15   A    Yes.

16   Q    So, is this email that you received after your

17   meeting with Mr. Barnes an example that you were referring

18   to when you say that no views other than his own appear to

19   be of interest?

20   A    That's what this represents:  His view that parking

21   decks are not to be built; the remote areas are a better way

22   to go.  We've researched that.  I've already mentioned the

23   need for 27 -- there's a deficiency of 2700 parking spots on

24   the campus.

25             I don't know what the deficiency ratio of these

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    other campuses are.  I don't know the land usage at these
2    other universities.
3            I couldn't apply any of these suggestions to the
4    campus at VSU.
5            I felt that it was a response reinforcing his point
6    of view, which I outlined in here, that is his interest to
7    do this rather than proceed with the parking decks; to find
8    alternative solutions.
9            This alternative -- this listing did not answer the
10   issues that were going to be on the agenda the following
11   day.  This came in at 7:09 p.m.  I wasn't in my office at
12   7:09 p.m.  I was on the road that evening to Georgia
13   Southern.
14           So, this was -- this was sent on April 16th at 7:09
15   when I was traveling to Georgia Southern for the morning
16   meeting on the 17th.
17   Q     Okay.  So, Mr. Barnes appeared to go out and
18   research the situation on other campuses to address the
19   situation, and your reaction was that research isn't
20   adequate?
21   A     I simply made a review that I could not use this
22   information; that we had already moved well beyond looking
23   at these alternatives in the master plan.
24           The assumption is that the university never looked
25   at these alternatives that were suggested by Mr. Barnes in

Page 126



1    the 18 months of master planning, which we did.  There were

2    a lot of alternatives that were mentioned by Mr. Barnes in

3    the master plan consideration and discussions on campus

4    community.  Open discussions.

5          So, this wasn't anything new.  It had already been

6    considered and not considered to be a viable approach for

7    Valdosta State.

8    Q     Okay.  So, there's no need for him to think about

9    it, right?

10   A     No.  I just said -- you asked what my reaction was.

11   Q     Yeah.

12   A     The reaction was that we've already been through

13   all this.

14   Q     And you seemed a little bit annoyed that he sent it

15   to you at 7:09 the evening before --

16         MR. WILL:  I object.  Mischaracterization of the

17      testimony.

18         THE WITNESS:  That's when it came.  I wasn't in

19      the office.

20   BY MR. CORN-REVERE:

21   Q     Looking back at Exhibit Five, paragraph nine, you

22   state, "Dean Mast provided you a copy of the document

23   generated by Mr. Barnes where he had posted a picture of an

24   image of a parking deck with the words "S.A.V.E. - Zaccari

25   Memorial Parking Deck."  Do you see that?



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1    A    Yes.

2    Q    Are you talking about Mr. Barnes' Facebook page?

3    A    Yes.

4    Q    Are you certain that Dean Mast is the one who

5    provided you with the copy of the Facebook page?

6    A    That's what I understand.

7    Q    Is there -- do you remember, yourself, who gave you

8    the page?

9    A    Dean Mast saw it.  Obviously, was either exploring,

10   found it, or it was brought to his attention.  But he is the

11   one that brought it to the attention of the President's

12   office.

13   Q    Okay.  I mean, the reason I'm a little puzzled is

14   because Dean Mast yesterday testified that he did not give

15   you a copy of the Facebook page and said that he has never

16   had a Facebook account.

17        So, is it possible someone else gave you the

18        Facebook page?

19   A    I don't know where it would have come from.  As far

20   as I knew, it didn't come from the President's office.

21   Q    Do you have any recollection of someone other than

22   Dean Mast giving you a copy of the Facebook page?

23   A    No.

24   Q    Do you have a recollection of the circumstances

25   under which Dean Mast gave you the Facebook page?
```

Page 128



1     A     I recall that the telephone call was made that

2  Mr. Barnes had put this on his Facebook.  I don't know where

3  that copy came into my office.  Maybe my administrative

4  assistant can shed some knowledge of exactly what happened.

5           But as far as I know, the President's office does

6  not have a Facebook account; and I don't remember any one of

7  my assistants doing anything about getting into a Facebook

8  account.

9           So, my point is:  It did not come, as far as I

10  know, from the President's office.

11    Q     Okay.  Well, again, I'm just trying to get a sense

12  of where it came from; because, as you testified earlier,

13  you wrote this letter and it appears from what you have

14  written here that you had a firm recollection of how the

15  Facebook page came into your possession.

16          I just wanted to explore that a bit.  Did you have

17  a meeting with Dean Mast?

18    A     I don't believe so.

19    Q     What were the circumstances that you recall that

20  led to his handing you the Facebook page?

21    A     It may have come through my administrative

22  assistant and was given to me.

23    Q     Theresa Boyd.

24    A     Yes.

25    Q     How would that have worked?  Someone would have

Page 129

1  given her the Facebook page, and she would have given it to
2  you?
3      A    That's usually how materials come into the
4  President's office.  I don't -- it's the way they come in.
5      Q    Do you have a recollection of a conversation with
6  Dean Mast about the Facebook page?
7      A    No.
8      Q    Did you receive the Facebook page on Friday,
9  April 20th, 2007?
10     A    I think it was in that -- it was either the 20th or
11 the 23rd, which would've been Monday.  So, Friday the
12 23rd -- it was a Friday -- or the 20th was a Friday, and the
13 23rd was a Monday.
14          So, it was sometime during that period either on
15 Friday or Monday.
16     Q    Now April 17th and 18th was the Board of Regents
17 meeting, so you were out of town, right?
18     A    Yes.
19     Q    And is it fair to assume that you would not have
20 received the Facebook page while you were at the Board of
21 Regents meeting?
22     A    No.  It did not come in at that point.
23     Q    Were you in the office of April 19th or were you
24 traveling that day?
25     A    I believe I was back in the office on the 19th.

Page 130



1    Wasn't the -- the Easter Island email was dated the 20th,

2    the Friday.  So, I'm assuming that that Facebook followed

3    the Easter Island on that Friday or the following Monday,

4    the 23rd.

5       Q    So, on April 20th you would've received the email

6    with the Easter Island reference?

7       A    I believe that's right, yes.

8       Q    Did you ask anyone to search Facebook for any

9    information about --

10      A    No.

11      Q    -- Hayden Barnes?

12      A    (Shakes head.)

13      Q    When you received a copy of the collage from

14    Facebook that you refer to here, was it a single page?

15      A    I don't remember.  I think it was more than a

16    single page.

17      Q    Okay.  Well, in the next paragraph, you refer to

18    other material from Facebook that you received about Hayden

19    Barnes.

20          It says it made reference to the Virginia Tech

21    shooter.

22      A    Uh-huh.

23      Q    It says, "The topic of attachment number five is

24    focused on the misunderstandings of people who suffer from

25    psychological disorders."

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          It has an article and a reference to, "Shoot it,

2     upload it, get famous.  Project spotlight is searching for

3     the next big thing.  Are you it?"

4          Were these the other pages that you were referring

5     to?

6     A     I think those were constructed from all the pages

7     from Facebook and some other personal statements as outlined

8     in paragraph 11.

9          So, that refers to all of the entries on the

10    Facebook that came in that particular day.

11    Q     Is it your recollection that Dean Mast gave you

12    these pages, as well?

13    A     Yes.

14    Q     Did he give them to you at the same time as the

15    collage from Facebook?

16    A     I've already mentioned that there wasn't a physical

17    handing of these.  They came to the President's office, and

18    I had an opportunity to review all the Facebook entries that

19    were copied.

20    Q     Help me understand that.  I mean, how did they come

21    to the President's office?

22    A     I said we are going to have to get clarification

23    from my assistant.

24    Q     Did someone just leave them in your inbox?

25    A     No.  They, obviously came in from some particular

1    place.

2        Q    Well, did someone hand them to you?

3        A    My assistant.

4        Q    Did she say anything when she handed them to you?

5        A    She said, "Here are the Facebook entries that were

6    referenced by Dean Mast."

7        Q    Referenced in what form?

8        A    If I recall, a telephone call saying Mr. Barnes had

9    posted these comments on his Facebook.

10       Q    Do you remember anything more about it than that?

11       A    No.

12            MR. CORN-REVERE:  Let's mark as Deposition Exhibits

13       Numbers 10 and 11 -- the collage and then as 11 the

14       Facebook page.

15            (The documents were marked for identification as

16       Plaintiff's Exhibit Numbers 10 and 11.)

17            THE WITNESS:  (Reviewing documents.)

18   BY MR. CORN-REVERE:

19       Q    Have you had a chance to look at these, or are they

20   still being --

21       A    Ten, yes.

22       Q    Okay.  Let's look first at Exhibit 10, the collage.

23   I think you testified that you perceived this as a threat to

24   you?

25       A    Yes.



1     Q     Why?

2     A     I was concerned that there was some controversy

3     about the students in the S.A.V.E. organization and

4     supportive philosophies and Mr. Barnes' reluctance to get

5     engaged with the S.A.V.E. organization and go off on his

6     own.

7           I saw my name referenced to memorial; I saw my

8     picture, and I couldn't understand and questioned why a

9     student would take the time to get -- extract my picture and

10    apply the statement "memorial" and include a student

11    organization side by side, which set in motion, to me, that

12    I did not really understand this student and where he was

13    headed with his -- my attempt to understand emails, now a

14    picture, now a reference to memorial, bringing the students

15    from the S.A.V.E. organization in.

16          I began to not only feel threatened, but what was

17    the next step and what would the university President and

18    other officials at the institution do in the wake of the

19    shootings that had taken place and some similar kinds of

20    messages that were left from people who have some issues

21    that personally can't be resolved.

22          So, when this came in either on the 20th or Monday,

23    the 23rd -- it was that week between the 23rd and the 27th

24    of April immediately following the Virginia Tech shooting

25    where more and more information was coming out of what

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    happened.

2          There was a lot of discussion in higher education

3    about:   Did the administration of Virginia Tech act in a way

4    that could have prevented or understood or openly

5    communicated about the potential problem on campus?

6          It was a very difficult time, as I've said many

7    times in my writings to this reaction to this situation.

8          I thought this was an intimidation factor to give

9    more attention to his points of view rather than the

10   university's approved points of view.

11         These were not President Zaccari's visions and

12   plans; this was a combination of Board of Regents,

13   facilities management and Board of Regents System office and

14   the campus and the community.

15         So, the intimidation factor started to come into

16   play.  I had no knowledge of Mr. Barnes' background leading

17   into the week of April the 23rd.  I had no background of his

18   history and -- or anything that would lead me to believe

19   that this was not an intimidation/threat factor.

20         On the 23rd to the 27th is when I tried to gather

21   as much information about what Mr. Barnes is leading to with

22   this type of correspondence, entries of what was coming out

23   of Virginia Tech, the concerns about a lack of

24   administrative overview, a lack of silence on certain

25   administrative points of view, and the questions coming from

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    the parents of a lot of our students who were calling in.

2            And my staff can attest to the number of telephone

3    calls coming in and saying, "Are you safe at Valdosta State

4    University?  Are you sure that our campus is not going to

5    involve similar types of things?  We're very, very concerned

6    about our children.  Should we move them off campus?  Should

7    we bring them home?"

8        Q    When did those calls start coming in?

9        A    They started coming in on the week of the 16th.

10       Q    The same day as Virginia Tech or --

11       A    Well, yes, that's when it happened.  And all the

12   week of the 16th.  We were receiving a lot of inquiries

13   about what's going on; what kind of safety factors we have

14   in place.

15       Q    I believe your testimony earlier was that "we were

16   all reeling from what happened at Virginia Tech."

17       A    That's right.  The other articles were coming out

18   saying that the administration didn't pay attention to the

19   warning signs.

20           So, that's when I called a number of officials at

21   the university in for a meeting for a general discussion

22   about Virginia Tech; what we had for safety measures; how we

23   contacted people on campus for safety issues if an emergency

24   were to arise; how all those elements were coming into play.

25           Because the Chancellor's office simultaneously

Page 136

1    started to try to help the university presidents with

2    information that would be of some assistance.  I think they

3    appointed a task force to look at these issues.

4         So, your question:  Yes, I thought that was an

5    intimidation factor.  I thought it was something of a red

6    flag that we had to pay attention to, and it wasn't

7    something starting with the week of the 23rd that I was just

8    going to let sit there and not pay any attention to it.  It

9    captured my attention.  It was a serious situation.

10        It's my responsibility for the safety on campus of

11   thousands of people.  I didn't know what that meant, but I

12   took it for exactly what the face value of it meant; that

13   memorial meant -- that the S.A.V.E. organization and the

14   President of the university may be memorialized in a parking

15   deck.

16        And, that, I will stand on today.  I will never

17   allow anyone to think that my opinions were not important

18   and they were not real and sincere, and that's the way it is

19   and it is today.

20   Q    And you believe the threat was equally serious for

21   the S.A.V.E. organization as it was for you?

22   A    I was very concerned about that, yes.

23   Q    Did you notify anyone in S.A.V.E. that they might

24   be in danger?

25   A    I did not at that point.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q      Why not?

2      A      Because I wanted to find out more about the

3   student.

4      Q      Did you ever notify anyone in S.A.V.E. that they

5   might be in danger?

6      A      No.

7      Q      And you thought the danger for them was equally as

8   serious as it was for you?

9      A      I thought the intimidation factor was there, yes.

10     Q      Wasn't one of the criticisms of Virginia Tech that

11   the university was slow in sharing information about the

12   danger with students?

13     A      I think it was not so much in getting -- there's a

14   difference here.

15            The difference was that the shootings had taken

16   place.  The killings had already taken place.

17     Q      Part of them.

18     A      Well, I'm talking about --

19     Q      Just recalling that day, weren't there shootings in

20   the morning in the dormitory --

21            MR. WILL:  Listen to the question.

22   BY MR. CORN-REVERE:

23     Q      Just to recall the events, weren't there shooting

24   earlier in morning in a dormitory and then later there were

25   shootings in a classroom building?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          And wasn't one of the concerns at Virginia Tech was

2   that the university was slow in notifying students on campus

3   of the danger?

4      A    The criticism -- that's part of the criticism, but

5   the criticism was, prior to that, that there was not enough

6   attention paid to the warning signs that were coming out

7   from the shooter.

8      Q    And you never notified S.A.V.E. that you believed

9   they were in danger because of this collage?

10     A    I'm saying that this was the beginning of my

11  concerns.

12          I didn't know what was behind this.  It was the

13  initial factor that I was concerned about what was going on.

14     Q    But at some point you went beyond the initial

15  concern, and it ripened into what you've described as

16  full-blown concern.

17          Why didn't at that point you notify S.A.V.E. that

18  you were concerned for their safety?

19     A    There are a number of reasons why.  First, I wanted

20  to find out more about the student's background.

21          Secondly, we were heading into the final stages of

22  the spring semester.  Parents were very alarmed about

23  pulling their children out of the university because of what

24  happened at Virginia Tech.

25          I had a responsibility to bring safely the

Page 139

1    conclusion of the spring semester, which was heading into

2    the final days of regular class and then four days of final

3    examinations.

4         We talked extensively in the division group about

5    how do we approach -- not disrupting -- not disrupting the

6    total campus and having sort of a panic-driven response

7    where students are calling their parents and saying, "We

8    have something that administration is concerned about;

9    there's been a threat against the President and some

10   students."

11        That would've been most disruptive at that

12   particular period.  So, we embarked on an investigation,

13   some sharing of some pertinent information, putting in the

14   Facebook elements, putting in some of the statements that

15   were made in here and beginning to look at the profile of

16   Mr. Barnes.

17        I had a responsibility to the total university at

18   that point to bring that semester to a successful conclusion

19   and, at the same time, investigate and see where this -- I

20   can't change my feeling or my reaction to this, but I had

21   the other responsibility to this student and to all the

22   thousands of others and, at the same time, giving Mr. Barnes

23   the opportunity to finish his semester's work while we went

24   through an investigation and had a little more awareness of

25   actually what was going on.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    If you thought he was an actual danger, why did you

2    allow Mr. Barnes to finish the semester?

3    A    I said it was the initial reaction.  I was

4    concerned -- personally, I was concerned about it, and I was

5    concerned about the students.

6         I did not put the plan -- a plan in action until we

7    had more understanding of what this situation was about.

8    Q    Now you testified that calls from parents and other

9    concerned people started coming in on April 16th about

10   Virginia Tech and that you were all reeling from the events.

11        How did you find the time on April 16th to meet

12   with Mr. Barnes?  Weren't you dealing with all the fall-out

13   with Virginia Tech?

14   A    We didn't have a lot of fall-out.  We didn't

15   understand.  All we were hearing was there were shootings on

16   the campus on the 16th.

17   Q    You testified that you were receiving calls the

18   same day.

19   A    No.  Receiving calls that week of the 16th.

20   Q    You didn't get calls the day of Virginia Tech?

21   A    If we did, it would've been late in the afternoon.

22   I was in meetings with S.A.V.E., and I was in a meeting with

23   Mr. Barnes, and I was on the road to Georgia Southern.

24        The point is:  The calls came in and they were

25   concerns of parents.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    And I believe you testified earlier that you became

2    aware of the events at Virginia Tech the morning of the

3    16th.

4    A    Just that there had been some shootings on the

5    campus.  That's it.

6    Q    In your meeting with Mr. Barnes on that day, did

7    the topic of Virginia Tech come up?

8    A    No.

9    Q    It wasn't relevant to --

10    A    Didn't talk about it.  I had no connection with

11    Virginia Tech and Mr. Barnes.  We were talking about parking

12    decks.

13    Q    Yes.  Looking at Exhibit 10, the collage, if the

14    word "memorial" had been left off this collage, would you

15    have been fine with it?

16    A    Hypothetical.  I don't know.  It's included.  Has

17    to be responsible for what he put on the paper.

18    Q    Have you ever asked Mr. Barnes what he meant by the

19    word memorial?

20    A    Nope.

21    Q    Did you ever try to find out what he meant by the

22    word memorial?

23    A    I'm finding out about other elements of his

24    background.

25    Q    Oh.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1       A       I did not ask him about memorial.

2       Q       When you say other elements of his background, what
3   do you mean?

4       A       Well, I meant that I asked other opinions of
5   Mr. Barnes' background.  I looked at his academic record.  I
6   had not looked at his transcripts.  I found that he arrived
7   here with a 1.83 overall grade point average from his
8   earlier experience and about 157 quality points, 82 hours
9   earned.

10          Had some problems with mathematics.  Had not
11  completed his math requirements.  Had withdrawn from college
12  algebra in the spring semester.

13          Was beginning to look at the academic records,
14  which was an indication that -- we were beginning to look at
15  what kind of a profile students who put these types of
16  activities in motion.  What you look for.

17      Q       Okay.  So, I believe you testified that you began
18  to get these concerns to look more deeply into it --

19      A       Yes.

20      Q       -- the week of April 23rd?  Is that right?

21      A       Yes.  It was the week of April 23rd.  That Monday,
22  the 23rd, through the 27th.

23      Q       Glad you didn't look at my math grades.

24          Now when you say that you were concerned about the
25  collage, I want to look back at Exhibit Number Two; because

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    I wonder if you have a similar reaction to the parody that

2    was published about you in the Spectator.

3             I believe you testified that with Mr. Barnes'

4    collage you were concerned because it had your picture.  Is

5    that right?

6        A    Yes.

7        Q    Did the Spectator article have your picture, as

8    well?

9        A    Yes.

10       Q    Again, as you've said in the collage by Mr. Barnes,

11   you were concerned because it had the word memorial, right?

12            Now in the Spectator article, at the end of the

13   article it talks about having the students start a

14   revolution, rise against the powers that celebrate the

15   corruption of our leader and students were ready to shoot

16   the man down.

17            You didn't have a similar reaction to this parody?

18       A    No.

19       Q    Okay.  Looking at Exhibit 11 -- these are the other

20   Facebook pages -- I believe you testified that these caused

21   you concern, as well?

22       A    Yes.

23       Q    Why?

24       A    I looked at some of the entries.  The first

25   statement at the top of Exhibit 11:  He's cleaning out and

Page 144



1    rearranging his room and, thus, his mind or so he hopes --

2        Q    Did you find that threatening?

3        A    I found it -- it's part of the puzzle that we were

4    trying to put together.  Trying to put pieces --

5    structurally trying to put together what drives Mr. Barnes

6    to do these types of things and to understand where he's

7    coming from.

8             Addressing your question:  It concerned me.  I

9    didn't understand it.

10             I didn't know if that is -- is that real?  Is he

11    trying to clean out his mind?  Is he having a difficult

12    time?  And what does this have to do with "memorial" or any

13    of the other activities that were showing up on this page?

14        Q    So, you were weaving a tapestry of what this all

15    might mean?

16        A    I wasn't weaving a tapestry.  I was trying to

17    understand structurally the components that make up what the

18    student is about.

19             It's not a highly analytical theory.  When you try

20    to isolate structures that are driving a particular system,

21    you put them in parts and see how they relate to one

22    another.

23             That's all I'm doing is putting pieces together

24    with what I have to go on.

25        Q    Okay.  Well, if you're trying to gather information

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    and figure out what a student may mean by something,
 2    wouldn't you have to look at all of the elements?
 3        A    That's what I mean by structural.
 4        Q    Okay.  For example, here on the front page of the
 5    Facebook page, it also says that Mr. Barnes is Buddhist.
 6    Did you notice that?
 7        A    Yes.
 8        Q    Did that mean anything to you?
 9        A    What does it mean?  I don't know what it means.
10        Q    Do you know many violent or war-like Buddhists?
11        A    No.  I don't know -- I don't know many Buddhists.
12        Q    Fair answer.  Let me ask it this way.
13             I mean, if you try and look at individual elements
14    and interpret them in their most threatening way, is that a
15    fair way to look at the material in front of you?
16        A    I thought it was a piece of information --
17    additional pieces of information from which I was beginning
18    to formulate a better understanding of what's going on with
19    the student.
20             And then as I looked at the other comments, they
21    didn't make much sense, either.
22        Q    What comments were those?
23             First of all, how much stuff do you know on
24    Facebook makes sense?
25        A    I don't know.  I don't look at Facebook.  I don't
```

Page 146

1    use Facebook, so I have no idea.

2        Q    Okay.

3        A    I'm going on the basis of once that is put into

4    this kind of form, that the person who put it there has to

5    be responsible for the entry.

6        Q    Right.  And on Facebook, a person invites users to

7    be friends.  It's not published to the world, is it?

8        A    I don't know.  I don't use Facebook.

9        Q    Well, this wasn't something that was distributed

10   like flyers on campus, was it?

11       A    No.

12       Q    It wasn't delivered to your door --

13       A    No.

14       Q    -- other than by the people you sent out to get it,

15   right?

16       A    This came in.

17       Q    But this was not a distribution on campus, was it?

18       A    No, it was not a distribution.

19       Q    Let's look at the attached article from salon.com.

20       A    Which one is it?

21       Q    This is the article entitled "I'm mentally ill but

22   I'm no mass killer."  The byline is for a writer named Cary

23   Tennis.

24            MR. WILL:  Tennis.

25            THE WITNESS:  Uh-huh.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   BY MR. CORN-REVERE:

2      Q    What was your concern about this article?

3      A    The concern was it was an entry based on Virginia

4   Tech.

5      Q    Yes.

6      A    That it was another one of those horizontal

7   linkages in the structure that points to a question of:  Why

8   put this on at this particular time as it relates to this

9   document.  (Indicating.)

10     Q    Did you read this article?

11     A    I did.

12     Q    Did it mean anything to you?

13     A    Yeah.  It meant that it was here; that it would

14   reference Virginia Tech.

15     Q    Well, yes.  But what did it have to say about

16   Virginia Tech based on your understanding?

17     A    My concern -- it concerned me because it was an

18   entry and a reference to Virginia Tech.

19     Q    All right.  Well, just looking at the headline, it

20   says, "I'm mentally ill, but I'm no mass killer."

21     A    Yes.

22     Q    Were you interpreting that to mean when someone

23   says "I'm no mass killer" that "I really am a mass killer"?

24     A    I just said that I was concerned because it was an

25   entry.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Well, wasn't Virginia Tech a matter of intense

2    interest to students?

3    A    Yes.

4    Q    Wasn't the concern of this article that because of

5    Virginia Tech people who have psychological problems may be

6    misunderstood?

7    A    Perhaps, yes.

8    Q    And wasn't the point of the article that people

9    will be unfairly stigmatized because of what happened at

10   Virginia Tech?

11   A    Yes.

12   Q    Isn't that exactly what happened here?

13   A    Well, you asked me my opinion and what concerned

14   me.

15        And I go back because it was an entry at a time

16   when we were trying to get a better understanding of what's

17   going on.  It was an entry.  It was a reference to Virginia

18   Tech.

19   Q    Are you saying that any reference to Virginia Tech

20   at all would cause you concern?

21   A    No.

22   Q    Then why is this one different?

23   A    Because it is part of a linkage.

24   Q    Now you understand that Mr. Barnes didn't write

25   this article, right?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

| | | |
|---|---|---|
| 1 | A | I understand that. |
| 2 | Q | It's simply something that he linked to? |
| 3 | A | Yes. |
| 4 | Q | Looking back a couple of pages from the beginning |

4    Q    Looking back a couple of pages from the beginning
5    of that article, there is another part that you referenced,
6    an advertisement for Project Spotlight, that says, "Shoot
7    it, upload it, get famous."

8         You said, "This reference concerns me," right?
9    A    (Nods head.)
10   Q    Why did it concern you?
11   A    Because it came in the middle of the page, and it
12   was an independent -- looked like an independent reference
13   to another website, and I couldn't figure out why does that
14   suddenly appear in becoming famous and shoot it, upload it
15   and become the next big thing.

16        I thought that maybe -- I was just concerned that
17   it appeared in there.

18   Q    Did you know what this advertisement was about?
19   A    All I did was look at the reference to it and what
20   it said.

21   Q    Again, let me repeat the question.  Did you know --
22   A    No, I did not.
23   Q    -- what the advertisement was about?
24        MR. WILL:  Wait until he finishes his sentence.
25        THE WITNESS:  I did not.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    BY MR. CORN-REVERE:

 2      Q    Do you know what Project Spotlight is?

 3      A    No.

 4      Q    You did not understand that this was a reference to

 5    photography?

 6      A    No.  I wrote that when I looked at it.

 7      Q    Well, it says at the bottom, "Upload your videos

 8    now."

 9      A    Uh-huh.

10      Q    That didn't mean anything to you?

11      A    No.

12      Q    No, it didn't?

13      A    No.

14      Q    Did you not understand that this was an ad that

15    appeared in salon.com and not one that Mr. Barnes selected?

16      A    He selected to put it on here.

17      Q    The salon.com link?

18      A    Yes.  That's what I said.  That reference concerned

19    me.  Why does it --

20      Q    Are you an unusually sensitive person?

21      A    No.

22      Q    Do you have any psychological problems?

23      A    No.

24      Q    Have you ever been to a therapist?

25      A    No.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Have you ever been treated for any psychological

2    disorders?

3    A    No.

4    MR. WILL:  I object to that area of inquiry anyway.

5    I think that's out of bounds.  So, if you venture into

6    something that comes up like that again, I hope you have

7    a basis for making sure it's relevant to the case.

8    MR. CORN-REVERE:  I'll be happy to explain the

9    basis right now on the record.  That is, Dr. Zaccari has

10    testified repeatedly about his individual concerns about

11    the use of a word on a Facebook page that seems out of

12    proportion to the reactions of most people who have seen

13    it.

14    I think that raises a fair area of inquiry on

15    whether or not he has some condition that may make him

16    more sensitive to it than the normal person would be.

17    And, besides, given the inquiries that Mister --

18    that you've entered on Dr. Zaccari's behalf into

19    Mr. Barnes' background, I can understand why it might be

20    uncomfortable if the shoe is on the other foot; but it

21    certainly is not unfair.

22    MR. WILL:  Mr. Barnes' condition is a matter of the

23    case.  His is not.

24    MR. CORN-REVERE:  His reactions are directly

25    material to the testimony he's just been providing.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577