```
 1              MR. WILL:  I hear you.  I don't agree with you.
 2       I'm just going to say you need to stick a little closer
 3       to the issues or we're going to have to seek
 4       intervention.
 5              MR. CORN-REVERE:  Well, you can seek whatever you
 6       want, but Dr. Zaccari was just testifying to his personal
 7       reactions to this material.
 8  BY MR. CORN-REVERE:
 9       Q     Looking back at Exhibit Five on page three, at the
10  bottom of the page, paragraph twelve -- and let me just read
11  this into the record.
12              It says, "At this point in the chronology of
13  events, a pattern emerged in the students' behavior:  First,
14  a flurry of aggressive actions with inaccurate information,
15  then a written apology followed by an immediate reversal,
16  telephone calls from state offices and Board of Regents,
17  posting my picture as 'memorial' and reference to the
18  Virginia Tech shooter.  These were, documented sequential
19  signs that indicated possible threats to me and the campus."
20              Is that your position?
21       A     Yes.
22       Q     So, anything else in this sequentially --
23  documented sequential signs that should be included in this
24  list?
25       A     Those are the references.  I put in twelve and I
```

Page 153

1    stand by those.

2        Q    Okay.  Let's break that down.

3             You said a pattern emerged in the student's

4    behavior -- okay? -- beginning with a flurry of aggressive

5    actions with inaccurate information.

6             What are you referring to?

7        A    I'm referring to the flyer, about awareness --

8    about the funding.

9             Referring to the emails, the telephone calls that

10   were sent -- telephone calls come a little bit later -- then

11   the written apology and then suddenly the shift in the

12   position and starting to go through the process, again, to

13   block the parking decks.  Those indicators were difficult

14   for me to understand.

15       Q    Okay.  So, I think we've already spoken about the

16   aggressive actions merely being his contacting the Board and

17   putting out information in ways that you didn't approve of;

18   the inaccurate information being Mr. Barnes' failure to

19   appreciate your master plan and then the written apology.

20            This was the apology following the meeting with

21   S.A.V.E.?

22       A    Apology following S.A.V.E.

23       Q    Okay.

24       A    And I want to clarify one point, sir.

25       Q    Okay.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

    1      A      It's not my master plan.

    2      Q      Okay.  Let me revise.

    3             You were concerned about inaccurate information

    4      about the master plan.  That was part of this tapestry of

    5      events?

    6      A      But your reference -- I don't want to get into --

    7      it's not -- it is the university's master plan.  I want to

    8      clarify that for the record.

    9      Q      Okay.  Then when you talk about the concern over

   10      the written apology and reversal, that was only about the

   11      flyers and what you perceived as a shift in position by

   12      Mr. Barnes on whether or not the flyers would continue?

   13      A      Yes.

   14      Q      Okay.  Anything else about the apology and

   15      reversal?  It was just about that?

   16      A      Nothing else.

   17      Q      Okay.  And then you talk about telephone calls to

   18      state offices and Board of Regents.

   19             These were the ones that led to Ms. Daniels to

   20      contact you?

   21      A      Yes.

   22      Q      Anything else there?

   23      A      No.

   24      Q      Now, as I recall, you also testified that a student

   25      has a First Amendment right to engage in things like putting

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    out flyers, making telephone calls to public officials and

2    sending emails, right?

3        A    Yes.

4        Q    So, your concern really came down to then -- the

5    next items in your list are:  Posting your picture with the

6    word "memorial," and the reference to -- in the salon.com

7    article to the Virginia Tech shooter, right?

8            Am I missing anything?  Is there anything else in

9    this document of sequential signs that led to your

10   conclusion that Mr. Barnes might be a threat?  Anything at

11   all?

12       A    At this point in 12, we haven't discussed the other

13   information that came in from my meeting with Ms. McMillan.

14       Q    Yeah, we'll get to that.

15           But at this point when you were talking about

16   documented sequential signs of a threat, this is the list,

17   right?

18       A    Yes.

19       Q    Emails, calls, an apology that wasn't an apology in

20   your mind, the collage, the Facebook pages.  That's it,

21   right?

22       A    That's a summary.

23       Q    Is any one of these things on your list enough to

24   make a threat, or do they have to appear together?

25       A    I think the analysis was that a combination of

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    factors.

2        Q     If Mr. Barnes had agreed with your opinions about

3    the parking decks, we would have had no problem here, would

4    we?

5             MR. WILL:  I object to the form of the question.

6             MR. CORN-REVERE:  I know.

7             THE WITNESS:  The answer to your question:  No.

8    BY MR. CORN-REVERE:

9        Q     Okay.  Let's move to the top of page four, Exhibit

10   Five.  It's the end of the previous paragraph 12, but it

11   just appears on the next page.

12            And it says, "Since I am not an expert in assessing

13   the psychological status of an individual but have the

14   appointed responsibility as VSU President and safety of the

15   campus, I took specific action."

16            Is that an accurate statement of your position?

17       A     Yes.

18       Q     Help me understand what you're saying here.

19            You say, "Since I am not an expert at assessing the

20   psychological problems but I have the responsibility for the

21   campus, I took action."

22            Are you saying that you had to take action whether

23   or not you had knowledge?

24       A     That's not what I said.  I put specific steps in

25   motion beginning with 13.

                                                  Page 157

1    Q    Okay.

2    A    The first step --

3    Q    Okay.

4    A    -- that's what I meant.  I took action.  The first

5    step is to alert the campus police.

6    Q    Okay.  So, is it your opinion that for you to

7    actually take action against Mr. Barnes you needed expert

8    opinion from others on your staff?

9    A    I said that we were taking -- getting additional

10   information, and I wanted to get other opinions about what

11   we were finding.

12   Q    Did you rely on the advice of anyone who's an

13   expert?

14   A    I listened to the reactions to the questions and --

15   Q    That's not what I'm asking.

16        Did you rely on the advice of anyone who is an

17   expert in deciding to withdraw Mr. Barnes?

18   A    I did not decide to withdraw Mr. Barnes at this

19   point.

20   Q    At some point you did, though, right?

21   A    I did, obviously.

22   Q    When you did --

23   A    Yes.

24   Q    -- did you rely on the advice of anyone who you

25   consider an expert?

Page 158

1      A      I relied on the advice of my administrative team

2    and the advice of the Board of Regents and the action that

3    was recommended to me if I felt that the campus was under

4    some kind of a problem with campus safety, and that is the

5    advice and the recommendation I listened to.

6      Q      Who provided that advice?

7      A      Betsy Neely was one.  Vice Chancellor for Legal

8    Affairs.

9      Q      And what was her advice?

10     A      If I felt that the campus was in some safety

11   problem that I needed to make the decision that I felt was

12   best to make.

13            MR. CORN-REVERE:  Okay.  I'm about to get into

14       questions starting with paragraph 13.  This might be a

15       good time for a five-minute break.

16            MR. WILL:  Let's make it ten and have a cookie.

17            MR. CORN-REVERE:  Excellent idea.

18            (A recess was taken from 2:47 p.m. to 2:55 p.m.)

19   BY MR. CORN-REVERE:

20     Q      Dr. Zaccari, we were about to look at paragraph 13

21   of Exhibit Five on page four.

22            This brings us up to the week of April 20th, 2007,

23   and it says, "The first step was to alert VSU campus police

24   of the student's behavior and the potential risk if we fail

25   to monitor his actions."

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1           Can you tell me what steps you took?

2      A    First, for the record, I'm referring to the week of

3   April 23rd through the 27th when these actions started,

4   which was a Monday rather than Friday.

5      Q    Okay.  So, based on your calendar -- actually, we

6   might want to get a copy of that so we all have a point of

7   reference.

8      A    Yeah.  For the record, what this is is the 2007

9   spring semester calendar of the university.

10     Q    Is this the calendar that you were using at the

11  time?

12     A    This is the calendar of -- it shows when the Board

13  of Regents meetings were and when classes end and finals.

14  It's a public document of 2007.

15          MR. WILL:  Would you like me to make a copy?  It's

16     not his personal calendar.

17          THE WITNESS:  No, this is the university

18     document -- calendar for students and faculty.

19  BY MR. CORN-REVERE:

20     Q    Okay.  I thought it might have been your personal

21  calendar showing when events took place --

22     A    No.

23     Q    And you were referring to it to refresh your

24  recollection.

25     A    No.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          MR. WILL:  If you want a calendar to have in front

2     of you, I'd be glad to make a copy for you.

3          MR. CORN-REVERE:  No.

4  BY MR. CORN-REVERE:

5     Q    Sorry that I interrupted you.

6     A    I just wanted to clarify that.  Let's go back to

7  the question, item 13.  The question that you asked on 13,

8  what was it?

9          (The requested portion was read back by the Court

10     Reporter.)

11         THE WITNESS:  By the question, I'm assuming

12     starting at the first part of the week, discussions --

13         MR. WILL:  Is that where you want to --

14  BY MR. CORN-REVERE:

15    Q    First of all, it says that your first step was to

16  alert VSU campus police.  So, tell me about that step.  What

17  did you do?  What did you ask campus police to do?

18    A    The campus police came in with some of the other

19  meetings that I had with the vice presidents to discuss what

20  does the university police at this point -- what do the

21  campus police officers do if there is a concern about

22  student behavior and a potential risk.

23    Q    Uh-huh.

24    A    So, there was a meeting to exchange views:  How

25  serious do you think this is; what can we do to assist.

Page 161

1          It was more of an open discussion about my -- the

2     concerns that were coming out.

3     Q     Okay.  Others have testified that there was a

4     meeting on April 20th, 2007.  Is that your recollection?

5     A     I don't remember that one.  But, I mean, there was

6     a lot of things going on there, and maybe that was the first

7     meeting rather than the 23rd.

8          So, Friday to Monday.  Perhaps that meeting did

9     take place on Monday the 20th rather than the 23rd.

10    Q     So, you asked a number of people in to discuss how

11    to handle the situation.

12         Do you recall who was in that meeting?

13    A     I believe it was outlined here.  Dr. Keppler

14    would've been there.  Dr. Levy.  I don't believe Mr. Black,

15    but I noticed Scott Sikes.  I believe Marsha Krotseng was

16    there.  Scott Doner and Ann Farmer.  Ann sat in for Scott a

17    number of times.  So, I believe that Scott and Ann were

18    there with the other people that I just mentioned.

19    Q     Okay.  Was Leah McMillan at this meeting?

20    A     She was not at that meeting, I don't believe.

21    Q     She's testified that she was at the April 20th

22    meeting.

23         MR. LaVALLEE:  Objection.  No, she hasn't.

24         MR. WILL:  I was going to say I don't believe --

25         MR. CORN-REVERE:  I'm sorry.

Page 162



```
1              MR. LaVALLEE:  Did you get the dates confused?
2              MR. CORN-REVERE:  Now it's just the dates, not the
3         years.  I'm sorry.  I'm thinking of the May 3rd meeting.
4              MR. LaVALLEE:  She wasn't at that one, either.
5              MR. CORN-REVERE:  May 7th?
6              MR. LaVALLEE:  She was at that one, but that was
7         with Ms. Gaskins.  We're talking about April 20th.
8         BY MR. CORN-REVERE:
9         Q    Let's strike that whole thing.
10             Let's go back to your recollections of the
11        April 20th meeting and who was there.
12        A    I just gave you the overview of the people that I
13        believed were there.
14        Q    Okay.  And you characterized that as an open
15        discussion?
16        A    Yes.
17        Q    You sought advice about what to do with Mr. Barnes?
18        A    It wasn't so much as what to do with him.  What is
19        this about and their perceptions and is this something that
20        we should be concerned about?  What do we do if we're in
21        this gathering of information stage -- what do we do in the
22        interim?
23        Q    Did you ask anyone whether or not they agreed that
24        based on this sequence of events that Mr. Barnes was a
25        threat to your security or campus security?
```

Page 163

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A      I gave an overview of all the pieces that I thought
 2    were of special concern to finding out about Mr. Barnes and
 3    just laid out some -- I believe there was a sharing of the
 4    Facebook and --
 5      Q      Well, you handed out the Facebook pages, right?
 6      A      Yes.
 7      Q      And did anyone express an opinion about whether or
 8    not they thought Mr. Barnes represented a threat?
 9      A      I think there was -- I invited open discussion in
10    most of my meetings about issues affecting the institution.
11      Q      Okay.  But at this meeting on April 20th --
12      A      Following that same procedure, people felt
13    comfortable in saying, "Well, you know, how far does this
14    really go?  Are you really that concerned as you appear to
15    be and why?"
16             Again, my concerns about some of the events of
17    Virginia Tech and especially a concern about what to do with
18    closing a semester -- that was foremost on my mind at that
19    meeting about how we're going to keep this thing from
20    getting to the point where people are going to react, panic
21    and some things are going to happen that would really be
22    negative to all the hard work that thousands of people put
23    in place.
24             And, so, I was trying to minimize, trying to find
25    some ground where we could move to the conclusion of the
```

Page 164

1    semester, get through the finals and, in the interim period,

2    continue to get as much information as we could to make a

3    decision.

4        Q     Okay.  Let me get back to my question.

5              Did anyone who attended the April 20th, 2007,

6    meeting agree with your point of view that based on the

7    evidence you provided Mr. Barnes represented a threat to

8    campus security or to your safety?

9        A     Obviously, they must've concurred because we put

10   certain measures in place to begin to look at what my

11   schedule was, what kind of public appearances that I had to

12   finish the semester, including some speaking engagements and

13   commencement.

14             So, obviously, it wasn't, "You don't know what

15   you're talking about and you're overreacting and you're far

16   too sensitive."

17             It was how can we help to get this process in place

18   where we're finding out more information and we feel a

19   little more comfortable about what we're dealing with.

20             Yes, I believe some people agreed that I had a

21   legitimate concern.

22             Some people -- I didn't hear any outright

23   opposition, like, oh, absolutely not.  This is not something

24   you can do.  Let's just blow this thing off and forget about

25   it.  It doesn't mean anything.  It's just a big joke.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q      Who made a statement agreeing with your conclusion
2    that Mr. Barnes represented a threat to your safety or to
3    campus security?  Anyone at that meeting?
4      A      I don't recall anyone that said, "You are
5    absolutely right."  But they felt that we were right in
6    formulating the plan and initiating the plan.
7      Q      Did anyone express an opinion at the April 20th,
8    2007, meeting disagreeing with your conclusion that
9    Mr. Barnes represented a threat to campus security or to
10   your safety?
11     A      I think there were some questions made from
12   Dr. Keppler from the student affairs side.  We have an
13   increase in students with mental health problems coming to
14   the universities in our country, and that's certainly true
15   in the State of Georgia.
16            And before we got too much into this reaction area,
17   we need to find out a little more information.
18            So, that was -- I think Kurt Keppler may have said
19   something and he disagreed, but I don't remember anyone else
20   coming out in opposition to my responses and actions.
21     Q      Did you seek the views of anyone from the
22   Counseling Center?
23     A      Not at that point.
24     Q      Really?
25     A      It's when -- I don't know when in the sequence, but

Page 166

1    it was sometime during that week that Ms. McMillan and I had

2    our first meeting, which was a one-on-one meeting.

3         Q    Did anyone from the Counseling Center provide an

4    opinion to you on whether or not they thought Mr. Barnes was

5    a threat to campus security or to your safety?

6              MR. WILL:  At what point?

7    BY MR. CORN-REVERE:

8         Q    At anytime?

9         A    Did anyone totally disagree with me?

10        Q    Let me back up and repeat the question.

11             Did anyone from the campus Counseling Center ever

12   provide you with an opinion about whether they believed that

13   Mr. Barnes represented a threat to himself or to campus

14   security or to your personal safety?

15        A    Not during that week of the 23rd to the 27th.

16             No one from the Counseling Center gave me an

17   opinion that he was not a threat.  I never received anything

18   in writing.  There was some cautionary we should look at.

19   This thing -- maybe look at it from a lot of different

20   views, three dimensionally, so to speak.

21             But I did not get anything in writing from anyone

22   in the Counseling Center until May the 8th:  The letter that

23   was written by Ms. McMillan on behalf of Mr. Barnes at his

24   request.

25             I did not see that letter that was signed on the

Page 167



1    8th until either late in the afternoon the 8th or the 9th.

2    The day that I wrote the letter, signed the letter of

3    withdrawal, was on the 7th.

4          So, I did not get that written document until late

5    on the 8th or the 9th of May.

6    Q    Dr. Zaccari, Leah McMillan is sitting here today.

7    A    Yes.

8    Q    She's already testified in this case under oath.

9    You were present at her deposition.

10   A    Yes.

11   Q    Did you ever have any conversation with Leah

12   McMillan, who is Hayden Barnes' counselor, about whether or

13   not Hayden Barnes represented a threat to either campus

14   security or to your personal safety?

15   A    There was a sharing of some points, but I don't

16   recall her ever saying, "Mr. Zaccari, there is not anything

17   here that he is a threat."

18          I don't ever recall that precise exchange of

19   information in the meetings that I had with her.

20   Q    You don't recall Leah McMillan ever telling you

21   directly that Hayden Barnes is no threat to himself or to

22   you or the campus?

23   A    When was that meeting?

24   Q    At anytime.

25   A    No.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q     You were at her deposition, right?

2    A     I was at her deposition.

3    Q     Were you listening to her testimony?

4    A     I heard -- you know, I heard probably about 85 to

5    90 percent of some of the things that were said.

6    Q     Did you hear her testify that she told you on

7    multiple occasions that Mr. Barnes represented no threat?

8    A     No.  I disagree with that.

9    Q     Did you have any conversations with Victor Morgan

10   about Hayden Barnes?

11   A     He was in the meeting.  One of the meetings.  I

12   never had a one-on-one meeting.  He was in the meeting.  I

13   do not recall Victor Morgan saying to me specifically the

14   student is not a threat.

15   Q     Now you said in your letter to the Board of Regents

16   that you're not an expert in assessing the psychological

17   status of an individual, and you also said that you

18   consulted with experts.  Is that right?

19   A     I consulted with these individuals that I have

20   listed here, and those are the experts that I'm talking

21   about:  Ph.D. in student affairs, Ph.D. in sociology,

22   academic affairs.

23         Those are the individuals, along with the

24   university campus police that were well trained in how to

25   handle situations of safety on campus.  Those were the

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    experts.

2          At that point I had not yet had my one-on-one

3    meeting with Ms. McMillan.

4      Q    When was your one-on-one meeting with Ms. McMillan?

5      A    It was during the week of April the 23rd.  I asked

6    her to come to my office to discuss what she thought about

7    Mr. Barnes' actions and comments.

8      Q    What did she tell you?

9      A    She told me that he was having difficulty

10   academically.  Depending upon the outcome of the spring

11   semester, it's possible that he wouldn't make the

12   probationary level of GPA to remain at the university; said

13   that he had lost his employment; that his medication wasn't

14   working properly.

15     Q    Really, she told you about his treatment?

16     A    No, treatment, no.

17     Q    What about the medication?

18     A    Said something about the medication that was

19   prescribed may not be functioning.  He had not -- Mr. Barnes

20   had not seen his psychiatrist in some period of time and

21   that it was on --

22     Q    How many details of his medical history did she

23   share with you?

24     A    Not a lot of -- other than what I just mentioned to

25   you.  It was an overview.  It wasn't specific information

Page 170



1    about his background.

2        Q    Well, that he had been seeing a psychiatrist and

3    hadn't seen him in some time; whether or not his medication

4    was working; whether or not he was making appointments; what

5    his prospects were academically --

6             MR. LaVALLEE:  Object to the form.

7             MR. CORN-REVERE:  I'm trying to list the things

8        that he's already told us.

9             MR. LaVALLEE:  Well --

10   BY MR. CORN-REVERE:

11       Q    Were there other details or were these just the

12   details or were these just the details that you listed?

13            MR. LaVALLEE:  Objection to form.  I'm sorry I

14       didn't say my objection until you were done talking;

15       however, you were interjecting several things that the

16       witness had not testified to.  That's my objection.

17            MR. WILL:  I object to the form, as well.

18            THE WITNESS:  Those were the points.

19   BY MR. CORN-REVERE:

20       Q    Okay.  And you don't recall a separate conversation

21   or participation in a meeting by Victor Morgan where

22   Mr. Barnes' potential to be a threat was discussed?

23       A    Our meeting with Victor Morgan was among others

24   that we had a meeting.

25            I do not recall Victor Morgan saying to me, "This



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    young man is not a threat."

2              No.   I don't remember that.

3     Q     Could it be you weren't listening?

4     A     Oh, I was listening.

5     Q     If you thought that there was a mental health

6    issue, why didn't you go directly to the Counseling Center

7    and ask for some kind of formal opinion about whether or not

8    Mr. Barnes represented a threat?

9     A     We were having meetings about the potential for the

10   threat or risk.

11    Q     Okay.   Let's look back at Exhibit Five, paragraph

12   13.   You've referred to this center part of the paragraph,

13   and let's look at it in somewhat more detail.

14              You state, "I sought the advice of the members of

15   the President's administrative unit consisting of:   Dr. Kurt

16   Keppler, Vice President of Students Affairs; Dr. Louis Levy,

17   Vice President of Academic Affairs; Mr. James Black, Vice

18   President of Finance and Administration; Mr. Scott Sikes,

19   Vice President of Institutional Advancement; and Dr. Marsha

20   Krotseng, Associate Vice President for Strategic Research

21   and Analysis.

22              "The administrative unit, along with Mr. Scott

23   Doner, VSU's Police Chief, Ms. Ann Farmer, Assistant Chief

24   of Police, and I collectively decided that VSU take

25   necessary steps to minimize as much as possible any security

Page 172

1    risks."

2              Is that your position?

3    A    Yes.

4    Q    Now I think you mentioned earlier that not all of

5    these people in this list attended the meetings of either

6    April 20th or May 3rd to discuss what to do about

7    Mr. Barnes.  Is that --

8    A    Yes.

9    Q    -- a correct understanding?  Of the people that

10   were just listed in this paragraph, which ones did not

11   attend the meetings?

12   A    Some of the --

13        MR. WILL:  Meetings plural or --

14        MR. CORN-REVERE:  Either of the two meetings.

15        THE WITNESS:  James Black and Scott Sikes.

16   BY MR. CORN-REVERE:

17   Q    Did you seek their advice separately about what to

18   do with Mr. Barnes?

19   A    I outlined that -- the Vice Presidents and

20   Dr. Krotseng, Associate Vice President, were part of a

21   Vision group that I met with every Thursday morning from

22   8:00 to 10:30.

23        And although Jim Black and Scott Sikes were not in

24   the earlier meetings of the week of April the 23rd, they did

25   have a meeting on Thursday, the 26th, where we had some

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      additional discussion about what was happening on the campus

2      and a way for us to safely finish the spring semester.

3          Q      Who was present at that meeting?

4          A      Keppler, Levy, Black, Sikes, Krotseng and me.

5          Q      Okay.  We have had deposition testimony from

6      Dr. Keppler.

7                 Dr. Louis Levy, did he express an opinion on

8      whether or not he believed Hayden Barnes was a threat in

9      your presence?

10         A      I believe he concurred that there were issues

11     enough to a point where there were discussions, yes.

12         Q      Let's get back to that because you have said that

13     before.  You assumed that the group concurred was, I

14     believe, the substance of your testimony.  What's that

15     assumption based on?

16         A      On the dialogue that took place and the concurrence

17     for us to move on a plan.

18         Q      Was this a group decision?  You say here it's a

19     collectively decision.  Is this a group --

20         A      I'm saying collective -- there was agreement from

21     the group for us to initiate the plan that I've outlined to

22     you.

23         Q      Did you take a vote?

24         A      No.

25         Q      Did you go around the room and ask people what they

Page 174

1    thought?

2        A    I did.  I gave them opportunity for discussion.

3        Q    That's different.  Did you go to each person and

4    say, "Do you agree or disagree"?

5        A    No.

6        Q    Okay.  There was generally just a topic of

7    discussion, and then people could chime in if they wanted

8    to.  Is that how it worked?

9        A    Agreement that we should be cautious and proceed

10   with the plan that we had outlined and put in place.

11       Q    If someone who attended the meeting, just for

12   whatever reason, remained silent, do you take that as

13   consent?

14       A    No.

15       Q    Why not?

16       A    No one sat in silence.

17       Q    I'm still waiting to hear the name of anyone who

18   expressed agreement with you.

19       A    Agreement?

20            MR. WILL:  Is that a question?

21   BY PLAINTIFF :

22       Q    Did anyone at the two meetings you've identified --

23   April 20th or May 3rd, 2007 -- make the statement, "I agree

24   that Hayden Barnes is a threat to campus security or to

25   President Zaccari"?

Page 175



1      A      I want to go back to my earlier testimony.

2      Q      Okay.

3      A      No one openly stated that.  It was not the question

4   at that point as much as it was continuing to investigate

5   and develop a plan that included the total university and

6   closing the spring semester.

7           It was not a question, "Do you think Mr. Barnes is

8   a threat," as much as it was, "Are there issues on the table

9   that we should be concerned about."

10          And I believe there was a consensus.  I'm not going

11   to say I went around and said, "Do you think there's a

12   question to be raised?  Do you think -- "

13          I believe there was a consensus.  Otherwise, we

14   would not have moved to the further unfolding of events and

15   what to do about getting us through.

16          It's a spring commencement at the university.  It

17   takes a tremendous amount of time as we begin to build

18   towards commencement.

19          A lot of activity.  Students moving in and out.

20   Final exams.

21          We were very concerned as the Vision group about

22   how the university would close out that spring semester.

23          And we felt that thousands of people affected on

24   this situation initiated by one student -- that we had to

25   take a great focus on how to get everyone through it.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Okay.  Let's return to the meetings.

2    A    All right.

3    Q    You've said that no one that you can name made a

4    statement saying they agreed with you about the

5    dangerousness of Mr. Barnes.

6         I believe you also testified that no one at those

7    meetings expressed open disagreement with you.

8         Is that a fair summary of what your testimony was?

9    A    Yes.

10   Q    Nor did you go around the room and ask people for

11   their individual views.  Is that right?

12   A    No, I did.  I said that I did not, to your

13   question, ask for a vote or go around and say, "Do you

14   agree?  Do you agree or do you disagree?"

15        I did not do that, because I felt there was enough

16   discussion from points that were coming out.  I knew that we

17   were going to move forward with the concern.

18   Q    Okay.  You assumed that there was a consensus.

19   A    I did.

20   Q    Now at some point Mr. Barnes was put under

21   surveillance.  Is that right?

22   A    Yes.

23   Q    What did that entail?

24   A    Getting a sense of a part of our investigation that

25   we -- sort of making sure that where I was going in public



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    appearances and what he was doing are not conflicting.

2         And that's, basically, what the university police

3    recommended that we do to minimize any contact with the

4    student.

5         MR. CORN-REVERE:  Let's mark as Zaccari Deposition

6    Exhibits Numbers 12, 13 and 14 copies of the reports

7    about Mr. Barnes' grades.

8         (The documents were marked for identification as

9    Plaintiff's Exhibit Numbers 12, 13 and 14.)

10        THE WITNESS:  (Reviewing documents.)

11   BY MR. CORN-REVERE:  Okay.  We'll get to those exhibits in

12   just a minute, but I did have a couple of questions first.

13        I believe you testified that it was the consensus

14   of the group to allow Mr. Barnes to finish exams before any

15   action was taken.  Is that right?

16   A    Yes.

17   Q    Why?

18   A    With just a few days remaining and final exams

19   coming up, we felt that we could monitor the situation and

20   provide the student an opportunity to finish the academic

21   work for the semester.

22   Q    Yeah, but you were also testifying earlier that you

23   were focused on Virginia Tech and all the questions that

24   people asked about why didn't you act?  What could you have

25   done?  What could have prevented this?

Page 178

1              Why didn't you take immediate action if he was such

2     a threat?

3        A      Because I felt that we had more understanding and

4     we could monitor the situation.

5        Q      What does that mean?

6        A      That we were finding out a little bit more about

7     Mr. Barnes and that we could -- I'm not going to say

8     control.  We didn't have any control over it, but I felt we

9     had a little bit better handle on the situation and that we

10    could move forward without alarming the campus in his

11    removal.

12       Q      Did you find out that he wasn't a threat?

13       A      I didn't say that.

14       Q      Didn't you talk to Leah McMillan?

15       A      About what?

16       Q      About Mr. Barnes.

17       A      I did.

18       Q      And you had no recollection of her telling you that

19    he wasn't a threat?

20       A      No.  I have a recollection of what she shared that

21    concerned me.

22       Q      If Ms. McMillan testified that she affirmatively

23    told you that her opinion was that Mr. Barnes was no threat,

24    would you have a reason to doubt that testimony?

25              MR. LaVALLEE:  It wasn't "if."  She did.

Page 179

```
1    BY MR. CORN-REVERE:
2        Q    Okay.  It's not a hypothetical.  Ms. McMillan has
3    testified -- and you heard the testimony -- that she told
4    you that Mr. Barnes was no threat.
5        A    And I'm testifying that I did not recall that that
6    language was used in my presence.
7        Q    But can you swear under oath that the language was
8    not used in your presence or you just don't recall it?
9        A    I don't believe -- I did not hear that
10   specifically.  I am testifying to that.
11       Q    Now, I don't mean to be indelicate, but we've
12   established today that you have a hearing impairment.
13       A    Yes.
14       Q    Is it possible that Ms. McMillan made that
15   statement that Mr. Barnes was no threat and you simply
16   failed to hear it?
17       A    That's a possibility, yes.
18       Q    What exactly was to be accomplished by withdrawing
19   Mr. Barnes after the semester was over?
20       A    I wanted to make sure that the withdrawal was
21   temporary and have Mr. Barnes look at what has taken place,
22   to get some assistance for what he was going through and try
23   to get -- get him moving in a direction that I think
24   would've -- get the help that I was beginning to understand
25   that he needed.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q      What more help did he need?  He was seeing
2   Ms. McMillan on a regular basis at the Counseling Center.
3      A      The question was:  Was that totally effective?  Was
4   that working?  Was it not working?
5      Q      Is that your professional opinion?
6      A      No.  It was a concern I had.  I didn't say it was
7   an opinion.  It was a concern I had.
8      Q      Did you not have confidence in the counseling that
9   he was getting at the VSU Counseling Center?
10     A      There were questions about what was going on with
11  his counseling, the progress that was being made in the
12  spring semester and the points that were coming out that
13  alarmed us.
14     Q      Well, you raised questions about whether or not it
15  was adequate.
16            In fact, didn't you ask Ms. McMillan to present
17  specific questions to Mr. Barnes about whether or not he was
18  feeling suicidal or having other problems?
19            MR. LaVALLEE:  Objection to form.
20            THE WITNESS:  Are you asking me if I directed her
21     in doing that?
22  BY MR. CORN-REVERE:
23     Q      Yes, I am.
24     A      I asked her to get some background information and
25  what her assessment was of the student.



```
 1      Q      What did you ask her to -- information did you ask
 2   her to get?
 3      A      I didn't ask her specific -- I asked what do we do
 4   to follow up and get some information about how he was
 5   doing.
 6             I also at some point -- the person who is in the
 7   support office, Kimberly Tanner, was in one of the meetings
 8   and said that I -- I believe it was her reaction that
 9   Mr. Barnes had checked into the South Georgia Medical Center
10   on two occasions during this semester with anxiety attacks.
11             So, I was trying to put together if that happened,
12   how does that fit with all the other elements that are going
13   on and how is he controlling those kinds of situations?
14      Q      You spoke with Ms. Tanner from the Access Office
15   about the details of Mr. Barnes' medical history?
16      A      No.   She was in a meeting as part of the 23 to 27th
17   week of understanding what we had and what accommodations
18   had been granted.
19             But there was no asking about his medical
20   background and that that was a problem that was referenced.
21      Q      Did Ms. Tanner say what the basis for her statement
22   was?
23      A      No.
24      Q      Do you know if she knew anything about Mr. Barnes'
25   background?
```



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      Only that she was in the accommodation office.  I

2  believe she was a director and probably had some contact

3  with Mr. Barnes.

4      Q      But you don't know?

5      A      I didn't know at that time, no.

6      Q      Okay.  Did Ms. Tanner express an opinion on whether

7  or not she believed Mr. Barnes was a danger to himself or to

8  you?

9      A      No.

10     Q      Didn't share that with you?

11     A      No.

12     Q      Let me return to the question I asked earlier and I

13  don't think I got an answer.

14            And that is:  What was to be accomplished by

15  withdrawing Mr. Barnes from school after the end of the

16  semester?

17     A      Have Mr. Barnes step out for the summer, which I

18  also believed was the recommendation of Ms. McMillan; to

19  assess his progress at the university; to make sure that he

20  met with someone where all of the points of what happened in

21  the semester of the spring of 2007 were clearly outlined;

22  where all points were understood about what was going on and

23  what was happening at Valdosta State University.

24     Q      I don't understand your answer.

25     A      I was hoping that he --

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          MR. WILL:  Let's make sure you understand the
2     question and then you can respond to it.  Would you
3     repeat the question so he knows what you want?
4          (The requested portion was read back by the Court
5     Reporter.)
6          THE WITNESS:  He was having academic problems,
7     which was known up to that particular point.
8          If he was going through anxiety attacks, if these
9     types of statements being made on the Facebook were
10    coming out -- I wanted answers to what is driving all
11    this and what kind of assistance can be given to the
12    student.
13         That's what we hoped to accomplish.  That's what
14    the withdrawal to -- to get some assistance and assure
15    the university that he could come back.
16    BY MR. CORN-REVERE:
17    Q    Is it your policy to withdraw students as a clear
18    and present danger because they have academic problems?
19         MR. WILL:  Just to clarify the question, are you
20    referring to him, personally, or in terms of the
21    university?
22         MR. CORN-REVERE:  I'm talking about the policy
23    implemented in this case.
24         MR. WILL:  And I'm asking:  Were you talking
25    about -- while you're using the word "your," are you

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      referring to him, Dr. Z., or are you referring to the

 2      university, itself, as an institution?

 3   BY MR. CORN-REVERE:

 4      Q     Let me rephrase the question.

 5            Is it the policy of Valdosta State University to

 6   withdraw students as a clear and present danger because they

 7   have academic problems?

 8      A     That wasn't the only factor involved.  It was one

 9   of the structural factors involved.

10      Q     Let's start with that one.  Is it the policy of

11   Valdosta State University to withdraw students as a clear

12   and present danger because they have academic problems?

13      A     A clear and present danger --

14      Q     Your words.

15      A     Yes.  My understanding, as a legal term, that I

16   felt when I signed that letter that there was some danger

17   involved in the student and --

18      Q     That's not my question.

19      A     I did -- it was not only -- you asked if there was

20   an academic reason for withdrawal.

21            MR. WILL:  No.  He's asking about whether it's the

22      institution's policy --

23            THE WITNESS:  Yes.

24            MR. WILL:  -- to administratively withdraw any

25      student whose got academic problems as a clear and
```

Page 185

1    present danger?

2         THE WITNESS:  No.

3    BY MR. CORN-REVERE:

4    Q    I'm sorry?

5    A    No.

6    Q    Is it the policy of Valdosta State University to

7    administratively withdraw students as a clear and present

8    danger because they may suffer from anxiety attacks?

9    A    Again, independently, no.

10   Q    Okay.  And I believe you've said the other benefit

11   of sitting the summer out was so he could get his life in

12   order?  Is that --

13   A    Did I use those words?

14   Q    If I'm misstating --

15   A    I think it was an opportunity to step back and see

16   what was going on with his life and get a better

17   understanding about what he needed to do to get out of this

18   frame of mind that seemed to be prevalent in his day-to-day

19   operations.

20   Q    Let's look at Exhibits 12, 13 and 14.

21        I believe you testified that one of the things that

22   you looked at as you were looking into Mr. Barnes'

23   background was his grades.  Is that right?

24   A    That's right.

25   Q    Have you seen these documents before, 12, 13 and

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      14?

2      A      Yes.

3      Q      Can you tell me what they are?

4      A      Twelve is a cover sheet.  I have to break it down.

5   The cover sheet is the projected summer enrollment for the

6   May Mester and the summer session.

7           And the bottom section is the preregistered

8   schedule for the fall of 2007.  That's the cover sheet.

9      Q      Uh-huh.

10     A      The second sheet shows the top section of courses

11  that he was enrolled in the spring of 2007 and, again, the

12  repetition of the same information that's on the cover

13  sheet.

14          The rest of that is numbers and courses that he was

15  enrolled in, in the spring semester.  Is that an answer to

16  your question on 12?

17     Q      Yes, it is.  And 13?

18     A      Thirteen is a student academic transcript, transfer

19  credit accepted by Valdosta State from Warren Wilson

20  College, and the second sheet is a further breakdown of

21  course work, advanced placement courses that earn no credit

22  but that was given credit for the A.P., advanced placement,

23  that is, and further breakdown courses that he had taken at

24  Valdosta State.

25     Q      Okay.  And Exhibit 14, can you identify that?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A     Fourteen is the grades that Mr. Barnes achieved
 2   following the spring of 2007 enrollment.
 3      Q     So, this included the spring 2007 grades?
 4      A     This one does, yeah.
 5      Q     This is undated.  Do you have an idea of when this
 6   document might have been created?
 7      A     No.  I would imagine that there was a request
 8   made --
 9      Q     Yeah.  It is directed to you.
10      A     -- from my office to the registrar's office.  I
11   wanted to see the final grades for the semester.
12      Q     Uh-huh.  Do you know when you made that request?
13      A     It was prior to -- it was probably -- (reviewing
14   document.)  Final exams were over on May the 3rd.  Excuse
15   me, May the 4th.  So, I project it was asked for on Friday,
16   May the 4th.
17      Q     Okay.  So, before Mr. Barnes was administratively
18   withdrawn?
19      A     Yes.
20      Q     Could you remind me why is it that you gathered
21   information on Mr. Barnes' grades?
22      A     To the earlier point.  To gather further
23   information about the student.
24      Q     So, this was pertinent to determining whether or
25   not Mr. Barnes might have represented some kind of threat?
```

Page 188



1      A      It was another piece of the puzzle.

2      Q      Because the reason I ask is you've testified that

3   you weren't concern about Mr. Barnes' potential threat until

4   April 20th, right?  Until you first saw the Facebook page.

5      A      I started to be concerned.  That's about -- the

6   telephone calls were starting before April the 17th, which

7   was --

8      Q      What phone calls were those?

9      A      I'm talking about the telephones calls to the Board

10  of Regents.  That wasn't the beginning of my concern.  It

11  was about the time that we started the emails and the

12  Facebook and the other information.  That was on the 20th,

13  correct.

14     Q      So, you started getting concerned earlier because

15  of phone calls and flyers, and that's why you started

16  looking into Mr. Barnes' grades?

17     A      That's why I started looking.  I already testified

18  that the week of the 23rd was a period of investigation and

19  talking to people and talking with my staff.

20     Q      Okay.  So, the actual investigation began the week

21  of April 23rd?

22     A      Twentieth.  As we go back and you said that the

23  documentation shows there was a meeting on the 20th, that

24  Friday, so that's when it was initiated, yes, that I had a

25  greater concern.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q     So, looking at Exhibit 12, it was issued on

2    April 17th, 2007?

3    A     Yes.

4    Q     And Exhibit 13 has a date of April 20th, 2007.  And

5    then you've testified that Exhibit 14 was at sometime before

6    the administrative withdrawal but after the end of the

7    semester.

8          Does this mean that you were looking at ways to

9    perhaps withdraw Mr. Barnes academically before you ever saw

10   the Facebook page?

11   A     No.

12   Q     No?  Why were you looking at his grades on

13   April 17th?

14   A     On April the 17th I asked -- I believe this is the

15   Assistant Vice President for Academic Affairs.  I believe

16   this is her evaluation in writing here.

17   Q     I'm sorry.  Where are you referring?

18   A     This is on Exhibit 12.

19   Q     Okay.

20         MR. WILL:  Handwritten notes on the second page.

21         THE WITNESS:  Second page.

22         MR. WILL:  Do you see those?

23   BY MR. CORN-REVERE:

24   Q     I see them.

25   A     I believe I talked to Dr. Levy about -- Dr. Levy

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      traveled with me to Georgia Southern for the meeting at the

2      Regents.

3              And I believe I said something to Dr. Levy about

4      what's the background, academic background of Mr. Barnes;

5      and I believe that the Assistant Vice President had this

6      sent, and I gave a report to Dr. Levy about his background.

7          Q      Okay.  Now the date on this -- April 17th, 2007 --

8      would've been the time of the Board of Regents meeting?

9          A      That's right.  That's right.

10         Q      Does this mean that someone had this information

11     faxed from the VSU registrar's office to someone at the

12     Board of Regents meeting?

13         A      No.  No.  What this means is it was sent from the

14     registrar's office over to the Assistant Vice President's

15     office, which is next to Dr. Levy's office, on the day that

16     we were at Georgia Southern.

17         Q      Uh-huh.

18         A      So, obviously, when the calls came in from Linda

19     Daniels on the 16th asking who is this person; what's going

20     on -- there was a request to look at -- find out about the

21     student and see his academic record.

22         Q      Okay.  So, the actual investigation of Mr. Barnes

23     started because of the inquiries made by the Board of

24     Regents?

25         A      It was a question of who is this student; what's

Page 191



1      going on.

2              And one of the first things you do in higher

3      education is take a look at who is this student

4      academically.  It's not an unordinary step to take.

5      Q      Do you conduct background checks on all of your

6      students who express political opinions?

7      A      No, only those who concern me.

8      Q      So, as of April 17th, 2007, your testimony is that

9      Mr. Barnes already concerned you, right?

10     A      Beginning.  This is the first step.

11     Q      Let's look back at page four of Exhibit Five --

12     A      (Reviewing document.)

13     Q      -- and the final paragraph on that page which

14     states, "I took what I believed to be appropriate action and

15     minimize campus focus on Mr. Barnes and his documented

16     behavior by not scheduling a judicial hearing.  The exigency

17     of the circumstances dictated action that would not invite

18     alarm.

19             "A campus hearing would have involved a judicial

20     panel comprised of students and faculty.  This format would

21     have alerted the campus of a potential threat and would have

22     compromised campus safety by exacerbating potential alarm."

23             Did I read that correctly?

24     A      Yes.

25     Q      Is that your position?

Page 192



```
 1      A      Yes.
 2      Q      Is it true that this states that you made an
 3   affirmative decision to deny Mr. Barnes a hearing?
 4             MR. WILL:  Object to the form of the question.
 5   BY MR. CORN-REVERE:
 6      Q      Did you make an affirmative decision to deny
 7   Mr. Barnes a hearing?
 8             MR. WILL:  Again, I object to the form of the
 9      question.
10             MR. CORN-REVERE:  Tell me what's wrong with that
11      question.
12             MR. WILL:  Because we have had -- let's do this.
13      Let's go off the record for a minute so you can step out
14      of the room.  I want to talk to him about it.
15             THE WITNESS:  You want me to step out --
16             MR. CORN-REVERE:  No.  We're not going to go off
17      the record.
18             MR. WILL:  I don't want to make a speaking
19      objection.  So, if he's outside the room, then he can't
20      hear it.
21             MR. CORN-REVERE:  I'll just rephrase the question.
22      I don't want to waste the time.
23   BY MR. CORN-REVERE:
24      Q      Okay.  That first sentence that I just read, "I
25   took what I believed to be appropriate action and minimize
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1    campus focus on Mr. Barnes and his documented behavior by
2    not scheduling a judicial hearing."
3         That was your decision, right?
4    A    Yes.
5    Q    You made the decision to not schedule a judicial
6    hearing for Mr. Barnes?
7         MR. WILL:  That's what he just said.
8         THE WITNESS:  Yeah.
9    BY MR. CORN-REVERE:
10   Q    Right.
11   A    That's what I said, yes.
12   Q    Good.  You state here that a campus hearing
13   would've caused campus alarm.
14        What's the basis of that opinion?
15   A    The make-up of the judicial committee and a hearing
16   composed of students and faculty where the issues that we've
17   talked about throughout this day would have been put on the
18   table for discussion in order to make a decision about the
19   committee's opinion of Mr. Barnes' behavior.
20   Q    Wouldn't it have been possible to schedule a closed
21   hearing?
22   A    What do you mean by a "closed hearing"?  Closed
23   meaning, the committee would not be permitted to talk about
24   confidential information that was going on in the meeting?
25   Q    Well, for starters, would it have been possible to
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    have a hearing that was not open to the public?

2        A     What type of hearing are you suggesting?

3        Q     What type of hearing do you normally have when you

4    discipline students?  The kind that you didn't provide here.

5        A     The committee composed of students and faculty

6    would have been called in.

7        Q     Would it have been possible to have a hearing of

8    that type that was not open to outsiders?

9        A     Outsiders?  You mean faculty and --

10       Q     Nonparticipants in the hearing.

11       A     My concern was nothing -- seeing those people

12   depart that meeting, there would've been immediate

13   discussion on the campus about what was going on.  That was

14   my concern.

15       Q     And why would that have been a problem?

16       A     As I said here, it would've compromised our

17   opportunity to get through the spring semester without this

18   blowing up in a public declaration of some sort that we had

19   a possible problem on the campus related to Virginia Tech.

20             I don't see how you can have a closed hearing where

21   people leave and they are not going to talk about what's

22   going on with the issues that were going on in relation with

23   Virginia Tech.

24       Q     Again, I'm curious how that was accomplished since

25   Mr. Barnes was then given a procedure for appealing to the

1     Board of Regents?

2        A     Yes.

3        Q     Didn't the public find out that there was a problem

4     that you've characterized as in some way related to Virginia

5     Tech because of the appeal process?

6        A     That was after the withdrawal that he appealed.

7     Not during the final exam schedule and in-between

8     commencement and the opening of the May Mester, which is

9     only about three days.

10       Q     I still do not understand what the problem would

11    have been for this to have been the subject of a hearing on

12    campus during that period.  Can you explain it to me?

13             MR. WILL:  I believe he's answered the question.

14       That is his answer.

15             MR. CORN-REVERE:  I believe I have the right to

16       ask.

17             MR. WILL:  Well, you've asked and he's answered.

18       Whether you don't understand his answer and can't

19       rationalize it, that's fine.

20    BY MR. CORN-REVERE:

21       Q     Now explain to me what the problem of having a

22    hearing on campus would be?  If people are going to find out

23    about the issue through an appeal, what's the problem of

24    having a hearing?

25       A     It was during the time that the campus was

Page 196

1    finalizing its semester, and I did not want a hearing with

2    information to move across the campus.  It would have

3    negated the discussions that went on for the entire week of

4    the 23rd and subsequent to that to the end of the final

5    exams on May the 5th.

6          It would have negated all the discussions and the

7    plan that was put in place for us to get through the

8    semester.

9          I was concerned about having that information move

10   quickly across the campus during a very, very precise time.

11   Q    That's a P.R. problem, not a security problem,

12   isn't it?

13   A    It's not a P.R. problem.  I disagree with you.  I

14   know that's not a question.

15   Q    Let's talk about some of the events of April 20th,

16   2007.  Did you attend a faculty breakfast on April 20th,

17   2007?

18   A    I attended a faculty breakfast.  I don't remember

19   if it was on that morning of the 20th or not.

20   Q    Do you recall having a conversation with

21   Dr. Michael Noll?

22   A    I did not have a conversation with him as much as

23   we were in the meeting and --

24   Q    Well, did you talk to him?

25   A    I gave an update to the group on the passage of the

Page 197

1   parking deck and that we were proceeding with plans for the
2   construction.
3          I said in my testimony that when I met with the
4   faculty senate, which was on a reoccurring meeting schedule
5   of about every four to six weeks, I would give the faculty
6   senate an update before it went to the full faculty senate
7   and gave updates on the progress of the institution.
8          I mentioned that there was some concern.  There was
9   some protest about the parking decks, but everything went
10   through and we were approved and we were moving on.
11          Dr. Michael Noll said, "I know this student that
12   you're referring to, and I will make an intervention and
13   speak to him."
14          And I said to him, "This is not a faculty senate
15   issue; that it would be handled from the administration side
16   and the faculty."  And I asked him not to discuss it.
17          Obviously, he left the meeting and went to
18   Mr. Barnes and discussed that.  I had brought up -- I did
19   not mention Mr. Barnes' name.  I said that there was -- I
20   gave the facts.
21          There was a protest and there was a concern that
22   there may be a protest and it didn't happen and the approval
23   was granted to move on the construction of the decks.
24   Q    But from what you said, Dr. Noll was able to
25   identify Mr. Barnes as the student to which you were

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    referring?

2       A     He, obviously, knew about it.  He knew about the

3    flyers and the activities that led up to that breakfast

4    meeting on the 20th.

5       Q     This is beginning to sound like a conversation.  I

6    mean, you said you hadn't had a conversation with Mr. Noll.

7       A     I'm just trying to put it into context of your

8    question.

9             I did not -- Dr. Noll asked me if he could talk to

10   the student, and I said there is -- it's not necessary for

11   you as a faculty member to do that.  Now is that a

12   conversation?  I'm giving you the facts of what went on in

13   the meeting.

14      Q     Did you tell Dr. Noll that you were going to deal

15   with the student?

16      A     I said that it would be -- it would be the

17   responsibility of the administration to deal with the

18   student.  He was not to deal with it.

19      Q     I'm sorry.  I didn't hear you.

20      A     It was the responsibility of the administration, of

21   my office, not the faculty member, to deal with the issues.

22   I didn't give any information about what those issues were.

23      Q     Did you tell Dr. Noll that your office was going to

24   deal with this student?

25      A     I said that the -- the language was that I would



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    deal with it; it was not his responsibility.

 2        Q    Okay.  That was a morning meeting with the faculty

 3    on April 20th?

 4        A    I said I'm not sure about the date, but it was

 5    always a breakfast meeting, yes.

 6        Q    Okay.  And I believe you've also provided

 7    information that April 20th was the date that you received

 8    an email from Mr. Barnes that I believe you described as

 9    "mocking."

10             Let me see.  It's paragraph eight of Exhibit Five.

11        A    Yes.

12        Q    Yes.  The Easter Island email?

13        A    Yes.

14        Q    You received that on April 20th?

15        A    Yes.

16        Q    And this is the date that you first saw the

17    Facebook page:  April 20th?

18        A    Yes.

19        Q    And is this the same date that you first convened a

20    meeting of your administrative unit to discuss Mr. Barnes:

21    April 20th?

22        A    I believe that's the date, yes.

23        Q    And this is the date you contacted VSU Police

24    Department to alert them to Mr. Barnes?

25        A    Yes.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q     And at this time did you seek advice from anyone

2    who you would describe as an expert in assessing the

3    psychological status of an individual?

4    A     Not on the 20th.

5    Q     When did you do that?

6    A     When did I ask someone's opinion?

7    Q     Yes.

8    A     When I met with Leah McMillan for the first time.

9    Q     Now you have also testified that she didn't give

10   you an opinion, right?

11   A     She gave me information.  I did not hear an opinion

12   that he was a non-threat.

13   Q     But wasn't the purpose of your meeting with Leah

14   McMillan to ask her her opinion?  That's what you just said,

15   I thought.

16   A     Asking about the background of the student.

17   Q     Why did you call -- why did you summon Leah

18   McMillan to your office?

19   A     I requested that she come to my office for the

20   discussion I just outlined:  Background of the student.

21   Q     As President of the university, when you request

22   someone to come to your office, is that seen as an informal

23   invitation?

24   A     It's semantic.  I asked her to come to my office.

25   Now if that's like presidential power, I wouldn't summon

Page 201



1    someone.  I asked her to come to the office for information.

2    That's her responsibility.

3        Q    So, it's not optional when you ask someone from the

4    Counseling Center to come to your office.

5            MR. WILL:  Is that a question?

6            THE WITNESS:  Is that a question?

7    BY MR. CORN-REVERE:

8        Q    Is it optional?

9        A    When a President requests someone, a staff member,

10   to come to the office, they usually come to the office.

11       Q    I imagine they do.

12            Looking back just briefly at Exhibit 14 --

13       A    Yes.

14       Q    -- this is the information that was received in

15   response to your request about Mr. Barnes' grades for spring

16   2007.

17            Was the result of this memo, or at least the

18   conclusion of this memo, that it would not be possible to

19   remove Mr. Barnes through academic suspension?

20       A    He wouldn't have to be removed.  It's an

21   automatic -- automatic dismissal.

22       Q    Okay.  I'm just looking at the last line here.

23            It says, "Probation is based on institutional GPA;

24   therefore, he is no longer on academic probation."

25       A    What that means is that he had a 2.0 GPA at VSU for



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    that semester, but his overall grade point average is still

2    a 1.93.

3              MR. CORN-REVERE:  Let's mark as Zaccari Exhibit

4         Number 15, an article with the headline:  Laws Limit

5         Options When a Student is Mentally Ill.

6              (The document was marked for identification as

7         Plaintiff's Exhibit Number 15.)

8              THE WITNESS:  (Reviewing document.)

9    BY MR. CORN-REVERE:

10        Q     Have you had a chance to look at this exhibit?

11        A     I'm doing so as quickly as possible.

12        Q     Okay.  Take what time you need.

13              (Pause)

14        A     I've finished.  Thank you.

15        Q     Okay.  Have you seen this exhibit before?

16        A     I believe I've read it, yes.

17        Q     Now this is an email from a Kevin Boyd to Theresa

18   Boyd dated April 19th, 2007.

19        A     Yes.

20        Q     Theresa Boyd is your administrative -- or was your

21   administrative assistant at that time?

22        A     Yes.

23        Q     Do you know -- first of all, who is Kevin Boyd?

24        A     Kevin Boyd is Theresa's husband who works in --

25   under the business, financial administration umbrella; and

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    he's responsible for things like risk management and

2    lawsuits.  Things that come into the campus.  He's --

3    insurance claims against the university, those types of

4    things.  That's Kevin's responsibility.

5        Q    Did Ms. Boyd share this article with you when she

6    received it in April of 2007?

7        A    I've read it before, yes.  It was, obviously, given

8    to me.

9        Q    Do you have a recollection of Ms. Boyd giving you

10   the article?

11       A    I have a recollection of reading it.  I may have --

12   I don't know if she handed it to me, personally, but I do

13   remember reading it.

14       Q    Did you discuss it with her?

15       A    I don't think I discussed it with her, no.

16       Q    Do you have any idea why she might have given you

17   this article?

18       A    It's a piece of information.

19       Q    Right.  But was it a piece of information relevant

20   to anything that you were working on on April 19th, 2007?

21       A    Well, it's relevant to what was going on with

22   Virginia Tech and close -- that's when I got back from

23   Georgia Southern Board of Regents meeting and had some

24   concerns, as you know, about the telephone calls and

25   other -- it was one day before the meeting that we had to

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    initiate some plan about Mr. Barnes.

2        Q    Yes.  Do you know if this was sent to you because

3    of the situation with Mr. Barnes?

4        A    I think it was related.

5        Q    But was it the reason, do you know?

6        A    No.

7             MR. CORN-REVERE:  Let's mark as Zaccari Deposition

8        Exhibit Number 16, a letter to the editor to the

9        Spectator entitled:  Response to Parking Decks to be

10       Built at VSU.

11            (The document was marked for identification as

12       Plaintiff's Exhibit Number 16.)

13            THE WITNESS:  What was the date on this?

14   BY MR. CORN-REVERE:

15       Q    This exhibit, itself, does not have a date.  I

16   think it's been established in the record that this was

17   published on April 19th, 2007.

18       A    Okay.  All right.  That was a Thursday.  Thank you.

19       Q    Have you seen this letter to the editor before?

20       A    I saw it -- I saw it when it first came out.

21       Q    So, you would've seen it on April 19th, 2007?

22       A    (Nods head.)

23       Q    I'm sorry?

24       A    Yes.

25       Q    Okay.  Would this have been your first day back at



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    the campus after the Board of Regents meeting?

2       A    Yes.

3       Q    So, you come back from the Board of Regents where

4    you've been asked questions about some student.  You get

5    back to campus, and you see that the Spectator has a big

6    letter to the editor from the student raising the issues

7    that caused you concerns in the first place, right?

8       A    (Nods head.)

9       Q    What did you do?

10      A    I didn't do anything.  Parking decks were approved

11   on the 17th and the 18th.  So, this is an opinion and had no

12   role as to the outcome of the vote.

13      Q    Right.  So, this wasn't going to affect anything at

14   the Board of Regents, right?

15           But the next morning you went to a faculty

16   breakfast where you talked about Mr. Barnes' protest with

17   Michael Noll, right?

18      A    I'll go back to what I said.  Every breakfast I

19   exchanged information with the faculty senate members who

20   were present.

21           Every breakfast changed faculty senate members who

22   went to the breakfast.  I shared an update, as I always

23   do -- that's policy -- of what happens at Board of Regents

24   meetings.

25           I said the parking decks have been approved.  There

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    was a protest, but they went forward.  And that's when

2    Michael Noll said, "I know who you're talking about, and I

3    want to see if I can make -- have some discussion with him."

4        Q    Okay.  And the day after this letter to the editor

5    was published was the day you first convened a meeting to

6    discuss whether or not to administratively withdraw

7    Mr. Barnes.  Is that right?

8        A    It's the first meeting I had to begin the

9    investigation of Mr. Barnes.  Understand that this was

10   submitted to the Spectator well before the day it's

11   published.

12       Q    Right.  You first saw it on April 19th, 2007,

13   right?

14       A    I'm saying this was submitted well before the vote

15   was taken.

16       Q    I understand.

17       A    Because it only comes out once every Thursday.

18       Q    You first became aware of it on April 19th --

19       A    Correct.

20       Q    -- 2007?

21       A    Correct.

22       Q    And the next day you convened the first meeting to

23   begin the investigation of Mr. Barnes.  Is that right?

24       A    That was after the emails began coming in that

25   morning.  Not because of the parking deck editorial, but

Page 207

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    because of the emails that were coming in that morning.
 2        Q    Oh, like the Easter Island email that you received
 3    on the April 20th --
 4        A    And Facebook, yeah.
 5        Q    Let's turn to page five of Exhibit Five.
 6        A    (Reviewing document.)
 7        Q    In the first paragraph under the heading
 8    "Discussion," you talk about Mr. Barnes' Constitutional
 9    guarantees, and then state, "With this freedom comes the
10    expense of responsibility."
11             What do you mean by that?
12        A    What I meant was he can say what he wants, but
13    there has to -- when he makes certain kinds of statements
14    and there is someone on the other side of that statement who
15    has a concern about it, he has a responsibility for what he
16    has put in writing.
17        Q    Does that mean he has a responsibility to get his
18    facts straight?
19        A    That's part of it.
20        Q    Does he have a responsibility to avoid mocking
21    people in authority?
22        A    I think he has to be responsible for what he says.
23        Q    And someone will hold him accountable if he mocks
24    someone of authority?
25        A    Your question is not to the point that I was making
```



WHEELER REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    in the first sentence in the discussion as you have

2    referenced.

3         He puts "memorial." The reader sees memorial as a

4    concern. That is the responsibility.

5         Now whether people after the fact agree that

6    memorial rises to some concern, I felt that it did, and that

7    is the type of responsibility that I am attaching to that

8    statement.

9    Q    Okay. Let's talk about Mr. Barnes' use of

10   "memorial." You're referring, of course, to the Facebook

11   collage that we've already discussed.

12        And here in this same paragraph on Exhibit Five,

13   you write, "Mr. Barnes takes a questionable approach in

14   advancing the notion that his use of the word memorial as

15   reflected in attachment four to this letter was an

16   unintentional use of the word. Webster's Dictionary defines

17   the word as something that is a reminder of...some person."

18        Is that your authority for the meaning of the word

19   memorial: Webster's Dictionary?

20   A    I felt, as I said before, that it was an

21   intentional reference. For whatever reason, I don't know.

22   But I think it was intended -- it was designed to do exactly

23   as he intended.

24   Q    You don't know what Mr. Barnes intended to do, do

25   you? You've already testified that you didn't ask him.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      A     I didn't ask him.

 2      Q     I'm sorry?

 3      A     I did not ask him.

 4      Q     Did anyone on your behalf ask him what he meant by

 5   the term memorial?

 6      A     No.

 7      Q     Did you direct anybody to ask him what he meant by

 8   the term memorial?

 9      A     I know what it meant.

10      Q     That's not my question.

11      A     I did not ask him.

12            MR. WILL:  Or direct anybody on your staff to ask

13      him was the question he was asking.

14   BY MR. CORN-REVERE:

15      Q     Did you direct anybody on your staff to ask

16   Mr. Barnes what he meant --

17      A     No.

18      Q     -- by the term memorial?

19      A     No.

20      Q     You state here that you consulted, instead,

21   Webster's Dictionary.

22            And the next sentence says, "The common usage and

23   understanding of this word."

24            Is that what you were basing your opinion on?

25      A     I based it on the other elements that were under
```

Page 210

```
 1    the investigation of this student and attached to the use of
 2    memorial.  And very puzzled, again, about the intent.
 3            The reference to this is a joke, is a cartoon.
 4    That's the responsibility factor.
 5            You cannot put something like that in writing and
 6    classify it as a cartoon or a joke.  I didn't take it as a
 7    cartoon, and others on my staff didn't see that as a joke or
 8    a cartoon.
 9      Q    Who else on your staff said it was not a joke or
10    cartoon?
11      A    Some of my vice presidents.
12      Q    Which ones?
13      A    Dr. Levy and Dr. Keppler thought that it was a
14    meaningful, additional sign that something just doesn't jell
15    here.  Something's not right.  This is an intentional
16    posting.
17            Why was my picture put on that Web page.  Why was
18    the term "memorial" put on that?  What happened that caused
19    the student to take those particular steps and call it a
20    joke?
21            That's what I meant by taking responsibility for
22    the placement on that Facebook.
23      Q    Well, it might've been nice to have bothered to try
24    to find out the answers to those questions.
25            But let me talk about the vice presidents you've
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1   named.  You've named Dr. Levy and Dr. Keppler.  Dr. Keppler

2   was here yesterday, and we deposed him on this issue.

3       A    Yes.

4       Q    And he said that the word "memorial" did not strike

5   him as a threat.

6            Now is it your testimony that he told you that he

7   thought it was a threat?

8       A    Well, my testimony is I felt that there was

9   agreement that I had a legitimate concern about; that my

10  concerns were real and genuine about it.

11      Q    Okay.

12      A    Whether he agreed with it is -- may not be the

13  question.

14           Was I concerned about it?  Was it real?  Did it

15  have an impact on me?  Yes, I think he agreed that that was,

16  in fact, true and real.

17      Q    Okay.  But just to be clear:  I'm not asking what

18  your feelings were, and I'm not asking your assumptions

19  about what others thought may have been.

20           I'm asking you what other people told you.  Did

21  Dr. Keppler tell you that he thought the use of the word

22  "memorial" made this collage into a threat?

23      A    He may have.  I don't know.

24      Q    But you have no independent recollection --

25      A    No.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1      Q     -- of that?  Do you have any reason to doubt his
 2    testimony where he said that it was not perceived by him as
 3    a threat?
 4      A     If that's what he said, that's his testimony.
 5      Q     Okay.  Do you have a specific recollection of
 6    Dr. Levy telling you that he thought the use of the word
 7    "memorial" on this collage made that into a threat?
 8      A     Not to that particular detail, no.
 9      Q     Looking at your use of Webster's Dictionary, I see
10    you left something out of the quote.  It says, "Something
11    that is a reminder of...some person."
12            Do you recall what you left out of the definition?
13      A     No.
14      Q     If Webster's had had some reference to memorial
15    necessarily referring to the dead, do you think you might've
16    included it here?
17      A     I don't know what I left out.
18      Q     Okay.
19      A     Do you have it?
20      Q     Well, as a matter of fact I do.  I have Webster's
21    New Universal Unabridged Dictionary.  This is the Deluxe
22    Second Edition.  Let me just find it here.
23            MR. LaVALLEE:  It's deluxe?
24            MR. CORN-REVERE:  It's deluxe.  It's old but it's
25        still deluxe.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    BY MR. CORN-REVERE:
 2        Q     And I'll pass it to you.  It actually lists six
 3    different definitions for the word "memorial," and I haven't
 4    been able to find a reference to any dead people.  You let
 5    me know if you do.
 6        A     (Reviewing document.)
 7              MR. WILL:  (Reviewing document.)
 8              (Pause.)
 9              THE WITNESS:  I don't see the same language that is
10        written here in your --
11    BY MR. CORN-REVERE:
12        Q     It may be a different edition.  I'm just asking you
13    about what you got handed.
14        A     I don't see where these are the same.
15        Q     I also have Webster's New Collegiate Dictionary, if
16    that will help.  And I have Black's Law Dictionary, if you
17    would like to look at that, too.  I have yet to find a
18    reference to dead people in the definition "memorial."  I'm
19    not suggesting that you're misquoting Webster's.
20              My question is:  Is there any standard definition
21    of the word "memorial" that you've been able to find that
22    necessarily says this relates to talking about dead people?
23        A     When you go to a memorial, you're not talking about
24    dead people?
25        Q     I understand you refer here to common usage.  I'm
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      talking about Dictionary definitions since you brought it up

2      in your letter to the Board of Regents, you consulted at

3      least one version of Webster's Dictionary.  The definition

4      you consulted says nothing about death.

5           My question is:  Can you find a standard definition

6      in the dictionary that necessarily links the word memorial

7      to death?

8           MR. WILL:  I object to the form of the question.

9      Whether he can do it, that's besides the point.  He can't

10     do it based on the document that you handed to him.  Are

11     you asking him to go conduct a search?

12          MR. CORN-REVERE:  No, I'm not.  I'm trying to probe

13     what is the basis for his reference to this definition

14     and his understanding of it.

15          THE WITNESS:  My understanding of it is that it

16     deals with someone who is no longer living.

17     BY MR. CORN-REVERE:

18     Q     But that's not based on dictionary definitions,

19     right?

20     A     I don't know.  Again, there may be opportunities to

21     find that type of reference.

22     Q     But you hadn't found it as of the time you had

23     administratively withdrawn Mr. Barnes, had you?  And you

24     didn't ask him what he meant.

25     A     Did not ask him.  But I, still, the understanding

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    that I attach to it was the one that I had previously given
 2    to you:  That it refers to someone who is no longer living.
 3        Q    Now are you aware that another definition of the
 4    word "memorial" -- and this one comes from Black's Law
 5    Dictionary -- is "a document presented to a legislative body
 6    or to the executive by one or more individuals containing a
 7    petition or a representation of facts"?
 8             Have you ever heard that definition?
 9        A    No.
10             MR. CORN-REVERE:   I'm done with that if you want
11        to pass it back.
12             MR. WILL:  (Tenders document.)
13             MR. CORN-REVERE:  Thanks.
14    BY MR. CORN-REVERE:
15        Q    I believe you testified that it concerned you that
16    your name was used in connection with a building structure
17    in the Facebook collage and that that reinforced your belief
18    that this was a reference to a posthumous memorial.  Is that
19    right?
20        A    Yes.
21        Q    So, when you saw that the possibility that a
22    building had been named after you, including a satirical
23    naming based on the parking decks that Mr. Barnes opposed,
24    you necessarily thought that meant it must be referring to
25    you as being dead.  That was your understanding?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A     My understanding.  But I didn't believe it was
2   satirical.
3      Q     Are you aware of any buildings on the Valdosta
4   State University campus that are named for living people?
5      A     Yes.
6      Q     Can you name some?
7      A     Hugh Bailey.  Dr. Hugh Bailey Science Center.
8      Q     Anyone else?
9      A     No.
10     Q     Would it surprise you to learn that of the 60
11  buildings on the VSU campus, 24 are named in honor of
12  various individuals?
13     A     Why would that surprise me?
14     Q     Well, it didn't surprise me, either.
15     A     I'm not surprised.  To answer your question, I'm
16  not surprised.
17         MR. CORN-REVERE:  Let's mark as Zaccari Deposition
18     Exhibit Number 17, the articles from the Valdosta Daily
19     Times and the Valdosta State University Spectator.
20         (The document was marked for identification as
21     Plaintiff's Exhibit Number 17.)
22         THE WITNESS:  (Reviewing document.)
23         (Pause)
24  BY MR. CORN-REVERE:
25     Q     Have you had a chance to look at that exhibit?

Page 217

1    A    Yes.

2    Q    The first article from Valdosta Daily Times, the

3    headline is "Hopper Hall dedicated."

4        And the second article from the Spectator, the

5    headline is "Hugh C. Bailey Science Center will be new name

6    for Valdosta State University's biology/chemistry building."

7        Do you know the buildings that are referred to in

8    these articles?

9    A    Yes.

10    Q    Are they named for individuals?

11    A    Hopper Hall is named after an individual who served

12    as Dean of Women.  I'm not sure of the exact year; but,

13    obviously, she's no longer living.

14        And the Science Center that was named after

15    Dr. Bailey is the building that he was a catalyst for having

16    it built.  So, I know both buildings you refer to.

17    Q    Okay.  So, in this photograph from the dedication

18    of the Hugh Bailey Science Center, you were present at that

19    dedication.

20    A    Yes.

21    Q    The picture is a little dark.  It's hard to see.

22    But based on the caption, it says the individuals there are

23    Hugh Bailey; you, Dr. Zaccari; and the alumnus award

24    recipient, Dr. Charles Gordon Howell.

25    A    Uh-huh.

Page 218



1    Q    This was a 2005 dedication?

2    A    Yes.

3    Q    So, this would've been just a couple of years

4    before the incidents that led to Mr. Barnes' withdrawal?

5    A    I believe it's dated October the 12th.  That

6    probably meant it was the day before.

7    Q    Now this gentleman in the photograph on the left,

8    is that Hugh Bailey?

9    A    Yes.

10    Q    He looks remarkably life-like.  Is he living here?

11    A    Yes.

12    Q    Let's return to Exhibit Five.  In the paragraph

13    under "discussion" where you talk about the freedom

14    entailing responsibility, you make the statement that a

15    well-settled principal of law -- "It is a well-settled

16    principal of law that the First Amendment was never intended

17    to bestow upon anyone the right to make a cognizable threat

18    of physical harm."

19         Do you see that?

20    A    (Nods head.)

21    Q    Is that your understanding of the First Amendment?

22    A    That was, in discussion with Attorney Laverne

23    Gaskins, recommended that that be put in there to support my

24    statement that there is responsibility; and the First

25    Amendment, as it states there, was not a freedom to say

Page 219

```
 1    whatever you want and to threaten someone physical harm.

 2       Q     And I believe you testified earlier that it was

 3    Ms. Gaskins who recommended putting the citation to the 1919

 4    case of Schenck versus United States in footnote 1 on that

 5    page.

 6       A     Yes.

 7       Q     Is that correct?

 8       A     Yes.

 9       Q     Do you have any idea whether or not the decision in

10    Schenck is still good law?

11       A     No.

12       Q     Did you have any discussion with Ms. Gaskins about

13    the First Amendment doctrine of true threats?

14       A     No.

15       Q     Do you have any understanding of what that doctrine

16    means?

17       A     I've not -- I could not give you specific reactions

18    to that question.  I don't have that knowledge.

19       Q     Okay.

20       A     I'm not an attorney.

21       Q     I understand.  I'm not trying to suggest that you

22    are.

23             Because this was sent to the Board of Regents as

24    your defense in the administrative appeal in this action,

25    I'm just trying to get a sense of whether or not you formed
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    a belief of whether or not the doctrine of true threats has

 2    any bearing on the Facebook collage or Mr. Barnes' actions

 3    in this case.

 4          Did you ever form an impression of that?

 5    A    No.

 6    Q    Looking at the fourth paragraph on page five,

 7    again, you're discussing the use of the term memorial; and

 8    you state, "However, Mr. Barnes made an affirmative effort

 9    to use a particular word -- the word memorial -- to convey

10    the full implication of its meaning."

11          Did you write that statement?

12    A    Yes.

13    Q    How did you know why Mr. Barnes used that

14    particular word?

15    A    I didn't know.  I made the statement that that is

16    what I believe he intended to do.  That's the statement.

17    Q    Well, I mean, it says, "Mr. Barnes made an

18    affirmative effort to use a particular word" --

19    A    Yes.

20    Q    -- "to convey a meaning."

21          You have no idea why Mr. Barnes -- why he used that

22    word, do you?

23    A    I didn't at the time.

24    Q    Do you now?

25    A    This was written on -- no.  I felt that that's what
```

Page 221

```
 1    he meant when I wrote it.
 2         Q    On June 21st, 2007?
 3         A    And felt that that's what he intended ever since it
 4    appeared on April the 20th.
 5         Q    But you didn't ask him.
 6         A    No.
 7         Q    And you didn't consult with professionals about
 8    what Mr. Barnes might've meant by that word, right?
 9         A    I did not do that.
10         Q    And then the final sentence in that paragraph says,
11    "Accordingly, Mr. Barnes should not expect to be insulated
12    with the protection of the Constitution while he engages in
13    disruptive, threatening behavior."
14         A    Yes.
15         Q    Is that your position?
16         A    Yes.
17         Q    What do you mean when you talk about disruptive,
18    threatening behavior?
19         A    All that we have talked about up to this point at
20    almost 4:45, and that is the information that I have given
21    you that led to my concerns about Mr. Barnes' behavior.
22    It's all predicated -- all the premises that I've talked
23    about are all into that statement.
24         Q    So, it's everything?
25         A    A combination of --
```

Page 222

1    Q    It's the flyers?  It's calling the Board?  It's the
2    letter to the editor?  It's the reference to Easter Island?
3    It's the Facebook page?  It's all of the above?
4    A    I believe that it focuses more on what followed the
5    Board of Regents meeting, not to include the Spectator
6    article, because it came -- it was submitted before the
7    Board of Regents meeting on the 17th and the 18th.  It came
8    out on the 19th.
9    Q    But you saw it for the first time on the 19th.
10   A    On the 19th.  What I'm saying:  I did not look at
11   the Spectator article as an issue.
12        I already mentioned to you that I didn't think one
13   way or another about it; that it was the following day on
14   the 20th that I began to have concerns.
15   Q    Because of his email?  His email to you?
16   A    I've already testified to that at the start.
17   Q    Looking at the final paragraph on page five, you
18   write, "Mr. Barnes and his behavior focus primarily on
19   himself and his views.  No one's opinion or appointed office
20   appear to be of value, and authority is something he
21   counters at every possible opportunity with an attitude
22   that, 'I'll get in your face.'"
23        Do you see that?
24   A    I see it.
25   Q    Is that your position?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A     Yes.

2      Q     Was this statement, the final paragraph on page

3  five, a factor in your decision to administratively withdraw

4  Mr. Barnes?

5      A     Yeah, I think it was a factor in the structural

6  analysis of this to his behavior and background.

7      Q     You state that, "No one's opinion or appointed

8  office appear to be of value."

9            Is it your opinion that they should be of value to

10  Mr. Barnes?

11      A     His opinions appear to be the only position.  Once

12  he makes a particular position known, that is the only one

13  that he's going to consider.  That is not what I felt was

14  the way we were going to resolve and get a handle on what

15  was going on.

16            I think his attitude is one of focusing on self, as

17  I said there.  And if he doesn't get his way, he's going to

18  start intimidation, putting things in motion.  And that is

19  what I felt was part of the substance of the puzzle that was

20  coming together.

21      Q     Okay.  And in justifying the decision to

22  administratively withdraw Mr. Barnes, this paragraph at the

23  bottom of page five accurately summarizes your views?

24      A     It doesn't summarize.  It was part of the

25  discussion that I -- it doesn't summarize it all.  It

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    doesn't all come to that particular paragraph.  It is a
2    combination of factors.
3       Q    All right.  But this is part of the reason that you
4    decided to withdraw Mr. Barnes?
5       A    No.  That's expressing his behavior, which was part
6    of the overall concern.
7       Q    And his behavior includes not showing you
8    sufficient deference, countering authority at every possible
9    turn, having a bad attitude, right?
10      A    Part of it, yes.
11      Q    Turn to page six on Exhibit Five.
12           The final sentence says, "Consistent with this
13   philosophy, I carefully weighed Mr. Barnes' interest in
14   continuing his enrollment at VSU against the competing
15   interest of campus safety.
16           "In the final analysis, based on the foregoing
17   series of events, I determined that the overall interest of
18   the campus community were paramount to that of Mr. Barnes."
19           Do you see that?
20           MR. WILL:  No.  Where were we reading?
21           MR. CORN-REVERE:  The last sentence of page six,
22      Exhibit Five --
23           MR. WILL:  Gotcha.
24           MR. CORN-REVERE:  -- going over to the top of page
25      seven.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1              MR. WILL:  Goes over to seven, okay.
 2    BY MR. CORN-REVERE:
 3       Q     Dr. Zaccari, did you see that sentence?
 4       A     Yes.
 5       Q     Does that accurately state your position in this
 6    case?
 7       A     Yes.
 8       Q     So, the decision to administratively withdraw
 9    Mr. Barnes was your decision?
10       A     Yes.
11       Q     And you've also described that in this document as
12    a collective decision of your staff and you?
13       A     I say it was a collaboration of discussions
14    throughout the entire investigation up to the time that I
15    withdrew.  It was collective in the sense that we agreed on
16    a plan and followed through with that plan until we got to
17    just prior to May the 7th when the President of the
18    university had to make the final call.  The vice President
19    couldn't make that call.  I had to make the call.
20              So, when I say it was my decision, it was.  I had
21    to sign the letter.  I had to make the final call.
22       Q     And the final call you made was that the interest
23    of the university outweighed Mr. Barnes' Constitutional
24    rights?
25       A     I made the decision to withdraw Mr. Barnes.
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Turning to page seven of Exhibit Five, two

2    paragraphs up from the heading that says "recommendation,"

3    it states, "As I am not an expert in the field of mental

4    health and because of my concern for campus safety, I felt

5    it necessary to defer to the experts and incorporated their

6    input as a condition for Mr. Barnes' readmission to the

7    university."

8          Do you see that?

9    A    Yes.

10    Q    Does that accurately state your position?

11    A    Yes.

12    Q    In what way in this case did you defer to the

13    experts?

14    A    Under the administrative withdrawal, he was to seek

15    counsel/advice about what was going on at Valdosta State and

16    to be totally open about everything that happened as it

17    happened and have some assessment of what all that was

18    about.

19          Was it a joke?  Was it a cartoon?  Was it genuine?

20    Those were the true feelings that he had?  Does he dislike

21    administrators?  My authority figure from the very first

22    time we met -- was I someone who opposed whatever he feels

23    about authority figures?  But the concern was what was he

24    about.  What was he going to -- I wanted someone to assess

25    openly -- full understanding of everything that went on from

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    a very strict chronology; what was going on and what causes

2    a particular behavior that I was seeing.

3         So, I asked him to seek the advice of an external

4    psychiatrist and to assess everything that was going on, and

5    I wanted to be assured that there was open exchange of

6    everything that had taken place during the spring semester

7    and the relevance of what happened to any previous problems

8    that he was having and to project how the university could

9    deal with Mr. Barnes when he comes back after withdrawal, if

10   he elects to do that.

11   Q    I believe you said in your answer just now you

12   wanted an "open exchange" with respect to Mr. Barnes.

13   A    Yeah.

14   Q    What do you mean by that?

15   A    Open exchange between Mr. Barnes and the selected

16   external psychiatrist.

17   Q    I see.  Now you state here that you're not an

18   expert in the field of mental health, so your feelings about

19   Mr. Barnes really don't matter.  Is that right?

20   A    Well, obviously, my feelings about it were

21   paramount to some of the decisions.

22   Q    Yes.  But not as a mental health expert because

23   here you say that you are not an expert and you want to

24   defer to those who are, right?

25   A    I am a professional educator of 43 years, and I

**WHEELER
REPORTING**
Court Reporting • Video • Litigation Support
*404.351.4577*

1     know about students in higher education environments.

2          So, my professional experience and opinion should

3     be a part of the feeling that I had about this particular

4     student and what was going on.  So, professional experience,

5     I consider myself to have some kind of understanding about

6     student affairs and higher education environments.

7     Q     Okay.  But when it comes to the mental health

8     withdrawal, as I understand it, you insisted that the

9     conditions of the withdrawal include reference to those who

10    are mental health professionals.  Is that right?

11    A     Yes.

12          MR. SMITH:  Object to the form of the question.

13    BY MR. CORN-REVERE:

14    Q     Was that for Mr. Barnes' protection?

15    A     It was for everyone's understanding of trying to

16    figure out what was going on.

17    Q     But as far as I can tell from reading this --

18    strike that.

19          The conditions of the administrative withdrawal

20    that relate to mental health experts only pertain to

21    conditions after the withdrawal, right?

22    A     Yes.

23    Q     Okay.  So, was there some way in this process for

24    the administrative withdrawal for considering the views of

25    mental health experts before the administrative withdrawal?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1              MR. WILL:  Objection to the form.

 2              THE WITNESS:  Well, we were getting into --

 3              MR. WILL:  Can you repeat the question?  I'm not

 4       sure I heard it clearly.

 5              (The requested portion was read back by the Court

 6       Reporter.)

 7              MR. WILL:  I object to the whole question as being

 8       vague and confusing.

 9       BY MR. CORN-REVERE:

10       Q     Do you understand what I'm asking?

11       A     Yes.

12       Q     Okay.  Could you answer the question?

13       A     Let's go back to the date of completion of finals.

14       Friday, May the 4th.  Graduation was the 5th.

15              Didn't make a final decision until that 4th --

16       early morning of the 7th.  The time elements involved here

17       in terms of the start of the May Mester, which was on the

18       9th of May -- in essence, the administrative withdrawal had

19       to take place before the 9th and beginning of a very

20       short-term, only about four weeks.

21              He was taking a first course in Spanish.  I felt

22       that the administrative withdrawal had to take place before

23       the beginning of the May Mester, which was on May the 9th.

24       Q     Did you consult any mental health expert about that

25       decision before administratively withdrawing Mr. Barnes?
```

Page 230

1            MR. WILL:  Object to the form of the question.

2    BY MR. CORN-REVERE:

3        Q    Do you understand the question?

4        A    I didn't.

5        Q    Okay.

6            MR. CORN-REVERE:  At this point I'm finished with

7        this Exhibit Five.  I have a few more to do, but this

8        might be a good time to take a break.

9            (A recess was taken from 5:00 p.m. to 5:08 p.m.)

10   BY MR. CORN-REVERE:

11       Q    Thank you for your patience, Dr. Zaccari.  It's

12   been a long day for everybody, I know.  I just have a few

13   more exhibits that I do want to go through before I finish

14   my question of you.

15           First, let's mark as Zaccari Deposition Exhibit

16   Number 18 the notice of administrative withdrawal dated

17   May 7th, 2007.

18           (The document was marked for identification as

19       Plaintiff's Exhibit Number 18.)

20           THE WITNESS:  (Reviewing document.)

21   BY MR. CORN-REVERE:

22       Q    Dr. Zaccari, have you had a chance to look at this

23   exhibit?

24       A    Yes.

25       Q    This is probably a superfluous question, but have

Page 231

1     you seen this before?

2        A      Yes.

3        Q      This is the notice of withdrawal sent on May 7,

4     2007, to Mr. Barnes?

5        A      Yes.

6        Q      And this is your signature on it?

7        A      Yes.

8        Q      Can you tell me what is your understanding of how

9     Mr. Barnes could satisfy the two conditions that are set

10    forth in this notice?

11              MR. WILL:  Object to the form of the question.

12    BY MR. CORN-REVERE:

13       Q      What did Mr. Barnes have to do under these two

14    conditions to successfully reapply to Valdosta State

15    University?

16       A      The two conditions as outlined on the letter --

17    there would be correspondence from a nonuniversity-appointed

18    psychiatrist indicating that Mr. Barnes was not a danger to

19    himself nor others.

20              The second was documentation from a health

21    professional, mental health professional stating that while

22    he remained at Valdosta State he would be receiving ongoing

23    therapy so that we, at the university, could determine that

24    people understood what had led up to this and help

25    Mr. Barnes complete his education and so the administration

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    would be aware that Mr. Barnes was making good progress in

2    his mental situation, as well as academically.

3        Q    Who was to be the judge of whether or not these

4    conditions were met?

5        A    That would have to come into the President's office

6    and discussed with my vice presidents.

7        Q    So, the letters that are described here would be

8    submitted to your office as President?

9        A    That was the understanding of the two prongs, yes.

10       Q    And was it contemplated that the President would

11   have the authority to make a decision on whether or not to

12   readmit Mr. Barnes?

13       A    After reviewing the materials submitted on the

14   ongoing evaluations, I would be very instrumental in making

15   the decision for readmission.

16       Q    And that would be the President's decision?

17       A    Yes.

18            MR. CORN-REVERE:  Let's mark as Zaccari Deposition

19       Exhibit Number 19, an email from Laverne Gaskins to

20       Elizabeth Neely dated April 26, 2007.

21            (The document was marked for identification as

22       Plaintiff's Exhibit Number 19.)

23            THE WITNESS:  (Reviewing document.)

24   BY MR. CORN-REVERE:

25       Q    Dr. Zaccari, have you had a chance to look at this

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    exhibit?

2        A       Yes.

3        Q       Have you seen it before?

4        A       Yes.

5        Q       Can you identify it for the record.

6        A       It's an email transmission from Laverne.

7        Q       Laverne Gaskins?

8        A       Laverne Gaskins, university attorney, to my office

9    reflecting emails that were exchanged between Betsy Neely

10   and Laverne Gaskins.

11       Q       Did you direct Ms. Gaskins to contact Elizabeth

12   Neely about the process for administratively withdrawing a

13   student?

14       A       Yes.

15       Q       What did you ask her to do?

16       A       Simply to -- under the circumstances, if the final

17   decision were to be made at some future point, what basis

18   would this withdrawal come from?

19               Now my concern was this.  The President is the

20   final decision-maker in these matters.  It's very rare in

21   higher education that the President is involved in a case

22   such as we are discussing here.

23               So, I found myself in a situation where had a

24   judicial hearing taken place and if all the relevant facts

25   would have come out, based on the recommendation of the

Page 234

1      committee, it would come to me for a final decision.  They

2      are a recommending body.  They are not a decision-making

3      body.

4             Under the circumstances, if I had said -- I still

5      have to make the decision and my decision is to withdraw the

6      student -- it was an awkward situation to be in; but that's

7      the nature of the responsibility, and I had to make the

8      decision.

9             That's sort of what this was about.

10     Q     Okay.  And so after Ms. Gaskins checked with

11     Elizabeth Neely and received a response, she then forwarded

12     the email chain to you and asked for an opportunity to

13     discuss it.  Is that right?

14     A     Yes.

15     Q     Now, here in the section of the email in the middle

16     that appears to be Elizabeth Neely's message back to Laverne

17     Gaskins, she writes, "Once the President has made a decision

18     in the matter, there is no due process at the campus level."

19            Do you see that?

20     A     Yes.

21     Q     Did you discuss that with Ms. Gaskins at the time?

22     A     Yes.

23     Q     What did she tell you?

24     A     A caution about -- this is a very unique, different

25     situation to have the President involved.  And the caution

Page 235

```
1    was if you decide to go ahead at some point in the future --
2    it's sort of a gray area.
3             Always one of the many issues that I had to ponder
4    about the call to my empowered and appointed position -- I
5    could make the final call on this, and that was a difficult
6    decision but one I felt that I needed to make.
7    Q    You attended Ms. Gaskins' deposition?
8    A    I did.
9    Q    You listened to her testimony?
10   A    Yes.
11   Q    Did you hear her testify under oath that she
12   advised you that it was necessary to provide Mr. Barnes with
13   a due process --
14   A    I did hear that, yes.
15   Q    When she received this response from Ms. Gaskins
16   and then discussed the matter with you, did she tell you
17   that due process required that the university provide
18   Mr. Barnes with a hearing?
19   A    Are you referring "she" to Ms. Gaskins?
20   Q    Ms. Gaskins.
21   A    Yes.
22   Q    I believe you testified earlier that you had two
23   conversations with Elizabeth Neely about Mr. Barnes'
24   administrative withdrawal.  Is that correct?
25   A    Yes.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1     Q     At some point did Ms. Neely send to Ms. Gaskins and
2    to you a copy of a policy from the Board of Regents?
3     A     Yes.
4           MR. CORN-REVERE:  Okay.  Let's mark as Zaccari
5    Deposition Exhibit Number 20 a fax dated May 1st, 2007.
6           (The document was marked for identification as
7    Plaintiff's Exhibit Number 20.)
8           THE WITNESS:  (Reviewing document.)  It will take
9    me a few minutes to get this straightened out.
10   BY MR. CORN-REVERE:
11    Q     Okay.
12    A     I'll pull it apart, if you don't mind.
13    Q     Sure.
14    A     Okay.  I've got them in order.
15    Q     Have you had a chance to review that exhibit?
16          And, again, I don't think it's necessary to review
17   it in detail.  I'm not going to be asking you about
18   specifics of the policies that are set forth therein.
19    A     I've read it.  I'm not sure of the relevance of the
20   second page.
21    Q     Yeah.  I'm not sure, either.  It just happened to
22   be together with the one that I think is what we'll be
23   talking about and the phone call that -- in which it was
24   discussed is this August 11th, 1983, Board of Regents policy
25   called medical withdrawal policy?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     A    I'm assuming this is highlighted, which means --
2     it's very difficult to read.
3     Q    Yeah.  And, again, I'm not going to be asking
4     questions about the material that we can't read in the
5     highlighting.  I really just want to have a more general
6     discussion about it.
7     A    Okay.
8     Q    Was this material that was sent to your office and
9     Ms. Gaskins in response to your request for advice on how to
10    handle this situation involving Mr. Barnes?
11    A    Yes.
12    Q    And then did you have a subsequent telephone
13    conference in which you and Ms. Gaskins spoke to Ms. Neely
14    about the situation?
15    A    I'm trying to be accurate in answering your
16    question.
17         I'm not sure if this document -- I believe it came
18    in after the first discussion.  Obviously, it did because
19    it's dated May 1st.
20         So, this would be after both telephone discussions
21    had been completed.
22    Q    Okay.  Is it fair to say that the discussion
23    involving this policy occurred after you had reached a
24    tentative decision to withdraw Mr. Barnes but during the
25    period in which you were trying to determine what the best

Page 238



1    procedure would be for accomplishing that objective?

2       A    I had not made the final decision to withdraw

3    Mr. Barnes until, again, about May 5th.

4       Q    Okay.

5       A    So this is the first.

6       Q    Okay.  So, you had a subsequent telephone

7    conversation about this policy in Exhibit 20?

8       A    As part of, I believe, the second -- second

9    discussion with her.  The first one was more expansive, more

10   substantive, and this was the follow-up.

11      Q    Yes.  And was the focus of the follow-up what the

12   procedures should be if you should choose to withdraw

13   Mr. Barnes?

14      A    Similar discussion about understanding the

15   policies.  And if we were to look at a medical withdrawal,

16   which was what this was about, I wanted her reactions in a

17   document that would say this is what it would involve as

18   opposed to the Board of Regents Policy 1902, which was

19   different than the medical withdrawal policy.

20      Q    Yes.  So, you had a range of choices.  One of them

21   was Board Policy 1902; one of them was a medical withdrawal

22   policy, and I guess a third option might be some

23   disciplinary action under the Student Code of Conduct.  Is

24   that sort of the smorgasbord there?

25      A    The only thing I would disagree with your question

Page 239

1    is "options."

2         Options is not the relevant use -- information

3    about the policies that would govern a withdrawal.

4         I wasn't looking for an option to plant -- attempt

5    to plant on this.  I was looking for a way for us to resolve

6    the topics that we have talked about so much during this

7    day.

8    Q    During your telephone conference with Ms. Neely and

9    Ms. Gaskins, did Ms. Gaskins, again, express the view that

10   the university had an obligation to provide Mr. Barnes with

11   a due process hearing?

12   A    Yes.  Yes, she did.

13   Q    And you disregarded that advice?

14   A    I didn't disregard it.

15   Q    You just didn't take it.

16   A    I didn't disregard it.  I took it into advice and

17   took the action that is now before us.

18   Q    Went in a different direction?

19   A    I went into a direction that I felt was unique to

20   this situation, and I had to make a difficult decision.

21   Q    Okay.  Now looking at this medical withdrawal

22   policy, this was not the policy that you ultimately

23   followed, was it?

24   A    That's correct.

25   Q    Is one reason for that decision the fact that

Page 240

1    Valdosta State never adopted this proposed medical

2    withdrawal policy?

3        A      No.   I think it was more in the sense that it was a

4    very lengthy process; a sequence of events to go through

5    with physicians' affidavits about suffering from physical,

6    mental, emotional, psychological, health conditions.

7             And time was getting very brief to the withdrawal

8    deadline that had been established before the opening of the

9    May Mester; and I just didn't believe -- although this

10   might've been a viable way to proceed, that there would've

11   been lengthy discussions about my views, documents,

12   submitting of Facebook comments, the behavior patterns.

13            I just didn't see how all those sequences could

14   become within the time element that we had.

15       Q      So, you needed a more streamlined approach that

16   didn't require the showings that would've been set forth in

17   the medical withdrawal policy?

18       A      It was not streamlined as much as it was I had a

19   deadline before the summer terms opened, and that deadline

20   was before the 9th.

21       Q      Okay.

22       A      With Board meetings in Atlanta scheduled for the

23   8th and 9th of May.

24       Q      And, so, you determined that you needed to act more

25   quickly than would've been permissible under the medical

Page 241



1    withdrawal policy?

2        A    I needed to act on a policy that would cover the

3    reason why I signed a withdrawal.

4             MR. CORN-REVERE:  Okay.  Let's mark as Zaccari

5        Deposition Exhibit Number 21, what appears to be a May

6        7th, 2007, email to Dr. Zaccari.

7             (The document was marked for identification as

8        Plaintiff's Exhibit Number 21.)

9             THE WITNESS:  (Reviewing document.)

10   BY MR. CORN-REVERE:

11       Q    Now as you look at that, let me just clarify the

12   date, which is very illegible at the bottom, is May 7th,

13   2007.

14            I think that may refer to the date this actual

15   document was printed.  It may not be the date that it was

16   sent.  I say that just for clarification, and I'll ask the

17   witness to identify it and perhaps put it in time.

18       A    This was the letter that was finalized.

19            And I believe because Laverne had this in her

20   computer and I made a few adjustments in it, I sent those

21   down to her and she printed this out for -- please see a

22   version of it.

23       Q    I see.  So, after your discussion with Elizabeth

24   Neely and Laverne Gaskins, you directed Ms. Gaskins to draft

25   the withdrawal notice?

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
1       A     I asked her to prepare -- support in drafting the
2   letter, yes.
3       Q     Okay.  And I may actually have these documents out
4   of sequence.
5           MR. CORN-REVERE:  Why don't we just go ahead and
6       mark this as Zaccari Exhibit Number 22.
7               (The document was marked for identification as
8       Plaintiff's Exhibit Number 22.)
9           MR. CORN-REVERE:  It is a memorandum to Dr. Ronald
10      Zaccari from Laverne Gaskins dated May 4th, 2007.  We can
11      talk about these two together.
12          THE WITNESS:  (Reviewing documents.)
13   BY MR. CORN-REVERE:
14      Q     Dr. Zaccari, have you had a chance to review that
15   exhibit?
16      A     Yes.
17      Q     Have you seen it before?
18      A     Yes, I have.
19      Q     Please identify it for the record.
20      A     It's a copy of a memorandum from Laverne Gaskins,
21   University Attorney, to my office recommending a draft of a
22   proposed letter.
23              It mirrors the final version, but -- let's see.
24   There's been some modification to the -- from the draft to
25   the final May 7th letter.
```

Page 243

1    Q    Okay.  Is it your understanding that this was her

2   first attempt to satisfy your request that she draft the

3   initial administrative withdrawal notice?

4    A    On May the 4th it was leading to that decision,

5   which was the next day.  So, I think it was a preparation

6   for it because, again, time was a crucial element.

7    Q    Yes.  Her memo to you describes pretty much what it

8   is.

9         It says, "Please find below the proposed letter.

10  You should note that due process dictates that the student

11  be apprised of what particular policy they have violated, an

12  opportunity to be heard and also be informed of the appeal

13  process.

14        "My research has led me to my following policies

15  that appear to be implicated.  I have attached the same for

16  your review and consideration."

17        And then it lists several different policies that

18  are contained in the student handbook.  Do you see that?

19   A    Yes.

20   Q    Can you state for the record how the particular

21  policy was selected -- strike that.

22        Was it your decision to determine which of these

23  policies should appear in the final draft of the withdrawal

24  notice?

25   A    It was my responsibility to do that.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Yes.  So, in this memorandum Ms. Gaskins is making

2    recommendations about possible policies that might be used,

3    and among those policies you selected Board of Regents

4    Policy 1902?

5    A    Yes.

6    Q    And then that was the policy that appears in the

7    May 7th, 2007, final administratively withdrawal letter?

8    A    Yes.

9    Q    Why did you choose Board Policy 1902?

10   A    When I looked at and searched the information that

11   had come in over almost a three-week period, I felt that the

12   disruptive behavior -- not in the strictest sense of campus

13   assemblies, but it was a sort of juxtaposition of meaning of

14   disruptive behavior that I felt classified more than the

15   others.

16        It was not disorderly conduct.  It was not a mental

17   health, as we discussed, or student conduct so much,

18   although there was some of that in there.

19        I believed that the disruptive behavior, the

20   intimidation factors, the concerns we had, hours and hours

21   of contemplation, concern, Virginia Tech -- bringing all

22   these elements together -- that his posting and his attitude

23   and his behavior patterns and what happened was disruptive

24   to the administration and the activities of the university.

25        A tremendous amount of time was focused on what had

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    been caused by the way this thing came out.

2          And 1902 is a Board of Regents policy which

3    supersedes any campus policy, and so I elected to use the

4    Board of Regents 1902 as the basis for the withdrawal.

5    Q    But Board Policy 1902 isn't an administrative

6    withdrawal policy, is it?

7    A    It is -- is the reason why I selected that as a

8    basis for the withdrawal.

9    Q    But there's nothing in Board Policy 1902 that

10   actually says "administrative withdrawal," is there?

11   A    No.

12   Q    You just chose to call it that.

13   A    Yes.  I chose to call it that because Policy 1902

14   is -- (reviewing documents).  If I read this from the policy

15   manual from the Board of Regents 1902, disruptive behavior

16   states the following:  "Any student, faculty member,

17   administrator, employee can result in dismissal or

18   termination."

19          I did not dismiss.  I did not terminate.  I used

20   the opportunity for Mr. Barnes to step out for a period of

21   time under administrative withdrawal.

22   Q    Right.  But Board Policy 1902 is a disciplinary

23   policy, isn't it, for gross irresponsibility?

24          MR. WILL:  Object to the form of the question.

25          THE WITNESS:  It's not grossly.  It says that --

Page 246

1      I'm putting this in the context that I believe that his

2      student behavior was out of the context of norm and

3      caused a great disruption to the administration of the

4      university, which says, "Any student who clearly

5      obstructs administrative activities in the university may

6      be discharged."

7           I felt that it was a disruptive behavior to the

8      administration of our campus.

9    BY MR. CORN-REVERE:

10     Q     Okay.  Did you select Board Policy 1902 because the

11   other policies listed in Ms.Gaskins' memo to you weren't

12   appropriate to this situation?

13     A     I selected this because I thought it was the most

14   appropriate.

15     Q     But why did you exclude the others?

16     A     I think I've already covered that.  The medical

17   withdrawal --

18     Q     Was too cumbersome?

19     A     It was not -- it was cumbersome, but it was going

20   to be a lengthy period of time before a decision could be

21   made.

22     Q     And you'd have to do things like provide evidence?

23     A     I would assume that that would be a part of it.  A

24   physician would have to make the decisions on that based on

25   information.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q      And is the same true of the mental health

2   withdrawal policy?

3      A      Yes.

4      Q      And is the same true of the policies with respect

5   to disciplinary procedures?

6              MR. WILL:  Object to the form.

7   BY MR. CORN-REVERE:

8      Q      I'm sorry.  Disorderly conduct?

9      A      Yes.

10             MR. CORN-REVERE:  Let's mark as Zaccari Deposition

11     Exhibits 23 and 24, two letters dated May 8th, 2007.

12             (The documents were marked for identification as

13     Plaintiff's Exhibit Numbers 23 and 24.)

14             THE WITNESS:  (Reviewing documents.)

15   BY MR. CORN-REVERE:

16     Q      The first is a letter from Leah McMillan to the

17   Board of Regents --

18             MR. LaVALLEE:  Bob, can we wait until it gets

19     circulated?

20             MR. CORN-REVERE:  Sure.

21             (Pause)

22             MR. CORN-REVERE:  Everyone got it?

23             (Pause)

24             THE WITNESS:  (Reviewing document.)

25   BY MR. CORN-REVERE:

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     Q     Dr. Zaccari, have you had a chance to look at these
2     two exhibits?
3     A     Yes.
4     Q     Have you seen them before?
5     A     Yes.
6     Q     Please identify them for the record.
7     A     Exhibit 23 is a letter directed to the Board of
8     Regents, University System of Georgia; also is directed to
9     the Office of the President.  It's dated May the 8th, 2007.
10          It's in reference to Mr. Barnes, and it is a letter
11    from Leah McMillan, VSU Counseling Center.  Subject is
12    writing a letter that was requested by Mr. Barnes on his
13    behalf.
14    Q     Do you recall when you first saw these two letters?
15    A     One was written on May the 8th.  The second one was
16    written on May the 8th from Dr. Winders.
17    Q     Do you know if you received them on May 8th, 2007?
18    A     I do not.  Keeping in mind that the Board of
19    Regents meetings were being held in Atlanta on the 7th and
20    the 8th.
21          I'm not sure I was back in the office.  I may have
22    been back later that afternoon, but they were signed on the
23    8th; and I'm not sure if they came to my attention the next
24    morning or late that afternoon of the 8th.
25    Q     Okay.  So, on or about May 8th, perhaps May 9th,

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    you saw these two letters?

2        A    Yes.

3        Q    Was it your understanding that these letters were

4    an attempt to satisfy the two conditions set forth in the

5    withdrawal notice to Mr. Barnes?

6        A    I was very surprised to get a copy of the letter

7    from Ms. McMillan.  I had no idea that there was a request.

8            There was no communication with the President's

9    office, knowing full well the concern that I had that such a

10   letter was being written by Ms. McMillan.

11           So, this was sort of a blind-sided event for me

12   when I saw it the next day after making the decision for

13   withdrawal on the 7th that this had come in.  There was no

14   communication about it.  My concerns are what would result

15   as a part of this.

16           So, my first reaction to Ms. McMillan's letter was

17   one of great surprise.

18       Q    Had you known that Ms. McMillan had been asked to

19   write a letter on Mr. Barnes' behalf, would you have

20   directed her as President of the university not to do so?

21       A    No.

22       Q    Did you understand these letters to reach the

23   conclusion that Mr. Barnes was not a threat to himself or to

24   you, personally?

25       A    I understood the endorsement that was in here by

Page 250

1    McMillan, yes.

2        Q      And by Dr. Winders or Winders?

3        A      My concern about -- is it Winders?

4        Q      It is actually Winders.

5        A      Dr. Winders' letter was a concern of trust at this

6    point.

7        Q      What do you mean by that?

8        A      What I mean by that is I had no idea that

9    Mr. Barnes was going to see Dr. Winders during this period

10   of time.

11       Q      Really?

12       A      That quickly.

13       Q      Oh, that quickly.

14       A      Yes.  And I was not sure -- as I had no awareness

15   of what transpired between the student and Dr. Winders --

16   what information was shared, the full chronology of events.

17              And so I wanted -- obviously, since the withdrawal

18   had already been signed and was underway, I wanted to

19   ascertain if full disclosure was discussed with Dr. Winders.

20       Q      So, you were surprised that Mr. Barnes was able to

21   meet the conditions of the withdrawal so quickly.

22       A      I was surprised by the letter from Leah McMillan

23   because it seemed to be in somewhat of a dichotomous

24   direction from what she and I had originally discussed about

25   some of the concerns with Mr. Barnes.

Page 251

1      Q      Well, I mean, it's a complete opposite conclusion

2    of what you believed, right?

3             I mean, she concludes in this letter to you that

4    Mr. Barnes is not a threat and you believed that he was.

5      A      Yes.

6      Q      And you thought -- I don't want to put words in

7    your mouth.  Let me just ask.

8             You said that you felt blind-sided by the fact that

9    Ms. McMillan had written a letter on Mr. Barnes' behalf.

10     A      Yes.

11     Q      And the reason for that was because you thought it

12   was very clear how you felt in the matter.

13     A      Oh, I felt it was understood that she, too, brought

14   out points that she was concerned about.

15            So, when this came out as somewhat different,

16   that's why I was surprised, not that it came in on the 8th

17   but after the withdrawal and after the decision was made.

18            Things were happening so quickly in that fine

19   period of time that the withdrawal was done and it was to

20   stand for, hopefully, the summer until we had an opportunity

21   to get more information and confirm that there's full

22   disclosure about everything that took place on the campus at

23   Valdosta State.

24     Q      Now if you had looked at these two letters and

25   concluded that they satisfied the conditions of the May 7th

Page 252

1   withdrawal, would that have permitted Mr. Barnes to enroll

2   in summer classes at Valdosta State?

3       A    Perhaps, yes.

4       Q    And you didn't want that, did you?

5       A    No.  I didn't say that.  I said I wanted to be sure

6   that this letter had full disclosure about everything.

7       Q    What do you mean by that?

8       A    I had no guarantee that Mr. Barnes had discussed

9   openly with Winders everything that took place between the

10  time that this business started on the 20th of April leading

11  up to the May 7th withdrawal.

12      Q    Didn't you earlier ask Leah McMillan to contact

13  Mr. Barnes' psychiatrist in this matter and find out what

14  was going on?

15           MR. LaVALLEE:  Objection to form.

16           MR. WILL:  I object to the form of the question.

17           THE WITNESS:  I asked -- I believe my testimony was

18      I asked Leah McMillan to do some follow-up about what was

19      going on with Mr. Barnes.

20  BY MR. CORN-REVERE:

21      Q    Okay.  Looking at Exhibit 24, Dr. Winders' letter,

22  the fourth line from the top says, "In fact, I conducted an

23  evaluation of Hayden on April 30, 2007, at her -- Leah

24  McMillan's -- "request and felt he was not a threat to harm

25  himself or anyone else."

Page 253

```
 1              The line before that, "I was surprised to hear" --
 2     that he has been expelled -- "as I have been in contact with
 3     Leah McMillan, a counselor at your university."
 4              Did you read this letter when it came in?
 5     A    I did.  It was either on or about May 8th or 9th.
 6     Q    Did you reach a decision that the conditions of the
 7     withdrawal had not been met by these letters?
 8     A    I did.
 9     Q    Did you reach that on your own or did you consult
10     with anybody?
11     A    It was primarily my decision.
12     Q    Did you have any meetings to discuss that with
13     anybody?
14     A    No.
15     Q    Did you document your decision in any way?
16     A    It was already documented on the 7th.  You mean
17     following the reading of these two --
18     Q    (Nods head.)
19     A    No.
20     Q    Did you send Mr. Barnes a letter notifying him that
21     these two letters he had gotten were insufficient to satisfy
22     the conditions of the administrative withdrawal?
23     A    No.
24     Q    Did you communicate your decision to anyone else?
25     A    Board of Regents.  I think that -- I didn't send a
```

Page 254

1    formal document that the administrative withdrawal would
2    stand, no.
3        Q    Did you put a note in the file memorializing your
4    decision to deny the appeal of the administrative
5    withdrawal?
6        A    No.  The letter was the final decision and that
7    stood, so there was no change.
8        Q    And no change from the May 7th, 2007, letter.
9        A    Yes.
10       Q    Did you just stick these in a drawer somewhere or a
11   file?  I mean, what did you do?  I mean, was there a
12   process?
13       A    There's a file in the office that remained with
14   these two in it.  These two letters.
15       Q    Now sometime after that, again, you wrote your
16   defense in the appeal to the Board of Regents.  And that,
17   again, is Exhibit Five.
18           MR. WILL:  I object to the characterization of the
19       doctor's letter as a defense letter.  It was written in
20       response to requested information from the Board of
21       Regents.
22   BY MR. CORN-REVERE:
23       Q    Okay.  In your letter that you sent to the Board of
24   Regents on June 21st, 2007, describing your reasons for the
25   administrative withdrawal, on page seven you state, "I am

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1     not an expert in the field of mental health; and because of
 2     my concern for campus safety, I felt it necessary to defer
 3     to the experts and incorporated their input as a condition
 4     for Mr. Barnes' readmission to the university."
 5              Is that an accurate statement of your position?
 6     A    Yes.
 7     Q    And these were the two conditions that relate to
 8     this statement in your letter to the Board?
 9     A    Yes.
10     Q    In what way did you defer to the experts in mental
11     health in deciding what to do with those two letters?
12     A    I felt more time was necessary to sort out the
13     complexity of the behavior patterns that I observed during
14     spring semester.
15              And this came in at a time when I was uncertain
16     about the dialogue and the information given to Dr. Winders
17     about what truthfully happened and the reasons behind what
18     happened.
19     Q    Okay.  So --
20     A    I was not convinced that a total understanding of
21     what has taken place or did take place was a basis for this.
22     Q    So, did you think it was necessary for the mental
23     health experts to defer to your judgment?
24     A    I felt my judgment as the person so closely
25     involved in it was not quite yet understood.
```

Page 256



1      Q      So, in a choice between the mental health experts

2    and your judgment, you went with your judgment.

3      A      I went with the judgment that I felt was best at

4    this particular period of time based on the future and

5    safety of the campus.

6            MR. CORN-REVERE:   Let's mark as Zaccari Deposition

7      Exhibit Number 25 a memorandum of May 9th, 2007, from

8      Ronald Zaccari to a list of recipients.

9            (The document was marked for identification as

10     Plaintiff's Exhibit Number 25.)

11           THE WITNESS:   (Reviewing document.)

12   BY MR. CORN-REVERE:

13     Q      Dr. Zaccari, have you had a chance to look at this

14   exhibit?

15     A      Yes.

16     Q      Can you identify it for the record?

17     A      Memorandum from my office to university officials

18   stating that Mr. Barnes has been withdrawn, giving his

19   student I.D. number and stating that he's received

20   notification he's been withdrawn and has been given 48 hours

21   to vacate Converse Residence Hall.

22     Q      Is this your signature on the exhibit?

23     A      Yes.

24     Q      Did you write this memorandum?

25     A      I did.

Page 257

1    Q    And then you directed that it be circulated to the
2    list of officials on the top of the memorandum?
3    A    Yes.
4    Q    Did you write this memorandum after you reviewed
5    the two letters that are Exhibits 23 and 24?
6    A    This was a follow-up to the decision to keep the
7    administrative withdrawal in place.
8         I think the only problem here is that this shows
9    where -- where it says effective May 7th, he was notified
10   May 9th.
11   Q    Okay.  So, it's a typographical error as to the
12   date in the first line of the memorandum.
13   A    In the first line, yes.
14   Q    Okay.  So, the sequence of events was on May 7th
15   Mr. Barnes received the notice of administrative withdrawal,
16   right?
17   A    Yes, sir.
18   Q    And then on May 8th, or perhaps on May 9th, you
19   reviewed the two letters from Ms. McMillan and from
20   Dr. Winders, right?
21   A    Yes.
22   Q    And then on May 9th, you wrote a memorandum to
23   senior officials saying that Mr. Barnes had been withdrawn
24   and he's vacating the campus.
25   A    Yes.

Page 258



1    Q    Is it fair to say that by the time you wrote this

2  memorandum you had made your decision to reject those two

3  letters, Exhibits 23 and 24, as satisfying the conditions of

4  the administrative withdrawal?

5         MR. WILL:  I object to the form of the question.

6  BY MR. CORN-REVERE:

7    Q    Do you understand the question?

8    A    I've already made the statement that I didn't feel

9  comfortable with Winders' reaction, because I was unaware of

10  what took place between the student and Dr. Winders in terms

11  of full disclosure --

12    Q    Okay.

13    A    -- of what I had been through.

14    Q    But by the time you circulated this Exhibit 25,

15  this memorandum of May 9th, you had already reached a

16  decision that the two letters were insufficient to satisfy

17  the conditions in the administrative withdrawal.  Is that

18  right?

19         MR. WILL:  I object to the form of the question.

20         THE WITNESS:  That's right.

21  BY MR. CORN-REVERE:

22    Q    I'm sorry.  Did you answer?

23    A    Yes.

24    Q    Thank you.  I just really have a couple of last

25  questions.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          MR. WILL:  It is now a couple of minutes short of

2     seven hours.  I had asked you for a time period, and you

3     said 20 and he's got another hour to go.

4          MR. CORN-REVERE:  I was shooting for 20 minutes.

5          MR. WILL:  Keep in mind now, when I asked for an

6     indulgence to do Hayden's deposition, you insisted we get

7     through in seven.

8          MR. CORN-REVERE:  You seemed to have run out of

9     questions before seven hours.

10         MR. WILL:  We rushed through to make sure we got

11    through in seven.  I have given you every indulgence.  I

12    ask that you do show some respect to other people that

13    have questions because we are now at seven.

14         MR. CORN-REVERE:  I don't know what you want me to

15    do.

16         MR. WILL:  What I want you do is recognize that the

17    Federal Rules says seven hours.  That's the rule.  And I

18    think it's unfair to the witness to make him stay longer

19    than that when y'all have had notice to try and wrap

20    these things up.

21         While I have said I will give you some indulgence,

22    I ask that you not take too much advantage of my courtesy

23    and the witness' courtesy.

24         MR. CORN-REVERE:  I'm ready to wrap it up in three

25    questions, if we can get passed this.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1          MR. LaVALLEE:  While we are on the record and while
 2     we are discussing this, Mr. Will is absolutely correct.
 3     The Federal Rules apply to seven hours.  I have questions
 4     I have to ask.  I don't know what everyone proposes we do
 5     in regard to that.
 6          MR. WILL:  Well, my bringing it up at the six-hour
 7     mark was to point out, "Hey, we are closing in on it.
 8     Let's wrap up your questions, so we can get on with your
 9     questions."
10          I'm not one to say who's been selfish or greedy.
11     I'm just saying we've gone seven.  I would like to try
12     and wrap this up at some point, understanding that we are
13     extending a courtesy.
14          MR. CORN-REVERE:  Well, we appreciate your
15     courtesy, and I understand it has been a long and tiring
16     day.  I'll just try and finish within a couple of
17     questions.
18          MR. LaVALLEE:  I have one question.  David, are you
19     going to stipulate to allowing David Smith and I to go
20     over the seven hours?
21          MR. WILL:  Yes.  But I'm going to -- assuming we
22     can get him wrapped up soon.  We may take another break
23     before we get started.
24          MR. LaVALLEE:  Sure.  Sure.
25     BY MR. CORN-REVERE:
```

Page 261

1    Q    Okay.  Dr. Zaccari, just looking at the timeline,

2    Mr. Barnes was withdrawn on May 7th and then, according to

3    this memorandum, has -- had until May 11th, 2007, to vacate

4    the campus?

5    A    Yes.  That's what it says.

6    Q    So, under the conditions of the withdrawal, you

7    gave Mr. Barnes five days to leave Valdosta State

8    University?

9    A    (Reviewing document.)  Yes.

10   Q    Is that time period consistent with your belief

11   that Mr. Barnes was a clear and present danger to your

12   safety and to the safety of the campus?

13   A    I believe that we understood the situation of

14   Mr. Barnes a little bit more than we had previously and that

15   more facts were coming to bear on the decision, and I felt

16   it was necessary to continue with his administrative

17   withdrawal and that he was -- he was to leave and there was

18   some understanding that I was -- I was going to -- I'm not

19   going to say to be protected, but I think there was an

20   understanding that there was a sequence of events that would

21   move Mr. Barnes off the campus for the summer.

22   Q    Right.  But if he were a danger as you believed or

23   said you believed, if you gave him five days to leave,

24   wouldn't that be even more dangerous?

25        MR. WILL:  I believe he has answered the question.

Page 262

```
1              MR. CORN-REVERE:  I couldn't tell what he was
2        saying?
3              THE WITNESS:  I'm referring to -- he was -- we were
4        cautious about his movement off the campus, and it was
5        done in a way that I felt secure that he was moving off
6        the campus.
7    BY MR. CORN-REVERE:
8        Q    But you didn't arrange for a police escort to move
9    Mr. Barnes off campus, did you?
10       A    No.
11       Q    And you didn't arrange to have his movements
12   monitored between May 7th, 2007, and May 11th, 2007, did
13   you?
14       A    I wouldn't say it was monitored, but it was
15   certainly -- my activities were monitored more than his.
16       Q    Were the activities of members of S.A.V.E.
17   monitored, as well?
18       A    No.  I don't think they were there at the time when
19   campus was not in session.
20             MR. CORN-REVERE:  Thank you, Dr. Zaccari.  I don't
21        have any further questions.
22             (A recess was taken from 6:03 p.m. to 6:13 p.m.)
23                          EXAMINATION
24   BY MR. LaVALLEE:
25       Q    Mr. Zaccari, my name is Matthew LaVallee.  As you
```

Page 263

```
1    know, I represent Leah McMillan in this matter.  I know it's
2    been a long day; but in being a good advocate for my client,
3    there's questions that I have to ask you.
4       A     I understand.
5       Q     Okay.  I want to go back to the occasions where you
6    met with Ms. McMillan regarding the plaintiff in this case,
7    Mr. Barnes.
8             Do you recall meeting with her once or twice?
9       A     The most vivid recollection is the first time when
10   she came to the office at my request.
11      Q     All right.
12      A     Yes.  And the second time, it's very vague because
13   of everything that was happening at that point, but I do
14   remember that she was at a meeting with other staff members
15   at one point.  I believe there was another meeting where she
16   attended where additional officials were there.
17      Q     Okay.  So, you recall there being two meetings that
18   Ms. McMillan was at and you were at that pertained to Hayden
19   Barnes, correct?
20      A     The first one was just the two of us.
21      Q     Right.  The first one was the one-on-one meeting,
22   correct?
23      A     (Nods head.)
24      Q     If I told you the date was April the 24th, 2007,
25   would you have any reason to dispute that?
```

Page 264

1      A      No.

2      Q      Okay.  And if I told you that the second meeting

3    was April the 26th, 2007, would you have any reason to

4    dispute that?

5      A      I have no reason to dispute it.

6      Q      Okay.

7      A      I have no documentation that that is true.  I'm

8    taking your word for it.

9      Q      We'll get there.  Let's talk about the one-on-one

10   meeting that you had with Ms. McMillan.  I believe you

11   testified that you asked her to come over to your office,

12   right?

13     A      Yes.

14     Q      All right.  And during this meeting with

15   Ms. McMillan, you expressed to her that you were fearful of

16   Mr. Barnes, correct?

17     A      The first meeting was more what is going on with

18   this student.

19     Q      Okay.  So, I guess in answer to my -- you would

20   dispute that you expressed to her that you were fearful of

21   Hayden Barnes during that first meeting?

22     A      I don't believe the focus of that meeting was on my

23   fear as much as it was finding out more about Mr. Barnes.

24     Q      Well, my question isn't whether that was the focus

25   of the meeting.  My question is:  Did you express to her

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     during that one-on-one meeting that you were fearful of

2     Mr. Barnes?

3         A     I may have.  I don't remember.

4         Q     Okay.  If she said that you did express that to

5     her, do you have any reason to dispute that?

6         A     I don't have any reason to reinforce that it's

7     accurate, either.  So, I'm not going to say I would have

8     reason to dispute it.  I don't have any reason to document

9     that that, in fact, was articulated to her.

10        Q     Well, there were two people at that first meeting,

11    correct, you and Ms. McMillan.

12        A     That's correct.

13        Q     So, it's either we're going on your word or we're

14    going on her word that she told -- that you told her that

15    you felt like you were -- let me rephrase that.

16              Again, the first meeting, one-on-one between you

17    and Ms. McMillan, if she stated -- and she has -- that you

18    told her that you were fearful of Mr. Barnes, do you have

19    any reason to dispute that?

20        A     What was the date of the first meeting?

21        Q     April the 24th, 2007, during the --

22        A     So, that was during the week of the 23rd where we

23    were doing more investigation of Mr. Barnes.

24              So, it is possible that I voiced my opinion of

25    concern for the safety of the campus, because it was after

Page 266

```
 1      the emails came in, after the Facebook and after the
 2      memorial collage and all that.
 3              So, it's very possible that I discussed that I was
 4      concerned about my safety and the campus.
 5      Q     All right.  So, it's possible during that first
 6      meeting, that one-on-one meeting with her, that you voiced
 7      your concern about Mr. Barnes potentially being a threat to
 8      you and to the campus.
 9      A     Yes.
10      Q     Have you read any of the discovery responses in
11      this case other than your own?
12      A     You mean the affidavits of --
13      Q     Of other defendants in this matter.  Have you read
14      any of the responses of the other defendants in this matter?
15      A     I've had a chance to -- I've not -- I've not read
16      Ms. McMillan's.
17      Q     Let's do that right now.  Not all of them, but I
18      want to direct your attention to some of her responses.
19              For purposes of identification, would you read into
20      the record what the top of that document says.  Not the case
21      style but --
22      A     This one?
23      Q     Yes, sir.
24      A     Defendant Leah McMillan's Responses to Plaintiff's
25      First Interrogatories and Request for Production of
```

Page 267

1    Documents.

2        Q      All right.  Would you please turn to page 15?

3        A      (Reviewing document.)

4        Q      I don't have copies.  What I'd like you to do is,

5    please, read the first paragraph that's located on page 15

6    to yourself.  You don't need to read it out loud.

7        A      (Reviewing document.)  Okay.  I've read it.

8        Q      Okay.  Her responses to that interrogatory state

9    that she told you she did not believe plaintiff was a threat

10   to either you or to the university, correct?

11       A      That's not what I recall.

12       Q      But my question is that's what she stated in --

13       A      That's what she stated, yes.

14       Q      Let's talk about this a little more thoroughly.

15   You're saying that you do not recall Ms. McMillan telling

16   you during that one-on-one meeting that she did not believe

17   Mr. Barnes to be a threat to you or to the university,

18   correct?

19       A      That's correct.

20       Q      Are you disputing that she told you that?  Or are

21   you just stating that you don't remember her saying that?

22       A      I'm just saying that I do not remember and that was

23   not the focus of our discussion during the first meeting.

24       Q      Okay.  I understand you to say to say -- having

25   said just now, number one, you -- let me pause for a second.

Page 268

1      It's been a long day for me, too.

2            You're stating right now that you do not recall her

3      telling you that she did not believe Hayden was either a

4      threat to you or to the university, correct?  You don't

5      remember --

6      A      I not only do not recall or remember.  I do not

7      believe that that was part of the first discussion that I

8      had one-on-one with Ms. McMillan.

9      Q      Okay.

10     A      The topic did not come up in the first discussion.

11     Q      All right.  So, let's just make sure we have it

12     clear.

13            You're saying that Ms. McMillan did not tell you

14     that and that "that" being that Mr. Barnes was not a threat

15     either to you or to the university --

16     A      That's what I'm saying.

17     Q      -- during that one-on-one meeting.

18     A      I'm sorry for interrupting.

19     Q      No.  That's fine.

20     A      Yes. I'm concurring with what you just stated.

21     Q      Okay.  Do you think Ms. McMillan is lying about

22     telling you that?

23     A      No, I don't think she's lying.  Maybe it is a

24     recall factor for Ms. McMillan.  Maybe she doesn't remember

25     saying that.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1        I'm not calling her a liar.  I'm just saying maybe

2   she doesn't remember saying it.  We talked about a number of

3   ideas and --

4   Q      Okay.  Okay.  I don't want to cut you off, but I

5   don't want to be here all day, either.

6   A      Okay.

7   Q      What I want to focus on right now is whether she

8   told you that in her opinion she did not believe Hayden

9   Barnes to be a threat either to you or to the university.

10       And you're telling me you don't believe she told

11  you that during that one-on-one meeting.

12  A      That's right.

13  Q      Okay.  And you're also stating that you don't think

14  she's lying about it; you just believe that she's not

15  remembering that correctly?

16  A      That's one possibility.  But I'm assertively

17  stating this evening that that topic was not among the

18  points we discussed in our first meeting in my office.

19  Q      All right.  So, it's clear that both -- that you

20  have a different opinion as to whether Ms. McMillan said

21  that as Ms. McMillan does, correct?

22  A      That's right.  That's correct.

23  Q      All right.  Have you reviewed her counseling record

24  notes in this case that were produced in discovery?

25  A      No, I haven't seen those.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      Q      Are you aware that her counseling record notes from

2  April the 24th, 2007, indicate that she met with President

3  Zaccari; that she talked to President Zaccari about Hayden

4  Barnes contracting safety in the past and that she processed

5  with you that he had zero suicidal ideations or homicidal

6  ideations.  Do you recall her telling you that?

7      A      No.

8      Q      Okay.  That's what her notes say.  Okay?  Those

9  notes were made that day.

10      A      I understand that's what her notes say.

11      Q      Still on this one-on-one meeting with Ms. McMillan

12  from the 24th of April -- okay? -- at no time did

13  Ms. McMillan tell you that she was discussing Mr. Barnes out

14  of retaliation for his having -- for his having -- let me

15  rephrase that.

16          At no time did Ms. McMillan tell you she was

17  discussing Mr. Barnes with you out of retaliation for his

18  having protested the construction of the parking garage,

19  correct?

20      A      That's correct.

21      Q      Okay.  Also, during this April the 24th meeting,

22  Ms. McMillan told you that her next scheduled appointment

23  with plaintiff was on April the 26th, 2007, correct?

24      A      I can't firmly attest to that.  I do remember her

25  saying that she was concerned because Mr. Barnes had missed

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    his scheduled appointment.  That was stated in the first
 2    meeting.
 3        Q    Your testimony is that she told you during that
 4    first meeting that Mr. Barnes had missed a scheduled
 5    appointment?
 6        A    Yes.
 7        Q    Isn't it possible that she told you that during the
 8    second meeting?
 9        A    (No response.)
10        Q    You don't recall right now?
11        A    No, I don't.
12        Q    All right.  You didn't instruct Ms. McMillan to
13    schedule a meeting with Hayden Barnes, did you?
14        A    No.
15        Q    More specifically, you didn't instruct her to have
16    a counseling session with Mr. Barnes on April the 26th,
17    2007, correct?
18        A    Huh-uh.
19        Q    And it's your testimony that you did not discuss
20    any specifics regarding Ms. McMillan's treatment of
21    Mr. Barnes with Ms. McMillan, correct?
22        A    That's correct.
23            MR. LaVALLEE:  I'm going to mark as an Exhibit
24        Defendant Ronald M. Zaccari's Responses to Plaintiff's
25        First Interrogatories and Request for Production of
```

Page 272

```
 1        Documents to Defendant Ronald M. Zaccari.
 2             (The document was marked for identification as
 3        Defendant's Exhibit Number 26.)
 4   BY MR. LaVALLEE:
 5        Q    Mr. Zaccari, I'd like to refer you to your
 6   responses to Mr. Barnes' First Interrogatories and Request
 7   for Production of Documents.
 8             And what I'd like to do is have you turn your
 9   attention to the particular interrogatory response.  Let me
10   find it.
11             I'd like to refer you to your response to
12   Interrogatory Number 15.
13        A    Page number?
14        Q    It starts on page 17 and your response is on page
15   18 and 19.  Let me know when you get there, okay?
16        A    (Reviewing document.)  I'm there.
17        Q    All right.  Would you take a moment and review your
18   response to that interrogatory, and I want to ask you some
19   questions about it.  You can read it to yourself.
20        A    I believe the only correction I would have to
21   this --
22        Q    Sir, I didn't ask you a question yet.
23        A    Oh.
24             MR. WILL:  He's just raring to go.
25             MR. LaVALLEE:  He is.
```

Page 273

```
 1    BY MR. LaVALLEE:
 2       Q     I'd like to refer to the bottom of page 18 and
 3    before those two bullet points you state, "I believe she
 4    outlined the following information regarding plaintiff."
 5             "She" being, in context to this question,
 6    Ms. McMillan?
 7       A     Yes.
 8       Q     Is it possible that some of this information you
 9    outlined here could've come from other sources?
10       A     That was the point I was going to raise.
11             MR. CORN-REVERE:  Object to the form.
12             THE WITNESS:  There's one bullet here that appears
13       on the top of page 19 about emergency room anxiety
14       attacks.  I believe that came, as I said earlier, from
15       Kimberly Tanner from the support office.
16    BY MR. LaVALLEE:
17       Q     Okay.  So, let's look at that bullet point real
18    quick on page 19.
19             Your response states, "Had checked himself in South
20    Georgia Medical Center's emergency room on two different
21    dates during 2007 spring semester, anxiety attacks."
22             Is it your testimony now that you believe that that
23    information came from Kim Tanner and not Leah McMillan?
24       A     Yes.
25       Q     Okay.  All right.  I want to refer you back up
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    towards the beginning part of page 18, the paragraph

2    starting with the word "numerous."

3    A    Yes.

4    Q    We're going to read that sentence into the record.

5         "Numerous questions were raised after reviewing the

6    plaintiff's academic record, including failure to make

7    satisfactory progress in the core curriculum."

8         You already knew Mr. Barnes wasn't doing very well

9    in school before you spoke to Ms. McMillan, correct?

10    A    That's correct.

11    Q    So, isn't it possible that that information

12    pertaining to his academic records did not come from

13    Ms. McMillan?

14    A    No.  It did come from -- her statement was that he

15    was having difficulty academically.

16    Q    Okay.  Well, here you indicate that you had already

17    reviewed his academic record prior to talking to

18    Ms. McMillan, correct?  Let me restate that.

19         You indicate here that you had already reviewed

20    Mr. Barnes' academic record prior to talking to

21    Ms. McMillan, right?

22    A    I reviewed his -- his record was sent to Academic

23    Affairs office, I believe, on the 16th.  The record or the

24    transcript was given to the Assistant Vice President.

25         That does not indicate the time that I saw the

Page 275

```
 1    transcripts.  I may not have seen his transcripts prior to
 2    the meeting with Ms. McMillan.
 3        Q    Well, is it possible that you reviewed his academic
 4    records prior to meeting with Ms. McMillan?
 5        A    I don't remember reviewing that before talking with
 6    Ms. McMillan.  I may have.
 7        Q    Okay.
 8        A    I'm not disputing the fact that --
 9        Q    You're saying you may have.
10        A    I may have.
11        Q    Okay.  We'll get to some testimony in regard to
12    that here in a little bit.
13             I'm sorry for the pregnant pauses.  Okay.
14             I want to next focus on this first bullet at the
15    bottom of page 18, where you say, "Failed to meet his
16    meetings at the Counseling Center."
17             Do you see where your response indicates that?
18        A    First bullet, yes.
19        Q    Okay.  And then on page 19 before Interrogatory
20    Number 16 starts, you state, "She stated that she had met
21    with him.  The plaintiff stated he missed the counseling
22    session because he forgot about it.  No other specific
23    information was exchanged that I recall."
24             Did I read that correctly?
25        A    Yes.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1     Q      Okay.  So, Ms. McMillan cleared up any confusion or

2     anything in regard to Mr. Barnes having missed a counseling

3     session with her because she, thereafter, told you that he

4     had called and said that he forgot about the appointment,

5     correct?

6     A      This information, obviously, came from a second

7     meeting because this was -- that information came to me

8     after the time we had our first meeting.  The first meeting

9     said he had missed the counseling session.

10           This says that she had talked with him and said

11    that he missed because he forgot about it.  I didn't have

12    that information the first meeting.

13    Q      You had that information when you wrote this

14    interrogatory response, right?

15    A      Yes.  This was written, what, several months ago?

16    Q      Well, the date's on here.

17    A      I responded to this almost two years after we had

18    the meeting.

19    Q      All right.  Well, I'll refer you to some testimony

20    in this case that I believe will maybe shed some light on

21    that.

22    A      Good.

23    Q      Ms. McMillan's psychotherapy notes indicate that

24    she expressed to you that Hayden had missed his appointment

25    on April the 26th; however, he, thereafter, called and said

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    that he had overslept -- something to that effect -- and
 2    had, in fact, showed up.  Do you recall that discussion?
 3         A    No.
 4         Q    Let's talk about conversations you had with
 5    Ms. Tanner.  And I'm referring to Kim Tanner, okay?
 6              You stated earlier that the information concerning
 7    Mr. Barnes and his having allegedly checked himself into the
 8    South Georgia Medical Center emergency room came from
 9    Ms. Tanner, correct?
10         A    I believe so, yes.
11         Q    Okay.
12         A    I did say that, yes.
13         Q    Yes, sir.  Do you recall Ms. Tanner providing you
14    additional information regarding Mr. Barnes?
15         A    I had no further contact that I remember with
16    Ms. Tanner, written or verbally, following the meeting in
17    which she attended.
18         Q    Okay.  Which meeting are you referring to?
19         A    She was in one of the meetings during that week,
20    the week of the 23rd to the 27th, as part of the university
21    officials that were called together to discuss Mr. Barnes.
22         Q    The meeting of April the 20th, 2007?
23         A    That's possibly the meeting, yes.
24         Q    Okay.  And you don't recall Ms. Tanner -- let me
25    rephrase that.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          Do you recall the specifics of what Ms. Tanner told
2    you at that meeting?
3      A     I think we were having discussion.  Various
4    individuals were adding points and reactions, and I believe
5    she mentioned about the anxiety attacks.
6      Q     And that's all you can remember at this time?
7      A     Yes.
8      Q     I'd like to refresh your recollection of what was
9    said during that April 20th, 2007, meeting by Ms. Tanner.
10          I'm going to show you a copy of Ann Farmer's
11    deposition.  That's her transcript.  Please turn to page 24.
12      A     (Reviewing document.)
13      Q     Please try to read along with me here.  I'm going
14    the read various portions of this deposition testimony and
15    tell me if I've read it correctly, okay?
16          Page 24, lines 18 through 19, Ms. Farmer testified,
17    "Then Kimberly Tanner was there, and she talked about Hayden
18    being registered at her office."
19          Did I read that correctly?
20      A     Yes.
21      Q     Okay.  Let's turn to page 25, lines 20 through 23.
22    Ms. Farmer's deposition testimony states, "She had a file.
23    She said that he was registered with her office.  In order
24    to get the services from her office, the students have to
25    come to her.  They have to seek her out and register is my

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    understanding."
 2            Did I read that correctly?
 3    A     Yes.
 4    Q     Okay.  Please turn to page 26, lines 16 through 11
 5    read, "She said that he had a psychological disability; that
 6    in August of 2006, thought it was a depressive disorder,
 7    agoraphobia, panic disorder; may have had some symptoms of
 8    ADHD; that he was on medications and had gone into the
 9    hospital at some point due to an inability to function; that
10    he was seeing a Dr. Kevin Winders."
11            Did I state that correctly?
12    A     Yes.
13    Q     Okay.  Then down below that, lines 17 through 20,
14    her testimony states, "She said that when they had received
15    his letter that they felt that Hayden was better and could
16    come to VSU and that the doctor had stated that he needed to
17    take advantage of the ongoing counseling."
18            Did I read that correctly?
19    A     Yes.
20    Q     And all of this information was provided by
21    Ms. Tanner at this April 20th, 2007, meeting, correct?
22    A     That's my recollection, yes.
23    Q     All right.  Prior to talking to Ms. McMillan on
24    April the 24th, 2007, you had some information pertaining to
25    Mr. Barnes and his mental health status, correct?
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1      A      You're referring to the first meeting I had with
2   Leah?
3      Q      Yeah.
4      A      Not specifically, no.
5      Q      How's what I just referred to from Ms. Farmer's
6   deposition testimony not specific information pertaining to
7   Mr. Barnes?
8      A      You mean that entry there?
9      Q      The information that we just covered that
10  Ms. Farmer testified that Ms. Tanner provided during that
11  April 20th meeting.
12     A      Well, that would be the basis of some beginning of
13  what we were investigating, yes.  I'm not saying that was --
14  that was an in-depth discussion.
15            Keep in mind that was over two years ago that we
16  were having a number of meetings, and people were adding
17  thoughts and reactions and recommendations, suggestions.
18            For me to go back over two years ago and remember
19  specifically all the details of meetings when I'm in
20  constant meetings -- I mean, that's, basically, what
21  university presidents --
22     Q      I'm not asking you to remember verbatim what was
23  stated at that meeting; however, my client has been sued in
24  a Federal lawsuit, and it's been very traumatic on her.
25            It's very important that I try and get down to the

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

 1    bottom of things for her.  So, it is appropriate for me to

 2    try to ask you questions about what was said during some of

 3    these meetings.

 4        A    Yes.  And I'm trying to respond to best of my

 5    recollection.

 6        Q    Well, my original question was:  Prior to talking

 7    to Ms. McMillan on April the 24th, you had a baseline of

 8    information pertaining to Hayden Barnes regarding his mental

 9    health, correct?

10        A    I had seen brief statements.  Obviously,

11    Ms. Farmer's thought was shared and took some notes in that

12    meeting on the 20th.

13        Q    Well, Ms. Tanner testified a couple of days ago and

14    expressed that she did, in fact, share this information with

15    the participants at the April 20th meeting.

16        A    Yeah.

17        Q    When you received that letter that was discussed

18    earlier by Mr. Corn-Reveal (sic) -- I'm sorry, Bob -- from

19    Mr. Corn-Revere on May the 8th from Dr. Winders, I believe

20    you stated earlier that that was the first information that

21    you had that Hayden had been seeing Dr. Winders?

22        A    Yes.  And I'm not certain that I saw that on May

23    the 8th.  If you recall, that was signed by Dr. Winders on

24    the 8th and signed by Ms. McMillan on the 8th; and I was in

25    the Board of Regents in Atlanta 7th and 8th.  So, it may



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    have been the 9th before I read those letters.
 2        Q    Well, two things on that.  Based on this
 3    April 20th, 2007, meeting, you knew that Hayden had been
 4    seeing Dr. Winders, correct?
 5        A    If Ms. Tanner mentioned his name, that didn't --
 6        Q    As it relates to Hayden Barnes, correct?
 7        A    I mean, that wasn't something -- Winders -- I
 8    didn't make -- my understanding was that he was seeing a
 9    psychiatrist.  I didn't know that he was seeing a particular
10    psychiatrist with the name attached.
11        Q    Well, you know, I was remiss perhaps in referencing
12    a couple of other lines in this deposition transcript on
13    page 26.
14        A    I'm there.
15        Q    Yes, sir.
16             Page 26, lines 12 through 16 state, "Everyone says
17    his name different by the way."
18             "Oh, do they."
19             "That's okay.  We can talk about that later.  With
20    Psychological Consultants, P.C., in Savannah, Georgia."
21             We know that that's Dr. Kevin Winders and that's
22    where he was located.
23             MR. CORN-REVERE:  Winders.
24             MR. LaVALLEE:  I'm the one who butchers his name.
25
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    BY MR. LaVALLEE:

2        Q    So, I mean, Dr. Kevin Winders and his having

3    treated Hayden Barnes or his treating Hayden Barnes came up

4    during this April 20th meeting, correct?

5        A    Obviously, it did because Ms. Farmer was taking the

6    notes.  So, it must've come up.

7        Q    Okay.  Leah wasn't at the April 20th meeting,

8    correct?

9        A    No.

10       Q    All right.  Let's shift gears.  And I don't have

11   terribly much more.

12            Let's shift gears to -- keep that with you, okay?

13            Let's shift gears to the second meeting -- do you

14   need me to stop?

15            (Discussion off the record.)

16   BY MR. LaVALLEE:

17       Q    Let's shift gears to the second meeting that you

18   had with Ms. McMillan where Hayden Barnes was discussed.

19   Are you there with me conceptually?

20       A    I'm there with you conceptually, but that second

21   meeting is really kind of a blur to me.

22       Q    Okay.

23       A    I mean, it was sort of a follow-up.  What has

24   happened.  Where are we.  But it was a very brief, very

25   brief meeting.



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    Q    Okay.  If I told you that Ms. McMillan and Vic

2  Morgan testified that that meeting took place on April the

3  26th, 2007, would you have any reason to dispute that?

4    A    No.

5    Q    If I told you that Ms. McMillan and Dr. Morgan have

6  testified that you, Kurt Keppler, Vic Morgan and Leah

7  McMillan were in attendance at that meeting, do you have any

8  reason to dispute that?

9    A    No.

10    Q    Does that sound right?

11    A    Yes.

12    Q    All right.  I want to refer back to your responses

13  to discovery.  In particular, we are on the same discovery

14  response.  Let me point it out for you.

15        Well, let me rephrase that.  That's incorrect.

16        I want to go back to Ms. McMillan's responses to

17  discovery in this matter.  I took it back from you.  I'll

18  give it to you, okay?

19        I'm handing back to you Ms. McMillan's responses to

20  discovery.  In particular, Interrogatory Number 11.  Would

21  you read the last full paragraph on page 15?

22    A    "April 26th, 2007" --

23    Q    You can read it to yourself.

24    A    Okay.

25    Q    If you'd like to read it out loud, that's fine.

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    A    No.  (Reviewing document.)  I've read it.

2    Q    Okay.  Ms. McMillan's testimony, in particular to

3  this interrogatory, indicates that she told you, once again,

4  that she did not believe that Hayden Barnes was a threat to

5  you or to the university.

6         Do you dispute that she said that to you during the

7  April 26th meeting?

8    A    I can't dispute it, and I can't make it a factual

9  reaction that I actually heard that loud and clear as the

10  message from Leah McMillan.  It may have been stated.  I

11  can't dispute that.

12    Q    Okay.  So, you're not disputing that she told

13  you --

14    A    No.

15    Q    -- during that April 26th meeting that she didn't

16  believe that Mr. Barnes was a threat to you or to the

17  university, correct?

18    A    I'm not disputing that.

19    Q    And her response to this interrogatory further

20  states that she had told you that Mr. Barnes had been a

21  no-show for his appointment that morning; however -- well,

22  let me rephrase that.

23         Ms. McMillan has testified that during that meeting

24  she was informed that Hayden Barnes had called her office

25  and had apologized for not making that appointment that was

Page 286

1    scheduled for that day.  Do you remember her telling you
2    that?
3        A     No.  Well, I remember at one of the meetings --
4        Q     Well, she was at -- I'm sorry.  You've testified
5    that she was at two meetings with you, and I believe your
6    testimony was that that didn't come up during the April 24th
7    meeting.  So, the only other place it could've come up was
8    the April 26th meeting, correct?
9        A     She told me that he had forgotten about it or
10   missed the appointment.
11       Q     Okay.  So, she told you that he had missed his
12   appointment that day but had called and apologized for
13   having missed it, correct?
14       A     That's correct.
15       Q     Okay.  Do you recall anything that was stated by
16   Vic Morgan during that April 26th, 2007, meeting?
17       A     No.
18       Q     Well, I'd like to refresh your recollection
19   concerning that by referring to his deposition transcript.
20             I'm showing you a copy of Vic Morgan's deposition
21   transcript.  I'm going to refer you to a couple of different
22   parts of it, okay?
23             Would you turn to page 21.  Are you there, sir?
24       A     Yes.
25       Q     I'd like to read some portions of page 21, 22 and

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    23; and I'm going to read it out loud.  Tell me if I've read

2    it correctly.  Is that okay?

3         A    Yes.

4         Q    Page 21 starting on paragraph 3, "Okay.  Did

5    Ms. McMillan tell President Zaccari that she did not believe

6    Hayden T. Barnes -- and I'm sorry -- was a threat to either

7    him or the university?"

8              Answer, "Ms. McMillan told him that based on her

9    counseling sessions with him and her experience with him, at

10   that point she had no history with Mr. Barnes of any

11   violence in his past history towards himself or others, nor

12   did she think that he was at the present time a danger to

13   himself, to the President or anyone else."

14             Did I read that correctly?

15        A    Yes.

16        Q    Okay.  I'd like to now go down to page 22, starting

17   with lines 21 through 25 and then carrying over to page 23,

18   line 1.  Are you there?

19        A    Yes.

20        Q    Okay.  Starting on line 21, "When Ms. McMillan told

21   him that she didn't believe he was a danger at the present

22   time or had exhibited violent behavior in the past, I said

23   to the President, "Dr. Zaccari, we cannot remove Hayden from

24   school based on a mental health withdrawal.  In my opinion

25   he's compliant with everything we're asking him to do.""



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1           Did I state that correctly?

2      A     That's what it says.

3      Q     Okay.  And then continuing further on page 23,

4    lines 7 through 11, Mr. Morgan's deposition testimony

5    states, "He has, according to Ms. McMillan, no history of

6    violence towards others or himself, and she's saying that he

7    is not communicating any present threat towards you or wish

8    to harm you.  So, I don't feel we have any reason to be able

9    to withdraw him for mental health reasons."

10          Did I state that correct?

11     A     Yes.

12     Q     Do you have a better recollection now of

13   Ms. McMillan having told you during that April the 26th

14   meeting that Mr. Barnes did not pose a threat to either you

15   or to the university?

16     A     No.  I don't have any further recollection.  If

17   Dr. Morgan said -- he stated that and it's in his

18   interrogatories or --

19     Q     This is his deposition testimony.

20     A     -- deposition, I can't dispute that that's what he

21   said.  But I don't -- again, that was well over two years

22   ago.  I can't remember all the dialogue that goes into it.

23     Q     I'm not asking you to remember verbatim.

24          The point was just a little while ago, you stated

25   that you could not dispute that Ms. McMillan told you during

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    the April 26th meeting that she did not believe Mr. Barnes
 2    to be a threat to either you or the university, correct?
 3       A    Yes.
 4       Q    Okay.  This testimony was meant to try to refresh
 5    your recollection as to whether you can definitively
 6    remember that; but, apparently, it doesn't, correct?
 7       A    That's correct.
 8       Q    You don't think Vic Morgan is lying about what --
 9       A    No.
10       Q    -- was said during that meeting, do you?
11       A    No.
12       Q    Because he's stating here that he heard
13    Ms. McMillan say that to you.
14       A    Pardon?
15       Q    Mr. Morgan is stating in his deposition testimony
16    that he heard Ms. McMillan tell you that she did not believe
17    that Mr. Barnes was a threat to you or to the university.
18       A    If that's what he put in the deposition -- again, I
19    don't believe that I took away from that meeting that --
20       Q    I'm not asking you what you took away from the
21    meeting.  The core question was whether that was stated; and
22    you're saying you don't recall, but you don't dispute that,
23    correct?
24       A    That's correct.
25       Q    All right.  And, again, during this April the 26th,
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    2007, meeting, Ms. McMillan did not discuss her treatment of
 2    Mr. Barnes with you, right?
 3        A     That's right.
 4        Q     There were no other meetings that you were in
 5    attendance with Ms. McMillan that pertained to Hayden
 6    Barnes, correct?
 7        A     That's correct.
 8        Q     The May 3rd meeting, Ms. McMillan wasn't there,
 9    correct?
10        A     That's correct.
11        Q     Leah McMillan had no authority to administratively
12    withdraw Mr. Barnes, did she?
13        A     She did not.
14        Q     And Leah never recommended to you that Mr. Barnes
15    should be administratively withdrawn, correct?
16        A     That's correct.
17        Q     We're approaching the 18th hole.  I'm almost done,
18    okay?
19              MR. WILL:  Yes, sir.  We're glad to hear it.
20    BY MR. LaVALLEE:
21        Q     I want to refer back to one of the exhibits that
22    are already in the record.  It's the May 7th administrative
23    withdrawal letter that I want to draw your attention to.
24    Can we find that?
25              MR. WILL:  It's Exhibit 18.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    BY MR. LaVALLEE:

 2       Q     Let me know when you have Exhibit 18 in front of

 3    you, okay?

 4       A     Are you referring to the May 7th letter?

 5       Q     Yes, sir.

 6       A     (Reviewing document.)  Thank you.

 7             MR. WILL:  Yes, sir.

 8    BY MR. LaVALLEE:

 9       Q     All right.  Do you have Exhibit 18 in front of you?

10       A     Yes.

11       Q     All right.  Let me ask you a few things in regard

12    to this letter.

13             Does this letter reflect that you made your own

14    evaluation into whether Mr. Barnes represented a threat?  Do

15    you believe that?  Let me rephrase that.

16       A     You're asking me did I independently make --

17       Q     Let me rephrase that.  It wasn't that articulate.

18    I apologize for that.

19             Would you agree that this letter reflects that you

20    made an independent evaluation into whether Mr. Barnes

21    represented a threat to you and to the university?

22       A     What I'm saying is that the responsibility of the

23    appointed President of the university -- it was my decision

24    to make the final call on the withdrawal.  I did that.

25       Q     And in the course and context of doing that, you
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    made your own evaluation in regard to whether Mr. Barnes
 2    presented a threat to you and to the university, correct?
 3        A    I took into consideration of all the pieces that
 4    we've talked about throughout this day.
 5             I have mentioned before that isolating the
 6    structures leading up to the decision, all of those pieces
 7    independently and collectively, were important to my final
 8    decision.
 9             Now -- and that's the simple answer.
10        Q    Well --
11        A    It's not so simple.  It's a complex situation, but
12    that's what I --
13        Q    I don't disagree with you on that, sir.  My
14    question, however -- and maybe I need to state it a little
15    differently.
16             The decision that you ultimately made to
17    administratively withdraw Hayden Barnes was an independent
18    decision of yours, correct?
19        A    Yes.  Independent of what?
20        Q    Independent meaning that at the end of the day this
21    administrative withdrawal came from you, correct?
22        A    I've said that earlier, yes.
23        Q    Okay.  It wasn't an administrative withdrawal from
24    anybody else other than you, correct?
25             It's not an indictment, sir.  It's just a straight
```

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    question.

2        A       Yes.

3        Q       The answer to that question is, yes?

4        A       I said earlier I had to make the final call.

5        Q       Okay.  Just one last thing on that.  The final call

6    that you made to administratively withdraw Mr. Barnes was

7    based on your evaluating a number of different things and

8    coming up with a certain conclusion, correct?

9        A       Yes.

10       Q       Okay.  Let's make sure we don't commingle all these

11   exhibits here.

12               Let's go to Exhibit 23.

13       A       (Reviewing document.)

14       Q       Do you have Exhibit 23 in front of you?

15       A       Yes.

16       Q       Okay.  Ms. McMillan hand delivered this letter to

17   you, correct?

18       A       It was hand delivered to the President's office.

19       Q       You don't recall her hand delivering it to you in

20   person?

21       A       Huh-uh.  No.

22       Q       She's testified that she did.  Would you dispute

23   that?  "That" meaning that she, personally, hand delivered

24   this to you?

25       A       I can't dispute it if I don't remember if she



**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
*404.351.4577*

1    carried it and gave it to me, personally, or not.

2        Q    All right.  I think you stated earlier that you

3    characterized some things after receiving this letter from

4    Ms. McMillan -- you tell me if I'm mischaracterizing, okay?

5            I believe you stated that this letter blind-sided

6    you; that you were surprised by it.  You refer to this

7    letter as an endorsement by Ms. McMillan.

8            Is that a fair recitation of things that you

9    discussed in regard to having received this letter from

10   Ms. McMillan?

11       A    That's a fair --

12       Q    That's what my notes say.

13       A    It's an accurate overview of what I said.

14       Q    Okay.  Were you ticked off at Ms. McMillan for

15   having written this letter?

16       A    I was surprised that knowing the severity of what I

17   thought was happening that there wasn't some notification

18   that a request had been made to write a letter and it had

19   been sent to the Board of Regents without the President's

20   understanding.

21           I was not ticked off.  I was surprised.  I felt a

22   little bit blind-sided to think all the meetings that we had

23   been in and the discussions we have had and knowing full

24   well that I was very concerned about the campus that this

25   letter would've notified rather than getting a copy of it --

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1    that I would've known something about its structure and

2    intent.

3         Q     So you --

4         A     And I didn't know when the request was made.   It

5    just said that I've been asked to write a letter.

6         Q     Well, it's dated May the 8th.

7         A     Pardon?

8         Q     It's dated May the 8th.

9         A     It's dated.  But I don't know when the request was

10   made by Mr. Barnes and when the draft of the letter was

11   beginning, but it was signed on the 8th.

12        Q     What's it matter whether you knew when Mr. Barnes

13   had approached Ms. McMillan in regards to writing you this

14   letter?

15             MR. WILL:  I object to the form of the question.

16   BY MR. LaVALLEE:

17        Q     Subject to his objection, you can answer.

18        A     One of my staff members, who was an integral part

19   of investigating what was going on, sent a letter which

20   really put things in a documented different context.

21             And I expected -- you were saying earlier that I

22   went through and I heard some of these testimonies at the

23   earlier meeting.

24             I have to go back to some of the discussion in the

25   first meeting, some concerns that I had about what was going

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    on.  And I simply -- I wasn't ticked off to answer your
 2    question.  I was surprised.
 3       Q    I'm going to object to the responsiveness of the
 4    answer.
 5            MR. LaVALLEE:  Ms. Court Reporter, could you read
 6       back what my original question was?  The last question
 7       that I asked.
 8            (The requested portion was read back by the Court
 9       Reporter.)
10            THE WITNESS:  I believe it would've made a
11       significant difference on Friday the 5th and Monday the
12       7th when the letter went out of withdrawal that I knew
13       that her position was moving in this direction and she
14       was going to write on behalf of Mr. Barnes.
15    BY MR. LaVALLEE:
16       Q    Well, let me ask you this.  How was Ms. McMillan
17    an integral part regarding an investigation -- let me
18    rephrase that.
19            Ms. McMillan is a counselor at the Counseling
20    Center, right?
21       A    Yes.
22       Q    She's, like, one of the lowest people on the totem
23    pole at the university.  Wouldn't you agree with that?
24       A    No.
25       Q    Well, she's not a member of your advisory cabinet,
```

Page 297

1     is she?

2         A     No.

3         Q     I'm just curious as to how you are characterizing

4     her as an integral part of your investigation.  I don't

5     understand that.  Could you explain that?

6         A     I called her to my office when issues started to

7     come into my office.  She was a key ingredient to

8     information about Mr. Barnes and some of his background.

9             So, I don't see how you can extract that as not

10    being integral to the profile of a student.

11        Q     Well, I still don't understand that part but maybe

12    it's just me.

13            Getting back to what I originally was asking you

14    about how you characterized, I guess, thoughts that you had

15    after receiving this letter, you don't think it's fair to

16    interpret your having been blind-sided and surprised as

17    connoting that you were displeased with Ms. McMillan for

18    having written that letter for Mr. Barnes?

19        A     I was not displeased with her.  I just didn't

20    understand the lack of communication leading up to it.

21        Q     Well, she's his counselor.  Doesn't she have a

22    right to write a letter on his behalf if she wanted to?

23        A     She would have the right to do that.

24        Q     And --

25        A     My surprise was knowing full well all that had

                                                    Page 298

1    happened and the involvement of the President and others and

2    all these decisions and recommendations that something

3    wasn't shared with the President's office about what I think

4    is a rather firm statement about the opposite of what I

5    perceived and understood.

6        Q    It wouldn't be appropriate for her to share

7    everything with you pertaining to Hayden Barnes, would it?

8        A    Well, I'm thinking about a professional courtesy

9    that this letter is going without my awareness.  So, does

10   that frame it a little bit more?

11       Q    Well, I think it does.  So, what you're saying is

12   that you would have expected Ms. McMillan to consult with

13   you before writing this letter?  Is that what you're saying?

14       A    Say consult.  An awareness that she had this

15   request and she was going to follow through and write a

16   letter to the Regents.

17       Q    All right.  Let me phrase it a different way.

18            Do you believe that Ms. McMillan should've given

19   you a heads-up that she was writing this letter on behalf of

20   Mr. Barnes prior to writing the letter?

21       A    I think that would've been a professional courtesy

22   in the relationship of what we were going through.

23       Q    I'm almost done.  I know I said that earlier.  I'm

24   sorry.

25            Well, after receiving this letter from

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1    Ms. McMillan, you didn't carry through with her advice in

 2    regard to -- well, let me rephrase that.

 3            You didn't take her position in this letter that he

 4    was not a threat to the university in a way so as to nullify

 5    your decision to administratively withdraw Hayden Barnes,

 6    correct?

 7    A      That's correct.

 8    Q      In other words, you didn't follow her advice or

 9    suggestions as articulated in this May 8th letter?

10    A      This was her letter to the Board of Regents.

11    Q      Well, it also says, "Dear President Zaccari."  So,

12    it was to you, too, right?

13    A      Yeah.

14    Q      Okay.  So, my question was, you didn't listen to

15    her advice or suggestions as were articulated in this

16    May 8th letter, correct?

17    A      Correct.

18            MR. LaVALLEE:  Can I speak to my client for 60

19        seconds?

20            (Discussion off the record.)

21            MR. LaVALLEE:  I am done with my line of

22        questioning, and I am going to go take some more cold

23        medicine.

24            MR. WILL:  Thank you very much.

25            THE WITNESS:  Thank you.
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

1          (Deposition concluded at 7:17 p.m.)

2          (Pertaining to  Federal Rules of Civil Procedure

3     and/or O.C.G.A. 9-11-30(e), the deponent and/or a party

4     having requested the right to review the deposition,

5     making corrections and/or changes and signing, for that

6     purpose the errata pages have been annexed hereto.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                    C E R T I F I C A T E

 2   STATE OF GEORGIA:

 3   COUNTY OF LOWNDES:

 4          I hereby certify that the foregoing transcript was

 5   taken down, as stated in the caption, and the questions and

 6   answers thereto were reduced to typewriting under my

 7   direction; that the foregoing pages 1 through 300 represent

 8   a true, complete, and correct transcript of the evidence

 9   given  upon said hearing, and I further certify that I am

10   not of kin or counsel to the parties in the case; am not in

11   the regular employ of counsel for any of said parties; nor

12   am I in any way interested in the result of said case.

13          This, the 30th day of August, 2009.

14

15

16          /s/ Sarah Williams

17          SARAH WILLIAMS, FPR, RPR, CCR B1653

18

19

20

21

22

23

24

25
```

Page 302

WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                                DISCLOSURE
 2    STATE OF GEORGIA         Deposition of:   RONALD ZACCARI
 3    COUNTY OF LOWNDES:   Date:  JULY 29, 2009
 4         Pursuant to Article 10.B of the Rules and Regulations
 5    of the Board of Court Reporting of the Judicial Council of
 6    Georgia, I make the following disclosure:
 7         I am a Georgia Certified Court Reporter.  I am here as a
 8    representative of Wheeler Court Reporting.  I am not
 9    disqualified for a relationship of interest under the
10    provisions of O.C.G.A. §9-11-28 (c).
11         Wheeler Court Reporting was contacted by the
12    offices of Bob Corn-Revere, Esq., to provide court reporting
13    services for this deposition.  Wheeler Court Reporting will
14    not be taking this deposition under any contract that is
15    prohibited by O.C.G.A. §15-14-37 (a) and (b).
16         Wheeler Court Reporting has no exclusive
17    contract to provide reporting services with any party to
18    the case, any counsel in the case, or any reporter or
19    reporting agency from whom a referral might have been
20    made to cover this deposition.
21         Wheeler Court Reporting will charge its usual and
22    customary rates to all parties in the case, and a financial
23    discount will not be given to any party to this litigation.
24                   _____
                     Sarah Williams, CCR, FPR, RPR.
25                               CCR No.  B1653


                                              Page 303
```



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

```
 1                DEPOSITION OF RONALD ZACCARI/SEW
 2           I do hereby certify that I have read all questions
 3      propounded to me and all answers given by me on the 29th day
 4      of July, 2009, taken before Sarah Williams, FPR, CCR, RPR,
 5      and that:
 6           1) ____        There are no changes noted.
 7           2) __✓__ The following changes are noted:
 8                Pursuant to Rule 30(e) of the Federal Rules of
 9      Civil Procedure and/or the Official Code of Georgia
10      Annotated 9-11-28(c), both of which read in part:  Any
11      changes in form or substance which you desire to make shall
12      be entered upon the deposition...with a statement of the
13      reasons given...for making them.  Accordingly, to assist you
14      in effecting corrections, please use the form below:
15      Page No. 30  Line No. 13    should read: IT WAS NOT
16   THE TYPE OF ARTICLE THAT REPRESENTS THE UNIVERSITY.
17      Page No. 41  Line No. 20   should read: SHOULD'VE
18   DONE.    REMOVE QUESTION MARK
19      Page No. 46  Line No. 24   should read: CONCERNS ON
20   THEIR UNIVERSITY CAMPUSES.  (NOT MEANT TO BE ONE CAMP
21      Page No. 57  Line No. 25   should read: LAVERNE GASKINS
22   REVIEWED IT FOR ITS FORMAT, BUT NOT THE CONTENT.
23      Page No. 124  Line No. 13   should read: UNDER DIFFERENT
24   CIRCUMSTANCES IN TERMS OF LAND CONTIGUOUS OR
25
```

Page 304



RONALD ZACCARI 7/29/2009

1    DEPOSITION OF RONALD ZACCARI/SEW

2    Page No. *140* Line No. *4*   should read: *WE TALKED*

3    *EXTENSIVELY IN THE VISION GROUP ABOUT* ....

4    Page No. *198* Line No. *15*   should read: .... *HANDLED*

5    *FROM THE ADMINISTRATIVE SIDE.*

6    Page No. *198* Line No. *16*   should read:

7    *REMOVE : AND THE FACULTY*

8    Page No. *51* Line No. *19 L20* should read: *the*

9    *CHANCELLOR'S ADMINISTRATIVE ASSISTANT*

10   Page No.      Line No.      should read:

11   _____

12   Page No.      Line No.      should read:

13   _____

14

15         If supplemental or additional pages are necessary,

16   please furnish same in typewriting annexed to this

17   deposition.

18

19   _____

20   RONALD ZACCARI

21

22   Sworn to and subscribed before me,
     this the *28th* day of *September* , 2009.

23

24   _____

25   Notary Public
     My commission expires: *01-29-2011*

Page 305

**WHEELER
REPORTING**

Court Reporting • Video • Litigation Support

**404.351.4577**