



1 of 1 DOCUMENT

Copyright 2005 The Chronicle of Higher Education
The Chronicle of Higher Education

August 5, 2005, Friday

**SECTION:** SHORT SUBJECTS; Pg. 7

**LENGTH:** 224 words

**HEADLINE:** Paving Paradise

**BYLINE:** DEVIN VARSALONA

**BODY:**

More green, less gravel: That was Ronald M. Zaccari's grand idea for Valdosta State University's second century. Everyone loved the university president's plans, says junior Ashley L. Zahn, but in June students were dismayed to find that sometimes gravel would win out.

That's when the administration posted plans online to turn a large portion of their beloved front lawn into a faculty parking lot to accommodate a space crunch.

"The front lawn is the only place that's common and central to everyone, no matter who they are," Ms. Zahn says. "The administration can't understand how highly we value our front lawn."

Ms. Zahn collected more than 300 student signatures on a petition to stop the construction before it began.

Even though administration officials say they had already consulted with students, Mr. Zaccari quickly moved to quell the controversy.

A week after Ms. Zahn began her petition, he called a meeting with the junior and a few other students in which he agreed to scale back the parking lot to leave most of the lawn intact.

Scott H. Sikes, vice president for university advancement, says that university officials were eager to please the petitioners. "Students are the reason we all have jobs," he says. "We care about them a lot, and we all love our lawn."

Send ideas to short.subjects@chronicle.com

**LOAD-DATE:** August 2, 2005



EXHIBIT
2
Zaccari 7-29-09

From:  Deborah Davis <dsdavis@valdosta.edu>
Subject: **Spectator Article**
Date:  August 29, 2008 2:38:47 PM EDT
To:  _____willc@thefire.org
► 1 Attachment, 3.7 MB

Mr. Barnes,

We have scanned and attached the Spectator article you requested: "The
Unofficial Biography of Robert Carlos Cortez Zaccari," November 9,
2006, page 3.

Deborah Davis, Archivist

--------------------------------------
Deborah S. Davis, C.A., MLIS, Archivist
Valdosta State University Archives
Odum Library, Valdosta State University
Valdosta, Ga. 31698
229 259-7756
dsdavis@valdosta.edu
fax: 229 333 5862

# The Unofficial Biography of Robert Carlos Cortez Zaccari
## He's gonna love us for this one - almost as much as the Centennial Celebration



*Kerry Lester*
*kmlester@valdosta.edu*

B001028

## VALDOSTA STATE UNIVERSITY

Prospective Students | Current Students | Faculty & Staff | Alumni & Friends | Parents & Visitors | BlazeNet

Home > Administrative Offices > Division of Student Affairs > Dean of Students > Communications Board > Meeting Minutes > 11/17/2006 Meeting Minutes

# 11/17/2006 CALLED MEETING

The Campus Communications Board was called to order by the Chair, Russ Mast. Members present were Octavia Meyers, Jennifer Outley, Robin Vickery, Michael Taylor, Dr. Pat Miller, Marcela Gonzalez, John Wright, Deven Jeffers, Andy Wood, and Adam MacDonald. Guest present were Johnna Pinholster, David Rodock, Kerry Laster, Emily Zimmerman, and Tanya O'Berry.

Russ Mast, the Chair stated that the reason for the called meeting of Communications Board was to address the temporary suspension of Johnna Pinholster, Editor-in-chief of the Spectator, David Rodock, Opinion/Darkside Editor of the Spectator, and Kerry Laster, News Editor on Wednesday, November 15, 2006. Russ Mast stated that he was asked by Dr. Pat Miller, Spectator Advisor to suspend the above mentioned Editors. He reminded the Editors that this was not a disciplinary action through the Dean of Students Office but a suspension by the Chair of the Communications Board. He also stated that this suspension would not be noted on their disciplinary records. On Wednesday, November 15, 2006 he also appointed Adam MacDonald and Danielle Green as Interim Co-Editors.

Russ Mast then asked Dr. Pat Miller to address the committee as to the reasons for this suspension. Dr. Miller stated that she received notice that there was possible legal action against the Spectator regarding the Darkside article "The unofficial autobiography of Robert Carlos Cortez Zaccari" that ran in the November 9, 2006 edition of the Spectator. Dr. Miller then read her statement addressing the rationale for her request of these susupension. (Dr. Pat Miller's statement is attached)

Russ Mast then asked Dr. Miller if she had a statement for the Board and opened the meeting up to the Board for questions. Dr. Miller stated that she had "no other option" in temporarily suspending the Editors of the Spectator regarding the November 9th article in the Darkside section of the Spectator. Due to the fact that she has no control over content this was the only way to guarantee that another Darkside article of this nature would not run. There is thirty minutes of questions and answers between the Board and Dr. Miller. This can be heard in its entirety on the official recorded minutes of the November 17, 2006 Communications Board Meeting which is located in the Dean of Students Office.

Russ Mast then asked Johnna Pinholster, David Rodock and Kerry Laster to introduce themselves and their guests to the Board. Guests included Emily Zimmerman and Tanya O'Berry. Mr. Mast then asked the editors to make a statement to the Board and opened the meeting up to the Board for questions. Johnna Pinholster stated that they still were not sure why they were suspended. At this time Johnna, David and Kerry were given a copy and an opportunity to read Dr. Miller's memo asking the Chair of the Communications Board to suspend them from their positions with the Spectator. Johnna stated that Wednesday, November 15, 2006 was the first time that they had heard about the November 9, 2006 Darkside article. She stated that the Spectator staff usually has a post production meeting on Thursday afternoons. Dr. Miller did not show up or email Johnna that she would not be at the meeting. The following Monday (11-13-06) Leah Cassoria came to the 2500 class and handed out a booklet on satire with no explanation. They stated that they knew that the article was in poor taste but was meant as test for Leah Cassoria to see if she would let in run. There is thirty plus minutes of questions and answers between the Board and Johnna Pinholster, David Rodock, Kerry Laster, Emily Zimmerman and Tanya O'Berry. This can be heard in its entirety on the official recorded minutes of the November 17, 2006 Communications Board Meeting which is located in the Dean of Students Office. It should be noted that at the end of this question/answer session letters of resignations submitted by Johnna Pinholster, David Rodock, and Kerry Laster under their own accord effective Friday, November 17, 2006.

The Board deliberated and decided on the following recommendations.

- The Communications Board recommended that Johnna Pinholster, David Rodock, and Kerry Laster be paid through the remainder of the semester (Fall 2006).
- The Communications Board recommended that at the beginning of each new staffing period of the Spectator that a satirical writing workshop be held by an outside professional.
- It appears that there are strong personality conflicts with the students and they do not feel comfortable addressing these concerns with Dr. Miller or Ms. Cassoria. The students also feel that they are not being supported.
- The Communications Board expects no repercussions for any employee (paid or unpaid) of the Spectator who came before the Board to make a statement or answer questions.

Next meeting of the Communications Board will be Friday, December 1, 2006 at 12 noon in the Dean of Students Conference Room. Meeting was adjourned at 11:40 am.

© 2009 Valdosta State University | Contact Information | A Regional University of the University System of Georgia | Disclaimer | Privacy Policy | Directories and Maps





EXHIBIT
4

# BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA

### 270 WASHINGTON STREET, S.W.
### ATLANTA, GEORGIA 30334-1450

ELIZABETH E. NEELY

Phone (404) 656-2221
Fax  (404) 657-7913

May 30, 2007

Dr. Ronald M. Zaccari
President
Valdosta State University
1500 N. Patterson Street
Valdosta, Georgia 31698

Dear President Zaccari:

Enclosed is a copy of an appeal to the Board of Regents from Mr. T. Hayden Barnes. The Office of Legal Affairs is charged with the responsibility of investigating all applications for review of final decisions made by the presidents of institutions of the University System.  The results of the investigation are reported to the Board or a committee thereof.  The Board may elect to (1) deny the application for review, (2) remand the matter back to the institution for further review, (3) review the application on the existing record, or (4) grant a hearing before a committee of the Board or a hearing officer appointed by the Board.  To assure a thorough and complete consideration of this application for review, the following information is required:

(1)     Please send copies of all relevant documents, including the President's final decision, copies of any correspondence, transcripts, or other documents that may be pertinent to this appeal.

(2)     Please describe on a separate sheet of paper the nature of the record your institution has with respect to this appeal.  For example, if you have transcripts, tape recordings or summaries of hearings, which have been held, please so state and forward copies.

(3)     Please describe precisely the procedures which have been followed at your institution in handling this complaint.  Who reviewed the matter and what action was taken at each level?

(4)     Please summarize in detail the position of your institution concerning each point of the complaint.  Please deal with each point separately.

B000365

Dr. Ronald M. Zaccari
**Page Two**

Please forward this information so as to reach the Office of Legal Affairs, Room 7038, 270 Washington Street, S.W., Atlanta, Georgia 30334 no later than June 29, 2007.

Any information furnished this office in connection with this application for review will not be returned. A copy of your response may be sent to the person or persons seeking a review of your decision. Thank you very much for your cooperation in this regard.

Sincerely,

Elizabeth E. Neely
Associate Vice Chancellor for Legal Affairs

EEN/klc

Enclosures

B000366

LI08218780





**Ronald M. Zaccari**
*Office of the President*

June 21, 2007

Ms. Elizabeth E. Neely
Associate Vice Chancellor for Legal Affairs
Board of Regents of the University System of Georgia
270 Washington Street, S.W.
Atlanta, Georgia 30334

RE: Application for Review
    Thomas Hayden Barnes
    Valdosta State University

Dear Ms. Neely:

This letter serves as a response to the above referenced matter and the following is a chronology of events pertinent to your investigation.

## HISTORY

1. Thomas Hayden Barnes enrolled in Valdosta State University on August 14, 2005 having transferred as a sophomore from Warren Wilson College, Swannanoa, North Carolina.

2. On March 23, 2007, I was informed by my Administrative Assistant that flyers opposing planned parking decks had been posted across campus and that Mr. Barnes was the author of the document. (See Attachment #1) At that time, I had never met Mr. Barnes nor had I heard any previous information about any opposition to the parking decks. Upon reading the flyer, it was apparent Mr. Barnes did not understand the funding process for parking decks nor was he aware that no state funds could be used to finance the projects.

3. Prior to the referenced flyer's appearance, I had several productive meetings with a campus student group known as S.A.V.E (Students Against Violating the Environment) and we had accomplished excellent partnerships and related actions steps leading to positive efforts to initiate recycling and discussions about other environmental projects. I view the S.A.V.E. organization as a productive means of discussing student issues and working harmoniously on behalf of Valdosta State University. On March 26, 2007, I

LI08218780

asked the leadership of the group if they knew about Mr. Barnes and his view points. They knew Mr. Barnes, but stated he left the organization to pursue his own agenda. The students were concerned that Mr. Barnes' approach was confrontational rather than pursuing open dialogue with the administration.

4.   On or about March 26, 2007, following my meeting with S.A.V.E, I received a correspondence from Mr. Barnes (see Attachment #2) stating his apologies and his intent to remove the flyers and discontinue public opposition.

5.   Several days prior to the April 17 and 18, 2007 Board of Regents' meeting, Mr. Barnes immediately reversed his decision to discontinue public opposition. I was informed by Vice Chancellor Linda Daniels that Mr. Barnes had been contacting the Governor's office, the Chancellor's office, and members of the Board of Regents. Mr. Barnes had voiced his opinions and requested referenced offices and individuals to immediately disallow the parking decks. When asked by those with whom he had personal telephone contact if he had met with the VSU president and discussed his view points, his response was that he had. His response represented an abuse of the truth as I had never engaged in any conversation with Mr. Barnes. Other than the correspondence of a short-lived apology, I had never met or interacted with this student. Mr. Barnes' actions led to a series of what I consider to be erratic behavior. Without regard to accurate information and open dialogue with individuals who could have provided valuable data about VSU's parking needs and related planning, he purposely misrepresented the truth and aggressively asked the various high-ranking state offices and officials to disallow VSU's parking decks.

6.   On April 16, 2007, I received a telephone call from Vice Chancellor Linda Daniels asking for a description of his physical appearance. I related to Vice Chancellor Daniels that I had never met Mr. Barnes, nor could I relate any specific information about the student. There was a concern that Mr. Barnes would appear at the Board of Regents meeting scheduled days later at Georgia Southern University and stage a protest. The Georgia Southern University Police department was alerted by Vice Chancellor Linda Daniels to a possible public protest.

7.   Following my call with Vice Chancellor Daniels, on April 16, 2007, I requested a meeting with Mr. Barnes and required VSU's Dean of Students, Mr. Russ Mast, to be present for the meeting. Mr. Barnes arrived at my office on April 16, 2007 at the appointed time (5:00 pm). He requested that another VSU student (his girlfriend) be permitted to participate in the meeting. I refused his request because the meeting did not involve the actions of his girlfriend.

The meeting lasted for approximately one hour and ten minutes. The topics discussed included his lack of knowledge of how parking decks are financed, required business models (public/private partnerships), mandated processes/sequences in the University System of Georgia Master Planning process, and procedures for Board of Regents approval. I explained that no state funds are permitted to construct the proposed decks. Although he appeared to listen, my attempt to provide an overview resulted in his

LI08218780

suggestion that rather than building parking decks, the funds should be diverted to such projects such as Amazon Rain Forest Protection and housing for Katrina Hurricane victims. When I explained the business plan involved borrowing funds through a long-term bond with external lenders, he had no response. I again emphasized that state funds could not be used to construct parking facilities and outlined that private/public partnerships required a conduit of funds into the project to pay the lenders over a prescribed period of the bond agreement. When asked why he failed to communicate his concerns through the VSU Student Government Association, he stated, "they are no help to my cause."

The remaining time was spent attempting to redirect his energies in a more positive direction and recommending ways in which to build relationships that would assist in coalescing individuals and engaging people to support his view points. I suggested that his current approach drives people in opposing directions. I stated that I wanted to advise him as I would in mentoring my own two sons. He was not interested in my views, a fact supported by the student's subsequent statements that mock my attempt to advise and communicate with him.

8. On Friday, April 20, 2007, Mr. Barnes sent an email to me (see Attachment #3) referencing Easter Island and mocking the meeting's discussion of required business plans. I began to view Mr. Barnes' behavior as the inability to listen, opposition to the administrative policies of the University and the University System of Georgia, and interested in only promoting self interests. No other views, other than his own, appeared to be of interest.

9. VSU's entries on the Board of Regents' meeting agenda (April 17-18, 2007) were approved, including the parking decks. Several days following the BOR meeting, Dean Mast provided a copy of a document generated by Mr. Barnes, wherein he had posted my picture on an image of a parking deck with the words, "S.A.V.E.- Zaccari Memorial Parking Deck" (see Attachment #4).

10. He additionally posted and made reference to the shooter of the April 16, 2007 Virginia Tech slayings (see Attachment #5). The topic of Attachment #5 is focused on the misunderstandings of people who suffer from psychological disorders. Also, included on the second page of the article referenced in Attachment # 5 is a reference to "Shoot it. Upload it. Get famous. Project Spotlight is searching for the next big thing. Are you it?"

11. An additional entry on Attachment #5 was brought to my attention by my Administrative Assistant that referenced Mr. Barnes' personal statement, "Hayden is cleaning out and rearranging his room and thus, his mind, or so he hopes".

12. At this point in the chronology of events, a pattern emerged in the student's behavior. First, a flurry of aggressive actions with inaccurate information, then a written apology followed by an immediate reversal, telephone calls to state offices and Board of Regents, posting my picture as "memorial", and reference to the Virginia Tech shooter. These were documented sequential signs that indicated possible threats to me and the campus.

LI08218780

Since I am not an expert in assessing the psychological status of an individual, but have the appointed responsibility as VSU president and the safety of the campus, I took specific action.

13. The first step was to alert VSU Campus Police on or about April 20, 2007 of the student's behavior and the potential risk if we fail to monitor his actions. Due to the heightened awareness of the Virginia Tech shooting and the national focus on "what should have been done", "what could have been done", "what university presidents must do to protect and possibly prevent such incidents", and "what signs of overt student behavior should immediately be addressed", I sought the advice of the members of the President's administrative unit consisting of Dr. Kurt Keppler, Vice President of Student Affairs, Dr. Louis Levy, Vice President of Academic Affairs, Mr. James Black, Vice President of Finance and Administration, Mr. Scott Sikes, Vice President of Institutional Advancement and Dr. Marsha Krotseng, Associate Vice President for Strategic Research and Analysis. The administrative unit, along with Mr. Scott Doner, VSU's Police Chief and Ms. Ann Farmer, Assistant Chief of Police and I collectively decided that VSU take necessary steps to minimize as much as possible any security risks. Due to the near ending of the Spring academic semester (approximately one week from final examination schedule), it was decided that we monitor Mr. Barnes' student activities and place high security on my public appearances. Non-uniformed campus officers were assigned to patrol my private residence during my off-campus hours, protect my wife and me from potential danger, and uniformed officers were placed on high alert to protect the campus as it concluded the 2007 Spring Semester of classes. My daily schedule was monitored by campus safety officers.

During this timeframe, there were a number of high profile/public events at which I was scheduled to speak, including a weekend Earth Day rally (requested by the S.A.V.E organization), six Commencement Exercises, and the final baseball game for a forty-year career VSU coach.

With high security and monitoring of Mr. Barnes' student activities, appropriate action was taken which allowed the semester to come to a conclusion without alarming the campus that a potentially dangerous situation was brewing, one that could have interrupted final examination schedules. Immediately following the Virginia Tech shooting, the VSU campus received numerous telephone calls from concerned parents inquiring as to what measures VSU was undertaking to protect the campus. Inherent in these inquires were concerns of "copy cat" behaviors.

I took what I believed to be appropriate action and minimize campus focus on Mr. Barnes and his documented behavior by not scheduling a judicial hearing. The exigency of the circumstances dictated action that would not invite alarm. A campus hearing would have involved a judicial panel comprised of students and faculty. This format would have alerted the campus of a potential threat, and would have comprised campus safety by exacerbating potential alarm.

LI08218780

## ISSUE ON APPEAL

Essentially, Mr. Barnes contends that his actions were not intended to be construed as a threat of physical harm toward myself or others; rather, he was simply exercising his First Amendment Rights. Additionally, Mr. Barnes maintains that he was never informed of the reason he was removed from the University.

## DISCUSSION

As with all students, Mr. Barnes is free to enjoy all his constitutional guarantees. However, with this freedom comes the expense of responsibility. It is my understanding, that it is a well settled principal of law that the First Amendment was never intended to bestow upon anyone the right to make a cognizable threat of physical harm.[1] Mr. Barnes takes a questionable approach in advancing the notion that his use of the word "memorial" as reflected in Attachment 4 was an unintentional use of the word. Webster's Dictionary defines the word as "something that is a reminder of ...some person." The common usage and understanding of this word in our society is in recognition of someone deceased.[2] Indeed, even Mr. Barnes' mother agreed that after she viewed the web posting she understood why I would be concerned. (See Attachment # 6, paragraph 3, line 1.)

His mother dismisses the student's actions as "passionate" and references her son as "intelligent", yet asks that VSU dismiss his reference to "memorial" as not knowing its true definition and that he is naïve about such understandings.

If one is to believe that Mr. Barnes has a history of activism regarding complex political issues, then, necessarily, one must conclude that his convenient explanation of his use of the word "memorial" is disingenuous. Further, Mr. Barnes asserts that his web page has limited access and therefore was not intended for my viewing. However, a web site has the potential of being viewed by hundreds. Ultimately, whether or not I viewed the site before or after others is immaterial to the fact that I perceived its contents as a threat of physical harm. However, Mr. Barnes made an affirmative effort to use a particular word to convey the full implication of its meaning. While in retrospect, Mr. Barnes may concede that his actions were inappropriate, I dealt with the facts as they were presented at that time. Accordingly, Mr. Barnes should not expect to be insulated with the protection of the constitution while he engages in disruptive, threatening behavior.

Mr. Barnes and his behavior focus primarily on himself and his views. No one's opinion or appointed office appear to be of value, and authority is something he counters at every possible opportunity with an attitude that "I'll get in your face". He does not follow any protocol, but expects everyone else to follow his protocol and whatever suits his current need and points of view.

---

[1] "The most stringent protection of free speech would not protect a man falsely shouting fire in a theatre and causing panic." *Schenck v. United States* (1919)

[2] For example, we honor our fallen military persons on Memorial Day.

LI08218780

My actions were not taken in response to the student's opposition to the proposed parking decks. The parking decks had been discussed and endorsed for several years through intense planning with campus governance groups such as the Student Government Association, Faculty Senate, Council of Classified Staff Affairs, and the President's Cabinet. Additionally, an appointed campus Master Plan Committee endorsed the parking decks through a mandated Board of Regents Ten-year Master Plan update that the University System of Georgia directed me to conduct when I assumed the VSU presidency in January, 2002. The revised Master Plan was done in concert with the Facilities Office of the University System of Georgia, external consultants, and the VSU campus. A twenty-four month period of hard work and a campus master plan were endorsed and accepted at the May, 2004 meeting of the Board of Regents. Extensive campus dialogue took place at all levels of open campus governance and public forums were held to discuss the pros and cons of the proposed Master Plan. External consultants were hired to conduct extensive research about VSU's ten-year growth and the projected facility and parking needs to serve current and future students, faculty, and staff.

My point: The parking decks were an integral part of the accepted Master Plan and based on projected parking needs that documented a deficit of 2,700 parking spots by the year 2014. Mr. Barnes was not enrolled at VSU when the external consultants engaged the campus in the revised Master Plan; however, he embarked on a public opposition to the parking decks without gathering pertinent information about the lengthy planning and strategic action required to implement such an expansive project. Had he requested the information in a logical inquiry, my staff and I would have supplied the information. Although Mr. Barnes opposed the parking decks, his opinion was not accepted as a mainstream voice; thus, I had no concern about his position. Obviously, his voice had no impact on the Board of Regents' decision to approve the construction of the two decks (approval took place at the April, 2007 meeting of the Board of Regents).

Indeed, Mr. Barnes recently displayed behavior that is in keeping with the observation that his focus is primarily on his concerns. The Board of Regents does not have a regularly scheduled meeting in July. Yet, following his appeal of this matter to the Board of Regents, Mr. Barnes, sent a communication to the VSU's Director of Housing, complaining, among other things, that the Board was "stone-walling" his appeal. (See Attachment # 7.)

Mr. Barnes' inclusion of my picture on his web site, coupled with the Virginia Tech tragedy, and his subsequent posting of an article wherein the author expresses "empathy with the shooter", culminated in the need to make a decision in the interest of my safety and that of the campus community.

I seek to dismantle obstacles that interfere with an individual's ability to pursue and fulfill his or her goals in an environment that is conducive for achievement. Consistent with this philosophy, I carefully weighed Mr. Barnes' interest in continuing his enrollment at VSU against the competing interest of campus safety. In the final analysis, based on the foregoing series of events, I determined that the overall interests of the

LI08218780

campus community were paramount to that of Mr. Barnes'.

As university administrators, we must try to understand how and why such events such as the Virginia Tech shootings happen and to consider carefully what precautions we can take to prevent them. I made my decision based on the belief that I was at risk and there was a real threat to my safety, the safety of my spouse, the safety of my administrative staff, and there existed a potential campus threat such as the one that occurred on the Virginia Tech campus, April 16, 2007.

As I am not an expert in the field of mental health, and because of my concern for campus safety, I felt it necessary to defer to the experts and incorporated their input as a condition for Mr. Barnes readmission to the University. Hence, my request for a professional evaluation was included in his administrative withdrawal and as a condition for readmission.

Mr. Barnes' behavior was disruptive to the administrative operation of the University and he was fully informed of the reason for his removal as set forth in Attachment #8.


RECOMMENDATION

My decision and the actions of VSU personnel permitted the campus to complete its Spring Semester. Mr. Barnes was able to complete his course work, and now he is given the opportunity to assess his behavior patterns, seek help, and decide whether he wants to return to VSU, transfer to another institution, and in general function on any post-secondary institution in order to achieve a college degree.

My actions were not intended to permanently withdraw the student from Valdosta State University, but to request the student to seek professional psychiatric assistance and allow VSU's administrative staff to assess his request for continued enrollment. He has the opportunity to present requested information for reevaluation of his readmission.

In closing, I offer the following quote from the May 11, 2007 edition of the Chronicle of Higher Education:

*"After the tears, the makeshift memorials, and the intensely painful series of funerals, higher education must come to grips with the fact that it had its own September 11. It will never be, nor should it be, the same again at our nation's colleges and universities."*

Let's look at September 11 and its aftermath. Let's review all of the reports that state how we should have paid more detailed attention to signs, analyzed more carefully apparent signs and pieces of information, and developed more proactive approaches to preventing such events and similar future events. Those are the underlying premises from which VSU took the action that is now under appeal. Those are the very reasons

LI08218780

why VSU stands firm on its actions and decisions. The campus was able to come to a point of resolution with safety, the continued effective regional mission firmly in place, and the successful completion of classes and final examinations. Mr. Barnes was able to complete his academic work and receive final grades. He now has the opportunity to present a case for readmission to Valdosta State University.

The unfortunate outcome in this appeal is that the student fails to understand that he must be responsible for his actions and words. He is in this situation because he chose to place himself squarely in a critical path – one of his own creation.

Sincerely,

Ronald M. Zaccari,
President

EXHIBIT
6
Zaccari 7-29-09


# AN ISSUE OF CONVENIENCE OR A MORAL QUESTION?



## $30,000,000 Parking Garage

Ugly eye-sore, construction noise, dust, more pollution, less grass to enjoy and <u>same long walks to class</u>

-----------------OR-----------------

2,940 FULL SCHOLARSHIPS to VSU[1]

Textbooks for 8,797 VSU students for 4 years[2]

PeachCare health coverage for 21,739 Georgia children[3]

Head Start/EOA for 2,845 Georgia children[4]

600,000 acres of Amazon rain forest protected[5]

Housing for 215 Katrina Victims for 18 Months[6]

# OPPOSE THE PARKING GARAGE PLAN
# DEMAND ALTERNATIVES

VSU PRESIDENT — 229-333-5952

GA BOARD OF REGENTS — 404-656-2202

GOVERNOR SONNY PERDUE — 404-656-1776

VSU SPECTATOR — SPEC@VALDOSTA.EDU

1  http://romulus.valdosta.edu/finadmin/financial/documents/undergrad_returning.pdf

2  http://www.nacs.org/common/research/faq_textbooks.pdf

3 "Health Insurance for Georgia's Children: Is it a Priority?", The Georgia Budget and Policy Institute (GBPI) , Tim Sweeney, Senior Healthcare Analyst.

4  http://www.acf.hhs.gov/programs/hsb/programs/chs/chs_funding.htm

5  http://www.rainforest.org/help/save-an-acre.html

6  http://www.washingtonpost.com/wp-dyn/content/article/2005/12/08/AR2005120802177.html

Found posted all over campus on Sunday March 25, 2007

**Thressea H. Boyd**

| | |
|---|---|
| Fr: | Beheruz Sethna [Beheruz.Sethna@usg.edu] |
| Se: | Monday, March 26, 2007 4:39 PM |
| To: | Thressea H. Boyd |
| Cc: | Demetra Morgan |
| Subject: | Re: [Fwd: [Fwd: Re: Proposed Parking Garage @ VSU]] |



Excellent.  Thank you Ms. Boyd.

Demetra, if you have other letters, could you send them to Dr. Zaccari so that he may respond in like manner.  Ms. Boyd, please request him to use a phrase something like: Thank you for your letter to the Chancellor.  Since this is a campus matter, it is appropriate that I respond.

Thanks.

A brief message from my BlackBerry Handheld.

-----Original Message-----
From: "Thressea H. Boyd" <thboyd@valdosta.edu>
Date: Mon, 26 Mar 2007 16:25:52
To:<Beheruz.Sethna@usg.edu>
Subject: FW: [Fwd: [Fwd: Re: Proposed Parking Garage @ VSU]]

Dr. Sethan,


I response to Mr. Hayden Barnes correspondence to Chancellor Davis I am attaching a letter from Mr. Barnes to President Zaccari which was hand delivered to our office today. As you will note Mr. Barnes is withdrawing his opposition to VSU's parking garage.  Mr. Barnes has met with members of VSU's SAVE (Students Against Violating the Environment) group and plans to work in partnership with this student organization.  The SAVE organization has had productive meetings with President Zaccari and VSU administrators and Mr. Barnes is agreeable to work with this group to voice his concerns.


Please let me know if you have any questions or need further information.


Sincerely,


Thressea H. Boyd

Assistant to the President

Valdosta State University

Valdosta, GA 31698

229-333-5952

   333-7400 (Fax)

thboyd@valdosta.edu: <mailto:thboyd@valdosta.edu>

1

LT08218780

EXHIBIT
8
Zaccari 7-29-09

## Ronald M. Zaccari

**From:** Linda Daniels [Linda.Daniels@usg.edu]
**Sent:** Monday, April 16, 2007 3:49 PM
**To:** USG President - Valdosta State University
**Subject:** [Fwd: Parking Decks at VSU]

------ Original Message ------
Subject:Parking Decks at VSU
Date:Mon, 16 Apr 2007 15:33:09 -0400
From:Hayden Barnes <thbarnes@gmail.com>
To:<linda.daniels@usg.edu>

Response to "Parking decks to be built at VSU"

We must look past our own selfish desires for more convenient parking options and examine the overlooked issues associated with the proposed parking decks.

I have a lot of questions about the parking deck plans which I would like to see answered and hope you will to.

1.Have there been any alternatives explored to building two large, expensive, and ugly parking decks on campus? Parking decks to do not produce income and while they might aid in attracting students to our University who want to bring their vehicles to campus, they do not add to the academic value of the University. Parking decks are a waste of valuable University real estate. I think the decision to build these parking decks is going to be looked down upon by future generations who are going recognize them for what they are, a bad investment.

2.Has there been a study done assessing the impact of these parking decks on the local environment? Is there a plan to make these studies easily accessible to the University community or will they be filled away in a drawer over in Auxiliary Services? This are going to be one of the largest construction projects and biggest investments every taken on by the university (yeah a parking deck, ironic, huh?) Construction waste, noise pollution, and increased car emissions all have to be taken into consideration, in addition to the destruction of habitat. While the rest of the world is cutting back and investing in innovative solutions to solve the climate crisis, VSU seems to be doing the opposite.

3.Speak of which, have there been any initiatives to cut down on current vehicle usage: carpooling boards, extending the campus bus system to outlying apartment complexes in the city, and dare I say, restricting cars?

Let me stop here and tell you a story. I survived my freshmen year without a vehicle at a small college, 800 students, in the mountains of Western North Carolina. Rather than detracting from the college experience, it allowed me to build deeper relationships with those around me including relationships with people I normally wouldn't hang out or party with. I think campus life would greatly benefit from fewer people leaving campus and

LI08218780

greater investments in campus activities. Imagine what CAB could do with just $15,000, the price of one parking space. Can you say more laser tag?

4. Do we want to continue coming across as a commuter college? I think VSU has the potential to be a major economic engine for South Georgia and will host pioneering research one day. The question is, do we want to see that happen in five years or twenty? We have to make the tough decisions and investments now to see that come to that fruition in the future.

5. Can't we all think of better ways to spend $30 million dollars on campus? I think you could think of a few off the top of your head right now. I was thinking building new dorms which use geothermal climate control, composting toilets, environmentally friendly building materials, gray water recycling, rain water collection, and permaculture gardens. How about a food co-op or converting all the campus vehicles to bio-diesel?

I call upon the administration to answer these questions, publicly and quickly, in the VSU Spectator, in particular regarding the environmental impact of parking decks.

I call upon the Faculty Senate and SGA to press for answers to these questions and any of your own you might have.

I call upon students, faculty, and staff to think about what you are willing to sacrifice for cleaner air, a more vibrant campus life, and a world-renowned University.

The ultimate decision to build these parking decks rests with the Board of Regents. You can email the Board of Regents at http://www.usg.edu/contact/ or give the Chancellor a call at (404) 656-2202.

T. Hayden Barnes
Class of 2009
Anthropology Major


Linda M. Daniels, Architect
Vice Chancellor for Facilities
The University System of Georgia/Board of Regents
270 Washington St., S.W.
Atlanta, Georgia 30334-1450
phone (404) 656-2243
fax  (404) 657-7433

Thressea H. Boyd

From:           Hayden Barnes
Sent:           Monday, April 16, 2007 7:09 PM
To:             president@valdosta.edu
Subject:        Remote Parking

President Zaccari,

Below I have listed schools I have found which utilize some form of remote parking
facilities, most if not all provide shuttle service to and from these remote parking lots.

University of Texas at El Paso (Shuttle Service)
http://admin.utep.edu/Default.aspx?tabid=34201

University of Texas at Austin (Shuttle Service) http://www.utexas.edu/parking/maps/

University of Vermont (Shuttle Service)
http://www.uvm.edu/~plan/masterplan/topics/G7transportation.html

University of Southern California
(Shuttle service, housing residents are allowed to park ONLY in remote lots)
http://transnet.usc.edu/Citations/regulations.aspx?category=9

Northwestern University
http://www.northwestern.edu/newscenter/stories/2005/09/parking.html

UC Santa Cruz (Shuttle service)
http://www2.ucsc.edu/taps/pages/ugcommuters.html

Arizona State University (Shuttle service) http://www.asu.edu/dps/pts/travel/index.html

University of Wyoming (Shuttle service)
http://uwadmnweb.uwyo.edu/tap/Parkingshortday.htm

University of Utah
http://aux.utah.edu/commuter.html

University of Arkansas
http://parking.uark.edu/16.htm

Wright State University
http://www.wright.edu/admin/parking/resident_permit.html

University of Nebraska at Omaha (Shuttle service)
http://www.unomaha.edu/security/remote.htm

University of Colorado(Shuttle service)
http://www.colorado.edu/masterplan/plan/plan.cgi?4&5&5&1

University of Illinois at Urbana
http://www.ci.urbana.il.us/urbana/finance/parking/regulations/Main.html

T. Hayden Barnes

1

B000191



Profile   edit   **Friends**      **Networks**      **Inbox (3)**          home   account   privacy   logout

**Search**

**Hayden Barnes' Photos – Creative Genius**
Photo 1 of 1 | Back to Album | See Hayden's Profile

Photos
Notes
Groups
Events
Posted Items

**Who's on Facebook?**
Check your address book.



careerbuilder.com

Search over
a million jobs

A better job awaits.

careerbuilder.com



Share        Added April 13

From the album:
"Creative Genius" by Hayden
Barnes

Tag This Photo
Report This Photo

Facebook © 2007                                    about   developers   jobs   advertisers   terms   privacy   help

Profile  edit   Friends   Networks   Inbox (3)

EXHIBIT
11
Zaclari 7-29-09



**Hayden Barnes**
is cleaning out and rearranging his room and thus, his mind, or so he hopes.
Updated 22 hours ago

Profile

Search

Photos
Notes
Groups
Events
Posted Items

**Find Friends**
Friend your address book.

| | |
|---|---|
| Networks: | Valdosta '09 |
| Sex: | Male |
| Relationship Status: | In a Relationship with Kimberly Chaffee |
| Birthday: | March 13 |
| Hometown: | Savannah, GA |
| Political Views: | Very Liberal |
| Religious Views: | Buddhist - Vajrayana |

**Mini-Feed**

Displaying 10 stories.                                      See All



For way less than digital cable.

Packages starting at $19.99/month for 12 months (after mail-in rebate)
* Restrictions apply

dish NETWORK

View More Photos of Hayden (77)

Send Hayden a Message

Poke Him!

Add Hayden as a Friend

**Valdosta Friends**

27 friends at Valdosta.          See All


Brandy Ledbetter


Trayan Kushev


Amanda Lippincott


Andrew McClure


Jennifer Stone


Michael G. Noll

**Friends in Other Networks**

Networks with the most friends

Valdosta (27)
Warren Wilson (14)
Armstrong (5)
Savannah, GA (4)
Atlanta, GA (4)
SCAD (3)
UGA (2)

Networks you belong to

Valdosta (27)

Show All Networks | View All Friends

**Photos**

2 of 3 albums.          See All

Yesterday



Creative
Genius
Created April 13



Photos of Me
Updated
March 27

**Posted Items**

3 of 1141 posted items.        See All

You Are What You Grow
8:47pm Apr 23

I'm mentally ill but I'm no mass killer.
8:40pm Apr 23

Homer On Weed
10:23am Apr 23 | 1 comment

**Groups**

30 of 72 groups.        See All

Savannah Arts Academy Class of 2003 • John Hodgman's Presidential Exploratory Committee • Dennis Kucinich • Dennis Kucinich for President in 2008 • John Edwards • Barack Obama • Ignorance is Gay • ...So Apparently I'm Going To Hell • Build The Parking Decks On The Front Lawn • May the Fetus You Save Be Gay • "I'm Chris Hanson from Dateline NBC" • I want to be Jack Donaghy • I Love Mountains • Abolish Abstinence Only Sex Education • C* ⊙ ε χℓ s 1 • Food Not Bombs • 400,000 Faces • I Picked a Major I Like, and One Day I Will Probably Be Living In a Box • Mental Illness Awareness • Anxiety Disorders Unite • When I was your age, Pluto was a planet. • I Take Refuge in the Buddha • Emergency Response Personnel of Facebook • Copyfuture Now! • Mental Health Parity • Close Guantanamo Bay • Don't Vote? Then Don't Bitch! • End the Genocide in Darfur! • Pro-Peace, Spread the Word • STOP GLOBAL WARMING

Hayden posted a news story.                    Share

**You Are What You Grow**
http://www.nytimes.com/2007/04...

He discovered that he could buy the most calories per dollar in the middle aisles of the supermarket, among the towering canyons of processed food and soft drink



Add a comment

Hayden posted a link.                    Share

**I'm mentally ill but I'm no mass killer.**
http://www.salon.com/news/col/henn/2007/04/23/schiz...

To many, the shootings at Virginia Tech are another senseless tragedy perpetrated by a mentally unstable person. This is doubly depressing for me. Not only is the specter of over 30 innocents killed by one individual depressing, but because I, too, am mentally unstable, I fear I will suffer even more stigma after events like that.

Add a comment

Hayden is cleaning out and rearranging his room and thus, his mind, or so he hopes.

Hayden posted a video.                    Share

**Homer On Weed**
http://www.youtube.com/watch?v...

"It smells like the art teacher's office"

Add a comment | 1 comment

Hayden posted a link.                    Share

**Real Time with Bill Maher — The Partial-Birth Abortion Ban**
http://www.jwharrison.com/blog...

Maher and his panel dispel the myth that the recent ban of partial-birth abortions is the first step in overturning Roe vs. Wade, which is nothing more than alarmism by the left and a false-victory for the right.



Add a comment

Hayden posted a link.                    Share

**The Daily Show — A Convenient Rapture**
http://www.jwharrison.com/blog...

The Daily Show celebrates Earth Day by highlighting the individuals in our society who still think said planet is flat. "The Rapture" is a politically convenient belief amongst conservative Protestants that the end of the world is actually a good thing.



Add a comment

Hayden posted a link.                    Share

**Maher on the Birds and the Bees — Earth Day Needs to be Everyday - The Largest Minority**
http://www.jwharrison.com/blog...

In honor of Earth Day, Maher stresses the necessity of sacrifice. He points to the colony collapse phenomenon, which has affected honeybees on a global scale. Because of our agricultural dependence on ...



**Education Info**

| | |
|---|---|
| College: | Valdosta '08 |
| | Sociology and Anthropology |
| High School: | Savannah Arts Academy '03 |

**Work Info**

| | |
|---|---|
| Employer: | Mid-Georgia Ambulance |
| Position: | Paramedic |
| Time Period: | February 2007 ~ Present |
| Location: | Adel, GA |
| Description: | EMT-Paramedics provide the most extensive prehospital trauma and medical care. In addition carrying out the procedures of an EMT-Basic and EMT-Intermediate, Paramedics may administer d orally and intravenously, interpret electrocardio (EKGs), perform endotracheal intubations, surgi cricothyrotomy, chest needle decompression, an use monitors and other complex equipment. |

**Courses**

- Biology 2651 Anatomy and Physiology (F)
- Anthropology 1102 Intro to Anthropology (A)
- Biology 2010 Introduction Biology (C)
- Sociology 1101 Introduction to Sociology (A)

**Gift Box**

Displaying 5 gifts

Give a Gift | S

| Private | From: Kimberly | From: Kimberly | From: Kimberly | From: Kent |
|---|---|---|---|---|

**The Wall**

Displaying 10 of 61 wall posts.

Wall-to-Wall | S



**Erin Simpson (SCAD)** wrote
at 8:33pm on April 23rd, 2007

rearrange is one of my first grade vocabulary wo
they would love your status and probably scream

# I'm mentally ill but I'm no mass killer

**Will people with schizoaffective disorder be lumped in with psychotic murderers?**

**By Cary Tennis**

Print Email Digg it Del.icio.us My Yahoo RSS Font: S / S+ / S++



April 23, 2007 | Dear Cary,

To many, the shootings at Virginia Tech are another senseless tragedy perpetrated by a mentally unstable person. This is doubly depressing for me. Not only is the specter of over 30 innocents killed by one individual depressing, but because I, too, am mentally unstable, I fear I will suffer even more stigma after events like that.

My official diagnosis is schizoaffective disorder, which, I am told, is a mild schizophrenia combined with a mood disorder. I currently take two medications for my condition and see a counselor, along with a doctor for my prescriptions. I wish I could say I got help as soon as my condition developed. From college onward, I have, on and off, behaved badly and hurt some people.

So I feel some sort of empathy with the shooter. Like Cho Seung-Hui, I've written some disturbing things, spent time in a mental institution, and been accused of stalking women. (Although looking back, it could be one of my delusions, since everyone involved has denied any accusations.) But then again, I am quite different from Seung-Hui. I'm not hostile to most people, I don't like guns, and the most violent I ever got was putting someone in a headlock. I've apologized to those whom I've hurt and for the last five years I have been trying my best to keep from hurting another human being.

My question is, though, shouldn't that count for something? Fighting to remain reasonable and pleasant is a hard thing to do when your moods are nearly

uncontrollable and your perception of reality is skewed. Yet most of my old friends and acquaintances are still angry with me. When I run into them, few will greet me and most just respond with a cold glare. At times it seems like people are going out of their way to glare at me. So when a tragedy like Virginia Tech happens, part of me feels it will just give people more reason to hate me.

I know I should expect it and for most of my life I've been dealing with the stigma of being mentally ill. My father was never shy about showing his anger to me about behaving "oddly." In high school, I was known as the strange kid. Worse was the psychologist who said my attempts at self-injury were a "narcissistic effort for attention" and screamed at me for "accusing" a priest-coach of forcing players to strip to their jock straps and wrestling them. (Which was true and, by the way, the priest in question has since confessed to raping teenage boys.) I also realize that my behavior, even now, isn't easy to deal with. But that doesn't stop the hatred and anger from hurting.

So I wonder, is most of my life to be filled with anger, fear and hatred because I am mentally ill? Will I be lumped together with monsters like Seung-Hui?

Unbalanced but Trying

*This reference concerns me.*



Dear Unbalanced,

You are thinking about what happened at Virginia Tech.

The worst thing of all, the hardest to fathom, the most infuriating but the most important, is this: It literally means nothing. It is random, senseless, incomprehensible. We wish it meant something. It would feel better if it meant something. We try hard to manufacture something that it can mean. But it stubbornly means nothing. Literally, it is a sign of nothing, the nothing that surrounds us, the nothing we must face, the implacable end we come to.

The fact that it means nothing is the worst thing about it. We can make up meaning, and we must. But we must know we are making it up. We make up our faith. We make up our rituals. We do what we have to do to live with it without going mad.

All the while, our impossible burden is to live with the nothingness that it means. Let us try to do that with dignity and grace. Let us try not to take shelter in illusion. Our illusions are manifold, our rituals abundant. It helps to lay wreaths. But there is no safety from madness.

The universe is random and cruel. Death will come. You can't know the hour.

So live in the world now, as it is.

That is the bottom line, my friend. You have to live in your world as it is and in order to live in your world as it is you must find peace with yourself. To find peace with yourself you may need to spend your whole life taking your meds and seeing your doctors, praying, digging vegetables, swimming upstream in the river, walking alone through crowded streets, brandishing a neutral face in alleys of consternation, paying in cash, sitting zazen with the master, making your therapy appointments on time, forgiving yourself for past transgressions, expecting nothing in return, rising at the same time every morning and never missing a pill, never skipping a meal, sleeping your allotted hours, keeping your hair combed and your clothes clean and your shoes shined, exercising regularly and saying please and thank you, remembering birthdays, paying the rent on time.

These are the things we do to get us through. Our thoughts fasten on drama like candy. We churn and churn about events beyond our ken. Meanwhile we work on the motorcycle, hoping for another hour of sunlight.

There's not a whole lot else you can do. Your thoughts will soar and dive. You have a disease of the mind. It is controllable. But it is not curable. It will have outbreaks like eczema. You take your medications and live a life of moderation. You treat people with as much respect and even-handedness as you can muster. The rest is out of your control. Occasionally you may have to go into the hospital for a while. But you will come out again. You will have good days and bad days.

What people think about all this is beyond your control. More than that: It is none of your business. What people think is their own concern. What they think of you, what they think of me: It's none of our business what they think. Let them think what they think. Their thoughts are their world. Our world is here, the waking every day, the arising from troubled sleep, the difficult interactions at the hardware store, the creeping sensation of omnipotence, the unreality on the subway. That is our world, the world of the half-sane, half-dreamer. We barely know what we ourselves are thinking. If you think you know what other people are thinking, that is your disease. Your disease is your delusion. You cannot know what people are thinking. You cannot read their thoughts on their faces. You cannot hear their thoughts.



**Who says?**

Fed up with anonymous and insipid online chatter?

Venture into a place where real people congregate using real names.

THE
W@LL

You can believe that you can. You can say that you can. But that is your own mind telling you things.

People will pass you and give you dirty looks. They are limited in goodness. They are limited in forgiveness. They are not holy. They are just people.

They will go on the Internet and say whatever they want. That does not make it true, or meaningful, or useful. People go on the Internet and blab blab blab. Blah blah blah. Wah wah wah. Primitive, primitive, primitive. Monkey screams. Jungle sounds. Tribal dissonance. Parrot squawking.

They can say you are crazy. They can say I am crazy. That does not make it true or useful. Meanwhile we put one shoe in front of the other, making a line in the sand and following it, day after day, through the weird storms.

You and I, we are just nameless travelers. You have your problems and I have mine. You have your burdens and I have mine. The world is crazy. It always has been. What can you do? Imagine you are living in Beauvais, north of Paris, in the 12th century. A builder needs some help. Go help him build a cathedral. It takes your mind off. You cart the stones up the hill, you get paid at the end of the day.

That's how we get by. We find things to occupy us. In the end, a cathedral is built. But nobody knows your name. Nobody even knows the name of the builder

LI08218780...       APR-17-2007(TUE) 08:46        12293335475              P.002
APR-17-2007  09:00        VSU REGISTRARS OFFICE              12293335475   P.002

Student No: 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    Date of Birth: 13-MAR-1985                Date Issued: 17-APR-2007
                                                                                  AD
Record of: Thomas Hayden Barnes                        U N O F F I C I A L    Page:  2

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|------|-----|--------------|------|-----|-----|---|

Pre-registered Schedule:

Summer 2007
ANTH  3070   Magic, Religion, and Witchcraft  3.00 IN PROGRESS
SPAN  1001   Bg Spa Lng/Intr Hispnc Cult I    3.00 IN PROGRESS
SPAN  1002   Bg Spa Lng/Intr Hispnc Cult II   3.00 IN PROGRESS
                              Hours: 9.00

Pre-registered Schedule:

Fall 2007
ANTH  4040   Sociocultural Change             3.00 IN PROGRESS
SOCI  3000   Soci Analysis/Statistical App    4.00 IN PROGRESS
SOCI  3710   Social Psychology                3.00 IN PROGRESS
                              Hours: 10.00

EXHIBIT
12
Zaccari 1-24

LI08218780

Student AcademicTranscript

## COURSES IN PROGRESS    -Top-

**Spring 2007**

**Student Type:**                     Continuing

| Subject | Course | Level | Title | Credit Hours | Start and End Dates |
|---------|--------|-------|-------|--------------|---------------------|
| ANTH | 1102 | US | Introduction to Anthropology | 3.000 | A    12 |
| BIOL | 2010 | US | Unifying Principles of Biology | 4.000 | C    4 |
| BIOL | 2651 | US | Human Anatomy/Physiology I | 4.000 | F    0 |
| MATH | 1111 | US | College Algebra | 3.000 | WITHDRAWN |
| SOCI | 1101 | US | Intro to Sociology | 3.000 | A    12 |

*14        28*

### Unofficial Transcript

**Summer 2007**

**Student Type:**                     Continuing

| Subject | Course | Level | Title | Credit Hours | Start and End Dates |
|---------|--------|-------|-------|--------------|---------------------|
| ANTH | 3070 | US | Magic, Religion, and Witchcraft | 3.000 | |
| SPAN | 1001 | US | Bg Spa Lng/Intr Hispnc Cult 1 | 3.000 | |
| SPAN | 1002 | US | Bg Spa Lng/Intr Hispnc Cult II | 3.000 | |

### Unofficial Transcript

**Fall 2007**

**Student Type:**                     Continuing

| Subject | Course | Level | Title | Credit Hours | Start and End Dates |
|---------|--------|-------|-------|--------------|---------------------|
| ANTH | 4040 | US | Sociocultural Change | 3.000 | |
| SOCI | 3000 | US | Soci Analysis/Statistical App | 4.000 | |
| SOCI | 3710 | US | Social Psychology | 3.000 | |

### Unofficial Transcript

## RELEASE: 7.2

LI08218780

*Summer 2007*

Registration Query SFARGQG 7.3.2 (PROD)   18-APR-07 07:09:56 AM

**Term:** 200705   **Registration From Date:** [ ]   **Registration To Date:** [ ]
**ID:** 870220374   Barnes, Thomas M.

| Term | CRN | Subject | Course | Section | Registration Status | CEU | Cross List | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Begin Time | End Time |
|------|-----|---------|--------|---------|---------------------|-----|-----------|-----|-----|-----|-----|-----|-----|-----|-----------|---------|

**Part of Term:** | **Campus:** | **Start Date:** | **Instructional Method:**
**Grading Mode:** | **Building:** | **End Date:**
**Credit Hours:** | **Room:** | **Instructor:** ☑ Primary

---

| 200705 | 50465 | SPAN | 1001 | A | RW | N | | | ☑ | ☑ | ☑ | ☑ | | | 1400 | 1650 |

**Part of Term:** 5   **Campus:** A   **Start Date:** 09-MAY-2007   **Instructional Method:** [ ]
**Grading Mode:** N   **Building:** 0001   **End Date:** 30-MAY-2007
**Credit Hours:** 3.000   **Room:** 00140   **Instructor:** Bajarano, Luis C.   ☑ Primary

---

| 200705 | 50470 | SPAN | 1002 | B | RE | N | | | ☑ | ☑ | ☑ | ☑ | | | 0800 | 1035 |

**Part of Term:** 7   **Campus:** A   **Start Date:** 07-JUN-2007   **Instructional Method:** [ ]
**Grading Mode:** N   **Building:** 0001   **End Date:** 28-JUN-2007
**Credit Hours:** 3.000   **Room:** 00140   **Instructor:** Cano, Israel J.   ☑ Primary

---

**Co-op Education:** [ ]        **Total Credit Hours:** 9.000        **Total CEU Hours:** .000

LI08218780

| Term | CRN | Subject | Course | Section | Registration Status | CEU | Cross List | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Begin Time | End Time |
|------|-----|---------|--------|---------|---------------------|-----|------------|-----|-----|-----|-----|-----|-----|-----|------------|----------|

**Term:** 200708    **Registrations From Date:**    **Registration To Date:**
**ID:** 670220374   Barnes, Thomas H.

| | | | | | | | | N | | | P | | | | 1200 | 1350 |
| **Part of Term:** | | **Campus:** | | **Start Date:** 13-AUG-2007 | | | **Instructional Method:** | | | | | | | | | |
| **Grading Mode:** N | | **Building:** 0212 | | **End Date:** 03-DEC-2007 | | | | | | | | | | | | |
| **Credit Hours:** | | **Room:** 1148 | | **Instructor:** Machoski, Ginger E. | | | | Primary | | | | | | | | |

| 200708 | 81149 | SOCI | 3730 | A | RE | N | | | | | | | | | 1100 | 1215 |
| **Part of Term:** 1 | | **Campus:** A | | **Start Date:** 13-AUG-2007 | | | **Instructional Method:** | | | | | | | | | |
| **Grading Mode:** N | | **Building:** 0212 | | **End Date:** 03-DEC-2007 | | | | | | | | | | | | |
| **Credit Hours:** 3.000 | | **Room:** 1163 | | **Instructor:** Capece, Michael | | | | Primary | | | | | | | | |

**Co-op Education:**    **Total Credit Hours:** 10.000    **Total CEU Hours:** .000

LI08218780

FAll 2007

Registration Query GRAROOG 7.3.6 (POOD)

| Term: | 200708 | | Registration From Date: | | Registration To Date: | |
| ID: | 07D220374 | Barnes, Thomas H. | | | | |

**Registration**

| Term | CRN | Subject | Course | Section | Status | CEU | Cross List | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Begin Time | End Time |
|------|-----|---------|--------|---------|--------|-----|-----------|-----|-----|-----|-----|-----|-----|-----|-----------|----------|

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part of Term: | | Campus: | | Start Date: | | | Instructional Method: | | | | | | | | |
| Grading Mode: | | Building: | | End Date: | | | | | | | | | | | |
| Credit Hours: | | Room: | | Instructor: | | | | | Primary | | | | | | |

| 200708 | 81142 | SOCI | 3000 | A | RE | N | | | ✓ | | ✓ | | | | 1230 | 1345 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part of Term: | 1 | Campus: | A | Start Date: | 13-AUG-2007 | | Instructional Method: | | | | | | | | |
| Grading Mode: | N | Building: | 0212 | End Date: | 03-DEC-2007 | | | | | | | | | | |
| Credit Hours: | 4.000 | Room: | 1163 | Instructor: | Mechoski, Ginger E. | | | | Primary | | | | | | |

| | | | | | | N | | | | ✓ | | | | | 1200 | 1350 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part of Term: | | Campus: | | Start Date: | 13-AUG-2007 | | Instructional Method: | | | | | | | | |
| Grading Mode: | N | Building: | 0212 | End Date: | 03-DEC-2007 | | | | | | | | | | |
| Credit Hours: | | Room: | 1148 | Instructor: | Mechoski, Ginger E. | | | | Primary | | | | | | |

| Co-op Education: | | Total Credit Hours: | 10.800 | Total CEU Hours: | .000 |
|---|---|---|---|---|---|

LI08218780

FAll 05 (VSU)

## Term GPA

Institution or Transfer: [I]    Transfer Number: [ ]    Attendance Period: [ ]

| | Attempted Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Term: | 12.000 | 9.000 | 9.000 | 9.000 | 15.00 | 1.66 |
| Cumulative: | 73.000 | 74.000 | 68.000 | 67.000 | 123.00 | 1.83 |

## Institutional Courses

| Subject | Course | Title | Grade | Mode | Hours | Repeat | Campus |
|---|---|---|---|---|---|---|---|
| PHIL | 2010 | Fundamentals of Philosophy | W | N | 3.000 | | A |
| REL | 3520 | Islam | D | N | 3.000 | | A |
| REL | 4700 | World Religion & Human Rights | D | N | 3.000 | | A |
| GEOG | 3920 | Geography of the Middle East | B | N | 3.000 | | A |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

LI08218780

Current Classes

| Term | CRN | Subject | Course | Section | Registration Status | CEU | Cross List | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Begin Time | End Time |
|------|-----|---------|--------|---------|---------------------|-----|-----------|-----|-----|-----|-----|-----|-----|-----|------------|----------|

**Term:** 200702   **Registration From Date:** ☐   **Registration To Date:** ☐
**ID:** 870220374   Barnes, Thomas H.

Part of Term:    Campus:    Start Date:    Instructional Method:
Grading Mode:    Building:    End Date:
Credit Hours:    Room:    Instructor:    ☑ Primary

Part of Term:    Campus:    Start Date: 08-JAN-2007    Instructional Method:
Grading Mode: N    Building: 0029    End Date: 30-APR-2007
Credit Hours:    Room: 1023    Instructor: Ring, Brian C.    ☑ Primary    0930 1045

| 200702 | 20796 | BIOL | 2651 | F | RW | N | | | ☑ | | ☑ | | ☐ | | 1100 | 1150 |

Part of Term: 1    Campus: A    Start Date: 08-JAN-2007    Instructional Method:
Grading Mode: N    Building: 0029    End Date: 30-APR-2007
Credit Hours: 4.000    Room: 1011    Instructor: Karim, Mohammed F.    ☑ Primary

Co-op Education: ☐      Total Credit Hours: 17.000      Total CEU Hours: .000

LI08218780

*Current Classes*



*Withdrawn*

Registration Query SFAREGQ 7.0.2 (FROST)    16-APR-2007 01:45:...

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Term: 200702
ID: 070220374  Barnes, Thomas H.

Registration From Date:
Registration To Date:

**Registration**

| Term | CRN | Subject | Course | Section | Status | CEU | Cross List | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Begin Time | End Time |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

200702  21477  ANTH  1102  A  RW  N
Part of Term: 1    Campus: A    Start Date: 08-JAN-2007    Instructional Method:
Grading Mode: N    Building: 0212    End Date: 30-APR-2007
Credit Hours: 3.000    Room: 1161    Instructor: Childs, Stephen M.    ☑ Primary

Begin Time 0800  End Time 0850

200702  21538  SOCI  1101  A  RW  N
Part of Term: 1    Campus: A    Start Date: 08-JAN-2007    Instructional Method: H
Grading Mode: N    Building: 0212    End Date: 30-APR-2007
Credit Hours: 3.000    Room: 1171    Instructor: Lowney, Kathleen S.    ☑ Primary

Begin Time 0800  End Time 0915

Co-op Education: ☐    Total Credit Hours: 17.000    Total CEU Hours: .000

*4 classes*



**Search** [            ] [Go]

# Student AcademicTranscript

Lisa D. Copeland
Apr 20, 2007 09:36 am

🛈 This is not an official transcript. Courses which are in progress may also be included on this transcript.

Transfer Credit    Institution Credit    Transcript Totals    Courses in Progress

### *Transcript Data*
### STUDENT INFORMATION

**Name :**          Thomas H. Barnes
**Birth Date:**     Mar 13, 1985
**Student Type:**   Continuing
### Curriculum Information

**Current Program**
**College:**             College of Arts & Sciences
**Major and Department:** Sociology, Dept of
                          Soc/Ant/Crm

\*\*\*Transcript type:UN is NOT Official \*\*\*

### DEGREES AWARDED

**Sought:**   Bachelor of Arts   **Degree Date:**
### Curriculum Information

**Primary Degree**
**Major:**          Philosophy

### TRANSFER CREDIT ACCEPTED BY INSTITUTION     -Top-

**non-univ sr:**   Warren Wilson College

| Subject | Course | Title | Grade | Credit Hours | Quality Points | R |
|---------|--------|-------|-------|--------------|----------------|---|
| ART  | 1XXX | Bookforms I | F | 2.000 | | 0.00 |
| BIOL | 1050 | Human Biology | C | 4.000 | | 8.00 |
| ENGL | 1101 | Composition I | RA | 4.000 | | 16.00 |
| GEOG | 1100 | Introduction to Geography | B | 4.000 | | 12.00 |
| KSPE | 1020 | Weight Training | S | 1.000 | | 0.00 |
| KSPE | 1XXX | Outdoor Rec Act:Orienteering | S | 1.000 | | 0.00 |
| KSPE | 1XXX | Canoeing | S | 1.000 | | 0.00 |
| MATH | 1XXX | Math for Liberal Arts | D | 4.000 | | 4.00 |
| MGNT | 3XXX | Intro Non-profit Management | F | 4.000 | | 0.00 |
| POLS | 2XXX | International Relations | B | 4.000 | | 12.00 |
| POLS | 3XXX | ST:Law Among Nations | F | 4.000 | | 0.00 |

| | | | | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA | |
|---|---|---|---|---|---|---|---|---|---|---|
| PSYC | 2500 | Fundamentals of Psychology | D | | 4.000 | | | | | 4.00 |
| REL | 1XXX | Intro to Buddhism | B | | 4.000 | | | | | 12.00 |
| REL | 2XXX | ST:Chan/Zen Buddhism | C | | 4.000 | | | | | 8.00 |
| SCI | 1XXX | Intro to Environmental Studies | F | | 4.000 | | | | | 0.00 |
| SOCI | 1XXX | Social Justice Movements | A | | 4.000 | | | | | 16.00 |
| SOCI | 2XXX | ST:Societies:SE Asia | B | | 4.000 | | | | | 12.00 |
| SOCI | 2XXX | Environmental Sociology | D | | 4.000 | | | | | 4.00 |

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 61.000 | 58.000 | 47.000 | 58.000 | 108.00 | 1.86 |

Unofficial Transcript

Adv Placment: Advanced Placement

| Subject | Course | Title | Grade | Credit Hours | Quality Points | | R |
|---|---|---|---|---|---|---|---|
| ENGL | 1101 | Composition 1 | K | 3.000 | | | 0.00 |
| HIST | 1012 | History of Civ II | K | 3.000 | | | 0.00 |
| HIST | 2111 | US His to 1865 (e,US his) | K | 3.000 | | | 0.00 |
| HIST | 2112 | US His sn 1865 (e,US his) | K | 3.000 | | | 0.00 |

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA | |
|---|---|---|---|---|---|---|---|
| Current Term: | 0.000 | 12.000 | 12.000 | 0.000 | 0.00 | | 0.00 |

Unofficial Transcript

**INSTITUTION CREDIT     -Top-**

**Fall 2005**
**Student Type:**          Transfer
**Academic Standing:**     Probation

| Subject | Course | Level | Title | Grade | Credit Hours | Quality Points | Start and End Dates | R |
|---|---|---|---|---|---|---|---|---|
| GEOG | 3920 | US | Geography of the Middle East | B | 3.000 | 9.00 | | |
| PHIL | 2010 | US | Fundamentals of Philosophy | W | 3.000 | 0.00 | | |
| REL | 3520 | US | Islam | D | 3.000 | 3.00 | | |
| REL | 4700 | US | World Religion & Human Rights | D | 3.000 | 3.00 | | |

**Term Totals (Undergraduate-Semester)**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Current Term: | 12.000 | 9.000 | 9.000 | 9.000 | 15.00 | 1.66 |
| Cumulative: | 12.000 | 9.000 | 9.000 | 9.000 | 15.00 | 1.66 |

Unofficial Transcript

**TRANSCRIPT TOTALS (UNDERGRADUATE-SEMESTER)     -Top-**

| | Attempt Hours | Passed Hours | Earned Hours | GPA Hours | Quality Points | GPA |
|---|---|---|---|---|---|---|
| Total Institution: | 12.000 | 9.000 | 9.000 | 9.000 | 15.00 | 1.66 |
| Total Transfer: | 61.000 | 70.000 | 59.000 | 58.000 | 108.00 | 1.86 |
| Overall: | 73.000 | 79.000 | 68.000 | 67.000 | 123.00 | 1.83 |

Unofficial Transcript

**COURSES IN PROGRESS        -Top-**

Spring 2007
**Student Type:**              Continuing

| Subject | Course | Level | Title | Credit Hours | Start and End Dates |
|---------|--------|-------|-------|--------------|---------------------|
| ANTH | 1102 | US | Introduction to Anthropology | 3.000 | A   1 2 |
| BIOL | 2010 | US | Unifying Principles of Biology | 4.000 | C   4 |
| BIOL | 2651 | US | Human Anatomy/Physiology I | 4.000 | F   0 |
| MATH | 1111 | US | College Algebra | 3.000 | WITHDRAWN |
| SOCI | 1101 | US | Intro to Sociology | 3.000 | A   1 2 |

*14* *28*

**Unofficial Transcript**

Summer 2007
**Student Type:**              Continuing

| Subject | Course | Level | Title | Credit Hours | Start and End Dates |
|---------|--------|-------|-------|--------------|---------------------|
| ANTH | 3070 | US | Magic, Religion, and Withcraft | 3.000 | |
| SPAN | 1001 | US | Bg Spa Lng/Intr Hispnc Cult I | 3.000 | |
| SPAN | 1002 | US | Bg Spa Lng/Intr Hispnc Cult II | 3.000 | |

**Unofficial Transcript**

Fall 2007
**Student Type:**              Continuing

| Subject | Course | Level | Title | Credit Hours | Start and End Dates |
|---------|--------|-------|-------|--------------|---------------------|
| ANTH | 4040 | US | Sociocultural Change | 3.000 | |
| SOCI | 3000 | US | Soci Analysis/Statistical App | 4.000 | |
| SOCI | 3710 | US | Social Psychology | 3.000 | |

**Unofficial Transcript**

# RELEASE: 7.2

LI08218780



President Zaccari

The following is the information I received from Chuck Hudson, regarding T. Hayden Barnes:

Anthropology         B

Biology 2010         C

Biology 2651         C

Sociology 1101       B

Semester GPA 2.42


Institutional GPA  2.13 (from 1.66)


Overall GPA 1.93


Probation is based on Institutional GPA—therefore he is no longer on academic probation.

**Thressea H. Boyd**

**From:** Kevin Boyd [wlboyd@valdosta.edu]
**Sent:** Thursday, April 19, 2007 1:02 PM
**To:** 'Thressea H. Boyd'
**Subject:** Article

EXHIBIT
15
Faccari 7-29-09

Thressea,

I thought you might find this article from Today's issue of the New York Times informative.

Kevin

April 19, 2007

# Laws Limit Options When a Student Is Mentally Ill

By TAMAR LEWIN

Federal privacy and antidiscrimination laws restrict how universities can deal with students who have mental health problems.

For the most part, universities cannot tell parents about their children's problems without the student's consent. They cannot release any information in a student's medical record without consent. And they cannot put students on involuntary medical leave, just because they develop a serious mental illness.

Nor is knowing when to worry about student behavior, and what action to take, always so clear.

"They can't really kick someone out because they're writing papers about weird topics, even if they seem withdrawn and hostile," said Dr. Richard Kadison, chief of mental health services at Harvard University. "Most state laws are pretty clear: you can only bring students to hospitals if there is imminent risk to themselves or someone else, so universities are in a bit of a bind that way."

But, he said, some schools do mandate limited amounts of treatment in certain circumstances.

"At the University of Missouri, if someone makes a suicide attempt, they mandate four counseling sessions, for example," said Dr. Kadison, an author of "College of the Overwhelmed: The Campus Mental Health Crisis and What To Do About It."

Universities can find themselves in a double bind. On the one hand, they may be liable if they fail to prevent a suicide or murder. After the death in 2000 of Elizabeth H. Shin, a student at the Massachusetts Institute of Technology who had written several suicide notes and used the university counseling service before setting herself on fire, the Massachusetts Superior Court allowed her parents, who had not been told of her deterioration, to sue administrators for $27.7 million. The case was settled for an undisclosed amount.

4/19/2007

On the other hand, universities may be held liable if they do take action to remove a potentially suicidal student. In August, the City University of New York agreed to pay $65,000 to a student who sued after being barred from her dormitory room at Hunter College because she was hospitalized after a suicide attempt.

Also last year, George Washington University reached a confidential settlement in a case charging that it had violated antidiscrimination laws by suspending Jordan Nott, a student who had sought hospitalization for depression.

"This is a very, very difficult and gray area, when you take action to remove the student from the campus environment, versus when you encourage the student to use the resources available on campus," said Ada Meloy, director of legal and regulatory affairs at the American Council on Education. "In an emergency, you can share certain information, but it's not clear what's an emergency."

Ms. Meloy estimated that situations complicated enough to involve a university's lawyers arise, on average, about twice a semester at large universities.

While shootings like the one at Virginia Tech are extremely rare, suicides, threats and serious mental-health problems are not. Last year, the American College Health Association's National College Health Assessment, covering nearly 95,000 students at 117 campuses, found that 9 percent of students had seriously considered suicide in the previous year, and 1 in 100 had attempted it.

So mental health experts emphasize that, whatever a college's concerns about liability, the goal of campus policies should be to maximize the likelihood that those who need mental-health treatment will get it.

"What we really need to do is encourage students to seek mental health treatment if they need it, to remove any barriers to their getting help, destigmatize it, and make it safe, so they know there won't be negative consequences," said Karen Bower, a lawyer at the Bazelon Center for Mental Health Law in Washington, who represented Mr. Nott.

With the Virginia Tech killings, many universities are planning to remind faculty members of their protocols. "We're actually going to go ahead and have the counseling service here do a session for all our instructors and faculty on what to look for, what the procedures are, and what the counseling center can do," said Shannon Miller, chairwoman of the English department at Temple University.

At Harvard, Dr. Kadison said, dormitory resident assistants watch for signs of trouble, and are usually the first to become aware of worrisome behavior — and to call a dean.

"The dean might insist that they get an evaluation to make sure they're healthy enough to live in a dorm," he said. "If it's not thought that they're in any immediate danger, they can take or not take the recommendation."

Last month, Virginia passed a law, the first in the nation, prohibiting public colleges and universities from expelling or punishing students solely for attempting suicide or seeking mental-health treatment for suicidal thoughts.

"In one sense, the new law doesn't cover new territory, because discrimination against people with mental health problems is already prohibited," said Dana L. Fleming, a lawyer in Manchester, N.H., who is an expert on education law. "But in another sense, it's ground-breaking since it's the first time we've seen states focus on student suicides and come up with some code of conduct for schools."

College counseling services nationwide are seeing more use.

"We're seeing more students in our service consistently every year," said Alejandro Martinez, director for counseling and psychological services at Stanford University, which sees about 10 percent of the student body each year. "Certainly more students are experiencing mental illness, including depression.

4/19/2007

B000308

"But there's also been a cultural shift," Mr. Martinez said, "in that more students are willing to get help."

College officials say that a growing number of students arrive on campus with a history of mental-health problems and a prescription for psychotropic drugs. But screening for such problems would be illegal, admissions officers say.

"We're restricted by the disabilities act from asking," said Rick Shaw, Stanford's admissions director. "We do ask a question, as most institutions do, about whether a student has been suspended or expelled from school, and if they have been, we ask them to write an explanation of it."

Federal laws also restrict what universities can reveal. Generally, the Family Educational Rights and Privacy Act, Ferpa, passed in 1974, makes it illegal to disclose a student's records to family members without the student's authorization.

"Colleges can disclose a student's private records if they believe there's a health and safety emergency, but that health and safety exception hasn't been much tested in the courts, so it's left to be figured out case by case," Ms. Fleming said.

And the Health Insurance Portability and Accountability Act prohibits the release of medical records. "The interaction of all these laws does not make things easy," she said.

Home

4/19/2007

B000309

EXHIBIT
10
Zaccari 7-29-09

# Response to 'Parking decks to be built at VSU'

*This editorial was written by Taylor Seay and it expresses the opinion of the entire editorial staff.*



## Dear Editor:

We must look past our own selfish desires for more convenient parking options and examine the overlooked issues associated with the proposed parking decks.

I have a lot of questions about the parking deck plans which I would like to see answered and hope you will too.

1. Have there been any alternatives explored to building two large, expensive, and ugly parking decks on campus? Parking decks do not produce income and while they might aid in attracting students to our University who want to bring their vehicle to campus, they do not add to the academic value of the University. Parking decks are a waste of valuable University real estate. I think the decision to build these parking decks is going to be looked down upon by future generations who are going recognize them for what they are, a bad investment, a short-term solution to a long-term problem.

2. Has there been a study done assessing the impact of these parking decks on the local environment? Is there a plan to make these studies easily accessible to the University community or will they be filed away in a drawer over in Auxiliary Services? This is going to be one of the largest construction projects and biggest investments ever taken on by the university (yeah a parking deck, ironic, huh?) Construction waste, noise pollution, and increased car emissions all have to be taken into consideration, in addition to the destruction of habitat. While the rest of the world is cutting back and investing in innovative solutions to solve the climate crisis, VSU seems to be doing the opposite.

3. Speaking of which, have there been any initiatives to cut down on current vehicle usage: carpooling boards, extending the campus

bus system to outlying apartment complexes in the city, and dare I say, restricting cars?

Let me stop here and tell you a story. I survived my freshman year without a vehicle at a small college, 800 students, in the mountains of Western North Carolina. Rather than detracting from the college experience, it allowed me to build deeper relationships with those around me, including relationships with people I normally wouldn't hang out or party with. I think campus life would greatly benefit from fewer people leaving campus and greater investments in campus activities. Imagine what CAB could do with just $15,000—the price of one parking space. Can you say more laser tag? How many freshmen 'need' cars to work off-campus for the sole purpose of financing those cars?

4. Do we want to continue coming across as a commuter college? I think VSU has the potential to be a major economic engine for South Georgia and will host pioneering research one day. The question is, do we want to see that happen in five years or twenty? We have to make the tough decisions and investments now to see that come to fruition in the future.

5. Can't we all think of better ways to spend $30 million dollars on campus? I think you could think of a few off the top of your head right now. I was thinking building new dorms which use geothermal climate control, composting toilets, environmentally friendly building materials, gray water recycling, rain water collection, and permanent gardens. How about a food co-op or converting all the campus vehicles to bio-diesel? I would be happy to see remote parking lots for residents and an expanded bus system to begin to start, just like many other schools: the University of Vermont, University of Texas at El Paso, University of Texas at Austin, University of Southern Cal-

ifornia, Northwestern University, UC Santa Cruz, Arizona State University, University of Wyoming, University of Utah, and many, many more.

Why is the administration bowing to the whims of incoming freshmen, in terms of allowing them to bring vehicles to campus? We know incoming freshmen don't make very good decisions, that's why we have freshmen orientation, the counseling center, alcohol and drug education, and STD testing.

I call upon the Faculty Senate and SGA to press for answers to these questions and to ask its own.

I specifically call upon the SGA to rescind its support for the parking garages and the student fee increase until these issues can be further explored.

I call upon students, faculty, and staff to think about what you are willing to sacrifice for cleaner air, a more vibrant campus life, and a world-renowned University, sooner rather than later.

The ultimate decision to build these parking decks rests with the Board of Regents. Please direct your feedback to the Office of President Zaccari at 229-333-5952. T. Hayden Barnes

# Consider what others [Need a good laugh]

# THE VALDOSTA DAILY TIMES



EASY PAY   SUBSCRIBE

## Hopper Hall dedicated



**By Rabyn Ratliff**
The Valdosta Daily Times

June 25, 2008 02:38 am

— VALDOSTA — Valdosta State University's newest residence hall was formally dedicated Tuesday, as President Ronald M. Zaccari was joined in a ribbon cutting ceremony by representatives from the University System of Georgia, state legislators, university officials, students and members of the community.

The new four-story facility holds quite a presence on campus, standing four stories high in the center of a courtyard, framed by two towers. And completed in the same Spanish Mission theme of the campus, with lighted outdoor seating and landscaping, Hopper Hall is sure to be a meeting place of students and university visitors alike.

Inside the 157,354-square-foot building, which sits on just under 2.5 acres, the facility offers a number of modern amenities designed to fit the contemporary student.

"The new facility bears little resemblance to the previous structure and boasts 513 beds in suite-style rooms that offers today's contemporary students a leading-edge living and learning environment," said President Ronald Zaccari.

In addition to its suite-style rooms, the facility also offers an 188-seat Euro-style show kitchen, campus mailroom, office space, as well as classroom stations and other facilities.

"The student really does not have to leave this facility to get his/her education," said Rob Kellner, director of Auxiliary Services.

The project is funded through a public venture within VSU's Auxiliary Services Real Estate Foundation, Inc. Construction of the $21.9 million building was performed by Juneau Construction under the direction of the Ambling University Development Group beginning fall 2007.

Springing up during a season of renewal and growth, lead by Zaccari over the past six years, Hopper Hall is only one of many capital projects which mark a milestone along the path toward reaching the university vision.

"The Hopper Hall replacement is the first of eight projects scheduled to be completed within the next two years, representing an excess of $150 million in capital construction," said Kellner.

In 2002, VSU's master plan strategically identified the need to increase on-campus housing to accommodate an expected enrollment of 16,000 by 2020. Since then, Zaccari, who will retire at the end of this month, has been working to prepare the university for that day.

In honor of Zaccari's efforts during his tenure to see the invisible, and partnering efforts to bring those visions to pass, Juneau Construction and the Ambling Company honored the leader through an appreciation endowment, by establishing the Ronald M. Zaccari Presidential Lecture Series.

"Our gift is primarily to honor the legacy of Dr. Zaccari and his great vision and thank him for the professional courtesy we have been extended during our time on campus," said Les Juneau, President of Juneau Construction.

The goal is grow the endowment to a minimum of $250,000, which will allow interest earned annually to support expenses associated with hosting guest speakers. Currently the endowment contains more than $125,000 in gifts and pledges, including many individual contributions.

Although Tuesday's ceremony was Zaccari's last while serving as president of the university, he looks forward to continuing his relationship with the college through the lecture series and other university events.

"I am honored that the Presidential Lecture Series will continue to grow and provide a venue for scholars,



HOME DELIVERY | SUBSCRIBER SERVICES | CONTACT US        SITE MAP  Buy a  classified        Fri, Jul 24 2009

# The Valdosta Daily Times.com



Currently

**76**
H: 91 L: 69

Click for more weather



travelocity

HOMEPAGE | CLASSIFIEDS | BUY A CLASSIFIED | LOCAL NEWS | LOCAL SPORTS | SPECIAL SECTIONS | JOBS | WHEELS | OBITUARIES | CELEBRATIONS | SGA SAVINGS |
PUBLIC NOTICES | REAL ESTATE | PHOTO GALLERY | FREE COUPONS | SHARE THE MOMENT | WHAT'S ON TV? | GAS PRICES | PERSONALS |

Local Sports | Business | Obituaries | Weather |



Pat Gallagher/The Valdosta Daily Times
**None /**



ROYAL BUFFET
229-219-9828
CLICK HERE



Zillow.com
Your Edge In Real Estate



monster
Coast to Coast. Around the Corner



Find your perfect car

Select A Make        Search



Classic Car Search (pre-1985)

Powered by            Search

**Find a business:**
Business name or type...
**Location:**
Valdosta, GA

Maps, Menus, Store hours,
Coupons, and more...

SEARCH



Tribune



Kid Scoop

Save over $80
This Sunday's Edition!

**TOP JOBS**

Immediate opening,
**EXPERIENCED USED
CAR TECHNICIAN**
Top Pay + full benefits. Langdale Honda
(Formerly Sunny Honda). 229-242-3835,
Lee MORE >>

Drivers/Flatbed
**HOME EVERY
WEEKEND!**
Earn Up to 37¢/mi
• 401K: 50% Company Match!
• BCBS Ins. (Med, Dental, Vision)
• 50% Preloaded & MORE >>

View All Employment Ads

distinction for 23 years (1978-2001).

"Under Dr. Bailey's leadership, VSU experienced tremendous growth in enrollment, faculty, staff, and facilities," said current VSU President Dr. Ronald M. Zaccari. "Naming the Science Center after Dr. Bailey is a fitting tribute to a man who served VSU's students, faculty, staff, alumni and the community throughout the majority of his higher education career. Dr. Bailey has a profound sense of identification with the Biology/Chemistry Building," he added.

Construction of new facilities during Bailey's tenure exceeded $60 million, including the $22.4 million Biology/Chemistry Building. The 148,165 square-foot facility features a three-story atrium, 22 teaching and 19 research laboratories, two greenhouses, 11 classrooms, two auditoriums, two conference rooms, and 41 offices. The facility is designed to exemplify the concept that science is accessible, students are welcomed, and faculty and students are engaged in doing science.

Dr. Bailey has been recognized for his commitment to quality design and specifically his dedication to preserving the institution's unique Spanish Mission style of architecture. In his retirement, he and his wife Joan live in the city of Valdosta.

VSU officials are planning a formal naming ceremony for the 'Hugh C. Bailey Science Center' as part of the Centennial events during Spring Semester 2006, upon completion of the new Pedestrian Mall which will surround the building.





EXHIBIT
18
Zaccari 7-29-09

**Ronald M. Zaccari**
*Office of the President*

May 7, 2007

Mr. T. Hayden Barnes
VSU Box 8106
Valdosta, GA 31698

Dear Mr. Barnes:

As a result of recent activities directed towards me by you, included but not limited to the attached threatening document, you are considered to present a clear and present danger to this campus. Therefore, pursuant to Board of Regents' policy 1902, you are hereby notified that you have been administratively withdrawn from Valdosta State University effective May 7, 2007.

Provided that you satisfy any and all necessary academic requirements at that time of application, your readmission to this University and continued enrollment at this institution is conditioned upon your submitting the following:

1. A correspondence from a non-university appointed psychiatrist indicating that you are not a danger to yourself and others.

2. Documentation from a certified mental health professional indicating that during your tenure at Valdosta State you will be receiving on-going therapy.

Generally, decisions of the University may be appealed to my office. However, because this matter directly concerns me, should you elect to appeal my decision, you should submit your written appeal within twenty (20) days of receipt of this letter to the Board of Regents at the following address:

Board of Regents of the University System of Georgia
270 Washington St. S.W.
Atlanta, Georgia 30334

Sincerely,

Ronald Zaccari
President

Profile  edit   Friends      Networks    Inbox (3)          home  account  privacy  logout

## Hayden Barnes' Photos – Creative Genius

Photo 1 of 1 | Back to Album | See Hayden's Profile





Share        Added April 13

From the album:
"Creative Genius" by Hayden
Barnes

Tag This Photo
Report This Photo

**Search**

Photos
Notes
Groups
Events
Posted Items

**Who's on Facebook?**
Check your address book.

careerbuilder.com

**Search over
a million jobs**

**A better job awaits.**

careerbuilder.com

Facebook © 2007                          about  developers  jobs  advertisers  terms  privacy  help

To: rzaccari@valdosta.edu
Subject: Fwd: Re: Student Appeal



Dr. Zaccari,
Please see below. Whenever your schedule permits, I would like to discuss the matter with you. Laverne

> Date: Thu, 26 Apr 2007 17:41:11 -0400
> From: Betsey Neely <Betsey.Neely@usg.edu>
> Subject: Re: Student Appeal
> To: Laverne Lewis Gaskins <llgaskins@valdosta.edu>
> X-Accept-Language: en-us, en
> User-Agent: Mozilla Thunderbird 1.0 (Windows/20041206)
> X-IronPort-Anti-Spam-Filtered: true
> X-IronPort-Anti-Spam-Result: AgAAAAy5MEaoGFEoh2dsb2JhbACQEgEBAQgOKg
> X-IronPort-AV: i="4.14,457,1170651600"; d="scan'208";
>  a="55253264:sNHT40958172"
> X-USG-MailScanner: Found to be clean
> X-USG-MailScanner-SpamCheck:
> X-MailScanner-From: betsey.neely@usg.edu
> X-Sophos-ESA: [es4000.valdosta.edu] 1.69, Antispam-Engine: 2.5.1.298073,
>  Antispam-Data: 2007.4.26.142334
> Original-recipient: rfc822;llgaskins@valdosta.edu
>
> In this case, the appeal should be directed straight to our office. It is not good practice for the President to be bringing a complaint against any student. That should be handled by staff in Student Affairs. Once the President has made a decision in a matter, there is no due process at the campus level.
>
> Laverne Lewis Gaskins wrote:
>
>> Today, Dr. Zaccari directed me to pose to you the following question to you.
>>
>> Our appeal process provides that decisions of the judicial board may be appealed to the President.
>> In the event the President files a complaint against a student for a violation of the Student Code of Conduct and the student wishes to file an appeal, should the appeal go directly to your office (BOR) or should the president appoint a designee (i.e. Dr. Levy)?
>>
>> Give me a call should you have any questions. See you tomorrow. Thank you. Laverne
>>
>>
>> Laverne Lewis Gaskins, M.Ed, J.D.
>> University Attorney
>> Office of Legal Affairs
>> Valdosta State University
>> 333-5351
>>
>> This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are

not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by telephone and permanently delete the original and any copy of any e-mail and any printout thereof.

Laverne Lewis Gaskins, M.Ed, J.D.
University Attorney
Office of Legal Affairs
Valdosta State University
333-5351

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by telephone and permanently delete the original and any copy of any e-mail and any printout thereof.

LI08218780
FROM EXTERNAL ACTIVITIES & FACILITIES          (TUE) 5. 1'07 19:09/ST. 19:08/NO. 4870102061 P  1




EXHIBIT
20
Zaccari T:29:09

# FAX COVER LETTER

**To:**            Ms. Laverne Gaskins

**Company:**        Valdosta State University

**Fax Number:**     229-245-6631    247-2687

**From:**           Elizabeth Neely
                Office of Legal Affairs
                Board of Regents – University System of Georgia

**Fax:**            404-651-9301

**Phone:**          404-656-2221

**Date:**           May 1, 2007

**Time:**

**No. pages:**      4

**Comments:** Per our discussion

The information contained in this fax message is intended only for the use of the individual
noted above. If you have received this copy I n error, please notify us immediately.
**BOARD OF REGENTS,** 270 Washington Street, S.W., Atlanta, Georgia  30334
Phone: 404-656-2221      Fax: 404-651-9301

which there is a learning support prerequisite unless they have been screened for and have exempted the relevant learning support course. (BR Minutes, February 2004)

b. Institutions may permit students who have earned the baccalaureate degree from a regionally accredited institution to enroll as non-degree students in courses with no limitation on the number of hours of undergraduate credit these students can earn.

## 402.0204 ADMISSION OF TRANSIENT STUDENTS

An applicant who is enrolled in one college or university and who wishes to take courses temporarily in another college or university shall submit the documents outlined in the Academic Affairs Handbook.

## 402.0205 ADMISSION OF AUDITORS

Students who submit evidence of graduation from a high school as specified in Section 402.0101 or a GED certificate may register as auditors. Under extraordinary circumstances, the president may waive the requirement of high school diploma or equivalent. Students registered as auditors shall be required to pay the regular tuition and fees for enrollment.

## 402.03 ADDITIONAL ADMISSIONS POLICIES

### 402.0301 IN GENERAL

In addition to the general admissions policies described above, each unit of the University System may increase the requirements, entry levels, and/or testing procedures for general admission to the institution or to special programs at the undergraduate or graduate levels provided they do not conflict with University System of Georgia policies. Institutions should make available appropriate admissions information to students.

### 402.0302 REFERRAL OF STUDENTS TO OTHER INSTITUTIONS

Institutions should actively assist Georgia applicants who have been denied admission to find another institution which more appropriately matches their academic credentials.

### 402.0303 RIGHT TO REFUSE ADMISSION

An applicant may be declared eligible for admission, registration, enrollment or re-enrollment at a University System institution only after satisfying all requirements established by the University System of Georgia and the institution concerned. The institution shall have the right to examine and appraise the character, personality and qualifications of the applicant. In order that this examination and appraisal may be made, the applicant shall furnish to the institution such biographical and other information, including references, as may be required.

Each unit of the University System reserves the right to refuse admission to a non-resident of Georgia, to an applicant whose admission would cause the institution to exceed its maximum

LI08216780

FROM EXTERNAL ACTIVITIES & FACILITIES          (TUE) 5. 1'07 19:09/ST. 19:08/NO. 4870102061 P 3



### BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA
244 WASHINGTON ST., S. W.
ATLANTA, GEORGIA 31334

HENRY G. NEAL
EXECUTIVE SECRETARY
656-2231

August 11, 1983

## M E M O R A N D U M

TO:     Presidents,
        University System of Georgia

From:   Henry G. Neal
        Executive Secretary

Re:     Medical Withdrawal Policy

We are frequently asked to advise institutions on matters involving mental health problems which pose a danger to students or others on the campus. ~~There is no clear cut~~ ~~~~

The enclosed suggested language has been prepared for your use in adopting a medical withdrawal policy. Such a policy (not necessarily this one) should be adopted or approved by your faculty pursuant to authority granted by the Board (Policy Manual § 203.0305) and incorporated into appropriate institutional documents such as the catalogue and student handbook.

In the event publication deadlines for your catalogue or handbook make it necessary or advisable, you may want to publish the enclosed language in your 1983-84 publications or supplements and make revisions as necessary following faculty approval.

Please note that this policy does not provide for the procedure to be followed for involuntary withdrawal. ~~~~ply ~~~~. Please contact me if such a hearing becomes necessary or if you have any questions concerning this policy.

HGN/mpoe
enclosure

cc:   Chancellor Vernon Crawford

LI08218780

FROM EXTERNAL ACTIVITIES & FACILITIES          (TUE) 5. 1'07 19:09/ST. 19:08/NO. 4870102061 P 4

## PROPOSED LANGUAGE
### FOR STUDENT MEDICAL WITHDRAWALS

A student may be administratively withdrawn from the collage when in the judgment of ~~the~~ ~~college~~ Physician, if any, and after consultation with the student's parents and personal physician, if any, it is determined that the student suffers from a physical, mental, emotional or psychological health condition which: (a) poses a significant danger or threat of physical harm to the student or to ~~the property of others~~ or (b) causes the student to interfere with the rights of other members of the college community or with the exercise of any proper activities or functions of the college or its personnel or (c) causes the ~~student to maintain the~~ institutional requirements for ad~~mission and~~ continued enrollment, ~~as set out in the~~ student ~~conduct code~~ and other publications of the college.

~~Except in emergency situations~~, a student shall, upon request, be accorded an appropriate hearing prior to final decision concerning his or her continued enrollment at the college.

To: rzaccari@valdosta.edu
Cc: thboyd@valdosta.edu



Dr. Zaccari,

Per your request, please see below. Laverne

As a result of recent activities directed towards me by you, included but not limited to the attached threatening document, you are considered to present a clear and present danger to this campus. Therefore, pursuant to Board of Regents' policy 1902, you are hereby notified that you have been administratively withdrawn from Valdosta State University effective May 7, 2007.

Provided that you satisfy any and all necessary academic requirements at that time of application, your readmission to this University and continued enrollment at this institution is conditioned upon your submitting the following.

1. A correspondence from a psychiatrist or psychologist indicating that you are not a danger to yourself and others.
2. Documentation from a certified mental health professional indicating that during your tenure at Valdosta State you will be receiving on-going therapy.

Generally, decisions of the University may be appealed to my office. However, because this matter directly concerns me, should you elect to appeal my decision, you should submit your written appeal within twenty (20) days of receipt of this letter to the Board of Regents at the following address.

Board of Regents of the University System of Georgia
270 Washington St. S.W.
Atlanta, Georgia 30334

Sincerely,

Dr. Ronald Zaccari

Laverne Lewis Gaskins, M.Ed, J.D.
University Attorney
Office of Legal Affairs
Valdosta State University
333-5351

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the

file://C:\DOCUME~1\llgaskin\LOCALS~1\Temp\end3E.htm                                5/7/2007

intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by telephone and permanently delete the original and any copy of any e-mail and any printout thereof.

B000112

LI08218780





EXHIBIT
22
Zaccari 7-29-09

## MEMORANDUM

TO:       Dr. Ronald Zaccari, President

FROM:     Laverne Lewis Gaskins, University Attorney

DATE:     May 4, 2007

Please find below the proposed letter. You should note that due process dictates that the student be apprised of what particular policy has been violated, an opportunity to be heard and also be informed of the appeal process. My research has led me to the following policies that appear to be implicated. I have attached the same for your review and consideration.

Valdosta State Student Code of Conduct
E.(7)  Disorderly Conduct
Mental Health Withdrawal

Board of Regents Policy 1902
Disruptive Behavior

DRAFT          DRAFT          DRAFT

As a result of recent activities directed towards me by you, included but not limited to the attached threatening document, you are considered to present a clear and present danger. Therefore, you are hereby notified that you have been administratively withdrawn from Valdosta State University effective May 6, 2007.

Provided that you satisfy any and all necessary academic requirements at that time of separation, your readmission to this University and continued enrollment at this institution is condition upon your submitting the following.

1. A correspondence from a psychiatric or psychologist indicating that you are not a danger to yourself and others.
2. Documentation from a certified mental health professional indicating that during your tenure at Valdosta State you will be receiving on-going therapy.

LI08218780

Generally, decisions of the University may be appeal to my office. However, because this matter directly concerns me, should you elect to appeal my decision, you should submit your written appeal within twenty (20) days of receipt of this letter to the Board of Regents at the following address.

Board of Regents of the University System of Georgia
270 Washington St. S.W.
Atlanta, Georgia 30334

Sincerely,

Dr. Ronald Zaccari

H. Barnes 1



VALDOSTA
S T A T E
UNIVERSITY
*Building for Our Next Century*
*190* May 8, 2007



EXHIBIT
23
Zaccari 7-29-09

Board of Regents of the University System of Georgia
270 Washington St. S.W.
Atlanta, GA 30334

Office of the President
Valdosta State University
1500 N. Patterson St.
Valdosta, GA 31698

**Re:    Thomas "Hayden" Barnes, VSU Student ID No. 8702203740**

Dear President Zaccari & Board of Regents Members:

Please be advised I have been asked by Mr. Hayden Barnes to write a letter on his behalf regarding his therapeutic treatment with the Valdosta State University Counseling Center. Enclosed is the Consent to Release Mr. Barnes signed in order for our office to disclose such information and documentation to you.

I began seeing Hayden as his Counselor in September 2005. Following the completion of Fall semester 2005, Hayden transferred from VSU to attend Paramedic School at the Rescue Training Facility of Savannah (uncertain correct name of said school). He attended said program from January 2006 to September 2006, where he completed his certificate and became certified. After completion of said program, Hayden returned to VSU, Spring 2007 and I began seeing him again in February 2007. In Spring semester 2007, I have seen Hayden a total of nine sessions; this total does not reflect phone calls with Mr. Barnes and/or his Psychiatrist, Dr. Kevin J. Winders, concerning his treatment.

It is my understanding that Mr. Barnes has been diagnosed previously by Dr. Winders with Generalized Anxiety Disorder, Panic Disorder with Agoraphobia, and mild ADHD symptoms; however, he did not meet full criteria for proper diagnosis of ADHD. In the past few months, I began seeing other behaviors that concerned me and I wanted to explore and observe further. I became concerned that Hayden could be decompensating and made contact with Dr. Winders to process treatment concerns. It was about this same time, that Hayden began to have issues with the administration at VSU.

Some of the behaviors I was concerned with, but not limited to, were: impulsive behavior, obsessive behavior and thoughts, grandiose ideologies, narcissistic behavior and thought pattern, "up and down" periods which could have been related to possible manic and depressive periods, severe anxiety, mood shifts, and absolute thinking. I met

**Counseling Center**
*Division of Student Affairs*
**Location** Powell Hall–East• **Address** 1500 N. Patterson St • Valdosta, GA 31698–0166
**Phone** 229.333.5940 • **Fax** 229.333.7169 • **Web** www.valdosta.edu/counseling
A Regional University of the University System of Georgia & an Equal Opportunity Institution

with Hayden and discussed my concerns. In addition, I spoke with Dr. Winders to discuss a possible change in diagnoses and medications. I suggested Hayden be reevaluated by Dr. Winders to address present concerns.

Hayden was reevaluated on May 1, 2007 by Dr. Winders and I have attached a copy of the letter that Dr. Winders sent me regarding this reevaluation. Dr. Winders has increased Hayden's medication to Lexapro, 15 mg, 1x daily, Gabitril, 4 mg, 1x daily, and Xanax as needed. It is my understanding that Hayden will continue treatment with Dr. Winders and if said behaviors are observed he may suggest another change in medications.

As far as your concern, I have seen the documentation and processed the behavior that has the President of VSU concerned for not only his own safety but the safety of others. I have discussed these issues directly with Mr. Barnes. As far as I am aware, Mr. Barnes has never acted out violently in his past or in the present. Mr. Barnes has contracted safety with me and discussed no suicidal or homicidal ideologies. Mr. Barnes has stated numerous times that he has not had nor does have any intentions to harm the President of VSU, others, or himself. He has been extremely apologetic that his behavior has frightened anyone. Hayden does admit to coping with stress and his political agendas inappropriately and will continuing working on reducing his anxiety and learn how to appropriately resolve conflict.

As you are aware, I cannot continue to see Hayden as his Counselor while he is no longer a student at VSU. However, if Hayden returns to VSU in the future, I will be more than willing to continuing seeing him in the VSU Counseling Center. In addition, I can refer Hayden to be monitored by our onsite consulting Psychiatrist to confirm that he is complying with said conditions and his mental state is stable.

It is my professional opinion after assessing Hayden that he is not a threat, indirectly or directly to anyone on the VSU Campus (i.e. President, staff, faculty, students, others, or self). Thank you for your time and assistance in this matter. Please contact my office if you have any questions or comments.

Respectfully Submitted,

Leah McMillan, L.M.F.T.
VSU Counseling Center

Cc:   Mr. Hayden Barnes

LI08218780

EXHIBIT
24
*[handwritten, illegible] 7-28-09*

# $\mathbf{P}$C

## Psychiatric Consultants, P.C.

515 E. 63rd St. • Suite 1 • Savannah, GA 31405 • Telephone (912) 352-2921 • Fax (912) 352-1038

Arnold J. Tillinger, M.D.
Emmet R. Bishop, Jr., M.D.
Kevin Winders, M.D.
Nancy Eschette, Ph.D.
Elizabeth Kitchens, Ph.D.
Cecil Barnes, ACSW, LCSW
Maria Coughenour, LPC
Carol A. McGee, M.A.

To:      Office of the President
         Valdosta State University
         Fax: 229-333-5952

From:  Kevin Winders, MD

Re:      Thomas "Hayden" Barnes

Dear Sir,                                                              May 8, 2007

    Hayden contacted me last night to inform me that he has been expelled from school. I was surprised to hear this, as I have been in contact with Leah McMillan, a counselor at your university, and she gave me no indication that expulsion was planned. In fact, I conducted an evaluation of Hayden on April 30, 2007, at her request and felt he was not a threat to harm himself or anyone else. As a precautionary step, I gave her options for a second opinion. Again, I am surprised that this action was taken with a good report from me and no further evaluation to contradict my findings. I understand that the "post Virginia Tech" period is difficult for all universities. I also understand that the university is not bound by my recommendations. However, Hayden had the insight to "drop" the anti parking garage campaign after the Virginia Tech tragedy, and I am not aware of any specific threats made by him.

    I am including my correspondences with Leah McMillan, so you have some background information. To make a full evaluation of Hayden, I would need to see your evidence that he is a threat. However, based on the information I have at this point, I think Hayden's main issue is being obsessive. It is impossible to predict the future, but I don't think he is violent or any more of a threat to harm someone than any other student.

    I support Hayden's effort to be re-enrolled in school to at least finish this semester.

Sincerely,

*[signature]*

Kevin Winders, MD



EXHIBIT
25
Zaccari 7-29-09

**Ronald M. Zaccari**
Office of the President

VALDOSTA
S T A T E
UNIVERSITY
*Building for Our Next Century*
*1906-2006*

# MEMORANDUM

**To:**   Mr. James Black, Vice President for Finance and Administration
Mr. Scott Doner, Director of University Police
Dr. Thomas Hardy, Director of Housing
Mr. Chuck Hudson, Registrar
Dr. Kurt Keppler, Vice President for Student Affairs
Dr. Louis Levy, Vice President for Academic Affairs
Mr. Russ Mast, Dean of Students

**From:**   Ronald M. Zaccari

**RE:**   Administrative withdrawal of Mr. Thomas Hayden Barnes
VSU Student ID #870220374

**Date:**   May 9, 2007

Effective May 9, 2007 Mr. Thomas Hayden Barnes, VSU student, has received notification that he has been administratively withdrawn as a Valdosta State University student. Mr. Barnes will be given 48 hours to vacate (5 p.m. May 11, 2007) form Converse Residence Hall and his entire May semester courses dropped without penalty. He is to receive full refund for housing, meal plans, and other charges.

**Location** 117 West Hall • **Address** 1500 N. Patterson St. • Valdosta, GA 31698–0180
**Phone** 229.333.5952 • **Fax** 229.333.7400 • **Web** www.valdosta.edu • **E-mail** rzaccari@valdosta.edu
A Regional University of the University System of Georgia & an Equal Opportunity Institution



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THOMAS HAYDEN BARNES,    )
                            )
      Plaintiff,          )
                            )
     v.                )      Civil Action File No.:
                            )      1:08-CV-0077-CAP
RONALD M. ZACCARI, *et al.*,    )
                            )
      Defendants.       )

## DEFENDANT RONALD M. ZACCARI'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT RONALD M. ZACCARI

COMES NOW Defendant Ronald M. Zaccari, by and through the undersigned counsel, and submits the following objections and responses to Plaintiff's First Interrogatories and Requests for Production of Documents to him:

### PRELIMINARY STATEMENT

Defendant's response to Plaintiff's First Interrogatories and Request for Production of Documents has been prepared in full compliance with the Federal

Rules of Civil Procedure, pursuant to a reasonable and duly diligent search for information properly requested. To the extent that Plaintiff's requests attempt to require Defendant to obtain information not in his possession, custody or control, Defendant objects to the requests as seeking to compel Defendant to conduct a search beyond the scope of permissible discovery contemplated by the Federal Rules of Civil Procedure and as imposing an undue burden and expense on Defendant.

Defendant reserves all rights to object regarding the confidentiality, relevancy, materiality, or admissibility of the information and documents disclosed pursuant to Plaintiff's First Interrogatories and Requests for Production of Documents. Defendant has not completed preparation for the trial of this matter, and the information provided is without prejudice to Defendant's rights to make further objections and present additional information and documents which are hereafter learned that are relevant to this action and called for by Plaintiff's First Interrogatories and Requests for Production of Documents.

Defendant does not concede that any of the responses and/or documents that are produced pursuant to this request will be admissible evidence at trial.

Further, Defendant does not waive any objections, whether or not stated herein, to Plaintiff using such responses and/or documents at trial.

## GENERAL OBJECTIONS

1.

This Defendant objects to the Instructions set out in Plaintiff's Interrogatories and Requests for Production of Documents to the extent that they impose greater actions or duties than those required by the Federal Rules of Civil Procedure.

2.

Defendant objects to the Plaintiff's Interrogatories and Requests for Production of Documents to Defendant to the extent that the Plaintiff seeks to obtain information that is protected by the attorney-client privilege or attorney work product doctrine.

3.

Defendant objects to the Plaintiff's Interrogatories and Requests for Production of Documents to Defendant to the extent that the Plaintiff seeks information and documents prepared in anticipation of litigation or for use at trial by Defendant and his attorneys.

4.

Defendant objects to Plaintiff's Interrogatories and Requests for Production of Documents to Defendant to the extent that Plaintiff seeks to obtain information that will not be admissible at trial and which is not reasonably calculated to lead to the discovery of admissible evidence.

5.

Defendant objects to Plaintiff's Interrogatories and Requests for Production of Documents to Defendant as they are overly broad, unduly burdensome, oppressive and expensive.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

Without waiving the above-referenced objections, Defendant responds to the numbered Interrogatories and Requests for Production of Documents as follows:

### INTERROGATORIES

INTERROGATORY NO. 1:   Identify each person having discoverable information that you believe supports a position that You have taken or intend to take in this action, and set forth the subject matter of the information possessed by that person.

**RESPONSE:**       Defendant Zaccari objects to this Interrogatory on the grounds that it seeks the discovery of mental impressions and legal theories concerning this litigation that request this Defendant to draw legal conclusions for the benefit of the Plaintiff, which exceeds the scope of permissible discovery.   Subject to the foregoing objection, and without waiving same, this Defendant answers as follows:

In addition to the named Defendants, the following individuals may have discoverable knowledge:

- Dr. Louis Levy, VSU VP for Academic Affairs

- Mr. James Black. Former VSU VP for Finance and Administration

- Ms. Thressea Boyd, VSU Assistant to the President

- Ms. Melinda Cutchens, VSU Senior Administrative Secretary to the President

- Ms. Elizabeth E. Neely, Board of Regents, Office of Legal Affairs

- Ann Farmer, VSU Police

**Each of the above individuals can attest to my genuine concern for campus safety and were aware of my daily actions prior to and following the VT shootings and related aftermath.**

INTERROGATORY NO. 2: If You intend to rely upon any documents or other tangible things to support a position that You have taken or intend to take in the action, provide a brief description, by category and location, of each such document and other tangible thing, and identify all persons having possession, custody, or control of them.

**RESPONSE:    I intend to rely on all documents produced by the university, by the Board of Regents, or by any other Defendant which tends to support my decision to withdraw the Plaintiff. I also intend to rely on any and all documents tendered as an exhibit in any deposition held for this civil action with supports by decision to withdraw the Plaintiff. As I am no longer an employee of the university and do not have direct possession of any such documents.**

INTERROGATORY NO. 3: Identify and describe all communications between You and any Person concerning any matter alleged in the Complaint.

<u>RESPONSE</u>:

- On or about April 16, 2007, I received a telephone call from Vice Chancellor Linda Daniels asking about the background related to a protest of the proposed parking decks. Her inquiries were based on the contacts initiated by the Plaintiff and directed to the University System of Georgia, Board of Regents, and Governor's Office. She was asking for background information on the Plaintiff and a physical description. At that time, I had no information on the student and had never met him. There was concern that the Plaintiff may attempt to protest the parking decks at the scheduled BOR meeting, April 17 and 18, 2007.

- Communication from Elizabeth E. Neely, Assistant Vice Chancellor for Legal Affairs, dated May 30, 2007. The letter stated the Plaintiff had filed an appeal to the Board of Regents. The letter requested my response to four inquiries, due no later than June 29, 2007. I complied with the request within the allotted time and submitted my responses to the BOR Legal Affairs Office. I do not have a copy of my response, but believe it was dated June 11, 2007.

- I object to any communications that I had with Ms. Gaskins, on the grounds of the attorney/client privilege.

INTERROGATORY NO. 4: To the extent you contend that Plaintiff was a threat to You or VSU campus security, set forth all bases for this claim identify any communications supporting your contention, and name the sources of such communications, the date, time and substance of such communications, and all witnesses thereto.

**RESPONSE:** **The Virginia Tech massacre elevated national awareness and concern about campus safety. It became one of the most pressing and highly accelerated issues in the history of higher education. It forced a greater analysis and interpretation of "crisis." In the week following the VT shootings, campuses were seeking benchmarking for steps to be taken that might prevent such event. Since April 16, 2007, much has been written about expecting the unexpected, and a heightened awareness has been generated to include many sound recommendations and development of improved intervention plans. Unfortunately, VSU did not have the benefit of the intense study and subsequent recommendations at the time when the Plaintiff began his display of questionable behavior. There was no precedent or exact procedure to follow.**

There were continued concerns and questions raised about what could have been done at VT to prevent the tragedy. The concerns became reality when additional campus shootings resulted in the loss of life. The main question:  when do you know when a student is potentially dangerous? What are the warning signs? My communications with Leah McMillan about the Plaintiff's patterns of behavior – psychological concerns, missed appointments, checking himself into a mental hospital, medications, and anxiety attacks were all taken into consideration. Furthermore, you look for warning signs such as serious grade problems; characteristics that the student is having trouble managing stress; repeated behavior that the student steps outside the usual decorum that triggers interference with the daily management of the campus; request for special consideration; questionable communication such as e-mail messages, and letters which may have threatening undertones. When a student is in the individual classroom and disrupts the instructional activity, the student will be removed because the faculty must follow the class syllabus, teach, and be responsible for other enrolled students.   When a student's behavior becomes disruptive and questionable to the operations of the university, similar type of sanctions must be imposed.   There is a standard of

expectation for students' conduct. When such conduct falls below a level of expectation, it purposely affects and interferes with the work performance and spins into an intimidating, hostile, and environment of harassment.

I have been in higher education for 44 years and 36 of those were dedicated to administrative/management positions. My analysis of Plaintiff's circumstances led me to believe that the Plaintiff was like no other student I had met and after the initial meeting, my levels of concern were increased. I had the primary duty to protect the University. The Plaintiff had serious academic problems at previous institutions and transferred to VSU with questionable grades to meet the entrance criteria. By most standards, he should have been denied entrance to VSU; however, the Admissions Office requested a probationary acceptance and it was granted through the VP for Academic Affairs. In his letter of admission to VSU, the Plaintiff stated he had other problems at previous campuses which caused the low grade point average, but he was going to function differently at VSU. As the end of the 2007 Spring semester approached, he was in danger of failing to complete the necessary gpa to remain enrolled at VSU. When he left VSU at the end of 2007 Spring Semester, his overall gpa did not reach 2.0.

The Plaintiff needed help and my letter directed him to seek that help if he wished to reenter VSU. I stated that he not be enrolled in the 2007 Summer Session. His academic work will continue to be a problem if he continues on the current path. A review of his transcript shows deficiencies in many areas of the core curriculum. At some point there must be a major shift in achieving A's and B's, otherwise, he will be unable to complete all graduation requirements.

Points of my concern: Academic problems; out of the ordinary student behavior, questionable email transmissions, especially those about his state of mind. Appeared to want to share his thoughts and give us clues that he was having problems. The reference to "threat" then becomes expanded by definition. It not only refers to people, but the entire campus operation. It refers to an intervention in my responsibilities to move the Master Plan and the accepted planning goals. Did he have the right to publicly oppose the parking decks? Yes. I did not take any action against those articles or flyers. Did I have the right to look at the circumstances opened by the sequence of behaviors displayed by the Plaintiff? By my appointed responsibility, I believe I did. The combination of statements,

events, and behavior patterns then combined with the posting of my picture.

I was genuinely concerned for my safety and for the safety of the University.

INTERROGATORY NO. 5: Specifically identify and describe all actions You took as VSU President in response to the April 2007 shootings at Virginia Polytechnic Institute and State University.

**RESPONSE:**

- Reviewed campus safety and crisis alert plans with appropriate VSU officials, including Campus Police and President's Cabinet. Conducted one-on-one meetings with vice presidents. Chancellor Davis had appointed a task force to review all campus crisis plans. A memorandum was transmitted to all USG campuses on April 17, 2007 directing presidents to review safety and crisis plans. The VSU campus team met, reviewed the plan, and revised/expanded the role, scope, and mission of the document. Conducted "table top" drills to assess updates and outcomes of the plan's revisions. An updated copy of the VSU plan is available through Robert Delong, VSU Director of Environmental and Occupational Safety. The new

plan is an improvement and better prepares the campus for crisis intervention.

- Installed video cameras at strategic locations throughout the campus.

- Walked the campus with Student Government leaders and VSU administrators and staff to get student recommendation for improving campus safety, especially focusing on safe walking areas, increased illumination of campus buildings and walkways, and appointed a student patrol for evening hours to assist/escort students when walking to and from multiple surface parking lots.

- James Black, VP for Finance and Administration met with Faculty Senate committees to discuss campus safety, increased illumination of areas of the campus, and walking trails. Mr. Black and I met with Faculty Senate committees to recommend and seek endorsement of a new front lawn fence that would provide safety when students crossed the heavily traveled North Patterson Street area. Worked with City and State DOT officials to receive permission to install new traffic lights on N. Patterson Street.

- **With the assistance of the VSU Director of Information Technology and his staff, installed a technology driven campus alert system.**

INTERROGATORY NO. 6:   Specifically identify and describe all communications directed to You or made by You regarding obtaining additional campus security services for Your protection in April and May 2007.

**RESPONSE:**   **There were no written directives.   There was a verbal directive to observe my public appearances concluding 2007 Spring Commencement exercises.**

INTERROGATORY NO. 7: Specifically identify all VSU rules, policies, and procedures for subjecting a student to "administratively withdrawal," including but not limited to any relevant sections of the VSU Student Code of Conduct.

**RESPONSE:**   **I was advised that as President, I had the authority to do so.   This authority I believe was based somewhat on the admissions policies and standards of the university and the Board of Regents, the mental health withdrawal procedures of the university, and the academic standards of the university.   Primarily my actions were based my duties as**

**the president to protect the university due to a perceived threat to the university. For this there was really no precedent for me to follow. The administrative withdrawal was temporary until I could be ensured of overall improvements with the Plaintiff and overall safety to the university.**

INTERROGATORY NO. 8: Specifically identify VSU rules, policies, and procedures for subjecting a student to expulsion, including but not limited to any relevant sections of the VSU Student Code of Conduct.

**RESPONSE:   I do not recall such procedures.   Moreover, Plaintiff was not expelled, he was "withdrawn" temporarily.**

INTERROGATORY NO. 9: Identify any and all VSU students who were administratively withdrawn from VSU during Your tenure as President of the University, including student who were admitted back into the University, and describe the reason why they were administratively withdrawn, how the decision to administratively withdraw the students was made, and how the students were notified by the You or VSU that they were administratively withdrawn.

**RESPONSE:   There were no others during my VSU tenure.**

INTERROGATORY NO. 10:  Identify any and all VSU students who were expelled from VSU during Your tenure as President of the University, including student who were admitted back into the University, and describe the reason why they were expelled, how the decision to expel the students was made, and how the students were notified by the You or VSU that they were expelled.

**RESPONSE:**       **I do not have this information available to me.**

INTERROGATORY NO. 11:  Specifically identify all VSU rules, policies, and procedures that empower the VSU President to determine that a student is a "clear and present danger" to campus security.

**RESPONSE:**       **Mental health withdrawal procedures and the current student handbook's policy on withdrawing a student who is a "clear and present" danger to the campus.**

INTERROGATORY NO. 12:  Specifically identify all VSU rules, policies, and procedures that empower the VSU President to decide unilaterally when a student no longer represents a "clear and present danger" to campus security.

**RESPONSE:**    **Mental health withdrawal procedures and the current student handbook's policy on withdrawing a student who is a "clear and present" danger to the campus.**

INTERROGATORY NO. 13: Identify and describe all communications directed to You or made by You relating to Your or VSU's policies regarding student speech and political activity.

**RESPONSE:**    **None that I recall.**

INTERROGATORY NO .14: Specifically identify all communications of which you are aware regarding Plaintiff's request to construct an atlatl for a VSU archeology class project, naming the parties to the communications and setting forth the date on which you became aware of the communications.

**RESPONSE:**    **I am not aware of what an "atlatl" is, and was not familiar with any class project undertaken by the Plaintiff to construct one.**

INTERROGATORY NO. 15: Identify and describe all communications between You and Leah McMillan regarding Plaintiff.

**RESPONSE:**     The post analysis and criticism of the VT shootings point to failure of the administration to act on the warnings left by the shooter.  The primary criticism was VT's failure to intervene effectively when it knew of numerous incidents related to the shooter.

Numerous questions were raised after reviewing the Plaintiff's academic record, including failure to make satisfactory progress in the core curriculum.  In addition, his statements of the status of his mental health alerted campus administrators to consider an investigation.  We had cause to learn more about the Plaintiff.  In essence, we had to find more answers to rapidly unfolding questions.  Since the Plaintiff's words and actions constituted what might be a safety issue, Ms. Leah McMillan was asked to come to my office.  I asked what could be shared about the Plaintiff and shared the reason for the concern.

I believe she outlined the following information regarding the Plaintiff:

- Failed to meet his meetings at the Counseling Center
- Was not doing well academically

- Had checked himself in South Georgia Medical Center's Emergency Room on two different dates during the 2007 Spring Semester (anxiety attacks)

- Had not seen his psychiatrist for a period of time (not sure of the time between visits)

- In her opinion, student needed to have medication adjusted because of continued problems

- Suffered from narcissistic tendencies

The meeting was brief and to the points outlined above.

The additional communication between Ms. McMillan and me was also verbal.  I asked about the Plaintiff.  She stated that she had met with him.  The Plaintiff stated he missed the counseling session because he forgot about it.  No other specific information was exchanged that I recall.

INTERROGATORY NO. 16:  Identify and describe all communications directed to You or made by You regarding Plaintiff's treatment at the VSU counseling center.

**RESPONSE:**    I did not discuss the Plaintiff's "treatment" at the VSU Counseling Center.  The treatment aspect of the Plaintiff was not shared with me.

INTERROGATORY NO. 17:    Specifically describe all meetings, discussions, or actions in which you participated in connection with the decision to "administratively withdraw" the Plaintiff from VSU.

**RESPONSE:**    The meetings were primarily with my vice presidents, considered to be my primary administration team.  I shared the information from Ms. McMillan with Laverne Gaskins and select members of the University Police (I believe Ann Farmer and Scott Doner).

INTERROGATORY NO. 18:  Specifically identify all communications from the Board of Regents or any employee of the Board of Regents concerning your decision to retire early from your job as President of VSU.

**RESPONSE:**    I did not leave the VSU presidency "early;" thus, there is no correspondence directed to the referenced topic.  I did have correspondence with USG Chancellor Erroll Davis and Vice Chancellor Susan Herbst.  They are as follows:

- My letter to Chancellor Davis, dated October 15, 2007, outlining my decision to conclude the VSU presidency at the end of the appointment year, June 30, 2008.

- Letter from Chancellor Davis, dated November 5, 2007, acknowledging receipt of my letter and approval to conclude the VSU presidency, June 30, 2008.

- Email from Vice Chancellor Herbst, dated November 12, 2007, requesting my assistance in recommending search committee members to begin selection of VSU's next president.

- Letter from Vice Chancellor Herbst, dated November 14, 2007, formally acknowledging my intent to leave the VSU presidency on June 30, 2007.

Please see Board of Regents of the University System of Georgia Policy Manual: Section 200: Institutional Governance, specifically Section 203, Presidential Transitions and 203.01, Educational Leave and Continued Employment. Section 200 was revised and approved at the BOR meeting, October 9, 2007. I remained at VSU 1.5 years longer than initially intended; thus I was very interested in revised Policy 203.01. It states, "Any person vacating a University System presidency that he or she has held for

not less than five years may, at the discretion of the Chancellor, be:
granted twelve months educational leave with pay." The specific revisions
opened the opportunity for me to apply for such a leave and as stated, "the
Chancellor has the option of allowing a president, at the end of a successful
presidency, a period of educational leave to prepare for another stage in his
or her career after the presidency." Timing was excellent. I announced my
plans to vacate the VSU presidency in November, 2007 and immediately
began preparation to apply for the educational leave. I grounded my
request in the desire to return to the art studio and possibly apply for a
visiting artist's position at some future date. That leave was granted by
Chancellor Davis, effective July 1, 2008 to June 30, 2009. My official
retirement date is June 30, 2009. Section 203 also requires "presidents of
the USG to provide the Board and the Chancellor not less than three
months notice of the president's intention to retire or resign." So, I gave
notice within the allotted time: November and December, 2007 and
January, 2008, and professionally gave the USG time to conduct a national
search for my replacement. Those searches usually take five to six months.
The successful search concluded with the appointment of new president,
July 1, 2008. All sequential transitions were planned to support VSU and

my leave request.  Had I not been granted the educational leave, my plans
for retirement would have continued on the planned course.

INTERROGATORY NO. 19:   Specifically identify and describe all
communications from any individual employed by the State of Georgia, or
anyone affiliated with the State of Georgia, including but not limited to the
Governor, state legislators, other state elected officials and other high ranking
state officials, concerning your decision to retire early from your job as
President of VSU.

**RESPONSE:**       **I did not retire "early."  Please see response to No.
18.**

### REQUESTS FOR PRODUCTION OF DOCUMENTS

**GENERAL RESPONSE:  I intend to rely on all documents produced by the
university, by the Board of Regents, or by any other Defendant which tends
to support my decision to withdraw the Plaintiff.  I also intend to rely on
any and all documents tendered as an exhibit in any deposition held for this
civil action with supports by decision to withdraw the Plaintiff.  As I am no**

**longer an employee of the university and do not have possession of any such documents.**

REQUEST FOR PRODUCTION NO. 1:   Produce all documents identified in your response to the preceding Interrogatories, and identify each Interrogatory or Interrogatories to which the documents relates.

**RESPONSE:**   **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 2:   Produce all documents on which you rely in support of You contention that Plaintiff was a threat to VSU campus security.

**RESPONSE:**   **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 3:   Produce all documents regarding VSU campus security matters, incidents, and policies from 2002 to the present.

**RESPONSE:**   **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

**REQUEST FOR PRODUCTION NO. 4**:  Produce all documents relating to past incidents of student violations of VSU campus security policies from 2002 to the present.

**RESPONSE:**    **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

**REQUEST FOR PRODUCTION NO. 5**:  Produce all documents in your possession relating to the shootings at Virginia Polytechnic Institute and State University in April 2007.

**RESPONSE:**    **I do not believe I have any such documents in my possession.  I may rely on documents produced by the Institution or the Board of Regents.**

**REQUEST FOR PRODUCTION NO. 6**:    Produce all documents regarding obtaining additional campus security services for Your protection in April or May 2007.

**RESPONSE:**    **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 7: Produce all documents relating to VSU's rules, policies, and procedures for administrative withdraw of students.

**RESPONSE:     I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 8: Produce all documents relating to VSU's rules, policies, and procedures for expulsion of students.

**RESPONSE:     I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 9: Produce all documents relating to any students who were administratively withdrawn from VSU during your tenure as President of the University, including students who were admitted back into the University.

**RESPONSE:     I do not recall any other student being administratively withdrawn except the Plaintiff.   Any such documents would be in the possession of Plaintiff. I do not have any such documents.**

**I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 10:  Produce all documents relating to any students who were expelled from VSU during Your tenure as President of the University, including students who were admitted back into the University.

**RESPONSE:**     **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 11:  Produce all documents relating to VSU's administrative withdrawal of Plaintiff, including any and all documents relating to Your actions, deliberations, and communications with any other persons regarding the decision.

**RESPONSE:**     **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 12:  Produce all documents relating to your decision to deny Plaintiff's appeal and request for readmission to VSU.

**RESPONSE:**      **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 13:  Produce all documents relating to You or VSU's policies on student speech and political activity.

**RESPONSE:**      **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 14:  Produce all documents relating to any students who have been sanctioned, reprimanded, or questioned by You or VSU during your tenure as President of the University for speech or political activities.

**RESPONSE:**      **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 15:  Produce all documents relating to any formal or informal student complaints during Your tenure as President of VSU concerning the University's policies on student speech or political activities.

**RESPONSE:**   I do not recall any, nor do I have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.

REQUEST FOR PRODUCTION NO. 16: Produce all documents relating to Plaintiff's request to build an atlatl for a VSU archeology class project.

**RESPONSE:**   I am not aware of any such documents.  I may rely on documents produced by the Institution or the Board of Regents.

REQUEST FOR PRODUCTION NO. 17: Produce all documents relating to VSU policies regarding student use of the internet and social networking sites, such as facebook.com.

**RESPONSE:**   I do not have any such documents, if such exist.  I may rely on documents produced by the Institution or the Board of Regents.

REQUEST FOR PRODUCTION NO. 18:   Produce all documents, correspondence, or communications relating to any West Liberty State College students who were sanctioned, reprimanded, or questioned by You for speech or

political activities during Your tenure as President of West Liberty State College.

**RESPONSE:**     **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 19:  Produce all documents and correspondence relating to VSU policies concerning the disclosure of confidential student medical records to other members of the University community.

**RESPONSE:**     **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

REQUEST FOR PRODUCTION NO. 20:  Produce all documents relating to communications between You and Leah McMillan regarding Plaintiff.

**RESPONSE:**     **I do not have any such documents.  I may rely on documents produced by the Institution or the Board of Regents.**

Respectfully submitted this _15_ day of June, 2009.


DAVID C. WILL
Georgia Bar No. 760150
Email: dwill@royallaw.net


**ROYAL WASHBURN WILL**
4799 Sugarloaf Parkway, Building J
Lawrenceville, Georgia 30044
Phone: (770) 814-8022 / Fax: (770) 814-8360

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

THOMAS HAYDEN BARNES,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　)　　　Civil Action File No.:
　　　　　　　　　　　　　　　　　)　　　1:08-CV-0077-CAP
RONALD M. ZACCARI, *et al.,*　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　　　)

## CERTIFICATE OF SERVICE

This is to certify that I have, this 15ᵗʰ day of June, 2009, served a true

and correct copy of the within and foregoing DEFENDAN T RONALD M.

ZACCARI'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES

AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT

RUSS MAST upon all parties and/or counsel of record via U.S. Mail with

postage prepaid and properly addressed as shown below and that I have filed

this Certificate of Service with the Clerk of court using the CM/ECF system.

Sent via U.S. Mail to:

**Robert Corn-Revere**

**Christopher A. Fedeli**

**Lisa Beth Zycherman**

Davis Wright Tremaine, LLP

Suite 200

1919 Pennsylvania Avenue, N.W.

Washington, DC 20006


**Irma I. Espino**

**Cary Stephen Wiggins**

Cook Youngelson & Wiggins

260 Peachtree Street, NW

Suite 401

Atlanta, GA 30303


**Matthew R. LaVallee**

**Paul Robert Koster**

Daley, Koster & LaVallee, LLC

2849 Paces Ferry Road

Suite 160

Atlanta, GA 30339

Page 2 of 3

**David R. Smith**

Brannen, Searcy & Smith

P.O. Box 8002

Savannah, GA 31412-8002

DAVID C. WILL
dwill@royallaw.net
Georgia Bar No. 760150

**ROYAL WASHBURN WILL**
4799 Sugarloaf Pkwy, Bldg J
Lawrenceville, GA 30043
Phone:  770-814-8022
Fax:  770-814-8360