## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

THOMAS HAYDEN BARNES,   )
            )
   Plaintiff,     )
            )
 v.         )  Civil Action File No.:
            )  1:08-CV-0077-CAP
RONALD M. ZACCARI, *et al.*,  )
            )
   Defendants.   )

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE DR. MATTHEW NORMAN AS AN EXPERT WITNESS

### I. BACKGROUND

Defendants hereby incorporate by reference as if fully stated herein all of Defendants' arguments, evidence, and authorities contained in "Defendants' Brief in Opposition to Plaintiff Motion to Exclude the Expert Report and Testimony of Matthew W. Norman, M.D. and In Support of Defendants' Motion for Leave to Introduce Expert Witness Matt W. Norman, M.D." Doc. 144. Dr. Norman's Expert Report is included as "Exhibit N-9."

On January 5, 2009, Plaintiff cited his intent to use expert witnesses Dr. Kevin Winders, Plaintiff's long-term clinical psychiatrist. Doc. 47. It was not until after June 18, 2009, the date of the execution of the Consent Protective Order, Doc. 95, that the Defendants achieved full access to the Plaintiff's mental health for discovery purposes. After a review of

Plaintiff's mental health records, Defendants' Counsel Holly Hance (hereafter "Hance") began to research forensic psychiatrists. On July 6, 2009, Hance made her first contact with Dr. Matt Norman, who agreed to review the Plaintiff's mental health records and other pertinent documents. Dr. Norman charged for his initial records review. See Doc. 164 at 4 (citing Plaintiff's Ex. A). An initial records review is billable time rendered *prior to being retained* to create an actual expert report. Dr. Norman itemized this initial records review time as one "Meeting," two entries of "Review of records," and one "Telephone consultation;" and do not reflect any documentation that Dr. Norman had been "retained." Plaintiff's Ex. A. The deposition of Dr. Winders, took place in Savannah, Georgia, on July 31, 2009. Doc. 164 at 5. Discovery closed on August 1, 2009. Doc. 76. From July 6, 2009 (date of Hance's first contact with Dr. Norman) to August 1, 2009 (the close of discovery), Defendants' attorneys attended and/or took thirteen (13) depositions, requiring long-distance travel, some of which lasted over seven (7) hours. Pat Sanders of the Department of Administrative Services (DOAS) (Georgia's liability insurance overseer) by email on July 28, 2009, authorized the Defendants to hire Dr. Norman as an expert. Exhibit ("Exh.") N-1.

At the time that Ms. Sanders emailed her authorization to retain Dr. Norman, counsel were out of town for depositions. Specifically, from July 27, 2009 through July 29, 2009, counsel were in Valdosta for depositions of the Defendants and other VSU officials, specifically arranged to accommodate the schedule of Plaintiff's counsel Bob Corn-Revere.

Thereafter, counsel traveled to Savannah for the depositions of Dr. Winders on Friday, July 31, 2009 and Plaintiff's mother, Kelly Burke, on Saturday, August 1, 2009, both taken pursuant to the limited dates and time provided by Plaintiff's counsel as to availability of the witnesses.

As a result of Sanders' approval, Hance reinitiated contact with Dr. Norman on August 3, 2009, to request creation of his expert report. Dr. Norman was out of town for a beach vacation from August 3 to 12, 2009, and requested that he be able to complete the report after he returned from vacation on August 12, 2009. Norman Affidavit ("Aff.") ¶ 9. Dr. Norman prepared and entered billing entries dated "8/15/09" and "8/16/09" after he was retained for the expert report. See Doc. 164 at 6 (citing Plaintiff's Ex. C); Plaintiff's Ex. A. On August 18, 2009, Defendants disclosed their intent to use Dr. Norman as an expert. Doc. 136 (containing Norman's Expert Rerport); Exh. N-9. Plaintiff immediately moved to exclude Dr. Norman on August 21, 2009. Doc. 139. Defendants responded to this motion on September 2, 2009. Doc. 144. On August 27, 2009, Dr. Winders' Deposition Transcript came available to the parties, which not given to Dr. Norman at that time as the ability to utilize Norman as an expert was unsettled due to the pending motions to exclude him, see Doc. 164 at 5, and quite frankly, Defendants did not want to incur the expense of having him review the deposition if he was not going to be able to testify.

On October 22, 2009, the Court denied Plaintiff's motion to exclude Dr. Norman. Doc.

156.  Thereafter, Hance contacted Plaintiff's Counsel Erin Reid, Defendant Gaskins' Counsel David Smith, and Defendant McMillan's Counsel Matthew LaVallee to set a date to depose Dr. Norman.  Exh. N-2, N-3.  After succeeding in scheduling Dr. Norman's deposition to suit the scheduling needs of seven (7) attorneys, on October 30, 2009, Plaintiff served Defendants/Dr. Norman with a voluminous Request for Production of Documents which was attached to Plaintiff's Notice of Deposition of Matthew W. Norman, M.D.  Doc. 157, Exh. N-4.

From October 30 through November 13, 2009, Plaintiff's Attorneys refused to pay Dr. Norman's pre-deposition and pre-discovery deposit and quibbled over financial responsibility for it over a two (2) week period of time.  Exh. N-5.  As a result of Plaintiff's ultimatum, and in order to "facilitate any further losses in attorney fees and expenses for this matter," Dr. Norman, accepted that he be paid for the fees already incurred in producing the discovery documents to Plaintiffs.  Exh. N-6.  While Dr. Norman received a check for the charges incurred in collecting the requested documents prior to the start of his deposition in the amount of $1,824.25.  Norman Aff. ¶ 16.  Unfortunately, to date, Plaintiff still has not paid Dr. Norman for the time spent preparing for, sitting for, or reading and signing, his deposition (despite Dr. Norman's prompt invoice to Plaintiff at the close of the deposition, in the amount of $3,570.00; a follow up invoice with the reading and signing fees added thereto, for a total amount of $4,305.00; and the express assurance of Plaintiff's counsel, Bob Corn-Revere, that

he would do so.  Norman Aff. ¶¶ 17-19, Exh. N-7.

On November 13, 2009, Defendants' Counsel provided Dr. Winders' deposition transcript to Dr. Norman, which he reviewed for the first time on November 14, 2009.  Doc. 164 at 3.  Dr. Norman was deposed on November 19, 2009.

## II. ARGUMENT

The Court is no doubt weary, as are the Defendants and their counsel, of Plaintiff's continued ad hominem attacks.  The Plaintiff's pattern of jumping to the hasty conclusions that Defendants have lied or acted with purposeful malice is shameful.

## A. The Defendants Have Been Candid in Their Disclosures to the Court in Disclosing Dr. Norman as an Expert.

Defendants have been candid over their tardy disclosure of their late discovered expert witness; and the Court has already ruled such that this issue is precluded from re-litigation. Doc. 144; Doc. 156.  The Court should therefore disregard the Plaintiff's argument that the "Defendants misrepresented to the Court and to Plaintiff their decision about the need for an expert witness as well as the timeframe in which they retained Dr. Norman."  Doc. 164 at 1.

The Defendants have already established (1) "substantial justification for the[ir] failure;" and (2) that "the failure was harmless."  See Doc. 164 at 5 (citing St. Fleurose v. Worldwide Dedicated Services, Inc., No. 6:06-cv-1272-Orl-18KRS4, 2007 U.S. Dis. LEXIS 89486 (M.D. Fla. Dec. 5, 2007)); see generally Doc. 144.  Plaintiff has yet to cite any harm Defendants' late disclosure of Dr. Norman has caused him.

Defendants were not able to "retain" Dr. Norman officially until approval was given from Pat Sanders of DOAS. Moreover, a records review does not establish that Defendants would actually retain Dr. Norman. If Dr. Norman had not been able to render an opinion after reviewing the records, Defendants would not have retained Dr. Norman as an expert. Moreover, the fact that Dr. Norman's opinion did not change based on his review of Dr. Winders' deposition transcription does not yield evidence that Defendants attorneys have "mislead the Plaintiff [or] the Court," nor does it yield evidence that Defendants have "strategized" to "evade discovery deadlines." See Doc. 164 at 6. This is yet another stretch of the Plaintiff's tiresome argument that if something doesn't quite go their way, the other side must be doing something unethical.

Nor does Defendants' sharing of Dr. Winders' transcript with Dr. Norman on November 14, 2009, shed any light on their argument that Defendants are liars. Why would Defendants send Dr. Norman a transcript to review at $350.00/hour when Dr. Norman might be completely excluded as an expert based on the Plaintiff's motion to exclude? Additionally, immediately after the Court's order allowed Norman's deposition to be taken, Dr. Norman received the Plaintiff's punitive fishing expedition of a Notice to Produce, and a new argument ensued between Plaintiff and Defendants regarding Plaintiff's refusal to pay Dr. Norman's bill for Plaintiff's discovery requests and Plaintiff's deposition.

## B. Dr. Norman's Testimony and Expert Report Meets the Requirements of Daubert

"[Federal Rule of Evidence] 702 has been amended in response to <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and to the many cases applying <u>Daubert</u>, including <u>Kumho Tire Co. v. Carmichael</u>, 119 S. Ct. (1999)." Fed. R. Evid. 702 Advisory Committee's Notes to Amendment effective December 1, 2000. Rule 702 provides that

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Fed. R. Evid. 702 (As amended effective December 1, 2000). Additionally, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether a particular expert testimony is reliable." <u>Kumho</u>, 119 S. Ct. 1167, 1176.

## 1. Dr. Norman's Testimony and Expert Report Meet the "Reliability" Requirement of Daubert.

Plaintiff's argue that Dr. Norman's testimony and expert report fail to fulfill the minimum requirements of <u>Daubert</u>. This argument is erroneous as outlined further below. First, Dr. Norman *will* assist the trier of fact in identifying the risk factors for dangerousness in a mentally ill patient. Second, Dr. Norman *in fact relies* on authoritative publications when

identifying the risk factors presented in Barnes in his expert report, *and* cites to them throughout his expert report. Exh. N-9. Finally, Dr. Norman *has* applied all relevant facts and data presented to Defendant Zaccari, Dr. Winders, and Defendant McMillan in April and May 2007.

### a. Dr. Norman is not a "Hired Gun."

Plaintiff misconstrues the following passage from Dr. Norman's deposition to insinuate that Dr. Norman will reach whatever conclusion will make him the most money:

> "**Q** And there hasn't been even one instance that you can remember where you were engaged and then once you looked at the facts you reached a conclusion that you couldn't provide the opinion that was sought? **A** There is at least once instance as you asked the question that way that came to mind . . . [where I] realized I had a conflict of interest."

Tr. 69: 15-25. A closer look at Dr. Norman's deposition testimony will show that Dr. Norman has indeed been engaged to render opinions, and, alas, those opinions were *not* favorable to the engaging attorney. Illustratively, Dr. Norman states,

> "You can call many of the attorneys that have retained me and say have I reached a result they're happy with and they'll tell you no. I talked to a Fulton County District

–8–

> Attorney yesterday who said, you know, look, you got hired
> by the defense, but I'm reading your report and I'm able
> to buy this because I know you call it the way you see
> it, so thank you very much.  The defense wasn't happy with
> the report."

Tr. 76: 6-14.  Why would Dr. Norman tarnish his reputation in the community for just one case when he has a substantial case load and has rendered forensic services in "[o]ver 500 cases," Tr. 32:20-22, has a forensic practice that accounts for almost sixty percent of his practice? Tr. 31:19-25.  But Plaintiff's Counsel Bob Corn-Revere ("Corn-Revere") continues to attempt to lead Dr. Norman into a trap:

> "Q . . . But the only times you have not been able to
> provide the opinion is in cases where you've perceived a
> conflict.  Isn't that your testimony? [which prompted an
> objection based on form of the question from counsel, to
> which Dr. Norman responds,]    "A Yeah, I – I don't
> understand that question in that sense.  I mean, I may
> get asked in a -- I may get an opinion on a very small
> piece of data and some attorney may say, well, that's not
> what I want, so go ahead.  Other times I may write a
> report that may not be favorable to the retaining party

```
yet it still gets out. I've been called in on cases

where I got retained by -- in criminal cases I know I've

gotten   -- I've testified, got called -- retained by the

defense and called by the prosecution to the stand."
```
Tr. 76:15-25 - 77:1-6.

Plaintiff also misconstrues Dr. Norman's testimony and deceptively argues that Dr. Norman violates his professional ethical duties by not conducting independent research and only doing what the retaining attorney tells him to do. However, a closer look at testimony reveals that Dr. Norman stated that he conducts `"independent thinking based on what data is presented and then provide[s] an opinion based on that"` Tr. 75: 5-8; and that `"if [he] come[s] across something in the records where [he's] reviewed that . . . references other data and [he] think[s] that would be helpful, [he] will ask for [more data]."` Tr. 71:2-5.

In another attempt to bolster Plaintiff's suggestion that Dr. Norman is ethically challenged, Corn-Revere reads Dr. Norman a passage from one of the authorities Dr. Norman quoted in his expert report (Gutheil) and asks if Dr. Norman agrees with the passage. Tr. 73:8-24 - 74:1-18. This passage states, inter alia, that experts `"often [need to go] beyond the direct assessment of the individual whose status is in question, seeking evidence from the family members,`

friends, and others who have come into contact with him." Id.

In response to Corn-Revere's question, Dr. Norman correctly identifies that such a course of investigation is "unattainable in most cases." Tr. 74:22. Moreover, in the case at hand, such a complete investigation is not germane. The crux of this case is deciding the reasonableness of Defendant Zaccari's belief that Barnes posed a threat of danger to himself and campus. Dr. Zaccari's belief was based on a limited amount of data presented on Barnes from April to May of 2007. Dr. Norman's expert opinion was intended to analyze the data available to Dr. Zaccari, Dr. Winders, and Defendant McMillan at the time. It was NOT intended to be a full-fledged *subjective* mental health examination of Barnes; but rather an *objective* analysis of the risk factors present in this limited data. Tr. 11:19-25 - 12:1 (citing the aspect of "objectivity" inherent in a *forensic* psychiatrist [Dr. Norman's role] as opposed to the *clinical* psychiatrist [Dr. Winders and McMillan's role], who has an "alliance" with their patient and a "duty" to "advocate for their patient."); see also Tr. 146:19-25 -147:1-7 ("an independent evaluator that understands the risk of dangerousness . . . and [doesn't] have a therapeutic alliance . . . with Mr. Barnes."); Tr. 278:19-25 - 279:1-7.

Plaintiff will undoubtedly continue to argue that the opinions of Dr. Winders and Defendant McMillan in April and May 2007 disparage Defendant Zaccari's belief. The jury

is entitled to hear the unbiased scientific analysis of the risk factors Barnes presented with at the time. The jury is entitled to know, from an expert, the potential biases faced by McMillan and Winders based on the therapeutic alliance. Because of these biases, this testimony could only come from an expert. Tr. 279:14-17 ("forensic psychiatrists are asked to do independent medical examinations because it tries to eliminate that bias of agency."); Tr. 279:2-5 ("Q You're not suggesting that Dr. Winders is *biased*, are you? A I'm suggesting that he *should* be biased. It's his patient.") (emphasis added).

### b./c. Dr. Norman's Record Review, Methodology, and Inference of Dangerousness are reliable and accepted under Daubert and progeny

An intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical or other specialized knowledge. The most common source of this knowledge is the expert witness . . . . Most of the literature assumes that experts testify only in the form of opinions. The assumption is logically unfounded. The rule accordingly recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case leaving the trier of fact to apply them to the facts. Since much of the criticism of expert testimony has centered upon the hypothetical question, it seems wise to recognize that opinions are not

indispensable and to encourage the use of expert testimony in nonopinion form when

counsel believes the trier can itself the requisite inference. . . .  It will continue to be

permissible for the expert to take the further step of suggesting the inference which

should be drawn from applying the specialized knowledge to the facts.

Fed. R. Evid. 702 Advisory Committee's Notes (citing Rules 703 to 705).

[Federal Rule of Evidence 702] is broad enough to permit testimony that is the product

of competing principles or methods in the same field of expertise." See, e.g., Heller v.

Shaw Industries, Inc., 167 F.3d 146, 160 (3d Cir. 1999) (expert testimony cannot be

excluded simply because the expert uses one test rather than another, when both test

are accepted in the field and both reach reliable results.)

Fed. R. Evid. 702, Advisory Cmte. Note to Amendment effective December 1, 2000.

Moreover, "proponents do not have to demonstrate to the judge by a preponderance of

evidence that the assessment of their experts are correct, they only have to demonstrate by a

preponderance of the evidence that their op[inions are reliable . . . ." and that the expert

"provides a reasonable link between the information and the procedures he uses and the

conclusions he reaches." Id (citing In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 744

(3d Cir. 1994) and Kumho, 119 S. Ct 1167.

Here, Plaintiff states that "opinions on future dangerousness are not reliable and should

be excluded." Doc. 164 at 10.  Plaintiff will undoubtedly continue to argue that the opinions

of Dr. Winders and Defendant McMillan in May 2007 are *reliable* authorities to belittle Defendant Zaccari's opinion on Barnes' dangerousness. The trier of fact is entitled to hear a second, differing, and more reliable, opinion from Defendants' expert. Accordingly, Dr. Norman's report lays out the relevant risk factors present during April and May 2007, and identifies how these factors, citing authority for each therefor, were indeed contributing risk factors for dangerousness. Norman's methodology, application of this methodology to the facts of the case, and suggested inferences to be drawn, are reliable and acceptable under Daubert and progeny. Exh. N-9.

Additionally, Plaintiff suggests that Dr. Norman's failure to conduct an in-person evaluation of Barnes negates his ability to provide any expert opinion on the topic of dangerousness. Defendants reiterate that is not the subjective propensity of Barnes for dangerousness, but rather what should have, or could have, been objectively perceived at the time by Dr. Winders, and McMillan, and at least communicated to Dr. Zaccari. Dr. Norman addressed the issue of the value of an in-person evaluation of Barnes in his deposition, and he indeed stated that if he had had the opportunity to interview Barnes inside the time period of April to May 2007 his opinion *may* have changed, Tr. 155:11-13; Norman Aff. ¶ 25. However, such an in-person assessment, anytime outside the period of April to May 2007, would *not* have changed his opinion. Norman Aff. ¶ 25. An ex post facto interview of Barnes would be futile. There is also the obvious tendency that Barnes would "play good"

and manipulate his responses in such an interview. See Tr. 281:20-25 – 282:1-8 (regarding malingering in self-reporting of post-traumatic stress disorder). Dr. Norman also testified that "a dangerousness assessment can be done *without* having to examine the individual," Tr. 152:7-8 (emphasis added), and that it's perfectly "ethical to offer an opinion [without an in-person exam of the subject] as long [the opinion] is qualified by the fact that [he] did not examine Mr. Barnes." Tr. 152:23-25 – 153:1-3. Dr. Norman was in possession the complete mental health records produced in discovery from third party mental health clinicians in this case and reviewed them all.

Plaintiff continues to argue that Dr. Norman's "record review" was unreliable, however Plaintiff can only cite to two (2) items he believes Dr. Norman lacks in conducting an evaluation of Barnes' dangerousness. Since the filing of the Plaintiff's motion to exclude Dr. Norman, Dr. Norman has reviewed the videotaped deposition of Barnes, as well as the deposition transcript of Kelly Burke, Barnes' mother. Norman Aff. ¶¶ 22, 23. Dr. Norman has concluded that his opinion on Barnes' risk factors for dangerous in April to May of 2007 have remain unchanged. Id.

### 2. a./b. Dr. Norman's Testimony and Expert Report Meet the "Relevance" Requirement of Daubert Because Dr. Norman's Reasonable Person and Reasonable Clinician Opinions are Admissible and Reliable.

As stated in the Advisory Committee Note for the Federal Rule of Evidence 702, "An

intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical or other specialized knowledge."    Fed. R. Evid. 702 Advisory Committee's Notes. The Note goes on to contemplate that Dr. Norman should be permitted to at the very least present the pertinent risk factors that were, or should have been, relevant to Dr. Zaccari, Dr. Winders, and McMillan in April and May 2007. Id. Additionally, Dr. Norman should also be permitted to suggest an inference to the trier of fact which should be drawn regarding Barnes' propensity for dangerousness after the objective analysis of the factors presented in Barnes' behavior. Id.

Assuming arguendo that the Court does not permit Dr. Norman to render a conclusion on the "reasonable person's" assessment as to Barnes' propensity for dangerousness at the time Dr. Zaccari withdrew him from school, Dr. Norman should be permitted to testify as to the risk factors that a reasonable person *should have* considered upon consulting a clinician regarding the risk factors for dangerousness. In his report, Dr. Norman intended for all of the factors listed in the in the "reasonable person" section to *not* be exclusive from the "reasonable clinician" section. Norman Aff. ¶ 24, Exh. N-9. That is to say that the factors listed in the "reasonable opinion" section as numbers "1" through "11" on pages 4 through 5, are also the factors which would be considered by the "reasonable clinician." Id.

Defendants have, at a minimum, carried the burden to show that Dr. Norman "provides a reasonable link between the information and the procedures he uses and the conclusions he

reaches." Fed. R. Evid. 702 Adv. Cmte. Note.

Professor Robert O'Neil's opinion of whether Dr. Zaccari should have subjectively perceived a threat from Barnes' speech activities does not require an objective scientific analysis of anything. The Court may use its broad discretion and evenly apply its reasoning for including Dr. Norman as he will provide an objective scientific basis from which the trier of fact may form its own conclusion. Without Dr. Norman's compass on the universal risk factors for dangerousness, there is no other source of objective forensic evidence for judging the psychiatric aspects of this case.

Plaintiff asserts that Dr. Norman's analysis of the risk factors that a reasonable person should or would consider in this case is impermissible because it is actually the perspective of an unreasonable person. This is another one of Plaintiff's remarkable conclusory non-sequiturs. Plaintiff's citations are to Corn-Revere's forcing Dr. Norman to answer the 31-line question "do you agree with that statement" (Tr. 28:18) which quotes a long passage from the Surgeon General's Report on the stigmatization of mental illness by the general public. Tr. 24:21-11, 26:7-12, 27:15-29:7. Plaintiff comes to the conclusion that because "Dr. Norman agrees with the Surgeon General Report's finding that stigmatization of mental illness is inexcusably used to discriminate (Tr. 26:7-12), and moreover, that the public overestimates the possibility that a mentally ill person might be violent. (Tr. 27:15-29:7)," that Dr. Norman is disqualified from rendering a reliable opinion under Daubert. Doc. 164 at 16-17.

However, the topic of the Surgeon General's Report is that of the general stigmatization and "the public's" perspective on propensities for dangerousness. These topics are exclusive from Dr. Norman's opinions of what a reasonable person should infer from observations of objective scientific data. Illustratively Dr. Norman explains that his "opinion is based on information of dangerousness and the risk for dangerousness and what a layperson may interpret from that [and is] a medical opinion [based from] forensic psychiatric literature." Tr. 129:5-9.

It is true that Dr. Norman did not consider the perspective of the Defendants Mast or Keppler because these other Defendants took no action at all with respective to the withdrawal of Barnes and, therefore, their perspective are irrelevant in this litigation; (and experts cost money).

Plaintiff asserts that Dr. Zaccari's reliance on the collective set of risk factors presented in Barnes is unreliable because each factor in and of itself would not lead to an inference of a propensity to violence. Doc. 164 at 18. However Plaintiff cites to no scientific authority which would contradict Dr. Norman's methodology. Dr. Winders and Defendant McMillan albeit come a different conclusion, but nevertheless cite to some of the same factors in their discussions about propensities of dangerous in assessing Barnes. Exh. N-8, McMillan Depo at 196, Winders Depo at 81:9-25. Plaintiff's argument is unreliable and erroneous.

The failure to list an "obvious alternate explanation" or the failure to mention a

"mitigating factor" does not render Dr. Norman's report and testimony irrelevant or unreliable. Plaintiff is urging that Dr. Norman must follow some unknown version of the rules of expert report construction in drafting his report. Furthermore, there is no rule that suggests that the presence of a mitigating factor cancels out a compilation of aggravating factors. Dr. Norman is not required to follow any format dictated by Plaintiff's whim.

The trier of fact is entitled to a second opinion from the biased assessments of Dr. Winders and Defendant McMillan who were required to advocate for their patient, Barnes. If Dr. Norman is not permitted to provide objective scientific guidance on the topic of dangerousness, the trier of fact will have no expert source on the matter. If Dr. Zaccari's inclinations as to Barnes' propensities to violence are confirmed, retroactively, by a forensic expert, at least on an objective basis, Dr. Zaccari is entitled to heightened deference, which is relevant to his defense of qualified immunity.

Plaintiff again attempts to force a temporal format upon Defendants' expert using sophistry on the word "imminent." Doc. 164 at 21. Dr. Norman does not use the word "imminent" in his report; he uses the term "clear and present danger" in his report. Exh. N-9. Dr. Norman is not required to follow any format dictated by Plaintiff's whim.

Plaintiff continues to misconstrue Dr. Norman's testimony. Dr. Norman clearly states that clinical psychiatrists have different duties than forensic psychiatrists, and, for this reason, their opinions are more trustworthy. Dr. Norman will show the reliable perspective of the

objective practitioner.

Finally, Plaintiff argues that Dr. Norman's opinion is inadmissible because Dr. Winders and Defendant McMillan's assessment of the same data presented in Barnes led them to conclude differently about Barnes' propensities toward dangerousness. However, as we know "[Federal Rule of Evidence 702] is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise;" and that "expert testimony cannot be excluded simply because the expert uses one test rather than another, when both test are accepted in the field and both reach reliable results." Fed. R. Evid. 702, Advisory Cmte. Note to Amendment effective December 1, 2000.

### c. Dr. Norman's Damages Opinion is Admissible and Reliable

Barnes' mental health report, before his withdrawal from VSU, and after his withdrawal from VSU, is the same. Dr. Norman has confirmed that there appear to be no new developments in Barnes' status over the course of his psychiatric treatment.   Exh. N-9 at 9. Dr. Norman has also reviewed Barnes' mental health records for documentation of post-traumatic stress disorder, and accounts for that in his report.  Id.  Norman also brings out objective forensic information on the tendency of the subject patient to malinger in reporting post-traumatic stress disorder.  Tr. 281:20-25 – 282:1-8.  By employing Dr. Norman's contributions, the Court will make it fundamentally easier for the trier of fact to understand and consider the evidence on Barnes' mental damages before making its decision.  Of course,

as discussed above, Rule 702 entitles the trier of fact to advice on the methodology and a suggestion of a logical inference based on that methodology.

## C. Dr. Norman's Testimony presents no danger of unfair prejudice; and Defendants would be unfairly prejudiced without Dr. Norman's Testimony

Dr. Norman's obvious abilities to speak on the principles relevant to the psychiatric aspects of case plainly fall within the purposes of Rule 702. While the Plaintiff may be able to convince someone on cross examine that Dr. Norman's opinion is unworthy, Plaintiff cannot exclude Dr. Norman's report and opinion under the principles of <u>Daubert</u> and progeny. The trier of fact will be hindered if Defendants are left to their lay perspectives on the esoteric topic of forensic psychiatry. The facts of the case place forensic psychiatry and the risk factors posed by Barnes directly in issue and they require an expert for coherent presentation and clarification.

## III. CONCLUSION

The unhappiness of Plaintiff's counsel with Dr. Norman's testimony does not make it <u>inadmissible</u>. Experts can, and often do, disagree. The bulk of Plaintiff's arguments go not to the admissibility, but to the <u>credibility,</u> of Dr. Normans' testimony, which can be determined by the trier of fact if and when Dr. Norman is utilized.

The Defendants respectfully submit that the Plaintiff's arguments offer no basis that would require or authorize the Court to exclude Dr. Norman's testimony, that his motion be

denied, and the Court order the Plaintiff's counsel to make payment to Dr. Norman for the

time spent testifying and in reviewing his deposition transcript, as Plaintiff's counsel had

specifically agreed to do, and is professionally obligated to do.

DAVID C. WILL
Georgia Bar No. 760150
Email: dwill@royallaw.net

HOLLY HANCE
Georgia Bar No. 153092
Email: hhance@royallaw.net

**ROYAL – WILL**
4799 Sugarloaf Parkway, Bldg J
Lawrenceville, Georgia 30044
Phone: (770) 814-8022
Fax: (770) 814-8360

## CERTIFICATE OF SERVICE

This is to certify that I have, this 5th day of January, 2010, served a true and correct

copy of the within and foregoing BRIEF IN OPPOSITION TO PLAINTIFF MOTION TO

EXCLUDE DR. MATTHEW NORMAN AS AN EXPERT WITNESS upon all parties

and/or counsel of record by electronic notice and by placing same in the United States Mail,

postage prepaid, properly addressed as follows:

**Robert Corn-Revere**
**Christopher A. Fedeli**
**Erin Reid**
Davis Wright Tremaine, LLP
Suite 200
1919 Pennsylvania Avenue, N.W.
Washington, DC 20006

**Irma I. Espino**
**Cary Stephen Wiggins**
Cook Youngelson & Wiggins
260 Peachtree Street, NW
Suite 401
Atlanta, GA 30303

**Matthew R. LaVallee**
**Paul Robert Koster**
Daley, Koster & LaVallee, LLC
2849 Paces Ferry Road
Suite 160
Atlanta, GA 30339

**Mr. David Smith**
Brannen Searcy & Smith
P.O. Box 8002
Savannah, GA 31412-8002

HOLLY HANCE
Georgia Bar No. 153092
Email:  hhance@royallaw.net

**ROYAL – WILL**
4799 Sugarloaf Pkwy, Bldg J
Lawrenceville, GA 30043
Phone:  770-814-8022
Fax:  770-814-8360

## CERTIFICATE OF COMPLIANCE WITH RULE 5.1B

I hereby certify that the foregoing has been prepared with one of the font and point Selections approved by the Court in Local Rule 5.1B, N.D.Ga. This document was prepared using Times New Roman (14pt.) and Courier New (14pt.).

This 5th day of January, 2010.

HOLLY HANCE
Georgia Bar No. 153092
Email:  hhance@royallaw.net

**ROYAL – WILL**
4799 Sugarloaf Parkway, Building J
Lawrenceville, Georgia 30044
Phone: (770) 814-8022
Fax: (770) 814-8360