# EXHIBIT A

## APRIL 26, 2007 EMAIL
## FROM LAVERNE GASKINS TO ELIZABETH NEELY

Out



EXHIBIT
19
Zaccari 7-29-09

To: rzaccari@valdosta.edu
Subject: Fwd: Re: Student Appeal

Dr. Zaccari,
Please see below. Whenever your schedule permits, I would like to discuss the matter with
you. Laverne

---

Date: Thu, 26 Apr 2007 17:41:11 -0400
From: Betsey Neely <Betsey.Neely@usg.edu>
Subject: Re: Student Appeal
To: Laverne Lewis Gaskins <llgaskin@valdosta.edu>
X-Accept-Language: en-us, en
User-Agent: Mozilla Thunderbird 1.0 (Windows/20041206)
X-IronPort-Anti-Spam-Filtered: true
X-IronPort-Anti-Spam-Result: AgAAAAy5MEaoGFEoh2dsb2JhbACQEgEBAQgOKg
X-IronPort-AV: i="4.14,457,1170651600";   d="scan'208";
 a="55253264:sNHT40958172"
X-USG-MailScanner: Found to be clean
X-USG-MailScanner-SpamCheck:
X-MailScanner-From: betsey.neely@usg.edu
X-Sophos-ESA: [es4000.valdosta.edu] 1.69, Antispam-Engine: 2.5.1.298073,
 Antispam-Data: 2007.4.26.142334
Original-recipient: rfc822;llgaskin@valdosta.edu

In this case, the appeal should be directed straight to our office.  It is not good practice for the
President to be bringing a complaint against any student.  That should be handled by staff in
Student Affairs. Once the President has made a decision in a matter, there is no due process
at the campus level.

Laverne Lewis Gaskins wrote:

Today, Dr. Zaccari directed me to pose to you the following question to you.

Our appeal process provides that decisions of the judicial board may be appealed to the
President.
In the event the President files a complaint against a student for a violation of the Student
Code of Conduct and the student wishes to file an appeal, should the appeal go directly to
your office (BOR) or should the president appoint a designee (i.e. Dr. Levy)?

Give me a call should you have any questions. See you tomorrow. Thank you. Laverne

Laverne Lewis Gaskins, M.Ed, J.D.
University Attorney
Office of Legal Affairs
Valdosta State University
333-5351

This e-mail, and any attachments thereto, is intended only for use by the addressee(s)
named herein and may contain legally privileged and/or confidential information. If you are

not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by telephone and permanently delete the original and any copy of any e-mail and any printout thereof.

Laverne Lewis Gaskins, M.Ed, J.D.
University Attorney
Office of Legal Affairs
Valdosta State University
333-5351

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by telephone and permanently delete the original and any copy of any e-mail and any printout thereof.

# EXHIBIT B

## ELIZABETH EVANS NEELY DEPOSITION

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

THOMAS HAYDEN BARNES,    )
                       )
    Plaintiff,     )
                 ) CASE NUMBER
vs.            )
             ) 1:08-CV-00077-CAP
RONALD M. ZACCARI, et al.,)
             )
   Defendants.    )

DEPOSITION OF

ELIZABETH EVANS NEELY

July 2, 2009

2:38 p.m.

Georgia Board of Regents
Suite 7059
270 Washington Street
Atlanta, Georgia

Amanda Upton, CCR-B-1523



### Page 14

1    Q.    Okay.

2    (Plaintiff's Exhibit No. 1 was marked for

3    identification.)

4    BY MR. FEDELI:

5    Q.    Introduce Exhibit 1, a email from Betsey

6    Neely to Laverne Gaskins. Have you seen this

7    document before?

8    A.    I don't remember it. But I have no reason

9    to doubt it. What it said in this document is advice

10    that we frequently gave to campuses and that is if a

11    president had made a decision and the appeal was

12    going to be regarding the president's decision we

13    thought we'd be vulnerable to charges that it wasn't

14    really fair to have a campus committee hear it when

15    all of the people on the campus committee would have

16    been employees of the president.

17    And so if the president had not had any

18    involvement in a case, normal practice was there'd be

19    a hearing on the campus with an appeal to the

20    president.

21    But when the president had taken action or

22    been intimately involved in a decision on the campus,

23    we generally recommended that there not be a hearing

24    on the campus and that the hearing be held by a

25    neutral body.

### Page 15

1    Q.    Okay. In the email you say, it's not good

2    practice for the president to be bringing a complaint

3    against any student.

4    What does that mean exactly?

5    A.    Student affairs generally handle student

6    affairs. It keeps the president out of issues

7    involving student conduct.

8    Presidents are usually busy with

9    fundraising and more global kinds of concerns than

10    concerns with individual students.

11    And so, as a general proposition, we

12    always recommended that somebody from the student

13    affairs office make the pertinent decisions in the

14    first instance.

15    Q.    You also say in this email, once the

16    president has made a decision in this matter, there

17    is no due process at the campus level.

18    What do you mean by that statement?

19    A.    What I just said, that we thought we were

20    subject to -- we'd be subject to criticism if a

21    committee on the campus comprised of persons who were

22    employed by the president were the committee to hear

23    an appeal because there might be the perception that

24    pressure would be on those committee members to make

25    a decision that reflected the president's viewpoint.

### Page 16

1    Q.    So it could have the appearance of

2    being -- of denying a student due process in other

3    words?

4    A.    Well, of -- I think it might be perceived

5    as not entirely fair.

6    Q.    Okay. And why did you use the words due

7    process?

8    A.    Shortcut for --

9    Q.    For fair?

10    A.    No. Shortcut for hearing really. Due

11    process usually meant a hearing or an administrative

12    -- an appeal up the administrative chain.

13    And in either case here where the

14    president had already weighed in on the decision my

15    judgment was that any questions about the decision

16    should be -- you know, that a perfectly neutral

17    entity ought to decide whether or not the president's

18    decision was correct.

19    Q.    When you said good practice for the

20    president to be bringing a complaint against any

21    student, is this a legal term, good practice?

22    Was it a comment only on the president's

23    -- the use of his time as opposed to fundraising

24    versus complaining about students? What exactly did

25    the phrase good practice mean?

### Page 17

1    A.    It just meant it's better if the student

2    affairs people make decisions related to students and

3    leave the president in a neutral position until all

4    of the facts have, you know, been fully --

5    Q.    And why is it better --

6    A.    -- explored.

7    Q.    -- for student affairs to be dealing with

8    the student directly and for the president to be

9    neutral until a later time presumably?

10    A.    Because that leaves the president in a

11    position to review the decisions of lower level

12    administrators.

13    Q.    So that there's due process at the campus

14    level, correct?

15    A.    Yes.

16    Q.    Okay. Did you consult with anybody about

17    this advice that you gave to Ms. Gaskins?

18    A.    Don't remember consulting anybody.

19    Q.    And what was your goal in communicating

20    this message to Ms. Gaskins?

21    A.    This message? To answer -- she apparently

22    had been asked by the president whether the appeal

23    should go directly to us or whether the president

24    should appoint somebody on the campus. And I was

25    just telling her that I thought the appeal should



**WHEELER REPORTING**

*Court Reporting • Video • Litigation Support*

**404.351.4577**

# EXHIBIT C

## LAVERNE GASKINS DEPOSITION

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA


THOMAS HAYDEN BARNES,            CASE NUMBER
    Plaintiff,              1:08-CV-00077-CAP
vs.
RONALD M. ZACCARI, et al,
    Defendants.

_____/


DEPOSITION OF
LAVERNE GASKINS, ESQ.

JUNE 12, 2009
10:05 A.M.


VALDOSTA STATE UNIVERSITY CENTER
1500 NORTH PATTERSON STREET
SOUTH BUILDING, ROOM 1149
VALDOSTA, GEORGIA


SARAH E. WILLIAMS, FPR, CCR, RPR



**WHEELER REPORTING**
*Court Reporting • Video • Litigation Support*
**404.351.4577**

## Page 25

1    Q        Do you know if there were formal meetings in which

2    you were invited to come discuss this topic with him?

3    A        When you say formal meetings, how do you define

4    formal meeting?

5    Q        You were invited to come to his office or summonsed

6    to his office.

7    A        It is the nature and practice -- it was the nature

8    and practice of our professional relationship that when he

9    wanted to discuss an issue with me, he would simply call my

10   office. And my office is close in physical proximity to his

11   office. So if I'm in the office and he wants to see me, I

12   walk down to the office.

13          So it's not a formal kind of arrangement in the

14   sense that he would schedule an appointment to see me. If

15   the President of the University wants to talk to me, I get

16   up and I go down there.

17   Q        Okay.

18          So I don't have a documented history of all the

19   times he's requested to see me over a period of some five or

20   six years that he was there, no.

21   Q        I see. So there's no kind of appointment book or

22   some physical record of meetings?

23   A        Well, if we have -- if there is a scheduled meeting

24   or if my secretary has been told to put down a particular

25   time that Dr. Zaccari wants to see me, that would be perhaps

## Page 26

1    on my calendar; but the nature of those communications would

2    not be.

3          So, you know, it would just be -- like this meeting

4    is -- I think she put down attorney's meeting.

5    Q        Well, it's that.

6    A        Yeah. But what, you know, do you -- what is it?

7    You know, having a deposition or having a party?

8    Q        But is it your testimony that you have no

9    recollection of any scheduled meetings with Dr. Zaccari to

10   discuss Hayden Barnes?

11   A        When I responded to the discovery request, because

12   I could not recall events that took place with absolute

13   accuracy -- events that took place in 2007 -- I relied on

14   documents that were in place so I could go through those

15   documents and generate the two dates that are reflected in

16   the discovery responses.

17          No, I could not recall those dates independently

18   while sitting in my office at my desk and looking at the

19   interrogatory. I couldn't pull up the date and just write

20   it down and say, yeah, I remember that particular date

21   because there was nothing unusual about me having a meeting

22   with Dr. Zaccari in front of other people.

23          It's a very, very, very common experience that I

24   couldn't draw independently without reviewing some

25   documents. You know, some time frame. So, that's why you

## Page 27

1    see very often "on or about."

2    Q        Okay. You mentioned, though, that you were able to

3    identify dates of two meetings from looking at documents to

4    refresh your recollection.

5          Do you remember which documents those were?

6    A        No.

7    Q        Can you tell me which two meetings you're referring

8    to in that answer?

9    A        Well, on the response to interrogatory number

10   three, I said on or about May 1st, 2001, there was a

11   telephone conversation with Betsy Neely; and then on or

12   about May 4th there was a meeting.

13          And, in addition to that, in my responses to the

14   first interrogatories and request for production of

15   documents, there's a reference to a May 3rd meeting.

16   Q        Okay. In this first paragraph in response to

17   interrogatory number three, you say that in general

18   discussions about what could be done to remove the perceived

19   threat that you advised Dr. Zaccari of the Constitutional

20   guarantees of due process requirements and ADA concerns that

21   apply to withdrawals.

22          Can you describe the concerns that you expressed

23   about those issues?

24   A        Anytime a student is suspended -- I generally don't

25   get involved in suspension of students unless there is, you

## Page 28

1    know, some legal implication that I'm called upon to ask a

2    particular question.

3          But, generally speaking, students are afforded all

4    the Constitutional guarantees of due process.

5          I'm of the opinion and I advised that if a student

6    is to be removed from campus, he's entitled to due process;

7    that is, an opportunity to understand the nature of the

8    complaint against him and an opportunity to be heard.

9          I also expressed to him the possibility that Hayden

10   Barnes could raise some Constitutional challenges under the

11   First Amendment if he believes -- Hayden that is -- that

12   because of his communications that there was an effort to

13   stifle his freedom of expression.

14          And because Dr. Zaccari shared with me that he had

15   access to information from the Counseling Center about

16   Hayden, necessarily there's also a possibility that Hayden

17   could raise some ADA challenges: Americans with

18   Disabilities Act.

19          To what extent he could raise those challenges, I

20   can't share that with you because I don't know the nature

21   and the history of Hayden's psychological concerns. I've

22   never had a sit-down talk with his counselor to understand

23   the full extent of the nature of his problems.

24   Q        Okay. Let's look at each part of your answers in a

25   little bit more detail.

Laverne Gaskin  6/12/2009
9 (Pages 29 to 32)

## Page 29

1    You told Dr. Zaccari, according to your testimony,

2    that you explained that Hayden Barnes could raise First

3    Amendment challenges to an expulsion because of his free

4    speech rights.

5    What precisely did you tell him about that, if you

6    recall?

7    A    Well, I'm going to testify in generalities because

8    I didn't have a tape recorder nor did I document every

9    single thing that came out of my mouth.

10   Q    I understand.

11   But, in general terms, Dr. Zaccari expressed to me

12   some concerns that he had with Hayden's comments at a

13   particular meeting at the Board of Regents relative to a

14   parking deck.

15   And sometime during this time frame, Hayden also

16   generated a picture of Dr. Zaccari beside a parking deck and

17   made references to it being a memorial or memoriam.  I'd

18   have to actually look at it again.  It's been quite a while

19   since I've seen it.

20   So those comments, Hayden could raise some issues

21   of First Amendment protection.  In other words, "I'm just

22   expressing myself."

23   Q    I see.  And you also discussed due process

24   protections.  What did you tell Dr. Zaccari about the due

25   process issue?

## Page 30

1    A    He was made fully aware of policies and procedures

2    that existed on campus relative to the suspension of

3    students.  And, as a matter of fact, I provided those copies

4    to him.

5    I can't recite verbatim the policy, the number, the

6    content without having it in front of me.

7    Q    I'm sorry.  I missed the last part.

8    A    I can't recite verbatim the policy number or the

9    content of the policy without having it in front of me.

10   Q    Okay.  I believe it was your testimony that you

11   believe that students who are to be suspended have a right

12   to full information about what the nature of the charge is

13   and an opportunity to respond.  Is there anything else?

14   A    An opportunity to be heard and present their side

15   of whatever it is.

16   Q    Uh-huh.  And you appraised Dr. Zaccari that that is

17   a due process requirement for any kind of suspension?

18   A    He was made fully aware of what Hayden was entitled

19   to under due process.

20   Q    And last I think you mentioned that Dr. Zaccari had

21   said something about information he had about Hayden based

22   on his use of the Valdosta State Counseling Center.  Is that

23   correct?

24   A    Uh-huh.

25   Q    What did Dr. Zaccari tell you that he knew about

## Page 31

1    Hayden?

2    A    I vaguely recall he said he had some concerns about

3    him missing appointments and — that's the extent of what

4    I'm able to recall at this point in time.

5    But missing appointments and his behavior at this

6    particular meeting at the Board of Regents caused him some

7    concern.

8    Q    Did any of this strike you as unusual?

9    A    Unusual in what sense?

10   Q    Does the President of the University usually know

11   what the habits of a student is with respect to the

12   Counseling Center?

13   A    I've worked with three presidents thus far, and I

14   can only speak to my experience with Dr. Zaccari in that

15   context.

16   I cannot and I will not make generalizations about

17   presidents and what is generally their response to students.

18   But I was a bit concerned about his communications

19   with the Counseling Center.

20   Q    Could you expand on that?  What do you mean by a

21   bit concerned?

22   A    In a past life I used to be a psychotherapist.  My

23   undergrad degree is in psychology, and I have a Master's in

24   counseling.

25   And at one point in time I was employed as a high

## Page 32

1    school guidance counselor.  And then for a very, very brief

2    period in my life I was employed as a psychotherapist under

3    the direction of a psychiatrist.  It was many, many, many

4    year ago.

5    So I know that communications between counselors

6    and their patients are protected.

7    Q    By protected, you mean they're supposed to be

8    confidential?

9    A    Yes, unless there are certain extenuating

10   circumstances that allow for that information to be shared.

11   Q    Let me back up a little bit on the earlier part of

12   your answer.

13   A    Can I finish that response?

14   Q    Oh, sure.  Absolutely.

15   A    And if Hayden presented a danger to himself or to

16   others, then those communications may be shared.

17   Q    How might they be shared?

18   A    To the appropriate authorities.

19   Q    We'll get back to that, but let me backtrack a

20   little bit first to an earlier part of your response.

21   You've said you've worked for three university

22   presidents.  Is that correct?

23   A    Uh-huh.

24   Q    Have you ever had an occasion in the past where a

25   university president knew the habits of the student with



## Page 53

1    (The document was marked for identification as

2    Plaintiff's Exhibit Number Five).

3    BY MR. CORN-REVERE:

4    Q    Have you had a chance to look this document over?

5    A    (Reviewing document.)  Yes.

6    Q    Can you identify it for the record?

7    A    It's a document that was faxed to my office

8    following a telephone conference call with Betsy Neely.

9    Q    Okay.  So looking at the cover page where in the

10   comments it says, "Per our discussion" --

11   A    Uh-huh.

12   Q    -- is that referring to the earlier conference call

13   to talk about this issue?

14   A    Yes.

15   Q    Okay.  Did this conference call also take place on

16   May 1st, 2007?

17   A    (Reviewing documents.)  I recall it took place on

18   or about May 1st, 2007.

19   Q    Okay.  I ask that because the date of the cover

20   letter on the fax sheet says May 1st, 2007.

21   So it's your recollection that it was either on

22   that day or might have been the day before?

23   A    I believe it was May 1st, 2007.

24   Q    Okay.

25   A    And you see at the top, I believe, that this was

## Page 54

1    faxed May 1st, 2007.

2    Q    Yes.  Okay.  What prompted the telephone call that

3    this is in response to?

4    A    Dr. Zaccari wanted to make certain that the Board

5    of Regents of the University System of Georgia's Office of

6    Legal Affairs was fully aware of his concerns and possible

7    action; and he wanted to confer with Betsy Neely, who was

8    the senior lawyer at that time, to get her advice,

9    And her advice was you do what you need to do to

10   protect the campus and worry about the lawsuit later, but

11   you do what you need to do to protect that campus.

12   And she said you can administratively withdraw the

13   student, and she faxed me this information for me to share

14   with Dr. Zaccari.

15   Q    Is it correct to say that the phone call you just

16   described and this fax was a follow-up to the earlier email

17   that we discussed?

18   A    Right.

19   Q    So after Elizabeth Neely responded to your email

20   and you passed that along to Dr. Zaccari, it was agreed to

21   set up a phone call to discuss those issues.  Is that how it

22   happened?

23   A    Repeat that again.

24   Q    Okay.  Is it correct to say that after your initial

25   email exchange, which you forwarded on to Dr. Zaccari, that

## Page 55

1    it was decided to set up a call to discuss those questions?

2    A    No.  The telephone call took place on Dr. Zaccari's

3    own initiative.  I think there was a gap between the initial

4    email and the telephone call.

5    Once again, the reason Dr. Zaccari felt, I believe,

6    a need to involve Betsy Neely was because any decision

7    that's made on the campus level --

8    Q    Go ahead.

9    A    I want to feel like someone's listening to me.

10   Q    I'm listening.

11   A    Okay.  Any decision that's made on the campus level

12   and there's an appeal -- there is a concern -- it would go

13   to Betsy Neely's office.

14   So he wanted her to be involved in, essentially,

15   the decision-making process so he could have some level of

16   assurance that what he was doing was the proper route to

17   take.

18   Q    Okay.  I think I understand that.  I'm just trying

19   to get the sequence of events correctly.

20   A    Uh-huh.

21   Q    So that looking back at Exhibit Four, which is the

22   email exchange --

23   A    Yes.

24   Q    -- it was your testimony and the date stamp on the

25   email is April 26th.

## Page 56

1    A    Uh-huh.

2    Q    Okay.  And then at some point on or about that

3    date, you passed along this exchange to Dr. Zaccari and

4    said, "I would like to discuss the matter with you."

5    A    Uh-huh.

6    Q    Is that correct?

7    A    (Nods head.)

8    Q    Then after you passed this along to Dr. Zaccari, a

9    decision was made to set up a phone call that resulted in

10   this fax being sent to you.  Is that the sequence?

11   A    When you're saying a decision was made -- he wanted

12   to see me.  I went down to his office; and he says he's

13   going to put Betsy Neely on speaker, and that's what

14   happened.

15   So when you say a decision was made, I can't state

16   and I can't testify that that email precipitated the phone

17   call to Betsy Neely in my presence.

18   Following that email to Dr. Zaccari, he could have

19   very well contacted Betsy Neely and I'm not aware of that.

20   Q    I see.  But sometime after this email exchange,

21   then you were asked to join Dr. Zaccari in a phone

22   conversation with Betsy Neely.

23   A    Yes.

24   Q    Okay.  I'm sorry if I'm asking the same thing or if

25   I'm just getting confused, but did you know about the phone

## Page 57

1  call before it was going to happen?

2  A  No.

3  Q  Okay.  You were in your office and then received a

4  request to join Dr. Zaccari for a phone call with Betsy

5  Neely?

6  A  No.  The request would not have been worded that

7  way.  The request would've been, "Hi, Verna.  This is" --

8  whomever -- "please tell Laverne Dr. Zaccari wants to see

9  her."

10  Q  And who would've placed that call to you?

11  A  My assistant would have said, "Ms. Gaskins,

12  Dr. Zaccari wants to see you."

13  Q  Okay.

14  A  So, you know, I don't necessarily know the nature

15  of the discussion prior to going down there.

16  Q  I understand.

17  A  Nor would I say, "What's he want to talk to me

18  about?"

19  Q  Right.  I'm just trying to figure out what

20  happened.

21  A  Yeah.

22  Q  The phone call was in process when you arrived in

23  Dr. Zaccari's office?

24  A  No.  I vaguely recall him dialing -- well, he

25  didn't dial; his assistant would've dialed.

## Page 58

1  Q  Okay.  So you were asked to join Dr. Zaccari; and

2  after you got to his office, a call was placed to Elizabeth

3  Neely.  Is that what happened?

4  A  Yes.

5  Q  Okay.

6  A  Based on my recollection.

7  Q  Yes.  What else do you recall about that telephone

8  conversation?

9  A  I raised due process concerns, the ADA concerns.

10  And Betsy said, "Well, Dr. Zaccari, you need to do what you

11  need to do to protect yourself and the campus community."

12  Q  Okay.  Do you have a more detailed recollection of

13  the concerns that you expressed about due process and ADA

14  problems?

15  A  No.  They were just very basic and general in

16  nature.  A student has a right to be heard.  An opportunity

17  to be heard.

18  And I could never tell someone else that whatever

19  causes them concern or fear for their safety and the safety

20  of the campus community is incorrect, because I can't

21  superimpose my response to something and pretend as if I'm

22  someone else.

23  I do believe that Dr. Zaccari firmly felt

24  threatened by Hayden Barnes, and I do believe that was a

25  constant thing and during this entire episode that he

## Page 59

1  expressed a genuine fear of Hayden Barnes in terms of his

2  safety and the safety of the campus community.  That never

3  wavered.

4  Q  But, so far as you know, no one else expressed that

5  same concern.  Isn't that right?

6  A  Not in my presence.

7  Q  Do you know if Dr. Zaccari consulted with anyone

8  else about whether or not those concerns were justified?

9  A  No.  I'm not aware of any, not to suggest that he

10  didn't.  I'm just not aware.

11  Q  When you expressed your concerns about due process

12  issues, was there a discussion of those concerns in this

13  conference call?

14  A  Dr. Zaccari represented to Betsy that Hayden

15  presented a threat to himself and the campus community.

16  So, in response to that threat, Betsy felt like the

17  primary concern should be that of Dr. Zaccari and the campus

18  community.  Take care of that first.

19  Q  Okay.  Does Valdosta State University have a

20  protocol to deal with threats to campus security?

21  A  We have policies in place that speak directly to

22  removal of students.

23  Q  Okay.

24  A  And I can't recite those policies verbatim without

25  the benefit of having them in front of me.

## Page 60

1  Q  We'll get to them.

2  A  Okay.

3  Q  But is there any policy or protocol other than the

4  ones you mentioned in your interrogatory answers that exists

5  to deal with threats to the campus community?

6  A  Of course, you know, there's always the campus

7  police if there's an indication of criminal behavior.

8  Q  Right.

9  A  Yeah.

10  Q  But I'm speaking in terms of policies.

11  A  Yes.

12  Q  And so far as you know, the ones that exist are the

13  ones you've listed in your interrogatory answers.  Is that

14  correct?

15  A  Yes.

16  Q  Okay.  Did you discuss your First Amendment

17  concerns during the call with Elizabeth Neely?

18  A  I discussed all of those concerns.

19  Q  Okay.  Did she respond to your concerns about the

20  First Amendment problems?

21  A  I don't recall.

22  MR. LaVALLEE:  Objection to form.

23  BY MR. CORN-REVERE:

24  Q  Did you also raise your concerns about the

25  Americans with Disability Act?

A Yeah, I recall.
Q Was there any discussion on that call of May 1st about the ADA?
A From Betsy Neely?
Q Yes.
A I vaguely recall that while she recognized those concerns and those concerns were legitimate and valid, ultimately the safety of the campus community was foremost in her mind based on representations that had been made to her by Dr. Zaccari.
Q Let's look at this exhibit, the fax that you got from Elizabeth Neely.
A Sure.
Q The second page of the exhibit --
A Uh-huh.
Q -- can you tell me the significance of this page?
A She had been made -- Elizabeth Neely had been made aware of the fact that Hayden Barnes had been seeing Leah McMillan; and, you know, she entertained during her discussions various ways that Hayden could be administratively withdrawn. So she sent us this information.
Q What was Elizabeth Neely told about Hayden's use of the Counseling Center?
MR. LaVALLEE: Object to the form.

THE WITNESS: In the course of the conversation, I vaguely recall -- he said that he was missing appointments. I'm sorry. I just can't recall.
BY MR. CORN-REVERE:
Q Was Leah McMillan's name specifically mentioned on this call with Ms. Neely?
A I don't recall that.
Q Is it accurate to say that Elizabeth Neely was simply told that Hayden was using the VSU counseling facilities?
A In addition to other information, yes.
Q Okay. What other information was that?
A Once again, Dr. Zaccari shared with Betsy the incident at the Board of Regents meeting. It was a meeting that I've already discussed -- testified to -- and also the Facebook page.
Q Well, if there was an incident at the Board of Regents meeting, Elizabeth Neely should've been aware of it, shouldn't she?
A I don't know.
MR. WILL: I object to the form of the question. Calls for speculation.
BY MR. CORN-REVERE:
Q Wouldn't Elizabeth Neely have been present at any meeting of the Board of Regents?

MR. WILL: Same objection. Calls for speculation.
THE WITNESS: I don't know. I don't know if she attends every single Board of Regents meeting.
BY MR. CORN-REVERE:
Q Do you know for a fact if Hayden Barnes ever went to a meeting of the Board of Regents?
A I don't know that.
Q Getting back to this page of the exhibit, I believe your testimony -- and correct me if I'm misstating it -- was that this was information that Elizabeth Neely sent to provide options for how Hayden Barnes might be withdrawn from school. Is that correct?
A Based on the information that was shared during that telephone conversation and based on the fact she felt like the primary concern was that of the campus community in terms of safety and the safety of Dr. Zaccari, of course, she said the student could be administratively withdrawn; and she provided this information consistent with that.
Q Okay. This first page after the cover sheet, do you have an understanding of which of these policies may have been relevant to withdrawal of a student?
A No. I don't know whether or not this was sent in error, because it clearly deals with auditors, transient students, the referral of students to institutions and rights to refuse admission. I think this might've been sent

in error.
Q Looking at the last two pages of this exhibit, it appears to be a memorandum from the Executive Secretary of the Board of Regents. Two pages.
Can you tell me if Valdosta State ever adopted a medical withdrawal policy based on this memorandum?
A I can't tell you that because you'll see at the top it's dated 1983.
Q Yes.
A And this is well before my employment with the University. So I don't know whether or not as a result of this memorandum that a medical withdrawal policy was adopted in response to this.
Q Uh-huh. Have you read this exhibit? These two pages?
A Yes.
Q Okay. Do you have an understanding of what it means?
A It means that a student can be administratively withdrawn from a campus if it is in the judgment of the physician or if the student causes or interferes with the right of members of the college community or with the exercise of proper activities or functions of college or it's personnel.
Q Right. You're reading from the last page with



Page 65

proposed language for student medical withdrawals. Is that correct?
A Right. But that's my understanding of it.
Q Okay. That's the policy if it were adopted.
Isn't it true that the first page of the memorandum says here's suggested language that your campus may adopt if the faculty chooses to do so?
A Yes.
Q Do you know if such a policy was ever adopted?
A I would have to review our policies to see if there was a policy adopted. My response to your question is it's likely that the campus did adopt a policy. But I can't speak to whether or not the campus adopted a policy in 1983 or 1984 in response to this memo because I was not here.
Q Right.
A But we do have a policy in place that speaks to withdrawal of students for medical reasons.
Q Okay. If a policy were adopted in 1983 or whenever, it would appear in the student handbook, wouldn't it?
A Yes.
Q Can you tell me where in the student handbook there is a medical withdrawal policy?
A No. I can't because I didn't commit to memory the student handbook policy.

Page 66

Q Looking at the final page of this exhibit, if such a policy had been adopted, it would say -- I mean, this exhibit suggests that -- actually, let me back up. Strike that.
Let's look at both the first page and the second page of this exhibit. It has a number of highlighting marks that make this exhibit a little bit hard to read.
When you received it, did it have the highlighting on it already?
A Yes. I received it just as you have it.
Q Okay. So just to be clear: The highlighting wasn't added after this was sent to you by Betsy Neely.
A No. Well -- repeat that.
Q Let me put it this way. You didn't do the highlighting, did you?
A Right.
Q Okay. Does the policy suggest that a hearing should precede a medical withdrawal?
A (Reviewing document.) Except in emergency situations.
Q Does it define what emergency situations are?
A The emergency situations are not defined in this document.
Q Okay. Do you believe that emergency situations would require immediate action?

Page 67

A Emergency situations would require immediate action.
Q Okay. According to this policy, if it were adopted, doesn't this require consultation with the campus physician and consultation with the student's parents and personal physician?
A Or --
Q Continue.
A Or "A student may be administratively withdrawn from the college when in the judgment of" -- I believe it's highlighted; I can't read that -- "causes the student to interfere with the rights of other members of the college community." So it's either/or.
Q And in what way did Hayden Barnes interfere with the rights of other members of the college community?
A I can't speak to that.
Q You don't know?
A No. I do believe that Hayden Barnes impacted Dr. Zaccari's ability to perhaps function in the manner that he would prefer because of concerns for his safety and the safety of the campus community.
Q Uh-huh. And I think I asked before: Do you know if Dr. Zaccari actually consulted with anybody about his concerns?
A I don't know.

Page 68

Q In your May 1st conversation with Dr. Zaccari and Elizabeth Neely, did Ms. Neely ask if Valdosta State had, in fact, adopted a medical withdrawal policy?
A No. I don't recall her asking that question specifically.
Q But it's your recollection that she simply said that Mr. Barnes could be administratively withdrawn pursuant to this policy.
A I don't recall those exact words. I recall that she said Hayden may be administratively withdrawn; you need to be concerned about the safety of campus and the campus community and yourself. That's what your major concern needs to be, and we'll worry about the lawsuit later.
And you can put that in quotation marks: "We'll worry about the lawsuit later."
Q That was an exact phrase?
A "We'll worry about the lawsuit later."
Q Okay. Looking at the top of this final page of the exhibit, it says "A student may be administratively withdrawn."
Do you know if that phrase, "administratively withdrawn," appears in any other policy?
A I can't recall. Once again, Dr. Zaccari wanted to make certain that his conduct was sanctioned by those individuals who would review the circumstances behind his

## Page 101

1    begins on page ten and goes over to the next page.

2    A    My page number is not clear.

3    Q    Yeah. The ten is cut off. But the last two pages

4    of the document.

5    A    (Reviewing document.) Okay.

6    Q    Essentially, it says, "Any person in the University

7    System aggrieved by a final decision of the president of an

8    institution may apply to the Board of Regents without

9    prejudice to his or her position for a review of the

10   decision," and then it goes on.

11   Does this policy of the Board of Regents supplant

12   the other due process policies that we've discussed?

13   Let me put it another way. Because it's possible

14   to appeal a decision of a university president, Board of

15   Regents, is the university free to ignore all of the other

16   policies of the Student Code of Conduct or the rights of

17   students?

18   A    No.

19   Q    So the fact that Hayden Barnes was given the right

20   to ultimately appeal his expulsion to the Board of Regents

21   doesn't change the fact that he was denied due process at

22   the university level.

23   A    Correct.

24   Q    Also, in the event of an appeal to the Board of

25   Regents, if the Board of Regents, itself, participated in

## Page 102

1    the decision that is being appealed, is that a denial of due

2    process?

3    A    It compromises due process.

4    MR. CORN-REVERE: I think this is a good breaking

5    point for lunch. I have a couple of more questions about

6    policies, but I think that -- just looking at the time,

7    it's almost one o'clock. I think it probably makes sense

8    to have lunch now and then reconvene after that.

9    THE WITNESS: What time are we talking?

10   MR. CORN-REVERE: How long will the deposition go?

11   THE WITNESS: No, the time you want to reconvene.

12   MR. CORN-REVERE: Would forty-five minutes work for

13   everybody? Or we can -- we can do a half hour,

14   forty-five minutes or an hour.

15   THE WITNESS: I'm for a half hour.

16   (Discussion off the record.)

17   (A lunch recess was held from 12:55 p.m. to 2:48

18   p.m.)

19   BY MR. CORN-REVERE:

20   Q    Will you take a look at Exhibit Number One which is

21   the complaint.

22   A    Uh-huh.

23   Q    And I'd just like to focus on paragraph 51 that

24   appears on page 17.

25   A    Uh-huh.

## Page 103

1    Q    Okay. And paragraph 51 states: On May 3rd, 2007,

2    Zaccari held a meeting regarding Barnes which, on

3    information and belief, Gaskins, Mast, McMillan, and Keppler

4    attended. At this meeting, Defendants, led by Zaccari,

5    decided unilaterally and without any due process due to

6    Barnes pursuant to the Constitution or to VSU and/or Board

7    policies to expel Barnes from VSU.

8    A    Uh-huh.

9    Q    Do you agree with that statement?

10   A    Well, let's see. There was a meeting on

11   or about May 3rd, and I agree that the people reflected in

12   paragraph 51 were in attendance at that meeting.

13   And I agree that Dr. Zaccari made a decision

14   without due process to Barnes to expel Barnes from Valdosta

15   State.

16   I agree that it was not a joint decision. It was

17   made by all the attendees. I agree that the individuals

18   listed in paragraph number 51 -- Gaskins, Mast, McMillan,

19   and Keppler -- could not have collectively made this

20   decision to expel Barnes. Dr. Zaccari was vested with the

21   full authority to do so.

22   MR. CORN-REVERE: Okay. Let's mark as Deposition

23   Exhibit Number 15, I believe, a single sheet called

24   Disciplinary Statistics.

25   (The document was marked for identification as

## Page 104

1    Plaintiff's Exhibit Number 15).

2    BY MR. CORN-REVERE:

3    Q    Have you had a chance to look at that?

4    A    I'm looking at it now. (Reviewing document.)

5    Q    And I'll represent for the record this is something

6    that I found on the web, on the Valdosta State web site,

7    that lists what are described as disciplinary statistics for

8    years 2007 and 2008.

9    Correct me if I'm wrong, but this appears to be

10   just a tally of the different kinds of disciplinary actions

11   that have occurred on campus during that time period. Is

12   that --

13   A    This appears to be a tally of disciplinary statics

14   for the year 2007/2008.

15   Q    Looking down the first column --

16   A    Uh-huh.

17   Q    -- about the middle of the column, there's a

18   category called "Disorderly Assembly."

19   A    Yes.

20   Q    And this reports that there were zero instances of

21   findings of disorderly assembly during this time period. Is

22   that a correct understanding of what this --

23   A    I can't speak to this document in terms of the

24   accuracy of the document because I didn't compile it, so I

25   can't speak to the representations that's reflected in the

## Page 133

1    Q    But it was in combination of that information and

2    these exhibits that his concerns were given credence?

3    A    His concerns weren't given credence by anybody. I

4    don't understand. Given credence by whom?

5    Q    Well, as I understand it, Hayden Barnes was

6    expelled because he was perceived a danger either to

7    Dr. Zaccari or to the campus.

8    A    Uh-huh.

9    Q    And you're telling me -- again, correct me if I'm

10   wrong -- that nobody looked into the fact or the suggestion

11   that he actually was a danger.

12       MR. WILL: I object to the form of the question.

13       THE WITNESS: I'm sure the police department

14   assessed the situation, Scott Doner and Ann Farmer, in

15   consultation with Dr. Zaccari.

16       I wasn't privy to whatever series of communications

17   he may have had with them.

18   BY MR. CORN-REVERE:

19   Q    So you have no direct knowledge of communications

20   with the police department and Dr. Zaccari. Is that your

21   testimony?

22   A    I have no direct knowledge, correct.

23   Q    Okay. Now earlier you testified that at one of the

24   meetings that Ann Farmer was present. Is that correct?

25   A    Yes.

## Page 134

1    Q    And if I understood your testimony, Ann Farmer's

2    recommendation to Dr. Zaccari was that if he had concerns

3    about security, he could get a retraining order.

4    A    Perhaps.

5    Q    Was that the recommendation she gave?

6    A    Yes, uh-huh.

7    Q    And so far as you know, Dr. Zaccari did not follow

8    that recommendation.

9    A    Not to my knowledge.

10   Q    And are you aware of any other communications

11   between Dr. Zaccari and the police department?

12   A    No. I'm not aware of any direct -- I don't have

13   direct knowledge of any communications.

14   Q    Okay. In discussing either Exhibits 21 or 22 at

15   the early May meetings in which Dr. Zaccari made them

16   available to the group, did you express any concerns about

17   the fact that these exhibits might be protected by the First

18   Amendment?

19   A    Yes.

20   Q    What did you say?

21   A    I said Hayden could challenge any action that you

22   take based on First Amendment grounds: Freedom of

23   expression. He could argue that he's entitled to have

24   something of this sort posted anywhere he chooses. This

25   includes Exhibit 21, as well.

## Page 135

1    Q    Okay. But as I understand your earlier testimony,

2    the advice you got from the Board of Regents was do what you

3    need to do and worry about the lawsuit later.

4    A    I didn't receive that advice. That was advice that

5    was given to Dr. Zaccari.

6    Q    Right. But that was the advice he was given in

7    your phone call with Elizabeth Neely on May 1st, 2007. Is

8    that correct?

9    A    The time that I testified the conversation took

10   place, right.

11       MR. CORN-REVERE: We're up to 23. Okay. Let's

12   mark as Exhibit 23 a memo from Laverne Gaskins to

13   Dr. Zaccari.

14       (The document was marked for identification as

15   Plaintiff's Exhibit Number 23.)

16   BY MR. CORN-REVERE:

17   Q    Before we get to that exhibit, let me just ask one

18   follow-up question about the concerns that Dr. Zaccari

19   expressed about Hayden Barnes based on what he had learned

20   from the Counseling Center.

21       Would it change or would it affect your opinion

22   about whether or not Hayden Barnes was dangerous if you knew

23   that President Zaccari had been told by Leah McMillan that

24   Mr. Barnes was no danger?

25   A    I never had an opinion that Hayden was dangerous,

## Page 136

1    so it would not affect my opinion because I never had an

2    opinion that he was dangerous. I always had a strong

3    opinion that he was entitled to an opportunity to be heard

4    and he was entitled to due process.

5       If the individuals who were listening to the facts

6    as they were presented determined that he was a danger to

7    the campus, then that was a determination for that body to

8    make.

9    Q    Okay. But for those bodies that did meet -- and

10   I'm referring to the meetings of early May, either May 3rd

11   or May 7th, 2007, where the subject of Hayden Barnes came

12   up -- did anyone express agreement with Dr. Zaccari that

13   Mr. Barnes was dangerous in some way?

14   A    No.

15   Q    Did you have any follow-up conversations with any

16   of the participants at those meetings of whether or not

17   Mr. Barnes was a danger?

18   A    No.

19   Q    And in your phone conference with Elizabeth McNeely

20   (sic) on May 1st, 2007, did Ms. McNeely (sic) express any

21   agreement or disagreement with the proposition that

22   Mr. Barnes was in some way dangerous?

23   A    She seemed to support Dr. Zaccari's representation

24   that he was a danger to the campus and to himself.

25       I also vaguely recall shortly after his withdrawal

## Page 137

1    from campus I was at the Board of Regents and I had lunch

2    with Betsy Neely and another attorney from another

3    institution.  One or two attorneys.  I just can't remember.

4         But I remember expressing some concerns about the

5    facts of the case and the fact that he didn't have a

6    hearing, and Betsy reemphasized the fact that it appeared to

7    be a danger to Zaccari and the campus community based on

8    representations made by Dr. Zaccari.

9    Q    Did she say what information she had for making

10   that determination other than Dr. Zaccari's claims?

11   A    No, she didn't.

12   Q    Do you know independently whether or not she had

13   any information?

14   A    No.

15   Q    Okay.  But in that conversation over lunch with

16   Betsy McNeely (sic), was she --

17   A    By the way, it's Betsy Neely.

18   Q    Sorry.  Sorry.  In that conversation, she

19   discounted your concerns about due process based on the

20   perceived danger?  Is that a fair characterization?

21   A    Yes.

22   Q    Okay.  Let's look at Exhibit 23 and also, in

23   conjunction with that, Exhibit 3, your supplemental answer

24   to interrogatory three.

25   A    (Reviewing document.)

## Page 138

1    Q    In the second paragraph on page three, the

2    supplemental answer --

3    A    Uh-huh.

4    Q    -- you state, "On May 4th, 2007, this Defendant

5    prepared a memorandum for Zaccari providing a draft of a

6    proposed withdrawal letter requested by Defendant Zaccari

7    together with a statement from this Defendant setting out

8    the requirements of due process implicated in any withdrawal

9    and providing copies of policies dealing with the withdrawal

10   issue.  Defendant Zaccari later directed this Defendant to

11   revise the proposed letter prepared for Defendant Zaccari's

12   signature and this Defendant did so."

13        Is that revised answer or supplemental answer to

14   interrogatory three a description of the document that

15   appears here as Exhibit 23?

16   A    Yes, it is.

17   Q    Can you describe -- strike that.

18        What did Dr. Zaccari say to you when he requested

19   this memo?

20   A    I made a decision -- these are not his exact words.

21   But, generally speaking, I made a decision to

22   administratively withdraw Hayden, and I need to have a

23   little draft that reflects that; and he included items one

24   and two.

25   Q    I'm sorry?

## Page 139

1    A    One and two in terms of what he wanted to have as a

2    condition for his continued enrollment.

3    Q    Okay.  Just so your answer is clear, the top half

4    of this memorandum, Number 23, is a transmittal from you to

5    Dr. Zaccari explaining that this is a response to his

6    request and in the bottom half under the line that says

7    "draft" is a copy of the proposed withdrawal notice that

8    would go to Mr. Barnes.  Is that correct?

9    A    Right.  And I wanted to, once again, emphasize to

10   the President that the student was entitled to due process.

11   The student was entitled to a hearing and an opportunity to

12   be heard and then a determination could be made as to

13   whether or not he should be administratively withdrawn.

14        And I did that as one last attempt to emphasize the

15   advice that I had consistently given him about this student.

16        And I have been oftentimes called upon by all three

17   Presidents to draft documents, letters, correspondences.

18   But I wanted to make certain that he understood very clearly

19   what my advice was in this matter.

20        And while certainly I am -- I would draft the

21   letter if you request that of me, but this is my advice.  So

22   the letter, the bottom part, is a written manifestation of

23   the decision he made.

24   Q    Okay.

25        And the top part is, once again, my emphasized

## Page 140

1    advice.

2    Q    Okay.  Do you believe Dr. Zaccari understood your

3    advice?

4    A    Yes, I do.

5    Q    And just to follow up on something you said a

6    moment ago, in the second half of the proposed notice of

7    withdrawal, these two conditions -- first, "A correspondence

8    from a psychiatric or psychologist indicating that you are

9    not a danger to yourself and others;" and, secondly,

10   "Documentation from a certified mental health professional

11   indicating that during your tenure at Valdosta State you

12   will be receiving ongoing therapy."  Those two conditions

13   were dictated by Dr. Zaccari?

14   A    Yes, it was.

15   Q    Did he prescribe the exact wording to be used?

16   A    No.

17   Q    Okay.  How did he tell you to characterize these

18   conditions?

19   A    He told me what to put as a condition, and I just

20   wrote it on a piece of paper and went to my office and typed

21   it.

22   Q    Did he give any indication of what policy of the

23   University this was intended to be based on?

24   A    No.

25   Q    Let's look at the top half of the memorandum which

**WHEELER REPORTING**

*Court Reporting • Video • Litigation Support*

**404.351.4577**

Page 169

1    later on May 8th.
2         And then the following day, on May 9th, Dr. Zaccari
3    circulated a letter to the administration indicating that
4    Mr. Barnes was in any event withdrawn from school.
5    A    Yes.
6    Q    That's the sequence.
7         MR. CORN-REVERE:  Let's mark as Exhibit 29 a letter
8    from Betsy Neely to Zaccari.
9         (The document was marked for identification as
10   Plaintiff's Exhibit Number 29).
11   BY MR. CORN-REVERE:
12   Q    This is a two-page letter under the letterhead of
13   the Board of Regents of the University System of Georgia,
14   specifically Elizabeth E. Neely, addressed to Dr. Ronald M.
15   Zaccari. Have you seen this letter before?
16   A    Yes.
17   Q    Could you identify it for the record?
18   A    It is a letter from Betsy Neely.  She's the
19   Associate Vice Chancellor for Legal Affairs, and she was
20   charged with responsibility for investigating all
21   applications for review.
22   Hayden Barnes submitted a request for a review, an
23   appeal, and she was directing the President to supply
24   specific information.
25   Q    Okay.  So, to make sure that I understand what

Page 170

1    happened, Elizabeth Neely recommended the process to
2    Dr. Zaccari for administrative withdrawal of Hayden Barnes.
3    Is that right?
4    A    Correct.
5    Q    And that's the process that in the end he chose to
6    use for dealing with Hayden Barnes.
7    A    Correct.
8    Q    And then the appeal, which goes to the Board of
9    Regents, is overseen by the same Elizabeth Neely who
10   recommended the administrative withdrawal process in the
11   first place.
12   A    Yes.
13   Q    Is that right?
14   A    (Nods head.)
15   Q    In your opinion, does this comport with principles
16   of due process?
17   A    No.
18   Q    Did Dr. Zaccari at any point ask you to assist in
19   his appeal before the Board of Regents?
20   A    Yes.
21   Q    What did Dr. Zaccari ask you to do?
22   A    He wanted me to review a document that he had
23   drafted because he wanted to have a full opportunity to
24   fully explain why he made the decision that he did,
25   understanding, of course, my strong feelings about due

Page 171

1    process, and gave me a detailed response to Betsy Neely to
2    review.
3    Q    Okay.  At what point -- strike that.
4         Did Dr. Zaccari ask you to draft his response for
5    him?
6    A    No.  He drafted it and I reviewed it.
7    Q    Okay.  Was the draft that you reviewed
8    substantially complete or were there blanks in the text
9    or -- can you describe the document that you saw?
10   A    It was not in complete form when I first received
11   it.  There were some modifications made.
12   Q    Did you recommend the modifications?
13   A    Some modifications I recommended.
14   Q    Do you remember the approximate date in which
15   Dr. Zaccari approached you to help with the appeal?
16   A    No.  He understood, of course, that it had to be
17   before June 29th.  The document, that is.
18   Q    Right.  I believe Exhibit 29 gives June 29th as the
19   deadline.  2007.
20        MR. CORN-REVERE:  Let's mark as Deposition Exhibits
21   Numbers 30, 31 and 32, three documents that appear to be
22   successive versions of the response.
23        (The documents were marked for identification as
24   Plaintiff's Exhibit Numbers 30, 31, and 32.)
25   BY MR. CORN-REVERE:

Page 172

1    Q    Have you had a chance to look at the exhibits?
2    A    Yes.
3    Q    Can you identify them for the record?
4    A    These are draft documents of Dr. Zaccari's response
5    to Hayden's request for an appeal.
6    Q    Okay.  Looking at the first draft, Exhibit Number
7    30, the date at the top is June 11th, 2007.
8    A    Uh-huh.
9    Q    Does that refresh your recollection of when you may
10   have first seen a draft of Dr. Zaccari's response?
11   A    On or about June 11th?
12   Q    2007, yes.
13   A    Yes.
14   Q    Okay.  Do you recall whether or not this first
15   draft dated June 11th is one that you saw at that time?
16   A    Yes.
17   Q    Okay.  You testified a moment ago, I believe, that
18   you had recommended some changes in the response.
19        Are any of the changes you suggested reflected in
20   the handwritten notes on this draft?
21   A    I would have to look at the final to see.  I'm on
22   Exhibit 30.
23   Q    Right.  But do you recognize the writing?
24   A    This is Dr. Zaccari's handwriting.
25   Q    In every case?



## Page 173

1    A    Yes.

2    Q    Okay.  Did you make any notes on the draft that

3    Dr. Zaccari gave you and give it back to him?

4    A    The blanks -- Dr. Zaccari drafted this response and

5    gave it to me to present in a proper format for the appeal

6    of Hayden Barnes.

7       I took that information and put it in the proper

8    format.  And then the blanks that you see there, those are

9    blanks that I had because I requested of him for

10   clarification sake that he had to include this information,

11   as well.

12   Q    Which information are you referring to?

13   A    Like, number two:  On, blank, of 2007, I was

14   informed that flyers were posted across the campus and

15   Mr. Barnes was the author of that document.

16      Because I was not party to these communications or

17   this information didn't come directly from me, I needed him

18   to supply the missing information.

19      So, what you're seeing here on June 11th is a

20   product of Dr. Zaccari giving me something in very, very

21   rough form; and I'm putting it in the format that's expected

22   from the Board of Regents.  But in reading his information,

23   it is not clear enough.

24   Q    I see.

25   A    He's got -- you know, there's not enough -- dates

## Page 174

1    are missing.

2    Q    Am I correct that there were an earlier draft that

3    you looked at and you recommended changes, and those changes

4    are reflected in this document, Exhibit Number 30?

5    A    My changes that I recommended are, for example, we

6    need the date of -- on item number one, for example, it says

7    Thomas Hayden Barnes enrolled on -- what -- having

8    transferred from what to what?  Okay?

9    Q    Uh-huh.

10   A    That's preliminary information that needs to be

11   outlined in Dr. Zaccari's response to Betsy Neely.

12      Then, for example, number four.  It says blank.  I

13   need to know about a meeting that he had with S.A.V.E.  He

14   wanted to include information about the S.A.V.E meeting.

15   Well, you need to put the date that you had the S.A.V.E

16   meeting in there for clarity sake so the reader can

17   understand the context in which you had this in.

18      So what I did -- what you're seeing is -- the

19   overwhelming information contained in this information is

20   Dr. Zaccari's.  I have blanks.  I'm sending it to him.  He's

21   reviewing it, and he's making changes of his own document.

22   Q    Yes.

23   A    In addition to recognizing that information needs

24   to be included in there, as well.

25   Q    I think I understand.  So, as part of your

## Page 175

1    revisions to put his response to the Board of Regents in the

2    correct form --

3    A    Form, uh-huh.

4    Q    -- you added paragraphs or language that called for

5    the filling in of specific facts like dates or other

6    information so that it would be in the correct form.  Is my

7    understanding correct?

8    A    Yes.  And, in addition to that, some of this

9    information I just felt as if it wasn't relevant.

10      The decision to withdraw Hayden Barnes had already

11   been made and that decision was involved.  The same

12   individual is going to be reviewing this report.

13      So, for example, on page -- I'm on Exhibit 30, page

14   five.  He talks about his evaluations by the Chancellor's

15   office places his work in the top five among thirty-five

16   college and university presidents and stuff like that.

17      I remember suggesting to him that I didn't know if

18   he needed to have that in there because it has no bearing on

19   the issue at hand.

20   Q    Uh-huh.

21      MR. CORN-REVERE:  Could we go off the record just

22   one moment?

23      (Discussion off the record.)

24   BY MR. CORN-REVERE:

25   Q    Were there any other deletions that you recall that

## Page 176

1    you recommended to Dr. Zaccari?

2    A    I think there were some, but I can't recall.

3    Q    Did Dr. Zaccari ask for your input on any of the

4    factual statements made in the letter?

5    A    I asked for his input because some of these facts I

6    could not speak to because I wasn't there.

7       For example, on page two of Exhibit 32, item six,

8    includes, "On April the 16th, 2007, I received a telephone

9    call from Vice Chancellor Linda Daniels asking for a

10   description of his physical appearance."  Well, I can't

11   speak to those facts.

12   Q    Yeah.

13   A    Because I wasn't there.

14   Q    Okay.  Let me just go back for a minute with these

15   three exhibits.

16      Exhibit 30 you've identified as a draft of

17   June 11th.  The Exhibit 31 appears to be a later draft.  It

18   is dated at the top June 18th, 2007.

19      Can you identify that document for the record?

20   A    I'm sorry.  What exhibit?

21   Q    Thirty-one.  It's dated June 18th.

22   A    It's a draft.

23   Q    Yes.  Have you seen this document before?

24   A    Yes, uh-huh.

25   Q    Yes?



## Page 177

1    A    Yes.

2    Q    Okay. After your initial recommendations and your

3    review of the June 11th draft, did Dr. Zaccari also ask you

4    to look at the June 18th draft?

5    A    Yes.

6    Q    And then just for authentication purposes, looking

7    at Exhibit 32, can you identify that document for the

8    record?

9    A    This is what was ultimately sent to Betsy Neely.

10   Q    So this is the final product?

11   A    I believe it is the final document signed by

12   Dr. Zaccari.

13   Q    And this was sent to the Board of Regents actually

14   ahead of the deadline: June 21st instead of June 29th.

15       Okay. Looking back on Exhibit 30, do you recognize

16   any other changes that you suggested on that draft?

17   A    You want me to look at 30 or 31?

18   Q    I just want to make sure that I haven't missed

19   anything on the first draft. So if there are any other

20   changes you suggested that I haven't already covered --

21   A    Exhibit 30 is not the same as Exhibit 31. There

22   have been modifications. So what you see in Exhibit 30, 31

23   and 32 is a progressive modification to the point we get to

24   a final document, which is Exhibit 32.

25       But if you look at Exhibit 31, you will see that

## Page 178

1    it's certainly not in its final form because if you look at

2    page six of eight, in the second paragraph, it says my point

3    XXX in there because that information needs to be in there.

4    Q    Yes. And, of course, on page one in paragraph one,

5    there are still some blanks.

6    A    Yeah.

7    Q    Okay. In looking at this June 18th draft, Exhibit

8    31 --

9    A    Uh-huh.

10   Q    -- were you also asked to review the draft at this

11   stage and make recommendations?

12   A    The June 18th?

13   Q    Yes.

14   A    Yes.

15   Q    And did you make any recommended changes in this

16   draft?

17   A    I may have. I don't recall specifically. But,

18   once again, Dr. Zaccari was the primary author of this

19   document. I just made modifications here and there.

20   Q    Looking at it today, does it refresh your

21   recollection on any of the modifications you might have

22   suggested?

23   A    No.

24   Q    Do you recall whether or not you made any

25   recommendations about deletions at this point?

## Page 179

1    A    I don't recall.

2    Q    And looking at Exhibit 32 --

3    A    Okay.

4    Q    -- this is the final copy of the response in the

5    appeal that Dr. Zaccari sent to the Board of Regents.

6    A    Uh-huh.

7    Q    Did Dr. Zaccari ask you to review this before it

8    was sent?

9    A    I believe he did.

10   Q    Did you make any recommendations to the final

11   version before it was delivered to the Board of Regents?

12   A    I may have.

13   Q    Do you recall any of the recommendations that you

14   made?

15   A    No.

16   Q    Did you review any of the factual claims that were

17   made in the letter?

18   A    I relied on his representations of the factual

19   claims. This was his response to the appeal.

20   Q    Okay. Based on your earlier testimony about the

21   meetings that you attended with Dr. Zaccari and with other

22   members of the administration in late April 2007 and in

23   early May 2007, particularly May 3rd and May 7th, 2007,

24   would you take a look at paragraph 13 on page 4 of Exhibit

25   32?

## Page 180

1    A    (Reviewing document.)

2        MR. LaVALLEE: What page?

3        MR. CORN-REVERE: Page four.

4        MR. LaVALLEE: Thank you.

5        MR. CORN-REVERE: It's the first full paragraph.

6    Paragraph number 13.

7    BY MR. CORN-REVERE:

8    Q    It begins about five lines down, middle of the

9    line: "I sought the advice of the members of the

10   President's administrative unit consisting of Dr. Kurt

11   Keppler, Vice President of Student Affairs; Dr. Louis Levy,

12   Vice President of Academic Affairs; Mr. James Black, Vice

13   President of Finance and Administration; Mr. Scott Sikes,

14   Vice President of Institutional Advancement, and Dr. Marsha

15   Krotseng, Associate Vice President for Strategic Research

16   and Analysis.

17       "The administrative unit, along with Mr. Scott

18   Doner, VSU's Police Chief, and Ms. Ann Farmer, Assistant

19   Chief of Police, and I collectively decided that VSU take

20   necessary steps to minimize as much as possible any security

21   risks."

22       I'm not asking you to say whether or not

23   Dr. Zaccari may have independently taken those steps; but in

24   the meetings that you attended in late April and early May

25   2007, did Dr. Zaccari seek anybody's advice on what to do

**EXHIBIT D**

**DRAFT WITHDRAWAL NOTICE AND
LAVERNE GASKINS MEMORANDUM**

EXHIBIT
23



**VALDOSTA**
**STATE**
**UNIVERSITY**
*Building for Our Next Century*
*1906-2006*

MEMORANDUM

TO:        Dr. Ronald Zaccari, President

FROM:      Laverne Lewis Gaskins, University Attorney

DATE:      May 4, 2007

Please find below the proposed letter. You should note that due process dictates that the student be apprised of what particular policy has been violated, an opportunity to be heard and also be informed of the appeal process. My research has led me to the following policies that appear to be implicated. I have attached the same for your review and consideration.

Valdosta State Student Code of Conduct
E.(7)  Disorderly Conduct
Mental Health Withdrawal

Board of Regents Policy 1902
Disruptive Behavior

DRAFT            DRAFT            DRAFT

As a result of recent activities directed towards me by you, included but not limited to the attached threatening document, you are considered to present a clear and present danger. Therefore, you are hereby notified that you have been administratively withdrawn from Valdosta State University effective May 6, 2007.

Provided that you satisfy any and all necessary academic requirements at that time of application, your readmission to this University and continued enrollment at this institution is condition upon your submitting the following.

1.  A correspondence from a psychiatric or psychologist indicating that you are not a danger to yourself and others.
2.  Documentation from a certified mental health professional indicating that during your tenure at Valdosta State you will be receiving on-going therapy.

**Office of Legal Affairs**
**Location** West Hall • **Room** 125 • **Address** 1500 N. Patterson St. • Valdosta, GA 31698–0181
**Phone** 229.333.5351 • **Fax** 229.245.6532

A Regional University of the University System of Georgia & an Equal Opportunity Institution

Generally, decisions of the University may be appeal to my office. However, because this matter directly concerns me, should you elect to appeal my decision, you should submit your written appeal within twenty (20) days of receipt of this letter to the Board of Regents at the following address.

Board of Regents of the University System of Georgia
270 Washington St. S.W.
Atlanta, Georgia 30334

Sincerely,

Dr. Ronald Zaccari

# EXHIBIT E

## MAY 21, 2007 LETTER FROM THOMAS HAYDEN BARNES TO BOARD OF REGENTS

T. Hayden Barnes

Board of Regents of the University System of Georgia
270 Washington Street, SW
Atlanta, GA 30334

This my written appeal, for the consideration of the Board of Regents, of my administrative withdrawal from Valdosta State University, which I received notice of May 7th, 2007. Due to the unprecedented and unparalleled nature of this case, I hope for speedy redress, so as not to materially interfere with my Constitutional rights to due process, which were so egregiously ignored at the University level, among other rights. I hope to have my case expedited and heard at the June Board of Regents meeting. If after reviewing these documents, you feel you cannot expedite my case, then please contact me ASAP.

The following documents are enclosed. All documents are in chronological order, with the exception of my letter of appeal and a letter of support from my mother, which appear first. *And VSU/BOR policy documents which appear last.*
Additional documentation may be included not listed below, appended just prior to submission. Please make a note that the following list may not be complete and review all documents contained herein

My letter of appeal
My mother's letter of support
Documentation from Dr. Kevin Winders of Psychiatric Consultants, P.C.
Documentation from Mrs. Leah McMillan, L.M.F.T. of Valdosta State University Counseling Center
Copies of Valdosta State University Policies related to my case
Copies of Board of Regents Policies related to my case
VSU Spectator Article (April 19, 2007)
Copy of letter I wrote to University President Ronald Zaccari
Copy of notice of administrative withdrawal (May 7, 2007)
Copy of 'cartoon' attached to administative withdrawal
Copy of memo dispatched from the Office of the President to Valdosta State University department heads (May 9, 2007)
Copy of memo sent to me after I "failed" to vacate my dorm after given 48 hours to do so, but not notified (May 11, 2007) *and was locked out of my room*

Respectfully,

*[signature]* 5/21/07

T. Hayden Barnes

**RECEIVED**

MAY 2 4 2007

**LEGAL AFFAIRS**


EXHIBIT
Hayden
14
6-25-09  JMeyer

B000614

# EXHIBIT F

## MAY 29, 2007 LETTER FROM ELIZABETH NEELY TO THOMAS HAYDEN BARNES

LI08218780



**BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA**

270 WASHINGTON STREET, S.W.
ATLANTA, GEORGIA 30334-1450

ELIZABETH E. NEELY

Phone (404) 656-2221
Fax (404) 657-7915

May 29, 2007

Mr. T. Hayden Barnes
1408 Iota Drive, Apt. B
Valdosta, Georgia 31602

**COPY**

RE:    **Application for Review:**
Valdosta State University

Dear Mr. Barnes:

Pursuant to the provisions of Article VIII of the <u>Bylaws</u> of the Board of Regents (copy enclosed), I will present your appeal regarding your administrative withdrawal from Valdosta State University to the Board at its meeting on August 7-8, 2007. You will be notified promptly thereafter of the Board's decision.

Please forward all the information requested, if any, on the attached form (Exhibit "A") so as to reach my office no later than June 29, 2007. Failure to receive this information within the time requested may be considered as an abandonment of your application for review.

Please note carefully the enclosed procedural rules, which must be followed in submitting materials in support of your appeal.

If you have questions concerning this procedure or the documents required for submission, please give me a call at (404) 656-2221.

Sincerely,

*Elizabeth E. Neely*

Elizabeth E. Neely
Associate Vice Chancellor for Legal Affairs

EEN/klc

cc    Chancellor Davis (w/o enclosure)
Dr. Ronald Zaccari, President ✓

Enclosure

LI08218780

EXHIBIT "A"

OFFICE OF LEGAL AFFAIRS
BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA

Date: May 29, 2007

To:     Mr. T. Hayden Barnes

Re:     **Application for Review**
        Valdosta State University

The Office of Legal Affairs is charged with the responsibility of investigating all applications for review of final decisions made by presidents of institutions in the University System. The results of the investigation are reported to the Board or a committee thereof. The Board may elect to (1) deny the application for review, (2) remand the matter to the institution for further review, (3) review the application on the existing record, (4) grant a hearing before a committee of the Board, or (5) take such action as deemed appropriate. To assure a thorough and complete consideration of this application for review, the following information is required:

1.  Please state on a separate sheet of paper all grounds (individually numbered) upon which you base your application for review and specify the exact relief that you seek. Be precise.

2.  Please enclose copies of any correspondence or other documents including the president's final decision, which you believe support or otherwise relate to your application for review.

3.  Please explain briefly and precisely on a separate sheet of paper all hearings or reviews which have been held at your institution. Include the names and titles of individuals who heard the complaint and the names and addresses of any witnesses who appeared in your behalf. If available, please include a transcript or tape recording of the hearing. If not, please include a brief summary of the oral evidence presented at the hearing.

4.  Please describe briefly on a separate sheet of paper any evidence that you believe supports your contentions. Was such information considered at previous hearings?

Please forward this information to the Office of Legal Affairs, Room 7038, 270 Washington Street, S.W., Atlanta, Georgia 30334 so as to reach my office no later than June 29, 2007. Failure to receive this information within the time required will be considered as an abandonment of your application for review. Information furnished in support of your application for review will not be returned. A copy of your response may be sent to the institution concerned.

_E. E. Neely_

Elizabeth E. Neely
Associate Vice Chancellor for Legal Affairs

# RULES GOVERNING THE PREPARATION AND SUBMISSION
## OF APPLICATIONS FOR REVIEW UNDER ARTICLE VIII
## OF THE BYLAWS OF THE BOARD OF REGENTS



The following standards are designed to facilitate the examination and analysis of Applications for Review submitted to the Office of Legal Affairs. These standards shall apply both to individual applicants and institutions.

1. The Board will not accept or consider any appeal unless all available remedies at the institution have been fully exhausted, including a final review and decision on each issue by the President of the institution in writing.

2. Article VIII of the Bylaws of the Board of Regents provides for an appeal by persons who have been "aggrieved" by a final decision of the president of an institution. Hence, applications, which do not request specific redress of individual complaints, will not be accepted or considered.

3. Applications must be received by the Office of Legal Affairs of the Board of Regents no later than twenty calendar days following the final decision of the President. The Board of Regents may deny untimely applications for review.

4. The failure of an applicant to furnish required submissions by deadline dates may be construed as an abandonment of the application for review.

5. The burden of persuasion is upon the Applicant to provide the evidence deemed sufficient by the Board to authorize a hearing, order a demand, or take such other action as may be determined by the Board.

6. Application packets and institutional responses shall be limited to no more than ten, single-spaced, letter-size pages of material, excluding exhibits and attachments relevant to the contested issues. Faxed copies will not be accepted.

7. Application packets and institutional responses must be stapled in the upper left-hand corner (paper clips and pressure clips are not acceptable).

8. Applications for review and institutional responses in loose-leaf binders or other types of soft or hard covers will not be accepted.

9. Applicants and institutions should submit only one copy of a document. If a document is submitted during the initial stages of review, a copy of the same document should not be included with subsequent submissions.

10. Documents larger than letter size must either be photo-copy-reduced to letter-size, or folded.

11. Audio cassettes or compact discs of hearings may be submitted, but videotapes will not be accepted or considered.

12. Physical evidence (such as a knife, gun, or bottle) may be submitted by photograph only, placed next to a ruler in the photograph for indication of the object's size.

13. All submissions, including but not limited to documents and audio cassettes/discs, become the property of the Board of Regents and will not be returned.

14. The Board will not accept or consider appeals based on academic grades, the guaranteed tuition plan, residency classification, parking, or other violations of traffic regulations. In such matters, the decision of the President shall be final and binding for all purposes.

Rules.Sub

# ARTICLE VIII

## APPEALS

Any person in the University System aggrieved by a final decision of the president of an institution may apply to the Board of Regents, without prejudice to his or her position, for a review of the decision. The application for review shall be submitted in writing to the Board's Senior Vice Chancellor for Support Services or designee within a period of twenty days following the decision of the president. It shall state the decision complained of and the redress desired. A hearing before the Board (or a Committee of or appointed by the Board) is not a matter of right but is within the sound discretion of the Board.

The Board may, in its discretion, refer a matter for mediation, arbitration, or evaluation of settlement options. If an application for review is granted, the Board, a Committee of the Board, a Committee appointed by the Board, or a hearing officer appointed by the Board shall investigate the matter thoroughly and report its findings and recommendations to the Board. The decision of the Board shall be final and binding for all purposes.

**EXHIBIT G**

**JUNE 21, 2007 LETTER FROM RONALD ZACCARI
TO ELIZABETH NEELY**

LI08218780



**VALDOSTA**
**S T A T E**
~~UNIVERSITY~~
*Building for Our Next Century*
*1906-2006*

EXHIBIT
S
Zaccari 7-29-09

**Ronald M. Zaccari**
*Office of the President*

June 21, 2007

Ms. Elizabeth E. Neely
Associate Vice Chancellor for Legal Affairs
Board of Regents of the University System of Georgia
270 Washington Street, S.W.
Atlanta, Georgia 30334

RE:    Application for Review
       Thomas Hayden Barnes
       Valdosta State University

Dear Ms. Neely:

This letter serves as a response to the above referenced matter and the following is a chronology of events pertinent to your investigation.

## HISTORY

1. Thomas Hayden Barnes enrolled in Valdosta State University on August 14, 2005 having transferred as a sophomore from Warren Wilson College, Swannanoa, North Carolina.

2. On March 23, 2007, I was informed by my Administrative Assistant that flyers opposing planned parking decks had been posted across campus and that Mr. Barnes was the author of the document. (See Attachment #1) At that time, I had never met Mr. Barnes nor had I heard any previous information about any opposition to the parking decks. Upon reading the flyer, it was apparent Mr. Barnes did not understand the funding process for parking decks nor was he aware that no state funds could be used to finance the projects.

3. Prior to the referenced flyer's appearance, I had several productive meetings with a campus student group known as S.A.V.E (Students Against Violating the Environment) and we had accomplished excellent partnerships and related actions steps leading to positive efforts to initiate recycling and discussions about other environmental projects. I view the S.A.V.E. organization as a productive means of discussing student issues and working harmoniously on behalf of Valdosta State University. On March 26, 2007, I

LI08218780

asked the leadership of the group if they knew about Mr. Barnes and his view points. They knew Mr. Barnes, but stated he left the organization to pursue his own agenda. The students were concerned that Mr. Barnes' approach was confrontational rather than pursuing open dialogue with the administration.

4.   On or about March 26, 2007, following my meeting with S.A.V.E, I received a correspondence from Mr. Barnes (see Attachment #2) stating his apologies and his intent to remove the flyers and discontinue public opposition.

5.   Several days prior to the April 17 and 18, 2007 Board of Regents' meeting, Mr. Barnes immediately reversed his decision to discontinue public opposition. I was informed by Vice Chancellor Linda Daniels that Mr. Barnes had been contacting the Governor's office, the Chancellor's office, and members of the Board of Regents. Mr. Barnes had voiced his opinions and requested referenced offices and individuals to immediately disallow the parking decks. When asked by those with whom he had personal telephone contact if he had met with the VSU president and discussed his view points, his response was that he had. His response represented an abuse of the truth as I had never engaged in any conversation with Mr. Barnes. Other than the correspondence of a short-lived apology, I had never met or interacted with this student. Mr. Barnes' actions led to a series of what I consider to be erratic behavior. Without regard to accurate information and open dialogue with individuals who could have provided valuable data about VSU's parking needs and related planning, he purposely misrepresented the truth and aggressively asked the various high-ranking state offices and officials to disallow VSU's parking decks.

6.   On April 16, 2007, I received a telephone call from Vice Chancellor Linda Daniels asking for a description of his physical appearance. I related to Vice Chancellor Daniels that I had never met Mr. Barnes, nor could I relate any specific information about the student. There was a concern that Mr. Barnes would appear at the Board of Regents meeting scheduled days later at Georgia Southern University and stage a protest. The Georgia Southern University Police department was alerted by Vice Chancellor Linda Daniels to a possible public protest.

7.   Following my call with Vice Chancellor Daniels, on April 16, 2007, I requested a meeting with Mr. Barnes and required VSU's Dean of Students, Mr. Russ Mast, to be present for the meeting. Mr. Barnes arrived at my office on April 16, 2007 at the appointed time (5:00 pm). He requested that another VSU student (his girlfriend) be permitted to participate in the meeting. I refused his request because the meeting did not involve the actions of his girlfriend.

The meeting lasted for approximately one hour and ten minutes. The topics discussed included his lack of knowledge of how parking decks are financed, required business models (public/private partnerships), mandated processes/sequences in the University System of Georgia Master Planning process, and procedures for Board of Regents approval. I explained that no state funds are permitted to construct the proposed decks. Although he appeared to listen, my attempt to provide an overview resulted in his

LIO8218780

suggestion that rather than building parking decks, the funds should be diverted to such projects such as Amazon Rain Forest Protection and housing for Katrina Hurricane victims. When I explained the business plan involved borrowing funds through a long-term bond with external lenders, he had no response. I again emphasized that state funds could not be used to construct parking facilities and outlined that private/public partnerships required a conduit of funds into the project to pay the lenders over a prescribed period of the bond agreement. When asked why he failed to communicate his concerns through the VSU Student Government Association, he stated, "they are no help to my cause."

The remaining time was spent attempting to redirect his energies in a more positive direction and recommending ways in which to build relationships that would assist in coalescing individuals and engaging people to support his view points. I suggested that his current approach drives people in opposing directions. I stated that I wanted to advise him as I would in mentoring my own two sons. He was not interested in my views, a fact supported by the student's subsequent statements that mock my attempt to advise and communicate with him.

8. On Friday, April 20, 2007, Mr. Barnes sent an email to me (see Attachment #3) referencing Easter Island and mocking the meeting's discussion of required business plans. I began to view Mr. Barnes' behavior as the inability to listen, opposition to the administrative policies of the University and the University System of Georgia, and interested in only promoting self interests. No other views, other than his own, appeared to be of interest.

9. VSU's entries on the Board of Regents' meeting agenda (April 17-18, 2007) were approved, including the parking decks. Several days following the BOR meeting, Dean Mast provided a copy of a document generated by Mr. Barnes, wherein he had posted my picture on an image of a parking deck with the words, "S.A.V.E.- Zaccari Memorial Parking Deck" (see Attachment #4).

10. He additionally posted and made reference to the shooter of the April 16, 2007 Virginia Tech slayings (see Attachment #5). The topic of Attachment #5 is focused on the misunderstandings of people who suffer from psychological disorders. Also, included on the second page of the article referenced in Attachment # 5 is a reference to "Shoot it. Upload it. Get famous. Project Spotlight is searching for the next big thing. Are you it?"

11. An additional entry on Attachment #5 was brought to my attention by my Administrative Assistant that referenced Mr. Barnes' personal statement, "Hayden is cleaning out and rearranging his room and thus, his mind, or so he hopes".

12. At this point in the chronology of events, a pattern emerged in the student's behavior. First, a flurry of aggressive actions with inaccurate information, then a written apology followed by an immediate reversal, telephone calls to state offices and Board of Regents, posting my picture as "memorial", and reference to the Virginia Tech shooter. These were documented sequential signs that indicated possible threats to me and the campus.

LI08218780

Since I am not an expert in assessing the psychological status of an individual, but have the appointed responsibility as VSU president and the safety of the campus, I took specific action.

13. The first step was to alert VSU Campus Police on or about April 20, 2007 of the student's behavior and the potential risk if we fail to monitor his actions. Due to the heightened awareness of the Virginia Tech shooting and the national focus on "what should have been done", "what could have been done", "what university presidents must do to protect and possibly prevent such incidents", and "what signs of overt student behavior should immediately be addressed", I sought the advice of the members of the President's administrative unit consisting of Dr. Kurt Keppler, Vice President of Student Affairs, Dr. Louis Levy, Vice President of Academic Affairs, Mr. James Black, Vice President of Finance and Administration, Mr. Scott Sikes, Vice President of Institutional Advancement and Dr. Marsha Krotseng, Associate Vice President for Strategic Research and Analysis. The administrative unit, along with Mr. Scott Doner, VSU's Police Chief and Ms. Ann Farmer, Assistant Chief of Police and I collectively decided that VSU take necessary steps to minimize as much as possible any security risks. Due to the near ending of the Spring academic semester (approximately one week from final examination schedule), it was decided that we monitor Mr. Barnes' student activities and place high security on my public appearances. Non-uniformed campus officers were assigned to patrol my private residence during my off-campus hours, protect my wife and me from potential danger, and uniformed officers were placed on high alert to protect the campus as it concluded the 2007 Spring Semester of classes. My daily schedule was monitored by campus safety officers.

During this timeframe, there were a number of high profile/public events at which I was scheduled to speak, including a weekend Earth Day rally (requested by the S.A.V.E organization), six Commencement Exercises, and the final baseball game for a forty-year career VSU coach.

With high security and monitoring of Mr. Barnes' student activities, appropriate action was taken which allowed the semester to come to a conclusion without alarming the campus that a potentially dangerous situation was brewing, one that could have interrupted final examination schedules. Immediately following the Virginia Tech shooting, the VSU campus received numerous telephone calls from concerned parents inquiring as to what measures VSU was undertaking to protect the campus. Inherent in these inquires were concerns of "copy cat" behaviors.

I took what I believed to be appropriate action and minimize campus focus on Mr. Barnes and his documented behavior by not scheduling a judicial hearing. The exigency of the circumstances dictated action that would not invite alarm. A campus hearing would have involved a judicial panel comprised of students and faculty. This format would have alerted the campus of a potential threat, and would have comprised campus safety by exacerbating potential alarm.

LI08218780

## ISSUE ON APPEAL

Essentially, Mr. Barnes contends that his actions were not intended to be construed as a threat of physical harm toward myself or others; rather, he was simply exercising his First Amendment Rights. Additionally, Mr. Barnes maintains that he was never informed of the reason he was removed from the University.

## DISCUSSION

As with all students, Mr. Barnes is free to enjoy all his constitutional guarantees. However, with this freedom comes the expense of responsibility. It is my understanding, that it is a well settled principal of law that the First Amendment was never intended to bestow upon anyone the right to make a cognizable threat of physical harm.[1] Mr. Barnes takes a questionable approach in advancing the notion that his use of the word "memorial" as reflected in Attachment 4 was an unintentional use of the word. Webster's Dictionary defines the word as "something that is a reminder of ...some person." The common usage and understanding of this word in our society is in recognition of someone deceased.[2] Indeed, even Mr. Barnes' mother agreed that after she viewed the web posting she understood why I would be concerned. (See Attachment # 6, paragraph 3, line 1.)

His mother dismisses the student's actions as "passionate" and references her son as "intelligent", yet asks that VSU dismiss his reference to "memorial" as not knowing its true definition and that he is naïve about such understandings.

If one is to believe that Mr. Barnes has a history of activism regarding complex political issues, then, necessarily, one must conclude that his convenient explanation of his use of the word "memorial" is disingenuous. Further, Mr. Barnes asserts that his web page has limited access and therefore was not intended for my viewing. However, a web site has the potential of being viewed by hundreds. Ultimately, whether or not I viewed the site before or after others is immaterial to the fact that I perceived its contents as a threat of physical harm. However, Mr. Barnes made an affirmative effort to use a particular word to convey the full implication of its meaning. While in retrospect, Mr. Barnes may concede that his actions were inappropriate, I dealt with the facts as they were presented at that time. Accordingly, Mr. Barnes should not expect to be insulated with the protection of the constitution while he engages in disruptive, threatening behavior.

Mr. Barnes and his behavior focus primarily on himself and his views. No one's opinion or appointed office appear to be of value, and authority is something he counters at every possible opportunity with an attitude that "I'll get in your face". He does not follow any protocol, but expects everyone else to follow his protocol and whatever suits his current need and points of view.

---

[1] "The most stringent protection of free speech would not protect a man falsely shouting fire in a theatre and causing panic." *Schenck v. United States* (1919)

[2] For example, we honor our fallen military persons on Memorial Day.

LI08218780

My actions were not taken in response to the student's opposition to the proposed parking decks. The parking decks had been discussed and endorsed for several years through intense planning with campus governance groups such as the Student Government Association, Faculty Senate, Council of Classified Staff Affairs, and the President's Cabinet. Additionally, an appointed campus Master Plan Committee endorsed the parking decks through a mandated Board of Regents Ten-year Master Plan update that the University System of Georgia directed me to conduct when I assumed the VSU presidency in January, 2002. The revised Master Plan was done in concert with the Facilities Office of the University System of Georgia, external consultants, and the VSU campus. A twenty-four month period of hard work and a campus master plan were endorsed and accepted at the May, 2004 meeting of the Board of Regents. Extensive campus dialogue took place at all levels of open campus governance and public forums were held to discuss the pros and cons of the proposed Master Plan. External consultants were hired to conduct extensive research about VSU's ten-year growth and the projected facility and parking needs to serve current and future students, faculty, and staff.

My point: The parking decks were an integral part of the accepted Master Plan and based on projected parking needs that documented a deficit of 2,700 parking spots by the year 2014. Mr. Barnes was not enrolled at VSU when the external consultants engaged the campus in the revised Master Plan; however, he embarked on a public opposition to the parking decks without gathering pertinent information about the lengthy planning and strategic action required to implement such an expansive project. Had he requested the information in a logical inquiry, my staff and I would have supplied the information. Although Mr. Barnes opposed the parking decks, his opinion was not accepted as a mainstream voice; thus, I had no concern about his position. Obviously, his voice had no impact on the Board of Regents' decision to approve the construction of the two decks (approval took place at the April, 2007 meeting of the Board of Regents).

Indeed, Mr. Barnes recently displayed behavior that is in keeping with the observation that his focus is primarily on his concerns. The Board of Regents does not have a regularly scheduled meeting in July. Yet, following his appeal of this matter to the Board of Regents, Mr. Barnes, sent a communication to the VSU's Director of Housing, complaining, among other things, that the Board was "stone-walling" his appeal. (See Attachment # 7.)

Mr. Barnes' inclusion of my picture on his web site, coupled with the Virginia Tech tragedy, and his subsequent posting of an article wherein the author expresses "empathy with the shooter", culminated in the need to make a decision in the interest of my safety and that of the campus community.

I seek to dismantle obstacles that interfere with an individual's ability to pursue and fulfill his or her goals in an environment that is conducive for achievement. Consistent with this philosophy, I carefully weighed Mr. Barnes' interest in continuing his enrollment at VSU against the competing interest of campus safety. In the final analysis, based on the foregoing series of events, I determined that the overall interests of the

LI08218780

campus community were paramount to that of Mr. Barnes'.

As university administrators, we must try to understand how and why such events such as the Virginia Tech shootings happen and to consider carefully what precautions we can take to prevent them. I made my decision based on the belief that I was at risk and there was a real threat to my safety, the safety of my spouse, the safety of my administrative staff, and there existed a potential campus threat such as the one that occurred on the Virginia Tech campus, April 16, 2007.

As I am not an expert in the field of mental health, and because of my concern for campus safety, I felt it necessary to defer to the experts and incorporated their input as a condition for Mr. Barnes readmission to the University. Hence, my request for a professional evaluation was included in his administrative withdrawal and as a condition for readmission.

Mr. Barnes' behavior was disruptive to the administrative operation of the University and he was fully informed of the reason for his removal as set forth in Attachment #8.

## RECOMMENDATION

My decision and the actions of VSU personnel permitted the campus to complete its Spring Semester. Mr. Barnes was able to complete his course work, and now he is given the opportunity to assess his behavior patterns, seek help, and decide whether he wants to return to VSU, transfer to another institution, and in general function on any post-secondary institution in order to achieve a college degree.

My actions were not intended to permanently withdraw the student from Valdosta State University, but to request the student to seek professional psychiatric assistance and allow VSU's administrative staff to assess his request for continued enrollment. He has the opportunity to present requested information for reevaluation of his readmission.

In closing, I offer the following quote from the May 11, 2007 edition of the Chronicle of Higher Education:

*"After the tears, the makeshift memorials, and the intensely painful series of funerals, higher education must come to grips with the fact that it had its own September 11. It will never be, nor should it be, the same again at our nation's colleges and universities."*

Let's look at September 11 and its aftermath. Let's review all of the reports that state how we should have paid more detailed attention to signs, analyzed more carefully apparent signs and pieces of information, and developed more proactive approaches to preventing such events and similar future events. Those are the underlying premises from which VSU took the action that is now under appeal. Those are the very reasons

LI08218780

why VSU stands firm on its actions and decisions. The campus was able to come to a point of resolution with safety, the continued effective regional mission firmly in place, and the successful completion of classes and final examinations. Mr. Barnes was able to complete his academic work and receive final grades. He now has the opportunity to present a case for readmission to Valdosta State University.

The unfortunate outcome in this appeal is that the student fails to understand that he must be responsible for his actions and words. He is in this situation because he chose to place himself squarely in a critical path – one of his own creation.

Sincerely,

Ronald M. Zaccari,
President

# EXHIBIT H

## ANN FARMER'S NOTES

DEFENDANT'S
EXHIBIT
Farmer
NO. 1  1-8-09
PENGAD 800-631-6989

4/20/07

<u>Dr. Z.</u>

- encounters w/ Hayden Barnes (D)

- D began distrib. of flyer.
    assertive tele. calls to Gov O/c
        "      "     "    Chancellors
        "      "     "    Bd. of Regent's members

- felt out of ordinary for a student

- Dr. Z. had meeting w/ SAVE on campus.
    student environ. group — good
    working arrangement w/ them.
    This atkend Pres. Speaking @
    Drexel Park  to support SAVE.
    (Sunday → V)

for Dr.Z. speak afterwards?

- met w/ SAVE but SAVE said he
    wasn't a part of their group :
    they talked to him.

- Dr.Z. → Sent apology to Dr. Z. →
    supports SAVE but actions
    were his individually. Blog/Facebook/
    Flyers taken up : deleted.

2 days later — D had contact
w/ 2 Regents while others
didn't deal w/ him.  Felt
he was irrational.

Tues/Thurs. Pres. @ GA Southern.
Pres spoke w/ 6 members of bd.
They were concerned abt his
Rationale.

. When asked if D spoke w/ Pres of
  VSU personally — he said yes
÷ he wasn't getting anywhere.
          Pres has not.
          Theresa called to have D
at Pres's office w/ Mast.  D arrived
w/ his girlfriend.  Pres. refused
to let " in mtg.
          Met w/ D for over an hr. w/
D.  Pres. tried to make D
understand that his tactics
weren't good ÷ tried to mentor
him on how to go abt it.
. Centered abt getting people
coalesed.  He didn't nod.
Staff/Aux funding, etc.
      Pres. asked D abt next
step — D said I don't know.

D's next step — Monday (this wk)
    sent email to Dr. Z. —
    wants Dr. Z to read abt some kind
of gov't shutdown in '85. → young
man who won an election in Cincinnati
that caused a lot of tbl. Makes
this guy out to a

     ↗ (Fri Am) ⟩ email to Pres Z.
Today          made up. to Easter Island
               and how there was no
               business dan.

now has on his facebook acct
    a copy of
        "The Zaccari Memorial
                Parking Deck"
     w/ pic of Dr. Z.

Transcripts → accepted here on
    probation.
         Here in Fall of '05

DOB
3/13/85  T. Hayden Barnes
              thomas

→ 3 faculty members sent emails by D ←

Barnes

Hayden Registered @ Tanner's JC

Psych. disability
→ Aug 2006 → thought depressive
disorder → agrophobia —
Psych. Consultants PC        Panic disorder →
    Kevin J Winters              → may have some
Savannah, GA.                 sympt of ADHD →
        on meds but has gone
        into hosp due to inability
        to function.
    When rec'd letter, felt D
        was better + could come to
        VSU. Dr. said that he
        needed to take adv. of
        on-going counseling.

        Dis a Bludist →


Allowed in due to Adv. placement testing.
Prof Warren Wilson college in N.C. (Environ.
                                    college)
→ D has private rm in Converse.
                            → ck of Mr.
                              Powers @
                                   SGMC
(Stratera)           S. GA Med Ctr, EMS.
ck meds.
        Max veiled threat. Can be used
            as basis for disord.
            conduct for w/drawl.

Linda Daniels so concerned that
she alerted GA Southern PD
ris      that there could be a
'rgant   disruption @ the Bd of Regents
         mtg.

Tech School — but '05 til this yr.?

(Run ck on CRedit Computer)

→ has academic accom.

(Dr. Hardee → run in c/ him?)

Thbaines  3/13/05

Alarm @ Diz @
3 AM this past
wkend → no one
@ home @ time

Call Vic Morgan

3.19

DEFENDANT'S
EXHIBIT
farmer
NO. 2 1-8-09

Hayden — usually
comes in. Leah
speaks to psychiatrist
@ home.
    Leah is concerned
abt this student.
- Past → inat. thought
pattern → never will harm him for him
→ Started seeing or anyone else
- inat. thought pattern
- has ADHD
- when obsessed w/
  something he gets
  obsessed
- a little paranoia
→ is inat. behavior here.
→ has not shared any of
  this w/ Leah.
  → missed last appt.
comes usually once a
wk or once every 2 wks.
not a no show - he called
to tell her he was sorry
for missing an appt.

↑ H/ started
g him.
anxiety disorder
in disorder.

→ got an idea ≠ can't let
it go.

psych. had not seen ↑ paranoia ÷
  inat. thought like Leah has.
Bi-polar/schizo affected disorder?

DEFENDANT'S EXHIBIT Farmer NO. 3 1-8-09 PENGAD 800-631-6989

Theresa Boyd
8:25 AM → called

→ reimburse 100 for parking garage. exempt for mand. fee.

→ potential losses
→ ~~violation of~~ ~~###~~

P.S. → have ordered copy of Jared's book Collapse.
Diamond.

unclear on how letter got into DLZ's in box.
on Medialla's desk

→ Wini's letter of Ref.
→ Radio agreement
→ Radio Microphones
→ Siren pkg.
→ Dennise Bogart

HR customize

Mr. Z.

→ spoke w/ SGMC
      → 3 mo. prob. → Oct. 2006 — 1st/8 Feb.
          released → lack of
          competence + skills.
    → Reported him for walking away from radio
      driving thru red lite
    → No progress on skills based on
         action plans → comments
    from dir. supervisor were that
    he was disturbing.

    → w/drew from math ⎫ not going to
      getting 2 A's ⎬ meet the
      1 F ⎭ 2.0 gpa.

→ facebook ⎱ passed article in
      sympathy.

∂ Fri. : 5:47 pm  w/m called → {at his home
    is this the business officer? (spoke
    (repeated → terminated call) (softly)

Thursday — Open day →

SCHWAB'S
EXHIBIT
NO. 4  Farmer
1-8-09

Dr. Zaccari

- Gaskins + Pres. Leon updates
  from System Ofc. legal
  affairs.

- If going thru conduct →
  will have to convene
  a stud/fac. review

- Administrative withdrawl →
  - must show threat to
    community or himself

  - Later must be concerned
  w/ 1st Amend Rts. But 1st
  must look @ Safety issue.

  Ultimately must have
  documentation to support
  that D is a danger/threat.

  How do we present to a
  3rd party that a threat
  exists?

Pres. feels:
- D's activities out of
the norm - the fliers -
letter of apology - then
calls to others (Gov. + Bd of Regents)
- called ea Regent -
admin. staff may have
spoken to him of were
refused access.
- GA Southern notified
that during Bd of Regents
mtg may be disrupted.

→ Posting of deck w/ reference
to the Pres.    Dr. Z became
alarmed → taking the
strictest definition of
"memorial" equating to
Dr. Z being dead.

→ his posting on his facebook
of articles sympathetic
to VaTech.

→ following → extra police
protection. City police
watching.
→ Threatening letters sent
to Mayor + Mrs. Simon

→alarm activation @ 3am
concern w/ Simons living
nearby.

→ Why feel threatened?
   • concerned abt focus of
atten being turned on D
   • on facebook had photos
of a faculty member notated
as a "friend"

   • Pres. Z. wanted to wait
and help student by letting
him get thru exams. End
Friday.
   • Rely @ sys S/c → why
not let him go now? didn't
want to cause uproar
that could cause a
flashpoint.
   • If D doesn't make
his grades, he can come
back this summer but
can't come Fall semester.
Could still come back
Jan '08.

)

Admin. withdrawl →
① no council needed
② nothing from Comprehensive
counseling ctr.

But, leaves campus in
precarious legal footing.

If Pres. does this + makes
it effective Fri. → D
would have to be moved
out by tomorrow p noon
while weekend graduation
take place.

On Monday → commencement
done/ grades in.

Housing gives 72 hrs. to
move out.  On Friday, Pres.
will be going to europe for
10 days.

us. Wants → housing to help him
move out.

Keppler → Counselors can't say D is
a threat because there
is nothing to support that
D is a threat.

Vic → Psychiatrist - say D on
Tues. -

1 eve
no toxical.
lucies to D's
ntal health -
it go ufout
sported evid. &
ust.

u Pres.
asn't had
ontact w/
during
ost of the
semester

his meds — anxiety +
panic disorder w/ no threat
to himself or others. He (Vic)
↤ believes that this is what
D's personal physician will
say.

D is taking meds — has
never stated in writing or
verbally that he is suicidal
or a threat to anyone.

Sp. Services → would hospitalization be
necessary w/ this disorder?
No. Initial letter indicated
1 if not more hospitalizations.
letter given to Special Services
S/c.

Lauren → do we act on the admin.
w/drawl?

Vic → he (D) follows what is asked
of him by counseling ctr.

Pres. → wife concerned. need for
extra protection. Unsettling
Pres. have { abt public speaking or in
private security? going out.

Admin. w/drawl → will contain
    Requirements or conditions.

    re-evaluate 3-4 mo from now,
based on info obtained over the
Summer.

① Gets D off campus for a while

Pres. wants strong statements from
    psychiatrist that support that
    the student is not a threat.

→ if D is removed — he has the
rt to appeal to Atlanta.

pler → try to go the route of the GPA.

inberly) saw D today → told her that he
aser) thinks he made the R.O.

⊂→ D is enrolled in classes for May-mester
    and this summer.
    Can't connect the letters to D →
    it is the timing.

Dr. Z. needs to meet w/ Laverne on Mon. to work out the conditions.

Laverne → it is not if but when will he sue over this.

President is focusing on the unknowns.
→ he is making the administrative decision because he doesn't know what is going on w/ D.

ic → focus only on what D has done to draw attn. to timing and the President.

Laverne → emerg. w/drawl must rest on mental health → clear + present danger.

<u>Logistics</u> :
① Cert. Mail / Police deliver?
② from Pres. Office →
③ need to notify Pres. etc. ASAP.

# EXHIBIT I

## LAVERNE GASKINS RESPONSES TO INTERROGATORIES

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THOMAS HAYDEN BARNES,      )
                                  )
      Plaintiff,              )      Case No. 1-08-CV-077- CAP
                                    )
vs.                                 )
                                  )
RONALD M. ZACCARI,        )
individually and in his official     )
capacity as President of Valdosta  )
State University; VALDOSTA    )
STATE UNIVERSITY; BOARD OF )
REGENTS OF THE UNIVERSITY  )
SYSTEM OF GEORGIA; LAVERNE )
GASKINS, individually and in her  )
capacity as in-house counsel      )
at Valdosta State University; KURT )
KEPPLER, individually and in his  )
official capacity as Vice President  )
for Student Affairs at Valdosta State )
University; RUSS MAST, individually )
and in his official capacity as Dean of )
Students at Valdosta State University; )
LEAH McMILLAN, individually and  )
in her official capacity as a counselor )
at Valdosta State University; and    )
VICTOR MORGAN, individually    )
and in his official capacity as Director )
of the Valdosta State University    )
Counseling Center,             )
                                  )
      Defendants.           )

## DEFENDANT LAVERNE GASKINS' RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

NOW COMES Laverne Gaskins, a Defendant in the above case and responds to

Plaintiff's First Interrogatories and Request for Production of Documents as follows:

**Interrogatory No. 1.**

Identify each person having discoverable information that you believe supports a position that you have taken or intend to take in this action, and set forth the subject matter of the information possessed by that person.

**Response:**    This Defendant objects to this interrogatory on the grounds that it seeks to invade this Defendant's trial preparation and work product activity, including her case strategy and preparation. Subject to, and without waiving, said objection, this Defendant shows that those persons known to this Defendant who may have discoverable information regarding the issues in this case were identified in this Defendant's initial disclosures, Attachment "A." Additionally, Dr. Louis Levy, Vice President of Academic Affairs, Mr. Jim Black, former Vice President of Finance and Administration, Mr. Scott Sikes, Vice President of Institutional Advancement, and Dr. Marcia Krotseng, former Associate Vice President of Strategic Research and Analysis, may have had involvement with Defendant Zaccari relevant to this case as members of his Senior Administrative Team.

Additionally, this Defendant Zaccari may have consulted with Scott Doner, University Police Chief, in the process of determining what action to take with regard to the plaintiff. Additionally, Defendant Zaccari may have consulted with J. Burns Newsome, Assistant Vice Chancellor of Legal Affairs, Board of Regents, regarding these matters.

**Interrogatory No. 2.**

If you intend to rely upon any documents or other tangible things to support a position that you have taken or intend to take in the action, provide a brief description, by category and location, of each such document, and other tangible thing, and identify all persons having possession, custody, or control of them.

2

**Response:**    This Defendant objects to this interrogatory, as it seeks production of this Defendant's trial preparation and work product activities, including mental impressions and legal strategy considerations, which are beyond the scope of discovery permitted under Rule 33. Subject to, and without waiving, this objection, this Defendant shows that documents arguably relevant to the issues in this case were identified in this Defendant's Rule 26 disclosures, Attachment "C." In addition, this Defendant notes that the following documents may be relevant to issues in this litigation:

a)    Board of Regents of the University System of Georgia Medical Withdrawal Policy

b)    Valdosta State University Student Code of Conduct

c)    Board of Regents of the University System of Georgia policy 1902

d)    Memoranda between and among the Defendants in this case and the Board of Regents of the University System of Georgia.

**Interrogatory No. 3.**

Identify and describe all communications between you and any person concerning any matter alleged in the Complaint.

**Response:**    This Defendant objects to this interrogatory on the grounds that it seeks information protected by the attorney/client privilege, as all communications between this Defendant and any other person concerning any matter alleged in the Complaint were in this Defendant's capacity as attorney for Valdosta State University. Subject to, and without waiving, this objection, see Exhibits "A" and "B," attached hereto.

**Interrogatory No. 4.**

Specifically identify and describe all communications between you and Defendant Zaccari during the period prior to April 20, 2007 through the present concerning Plaintiff,

3

including, but not limited to, communications concerning Zaccari's concerns, or lack thereof, of any danger Plaintiff posed to others.

**Response:**    This Defendant objects to this interrogatory on the grounds that it seeks information protected by the attorney/client privilege, as all communications between this Defendant and Defendant Zaccari requested in this paragraph were in her capacity as attorney for Valdosta State University.

**Interrogatory No. 5.**

Specifically identify and describe all communications between you and Defendant Zaccari during the period prior to April 20, 2007 through the present concerning Plaintiff including, but not limited to, communications setting forth Zaccari's concerns about Plaintiff's protests about the construction of parking garages VSU campus.

**Response:**    This Defendant objects to this interrogatory on the grounds that it seeks information protected by the attorney/client privilege, as all communications between this Defendant and Defendant Zaccari covered by this request were in her capacity as attorney for Valdosta State University.

**Interrogatory No. 6.**

Specifically identify all VSU rules, policies, and procedures for subjecting a student to "Administrative Withdrawal," including but not limited to any relevant sections of the VSU Student Code of Conduct.

**Response:**    a)    Valdosta State Student Code of Conduct

b)    Board of Regents of the University System of Georgia Medical Withdrawal Policy

c)    Board of Regents of the University System of Georgia Mental Health Withdrawal

4

d)      Board of Regents of the University System of Georgia policy 1902

e)      Board of Regents of the University System of Georgia policy on Administrative Withdrawals.

**Interrogatory No. 7.**

Specifically identify all VSU rules, policies and procedures for subjecting a student to expulsion, including but not limited to any relevant section of the VSU Student Code of Conduct.

**Response:**    See response number 6, above.

**Interrogatory No. 8.**

Specifically identify all communications between you and Betsy Neely relating to Plaintiff or VSU's and the Board's policies and procedures, concerning administration responses, initiation of, or involvement in complaints concerning violations of the Student Code of Conduct.

**Response:**    This Defendant objects to this interrogatory, as the information sought is protected by the attorney/client privilege, as all discussions between this Defendant and Betsey Neely were in those parties' capacity as co-counsel for a common client, Valdosta State University. Subject to, and without waiving, such objection, see Exhibit "A," attached hereto.

**Interrogatory No. 9.**

Specifically identify all VSU rules, policies, and procedures that empower the VSU president to determine that a student is a "clear and present danger" to campus security.

**Response:**    See all materials identified in response number 6, above.

**Interrogatory No. 10.**

Specifically identify any and all VSU students who were expelled from VSU during Defendant Zaccari's tenure as President of the University, including students who were

admitted back into the University, and describe the reason why they were expelled, how the decision to expel the students was made, and how the students were notified by VSU.

**Response:**    This Defendant does not posses the information requested in this interrogatory.

**Interrogatory No. 11.**

Specifically identify all VSU rules, policies and procedures that empower the VSU President to decide unilaterally when a student no longer represents a "clear and present danger" to campus security.

**Response:**    See response number 6, above.

**Interrogatory No. 12.**

Identify and describe all communications between you and Leah McMillan regarding Plaintiff.

**Response:**    This Defendant objects to this interrogatory, on the grounds that the information sought is protected by the attorney/client privilege to the extent it inquires about communications prior to the filing of this lawsuit, as, during all such communications, this Defendant was acting in her capacity as attorney for Valdosta State University, and, to the extent the request applies to communications occurring  after the filing of this lawsuit, such communications constitute work product and trial preparation and activity, occurring in anticipation of, and in the defense of, this lawsuit, and are not subject to discovery. Subject to, and without waiving, this objection, see Exhibit "B," attached hereto.

**Interrogatory No. 13.**

Specifically identify and describe all communications by and between you and Defendant Zaccari in connection with the decision to "administratively withdraw" Plaintiff from VSU. In addition, please identify and describe any and all subsequent communications by

6

between you and any employee of Valdosta State University relating to or discussing the Communications described in this Interrogatory.

      **Response:**   This Defendant objects to this interrogatory, on the grounds that, to the extent the request addresses communications occurring prior to the filing of this lawsuit, the information is protected by the attorney/client privilege, as all such communication included this Defendant in her capacity as attorney for Valdosta State University; and, to the extent the request refers to communications occurring after the filing of this litigation, all such communications are protected by the attorney/client privilege, or, constitute work product and trial preparation activities occurring in anticipation of, and in the defense of, this litigation, and containing the thoughts and mental impressions of the participants, and are not subject to discovery.

      **Interrogatory No. 14.**

      Specifically identify and describe all communications between you and other Defendants regarding the Plaintiff.

      **Response:**   This Defendant objects to this interrogatory, to the extent it refers to communications occurring prior to the filing of this lawsuit, as seeking information regarding communications protected by the attorney/client privilege, as all such communications involved this Defendant in her capacity as attorney for Valdosta State University;  to the extent this request is directed to communications occurring after the filing of this litigation, this Defendant objects to said interrogatory on the grounds that it seeks discovery of information constituting protected work product and trial preparation activity, concerning communication occurring in anticipation of, and in the defense of, this litigation, and containing the thoughts and mental impressions of the participants, which are not subject to discovery. Subject to, and without waiving, this objection, see Exhibit "B," attached hereto.

**Interrogatory No. 15.**

Specifically identify and describe all communications by and between you and any employee of Valdosta State University concerning Plaintiff's appeal of his expulsion from VSU to the BOR.

**Response:**    This Defendant objects to this interrogatory, as the information sought is protected by the attorney/client privilege, as this Defendant's participation in all such communications was in her capacity as attorney for Valdosta State University. This Defendant further objects to this interrogatory on the grounds that the interrogatory seeks discovery of protected work product, occurring in anticipation of, and in the defense of, this litigation, and containing the thoughts and mental impressions of the participants, which are not subject to discovery. Subject to, and without waiving, this objection, see Exhibit "B," attached hereto.

**Interrogatory No. 16.**

Specifically describe all meetings, discussions, or actions in which you participated in connection with the decision to "administratively withdraw" the Plaintiff from VSU.

**Response:**    This defendant objects to this interrogatory, as the information sought is protected by the attorney/client privilege, as this Defendant's participation in all such meetings and discussions was in her capacity as attorney for Valdosta State University. Subject to, and without waiving, this objection, this Defendant shows that she was present at two (2) meetings where the issue of concerns regarding the Plaintiff's behavior and actions were discussed. To the best of this Defendant's recollection, the first meeting was attended by Dr. Kurt Keppler, Russ Mast, Scott Doner, Ann Farmer, Dr. Victor Morgan and Kimberly Tanner, Director of VSU's Access Office, and the second was attended by Kurt Keppler, Russ Mast, Scott Doner, Ann

Farmer and Dr. Victor Morgan. This Defendant was present at each meeting in her capacity as legal counsel for VSU.

**Request for Production No. 1.**

Produce all documents identified in your responses to the proceeding Interrogatories, and identify which Interrogatory or Interrogatories the document correlates with.

**Response:** This Defendant objects to this request, to the extent it seeks production of memoranda between and among the Defendants and the Board of Regents of the University System of Georgia, as all such documents within the custody and control of this Defendant are protected by the attorney/client privilege. This Defendant understands that all remaining documents identified, consisting of policies and publications of Valdosta State University and the Board of Regents of the University System of Georgia, are already in the possession of the Plaintiff, and are equally accessible to Plaintiff and this Defendant.

**Request for Production No. 2.**

Produce all documents on which you rely in support of the contention that Plaintiff was a threat to VSU campus security.

**Response:** This Defendant objects to this item of the request, as it seeks to invade this Defendant's work product and trial preparation activities, and is not reasonably designed to lead to the discovery of admissible evidence. Subject to, and without waiving, this objection, see Exhibit "C," attached hereto.

**Request for Production No. 3.**

Produce all documents relating to VSU campus security issues, incidents, and policies from 2002 to the present.

**Response:** This Defendant does not have custody or control of any documents responsive to this request.

9

**Request for Production No. 4.**

Produce all documents relating to VSU's rules, policies and procedures for expulsion of students.

**Response:**    This Defendant understands that the Plaintiff already has possession of the policies and publications identified in this Defendant's response to interrogatory no. 2. This Defendant has custody and control of no other documents responsive to this item of the request.

**Request for Production No. 5.**

Produce all documents relating to the shooting at Virginia Polytechnic Institute and State University in April 2007.

**Response:**    This Defendant does not have custody or control of any documents responsive to this request.

**Request for Production No. 6.**

Produce all documents relating to any past incident from 2002 to the present in which a student has been expelled or "administratively withdrawal" because of concerns about campus security.

**Response:**    This Defendant shows that Plaintiff already has a copy of the official notice of administrative withdrawal for his own incident. This Defendant objects to this request, to the extent it refers to internal documents of this Defendant, as, to that extent, the request seeks production of materials protected by the attorney/client privilege, as all such documents were communications between this Defendant, acting in her capacity as legal counsel for Valdosta State University, and officers and agents of the university engaged in their official duties. Subject to, and without waiving, this objection, this Defendant shows that she does not

have custody or control of any documents relating to other students responsive to this item of the request.

**Request for Production No. 7.**

Produce all documents relating to any students who have been administratively withdrawn by the University during the tenure of President Zaccari, including students who were admitted back into the University.

**Response**:    See this Defendant's response to request no. 6 above.    This Defendant objects to this request, to the extent it seeks production of internal documents of this Defendant, as such documents are protected by the attorney/client privilege, having been prepared or received in her capacity as legal counsel for Valdosta State University, dealing with officers and agents of the University.

**Request for Production No. 8.**

Produce all documents relating to any students who have been expelled by the University during the tenure of Zaccari as President of VSU, including students whose expulsions were reversed.

**Response:**    This Defendant does not have custody or control of any documents responsive to this request.

**Request for Production No. 9.**

Produce all documents relating to any students who have been sanctioned, reprimanded, fined, or questioned by you, the University, or any branch of the Division of Student Affairs for speech or political activities.

**Response:**    This Defendant does not have custody or control of any documents responsive to this request.

11

**Request for Production No. 10.**

Produce all documents relating to any formal or informal student complaints during the tenure of President Zaccari concerning the University's restraints on student speech or political activities.

**Response:**    Other than Plaintiff's administrative appeal and lawsuit, this Defendant does not have custody or control of any documents responsive to this request.

**Request for Production No. 11.**

Produce all documents relating to any students who have been sanctioned, reprimanded, fined, or questioned by the University during the tenure of President Zaccari for speech or political activities.

**Response:**    This Defendant does not have custody or control of any documents responsive to this request.

**Request for Production No. 12.**

Produce all documents and correspondence relating to any formal or informal accusations during the tenure of President Zaccari of due process violations by VSU.

**Response:**    This Defendant does not have custody or control of any documents responsive to this request.

**Request for Production No. 13.**

Produce all documents and correspondence relating to University policy concerning the disclosure of confidential medical records to other members of the University community.

**Response:**    The University relies upon FERPA and HIPPA policies, which may be found online at VSU's website. See also Exhibit "B," attached hereto.

12

**Request for Production No. 14.**

Produce all documents relating to communications between you and Leah McMillan regarding Plaintiff.

**Response:** This Defendant objects to this item of the request, as the materials sought are protected by the attorney/client privilege, or constitute protected work product, prepared in anticipation of, and in the defense of this action. Subject to, and without waiving, such objection, see Exhibit "B," attached hereto

**Request for Production No. 15.** Produce all documents relating to communications between you and the BOR regarding Plaintiff.

**Response:** This Defendant objects to this item of the request, as all such documents are communications between this Defendant, as legal counsel for VSU, and legal counsel for the BOR, acting as co-counsel for the same client, Valdosta State University. Subject to, and without waiving, this objection, see Exhibits "A" and "B," attached hereto.

This ___8th___ of April, 2009

BRANNEN, SEARCY & SMITH, LLP


_____
**DAVID R. SMITH**
Georgia State Bar No. 655587
**BEVERLY G. O'HEARN**
Georgia State Bar No. 287650
ATTORNEYS FOR DEFENDANT
LAVERNE GASKINS

13

STATE OF GEORGIA      )
          Lowndes    )
COUNTY OF ~~CHATHAM~~    )      **VERIFICATION**

       **PERSONALLY APPEARED before me LAVERNE GASKINS,** who, being duly sworn, deposes and says that she has read the foregoing responses and that they are true of her own knowledge, except for those matters therein stated upon information and belief. As to those matters, she believes them to be true.

                           LAVERNE GASKINS

Sworn to and Subscribed before me

this  8th day of  April  , 2009.

NOTARY PUBLIC

Notary Public, Brooks County, Georgia
My Commission Expires Aug. 31, 2018

# EXHIBIT J

## MAY 1, 2007 FACSIMILE FROM ELIZABETH NEELY TO LAVERNE GASKINS

LI08218780
FROM EXTERNAL ACTIVITIES & FACILITIES        (TUE) 5. 1'07 19:09/ST. 19:08/NO. 4870102061 P  1




EXHIBIT
20
Zaccari T-29-09

# FAX COVER LETTER

To:            Ms. Laverne Gaskins

Company:       Valdosta State University

Fax Number:    229-245-6651          247-2687

From:          Elizabeth Neely
               Office of Legal Affairs
               Board of Regents – University System of Georgia

Fax:           404-651-9301

Phone:         404-656-2221

Date:          May 1, 2007

Time:

No. pages:     4

Comments:  Per our discussion

_____

_____

_____

_____

_____

_____

_____

_____

The information contained in this fax message is intended only for the use of the individual
noted above.  If you have received this copy in error, please notify us immediately.
BOARD OF REGENTS, 270 Washington Street, S.W., Atlanta, Georgia 30334
Phone:  404-656-2221        Fax:  404-651-9301

LI08218780

J-5B



**BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA**
244 WASHINGTON ST., S. W.
ATLANTA, GEORGIA 30334

HENRY G. NEAL
EXECUTIVE SECRETARY

August 11, 1983

## M E M O R A N D U M

To:      Presidents,
         University System of Georgia

From:    Henry G. Neal
         Executive Secretary

Re:      Medical Withdrawal Policy

We are frequently asked to advise institutions on matters
involving mental health problems which pose a danger to
students or others on the campus. █████████████████████
██████████████████████████████████████████████████ to take
████████████████████████████████████████

The enclosed suggested language has been prepared for your
use in adopting a medical withdrawal policy. Such a policy
(not necessarily this one) should be adopted or approved by
your faculty pursuant to authority granted by the Board
(Policy Manual § 203.0305) and incorporated into appropriate
institutional documents such as the catalogue and student
handbook.

In the event publication deadlines for your catalogue or
handbook make it necessary or advisable, you may want to
publish the enclosed language in your 1983-84 publications
or supplements and make revisions as necessary following
faculty approval.

Please note that this policy does not provide for the pro-
cedure to be followed for involuntary withdrawal. ████████ply
send ████████████████████████████████████████████████ re-
██████ Please contact me if such a hearing becomes necessary
or if you have any questions concerning this policy.

HGN/mpoe
enclosure

cc:   Chancellor Vernon Crawford

LI08218780

PROPOSED LANGUAGE

FOR STUDENT MEDICAL WITHDRAWALS

A student may be administratively withdrawn from the collage when
in the judgment of ~~the~~ ~~~~ ~~~~ ~~college~~
~~physician, if any,~~ and after consultation with the student's parents
and ~~personal physician, if any, it is determined that the student~~
~~suffers from a physical, mental, emotional or psychological~~ health
condition which: (a) ~~poses a significant danger or threat of phys-~~
~~ical harm to the student or to the~~ ~~~~ ~~property~~ ~~~~ or
(b) causes the student to interfere with the rights of other mem-
bers of the college community or with the exercise of any proper
activities or functions of the college or its personnel or (c) causes
the ~~student~~ ~~~~ ~~~~ ~~institutional~~ requirements for
~~admission and continued enrollment, as~~ ~~~~ ~~the~~ student
~~conduct code and other publications of the college.~~

~~Except in emergency situations,~~ a student shall, upon request, be
accorded an appropriate hearing prior to final decision concerning
his or her continued enrollment at the college.