IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| THOMAS HAYDEN BARNES,<br><br>Plaintiff,<br><br>v.<br><br>RONALD M. ZACCARI, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action File No.:<br>1:08-CV-0077-CAP |

**BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I. INTRODUCTION

The Defendants have also moved for summary judgment and incorporate by reference their Motion, Brief and all documents submitted in support of it, including the Statement of Material Facts, Affidavits, Depositions and Exhibits. Doc. 177. The Defendants also incorporate by reference their Briefs and all supportive documents in their motions to include Dr. Matthew Norman as an expert. Doc. 194, 144.

II. ARGUMENT AND CITATION OF AUTHORITIES

1. THE PLAINTIFF WAS NOT EXPELLED

The Plaintiff's mischaracterization of the action as an "expulsion" is sophistry at work, notwithstanding the attempt to explain that the Plaintiff is using "expulsion" instead of "clunky bureaucratic euphemism 'administratively withdrawn.' "Doc. 179 at 1. The action taken was not an expulsion. As Betsey Neely, Associate Vice-Chancellor for Legal Affairs for the Board of Regents testified:

> First of all, **he was not expelled.** He was administratively withdrawn. He was – **expulsion is a term with a precise meaning that he would not be able to reenter the college.** And there was nothing that I remember that would have prevented him from being able to continue at Valdosta State so long as he had this kind of letter from someone...familiar with his diagnosis and treatment.

Neely depo 48:2-11(emphasis added). See also VSU Student Handbook, Defendant's Exh. (Doc. 177), which defines "expulsion" as "permanent severance of the student's relationship with the University."

The Plaintiff's word choice is intentional – by calling the action an "expulsion," he is hoping to create the impression of a far more serious and permanent action than that which actually occurred – he was given a "time out." See Defendants Exh. 28 (letter from Zaccari to BOR, dated June 21, 2007) (Doc. 177).

It is undisputed that the Plaintiff was allowed to finish the semester and to take his final exams. To minimize the impact on the Plaintiff, when he announced that Mr. Barnes was being administratively withdrawn, President Zaccari advised the senior staff that the Plaintiff was to be dropped from "May semester courses without penalty. He is to receive a full refund for housing, meal plans and other charges." Plaintiff's Ex. 46. The Plaintiff then went on to matriculate at another state university operated by the Board of Regents, Kennesaw State University (KSU).

2. VALDOSTA STATE UNIVERSITY IS NOT A PROPER PARTY

For the reasons more fully set out in the Brief in support of their Motion for Summary Judgment, Valdosta State University is not a proper party as it is not an entity that is capable of being sued. Doc. 177. Hence, all claims against it should be dismissed.

3. THE PLAINTIFF WAS NOT DEPRIVED OF ANYTHING

While the Plaintiff was wailed of his claimed denial of due process, he has completely glossed over a critical element of such a claim – whether there was a deprivation of a constitutionally protected interest – to focus exclusively on the process claimed to be due. The Plaintiff's reason for doing so is simple – he has

not been deprived of anything. He cannot establish a deprivation of a constitutionally protected interest.

As the Supreme Court emphasized in Bishop v. Wood, 46 US 341, 96 S.Ct. 2074, 48 L.Ed. 2d. 684 (1976), property interests are created by State law. The Plaintiff cannot point to any Georgia law granting a student the right to attend the college of his choice or when he chooses to attend.

Barnes was allowed to complete his final exams and to finish the semester. The Plaintiff then transferred to Kennesaw State (another institution operated by the Board of Regents) where he completed his degree.

Attending VSU is a privilege. No constitutionally protected right was impacted and no deprivation occurred when the Plaintiff was administratively withdrawn.

4. THE PLAINTIFF WAS NOT DEPRIVED OF DUE PROCESS

If a deprivation occurred, and that Defendants maintain it did not, the Court would then consider whether due process was denied. The Plaintiff argues that a post-deprivation hearing was insufficient and cites to Castle v. Marquardt, 632 F. Supp. 2d. 1317, 1333-34 (N.D. Ga. 2009). Doc. 179 at 54. However, Castle points out that a post-deprivation hearing is insufficient only when "procedural due process requires a pre-deprivation opportunity to be heard." Id. Moreover, "[t]he

fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Nash v. Auburn University, 812 F.2d. 655, 660 (11th Cir. 1987) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)) (emphasis added). "What process is due is measured by a flexible standard that depends on the practical requirements of the circumstances." Id. (quoting Mathews, 424 U.S. at 334). "[T]he standards of procedural due process are not wooden absolutes. The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved." Id. at 663 (quoting Keough v. Tate County Bd. of Ed., 748 F.2d 1077, 1081-82 (5th Cir. 1984)). "[T]here are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable . . . ." Goss v. Lopez, 419 U.S. 565, 582-83 (1975). The Ninth Circuit has stated that "a predeprivation hearing, where required, need only take place before an individual is 'finally' deprived of a property interest." Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 985 (9th Cir. 1998) (citing Parratt v. Taylor, 451 U.S. 527, 539-40 and Mathews, 424 U.S. at 332).

The Eleventh Circuit has noted that "[a]lthough the Due Process Clause generally recognizes notice and an opportunity to be heard *before* the government seizes one's property…the Supreme Court has 'rejected the proposition that 'at a meaningful time and meaningful manner' *always* requires the State to provide a hearing prior to the initial deprivation of property.' " Reams v. Irvin, 561 F.3d 1258 (11th Cir. 2009) (citations omitted, emphasis in original). Instead, due process is "a flexible concept that varies with the particular circumstances of each case." Id.

The Defendants submit that an application of the balancing test articulated in Matthews, supra, does not compel a decision that a pre-deprivation hearing is required. These factors are

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. However, the court does not even need to consider if the Plaintiff was entitled to pre-deprivation notice and hearing, as it is "well-settled that a constitutional violation is actionable under §1983 'only when the state refuses to provide a process sufficient to remedy the procedural deprivation.'" Reams, supra, at1266.

As in the Reams case, the remedy provided by the Board of Regents, provided full redress. The Plaintiff was provided an appeal to the Board of Regents, which the Plaintiff accepted. The Board, in turn, referred it to the Office of State Administrative Hearings, which would have provided the Plaintiff with a full evidentiary hearing. Defendants' Exh. 39, 40 (Doc. 177). See O.C.G.A. §§ 50-13-70, et seq. (After the referral to the Office of State Administrative Hearings, the Board of Regents requested the matter be returned to it, and the Board of Regents ruled in favor of the Plaintiff.) Following such an administrative hearing, the agency makes a final decision which may then be appealed to the Superior Court. See O.C.G.A. §50-13-19. The Eleventh Circuit specifically approved this procedure and found in Reams that this "judicial safety valve" foreclosed any constitutional challenge and that the Defendants were entitled to qualified immunity. In this case, the Plaintiff specifically took advantage of the remedy afforded him and prevailed.

The Plaintiff is wrong in categorizing the appeal process to the Board of Regents as "illusory." The Plaintiff inappropriately and unfairly taints the reputation of Betsey Neely, a widely respected attorney who devoted herself to serving the public, when stating in his brief "The Board official who had advised Zaccari and Gaskins in creating the evidence-free administrative withdraw

'process,' was also directly responsible for overseeing Barnes' administrative appeal...." Doc. 179 at 59. The truth, however, specifically known to Plaintiff's counsel, is to the contrary – Ms. Neely testified that she did not have any involvement in the appeal to the Board of Regents, specifically because she was involved in offering advice and counsel to Dr. Zaccari:

- As a practical matter, my administrative assistant Keisha Coleman usually received all of the mail, all of the correspondence, put it in a file folder, assigned it on a – you know, we would do it on an alternate basis **except if one of us had had previous involvement in which case the appeal would be assigned to another attorney in the office.** And I expect that's why I haven't seen this because it probably came into our office, **got assigned to someone else to present to the Board** and I never saw the correspondence.

  Neely 61:21-62:7

- "Q. And so Keisha is just kind of acting as a court clerk? A. Exactly. I mean the letter comes to me because I'm the designated recipient. But as a practical matter, I don't see them." Neely 64:21-25

- "But in this case, I don't believe that I ever saw the file – the appeal file." Neely 66:12-13

- Q. How would you describe your role in Hayden Barnes' appeal of the VSU decision to administratively withdraw him?...A. I was by Board policy the recipient of the correspondence – of the form correspondence. But I do not recall discussing – I don't recall who presented it to the board

of regents to be honest with you. So I – and I don't recall discussing it with anyone.

Neely 66:12-24

- **"But if either of us had had conversations with the campus about the case, we would be sure that the appeal got assigned to another attorney."** Neely 67:5-7
- "But at any rate, we would find a neutral attorney – there were usually three attorneys in the office of legal affairs one of whom was not at all involved in personnel decisions – and get that person to do the presenting." Neely 67:19-22
- Q. Why was the Hayden Barnes' appeal directed to you and not to Burns Newsome? A. Simply because the policy manual may, you know, I was the head of the office and so correspondence will be distributed to me. But as a practical matter, Keisha did all of the form correspondence. And then she would by my instruction assign cases to different people. And then once – once all of the correspondence was in, all the materials that we were going to review, we each did our individual cases. So I think I just didn't see this one. **I think this – on appeal because I had already had some conversations with President Zaccari. And so I didn't want anybody to think I was – you know, when Mr. Barnes appealed, I wasn't going to review my own consultation with the president. I wanted to stay out of it.** So that's – I think that's what happened here.

Neely 68:10-69:3

The Plaintiff's repeated suggestion that the Plaintiff was "denied due process at the campus level" does **not** equate to a total denial of due process. The Plaintiff **was** provided due process. The only reason that he was not given due process at the campus level was because the administrator initiating the action was the ultimate decisionmaker on campus – the University President. Hence, as Ms. Neely testified:

> What it said in this document is **advice that we frequently gave to campuses** and that is if a president had made a decision and the appeal was going to be regarding the president's decision we thought we'd be vulnerable to charges that it wasn't really fair to have a campus committee hear it when all of the people on the campus committee would have been employees of the president. And so if the president had not had any involvement in a case, normal practice was there'd be a hearing on the campus with an appeal to the president. But when the president had taken action or been intimately involved in a decision on the campus, we generally recommended that there not be a hearing on the campus and that the hearing be held by a neutral body....Q. You also say in this email, once the president has made a decision in this matter, there is no due process at the campus level. What do you mean by that statement? A. What I just said, that we thought we were subject to – we'd be subject to criticism if a committee on the campus comprised of persons who were employed by the president were the committee to hear an appeal because there might be the perception that the pressure would be on those committee members to make a decision that reflected the president's viewpoint...here where the president had already weighed in on the decision my judgment was that any questions about the decision should be – you know, that a perfectly neutral entity ought to decide whether or not the president's decision was correct.

Neely 14:9-16:18

5. THE PLAINTIFF HAS NO CAUSE OF ACTION UNDER §1983 AGAINST DR. KEPPLER AND DEAN MAST AS THEY HAD NO PERSONAL INVOLVEMENT IN ANY CLAIMED DEPRIVATION

A cause of action is not authorized under § 1983 against a public official who had no personal involvement in the alleged wrongdoing. *See Kostka v. Hogg*, 560 F.2d 37 (1st Cir. 1977).

> An official will not be liable in a Civil Rights action unless he directly and personally participates in conduct under color of state law which deprives the plaintiff of rights, privileges and immunities secured him by the Federal Constitution. . . . It is an essential element of a Civil Rights claim that the particular defendant be personally involved in the alleged denial of the Constitutional right.

Hill v. Anderson, 381 F. Supp. 906 (E.D. Okla. 1974) (emphasis added, citations omitted).

The Plaintiff's claimed deprivation is the decision to administratively withdraw him from VSU. Having taken the depositions of nearly all of the participants, the Plaintiff now concedes (as was presented by the Defendants heretofore at every stage of this litigation) that it was Dr. Zaccari who made the decision to administratively withdraw the Plaintiff. Doc. 179 at 70. "I made the decision to withdraw Mr. Barnes." Zaccari Depo. 226:20-25, see also Mast 33:16-23, 61:24-62:21. There is no evidence to the contrary. Dr. Keppler has affirmatively testified that he did not make or participate in the decision to

administratively withdraw the Plaintiff. Keppler Aff. ¶ 7. Similarly, Dean Mast has also testified that he did not make or participate in the decision to administratively withdraw the Plaintiff. Mast Aff. ¶ 6. Plaintiff attempts to pass liability on to all Defendants, including Defendants Dr. Keppler and Mr. Mast, by vaguely alluding to some vague "duties" that he ascribes to them. Doc. 179 at 70-73. However, Plaintiff cannot cite to *anything* that Dr. Keppler or Mr. Mast were required to have done with respect to Barnes' withdrawal. Doc. 179 at 70-73.

The Plaintiff mocks Dr. Keppler and Dean Mast for "cowardly" acquiescing in the process as it was not their decision to second-guess. Name-calling, however, is the Plaintiff's only recourse, as their limited involvement as sideline players is insufficient as a matter of law to rise to the level of personal involvement for liability under §1983. Both have testified in their affidavits that in their respective positions, they did not have the authority to override the decision of their President. Keppler Aff. ¶ 8; Mast Aff. ¶ 7. The plaintiff then suggests that they negligently failed to advocate for the Plaintiff.

Negligence, however, cannot form the basis of a §1983 claim. While there is case law that allows for a police officer to be held liable under §1983 for failing to intervene when another police officer uses unconstitutional force, Ensley v. Soper, 142 F.3d 1402 (11th Cir. 1998), that line of cases has not been extended

beyond excessive force cases. There is no case authority that would impose liability on them for their alleged "passivity in response to a blatant disregard of student rights." In fact, the case law is to the contrary: The Third Circuit has held that the following conduct was insufficient to create a cause of action under § 1983 under a negligence theory:

> (1) [F]ailing to report to the parents or other authorities the misconduct resulting in abuse to plaintiffs; (2) placing the class under the control of an inadequately trained and supervised student teacher; (3) failing to demand proper conduct of the student defendants; and (4) failing to investigate and put a stop to the physical and sexual misconduct.

D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364, 1373 (1992). "Thus, they assert that having placed plaintiffs in the situation alleged, the school defendants were obligated to protect them from violations of their personal bodily integrity by other students who were also under such defendants' control." Id. The plaintiffs' allegations demonstrated the defendants'

> nonfeasance but they **do not rise to the level of a constitutional violation.** As in [DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 248 (1989)], **"[t]he most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them."**

D.R. by L.R. at 1376 (bold added).

6. PRESIDENT ZACCARI'S FEAR WAS REAL AND PALPABLE.

In several pages of Plaintiff's brief in support of his motion for summary judgment, Plaintiff asserts that not one single other person gave any credence to President Zaccari's safety concerns regarding Barnes' behavior. Doc. 179 at 41-46. However, the following statements from the other party Defendants and other witnesses show that the opposite is true – that all believed that President Zaccari perceived a real threat.

Dr. Morgan testified that "[Dr. Zaccari] said that he was quite upset by it and worried about it, concerned that this blog with the word mentioning 'memorial' took on another level of concern for him above and beyond the unpredictableness of his behavior; that he had been receiving phone calls at his home; that when he or his wife would answer the phone, the person would hang up." Morgan Depo at 20.

Betsey Neely of the BOR testified "I remember that he was very, very worried himself. That made an impression on me." "[I]t was my impression of what he said – because he was fearful of an attack from this student." Neely Depo at 29:17, 38:6.

Gaskins testified:

> I do believe that Dr. Zaccari firmly felt threatened by Hayden Barnes, and I do believe that was a constant thing during this entire episode that he expressed a genuine fear of Hayden Barnes in terms of his safety and the safety of the campus community. That never wavered .

> . . . I do believe that Hayden Barnes impacted Dr. Zaccari's ability to perhaps function in the manner that he would prefer because of concerns for his safety and the safety of the campus community.

Gaskins Depo 58:23 – 59:3, 67:18–21.

McMillan testified:

> I also knew that President had a genuine fear; that he felt in danger . . . . I could tell he was visibly shaken . . . . [W]e could tell that President Zaccari was visibly shaken . . . . [W]e discussed his concerns again because he has a genuine fear . . . . At both of the meetings I had with the President, there was a genuine concern . . . . It was apparent in both meetings that I was at with Dr. Zaccari that he did feel he was a threat . . . . He was visibly shaken. He stated that he had security following him and that he was very concerned for himself and also concerned for the campus.

McMillan Depo 81:21-22, 108:3-4, 114:1-2, 151:24-25, 37:1-2, 21:8-9, 17:17-20; see also 20:7-8. Of one of her initial encounters with the situation McMillan explains, "That was the first knowledge that I had of Mr. Barnes being upset about the parking deck but that the more significant issue was that the President felt in danger." McMillan Depo 9:19-22.

Keppler testified of Dr. Zaccari at the faculty meetings:

> I honestly believe and still believe to this day that he sincerely believed that the campus and perhaps himself or his wife or family was, indeed in danger and that he was very concerned that his was so serious that I could've been worse if there had been a hearing.

Keppler Depo at 158:25 – 159:4. "I can clearly tell you that I don't believe that Dr. Zaccari was anything but genuine over his concern. Keppler Depo 28:14-15.

"He was genuinely scared and frightened and, I think, sincerely worried." Keppler Depo 27:4-5.

> He had mentioned to me that he had received phone calls at home in the middle of the night. He had no idea what happened because the people would hang up when he dropped the phone or when he hung up the phone. And it was clear to me that he was very concerned about the personal safety of his self and family.

Keppler Depo 25:11-16.

Mast testified "My impression, the President was expressing his concerns over the Facebook account, his personal safety and then he referred to Virginia Tech several times." Mast Depo 36:19-21.

Tanner testified "I believe that he felt threatened by Hayden's increasing anger toward him individually, and some of the actions that Hayden had been taking didn't seem very consistent or logical and that he felt threatened by being in the same vicinity with Hayden." Tanner Depo 32:2-6.

This is however, no evidence of any animus that would have motivated Dr. Zaccari to intentionally discriminate against the Plaintiff.

In addition to these witnesses and parties giving credence to President Zaccari's concerns for Barnes, Dr. Matt Norman, the Defendants expert has confirmed that Barnes indeed presented forensic risk factors for dangerousness. Doc. 194, 144.

7. THE BREACH OF CONTRACT CLAIM FAILS:

Federal courts look to state law to determine whether a contract claim exists for students with respect to their college handbook. Goodman v. President and Trustees of Bowdoin College, 135 F. Supp. 2d 40, 54 (D. Maine 2001); Pacella v. Tufts Univ. School of Dental Medicine, 66 F. Supp. 2d 234, 240 (D. Mass. 1999). Georgia courts have confined the rulings permitting expelled students to bring breach of contract claims under student handbooks, to *private* universities. See Morehouse College, Inc. v. McGaha, 277 Ga. App. 529, 531 (2005); Kurtizky v. Emory Univ., 2008-GA-1020.130 669 S.E.2d 179, 181 (2008). The Tenth Circuit has held that " 'contract law" must [not] be rigidly applied in all its aspects, nor is it so applied even when the contract analogy is extensively adopted." Slaughter v. Brigham Young Univ., 514 F.2d 622, 626 (1975). "The student-university relationship is unique, and it should not be and cannot be stuffed into one doctrinal category. It may also be different at different schools." Id.

Under Georgia law, the enforceability of a contract is determined by whether its terms are expressed in plain and explicit language so as to convey what was agreed upon by the parties. Dibrell Bros. Int'l S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1582 (11th Cir. 1994). No contract is formed without certainty regarding the terms of the subject matter, "consideration, and mutual

assent." Lamb v. Decatur Fed. Sav. & Loan Ass'n, 201 Ga. App. 583, 411, S.E.2d 527, 529 (1991); see O.C.G.A. § 13-3-1 (1982). A contract is formed only when there is a meeting of the minds. Oldham v. Self, 279 Ga. App. 703, 707 (2006).

Here, a contract was not formed in the VSU Student Handbook because there was no meeting of the minds, certainty of terms, mutual assenting to duties, or consideration. Assuming arguendo that a contract was formed, none of the items cited by Plaintiff were applicable or appropriate for Barnes under the circumstances.

8. THE PLAINTIFF HAS NOT PROVEN A CLAIM UNDER THE AMERICANS WITH DISABILITIES ACT OR REHABILITATION ACT

The Plaintiff has alleged a violation of the Americans with Disabilities Act and Rehabilitation Act against the Board of Regents, VSU and the individual Defendants in their official capacity. The Plaintiff is not entitled to summary judgment on these claims as he has not proven a disability.

Bragdon v. Abbott, 524 U.S. 624, 1185 S.Ct. 2196, 141 L.Ed. 2d. 540 (1998) sets out a three-step analysis to determine a disability. See also Rossbach v. City of Miami, 371 F.3d 1354, 1357 (11th Cir. 2004). First, the Plaintiff must show he is impaired. Second, he must show a major life activity that is limited. Finally,

and most importantly, he must show that the impairment substantially limits the "major life activity." Barnes has *not* done this.

Barnes' claimed impairment is from a mental disorder – panic attacks and anxiety diagnosed by his psychiatrist in 2006. The last panic attack Barnes suffered took place in 2004, prior to his enrollment at VSU. Nevertheless, Barnes requested and received assistance from the VSU Access Office, which arrange for him to have a private room on campus. There is no complaint by Barnes that he did not receive any other services that he requested.

As to the second element, "learning" is included in the definition of "major life activity" under 29 CFR § 1630.2. Barnes cannot establish that the impairment substantially limits a major life activity.

In determining whether an individual is substantially limited, the Eleventh Circuit considers:

> "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.' Sutton, 185 F.3d at 1208-09 (citing 20 C.F.R. § 1630.2(j)(2)). Sutton v. United Air Lines, Inc., 527 U.S. 471, 488, 119 S.Ct. 2139, 2149, 144 L.Ed.2d 450 (1999). The terms "major life activities" and "substantially limits" are to be strictly interpreted "so as 'to create a demanding standard for qualifying as disabled . . . ." Garrett v. Univ. of Ala. At Birmingham Bd. Of Trustees, 507 F.3d 1306, 1311 (11th Cir. 2007) . . . . That a person is disabled means "that [the] person be presently – not potentially or hypothetically – substantially limited." Sutton, 527 U.S. at 482, 119 S.Ct. at 2146. "It

> is insufficient for individual attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. . . . Rather, the plaintiff must offer evidence 'that the extent of the limitation [caused by the impairment] in terms of own experience . . . is substantial." Id. . . .

Simpson v. Alabama Dep't of Human Resources, 08-12330 (11th Cir. 2009) (unpublished) (Unpublished opinions of the Eleventh Circuit are not binding precedent.) Barnes has not established his disability. He relies entirely on a previous diagnosis. Moreover, the evidence is to the contrary: Barnes was able to successfully matriculate at KSU and obtain a degree. Barnes' suggestion that he was entitled to remain at VSU is without legal support.

9. THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON THE PLAINTIFF'S FIRST AMENDMENT CLAIMS

Barnes' First Amendment claims are necessarily entwined in his Due Process claims, for which he is not entitled to summary judgment as shown above. To the extent not otherwise disposed of, the Defendants are entitled to qualified immunity as to the Plaintiff's First Amendment claims as set out in their Motion for Summary Judgment. Doc. 177.

10. MISCELLANEOUS MISCONSTRUCTIONS BY PLAINTIFF

"The defendants never have denied that Mr. Barnes' communications about the parking deck were the sole reason for terminating him . . . ." Doc. 179 at 1.

Plaintiff incorrectly states that the "Court already has found 'the inclusion of the word 'memorial' by its mere utterance in a photo collage . . . posted on an internet website simply cannot be rationally construed as likely to incite immediate violence, even in the wake of the Virginia Tech tragedy that defendant allude to in their motion.' " Doc. 179 at 2. However, not surprisingly, the Plaintiff fails to include the conditional introductory portion of the Court's sentence where the Court states that such a decision was only "[f]or purposes of the motion to dismiss . . . ." Doc. 37 at 15.

The Virginia Tech tragedy has not been exploited. See Doc. 179 at 3. The Virginia Tech tragedy provides the context during which the decisions were made. Rather, this IS the very situation that President Zaccari was worried about with Barnes. It is not vital to the assessment of President Zaccari's qualified immunity whether the conclusion he reached while exercising his discretion was correct; albeit Defendants do not allude that President Zaccari was incorrect. Notably, the reversal by the Board of Regents of President Zaccari's decision came a time after the most concerning information on Barnes had dissipated.

The only person that has described President Zaccari's opinion of the parking deck as being his "legacy" is Barnes himself. Doc. 179 at 5 (citing Barnes' Depo (Exh. 1 at 189:10-16)).

Plaintiff argues that Barnes' initial fliers opposing the parking deck prompted "an immediate negative reaction from President Zaccari," and that President Zaccari was "upset" with Barnes. Doc.179 at 6. However, again, when Barnes was asked at his deposition what evidence he had that President Zaccari was "upset," he responded that is was only based on what two (2) other students had told him. Barnes Depo at 113:20-22.

The actions of Linda Daniels of the Board of Regents and President Zaccari prior to the Board of Regents meeting on April 17, 2007, of the which the Plaintiff speaks and characterizes as prompting their immediate "ire," Doc.179 at 8-12, to the contrary, were normal responses to a student who is directing criticism towards them. Daniels explained that a due diligence inquiry on a student expected to protest would be "a typical conversation during the course of a meeting." Daniels Depo. at 45:14-23. Zaccari explained that an academic background check on the student in question is "not an unordinary step to take," and is "one of the first things you do in higher education." Zaccari Depo at 192:2-4.

Plaintiff misconstrues a quote from the Deposition of Kimberly Tanner: "he asked Tanner to 'provide him with any supportive information for how to deal with Hayden.' " Doc. 179 at 12 (citing Tanner Depo at 22-14). A closer look at the quote shows that Dr. Tanner was providing the information in order to "facilitate

communication," Tanner Depo at 24:17-19, between the two: "If there's trouble communicating, sometimes it's helpful to know how that student best communicates, if they communicate verbally or written, things like that." Tanner Depo at 23:13-15. Moreover, Tanner states that such a meeting was "a pretty common thing when people have learning disabilities or anything like that." Tanner Depo at 23:10-12.

Plaintiff again excerpts the words "deal with" from a string of deposition testimony which misconstrues the meaning. Doc. 179 at 13. Plaintiff describes a faculty senate breakfast meeting in which President Zaccari and Dr. Michael Noll attended. Doc. 179 at 13. Michael Noll was one of Barnes' professors at VSU and one of Barnes' Facebook "Friends." Doc. 179 at 13; Exh. R-MSJ 1. In this excerpt, Plaintiff states that President Zaccari refused a request from Noll to "help with the situation" and that Zaccari responded that the "administration would 'deal with the student.' " Doc. 179 at 13 (quoting Zaccari Depo at 199:9-18). Zaccari intended to allow Barnes (and did allow Barnes) to complete his semester at VSU. Involving one of Barnes' direct professors would have been inappropriate. As Noll was essentially one of Barnes Facebook Friends, he too was not sufficiently removed from the situation to provide an unbiased assessment.

President Zaccari relied on a letter from Dr. Winders, contained within Barnes' Access Office file which stated that Barnes had been hospitalized for some of his mental health issues which rendered him unable to function. Exh. R-MSJ 2. Confusingly, Plaintiff now argues that this is not true and states that Barnes was never hospitalized. Doc. 179 at 15 n.19.

III.CONCLUSION

The Defendants respectfully submit that the Plaintiff has not and cannot establish that he is entitled to summary judgment as a matter of law on his claims against Defendants. On the contrary, the Motions of the Defendants do establish that they are entitled to summary judgment on all claims. The Defendants therefore request the Court to grant their Motion in its entirety and to deny the Motion of the Plaintiff.

This 24th day of March, 2010.

DAVID C. WILL
Georgia Bar No. 760150
Email: dwill@royallaw.net

HOLLY HANCE
Georgia Bar No. 153092
Email: hhance@royallaw.net

**ROYAL – WILL**
4799 Sugarloaf Parkway, Bldg. J
Lawrenceville, Georgia 30044
(770) 814-8022/Fax: (770) 814-8360

## CERTIFICATE OF SERVICE

This is to certify that I have, this 24th day of March, 2010, served a true and correct copy of the within and foregoing **BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** upon all parties and/or counsel of record by electronic notice and by placing same in the United States Mail, postage prepaid, properly addressed as follows:

**Robert Corn-Revere**
**Christopher A. Fedeli**
**Erin Reid**
Davis Wright Tremaine, LLP
Suite 200
1919 Pennsylvania Avenue, N.W.
Washington, DC 20006

**Irma I. Espino**
**Cary Stephen Wiggins**
Cook Youngelson & Wiggins
260 Peachtree Street, NW
Suite 401
Atlanta, GA 30303

**Matthew R. LaVallee**
**Paul Robert Koster**
Daley, Koster & LaVallee, LLC
2849 Paces Ferry Road
Suite 160
Atlanta, GA 30339

**Mr. David Smith**
Brannen Searcy & Smith
P.O. Box 8002
Savannah, GA 31412-8002

DAVID C. WILL
Georgia Bar No. 760150
Email: dwill@royallaw.net

**ROYAL – WILL**
4799 Sugarloaf Pkwy, Bldg J
Lawrenceville, GA 30043
Phone: 770-814-8022
Fax: 770-814-8360