IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THOMAS HAYDEN BARNES,     *
          *
Plaintiff,          *
          *
-vs-          *
          *     Case No. 1:08-cv-00077-CAP
RONALD M. ZACCARI, *et al.*,     *
          *
Defendants.     *
          *

## STATEMENT OF DISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1(B)(2)(a), Plaintiff Thomas Hayden Barnes ("Barnes") hereby submits this Statement of Disputed Material Facts in connection with his Memorandum of Law in Support of his Consolidated Opposition to the VSU Defendants' (Dkt. #177-2) and Leah McMillan's (Dkt. # 167-2) Motions for Summary Judgment.

Plaintiff submits that there are generally few, if any, disputed facts in this matter. Accordingly, this statement identifies particular statements in the VSU Defendants' (Dkt. # 177-1) and Leah McMillan's (Dkt. # 167-1) Statements of Undisputed Facts that fail to set forth genuine issues of material fact, and instead provide conclusory statements or immaterial facts. *See* LR 56.1(B)(2)(a)(2)(iii). Whether or not a fact is material is guided by the substantive evidentiary standards

that apply to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255-56 (1986).

Plaintiff responds to the VSU Defendants' and Leah McMillan's Statements of Undisputed Material Facts as follows:

## **VSU Defendants**

1.    *At the time of enrollment, he was on academic probation and remained on it throughout his tenure at VSU.*

**Response:**  This is not a material fact.  Plaintiff's academic status is not dispositive of any of the claims at issue in this action.  When Barnes was administratively withdrawn, he was not on academic probation.  (*See* Affidavit of Thomas Hayden Barnes ¶ 10 (hereinafter "Barnes' Aff.") (attached to Barnes' Memorandum of Law in Support of his Consolidated Opposition to the VSU Defendants' and Leah McMillan's Motions for Summary Judgment (hereinafter "Barnes' Consolidated Opp.") at Ex. F).)


2.    *Barnes had previously flunked out of Warren Wilson College and was on probation following a previous enrollment at VSU.*

**Response:**  This is not a material fact.  Barnes' academic record at a different institution is not dispositive.

20.    *President Zaccari learned of the flyers, and, at a previously scheduled meeting with SAVE ("Students Against Violating the Environment"), a VSU Student environmental group, asked if it was behind the flyers.*

**Response:** This statement is unsupported by the record, including Defendant Zaccari's own testimony. Zaccari confirmed repeatedly that he asked his administrative assistant to find out who had posted the flyers on the VSU campus and learned that Barnes was responsible before the meeting with SAVE. (Dkt. # 179-23, Plaintiff's Motion for Summary Judgment (hereinafter "Barnes' Mot."), Ex. 4, Deposition of Ronald Zaccari 49:5-6 (hereinafter "Zaccari Dep."); Dkt. # 179-24, Barnes' Mot., Ex. 5, Zaccari letter to Board of Regents, June 21, 2007 at 1 (hereinafter "Zaccari letter to Board of Regents, June 21, 2007").) However, Zaccari's false statement is not material.

26.    *Daniels inquired as to whether Barnes was likely to attempt to disrupt the Board of Regents' meeting.*

**Response:** This statement is not supported by the record. Daniels inquired as to whether Barnes was likely to "protest" the Board of Regents' meeting, not disrupt it. (Dkt. # 179-24, Barnes' Mot., Ex. 5, Zaccari letter to Board of Regents, June 21, 2007 at 2; Dkt. # 179-23, Barnes' Mot., Ex. 4, Zaccari Dep. 91:25-92:11.)

27.    *During the time that Barnes was opposing the parking deck, Dr. Zaccari*

*began receiving crank phone calls at his house.*

**Response:**  Zaccari's purported statement that he received hang-up calls at

his home is not material, because it was never suggested that Barnes had made

such calls, nor was such possibility cited as a justification for the administrative

withdrawal.  (*See* Dkt. #172, Deposition of Victor Morgan 59:5-60:16 (hereinafter

"Morgan Dep."); Dkt. # 179-9, Barnes' Mot., Ex. 9, Deposition of Dr. Kurt

Keppler 108:12-109:14 (hereinafter "Keppler Dep.").)  Moreover, Barnes avers

that he did not make prank calls to Dr. Zaccari.  (Barnes' Consolidated Opp., Ex.

F., Barnes' Aff. ¶ 4.)


28.    *The crank calls included calls when the caller would hang up after the call*

*was answered by Dr. Zaccari and his wife.  In other calls, a male caller would ask*

*for "the business officer."*

**Response:**  Zaccari's purported statement that he received hang-up calls at

his home is not material, because it was never suggested that Barnes had made

such calls, nor was such possibility cited as a justification for the administrative

withdrawal.  (*See* Dkt. # 172, Morgan Dep. 59:5-60:16; Dkt. # 179-9, Barnes'

Mot., Ex. 9, Keppler Dep. 108:12-109:14.)  Moreover, Barnes avers that he did not

make prank calls to Dr. Zaccari.  (Barnes' Consolidated Opp., Ex. F., Barnes' Aff. ¶ 4.)

29.    *During the time that Barnes was opposing the parking deck objects were thrown at Dr. Zaccari's house.  On one occasion, the security alarm was activated by an intruder.*

**Response:**  Zaccari's purported statement that the security alarm was activated at his home is not material, because it was never suggested that Barnes was responsible, nor was such possibility cited as a justification for the administrative withdrawal. (*See* Dkt. # 172, Morgan Dep. 59:5-60:16; Dkt. # 179-9, Barnes' Mot., Ex. 9, Keppler Dep. 108:12-109:14.)  Major Farmer suggested to President Zaccari that if he was concerned about an intruder or an alarm going off at his house, he should have filed a police report, which he declined to do.  (*See* Dkt. # 179-6, Barnes' Mot., Ex. 27, Deposition of Major Ann Farmer 30:1-31:1 (hereinafter "Farmer Dep.").)  Moreover, Barnes avers that he has never visited Zaccari's residence and that he never caused the security alarm to go off there. (Barnes' Consolidated Opp., Ex. F., Barnes Aff. ¶ 6.)

30.    *Prior to the call from Linda Daniels, Dr. Zaccari did not know Barnes and had not heard of him.*

**Response:**  This statement is unsupported by the record, including Zaccari's own testimony.  Zaccari confirmed that he asked his administrative assistant to find out who had posted the flyers and learned Barnes was responsible before the meeting with SAVE, several weeks before the call from Daniels.  (*See* Dkt. # 179-23, Barnes' Mot., Ex. 4, Zaccari Dep. 49:5-6; *See* Dkt. # 179-24, Barnes' Mot., Ex. 5, Zaccari letter to Board of Regents, June 21, 2007 at 1.)  However, this false statement is not material to dispositive issues of law.


31.    *In a document prepared by Barnes to McMillan to introduce himself to her prior to beginning counseling, Barnes described himself as "an angry liberal" "with anarchist tendencies," and said he "despised authority, plain and simple, and have deeply held passive-aggressive anger towards anyone or anything that holds sway over my life (parents, school administration, the government, etc.)."*

**Response:**  This statement is not material to the issues in this case.  Barnes and Defendant McMillan shared a therapeutic relationship in which Barnes disclosed many of his personal feelings.  Barnes' political views are not at issue, and the letter in question was not part of the discussions that led to Barnes' administrative withdrawal.  Zaccari and the VSU Defendants became aware of the

letter during discovery in this case. McMillan claims she otherwise never shared her files with Zaccari.

32.    *On Monday, April 16, 2007, a student at Virginia Polytechnic Institute and State University ("Virginia Tech") shot and killed two students at a Virginia Tech dormitory and then later shot 60 people on campus, killing 30 of them.*

**Response:** This is not a material fact. The shooting at Virginia Tech is not relevant to any claim at issue in this case.

33.    *The Virginia Tech shooter, student Seung-Hui Cho, was mentally ill with a diagnosis of anxiety disorder and depressive disorder.*

**Response:** This is not a material fact. Cho's mental state is not part of the record in this case. The VSU Defendants' reference to Seung-Hui Cho is nothing more than an argument, after the fact, to draw a comparison between Cho and the Plaintiff. However, publicly reported information indicates that Cho's problems extended far beyond depression and anxiety. (*See* Barnes' Consolidated Opp., Ex. A, Jerry Seper, *A Signal of Deadly Violence to Come*, Wash. Times, Apr. 20, 2007 (hereinafter "A Signal of Deadly Violence to Come"); Barnes Consolidated Opp., Ex. B, Robert O'Harrow Jr., *Gunman's Writings 'Out of a Nightmare,'* Wash. Post, Apr. 18, 2007 at A10 (hereinafter "Gunman's Writings 'Out of a Nightmare'").)

There is no discussion of Cho in any of the contemporaneous notes that document the decision to "administratively withdraw" Plaintiff. (*See* Dkt. # 179-6, Barnes' Mot., Ex. 30, Contemporaneous Notes of Major Anne Farmer (hereinafter "Contemporaneous Notes of Major Anne Farmer").)

34. *Following the shooting, the Board of Regents staff was in contact with the respective institutions of the University System of Georgia regarding the Virginia Tech massacre, including VSU.*

**Response:** This is not a material fact. The actions of the Board of Regents following the Virginia Tech massacre had nothing to do with Barnes and are not relevant to this case.

35. *The Virginia Tech Massacre caused a heightened sense of awareness on Georgia college campuses in general, and at VSU.*

**Response:** This is not a material fact. The actions of the Board of Regents following the Virginia Tech massacre had nothing to do with Barnes and are not relevant to this case.

36. *Among the fears was that a "copy cat" would engage in a similar violent attack on a Georgia campus.*

**Response:**  This is not a material fact.  The actions of the Board of Regents following the Virginia Tech massacre had nothing to do with Barnes and are not relevant to this case.

41.    *The participants in the April 20, 2007 meeting were told by Dr. Zaccari that an intruder had tripped the alarm at his residence, and that he had been receiving crank calls from a male caller.*

**Response:**  Zaccari's purported statements that the security alarm was activated at his home and that he claimed to have received crank calls are not material, because it was never suggested that Barnes was responsible, nor was such possibility cited as a justification for the administrative withdrawal.  (*See* Dkt. # 172, Morgan Dep. 59:5-60:16; Dkt. # 179-9, Barnes' Mot., Ex. 9, Keppler Dep. 108:12-109:14.)  Major Farmer suggested to President Zaccari that if he was concerned about an intruder or an alarm going off at his house he should have filed a police report.  (*See* Dkt. # 179-6, Barnes' Mot., Ex. 27, Farmer Dep. 30:1-31:1.)  Moreover, Barnes avers that he has never visited Zaccari's residence and that he never caused the security alarm to go off there.  (Barnes' Consolidated Opp., Ex. F, Barnes' Aff. ¶ 6.)

44.    *As a result of the belief that the Plaintiff posed a threat to President Zaccari,*
*after the meeting of April 27, 2007, the Campus Police assigned a plain clothes*
*security team to guard the President at certain functions.*

**Response:**  This misleading statement presents a false impression of the
record.  Campus police never concluded that Barnes presented any type of threat,
(*see* Dkt. # 179-6, Barnes' Mot., Ex. 27, Farmer Dep. 42:21-43:18), and the
security office did not "assign" a security team for Zaccari.  Rather, Zaccari
demanded extra security and campus police acceded to his request.  (*See* Dkt. #
181, Deposition of Chief Howard Scott Doner 11:24-12:20 (hereinafter "Doner
Dep.").)  The record is clear that no one except Zaccari ever suggested that Barnes
was a threat of any kind.  (*See* Dkt. # 179-6, Barnes' Mot., Ex. 36, Deposition of
Dean Richard Lee at 75:14-17 (hereinafter "Lee Dep."); *see* Dkt. # 179-4, Barnes'
Mot., Ex. 8, Deposition of Laverne Gaskins 135:25-136:14 (hereinafter "Gaskins
Dep."); Dkt. # 179-10, Barnes' Mot., Ex. 11, Deposition of Leah McMillan 12:10-
12:22; 14:4-17; 15:5-19; 18:4-6; 28:6-29:6; 30:13-31:25; 83:3-84:9 (hereinafter
"McMillan Dep."); *see* Dkt. # 179-7, Barnes' Mot., Ex. 38, Deposition of Victor
Morgan at 34:2-12 (hereinafter "Morgan Dep.");  *see* Dkt. # 179-9, Barnes' Mot.,
Ex. 10, Deposition of Russ Mast 51:20-23 (hereinafter "Mast Dep."); *see* Dkt. #
179-9, Barnes' Mot., Ex. 9, Keppler Dep. 28:16-20; 152:1-6; 30:14-19).)

46.    *During the period through May 7, 2007, President Zaccari consulted with Betsy Neely, Assistant Vice Chancellor at the Board of Regents and sought her legal advice as to how to deal with the Plaintiff.*

**Response:**  This statement is unsupported by the record.  Elizabeth Neely testified that her professional relationship to the Presidents of the University System of Georgia was to act as a consultant and not a legal counselor. (*See* Dkt. # 188, Deposition of Elizabeth Evans Neely 8:21-9:11 (hereinafter "Neely Dep.").) Accordingly, she provided no legal advice to Zaccari.  (*See id.*)  However, this false statement is not dispositive of material legal issues in the case.

47.    *Acting on the advice of Ms. Gaskins and Ms. Neely, Dr. Zaccari made the decision to "administratively withdraw" the Plaintiff from VSU.*

**Response:**  This statement is not supported by the record.  Neely did not provide legal advice to Zaccari.  (*See* Dkt. # 188, Neely Dep. 8:21-9:11.) Additionally, Gaskins repeatedly counseled President Zaccari that "administratively withdrawing" Barnes without a hearing would place VSU on "precarious legal footing."  (*See* Dkt. # 179-6, Barnes' Mot., Ex. 30, Contemporaneous Notes of Major Anne Farmer at 11.)  On multiple occasions, Gaskins raised "due process concerns [and] ADA concerns." (*Id.* at 8-15; Dkt. # 179-4, Barnes' Mot., Ex.8,. Gaskins Dep. 58:9-61:1; 89:9-12; 138:4-139:19).)

50.    *An "administrative withdrawal" is not an "expulsion." An expulsion is a decision to permanently remove a student from campus. The "administrative withdrawal" of the Plaintiff was a conditional removal, from which the Plaintiff could return to campus once certain conditions were met.*

**Response:**  This is not a material fact but a legal conclusion.  Moreover, VSU's makeshift procedure still lacks necessary due process protections, so whether or not an "administrative withdrawal" is the same as an "expulsion" is not material to the ultimate legal issues.

53.    *The Plaintiff was unable to meet these conditions as he was academically ineligible.*

**Response:**  This statement is false and unsupported by the record. Defendants could not withdraw Barnes for academic reasons, and defendants were aware of that fact.  (*See* Dkt. # 179-6, Barnes' Mot., Ex. 29, Faxed copies of Plaintiff's academic transcript; Dkt. # 179-6, Barnes' Mot., Ex. 30, Contemporaneous notes of Major Anne Farmer, at 15 (discussion between Ms. Tanner and Dr. Keppler at May 3, 2007 Meeting).)  However, defendants' mischaracterization of the record on this point is not dispositive of any of the legal issues in this case.

55.    *In order to provide due process to the Plaintiff, Ms. Neely advised President Zaccari that an appeal by Barnes should go directly to the Board of Regents.*

**Response:**  This statement is not supported by the record.  Neely did not provide legal advice to Zaccari.  (*See* Dkt. # 188, Neely Dep. 8:21-9:11.) Moreover, Defendant Gaskins warned Zaccari that "due process dictates that the student be apprised of what particular policy has been violated, an opportunity to be heard and also be informed of the appeal process." (*See* Dkt. # 179-7, Barnes' Mot., Ex. 38, Morgan Dep. 34:2-12.) Far from providing legal advice, Vice Chancellor Neely disregarded Gaskins' concerns and said to "worry about the lawsuit later." (*See* Dkt. # 179-4, Barnes' Mot., Ex. 8, Gaskins Dep. 68:13-17.)

57.    *On January 17, 2008, the Board of Regents ruled in favor of the Plaintiff and set aside the Plaintiff's administrative withdrawal.*

**Response:**  This statement is not material to the legal issues in this case. The Board of Regents rescinded Plaintiff's administrative withdrawal without comment a week after Plaintiff filed a Complaint in federal court. (*See* Dkt. # 179-7, Barnes' Mot., Ex. 57, January 17, 2008, letter from the Board of Regents to Hayden Barnes.)

## **Defendant Leah McMillan**

3.    *Plaintiff and Mrs. McMillan had a positive relationship.  According to Plaintiff, Mrs. McMillan improved his quality of life by providing him advice with his personal, social, academic, and family situations.*

    **Response:** This is not a material fact.  Whether or not the Plaintiff and Defendant McMillan had a positive relationship is a subjective statement, not a fact, and it is not material to the legal questions at issue.

4.    *At the beginning of their counseling relationship,  Plaintiff provided Mrs. McMillan with some notes he had written about himself that referenced things that Mrs. McMillan found concerning.  Mrs. McMillan talked with Plaintiff regarding her concerns.  One of the things referenced by Plaintiff in his notes was that he had previously engaged in some self-directed violence when he was fifteen years old. At no time, however, did Plaintiff ever exhibit or acknowledge any current issues with self-directed violence to Mrs. McMillan.*

    **Response:**  Plaintiff and Mrs. McMillan had a therapeutic relationship in which they discussed many details of Plaintiff's life.  Whether or not Mrs. McMillan found them concerning is not material to any element at issue in Plaintiff's case against Mrs. McMillan, including, but not limited to Mrs. McMillan's liability for damages.

9.      *Sometime after Plaintiff's return to VSU in February 2007, Mrs. McMillan*

*started having concerns that Plaintiff needed an increase or change in medication*

*because he appeared to be having mood swings.*

**Response:**  This is not a material fact.  Whether or not Plaintiff was having

mood swings is irrelevant and not material to any element at issue in Plaintiff's

case against Mrs. McMillan, since she concluded that he did not represent a danger

to himself or to others.  (*See* Dkt. # 179-6, Barnes' Mot., Ex. 27, Farmer Dep.

41:20-23, 42:19-22, 92:22-25; Dkt. # 179-10, Barnes' Mot., Ex. 11, McMillan

Dep. 17:24-18:6, 110:13-15; Dkt. # 182, Deposition of Leah McMillan, Ex. 6 at

20, Unredacted Therapy Notes (hereinafter "McMillan Unredacted Therapy

Notes").)


12.     *Additionally, President Zaccari stated that his house alarm had gone off that*

*past weekend at 3:00 a.m.*

**Response:**  This "fact" is only President Zaccari's unverified statement that

his house alarm went off, which is not supported by the record.  Major Farmer

suggested to President Zaccari that, if he was concerned about an alarm going off

at his house, he should have filed a police report, which he declined to do.  (*See*

Dkt. # 179-6, Barnes' Mot., Ex. 27, Farmer Dep. 30:1-31:1.)

14.     *President Zaccari stated that seeing his name and picture associated with a*
*"memorial" caused him to feel threatened and that, in light of the recent shootings*
*at Virginia Tech, he was concerned.*

**Response:**  This is a statement of feeling, not fact.  Leah McMillan testified
that she did not know what President Zaccari was really feeling.  (Dkt. # 179-10,
Barnes' Mot., Ex. 11, McMillan Dep. 21:10-22.)  Zaccari was informed on
numerous occasions that the Facebook collage was not threatening. (*See* Dkt. #
179-7, Barnes' Mot., Ex. 38, Morgan Dep. 21:13-22; Dkt. # 179-10, Barnes' Mot.,
Ex. 11, McMillan Dep. 162:10-15.)


20.     *Major Farmer believed that she could not yet rule out that Plaintiff posed a*
*danger similar to that of the Virginia Tech shooter - Mr. Cho.*

**Response**:  There is no support in the record to suggest that Major Farmer at
any time believed Barnes posed a danger similar to that of the Virginia Tech
shooter.  After talking about Barnes with Leah McMillan, Farmer testified that she
was told "exactly what I needed to know" to conclude that Barnes presented no
danger.  (Dkt # 179-6, Barnes' Mot., Ex. 27, Farmer Dep. 42:21-43:18.)
Nevertheless, McMillan later disclosed to Zaccari information about Barnes'

counseling record.  (Dkt. # 179-10, Barnes' Mot., Ex. 11, McMillan Dep. 16:22-18:9.)

28.     *Mrs. McMillan provided the aforementioned information regarding Plaintiff to Major Farmer out of good faith and for several reasons.  First, Mrs. McMillan believed that for Major Farmer to best understand her professional opinion that Plaintiff was not a threat to harm President Zaccari or anyone else, Major Farmer needed context as to why Mrs. McMillan felt the way she did.   Secondly, Mrs. McMillan wanted to protect Plaintiff.  Major Farmer's phone call came four days after the shootings at Virginia Tech and Mrs. McMillan wanted Major Farmer to understand that she had never seen that type of behavior from Plaintiff.  Mrs. McMillan did not want "someone going to his dorm room and snatching him out" or for "anyone going after him."*

       **Response:**  This is not a material fact, but is a legal argument.  Mrs. McMillan's reasons for disclosing Plaintiff's confidential medical information to Major Farmer are not dispositive.  Nevertheless, McMillan later disclosed the same information to Zaccari about Barnes' counseling record.  (Dkt. # 179-10, Barnes' Mot., Ex. 11, McMillan Dep. 16:22-18:9.)

30.    *At no time did Mrs. McMillan communicate with Major Farmer regarding the specifics of her treatment of Plaintiff.*

**Response:**  This statement is not supported by the record, including McMillan's own testimony.  Defendant McMillan "processed with Major Farmer some symptoms" she observed in Plaintiff and shared with Major Farmer other details of her therapeutic relationship with the Plaintiff.  (*See* Dkt. # 179-10, Barnes' Mot., Ex. 11, McMillan Dep. 94:20-96:23; *id.* 127:3-128:7 (waiver required to provide information to Zaccari); Dkt. # 179-6, Barnes' Mot., Ex. 30, Contemporaneous Notes of Major Farmer at 6.)

33.    *Mrs. McMillan did not share any information regarding Plaintiff to Major Farmer out of retaliation for Plaintiff's opposition to the construction of a parking deck at VSU.*

**Response:**  This is not a material fact, but is a legal argument.  It is immaterial to the issue of McMillan's unauthorized disclosure of confidential information.

36.    *During this second meeting attended by Major Farmer, President Zaccari discussed speaking with someone at the South Georgia Medical Center regarding Plaintiff having been terminated from his job.  President Zaccari also discussed*

*that he did not believe Plaintiff was going to meet his required 2.0 grade point average to stay in school, that he had received a phone call at his home where the caller asked for the business officer and hung up.*

    **Response:** None of these statements constitute material facts, nor are they undisputed. Barnes was not terminated from his job at the South Georgia Medical Center ("SGMC"). After his probationary period ended, Barnes and SGMG mutually decided to part ways. (*See* Barnes' Consolidated Opp., Ex. F, Barnes Aff. ¶ 7.) In addition, President Zaccari's statement that he received an anonymous phone call asking for the "business officer" at SGMG is unverified and not supported by any evidence in the record. Zaccari's statement that Barnes would not meet his GPA requirements is contradicted by the record. First, the copies of Barnes academic transcript included as an exhibit to Dkt. # 179, (Barnes' Mot.) already in the record show that Barnes was meeting his GPA requirements. (*See* Dkt. # 179-6, Faxed copies of Barnes' academic transcript). In addition, Barnes provides a copy of his VSU transcript as an attachment to his Affidavit, which confirms that he was meeting his applicable GPA requirements in Spring 2007. (*See* Attachment 1 to Barnes Consolidated Opp., Ex. F, Barnes Aff.) Zaccari's purported statement that he received a phone call at his home is not material because it was never suggested that Barnes had made such calls, nor was such a possibility cited as a justification for the administrative withdrawal. (Dkt. #

172, Morgan Dep. 59:5-60:16; Dkt. # 179-9, Barnes' Mot., Ex. 9, Keppler Dep. 108:12-109:14.)   It also is immaterial to the issue of McMillan's unauthorized disclosure of confidential information.

41.   *Mrs. McMillan provided the foregoing information regarding Plaintiff to President Zaccari during their one-on-one meeting on April 24, 2007 out of good faith and for several reasons.  First, Mrs. McMillan believed that for President Zaccari to best understand her professional opinion that Plaintiff was not a threat to himself or anyone else, he needed context as to why Mrs. McMillan felt the way she did.  Therefore, in an attempt to allay President Zaccari's fears, Mrs. McMillan explained Plaintiff's current behaviors - all of which she believed were non-threatening.  Mrs. McMillan also believed that informing President Zaccari that Plaintiff was seeing a psychiatrist in addition to her, and that she had been in contact with Plaintiff's psychiatrist regarding a re-evaluation and possible medication change to address his current behaviors, would further alleviate any fears President Zaccari might have that Plaintiff somehow posed a threat.*

**Response:**  The parties agree that McMillan provided confidential information about Barnes.  (*See* Dkt. # 179-10, Barnes' Mot., Ex. 11, McMillan Dep. 17:21-22 (McMillan told Zaccari that Barnes was seeing a psychiatrist); *id.* 17:22-23 (McMillan described to Zaccari certain behaviors that concerned her); *id.*

17:24-18:6 (McMillan told Zaccari that she "had been in contact with Dr. Winders regarding a possible re-evaluation of Mr. Barnes and a medication change."); *id.* 127:3-128:7 (McMillan understood that disclosure of information requires a waiver).)  That she allegedly did so despite her knowledge that Barnes had never presented the slightest danger, but for the best intentions, is immaterial to the legal questions at issue.

42.    *Additionally, Mrs. McMillan's concern for Plaintiff's safety played a large role in her having communicated the foregoing to President Zaccari on April 24, 2007.  The conversation Mrs. McMillan had on April 24, 2007, took place shortly after the shootings at Virginia Tech.  Mrs. McMillan tried to communicate to President Zaccari that Plaintiff did not pose a similar threat.  Mrs. McMillan did not want the police snatching Plaintiff out of his dorm room or for anyone going after the Plaintiff out of fear that he posed a threat similar to that of the Virginia Tech shooter.*

**Response:**  The parties agree that McMillan provided confidential information about Barnes.  (*See* Dkt. # 179-10, Barnes' Mot., Ex. 11, McMillan Dep. 17:21-22 (McMillan told Zaccari that Barnes was seeing a psychiatrist); *id.* 17:22-23 (McMillan described to Zaccari certain behaviors that concerned her); *id.* 17:24-18:6 (McMillan told Zaccari that she "had been in contact with Dr. Winders

regarding a possible re-evaluation of Mr. Barnes and a medication change."); *id.*

127:3-128:7 (McMillan understood that disclosure of information requires a

waiver).)  That she allegedly did so despite her knowledge that Barnes had never

presented the slightest danger, but for the best intentions, is immaterial to the legal

questions at issue.


44.    *At no time did Mrs. McMillan discuss her treatment of Plaintiff with*
*President Zaccari.*

     **Response:**  The parties agree that McMillan provided confidential

information to Zaccari about Barnes.  (*See* Dkt. # 179-10, Barnes' Mot., Ex. 11,

McMillan Dep. 17:21-22 (McMillan told Zaccari that Barnes was seeing a

psychiatrist); *id.* 17:22-23 (McMillan described to Zaccari certain behaviors that

concerned her); *id.* 17:24-18:6 (McMillan told Zaccari that she "had been in

contact with Dr. Winders regarding a possible re-evaluation of Mr. Barnes and a

medication change."); *id.* 127:3-128:7 (McMillan understood that disclosure of

information requires a waiver).)  That she allegedly did so despite her knowledge

that Barnes had never presented the slightest danger, but for the best intentions, is

immaterial to the legal questions at issue.  McMillan's claim that the information

she disclosed did not include "her treatment" of Barnes is contradicted by the

record.  Defendant McMillan disclosed to President Zaccari, without a release, details of Barnes' therapeutic and psychiatric histories.  (*Id.*)

45.    *Mrs. McMillan did not share any information regarding Plaintiff to President Zaccari out of retaliation for Plaintiff's opposition to the construction of a parking deck at VSU.*

    **Response:**  The parties agree that McMillan provided confidential information to Zaccari about Barnes.  (*See* Dkt. # 179-10, Barnes' Mot., Ex. 11, McMillan Dep. 17:21-22 (McMillan told Zaccari that Barnes was seeing a psychiatrist); *id.* 17:22-23 (McMillan described to Zaccari certain behaviors that concerned her); *id.* 17:24-18:6 (McMillan told Zaccari that she "had been in contact with Dr. Winders regarding a possible re-evaluation of Mr. Barnes and a medication change."); *id.* 127:3-128:7 (McMillan understood that disclosure of information requires a waiver).)  That she allegedly did so without regard to the parking garage controversy is immaterial to the legal questions at issue.

48.    *President Zaccari also stated that he and his wife had been receiving hang-up telephone calls at home.  Additionally, President Zaccari stated that he had been involved in a situation at a prior university where a student had threatened*

*him and his family and he felt that the present situation with Plaintiff was very*
*similar to that.*

     **Response:** Defendant Zaccari's purported statement that he received hang-up calls at his home is not material, because it was never suggested that Barnes had made such calls, nor was such possibility cited as a justification for the administrative withdrawal. (Dkt. # 172, Morgan Dep. 59:5-60:16; Dkt # 179-9, Barnes' Mot., Ex. 9, Keppler Dep. 108:12-109:14.) It is also immaterial to the issue of McMillan's unauthorized disclosure of confidential information.

54.    *The comments Mrs. McMillan made to President Zaccari during the*
*aforementioned April 26, 2007 meeting were not made out of retaliation for*
*Plaintiff's opposition to the construction of a parking deck at VSU. Mrs.*
*McMillan's comments were made in an attempt to allay any fears President*
*Zaccari may have held regarding Plaintiff and to try to help and protect Plaintiff.*

     **Response:** The parties agree that McMillan provided confidential information to Zaccari about Barnes. (*See* Dkt. # 179-10, Barnes' Mot., Ex. 11, McMillan Dep. 17:21-22 (McMillan told Zaccari that Barnes was seeing a psychiatrist); *id.* 17:22-23 (McMillan described to Zaccari certain behaviors that concerned her); *id.* 17:24-18:6 (McMillan told Zaccari that she "had been in contact with Dr. Winders regarding a possible re-evaluation of Mr. Barnes and a

medication change."); *id.* 127:3-128:7 (McMillan understood that disclosure of information requires a waiver).)  That she allegedly did so despite her knowledge that Barnes had never presented the slightest danger, but for the best of intentions, is immaterial to the legal questions at issue.

57.    *To the contrary, Mrs. McMillan believed it was appropriate for Plaintiff to have political views and to want to fight what he felt were social injustices.  Mrs. McMillan did, however, believe that the manner in which Plaintiff's Facebook blog was presented was inappropriate because she perceived it to be disrespectful to President Zaccari.*

**Response:**  This is a statement of belief, not fact.  Defendant McMillan's beliefs surrounding the appropriateness of Plaintiff's speech activities are not material.

66.    *In Plaintiff's three page memo, he states that "I understand that school counselors are in a tough spot right now following Virginia Tech in terms of risky students.  I am insulted I am thought as one."  Additionally, Plaintiff stated that he can become "obsessive at times" about his causes, that he "can be a little paranoid at times," that he has "social anxiety compounded by poor self-image," and that he often has a "difficult time figuring out how people see [him.]."  Dr.*

*Winders was concerned with Plaintiff's three page memo because it sounded to him like Plaintiff was anxious, obsessive and had low self-esteem. According to Dr. Winders, he thought that Plaintiff appeared more anxious than the last time he saw him.*

**Response:** This is not a material fact. The details surrounding Barnes' confidential communications with his psychiatrist are not relevant to any claim at issue in summary judgment.

67. *As a result of this reevaluation, Dr. Winders increased Plaintiff's medication to target his symptoms of anxiety, depression, and obsessiveness.*

**Response:** This is not a material fact. Whether or not Dr. Winders adjusted Plaintiff's medication is not material in any legal issue in this case.

82. *Mrs. McMillan did not participate in the decision to withdraw Plaintiff from VSU.*

**Response:** This conclusory statement is not supported by the record. McMillan actively participated in meetings where the decision to "academically withdraw" Barnes was discussed and she provided confidential information to Zaccari about Barnes during these meetings. This statement is also contradicted by the record. McMillan was present and participated in meetings where President

Zaccari indicated that he was interested in finding a way to remove Barnes from VSU. (*See* Dkt. # 179-10, Barnes' Mot., Ex. 11, McMillan Dep. 17:21-18:6; Dkt. # 179-7, Barnes' Mot., Ex. 38, Morgan Dep. 22:10-20.)

85.    *Plaintiff does not have any evidence that Mrs. McMillan released information about him prior to his administrative withdrawal in retaliation for his opposition to the parking garage.*

**Response:**  This is a legal argument, not a statement of material fact.  The parties agree that McMillan provided confidential information to Zaccari about Barnes. (*See* Dkt. # 179-10, Barnes' Mot., Ex. 11, McMillan Dep. 17:21-22 (McMillan told Zaccari that Barnes was seeing a psychiatrist); *id.* 17:22-23 (McMillan described to Zaccari certain behaviors that concerned her); *id.* 17:24-18:6 (McMillan told Zaccari that she "had been in contact with Dr. Winders regarding a possible re-evaluation of Mr. Barnes and a medication change."); *id.* 127:3-128:7 (McMillan understood that disclosure of information requires a waiver).)  That she allegedly did so without regard to the parking garage controversy is immaterial to the legal questions at issue.

Respectfully submitted this 24th day of March, 2010.

By: /s/ Robert Corn-Revere
     Robert Corn-Revere
     Christopher A. Fedeli
     Lisa B. Zycherman
     Erin N. Reid
     Admitted Pro Hac Vice
     Attorneys for Plaintiff
     Davis Wright Tremaine, LLP
     Suite 200
     1919 Pennsylvania Avenue, NW
     Washington, DC 20006
     202-973-4200
     Email: bobcornrevere@dwt.com


/s/ Cary S. Wiggins
Cary S. Wiggins
Ga. Bar No. 757657
Irma Espino
Ga. Bar No. 558220
Attorneys for Plaintiff
Wiggins Law Group
Suite 401
260 Peachtree Street, NW
Atlanta, GA 30303
404-659-2880
Email: cary@wigginslawgroup.com

## CERTIFICATE OF COMPLIANCE AND SERVICE

I hereby certify that on March 24, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.  I also certify, pursuant to Local Rule 7.1(D), that this motion has been prepared in Times New Roman 14-point font.

*/s/ Robert Corn-Revere*
Robert Corn-Revere
Admitted *Pro Hac Vice*
Attorney for Plaintiff
Davis Wright Tremaine LLP
Suite 200
1919 Pennsylvania Avenue, N.W.
Washington, DC 20006
202-973-4200
Email: bobcornrevere@dwt.com