IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THOMAS HAYDEN BARNES,        *
                                         *

Plaintiff,                       *
                                       *

-vs-                           *
                                     *    Case No. 1:08-cv-00077-CAP

RONALD M. ZACCARI, *et al.*,      *
                                     *

Defendants.                    *
                                     *

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Robert Corn-Revere
Christopher A. Fedeli
Lisa B. Zycherman
Erin N. Reid
Admitted *Pro Hac Vice*
Davis Wright Tremaine LLP, Suite 200
1919 Pennsylvania Avenue, N.W.
Washington, DC 20006
202-973-4200
Email: bobcornrevere@dwt.com

Cary Stephen Wiggins
Georgia Bar No. 757657
Irma Espino
Georgia Bar No. 558220
The Wiggins Law Group
260 Peachtree Street, NW, Suite 401
Atlanta, GA 30303
404-659-2880
Email: cary@cywlaw.com

April 12, 2010

# TABLE OF CONTENTS

                                                                          **Page**

TABLE OF AUTHORITIES .................................................................... ii

ARGUMENT.........................................................................................1

I.     NO MATERIAL FACTS ARE IN DISPUTE ..............................................1

II.    DEFENDANTS VIOLATED BARNES' FIRST
       AMENDMENT RIGHTS ...........................................................................3

III.   DEFENDANTS VIOLATED BARNES' DUE
       PROCESS RIGHTS...................................................................................9

IV.    DEFENDANTS VIOLATED BARNES' RIGHTS
       UNDER THE ADA .................................................................................16

V.     DEFENDANTS VIOLATED BARNES'
       CONTRACTUAL RIGHTS.......................................................................20

VI.    EACH OF THE DEFENDANTS WILLINGLY ENGAGED
       IN A COURSE OF CONDUCT THAT VIOLATED
       BARNES' RIGHTS .................................................................................22

       A.    Defendants Are Responsible for Disregard of Their Legal
             Duties ..........................................................................................22

       B.    Each Defendant Played an Enabling Role in the Withdrawal
             Decision.......................................................................................26

             1.    Defendant McMillan ..............................................................26

             2.    Defendant Gaskins .................................................................31

             3.    Defendant Keppler and Defendant Mast....................................33

CONCLUSION ....................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amnesty Int'l, USA v. Battle,*
    559 F.3d 1170 (11th Cir. 2009)..................................................................14

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)......................................................................................1

*Bennett v. Hendrix,*
    423 F.3d 1247 (11th Cir. 2005)...................................................................3

*Bloch v. Ribar,*
    156 F.3d 673 (6th Cir. 1998).......................................................................8

*Braddy v. Florida Dep't of Labor & Employment Sec.,*
    133 F.3d 797 (11th Cir. 1998)...................................................................14

*Byrd v. Clark,*
    783 F.2d 1002 (11th Cir. 1986)...........................................................24, 33

*Castle v. Marquardt,*
    632 F. Supp. 2d 1317 (N.D. Ga. 2009)...................................................9, 10

*Colquitt v. Ellegood,*
    No. 2:07-cv-548, 2009 WL 772896 (M.D. Fla. Mar. 20, 2009)....................4

*Constantine v. Rectors & Visitors of George Mason Univ.,*
    411 F.3d 474 (4th Cir. 2005)..............................................................6, 7, 8

*Crawford-El v. Britton,*
    523 U.S. 574 (1998)......................................................................................4

*Dixon v. Brown,*
    38 F.3d 379 (8th Cir. 1994).........................................................................8

*Doe v. Rains County Indep. Sch. Dist.*,
      66 F.3d 1402 (5th Cir. 1994) .................................................................. 24

*Ensley v. Soper*,
      142 F.3d 1402 (11th Cir. 1998) .............................................................. 34

*Forsyth v. Kleindienst*,
      599 F.2d 1203 (3d Cir. 1979) ........................................................... 23, 33

*Gonzalez v. Reno*,
      325 F.3d 1228 (11th Cir. 2003) .............................................................. 14

*Goss v. Lopez*,
      419 U.S. 565 (1975) ............................................................................. 9, 12

*Howard v. Fortenberry*,
      723 F.2d 1206 (5th Cir. 1984) ................................................................ 30

*Keating v. City of Miami*,
      No. 09-10939, 2010 WL 703000 (11th Cir. Mar. 2, 2010) ....................... 14

*Kurtizky v. Emory Univ.*,
      669 S.E.2d 179 (2008) ............................................................................ 21

*Life Chiropractic College v. Fuchs*,
      176 Ga. App. 606 (1985) ......................................................................... 21

*Mahavongsanan v. Hall*,
      401 F. Supp. 381 (N.D. Ga. 1975) ..................................................... 20, 21

*Mahavongsanan v. Hall*,
      529 F.2d 448 (5th Cir. 1976) .................................................................. 20

*Matsushita Elec. v. Zenith Radio Corp.*,
      475 U.S. 574 (1986) ............................................................................... 1, 2

*Morehouse College, Inc. v. McGaha*,
   277 Ga. App. 529 (2005) ...........................................................................21

*Moulds v. Bullard*,
   345 Fed. Appx. 387 (11th Cir. 2009) .........................................................4

*Nolin v. Isbell*,
   207 F.3d 1253 (11th Cir. 2000).................................................................24

*Putman v. Gerloff*,
   639 F.2d 415 (8th Cir. 1981)......................................................................23

*Reams v. Irvin,*
   561 F.3d 1258 (11th Cir. 2009)..................................................................10

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995)........................................................................................5

*Smith v. Mosley,*
   532 F.3d 1270 (11th Cir. 2008)..........................................................4, 5, 6

*Suarez Corp. Indus. v. McGraw,*
   202 F.3d 676 (4th Cir. 2000)........................................................................8

*Tasker v. Moore*,
   738 F. Supp. 1005 (S.D. W. Va. 1990)................................................24, 33

*Thaddeus-X v. Blatter*,
   175 F.3d 378 (6th Cir. 1999)..........................................................3, 5, 6, 8

*United States v. Kelner*,
   534 F.2d 1020 (2d Cir. 1976)........................................................................7

*United States v. Callahan*,
   702 F.2d 964 (11th Cir. 1983)......................................................................6

*Villanueva v. George*,
   659 F.2d 851 (8th Cir. 1981) (en banc) ...............................................24, 33

*West Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)....................................................................35

*Zwick v. Regents of Univ. of Mich.*,
    No. 06-12639, 2008 WL 1902031 (E.D. Mich. Apr. 28, 2008) ..............8, 15

## STATUTES

Ga. Code of Professional Conduct § 1.13.............................................33

Plaintiff Hayden Barnes hereby replies to oppositions to his Motion for Summary Judgment filed by the VSU Defendants, as well as individual defendants Laverne Gaskins and Leah McMillan.

## ARGUMENT

## I.    NO MATERIAL FACTS ARE IN DISPUTE

This case is ripe for summary judgment.  After Barnes supported his motion for summary judgment, the burden shifted to the defendants to cite specific facts showing that a genuine issue for trial exists.  *Matsushita Elec. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The existence of a mere scintilla of evidence is not enough.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 252 (1986).  The record taken as a whole must be sufficient to lead the factfinder to rule for the nonmoving party to create a genuine issue for trial.  *Matsushita Elec.*, 475 U.S. at 587.

Although the defendants occasionally quibble with details in Barnes' Statement of Undisputed Facts, none show any disputes of fact that preclude a grant of summary judgment for the Plaintiff.  As the attached chart illustrates, the few issues raised by the defendants fall far short of demonstrating any genuine issues of material fact.[1]  For example, in most cases, defendants "deny" without

---

[1]   (*See* Chart of Defendants' Responses to Plaintiff's Statement of Undisputed Facts (hereinafter "SUF Chart") (attached hereto as Ex. A).)  The SUF

explanation that the record supports a particular statement, or object to a statement "as worded" or "as stated."[2] Such cursory treatment of the record does not satisfy their obligation to cite "specific facts showing that . . . a genuine issue for trial" exists. *Matsushita Elec.*, 475 U.S. at 587. In other instances, the defendants cite disagreements of fact involving trivial issues that obviously fail to articulate material disputes.[3]

The defendants identify no disputes that establish any genuine issues requiring trial and factfinding.[4] For example, the VSU Defendants assert that all facts that document VSU policies that establish students' due process rights are "immaterial," evidently in the hope that they can wish away their liability for actively disregarding Barnes' rights under the school's official policies.[5] Similarly, McMillan tries to dispute some details regarding her unauthorized disclosure of confidential information, but only confirms that she disclosed more information

_____

Chart lists only those paragraphs in which one or more of the defendants expressed some disagreement.

[2] (*See* SUF Chart ¶¶ 14, 17, 26, 30, 37, 38, 41, 42, 46, 47, 50, 53, 55, 56, 60, 61, 68, 69, 70, 71, 73, 75, 77-79, 81, 82, 84, 85, 89, 90, 92, 94, 96-98, 100, 102, 107-109, 110, 112, 119, 121, 123, 124, 126.)

[3] (*See id.* ¶¶ 10, 14, 20, 22, 29, 60, 76, 104.)

[4] (*See, supra,* notes 2-3; *see also id.* ¶¶ 27, 33, 99.)

[5] (*See id.* ¶¶ 86, 87, 88, 95, and 112.)

than VSU policies permit without obtaining a release from the student.[6]  And Gaskins tries to manufacture a significant dispute regarding the purpose of her contact with Elizabeth Neely, but only confirms the point Barnes has made all along – that the defendants were advised that the proposed course of action would eliminate due process at the campus level.  (*See id.* ¶ 99.)

## II.    DEFENDANTS VIOLATED BARNES' FIRST AMENDMENT RIGHTS

No defendant in this case has ever disputed that Hayden Barnes was withdrawn from VSU because of his speech regarding the parking deck.  Nor have they questioned the applicable test for a First Amendment retaliation claim. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).  Although Defendants McMillan and Gaskins argue that they are not liable for retaliation because they were not personally motivated to restrict Barnes' speech, neither denies that they were direct participants in the series of events that lead to Barnes' removal.[7]

---

[6] (*See id.* ¶¶ 71, 79, 89.)

[7] *Thaddeus-X v. Blatter*, 175 F.3d 378, 393 (6th Cir. 1999) ("Reliance on a superior's orders does not in itself dissipate all liability.").  McMillan misses the point in arguing she is not liable under Section 1983.  (*See* Dkt. # 222, Defendant Leah McMillan's Response in Opposition to Plaintiff's Motion for Summary Judgment at 13-15 (hereinafter "McMillan's Opp.").)  Barnes never suggested that Section 1983 created a separate substantive offense.  Instead, he asserted that the defendants' various acts and omissions made them responsible "for the deprivation of Mr. Barnes' federal rights," in a case brought pursuant to Section 1983.  (Dkt. #

The few cases McMillan cites for the proposition that Barnes must "articulate affirmative evidence of retaliation," all arise in the unrelated context of prison speech, and do nothing to undermine Barnes' First Amendment claim. (Dkt. # 222, McMillan's Opp. at 3.)  In each of these cases, the prisoners could not show that disciplinary actions were motivated by their exercise of protected rights. *See*, *e.g.*, *Moulds v. Bullard*, 345 Fed. Appx. 387, 393 (11th Cir. 2009) ("bare assertion of a conspiracy to retaliate . . . without alleging any other details or providing any supporting evidence"); *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008) ("nothing . . . even suggests that [the plaintiff] thought the charges were a mere pretext – that they had been brought in retaliation for his grievances"); *Colquitt v. Ellegood*, No. 2:07-cv-548, 2009 WL 772896, at *6 (M.D. Fla. Mar. 20, 2009) (not reported in F. Supp.) (the complaint "is unclear what type of harassment Plaintiff claims to have experienced").

McMillan's citation to *Crawford-El v. Britton*, 523 U.S. 574 (1998) is unhelpful to her argument, since the Supreme Court in that case held merely that a Section 1983 plaintiff is not required to adduce clear and convincing evidence of

---

179-2, Plaintiff's Motion for Summary Judgment (hereinafter "Barnes' Mot.") at 72.) (s*ee also id*. at 73-75) (*see also infra* at 22-35 (discussing details of defendants' respective contributions to the constitutional and statutory violations.)

improper motive in order to defeat an official's motion for summary judgment.[8]  In

making an affirmative case to show retaliation, the plaintiff is required only to

show that the adverse action was taken "at least in part" because of the protected

conduct.  *Thaddeus-X*, 175 F.3d at 386-87.  *See also id.* at 394.  Once the plaintiff

has identified evidence in the record that would support a retaliation claim,

summary judgment cannot be denied based on "summary denials" of a retaliatory

purpose.  *Id.* at 399-400.

    In this case, any such denials would be pointless.  From the beginning, the

defendants have embraced the notion that the withdrawal decision was a direct

reaction to Barnes' speech.  McMillan and Gaskins certainly do not dispute that

fact, but claim only that they did not "participate" (or at least were not responsible

for the decision).  Zaccari, on the other hand, argues that he had every right to

order Barnes' removal from campus.  Either way, there is no disputing the causal

connection between Barnes' speech and the withdrawal order.  Zaccari does not

---

    [8] The cases McMillan cites are particularly inapt here, since they occur in a
specialized context in which "[p]rison officials are . . . accorded latitude in the
administration of prison affairs."  *Mosley*, 532 F.3d at 1277 (citation and internal
quotation marks omitted).  *See also Thaddeus-X*, 175 F.3d at 395 ("it is generally
much harder for a prisoner to show that his conduct is protected").   That
institutional setting is a far cry from the university campus, which is "at the center
of our intellectual and philosophic tradition."  *Rosenberger v. Rector & Visitors of
Univ. of Va.*, 515 U.S. 819, 835 (1995).

even attempt to show that he "would have taken the same action [against Barnes] in the absence of the protected activity." *Mosley*, 532 F.3d at 1278 (*quoting Thaddeus-X*, 175 F.3d at 399). The record in this case clearly satisfies the causation element of a First Amendment retaliation claim – particularly in the university context. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). (*See* Dkt. # 179-2, Barnes' Mot. 4-27, 30-49; Dkt. # 224, Plaintiff's Consolidated Opposition to VSU Defendants and Defendant Leah McMillan's Motions for Summary Judgment at 12-17, 21-23 (hereinafter "Barnes' Opp.").)

Zaccari and the other VSU Defendants defend their actions on the claim that Barnes' speech was unprotected expression. However, they are wrong as a matter of law. (*See* Dkt. # 179-2, Barnes' Mot. at 28-30, 36-39; Dkt. # 224, Barnes' Opp. at 23-28.) Zaccari's claim that he was concerned about campus security and that other defendants believed his concern was genuine is irrelevant. (*See* Dkt. # 216, VSU Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment at 14-16 (hereinafter "VSU Defs.' Opp.").) The issue here is not what Zaccari may have felt; it is what "a reasonable person would construe . . . as a serious expression of an intention to inflict bodily harm." *United States v. Callahan*, 702 F.2d 964, 965 (11th Cir. 1983). To be a "true threat," the speech at issue must be

"unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976). The record in this case is quite clear that Barnes' political activities were not perceived as any kind of threat – much less an imminent threat – and that Zaccari's actions spoke far more loudly than his words in this respect. (*See* Dkt. # 179-2, Barnes' Mot. at 40-49.)

The VSU Defendants' argument that Barnes "faced no impediment or chilling effect . . . despite his withdrawal" and that he "could have re-entered, and did re-enter, the VSU campus at any time to engage in non-threatening speech," (Dkt. # 177-2, VSU Defendants' Motion for Summary Judgment at 28 (hereinafter "VSU Defs.' Mot.")), simply fails to grasp the applicable law. It is well established that a retaliation claim does not require the plaintiff must prove "that the allegedly retaliatory conduct caused her to cease First Amendment activity altogether." *Constantine*, 411 F.3d at 500 (collecting cases from numerous circuits). The cause of action "targets conduct that tends to ***chill*** such activity, not just conduct that ***freezes*** it completely." *Id*. (emphasis in original). Consequently, "for purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment

rights." *Id.* (citation omitted).    Dismissal from school easily meets that requirement.  *See, e.g., Zwick v. Regents of Univ. of Mich.*, No. 06-12639, 2008 WL 1902031, at *9 (E.D. Mich. Apr. 28, 2008) (not reported in F. Supp.) ("The dismissal of Plaintiff – if it is seen to be motivated by Plaintiff's speech – would clearly have the effect of chilling speech at the . . . school.").

Finally, the VSU Defendants ignore that fact that a retaliation claim may be brought not only when a person is denied constitutional rights, but also when he is penalized for exercising them.  *Thaddeus-X*, 175 F.3d at 394.  *See Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994) ("the injury to this [First Amendment] right inheres in the retaliatory conduct itself").  Under this standard, even such actions as a disclosure of information "may constitute adverse action if it is 'sufficiently embarrassing, humiliating, or emotionally distressful.'"  *Constantine*, 411 F.3d at 500 (*quoting Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 688 (4th Cir. 2000)). *See Bloch v. Ribar,* 156 F.3d 673, 681 (6th Cir. 1998) (sheriff's publication of the explicit details of a rape in retaliation for the rape victim's criticism of the sheriff was sufficiently adverse to "chill people of ordinary firmness").  In this case, the defendants' various adverse actions toward Barnes, culminating in his forced removal from school, have been amply demonstrated.

## III.    DEFENDANTS VIOLATED BARNES' DUE PROCESS RIGHTS

The defendants' callous insensitivity to Barnes' constitutional rights does not end with the First Amendment.  The VSU Defendants continue to trivialize their due process violations, now calling the sanction imposed on Barnes a "time out," as if Barnes were an errant kindergarten student who was sent to be alone in the corner.  (Dkt. # 216, VSU Defs.' Opp. at 2.)  Their continuing fixation on the purported distinction between "expulsion" from school and "administrative withdrawal," (*id.* at 2-3), misses the point entirely.  It is utterly unresponsive to Barnes' substantive due process claim, (*see* Dkt. # 179-2, Barnes' Mot. at 49-51; Dkt. # 224, Barnes' Opp. at 29), and it ignores that, as a matter of procedural due process, suspension lasting ten days or more is considered to be a major sanction. *See Goss v. Lopez*, 419 U.S. 565, 584 (1975); *Castle v. Marquardt*, 632 F. Supp. 2d 1317, 1336 & n.22 (N.D. Ga. 2009).  (*See generally* Dkt. # 179-2, Barnes' Mot. at 51-60; Dkt. # 224, Barnes' Opp. at 30-31.)

The VSU Defendants misleadingly cite *Castle* to support their argument that due process was not offended by denying a pre-deprivation hearing in this case, (Dkt. # 216, VSU Defs.' Opp. at 4-6), yet make no effort to respond to the well-

established precedent to the contrary.[9]  (*See* Dkt. # 179-2, Barnes' Mot. at 53; Dkt. # 224, Barnes' Opp. at 30.)  *Castle* itself, in the passages the VSU Defendants neglect to cite, makes clear that the ability to forego a pre-deprivation hearing is limited to "rare and extraordinary" situations and "emergency situations."  632 F. Supp. 2d at 1332 (cited cases omitted).  Although the VSU Defendants argue that post-deprivation remedies may be used where a student's presence "poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process," (Dkt. # 216, VSU Defs.' Opp. at 5), they do not seriously contend that such an emergency was present in this case.[10]  As Gaskins explained,

---

[9] The other due process cases the VSU Defendants cite (other than for neutral due process boilerplate language) are inapposite.  (*See* Dkt. # 216, VSU Defs.' Opp. at 6-7.)  *Reams v. Irvin*, 561 F.3d 1258 (11th Cir. 2009), for example, involved the seizure and impoundment of horses to prevent their mistreatment.  No liberty interest was involved, as there is here, and – also unlike this case – the state followed its standards and procedures for inspection and impoundment before the seizure, which included "an examination of the equines and an assessment of their condition by a veterinarian."  *Id*. at 1264.  In this case, existing policies were ignored, and a new "process" was concocted on the fly.

[10] Even the defendants' putative "expert," Dr. Matthew Norman, retracted his initial impression that Barnes represented any kind of "imminent" danger.  (*See* Dkt. # 164, Plaintiff's Motion to Exclude Dr. Matthew Norman as an Expert Witness, Ex. B, Deposition of Dr. Matthew Norman 125:22-126:15.)   And representatives of the VSU Counseling Center made clear their unanimous belief that Barnes represented no threat of any kind, which is why they would not support action under the Mental Health Withdrawal Policy – the established process for dealing with any such "emergency" situations.  (*See* Dkt. # 179-2, Barnes' Mot. at 42-46.)

"[t]here are no circumstances the hearing procedure should have been disregarded. Ultimately, a student is entitled to a hearing."  (Dkt. # 231-7, Barnes' Mot., Ex. 8, Deposition of Laverne Gaskins 95:10-97:20 (hereinafter "Gaskins Dep.").)

Contrary to their current claims of "emergency,"  the VSU Defendants state that "Barnes was allowed to complete his final exams and to finish the semester" in an apparent attempt at damage control.  (Dkt. # 216, VSU Defs.' Opp. at 4.)  This fact alone confirms that the defendants perceived no actual emergency, and it is just one of many such indicia in the record – all undisputed – that none of the defendants, Zaccari included, perceived any actual danger.  (*See* Dkt. # 231-7, Barnes' Mot., Ex. 8, Gaskins Dep. 158:5-21) (explaining that the delay is inconsistent with claims that Barnes posed a threat or the situation was an emergency that would justify foregoing a hearing.)  Such actions speak far louder than words, including Zaccari's feigned concerns.  No one on Zaccari's staff when presented with the facts separately concluded that Barnes presented any threat.

Zaccari had looked for various ways to get rid of Barnes before he latched on to the "security" theme, the defendants deliberated for more than two weeks about how to implement a "withdrawal," and campus security confirmed that Barnes would have been suspended immediately and escorted from campus if any real danger had been perceived.  (*See* Dkt. # 179-2, Barnes' Mot. at 46-49.)

Campus police were ***never even asked*** to interview Barnes, and Major Farmer concluded that she had "exactly what I needed to know" to conclude that Barnes was no danger to anyone after her initial conversation with Leah McMillan on April 20. (*Id.* at 16.) This clearly was no emergency.

Yet even if the defendants could show that post-withdrawal remedies would have been appropriate in this case, the procedures they used fell far short of the "necessary notice and rudimentary hearing" that even the VSU Defendants acknowledge "should follow as soon as practicable." (Dkt. # 216, VSU Defs.' Opp. at 5 (*quoting Goss v. Lopez*, 419 U.S. at 582-83).) Defendant Zaccari consciously adopted a process calculated to avoid any requirement for the presentation of evidence or that would be subject to any kind of accountability. (*See* Dkt. # 179-2, Barnes' Mot. at 20-21, 57-60.) He ignored Major Farmer's suggestion that he should seek a restraining order if he really felt threatened,[11] and bypassed the University's established due process procedures. (*See id.* at 20-24.)

The process that they concocted failed to provide adequate and neutral review of the arbitrary decision to withdraw Barnes. The two conditions that

---

[11] (*See* Dkt. # 179-1, Barnes' SUF ¶¶ 63-64; Dkt. # 231-7, Barnes' Mot., Ex. 8, Gaskins Dep. 48:10-20; Dkt. # 231-20, Barnes' Mot., Ex. 27, Deposition of Major Anne Farmer 30:20-31:1, 77:12-79:3, 81:11-82:3, 97:1-3 (hereinafter "Farmer Dep."); Dkt. # 181, Deposition of Chief Howard Scott Doner 13:20-23, 22:22-23:2.) (*See also* Dkt. # 179-2, Barnes' Mot. at 14, 45.)

Zaccari inserted in the May 7 Withdrawal Notice were a sham that were ignored, despite the fact that Barnes promptly complied with them. (*See id.* at 23-26, 58-59.) The eventual appeal to the Board of Regents was similarly tainted. The VSU Defendants quote long passages from Betsey Neely's deposition to support the claim that she was not involved in the administrative appeal in recognition of the clear conflict created by her involvement in assisting Zaccari make up the administrative withdrawal "process." (*See* Dkt. # 216, VSU Defs.' Opp. at 8-10.) However, the documentary evidence shows unequivocally that Neely supervised the Board's appeal process as head of the Board's Office of Legal Affairs.[12]

As the Board's Associate Vice-Chancellor for Legal Affairs, Neely commanded all subordinates who might have also participated in Barnes' appeal.[13]

---

[12] (*See, e.g.,* Dkt. # 188, Ex. 15 to Deposition of Elizabeth Neely (hereinafter "Neely Dep."), May 29, 2007 Letter from *Neely* to Barnes regarding Barnes appeal; Dkt. # 188, Ex. 16 to Neely Dep., May 30, 2007 Letter from *Neely* to Zaccari regarding Barnes appeal; Dkt. # 188, Ex. 17 to Neely Dep., June 21, 2007 Letter from Zaccari to *Neely* regarding Barnes appeal; Dkt. # 188, Ex. 18 to Neely Dep., August 15, 2007 Letter from *Neely* to Dennis Dunn concerning Barnes appeal; Dkt. # 188, Ex. 19 to Neely Dep., August 9, 2007 Letter from *Neely* to Barnes regarding Barnes appeal) (emphasis added).)

[13] Relevant subordinates included her secretary Keisha Coleman (who duties Neely compared to a "court clerk"), (Dkt. # 188, Neely Dep. 64:21-25), and Burnes Newsome and Daryl Griswold, (*id.* 66:25-67:14), all of whom reported directly to Neely. (*Id.* 72:20-73:4.) It is notable in this regard that Zaccari claimed that his subordinates could not fairly administer a hearing process at the campus level where he was the complainant. (Dkt. # 190, Deposition of Ronald Zaccari

She should have **at least** directed those involved to ensure that all correspondence concerning Barnes' appeal be officially addressed to her subordinates Burnes Newsome or Daryl Griswold and not to her. However, Neely neglected to take even this modest remedial step. But this was consistent with how the rigged process had been conducted from the beginning. Zaccari contacted Neely in the first place to make sure that the withdrawal decision "was sanctioned by those who would review the circumstances behind his decision." (Dkt. # 231-7, Barnes' Mot., Ex. 8, Gaskins Dep. 68:23-70:1.)

As a matter of law, Neely was responsible for decisions made by the Office of Legal Affairs and for ensuring the lawful actions of her subordinates. *Gonzalez v. Reno,* 325 F.3d 1228, 1234 (11th Cir. 2003) (*citing Braddy v. Florida Dep't of Labor & Employment Sec.,* 133 F.3d 797, 802 (11th Cir. 1998)). The assertion that Newsome and Griswold oversaw Barnes' appeal lacks merit because, where an appeal is **supervised** by a person involved in the underlying decision, even if not directly handled by that person, due process is denied.[14]

---

193:24-197:10 (hereinafter "Zaccari Dep.").) By the same logic, Neely cannot launder her official involvement by claiming to have passed off the case to those under her direct supervision.

[14] *See Keating v. City of Miami,* No. 09-10939, 2010 WL 703000, at *7 (11th Cir. Mar. 2, 2010); *see also Amnesty Int'l, USA v. Battle,* 559 F.3d 1170, 1180-81 (11th Cir. 2009). Neely acknowledged that VSU would be subject to "criticism" if

Contrary to the VSU Defendants' persistent claims that Barnes "has not been deprived of anything," (Dkt. # 216, VSU Defs.' Opp. at 3-4), the denial of due process is a serious matter when it involves an involuntary dismissal from school. Thus, in *Zwick*, the court found that the defendants violated a student's due process rights, and the jury awarded substantial damages, for dismissing a student under circumstances far less egregious than what happened in this case. There, the dismissal was imposed following an "unscheduled and apparently informal meeting" of the Academic Review Board after the associate dean of student affairs unilaterally solicited "draft letters of evaluation" from selected faculty members. The jury found for the plaintiff, and awarded $1.72 million in compensatory and punitive damages, imposing a $1 million punitive damages award on the associate dean who initiated the illegal process.[15]

---

the same "committee" of decision-makers expelling Barnes also reviewed his appeal, and stated that a "neutral entity" should have such review authority. (Dkt. # 216, VSU Defs.' Opp. at 10 (*citing* Neely Dep.).) Undisputed facts show that Neely was indeed on the "committee" advising Zaccari to expel Hayden Barnes. (*See, e.g.,* Ex. A, SUF Chart ¶¶ 99-100, 102; Dkt. # 188, Neely Dep. 24:19-23.)

[15] The relevant facts are set forth in *Zwick v. Regents of Univ. of Mich.*, No. 06-12639, 2008 WL 1902031, at *2 ((E.D. Mich. Apr. 28, 2008), where the court rejected the defendant's motion for summary judgment on the procedural due process claim. The facts in that case would not support a First Amendment retaliation claim. *Id.* at *9-10. The ultimate damages award was based entirely on the procedural due process claim. *See Zwick*, Judgment Order (attached hereto as Ex. B.)

The VSU Defendants in particular seem to be blithely unaware that much of their "defense" consists of nothing more than making statements against interest. (*See, e.g.*, Dkt. # 216, VSU Defs.' Opp. at 10 ("The only reason [Barnes] ***was not given due process at the campus level*** was because the administrator initiating the action was the ultimate decisionmaker on campus – the University President.") (emphasis added.))  Defendants McMillan and Gaskins continue to assert that they had nothing to do with the denial of due process, but as explained, *infra*, at 26-33, their actions (and inactions) were an integral part of the breakdown of process.

## IV.   DEFENDANTS VIOLATED BARNES' RIGHTS UNDER THE ADA

In opposition to Plaintiff's motion for summary judgment of his Americans With Disabilities Act ("ADA") and Rehabilitation Act claims, the VSU Defendants do not dispute two of the three-prongs necessary for Plaintiff to establish a prima facie violation under Title II of the ADA and the Rehabilitation Act.  (*See* Dkt. # 179-2, Barnes' Mot. at 61 (summarizing elements of ADA and Rehabilitation Act claims).)  Specifically, the defendants do not dispute that they are subject to the ADA and the Rehabilitation Act, or that they discriminated against Plaintiff because of his disability.[16]  (*See* Dkt. # 216, VSU Defs.' Opp. at 18-20.)  The VSU

---

[16] Indeed, the VSU Defendants' motion for summary judgment baldly admits that Barnes was expelled from the University because of his disability.

Defendants merely argue that Barnes was not a qualified individual with a disability under the Acts when he was expelled from the University.

The VSU Defendants' assertion that Barnes is not a qualified individual under the ADA and the Rehabilitation Act is plainly unsupported by the record and has already been admitted by the VSU Defendants. Defendants appear to dispute whether Barnes had an impairment because "he relies entirely on a previous diagnosis." (Dkt. # 216, VSU Defs.' Opp. at 20.) However, no defendant in this case disputes that Dr. Winders diagnosed Barnes with a mental disorder as early as December 2000. (*See* Ex. A, SUF Chart ¶ 10.) Record evidence establishing Barnes' long-term diagnosis and treatment by Dr. Winders before his enrollment at VSU in 2007 is highly relevant and required under the Acts to establish his disability. Barnes' status as a qualified individual is not diminished by the fact that his most recent panic attack occurred in 2004 – as the VSU Defendants' appear to assert. (Dkt. # 216, VSU Defs.' Opp. at 19.) Barnes continued to suffer from anxiety at the time he enrolled at VSU, whereupon he contacted the VSU Access Office to register as an on-campus disabled student suffering from panic disorder with agoraphobia. (*See* Ex. A, SUF Chart ¶ 14.) It is undisputed by defendants

---

(Dkt. # 177-2, VSU Defs.' Mot. at 29) (explaining that Barnes was expelled in part because he "ha[d] a mental illness.").)

that, at the time Barnes enrolled at VSU, Dr. Winders wrote a letter to the Access Office on Barnes' behalf describing Plaintiff's medical history and current diagnoses, as well as Barnes' present need for accommodations. (*See* Ex. A, SUF Chart ¶ 16.) Thereafter, Barnes obtained ADA accommodations from the VSU Access Office. (*See* Ex. A, SUF Chart ¶ 17.)

Although VSU Defendants quibble that Barnes "received accommodations from the Access Office," but "den[y] as worded" that such accommodations were "ADA accommodations," Defendant Gaskins admits that the VSU Access Office accommodated Barnes' disability under the ADA.[17] (*See* Ex. A, SUF Chart ¶ 17.) Indeed, Defendant Gaskins testified that Defendant Zaccari's use of confidential information about Barnes might violate the ADA, (*see* Dkt # 231-7, Barnes' Mot., Ex. 8, Gaskins Dep. 99:18-100:9), and that singling a student out for unfavorable treatment because he used the VSU Counseling Center would violate the ADA. (*Id*. 99:2-9.)

Conceding that "learning" is a "major life activity" under the ADA and the Rehabilitation Act, VSU Defendants nevertheless argue that Plaintiff cannot

---

[17] Moreover, Dr. Kimberly Tanner, Director of the VSU Access Office repeatedly confirmed that Barnes obtained services from the Access Office due to his qualifying disabilities, which were typical of the kinds of disabilities accommodated there. (Dkt. # 231-12, Barnes' Mot., Ex. 18, Tanner Dep. 7:7-23.)

establish that his impairment "substantially limits" one or more of his major life activities.  (Dkt. # 216, VSU Defs.' Opp. at 19.)  However, in his August 2006 letter to the VSU Access Office, Dr. Winders explained that Plaintiff's condition, which result in "panic attacks and anxiety ***have caused a great deal of difficulty in functioning in school and in life in general***."  (Dkt. # 232-5, Barnes' Mot., Ex. 14, Aug. 28, 2006 Letter from Dr. Kevin Winders to VSU Access Office) (emphasis added.)  In the end, defendants' argument is pointless, since they repeatedly concede that Barnes' impairment limited him to the extent that he qualified for and obtained assistance through the VSU Access Office.[18]

The VSU Defendants further claim that Barnes was not "substantially limited" in his ability to learn because "Barnes was able to successfully matriculate at [Kennesaw State University] and obtain a degree" after his expulsion from VSU. (Dkt. # 216, VSU Defs.' Opp. at 20.)  Plaintiff's ADA and Rehabilitation Act claims are not diminished because he successfully earned a degree from KSU – this achievement only demonstrates Barnes' success in spite of his challenges. Simply put, being able to graduate college does not mean you don't have a disability.  Moreover, for the purpose of Barnes' ADA and Rehabilitation Act

---

[18] (*See, e.g.,* Dkt. # 216, VSU Defs.' Opp. at 19; Dkt. # 177-1, VSU Defs.' SUF ¶ 15; *see also* Dkt. # 231-12, Barnes' Mot., Ex. 18, Tanner Dep. 7:7-23, 9:16-10:11.)

claims, the only relevant time period for assessing Barnes' disability status is the time leading up to and ending with his expulsion from VSU.

In light of undisputed evidence that Plaintiff is a qualified individual with a disability under the ADA and Rehabilitation Acts, and defendants' admission that they discriminated against Barnes on the basis of his disability, the Court should grant summary judgment to Plaintiff on these claims.

## V.    DEFENDANTS VIOLATED BARNES' CONTRACTUAL RIGHTS

The VSU Defendants argue incorrectly that Georgia law limits student contract formation via student handbooks to private universities. (Dkt. # 216, VSU Defs.' Opp. at 17.) This is a plain misreading of applicable law, and VSU would not have had to look far to find its error. This very Court, in a prior breach of contract action against a Georgia public university, found that a contract was formed between a public university and a student under Georgia law based on the "general catalogue of Georgia State University and the graduate bulletin in effect at the time that plaintiff enrolled."[19] This unambiguous holding remains the

---

[19] *Mahavongsanan v. Georgia State University*, 401 F. Supp. 381, 382 (N.D. Ga. 1975) (hereinafter "*Georgia State University*"). This case was reversed on the grounds that the academic requirement terms of the contract between the student and the public university formed by the catalogue were subsequently lawfully modified. 529 F.2d 448, 450 (5th Cir. 1976) ("Implicit in the student's contract with the university upon matriculation is the student's agreement to comply with

clearest interpretation of Georgia contract law on this issue. *Georgia State University*, 401 F. Supp at 383 ("[T]he catalogues and bulletins in effect at the time plaintiff enrolled in the school, did constitute a contract binding upon the defendants.").

The defendants' reading of applicable law is not just wrong, it is repetitively so. As VSU did in arguing for summary judgment, (*see* Dkt. # 224, Barnes' Opp. at 39-40), the defendants once again misinterpret two (additional) Georgia court decisions concerning contract law. VSU argues that both *Morehouse College, Inc. v. McGaha*, 277 Ga. App. 529 (2005), and *Kurtizky v. Emory Univ.*, 669 S.E.2d 179 (2008), support the notion that only private universities form contracts with their students via enrollment handbooks. (Dkt. # 216, VSU Defs.' Opp. at 17.) However, both of those decisions in turn rely on *Life Chiropractic College v. Fuchs*, 176 Ga. App. 606 (1985), which makes just the opposite point from the one the defendants intend. *Life Chiropractic* held that private universities are ***less*** contractually bound than ***public institutions*** by handbook provisions guaranteeing due process to students. *Life Chiropractic*, 176 Ga. App. at 608.

---

the university's rules and regulations, which the university clearly is entitled to modify so as to properly exercise its educational responsibility.").

The remainder of the VSU Defendants' argument concerning the breach claim consist of nothing more than a recitation of the elements of contract and breach combined with a bare assertion that they were not met, without reference to so much as a single fact or piece of evidence in support.  (Dkt. # 216, VSU Defs.' Opp. at 17-18.)  Plaintiff Barnes has already established that all the elements of a contract and breach are present here.  (*See* Dkt. # 179-2, Barnes' Mot. at 67-70.) As the defendants have failed to raise a valid legal argument or material disputed issue of fact that would contradict Barnes' account, the Court should grant Plaintiff's summary judgment motion on the breach of contract claim.

## VI.  EACH OF THE DEFENDANTS WILLINGLY ENGAGED IN A COURSE OF CONDUCT THAT VIOLATED BARNES' RIGHTS

Defendants McMillan, Gaskins and, to a certain extent, Mast and Keppler, argue erroneously that they are not responsible for any violations of Barnes' rights because they personally did not retaliate against Barnes' speech and that they lacked authority to change Zaccari's decision.  However, as explained below, they knowingly and willingly engaged in a course of conduct that contributed to the constitutional violations, and the breach of their own legal duties contributed directly to that outcome.

### A.    Defendants Are Responsible for Disregard of Their Legal Duties

Apart from Zaccari, other defendants offer essentially a Nuremberg defense

– that they were "just following orders." However, each of the defendants participated in the deliberations that led to Barnes' withdrawal and each could have taken steps within the range of their responsibilities to change the course of events. It would be one thing if these defendants were asserting qualified immunity based on a good faith belief that they were supporting appropriate and lawful actions by the University President. But that is not what happened, since each of the defendants now claims that they knew Zaccari's actions were wrong and probably unconstitutional. In this situation, where the defendants "knew or should have known that their [failure to act was] violating the plaintiffs' constitutional rights, . . . [they may not] hide behind the cloak of institutional loyalty." *Forsyth v. Kleindienst*, 599 F.2d 1203, 1217 (3d Cir. 1979); *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981).

Nor may the defendants claim that they cannot be held responsible because theirs were not supervisory positions.[20] The law is clear that liability is not

---

[20] (Dkt. # 222, McMillan's Opp. at 15-16; Dkt. # 217, Defendant Laverne Gaskins' Response in Opposition to Plaintiff's Motion for Summary Judgment at at 8-12 (hereinafter "Gaskins' Opp.").) (*See* Dkt. # 216, VSU Defs.' Opp. at 12-13.) McMillan not only misstates the applicable law, but argues erroneously that Barnes cites only out of context quotations from cases involving only supervisor liability. (Dkt. # 222, McMillan's Opp. at 15.) However, Plaintiff explained quite plainly that "[w]hile this analysis usually is associated with defendants in supervisory positions, ***such is not always the case***." (Dkt. # 179-2, Barnes' Mot. at 71 (emphasis added) (citing cases).)

confined only to supervisors whose failure to act results in constitutional injury. (*See, e.g., Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402, 1411-12 (5th Cir. 1995); (Dkt. # 202, Plaintiff's Opposition to Defendant Laverne Gaskins' Motion for Summary Judgment at 10-13.)  In *Villanueva v. George*, 659 F.2d 851, 856 (8th Cir. 1981) (en banc), for example, the court rejected prison officers' arguments that they could not be held responsible for a prisoner's loss of rights because "they did not have the authority to alter the [prisoner's security] classification."  *See Tasker v. Moore*, 738 F. Supp. 1005, 1011 (S.D. W. Va. 1990) (liability imposed on prison warden and Commissioner of Corrections who refused to release a prisoner because of contrary orders from the Governor).

In this regard, the Eleventh Circuit has made clear that "[i]f a police officer, ***whether supervisory or not***, fails or refuses to intervene when a constitutional violation . . . takes place in his presence, the officer is directly liable under Section 1983."  *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) (emphasis added), *abrogation on other grounds* recognized by *Nolin v. Isbell*, 207 F.3d 1253, 1255-56 (11th Cir. 2000). Likewise, the Eighth Circuit explained that liability may be imposed where "correctional officers . . . had personal knowledge of the conditions of confinement to which the appellant was subjected and nevertheless failed to take steps to remedy the situation."  *Villanueva*, 659 F.2d at 854-55.

Here, each of the defendants was well aware that Barnes was being stripped of his legal rights as it was happening, and each could have taken steps within their respective spheres of responsibility to prevent it.  Instead of doing so, however, each in his or her own way helped facilitate the "administrative withdrawal." Their actions stand in stark contrast to those of Dr. Victor Morgan, the Director of VSU's Counseling Center, who originally was among the defendants.

Barnes voluntarily dismissed claims against Dr. Morgan, after discovery revealed that Morgan directly challenged Zaccari's story about there being a threat, and, by standing up to the President, blocked Zaccari's ability to misuse the mental health withdrawal policy to remove Barnes.[21]  Realizing that Zaccari was looking for a way to remove Barnes without any evidence of a threat, Dr. Morgan said to the President, "Dr. Zaccari, we cannot remove Hayden from school based on a mental health withdrawal.  In my opinion, he's complying with everything we're asking him to do."  (Dkt. # 231-31, Barnes' Mot., Ex. 38, Morgan Dep. 22:23-

---

[21] (Dkt. # 161, Plaintiff's Motion to Dismiss Defendant Victor Morgan.)  Dr. Morgan explained in detail why Barnes' advocacy did not represent a threat, and told Zaccari that the use of the word "memorial" on Barnes' Facebook.com collage was nothing more than "Hayden . . . saying that you're going to go down in history . . . .  This is going to be a building with your name on it."  (Dkt. # 231-31, Barnes' Mot., Ex. 38, Deposition of Dr. Victor Morgan, 22:10-24:20 (hereinafter "Morgan Dep.").)

23:1.)  As with the other defendants, Zaccari's ultimate decision was above Dr. Morgan's pay grade.  But unlike the others, Dr. Morgan did the right thing.

**B.  Each Defendant Played an Enabling Role in the Withdrawal Decision**

**1.  Defendant McMillan**

There is no doubt that McMillan sought to help Barnes once it became clear that Zaccari was determined to retaliate against the student because of his speech, but her ostentatious display of righteous indignation over being named in this suit is wearing quite thin.  (*See, e.g.*, Dkt. # 222, McMillan's Opp. at 4-8.)  It is equally clear that McMillan knowingly breached her duty – her contract, as she put it – to preserve confidentiality regarding her relationship with Barnes.  And she did so knowing how Zaccari planned to use the information, and how he uses it to this day – as a club to pummel the Plaintiff.  McMillan's intentions may have been good, but she cannot avoid responsibility for her actions.[22]

McMillan cannot deny that she participated in Barnes' withdrawal, whether or not she agreed with it.  She spoke with Ann Farmer on April 20, 2007, met with Zaccari individually on April 24, and met with him again on April 26, along with Keppler and Morgan.  (Dkt. # 179-2, Barnes' Mot. at 15-20.)  She also participated

---

[22] McMillan's belated remedial efforts should help her avoid an award of punitive damages, but they do not preclude a finding of liability.

in a meeting called by Defendant Gaskins on May 7, where she, along with Dr. Morgan and Defendant Keppler, were told that the withdrawal was about to happen.  (Dkt. # 231-31, Barnes' Mot., Ex. 38, Morgan Dep. 33:6-19); Defendant Leah McMillan's Answer to Interrogatory No. 12 (hereinafter "McMillan Ans. to Int.") (attached hereto as Ex. C).)  Barnes agrees that McMillan did not attend an earlier meeting on May 3, nor did she "vote" for Hayden's withdrawal (if Zaccari had bothered to ask), but by then the damage from her disclosure was done.

Although McMillan claims that she did not provide details of her treatment to Zaccari, the record speaks for itself.  (*See* Dkt # 179-2, Barnes' Mot. at 17 n.25; Ex. C, McMillan Ans. to Int. No. 11; Dkt. # 224, Barnes' Opp., Ex. E, Defendant Ronald Zaccari's Answer to Interrogatory No. 15;  Dkt. # 232-2, Barnes' Mot., Ex. 11, Deposition of Leah McMillan 106:6-111:9 (hereinafter "McMillan Dep.").  Zaccari was so focused on Barnes, he briefly interrupted the April 26 meeting when he thought Barnes had missed his appointment with McMillan.  (Dkt. # 179-2, Barnes' Mot. at 19 & n.30.)  Information about Barnes' experience at the Counseling Center and his therapeutic history became the focal point of Zaccari's claims and drove the withdrawal decision.  Gaskins noted that Zaccari had confidential information about Barnes' use of the Counseling Center, and "because Dr. Zaccari shared with me that he had access to information from the Counseling

Center about Hayden," it raised the possibility of ADA violations.  (Dkt. # 231-7, Barnes' Mot., Ex. 8, Gaskins Dep. 28:14-18, 30:25-32:18, 33:7-37:24.)  (*See also* Defendant Laverne Gaskins' Supplemental Answer To Interrogatory No. 3 (attached hereto as Ex. D).)

Barnes' experience at the Counseling Center has become the cornerstone of Zaccari's legal argument.  (Dkt. # 177-2, VSU Defs.' Mot. at 12-17.)  Although McMillan may have disagreed with Zaccari's ultimate decision and the erroneous assumptions on which it was based, she handed him the weapon he has wielded throughout this case.  McMillan knew that she should have had a confidentiality release from Barnes "to communicate with the Administration about his treatment to show he is no threat."  (Dkt. # 232-2, Barnes' Mot., Ex. 11, McMillan Dep. 126:18-128:20.)

McMillan is fully aware that the information she shared about Barnes violated the Counseling Center Policy with respect to confidentiality.  (Dkt. # 231-25, Barnes' Mot., Ex. 32, VSU Counseling Center Intake Form.)  The Policy plainly provides that "[i]nformation will not be released outside the Center without your written consent, except when required by law."  (*See* Dkt. # 172,  Morgan Dep. 46:2-21) (policy prohibits release of confidential information without consent, exigent circumstances, or a subpoena).)  The Counseling Center enforces

28

special procedures to assure student confidentiality, including maintaining files in a locked filing cabinet inside a locked room. Only the counselors and the custodian of records has access to them. (Dkt. # 187, McMillan Dep. 87:23-89:7.) Now, student files are in digital form and encrypted. (*Id.* 87:20-88:1.)[23]

McMillan's awareness of the need for a waiver is illustrated by the one she obtained to write a letter supporting Barnes' reinstatement. (Dkt. # 231-40, Barnes' Mot., Ex. 47, May 7, 2007 Release.) It covers precisely the types of details that she previously had provided without such a waiver for the purpose of verifying that Barnes was "not a danger to [himself] or others." (*Id.*) McMillan acknowledged that this waiver was required to convey essentially the same information she already had shared with Zaccari, but that it was necessary because this was the first time Barnes became aware that she was providing the information. (Dkt. # 232-2, Barnes' Mot., Ex. 11, McMillan Dep. 126:18-23.)

---

[23] In this regard, it may be arguable that McMillan did not violate the policy when she spoke to Major Farmer on April 20, since information may be disclosed where there is "reasonable suspicion of current child abuse or elder abuse, imminent danger to self or others." (Dkt. # 231-25, Barnes' Mot., Ex. 32, VSU Counseling Center Intake Form.) However, McMillan never believed Barnes was a threat to anyone, much less an "imminent danger." Quite to the contrary, she believed that Barnes was the one in peril, and she didn't want anyone "going [to] his dorm room and snatching him out." (Dkt. # 232-2, Barnes' Mot., Ex. 11, McMillan Dep. 81:13-17.) But even that possible defense cannot plausibly be asserted for her private meeting with Zaccari.

Simply put, McMillan decided it was necessary to get a waiver once somebody was watching.

It does not matter that McMillan was not driven by a retaliatory motive, nor is it relevant that she did not have a "vote" on the administrative withdrawal. What matters is that she took action under color of state law that violated a duty that in turn supported Zaccari's illegal actions. (See Dkt. # 232-2, Barnes' Mot., Ex. 11, McMillan Dep. 76:5-78:15) (describing limited areas "under the law in the State of Georgia where we can disclose information about a patient regarding their mental health").) Counsel for McMillan is quite indignant about the fact that his client was sued despite her attempts to assist Barnes, but ignores that fact that her involvement contributed to the decision, and continues to be the mainstay of Zaccari's defense.[24]

McMillan might not have been able to control Zaccari, but she did have control over the information the President used to violate Hayden's rights. *See Howard v. Fortenberry*, 723 F.2d 1206, 1213 (5th Cir. 1984) (failure by subordinate officials to control facilities under their power to prevent constitutional

---

[24] McMillan makes much of the fact that she summarized her notes for Barnes' counsel, (Dkt. # 222, McMillan Opp. at 8-9), but was required to release the information under FERPA and pursuant to Barnes' signed release. Yet, even then, the information she provided was heavily redacted and had to be supplemented by discovery.

harm is action under color of state law), *vacated in part on other grounds on denial of rehearing*, 728 F.2d 712 (5th Cir. 1984). When Zaccari told her about "indirect threats" and asked about Barnes' counseling experience, McMillan should have told him that she was familiar with the student and could assure the President that he did not present an imminent threat. (Dkt. # 232-2, Barnes' Mot., Ex. 11, McMillan Dep. 80:9-82:25) ("But once I stated there was not a threat in my professional opinion, then I should not have given any more information.").) Absent a "reasonable suspicion" of a threat, she should have informed Zaccari that VSU policies and state law required that she obtain a written release from Barnes before she could share any more specific information. Her failure to do so facilitated the violation of Barnes' First and Fourteen Amendment rights, as well as his rights under the ADA, Rehabilitation Act, and VSU policies.

### 2. Defendant Gaskins

Defendant Gaskins appears to have a difficult time deciding whether she wants her role in this case to be characterized as that of a "legal advisor" or as a mere "scrivener." (*See*, *e.g.*, Dkt. # 217, Gaskins' Opp. at 4-5 ("Gaskins simply typed up what President Zaccari told her to include in the draft of the withdrawal letter").) The problem with trying to have it both ways, is that in her role as legal advisor, Gaskins identified the many ways in which the withdrawal decision

31

violated VSU policies, the ADA, and Barnes' rights under the First and Fourteenth Amendments to the Constitution.[25]  Notwithstanding this knowledge of these clear violations, Gaskins drafted the withdrawal notice and coordinated the decision with other staff members.

This was not the "vague participation" that Gaskins asserts is insufficient to establish a causal connection, (*id.* at 13), but a series of tangible steps to plan and implement the withdrawal.  Beginning with the meeting on April 20, 2007, Gaskins was involved in deliberations over the withdrawal.  (Dkt. # 179-1, Barnes' Mot., SUF ¶ 59.)  When Zaccari found that he lacked the support of the VSU Counseling Center for a mental health withdrawal, he enlisted Gaskins to find out what the process would be for the President to withdraw a student unilaterally.[26] Gaskins continued to participate in conference calls and meetings about the

---

[25] (*See* Dkt. # 183, Gaskins Dep. 8:9-12, 11:4-12:8, 28:14-18, 30:25-32:18, 40:12-19, 58:9-61:10, 84:13-25, 85:1-86:20, 89:9-92:15, 93:2-94:5, 95:10-97:20, 99:5-7, 99:18-100:9, 130:20-131:10, 134:14-25, 144:7-21, 161:10-169:6.)

[26] (*See* Ex. A, SUF Chart ¶ 99.)  Gaskins testily disputes that she asked Elizabeth Neely "how" the President can file a complaint but that Gaskins instead "asked only about appeal rights." (*See id.*)  However, Gaskins' hair-trigger sense of outrage is misplaced, and misses the point.  Apart from the fact that the email from Gaskins to Neely speaks for itself and confirms Gaskins' involvement (*see* Dkt. # 231-33, Barnes' Mot, Ex. 40, April 26, 2007 Email from Gaskins to Neely), Barnes only cited it to confirm defendants' awareness that their scheme eliminated due process at the campus level.  (*See* Ex. A, SUF Chart ¶ 100.)

withdrawal up until its implementation.[27]   Gaskins advised Zaccari of the legal problems of unilaterally withdrawing Barnes, but he fashioned a new procedure, drawing from the conference calls and the options Gaskins presented.  (*See* Ex. A, SUF Chart ¶¶ 104, 107, 108, 110.)   Gaskins was fully aware that Zaccari's concoction violated Barnes' rights, yet she dutifully helped him implement it.

On these facts, Gaskins cannot "hide behind the cloak of institutional loyalty."  *Forsyth*, 599 F.2d at 1217.  Her knowing participation in constitutional and statutory violations cannot be excused by claiming she was "just following orders" since Georgia Code of Professional Conduct §§ 1.13(b) and (c) provide a clear way to reconcile her professional obligations.  She cannot avoid liability now simply because she chose the path of least resistance.  *Byrd*, 783 F.2d at 1007; *Villanueva*, 659 F.2d at 854-55; *Tasker*, 738 F. Supp. at 1011.

### 3.  Defendant Keppler and Defendant Mast

---

[27] (Ex. A, SUF Chart ¶¶ 102, 112; Dkt. # 179-1, Barnes' SUF ¶ 103.)  Again, Gaskins jumps the gun and accuses Barnes of mischaracterizing the record by attributing Neely's statement that "we will worry about the lawsuit later" to Gaskins.  This misread's Barnes' brief.  The quoted sentence clearly referenced ***the Board's*** knowledge and intentions.  (Dkt. # 179-2, Barnes' Mot. at 73.)  But if there were any doubt, Barnes' Statement of Undisputed Facts ¶ 102 sets forth the full context of Neely's statement anticipating litigation (as Gaskins reported it).  (*See* Ex. A, SUF Chart ¶ 102.)

The same principles apply to Defendants Keppler and Mast. They participated in the meetings regarding Barnes, and not always as the passive lumps that they now claim they were. For example, contemporaneous notes from the April 20 meeting show that Mast suggested that a "veiled threat" could be used as a justification of a disorderly conduct withdrawal. (Dkt. # 231-23, Barnes' Mot., Ex. 30, Contemporaneous notes of Major Anne Farmer). Likewise, Keppler suggested that another way to remove Barnes would be to "go the route of the GPA." (*Id.* at 14.) (*See also* Dkt. # 231-20, Barnes' Mot., Ex. 27, Farmer Dep. 62:4-10.) They thus supported Zaccari's actions to remove Barnes even though they knew he was no threat, and that doing so would be inconsistent with VSU policies and due process protections for which they were responsible. Their silence was taken by Zaccari to be consent, (Dkt. # 190, Zaccari Dep. 162:12-166:20), and he specifically cited their advice as supporting his actions. (Dkt. # 231-4, Barnes' Mot., Ex. 5, June 21, 2007 Letter from Zaccari to Neely.)

The VSU Defendants incorrectly cite *Ensley v. Soper*, 142 F.3d 1402 (11th Cir. 1998) for the proposition that negligence cannot be the basis of a Section 1983 claim and that a police officer cannot be held liable for failing to prevent a fellow cop from using excessive force. (Dkt. # 216, VSU Defs.' Opp. at 12.) What *Ensley* actually held, however, is that an officer *is* liable if he fails to intervene

34

"when a constitutional violation such as an unprovoked beating takes place in his presence." 142 F.3d at 1407. This rule applies whether or not the officer is in a supervisory position. *Id*. In this case, there is no doubt but that Barnes' constitutional beating took place in the presence of the two University officials charged with protecting students' rights. Unfortunately, their concern about their relative "pay grade" exceeded their concern about due process.

## CONCLUSION

The VSU Defendants describe the official reactions to Barnes' speech – beginning with background checks and physical surveillance, and ending with involuntary, forced withdrawal from campus – as "normal responses to a student who is directing criticism towards them." (Dkt. # 216, VSU Defs.' Opp. at 22.) Sadly, such actions do seem to be the "normal response" in the small-minded authoritarian world of former VSU President Ronald Zaccari. (Dkt. # 224, Barnes' Opp. at 17-21.) But in the United States of America, where we are governed by the Constitution and the rule of law, it is a "fixed star in our constitutional constellation" that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Under this clear principle, Plaintiff's motion for summary judgment should be granted in its entirety.

Respectfully submitted this 12th day of April, 2010,

By:     */s/ Robert Corn-Revere*
        Robert Corn-Revere
        Christopher A. Fedeli
        Lisa B. Zycherman
        Erin N. Reid
        Admitted *Pro Hac Vice*
        Attorneys for Plaintiff
        Davis Wright Tremaine LLP
        1919 Pennsylvania Avenue, NW
        Suite 200
        Washington, DC 20006
        Email: bobcornrevere@dwt.com

        */s/ Cary S. Wiggins*
        Cary S. Wiggins
        Ga. Bar No. 757657
        Irma Espino
        Ga. Bar No. 558220
        Attorneys for Plaintiff
        Wiggins Law Group
        Suite 401
        260 Peachtree Street, NW
        Atlanta, GA 30303
        404-659-2880
        Email: cary@wigginslawgroup.com

## CERTIFICATE OF COMPLIANCE AND SERVICE

I hereby certify that on April 12, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.  I also certify, pursuant to Local Rule 7.1(D), that this motion has been prepared in Times New Roman 14-point font.

*/s/ Robert Corn-Revere*
Robert Corn-Revere
Admitted *Pro Hac Vice*
Attorney for Plaintiff
Davis Wright Tremaine LLP
Suite 200
1919 Pennsylvania Avenue, N.W.
Washington, DC 20006
202-973-4200
Email: bobcornrevere@dwt.com