## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| THOMAS HAYDEN BARNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action File No.: |
| | ) | 1:08-CV-0077-CAP |
| RONALD M. ZACCARI, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

_____

## BRIEF IN REPLY TO PLAINTIFF'S RESPONSE (DOC. # 224) TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 177)

### A. THE PLAINTIFF, *NOT THE DEFENDANTS*, BEARS THE BURDEN OF PROOF

This is not a criminal trial initiated by the Defendants against Barnes, where the Defendants must prove facts about Barnes beyond a reasonable doubt. Rather, this is a lawsuit *initiated* by Barnes *against* the Defendants.

They do not have the burden of proving that Barnes actually was going to harm someone.

They do not have the burden to prove that Barnes constructed an atlatl with the intent to kill President Zaccari.  The undisputed fact is that Barnes actually requested to construct and bring a weapon on campus.  Defendants need not prove that he actually Barnes intended to use the atlatl.

Defendants need not prove that Barnes actually made the prank phone calls to President Zaccari's house, but rather, Defendants need only prove that a reasonable person could have associated the calls with Barnes' agenda.

Defendants do not have the burden of proving that Barnes had the intent to yield a "dead President Zaccari" when he created the "Zaccari Memorial" collage.  All they must prove is that President Zaccari "reasonably believe[d] that his  . . . conduct complie[d] with the law" in withdrawing Barnes due to his alarming messages.  *Pearson v. Callahan*, No. 07-751 (U.S. Sup. Ct. 2009).

Defendants need only prove that objectively Barnes exhibited factors which were anomalous enough to question his propensities toward Zaccari and the campus.  Barnes directed his campaign about a global issue against one individual: President Zaccari.

It is immaterial that Plaintiff agree that each and every single one of the facts known or perceived about Barnes' behavior is true.  An analytical parallel is found in the non-hearsay definition:  where a statement that is not offered to prove the

truth of the matter asserted, but rather for the effect on the putative hearer, the statement is not hearsay. *See* Fed. R. Evid. 801(c).  Here, the putative hearer is President Zaccari.  All the Defendants need to prove was that the effect on President Zaccari of the information he possessed from his advisors, and his conduct reacting thereto, was, at the time he made the decision to withdraw Barnes from VSU, reasonable.  For these very reasons, the Defendants can simultaneously argue that Barnes was not a qualified individual with a disability under the ADA or the RA, and that President Zaccari's was reasonable to fear for Barnes' potential for dangerousness.  That is, that Barnes was not disabled, but rather, was intentionally intimidating.

## B. DIFFERENT CONCLUSIONS AFTER THE FACT DO NOT RENDER ZACCARI'S DECISION UNWORTHY OF QUALIFIED IMMUNITY

It is also irrelevant that some Defendants thought differently about the situation.  As discussed in prior briefs filed by the Defendants, not all Defendants were privy to the same information and, with the exception of President Zaccari, none of the Defendants was the targeted individual of Barnes' inappropriately contrived movement.  The assessment of the reasonableness of President Zaccari's

decision must be isolated to that time when the decision was made to withdraw Barnes; not years later with the benefit of hindsight.

Major Farmer testified that it was her decision alone to involve the VSU Counseling Center.  Doc. # 177 at 9 (citing Farmer Depo at 36).  Major Farmer's decision to involve the Counseling Center involved the possibilities of Virginia Tech Massacre similarities in the security issues involving Barnes at VSU.  Major Farmer's  opinion and conclusion about Barnes' dangerousness does not mean that Barnes' dangerousness was actually impossible or improbable.  The individuals with opinions that Barnes was not dangerous also come much later in time.  At the time that Barnes was withdrawn, in May 2007, no single person ruled out his dangerousness.  Furthermore, Defendants' expert Dr. Matthew W. Norman shows the Court that the factor exhibited by Barnes constituted the factors that are used to forensically predict dangerousness.

## C.  THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON THE PLAINTIFF'S FIRST AMENDMENT CLAIMS

"Once it is determined that defendants violated plaintiff's settled constitutional rights, *Harlow* requires further analysis of whether the defendants have proved extraordinary circumstances which show a reasonable official should

not have known he was violating those rights." *Green v. Brantley*, 719 F.Supp. 1570, 1583 (citing H*arlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (also citing *Barnett v. Housing Authority of City of Atlanta,* 707 F.2d 1571, 1583 (11th Cir.1983)).

"Courts have recognized that an extraordinary circumstance may be where the defendant seeks legal advice before acting."  *Green* at 1583 (citing *Watertown Equipment Co. v. Norwest Bank Watertown,* 830 F.2d 1487, 1495 (8th Cir.1987), *cert. denied,* 486 U.S. 1001, 108 S.Ct. 1723, 100 L.Ed.2d 188 (1988)). "[W]hether the official was faced with a 'perilous' or 'unique' situation" is relevant.  *Green* at 1584 (citing *Watertown at 1495).  " '[T]*o insure an adequate factual basis for that good faith immunity defense there should be detailed information as to whether and when such advice was given and the degree of mature consideration accorded the matter by the [attorney] ... to whom the defendants turned and who gave the advice.'" *Green* at 1584 (citing *Tanner v. Hardy,* 764 F.2d 1024, 1027 (4th Cir.1985)).

In the case at hand, President Zaccari relied on the legal advice of Betsey Neely, which was well reasoned and unequivocal.  First, Neely identified the primary objective for President Zaccari's official role at VSU:  protect the campus.

Second, Neely identified the inherent litigation liability potential from the student.[1] Third, Neely identified the appropriate method for Zaccari to conduct the withdrawal:  BOR Policy 1902.[2]  Fourth, Neely identified the exact procedure through which Barnes could contest the decision:  an appeal to the BOR.

Barnes was withdrawn from VSU during a unique time where fears of perilous student behavior alarmed campus communities across the country. President Zaccari is entitled to qualified immunity from liability in his decision because he acted in reliance on the well-reasoned and unequivocal advice of legal counsel.

## D. PLAINTIFF CONCEDES THAT BARNES WAS NOT IMPAIRED SUCH THAT HE WAS SUBSTANTIALLY LIMITED IN ONE OR MORE MAJOR LIFE ACTIVITIES

Plaintiff asserts essentially that Defendants have conceded that Barnes was "mentally ill" and use it to sustain Barnes' claims under the ADA.  Doc. # 224 at 36, or 43 of 59.  Defendants do NOT concede that Barnes' mental status rose to a level of a "disability" to the point of protection under the ADA.  Conversely, this is

---

[1] Neely's statement to Zaccari and Gaskins that they should do what he needed to do to protect the campus now, and then worry about a potential lawsuit later, does not admit that such a route was legally incorrect; it rather contemplates the universally known possibility that all recipients of adverse action, particularly those that are outspoken, are likely to to pursue legal remedies, including litigation.
[2] Defendant Gaskins assisted in drafting the necessary documents to carry out Neely's advice.

Defendants' iteration of Barnes' superficial label of self-diagnosis.  Barnes self-diagnosis and attendance to mental health therapy sessions throughout his life, while alarming President Zaccari, the one individual target in his campaign against global environmental concerns, they are not sufficient to interfere with the major life activities of a college student at VSU.  In fact, Plaintiff concedes this in his responsive brief:

> The fact that Barnes experiences anxiety and depression does not make him dangerous; nor does it set him apart from a significant percentage of the general population or from other university students.  Leah McMillan acknowledged that she counsels approximately fifty students per week, and she is just one of several full-time counselors at the VSU Counseling Center.  [footnotes omitted]  In short, for all defendants' bluster about "mental illness," that is not what this case is about.

Doc. # 224 at 5 or 12 of 59.


E. WHY KELLY BURKE'S HEART SINKING IS PROBATIVE

Plaintiff tries to paint a bad picture of Defendants' arguments regarding Kelly Burke's (Barnes' mother) statement in her letter to President Zaccari that "As soon as I saw the caption on the parking garage, 'President Zaccari Memorial Parking Garage,' my heart sank."  Doc. #224 at 26, or 33 of 59 (referring to Doc. #177 at 24 (citing Exh. 30 at the 5th page)).  "They also cite the reaction of Barnes' mother to the word in her post-expulsion letter to Zaccari ("my heart sank"), (*id*.),

yet ignore her explanation that the letter was an attempt to get through to "an arrogant and high-handed man" and to "assuage his arrogance." (Deposition of Kelly Burke, 90:23-91:22 (hereinafter "Burke Dep.")"  Doc. #224 at 26, or 33 of 59.  Defendants did not ignore this statement, rather Defendants expected this reaction from a protective mother and deemed it logically irrelevant.  Ms. Burke's statement that her "heart sank" is probative because it is revealing as to what most readers would think about the word "Memorial" appearing after their name, even from the perspective of a highly biased witness.  It shows that even Barnes' own mother experienced an immediate feeling of regret for the words her wayward son chose, words she understood immediately to signify a death threat to President Zaccari.

### F. DEFENDANTS DO NOT CONCEDE THAT ANY CONTRACT EXISTED WITH BARNES

Defendants correct Plaintiff's assertion that "the defendants' claim that only an 'implied contract' was present . . . ."  *See* Doc. #224 at 39, or 46 of 59.  The Defendants do NOT concede that *any* contract existed.  There must be an express written contract in order for this claim to survive summary judgment.  Any arguments based on an implied contract, or a non-written contract, are not valid

argument for the Court to consider and the contract claim must fail.  O.C.G.A. §

50-21-1, <u>Merk v. DeKalb County</u>, 226 Ga. App. 191, 193, 486 S.E. 2d 66 (1997);

<u>Federov</u>, 194 F. Supp. 2d at 1395.


## G. PLAINTIFF'S EVIDENCE IS SHODDY AND SCANT EVIDENCE ON ZACCARI'S ALLEGED PROTECTIVENESS OF HIS LEGACY

Plaintiffs conclude that "[t]he record shows that Zaccari was unusually

protective of his legacy . . . ."  Doc. #224 at 20, or 27 of 59.  This conclusion is

based upon the Plaintiff's citation to one piece of evidence, President Zaccari's

recommendation of the discipline of students who wrote an article in the VSU

student newspaper which contains a quote insinuating that students would "kick

him in the nuts."  Doc. 224-9.  It also calls two female faculty members "vaginas."

Doc.# 224-9.  The student authors of *The Spectator* article "stated that they knew

that the article was in poor taste but was meant as [sic] test for Leah Cassorla

[VSU professor] to see if she would let it run."  Doc. #224-12 (Plaintiff's Exhibit 3

to Plaintiff's Response Brief).  The students who drafted this *The Spectator* article

which brought them before the VSU Communications Board admitted that they did

not intend the article to be published, but rather their intent was to create a

document which would intentionally break rules and cause a disciplinary reaction.

*See* Doc. #224-11 at DS_20028 at 04:33-05:23 (using Windows Media Player to play Electronic Media).  President Zaccari's reaction to this does not show that he was "unusually protective of his legacy," but rather, that he wanted to ensure the University procedures were followed in the preparation and publishing of the student newspaper.

## H. THE ZACCARI MEMORIAL COLLAGE INDEED CREATED AN IMMEDIATE SENSE OF PANIC IN HIS SOLE TARGET:  DR. ZACCARI.

Contrary to Plaintiff's assertion, Barnes Memorial Collage indeed creates an immediate sense of panic especially for the person who's been named as intended victim to be memorialized by Barnes.  *See* Doc. # 216 at 14-16.  Barnes had immediate access to President Zaccari.  He lived on campus within less than five (5) minutes walking distance of President Zaccari's office.  Notes from Barnes were cryptically hand-delivered to Zaccari's office.  Doc. #177 at 28, 18.  It caused fear on President Zaccari's part, as it was intended to do.

## I. VSU IS AN IMPROPER PARTY AND A LEGAL ENTITEY INCAPABLE OF BEING SUED; THE DEFENDANTS PRESERVED THIS IN THEIR "ANSWER AND DEFENSES."

Plaintiff's argue that the Defendants waived their ability to contest that VSU cannot be sued. Doc. #224 at 46-46, or 53-53 of 50, n30. However, this is not true, as Defendants preserved this in their "Eleventh Defense," which states: "Valdosta State University is not a legal entity capable of suing or being sued." Doc. #39 at 5.    Moreover Plaintiff's argument regarding personal jurisdiction simply has nothing to do with the Eleventh Defense and VSU's inability to be sued. *See* Doc. #224 at 46, or 53 of 59 n30.  This defense, rather, is that encompassed by Federal Rule of Civil Procedure 17(b)(3) which pertains to "capacity to be sued." The Plaintiff chose not to respond to the legal authorities cited by VSU, as they are clear, unequivocal and irrefutable.


## J. DUE PROCESS

Defendants disagree with Plaintiff's suggestion that Defendants have attempted to mislead the Court with Gaskins' testimony.  *See* Doc. #224 at 31, or 38 of 59.  Gaskins' testimony lays some of the best evidence for how Barnes actually received procedural due process.  Doc. #177 at 37-40.  A fact showing Barnes experienced little to no deprivation at all is that Barnes was withdrawn at the end of the spring semester in 2007, prior any summer mini-mester classes beginning.  Barnes was not expelled or suspended permanently.  Barnes was not

charged with any wrongdoing, nor is his record with VSU tainted with any notation of misconduct.  Pre-deprivation procedural due process does not apply. Doc. # 216 at 4-10 (Defendants' Response to Plaintiff's Motion for Summary Judgment).  Barnes was given notice and an opportunity to be heard before the Georgia Office of State Administrative Hearing ("OSAH"), an independent state agency, separate and apart from the Board of Regents.  The Board of Regents ultimately recalled the case from OSAH, and ruled in favor of the Plaintiff, without the necessity of a hearing.  Barnes own testimony reveals that he has no claim for procedural due process.

> " Q: And so my understanding, your claim against the Regents with respect to the consideration of the appeal is because you were denied some process because they took too long to rule, in your opinion?  A: They took too long and appeared to arbitrarily delay the hearing, to me.  Q: Okay. But even though they ruled in your favor, you just feel that didn't rule soon enough? A: Correct.  I took them several months; I mean May, June, July, August, September, October, November, December, January."

Barnes Depo. at 187:23 - 188:8 (a sealed document, as per Doc. #211 at 2). Barnes was provided with meaningful procedural due process at the state level. There is no authority that says that Barnes is entitled to choose where he gets due process.  There is no authority that says that he must get due process at the *campus* level; instead of at the *state* level, which was provided to him.  Most importantly, it is beyond comprehension how Barnes could take advantage of the appeal provided

to him, prevail, and then claim that the process was "tainted," so as to be unfair to him.

## K. CONTRACT

The Defendants disagree with the Plaintiff's interpretations of the *Fedorov*, *Merk*, and *Tysons* cases, and reiterate that the Plaintiff's claim for contact is NOT based on an express contract, but rather one implied from several different documents and other records. *See* Doc. # 224 at 39, or 46 of 59. "The State is only subject to a lawsuit for breach of contract if the contract is in writing. [citations omitted] An 'implied' contract does not satisfy this requirement. Accordingly, the Board of Regents is entitled to summary judgment on this claim." *Fedorov v. Board of Regents Univ. of Ga.*, 194 F. Supp. 2d 1378, 1394 (S.D. Ga. 2002).

Plaintiff cites to *Jenkins v. Brick Co., v. Bremer*, 321 F.3d 1366, 1370 (11th Cir. 2003) at the end of a statement intended to support their contract claim. *Jenkins* has absolutely no bearing on any issue in this case. Doc. #224 at 42, 49 of 59.

## L. CHO COMPARISON

Plaintiff diabolizes the Defendants' honest iteration of the simple proximity of Barnes' "Memorial" campaign against President Zaccari with the Virginia Tech Massacre: "Cynically exploiting" and "recklessly compare" are the accusations. *See* Doc. # 224 at 2-3, or 9-10 of 59. The inclusion of the data on Cho were intended to show that President Zaccari's decision was not made in a vacuum, but rather at a time of great fear and grievance which followed Cho's massacre at Virginia Tech. This included the fear of copycats. Doc. #177 at 20. BOR Attorney Betsey Neely even noted the universal fear across the state: "It was the week after the Virginia Tech incident. Everybody was on heightened alert . . . . I think that made us all a little nervous about a copy cat possibility . . . for some student." Neely Depo. at 24:4-18.

## CONCLUSION

The Defendants respectfully submit that the Plaintiff's response offers no legal or factual basis sufficient to thwart the summary judgment to which they have shown they are entitled, and request that summary judgment be entered in their favor.

This 12th day of April, 2010.

/s/ David C.Will
DAVID C. WILL
Georgia Bar No. 760150
Email:  dwill@royallaw.net


/s/ Holly Hance
HOLLY HANCE
Georgia Bar No. 153092
Email:  hhance@royallaw.net

**ROYAL – WILL**
4799 Sugarloaf Pkwy, Bldg J
Lawrenceville, GA 30043
Phone:  770-814-8022
Fax:  770-814-8360

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have, this 12th day of April, 2010, served a true and correct copy of the within and foregoing **BRIEF IN REPLY TO PLAINTIFF'S RESPONSE (DOC. # 224) TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 177)** upon all parties and/or counsel of record by electronic notice and/or by placing same in the United States Mail, postage prepaid, properly addressed as follows:

**Robert Corn-Revere**
**Christopher A. Fedeli**
**Erin Reid**
Davis Wright Tremaine, LLP
Suite 200
1919 Pennsylvania Avenue, N.W.
Washington, DC 20006

**Irma I. Espino**
**Cary Stephen Wiggins**
Cook Youngelson & Wiggins
260 Peachtree Street, NW
Suite 401
Atlanta, GA 30303

**Matthew R. LaVallee**
**Paul Robert Koster**
Daley, Koster & LaVallee, LLC
2849 Paces Ferry Road
Suite 160
Atlanta, GA 30339

**Mr. David Smith**
Brannen Searcy & Smith
P.O. Box 8002
Savannah, GA 31412-8002


/s/ Holly Hance
HOLLY HANCE
Georgia Bar No. 153092
Email:  hhance@royallaw.net

**ROYAL – WILL**
4799 Sugarloaf Pkwy, Bldg J
Lawrenceville, GA 30043
Phone:  770-814-8022
Fax:  770-814-8360

17

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 5.1B</u>

I hereby certify that the foregoing has been prepared with one of the font and point Selections approved by the Court in Local Rule 5.1B, N.D.Ga. This document was prepared using Times New Roman (14pt.).

This 12th day of April, 2010.


/s/ Holly Hance                       
HOLLY HANCE
Georgia Bar No. 153092
Email:  hhance@royallaw.net


**ROYAL – WILL**
4799 Sugarloaf Parkway, Bldg J
Lawrenceville, Georgia 30044
Phone: (770) 814-8022
Fax: (770) 814-8360