UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THOMAS HAYDEN BARNES,

      Plaintiff,

    v.

RONALD M. ZACCARI,
individually and in his
official capacity as President
of Valdosta State University;
et al.,

      Defendants.

CIVIL ACTION
NO. 1:08-CV-0077-CAP

## O R D E R

This matter is now before the court on Leah McMillan's motion for summary judgment [Doc. No. 167]; Laverne Gaskins's motion for summary judgment [Doc. No. 174]; Gaskins's motion for oral argument [Doc. No. 175]; Board of Regents of the University System of Georgia, Kurt Keppler, Russ Mast, Valdosta State University, and Ronald M. Zaccari's motion for summary judgment [Doc. No. 177]; Thomas Hayden Barnes's motion for summary judgment [Doc. No. 179]; and Barnes's motion to exclude Dr. Matthew Norman as an expert witness [Doc. No. 164].  As an initial matter, the court denies Gaskins's motion for oral argument [Doc. No. 175].

## I.   Factual Background

This lawsuit arises out of the administrative withdrawal of the plaintiff, Thomas Hayden Barnes, from Valdosta State University

in May 2007.  The remaining defendants in this action are: Valdosta State University ("VSU"); the Board of Regents of the University System of Georgia ("BOR"); Ronald M. Zaccari, former President of VSU; Kurt Keppler, Vice President for Student Affairs at VSU; Russ Mast, Dean of Students at VSU;[1] Laverne Gaskins, in-house counsel for VSU; and Leah McMillan, a counselor at VSU's Student Counseling Center.  The relevant facts are as follows.

### A.   Barnes's Enrollment at VSU

Barnes initially enrolled at VSU in the fall of 2005 as a transfer student, but he later left while on academic probation to attend paramedic school in Savannah, Georgia in 2006.[2]  Then, in January 2007, Barnes re-enrolled at VSU.  During the re-enrollment process, Barnes contacted the VSU Access Office regarding the procedures necessary to register as an on-campus disabled student suffering from a panic disorder with agoraphobia.  Dr. Kimberly Tanner, Director of the VSU Access Office, worked with Barnes to help him submit the proper documentation of his disability and to help him secure housing accommodations that VSU had available for

---

[1] Zaccari, Mast, Keppler, VSU, and the BOR are jointly represented and will be collectively referred to as "VSU Defendants" throughout this order.

[2] Barnes completed his paramedic training and is a licensed paramedic in the State of Georgia.

Barnes.[3]   In addition to obtaining these accommodations, Barnes resumed therapy sessions with Leah McMillan after he re-enrolled.[4]

**B.   The Parking Garage**

On March 22, 2007, the VSU student newspaper, *The Spectator*, ran a story regarding VSU President Zaccari's plans to construct a large parking garage on campus.  More specifically, the parking structure was part of a "Master Plan" that Zaccari had developed between 2002 and 2004 at the direction of the BOR.  After reading the article, Barnes started an initiative to raise public awareness of the issue and its potential environmental affects.  Over the next week, Barnes posted a series of flyers around the VSU campus expressing his concerns for the possible environmental damage that the parking garage plan might cause,[5] emailed VSU officials and

_____

[3] For example, Barnes was permitted extended time for test-taking and authorized a private dorm room as a result of the accommodations made by VSU.

[4] Barnes first saw McMillan on September 9, 2005, during his initial enrollment at VSU.  In fact, Barnes met with McMillan a total of 4 times during the fall of 2005.  After his return in 2007, Barnes saw McMillan for a total of 9 sessions between January – June 2007.

[5] Based upon the fact that an estimated $30 million was earmarked to construct the parking structure, Barnes created and disseminated a flyer.  [Doc. No. 179, Ex. 22].  The flyer suggested alternative uses for the $30 million, such as providing 2,940 full scholarships to VSU students, textbooks for 8,797 VSU students for 4 years, providing health care or Head Start programs for 2,845 children in Georgia, devoting resources to preserving 600,000 acres of Amazon rain forest, or aiding the victims of Hurricane Katrina

fellow students, and electronically posted information and responses concerning the construction project on his Facebook webpage, an internet social networking website.

Shortly after Barnes's flyers started appearing around campus, Zaccari directed his assistant, Thressea Boyd, to find out who had posted the flyers. On March 26, 2007, classmates involved with Students Against Violating the Environment ("S.A.V.E."), a campus environmental advocacy organization, informed Barnes that Zaccari was upset with Barnes's speech activities and had recently contacted S.A.V.E. to express his displeasure, particularly with the flyers. In response, Barnes took down his flyers and deleted his entries that were posted on the Facebook webpage. In addition, Barnes wrote a letter to Zaccari stating that he would remove the flyers and expressing a desire not to have an adverse response to his activities [Doc. No. 179, Ex. 22]. In the letter, Barnes also explained that he did not wish for his "actions to be perceived as a personal 'attack' or to jeopardize other environmental initiatives on campus." Id.

After he sent his letter to Zaccari, Barnes maintained his interest in the parking garage's construction. Specifically, Barnes created a satirical collage protesting the project [Doc. No.

---

by providing housing for 18 months.

179, Ex. 25],[6] which he posted on his Facebook website. Additionally, upon learning in early April 2007, that the BOR would be convening on April 17, 2007, to vote on the proposed parking garage, Barnes found the BOR members' phone numbers and contact information on the BOR website and began contacting those individual members via telephone and/or email to explain his opposition prior to the scheduled vote.  Barnes's message to the BOR members was at all times respectful.

### C.   Barnes's Meeting with President Zaccari

Upon being informed of Barnes's contact with members of the BOR,[7] Zaccari summoned Barnes to meet with him and Russ Mast (VSU Dean of Students) on April 16, 2007, at 5:00 p.m.  Barnes complied with the summons and arrived at the President's office with his girlfriend.  Prior to the start of the meeting, Zaccari denied

---

[6] The collage included images of a multi-level parking structure, a bull-dozer, a globe flattened tire tread, an asthma inhaler, a photo of Zaccari, and a picture of a public bus under a no-smoking-styled "not allowed" red circle and slash.  It also included slogans such as "more smog"; "bus system that might have been"; "climate change statement for President Zaccari"; and, "S.A.V.E. - Zaccari Memorial Parking Garage."

[7] One of the BOR members, Linda Daniels, received an email from Barnes on April 16, 2007, and within 10 minutes of receiving the email, Daniels forwarded it to President Zaccari.  [Doc. No. 179, Ex. 26].  Daniels also expressed a concern that Barnes would show up at the BOR meeting on April 17 at Georgia Southern University and stated that the BOR preferred that the possibility of a protest by Barnes be handled at the campus level.  Daniels Depo. [Doc. No. 179, Ex. 16].

Barnes's request to permit his girlfriend to attend the conference with the school officials because, as Zaccari explained, the matter concerned only Barnes and the President.  During his one-hour and ten-minute meeting with Barnes, Zaccari attempted to explain his reasoning and decisions regarding the parking garage and expressed his general frustration with Barnes's opposing views and actions. [Doc. No. 3, p. 2].  Zaccari further stated that Barnes had personally embarrassed the President with Barnes's protest activities and that he thought Barnes had "gone away" after receipt of the apology letter.  Id.  Finally, Zaccari questioned Barnes as to, "Who did [Barnes] think [he] was?," adding that Barnes had made his life hard for him and that he "could not forgive [Barnes]." Id.

In the days following the April 16 meeting with Zaccari, Barnes sent the President a follow-up email [Doc. No. 179, Ex. 28] to introduce alternative ideas to the planned construction.  Then, on April 19, 2007, *The Spectator* published a letter [Doc. No. 179, Ex. 21] that Barnes had submitted to the editor in which he expressed his views regarding the planned parking garage. Meanwhile, while attending the BOR meeting on April 17-19, 2007, Zaccari directed that inquiries be made by members of his staff into Barnes's academic records, his medical history, his religion,

and his registration with the VSU Access Office.[8]   Zaccari contacted Dr. Tanner from the VSU Access Office to obtain more information about Barnes's accommodations and to possibly learn how to better communicate with Barnes.  Then, after returning from the BOR meeting, Zaccari read Barnes's letter in *The Spectator*.

On April 20, 2007, Zaccari attended a faculty senate breakfast, where he made some remarks about his frustrations with the protests and opposition to his parking deck plan.  One of the professors in the audience, Dr. Michael Noll, was one of Barnes's professors.  Dr. Noll approached Zaccari at the conclusion of the meeting to discern whether Barnes was the subject of the President's ire and to ask if he could help in any way.  Zaccari rejected the offer and told Dr. Noll that "it was not a faculty senate issue; that it would be handled from the administration side and the faculty.  And [Zaccari] asked [Noll] not to discuss it." Zaccari Depo. [Doc. No. 179, Ex. 4 at 198:14-16].

D.   **Zaccari's Meetings Regarding Barnes**

1.   **First Meeting**

After his breakfast with faculty members on April 20, 2007, Zaccari met with his assistant, Thressea Boyd, Major Ann Farmer of

---

[8] Some of this information was faxed to Zaccari while he was attending the BOR meeting at Georgia Southern University, in Statesboro, Georgia. [Doc. No. 179, Ex. 29].

the VSU Police, Dean Russ Mast, Laverne Gaskins (VSU in-house counsel), and Dr. Tanner in the President's conference room. During the meeting, Zaccari informed the group that he had investigated Barnes's employment and grades, and he further expressed complaints about Barnes's correspondence regarding the parking garage.

In response to Zaccari's information, Dr. Tanner informed the group of the contents of Barnes's file with the Access Office, including details regarding Barnes's medical condition and the identity of his treating counselor at the VSU Counseling Center. Major Farmer suggested that if Zaccari felt threatened, the President could file a formal report and get a temporary restraining order. However, Zaccari declined to file a report against Barnes.

After the conclusion of the April 20 meeting with Zaccari, Major Farmer conducted her own follow-up investigation in an effort to determine if Barnes could potentially be a threat to Zaccari. First, Major Farmer "ran a check through our records person to see if she could pull up any records with Hayden Barnes's name on them" but there were "no kinds of reports where there had been any trouble with Hayden Barnes." Farmer Depo. [Doc. No. 179, Ex. 27 at 34:21-35:7]. Then, Major Farmer called the VSU Counseling Center to inquire whether Barnes was a patient or "whether or not Hayden

may be a problem." <u>Id.</u> at 36:7-12.  Major Farmer ultimately spoke with McMillan, who told Farmer that Barnes had exhibited grandiose thinking, narcissism at times, manic behavior at times, the tendency to become obsessed with situations, and being paranoid at times.  Nevertheless, McMillan concluded by effectively communicating that Major Farmer did not have to worry about whether Barnes was a danger to anyone.[9]  The VSU police never conducted an interview with Barnes.

### 2.   Barnes's Facebook Webpage

On April 23, 2007, Barnes posted a series of items on his Facebook webpage [Doc. No. 179, Ex. 34].  The postings included clips of Bill Maher and The Daily Show television programs, a New York Times article about processed foods, a status update that "Hayden Barnes is cleaning out and rearranging his room and thus, his mind, so he hopes", and a link to a Salon.com article written

---

[9] After her conversation with Major Farmer, McMillan called Barnes because she was concerned about him.  During the conversation, Barnes stated that he felt fine and apologized for missing his previous appointment.  McMillan and Barnes then re-scheduled an appointment for April 26, 2007.

by Cary Tennis.[10]   In addition, there were various advertisements on the Facebook page and on some of Barnes's linked websites.[11]

### 3.   Second Meeting

Zaccari held a second meeting on April 23, 2007, with various members of his staff, including Major Farmer, to discuss Barnes and any new information since the last meeting.  During this meeting, Zaccari discussed speaking with someone at the South Georgia Medical Center regarding Barnes's termination of employment. Additionally, Zaccari pointed out that Barnes would not likely be able to meet the required 2.0 grade point average in order to remain in school.  Finally, Zaccari claimed that an intruder had tripped the alarm at his residence and that he had been receiving crank calls on his home phone line from a male caller.

Then, around lunchtime on April 24, 2007, Zaccari summoned McMillan to his office to discuss Barnes and obtain more

---

[10] Cary Tennis's article was entitled "I'm mentally ill but I'm no mass murderer" and written in response to the Virginia Tech shootings.  In the article, Tennis observed that the tragedy was "doubly depressing" because not only was the act terrible, but that, in the author's view, people would thereafter irrationally associate the heinous acts of the shooter with all people suffering from a mental illness.  [Doc. No. 179, Ex. 34].

[11] One of the advertisements marketed the internet website webshots.com.  The webshots.com advertisement encouraged users to "Shoot it. Upload it. Get Famous."  In other words, it solicited users to upload their own videos onto the internet and potentially become famous. [Doc. No. 179, Ex. 34].

information about Barnes's treatment history.  During the meeting,[12] Zaccari told McMillan that he felt threatened by Barnes's continued advocacy against the parking garage and suggested that some of Barnes's efforts constituted "indirect threats" against the President.[13]   Further, Zaccari told McMillan that Barnes had contacted numerous people across the State of Georgia about the parking garage and those people were concerned about Barnes's behavior.

In response, McMillan explained to Zaccari what she had observed during her counseling sessions with Barnes.  She also alerted the President that she had been in contact with Barnes's psychologist, Dr. Winders, in Savannah about a possible re-evaluation.[14] She further emphasized that she had "never at anytime observed any behaviors that warranted [her] being concerned that Mr. Barnes was a threat to himself or anyone else" and that he had behaved in a safe way in the past and had expressed "no suicidal or homicidal ideas."  McMillan Depo. [Doc. No. 179, Ex. 11 at 17:24-

---

[12] Zaccari and McMillan were the only people present at this meeting.

[13] Specifically, Zaccari articulated that Barnes had made postings on his Facebook webpage about the President and posted an article regarding the shooter at Virginia Tech.

[14] After her meeting with President Zaccari, McMillan contacted Dr. Winders again about conducting a re-evaluation on Barnes.

18:6, 110:13-15].   Finally, McMillan informed Zaccari that she would be meeting with Barnes on April 26, 2007.

### 4.   Keppler Meeting

On April 25, 2007, Kurt Keppler (Vice President of Student Affairs) called a meeting to discuss the situation involving Barnes.   The meeting was attended by Keppler, Mast, VSU Assistant Dean of Students Richard Lee, and Erin Sandonato, an R.H.D. in the residence hall.[15]   The attendees discussed Barnes and reviewed the VSU Student Code of Conduct.   In the end, the group did not identify where any of Barnes's activities were in violation of the VSU Student Code.   In fact, Lee later stated that it was the consensus of the group that there was no danger based on Barnes's acts, and Zaccari's concerns were an overreaction.

### 5.   Third Meeting

On April 26, 2007, Zaccari held another meeting in his office again to discuss Barnes.   The third meeting was attended by Keppler, McMillan, and Dr. Victor Morgan of the VSU Counseling Center.   During the meeting, Zaccari reiterated his concern regarding Barnes and claimed that he felt threatened for his own safety and for that of the VSU campus.   Zaccari then discussed the possibility of using a procedure he called an "administrative

---

[15] The parties never explained what "R.H.D." meant.

withdrawal" to remove Barnes from VSU.   Zaccari believed the withdrawal would not require the involvement of a student/faculty council or anyone from the VSU Counseling Center.   Furthermore, Zaccari felt that a "mental health" or "disorderly conduct" withdrawal process was "cumbersome" because it would take time and require the President to produce evidence to support his decision. Zaccari Depo. [Doc. No. 179, Ex. 4 at 247:10-248:9].

During the meeting, Zaccari also showed a copy of the collage found on Barnes's Facebook webpage and described the document as "an indirect threat" on him regarding the parking garage.   However, none of the other attendees expressed agreement with Zaccari's concerns.   In fact, McMillan and Keppler did not perceive anything threatening about the collage, and Dr. Morgan did not believe that Barnes used the word "memorial" in the collage in a threatening manner.   Specifically, Dr. Morgan's belief was that Barnes used the term to mean that "this is a building that is going to be designated with your name on it; that you're going to be held responsible for the parking garage." Morgan Depo. [Doc. No. 179, Ex. 38, p. 21:13-22:6].

Later during the meeting, McMillan told Zaccari that she did not believe Barnes "was a danger at the present time or had exhibited violent behavior in the past."   McMillan Depo. [Doc. No. 179, Ex. 11 at 163:4-9].   Dr. Morgan followed up by asserting,

13

"[i]n my opinion, he's complying with everything we're asking him to do."   Morgan Depo. [Doc. No. 179, Ex. 38 at 22:21-23:1].   He added that Barnes was "seeing his counselor on a regular basis" and was "taking the prescribed medication that his physician prescribed for him."   Id. at 23:2-6.   Finally, Morgan concluded that he did not "feel that we have any reason to be able to withdraw him for mental health reasons."[16]   Id. at 22:23-23:25.   McMillan and Keppler agreed with Morgan's conclusion.   Before leaving the meeting, McMillan urged Zaccari that Barnes needed to be allowed to finish his final exams. Despite the opinions of the attendees at the third meeting, Zaccari decided to employ a personal security team from the VSU police for protection starting on April 27, 2007, based upon his fear that Barnes would ultimately personally attack him.

On the same day of his meeting with Keppler, Morgan, and McMillan, Zaccari directed that in-house counsel Gaskins inquire of Elizabeth Neely, Vice Chancellor for Legal Affairs at the BOR, as to a student's appeal rights if a university president files a complaint against a student for violation of the Student Code of

---

[16]   Furthermore, Morgan declared that Barnes could not be withdrawn from VSU for mental health reasons because McMillan had stated that Barnes had no known history of violence towards others or himself and he had not communicated a desire for such violence.

Conduct [Doc. No. 179, Ex. 40].   Neely responded via email by
stating,

> In this case, the appeal should be directed
> straight to our office. It is not good practice for
> the President to be bringing a complaint against
> any student.   That should be handled by staff in
> Student Affairs.   Once the President has made a
> decision in a matter, there is no due process at
> the campus level.

Id.   Then, on May 2, 2007, Zaccari summoned Gaskins to his office
to participate in a telephone conference with Neely regarding
Barnes.   During the conference, Neely discussed various ways that
Barnes could be administratively withdrawn.   Gaskins responded by
expressing concern that any withdrawal might be in violation of his
rights under the First Amendment, the Due Process Clause, and/or
the Americans with Disabilities Act ("ADA").   Neely later told
Zaccari that the President should focus on the safety of campus and
himself and "we'll worry about the lawsuit later."   Gaskins Depo.
[Doc. No. 179, Ex. 8 at 68:14-15].   After the conclusion of the
telephone conference, Neely faxed a series of documents [Doc. No.
179, Ex. 43] to Zaccari and Gaskins regarding various BOR policies.

   **E.   McMillan's Session with Barnes**

   Meanwhile, after leaving the third meeting with Zaccari,
McMillan attended a scheduled counseling with Barnes on the same
day.   During her meeting with Barnes, McMillan and Barnes discussed
his issues with Zaccari.   Further, McMillan specifically inquired

as to whether Barnes was planning or thinking about hurting
Zaccari. Barnes responded that he had made "no direct or indirect
threats to [the] President" and that he "would not harm self or
others" [Doc. No. 179, Ex. 20 at 16-17]. McMillan then requested
that Barnes be careful in the future so that the behaviors and
mannerisms he used in expressing his views could not be perceived
by other as aggressive or threatening.

On April 30, 2007, Dr. Winders re-evaluated Barnes in person.
As result of the re-evaluation, Dr. Winders increased Barnes's
medication to target his symptoms of anxiety, depression, and
obsessiveness. Following the in-person evaluation, Dr. Winders
sent McMillan a letter on May 2, 2007, which described the re-
evaluation and concluded, "There was nothing during the interview
that led me to think that [Barnes] was a danger to himself or
others. He also appeared to be able to care for himself. He
specifically stated that he did not want to hurt anyone or himself"
[Doc. No. 179, Ex. 42]. Further, Winders spoke with McMillan by
phone on May 2, 2007, and confirmed his beliefs to her.

**F.   Zaccari's Decision**

On May 3, 2007, Zaccari led a meeting which was attended by
Boyd, Keppler, Mast, Major Farmer, Police Chief Scott Doner,

Gaskins, Dr. Tanner, and Dr. Morgan.[17]  During the meeting, Zaccari informed the group that he had been in contact with the BOR and had discussed the Barnes situation with the BOR.    Further, Zaccari expressed his belief that under BOR Policy 1902,[18] he had the authority to unilaterally decide to "withdraw any student from campus if he feels they pose a danger and that he planned to administratively withdraw Mr. Barnes." Morgan Depo. [Doc. No. 179, Ex. 38 at 26:24-27:7].    In response to Zaccari's declaration, Gaskins informed the group that "a student accused of violating Board Policy 1902 is entitled to due process" and then reiterated her concern to the group that any type of withdrawal would leave the group in a precarious legal position.  Gaskins Depo. [Doc. No. 179, Ex. 8 at 89:9-12].  Keppler then commented that no one at the counseling center could withdraw Barnes for mental health reasons because there was nothing to support that Barnes was a threat.

---

[17] There is a factual dispute as to whether Dr. Levy attended the May 3 meeting.

[18] BOR Policy 1902 provides, "Any student, faculty member, administrator, or employee, acting individually or in concert with others, who clearly obstructs or disrupts, or attempts to obstruct or disrupt the teaching, research, administrative, disciplinary, or public service activity, or any other activity authorized to be discharged or held on any campus of the University System is considered by the Board to have committed an act of gross irresponsibility and shall be subject to disciplinary procedures, possibly resulting in dismissal or termination of employment." [Doc. No. 179, Ex. 44].

Keppler further noted that Barnes's psychiatrist had agreed with McMillan that Barnes was rational and presented no threat to himself or anyone else.

One day after the May 3 meeting, Zaccari directed Gaskins to prepare a memorandum with a draft of a proposed withdrawal letter for Barnes.  More specifically, Zaccari instructed her to impose two conditions for Barnes's readmission to VSU, including: "(1) A correspondence from a non-university appointed psychiatrist that you are not a danger to yourself and others; [and] (2) documentation from a certified mental health professional indicating that during your tenure at Valdosta State you will be receiving on-going therapy" [Doc. No. 179, Ex. 2].  Gaskins drafted the requested memorandum to Zaccari's specifications, but on the top of the document, she wrote,

> Please find the below proposed letter.  You should note that due process dictates that the student be apprised of what particular policy has been violated, an opportunity to be heard and also informed of the appeal process.  My research has led me to the following policies that appear to be implicated.  I have attached the same for your review and consideration.
>
> Valdosta State Student Code of Conduct
> E.(7) Disorderly Conduct
> Mental Health Withdrawal
>
> Board of Regents Policy 1902
> Disruptive Behavior

[Doc. No. 179, Ex. 45].

On May 7, 2007, Gaskins met with McMillan, Keppler, and Morgan to discuss the possible withdrawal of Barnes.  During the meeting, McMillan reiterated to the others that she did not feel that Barnes was a threat.  On the same day, Barnes received a notice, signed by Zaccari, underneath his dorm room door.  The notice stated that he had been administratively withdrawn from VSU, and it had his Facebook webpage collage as an attachment [Doc. No. 179, Ex. 2]. The notice further stated that he was a clear and present danger to the school and provided the two conditions for readmission.

Shortly after receipt of the expulsion notice, Barnes contacted McMillan and Dr. Winders to inform them of the situation and in an effort to gain the documentation necessary to be reinstated at VSU.[19]  While talking to McMillan, Barnes scheduled a time to meet with her on May 8, 2007, to further discuss the letter from Zaccari in person.  Within one day of receiving his withdrawal notice, Barnes filed for reinstatement in accordance with the requirements listed in Zaccari's withdrawal notice by submitting McMillan and Winders' letters to Zaccari.  However, after receiving the letters, Zaccari determined that the letters did meet the conditions set forth in the withdrawal notice, and

---

[19] Barnes requested that McMillan write a letter to Zaccari on his behalf and also had Dr. Winders write a letter about the re-evaluation of Barnes that was conducted approximately a week earlier.  Both letters emphasized that Barnes was not a threat.

therefore Zaccari did not take any action.  Zaccari maintained his opinion that Barnes was a danger to the VSU campus.  On May 9, 2007, Barnes was notified that he had 48 hours to vacate his room in the residence hall.

### G.   Barnes's Appeal

On May 21, 2007, Barnes appealed his administrative withdrawal to the BOR.  In response to the appeal, Zaccari submitted a letter to the BOR defending his position.  Barnes's appeal was heard by the BOR in August 2007.  After being heard by the BOR, Barnes's appeal was referred to an Administrative Law Judge.  On January 17, 2008, after Barnes had filed the instant lawsuit, the BOR rescinded Barnes's administrative withdrawal without comment.

## II.  Procedural Background

Barnes's complaint was filed on January 9, 2008, and contained a total of seven counts.  In the court's November 19, 2008, order [Doc. No. 37] ruling on the defendants' motion to dismiss, the court dismissed Counts 1 and 2 based upon Eleventh Amendment Immunity for the BOR and VSU and dismissed Dr. Victor Morgan as a defendant in this case.  Therefore, the remaining claims in Barnes's lawsuit include: Count 3 (Liability under 42 U.S.C. § 1983 for Free Speech Clause violation) and Count 4 (Liability under 42 U.S.C. § 1983 for Violation of Substantive and Procedural Due Process Rights) against the individual defendants; and Count 5

(Breach of Contract), Count 6 (ADA claim), and Count 7 (Rehabilitation Act claims) against the BOR and VSU.  The plaintiff and all of the remaining defendants have filed motions for summary judgment.

## III. Summary Judgment Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure authorizes a court to enter summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  The party seeking summary judgment bears the burden of demonstrating that no dispute exists as to any material fact.  Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  This burden is discharged by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support [an essential element of] the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In determining whether the moving party has met its burden, a district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion.  Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the nonmovant has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine

dispute.  <u>Matsushita Elec. Indust. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Ultimately, the court's function is not to resolve issues of material fact, but rather to determine whether there are any such issues to be tried.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251 (1986).  Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment.  <u>Id.</u> at 248. Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

## IV. McMillan's Motion for Summary Judgment [Doc. No. 164]

### A.   Parties' Arguments

In her brief, McMillan contends that the court should grant her motion for summary judgment on the two counts remaining against her, Count 3 (Liability under 42 U.S.C. § 1983 for Free Speech Clause violation) and Count 4 (Liability under 42 U.S.C. § 1983 for Violation of Substantive and Procedural Due Process Rights).  More specifically, McMillan argues that Barnes has not produced any evidence to support his claims that she retaliated against him for expressing his beliefs regarding the parking garage at VSU or violated his procedural and substantive due process rights. Moreover, McMillan highlights Barnes's testimony during his deposition in which he states, "I don't have any specific evidence

22

for [McMillan] releasing information prior to my administrative withdrawal in retaliation for my beliefs regarding the parking garage, to my knowledge." Next, McMillan maintains that it is undisputed that Zaccari alone made the decision to withdraw Barnes. Finally, McMillan points out that the undisputed evidence established that she was at a conference held on St. Simons Island, Georgia on May 3, 2007, when Zaccari announced his withdrawal decision to various VSU staff members.

In response, Barnes asserts that McMillan is liable for Counts 3 and 4 of this lawsuit and that her motion for summary judgment should be denied. According to Barnes, McMillan is liable under 42 U.S.C. § 1983 because she participated in, and contributed to, the series of events that led to Barnes's expulsion from VSU. Further, McMillan, who was quite familiar with the rules regarding confidentiality, nevertheless disclosed sensitive information without a waiver to Zaccari, knowing full well how the President planned to use it. Finally, Barnes argues that the sensitive mental health information provided by McMillan to Zaccari "became the linchpin of Zaccari's rationale for withdrawing Barnes."

### B. Count 3 - 42 U.S.C. § 1983 Claim for Retaliation Against Barnes for Exercising His Rights under the Free Speech Clause Right of the First Amendment

In order to prove a First Amendment Retaliation claim, the plaintiff must establish: (1) that his speech or act was

23

constitutionally protected, (2) that the defendant's retaliatory conduct adversely affected the protected speech, and (3) that there is a causal connection between the retaliatory actions and the adverse effect on speech.  <u>Bennett v. Hendrix</u>, 423 F.3d 1247, 1250 (11th Cir. 2005).  In his complaint, Barnes claims, "Defendants' actions in conspiring to expel Barnes from VSU were taken in retaliation for Barnes's exercise of his First Amendment Freedoms" [Doc. No. 1, p. 26, ¶ 86].  Moreover, Barnes asserts,

> Zaccari then decided to use the Facebook posting, along with his awareness that Barnes availed himself of campus counseling services to concoct a claim, in retaliation for Barnes's speech activities questioning his parking garage plans, that Barnes represented some kind of danger. Zaccari pursued this strategy with the assistance of defendants Gaskins, Keppler, Mast, McMillan and Morgan.

[Doc. No. 1, p. 13, ¶ 38].  In sum, Barnes claims that all of the individual defendants are liable because they conspired to retaliate against his constitutionally protected speech by having him administratively withdrawn from VSU.[20]

-------

[20] In the court's November 19, 2008, order [Doc. No. 37, pp. 19-20] ruling on the defendants' motions to dismiss, the court accepted as true that there was a conspiracy to retaliate against Barnes and declined to dismiss Barnes's claim "until the parties conduct discovery and reveal exactly what occurred leading up to and during the May 3 meeting." <u>Id.</u> at 21.  The court notes that in many of Barnes's briefs and arguments therein, Barnes argues that the defendants are liable for acts or omissions that are different than the claim of liability based on a conspiracy.  However, Barnes may not amend his complaint through his summary judgment papers.

Conspiring to violate another person's constitutional rights under the First Amendment violates 42 U.S.C. § 1983.  See Dennis v. Sparks, 449 U.S. 24, 27 (1980).  To establish a conspiracy under § 1983, the plaintiff must show, among other things, that the defendants "reached an understanding to violate [the plaintiff's] rights."  Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1283 (11th Cir. 2002).  Thus, there must be some evidence of an agreement between the defendants.  Bailey v. Board of County Commissioners of Alachua County, 956 F.2d 1112, 1122 (11th Cir. 1992)("The linchpin for conspiracy is agreement, which presupposes communication.").  Further, for a conspiracy claim to survive a motion for summary judgment, "[a] mere 'scintilla' of evidence . . . will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  Finally, merely "string[ing] together" adverse acts of individuals is insufficient to demonstrate the existence of a conspiracy.  Harvey v. Harvey, 949 F.2d 1127, 1133 (11th Cir. 1992).

After reviewing the parties' briefs and the evidence in this case,[21] the court concludes that Barnes has failed to present

See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004).

[21] The court viewed the evidence and all factual inferences in the light most favorable to Barnes, the party opposing the motion.

sufficient evidence to support his conclusory allegation that McMillan conspired with someone else to have Barnes withdrawn from VSU in retaliation for his speech.  First, the undisputed facts show that Zaccari alone made the decision to administratively withdraw Barnes from VSU.[22]   Next, Barnes did not produce any evidence to support a claim that McMillan and any other defendant "reached an understanding [or agreement] to violate [Barnes's] rights."  Rowe, 279 F.3d at 1283.  At most, Barnes argued that the attendees at the May 3 meeting with Zaccari conspired or agreed to "administratively withdraw" Barnes from VSU to retaliate against him for his speech activity regarding the parking garage.  However, this assertion fails because it is undisputed that (a) Zaccari independently made the withdrawal decision and (b) McMillan was on St. Simmons Island while the May 3 meeting was being held at VSU.  Finally, all of the evidence produced in this case shows that there was a steadfast disagreement between McMillan and Zaccari regarding

---

Johnson, 74 F.3d at 1090.

[22] In the VSU Defendants' Statement of Material Facts Not in Dispute, Paragraph 47 states, "Acting on the advice of Ms. Gaskins and Ms. Neely, Dr. Zaccari made the decision to 'administratively withdrawal' the Plaintiff from VSU." [Doc. No. 177-1, ¶].  In his response [Doc. No. 223] to the VSU Defendants' Statement of Material Facts Not in Dispute, Barnes contends that Neely did not provide legal advice to Zaccari and Gaskins repeatedly warned Zaccari of the legal repercussions of administratively withdrawing Barnes.  Barnes does not dispute that Zaccari independently made the "administrative withdrawal" decision.

the issue of Barnes's withdrawal from VSU.  McMillan consistently and repetitively voiced her objection to Zaccari's opinion that Barnes or the Facebook collage was a threat.  She argued that Barnes should be permitted to remain a student, and then she lobbied for Barnes's re-admission after Zaccari served notice of the withdrawal.  Accordingly, the court grants McMillan's motion for summary judgment as to Count 3.

### C.   Count 4 - 42 U.S.C. § 1983 Claim for Violation of Barnes's Procedural and Substantive Due Process Rights

In Count 4 of the complaint, Barnes claims that all of the defendants are liable under 42 U.S.C. § 1983 for violating his substantive and procedural due process rights.  More specifically, Barnes claims, "Students at public universities enjoy a protected property interest in their education such that due process must be afforded them prior to the denial of those interests.  At a minimum, this includes notice and an opportunity to be heard" [Doc. No. 1, p. 27, ¶ 92]. According to Barnes, "[a]t no time have Defendants provided Barnes with these essential rights."  Id. at ¶ 93.

### 1.   Substantive Due Process Rights

Barnes argues that McMillan (and all the other individual defendants) violated his substantive due process rights under the Fourteenth Amendment by administratively withdrawing him from VSU.

27

The substantive component of the Due Process Clause recognizes a limited class of "rights that a state may not remove, regardless of the process, as well as actions that can not be countenanced, regardless of the appropriateness of the process." McKinney v. Pate, 20 F.3d 1550, 1560 n.15 (11th Cir. 1994). A school's decision to suspend a student is an executive act, see id. at 1557 n.9, and executive acts "contravene substantive due process rights only if, in the Supreme Court's words, the right affected is 'implicit in the concept of ordered liberty.'" C.B. v. Driscoll, 82 F.3d 383, 387 (11th Cir. 1996)(quoting Palko v. Connecticut, 302 U.S. 319, 325(1937)). Because "[p]ublic education is not a 'right' granted to individuals by the Constitution," Plyler v. Doe, 457 U.S. 202, 221 (1982), "the 'right' to avoid school suspension may be abridged as long as proper procedural protections are afforded." Driscoll, 82 F.3d at 387; see also Plyer, 457 U.S. at 221 ("The right to attend a public school is a state-created, rather than a fundamental, right for the purposes of substantive due process."); San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 35 (1973)(holding that education is not a fundamental constitutional right). Therefore, as a matter of law, Barnes suffered no substantive due process violation and, accordingly, summary judgment is appropriate for all of the defendants on Barnes's substantive due process claim in Count 4.

28

## 2.   Procedural Due Process

In order for Barnes's claim of denial of his Procedural Due Process Rights under the Fourteenth Amendment to succeed under § 1983, Barnes must show that each defendant, acting under color of state law, deprived (or caused to be deprived) Barnes's constitutional rights to due process.   See Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th Cir. 1995).   Prior to examining the evidence and determining whether any questions of fact exist regarding the individual defendants' roles in the alleged deprivation, the court will first determine if Barnes was entitled to any due process rights as a student at VSU.

### a.   Procedural Due Process Rights of College Students

In the court's November 19, 2008, order ruling on the defendants' motions to dismiss, the court held that the case law in the Eleventh Circuit "clearly recognize[s] the existence of some . . . procedural due process rights for college students when facing disciplinary action" [Doc. No. 37, p. 23].   Furthermore, all of the cases cited in the VSU Defendants' briefs, which were binding on this court and involved the removal or withdrawal of a college student, support the same conclusion -- that a college student is entitled to notice and some sort of hearing prior to

removal, expulsion, and/or disciplinary action.[23] Moreover, the BOR
policy relied upon by Zaccari in withdrawing Barnes, BOR Policy
1902, provides that students "shall be subject to disciplinary
procedures" [Doc. No. 179, Ex. 44]. Therefore, the court concludes
as a matter of law that Barnes's procedural due process rights
while a student at VSU required that he (a) receive notice of the
allegations and charges against him and (b) be permitted to address
those allegations and charges prior to his withdrawal.

---

[23] Dixon v. Alabama State Board of Education, 294 F.2d 150, 158
(5th Cir. 1961)(holding that due process requires notice and some
opportunity for hearing before a student at a tax-supported college
is expelled for misconduct); Nash v. Auburn University, 812 F.2d
655, 664 (11 Cir. 1987)(holding that a notice and hearing were
required and that the notice of hearing, the timing of the issuance
of the notice, and the hearing itself were adequate in the case);
Fedorov v. Board of Regents for University of Georgia, 194
F.Supp.2d 1378, 1392 (S.D. Ga. 2002) (holding that defendants
exceeded the procedural requirements of the Constitution given that
defendants sent plaintiff written notification of the charges
against him; the same notification also named the adversary
witnesses; a hearing was held, and plaintiff testified; Plaintiff
presented his own witnesses and questioned the opposition's
witnesses; and, although the plaintiff was prohibited from bringing
an attorney, defendants allowed Plaintiff to have a
representative); Castle v. Marquardt, 632 F.Supp.2d 1317, 1330
(N.D. Ga. 2009)(holding that procedural due process requires a
notice and an opportunity to be heard); see also Goss v. Lopez, 419
U.S. 565, 579 (1975)(holding that, at the very minimum, students
facing suspension and the consequent interference with a protected
property interest must be given some kind of notice and afforded
some kind of hearing); Cleveland Board of Education v. Loudermill,
470 U.S. 532, 547-48 n.12 (1985)(holding that while "the existence
of post-termination procedures is relevant to the necessary scope
of pre-termination procedures," a post-termination hearing cannot
satisfy due process unless the plaintiff also receives a
pre-termination opportunity to be heard).

**b.   Claims against McMillan**

Regarding McMillan, Barnes must show how McMillan deprived him of his rights to notice and an opportunity to be heard prior to the withdrawal.   After reviewing all of the parties' briefs and arguments therein, the main issue before the court is whether Barnes adequately established a causal link between McMillan's actions as a counselor at VSU and the deprivation of Barnes's procedural due process rights prior to his withdrawal.

The Eleventh Circuit Court of Appeals addressed the issue of causation in a § 1983 claim in Dixon v. Burke County, Georgia, 303 F.3d 1271 (11th Cir. 2002).   In Dixon, a vacancy on the Board of Education for Burke County, Georgia occurred after the death of a white, male, board member in 1999.   In response to the vacancy, the Georgia Secretary of State ordered that the 19 members of the Burke County Grand Jury select someone to fill the vacancy.   The Grand Jury's selection would then be submitted to a Georgia Superior Court Judge for approval.   Eleven people applied for the vacant Board of Education position, including the plaintiff.   Prior to the 19 members of the Grand Jury convening to vote and decide the replacement, the District Attorney for the judicial circuit for Burke County orally recommended to the members of the Grand Jury that it should select someone of the same race and gender as the board member who had passed away.   After the Grand Jury selected a

white male to fill the vacant position, the plaintiff, a female applicant, filed a lawsuit under § 1983 against the District Attorney and others.  In ruling that the plaintiff had failed to establish a causal connection between District Attorney's actions and the alleged violation of the plaintiff's constitutional rights, the Eleventh Circuit Court of Appeals held,

> As with any common law tort, Plaintiff must establish an adequate causal link between the alleged harm and the alleged unlawful conduct. Without causation, [plaintiff's] § 1983 case fails as a matter of law.  The connection between conduct and harm must be legally sufficient to satisfy notions of common fairness and policy.  In other words, a physical causal relationship, although existing at some level, may still be too remote to fairly permit the imposition of civil liability. The causal relation does not exist when the continuum between Defendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers.

Dixon, 303 F.3d at 1275 (citations omitted).

With the principles of Dixon in mind, the court concludes that Barnes has failed to meet the causation requirement with regard to his claim that McMillan deprived him of his substantive and procedural due process rights.[24]  The court notes again that it is undisputed that Zaccari independently decided to administratively withdraw Barnes without any kind of hearing and that McMillan

---

[24] The court viewed the evidence and all factual inferences in the light most favorable to Barnes, the party opposing the motion. Johnson, 74 F.3d at 1090.

voiced opposition to the withdrawal of Barnes on multiple
occasions.   Therefore, Zaccari's act of making the decision by
himself destroys any causal link between McMillan's conduct and
Barnes's withdrawal.   Further, the court is not persuaded by the
various phrases from cases cited by Barnes in support of his
argument that McMillan is liable because those quotations are taken
out of context and fail to sufficiently address how McMillan, as
counselor at a state university, caused Barnes to be withdrawn.[25]
Because the undisputed facts show that Zaccari made the withdrawal
decision on his own, the link between McMillan's actions in April-
May 2007 and Barnes's alleged harm regarding his substantive and
procedural due process rights is "too remote to fairly permit the

---

[25] <u>Zatler v. Wainwright</u>, 802 F,2d 397, 401 (11th Cir.
1986)(involving a former inmate of the State of Florida Department
of Corrections who brought civil rights action alleging that prison
officials failed to protect him from sexual assault while he was in
prison); <u>Williams v. Bennett</u>, 689 F.2d 1370 (11th Cir.
1982)(involving inmate who was assaulted while sleeping his bunk
and filed a damages action under § 1983 against the Alabama Board
of Corrections and its members, the Board's commissioner and deputy
commissioner, the warden, deputy warden, the captain and the
assistant captain of the guards at the prison); <u>Sims v. Adams</u>, 537
F.2d 829 (11th Cir. 1976)(involving police defendants that were
allegedly present and participating at various stages of the arrest
and beating of the plaintiff); <u>Doe v. Taylor Independent School
District</u>, 15 F.3d 443, 452 (5th Cir. 1994)(involving school
principal and superintendent of school district who were sued in
their supervisory capacity by student who was sexually assaulted by
her teacher); and <u>Doe v. Rains County Independent School District</u>,
66 F.3d 1402 (5th Cir. 1995)(involving student who brought § 1983
action against teachers and school district, alleging that teacher
had sexually abused student and that second teacher failed to
report sexual abuse).

imposition of civil liability" against McMillan.  _Id._  Accordingly, the court grants McMillan's motion for summary judgment as to Count 4.

**V.   Gaskins's Motion for Summary Judgment [Doc. No. 174]**

    **A.   Parties' Arguments**

In her brief in support of her motion for summary judgment as to Counts 3 and 4, Gaskins argues that she did not participate in the decision to administratively withdraw Barnes, other than to repeatedly and consistently offer her legal counsel that Barnes's due process rights had to be respected in any withdrawal procedure. Additionally, Gaskins points out that she had no authority to withdraw any student and was never asked for her opinion or advice about whether Barnes should be withdrawn.   In sum, Gaskins maintains that her role in this entire matter was limited to offering legal advice about the due process and equal protection concerns raised by any student withdrawal, and the decision of whether to accept that advice or reject it was Zaccari's alone. Therefore, Gaskins argues that she is entitled to judgment as a matter of law.

In response, Barnes argues that Gaskins knew that actions taken against him regarding the withdrawal were wrong, and through her acts and omissions, Gaskins shares responsibility for the

deprivation of Barnes's rights.  According to Barnes, Gaskins is liable despite her warnings because she assisted in implementing the withdraw decision.  Barnes maintains that (a) Gaskins is precluded from immunity where, as here, she knowingly participated in a course of action that violated Barnes's rights, and (b) Gaskins failed to adhere to her legal obligations to bring the Barnes matter to the attention of higher authority.  Accordingly, Barnes contends the court should deny Gaskins's motion for summary judgment.

**B.    Count 3 - 42 U.S.C. § 1983 Claim for Retaliation Against Barnes for Exercising His Rights under the Free Speech Clause Right of the First Amendment**

As discussed more thoroughly above in Part IV., Paragraph B., Barnes claims that the all of the defendants, including Gaskins, are liable because they conspired to retaliate against his constitutionally protected speech by having him administratively withdrawn from VSU.  And, explained above, to establish a conspiracy under § 1983, a plaintiff must show, among other things, that the each of the defendants "reached an understanding to violate [the plaintiff's] rights." Rowe, 279 F.3d at 1283.  Thus, there must be some evidence of an agreement between Gaskins and someone else to retaliate against Barnes for exercising his rights under the First Amendment.  Bailey, 956 F.2d at 1122.

With regard to Gaskins, neither the undisputed facts nor any other evidence supports the conclusory allegation that she made an agreement with anyone to violate Barnes's constitutional rights.[26] To the contrary, the undisputed facts and evidence in this case show that Gaskins opposed the withdrawal of Barnes, and, whenever given the opportunity, she alerted anyone who would listen of the legal ramifications of taking such action.[27]   In fact, even after Zaccari announced his decision to withdraw Barnes and directed Gaskins to draft a memorandum that would serve as a withdrawal notice, Gaskins drafted the memorandum which included the pointed reminder and warning,

> Please find the below proposed letter.  You should note that due process dictates that the student be apprised of what particular policy has been violated, an opportunity to be heard and also informed of the appeal process.  My research has led me to the following policies that appear to be implicated.  I have attached the same for your review and consideration.
>
> Valdosta State Student Code of Conduct
> E.(7) Disorderly Conduct
> Mental Health Withdrawal

---

[26] The court viewed the evidence and all factual inferences in the light most favorable to Barnes, the party opposing the motion. <u>Johnson</u>, 74 F.3d at 1090.

[27] As explained in more detail in Part I of this order, Gaskins raised these issues of Barnes's rights under the First Amendment, due process rights, and potentially liability under the ADA during her meeting with Zaccari on April 24, 2007, again during the phone conference with Neely on May 2, 2007, and another time during the May 3 meeting when Zaccari announced his decision.

Board of Regents Policy 1902
Disruptive Behavior

[Doc. No. 179, Ex. 45].   This final written warning came after multiple verbal alerts by Gaskins but was still insufficient to deter Zaccari in his mission to have Barnes withdrawn.   Therefore, all of the evidence produced in this case supports a finding that Gaskins did not reach an agreement with anyone to retaliate against Barnes for exercising his constitutional rights.   Accordingly, the court grants Gaskins's motion for summary judgment as to Count 3.

**C.   Count 4 - 42 U.S.C. § 1983 Claim for Violation of Barnes's Procedural Due Process Rights**

In order for Gaskins to be liable for Count 4 of the complaint, Barnes must show how Gaskins deprived him of his right to notice and an opportunity to be heard prior to Barnes's withdrawal.   Thus, as more thoroughly discussed above in Part IV., Paragraph C., Barnes must establish an adequate causal link between Gaskins's conduct and the alleged failure to provide notice and a hearing.   Dixon, 303 F.3d at 1275.

In Dixon, the Eleventh Circuit held that an attorney who "merely advised" the grand jury could not be held liable under § 1983 because "the causal connection between [the attorney's] words and [the selection by the Grand Jury] is severed by the intervening free, independent, and volitional acts of the Grand Jury and state Judge.   The Grand Jury understood that it did not

37

have to accept [the attorney's] advice." <u>Dixon</u>, 303 F.3d 1275.
Here, the same line of reasoning severs the causal connection
between Gaskins's advice, which was ignored because it advised
Zaccari against withdrawal without due process, and Zaccari's solo
decision to withdraw Barnes.   The undisputed facts and other
evidence show that Gaskins repeatedly advised against and/or warned
Zaccari of the ramifications of removing Barnes without some sort
of due process.   Then, ignoring Gaskins's advice and making the
decision on his own, Zaccari decided to issue the notice of
withdrawal to Barnes without any kind of notice of the allegations
or a hearing.   Therefore, any causal connection between Gaskins
actions and the violation of Barnes's constitutional rights was
"severed by the intervening free, independent, and volitional acts
of" Zaccari.   <u>Id.</u>   Accordingly, the court grants Gaskins motion for
summary judgment as to Count 4.

**VI.  VSU Defendants' Motion for Summary Judgment [Doc. No. 177]**

> **A.   Parties' Arguments**

The VSU Defendants argue that they are entitled to judgment as
matter of law on Counts 3, 4, 5, 6 and 7.   More specifically, as to
Count 3 (First Amendment Retaliation claim), the VSU Defendants
argue that Barnes's speech constituted "fighting words" and,
therefore, was not protected; they further argue that there was no
evidence of retaliation against Barnes or that Mast or Keppler took

38

any action.  Regarding Count 4 (Violation of Procedural Due Process Rights), the VSU Defendants contend that they are entitled to qualified immunity because their decisions and actions were made in reliance upon legal advice, and Barnes received procedural due process.  With regard to the Count 5 (Breach of Contract), the VSU Defendants maintain that VSU is an improper party and no written contract existed.  Finally, in their arguments for summary judgment on Counts 6 (ADA claim) and 7 (Rehabilitation Act claim), the VSU Defendants contend Barnes failed to show that he is disabled and also failed to adequately allege that he was subjected to unlawful discrimination because of his alleged disability.

In response, Barnes argues that the VSU Defendants' arguments as to Count 3 fail because his speech was protected as a matter of law, and it is undisputed that the defendants retaliated against him.  Regarding Count 4, Barnes asserts that the undisputed facts show that his substantive and procedural due process rights were violated.  Next, Barnes argues that he had a contract with VSU and the BOR, and those defendants breached that contract by not following the procedures for student discipline and expulsion.  Finally, Barnes argues that he is a "qualified individual" under the ADA and the Rehabilitation Act and that the defendants admit that they discriminated against him because of his disability.

**B.   Count 3 - 42 U.S.C. § 1983 Claim for Retaliation Against Barnes for Exercising His Rights under the Free Speech Clause Right of the First Amendment**

As discussed above in both Part IV., Paragraph B. and Part V., Paragraph B., Barnes's complaint alleges that all of the individual defendants participated in a conspiracy to retaliate against Barnes for exercising his rights under the First Amendment.  In order to prevail on such claim of conspiracy, Barnes has the burden of proving that each of the defendants conspired by reaching an agreement with someone else to retaliate against him.

**1.   Russ Mast**

Mast was the Dean of Students at VSU in 2007 and attended (1) the meeting between Zaccari and Barnes on April 16, (2) Zaccari's first meeting regarding Barnes on April 20, (3) Keppler's meeting on April 25, and (4) the May 3 meeting at which Zaccari announced to various staff members his decision to withdraw Barnes. Beyond his attendance at those 4 meetings, the facts also show that Mast agreed with the consensus of the attendees at the Keppler meeting that Zaccari's response to Barnes was an overreaction. Finally, Mast explained to Zaccari during at least one of the meetings that some kind of hearing would be involved if Mast were overseeing a disorderly conduct withdrawal.

Based upon these facts and all other evidence taken in a light most favorable to Barnes, the court concludes that there is an

40

absence of evidence to support a claim that Mast agreed with anyone
to retaliate against Barnes for speaking out against Zaccari's
parking garage plan by withdrawing him as a student at VSU.  This
conclusion is further supported by the fact that Barnes failed
pointed to any evidence to support a finding that Mast made an
agreement with Zaccari or anyone else.  When Barnes was questioned
about what facts he had to base his claim against Mast, Barnes
responded,

> Other than his attendance at the meetings, other
> than my assumption - you could say speculation -
> that he was aware of President Zaccari's action, my
> speculation that - well, my knowledge - my fact
> that he is over the judicial process at Valdosta
> State University, and my speculation that he could
> have done something to prevent what happened, is
> the basis.  Those are my facts.

Barnes Depo. [Doc. No. 179, Ex. 4 at 197-98].  Finally, and most
importantly, given that the undisputed facts show that Zaccari
acted alone in making his decision to withdraw Barnes, there is
simply no evidence to support the conclusion that Mast reached an
agreement with anyone to retaliate against Barnes.  Accordingly,
the court grants judgment as a matter of law as to Count 3 in favor
of Mast.

### 2.  Kurt Keppler

The court's review of the facts and evidence regarding Keppler
leads to the same conclusion reached regarding McMillan, Gaskins,
and Mast -- there is an absence of evidence to support Barnes's

conclusory allegation that Keppler agreed with anyone to retaliate against Barnes.  Specifically, the evidence reveals that Keppler was the Vice President for Student Affairs at VSU in 2007, and he attended several of the meetings regarding Barnes.  On April 25, Keppler himself called a meeting with Mast, Richard Lee, and Erin Sandonato, and during the meeting the attendees reached a consensus that Zaccari's response to Barnes was an overreaction.  On April 26, Keppler attended Zaccari's third meeting regarding Barnes.  At that meeting, Keppler voiced disagreement with Zaccari's opinion that Barnes's Facebook collage was an indirect threat but agreed with Dr. Morgan's position that Barnes could not be withdrawn from VSU for mental health reasons.  Finally, at the May 3 meeting, Keppler reiterated his position against the withdrawal after Zaccari announced he was going to withdraw Barnes.  Barnes has not pointed to or produced any other evidence to suggest that Keppler reached an agreement with Zaccari or any other defendant to retaliate against Barnes.  Accordingly, the court grants judgment as a matter of law as to Count 3 in favor of Keppler.

### 3.   Zaccari

With regard to Zaccari and the allegation of a conspiracy, the court's review of the evidence in a light most favorable to Barnes reveals that there is an absence of evidence to support a finding that Zaccari made an agreement with anyone else to retaliate

against Barnes for exercising his freedom of speech rights.
Conversely, the parties have declared in their statements of
undisputed facts and throughout their briefs that Zaccari acted
alone in making the decision to administratively withdraw Barnes.
Further, as explained in the liability analysis of McMillan,
Gaskins, Mast, and Keppler, all of the other individual defendants
disagreed with the withdrawal decision.  Simply put, Zaccari did
not participate in any sort of conspiracy because no one would
agree with decision to withdraw Barnes.  Therefore, the court
grants judgment as a matter of law as to Count 3 in favor of
Zaccari.[28]

### C.   Count 4 - 42 U.S.C. § 1983 Claim for Violation of Procedural Due Process Rights

#### 1.   Mast and Keppler

In his arguments that Mast and Keppler are liable for
violating his procedural due process rights, Barnes primarily
focuses on the omissions and lack of action by the Dean of Students
(Mast) and the Vice President for Student Affairs (Keppler) to
support their respective liability.  However, as explained in Dixon
and discussed above,[29] any omissions of lack of actions on the part

---

[28] The court notes that Barnes's complaint does not contain a
stand alone claim for retaliation against Zaccari.  See [Doc. No.
1].

[29] See the analysis of McMillan and Gaskins's liability
regarding Count 4 in Part IV., Paragraph C. and Part V.,

of Mast and Keppler that Barnes contends caused his rights to be violated were "severed by the intervening free, independent, and volitional acts of" Zaccari when he chose to ignore the advice and warnings of all those around him and decided to withdraw Barnes without notice or a hearing. Dixon, 303 F.3d 1275. Therefore, the court grants judgment as a matter of law as to Count 4 in favor of Mast and Keppler.

### 2. Zaccari

In Barnes's claim in Count 4 against Zaccari, it is undisputed that Zaccari was acting under color of state law. Regarding the second element of the claim, Barnes alleges the violation of his procedural due process rights as a college student under the Fourteenth Amendment. Zinermon v. Burch, 494 U.S. 113, 125 (1990). The court has already concluded in Part V., Paragraph C., (2.), (a.) that Barnes, as a VSU student, was entitled to notice and a hearing. The undisputed facts in this case show that prior to Zaccari's withdrawal decision, Barnes did not (a) receive any notice of the allegations and charges against him or (b) have an opportunity to respond to those allegations and charges in some sort of hearing.[30] Further, the undisputed facts show that Zaccari

---

Paragraph C.

[30] The first time that Barnes received any notice of the charges against him was on May 7, 2007, when he received a notice informing him that he had been administratively withdrawn from VSU.

44

was the sole decision-maker in the withdrawal decision and, therefore, caused Barnes to be deprived of his rights to notice and a hearing or opportunity to respond.

The court is unpersuaded by Zaccari's argument that he is entitled to qualified immunity because he "sought out legal advice" from Gaskins and Neely and relied on their advice. The law is clearly established in the Eleventh Circuit that "due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." <u>Dixon v. Alabama State Board of Education</u>, 294 F.2d at 151. Moreover, the court finds Zaccari's assertion that he relied upon the advice of Gaskins and Neely disingenuous. The undisputed facts show that Zaccari ignored the lawyers' warnings that withdrawing Barnes would require due process in executing his administrative withdrawal of Barnes.[31] The court declines to accept Zaccari's argument that because he sought legal advice from Gaskins and Neely, both of whom

[Undisputed Facts, ¶ 113]. Moreover, Barnes was never apprised of an opportunity to respond or a hearing prior to Zaccari making his decision.

[31] As discussed in detail in Part V., Paragraph B., Gaskins verbally informed Zaccari on at least three different occasions and again in writing when she drafted the notice of withdrawal of the legal consequences of withdrawing Barnes without notice and a hearing. In Neely's email, she specifically advised against the President "bringing a complaint against a student. That should be handled by the staff in Student Affairs. Once the President has made a decision in a matter, there is no due process at the campus level." [Doc. No. 179, Ex. 40].

advised against the President's withdrawal of Barnes, Zaccari is still entitled to qualified immunity even though he took action contrary to the advice. Accordingly, the court denies Zaccari's motion for summary judgment as to Count 4 of Barnes's complaint.

### D.   VSU as a party

The VSU Defendants contend that VSU should be dismissed from this action because the university is not a properly named party. The court agrees. Under Federal Rule of Civil Procedure 17, the capacity to be sued is determined by state law. Dean v. Barber, 951 F.2d 1210, 1214-15 (11th Cir. 1992). Under Georgia law, "[t]he government, control, and management of the University System of Georgia and all of the institutions in said system shall be vested in the Board of Regents of the University System of Georgia." Ga. Const. Art 8, § 4 ¶ I(b). As a result, the Board of Regents is the proper party to sue under state law, not VSU. McCafferty v. Medical College of Georgia, 287 S.E.2d 171, 174 (Ga. Ct. App. 1982) ("[T]he power to sue and be sued . . . has been . . . vested in the Board of Regents."), overruled on other grounds, Self v. City of Atlanta, 377 S.E.2d 674, 676 (Ga. 1989). Therefore, the court dismisses VSU as a named party in this action.

### E.   Count 5 - Breach of Contract Claim

In Count 5 of the complaint, Barnes alleges that the BOR is liable for breach of contract. More specifically, Barnes claims

46

that the BOR and VSU policies found in the VSU Student Handbook establish a binding agreement between the BOR and Barnes.   In its motion for summary judgment, the BOR argues that they are entitled to judgment as a matter of law on Barnes's breach of contract claim because Barnes has failed to meet his burden of proof in proving that a contract existed or that any contract was breached.

Under O.C.G.A. § 50-21-1(a), the BOR, as an entity of the state, waives its immunity from breach of contract claims that are based upon written contracts.   Therefore, the issue now before the court is whether the VSU Student Handbook constitutes a valid, written contract between Barnes and the BOR.   Under Georgia law, "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate."   O.C.G.A. § 13-3-1; see Lamb v. Decatur Fed. Savings & Loan Association, 411 S.E.2d 527, 529 (Ga. Ct. App. 1991).   The court's application of Georgia's law on valid contracts to the instant case reveals that (a) both BOR and Barnes are able to contract, (b) consideration was present in the form of tuition paid by Barnes along with his agreement to abide by the rules set forth in the VSU Student Handbook in return for the BOR permitting Barnes to attend VSU, (c) Barnes assented to the terms of the VSU Student Handbook (the contract), which was assented to

47

and written by VSU, and (d) the subject matter was the agreed upon conduct and action of the two parties during Barnes's enrollment.

Georgia Courts have not specifically determined whether a student handbook issued at one of Georgia's public state universities and colleges constituted a valid, written contract. However, the Georgia Court of Appeals has held that private universities in Georgia formed contracts with their students via the student handbook issued during the student's enrollment. Morehouse College, Inc. v. McGaha, 627 S.E.2d 39, 42 (Ga. Ct. App. 2005)(recognizing the breach of contract was Morehouse's failure to abide by the hearing procedures in its student handbook); Kuritzky v. Emory University, 669 S.E.2d 179 (Ga. Ct. App. 2008)(recognizing an expelled student's right to bring a breach of contract action against a private educational institution for failure to abide by the hearing procedures set forth in the student handbook); Life Chiropractic College, Inc. v. Fuchs, 337 S.E.2d 45, 48 (Ga. Ct. App. 1985)(holding that a provision in a private university bulletin contractually obligates the institution to provide only those procedures specifically provided for in the bulletin itself). Furthermore, the court notes that there was nothing in the VSU Student Handbook disclaiming that the document established a contract between the student and the university. See Carr v. Board of Regents of University System of Georgia, 249 Fed.Appx. 146, 150

(11th Cir. 2007)(concluding that the undergraduate catalog did not form a binding written contract between the plaintiff and the Board of Regents because each version of the undergraduate catalog contained the statement that it was for "informational purposes only and should not be construed as the basis of a contract between a student and [the Board]").

Based upon the court's application of Georgia's law on valid contracts and the Georgia Court of Appeals's line of reasoning in McGaha, Kuritzky, and Fuchs, the court concludes that the VSU Student Handbook provided to Barnes upon enrollment constituted a valid, written contract between Barnes and the BOR.  Therefore, the court denies the BOR's motion for summary judgment as to Barnes's breach of contract claim (Count 5).

### F.   Counts 6 and 7 - ADA and Rehabilitation Act[32]

In order to establish a prima facie case of discrimination under the ADA, Barnes must demonstrate that he (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of his disability.   See 42 U.S.C. § 12112(a);  Rossbach v. City of Miami, 371 F.3d 1354, 1356-57 (11th

---

[32] The court addresses jointly Counts 6 (ADA claim) and 7 (Rehabilitation Act claim) because discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases.  See 29 U.S.C. § 794(d).  Moreover, cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice versa. See Pritchard v. Southern Co. Services, 92 F.3d 1130, 1132 n.2 (11th Cir. 1996).

Cir. 2004).   In its motion for summary judgment, the BOR argues that Barnes failed to show that (a) his alleged disability affects a major life activity and (b) he was discriminated against because of his disability.

The ADA and applicable regulations define "disability" as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of the individual, (2) a record of such impairment, or (3) being regarded as having an impairment. 42 U.S.C. §§ 12102(1) and (2); 34 C.F.R. 104.3(j)(1); Carruthers v. BSA Advertising, Inc., 357 F.3d 1213, 1215 (11th Cir. 2004). According to Barnes, he has been diagnosed with certain psychological disorders, which have been recorded by his treating psychiatrist,[33] and his impairment has interfered with several aspects of his life activities, including learning.   Therefore, Barnes contends that his disability under the ADA can be defined by the first and/or second definition.

Disability under the first definition above involves a three-step analysis.   Bragdon v. Abbott, 524 U.S. 624, 631 (1998). First, the plaintiff must be impaired.   Id.   Next, the court must identify the life activity that the plaintiff claims has been limited and determine whether it is a major life activity under the

---

[33] For example, Dr. Winders diagnosed Barnes in 2000 with "depressive disorder otherwise not specified" and then later diagnosed Barnes with "panic disorder with agoraphobia" in 2006.

ADA.[34]  Id.   Finally,   the   court   must   determine   whether   the
impairment  "substantially  limits"  that  life  activity.   Id.
Disability  under  the  second  definition  above,  the  record  of
impairment  definition,  "is  satisfied  only  if  [the  plaintiff]
actually suffered a physical impairment that substantially limited
one  or  more  of  his  major  life  activities."   Hilburn v. Murata
Electronics North America, Inc., 181 F.3d 1220, 1229 (11th Cir.
1999).   "The  impairment  indicated  in  the  record  must  be  an
impairment  that  would  substantially  limit  one  or  more  of  the
individual's  major  life  activities."   Id.   For  both  of  the
definitions under which Barnes claims to have a disability, Barnes
is  required  to  prove  that  the  alleged  disability  substantially
limits  one  or  more  of  his  major  life  activities.   Here,  Barnes
asserts  that  his  psychiatric  conditions  constitute  a  disability
that  substantially  limit  his  ability  to  learn.[35]

---

[34]   In  construing  the  various  terms  of  this  definition  of
disability,  there  are  two  potential  sources  for  guidance  --  the
regulations  interpreting  the  Rehabilitation  Act  and  the  EEOC
regulations  interpreting  the  ADA  at  29  C.F.R.  §  1630.2.  Toyota
Motor Manufacturing v. Williams, 534 U.S. 184, 193 (2002).   The
regulations  interpreting  the  Rehabilitation  Act  of  1973  define
major  life  activities  as  "functions  such  as  caring  for  oneself,
performing  manual  tasks,  walking,  seeing,  hearing,  speaking,
breathing,  learning and working."  45 C.F.R. § 84.3(j)(2)(ii).

[35]   The  court  notes  that  in  his  motion  for  summary  judgment
[Doc.  No.  179,  p.  62],  Barnes  states,  "[h]is  impairment  has
interfered with several aspects of [his] life activities, including
learning."   However,  the  court  declines  to  accept  such  a  generic
assertion  and  therefore  construes  "learning"  to  be  the  only  "major

The EEOC defines the "substantially limits" phrase to mean "significantly restricted as to the condition, manner or duration under which the average person in the general population can perform the same major life activity." 29 C.F.R. § 1630.2(j)(1). In determining whether an individual is substantially limited, the court considers: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Sutton v. Lader, 185 F.3d 1203, 1208-09 (1999)(citing 29 C.F.R. § 1630.2(j)(2)).   In addition, the court considers any alleged disability "with reference to corrective [or mitigating] measures." Sutton v. United Air Lines, Inc., 527 U.S. 471, 488 (1999).   The terms "major life activities" and "substantially limits" are to be strictly interpreted "so as 'to create a demanding standard for qualifying as disabled.'"   Garrett v. University of Alabama at Birmingham Board Of Trustees, 507 F.3d 1306, 1311 (11th Cir. 2007) (quoting Williams, 534 U.S. at 197).   That a person is disabled means "that [the] person be presently -- not potentially or hypothetically -- substantially limited." United Air Lines, 527 U.S. at 482.   "It is insufficient for individuals attempting to

_____

life activity" that Barnes's alleged disability "substantially limits."

52

prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." Williams, 534 U.S. at 198.  Rather, the plaintiff must offer evidence "that the extent of the limitation [caused by the impairment] in terms of their own experience . . . is substantial." Id.

Here, Barnes has presented evidence of his treatment and the various diagnoses by his treating psychiatrist, but he has failed to offer evidence "that the extent of the limitation [caused by the impairment] in terms of [his] own experience . . . is substantial." Id.  To the contrary, the evidence in this case indicates that Barnes has not been "substantially limited" by his alleged disability.  Barnes completed paramedic training at Rescue Training Incorporated in 2006 and is a licensed paramedic in the State of Georgia.  He graduated from Kennesaw State University after being administratively withdrawn from VSU.  And at the time of his deposition in June 2009, Barnes indicated that he was preparing for the law school admissions exam, the LSAT, while working full-time at Children's Healthcare of Atlanta as a paramedic.  The court rejects Barnes's assertion that his psychiatric conditions constitute a disability that substantially limits his ability to learn because Barnes failed to offer evidence that his limitation is substantial.  Accordingly, Barnes's ADA and Rehabilitation Act

claims fail as a matter of law, and the court grants the BOR's motion for summary judgment as to Counts 6 and 7.

**VII. Barnes's Motion for Summary Judgment [Doc. No. 179]**

For the reasons discussed in Parts IV, V, and VI, the only remaining claims in Barnes's complaint are his Count 4 (§ 1983 Claim for Violation of Procedural Due Process Rights) against Zaccari and Count 5 (Breach of Contract claim) against the BOR. The court denies Barnes's motion for summary judgment on all other counts.

**A.   Count 4 against Zaccari - 42 U.S.C. § 1983 Claim for Violation of Barnes's Procedural Due Process Rights**

In order for his claim under § 1983 of denial of his Procedural Due Process Rights to succeed, Barnes must show that Zaccari, acting under color of state law, deprived Barnes of his constitutional rights to due process.   See Edwards, 49 F.3d at 1522.   It is undisputed that Zaccari acted under color of state law as the President of VSU.   Next, the court has concluded as a matter of law that, as a VSU student, Barnes's due process rights required that he receive pre-withdrawal notice of the charges against him and some kind of hearing.   The undisputed facts show that Barnes did not receive pre-withdrawal notice or a hearing.   Finally, it is undisputed that Zaccari was the sole decision-maker when it was decided to withdraw Barnes without notice or a hearing.   Therefore,

Zaccari caused Barnes to be deprived of his rights to notice and a hearing.  Accordingly, the court grants Barnes's motion for summary judgment as to Count 4 against Zaccari.

### B.   Count 5 against BOR  - Breach of Contract Claim

In Count 5 of the complaint, Barnes claims that the VSU Student Handbook constituted a valid, written contract with the BOR, and he was damaged as a result of the BOR's breach of that contract when it failed to provide Barnes with the procedural processes outline in the handbook prior to his withdrawal.[36]  The court has already concluded that the VSU Student Handbook was a valid, written contract between Barnes and the BOR.

Once a contract has been shown, the elements of a right to recover for the breach of said contract are (1) the breach and (2) the resultant damages to the party who has the right to complain about the contract being broken.  Graham Brothers Construction Co. v. C.W. Matthews Contracting Co., 284 S.E.2d 282 (Ga. Ct. App. 1981).  Regarding the first element, Barnes asserts that the BOR breached the contract terms of the VSU Student Handbook by not abiding by the rules and processes to be used in disciplinary

---

[36] The court notes that Barnes also argues that the paperwork he filed out with the VSU Access Office and the VSU Counseling Center also constitute valid, written contracts that were breached. However, such claims were not asserted by Barnes in his complaint. See [Doc. No. 1].  Barnes may not amend his complaint through his summary judgment papers.  Gilmour, 382 F.3d at 1315.

55

hearings. [Doc. No. 179, Ex. 37, p. 64]. Specifically, the Student Handbook provides, in relevant part, that an "accused student, . . . shall be notified in writing of specific charge(s) made against them and of the date, time, and place where a hearing will be held." Id. It is undisputed that Barnes did not receive notice of the charge that he was "a clear and present danger" prior to Zaccari deciding to withdraw him, and Barnes was denied any opportunity to address the "clear and present danger" charge at a hearing. Therefore, the court concludes as a matter of law that the BOR breached its contract with Barnes and therefore grants Barnes's motion for summary judgment as to Count 6 against the BOR.

**VIII. Barnes's motion to exclude Dr. Matthew Norman as an expert witness [Doc. No. 164]**

Dr. Matthew Norman was identified by the VSU Defendants as an expert witness in this case, and they intended for Dr. Norman to testify about the reasonableness of the action of Zaccari, McMillan, and Dr. Winders. However, because the court has granted summary judgement as to all the pending counts, Dr. Norman's testimony is no longer necessary. Accordingly, the court dismisses as moot Barnes's motion to exclude [Doc. No. 164].

**IX. Conclusion**

For the reasons set for above, the court hereby:

- DENIES Gaskins's motion for oral argument [Doc. No. 175];

56

- GRANTS McMillan's motion for summary judgment [Doc. No. 167];

- GRANTS Gaskins's motion for summary judgment [Doc. No. 174];

- DISMISSES VSU as a defendant in this action;

- GRANTS in part and DENIES in part the VSU defendants' motion for summary judgment [Doc. No. 177].  Specifically, the court grants the motion with regards to Count 3 against Mast, Keppler, and Zaccari, Count 4 against Mast and Keppler, and Counts 6 and 7 against the BOR.  The court denies the motion with regards to Count 4 against Zaccari and Count 5 against the BOR;

- GRANTS in part and DENIES in part Barnes's motion for summary judgment [Doc. No. 179].  Specifically, the court grants the motion with regards to Count 4 against Zaccari and Count 5 against the BOR.  The court denies the motion with regards to all other counts; and,

- DISMISSES as moot Barnes's motion to exclude [Doc. No. 164].

Having resolved all pending claims in this lawsuit as a matter of law, the only remaining issue in this case is damages.  The court directs the parties to file their proposed pre-trial order no later than 30 days of the date of this order.

SO ORDERED, this <u>3rd</u> day of September, 2010.

<u>/s/ Charles A. Pannell, Jr.</u>
CHARLES A. PANNELL, JR.
United States District Judge

57